**EXHIBIT B**

**ROA #17**

1  **HATTON, PETRIE & STACKLER APC**
   Attorneys at Law
2  12 Journey, Suite 255
   Aliso Viejo, Ca. 92625
3  Telephone: (949) 474-4222

4  **GREGORY M. HATTON, CAL. BAR NO. 119810**
   **ARTHUR R. PETRIE, II, CAL. BAR NO. 158654**
5  **DAN E. HECK, CAL. BAR NO. 210383**
   **JOHN A. McMAHON, CAL. BAR NO. 237261**
6
   Attorneys for Plaintiff
7  BORREGO COMMUNITY HEALTH FOUNDATION

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9       IN AND FOR THE COUNTY OF SAN DIEGO—CENTRAL DIVISION

10 | BORREGO COMMUNITY HEALTH ) Case No. 37-2021-00024676-CU-FR-CTL
   | FOUNDATION, a California non-profit )
11 | public benefit corporation, ) NOTICE OF ERRATA RE SECOND
   |                              ) AMENDED COMPLAINT FOR:
12 |                Plaintiff, )
   |                              ) (1) FRAUD
13 |        vs. ) (2) REFORMATION
   |                              ) (3) RESCISSION (in the alternative)
14 | INLAND VALLEY INVESTMENTS, LLC, a ) (4) MONEY HAD AND RECEIVED
   | California limited liability company; DRP ) (5) UNFAIR BUSINESS PRACTICES
15 | HOLDINGS, LLC, a California limited ) (6) DECLARATORY RELIEF
   | liability company; PROMENADE SQUARE, ) (7) INTERPLEADER;
16 | LLC, a California limited liability company; ) (8) INJUNCTION; and
   | WILL LIGHTBOURNE, Director, ) (9) RICO
17 | CALIFORNIA DEPARTMENT OF HEALTH )
   | CARE SERVICES; and DOES 1 through 50, ) [DEMAND FOR JURY TRIAL]
18 | inclusive, )
   |                              ) Case assigned for all purposes to:
19 |                Defendants. )
   |                              ) Hon. Katherine Bacal
20 |                              ) Dept. C-69
   |                              )
21 |_____) Complaint filed 6/4/2021

22
23          The Second Amended Complaint filed on July 30, 2021, inadvertently omitted mention of

24 Doe defendants in the 1st, 2nd, 3rd, 4th, 5th, and 9th causes of action.  This has been corrected by

   adding Does 1-15 as defendants to the first three causes of action, Does 16-25 to the fourth cause of
25
   action, Does 26-35 to the fifth cause of action, and Does 36-50 to the ninth cause of action.  There
26
   are no other corrections to the Second Amended Complaint.
27
   // // //
28

                                    - 1 -

1       Plaintiff Borrego Community Health Foundation ("BCHF") alleges as follows:

2   **I.   Parties and their Respective Roles in Relevant Transactions**.

3       A.   Plaintiff BCHF.

4       1.   Plaintiff BCHF is, and at all times mentioned herein was, a California non-profit public

5   benefit corporation. BCHF is a Federally Qualified Health Center ("FQHC") with a mission to

6   provide high quality, comprehensive, compassionate primary healthcare to people in their

7   communities, regardless of their ability to pay. BCHF operates 26 clinics, primarily in underserved

8   desert and inland communities throughout San Diego, Riverside, and San Bernardino Counties.

9   BCHF provides essential services in Family Practice, Pediatrics, OB/GYN, Internal Medicine,

10  Podiatry, Dermatology, Cardiology, HIV/Hepatitis C and Covid 19 related testing and vaccinations

11  to over 200,000 patients, most of whom cannot find affordable comprehensive primary care from

12  other sources. During the recent pandemic, BCHF tested more than 80,000 Californians for Covid-19

13  infections, and has thus far vaccinated over 18,000. BCHF's continued operation is in the public

14  interest.

15      2.   Like all non-profit public benefit corporations, BCHF has no owners or shareholders.  It is

16  governed by a Board of Trustees ("Board") and managed by salaried executives who report to the

17  Board.

18      3.   As a FQHC, BCHF operates pursuant to a comprehensive scheme of state and federal laws

19  and regulations under which:

20          a.   Rates for federally funded medical services paid by the State of California are set for each

21              BCHF clinic based in part on mandatory cost reports submitted to the United States

22              Center for Medicare & Medicaid Services ("CMS");

23          b.   Utilization of medical services is regulated; and,

24          c.   Provider services are invoiced, reviewed, audited, and paid.

25      4.   As a non-profit public benefit corporation providing essential medical services to

26  underserved communities, BCHF is generally prohibited from intentionally entering into contracts

27  for employment, facilities, goods, or services priced above fair market values without good cause.

28  Numerous laws and regulations prohibit and/or penalize the "use" of a non-profit FQHC as a

- 2 -

"conduit" to unlawfully siphon federal health care funds into the hands of third parties by way of third-party contracts intentionally and without good cause set above fair market values. Billions of dollars of federally funded health program funds flow through FQHCs nationally every year.  Over $100 million of these funds are paid to BCHF each year.

5. Because there are no owners or shareholders to report to, a FQHC's Board of Trustees (typically made up of individuals untrained to detect so-called "white collar" crime) provides a thin line of defense against unscrupulous board members, executives, and employees who would circumvent the Board of Trustees' oversight and unlawfully divert federal health program funds to third parties.  One vehicle for the diversion of federal health program funds is contracts between the non-profit FQHC and providers of facilities, goods, or services that are unreasonably in excess of fair market value. When a diversion of funds like this occurs, the non-profit FQHC is not a perpetrator of the fraud; it is a victim of it.  So are the underserved men, women, and children who rely on the continued operation of the FQHC to provide them with essential primary healthcare services.

6. As is relevant here, BCHF was victimized by three grossly over-priced 30-year term facility leases engineered by its deceased former CEO and his long-time friend, who develops, owns, and leases commercial property.  The total combined full-term price of these three leases is **over $100 million dollars**. As further detailed below, these leases were never subject to due diligence.  Nor were they submitted to the BCHF Board for analysis, review, and informed consent and approval. They couldn't be. Even if it were marginally reasonable for a non-profit FQHC to enter into a 30-year facility lease (which it is not), recent independent appraisals show the total combined lease prices are **$58 million over fair market rent** ("FMR"). No informed rational FQHC board could lawfully approve these leases.

7. The leases were paid because BCHF's former CEO personally directed and controlled the activities of BCHF's former business manager (his wife) and its former chief legal officer. The scheme victimized BCHF and its patients in at least three ways:

a. <u>Exposure to State Suspensions and Federal Disqualification</u>: In California, government funded health program funds flow to FQHCs under the oversight of the California Department of Health Care Services ("DHCS").  DHCS is empowered to suspend all

- 3 -

reimbursement for the provision of health care services to Medi-Cal members in accordance with, *inter alia*, Welfare and Institutions Code section 14107.11 and Title 42 of the Code of Federal Regulations section 455.23.[1] Further, the United States Health Resources and Services Administration (HRSA)/Bureau of Primary Health Care (BPHC) monitors FQHCs and can suspend and/or disqualify BCHF from the FQHC program, including, *inter alia*, an action by HRSA requiring BCHF to cease all activities in the program pending corrective action (45 CFR 75.375) and possible suspension under HHS regulations (2 CFR Part 376, 45 CFR 75.2). (As detailed below, DHCS is presently allowing BCHF to continue operations under the guidance, oversight, and direction of a DCHS appointed independent monitor. DCHS and its monitor have directed BCHF to suspend payment of rent over FMR on the three leases that are the subject of this action.)

b. <u>Reimbursement rate adjustments</u>: The cost of owning, renting, maintaining, and upgrading clinic facilities is a substantial cost center for FQHCs providing primary health care services of the type described above.  As such, CMS recognizes the fair market value of facility costs reasonably incurred and truthfully reported by FQHCs in determining the reimbursement rates to be paid clinics operated by the FQHC. Cost reporting in excess of fair market value inflates the FQHC's mandatory cost reports required under title 42 of the United States Code section 1395g, and exposes BCHF to an order that it retroactively amend its cost reports, potentially leading to a reduction in reimbursement rates paid by federally funded health programs. (DHCS and its monitor recently indicated that DHCS will require BCHF to amend its CMS mandated cost reports to reflect the fair market value of the three subject leases, and not the over market rents actually paid on them.)

---

[1] It is public knowledge that BCHF is currently under investigation by the California Attorney General's Division of Medi-Cal Fraud and Elder Abuse for fraud against the Medi-Cal program partly as the result of unauthorized contracts signed by BCHF's former CEO, including contracts other than the facilities leases herein at issue.

c.  <u>Non-profit 501(c)(3) tax status</u>: Contract payments to disqualified persons in excess of fair market values (or other unlawful diversion of a non-profit entity's revenue to falsely disguise profits as operating expenses) can result in tax liability and/or loss of non-profit tax status. (*See*, e.g., Internal Revenue Code sections 4958(c)(1) and 4958(f)(1) and related Treasury Department Regulations in section 53.4958-3.)

8.  Board oversight of executive action is therefore essential to BCHF's placement of facility leases, which must be: (1) Entered into for a lawful purpose; (2) Sought competitively, and subjected to a diligent market value analysis; and, (3) To the extent reasonably possible, for no more than FMR and reasonable duration.  The leases must also include reasonable terms under which the FQHC can terminate the lease.

9.  Facility leases entered into by a BCHF executive intentionally above FMR, without good cause, and without the fully informed consent of the Board, are *per se* unlawful *ab initio*, because, *inter alia*, they are entered into for an unlawful purpose—to defraud BCHF for thousands or even, as here, millions of dollars, while at the same time exposing BCHF to regulatory sanctions and related adverse financial and tax consequences.

B.  <u>Defendant Promenade Square, LLC.</u>

10.  Defendant Promenade Square, LLC ("Promenade") is a California limited liability company whose primary place of business is in El Cajon, California. Promenade is engaged in the commercial real estate business.  BCHF is informed and believes that Promenade's sole member and manager is Daryl Priest ("Priest").

11. Promenade is the owner and lessor of the structures and appurtenances located at 133 and 155 West Main Street, El Cajon, County of San Diego, California, of which BCHF is the lessee ("Promenade Lease").

C.  <u>Defendant DRP Holdings, LLC.</u>

12.  Defendant DRP Holdings, LLC ("DRP") is a California limited liability company whose primary place of business is in El Cajon, California.  DRP is engaged in the commercial real estate business.  Plaintiff is informed and believes that DRP's sole member and manager is Priest.

// // //

- 5 -

13.     DRP is the owner and lessor of the structures and appurtenances located at 590 North D Street, City of San Bernardino, County of San Bernardino, California, of which BCHF is the lessee ("DRP Lease").

D.   Defendant Inland Valley Investments, LLC.

14.     Defendant Inland Valley Investments, LLC ("Inland Valley") is a California limited liability company whose primary place of business is in El Cajon, California.  Inland Valley is engaged in the commercial real estate business.  Plaintiff is informed and believes that Inland Valley's sole member and manager is Priest.

15.     By way of assignment from DRP, Inland Valley is now the lessor of the structures and appurtenances located at 750 East Main Street, City of Barstow, County of San Bernardino, California, of which BCHF is the lessee ("Inland Valley Lease").

E.   Allegations Common to Defendants Promenade, DRP, and Inland Valley.

16.     BHCF is informed and believes, and on that basis alleges, Priest is a longtime personal friend of former BCHF CEO Bruce Hebets ("Hebets").  Priest also owned and operated a management service organization, which had managerial control over discrete portions of BCHF, including but not limited to provider relations, claims management, management of information related systems, quality assurance management, data reporting, and general administration of BCHF's contract dental program. For these and other reasons, Promenade, DRP, and Inland Valley are more likely than not "disqualified persons" under the Internal Revenue Code and Treasury regulations referenced above.

17.     For the sake of brevity, and because BCHF is informed and believes that Priest is the sole owner, member, and manager of Promenade, DRP, and Inland Valley:

    a.   Promenade, DRP, and Inland Valley are also referred to collectively as the "Priest LLCs"; and,

    b.   The three leases BCHF entered into with the Priest LLCs are referred to collectively as the "Priest Leases."

//

//

- 6 -

F.   <u>California Department of Health Care Services</u>.

18.      Defendant California Department of Health Care Services ("DHCS") administers the California Medicaid program, called "Medi-Cal."  DHCS is the state agency responsible for the administration of the Medi-Cal program.  As noted above, government health program funds flow to FQHCs under the oversight of the DHCS, and the DHCS is empowered to suspend all reimbursement for the provision of health care services to Medi-Cal members.

19.      Defendant Will Lightbourne is DHCS' current Director and is sued in his official capacity solely for the purpose of naming the DHCS as a defendant in this action as an interested party to the interpleader cause of action.  Director Lightbourne is responsible for directing, organizing, and administering the Medi-Cal program in accordance with all applicable laws and regulations.  As such, he is responsible for DHCS' compliance with state and federal laws governing the Medi-Cal program.

20.      As further alleged below, DHCS has a direct, immediate, and ongoing interest in monitoring and directing BCHF's performance of its leases with the Priest LLCs, including the prevention of payment of rent in excess of FMR.  (Through no fault of its own, BCHF has already paid the Priest LLCs approximately $11,500,000 **over** FMR under the Priest Leases. DHCS' interest in the disposition of funds deposited under the interpleader is therefore current and valid under law.)

G.   <u>Fictitious Defendant, Agency, and Alter Ego Allegations</u>.

21.      The true names or capacities, whether individual, corporate, associate, or otherwise, of those identified herein as DOES 1 through 50, inclusive, are unknown to BCHF, who therefore sues said defendants by such fictitious names.  BCHF is informed and believes, and based thereon alleges, each of the defendants designated herein as a DOE is legally responsible in some manner for the events and happenings herein referred to, and legally caused injury and damage to BCHF as alleged herein.  BCHF is informed and believes, and based on that alleges, DOES are business entities or individuals who:

    a.   Are individually responsible in some manner for the damages arising from transactions, acts, omissions, and/or occurrences that relate to matters referred to in this complaint;

    b.   Are in privity of contract;

c.  Have ratified and adopted the conduct of another person or entity (who is responsible in some manner for the damages alleged herein) as their own;

d.  Are the principals, agents, guarantors, owners, alter egos, joint venturers, or partners of another person or entity who is responsible in some manner for the damages alleged herein; or,

e.  Are pooling participants with, or are otherwise jointly liable with another person or entity who is responsible in some manner for the damages alleged herein (whether based on *Delos v. Farmers Insurance Group* (1979) 93 Cal.App.3d 642, *Downey Savings & Loan v. Ohio Casualty* (1987) 189 Cal.App.3d 1072, or any similar joint liability theory).

22.  BCHF will amend this Complaint to insert the true names and capacities of said DOE individuals or entities when they become known to BCHF.

23.  With the exception of DHCS and its director Will Lightbourne, each defendant sued herein is the agent, co-conspirator, joint venturer, partner, employer, guarantor, ratifier, or employee of every other defendant and non-party participant in the wrongful acts alleged herein, and has been acting within the course and scope of said agency, conspiracy, joint venture, partnership, guarantee, or employment, with the knowledge or consent of co-defendants and non-party participants, and each of them.

24.  BCHF is informed and believes, and based thereon alleges, that each defendant (other than DHCS and its director Will Lightbourne) has authorized or ratified the wrongful activities of each of the remaining defendants, and of the non-party participants in the wrongful acts alleged herein.

25.  BCHF is informed and believes, and on that basis alleges, there is such unity of interest and ownership between the Priest LLCs that the separate personalities of the limited liability companies no longer exist and that if the acts are treated as those of the individual limited liability companies alone an inequitable result will follow (based on the factors set forth in *Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.3d 825 and *Arnold v. Browne* (1972) 27 Cal.App.3d 386, 394-395, and other applicable law).

**II. Venue**.

26.     Venue in the above-entitled Court is proper because: (1) the acts and omissions occurred in the County of San Diego; (2) the liability sued upon arose in the County of San Diego; and, (3) all of the defendants reside in or have their principal place of business in the County of San Diego, or did so reside at the time they committed the acts giving rise to this Complaint. (Cal. Code Civ. Proc., § 395.5.)

27.     BCHF filed this matter in the Central Division pursuant to San Diego Superior Court Rules, rule 1.2.2.

**III. Relevant Transactions**.

A. Overview.

28.     BCHF received its first grant award from the HRSA in 2003, designating the organization as a FQHC in light of its commitment to increase access to medical services to the underserved communities surrounding BCHF. BCHF experienced substantial growth as a FQHC in the years that followed, expanding to over 20 clinic locations in three counties.  Annual federally funded health program revenues thereafter reached nine figures.

29.     Beginning no later than 2012, certain (now former) BCHF executives and Board members caused BCHF to enter into contracts with companies owned in whole or in part by Priest. None of these contracts were entered into with the informed consent of the BCHF Board.  All of them were priced substantially above fair market value.  Three of these contracts are the Priest Leases that are the subject of this action.

30.     Late in 2020, following October 2020 raids by state and federal law enforcement authorities, DHCS suspended payment of federal funds to BCHF in conjunction with an investigation relating in part to contracts with Priest-owned entities *other than* the Priest LLCs.  BCHF is a victim of unlawful contracting practices that are a subject of DHCS' investigation.  BCHF has cooperated, and continues to cooperate, with DCHS and law enforcement.

// // //

// // //

31.     In the course of the investigation, numerous contracts were reviewed, including the Priest Leases. Independent certified commercial real estate appraisers made the following findings:

a.   On the lease with Promenade (El Cajon location), BCHF was paying $39,104.75 a month above FMR, or $469,257 above FMR per year;

b.   On the lease with DRP (San Bernardino location), BCHF was paying $38,405.95 a month above FMR, or $460,871.40 above FMR per year; and,

c.   On the lease with Inland Valley (Barstow location), BCHF was paying $80,025.25 a month above FMR, or $960,303 above FMR per year.

32.     In sum, BCHF has been paying the Priest LLCs $1,890,431.40 a year above FMR, and has paid over $11,500,000 above FMR cumulatively since inception of the Priest Leases. Here is a summary of the appraiser's findings:

|  | El Cajon | San Bernardino | Barstow | Overpayments |
|---|---|---|---|---|
| Lessor | Promenade | DRP | Inland Valley | |
| Current Rent - Month | $ 111,686.00 | $ 62,704.00 | $ 104,920.00 | |
| FMR | $ 72,581.25 | $ 24,298.05 | $ 24,894.75 | |
| Monthly Overpayment | $ 39,104.75 | $ 38,405.95 | $ 80,025.25 | $ 157,535.95 |
| Yearly Overpayment | $ 469,257.00 | $ 460,871.40 | $ 960,303.00 | $ 1,890,431.40 |
| Initiation | 9/21/2012 | 9/15/2015 | 2/2/2016 | |
| Years (to date) | 8.5 | 5.5 | 5.25 | |
| Cumulative | $ 3,988,684.50 | $ 2,534,792.70 | $ 5,041,590.75 | $ 11,565,067.95 |

33.     Additionally, the lease terms of 30 to 33 years on the Priest Leases is unreasonably over market as well. A reasonable fair market term for these commmercial leases is 3 to 5 years.

34.     In order to remain in operation, BCHF signed an agreement with DHCS in February 2021 under which an independent monitor selected by DHCS would institute a robust corporate integrity and compliance program at BCHF.  As is relevant here, DHCS' monitor has directed BCHF to: (1) stop paying above FMR on the Priest Leases; and, (2) take action to address over-FMR payments, excessive 30-year lease terms, and the failure to include lease provisions under which BCHF may terminate the leases. This lawsuit is BCHF's good faith attempt to comply with those directives.

// // //

// // //

- 10 -

35.     In response, the Priest LLCs are now acting in unison. The Priest LLCs have demanded that BCHF continue to make over-FMR rent payments under the Priest Leases.  In a May 25, 2021, email the Priest LLCs threatened that BCHF failure to pay the demanded rent on **any one** of the Priest Leases will result in immediate eviction proceedings **as to all** three locations that are the subject of the Priest Leases. The DHCS monitor says DHCS will not allow BCHF to pay the rent currently demanded.  Under BCHF's agreement with DHCS, BCHF must comply with those directives.

36.     For these and other reasons detailed below, BCHF seeks the relief requested below.

B. The Hebets/Priest Relationship "Disqualifies" the Priest LLCs Under the Internal Revenue Code and Related Treasury Regulations.

37.     As noted above, Hebets (now deceased) was BCHF's CEO from 2004 until his retirement in 2018.  BCHF is informed and believes, and based thereon alleges, Hebets and Priest knew each other dating to their high school years. Beginning in 2012 and continuing through December 2016, Hebets and Priest caused BCHF and several Priest-owned entities to enter into various contracts under which millions of dollars of federal healthcare program funds were unlawfully diverted to the Priest-owned entities.  Concurrently, Priest also owned and operated a management service organization, which had managerial control over discrete portions of BCHF's operations, including but not limited to provider relations, claims management, management of information related systems, quality assurance management, data reporting, and general administration of BCHF's contract dental program.  For these and other reasons, the Priest LLCs are more likely than not "disqualified persons" under the Internal Revenue Code and Treasury regulations.

// // //

// // //

// // //

// // //

// // //

// // //

38.      In breach of his fiduciary duties, Hebets signed each of these contracts **without**:

    a.   Approval from the Board;

    b.   Disclosing their terms to the Board;

    c.   Disclosing to the Board his relationship with Priest;

    d.   Presenting the Board with any evidence of due diligence in determining the fair market value of the contracts; and,

    e.   A Board resolution approving any of the Priest Leases.

39.      BCHF is the victim of the undisclosed relationship between Priest and Hebets, and their scheme, via the three leases, to direct funds embezzled from BCHF to the Priest LLCs.

C.   <u>The Promenade Lease</u>.

40.      Attached hereto as Exhibit A and incorporated as though set forth in full at this point is a true and correct copy of the 2012 Promenade Lease.  It was amended to extend the term to 2045 (a total of 33 years).

41.      The Promenade Lease was never presented to the BCHF Board for authorization or approval.  In breach of his fiduciary duties, Hebets engaged in the conduct described above with respect to the Promenade Lease.

42.      There has been no action by the Board to ratify Hebets' signing of the Promenade Lease or any of its amendments post signature.

D.   <u>The DRP Lease</u>.

43.      Attached hereto as Exhibit B and incorporated as though set forth in full at this point is a true and correct copy of the 2015 DRP Lease.  The DRP Lease was amended to change the commencement date to October 2016.  The DRP Lease has a term of 30 years, to 2046.

44.      The DRP Lease was never presented to the BCHF Board for authorization or approval. In breach of his fiduciary duties, Hebets engaged in the conduct described above with respect to the Promenade Lease.

// // //

45.     There has been no action by the Board to ratify Hebets' signing of the lease or any of its amendments post signature.

E.   Inland Valley Lease.

46.     Attached hereto as Exhibit C and incorporated as though set forth in full at this point is a true and correct copy of the 2016 Inland Valley Lease.  The Inland Valley Lease was initially made between DRP and BCHF.  DRP promptly assigned it to Inland Valley in 2017, in an assignment signed by Hebets and Priest. It has a term of 30 years, to 2046.

47.     The Inland Valley Lease was never presented to the BCHF Board for authorization or approval. In breach of his fiduciary duties, Hebets engaged in the conduct described above with respect to the Promenade Lease.

48.     There has been no action by the Board to ratify Bruce Hebets' signing of the lease or any of its amendments post signature.

F.   Allegations Common to the Promenade, DRP, and Inland Valley Leases.

49.     With minimum due diligence, the over-FMR price and excessive duration of the Promenade, DRP, and Inland Valley Leases, combined with the absence of any term allowing BCHF to terminate a lease prior to their respective lease terms[2], would have been readily apparent. The Promenade, DRP, and Inland Valley Leases and a due diligence report relating to them therefore could not be presented to the Board.

50.     No rational, informed Board of Trustees for a non-profit FQHC would have, or could have, lawfully approved the Promenade, DRP, or Inland Valley Leases for, *inter alia*, the following reasons:

    a.   The lease terms are unconscionable, and would result in the diversion of millions of "over-FMR" dollars of federal health program money to entities owned by an accomplice of the CEO;

_____

[2]  Promenade: 2045 (33 years); DRP: 2046 (30 years); and, Inland Valley: 2046 (30 years).

- 13 -

b. As set forth above:

    i.  The Promenade Lease calls for payment of nearly $40,000 **per month** over FMR, or more than $15,000,000 over FMR over the 33-year life of the lease;

    ii.  The DRP Lease calls for payment of nearly $39,000 **per month** over FMR, or approximately $14,000,000 over FMR over the 30-year life of the lease;

    iii.  The Inland Valley Lease calls for payment of more than $80,000 **per month** over FMR, or approximately $29,000,000 above FMR over the 30-year life of the lease;

c. Approximately 90% of the revenue received by BCHF is paid by government funded health programs (Medi-Cal and Medicare), and therefore:

    i.  If the Promenade Lease was enforceable, then $13,500,000 of the over-FMR dollars paid to Promenade could be government health program money;

    ii.  If the DRP Lease was enforceable, $12,600,000 of the over-FMR dollars paid DRP could be government health program money; and,

    iii.  If the Inland Valley Lease was enforceable, nearly $26,000,000 of the over-FMR dollars paid Inland Valley could be government health program money;

d. The over-FMR facility lease payments expose BCHF to reductions in the allowed reimbursements paid BCHF in prior years; and,

e. The close relationship between Hebets and Priest exposes the non-profit FQHC to adverse federal tax consequences.

51.    Priest is the sole manager and member of Promenade, DRP, and Inland Valley.  Priest is an experienced owner and lessor of commercial properties.  Promenade, DRP, and Inland Valley must each present their commercial leases to banks providing them with mortgages and other funding related to their leased properties. Promenade, DRP, and Inland Valley must perform due diligence regarding their lessees, before entering into a 30+ year lease that will be reviewed by lenders providing millions of dollars of financing to Promenade, DRP, and Inland Valley. Promenade, DRP, and Inland Valley are therefore presumed to know BCHF's business, including that it is a non-profit health care provider doing business with federally funded health programs. Promenade, DRP, and Inland Valley are presumed to know FMR for their respective leases, that the

- 14 -

1   stated rent is over FMR, and that the lease terms of 30+ years are far beyond fair market lease terms

2   (in the absence of terms allowing BCHF to terminate the lease on reasonable notice). Priest signed

3   the Promenade, DRP, and Inland Valley Leases and presented them to Hebets for his signature.

4   Under these facts and circumstances, Promenade, DRP, and Inland Valley are charged with

5   knowledge that they were each  entering into an over-FMR lease with a non-profit FQHC.

6       52.      BCHF has performed all of its obligations and duties under the Priest Leases, except

7   those excused by law and equity.

8

9       G.  Combined Effect of the Priest Leases.

10      53.      If enforceable, the Priest Leases would siphon $58 million in over-FMR money from

11  BCHF over the life of the leases.  (This is in addition to the near catastrophic harm caused by other

12  unauthorized contracts between other Priest entities and BCHF, which are not the subject of this

13  Complaint.)  Without judicial intervention on the Priest Leases, the actions of Hebets and a handful

14  of Priest entities that took place prior to Hebets' death will continue to present an immediate threat to

15  disable an essential provider of primary healthcare services to underserved inland communities in

16  San Diego, San Bernardino, and Riverside Counties. The Priest Leases therefore cry out for the relief

17  requested below.

18

19                          FIRST CAUSE OF ACTION

20              (Imposition of a Constructive Trust Against Priest LLCs and Does 1-15)

21      54.      BCHF incorporates by reference Paragraphs 1 through 53 above as though fully set forth

22  herein.

23      55.      In committing the acts and omissions alleged above, Hebets, acting as BCHF's Chief

24  Executive Officer at the time, knowingly acted in concert with each of the Priest LLCs to enter into

25  30+ year leases at more than twice FMR.  The Priest Leases were never presented to the BCHF

26  Board for authorization or approval.

27  // // //

28  // // //

56.     In breach of his fiduciary duties, Hebets signed each of these contracts **without**:

    a.   Approval from the Board;

    b.   Disclosing their terms to the Board;

    c.   Disclosing to the Board his relationship with Hebets;

    d.   Presenting the Board with any evidence of due diligence in determining the fair market value of the contracts; and,

    e.   A Board resolution approving any of the Priest Leases.

57.     There has been no action by the Board to ratify Hebets' signing of the Priest Leases or any of their amendments post signature.

58.     After Hebets signed the Priest Leases, Hebets and other former BCHF executives under Hebets' direct control, who had knowledge that the terms of the Priest Leases were over FMR, suppressed disclosure of those lease terms to the Board. The misrepresentations and failures to disclose information and suppression of information concerning the Priest Leases were made with the intent to induce BCHF to pay and continue to pay the Priest LLCs over-FMR, and to act in the manner herein alleged in reliance thereon.

59.     At all relevant times, Hebets was BCHF's chief executive officer, standing in a position of trust with respect to BCHF.  At all times, Hebets owed plaintiff a fiduciary duty.

60.     At the time Hebets' failure to disclose and suppression of facts occurred, and at the time the BCHF took actions in reliance thereon, BCHF was ignorant of the existence of the facts that Hebets and executives under his direct control suppressed and failed to disclose to the BCHF Board as detailed above. If the BCHF Board had been aware of the existence of the facts not disclosed by the Priest LLCs, the BCHF would not have, as it did, paid substantial sums above market rent in violation of law and regulations pertaining to its governance.

61.     Concealment of the terms of the Promenade, DRP, and Inland Valley Leases from the BCHF Board, and prevention of due diligence in regard to the Priest Leases, was essential to success of the scheme. With a minimum of due diligence, the over-FMR price and excessive duration of the Priest Leases, combined with the absence of any terms allowing BCHF to terminate any of the Priest Leases prior to 2046 would have been readily apparent. The Priest Leases and due diligence reports

- 16 -

relating to those leases therefore could not be presented to the Board. No rational, informed Board of Trustees for a non-profit FQHC would have, or could have lawfully approved any of the Priest Leases, for, inter alia, the following reasons:

    a.  The lease terms are unconscionable, and would result in the diversion of millions of "over-FMR" dollars of federal health program money to entities owned by a friend and accomplice of the CEO;

    b.  As set forth above:

        i.  The Promenade Lease calls for payment of nearly $40,000 **per month** over FMR, or more than $15,000,000 over FMR over the 33-year life of the lease;

        ii.  The DRP Lease calls for payment of nearly $39,000 **per month** over FMR, or approximately $14,000,000 over FMR over the 30-year life of the lease; and,

        iii.  The Inland Valley Lease calls for payment of more than $80,000 **per month** over FMR, or approximately $29,000,000 above FMR over the 30-year life of the lease.

    c.  Approximately 90% of the revenue received by BCHF is paid by government funded health programs (Medi-Cal and Medicare), and therefore:

        i.  If the Promenade Lease was enforceable, then $13,500,000 of the over-FMR dollars paid to Promenade could be considered government funded health program money;

        ii.  If the DRP Lease was enforceable, $12,600,000 of the over-FMR dollars paid DRP could be considered government funded health program money; and,

        iii.  If the Inland Valley Lease was enforceable, nearly $26,000,000 of the over-FMR dollars paid Inland Valley could be considered government funded health program mone.;

    d.  FQHC reimbursement rates are directly affected by the FQHC's annual operating cost reports submitted to CMS. Over-FMR facility lease payments result in inflated CMS cost reports (unless there is a reasonable basis for payment of over-FMR). Inflated cost reports expose BCHF to a demand that it amend and correct its prior cost reports

1   to reflect FMR.  Amended cost reports showing $11,500,000 in reduced operating

2   costs can result in retroactive rate adjustments. Retroactive rate adjustments resulting

3   from amended cost reports showing FMR (as opposed to the over-FMR rent paid on

4   the Priest leases) further expose BCHF to claims that it refund claims overpayments

5   resulting from inflated cost reports in prior years.

6   e.   The close relationship between Hebets and Priest exposes the non-profit FQHC to adverse

7       federal tax consequences as detailed above in regard to Internal Revenue Code and

8       related Treasury Department regulations.

9   62.   The fraud and deceit alleged herein were not discovered by BCHF until law enforcement

10  raids on or about October 20, 2020, a date within three years before the commencement of this

11  action. BCHF could not with due diligence have discovered the fraud and deceit of the Priest LLCs

12  until on or about this date because the true facts were suppressed by Hebets, and others acting in

13  concert with him even after his death.

14  63.   In contrast, the Priest LLCs were always aware that the Priest Leases called for payment

15  of rent by a non-profit FQHC so far in excess of FMR that no reasonable Board would consider their

16  approval, much less approve them.

17  64.   As alleged above, Priest is the sole manager and member of Promenade, DRP, and Inland

18  Valley.  Priest is an experienced owner and successful lessor of commercial properties.  Promenade,

19  DRP, and Inland Valley must each present its commercial leases to banks providing Promenade,

20  DRP, and Inland Valley with mortgages and other funding on their leased properties. Promenade,

21  DRP, and Inland Valley must perform due diligence regarding their lessees, before entering into a

22  30+ year lease that will be reviewed by lenders of Promenade, DRP, and Inland Valley. Promenade,

23  DRP, and Inland Valley are therefore presumed to know BCHF's business, including that it is a non-

24  profit health care provider doing business with federally funded health programs. Promenade, DRP,

25  and Inland Valley are presumed to know FMR for their respective leases, that the rent is far in excess

26  of FMR, and that the lease term of 30+ years is far beyond fair market lease terms (in the absence of

27  a term allowing BCHF to terminate the lease on reasonable notice). Priest signed the Promenade,

28  DRP, and Inland Valley Leases and presented them to Hebets for his signature. Under these facts and

- 18 -

1    circumstances, Promenade, DRP, and Inland Valley are each charged with knowledge that they were

2    entering into over-FMR leases with a non-profit FQHC.

3        65.    Accordingly, each of the Priest LLCs knowingly and willfully conspired and agreed with

4    Hebets and Does 1-50, inclusive, to damage BCHF by and through Hebets' and others' fraud and

5    deceit as described in detail above.

6        66.    The Priest LLCs are now acting in concert in an effort to compel BCHF to continue to

7    pay over-FMR rent on all three leases.  As such, by adoption, ratification, and joint enforcement of

8    the fraudulently induced and maintained Priest Leases, each of the Priest LLCs has joined with the

9    other Priest LLCs in the conspiracy to defraud BCHF.

10       67.    By virtue of defendants' wrongful acts they hold embezzled funds totaling over $11.5

11   million, or real or personal property purchased with such funds, as constructive trustees for the

12   benefit of plaintiff.

13

14                              SECOND CAUSE OF ACTION

15                   (Reformation Based on Fraud Against Priest LLCs and Does 1-15)

16       68.    BCHF incorporates by reference Paragraphs 1 through 67 above as though fully set forth

17   herein.

18       69.    In each of the Priest Leases (Exhibits A, B, and C) the parties thereto express their

19   intention that the Priest Leases be interpreted so as to make and maintain performance thereunder

20   lawful.  The unlawful purpose of the leases is self-evident. As explained above, each of the Priest

21   Leases were entered into without the informed consent of BCHF's Board. Each of the leases call for

22   a non-profit FQHC to pay and to report as operating expenses to CMS rent that is millions of dollars

23   in excess of FMR, thereby resulting in the diversion of millions of dollars of federal health care

24   funds to the Priest LLCs, and the inflation of reimbursement rates paid by the DHCS to the FQHC.

25       70.    The above-described failure of the Priest Leases to reflect the true intent of the parties

26   (i.e., that performance under the lease be only lawful) resulted from Hebets' concealment from

27   BCHF that, despite its express promise to the contrary, BCHF's performance of the pricing terms

28   and duration of the above-mentioned written instruments would be unlawful.

- 19 -

71.     Without knowledge of the true facts and in reliance on Hebets' false representations, BCHF was deceived and misled into performing under a lease that differed materially from the expressed intent of the parties that performance thereunder be lawful. BCHF's reliance on Hebets' fraudulent omissions was reasonable and justified in that he was at all times plaintiff BCHF's Chief Executive Officer and fiduciary.

72.     Fraud, as a basis for reformation, consists of (1) a false representation by one party and (2) justifiable reliance on the false representation by the other party. Here both exist. Civil Code section 3399 codifies the equitable remedy of reformation of written instruments. Section 3399 provides that a written contract may be revised on application of the party aggrieved, when, through fraud, mutual mistake, or mistake of one party that the other party knew of or suspected at the time, a written contract does not express the true intention of the parties.

73.     Here, the strong public interest in BCHF's continued service of underserved and financially disadvantaged patients throughout the communities of San Diego, San Bernardino, and Riverside Counties, as detailed above, compels the court's exercise of its equitable power to reform the Priest Leases.

74.     Even though the BCHF Board was never given the opportunity give its fully informed consent to any of the Priest Leases, the Board reasonably expects and intends that all BCHF contracts conform with all applicable laws.

75.     For the reasons detailed above, BCHF's intent that the Priest Leases conform with all applicable laws (consistent the terms of the leases) cannot possibly be fulfilled without reformation of the rent prices to FMR, and without reformation of the 30-year lease term to five years or less, and without reformation of the leases to allow the non-profit FQHC tenant to terminate the lease for good cause on reasonable notice.

76.     Plaintiff BCHF respectfully prays for each of the Priest Leases to be so reformed.

// // //

// // //

// // //

// // //

<u>THIRD CAUSE OF ACTION</u>

(Rescission Based on Fraud Against Priest LLCs and Does 1-15)

77.     BCHF incorporates by reference Paragraphs 1 through 76 above as though fully set forth herein.

78.     Alternatively, if the Court cannot exercise its statutory and/or equitable powers to reform the leases, BCHF is entitled to rescind the Priest Leases, and for restitution of all sums paid the Priest LLCs to date, less the reasonable rental value of the premises during BCHF's occupation of them.

79.     BCHF may rescind Priest Leases (1) if the contract is unlawful for causes which do not appear in its terms or conditions, and the parties are not equally at fault (Civ. Code, § 1689, subd. (b)(5)) or (2) if the public interest would be prejudiced by permitting the leases to stand (Civ. Code, § 1689, subd. (b)(6)). A commercial lease is unlawful if its consideration or object is (1) contrary to an express provision of law, (2) contrary to the policy of express law, though not expressly prohibited, or (3) otherwise contrary to good morals (Civ. Code, § 1667). Another ground for rescission and restitution not addressed by Civil Code section 1689, subdivision (b) allows recovery when the parties were ignorant of the illegality at the time they entered into the contract.[3]  Under the facts alleged in this Complaint, each and every one of the aforementioned grounds for rescission are met. In addition, the public interest will be prejudiced if the Priest Leases are permitted to stand, in that BCFH's ability to provide quality healthcare in underserved areas will be undermined by inequitable diversion of funds to defendants.  Further, the fraud described above is grounds for rescission.

80.     BCHF therefor prays, in the alternative, and in the event that the Priest Leases cannot be reformed, for judgment rescinding the Priest Leases, and for restitution of all sums paid the Priest LLCs to date, less the reasonable rental value of the premises during BCHF's occupation of the three leased facilities, along with orders providing for the reasonable surrender of the premises in a manner that will protect the interests of the patients BCHF is required to serve.

---

[3] *Adams v. Heinsch* (1948) 89 Cal. App. 2d 300, 302–305, 200 P.2d 796 (also on ground of mistake); *Brashears v. Giannini* (1933) 131 Cal. App. 706, 709–711, 22 P.2d 47; *Restatement (2d) of Contracts,* § 198].

<u>FOURTH CAUSE OF ACTION</u>

(Common Count for Money Had and Received Against Priest LLCs and Does 16-25)

81.     BCHF incorporates by reference Paragraphs 1 through 80 above as though fully set forth herein.

82.     A judgment of rescission supports an award of money to BCHF under a common count for money had and received.  In addition to the facts supporting the fraud count pled above, the following facts also support a common count for money had and received.

83.     BCHF is further informed and believes Hebets and Priest were friends. Beginning in 2012, and continuing through December 2016, Hebets and Priest caused BCHF and several Priest-owned entities to enter into various contracts under which millions in federal healthcare funds were unlawfully diverted to the Priest-owned entities. Priest owned and operated a management service organization, which exercised control over discrete portions of BCHF, including provider relations, claims management, information systems management, quality assurance, data reporting, and general administration of BCHF's contract dental program. For these and other reasons, the Priest LLCs are more likely than not "disqualified persons" under the Internal Revenue Code and Treasury regulations. Accordingly, rent money BCHF paid the Priest LLCs in excess of FMR is money unlawfully had and received by the Priest LLC's: its return to BCHF is mandatory under law.

84.     Beginning in 2012, and continuing through 2020, the Priest LLCs became indebted to BCHF in the sum of at least $11.5 million for money had and received by the Priest LLCs. Neither the whole nor any part of this sum has been paid, although demand therefor has been made, and there is now due, owing, and unpaid the sum of at least $11.5 million, with interest thereon, at the legal rate as the court may allow, according to proof at trial.

// // //

// // //

// // //

// // //

// // //

// // //

FIFTH CAUSE OF ACTION

(Violation of Business and Professions Code Section 17200, et seq. Against Priest LLCs and

Does 26 through 35)

85.     BCHF incorporates by reference Paragraphs 1 through 84 above as though fully set forth herein.

86.     The actions described herein constitute unlawful and unfair business practices within the meaning of Business & Professions Code section 17203. BCHF has requested that the Priest LLCs cease the unfair business practices described herein. The Priest LLCs have rejected and continue to reject these requests.

87.     As a direct, proximate and foreseeable result of the Priest LLCs' unfair business practices, as described herein, BCHF has paid over $11.5 million in over-FMR rent, which is subject to orders of disgorgement and/or restitution under the UCL.

88.     BCHF is informed and believes, and based thereon alleges, the Priest LLCs' unlawful and unfair business practices, as described herein, are part of a plan to ignore and violate laws, and to compel BCHF to violate laws, applicable to contracts with non-profit FQHCs, as described above. BCHF is informed and believes, and based on that alleges, the Priest LLCs will continue with their unlawful and unfair business practices unless they are enjoined from doing so.

SIXTH CAUSE OF ACTION

(Declaratory Relief Against Priest LLCs)

89.     BCHF incorporates by reference Paragraphs 1 through 88 above as though fully set forth herein.

90.     An actual controversy exists in regard to the parties' duties and obligations under the Priest Leases as alleged in this Complaint, and as such, a judicial declaration of the parties' respective duties and obligations is appropriate as to the matters in dispute, as alleged herein.

// // //

// // //

// // //

- 23 -

SEVENTH CAUSE OF ACTION

(Interpleader Against All Defendants)

91.     BCHF incorporates by reference Paragraphs 1 through 90 above as though fully set forth herein.

92.     As detailed above, the Priest LLCs, acting in concert, continue to demand BCHF pay rent in excess of FMR on all three Priest Leases.  The Priest LLCs threaten BCHF that failure to do so will result in immediate eviction proceedings. At the same time, DHCS and its appointed monitor have directed BCHF not to pay rent in excess of FMR, and to take immediate action to either reform or rescind the Priest Leases (with all attendant remedies), for the reasons alleged herein. Further, because the DHCS considers that BCHF has already paid $11.5 million over FMR to the Priest LLCs, it is unlikely the Priest LLCs are entitled to payment of further rent until the payments in excess of FMR are reconciled and accounted for, and in fact owe BCHF funds far in excess FMR due under the leases now, and for any reasonably foreseeable period of time.  As roughly 90% of all BCHF revenue is derived directly from federal health plan money paid BCHF under DHCS oversight, and considering that DHCS is exercising its right to control payment of funds to outside contractors and vendors such as the Priest LLCs, DHCS has a direct and enforceable interest in the payment of any funds to the Priest LLCs, including monthly rent for BCHF's use of the facilities under those leases.

93.     As a result, BCHF faces contrary competing claims on its money, one based on contract (the Priest Leases), and one based on an authorized regulatory agency's mandates (DHCS directives).  Accordingly, plaintiff BCHF has no alternative other than to interplead FMR to this court.

94.     The remedy of interpleader is codified under Code of Civil Procedure sections 386–386.6. The statutes are to be broadly interpreted to give effect to the remedial nature of the codifying provisions and to promote justice. An action of interpleader may be maintained under Code of Civil Procedure section 386, subdivision (b) even though the claims made on the party bringing the action are unliquidated and no liability on the part of such party has arisen.  (Code Civ. Proc., § 386 subd. (b).)  Interpleader actions are also proper under Code of Civil Procedure section 386, subdivision (a),

- 24 -

1    in which the conflicting claims relate to personal property or a contract obligation, liability for which

2    is wholly or partly admitted by the stakeholder. Accordingly, BCHF will deposit with the court the

3    FMR for the three locations leased from the Priest LLCs, and thereafter await the court's ruling on

4    amounts it owes defendants, if anything.

5

6                                    EIGHTH CAUSE OF ACTION

7                                    (Injunction Against Priest LLCs)

8        95.    BCHF incorporates by reference Paragraphs 1 through 94 above as though fully set forth

9    herein.

10       96.    For clarity and to avoid confusion only, BCHF sets out its claim for injunctive relief

11   separately, even though technically a remedy and not a distinct cause of action.

12       97.    As to the interpleader (count seven, above), BCHF requests the Court make such

13   temporary restraining orders, or issue such preliminary injunctions as necessary to restrain and enjoin

14   defendants until further notice and order of the court from prosecuting any and all proceedings and

15   any and all actions at law now pending, or from bringing any proceeding or action against BCHF

16   affecting the rights and obligations as between the parties in the action with respect to the Priest

17   Leases, and as to any other properties leased by BCHF from any of the Priest LLCs that are not

18   described with specificity in any of the Priest Leases.

19       98.    As to the ongoing UCL violations, BCHF seeks a separate injunction forever terminating

20   the violations.

21   // // //

22   // // //

23   // // //

24   // // //

25   // // //

26   // // //

27   // // //

28   // // //

                                            - 25 -

<u>NINTH CAUSE OF ACTION</u>

(RICO against Priest LLCs and Does 36-50)

99.   BCHF incorporates by reference Paragraphs 1 through 98 above as though fully set forth herein.

100.   Defendants' conduct described herein is unlawful under 18 U.S.C. 1962(c).

101.   The defendants, their misconduct and basis of liability are as follows:

    a.   Inland Valley Investments, LLC ("IVI") was a receiver of monies embezzled from Borrego Community Health Foundation ("BCHF") by the efforts of its former CEO Bruce Hebets ("Hebets") and his friend and accomplice Daryl Priest ("Priest"). Priest is the sole member and manager of IVI.  The embezzlement took the form of Hebets, in concert with Priest, executing extremely lengthy leases (30 years more or less) obliging BCHF to pay extremely above-market rents to the defendant LLC.  This violates multiple statutes prohibiting "federal healthcare offenses."

    b.   DRP Holdings, LLC ("DRP") was a receiver of monies embezzled from BCHF by the efforts of Hebets and his friend and accomplice Priest. Priest is the sole member and manager of DRP.  The embezzlement took the form of Hebets, in concert with Priest, executing unreasonably lengthy leases (30 years more or less) obliging BCHF to pay extremely above-market rents to the defendant LLC.  This violates multiple statutes prohibiting "federal healthcare offenses."

    c.   Promenade Square, LLC ("PS") was a receiver of monies embezzled from BCHF by the efforts of Hebets and his friend and accomplice Priest. Priest is the sole member and manager of PS.  The embezzlement took the form of Hebets, in concert with Priest, executing extremely lengthy leases (30 years more or less) obliging BCHF to pay extremely above-market rents to the defendant LLC.  This violates multiple statutes prohibiting "federal healthcare offenses."

102.   Wrongdoers, other than the defendants listed above, and their misconduct, are as follows:

    a.   Bruce Hebets, former BCHF CEO, now deceased.  In concert with Priest, Hebets committed BCHF to unreasonably long-term leases, at rental rates far above market

- 26 -

value.  Hebets did not present these leases for review or approval by the BCHF Board of Trustees.  The Board only learned of the unlawful terms of these leases after law enforcement teams raided BCHF and Priest facilities in October 2020.

b. Daryl Priest, sole member and manager of each defendant LLC.  Priest worked with Hebets to oblige BCHF on unlawful leases, without the knowledge or consent of the BCHF Board.  Priest's LLCs received the unlawful, above-market rents embezzled by Hebets.

c. Former executives of BCHF, who cooperated with Hebets in keeping information about the unlawful leases from the Board, including after Hebets' 2018 "retirement."

d. Currently unknown executives and agents of each of the Priest LLCs, who knowingly took possession of funds embezzled from BCHF.

103.    BCHF, the United States, and the State of California are victims here.  BCHF is largely funded by federal health care dollars (largely Medicaid), administered by and through the California DHCS, and it must account to the United States for its lawful expenditures.  In turn, the United States uses those reports in calculating the proper level of federal health care funding to direct to BCHF.  In light of the unlawful scheme described above, improperly high operating costs were reported to the United States, resulting in improperly high funding levels.  The United States and DHCS expect this improper funding either to be returned, or credited against future funding.  It is as yet unknown the size of the reimbursement of overpayments claim on BCHF.  As to each of the individual defendants, here is an accounting of the damages ascribed to each:

a. IVI billed BCHF $960,303 in unlawful yearly rent, over the course of the last 5.25 years, resulting in damages no less than $5,041,590.75;

b. DRP billed BCHF $460,871.40 in unlawful yearly rent, over the course of the last 5.5 years, resulting in damages no less than $2,534,792.70;

c. PS billed BCHF $469,257 in unlawful yearly rent, over the course of the last 8.5 years, resulting in damages no less than $3,988,684.50.

// // //

104.    Here is a detailed description of the pattern of racketeering activities for this RICO claim:

a.    Here is a list of predicate acts and the specific statutes that were violated;

i.    DRP & IVI – On February 2, 2016, Priest and Hebets entered into a lease obliging BCHF to pay above-market rents for 30 years on property located on East Main Street in Barstow.  Initially, Priest signed on behalf of DRP as landlord.  Base monthly rent was set at $60,000.  On April 3, 2016, Priest and Hebets executed an amendment to the lease, raising the monthly rent to $104,820.  On August 29, 2017, Priest (acting for DRP) assigned all landlord rights in the lease to IVI (Priest signed for IVI).  At all times the fair market rent for this property never exceeded $25,000.  BCHF calculates that DRP or IVI or both of them have thus collected $5,041,590.75 in unlawful rent.

ii.    DRP – On September 15, 2015, Priest and Hebets entered into a lease obliging BCHF to pay above-market rents for 30 years on property located on North D Street in San Bernardino.  Priest signed on behalf of DRP as landlord.  Base monthly rent was set at $62,704.  At all times the fair market rent for this property never exceeded $25,000.  BCHF calculates that DRP has thus collected $2,534,792.70 in unlawful rent.

iii.    PS -- On September 21, 2012, Priest and Hebets entered into a lease obliging BCHF to pay above-market rents for 20 years on property located on West Main Street in El Cajon.  Priest signed on behalf of PS as landlord.  Base monthly rent was set at $41,749.52.  In March 2013 Priest and Hebets executed Amendment 1 to the lease substantially increasing monthly rent in future years.  On or about September 13, 2013, Priest and Hebets executed Amendment 2 to the lease increasing the monthly rent to $52,000, and substantially increasing monthly rent in future years.  On April 3, 2015, Priest and Hebets executed Amendment 3 to the lease increasing the square footage, the term by 30 years, and the monthly rent to $97,912.50.  On March 22, 2016, Priest and Hebets executed Amendment 4 to the lease increasing the monthly

- 28 -

1    rent to $111,900.  At all times the fair market rent for this property never

2    exceeded $73,000.  BCHF calculates that PS has thus collected $3,988,684.50

3    in unlawful rent.

4    iv.  Defendants, Priest, and Hebets' acts in entering into these leases, hiding their

5    terms from the BCHF Board, and causing unlawful and inaccurate expense

6    reports be submitted to the United States violated each of the following

7    statutes, from time to time:

8    1.  18 USC § 669 ("Theft or embezzlement in connection with health

9    care");

10    2.  18 USC § 1035 ("False statements relating to health care matters");

11    3.  18 USC § 1347 ("Health care fraud");

12    4.  18 USC § 287 ("False, fictitious or fraudulent claims");

13    5.  18 USC § 371 ("Conspiracy to commit offense or to defraud United

14    States");

15    6.  18 USC § 666 ("Theft or bribery concerning programs receiving

16    Federal funds");

17    7.  18 USC § 1001 (False "Statements or entries generally"); and,

18    8.  18 USC § 1349 ("Attempt and conspiracy").

19    b.  The predicate acts form a "pattern of racketeering activity": Execution of each of the

20    documents listed above, and collection of the unlawful monthly rents, constitute a

21    pattern of Federal health care offenses as detailed in the cited statutes;

22    c.  The predicate acts relate to each other as part of a common plan.  The predicate acts

23    are a part of a common plan to steal money from BCHF; each act is related as to its

24    purpose, results, participants, victims and method of commission.  The predicates

25    form a closed-end series of related predicates extending over a substantial period.

26    // // //

27    // // //

28    // // //

105.    A detailed description of the RICO enterprise follows, including: (a) the name of the individuals, partnerships, corporations, associations, or other legal entities, which allegedly constitute the enterprise; (b) a description of the structure, purpose, function and course of conduct of the enterprise; (c) whether any defendants are employees, officers or directors of the enterprise; (d) whether any defendants are associated with the enterprise; (e) whether plaintiff is alleging that the defendants are individuals or entities separate from the enterprise or that the defendants are the enterprise itself, or members of the enterprise; (f) if any defendants are alleged to be the enterprise itself, or members of the enterprise, an explanation of whether such defendants are perpetrators, passive instruments, or victims of the alleged racketeering activity.

   a.   The Enterprise is BCHF, a legitimate non-profit corporation which defendants and Hebets commandeered for their own criminal purposes;

   b.   BCHF is a Federally Qualified Health Center with a mission to provide high quality, comprehensive, compassionate primary healthcare to people in their communities, regardless of their ability to pay. BCHF operates 26 clinics, primarily in underserved desert and inland communities throughout San Diego, Riverside, and San Bernardino Counties. BCHF provides essential services in Family Practice, Pediatrics, OB/GYN, Internal Medicine, Podiatry, Dermatology, Cardiology, HIV/Hepatitis C and Covid 19 related testing and vaccinations to over 200,000 patients, most of whom cannot find affordable comprehensive primary care from other sources. During the recent pandemic, BCHF tested more than 80,000 Californians for Covid-19 infection, and has vaccinated over 18,000 people. BCHF's continued operation is in the public interest;

   c.   None of the current defendants are employees, officers or directors of the Enterprise;

   d.   The current defendants are associated with the Enterprise in that they are the Enterprise's landlords for 3 locations;

   e.   The defendants are entities separate from the Enterprise;

// // //

- 30 -

f.   None of the defendants are alleged to be the Enterprise itself, or members of the
Enterprise.

106.   BCHF, the Enterprise, is engaged in interstate commerce acting as a FQHC.  Defendants, together with Hebets and Priest, worked together to perpetrate an embezzlement scheme to steal money from the Enterprise, and to utilize the Enterprise as their tool to steal money from governmental entities.  The pattern of racketeering described above is separate and distinct from the Enterprise.

107.   The relationship between the activities of the enterprise and the pattern of racketeering activity and how the racketeering activity differs from the usual daily activities of the enterprise is as follows: Rental of real estate is ancillary to the primary mission of the FQHC, which is the provision of healthcare to under-served communities.  All efforts of BCHF are to be directed at the efficient accomplishment of this mission.  Significant contracts necessary to BCHF's operation are to be reviewed and approved by the BCHF Board of Trustees.  In this case, as an essential part of the racketeering activity, Hebets and other BCHF executives and employees under Hebets' control kept the leases from Board review.  No competent Board would, or could, have approved these extremely long leases at extremely high prices.

108.   Although BCHF enjoys occupancy of the several properties, it would not have done so had a rational exercise of due diligence taken place.  Priest, Hebets, and others under Hebets' control ensured that would not take place.

109.   Hebets and the other BCHF executives under his control were employed by the Enterprise (BCHF) during the commission of the predicate acts.  The liable persons (i.e., the defendants) are not the Enterprise.

110.   The facts described herein demonstrate the existence of a conspiracy between Hebets, Priest, and the defendants.  (18 USC 1962(d).)

111.   Hebets retired from BCHF in 2018.  He died in January 2019.

// // //

// // //

// // //

- 31 -

112.    Hebets and his accomplices managed to keep the "lease arrangement" with the Priest LLCs hidden from Board oversight until raids by state and federal law enforcement authorities in October 2020.  Thereafter, real estate experts calculated BCHF funds totaling more than $11.5 million had been stolen, as follows:

|  | El Cajon | San Bernardino | Barstow | Overpayments |
|---|---|---|---|---|
| Lessor | Promenade | DRP | Inland Valley | |
| Current Rent - Month | $     111,686.00 | $    62,704.00 | $    104,920.00 | |
| FMR | $      72,581.25 | $    24,298.05 | $      24,894.75 | |
| Monthly Overpayment | $      39,104.75 | $    38,405.95 | $      80,025.25 | $     157,535.95 |
| Yearly Overpayment | $    469,257.00 | $  460,871.40 | $    960,303.00 | $  1,890,431.40 |
| Initiation | 9/21/2012 | 9/15/2015 | 2/2/2016 | |
| Years (to date) | 8.5 | 5.5 | 5.25 | |
| Cumulative | $  3,988,684.50 | $ 2,534,792.70 | $5,041,590.75 | $ 11,565,067.95 |

113.    Hebets and his BCHF fiduciary accomplices' Federal health care offenses unlawfully directed over $11.5 million in BCHF money to the Priest LLCs over the last nine years.  BCHF is entitled to trace this money, and have the court impose a constructive trust for the stolen funds and their proceeds on the Priest LLCs or other recipients.  Moreover, the Priest LLCs were willing, knowing participants in, and beneficiaries of, the scheme.

114.    By way of their knowing participation in the scheme, the Priest LLCs are culpable persons for purposes of 18 U.S.C. § 1964.

115.    The embezzlement scheme, including the several leases and related concealment, constitutes a pattern of racketeering activity as described in 18 USC § 1961(1)(B), as an act indictable under 18 USC § 1957 ("Engaging in monetary transactions in property derived from specified unlawful activity").  "Specified unlawful activity" is, in turn, defined in 18 USC § 1956 as including "any act or activity constituting an offense involving a "Federal health care offense."  18 USC § 24 defines "Federal health care offense" as including "a violation of, or a criminal conspiracy to violate" any of the following:

> ➢  18 USC § 669 ("Theft or embezzlement in connection with health care");

> ➢  18 USC § 1035 ("False statements relating to health care matters");

> ➢  18 USC § 1347 ("Health care fraud");

1          ➢   18 USC § 287 ("False, fictitious or fraudulent claims");

2          ➢   18 USC § 371 ("Conspiracy to commit offense or to defraud United States");

3          ➢   18 USC § 666 ("Theft or bribery concerning programs receiving Federal funds");

4          ➢   18 USC § 1001 (False "Statements or entries generally"); and,

5          ➢   18 USC § 1349 ("Attempt and conspiracy").

6      116.    But for the embezzlement scheme detailed above, BCHF would have leased properties at

7   fair market value, and for reasonable terms.  Accordingly, BCHF has been damaged by performing

8   under the unlawful leases in an amount susceptible to proof, by no less than $11.5 million.

9      117.    Accordingly, plaintiff is entitled to $11.5 million in damages, trebled pursuant to statute,

10  together with reasonable attorney's fees and costs, and interest.

11

12                                    PRAYER FOR RELIEF

13      WHEREFORE, BCHF prays for judgment against defendants, and each of them, as follows:

14  1.  With respect to the First Cause of Action—Constructive Trust (As to Priest LLCs only):

15      a.  For imposition of a constructive trust in an amount subject to proof at trial, but no less

16          than $11.5 million and on any real or personal property purchased with a portion of

17          that amount; and,

18      b.  Pre-judgment and post-judgment interest.

19  2.  With respect to the Second Cause of Action—Reformation Due to Fraud (Priest LLCs only):

20      a.  Order reforming the payments under the Priest Leases to reflect only FMR as rent due

21          and owing, and further, to limit the term of the leases as commercially reasonable to

22          no more than five years;

23      b.  Order of restitution that all money paid to Priest LLCs in excess of the amount of rent in

24          the reformed Priest Leases be returned to BCHF; and

25      c.  Pre-judgment and post-judgment interest on all sums ordered returned.

26  3.  With respect to the Third Cause of Action—Rescission Due to Fraud (As to Priest LLCs

27  only):

28      a.  Rescission of the Priest Leases;

                                        - 33 -

b. For actual and consequential damages in an amount subject to proof at trial, but in an amount no less than $11.5 million or, in the alternative, restitution of all sums unlawfully paid, less the reasonable rental value of the premises during BCHF's occupation of the three leased facilities;

c. Punitive damages as allowed by law;

d. Order providing for the reasonable surrender of the premises in a manner that will protect the interests, safety, and health of BCHF's patients; and

e. Pre-judgment and post-judgment interest.

4. With respect to the Fourth Cause of Action—Money Had and Received (As to Priest LLCs only):

a. Order that money had and received by Priest LLCS be returned to BCHF, subject to proof at trial, but in an amount no less than $11.5 million; and

b. Pre-judgment and post-judgment interest.

5. With respect to the Fifth Cause of Action—UCL Violations (As to Priest LLCs only):

a. Restitution of all sums unlawfully paid, less the reasonable rental value of the premises during BCHF's occupation of the three leased facilities; and

b. Pre-judgment and post-judgment interest.

6. With respect to the Sixth Cause of Action—Declaratory Relief (As to Priest LLCs only):

a. A declaration of the rights and liabilities of the parties to the attached Priest leases, as to the matters alleged in dispute herein.

7. With respect to the Seventh Cause of Action—Interpleader (As to All Defendants):

a. Order that defendants to take whatever action they believe appropriate in this lawsuit to establish their right to control or direct distribution of the money deposited by BCHF herein, to issue such decrees and orders of payment appropriate thereto. During the pendency of this action, to make such temporary restraining orders, or issue such preliminary injunctions as necessary restrained and enjoining defendants until further notice and order of the court from prosecuting any and all proceedings and any and all actions at law now pending, or from bringing any proceeding or action against BCHF

- 34 -

1    affecting the rights and obligations as between the parties in the action with respect to

2    the Priest Leases attached hereto.

3  8.  With respect to the Eighth Cause of Action—Injunction (As to Priest LLCs only):

4    a.  That the Court make such temporary restraining orders, or issue such preliminary

5       injunctions as necessary to restrain and enjoin the Priest LLCs until further notice and

6       order of the court from prosecuting any and all proceedings and any and all actions at

7       law now pending, or from bringing any proceeding or action against BCHF affecting

8       the rights and obligations as between the parties in the action with respect to the Priest

9       Leases referenced above, and as to any other properties leased by BCHF from any of

10       the Priest LLCs that are not described with specificity in any of the Priest Leases; and

11    b.  As to the ongoing UCL violations, BCHF seeks a separate injunction forever terminating

12       the violations.

13  9.  With respect to the Ninth Cause of Action---RICO (As to Priest LLCs only)

14    a.  For damages of $11.5 million, trebled to $34.5 million pursuant to statute;

15    b.  Pre-judgment and post-judgment interest; and,

16    c.  Reasonable attorney's fees and costs.

17  10. With respect to all causes of action:

18    a.  Costs of suit;

19    b.  Reasonable attorney's fees and costs as allowed by law; and

20    c.  Such other and further relief the Court deems just and proper.

21  Dated:  August 4, 2021                    HATTON, PETRIE & STACKLER

22

23                                                      Digitally signed by
                                                        Dan E. Heck
                                                        Date: 2021.08.04
                                                        11:15:57 -07'00'
                                          By:_____

24                                            Gregory M. Hatton
                                              Arthur R. Petrie, II
25                                            Dan E. Heck
                                              John McMahon
26                                            Attorneys for Plaintiff
                                              BORREGO COMMUNITY HEALTH FOUNDATION

27

28

- 35 -

1

<u>DEMAND FOR JURY TRIAL</u>

2

BCHF hereby demands a jury trial in this matter.

3    Dated:  August 4, 2021                    HATTON, PETRIE & STACKLER

4                                              Digitally signed by
                                               Dan E. Heck
                                               Date: 2021.08.04
5                                   By:_____11:16:51 -07'00'_____

6                                        Gregory M. Hatton
                                         Arthur R. Petrie, II
                                         Dan E. Heck
7                                        John McMahon
                                         Attorneys for Plaintiff
8                                        BORREGO COMMUNITY HEALTH FOUNDATION

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 36 -

# EXHIBIT A

# LEASE

### BETWEEN

### PROMENADE SQUARE LLC.
LANDLORD

### AND

### BORREGO COMMUNITY HEALTH FOUNDATION
TENANT

### DATED

SEPTEMBER 21, 2012
LEASE

© Stephen J Fitch

0

# TABLE OF CONTENTS

1.   BASIC LEASE PROVISIONS.................................................................1
2.   PREMISES, PARKING AND COMMON AREAS...................................... 1
3    TERM ..............................................................................................2
4.   RENT ............................................................................................ 3
5    SECURITY DEPOSIT ........................................................................3
6.   USE.............................................................................................4
7.   MAINTENANCE, REPAIRS, ALTERATIONS AND COMMON AREA SERVICES ........................4
8.   INSURANCE; INDEMNITY; RELEASE....................................................6
9.   DAMAGE OF DESTRUCTION ...............................................................9
10.  REAL PROPERTY TAXES ..................................................................11
11.  UTILITIES .....................................................................................12
12.  ASSIGNMENT AND SUBLETTING .......................................................12
13.  DEFAULT REMEDIES .......................................................................14
14.  CONDEMNATION ............................................................................16
15.  BROKER'S FEE ...............................................................................16
16.  ESTOPPEL CERTIFICATE . ................................................................16
17.  LANDLORD'S TRANSFER OF OWNERSHIP .............................................17
18.  SEVERABILITY ...............................................................................17
19   INTEREST ON PAST-DUE OBLIGATIONS . ............................................17
20.  TIME OF ESSENCE ...........................................................................17
21.  ADDITIONAL RENT ...........................................................................17
22.  INCORPORATION OF PRIOR AGREEMENTS; AMENDMENTS ......................17
23.  NOTICES ...................................................................................... 18
24.  WAIVERS .....................................................................................18
25.  RECORDING ..................................................................................18
26.  HOLDING OVER ..............................................................................18
27.  CUMULATIVE REMEDIES ..................................................................18
28.  COVENANTS AND CONDITIONS ..........................................................18
29   BINDING EFFECT; CHOICE OF LAW ..................................................... 18
30.  SUBORDINATION .............................................................................19
31.  ATTORNEY'S FEES ...........................................................................19
32   LANDLORD'S ACCESS .......................................................................19
33.  AUCTIONS .....................................................................................20

| 34. | SIGNS ....................................................................... | , 20 |
|-----|-----------------------------------------------------------------------|------|
| 35. | MERGER ..................................................................... | . .. ....20 |
| 36. | LANDLORD'S CONSENT ..................................................... | . 20 |
| 37. | QUIET POSSESSION ........................................................ | . ....20 |
| 38. | SECURITY MEASURES-LANDLORD'S RESERVATIONS ................ | 20 |
| 39. | EASEMENTS ................................................................... | .21 |
| 40. | LIMITATION OF LANDLORD'S LIABILITY ................................ | .21 |
| 41. | AUTHORITY .................................................................... | .21 |
| 42. | CONFLICT ...................................................................... | .21 |
| 43. | NO OFFER ..................................................................... | .21 |
| 44  | LENDER MODIFICATION ................................................... | ......22 |
| 45. | OPTION TO RENEW ........................................................ | .22 |
| 46. | TENANT IMPROVEMENT ALLOWANCE .................................. | .22 |
| 47  | MULTIPLE PARTIES .......................................................... | .22 |
| 48. | LIMITATIONS OF LIABILITY............................................... | .22 |
| 49. | SPECIAL PROVISIONS ...................................................... | ......22 |
| 50. | ATTACHMENTS ............................................................... | ..24 |
|     | Signatures ................................................................... | ..24 |

© Stephen J Fitch

2

12 1007.3

# LEASE

## 1. BASIC LEASE PROVISIONS

1.1    _Parties_. This Lease dated as of this 21st day of September, 2012 by and between PROMENADE SQUARE, LLC., a California limited liability company having an address at 124 West Main Street, Ste 240, El Cajon, CA 92020, (hereinafter called "Landlord") and BORREGO COMMUNITY HEALTH FOUNDATION, a California corporation, having an address at P.O Box 2369, Borrego Springs, CA 920004 (hereinafter called "Tenant").

1.2    _Premises_.    16,383 rentable square feet of space comprising the first and third floors, of the Building (as hereinafter defined) and shown on Exhibit "A" hereto (the "Premises").

1.3    _Building_. The structure and appurtenances commonly known as 133 West Main Street in the City of El Cajon, County of San Diego, State of California, and as defined in paragraph 2.1.

1.4    _Use_.    General medical and dental offices for the operation of the Borrego Community Health Foundation and for no other use.

1.5    _Term_.  Commencing on January 1, 2013 (the "Commencement Date") and terminating on December 31, 2033  As soon as the Commencement Date has been established, if different from January 1, 2013 Landlord and Tenant shall enter into a Commencement Date Agreement in the form attached hereto as Schedule "A".

1.6    _Rent_.  Years 1-5, $501,114.24 per annum payable in equal monthly installments of $41,749.52 on the first day of each calendar month occurring during the term without demand, set-off, deduction or abatement of any kind, except as may otherwise be set forth herein  Rent shall commence on the Commencement Date.

1.7    Rent Increase. The Rent shall adjust on January 1, 2018 and thereafter as follows:

a.    Years 6-10        $530,537.64 per annum payable in equal monthly installments of $44,211.47.

b.    Years 11-15       $560,081.04 per annum payable in equal monthly installments of $46,673.42

c.    Years 16-20       $589,624.44 per annum payable in equal monthly installments of $49,135.37.

1.8    Rent Paid Upon Execution.    First two months- $83,499.04

1.9    Security Deposit.    $46,673.42

1.10   Tenant's Share.  [Intentionally omitted]

## 2. PREMISES, PARKING AND COMMON AREAS

2.1    _Premises_. The Premises are a portion of the Building identified in paragraph 1.3 hereof. "Building" shall include adjacent parking. The Premises, the Building, the Common Areas, the land upon which the same are located, thereon or thereunder, are herein collectively referred to as the "Building Project"  Landlord hereby leases to Tenant, and Tenant hires from Landlord, for the term, at the rental, and upon all of the conditions set forth herein, the Premises referred to in paragraph 1.2 hereof, including non-exclusive rights to the Common Areas as hereinafter specified.

2.1.1    _Construction_. Landlord agrees that, after execution of this Lease by both parties, it will, at its sole cost and expense, commence and pursue to completion the construction of the improvements to be erected by Landlord pursuant to the List of Improvements ("Exhibit F") with a not to exceed cost to Landlord of

© Stephen J. Fitch

1

$1,065,000.00  Any costs over $1,065,000.00 shall be reimbursed by Tenant to Landlord upon written demand Landlord shall provide Tenant with five (5) day written notice prior to incurring any costs for which reimbursement will be sought. Upon completion of the List of Improvements Tenant accepts the Premises "as is". Tenant shall provide, at its sole cost, to Landlord upon execution of this Lease space plans for the Premises. Any revisions to the space plan shall be mutually agreed upon by the Parties. Any increase in the cost to complete the List of Improvements resulting from the modification of the space plan shall be reimbursed by Tenant to Landlord upon written demand.

    2.2    **Vehicle Parking.**  So long as Tenant is not in default hereunder, and subject to the rules and regulations attached hereto or as otherwise may be established by Landlord from time to time, Tenant shall be entitled to have for its use a total of thirty (30) parking space of which twenty (20) shall be on a non-exclusive shared basis and ten (10) shall be designated as for the exclusive use of Tenant. It is understood that Landlord has no effective means of control as to use of parking spaces.

    2.2.1    If Tenant commits or allows any of the prohibited activities described in the Lease or the rules then in effect, Landlord shall have the right, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Tenant, which cost shall be immediately payable as additional rent upon demand by Landlord, landlord shall give Tenant notice of any such action under this provision.

    2.3    **Common Areas-Definition.**  The term "Common Areas" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Office Building Project that are provided and designated by Landlord from time to time for the general non-exclusive use of Landlord, Tenant and other tenants of the Office Building Project and their respective employees, suppliers, shippers, customers and invitee, including, but not limited to common entrances, lobbies, corridors, stairways and stairwells, public rest rooms, elevators, parking areas to the extent not otherwise prohibited by this Lease, loading and unloading areas, trash areas, roadways, sidewalks, walkways, parkways, ramps, driveways, landscape areas and decorative walls.

    2.4    **Common Areas-Rules and Regulations.**  Tenant agrees that Tenant, its employees, agents, visitors and licensees shall abide by and conform to the rules and regulations attached hereto as Exhibit "B". Landlord or such person(s) as Landlord may appoint shall have the exclusive control and management of the Common Areas and shall have the right, from time to time, to modify, amend and enforce said rules and regulations. Landlord shall not be responsible to Tenant for the non-compliance with said rules and regulations by others.

    2.5    **Common Areas-Changes.**  Landlord shall have the right, in Landlord's sole discretion, from time to time, to:

    (a)    make changes to the Building interior and exterior and Common Areas, including size, shape, number and appearance thereof, but not limited to the lobbies, windows, stairways, air shafts, elevators, escalators, restrooms, driveways, entrances, parking spaces, parking areas, loading and unloading areas, egress, direction of traffic, decorative walls, signs, landscaped area and walkways;

    (b)    close temporarily any of the Common Areas for maintenance purposes;

    (c)    designate other land and improvements outside the boundaries of the Office Building Project to be a part of the Common Areas, provided that such other land and improvements have a reasonable and functional relationship to the Office Building Project;

    (d)    add improvements to the Common Areas;

    (e)    use the Common Areas while engaged in making additional improvements, repairs or alterations to the Office Building Project, or any portion thereof; and

    (f)    do and perform such other acts and make such other changes in, to, or with respect to the Common Areas and Office Building Project as Landlord may deem to be appropriate.

3.    TERM

3.1    Term.  The term of this Lease and Commencement Date of such term shall be as specified in paragraph 1.5 hereof.

3.2    Delay in Possession.  Notwithstanding the Commencement Date herein before specified, if for any reason, Landlord cannot deliver possession of the Premises to Tenant on the Commencement Date, but subject to paragraph 3.2.2, Landlord shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or the obligations of Landlord or Tenant hereunder or extend the term hereof; but, in such case, Tenant shall not be obligated to pay rent or perform any other obligation of Tenant under the terms of this Lease, except as may be otherwise provided in this Lease, until possession of the Premises is tendered to Tenant, as hereinafter provided. The parties hereto agree that this constitutes an express provision as to the time at which Landlord shall deliver possession of the Premises to Tenant, and Tenant hereby waives any rights to rescind this Lease which Tenant might otherwise have pursuant to law now or hereafter in force.

3.2.1    Possession Tendered-Defined.  Possession of the Premises shall be deemed tendered to Tenant when (1)all utilities are ready for use in the Premises (2) Tenant has reasonable access to the Premises, and (3) five (5) days shall have expired following advance written notice to Tenant of the occurrence of the matters described in (1) and (2) above of this paragraph 3.2.1. The Premises shall not be deemed to be unready for Tenant's occupancy or incomplete if only minor or insubstantial details of construction, decoration or mechanical adjustments remain to be done in the Premises.

3.2.2    Delays Caused by Tenant.  If the delay in the availability of the Premises for occupancy shall be due to special work, changes, alterations or additions required or made by Tenant in the layout or finish of the Premises or any part thereof, or shall be caused in whole or in part by Tenant through the delay of Tenant in submitting any plans and/or specifications, supplying information, approving plans, specifications or estimates, giving authorization or otherwise, or shall be caused in whole or in part by the acts, conduct, failure, breach of default on the part of Tenant, there shall be no postponement of the Commencement Date.

4.    RENT

4.1    Rent.  Except as may be otherwise expressly provided in this Lease, Tenant shall pay to Landlord the Rent set forth in paragraph 1.6, in equal monthly installments, without demand, set-off, deduction or abatement of any kind except as may otherwise be set forth herein. Rent, additional rent and any other sums or charges payable by Tenant for any period during the term hereof which is for less than one (1) month shall be prorated based upon the actual number of days of the calendar month. Each month's rent shall be payable, in advance, on the first day of each month, in lawful money of the United States to Landlord at the address stated herein or to such other persons or at such other places as Landlord may designate in writing.

4.2    Operating Expenses.    [Intentionally omitted]

5.    SECURITY DEPOSIT

Tenant shall deposit with Landlord the Security Deposit set forth in paragraph 1.9 as security for Tenant's faithful performance of Tenant's obligations hereunder. If Tenant fails to pay rent or other charges due hereunder, or otherwise defaults with respect to any provision of this Lease, Landlord may use, apply or retain all or any portion of the Security Deposit for the payment of any rent or other sum to which Tenant is then in default of or for the payment of any other sum to which Landlord may become obligated by reason of Tenant's default, or to compensate Landlord for any loss or damage which Landlord may suffer thereby. If Landlord so uses or applies all or any portion of said deposit, Tenant shall, within five (5) days after written demand therefor, deposit cash with Landlord in an amount sufficient to restore the Security Deposit separate from its general accounts. If Tenant performs all of Tenant's obligations hereunder, the Security Deposit shall be returned, without payment of interest or other increment for its use, to Tenant (or, at Landlord's option to the last assignee, if any, of Tenant's interest hereunder) at the expiration of the term hereof, and after Tenant has vacated the Premises. No trust relationship is created herein between Landlord and Tenant with respect to the Security Deposit.

6.    USE

6.1      Use.  The Premises shall be used and occupied only for the purpose set forth in paragraph 1 4 and for no other purpose.

6.2      Compliance With Law.  Tenant shall, at Tenant's expense, promptly comply with all applicable laws, statutes, ordinances, rules regulations, orders, covenants and restrictions of record, and requirements of any fire insurance underwriters or rating bureaus, now or hereafter in effect, whether or not they reflect a change in policy from that now existing, during the term, or any part of the term hereof, relating in any manner to the Premises or the occupation and use by Tenant of the Premises  Tenant shall conduct its business in a lawful manner and shall not use or permit the use of the Premises or the Common Areas in any manner that will create or tend to create waste or a nuisance, or shall disturb or tend to disturb other occupants of the Office Building Project.  Throughout the term, Tenant shall procure and maintain any and all licenses or permits necessary for Tenant to conduct its business and shall, ask Landlord's request, furnish Landlord with certified copies thereof.

6.3      Condition of Premises.  Except as may otherwise be provided in this Lease, Tenant hereby accepts the Premises and the Office Building Project in their "as is" condition subject to all applicable zoning, municipal, county, state and federal laws, ordinances and regulations governing and regulating the Office Building Project, including the Premises, and any easements, covenants or restrictions of record, and accepts this Lease subject thereto and to all matters disclosed thereby and by any Exhibit attached hereto.  Tenant acknowledges that it has caused and is satisfied by its own independent investigation that the Premises are suitable for its intended use and that neither Landlord nor Landlord's agent or agents has made any representation or warranty as to the present or future suitability of the Premises, Common Areas, or Office Building Project for the conduct of Tenant's business.

7.    MAINTENANCE, REPAIRS, ALTERATIONS AND COMMON AREA SERVICE

7 1      Landlord's Obligations.

(a)      Landlord shall keep the exterior wall and roof of the Building and the Common Areas in good condition and repair; provided, however, Landlord shall not be obligated to paint, repair or replace wall coverings, or to repair or replace any improvements that are not ordinarily a part of the Building or are above then Building standard.  Except as provided in paragraph 9 5, there shall be no abatement of rent or any other sum payable under the Lease or liability to Tenant on account of any injury or interference with Tenant's business with respect to any improvements, alterations or repairs made by Landlord to the Office Building Project or any part thereof.

(b)      In the event Landlord makes any repair or alteration on behalf of Tenant, those repairs will be at like kind to the standard of workmanship in the building.

(c)      Landlord represents that the plumbing, electrical, gas and HVAC servicing shall be in good working condition and order on the Commencement Date.

7 2      Tenant's Obligations.

(a)      Tenant shall pay, as additional rent, for Landlord's cost of any maintenance and repair of the Premises or any equipment (wherever located that serves only Tenant or the Premises) to the extent such cost is attributable to causes beyond ordinary wear and tear  Tenant shall be responsible for the cost of painting, repairing or replacing wall coverings and to repair or replace any Premises improvements that are not ordinarily a part of the Building or that are above then Building standard.  After the Commencement Date, Tenant shall be responsible for the cost of repairing, maintaining and replacing the plumbing, electrical, gas and HVAC.  Landlord may, at its option, upon reasonable notice, elect to have Tenant perform any particular item of maintenance or repair, the cost of which is otherwise Tenant's responsibility hereunder.

(b)      On the last day of the term hereof, or on any sooner termination, Tenant shall surrender

© Stephen J  Fitch                                                                                                      12 1007.3

4

the Premises to Landlord in good repair, order and condition, ordinary wear and tear excepted. Tenant shall repair any damage to the Premises occasioned by the installation or removal of Tenant's trade fixtures, alterations, furnishings and equipment and, if necessary, restore the Premises. Except as otherwise set forth in this Lease, Tenant shall leave the airlines, power panels, electrical distributions systems, lighting fixtures, air-conditioning, window coverings, wall coverings, carpets, wall paneling, ceilings and plumbing on the Premises.

7.3    **Alterations and Additions.**

(a)    Tenant shall not, without Landlord's prior written consent, make any alterations, improvements, additions, utility installations (hereinafter collectively referred to as "Alterations") or repairs in, to or about the Premises As used in this paragraph 7 3, the term "utility installation" shall mean carpeting, window and wall coverings, power panels, electrical distribution systems, lighting fixtures, air-conditioning and plumbing At the expiration of the term, Landlord may require the removal by Tenant, at Tenant's expense, of any or all of said Alterations and the restoration of the Premises to the condition existing prior to the making of said Alterations. If Landlord permits Tenant to make any Alterations, Tenant shall use only such contractors as have been expressly approved in writing by Landlord, and Landlord may require Tenant to provide Landlord, at Tenant's sole cost and expense, a lien and completion bond, in an amount equal to one and one-half (1 ½) times the estimated cost of such Alterations, to insure Landlord against any liability for mechanic's and material men's liens and to insure completion of the Alterations. If Tenant makes any Alterations without the prior written approval of Landlord, Landlord may, at any time during the term of this Lease, require that Tenant remove any part or all of same.

(b)    Any Alterations in, to, or about the Premises that Tenant shall desire to make shall be presented to Landlord in written form, with proposed detailed plans and specifications. If Landlord shall give its consent to Tenant's making such Alterations, the consent shall be deemed conditioned upon Tenant acquiring all necessary permits required to do so from the applicable governmental agencies, furnishing a copy thereof to Landlord prior to the commencement of the work and compliance by Tenant with all conditions of said permits and all requirements of law in a prompt and expeditious manner.

(c)    Tenant shall not permit any mechanic's or material men's lien to be filed against the Premises or Office Building Project or any part thereof or interest therein. Tenant shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Tenant at or for use in the Premises.

(d)    Tenant shall give Landlord not less than ten (10) days notice prior to the commencement of any work in the Premises by Tenant, and Landlord shall have the right to post notices of non-responsibility in or on the Premises, the Building or Office Building Project as provided by law If Tenant shall, in good faith, contest the validity of any such lien, claim or demand, then Tenant shall, at its sole expense, defend itself and Landlord, with counsel selected by Landlord, against any such lien, claim or demand filed against Landlord or the Premises, the Building or the Landlord in an amount equal to such contested lien, claim or demand indemnifying Landlord against liability for the same and holding the Premises, the Building and the Office Building Project free from the effect of such lien, claim or demand. In addition, Landlord may require Tenant to pay Landlord's reasonable attorney's fees and costs in participating in such action if Landlord shall decide it is in Landlord's best interest so to do. Landlord, at its sole option, shall have the right, but not the obligation, to satisfy any such lien, claim or demand filed against the Premises, the Building or Office Building Project, at Tenant's expense.

(e)    All Alterations (and whether or not utility installations constitute trade fixtures of Tenant), which may be made in, to or on the Premises by Tenant including, but not limited to, floor coverings, panels, doors, drapes, built-ins, communication systems conduit, wiring and outlets, shall be made and done in a good and workmanlike manner and be of good quality and remain upon and be surrendered with the Premises at the expiration of the Lease term, unless Landlord requires their removal pursuant to paragraph 7.3(a). Provided Tenant is not in default, notwithstanding the provisions of this paragraph 7.3(e), Tenant's personal property and equipment, other than that which is affixed to the Premises, so that it cannot be removed without damage to the Premises or the Building, and other than utility installations, shall remain the property of Tenant and may be removed by Tenant subject to the provisions of paragraph 7 2.

(f)    Tenant shall provide Landlord with as-built plans and specifications for any Alterations.

7.4     **Utility Additions.** Landlord reserves the right to install new or additional utility facilities throughout the Office Building Project for the benefit of Landlord or Tenant, or any other tenant of the Office Building Project, including, but not by way of limitation, such utilities as plumbing, electrical systems, security systems, communication systems and fire protection and detection systems.

## 8.     INSURANCE; INDEMNITY

8.1     **Liability Insurance-Tenant.** Tenant shall, at Tenant's expense, obtain and keep in force during the term of this Lease, a policy of General Commercial Liability insurance utilizing an Insurance Service Office standard form with Broad Form General Liability Endorsement, or equivalent, in an amount of not less than $5,000,000 per occurrence of bodily injury and property damage combined or in a greater amount as reasonably determined by Landlord and shall insure Tenant, Landlord and any lender whose name shall have been given by Landlord to Tenant as additional insureds against liability arising out of, under or in connection with the use, occupancy or maintenance of the Premises or this Lease. Compliance with the above requirement shall not, however, limit the liability of Tenant hereunder. Tenant's insurance company shall be subject to the reasonable approval of Landlord and shall be licensed to do business in the State of California

8.2     **Property Insurance-Tenant.** Tenant shall, at Tenant's expense, obtain, and keep in force during the term of this Lease, for the benefit of Tenant, replacement cost fire and extended coverage insurance, with vandalism and malicious mischief, sprinkler leakage and in an amount sufficient to cover not less than 100% of the full replacement cost, as the same may exist from time to time, of all of Tenant's personal property, fixtures and equipment.

8.3     **Property-Insurance-Landlord.** Landlord may obtain, and keep in force during term of this Lease, a policy or policies of insurance covering loss or damage to the Office Building Project, but not Tenant's personal property, fixtures, equipment or Tenant's improvements, and rent loss insurance in the amount of the full replacement cost thereof, as the same may exist from time to time, utilizing an Insurance Services Office standard for or equivalent providing protection against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, plate glass, and such other perils as Landlord deems advisable or may be required by a lender having a lien on the Office Building Project. In addition, Landlord may obtain, and keep in force during the term of this Lease, a policy of rental value insurance covering a period of one (1) year with loss payable to Landlord, which insurance shall also cover all Operating Expenses for said period Tenant will not be named in any such policies carried by Landlord and shall have no right to any proceeds therefrom. The policies referred to in these paragraph 8.2 and 8.4 shall contain such deductibles as Landlord or its lender may determine. In the event that the Premises shall suffer an insured loss as defined in paragraph 9 1(f) hereof, the deductible amounts under the applicable insurance policies shall be deemed an Operating Expense Tenant shall pay the entirety of any increase in the property insurance premium for the Office Building Project over what it was immediately prior to the commencement of the term of this Lease if the increase is specified by Landlord's insurance carrier as being caused by the nature of Tenant's occupancy or any act or omission of Tenant. Landlord shall furnish Tenant with any written notice given to Landlord by any insurance carrier notifying Landlord that Tenant has, or Tenant's activities from the Premises or other acts or conduct have, caused an increase in the property insurance premium.

8.4.    **Insurance Policies.** Tenant shall deliver to Landlord copies of liability insurance policies required under Paragraphs 8.1 and 8.3 or certificates evidencing the existence and amounts of such insurance not later than ten (10) business days prior to the Commencement Date. No such policy shall be cancelable or subject to reduction of coverage or other modification except after thirty (30) days prior written notice to Landlord. Tenant shall furnish Landlord with renewal certificates at least ten (10) business days prior to the expiration of any applicable policy.

8.5.    **Waiver of Subrogation.** Tenant and Landlord each hereby release and relive the other, and waive their entire right of recovery against the other, for direct or consequential loss or damage arising out of or incident to the perils covered by property insurance carried by such party, whether due to negligence of Landlord or Tenant or their agents, employees, contractors, and/or invitee. All property insurance policies required under this Lease shall be endorsed to so provide.

8.6 **_Indemnity._** Tenant shall indemnify, defend (at Tenant's sole cost and expense and with legal counsel approved by Landlord, which approval shall not be unreasonably withheld) and hold harmless Landlord and its officers, directors, employees successors and assigns, and any lender of Landlord with an interest in the Premises, from and against any and all losses, costs, damages, expenses, claims, actions or causes of action arising, directly or indirectly, out of, under or in connection with this Lease or from Tenant's business or from any activity, work or thing done, permitted or suffered by Tenant in, to, on or about the Premises, Building or Office Building Project or elsewhere and shall further indemnify and hold harmless Landlord from any breach or default by Tenant in the performance of any covenant, agreement, term, provision, condition or obligation on Tenant's part to be kept or performed under the terms of this Lease, or arising, directly or indirectly, from any act or omission of Tenant or any of Tenant's agents, contractors, employees or invitee and from and against all costs, attorney's fees, expenses and liabilities incurred by Landlord as the result of any use, conduct, activity, work, thing done, permitted or suffered, breach, default or negligence, and in case any action or proceeding be brought against Landlord by reason of anything or matter referred to in this Paragraph 8.6. Tenant understands and acknowledges that the indemnification obligation hereunder is intended to constitute a "Type I" indemnity under California law and extends to and includes Claims arising from the active or passive negligence of Landlord. Notwithstanding the foregoing, nothing herein shall be construed to require Tenant to indemnify Landlord from any Claim arising from the sole negligence or willful misconduct of Landlord. The duty to defend hereunder is wholly independent of and separate from the duty to indemnify and such duty to defend exists regardless of any ultimate liability of Landlord or Tenant. Such defense obligation shall arise immediately upon presentation of a Claim by any party and written notice of such Claim being provided to Tenant. Tenant, as a material part of the consideration to Landlord for entering into this lease, hereby assumes all risk of damage to property of Tenant, or injury to persons, in, upon or about the Premises, Building or Office Building Project arising from any cause whatsoever and Tenant hereby waives all claims in respect thereto against Landlord except for those arising from the negligence of Landlord or its agents or employees.

8.7 **Release of Landlord.** Landlord shall not be responsible or liable at any time for any loss or damage to Tenant's merchandise, equipment, fixtures or other personal property or to Tenant's business, including without limitation any loss or damage to either the person or property of Tenant or loss of profits or otherwise that may be occasioned by or through the acts or omissions of persons occupying adjacent, connecting, adjoining or other space in the Center or by or through the acts or omissions of Landlord, its employees, agents, contractors, invitees or licensees, other than actions of Landlord constituting gross negligence or willful misconduct. Tenant shall store its property in and shall use and enjoy the Premises and the Common Areas of the Center at its own risk, and hereby releases Landlord, its employees, agents, contractors, partners, invitees, and licensees, to the fullest extent permitted by law, from all claims of every kind, including without limitation, leakage of any nature, resulting in loss of life, personal or bodily injury, or property damage

8 8. **No Representation of Adequate Coverage.** Landlord makes no representation that the limits or forms of coverage of insurance specified in this Paragraph 8 are adequate to cover Tenant's property or obligations under this Lease.

8.9 **Hazardous Materials Indemnity.**

(a) Tenant shall not cause or permit the presence, use, generation, release, discharge, storage, disposal or transportation of any "Hazardous Materials" on, under, in, about, to or from, the Premises and/or the Center; provided that the presence or use of Hazardous Materials (a) in products required for the prudent and ordinary management and operation of the Premises as a medical facility and (b) held and used strictly in accordance with (i) all applicable federal, state or local laws, regulations or orders, (ii) guidelines issued by any national or regional board of insurance underwriters, and (iii) prudent standards of practice shall not be deemed in violation of this provision.

(b) As used herein, the term "Hazardous Materials" shall mean any toxic or hazardous substance, material or waste or any pollutant or contaminant or infectious or radioactive material, including but not limited to those substances, materials or wastes regulated now or in the future under any of the following statutes or regulations promulgated thereto: (a) any "hazardous substance" within the meaning of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA") 42 U S C  § 9601, et seq.  or the California Hazardous Substance Account Act, Cal. Health and Safety Code § 25300 et seq  or the Porter-Cologne Water Quality Act, Cal. Water Code § 13000 et seq.  or the Hazardous Materials Transportation

7

Act, 49 U.S.C. § 1801, et seq.; (b) any "hazardous waste" within the meaning of the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq.; (c) any "pesticide" or "economic poison" as defined in California Food & Agricultural Code § 12753 and any regulations promulgated in connection therewith, or (d) any other substance, chemical, waste, toxicant, pollutant, pesticide or contaminate regulated by any federal, state or local law, statute, rule, regulation or ordinance for the protection of health or the environment ("Environmental Laws"), including, without limitation, methane and any petroleum products or fractions thereof and any asbestos-containing materials

(c) If Tenant's use of the Premises may involve the storage and/or use of Hazardous Materials as defined herein, Tenant, in addition to its covenants defined above, further covenants, agrees, warrants and represents that it will comply with all Environmental Laws, rules, regulations, court decisions, municipal codes and ordinances regulating such storage and/or use of Hazardous Materials, including without limitation Chapter 6.95 of the California Health and Safety Code; and to permit Landlord to monitor such compliance, without the assumption of any liability by Landlord nor any obligation of Landlord to so monitor, Tenant covenants and agrees to provide to and/or permit Landlord:

(1)    To review and approve prior to submission to any governmental agency all applications with respect to the handling, storage and/or use of Hazardous Materials in, on or about the Premises, including without limitation applications to the County Hazardous Materials Management Division ("HMMD") and/or to Air Pollution Control District ("APCD"), and after such submission to provide Landlord with a copy of all responses, notices, comments or other communications with said governmental agencies; and

(2)    To receive and review a copy of all completed and approved "Business Plans", as defined by the statutes, and all updates, renewals, or replacement "Business Plans" when submitted and all responses, notices, comments or communications with any governmental agencies regarding same; and

    (3)    To receive and review a copy of all notices, reports, comments or communications relating to any governmental inspection, complaint, investigation or other matter relating to Tenant's storage, handling or use of Hazardous Materials at, on, in or about the Premises; and

(4)    To receive and review a copy of any and all E.P.A. numbers, County Health Department permits, APCD permits, contracts with certified hazardous waste handlers (and all credentials and certifications of such handlers), and all schedules for delivery, pick-up and disposal of Hazardous Materials to or from the Premises; and

(5)    To immediately notify Landlord of any leaks, spills, emissions, release or suspected release of any Hazardous Materials at, on, in, under, above or about the Premises from any cause or source whatsoever; and

(6)    To receive and review a copy of all records of every nature that are required by law, regulations, ordinance or court order to be maintained by Tenant with respect to the storage, handling or use of any Hazardous Materials at, on, in, under, above or about the Premises.

(d) Tenant shall exonerate, indemnify, pay and protect, defend (with counsel reasonably approved by Landlord) and save Landlord, and its directors, trustees, beneficiaries, officers, shareholders, partners, members, employees, agents, and invitees and of those of the other tenants of the Center (collectively, the "Related Parties"), harmless from and against any claims (including, without limitation, third party claims for personal injury or real or personal property damage, actions, administrative proceedings (including informal proceedings), judgments, damages, punitive damages, penalties, fines, costs, taxes, assessments, liabilities (including sums paid in settlements of claims), interest or losses, including reasonable attorneys' fees and expenses (including any such fees and expenses incurred in enforcing this Lease or collecting any sums due hereunder), consultant fees, and expert fees, together with all other costs and expenses of any kind or nature (collectively, the "Costs") that arise directly or indirectly in connection with the presence, suspected presence, release or suspected release of any Hazardous Materials in or into the air, soil, ground water, surface water or improvements at, on, about, under or within the Center, or any portion thereof, or elsewhere in connection with the transportation of Hazardous Materials to or from the Center by or on behalf of Tenant or with respect to the Premises. The indemnification provided in this paragraph shall specifically apply to and include claims or actions brought by or on behalf of employees of Tenant. In the event

8

© Stephen J. Fitch                                                                                                    12.1007.3

that any of the Related Parties shall suffer or incur any such Costs, Tenant shall pay to Landlord or such Related Parties, the total of all such Costs suffered or incurred upon demand therefor. Without limiting the generality of the foregoing, the indemnification provided herein shall specifically cover Costs including, without limitation, capital, operating and maintenance costs, incurred in connection with any investigation or monitoring of site conditions, any clean-up, containment, remedial, removal or restoration work required or performed by any federal, state or local governmental agency or political subdivision or performed by any non-governmental entity or person because of the presence, suspected presence, release or suspected release of any Hazardous Materials in or into the air, soil, ground water, surface water or improvements at, on, about, under or within the Center (or any portion thereof), or elsewhere in connection with the transportation of Hazardous Materials to or from the Center and any claims of third parties for loss or damage due to such Hazardous Materials. This indemnification shall survive the termination of this Lease and shall be binding upon the Tenant and its successors in interest whenever such threat, claim, or cause of action may arise. Tenant expressly waives any defense concerning laches or the statute of limitations, constructive eviction or rent abatement with respect to such claims.

9.    DAMAGE OR DESTRUCTION

    9.1    Definitions.

        (a)    "Premises Damage" shall mean the Premises are damages or destroyed to any extent

        (b)    "Premises Building Partial Damage" shall mean the Building of which the Premises are a part is damages or destroyed to the extent that the cost of repair is fifty percent (50%) or more of the then Replacement Cost of the Building.

        (c)    "Premises Building Total Destruction" shall mean the Building of which the Premises are a part is damaged or destroyed to the extent that the cost of repair is fifty percent (50%) or more of the then Replacement of Cost of the Building.

        (d)    "Office Building Project Buildings" shall mean all of the buildings on the Office Buildings Project site.

        (e)    "Office Building Project Buildings Total Destruction" shall mean the Office Building Project Buildings are damaged or destroyed to the extent that the cost of the repair is fifty percent (50%) or more of the then Replacement Code of the Office Building Project Buildings

        (f)    "Insured Loss" shall mean damage or destruction which was caused by an event covered by the insurance described in Paragraph 8. The fact that an Insured Loss has a deductible amount shall not make the loss and Uninsured Loss.

        (g)    "Replacement Cost" shall mean the amount necessary to be spent in order to repair or rebuild the damaged area to the condition that existed immediately prior to the damage occurring, excluding all improvements made by tenants, other than those installed by Landlord at Tenant's expense.

    9.2    Premises Damage:  Premises Building Partial Damage.

        (a)    Insured Loss.  Subject to the provisions of Paragraphs 9.4 and 9.5, if, at any time during the term of this Lease, there is Premises Damage or Premises Building Partial Damage which is an Insured Loss, Landlord shall, (subject to the terms of any mortgage covering the Office Building Project), as soon as reasonably possible (but not before collection of any applicable insurance proceeds), and to the extent that the required materials and labor are readily available through usual commercial channels, at Landlord's expense, repair such damage (but not Tenant's fixtures, equipment or Tenant improvements originally paid for by Tenant) to the condition existing immediately prior to the damage, and this Lease shall continued in full force and effect. Landlord shall not be required to expend more than the amount of insurance proceeds received by it.

        (b)    Uninsured Loss. Subject to the provisions of Paragraphs 9.4 and 9.5, if, at any time during the term of this Lease, there is Premises Damage or Premises Building Partial Damage which is not an

Insured Loss, then, unless caused by the negligent or other act of Tenant (in which event Tenant shall make the repairs at Tenant's expense), and, as a result thereof, Tenant is prevented from making any substantial use of the Premises, Landlord may, at Landlord's option, either (i) repair such damage as soon as reasonably possible at Landlord's expense, in which event this Lease shall continue in full force and effect or (ii) give written notice to Tenant within sixty (60) days after the date of the occurrence of such damage of Landlord's intention to cancel and terminate this Lease as of a date set forth in Landlord's notice which date shall not be more than thirty (30) days following the giving of such notice by Landlord. Any cancellation pursuant to the provisions hereof shall be subject to the covenants, agreements, terms, provisions and conditions of this Lease to be kept and performed by Tenant.

9 3     **Premises Building Total Destruction; Office Building Project Buildings Total Destruction.**

(a)     Subject to the provisions of Paragraphs 9.4 and 9.5, if, at any time during the term of this Lease, there is damage, whether or not an Insured Loss, which falls into the classification of either (i) Premises Building Total Destruction or (ii) Office Building Project Building Total Destruction, then, Landlord may, at Landlord's option, either (a) repair such damage or destruction as soon as reasonably possible (but not before collection of any insurance proceeds, if applicable) at Landlord's expense (which shall not be more than the amount of insurance proceeds received by it), to the extent the required materials are readily available through usual commercial channels, to its condition existing at the time of the damage, but not Tenant's fixtures, equipment or tenant improvements, and this Lease shall continue in full force and effect, or (b) give written notice to Tenant within sixty (60) days after the date of the occurrence of such damage of Landlord's intention to cancel and terminate this Lease, in which case this Lease shall be canceled and terminated as of a date set forth in Landlord's notice which date shall not be more than thirty (30) days following the giving of such notice by Landlord. Any cancellation pursuant to the provisions hereof shall be subject to the covenants, agreements, terms, provisions and conditions of this Lease to be kept and performed by Tenant.

(b)     Notwithstanding (a) above, in the event the demised premises becomes uninhabitable for a period of greater than thirty (30) days, this Lease may be terminated at the option of Tenant.

9.4     **Damage Near End of Term.**

(a)     Subject to Paragraph 9.4(b), if, at any time during the last twelve (12) months of the term of this Lease, there is, in Landlord's option, substantial damage to the Premises, Landlord, may at Landlord's option, within sixty (60) days after the date of the occurrence of such damage, cancel and terminate this Lease as of a date set forth in Landlord's notice which date shall not be more than thirty (30) days following the giving of such notice by Landlord. Any such cancellation and termination shall be subject to all of the covenants, agreements, terms, provisions and conditions of this Lease on the part of Tenant to be kept and performed.

(b)     Notwithstanding Paragraph 9.4(a), in the event that Tenant has an option to extend or renew this Lease, and the time in which said option may be exercised has not yet expired, Tenant shall exercise such option, if it is to be exercised at all, no later than twenty (20) days after the occurrence of an Insured Loss falling within the classification of Premises Damage during the last twelve (12) months of the term of this Lease. If Tenant exercises such option during said twenty (20) day period, Landlord shall (subject to the terms of any mortgage covering the Office Building Project), at Landlord's expense (which shall not be more than the amount of insurance proceeds received by it), repair such damage, but not Tenant's fixtures, equipment or tenant improvements, as soon as reasonably possible (but not before collection of any applicable insurance proceeds) and this Lease shall continue in full force and effect. If Tenant fails to exercise such option during said twenty (20) day period, then Landlord may, at Landlord's option, cancel and terminate this Lease as of the expiration of said twenty (20) day period, by giving written notice to Tenant of Landlord's election to do so within ten (10) days after the expiration of said twenty (20) day period, notwithstanding any term or provision in the grant of option to the contrary. Any such cancellation and termination shall be subject to all of the covenants, agreements, terms, provisions and conditions of this Lease on Tenant's part to be kept and performed.

9.5     **Abatement of Rent: Tenant's Remedies:**

(a)     In the event Landlord repairs or restores the Building or Premises pursuant to the provisions of this paragraph 9, and any party of the Premises are not usable, Base Rent payable hereunder for the

10

© Stephen J. Fitch                                                                              12 1007 3

period during which such repair or restoration continues shall be abated, provided (1) the damage was not caused by Tenant, and (2) such abatement shall only be to the extent the Premises are not actually usable. Except for said abatement of Base Rent, if any, Tenant shall have no claim against Landlord for any damage suffered by reason of any such damage, destruction, repair or restoration.

(b)   Tenant agrees to cooperate with Landlord in connection with any such restoration and repair, including, but not limited to, the approval and/or execution of plans and specifications required therefor.

9 6   **Termination-Advance Payments.**   Upon termination of this Lease pursuant to this paragraph 9, so long as Tenant is not in default of any covenant, agreement, term, provision or condition of this Lease on its part to be kept and performed, an equitable adjustment shall be made concerning advance rent and any advance payments made by Tenant to Landlord.   Landlord shall, in addition, return to Tenant so much of the Security Deposit as has not theretofore been applied Landlord or may then be applied by Landlord.

9.7   **Waiver.**   Landlord and Tenant waive the provisions of any statute which relates to termination of leases when leased property is destroyed and agree that such event shall be governed by the terms of this Lease.

9.8   **No Release of Tenant.**   No cancellation or termination of this Lease as provided herein, or elsewhere in this Lease, shall release or relieve Tenant of any liability, responsibility or obligation accrued or incurred or outstanding or unsatisfied as of the date of such cancellation and termination.

9.9   **Tenant's Waiver.**   Tenant hereby waives the right to make repairs at Landlord's expense under provisions of Section 1941 and 1942 of the Civil Code of California  With respect to any partial destruction which Landlord is obligated to repair or may repair under any of the provisions of this Lease, the provisions of Section 1932 (2) and Section 1933 (4), of the Civil Code of California are hereby waived by Tenant. Nothing contained in this Lease shall constitute a waiver by Landlord of Tenant's obligations pursuant to California Civil Code Section 1941.2, or otherwise.

10.   **REAL PROPERTY TAXES**

10.1   **Payment of Taxes.**   [Intentionally omitted]

10.2   **Additional Improvements by Tenant.**   Tenant shall pay to Landlord, upon demand, the entirety of any increases in Real Property Tax assessed solely by reason of additional improvements placed in, on or to the Premises by Tenant or at Tenant's request

10.3   **Definition of "Real Property Tax".**   As used herein, the term "Real Property Tax" shall include any and all forms of real estate tax or assessment, general or special, ordinary or extraordinary and any license fee, commercial rental tax, improvement bond or bonds, levy or other similar or dissimilar tax of any kind or nature whatsoever (other than inheritance, personal income or estate taxes) imposed on the Building Project or any portion thereof by any authority having the direct or indirect power to tax, including any city, county, state or federal government, or any school, agricultural, sanitary, fire, street drainage, or other improvement district thereof, as against any legal or equitable interest of Landlord in the Building Project or in any portion thereof, as against Landlord's right to rent or other income therefrom, and as against Landlord's business of leasing the Building Project. The term Real Property Tax shall also include any tax, fee, bond, levy, assessment or similar or dissimilar charge (i) in definition of Real Property Tax, or (ii) the nature of which was hereinbefore included within the definition of Real Property Tax, or (iii) which is imposed as a Building Project or which is added as a tax or charge herein above included within the definition of Real Property Tax by reason of such change of ownership, or (iv) which is imposed by reason of this transaction or any modifications or changes hereto or any transfer hereof.

10 4   **Joint Assessment.**   If the improvements or property, the taxes for which are to be paid separately by Tenant under paragraphs 10.2 or 10.5, are not separately assessed, Tenant's portion of that tax shall be equitably determined by Landlord from the respective valuations assigned in the assessor's work sheets or such other information (which may include the cost of construction) as may be reasonably available.  Landlord's reasonable determination thereof, in good faith, shall be conclusive

10.5   **Personal Property Taxes.**

(a)   Tenant shall pay, prior to delinquency, all taxes assessed against and levied upon the trade fixtures, furnishings, equipment and all other personal property of Tenant contained in the Premises or elsewhere.

(b)   If any Tenant's personal property shall be assessed with Landlord's real property, Tenant shall pay to Landlord the taxes attributable to such personal property within ten (10) days after receipt of a written statement setting forth the taxes applicable to Tenant's personal property.

## 11.   UTILITIES AND SERVICES

11.1   **Services Provided by Landlord.**   So long as Tenant is not in default hereunder, Landlord shall provide heating, ventilation, air conditioning and water for reasonable drinking and lavatory use.

11.2   **Services Exclusive to Tenant.**   Tenant shall pay for all water, gas, heat, light, power, telephone and other utilities and services supplied and/or metered exclusively to the Premises or to Tenant, together with any taxes thereon. Tenant shall be solely responsible for the installation and maintenance of any meter used exclusively for the Premises. If any such services are not separately metered to the Premises, Tenant shall pay, at Landlord's option, either Tenant's Shares or a reasonable proportion to be determined by Landlord of any charges jointly metered with other premises in the Building.

11 3   **Hours of Service.**   So long as Tenant is not in default hereunder, the services and utilities described in paragraph 11.1 shall be provided during generally accepted Business Days, i.e., Monday through Friday, from 7:00 a.m. to 8:00 p.m., 8:00 a.m to 5:00 p.m. on Saturdays. Any services provided to Tenant pursuant to the terms of this Article 11 and not otherwise paid for by Tenant in accordance with the provisions of paragraph 11.2 hereof shall, nevertheless, be paid for by Tenant Utilities and services required at other times shall be subject to advance request and payment by Tenant to Landlord of Landlord's charges therefor.

11.4   **Excess Usage by Tenant.**   Tenant shall not install or use any machinery or equipment in or about the Premises that uses excess water, lighting or power, or suffer or permit any act that, in Landlord's opinion, causes or would cause extra burden upon the utilities or services, including, but not limited to, security services, over standard office usage for the Office Building Project. Tenant shall pay Landlord for any excess expenses or costs that may arise out of a breach of this subparagraph by Tenant. Landlord may, in its sole discretion, install, at Tenant's expense, supplemental equipment and/or separate metering applicable to Tenant's excess usage or loading. Landlord acknowledges that Tenant will use as standard office equipment computers, copiers and fax machines.

11.5   **Interruptions.**   There shall be no abatement of rent and Landlord shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or any other cause of any kind or nature whatsoever or in cooperation with governmental request or direction

## 12.   ASSIGNMENT AND SUBLETTING

12 1   **Landlord's Consent Required.**   Tenant shall not voluntarily or by operation of law assign or mortgage, sublet, or otherwise transfer or encumber all or any part of this Lease or in the Premises, without Landlord's prior written consent, which consent shall not be unreasonably withheld in accordance with paragraph 12 6, and any attempt thereat shall be void and of no force or effect and shall constitute a material default and breach of this Lease without the need for notice to Tenant under paragraph 13.1. "Transfer", within the meaning of this paragraph 12, shall include the transfer or transfers aggregating fifty percent or more of the outstanding stock of tenant

12.2   **Tenant Affiliate.**   Notwithstanding the provisions of paragraph 12.1 hereof, Tenant may assign this Lease or sublet the Premises, or any portion thereof, without Landlord's consent, to any corporation which controls, is controlled by or is under common control with Tenant, or to any corporation resulting from the merger

© Stephen J. Fitch

12

12 1007 3

or consolidation with Tenant, or to any person or entity which acquires all of the assets of Tenant as a going concern of the business that is being conducted on the Premises, all of which are referred to as "Tenant Affiliate"; provided that before an assignment shall be effective, (a)the assignee shall, in writing, assume, in full, the obligations of Tenant under this Lease and (b)Landlord shall be given written notice of such assignment and assumption. Any such assignment shall not, in any way, affect or limit the liability of Tenant under the terms of this Lease even if after such assignment the terms of this Lease are materially changed or altered without the consent of Tenant whose consent shall not be necessary therefor.

12.3    Terms and Conditions Applicable to Assignment and Subletting.

(a)    No assignment or subletting shall release Tenant of Tenant's obligations hereunder, including, but not limited to, Tenant's share of Operating Expenses, and to perform all covenants, agreements, terms, provisions and conditions to be kept and performed by Tenant hereunder.

(b)    Landlord may accept rent from any person other than Tenant pending approval or disapproval of an assignment. The acceptance of such rent shall not constitute acceptance of the proposed assignment.

(c)    Neither a delay in the approval or disapproval of an assignment or subletting nor an acceptance of rent, shall constitute a waiver or estoppel of Landlord's right to exercise its remedies for the breach of any of the covenants, agreements, terms, provisions or conditions of this paragraph 12.

(d)    If Tenant's obligations under this Lease have been guaranteed by third parties, an assignment of this Lease or a sublease, and Landlord's consent thereto, at Tenant's request as required herein, shall not require the prior consent of such guarantors to such assignment or sublease

(e)    The consent by Landlord to any assignment or subletting shall not constitute consent to any subsequent assignment or subletting by Tenant or to any subsequent or successive assignment or subletting by an assignee or subtenant.

(f)    In the event of any default under this Lease, Landlord may proceed directly against Tenant, any guarantors or anyone else responsible for the performance of this Lease, including any assignee or subtenant, without first exhausting Landlord's remedies against any other person or entity responsible thereto to Landlord, or any security held by Landlord or Tenant.

(g)    Landlord's written consent to any assignment or subletting by Tenant shall not constitute an acknowledgment that no default then exists under this Lease of any of the obligations to be performed by Tenant, nor shall such consent be deemed a waiver of any than existing fault.

(h)    The discovery that any financial statement relied upon by Landlord in granting its consent to as assignment or subletting was false shall, at Landlord's election, render Landlord's consent null and void and of no force or effect.

12.4    Additional Terms and Conditions Applicable to Subletting.  The following terms and conditions shall apply to any subletting by Tenant of all or any part of the Premises and shall be deemed included in all subleases whether or not expressly incorporated therein:

(a)    Tenant hereby assigns and transfers to Landlord all of Tenant's interest in any and all rentals and income arising from any sublease heretofore or hereafter made by Tenant, and Landlord may collect such rent and income and apply same toward Tenant's obligations under this Lease provided, however, that until a default shall occur in the performance of Tenant's obligations under this Lease, Tenant may receive and collect the rent accruing under such sublease; provided, Landlord shall not, by reason of the collection of the rents from a subtenant, be deemed liable to the subtenant for any failure of Tenant to perform and comply with any of Tenant's obligations to such subtenant under such sublease. Tenant hereby irrevocably authorizes and directs any such subtenant, upon receipt of a written notice from Landlord stating that a default exists in the performance of Tenant's obligations under this Lease, to pay to landlord the rents due and to become due under the sublease  Tenant agrees

13

that such subtenant shall have the right to rely upon any such statement and request from Landlord and that such subtenant shall pay such rents to Landlord without any obligation or right to inquire as to whether such default exists and notwithstanding any notice from or claim from Tenant to the contrary, Tenant shall have no right or claim against said subtenant or Landlord for any such rents so paid by said subtenant to Landlord.

(b)      No sublease entered into by Tenant shall be effective unless and until it has been approved in writing by Landlord. In entering into any sublease, Tenant shall use only such form of sublease as is satisfactory to Landlord. Such sublease shall not be changed or modified without Landlord's prior written consent. Any subtenant shall, by reason of entering into a sublease under this Lease, be deemed, for the benefit of Landlord, to have assumed and agreed to conform and comply with each and every obligation herein to be performed by Tenant other than such obligations as are contrary to or inconsistent with provisions contained in sublease to which Landlord has expressly consented in writing; however, nothing contained herein or in such sublease shall create any privity between Landlord and such subtenant

12 5      **Landlord's Expenses.** In the event Tenant shall assign this Lease or sublet the Premises or request the consent of Landlord to any assignment or subletting or if Tenant shall request the consent of Landlord for anything or matter or in connection with this Lease, including, but not limited to, this paragraph 12, then Tenant shall pay Landlord's costs and expenses incurred in connection therewith, including attorneys', architects', engineers', consultants' or other fees and an amount not to exceed the actual amount of billing for services required by Tenant's rights hereunder, or Seven Hundred Fifty Dollars ($750 00), whichever the greater.

12.6      **Conditions to Consent.** Landlord reserves the right to condition any approval to assign this Lease or sublet all or a portion of the Premises upon Landlord's determination that (a)the proposed assignee or proposed subtenant shall conduct a business at the Premises consistent with the general character of the other occupants of the Office Building Project and not in violation of any exclusive or rights then held by other tenants or occupants and (b)the proposed assignee or proposed subtenant be, in Landlord's opinion, at least as financially responsible as Tenant was expected to be at the time of the execution of this Lease or of such assignment or subletting, whichever is greater. Provided, in the reasonable judgment of Landlord, a proposed assignee or a proposed subtenant is financially responsible with respect to its proposed obligations and is of a character and engaged in a business which is in keeping with the standards of the Office Building Project, Landlord agrees it will not unreasonably withhold or delay its consent to such proposed assignment or proposed subletting upon, and subject, however to all the provisions of this paragraph 12.

13.      DEFAULT; REMEDIES

13.1      **Default.** The occurrence of any one or more of the following events shall constitute a default of this Lease by Tenant

(a)      The vacation or abandonment of the Premises by Tenant shall be defined as the failure by Tenant to occupy the Premises for a continuous period of fifteen (15) days or more whether or not rent is paid.

(b)      The breach by Tenant of any of the covenants, conditions or provisions of paragraphs 7.3(a),(b), or (d), 12.1, 13.1(f), 16(a), 30.2, 33, or 40.1, all of which are hereby deemed to be material, non-curable defaults without the necessity of any notice, except as otherwise provided by this Lease

(c)      The failure of Tenant to pay or cause to be paid when due any rent, monies, or charges required by this Lease to be paid by Tenant when such failure continues for a period of three (3) days after written notice thereof from Landlord to Tenant.

(d)      The failure by Tenant to observe or perform any of the covenants, agreements, terms, conditions or provisions of this Lease to be observed or performed by Tenant other than those referenced in subparagraphs (a),(b) and (c), above, where such failure shall continue for a period of ten (10) days after written notice thereof from Landlord to Tenant; provided, however, that if the nature of Tenant's noncompliance is such that more than ten (10) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within said ten (10) day period and thereafter diligently pursues such cure to completion within thirty (30) days after such written notice from Landlord. To the extent permitted by law, such ten

(10) days notice shall constitute the sole and exclusive notice required to be given to Tenant under applicable Unlawful Detainer statutes.

(e)     (i)The making by Tenant of any general arrangement or general assignment for the benefit of creditors; (ii)Tenant becoming a "debtor" as defined in 11 U.S.C. 101 or any successor statute thereto [unless, in the case of a petition filed against Tenant, the same is dismissed within sixty (60) days of this filing of such petition]; (iii)The appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Premises of Tenant's interest in this Lease, where such seizure is not discharged within thirty (30) days. In the event that any provision of this paragraph 13.1(e) is contrary to any applicable law, such provision shall be of no force or effect.

(f)     The discovery by Landlord that any financial statement given to Landlord by Tenant, or its successor in interest, or by any guarantor of Tenant's obligation hereunder was false.

13.2    Remedies.  In the event of any default or breach of this Lease by Tenant, Landlord may, at any time thereafter, with or without notice or demand, and without limiting Landlord in the exercise of any right or remedy which Landlord may have by reason of such default:

(a)     Terminate Tenant's right to possession of the Premises by any lawful means, in which case this Lease and the term hereon shall terminate and Tenant shall immediately surrender possession of the Premises to Landlord. In such event, Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of Tenant's default including, but not limited to: (i) the cost of recovering possession of the Premises; (ii) the expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees and any real estate commission actually paid, (iii) the worth, at the time of the award, of the unpaid rent that had been earned at the time of the termination of this Lease; (iv) the worth, at the time of the award, of the amount by which the unpaid rent would have been earned after the time of termination of this Lease until the time of the award exceeds the amount of the loss of rent that Tenant proves could have been reasonably avoided, (v) the worth, at the time of the award, of the amount by which the unpaid rent for the balance of the Lease Term after the time of award exceeds the amount of the loss of rent that Tenant proves could have been reasonably avoided; and (vi) that part of the leasing commission paid by Landlord pursuant to paragraph 15 applicable to the unexpired term of this Lease.

(b)     Maintain Tenant's right to possession in which case this Lease shall continue in effect whether or not Tenant shall have vacated or abandoned the Premises  In such event, Landlord shall be entitled to enforce all of Landlord's rights and remedies under this Lease, including the right to recover rent as it become due hereunder.

(c)     Pursue any other remedy now or hereafter available to Landlord under the laws or judicial decisions of the state wherein the Premises are located.

13.3    The Worth at Time of The Award.  "The worth at the time of the award", as used in subparagraphs (a) (iii) and (a) (iv) above, is to be computed by allowing interest at the rate of ten (10%) percent per annum.  "The worth at the time of the award", as referred to in subparagraph (a)(v) above is to be computed by discounting the amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award plus two (2%) percent.

13.4    Late Charges.  Tenant hereby acknowledges that late payment by Tenant to Landlord of rent, Tenant's Share of Operating Expenses or any other sum due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount which will be difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges and late charges which may be imposed on Landlord by the terms of any mortgage or trust deed covering the Office Building Project  Accordingly, if any installment of rent, Operating Expenses, or any other sums due from Tenant shall not be received by Landlord or Landlord's designee within ten (10) days of the date upon which it is due, Tenant shall pay to Landlord a late charge equal to Ten (10%) percent of such overdue amount  The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of late payment by Tenant.

14.    CONDEMNATION

        If the Premises or the Office Building Project, or any portion thereof, are taken under the power of eminent domain, or sold under the threat of the exercise of said power (all of which are herein called "Condemnation"), this Lease shall terminate as to the part so taken as of the date of the condemning authority takes title or possession, whichever first occurs; provided, if more than fifty (50%) percent of the Premises are taken by Condemnation, Tenant shall have the option, to be exercised in writing within thirty (30) days after Landlord shall have given Tenant written notice of such taking (or in the absence of such notice, within thirty (30) days after the condemning authority shall have taken possession), to terminate this Lease as of the date the condemning authority takes such possession. If Tenant does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the premises remaining, except that the rent and Tenant's Share shall be reduced in the proportion that the floor area of the Premises taken bears to the total floor area of the Premises. Common Areas taken shall be excluded from the Common Area usable by Tenant and no reduction of rent shall occur with respect thereto or by reason thereof. In the event of a Condemnation, landlord shall have the option, in its sole discretion, to terminate this Lease as of the date of the taking of possession by the condemning authority, by giving written notice to Tenant of such election within thirty (30) days after receipt of notice of a taking by Condemnation of any part of the Premises or the Office Building Project. any aware for the taking of all or any part of the Premises or the Office Building Project under the power of eminent domain or any payment made under threat of the exercise of such power shall be the property of Landlord, whether such award shall be made as compensation for diminution in value for the leasehold or for the taking of the fee or as severance damages. Tenant shall be entitled to make a separate claim and receive an award for (i)the unamortized value of improvements to the Premises made by Tenant, at Tenant's sole cost and expense, and which are removable by Tenant at the expiration of the term hereof pursuant to the terms of this Lease; (ii)an amount equal to any excess in the market value of the Premises, exclusive of Tenant's improvements or alterations for which Tenant is compensated pursuant to provisions hereof, for the remainder of the term, over the present value at the date of taking of the minimum monthly rent payable for the remainder of the term; and (iii)an amount determined to be equal to the loss of good will; provided, however, no such separate claim by Tenant shall reduce the award to which Landlord would be entitled if Tenant had not made such separate claim. In the event that this Lease is not terminated by reason of such Condemnation, Landlord shall, to the extent of severance damage received by Landlord in connection with such Condemnation, repair any damage to the Premises caused by such Condemnation.

15.    BROKER'S FEE

        Tenant warrants that Tenant has had no dealing with any broker or agent in connection with this Lease other than Travis Lyon of Sperry Van Ness Valley Commercial Real Estate  Tenant covenants and agrees to indemnify and hold Landlord harmless from and against any and all loss, cost, damage, expense or liability for any compensation, commissions or charges of any kind of nature whatsoever claimed by any broker or agent (licensed or otherwise) other than Sperry Van Ness Valley Commercial Real Estate  with respect to this Lease or the procurement, negotiation or execution thereof.  Landlord shall compensate Travis Lyon of Sperry Van Ness Valley Commercial Real Estate pursuant to a separate written agreement.

16.    ESTOPPEL CERTIFICATE

        (a)    Tenant shall, upon not less than five (5) days prior written notice from Landlord, execute, acknowledge and deliver to Landlord a statement in writing, in the form attached hereto as Exhibit "E", (i)certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect) and the date to which the rent and other sums or charges are paid in advance, if any, and (ii)acknowledging that there are no uncured defaults on the part of Landlord, or specifying any defaults that are claimed  Any such statement may be conclusively relied upon by any prospective purchaser or mortgagee of the Office Building Project or any part thereof or to any other who Landlord shall have delivered such statement to.

        (b)    The failure to deliver such statement within such time shall be a material default by Tenant under this Lease, without any further notice to Tenant, or it shall be conclusive upon Tenant that (i) this Lease is in full force and effect, without modification except as may be represented by Landlord (ii) there are no uncured defaults of Landlord and (iii) not more than one month's rent has been paid in advance.

© Stephen J. Filch                                                                                                                                   12 1007.3

(c)     In the event Tenant does not comply with Landlord's request for the execution of an estoppel certificate, Landlord shall be deemed to be Tenant's attorney-in-fact to execute such certificate on Tenant's behalf.

(d)     If Landlord desires to finance, refinance, or otherwise encumber the Office Building Project, or any part thereof, Tenant hereby agrees to deliver to any lender or other entity or individual designated by Landlord such financial statements of Tenant as may be reasonably required by such lender or other entity or individual.

## 17.     LANDLORD'S TRANSFER OF OWNERSHIP

(a)     The term "Landlord" as used herein shall mean only the owner or owners of the fee title or a lessee's interest in a ground lease of the Office Building Project.

(b)     Notwithstanding any other provisions of this Lease, Landlord may assign, in whole or in part, Landlord's interest in this Lease and may sell, exchange or master lease all or part of the real estate of which the Premises are a part. In the event of any sale or exchange of the Premises by Landlord and assignment by Landlord of this Lease, Landlord shall be and is hereby entirely freed and relieved of all liability under any and all covenants and obligations contained in or derived from this Lease or arising out of any act, occurrence or omission relating to the Premises which occurs after the consummation of such sale, exchange, or assignment.

## 18.     SEVERABILITY

The invalidity of any provision of this Lease as determined by a court of competent jurisdiction shall in no way affect the validity of this Lease or any other provisions hereof.

## 19.     INTEREST ON PAST-DUE OBLIGATIONS

Except as expressly herein provided, any amount due Landlord or Tenant not paid when due shall bear interest at the maximum rate permitted by law from the date such payment was due until the date such payment is actually received. Payment of such interest shall not excuse or cure any default by Tenant under this Lease.

## 20.     TIME OF ESSENCE

Time is of the essence with respect to the performance by Tenant of its obligations under this Lease

## 21.     ADDITIONAL RENT

All monetary obligations of Tenant to Landlord under the terms of this Lease, including any other sums charges payable by Tenant hereunder, shall be deemed to be additional rent and Landlord may recover same in the same manner as recovery of rent.

## 22.     INCORPORATION OF PRIOR AGREEMENTS; AMENDMENTS

This Lease contains all of the agreements of the parties with respect to any matter mentioned herein. NO prior or contemporaneous agreement or understanding pertaining to any such matter shall be effective This Lease may be modified in writing only signed by the parties in interest at the time of the modification Except as otherwise stated in this Lease, Tenant hereby acknowledges that neither the real estate broker listed in paragraph 15 hereof nor any cooperating broker on this transaction nor the Landlord or any employee or agents of any said persons had made any oral or written warranties or representations to Tenant relative to the condition or use by Tenant of the Premises or the Office Building Project and Tenant acknowledges that Tenant assumed all responsibility regarding the Occupational Safety Health Act, the legal use and adaptability of the Premises and compliance thereof with all applicable laws and regulations in effect during the term of this Lease

## 23.     NOTICES

© Stephen J. Fitch                                                                                   12 1007.3

Any notice, consent, approval, request, bill demand or statement hereunder by either party to the other party shall be in writing and shall be deemed to have been duly given when mailed if sent by registered or certified mail, return receipt requested, addressed to such other party, which address for Landlord shall be 124 W Main Street, Suite 240, El Cajon, CA 92020, and for Tenant shall be the Premises (or Tenant's address as hereinbefore set forth if mailed prior to Tenant's occupancy of the Premises), of it the address of such other party for such notices, consents, approvals, requests, bills, demands or statements shall have been duly changed as hereinafter provided, if mailed, as aforesaid, to such other party at such changed address.

Either party may at any time change the address for such notices, consents, approvals, requests, bills, demands or statements by delivering or mailing, as aforesaid, to the other party a notice stating the change and setting forth the changed address. If the term "Tenant" as used in this Lease refers to more than one person, any notice, consent, approval, request, bill, demand or statement given as aforesaid to any one of such persons shall be deemed to have been duly given to Tenant. Notwithstanding the foregoing, bills and statements by Landlord to Tenant for rent, additional rent, Common Area charges or other sums or charges payable to Tenant to Landlord may be delivered personally r sent by regular mail.

## 24.    WAIVERS

No waiver by Landlord of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by Tenant of the same or any other provision. Landlord's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any subsequent act by Tenant. The acceptance of rent hereunder by Landlord shall not be a waiver of any breach by Tenant of any provision hereof regardless of Landlord's knowledge of such breach at the time of acceptance of such rent

## 25.    RECORDING

Tenant shall not record this Lease or any memorandum thereof and any attempt thereat shall be void and of no force or effect.

## 26.    HOLDING OVER

If Tenant, without Landlord's consent, remains in possession of the Premises or any part thereof after the expiration of the term hereof, such occupancy shall be deemed to be a tenancy from month to month upon all the provisions of this Lease pertaining to the obligations of Tenant, except that the rent payable shall be one hundred and fifty (150%) percent of the rent and additional rent payable immediately preceding the termination date of this Lease and all options, if any, granted under the terms of this Lease shall be deemed terminated and be of no further effect during said month to month Tenant; provided, however, nothing contained herein shall be deemed to prevent or preclude Landlord from recovery from Tenant of such damages that Landlord may suffer, directly or indirectly, as a result of such holding over.

## 27.    CUMULATIVE REMEDIES

No remedy or election by Landlord hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity

## 28.    COVENANTS AND CONDITIONS

Each provision of this Lease to be performed by Tenant shall be deemed both a covenant and a condition.

## 29.    BINDING EFFECT; CHOICE OF LAW

Subject to any provisions hereof restricting assignment or subletting by Tenant and subject to the provisions of paragraph 17, this Lease shall bind the parties, their personal representatives, and successors and permitted assigns  This Lease shall be governed by the laws of the State of California and any litigation concerning this Lease between the parties hereto shall be initiated in the Superior Court for the County of San Diego.

18

## 30. SUBORDINATION

30.1    This Lease is subject and subordinate in all respects to all ground leases and/or underlying leases now or hereafter covering the Building or the Office Building Project of which the Premises forms a part and to all mortgages which may now or hereafter be placed on or affect such leases and/or Building and/or Office Building Project and/or Landlord's interest therein, and to each advance made and/or hereafter to be made under any such mortgage, and to all renewals, modifications, consolidations, replacements, assignments and extensions thereof and all substitutions of and for such ground leases and/or underlying leases and/or mortgages. This paragraph 30.1 shall be self-operative and no further instrument of subordination shall be required. In confirmation of such subordination, Tenant shall execute and deliver promptly any certificate that Landlord and/or any mortgagee and/or the lessor under any ground or underlying lease and/or their respective successors in interest may request. Tenant hereby constitutes and appoints landlord and/or any mortgagee and/or the lessor under any ground or underlying lease and/or their respective successors in interest Tenant's attorney-in-fact to execute and deliver any such certificate of certificates for and on half of Tenant.

30.2    Without limitation of any of the provisions of this Lease, if, at any time during the term of this Lease, Landlord shall be the holder of a leasehold estate covering the Building or Office Building Project of which the Premises forms a part and if such leasehold estate shall terminate or be terminated for any reason, Tenant agrees, at the election and upon demand of any owner of the Building or Office Building Project of which the Premises form a part, or of any mortgagee in possession thereof, or of any holder of a leasehold hereafter affecting the Building or Office Building Project of which the Premises form a part, to attorn, from time to time, to any such owner, mortgagee or holder, upon the terms and conditions set forth herein for the remainder of the term demised in this Lease. The foregoing provisions shall endure to the benefit of any such owner, mortgagee or holder, shall apply to the tenancy of Tenant notwithstanding that this Lease may terminate upon the termination of any such leasehold estate, and shall be self-operative upon any such demand, without requiring any further instrument to give effect to said provisions. Tenant, however, upon demand of any such owner, mortgagee or holder, agrees to execute, from time to time, an instrument in confirmation of the foregoing provisions, satisfactory to such owner, mortgagee or holder, in which same as those set forth herein and shall apply for the remainder of the term originally demised in this Lease. Nothing contained in this paragraph 30.2 shall be construed to impair any right, privilege or option of any such owner, mortgagee or holder.

30.3    The term "mortgage(s)" as used in this Lease shall include any mortgage or any deed of trust. The term "mortgagee(s)" as used in this Lease shall include any mortgagee or any trustee under a deed of trust. The term "mortgagor(s)" as used in this Lease shall include any mortgagor or any grantor under a deed of trust.

## 31. ATTORNEY'S FEES

31.1    If either Party brings action to enforce the terms hereof or declare rights hereunder, and shall prevail in any such action, trial, or appeal thereof, the prevailing Party shall be entitled to attorney's fees to be paid by other Party whether or not such action is pursued to decision or judgment.

31.2    The attorney's fee award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees incurred.

31 3    Landlord shall be entitled to attorney's fees and all other costs and expenses incurred in the preparation and service of notice of default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such default.

## 32. LANDLORD'S ACCESS

32.1    Landlord and Landlord's agents shall have the right to enter the Premises at reasonable times upon twenty-four (24) hours prior notice (which notice may be oral) for the purpose of inspecting the same, performing any services required of Landlord, showing the same prospective purchasers, lenders, or tenants, taking such safety measures, erecting such scaffolding or other necessary structures, making such alterations, repairs, improvements or

19

additions to the Premises or to the Office Building Project as Landlord may deem necessary, appropriate or desirable and the erecting, using and maintaining of utilities, service, pipes and conduits through the Premises and/or other premises. Landlord may, at any time, place on or about the Premises or the Office Building Project any ordinary "For Sale" signs and Landlord may during the last twelve (12) months of the term hereof place on or about the Premises ordinary "For Lease" signs. Landlord shall have the right to enter the Premises at any time during an emergency.

      32.2    Landlord shall have the right to retain keys to the Premises and to unlock all doors in or upon the Premises other than to files, vaults or safes, and, in the case of emergency, to enter the Premises by any appropriate means and Landlord shall not be liable to Tenant for any loss or damage as a result of Landlord's retention of such keys or any entry by Landlord into the Premises.

      32.3    No entry by Landlord pursuant to the provisions hereof shall constitute an eviction or constructive eviction.

### 33.    AUCTION

      Tenant shall not conduct, nor permit to be conducted either voluntarily or involuntarily, any auction upon the Premises or the Common Areas. The holding of any auction on the Premises or Common Areas in violation of this paragraph shall constitute a material default of this Lease

### 34.    SIGNS

      Tenant shall not place any sign upon the Premises or the Office Building Project or any roof thereof, without Landlord's prior written consent. Notwithstanding the foregoing, Tenant shall have the right, subject to Landlords written approval of the plans, at Tenant's sole cost and expense, to install a sign on the exterior of the top east facing side of the Building in accordance with Exhibit "D" attached hereto, provided Tenant complies with all laws, orders, rules and regulations of all governmental authorities having jurisdiction and otherwise complies with all of the covenants, agreements, terms, provisions and conditions of this Lease. Tenant shall send a copy to Landlord, for landlord's files, any and all permits necessary for the above.

### 35.    MERGER

      The voluntary or other surrender of this Lease by Tenant, or a mutual cancellation thereof, or a termination by Landlord, shall not work a merger, and shall, at the option of the Landlord, terminate all or any existing subtenancies or may, at the option of Landlord, operate as an assignment to Landlord of any such subtenancies.

### 36.    LANDLORD'S CONSENT

      If, pursuant to any provision of this Lease, Landlord shall withhold its consent or approval to anything or matter requested by Tenant, Tenant shall not be entitled to bring or institute any action or other proceeding for damages or for any other remedy of any kind or nature whatsoever and Tenant agrees to waive, and does hereby waive, any rights that it may have to bring any such action or other proceeding.

### 37.    QUIET POSSESSION

      Upon Tenant paying the rent for the Premises and observing and performing all of the covenants, agreements, terms provisions and conditions of this Lease on Tenant's part to be observed and performed hereunder, Tenant shall have quiet possession of the Premises for the entire term hereof subject to the provisions of this Lease and to any and all present or future mortgages, deeds of trust and ground or underlying leases.

### 38.    SECURITY MEASURES-LANDLORD'S RESERVATIONS

      38.1    Landlord may, but is not obligated under the terms of this Lease, to provide security measures for the benefit of the Premises or the Building. Tenant may provide security measures approved by Landlord at no cost to Landlord;

20

38 2    Without limiting any other right of Landlord, Landlord shall have the right to do the following:

(a)    To change the name or title of the Building in which the Premises are located and the Office Building Project.

(b)    At Landlord's expense, to provide and install Building Standard graphics at the entry of the Premises and such portion of the Common Areas as Landlord shall deem appropriate.

(c)    To permit any tenant the exclusive right to conduct any business as long as such exclusive right does not conflict with any rights expressly given herein.

(d)    To place such signs, notice or displays as Landlord deems necessary, appropriate or desirable upon the roof, exterior of the Building or the Office Building Project or on pole signs in the Common Areas.

38.3    Tenant shall not suffer or permit anyone to go upon the roof of the Building.

## 39.    EASEMENTS

39.1    Landlord reserves to itself the right, from time to time, to grant such easements, rights and dedications that Landlord deems necessary, appropriate or desirable, and to cause the recordation of Parcel Maps and restrictions. Tenant shall execute any documents required in connection with the foregoing upon request of Landlord and failure to do so shall constitute a material default of this Lease by Tenant without the need for further notice to Tenant. Tenant hereby constitutes Landlord as Tenant's attorney-in-fact to execute any such documents if Tenant fails to do so.

39.2    The obstruction of Tenant's view, air, or light by a structure erected in the vicinity of the Building, whether the Landlord or third parties, shall in no way affect this Lease or impose any liability upon Landlord.

## 40.    LIMITATION OF LANDLORD'S LIABILITY

Tenant shall look solely to the estate and interest of Landlord, its successors and assigns in the Building for the collection of a judgment or other judicial process requiring the payment of damages or money by Landlord or in the event of any default by Landlord hereunder and no other property or assets of Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under and with respect to this Lease, the relationship of Landlord and Tenant hereunder, Tenant's use and occupancy of the Premises or otherwise.

## 41.    AUTHORITY

If Tenant is a corporation, trust or general or limited partnership, Tenant, and each individual executing this Lease on behalf of such entity, represent and warrant that such individual is duly authorized to execute and deliver this Lease on behalf of said entity. If Tenant is a corporation, trust or partnership, Tenant shall, within thirty (30) days after execution of this Lease, deliver to Landlord evidence of such authority.

## 42.    CONFLICT

Any conflict between the printed provisions, Exhibits or Addenda of this Lease and the typewritten or handwritten provisions, if any, shall be controlled by the typewritten or handwritten provisions.

## 43.    NO OFFER

This Lease shall become binding upon Landlord and Tenant only when fully executed by both parties and a fully executed counterpart hereof is delivered by Landlord and Tenant.

## 44.    LENDER MODIFICATION

21

Tenant agrees to make such reasonable modifications to this Lease as may be required by an institutional lender in connection with the obtaining of financing or refinancing of the Office Building Project, but not those affecting term or rent payable.

45.    OPTION TO RENEW.    [Intentionally omitted]

46.    TENANT IMPROVEMENT ALLOWANCE.  [Intentionally omitted]

47.    MULTIPLE PARTIES

If more than one person or entity is named as either Landlord or Tenant herein, except as otherwise expressly provided herein, the obligations of the Landlord or Tenant herein shall be joint and several responsibility of all persons or entities named herein as such Landlord or Tenant respectively.

48.    LIMITATION OF LIABILITY.

48.1   Agreement by Tenant.

(a)  In consideration of the execution of this Lease by Landlord, Tenant agrees in the event of any actual or alleged failure, breach, or default hereunder by Landlord: (1) The sole and exclusive remedy shall be against the partnership and its partnership assets; (2) no partner of Landlord should be sued or named as a party in any suit or action (except as may be necessary to secure jurisdiction of the partnership); and (3) no judgment will be taken against any partner of Landlord  These covenants and agreements are enforceable both by Landlord and also by any partner of Landlord.

(b)  Notwithstanding anything to the contrary in this Lease, any judgment obtained by Tenant against Landlord shall be satisfied only out of Landlord's interest in the Center of which the Premises form a part and the rents receivable by Landlord therefrom. Neither Landlord nor any of its general or limited partners, officers, directors, shareholders, beneficiaries or employees shall have any personal liability for any matter in connection with this Lease or its obligations as Landlord of the Premises, except as provided above. Tenant shall not institute, seek or enforce any personal or deficiency judgment against Landlord or any of its general or limited partners, officers, directors, shareholders, beneficiaries, or employees, and none of their property, except the Center, shall be available to satisfy any judgment hereunder.

(c)  Tenant agrees that each of the foregoing covenants and agreements shall be applicable to any covenant or agreement either expressly contained in this Lease or imposed by statute or at common law.

49.    SPECIAL PROVISIONS:

49.1   Legal Representation.  Landlord and Tenant each acknowledge, warrant and represent to the other that it has had an adequate opportunity to seek the advice of legal counsel of its choice prior to entering into this Lease, that such opportunity was undertaken or waived by the free and voluntary act of such party, and that each party waives and covenants to forego and/or forebear from the assertion of any claim or defense that this Lease is not a valid and binding obligation upon it by reason of the failure to secure or receive adequate legal representation.

49.2   General.  By insertion of numbers in the following blanks, Landlord and Tenant acknowledge that Paragraph(s) N/A  is/are attached hereto and made a part hereof. If numbers have not been set forth in the blank in this Paragraph 49 3, it is conclusive that no additional provisions are a part of this Lease.

49 3   Non-Discrimination.  The Tenant herein covenants by and for itself, its officers, directors, successors and assigns and all persons claiming under or through it, and this Lease is made and accepted upon and subject to the following conditions:

There shall be no discrimination against or segregation of, any person or group of persons on account of race, color, creed, religion, sex, marital status, ancestry or national origin in the leasing, subleasing, transferring, use,

22

occupancy, tenure, or enjoyment of the land herein leased nor shall the Lessee itself, or any person claiming under or through it, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, use or company of tenants, lessees, sublessees, subtenants or vendees in the premises herein leased.

    49.4   Condition Precedent. Tenant acknowledges that the a portion of the Premises (i.e. the third floor) is subject to a Right of First Offer on Additional Space held by PUBLIC CONSULTING GROUP, INC., a Massachusetts corporation. Landlord has provided notice to PUBLIC CONSULTING GROUP, INC. pursuant to the terms of their lease regarding the lease offer represented by the terms of this Lease. PUBLIC CONSULTING GROUP, INC. did not exercise its right to lease the additional space. A copy of said action by PUBLIC CONSULTING GROUP, INC. shall be provided to Tenant. Should this Lease not be executed within the required time frame set forth in the Right of First Offer on Additional Space held by PUBLIC CONSULTING GROUP, INC. or the terms set forth in the notice provided by Landlord to PUBLIC CONSULTING GROUP, INC. are materially changed then Tenant further acknowledges that Landlord will be required to provide to PUBLIC CONSULTING GROUP, INC. a new notice pursuant to the Right of First Offer on Additional Space. Should Landlord be required to provide such new notice and should PUBLIC CONSULTING GROUP, INC exercise their right and sign a lease for such additional space (i.e. the third floor) than this Lease shall at the option of Tenant (i) terminate upon written notice from Tenant to Landlord or (ii) remain in affect with the Premises being reduced to the 1st floor and the Rent shall be adjusted accordingly. In the event Tenant elects to continue to lease the reduced square footage, Landlord and Tenant shall execute a lease amendment setting forth the reduced square footage and the new rent.

[Remainder of page left intentionally blank]

© Stephen J Fitch

12 1007.3

50.    **ATTACHMENTS**

Attached hereto are the following documents which constitute a part of this Lease.

| SCHEDULE "A" | Lease Commencement |
| EXHIBIT "A" | Demised Premises |
| EXHIBIT "B" | Rules and Regulations |
| EXHIBIT "C" | Parking Rules |
| EXHIBIT "D" | Sign Criteria |
| EXHIBIT "E" | Estoppel Certificate |
| EXHIBIT "F" | List of Improvements |

LANDLORD AND TENANT HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN AND, BY EXECUTION OF THIS LEASE, SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LANDLORD AND TENANT WITH RESPECT TO THE PREMISES.

THIS LEASE HAS BEEN FILLED IN AND PREPARED FOR SUBMISSION TO YOUR ATTORNEY FOR HIS/HER APPROVAL. NO REPRESENTATION OR RECOMMENDATION IS MADE AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION RELATING THERETO THE PARTIES SHALL RELY SOLELY UPON THE ADVICE OF THEIR OWN LEGAL COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.

**Landlord**

PROMENADE SQUARE, LLC.,
a California limited liability company

By
Daryl R. Priest, Manager

**Tenant**

BORREGO COMMUNITY HEALTH FOUNDATION
a California corporation

By: _____
Name: _____
Its: _____

© Stephen J. Fitch

24

12.1007.3

50.    **ATTACHMENTS**

Attached hereto are the following documents which constitute a part of this Lease.

| | |
|---|---|
| SCHEDULE "A" | Lease Commencement |
| EXHIBIT "A" | Demised Premises |
| EXHIBIT "B" | Rules and Regulations |
| EXHIBIT "C" | Parking Rules |
| EXHIBIT "D" | Sign Criteria |
| EXHIBIT "E" | Estoppel Certificate |
| EXHIBIT "F" | List of Improvements |

LANDLORD AND TENANT HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN AND, BY EXECUTION OF THIS LEASE, SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LANDLORD AND TENANT WITH RESPECT TO THE PREMISES.

THIS LEASE HAS BEEN FILLED IN AND PREPARED FOR SUBMISSION TO YOUR ATTORNEY FOR HIS/HER APPROVAL. NO REPRESENTATION OR RECOMMENDATION IS MADE AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION RELATING THERETO THE PARTIES SHALL RELY SOLELY UPON THE ADVICE OF THEIR OWN LEGAL COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.

**Landlord**

PROMENADE SQUARE, LLC ,
a California limited liability company

By: _____
    Daryl R. Priest, Manager

**Tenant**

BORREGO COMMUNITY HEALTH FOUNDATION
a California corporation

By: _____
Name: _____
Its: _____

## SCHEDULE "A"

ATTACHED HERETO AND MADE A PART OF THIS LEASE DATED SEPTMBER __, 2012, ENTERED INTO BY AND BETWEEN PROMENADE SQUARE, LLC., a California limited liability company, LANDLORD, AND BORREGO COMMUNITY HEALTH FOUNDATION, a California corporation, TENANT, SCHEDULE "A" IS SET FORTH IN AGREEMENT BY THE PARTIES AS FOLLOWS:

Landlord and Tenant declare the possession of the Premises, Suite 300 of the Building Project was accepted by Tenant on _____, 2013. That the Lease commencement date is hereby established to be_____, 2013; that the Lease term expires _____, 2033; the Lease is as of the date below in full force and effect; and that Landlord and Tenant have fulfilled all their respective obligations as to the commencement of this Lease

Landlord and Tenant hereby acknowledge that the total rentable square feet of the demised premises is 16,383; the monthly rent is $41,749.52 and the Security Deposit in Landlord's possession is $46,673 42

### LANDLORD

PROMENADE SQUARE, LLC.,
a California limited liability company

By. _____
    Daryl R. Priest, Manager


Dated: _____, 2013


### TENANT

BORREGO COMMUNITY HEALTH FOUNDATION
a California corporation

By: _____
Name: _____
Its: _____


Dated· _____, 2013

© Stephen J Fitch

25

12 1007 3

EXHIBIT "A"
DEMISED PREMISES

See Floor Plan of 1st and 3rd floors attached.



PRIEST DEVELOPMENT
CORNERS PROMENADE



PRIEST DEVELOPMENT
CORNERS PROMENADE

### EXHIBIT "B"

### RULES AND REGULATIONS
### FOR STANDARD OFFICE LEASE

### GENERAL RULES

1.  Tenant shall not suffer or permit the obstruction of any Common Areas, including driveways, walkways and stairways.

2.  Landlord reserves the right to refuse access to any person Landlord, in good faith, judges to be a threat to safety, reputation, or property of the Office Building Project

3.  Tenant shall not make or permit any noise odors that annoy or interfere with other lessees or person having business within the Office Building Project.

4.  Tenant shall not keep animals or birds within the Office Building Project, and shall not bring bicycles, motorcycles or other vehicles into areas not designated as authorized for same.

5.  Tenant shall not make, suffer or permit litter except in appropriate receptacles for that purpose.

6   Tenant shall not alter any lock or install new or additional locks or bolts.

7.  Tenant shall be responsible for its inappropriate use of any toilet rooms, plumbing or other utilities.  No foreign substances of any kind are to be inserted therein.

8.  Tenant shall not deface the walls, partitions or other surfaces of the Premises or Office Building Project.

9.  Tenant shall not suffer or permit anything in or around the Premises of Building that causes excessive vibration floor loading in any part of the Office Building Project.

10.  Furniture, freight and equipment shall be moved into or out of the Building only with the Landlord's knowledge and consent, and subject to such reasonable limitations, techniques and timing, as may be designated by Landlord.  Tenant shall be responsible for any damage to the Office Building Project arising from any such activity.

11.  Tenant shall not employ any service or contractor for services or work to be performed in or on the Building except as approved by Landlord.

12.  Landlord reserves the right to close and lock the Building on Saturdays, Sundays and legal holidays and on other days between the hours of 8 p.m. and 6 a.m. of the following day  If Tenant uses the Premises during such periods, Tenant shall be responsible for security and for locking any doors it may have opened for entry.

13   Tenant shall return all keys at the termination of its tenancy and shall be responsible for the cost of replacing any keys that are lost.

14.  No window coverings, shades or awnings shall be installed or use by Tenant.

15   No lessee, employee or invitee shall go upon the roof of the Building.

16.  Tenant shall not suffer or permit smoking or carrying of lighted cigars or cigarettes in any part of the building.

17.    Tenant shall not use any method of heating or air conditioning other than as provided by Landlord

18.    Tenant shall not install, maintain or operate any vending machines upon the Premises without Landlord's written consent.

19.    The Premises shall not be used for lodging or manufacturing, cooking or food preparation.

20    Tenant shall comply with all safety, fire protection and evacuation regulations established by Landlord or any applicable governmental agency.

21.    Landlord reserves the right to waive any one of these rules or regulations, and/or as to any particular lessee, and any such waiver shall not constitute a waiver of any other rule or regulation or any subsequent application thereof to such lessee.

22.    Tenant assumes all risks from theft or vandalism and agrees to keep its Premises locked as may be required.

23.    Landlord reserves the right to make such other reasonable rules and regulations as it may from time to time deem necessary for the appropriate operation and safety of the Office Building Project and its occupants   Tenant agrees to abide by these and such rules or regulations

© Stephen J Fitch

28

## EXHIBIT "C"

### PARKING RULES

1.      Parking areas shall be used only for parking by vehicles no longer than full size, passenger automobiles herein called "Permitted Size Vehicles"   Vehicles other than Permitted Size Vehicles are herein referred to as "Oversized Vehicles".

2.      Tenant shall not permit or allow any vehicles that belong to or are controlled by Tenant or Tenant's employees, suppliers, shippers, customers, or invitee to be loaded, unloaded, or parked in areas other than those designated by Landlord for such activities.

3.      Landlord reserves the right to refuse the sale of monthly identification devices to any person or entity that willfully refuses to comply with the applicable rules, regulations, laws and/or agreements.

4.      Users of the parking area will obey all posted signs and park only in the area designated for vehicle parking.

5       Unless otherwise instructed, every person using the parking area is required to park and lock his own vehicle. Landlord will not be responsible for any damage to vehicles, injury to persons or loss or property, all of which risks are assumed by the party using the parking area.

6.      The maintenance, washing, waxing or cleaning of vehicles in the parking structure or Common Areas is prohibited.

7.      Tenant shall be responsible for seeing that all of its employees, agents and invitee comply with the applicable parking rules.

8.      Landlord reserves the right to modify these rules and/or adopt such other reasonable and non-discriminatory rules and regulations as it may deem necessary for the proper operation of the parking area.

9.      Such parking use as is herein provided is intended merely as a license only and no bailment is intended or shall be created hereby.

EXHIBIT "D"
SIGN CRITERIA

Tenant shall submit to Landlord plans for an exterior sign in conformity with the standards of the City of El Cajon.  Said plans shall show the size, color, proposed location, materials and manner of affixing to building Landlord shall review and approve, reject or modify the plans in its sole discretion in accordance with the design, aesthetics of the Building taking into to consideration the new construction of the Building

All interior signs must be pre-approved in writing by Landlord.

© Stephen J Fitch

12.1007 3

## EXHIBIT "E"

### ESTOPPEL CERTIFICATE

RE:     Date of Lease:
        Dates of Amendments to Lease:
        Landlord:
        Tenant:
        Premises:

Gentlemen:

The undersigned, as Tenant under the referenced Lease including all amendments (the "Lease") does hereby certify to _____, as follows:

    1.     The Lease is now in full force and effect and has not been modified or amended, except as noted above.

    2.     The Premises have been completed (including all repairs, replacements and maintenance obligations) in accordance with the terms of the Lease; all obligations and conditions of Landlord under the Lease, including those pertaining to construction and tenant improvements, have been satisfied; Tenant has accepted possession of said premises; and Tenant now occupies the same.

    3.     No rent, additional rent or other charges of any nature have been paid more than thirty (30) days in advance; all payments to be made shall be made strictly in accordance with the Lease; there is no charge, lien or claims of offset against future rents or other sums to become due under the Lease.

    4.     The current monthly base rent under the Lease is $_____.

    5     The current basic additional rent and other charges payable under the Lease is $_____ per annum.

    6     Tenant has paid $_____ to Landlord as a security deposit.

    7.     All rent, additional rent and other charges payable under the Lease to the date hereof are current, and the undersigned is not in default of the performance of any of its obligations, monetary or otherwise, under the Lease and the undersigned has received no notice of any such default. There are no agreements or understandings, written or verbal, allowing the undersigned any abatement or reduction of rent, or allowing the payment of rent in other than cash

    8.     There exists no defenses or offsets to enforcement of the Lease by the Landlord; and there are, as of the date hereof, regardless of the giving of notice or passage of time or both, no defaults or breaches on the part of the Landlord under the Lease which are known to the undersigned.

    9.     Tenant has not conducted nor in the future shall conduct any activity upon the Premises or upon the property of which the premises neither are a part (the Property") nor used the Premises or the Property in violation of any federal, state or local environmental or hazardous waste law, ordinance, rule or regulation.

This Estoppel Certificate shall be binding upon Tenant and its successors and assigns, and shall inure to the benefit of Landlord and its successors and assigns.

Dated: _____, 20

By:

31

© Stephen J Fitch                                                           12 1007.3

EXHIBIT "F"

LIST OF IMPROVEMENTS

Landlord shall provide the work for a turnkey build out reflecting the space plan to be provided by Tenant. Tenant shall provide Landlord, within thirty (30) days of the execution of this Lease, a detailed space plan sufficient to bid, permit and construct the required build out. Notwithstanding the preceding sentence any delivery of the space plan more than ten (10) days following execution of this Lease shall allow Landlord one day extension for each day, after 10 days, to complete the build out.    Landlord's work shall include but not be limited to the cost of materials, labor cost, contingency fees, architectural and engineering design fees, cost of drawings and printing, permitting fees, construction management fees and other all other necessary work and related cost and or fees for the Premises to be delivered both code compliant and substantially complete subject to the provisions of Section 2.1.1 of the Lease.

Work to include:

- Construction of all walls and corridors inside the premises
- Construction of lobby/reception area
- Construction of all exam rooms including one sink & cabinetry per room
- Construction of all provider offices
- Construction of all restrooms, break rooms, kitchen, etc.
- Installation of all carpet and vinyl flooring, dropped ceilings, textured drywall, and finished paint throughout the premises
- Construction to include all necessary lighting, plumbing, electrical service, data wiring, sprinkler systems, heating, ventilation, and air conditioning systems.

AMENDMENT NO. 1 TO LEASE

This **AMENDMENT NO. 1 TO LEASE** (this "Amendment No.1") is made as of the ____ day of March, 2013, by and between **PROMENADE SQUARE, LLC,** a California limited liability company ("Landlord"), and **BORREGO COMMUNITY HEALTH FOUNDATION,** a California corporation ("Tenant").

R E C I T A L S

A.      Landlord and Tenant previously entered into that certain Commercial Lease dated as of September 21, 2012 ("Lease") with respect to the lease of 133 West Main Street Floors 1 and 3 El Cajon, CA ("Premises").

B.      All defined terms used herein but not defined herein shall have the meaning ascribed to such terms in the Original Lease.

C.      Landlord and Tenant now desire to enter into this Amendment No. 1 to amend the Lease as hereinafter provided.

AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, notwithstanding anything in the Original Lease to the contrary:

1.      Section 1.5.      Section 1.5 of the Lease is hereby deleted and the following new Section 1.5 is hereby added in its place:

*1 5      Term,      Commencing on January 1, 2013 (the "Commencement Date") and terminating on December 31, 2032*

2.      Section 1 6.      Section 1.6 of the Lease is hereby deleted and the following new Section 1.6 is hereby added in its place:

*1 6      Rent,      Years 1-5, $560,897 04 per annum payable in equal monthly installments of $46,741 42 on the first day of each calendar month occurring during the term without demand, set-off, deduction or abatement of any kind, except as may otherwise be set forth herein.  Rent shall commence on the Commencement Date (January 1, 2013).*

3.      Section 1.7.      Section 1.7 of the Lease is hereby deleted and the following new Section 1.7 is hereby added in its place·

*1 7      Rent Increase. The Rent shall adjust on January 1, 2018 and thereafter as follows.*

| | | |
|---|---|---|
| *a.* | *Years 6-10 of $49,203.37.* | *$590,440.44 per annum payable in equal monthly installments* |
| *b.* | *Years 11-15 of $51,665.32.* | *$619,983 84 per annum payable in equal monthly installments* |
| *c.* | *Years 16-20 of $54,127.27.* | *$649,527 24 per annum payable in equal monthly installments* |

1

4.      Section 2 1.1.      Section 2.1.1 of the Lease is hereby deleted and the following new Section 2.1.1 is hereby added in its place.

    *2.1.1      Acceptance of Premises.  Tenant accepts the Premises "as is".  Further Tenant agrees that possession of the Premises was delivered to Tenant on January 1, 2013.*

5.      Article 46.      A new Article 46 entitled TENANT IMPROVEMENT ALLOWANCE is added as follows·

    *46.      TENANT IMPROVEMENT ALLOWANCE*

    *46.1      Tenant Improvement Allowance  Landlord shall provide a Tenant Improvement Allowance ("TI Allowance") in the amount of Eight Hundred Twenty-one Thousand and 10/100 Dollars ($821,309.10) for the construction of Tenant's improvements in the Premises, which are to be fixed in the Premises and shall remain with the Premises*

    *46 2      Construction of Improvements.  The construction of Tenant's improvements in the Premises shall be done in accordance with Section 7.3 of this Lease by licensed and insured contractors.*

    *46.3      Payment of TI Allowance   The TI Allowance shall be paid by Landlord to Tenant based on a mutually agreed upon construction draw schedule to be submitted by Tenant to Landlord for approval.  Any amount not drawn under the draw schedule shall be paid to Tenant within thirty (30) days from the later to occur of: (1) Tenant opens for business in the Building; (2) the period allowed for the filing of mechanic's liens has expired or duly executed unconditional lien waivers from all contractors, subcontractors and material men who have performed work on behalf of Tenant at the Premises are presented to Landlord; and (3) the Tenant has provided to Landlord a Certificate of Occupancy, a copy of Tenant's Recorded Notice of Completion and a complete set of "as-built" construction documents for all work performed by Tenant and/or Tenant's contractors and subcontractors.*

6.      Section 49 5      A new Section 49.5 is added as follows:

    *49 5      Rent Abatement.  Landlord shall abate rent payable by Tenant as follows· $4,991.90 for January 2013; $4,991 90 for February 2013, $46,741.42 for May 2013, $46,741.42 for June 2013; $46,741.42 for July 2013, $46,741.42 for August 2013 and $46,741.42 for September 2013.*

7      Conflict.      In the event of any conflict between the Lease and this Amendment No. 1, this Amendment No. 1 shall prevail.  Except to the extent herein modified, the Lease, as modified by the Lease Amendment, shall continue in full force and effect.

8.      Terms.      Except as specifically provided in this Amendment No. 1 all capitalized terms shall have the same meaning as defined in the Lease.

9      Counterparts.      This Amendment No. 1 may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument

[Signatures on next page]

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Amendment No. 1 as of the date first above written.

Landlord                                    Tenant

PROMENADE SQUARE, LLC.,                      BORREGO COMMUNITY HEALTH FOUNDATION
a California limited liability company       a California corporation

By:                                          By:
    Daryl R. Priest, Manager                 Name: _MARGARET  SMITH_
                                             Its: _CEO_

3

## AMENDMENT NO. 2 TO LEASE

This **AMENDMENT NO. 2 TO LEASE** (this "Amendment No.2") is made as of the ____ day of September, 2013, by and between **PROMENADE SQUARE, LLC.,** a California limited liability company ("Landlord"), and **BORREGO COMMUNITY HEALTH FOUNDATION,** a California corporation ("Tenant").

## RECITALS

A.    Landlord and Tenant previously entered into that certain Commercial Lease dated as of September 21, 2012 as amended by Amendment No. 1 to Lease ("Lease") with respect to the lease of 133 West Main Street Floors 1 and 3 El Cajon, CA ("Premises").

B.    Landlord and Tenant desire to amend the terms of the Lease to increase the tenant improvement allowance, increase rent effective October 1, 2013 and to convert the lease to a NNN lease whereby Tenant shall pay its prorate share of all operating costs including but not limited to common area expenses, insurance and taxes.

C.    All defined terms used herein but not defined herein shall have the meaning ascribed to such terms in the Lease.

C    Landlord and Tenant now desire to enter into this Amendment No. 2 to amend the Lease as hereinafter provided.

## AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, notwithstanding anything in the Original Lease to the contrary.

1.    Section 1 6    Section 1.6 of the Lease is hereby deleted and the following new Section 1.6 is hereby added in its place:

*1 6    Rent.    Rent from Commencement Date (January 1, 2013) thru September 30, 2013, $560,897.04 per annum payable in equal monthly installments of $46,741.42.   Rent from October 1, 2013 of year 1-5, $624,000 per annum payable in equal monthly installments of $52,000 on the first day of each calendar month occurring during the term without demand, set-off, deduction or abatement of any kind, except as may otherwise be set forth herein   Monthly rent shall also be known as "Base Monthly Rent" Base Monthly Rent shall commence on the Commencement Date (January 1, 2013).*

2.    Section 1 7.    Section 1.7 of the Lease is hereby deleted and the following new Section 1.7 is hereby added in its place:

*1.7    Rent Increase. The Rent shall adjust on January 1, 2018 and thereafter as follows·*

| | | |
|---|---|---|
| a | *Years 6-10 of $55,000.00.* | *$660,000.00 per annum payable in equal monthly installments* |
| b. | *Years 11-15 of $58,000.00.* | *$696,000 00 per annum payable in equal monthly installments* |
| c. | *Years 16-20 of $61,000.00.* | *$732,000 00 per annum payable in equal monthly installments* |

////

1

3.      Section 1.10.      Section 1.10 of the Lease is hereby deleted and the following new Section 1.10 is hereby added in its place:

    *1.10    Additional Rent*  *Tenant shall pay as "Additional Rent" its pro rata share of the cost of operation and maintenance of the Building Project, i.e., the cost of utilities (if not separately metered), taxes, insurance provided by Landlord, roof and structural repairs, and Common Area Expenses, and all other charges, as described and in the manner provided in Section 2.7. The Base Monthly Rent, the Additional Rent, rental adjustments and any and all other amounts, however designated, required to be paid or reimbursed by Tenant under this Lease are sometimes collectively referred to as and shall constitute "rent".*

4.      Section 2.3      Section 2 3 of the Lease is hereby deleted and the following new Section 2 3 is hereby added in its place:

    *2.3    Common Areas- Definition*  *The term "Common Area" shall include all areas within the Office Building and Building Project outside the exterior boundaries of the buildings situated thereon, including, but not limited to, streets, tunnels, driveways, parking areas, truck ways, delivery passages, access roads, loading doors, sidewalks, ramps, open and closed courts and malls, landscaped and planted areas, slopes, comfort and first aid stations, washrooms and parcel pick-up stations, exterior stairways, bus stops, retaining and decorative walls and planters, and other areas provided by Landlord and/or other Owners of portions of the Building Project, their employees and invitees. Landlord reserves the right to install kiosks and other free-standing structures within the Common Areas, and also reserves the right to make changes, alterations or additions at any time and from time to time in the size, shape, location, number and extent of the Common Areas, or any of them, and no such change shall entitle Tenant to any abatement of rent, claim or allowance for any damages for injury or inconvenience to Tenant occasioned thereby.*

5.      Section 2.6.      Section 2.6 is hereby added as follows:

    *2.6    Maintenance of Common Areas.*  *Landlord shall maintain the Common Areas in a neat, clean and orderly condition, properly lighted and landscaped as Landlord, in its reasonable discretion, shall determine. Tenant shall pay to Landlord in the manner set forth in Section 2 7 (Payment of Common Areas Expenses) Tenant's pro rata share of the expenses (hereafter "Common Areas Expenses") in connection with the maintenance and operation of the Common Areas. Tenant's pro rata share of Common Areas Expenses shall be that amount which is a fraction (or expressed as a percentage), the numerator of which shall be the total floor area of the Premises and the denominator of which shall be the total floor area of the buildings in the Building Project (or portion thereof relating to the expense). Tenant's share of Common Areas Expenses shall also include any additional costs arising from special requirements created by Tenant's use of the Premises. Common Areas Expenses shall include, but shall not be limited to, (a) all sums expended and costs incurred in connection with the Common Areas for maintenance, landscaping, pest control, lighting, cleaning, trash removal, painting, restriping, repaving, resurfacing, sweeping, security, fire protection, sprinkler and irrigation systems; maintenance and repair of sidewalks, curbs and signs (which Tenant or other occupants of the Building Project are not obligated to repair), (b) operating, managing, policing, insuring, repairing and maintaining the Building Project and, if applicable, the security offices, management offices and any non-profit community buildings located in the Building Project from time to time, and maintaining repairing and replacing roofs of the buildings in the Building Project, (c) operating, insuring, repairing, replacing and maintaining the "Common Utility Facilities" defined to include, but not limited to, sanitary sewer lines and systems, gas lines and systems, waterlines and systems, fire protection lines and systems, electric power, telephone and communication main lines and systems, HVAC equipment and systems, storm drainage and retention facilities and all other utility main lines and systems not exclusively serving the premises of any specific tenant; (d) parking charges, surcharges and other levies, assessments, or any other costs imposed or assessed by any local, state or federal government agencies in connection with the use of the parking facilities and/or the Common Utility Facilities, real and personal property taxes and assessments on the improvements and land comprising the Common Areas, depreciation and maintenance on operating machinery and equipment (if owned) and rental paid for such machinery and equipment (if rented) which machinery and equipment is used solely for*

2

the operation and maintenance of the Building Project, and (e) public liability and property damage insurance on the Common Areas and Common Facilities, fire with extended coverage insurance with vandalism and malicious mischief endorsements with, at Owner's option, earthquake damage and/or hazardous waste endorsements, rental loss coverage and any additional coverages required pursuant to Section 8 3. In the event that any alteration, removal, replacement or repair is required to be made to any equipment or any portion of the Building Project pursuant to governmental authority, statute, law or court order, all expenses associated therewith shall be included in Common Areas Expenses unless such expenses are born by a specific tenant or occupant of the Building Project. Common Area Expenses shall include property management costs, Property Management Costs shall not exceed ten percent (10%) of the gross base rents received for the entire Building Project

        Section 2 7.      Section 2.7 is hereby added as follows:

        2.7      *Payment of Common Areas Expenses*  *Prior to the commencement of each lease year or such other annual accounting period as Landlord shall utilize from time to time, Landlord shall give Tenant a written estimate of the Additional Rent payable by Tenant during the coming year. Tenant shall pay such estimated amount to Landlord in equal monthly installments, in advance, at the same time the Base Monthly Rent is paid Within ninety (90) days after the end of each lease year, or such other annual accounting period as Landlord shall utilize from time to time, Landlord shall furnish to Tenant a statement showing in reasonable detail the actual costs incurred by Landlord for the operation and maintenance of the Building Project during the year then ended, and Tenant shall pay to Landlord Tenant's proportionate share of the cost incurred in excess of the payments of Additional Rent made by Tenant within ten (10) days of receipt of such statement. In the event that the payments of Additional Rent made by Tenant exceed Tenant's share of the actual cost of the operation and maintenance of the Building Project, the amount of any such excess shall be credited by Landlord to the Additional Rent next due and owing; provided, however, that, if the Lease term has expired, Landlord shall accompany said statement with the amount due to Tenant. Notwithstanding the foregoing, Landlord shall have the right to submit statements to Tenant for unbudgeted Common Area Expenses incurred on an emergency basis, and Tenant shall remit payment on such statements for its pro rata share of such Common Area Expenses within thirty (30) days of receipt of same Tenant hereby acknowledges that major tenants (First Citizen Bank) and tenants of kiosks and similar structures, may not pay Common Area Expenses and other Additional Rent charges at all or on the same basis as Tenant herein The estimate for Additional Rent commencing on October 1 of the first lease year is $6,500 per month.*

        6.      Section 7.1.      Section 7.1 of the Lease is hereby deleted and the following new Section 7.1 is hereby added in its place:

        7.1      *Landlord's Obligations.*

        *(a)*      *General Landlord shall keep in good condition and repair the roof and structural components of the Premises and Building Project, but the cost thereof shall be prorated based upon that proportion which the Gross Floor Area of the Premises bears to the total number of leasable square feet in the building in which the Premises are located and shall be paid by Tenant in the manner set forth in Section 2.7 (Payment of Common Area Expenses). Landlord shall have no obligation to make any such repairs until Landlord has received written notice from Tenant with respect to the need for such repairs. Landlord shall not be deemed to be in default with respect to its obligation to repair unless and until Landlord has (1) received said written notice and (2) failed to make such repairs within a reasonable period following receipt of said notice. Landlord shall, after receiving written notice, exercise due diligence in making such repairs. Tenant hereby waives any provisions of law permitting Tenant to make repairs at Landlord's expense. Landlord shall enforce any construction warranties for the benefit of Tenant to the extent that they are available.*

        *(b)*      *Landlord's Right of Access. In order to perform any of its obligations under this Lease, Landlord hereby reserves to itself and its successors the right of access to the exterior walls and roof of the Premises and the right to install, maintain, use, repair and replace pipes, ducts, conduits, and*

*wires through the Premises in locations which will not materially interfere with Tenant's use thereof*

7.  Section 8.3      Section 8.3 of the Lease is hereby deleted and the following new Section 8.3 is hereby added in its place:

8.3      *Insurance Coverage by Landlord*

(a)      *Landlord shall maintain, at Tenant's expense as provided in Paragraph 8.1(b), a policy or policies of insurance protecting against the following:*

(1)      *Fire and other perils normally included in extended coverage insurance to the extent of at least ninety percent (90%) of the replacement value of the Premises, exclusive of personal property, trade fixtures and equipment belonging to Tenant and improvements and betterments made to the Premises by Tenant for which Tenant shall maintain fire and other perils insurance, which shall also name Landlord and its lenders as additional insureds.*

(2)      *Loss of rental income insurance to the extent of at least sixty percent (60%) of the annual gross rentals received by Landlord from the Building Project*

(3)      *Public liability and property damage insurance with respect to the Common Areas in an amount not less than Two Million Dollars ($2,000,000) combined single limit for both bodily injury and property damage.*

(4)      *Catastrophic, flood and additional insurance coverages as Landlord may deem appropriate in its sole and absolute discretion.*

(b)      *Tenant shall pay to Landlord, as Additional Rent in the manner set forth in Section 2 7 (Payment of Common Area Expenses), Tenant's pro rata share of the cost of the insurance required in subparagraph (a). Tenant's pro rata share of such cost shall be that proportion of the annual premiums for insurance which the Gross Floor Area of the Premises bears to the total Gross Floor Area of the premises in the Building Project covered by such insurance*

8.  Section 10.1      Section 10.1 of the Lease is hereby deleted and the following new Section 10.1 is hereby added in its place:

10 1      *Real Estate Taxes   Tenant shall also pay in the manner set forth in Sections 2.6 and 2.7 any and all "real estate taxes" (as hereafter deemed) assessed or imposed, or which become a lien upon or become chargeable against or payable in connection with the Premises, including Tenant's pro rata share of such real estate taxes which are attributable to the Common Areas. Real estate taxes for the last year of the term of this Lease shall be prorated between Landlord and Tenant as of the expiration date of the Lease term. With respect to any assessments which may be levied against or upon the Premises, or which under the laws then in force may be evidenced by improvements or other bonds and may be paid in annual installments, only the amount of such annual installment, with appropriate proration for any partial year, and interest thereon, shall be included within a computation of taxes and assessments levied against the Premises  Tenant shall be responsible for all increases in real estate taxes attributable to or caused by any organization, re-organization, purchase, sale, merger, acquisition or consolidation of Tenant, Tenant's assets or Tenant's business or by reason of any sale, assignment or recording of any transfer of interest in the Premises or the Building Project by Landlord*

9.  Section 10.3.      Section 10.3 of the Lease is hereby deleted and the following new Section 10.3 is hereby added in its place:

10 3      *Definition of Real Estate Taxes.*

(a)      *"Real estate taxes" shall mean and include each of the following.*

4

*(1)      Any form of assessment, license fee, license tax, business license fee, business license tax, commercial rental tax levy, charge, penalty, bond or tax, imposed by any authority having the direct power to tax, including any city, county, state or federal government, or any school, agricultural, lighting, drainage or other improvement or special district thereof, as against any legal or equitable interest of Landlord in the Premises or in the real property of which the Premises are a part.*

*(2)      Any tax on Landlord's right to rent or other income from the Premises or as against Landlord's business or leasing the Premises.*

*(3)      Any assessment, tax, fee, levy or charge in substitution, partially or totally, or any assessment, tax, fee, levy or charge previously included within the definition of real property tax, it being acknowledged by Tenant and Landlord that Proposition 13 was adopted by the voters of the State of California in the June 1978 election and that assessments, taxes, fees, levies and charges may be imposed by governmental agencies for such services as are protection, street, sidewalk and road maintenance, refuse removal and for other governmental services formerly provided without charge to property Owners or Occupants. It is the intention of Tenant and Landlord that all such new and increased assessments, taxes, fees, levies and charges, and similar assessments, taxes, fees, levies and charges be included within the definition of "real property taxes for purposes of this Lease*

*(4)      Any tax allocable to or measured by the Gross Floor Area of the Premises or the rent payable hereunder, including without limitation, any gross income tax or excise tax levied by the State of California, any political subdivision thereof, city, or federal government, with respect to the receipt of such rent, or upon with respect to the possession, leasing, operating, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises, or any portion thereof.*

*(5)      Any tax upon this transaction or any document to which Tenant is a party, creating or transferring an interest or an estate in the Premises*

*(b)      "Real estate taxes" shall not include Landlord's federal or state income, franchise, inheritance or estate taxes.*

10      Article 46.      Article 46 of the Lease is hereby deleted and the following new Article 46 is hereby added in its place:

### 46.      TENANT IMPROVEMENT ALLOWANCE

*46.1      Tenant Improvement Allowance.   Landlord shall provide a Tenant Improvement Allowance ("TI Allowance") in the amount of One Million Four Hundred Thousand and 00/100 Dollars ($1,400,000 00) for the construction of Tenant's improvements in the Premises, which are to be fixed in the Premises and shall remain with the Premises.*

*46.2      Construction of Improvements.   The construction of Tenant's improvements in the Premises shall be done in accordance with Section 7.3 of this Lease by licensed and insured contractors*

*46.3      Payment of TI Allowance.   The TI Allowance shall be paid by Landlord to Tenant based on a mutually agreed upon construction draw schedule to be submitted by Tenant to Landlord for approval. Any amount not drawn under the draw schedule shall be paid to Tenant within thirty (30) days from the later to occur of, (1) Tenant opens for business in the Building; (2) the period allowed for the filing of mechanic's liens has expired or duly executed unconditional lien waivers from all contractors, subcontractors and material men who have performed work on behalf of Tenant at the Premises are presented to Landlord; and (3) the Tenant has provided to Landlord a Certificate of Occupancy, a copy of Tenant's Recorded Notice of Completion and a complete set of "as-built" construction documents for all work performed by Tenant and/or Tenant's contractors and subcontractors*

5

11.   Conflict.   In the event of any conflict between the Lease and this Amendment No. 2, this Amendment No. 2 shall prevail.   Except to the extent herein modified, the Lease, as modified by the Lease Amendment, shall continue in full force and effect.

8.   Terms.   Except as specifically provided in this Amendment No. 2 all capitalized terms shall have the same meaning as defined in the Lease.

9.   Counterparts.   This Amendment No. 1 may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Amendment No. 2 as of the date first above written.

**Landlord**

PROMENADE SQUARE, LLC.,
a California limited liability company

By:
Daryl R. Priest, Manager

**Tenant**

BORREGO COMMUNITY HEALTH FOUNDATION
a California corporation

By:
Name: Bruce Hebets
Its: 9/13/13

6

## AMENDMENT NO. 3 TO LEASE

This AMENDMENT NO 3 TO LEASE (this "**Amendment No.3**") is made as of the 3rd day of April, 2015, by and between PROMENADE SQUARE, LLC., a California limited liability company ("**Landlord**"), and BORREGO COMMUNITY HEALTH FOUNDATION, a California corporation ("**Tenant**").

### RECITALS

A.    Landlord and Tenant previously entered into that certain Commercial Lease dated as of September 21, 2012 as amended by Amendment No 1 to Lease and Amendment No. 2 to Lease ("**Lease**") with respect to the lease of 133 West Main Street, El Cajon, CA 92020 ("**Premises**")

B    Landlord and Tenant desire to amend the terms of the Lease to increase the square footage of the lease, rent, length of term and other terms as specifically set forth in this Amendment No 3

C.    All defined terms used herein but not defined herein shall have the meaning ascribed to such terms in the Lease

D.    Landlord and Tenant now desire to enter into this Amendment No. 3 to amend the Lease as hereinafter provided

### AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, notwithstanding anything in the Original Lease to the contrary

1    Section 1.2.    Section 1.2 of the Lease is hereby deleted and the following new Section 1.2 is hereby added in its place·

*1.2    Premises.    27,975 rentable square feet of space comprising the entire Building (as hereinafter defined) and shown on Exhibit "A" hereto (the "Premises")*

1.    Section 1 5    Section 1.5 of the Lease is hereby deleted and the following new Section 1 5 is hereby added in its place

*1.5    Term.    Possession of the second floor of the Building will commence on August 1, 2015 and the Lease shall terminate on July 31, 2045*

2    Section 1.6.    Section 1 6 of the Lease is hereby deleted and the following new Section 1.6 is hereby added in its place·

*1.6    Rent.    Effective August 1, 2015 the rent ("Rent") shall be $1,174,950 per annum payable in equal monthly installments of $97,912 50 on the first day of each calendar month occurring during the term without demand, set-off, deduction or abatement of any kind, except as may otherwise be set forth herein. Monthly rent shall also be known as "Base Monthly Rent" or "Rent". Rent shall be subject to annual adjustments as set forth in Section 1 7.*

////

////

3     Section 1.7     Section 1.7 of the Lease is hereby deleted and the following new Section 1.7 is hereby added in its place·

    1 7     *Rent Increase.*     *The Rent for the Lease term shall adjust (in addition to the adjustment in Section 1 10), as follows:*

        *a     Commencing on August 1, 2016 and then annually thereafter ("Adjustment Date") the Rent during the Lease Term shall be adjusted to an amount equal to the product obtained by multiplying the Rent in effect immediately prior to the Adjustment Date by the annual percentage increase in Consumer Price Index All Urban Consumers U.S. City Average (1982-84 = 100) published by the Bureau of Labor Statistics of the U.S Department of Labor ("Index"), i.e, Index published 30 days prior to each new Adjustment Date ("New Extension Index") divided by the Index (in effect for the immediately preceding Lease Year) published 30 days prior to the preceding Adjustment Date ("Current Extension Index"). Landlord shall give written notice to Tenant indicating the amount of the adjustment and manner of computation of same as soon as the information becomes available to Landlord.*

4     Section 2 2     Section 2 2 of the Lease is hereby deleted and the following new Section 2 2 is hereby added in its place·

        2.2     *Vehicle Parking.     So long as Tenant is not in default hereunder, and subject to the rules and regulations attached hereto or as otherwise may be established by Landlord from time to time, Tenant shall be entitled to use a total of forty-eight (48) general parking spaces and four (4) Handicap parking spaces. It is understood that Landlord has no effective means of control as to use of parking spaces*

        2.2 1     *If Tenant commits or allows any of the prohibited activities described in the Lease or the rules then in effect, Landlord shall have the right, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Tenant, which cost shall be immediately payable as additional rent upon demand by Landlord, landlord shall give Tenant notice of any such action under this provision*

5.     Section 2.6.     Section 2 6 is amended to provide that Tenant's pro rata share of the Common Area Expenses shall be 100% of the Common Area Expenses attributable to the Building and 83.32% of the Common Area Expenses for the remainder of the Building Project. The estimate for Additional Rent commencing on August 1, 2015 is $11,500 per month

6     Section 46     Article 46 of the Lease is hereby deleted and the following new Article 46 is hereby added in its place

    46     TENANT IMPROVEMENT ALLOWANCE

        46.1     *Tenant Improvement Allowance. Landlord shall provide a Tenant Improvement Allowance ("TI Allowance") in the amount not to exceed Nine Hundred Eighty-five thousand and 00/100 Dollars ($985,000 00) for the construction of Tenant's improvements on the second floor of the Premises, which are to be fixed in the Premises and shall remain with the Premises  All such tenant improvements shall be pursuant to plans approved by both Landlord and Tenant*

        46.2     *Construction of Improvements  The construction of Tenant's improvements in the Premises shall be done in accordance with Section 7.3 of this Lease by licensed and insured contractor(s) selected by Landlord*

        46 3     *Payment of TI Allowance     The TI Allowance shall be paid by Landlord to Tenant based on a mutually agreed upon construction draw schedule to be submitted by Tenant to Landlord for approval. In Landlord's sole discretion, Landlord may satisfy its obligations under this*

2

*Section 46 by contracting with and paying directly a contractor of Landlord's choosing to complete the tenant improvements.*

7.    Section 50    A new Section 50 is added as follows

     *50    RIGHT OF FIRST REFUSAL:*

     *50.1    Landlord hereby grants to Tenant a right of first refusal to purchase the Building Project on the following terms ("RFR")*

     *50.1.1.    Subject to the rights set forth in Paragraph 50.1.2 below, in the event Landlord desires to sell the Building Project, or any portion of its interest in the Building Project, and shall have received an acceptable bona fide offer to purchase the Building Project or such interest (the "Offer"), Landlord shall give written notice of its intent to sell (the "Notice of Intent to Sell") to Tenant, together with an executed copy of the Offer setting forth all of the terms of the proposed purchase and identifying the prospective purchaser. Tenant shall then have an option to purchase the Building Project on the same terms and conditions as set forth in the Offer; provided that if the terms and conditions of the Offer provide for an exchange of like kind real property as payment of all or a portion of the purchase price, Tenant may exercise its option to purchase by stating in its written notice of exercise its willingness to participate in an exchange transaction in which Landlord shall identify certain real property which Tenant, at no additional cost or expense to Tenant, shall acquire and exchange with Landlord for the Building Project on terms and conditions otherwise consistent with the Offer. If no exchange is contemplated in the Offer, Tenant shall have the further option of paying Landlord in cash at closing the full amount of the purchase price of the Building Project or Landlord's interest in the Building Project, notwithstanding any non-cash terms set forth in the Offer. If Tenant elects to exercise its option, it shall give Landlord written notice of such election within twenty (20) days after receipt of the Notice of Intent to Sell and Tenant shall provide to Landlord evidence reasonably acceptable to Landlord that Tenant has the financial resources readily available for Tenant to purchase the Building Project under the terms of the Offer. If Tenant fails to deliver to Landlord its written exercise of the option (with evidence of financial resources) within the twenty day period Tenant shall be deemed to have not exercised its option. If Tenant fails to exercise its option within such twenty-day period or is deemed to not have exercised its option, (i) Landlord shall be free to accept an offer to sell the Building Project or interest therein on the terms set forth in the Offer (sale price no less than ninety percent (90%) of that contained in the Offer) at any time within one-hundred twenty (120) days after the expiration of such twenty-day period and (ii) Tenant shall, upon request, deliver to Landlord an acknowledgment of Tenant's failure to exercise the option and Landlord's right to sell the Building Project or interest therein pursuant to this Paragraph 50.1.1*

     *50.1.2    Notwithstanding the foregoing, Landlord shall be free to convey, transfer or assign the Building Project or any portion of its interest in the Building Project without compliance with Paragraph 50.1.1 above (a) in the event that such conveyance, transfer or assignment is either (i) made to any holder of a Security Interest in Landlord's fee estate in the Building Project, provided that the lien of any fee mortgage or other security instrument shall expressly remain subordinate to Tenant's leasehold interest herein created, or (ii) made to any trust under which the Landlord is the Trustor and beneficiary, or (iii) made to any entity controlled by Landlord, or (iv) made to any lineal descendants (natural or adopted) of Landlord, the spouses of such lineal descendants or any trust the total beneficial interest of which is held by such lineal descendants or their spouses, or (v) made as part of a merger, consolidation, conversion or liquidation of Landlord*

     *50.1.3    This Right of First Refusal shall terminate and be of no further force or effect upon the termination of the Lease. The Right of First Refusal is personal to Tenant and may not be exercised or assigned voluntarily or involuntarily, by or to any person or entity other than Tenant or an entity controlled by Tenant, provided, however, the Right of First Refusal shall be assignable with this Lease to any assignee of Tenant with the prior written consent of Landlord, as provided for in this Lease. The Right of First Refusal granted to Tenant is not assignable separate and apart from this Lease*

     *50.1.4    If Tenant is in default on the date of the Notice of Intent to Sell or the exercise by*

*Tenant of its option, or has been late on the payment of rent which has resulted in a late charge being imposed more than four (4) times during the Lease term, the Tenant's right to exercise its option and this RFR shall be void and Tenant shall have no right to purchase the Property and the RFR shall become null and void.*

8      Section 51      A new Section 51 is added as follows.

51      Accessibility Inspection.      Landlord ☐ has or ☒ has not had the Demised Premises inspected for disability access by a Certified Access Specialist ("CASp")   The CASp determined that the Property ☐ met or ☐ did not meet all applicable construction-related accessibility standards pursuant to California Civil Code Section 55 53

9.      Condition Precedent.   Tenant acknowledges that a portion of the Premises (i.e. the second floor) is currently leased to PUBLIC CONSULTING GROUP, INC., a Massachusetts corporation under a lease dated June 8, 2010 ("PCG Lease").   The initial term of the PCG Lease is to expire on July 31, 2015.   Under the terms of the PCG Lease the tenant has an option to extend their lease.   Should PUBLIC CONSULTING GROUP, INC. exercise their option to extend the PCG Lease than this Amendment No. 3 shall immediately become null and void.

10      Conflict      In the event of any conflict between the Lease and this Amendment No 3, this Amendment No. 3 shall prevail   Except to the extent herein modified, the Lease, as modified by the Lease Amendments shall continue in full force and effect.

11      Terms.   Except as specifically provided in this Amendment No. 3 all capitalized terms shall have the same meaning as defined in the Lease

12.      Counterparts.      This Amendment No  3 may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Amendment No  3 as of the date first above written.

Landlord                                    Tenant

PROMENADE SQUARE, LLC.,                     BORREGO COMMUNITY HEALTH FOUNDATION
a California limited liability company       a California corporation

By                                          By:
Daryl R  Priest, Manager                    Name:
                                            Its.

4

## AMENDMENT NO. 4 TO LEASE

This AMENDMENT NO. 4 TO LEASE (this "Amendment No. 4") is made as of the 22 day of March, 2016, by and between PROMENADE SQUARE, LLC., a California limited liability company ("Landlord"), and BORREGO COMMUNITY HEALTH FOUNDATION, a California non-profit corporation ("Tenant").

## RECITALS

A.     Landlord and Tenant previously entered into that certain Commercial Lease dated as of September 21, 2012 as amended by Amendment No. 1 to Lease, Amendment No. 2 to Lease and Amendment No. 3 to Lease ("Lease") with respect to the lease of 133 West Main Street El Cajon, CA ("Premises").

B.     Landlord and Tenant desire to amend the terms of the Lease.

C.     All defined terms used herein but not defined herein shall have the meaning ascribed to such terms in the Lease.

D.     Landlord and Tenant now desire to enter into this Amendment No. 4 to amend the Lease as hereinafter provided.

## AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, notwithstanding anything in the Original Lease to the contrary:

1.     Section 1.6.     Section 1.6 of the Lease is hereby deleted and the following new Section 1.6 is hereby added in its place:

*1 6     Rent.     Effective April 1, 2016 the rent ("Rent") shall be $1,342,800 per annum payable in equal monthly installments of $111,900.00 on the first day of each calendar month occurring during the term without demand, set-off, deduction or abatement of any kind, except as may otherwise be set forth herein  Monthly rent shall also be known as "Base Monthly Rent" or "Rent". Rent shall be subject to annual adjustments as set forth in Section 1.7  Tenant has been paying rent from September 2015 thru March 2016 in the monthly amount of $57,340 50 instead of the agreed upon rent of $97,912.50 per month, current rent arrearages of $284,004.00  Provided Tenant is not in default beyond any applicable cure periods for the reminder of the Lease Term the balance of the rent owing for the period September 2015 through March 2016 shall be abated*

2.     Section 1.7.     Section 1.7 of the Lease is hereby deleted and the following new Section 1.7 is hereby added in its place:

*1 7     Rent Increase.     The Rent for the Lease term shall adjust (in addition to the adjustment in Section 1.10), as follows:*

*a     Commencing on October 1, 2016 and then annually thereafter("Adjustment Date") the Rent during the Lease Term shall be adjusted to an amount equal to the greater of (a) two (2) percent or (b) the product obtained by multiplying the Rent in effect immediately prior to the Adjustment Date by the annual percentage increase in Consumer Price Index All Urban Consumers U.S City Average (1982-84 = 100) published by the Bureau of Labor Statistics of the U.S Department of Labor ("Index"), i.e., Index published 30 days prior to each new Adjustment Date ("New Extension Index") divided by the Index (in effect for the immediately preceding Lease Year) published 30 days prior to the preceding Adjustment Date ("Current Extension Index")  Landlord shall give written notice to Tenant indicating*

1



the amount of the adjustment and manner of computation of same as soon as the information becomes available to Landlord.

3.     Conflict.     In the event of any conflict between the Lease and this Amendment No. 4, this Amendment No. 4 shall prevail. Except to the extent herein modified, the Lease, as modified by the Lease Amendments shall continue in full force and effect.

4.     Terms.     Except as specifically provided in this Amendment No. 4 all capitalized terms shall have the same meaning as defined in the Lease.

5.     Counterparts.     This Amendment No. 4 may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Amendment No. 3 as of the date first above written.

Landlord                                        Tenant

PROMENADE SQUARE, LLC.,                          BORREGO COMMUNITY HEALTH FOUNDATION
a California limited liability company           a California non-profit corporation

By: _____                     By: _____
Daryl R. Priest, Manager                         Name: _Bruce Hebets_
                                                 Its: _CEO_



2

1

## AMENDMENT NO. 5 TO LEASE

This AMENDMENT NO. 5 TO LEASE (this "**Amendment No. 5**") is made as of the 4th day of December 2019, by and between PROMENADE SQUARE, LLC, a California limited liability company ("**Landlord**"), and BORREGO COMMUNITY HEALTH FOUNDATION, a California corporation ("**Tenant**").

R E C I T A L S

A.     Landlord and Tenant previously entered into that certain Commercial Lease dated as of September 21, 2012 as amended by Amendment No. 1 to Lease, Amendment No. 2 to Lease, Amendment No. 3 to Lease and Amendment No. 4 to Lease ("**Lease**") with respect to the lease of 133 West Main Street, El Cajon, CA ("**Premises**").

B.     Landlord and Tenant desire to amend the terms of the Lease.

C.     All defined terms used herein but not defined herein shall have the meaning ascribed to such terms in the Lease.

D.     Landlord and Tenant now desire to enter into this Amendment No. 5 to amend the Lease as hereinafter provided.

## AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, notwithstanding anything in the Original Lease to the contrary:

1.     Section 1.2     Section 1.2 of the Lease is hereby deleted in its entirety and the following new Section 1.2 is hereby added in its place:

*1.2. Premises:   27,975 rentable square feet of space comprising the entire Building located at 133 West Main Street and 1,650 rentable square feet of space comprising the entire Building at 155 West Main Street (as hereinafter defined) and as shown on Exhibit "A" hereto (the "**Premises**")*.

2.     Section 1.3     Section 1.3 of the Lease is hereby deleted in its entirety and the following new Section 1.3 is hereby added in its place:

*1.3 Building:   The structures and appurtenances commonly known as 133 West Main Street and 155 West Main Street in the City of El Cajon, County of San Diego, State of California, and as defined in paragraph 2.1.*

3.     Section 1.5.     Section 1.5 of the Lease is hereby amended to reflect Tenant's possession of 155 West Main Street will commence on February 1, 2020.  There are no additional changes to this section.

4.     Section 1.6.     Section 1.6 of the Lease is hereby amended to establish effective February 1, 2020, or at the time possession of 155 W. Main Street is delivered to Tenant, the monthly base rent shall increase based on the following formula: the then current monthly rental rate per square foot times 1650 square feet.  There are no additional changes to this section.

2

     5.     Section 2.2     Section 2.2 is amended to reflect an increase in general parking spaces for a new total of 50 parking spaces in the Building Project allocated for Tenant's use. There are no additional changes to this section.

     6.     Section 2.6.     Section 2.6 is amended to provide that Tenant's pro rata share of the Common Area Expenses shall be 100% of the Common Area Expenses attributable to the Buildings at 133 and 155 West Main Street and 88.23% of the Common Area Expenses for the remainder of the Building Project.

     7.     Conflict.     In the event of any conflict between the Lease and this Amendment No. 1, this Amendment No. 1 shall prevail. Except to the extent herein modified, the Lease, as modified by the Lease Amendments shall continue in full force and effect.

     8.     Terms.     Except as specifically provided in this Amendment No. 5 all capitalized terms shall have the same meaning as defined in the Lease.

     9.     Counterparts.     This Amendment No. 5 may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument.

     IN WITNESS WHEREOF, Landlord and Tenant have entered into this Amendment No. 5 as of the date first above written.

**Landlord**

Promenade Square, LLC,
a California limited liability company

By: _____
Daryl R. Priest, Manager

**Tenant**

BORREGO COMMUNITY HEALTH FOUNDATION
a California corporation

By: _____
Name: Mikia Wallis, Esq
Its: Chief Executive Officer

**STATEMENT FOR PHARMACY ACCESS**

**Borrego Community Health Foundation Pharmacy**

**155 WEST MAIN STREET**

**El Cajon, California, 92020**

A: Business and Professions Code 4116 states that no person shall be permitted enter into a premises licensed by the Board of Pharmacy unless a registered pharmacist is present at all times.

B: Title 16, Section 114(d) of California Code of regulations provides that only a licensed pharmacist may have a key to an area where dangerous drugs and controlled substances are stored.

C: The California State Board of Pharmacy requires that no lease for a licensed premises contain a provision inconsistent with Sections 4116 or 1714(d).

D: The landlord and the tenant hereby clarify the lease with respect to the Landlord's ability to access the premises by affixing their signatures below. The signatories agree to the adhering to Sections 4116 or 1714(d).

**Landlord**

Promenade Square, LLC

124 West Main Suite 240

El Cajon, California 92020

Signature          Date

**Tenant**

Borrego Community Health Foundation

P.O. Box 2369

Borrego Springs, California 92004

Signature          Date

Page 1 of 1

## TENANT ESTOPPEL CERTIFICATE

TO: **KINECTA FEDERAL CREDIT UNION, a Federal Credit Union, its successors and/or assigns (the "Lender")**

THE UNDERSIGNED HEREBY CERTIFIES THAT AS OF THE DATE OF SIGNATURE BELOW:

1. **Tenant**: Borrego Community Health Foundation, a California Corporation

   **Landlord**: Promenade Square, LLC, a California limited liability company

   Lease Date: September 21, 2012      Lease Commenced: January 1, 2013   Lease Ends: July 31, 2045

   Modification Date(s):
   1st amendment – March 15, 2013
   2nd amendment – September 13, 2013
   3rd amendment – April 3rd, 2015

   Address: 133 West Main Street, El Cajon, CA 92020      Suite No.: 1st, 2nd, and 3rd floor   # of Parking Spaces: 48

   Current Annual Base Rent: $1,174,950      Paid through: July 31, 2015      Security Deposit: $ 46,673.42

   Additional Rents (base year), *if applicable*:
   Lease is a fully NNN lease. The current NNN/CAM charges are paid by tenant at a monthly estimated rate of $11,500, with annual reconciliation of overage/underage.

2. Tenant has accepted possession of and is currently open for business. No one other than Landlord, Tenant and Tenant's employees occupies or has any right to occupy any part of the Leased Premises. Tenant's obligation to pay all rents and other payments required under the Lease have been satisfied. Tenant agrees that no such rents or other payments will in the future be paid, more than one (1) month in advance of their due date. Tenant is not entitled to any concession, rebate, allowance or free rent for any period after the date of this Tenant Estoppel Certificate.

3. The Lease is in full force and effect and is the only agreement between Landlord and Tenant relating in any way to the Leased Premises. The "Lease Ends" date shown above is the earliest date that the Lease expires or may be terminated, subject to any renewal or cancellation rights specified in the Lease. The undersigned does not have any option or right to renew or cancel the Lease and does not have the option to lease additional space except as specified in the Lease. The interest of the undersigned in the Lease has not been assigned or encumbered.

4. There is no existing default or claimed default by either Landlord or Tenant under the Lease. No event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default by either Landlord or Tenant under the Lease. Tenant has no existing defenses or offsets against Landlord's enforcement of the Lease.

5. Since the date of the Lease, there has been no material adverse change in the financial condition of Tenant. There are no actions, voluntary or otherwise, pending against Tenant or any of its general partners and/or principals under any bankruptcy, receivership, insolvency or similar laws of the United States or any state thereof.

6. To the best of Tenant's knowledge, its use, maintenance and operation of the Leased Premises complies with, and will at all times comply with, all applicable federal, state, county or local statutes, laws, rules and regulations of any governmental authorities relating to environmental, health or safety matters. Tenant does not and will not engage in any activity which would involve the use of the Leased Premises for the storage, generation, use, treatment, transportation or disposal of any chemical, material or substance which is regulated as toxic or hazardous or exposure to which is prohibited, limited or regulated by any federal, state, county, regional, local or other governmental authority or which, even if not so regulated, may or could pose a hazard to the health and safety of the other tenants and occupants of Landlord's property.

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

Kinecta Federal Credit Union
2100 Park Place
El Segundo, CA 90245
Attn: Business Services CU/88

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (the "**Agreement**") is made as of June 12, 2015, between **Borrego Community Health Foundation, a California corporation** ("**Tenant**"), having an address at 124 West Main Street, Suite 240, El Cajon, CA 92020 and **KINECTA FEDERAL CREDIT UNION, a Federal Credit Union**, its successors and/or assigns ("**Lender**"), with a mailing address at 1440 Rosecrans Avenue, Manhattan Beach, CA 90266.

### RECITALS:

A.   Tenant is the tenant under that certain lease (the "**Original Lease**") dated September 21, 2012, by and between Tenant and **Promenade Square, LLC, a California limited liability company** (the "**Landlord**"), as landlord (together with any amendments, modifications, renewals, or extensions attached hereto and made a part hereof, whether now or hereafter existing) (the "**Lease**"), wherein Landlord leased to Tenant certain premises known as Promenade Plaza (the "**Premises**") and located on that certain land described in Exhibit A attached hereto and made a part hereof (the "**Land**");

B.   Landlord is about to make, execute and deliver its Promissory Note (the "**Note**") to Lender which Note shall be secured by, among other security, a mortgage lien or Deed of Trust encumbering the Land pursuant to a "**Security Instrument**" (as defined in the Note) (such Security Instrument and all other documents securing the Note are herein collectively called the "Loan Documents");

C.   Tenant desires to be assured of continued occupancy of the Premises under the terms of the Lease, subject to the terms of the Security Instrument and to the terms hereof;

D.   Lender is willing to make the Loan on the condition that the Security Instrument is a lien and charge upon the Premises prior and superior to the Lease and provided that Tenant specifically subordinates the Lease to the lien and charge of the Security Instrument;

E.   Tenant is agreeable to the Security Instrument constituting a lien or charge upon the Premises which shall be prior and superior to the Lease, subject to the terms hereof, and is willing to attorn to Lender provided Lender grants Tenant a non-disturbance agreement as provided herein.

F.   Lender and Tenant desire to confirm their agreements with respect to the Lease and the Loan Documents.

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual covenants and agreements herein contained, and in order to induce Lender to make a loan to Landlord, Lender and Tenant hereby agree and covenant as follows:

1.   Lease. As used in this Agreement, "Lease" includes, without limitation, all right, title and interest that Tenant may have in all or any portion of the Premises, whether granted by the terms of the Lease, by a separate written agreement or otherwise, including without limitation, all options, purchase rights, rights of first refusal provided for in the Lease or by separate agreement between Landlord and Tenant.

2.    Subordination.   The Lease and all right, title and interest in the Land created thereby (including without limitation, any purchase options, rights of first refusal or similar rights possessed by Tenant with respect to the Premises) are, shall be and shall at all times remain and continue to be subject and subordinate in all respects to the liens, terms, covenants, provisions and conditions of the Security Instrument and the Loan Documents, including renewals, modifications, consolidations, replacements, and extensions of such lien rights, in the same manner and to the same extent as if the Lease were executed subsequent to the execution, delivery, and recording of the Security Instrument in creation of the lien rights.

3.    Non-Disturbance.   So long as the Lease is in full force and effect and Tenant is not in default under the Lease (beyond any period given Tenant to cure such default) or under this Agreement:

   a.    Tenant's possession of the Premises, and Tenant's rights and privileges under the Lease (other than any purchase options, rights of first refusal or similar rights possessed by Tenant with respect to the Premises), shall not be diminished or interfered with by Lender, and Tenant's occupancy of the Premises shall not be disturbed by Lender for any reason whatsoever during the term of the Lease or any extensions or renewals thereof; and

   b.    Lender will not join Tenant as a party defendant in any action or proceeding to foreclose the Security Instrument or to enforce any rights or remedies of Lender under the Security Instrument which would cut-off, destroy, terminate or extinguish the Lease or Tenant's interest and estate under the Lease.

Notwithstanding the foregoing provisions of this paragraph, if it would be procedurally disadvantageous for Lender not to name or join Tenant as a party in a foreclosure proceeding with respect to the Security Instrument, Lender may so name or join Tenant without in any way diminishing or otherwise affecting the rights and privileges granted to, or inuring to the benefit of, Tenant under this Agreement.

4.    Attornment.

   a.    After notice is given by Lender that a default has occurred under the Security Instrument and that the rentals and all other payments to be made by Tenant under the Lease should be paid to Lender, Tenant will attorn to Lender and pay to Lender, or in accordance with the directions of Lender, all rentals and other monies due and to become due to Landlord under the Lease or otherwise in respect to the Premises; such payments will be made regardless of any right of set-off, counterclaim or other defense which Tenant may have against Landlord (or any prior landlord), whether as tenant under the Lease or otherwise; and

   b.    In addition, if Lender (or its nominee or designee) shall succeed to the rights of Landlord under the Lease through possession or foreclosure action, delivery of a deed or otherwise, or another person purchases the Premises upon or following foreclosure of the Security Instrument, then at the request of Lender (or its nominee or designee) or such purchaser (Lender, its nominees and designees, and such purchaser, each being a "**Successor-Landlord**"), Tenant shall attorn to and recognize Successor-Landlord as Tenant's landlord under the Lease.  Such attornment shall be effective and self-operative without the execution of any other instruments on the part of any of the parties hereto; provided, however, Tenant agrees to promptly execute and deliver any instrument that Successor-Landlord may reasonably request to evidence such attornment. Upon such attornment, the Lease shall continue in full force and effect as, or as if it were, a direct lease between Successor-Landlord and Tenant upon all terms, conditions and covenants as are set forth in the Lease, except that Successor-Landlord shall not:

      (i)    be liable for any previous act or omission of Landlord (or any prior landlord) under the Lease;

      (ii)    be subject to any off-set, defense or counterclaim, which shall have previously accrued to Tenant against Landlord (or any prior landlord);

      (iii)    be bound by any modification of the Lease or by any previous prepayment of rent or additional rent for more than one month which Tenant might have paid to Landlord (or any prior landlord), unless such modification or prepayment shall have been expressly approved in writing by Lender;

      (iv)    be bound by any purchase options, rights of first refusal or similar rights possessed by Tenant with respect to the Premises; or

        (v)      be liable for any security deposited under the Lease unless such security has been physically delivered to Lender.

5.      Lease Modifications.   Tenant agrees that without the prior written consent of Lender, it shall not: (a) amend or modify the Lease or any extensions or renewals thereof; (b) terminate, cancel or tender a surrender of the Lease; (c) make a prepayment of any rent or additional rent in excess of one (1) month; or (d) subordinate or permit the subordination of the Lease to any lien subordinate to the Security Instrument. Any such purported action without such consent shall be void as against the holder of the Security Instrument. Except as may be expressly permitted by the Lease, Tenant shall not assign the Lease, nor sublet any portion of the Premises, and Landlord shall not consent to any such assignment or subletting other than as expressly permitted by the terms of the Lease, without Lender's prior written consent, which consent shall not be unreasonably withheld.

6.      Notice of Default; Opportunity to Cure.

      a.      Any notice required or permitted to be given by Tenant to Landlord shall be simultaneously given also to Lender, and any right of Tenant dependent upon notice shall take effect only after such notice to Lender is so given. Performance by Lender shall satisfy any conditions of the Lease requiring performance by Landlord, and Lender shall have a reasonable time to complete such performance as provided in section (b) below.

      b.      Without limiting the generality of the foregoing, Tenant shall promptly notify Lender of any default, act or omission of Landlord which would give Tenant the right, immediately or after the lapse of a period of time, to cancel or terminate the Lease or to claim a partial or total eviction (a "**Landlord Default**"). In the event of a Landlord Default, Tenant shall not exercise any rights available to it: i) until it has given written notice of such Landlord Default to Lender; and ii) unless Lender has failed, within thirty (30) days after Lender receives such notice, to cure or remedy the Landlord Default or, if the same is not reasonably capable of being remedied by Lender within such thirty (30) day period, until a reasonable period for remedying such Landlord Default has elapsed following the giving of such notice and following the time when Lender shall have become entitled under the Loan Documents to remedy the same (which reasonable period shall in no event be less than the period to which Landlord would be entitled under the Lease or otherwise, after similar notice, to effect such remedy); provided that Lender shall with due diligence commence and prosecute a remedy for such Landlord Default. If Lender cannot reasonably remedy a Landlord Default until after Lender obtains possession of the Land, Tenant may not terminate or cancel the Lease or claim a partial or total eviction by reason of such Landlord Default until the expiration of a reasonable period necessary for the remedy after Lender institutes proceedings to obtain possession of the Land through a foreclosure or otherwise, or for the appointment of a receiver for the Land, provided that Lender institutes and prosecutes such proceedings with due diligence. Lender shall have no obligation hereunder to remedy any Landlord Default.

7.      Application of Casualty Insurance Proceeds and Condemnation Awards.   Tenant hereby agrees that, notwithstanding anything to the contrary contained in the Lease, the terms and provisions of the Security Instrument shall control with respect to the application of casualty insurance proceeds and condemnation awards.

8.      Notice of Lien.   To the extent that the Lease entitles Tenant to notice of the existence of any mortgage lien or Deed of Trust and the identity of any lender, this Agreement shall constitute such notice to Tenant with respect to the Security Instrument.

9.      Remedies.   Upon and after the occurrence of a default under the Security Instrument, Lender shall be entitled, but not obligated, to exercise the claims, rights, powers, privileges and remedies of Landlord under the Lease and shall be further entitled to the benefits of, and to receive and enforce performance of, all of the covenants to be performed by Tenant under the Lease as though Lender were named therein as Landlord. Landlord agrees that this Agreement does not constitute a waiver by Lender of any of its rights under the Security Instrument or the Loan Documents, and that the Security Instrument and the Loan Documents remain in full force and effect and shall be complied with in all respects by the Landlord.

10.     Limitation of Liability.   Except as specifically provided in this Agreement, Lender shall not, by virtue of this Agreement, the Security Instrument or any other instrument to which Lender may be a party, be or become subject to any liability or obligation to Tenant under the Lease or otherwise.

11.     Priority.

a. Tenant acknowledges and agrees that this Agreement supersedes (but only to the extent inconsistent with) any provisions of the Lease relating to the priority or subordination of the Lease and the interests or estates created thereby to the Security Instrument.

b. Tenant agrees to enter into a subordination, non-disturbance and attornment agreement with any entity which shall succeed Lender with respect to the Land, or any portion thereof, provided such agreement is substantially similar to this Agreement.

12. Notices. Any notice, consent, request or other communication required or permitted to be given hereunder shall be in writing and shall be: (a) personally delivered; (b) delivered by Federal Express or other comparable overnight delivery service (collectively, a "Delivery Service") ; or (c) transmitted by postage prepaid registered or certified mail, return receipt requested. All such notices, consents, requests or other communications shall be addressed to Landlord, Lender or Tenant at the following addresses, or to such other address as Landlord, Lender or Tenant shall in like manner designate in writing. All notices and other communications shall be deemed to have been duly given on the first to occur of actual receipt of the same or: (i) the date of delivery if personally delivered; (ii) one (1) business day after depositing the same with the Delivery Service if by Delivery Service; and (iii) five (5) days following posting if transmitted by mail. Any party may change its address for purposes hereof by notice to the other parties given in accordance with the provisions hereof.

If to Tenant:
**Borrego Community Health Foundation**
124 West Main Street
El Cajon, CA 92020

If to Landlord:
**Promenade Square, LLC**
124 West Main Street, Ste 240
El Cajon, CA 92020

If to Lender:
**Kinecta Federal Credit Union**
2100 Park Place
El Segundo, CA 90245
Attn: Business Services CU/88

13. General. This Agreement may not be modified or terminated orally. This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors and assigns. The term "Lender" shall mean the then holder of any interest in the Security Instrument. The term "Landlord" shall mean the then holder of the lessor's interest in the Lease. The term "person" shall mean any individual, joint venture, corporation, partnership, trust, unincorporated association or other entity. All references herein to the Lease shall mean the Lease as modified by this Agreement and any amendments or modifications to the Lease which are consented to in writing by the Lender. In the event there is any inconsistency between the Lease and the provisions of this Agreement, the provisions of this Agreement shall be controlling. In the event any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

14. Tenant Representations and Warranties. Tenant hereby represents and warrants that there is no known defects or defaults on the part of the Landlord. The Lease is a complete statement of the Agreement of the parties thereto with respect to the leasing of the Premises.

15. No Warranties by Lender. Lender shall have no obligations nor incur any liability with respect to any warranties of any nature whatsoever, whether pursuant to the Lease or otherwise, including, without limitation, any warranties respecting use, compliance with zoning, Landlord's title, Landlord's authority, habitability, fitness for purpose, or possession.

16. Limitation on Lender's Liability. If Lender shall acquire title to the Premises or the Property, Lender shall have no obligation, nor incur any liability, beyond Lender's then equity interest, if any, in the Premises, and Tenant shall look exclusively to such equity interest of Lender, if any, in the Premises for the payment and discharge of any obligations imposed upon Lender hereunder or under the Lease, and Lender is hereby released and relieved of any other obligations hereunder and under the Lease.

Commercial SNDA Rev 10.20.08

17. Attorneys' Fees. If any action or proceeding is brought by any party against any other party arising from or related to this Agreement, the prevailing party shall be entitled to recover its reasonable costs and attorneys' fees. Attorneys' fees shall include, without limitation, such amounts as may then be charged by Lender for legal services provided by attorneys in the employ of Lender, at rates not exceeding those that would be charged by outside attorneys for comparable services.

18. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the state in which the Land is located.

19. Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which when taken together shall constitute one and the same Agreement. The separate signature pages and notary acknowledgements may be combined into a single original document for recordation.

IN WITNESS WHEREOF, the parties hereto have executed this Subordination, Non-Disturbance and Attornment Agreement to be effective as of the day and year first stated above.

LENDER:                                                    TENANT:

KINECTA FEDERAL CREDIT UNION, a Federal Credit Union      Borrego Community Health Foundation, a California corporation

                                                          By: _____
By: _____                       Print Name: _Bruce Hebets_
    Robert Farrington, Vice President                     Title: _CEO_

AGREED AND CONSENTED TO:

LANDLORD:

Promenade Square, LLC, a California limited liability company

By: _____
    Daryl R. Priest, Manager

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO                     SS.

On JULY 15, 2015          before me, RITA M. ANDERSEN NOTARY PUBLIC

[insert name and title of the officer]

personally appeared BRUCE HEBETS

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

RITA M. ANDERSEN
COMM. #2077973
Notary Public · California
San Diego County
My Comm. Expires Sep. 12, 2018

_____

Signature

RITA M. ANDERSEN

Printed/Typed Name of Notary

[seal]                          My Commission Expires: SEP7. 12, 2018

*A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.*

THE STATE OF CALIFORNIA

ss.

COUNTY OF _____

On _____ before me, _____

[insert name and title of the officer]

personally appeared _____

_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

_____

Signature

_____

Printed/Typed Name of Notary

[seal]                    My Commission Expires: _____

EXHIBIT "A"

LEGAL DESCRIPTION

The land referred to herein is situated in the State of California, County of San Diego, City of El Cajon and described as follows:

PARCEL A: (APN: 488-152-47)

LOTS 1 & 2 AND A PORTION OF LOT 4 OF PROMENADE SQUARE, IN THE CITY OF EL CAJON, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 14421, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY ON AUGUST 6, 2002, AMENDED PURSUANT TO THAT CERTAIN CERTIFICATE OF CORRECTION RECORDED ON MARCH 09, 2012 AS INSTRUMENT NO. 2012-0142345 OF OFFICIAL RECORDS, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY LINE OF LOT 4 OF MAP 14421, SAID POINT BEING DISTANT THEREON SOUTH 02° 52' 18" EAST 5.99 FEET FROM THE SOUTHEAST CORNER OF LOT 1 OF MAP 14421, THENCE ALONG THE EASTERLY LINE OF SAID LOT 4 AND SAID LOT 1; NORTH 02° 52' 18" WEST 64.34 FEET TO THE BEGINNING OF A TANGENT 25.00 FOOT RADIUS CURVE, CONCAVE SOUTHWESTERLY, THENCE ALONG THE ARC OF SAID CURVE, THROUGH A CENTRAL ANGLE OF 87° 06' 27"; NORTHWESTERLY 38.01 FEET; THENCE ALONG THE NORTHERLY LINE OF SAID LOTS 1, 2 & 4; NORTH 89° 58' 45" WEST 137.06 FEET TO A POINT ON THE NORTHERLY LINE OF LOT 4, SAID POINT BEING DISTANT THEREON NORTH 89° 58' 45" WEST 3.64 FEET FROM THE NORTHWEST CORNER OF SAID LOT 2, THENCE SOUTH 00° 01' 15" WEST 88.00 FEET; THENCE SOUTH 89° 58' 45" EAST 165.27 FEET TO THE POINT OF BEGINNING.

PARCEL B: (APN: 488-152-48)

PORTION OF LOTS 3 & 4 OF PROMENADE SQUARE, IN THE CITY OF EL CAJON, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 14421, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY ON AUGUST 6, 2002, AMENDED PURSUANT TO THAT CERTAIN CERTIFICATE OF CORRECTION RECORDED ON MARCH 09, 2012 AS INSTRUMENT NO. 2012-0142345 OF OFFICIAL RECORDS, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY LINE OF LOT 4 OF MAP 14421, SAID POINT BEING DISTANT THEREON NORTH 89° 58' 45" WEST 3.64 FEET FROM THE NORTHWEST CORNER OF LOT 2 OF MAP 14421, THENCE ALONG THE NORTHERLY LINE OF SAID LOT 4 AND SAID LOT 3; NORTH 89° 58' 45" WEST 60.90 FEET TO A POINT ON THE NORTHERLY LINE OF LOT 3, SAID POINT BEING DISTANT THEREON NORTH 89° 58' 45" WEST 11.66 FEET FROM THE NORTHEAST CORNER OF SAID LOT 3; THENCE SOUTH 00° 01' 15" WEST 44.00 FEET; THENCE SOUTH 89° 58' 45" EAST 60.90 FEET; THENCE NORTH 00 Degrees 01' 15" EAST 44.00 FEET TO THE POINT OF BEGINNING.

PARCEL C: (APN: 488-152-50)

PORTION OF LOT 4 OF PROMENADE SQUARE, IN THE CITY OF EL CAJON, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 14421, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY ON AUGUST 6, 2002, AMENDED PURSUANT TO THAT CERTAIN CERTIFICATE OF CORRECTION RECORDED ON MARCH 09, 2012 AS INSTRUMENT NO. 2012-0142345 OF OFFICIAL RECORDS, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF LOT 4 OF MAP 14421; THENCE ALONG THE EASTERLY LINE OF SAID LOT 4; NORTH 02° 52' 18" WEST 70.13 FEET; THENCE NORTH 89 Degrees 58' 45" WEST 165.27 FEET; THENCE NORTH 00 Degrees 11' 15" EAST 44.00 FEET; THENCE NORTH 89° 58' 45" WEST 60.90 FEET; THENCE SOUTH 00° 01' 15" WEST 42.00 FEET;

THENCE NORTH 89° 58' 45" WEST 69.10 FEET TO THE WESTERLY LINE OF SAID LOT 4; THENCE ALONG SAID WESTERLY LINE; SOUTH 00 Degrees 00' 49" EAST 72.09 FEET TO THE SOUTHWEST CORNER OF SAID LOT 4; THENCE ALONG THE SOUTHERLY LINE OF SAID LOT 4; SOUTH 89° 59' 22" EAST 298.76 FEET TO THE POINT OF BEGINNING. APN: 488-152-47-00, 488-152-48-00, and 488-152-50-00

# EXHIBIT B

## BASIC LEASE PROVISIONS

The following Basic Lease Provisions constitute a part of the Lease to which they are attached.

1   **Landlord:**        DRP Holdings, LLC., a California limited liability company

2.   **Tenant.**        Borrego Community Health Foundation, a California non-profit public benefit
     corporation

3.   **Premises:**
     (a)      Area: Approximately 15,676 sq. ft. office building including approximately 80 parking spaces
     ("Office Building" or "Premises").

     (b)      Location: The Premises commonly referred to as 590 N. D Street, San Bernardino, California, are
     depicted on Exhibit "A" attached hereto ("Property").

4.   **Lease Term:** The term of this Lease shall be 30 years and 0 months from the Commencement Date.

5.   **Condition of Premises:**    The Premises are accepted "as is", "where is", and with all faults.

6.   **Rent:**

     (a)      Base Monthly Rent: $62,704.00 per month, subject to adjustment as provided in Article 3.

     (b)      Additional Rent· Taxes, Utilities, Insurance, Maintenance, Management and other Expenses shall
     be based on direct cost or consumption by Tenant or upon Tenant's share of such Expenses.

     (c)      The "Rent Commencement Date" shall be earlier of (i) four (4) months from the date that
     Landlord acquires title to the Property or (ii) the date Tenant opens for business.

     (d)      "Tenant's Share" – 100%

7.   **Prepaid Base Monthly Rent:** $-0-

8.   **Security Deposit:** $ -0-.

9.   **Permitted Use:** The Premises shall be used solely for a general office and medical office use including a
     pharmacy and for any other lawful purpose.

10.   **Addresses for Notices and Payment of Rent:**

     (a)      If to Landlord·              DRP Holdings, LLC.,
                                           a California limited liability company
                                           124 Main Street, Suite 240
                                           El Cajon, Ca 92020
                                           Fax: (619) 444-8597
                                           Attn:  Daryl R  Priest
                                           Email: darly@priesthomes.com

Tenant's Initials
© Stephen J  Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

Page 1 of 27

|  | Copy of notices to: | Fitch Law Firm, APC<br>Stephen J. Fitch, Esq.<br>3465 Camino Del Rio South, Ste. 250<br>San Diego, CA 92108<br>Telephone No. (619) 282-8100<br>Email: steve@fitchlawfirm.com |
|---|---|---|
| (b) | If to Tenant: | Borrego Community Health Foundation<br>P.O. Box 2369<br>Borrego Springs, CA  920004<br>Attn: Bruce Hebets<br>Fax:  (760) 767-5051<br>Email: bhebets@borregomedical.org |
|  | Copy to: | Borrego Community Health Foundation<br>P.O. Box 2369<br>Borrego Springs, CA  920004<br>Attn: Mikia Wallis, Chief Legal Officer<br>Fax:  (760) 767-6722<br>Email: mwallis@borregomedical.org |

11.  **Broker(s).**

   Landlord:    NONE

   Tenant:     NONE

12. **Certificate of Insurance:** Tenant acknowledges that a certificate of insurance with endorsements attached, as required by Paragraph 8.2(b), must be provided to Landlord prior to delivery of the keys to Premises to Tenant.

13. **Guarantor:** NONE

The foregoing Basic Lease Provisions are incorporated into and made a part of the Lease. Each reference in the Lease to any of the Basic Lease Provisions shall mean the respective information above and shall be construed to incorporate all of the terms provided under the particular Lease paragraph pertaining to such information. In the event of any conflict between the Basic Lease Provisions and the Lease, the Basic Lease Provisions shall control. Unless otherwise defined in the Lease, all initially-capitalized terms used in the Lease shall have the meanings ascribed to them in the Basic Lease Provisions.

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

Page 2 of 27

# BUILDING LEASE

This BUILDING LEASE ("Lease") is executed as of the 15th day of September, 2015 ("Effective Date"), by and between DRP Holdings, LLC, a California limited liability company ("Landlord"), and BORREGO COMMUNITY HEALTH FOUNDATION, a California corporation ("Tenant"). Landlord and Tenant are also referred to herein individually as a "Party" and collectively as the "Parties". The Basic Lease Provisions attached to this Lease are incorporated herein and made a part of this Lease.

1.     PREMISES:

   1.1     Premises. Subject to all the terms and conditions of this Lease, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, pursuant to the terms, covenants, conditions and uses herein set forth, the Premises, as more particularly described in Item 3 of the Basic Lease Provisions. The Property and the Office Building are more particularly depicted on Exhibit "A" attached hereto and incorporated by reference herein.

      1.1.1     Current Tenant. Landlord and Tenant acknowledge that 1,320 sq. ft. of the Premises are currently subject to a lease with TW TELECOM OF CALIFORNIA, L.P. ("Adjoining Tenant"). The lease to Adjoining Tenant expires on September 14, 2017 (Adjoining Tenant has a three (3) option which Landlord has the right to terminate based on its purchase of the Property). Until September 14, 2017 or earlier termination of the lease with Adjoining Tenant the following modifications to the Lease shall be applicable:

   |   |   |   |
   |---|---|---|
   | a. | Premises – | 14,356 sq. ft. |
   | b. | Rent – | $57,424.00 |
   | c | Tenants Share – | 92% |

Except as modified in this Section 1.1.1 all other terms of the Lease shall remain the same. Landlord shall give Tenant a thirty (30) day notice of its ability and obligation to occupy the portion of the Premises subject to the Adjoining Tenant lease. Upon termination of the Adjoining Tenant lease all terms contained in the Basis Lease Provisions shall be applicable for the remaining Lease Term

   1.2     Condition of Premises. Tenant accepts the Premises "as is", "where is", and with all faults. The square footage of the Premises, at Landlord's or Tenant's election, is subject to verification by Landlord's space planner or architect at any time within 90 days of the Commencement Date—with the stated square footage stated in the Basic Lease Provisions being deemed mutually agreed-upon and controlling if no such verification is done during such timeframe.

   1.3     Tenant Improvement Allowance. Landlord shall provide a Tenant Improvement Allowance ("TI Allowance") in an amount not to exceed One Million and 00/100 Dollars ($1,000,000.00) for the construction of Tenant's improvements of the Premises, which are to be fixed in the Premises and shall remain with the Premises. All such tenant improvements shall be pursuant to plans approved by Landlord. Tenant shall provide, at its sole cost, to Landlord upon execution of this Lease space plans for the Premises. Any revisions to the space plan shall be mutually agreed upon by the Parties.

      a     Construction of Improvements. The construction of Tenant's improvements in the Premises shall be done in accordance with Section 5 1 of this Lease by licensed and insured contractors approved by Landlord.

      b.     Payment of TI Allowance. The TI Allowance shall be paid by Landlord to Tenant based on a mutually agreed upon construction draw schedule to be submitted by Tenant to Landlord for approval  Any amount not drawn under the draw schedule shall be paid to Tenant within thirty (30) days from the later to occur of: (1) Tenant opens for business in the Building; (2) the period allowed for the filing of mechanic's liens has expired or duly executed unconditional lien waivers from all contractors, subcontractors and material men who have performed work on behalf of Tenant at the Premises are presented to Landlord, and (3) the Tenant has

LEASE – OFFICE BUILDING

Tenant's Initials
© Stephen J Fitch

Landlord's Initials

Page 3 of 27

provided to Landlord a Certificate of Occupancy, a copy of Tenant's Recorded Notice of Completion and a complete set of "as-built" construction documents for all work performed by Tenant and/or Tenant's contractors and subcontractors.

In Landlord's sole discretion, Landlord may satisfy its obligations under this Section 1.3 by contracting with and paying directly a contractor of Landlord's choosing to complete the tenant improvements.

2.    TERM:

2.1    General

(a)    The term of this Lease shall be as specified in Item 4 of the Basic Lease Provisions, commencing on the earliest of (1) the date Landlord acquires title to the Property, or (2) the date on which Landlord and Tenant execute the Confirmation of Lease (in the form attached hereto as Exhibit "B"), or (3) the date upon which Tenant actually occupies the Premises for any reason. The date on which the Lease term commences is hereafter referred to as the "Commencement Date".

3.    RENT

3.1    Base Monthly Rent

(a)    Tenant shall pay to Landlord at the address provided for in Item 10 of the Basic Lease Provisions (subject to the provisions of Section 1.1.1 above), without deduction or prior notice or demand, and Landlord shall accept, as rent for the Premises the "Base Monthly Rent" specified in Item 6(a) of the Basic Lease Provisions The Base Monthly Rent shall be payable in advance in lawful money of the United States on the first day of each month of the Lease term. The first installment of the Base Monthly Rent shall be due and payable on the Rent Commencement Date.

(b)    In the event that the Rent Commencement Date is not the first day of the month, Tenant shall pay to Landlord prior to the first day of the first full calendar month which is ninety (90) days after the commencement date, an amount equal to the Base Monthly Rent multiplied by a factor having as its numerator the number of days remaining in the first month and as its denominator the number thirty (30). Thereafter, the Base Monthly Rent shall be payable in accordance with the terms of this Paragraph 3.1.

(c)    Tenant's obligation to pay rent, including Base Monthly Rent and Additional Rent shall commence as set forth in the Basic Lease Provisions.

3.2    Adjustments to Base Monthly Rent.    The Base Monthly Rent for the Lease term shall adjust (in addition to the adjustment in Paragraph 3.3 below), as follows:

a.    Commencing on the first anniversary date of the Lease term, and then annually thereafter on each Adjustment Date, the Base Monthly Rent during the Lease Term shall be adjusted to an amount equal to the greater of (a) two (2) percent or (b) the product obtained by multiplying the Base Monthly Rent in effect immediately prior to the Adjustment Date by the annual percentage increase in Consumer Price Index All Urban Consumers U S. City Average (1982-84 = 100) published by the Bureau of Labor Statistics of the U.S. Department of Labor ("Index"), i.e., Index published 30 days prior to each new Adjustment Date ("New Extension Index") divided by the Index (in effect for the immediately preceding Lease Year) published 30 days prior to the preceding Adjustment Date ("Current Extension Index"). Landlord shall give written notice to Tenant indicating the amount of the adjustment and manner of computation of same as soon as the information becomes available to Landlord.

3.3    Additional Rent. Tenant shall pay as "Additional Rent" its pro rata share of the cost of operation and maintenance of the Property, i.e., the cost of utilities (if not separately metered), taxes, insurance provided by Landlord, roof and structural repairs, and Common Area Expenses, or other charges, as described and in the manner

Tenant's Initials
© Stephen J Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

provided in Article 11 (Common Areas). The Base Monthly Rent, the Additional Rent, rental adjustments and any and all other amounts, however designated, required to be paid or reimbursed by Tenant under this Lease are sometimes collectively referred to as, and shall constitute, "rent.".

3.4     Interest on Past Due Obligations.  In the event of default by Tenant in payment of any items of rent, Tenant shall pay, as Additional Rent, interest at the rate of two (2) points over the published prime rate of Citi Bank or the maximum rate permitted by law, whichever is less, on each such obligation from the day it is due until received by Landlord. Notwithstanding the foregoing, no interest shall accrue on any Late Charges under this Lease as defined in Paragraph 3.5 below.

3.5     Late Charges   Tenant acknowledges that late payment by Tenant to Landlord of rent will cause Landlord to incur costs not contemplated by this Lease, the exact amount of such costs being extremely difficult and impractical to fix  Such costs include, without limitation, processing, administration and accounting charges. If any installment of any item of rent due from Tenant is not received by Landlord within five (5) business days of when due, Tenant shall pay to Landlord an additional sum equal to six percent (6%) of the overdue rent as a late charge The parties agree that this late charge represents a fair and reasonable estimate of the costs that the Landlord will incur by reason of late payment by Tenant. Acceptance of any late charge shall not constitute a waiver of Tenant's default with respect to the overdue amounts, nor prevent the Landlord from exercising any of the other rights and remedies available to Landlord hereunder. The payment of a late charge shall be in addition to any interest payable by Tenant under Paragraph 3.4 (Interest on Past Due Obligations). In addition to the charges provided for above, Tenant shall pay a charge of Fifty Dollars ($50.00) to Landlord for each check returned for insufficient funds and One Hundred Fifty Dollars ($150.00) for each "three (3) day pay or quit" notice

3.6     Intentionally Deleted

4.     USE:

4.1     Permitted Use.  The Premises shall be used and occupied by Tenant and for the use and purpose(s) specified in Item 9 of the Basic Lease Provisions and under no other trade names and for no other use or purposes, including, but not limited to, unlawful, immoral, "second hand" or used merchandise, distress goods, surplus stores or auctions. Tenant shall not permit any act to be done in, upon or about the Premises which would increase the existing rate of insurance upon the Premises, or cause the cancellation of any insurance policy covering the Premises, nor shall Tenant sell or permit to be kept, used or sold in, upon or about the Premises any article which may be prohibited by a standard form policy of fire insurance. In the event that Tenant's use increases said rate or causes the cancellation of a policy of insurance, Landlord may charge Tenant, as Additional Rent, the additional cost of insurance; or Landlord, at its option may cancel the Lease. Landlord does not represent nor warrant that the Premises can be used for any specific use or purpose, and it is incumbent upon Tenant to ascertain from the proper governmental authorities whether the Premises may be used for Tenant's intended use.

4.2     Hazardous Materials Indemnity.

(a)     Tenant shall not cause or permit the presence, use, generation, release, discharge, storage, disposal or transportation of any "Hazardous Materials" on, under, in, about, to or from, the Premises and/or the Property; provided that the presence or use of Hazardous Materials (a) in products required for the prudent and ordinary management and operation of the Premises as a car wash and auto detail facility and (b) held and used strictly in accordance with (i) all applicable federal, state or local laws, regulations or orders, (ii) guidelines issued by any national or regional board of insurance underwriters, and (iii) prudent standards of practice shall not be deemed in violation of this provision

(b)     As used herein, the term "Hazardous Materials" shall mean any toxic or hazardous substance, material or waste or any pollutant or contaminant or infectious or radioactive material, including but not limited to those substances, materials or wastes regulated now or in the future under any of the following statutes or regulations promulgated thereto: (a) any "hazardous substance" within the meaning of the Comprehensive

Tenant's Initials.
© Stephen J Fitch

LEASE—OFFICE BUILDING

Landlord's Initials

Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA") 42 U.S.C § 9601, et seq. or the California Hazardous Substance Account Act, Cal. Health and Safety Code § 25300 et seq. or the Porter-Cologne Water Quality Act, Cal. Water Code § 13000 et seq. or the Hazardous Materials Transportation Act, 49 U.S.C. § 1801, et seq.; (b) any "hazardous waste" within the meaning of the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq.; (c) any "pesticide" or "economic poison" as defined in California Food & Agricultural Code § 12753 and any regulations promulgated in connection therewith; or (d) any other substance, chemical, waste, toxicant, pollutant, pesticide or contaminate regulated by any federal, state or local law, statute, rule, regulation or ordinance for the protection of health or the environment ("Environmental Laws"), including, without limitation, methane and any petroleum products or fractions thereof and any asbestos-containing materials

(c)    If Tenant's use of the Premises may involve the storage and/or use of Hazardous Materials as defined herein, Tenant, in addition to its covenants defined above, further covenants, agrees, warrants and represents that it will comply with all Environmental Laws, rules, regulations, court decisions, municipal codes and ordinances regulating such storage and/or use of Hazardous Materials, including without limitation Chapter 6.95 of the California Health and Safety Code; and to permit Landlord to monitor such compliance, without the assumption of any liability by Landlord nor any obligation of Landlord to so monitor, Tenant covenants and agrees to provide to and/or permit Landlord:

(1)    To review and approve prior to submission to any governmental agency all applications with respect to the handling, storage and/or use of Hazardous Materials in, on or about the Premises, including without limitation applications to the County Hazardous Materials Management Division ("HMMD") and/or to Air Pollution Control District ("APCD"), and after such submission to provide Landlord with a copy of all responses, notices, comments or other communications with said governmental agencies; and

(2)    To receive and review a copy of all completed and approved "Business Plans", as defined by the statutes, and all updates, renewals, or replacement "Business Plans" when submitted and all responses, notices, comments or communications with any governmental agencies regarding same; and

(3)    To receive and review a copy of all notices, reports, comments or communications relating to any governmental inspection, complaint, investigation or other matter relating to Tenant's storage, handling or use of Hazardous Materials at, on, in or about the Premises, and

(4)    To receive and review a copy of any and all E.P.A. numbers, County Health Department permits, APCD permits, contracts with certified hazardous waste handlers (and all credentials and certifications of such handlers), and all schedules for delivery, pick-up and disposal of Hazardous Materials to or from the Premises; and

(5)    To immediately notify Landlord of any leaks, spills, emissions, release or suspected release of any Hazardous Materials at, on, in, under, above or about the Premises from any cause or source whatsoever; and

(6)    To receive and review a copy of all records of every nature that are required by law, regulations, ordinance or court order to be maintained by Tenant with respect to the storage, handling or use of any Hazardous Materials at, on, in, under, above or about the Premises.

(d)    Tenant shall exonerate, indemnify, pay and protect, defend (with counsel reasonably approved by Landlord) and save Landlord, and its directors, trustees, beneficiaries, officers, shareholders, partners, members, employees, agents, and invitees and of those of the other tenants of the Property (collectively, the "Related Parties"), harmless from and against any claims (including, without limitation, third party claims for personal injury or real or personal property damage, actions, administrative proceedings (including informal proceedings), judgments, damages, punitive damages, penalties, fines, costs, taxes, assessments, liabilities (including sums paid in settlements of claims), interest or losses, including reasonable attorneys' fees and expenses (including any such fees and expenses incurred in enforcing this Lease or collecting any sums due hereunder),

Tenant's Initials
Ͻ Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

Page 6 of 27

consultant fees, and expert fees, together with all other costs and expenses of any kind or nature (collectively, the "Costs") that arise directly or indirectly in connection with the presence, or release, caused by Tenant of any Hazardous Materials in or into the air, soil, ground water, surface water or improvements at, on, about, under or within the Property, or any portion thereof, or elsewhere in connection with the transportation of Hazardous Materials to or from the Property or the Premises by or on behalf of Tenant. The indemnification provided in this Paragraph shall specifically apply to and include claims or actions brought by or on behalf of employees of Tenant. In the event that Landlord or any of the Related Parties shall suffer or incur any such Costs, Tenant shall pay to Landlord or such Related Parties, the total of all such Costs suffered or incurred upon demand therefor, which demand shall be accompanied by an accounting and copies of back up documentation for such Costs. Without limiting the generality of the foregoing, the indemnification provided herein shall specifically cover Costs including, without limitation, capital, operating and maintenance costs, incurred in connection with any investigation or monitoring of site conditions, any clean-up, containment, remedial, removal or restoration work required or performed by any federal, state or local governmental agency or political subdivision or performed by any non-governmental entity or person because of the presence, or release, caused by Tenant of any Hazardous Materials in or into the air, soil, ground water, surface water or improvements at, on, about, under or within the Property (or any portion thereof), or elsewhere in connection with the transportation of Hazardous Materials to or from the Property or the Premises by or on behalf of Tenant, and any claims of third parties for loss or damage due to such Hazardous Materials  This indemnification shall survive the termination of this Lease and shall be binding upon the Tenant and its successors in interest whenever such threat, claim, or cause of action may arise. Tenant expressly waives any defense concerning constructive eviction or rent abatement with respect to such claims arising from the act or omission of Tenant.

4.3    Compliance with Laws.   Tenant and Landlord shall promptly comply with all laws, ordinances, zoning restrictions, rules, regulations, orders and any requirements of any duly constituted public authorities now or hereafter affecting the use, safety, cleanliness or occupation of the Premises. Tenant's use of the Premises shall not adversely affect Landlord's use of the Property and the use of the Property by other tenants. Any alteration or improvement to the Premises or the providing of any auxiliary aids or services required by any statute, ordinance, governmental regulation or court order in order for Tenant to conduct business shall be undertaken at Tenant's sole cost and expense in the manner provided in Article 5 below. Landlord shall have the absolute right to cancel this Lease, upon thirty (30) days written notice to Tenant, in the event that Tenant's plans for construction or subsequent use of the Premises shall adversely affect the allocation of available energy requirements or other utility services to Landlord or other tenants within the Property.

4.4    No Nuisances   Tenant shall not commit or permit any nuisance, act or other thing which may disturb the quiet enjoyment of the other tenants of the Property.

5.    ALTERATIONS AND ADDITIONS:

5.1    General   Tenant shall not make any non-structural interior alterations, improvements or additions to the Premises without obtaining Landlord's prior written consent, which shall not be unreasonably withheld. Any such improvements, excepting movable furniture and trade fixtures, shall become part of the realty and belong to Landlord upon their completion of construction. Tenant shall, at its sole cost and expense, obtain all necessary governmental permits and approvals, and pay for all assessments, taxes and charges associated with such work. All alterations and improvements shall be in conformity with the laws of all applicable duly constituted public authorities and shall be done in a good workmanlike manner. Tenant shall not make any structural changes or changes to the exterior of the Premises including but not limited to penetration of roof or alteration or relocation of windows or doorways or exterior walls or the affixing or setting of satellite dishes, antennae, lighting, electronic or other devices without Landlord's prior written consent, which may be withheld in its sole and absolute discretion. All alterations, additions, repairs or changes to be made to the Premises which require Landlord's approval shall be under the supervision of a competent licensed architect and/or competent licensed structural engineer and made in accordance with plans and specifications submitted to and approved by Landlord before commencement of work. Landlord reserves the right to retain or hire an architect or engineer to review said plans and specifications, and the reasonable cost of such professional fees shall be reimbursed by Tenant to Landlord. All such work shall be

Tenant's Initials
© Stephen J  Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

performed by a licensed and insured contractor, approved by Landlord, and if requested by Landlord, a completion bond naming Landlord as the beneficiary shall be provided by Tenant.

    5.2   No Liens. Prior to commencing any work relating to any alterations, improvements or additions approved by Landlord, Tenant shall notify Landlord in writing of the expected date of commencement. Tenant shall not commence the making of any approved alterations until after Landlord shall have received notice of the commencement date thereof, in order that Landlord may post and record any appropriate Notice of Non-Responsibility. Landlord shall have the right at any time to post and maintain on the Premises such notices as Landlord reasonably deems necessary to protect Landlord and the Premises from mechanic's liens, material men's liens or any other liens. In performing the work on any such alterations, improvements or additions, Tenant agrees to cooperate with Landlord in arranging and undertaking such work so as to minimize any adverse impact and business interruption of Tenant, Landlord or any other occupant of the Property, and to diligently complete all such work. In no event shall such work be performed in a manner that obstructs access to the Property or to the Premises of any other occupant of the Property. Tenant shall pay, when due, all claims for labor or materials furnished to or for Tenant for use in improving the Premises. Tenant shall not permit any mechanic's or material men's liens to be levied against the Premises arising out of work performed, materials furnished, or obligations to have been performed on the Premises by or at the request of Tenant. Should any mechanic's or other lien be filed against the Premises, Property, or any part thereof by reason of Tenant's acts or omissions or because of a claim against Tenant, Tenant shall cause the same to be canceled and discharged of record by bond or otherwise within ten (10) business days after notice by Landlord. Tenant hereby agrees to indemnify, hold harmless, defend and protect Landlord against loss, damage, attorney's fees and all other expenses on account of claims of lien of laborers or material men or others for work performed or materials or supplies furnished for Tenant or persons claiming under it

    5.3   Trade Fixtures. Tenant shall install trade fixtures, machinery or other trade equipment in conformance with the ordinances of all applicable duly constituted public authorities and for a first class operation of Tenant's business, and Tenant shall maintain its operation in such first class condition Tenant may and upon Landlord's request shall, at Tenant's sole cost and expense, remove any of such trade fixtures or machinery upon the termination of this Lease, provided Tenant is not then in default under the terms and conditions of this Lease.

6.   UTILITIES:

    6.1   Responsibility for Payment. Tenant shall pay for all water, sewer, gas, heat, light, power, telephone service and any other services or utility provided to the Premises.

    6.2   Tenant's Share In the event that any utilities are furnished by Landlord, Tenant shall pay to Landlord its pro rata share of the cost thereof in the manner set forth in Paragraphs 11.2 and 11.3 (payment of Common Area Expenses). Tenant's pro rata share shall be based upon the percentage set forth in the Item 3(e) of the Basic Lease Provisions and (b) any extraordinary use which may be made by Tenant, as reasonably determined by Landlord in its sole and absolute discretion. If any utilities are furnished by Landlord directly or indirectly through joint metering, Landlord shall not be obligated to continue to provide such service if Tenant is in default under the terms hereof.

    6.3   Non-liability of Landlord Landlord shall not be liable for any failure or interruption for any reason of any utility service being furnished to the Premises.

    6.4   Separate Metering Tenant may elect, subject to Landlord's reasonable approval, to install and maintain its own meter for any utilities which are jointly metered by written notice delivered to Landlord thirty (30) days prior to the initiation by Tenant of any work to effectuate such change. All separate meters shall be installed and maintained at Tenant's sole cost and expense.

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

7.    INDEMNIFICATION:

7.1    Tenant's Indemnity Obligation.  Tenant does hereby agree to indemnify, hold harmless, defend, and protect Landlord, its employees, agents, partners, contractors, invitees and licensees from and against any and all suits, actions, damages, claims, liability and expense in connection with loss by reason of injury to person or property from caused by the negligent act or omission of Tenant, its employees, agents or contractors, invitees, or licensees, arising from or out of any occurrence in, upon, at or from the Premises, or the occupancy or use by Tenant of the Premises or any part thereof, including without limitation acts or omissions relating to the sidewalks and Common Areas, as hereafter defined, within the Property

7.2    Landlord's Indemnity Obligation  Landlord does hereby agree to indemnify, hold harmless, defend, and protect Tenant, its employees, agents, partners, contractors, invitees and licensees from and against any and all suits, actions, damages, claims, liability and expense in connection with loss by reason of injury to person or property from caused by the negligent act or omission of Landlord, its employees, agents or contractors, invitees, or licensees, arising from or out of any occurrence in, upon, at or from the Premises, or the occupancy or use by Landlord of the Premises or any part thereof, including without limitation acts or omissions relating to the sidewalks and Common Areas, as hereafter defined, within the Property.

7.3    Release of Landlord.  Except for loss or damages arising from the acts or omissions of Landlord or Landlord's Related Parties constituting sole negligence, gross negligence, or willful misconduct, Landlord shall not be responsible or liable at any time for any loss or damage to Tenant's merchandise, equipment, fixtures or other personal property or to Tenant's business, including without limitation any loss or damage to either the person or property of Tenant or loss of profits or otherwise that may be occasioned by or through the acts or omissions of persons occupying adjacent, connecting, adjoining or other space in the Property or by or through the acts or omissions of Landlord, its employees, agents, contractors, invitees or licensees  Tenant shall store its property in and shall use and enjoy the Premises and the Common Areas of the Property at its own risk, and hereby releases Landlord, its employees, agents, contractors, partners, invitees, and licensees, to the fullest extent permitted by law, from all claims of every kind, including without limitation, leakage of any nature, resulting in loss of life, personal or bodily injury, or property damage, except for loss or damages arising from the acts or omissions of Landlord or Landlord's Related Parties constituting sole negligence, gross negligence or willful misconduct.

7.4    Notice of Loss.  Tenant shall give prompt notice to Landlord in case of fire or accidents or other losses in the Premises or in the building of which the Premises are a part or in the Common Area as well as of any defects therein or in any fixtures or equipment located therein.

7.5    Survival of Lease Termination.  Tenant's obligations under Paragraphs 4.2, 7.1-7.5 inclusive, 21.1, and 27.1 shall survive the termination of this Lease for any reason whatsoever, if the incident requiring such defense occurred during the Lease term or otherwise directly or indirectly relates to the performance of any party under this Lease.  None of the indemnity obligations provided for in these Paragraphs 7 1-7.5 inclusive, or in Paragraph 4.2 shall require any payment as a condition precedent to recovery.

8.    INSURANCE:

8.1    Insurance Coverage by Landlord

(a)    Landlord shall maintain, at Tenant's expense as provided in Paragraph 8.1(b), a policy or policies of insurance protecting against the following.

(1)    Fire and other perils normally included in extended coverage insurance to the extent of at least ninety percent (90%) of the replacement value of the Premises, exclusive of personal property, trade fixtures and equipment belonging to Tenant and improvements and betterments made to the Premises by Tenant for which Tenant shall maintain fire and other perils insurance, which shall also name Landlord and its lenders as additional insureds.

LEASE – OFFICE BUILDING

Tenant's Initials
© Stephen J. Fitch

Landlord's Initials

        (2)      Public liability and property damage insurance with respect to the Common Areas in an amount not less than Two Million Dollars ($2,000,000) combined single limit for both bodily injury and property damage.

        (b)      Tenant shall pay to Landlord, as Additional Rent in the manner set forth in Paragraph 11.3 (Payment of Common Area Expenses), Tenant's pro rata share of the cost of the insurance required in Paragraph 8.1 (a). Tenant's pro rata share of such cost shall be that proportion of the annual premiums for insurance based upon the percentage set forth in Item 3(e) of the Basic Lease Provisions.

    8.2    Insurance Coverage by Tenant.

        (a)      Contents Insurance. Tenant shall maintain in force a policy or policies of special peril contents insurance, including without limitation vandalism and malicious mischief coverage, sprinkler leakage coverage and plate glass coverage for the Premises, with respect to Tenant's personal property, trade fixtures and equipment located in the Premises and all improvements and betterments to the Premises made by Tenant to the extent of at least ninety percent (90%) of their insurable value. During the term of this Lease, the proceeds of any such policy or policies of contents insurance shall be used solely for the repair or replacement of the property so insured. Landlord shall have no claim or interest in said insurance and will sign all documents necessary to effectuate the settlement of any claim or loss by Tenant.

        (b)      Liability Insurance. Tenant shall maintain during the term of this Lease worker's compensation insurance as required by applicable law and commercial liability insurance with respect to the Premises, all assumed liabilities by Tenant pursuant to Paragraphs 4 2 and 7.1-7.5 inclusive, product liability and all owned or non-owned and hired vehicles utilized in Tenant's business, adequate to protect Landlord as provided hereinafter. Such policy or policies of liability insurance shall add as additional insureds, Landlord and each of its partners, affiliates, directors, agents, employees, and lenders, and shall expressly provide that the interest of Landlord therein shall not be affected by any breach by Tenant of any policy provisions. Initially, such policy of liability insurance shall be in an amount not less than Three Million Dollars ($3,000,000.00) combined single limit for both bodily injury and property damage. The amounts of such liability insurance shall be increased from time to time, as Landlord or Landlord's mortgagee or beneficiary may reasonably determine. All insurance policies required hereunder shall be obtained upon an "occurrence" basis and not as "claims made" policies (except for any professional liability insurance which may be on a "claims made" basis). All liability, property damage, and other liability policies of Tenant shall be written as primary policies, not contributing with and not in excess of coverage which Landlord may carry. All such policies shall contain a provision that Landlord, and its lenders, although additional insureds, shall nevertheless be named as loss payees and be entitled to recover under said policies for any loss occasioned to it, its employees, agents, contractors, invitees and licensees by reason of the negligence of Tenant, its employees, agents, contractors, invitees and licensees. Tenant shall furnish Landlord with a certificate of insurance with attached endorsements with respect to such policies prior to Tenant's entry into the Premises  Such policies shall be secured from insurance companies with a Best's rating of A· Class VII or better and provide by endorsement that they may not be canceled or altered without sixty (60) days prior written notice delivered by the insurer to Landlord and/or its lenders.

    8.3    Waiver of Subrogation   Landlord and Tenant hereby release and relieve each other from liability and waive all right to recover against each other for any loss or damage arising out of or incident to the perils covered under their respective policies of insurance, which perils occur in, on or about the Premises, as a result of the negligence of Landlord or Tenant or their respective agents, employees, contractors and/or invitees  Landlord and Tenant shall, upon obtaining the policies of insurance required under this Lease, give notice to their respective insurance carrier(s) that the foregoing mutual waiver of subrogation is contained in this Lease, and shall provide to the other appropriate endorsements of such waiver from the insurers.

Tenant's Initials
© Stephen J Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

9       CARE OF THE PREMISES:

    9.1     Tenant's Obligations

        (a)     General. Tenant shall, at its expense, keep the Premises and exterior and interior portions thereof, including without limitation windows, doors, and all other glass or plate glass fixtures, in a neat, clean, sanitary and safe condition, and shall keep the Premises free from trash, rubbish and dirt. Tenant shall be solely responsible for glass breakage in the Premises, whether due to vandalism or otherwise Tenant shall immediately make all repairs or replacements thereon or thereto, whether ordinary or extraordinary. If Tenant fails to keep the Premises neat, clean or in reasonable repair, Landlord may, in its sole discretion, enter the Premises during reasonable hours in order to clean or repair same. Tenant shall immediately pay to Landlord its actual cost thereof as set forth in Landlord's statement submitted to Tenant for payment, provided, however, any such payment shall not be deemed a cure of Tenant's default and Landlord shall have all remedies available to it under Article 18 herein.

        (b)     Equipment and Fixtures Tenant shall, at its sole cost, keep and maintain all utilities, fixtures and mechanical equipment used by Tenant in good order, condition and repair. Said items shall include, but are not limited to, all plumbing or sewage facilities, doors, locks and closing devices, windows (including glass), lights, electric systems and equipment of every kind. Tenant shall pay to Landlord in the manner set forth in Paragraph 11.3 (Payment of Common Area Expenses), Tenant's pro rata share of the cost of any maintenance agreement for the Property. Tenant's pro rata share shall be the proportion of the cost of any maintenance agreement based on the percentage share set forth in Item 3 (e) of the Basic Lease Provisions.

    9.2     Landlord's Obligations.

        (a)     General. Landlord shall keep in good condition and repair the roof and structural components of the Premises, but the cost thereof shall be prorated based upon the percentage share set forth in Item 3 (e) of the Basic Lease Provisions and shall be paid by Tenant in the manner set forth in Paragraph 11.3 (Payment of Common Area Expenses). Landlord shall have no obligation to make any such repairs until Landlord has received written notice from Tenant with respect to the need for such repairs. Landlord shall not be deemed to be in default with respect to its obligation to repair unless and until Landlord has (1) received said written notice and (2) failed to make such repairs within a reasonable period following receipt of said notice Landlord shall, after receiving written notice, exercise due diligence in making such repairs.

        (b)     Landlord's Right of Access. In order to perform any of its obligations under this Lease, Landlord hereby reserves to itself and its successors the right of access to the exterior walls and roof of the Premises and the right to install, maintain, use, repair and replace pipes, ducts, conduits, and wires through the Premises in locations which will not materially interfere with Tenant's use thereof

10.     TAXES:

    10.1    Personal Property Taxes   Tenant shall pay prior to delinquency all taxes, assessments, license fees, and other public charges levied, assessed or imposed or which become payable during the term of this Lease upon any trade fixtures, furnishings, equipment and all other personal property of Tenant installed or located in the Premises. Whenever possible, Tenant shall cause said trade fixtures, furnishings, equipment and personal property to be separately assessed. If, however, any or all of said items shall be assessed and taxed with the Premises' real property, Tenant shall pay to Landlord such taxes as are attributable to Tenant's trade fixtures, furnishings, equipment and personal property within fifteen (15) days after receipt of any invoice from Landlord advising Tenant of the taxes applicable to Tenant's property.

    10 2    Real Estate Taxes.   Tenant shall also pay in the manner set forth in Paragraphs 11.2 and 11.3 any and all "real estate taxes" (as hereafter deemed) assessed or imposed, or which become a lien upon or become chargeable against or payable in connection with the Premises, including Tenant's pro rata share of such real estate taxes which are attributable to the Common Areas. Real estate taxes for the last year of the term of this Lease shall

Tenant's Initials
Ⓓ Stephen J Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

be prorated between Landlord and Tenant as of the expiration date of the Lease term  With respect to any assessments which may be levied against or upon the Premises, or which under the laws then in force may be evidenced by improvements or other bonds and may be paid in annual installments, only the amount of such annual installment, with appropriate proration for any partial year, and interest thereon, shall be included within a computation of taxes and assessments levied against the Premises  Tenant shall be responsible for all increases in real estate taxes attributable to or caused by any organization, re-organization, purchase, sale, merger, acquisition or consolidation of Tenant, Tenant's assets or Tenant's business or by reason of any sale, assignment or recording of any transfer of interest in the Premises or the Property by Landlord, but only to the extent of Tenant's share as set forth in this Paragraph 10.2 herein.

    10.3    Definition of Real Estate Taxes

        (a)    "Real estate taxes" shall mean and include each of the following:

        (1)    Any form of assessment, license fee, license tax, business license fee, business license tax, commercial rental tax levy, charge, penalty, bond or tax, imposed by any authority having the direct power to tax, including any city, county, state or federal government, or any school, agricultural, lighting, drainage or other improvement or special district thereof, as against any legal or equitable interest of Landlord in the Premises or in the real property of which the Premises are a part.

        (2)    Any tax on Landlord's right to rent or other income from the Premises or as against Landlord's business or leasing the Premises.

        (3)    Any assessment, tax, fee, levy or charge in substitution, partially or totally, or any assessment, tax, fee, levy or charge previously included within the definition of real property tax, it being acknowledged by Tenant and Landlord that Proposition 13 was adopted by the voters of the State of California in the June 1978 election and that assessments, taxes, fees, levies and charges may be imposed by governmental agencies for such services as are protection, street, sidewalk and road maintenance, refuse removal and for other governmental services formerly provided without charge to property Owners or Occupants. It is the intention of Tenant and Landlord that all such new and increased assessments, taxes, fees, levies and charges, and similar assessments, taxes, fees, levies and charges be included within the definition of "real property taxes for purposes of this Lease

        (4)    Any tax allocable to or measured by the Gross Floor Area of the Premises or the rent payable hereunder, including without limitation, any gross income tax or excise tax levied by the State of California, any political subdivision thereof, city, or federal government, with respect to the receipt of such rent, or upon with respect to the possession, leasing, operating, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises, or any portion thereof.

        (5)    Any tax upon this transaction or any document to which Tenant is a party, creating or transferring an interest or an estate in the Premises.

        (b)    "Real estate taxes" shall not include Landlord's federal or state income, franchise, inheritance or estate taxes.

## 11.    COMMON AREAS:

    11.1    Definition of Common Areas  The term "Common Area" shall include all areas within the Property outside the exterior boundaries of the buildings situated thereon, including, but not limited to, streets, tunnels, driveways, parking areas, truck ways, delivery passages, access roads, loading doors, sidewalks, ramps, open and closed courts and malls, landscaped and planted areas, slopes, comfort and first aid stations, washrooms and parcel pick-up stations, exterior stairways, bus stops, retaining and decorative walls and planters, and other areas provided by Landlord and/or other Owners of portions of the Property, their employees and invitees  Landlord reserves the right to install kiosks and other free-standing structures within the Common Areas, and also reserves the

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

right to make changes, alterations or additions at any time and from time to time in the size, shape, location, number and extent of the Common Areas, or any of them, so long as such changes, alterations or additions do not materially interfere with the Tenant's use and quiet enjoyment of the Premises, and no such change shall entitle Tenant to any abatement of rent, claim or allowance for any damages for injury or inconvenience to Tenant occasioned thereby.

      11.2    Maintenance of Common Areas. Landlord shall maintain the Common Areas in a neat, clean and orderly condition, properly lighted and landscaped as Landlord, in its reasonable discretion, shall determine. Tenant shall pay to Landlord in the manner set forth in Paragraph 11.3 (Payment of Common Areas Expenses) Tenant's pro rata share of the expenses (hereafter "Common Areas Expenses") in connection with the maintenance and operation of the Common Areas. Tenant's pro rata share of Common Areas Expenses shall be the percentage share set forth in Item 3(e) of the Basic Lease Provisions. If applicable, those common area charges that are attributable to retail operations shall be allocated solely among the retail spaces in the Property as opposed to the office spaces. Tenant's share of Common Areas Expenses shall also include any additional costs arising from special requirements created by Tenant's use of the Premises. Common Areas Expenses shall include, but shall not be limited to, (a) all sums expended and costs incurred in connection with the Common Areas for maintenance, landscaping, pest control, lighting, cleaning, trash removal, painting, restriping, repaving, resurfacing, sweeping, security, fire protection, sprinkler and irrigation systems; maintenance and repair of sidewalks, curbs and signs (which Tenant or other occupants of the Property are not obligated to repair); (b) operating, managing, policing, insuring, repairing and maintaining the Property and maintaining repairing and replacing roofs of the buildings in the Property; (c) operating, insuring, repairing, replacing and maintaining the "Common Utility Facilities" defined to include, but not limited to, sanitary sewer lines and systems, gas lines and systems, waterlines and systems, fire protection lines and systems, electric power, telephone and communication main lines and systems, HVAC equipment and systems, storm drainage and retention facilities and all other utility main lines and systems not exclusively serving the premises of any specific tenant; (d) parking charges, surcharges and other levies, assessments, or any other costs imposed or assessed by any local, state or federal government agencies in connection with the use of the parking facilities and/or the Common Utility Facilities, real and personal property taxes and assessments on the improvements and land comprising the Common Areas, depreciation and maintenance on operating machinery and equipment (if owned) and rental paid for such machinery and equipment (if rented) which machinery and equipment is used solely for the operation and maintenance of the Property; and (e) public liability and property damage insurance on the Common Areas and Common Facilities, fire with extended coverage insurance with vandalism and malicious mischief endorsements with, at Owner's option, earthquake damage and/or hazardous waste endorsements, rental loss coverage and any additional coverages required pursuant to Paragraph 8.1. In the event that any alteration, removal, replacement or repair is required to be made to any equipment or any portion of the Property pursuant to governmental authority, statute, law or court order, all expenses associated therewith shall be included in Common Areas Expenses unless such expenses are born by a specific tenant or occupant of the Property. Common Area Expenses shall include property management costs, Property Management Costs shall not exceed ten percent (10%) of the gross base rents received for the entire Property.

      11.3    Payment of Common Areas Expenses. Prior to the commencement of each lease year or such other annual accounting period as Landlord shall utilize from time to time, Landlord shall give Tenant a written estimate of the Additional Rent payable by Tenant during the coming year. Tenant shall pay such estimated amount to Landlord in equal monthly installments, in advance, at the same time the Base Monthly Rent is paid. Within ninety (90) days after the end of each lease year, or such other annual accounting period as Landlord shall utilize from time to time, Landlord shall furnish to Tenant a statement showing in reasonable detail the actual costs incurred by Landlord for the operation and maintenance of the Property during the year then ended, and Tenant shall pay to Landlord Tenant's proportionate share of the cost incurred in excess of the payments of Additional Rent made by Tenant within ten (10) days of receipt of such statement. In the event that the payments of Additional Rent made by Tenant exceed Tenant's share of the actual cost of the operation and maintenance of the Property, the amount of any such excess shall be credited by Landlord to the Additional Rent next due and owing; provided, however, that, if the Lease term has expired, Landlord shall accompany said statement with the amount due to Tenant. Notwithstanding the foregoing, Landlord shall have the right to submit statements to Tenant for unbudgeted Common Area Expenses incurred on an emergency basis, and Tenant shall remit payment on such statements for its pro rata share of such Common Area Expenses within thirty (30) days of receipt of same. Tenant hereby

Tenant's Initials
© Stephen J Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

acknowledges that major tenants and tenants of kiosks and similar structures, may not pay Common Area Expenses and other Additional Rent charges on the same basis as Tenant herein.

11.4    Use of Common Areas   Tenant shall have for its use and benefit the nonexclusive right in common with Landlord and future Owners, other Occupants of the Property, and their agents, employees, customers, invitees, licensees and sublessees to use the Common Areas from time to time existing during the entire term of this Lease, or any extension thereof, for ingress and egress, roadway, automobile parking and sidewalks. Tenant shall not use any portion of the Common Area for any purpose, other than as set forth herein, without the prior written consent of Landlord, which consent may be withheld in its sole and absolute discretion.

12.    SIGNS AND ADVERTISING:

12.1    Tenant shall not place any sign upon the Premises or the Office Building or any roof thereof, without Landlord's prior written consent. Notwithstanding the foregoing, Tenant shall have the right, subject to Landlord's written approval of the plans, at Tenant's sole cost and expense, to install a sign on the exterior of the top of the Office Building, provided Tenant complies with all laws, orders, rules and regulations of all governmental authorities having jurisdiction and otherwise complies with all of the covenants, agreements, terms, provisions and conditions of this Lease. Tenant shall send a copy to Landlord, for Landlord's files, any and all permits necessary for the above.

12.2    Prohibited Advertising.

(a)    Tenant shall not, without Landlord's written consent, install any exterior lighting, amplifiers or similar devices or use in, upon or about the Premises any advertising media which may be heard or seen outside the Premises, such as flashing lights, search lights, loudspeakers, phonographs or radio broadcasts. Landlord may withhold its consent in its sole and absolute discretion.

(b)    Tenant shall not, without Landlord's written consent, which may be withheld in its sole and absolute discretion, solicit business in the Common Areas, nor distribute any hand bills or other advertising matter in the Common Areas

13.    ENTRY BY LANDLORD:

13.1    Permitted Entry by Landlord.   Landlord and its agents may enter the Premises at any reasonable time upon reasonable notice to Tenant, or immediately in the case of an emergency, for the purpose of inspecting the same, for the purpose of maintaining the Property and for the purpose of making repairs, alterations, or additions to any portion of the Property, including the erection and maintenance of such scaffolding, canopies, fences, and props as may be required, or for the purpose of posting notices of non-responsibility for alterations, additions, or repairs Landlord may, at any time during the last sixty (60) days of the term of this Lease, enter the Premises during normal business hours to place any usual or ordinary "For Leases" signs and/or to show the Premises to prospective lessees.

14.    ASSIGNMENT AND SUBLETTING:

14.1    Consent Required.   Notwithstanding anything to the contrary contained in this Lease, Tenant shall not assign this Lease or any interest herein or sublet, license, grant any concession or otherwise give permission to anyone other than Tenant to use or occupy all or any part of the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld. Any attempted assignment, subletting, license or concession agreement or change of ownership without Landlord's written consent shall be void and shall confer no rights upon any third person. Without in any way limiting Landlord's right to refuse to give such consent for any other reason or reasons, Tenant agrees that it would not be commercially unreasonable to withhold consent, if in Landlord's reasonable business judgment (a) the financial worth as adjusted for inflation and/or net current assets of the proposed new Tenant is less than that of the Tenant executing this Lease or of Tenant and Tenant's Guarantor, as the case may be, (b) the transferee is not of a character or is not engaged in a business which is in keeping with the

Tenant's Initials
O Stephen J Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

standards of Landlord for the Premises or the Property, (c) the operation of the transferee's business will interfere with or be in competition to or violate any restriction or exclusive right given in or contrary to any lease or use of any other tenant or occupant in the Property, or potential tenant with whom Landlord is negotiating, or (d) the use of the proposed new Tenant may increase the risk of the use, release or mishandling of Hazardous Materials, or (e) the purpose for which the transferee intends to use the Premises is different from that of Tenant in violation of this Lease or other requirements of the Property. Landlord shall require a reasonable payment, including attorney's fees, of not less than One Thousand Five Hundred Dollars ($1,500.00), to cover its handling charges for each assignment or sublease it is requested to approve. The sale, assignment, transfer or disposition, whether for value, by operation of law, gift, will or intestacy, of (i) twenty-five percent (25%) or more of the issued and outstanding stock of Tenant if Tenant is a corporation, or (ii) the interest of any general partner, joint venturer, associate or co-tenant, if Tenant is a partnership, joint venture, association or co-tenancy, or (iii) the alienation, hypothecation, encumbrance, mortgaging or other transfer of Tenant's interest in this Lease or in the Premises, shall be deemed an assignment of this Lease under this Paragraph  Notwithstanding the foregoing Tenant shall have a onetime right during the first three years of the Lease to an assignment of this Lease as part of a merger of Tenant with another non-profit corporation.

14.2  General Conditions.  In the event of any approved assignment or sublease of this Lease, Tenant shall remain primarily liable on its covenants hereunder for the entire term of any approved sublease. In the event of any assignment or sublease, the assignee or sublessee shall agree in writing to perform and be bound by all of the covenants of this Lease required to be performed by Tenant, including without limitation all prior, past due and future obligations of Tenant. Tenant agrees that any options to extend the term of this Lease are not assignable to a subtenant and further agrees that Tenant cannot exercise any option to extend the term of this Lease if a sublessee is in possession of the Premises at the time of the exercise of the option.  If Landlord so elects during the term of this Lease, Landlord may require, and Tenant hereby consents to assignee or subtenant paying the Base Monthly Rent and Additional Rent, and in the event of sublease the Landlord's portion of the above-mentioned increase, directly to Landlord. Notwithstanding the foregoing, the receipt and retention by Landlord of any rent payment by a proposed assignee or subtenant shall not constitute consent to such assignment or sublease unless specified in writing by Landlord.

14.3  Requirements.  If Tenant desires at any time to assign this Lease or to sublet the Premises or any portion thereof, it shall notify Landlord of its desire to do so and shall submit in writing to Landlord (a) the name of the proposed subtenant or assignee; (b) the nature of the proposed subtenant's or assignee's business to be carried on in the Premises; (c) the terms and provisions of the proposed sublease or assignment, including copies of any and all documents and instruments; (d) a current financial statement of the proposed subtenant or assignee and of any additional guarantor proposed for such assignment or subletting; (e) a business plan prepared by the proposed subtenant or assignee for the remainder of the term of the Lease; (f) a drawing depicting the proposed sign, and (g) such other information, financial or otherwise, as Landlord may request concerning the proposed subtenant or assignee. As provided in Paragraph 14.1, any request for Landlord's approval of a sublease or assignment shall be accompanied with a check in such reasonable amount as Landlord shall advise for the cost of review and/or preparation of any documents relating to such proposed transfer  Furthermore, Tenant and the proposed subtenant or assignee shall agree that Landlord shall have the right to enforce any and all of the terms of the sublease, as well as of the Lease, directly against such subtenant or assignee.

14.4  Election  At any time within fifteen (15) days after Landlord's receipt of the information specified in Paragraph 14 3 above, Landlord may by written notice to Tenant elect to either  (a) accept the proposed assignment or sublease to the Premises or the portion thereof as shall be specified in said notice upon the same terms as those offered to the proposed subtenant or assignee, as the case may be; or (b) disapprove and reject the proposed assignment or sublease  If Landlord does not provide notice or rejection or disapproval within said fifteen (15) day period, then the proposed assignment or sublease shall be deemed approved.  If Landlord rejects the proposed assignment or sublease, Landlord shall have the right to terminate this Lease; provided, however, Tenant shall have the right to withdraw the proposed assignment or sublease assignment within ten (10) days of Landlord's notice of rejection and termination given pursuant to this Paragraph 14.4, and Tenant shall remain in possession under the terms of this Lease.  Any consent given to a proposed assignment or sublease shall not be deemed to be a consent to

LEASE – OFFICE BUILDING

Tenant's Initials
© Stephen J Fitch

Landlord's Initials

Page 15 of 27

any future assignment or sublease.

     14.5   <u>Bankruptcy.</u>

     (a)   If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, 11 U.S.C Section 101, et seq. (the "Bankruptcy Code"), any and all monies or other consideration payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, shall be the exclusive property of Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code. Any and all monies or other consideration constituting Landlord's property under the preceding sentence not be paid or delivered to Landlord, shall be held in trust for the benefit of Landlord and shall be promptly paid or delivered to Landlord.

     (b)   Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment. Any such assignee shall upon demand execute and deliver to Landlord an instrument confirming such assumption.

     (c)   This is a lease of real property in a center within the meaning of Section 365(b)(3) of the Bankruptcy Code.

     14.6   <u>Limitation of Remedy.</u> Tenant acknowledges and agrees that each of the rights of Landlord set forth in Paragraphs 14.1-14.5 are reasonable restrictions on subletting and assignment for purposes of California Civil Code Section 1951 4, and Landlord shall have no liability to Tenant or to any proposed transferee of Tenant for any damages if it is adjudicated that Landlord's consent has been unreasonably withheld. Tenant's sole remedy shall be to have the proposed assignment or sublease declared valid.

15.    ABANDONMENT:

     15.1   <u>Tenant's Abandonment Prohibited.</u> Absent Tenant's prior written notice to Landlord and Landlord's written approval thereof, which may be withheld in its sole and absolute discretion, Tenant shall not vacate or abandon the Premises any time during the term of this Lease nor permit the Premises to remain unoccupied for a period of longer than fifteen (15) consecutive days during the term of this Lease. If Tenant shall abandon, vacate, or surrender the Premises, or be dispossessed by process of law, or otherwise, any personal property or trade fixtures belonging to Tenant and left on the Premises shall, at the option of Landlord, be deemed abandoned. In such case, Landlord may dispose of said personal property in any manner as permitted by applicable law and is hereby relieved of all liability for doing so. These provisions shall not apply if the Premises should be closed and business temporarily discontinued therein on account of strikes, lockouts, or similar causes (other than those of a financial nature) beyond the reasonable control of Tenant.

16.    BREACH BY TENANT:

     16.1   <u>Events of Default.</u> The occurrence of any of the following shall constitute a default, and if such default is not timely cured shall constitute a material breach of this Lease, by Tenant:

     (a)   The failure of Tenant to pay or cause to be paid when due any rent, monies, or charges required by this Lease to be paid by Tenant when such failure continues for a period of three (3) days after written notice thereof from Landlord to Tenant; or

     (b)   The abandonment of the Premises by Tenant within the meaning of Paragraph 15 1; or

     (c)   The failure of Tenant to do or cause to be done any material act, other than payment of rent, monies or charges, required by this Lease, or

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

      (d)      Tenant causing, permitting, or suffering, without the prior written consent of Landlord, any material act when this Lease requires Landlord's prior written consent or prohibits such act; or

      (e)      The occurrence of any event of insolvency or bankruptcy with respect to Tenant, including any of the following by way of illustration:

          (1)      Any general assignment or general arrangement for the benefit of creditors;

          (2)      The filing of any petition by or against Tenant to have Tenant adjudged a bankrupt or a petition for reorganization or arrangement under any law relating to bankruptcy, unless such petition is filed against Tenant and the same is dismissed within sixty (60) days;

          (3)      The appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located in the Premises or of Tenant's interest in this Lease; or ;

          (4)      The attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease.

      (f)      The falsification of any written report or statement required to be given by Tenant to Landlord under this Lease.

    16.2    No Waiver.  The acceptance by Landlord of any partial payment of rent due hereunder after breach by Tenant will not constitute a waiver of such breach, unless a written statement to that effect signed by Landlord has been delivered to Tenant.

17.      REMEDIES UPON BREACH:

    17.1    Landlord's Remedies  In the event of any breach by Tenant, in addition to other rights or remedies of Landlord at law or in equity, Landlord shall have the right to exercise any one or more of the following remedies:

      (a)      Collect Rent Without Terminating Lease. Landlord may recover from Tenant the rent as it becomes due and any other amount necessary to compensate Landlord for all detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom. Landlord may sue monthly, annually or after such equal or unequal periods as Landlord desires for amounts due under this subparagraph (a). The right to collect rent as it becomes due shall terminate upon the termination by Landlord of Tenant's right to possession of the Premises. Tenant's right to possession shall not be terminated unless and until Landlord delivers to Tenant written notice thereof.

      (b)      Terminate Lease. Landlord an alternative to exercising the remedies set forth in Paragraph 17.1 (a), may terminate Tenant's right to possession of the Premises by and upon delivery to Tenant of written notice of termination. Landlord shall then immediately reenter the Premises and take possession thereof pursuant to legal proceedings and remove all persons and property from the Premises. Such property may be removed and stored in a public warehouse or elsewhere at the cost of and for the account of Tenant  No notice of termination shall be necessary in the event that Tenant has abandoned the Premises. In the event that Landlord elects to terminate Tenant's right of possession, Landlord may recover all of the following:

          (1)      The worth at the time of award of the unpaid rent which had been earned at the time of termination. "Worth at the time of award" shall be computed by allowing interest at ten percent (10%) per annum, or the highest rate allowed at law, whichever is less, from the first day the breach occurs;

          (2)      The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Tenant proves could have been reasonably avoided  Worth at the time of award" shall be determined by allowing

LEASE – OFFICE BUILDING

Tenant's Initials
© Stephen J. Fitch

Landlord's Initials

interest at the rate of ten percent (10%) per annum, or the highest rate allowed at law, whichever is less, from the first day a breach occurs;

      (3)    The worth at the time of award by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Tenant proves could be reasonably avoided "Worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award, plus one percent (1%);

      (4)    Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under the Lease or which in the ordinary course of events would be likely to result therefrom including, but not limited to, expenses of reletting, attorney's fees, costs of alterations and repairs, recording fees, filing fees and any other expenses customarily resulting from obtaining possession of leased Premises and releasing.

      17.2    Landlord's Right to Cure.  In the event of breach, default, or noncompliance under this Lease by Landlord, Tenant shall, before exercising any right or remedy available to it, give Landlord written notice of the claimed breach, or noncompliance in reasonable detail, setting forth the necessary actions to be taken to cure such default. If, prior to its giving such notice, Tenant has been noticed in writing (by way of Notice of Assignment of Rents and Leases or otherwise) of the address of a lender which has furnished any financing to Landlord or is a beneficiary of any deed of trust recorded against the Premises or the Property, then concurrently with giving the aforesaid notice to Landlord, Tenant shall, pursuant to the manner of giving notice set forth in Paragraph 30.9 below, transmit a copy thereof to such lender or lenders. For thirty (30) days following the receipt of the notice by Landlord, Landlord shall have the right to cure such breach or to commence the cure if more than thirty (30) days is reasonably required to affect such cure, so long as Landlord shall thereafter diligently pursue such cure to a completion. If Landlord has failed to commence the cure within such thirty (30) day period, then Tenant shall so notify Landlord's lender or lenders and provide any such lender with an additional thirty (30) days to effect such cure, so long as any such lender shall thereafter diligently pursue such cure to a completion, (including, but not limited to, commencement and prosecution of proceedings to foreclose or otherwise exercise its rights under its mortgage or other security instrument, if necessary to effect such cure), in which event this Lease shall not be terminated by Tenant so long as such actions or remedies are being diligently pursued by said lender. If the default is cured by Landlord or lender as provided above, Tenant shall have no other remedy available to it and this Lease shall remain in full force and effect.  If Landlord, or lender as provided herein, fails to cure the breach, default or noncompliance as set forth herein Tenant shall have the right to terminate the Lease upon sixty (60) day notice to Landlord and lender after the expiration of the applicable time frames to cure

## 18.    DAMAGE OR DESTRUCTION:

      18.1    Destruction in Whole or Part.  In the event that the Premises is partially or completely damaged or destroyed or declared unsafe or unfit for occupation by any authorized public authority for any reason other than Tenant's acts, use or occupation, which declaration requires repairs to either the Premises or the building in which the Premises are located, the rights and obligations of Tenant and Landlord shall be as follows.

      (a)    If the damage is covered under the form of property insurance carried by Landlord, and sufficient insurance proceeds are available to make all necessary repairs, Landlord shall repair such damage as soon as is reasonably possible and this Lease shall continue in full force and effect.

      (b)    In the event that such damage is not covered, or is "under insured" by the form of property insurance carried by Landlord, Landlord shall repair such damage; provided, however, that if such damage or destruction exceeds thirty percent (30%) of the then replacement value of the improvements on the Premises (exclusive of trade fixtures, equipment and foundations), Landlord shall have no obligation to repair such damage. If Landlord elects not to repair such damage Tenant shall have the right to terminate the Lease upon sixty (60) day notice to Landlord and lender.

      (c)    Notwithstanding anything contained herein above, (1) if the Premises are damaged or

Tenant's Initials
© Stephen J Fitch

LEASE—OFFICE BUILDING

Landlord's Initials

destroyed to any extent during the last twelve (12) months of the term of this Lease, (2) if the uninsured portion of such damage exceeds thirty percent (30%) of the then replacement value of the building of which the Premises constitute all or a part, or (3) if over fifty percent (50%) of the Premises shall be damaged or destroyed at any time whether such casualty is insured or not, Landlord may, at Landlord's option, cancel and terminate this Lease by delivery of written notice to Tenant to so terminate. Said written notice shall be made within ninety (90) days after the date of occurrence of such damage or destruction and shall be effective as of the date of such notice. If notice is not given within said ninety (90) day period, Landlord shall be deemed to have elected to restore the damage or destruction and shall repair such damage as soon as reasonably possible. If the above occurs and Landlord does not elect to terminate or repair than Tenant shall have the right to terminate the Lease upon sixty (60) day notice to Landlord and lender.

18.2    Rent Abatement.   If Landlord elects or is required to make repairs to the Premises, pursuant to Paragraph 18.1 above, Tenant shall be entitled to a reduction in the Base Monthly Rent during the time in which the repairs are being made to the extent to which Tenant's use of the Premises is impaired. Wherever the Lease provides for rent abatement, that phrase shall mean Base Monthly Rent and Additional Rent. All rent abatement shall terminate upon the substantial completion of such repair or restoration.

18.3    Restoration of Tenant's Property.   Landlord's obligation to restore shall not include the restoration or replacement of Tenant's trade fixtures, equipment, merchandise or any improvements or alterations made by Tenant to the Premises. Tenant shall restore and replace the same in the event that Landlord is obligated or elects to repair any damage or destruction of the Premises.

19.    CONDEMNATION:

19.1    General.   If the Premises or any portion thereof are taken under the power of eminent domain, or sold by Landlord under the threat of the exercise of such power, this Lease shall terminate as to the part so taken as of the date that the condemning authority takes possession of the Premises. If more than twenty-five percent (25%) of the Premises is taken or sold under such threat, either Landlord or Tenant may terminate this Lease as of the date that the condemning authority takes possession by delivery of written notice of such election within twenty (20) days after such party has been notified of the taking or, in the absence thereof, within twenty (20) days after the condemning authority shall have taken possession.

19.2    Continuation of Lease After Condemnation   If this Lease is not terminated by Landlord or Tenant, it shall remain in full force and effect as to the portion of the Premises remaining; provided, however, that the Base Monthly Rent and Tenant's share of Common Areas Expenses shall be reduced in proportion to the reduction of the Gross Floor Area of the Premises. In such event, Landlord shall, at Landlord's expense, restore the Premises to a complete unit of like quality and character, except as to size, as existed prior to the date on which the condemning authority took possession. If more than twenty-five percent (25%) of the Premises is taken under the power of eminent domain, or sold by Landlord under the threat of the exercise of such power than Tenant shall have the right to terminate the Lease upon sixty (60) day notice to Landlord and lender

19.3    Allocation of Condemnation Award.   All awards for the taking of any part of the Premises or proceeds from the sale made under the threat of the exercise of the Power of eminent domain shall be the property of Landlord, whether made as compensation for diminution of value of the leasehold estate, for the taking of the fee, or as severance damage; provided, however, that Tenant shall be entitled to any award for loss of or damage to Tenant's trade fixtures, and removable personal property which is separately stated within such award. Any other claim of Tenant relative to this Paragraph 19.3 shall not diminish Landlord's recovery in any respect.

20.    SURRENDER OF LEASE:

20.1    Effect of Surrender.   The voluntary or other surrender or a mutual cancellation of this Lease by Tenant shall not work a merger, and shall, at the election of Landlord, either terminate all or any existing subleases or subtenancies or may operate as an assignment to it of any or all of such subleases or subtenancies. Landlord shall

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

exercise its election within thirty (30) days of the event so requiring.

21.    ATTORNEY'S FEES:

    21.1    Attorney's Fees. If Landlord is involuntarily made a party defendant to any litigation relating to this Lease or the Premises by reason of any act or omission of Tenant, then Tenant shall defend, protect and hold Landlord harmless from any loss, cost or expense, including reasonable attorney's fees, arising out of or relating to any such litigation. In the event of any legal action or proceeding between the parties, the ultimately prevailing party shall be entitled to reasonable attorney's fees and expenses as a part of the judgment resulting therefrom

22.    SALE, EXCHANGE OR MASTER LEASE OF THE PREMISES BY LANDLORD:

    22.1    Landlord's Residual Liability. Notwithstanding any other provisions of this Lease, Landlord may assign, in whole or in part, Landlord's interest in this Lease and may sell, exchange or master lease all or part of the real estate of which the Premises are a part. In the event of any sale or exchange of the Premises by Landlord and assignment by Landlord of this Lease, Landlord shall be and is hereby entirely freed and relieved of all liability under any and all covenants and obligations contained in or derived from this Lease or arising out of any act, occurrence or omission relating to the Premises which occurs after the consummation of such sale, exchange, or assignment. Landlord shall provide Tenant with notice of any assignment, sale, exchange or master lease.

23.    QUIET ENJOYMENT:

    23.1    Landlord's Covenant. If Tenant is not in breach under the covenants made in this Lease and has satisfactorily attorned to any successor in interest to Landlord or any lender of Landlord as provided in Article 25, Landlord covenants that Tenant shall have peaceful and quiet enjoyment of the Premises without hindrance on the part of Landlord. Landlord will defend Tenant in the peaceful and quiet enjoyment of the Premises against claims of all persons claiming through or under the Landlord.

24.    ESTOPPEL CERTIFICATES:

    24.1    Tenant's Obligation. Tenant shall at any time during the term of this Lease, within five (5) business days of receipt of written notice from Landlord, execute and deliver to Landlord a statement in a form acceptable to Landlord in writing certifying that this Lease is unmodified and in full force and effect or, if modified, stating the nature of such modification. Tenant's statement shall include other commercially reasonable information and details requested by Landlord, such as the date to which rent and other charges are paid, Tenant's knowledge concerning any uncured defaults with respect to Landlord's obligations under this Lease and the nature of such defaults if they are claimed. Any such statement may be relied upon conclusively by any prospective purchaser or lender of the Premises. Should Tenant shall fail to timely deliver such estoppel certificate to Landlord, Tenant agrees that such failure shall be conclusive upon Tenant that this Lease is in full force and effect, except to the extent any modification has been represented by Landlord, and that there are no uncured defaults in the Landlord's performance, and that not more than one month's rent has been paid in advance.

25.    SUBORDINATION; ATTORNMENT; NON-DISTURBANCE:

    25.1    Subordination of Lease to Landlord's Financing. Except as otherwise provided herein, this Lease is hereby made subordinate to the lien of any mortgage or deed of trust to any bank, insurance company or other lending institution, now or hereafter in force against the real property of which the Premises constitute a part, and to all advances made or hereafter made upon the security thereof ("Security Instrument"). Any holder of a Security Interest at any time existing or encumbering the Landlord's interest in the Property may, at its option, subordinate its Security Interest to this Lease.

    25.2    Attornment by Tenant. In the event of the sale or assignment of Landlord's interest in the Property of which the Premises are a part, or in the event any proceedings are brought for foreclosure, or in the event

Tenant's Initials
© Stephen J Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

of the exercise of the power of sale under any mortgage or deed of trust made by Landlord covering the Premises, Tenant shall, subject to the non-disturbance provisions of Paragraph 25.5 below, attorn to the purchaser or assignee upon any such foreclosure or sale or assignment and recognize such purchaser or assignee as Landlord under this Lease.

25.3    Subordination of Lease to Certain Agreements with Third Parties.   Tenant hereby subordinates its rights hereunder to any Declaration of Restrictions and Grant of Easements or any other operation and reciprocal easement agreement, or any amendments thereto, for access and parking between Landlord and the Owner(s) of any property located within or adjacent to the Property whenever, in the reasonable discretion of Landlord, it is determined that any such agreement would be beneficial to the use and operation of the Property

25.4    Execution of Documents.   Tenant, upon request of any party in interest, shall execute promptly such instruments and certificates, to carry out the intent of Articles 24 and 25. If, within ten (10) days after the date of a written request by Landlord to execute such instruments, Tenant shall not have executed the same, Tenant shall be deemed to have irrevocably appointed Landlord as attorney-in-fact for Tenant with full power and authority to execute and deliver in the name of Tenant any such instruments, certificates, and/or documents.

25.5    Non-Disturbance.   With respect to any Security Instrument entered into by Landlord after execution of this Lease, and with respect to any requested attornment by Tenant per Paragraph 25.2 above, Tenant's subordination of this Lease, and Tenant's attornment, shall be subject to receiving a commercially reasonable non-disturbance agreement ("Non-Disturbance Agreement") from the holder of such Security Instrument, or purchaser or assignee of Landlord, which Non-Disturbance Agreement shall provide that Tenant's possession of the Premises, and this Lease and options to extend the term hereof, will not be disturbed so long as Tenant is not in breach under the Lease and attorns to the record owner of the Premises.

26    HOLDING OVER; SURRENDER:

26.1    Effect of Holding Over.   If Tenant remains in possession of the Premises after the expiration of the term of this Lease, including options, if applicable, without executing a new Lease, or after Landlord has declared a forfeiture by reason of a material breach by Tenant, then such holding over shall be construed as a tenancy from month to month, subject to all the conditions, provisions and obligations of this Lease insofar as they are applicable to a month-to-month tenancy. The Base Monthly Rent payable during any period of holding over should be equal to one hundred five percent (105%) of the Base Monthly Rent payable during the period immediately preceding Tenant's holding over, and all Percentage Rent and Additional Rent payments shall also be made as specified within this Lease.

26.2    Surrender of Premises.   At the expiration of this Lease, Tenant shall surrender the Premises in the same condition as it was upon delivery of possession thereto under this Lease, reasonable wear and tear excepted, and shall deliver all keys to Landlord. Before surrendering the Premises, Tenant shall, at its sole cost and expense, remove all of its personal property and trade fixtures and such alterations or additions to the Premises made by Tenant as may be specified for removal by Landlord, and shall repair any damage caused by such property or the removal thereof. If Tenant fails to remove its personal property and fixtures upon the expiration of this Lease, the same shall be deemed abandoned and shall become the property of Landlord.

27.    LIMITATION OF LIABILITY:

27.1    Agreement by Tenant.

(a)    In consideration of the execution of this Lease by Landlord, Tenant agrees in the event of any actual or alleged failure, breach, or default hereunder by Landlord: (1) The sole and exclusive remedy shall be against the partnership and its partnership assets; (2) no partner of Landlord should be sued or named as a party in any suit or action (except as may be necessary to secure jurisdiction of the partnership); and (3) no judgment will be taken against any partner of Landlord  These covenants and agreements are enforceable both by Landlord and also

Tenant's Initials
© Stephen J  Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

by any partner of Landlord.

(b)     Tenant agrees that each of the foregoing covenants and agreements shall be applicable to any covenant or agreement either expressly contained in this Lease or imposed by statute or at common law.

28.     LIABILITY OF SUCCESSORS:

28.1     Inurement.  The covenants and conditions herein contained shall, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators and assigns of all of the parties hereto and all of the parties hereto shall be jointly and severally liable for the covenants contained herein

29.     MISCELLANEOUS PROVISIONS:

29.1     Gender and Number.  Whenever the singular number is used in this Lease, the same shall include the plural, and the masculine shall include the feminine and neuter gender; and the word "person" shall include corporation, form or association, when required by the context.

29.2     Captions.  The headings or titles to the articles and paragraphs of this Lease are for convenience only and do not in any way define, limit or construe the contents of such articles and paragraphs.

29.3     Entire Agreement.  This Lease and its exhibits contain all of the agreements and conditions made between the parties with respect to the leasing of the Premises. Landlord and Landlord's Real Estate Brokers make no warranty or representation with respect to any other tenants or owners which may or may not construct improvements, occupy or conduct business within the Property, and Tenant hereby acknowledges and agrees that it is not relying on any warranty or representation relating thereto in entering into this Lease. Landlord specifically disavows any oral representations made by or on behalf of its employees, agents, and independent contractors, other than the express terms of this Lease. Tenant hereby acknowledges and agrees that it is not relying on and will not rely on any oral representations in entering into this Lease. References upon the exhibits to potential tenants within the Property are to be considered generic and are not to be considered as specific representations that any particular company, firm, business enterprise will occupy a specific area within the Property.  This Lease may not be amended, modified, or any of its provisions waived except by a written instrument signed by all the parties to this Lease.

29.4     Governing Law.  The laws of the State of California shall govern the validity, performance and enforcement of this Lease.

29.5     Invalidity; Construction.  If any provision of this Lease is determined to be void by any court of competent jurisdiction, such determination shall not affect any other provision of this Lease and such other provisions shall remain in full force and effect. If any provision of this Lease is capable of two constructions, one which would render the provision void and one which would render the provision valid, the provision shall be interpreted in the manner which would render it valid.

29.6     Payments.  Except as may otherwise be expressly stated, each payment required to be made by Tenant shall be in addition to and not in substitution for other payments to be made by Tenant.

29.7     Time of Essence.  Time is of the essence of each and every provision of this Lease.

29.8     Force Majeure  Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, regulations, or controls, enemy or hostile government action, civil commotion, fire or other casualty, and other causes (other than financial) beyond the reasonable control of the party obligated to perform, shall excuse the performance by such party for a period equal to that resulting from such prevention, delay or stoppage, except those obligations of Tenant to pay rent and other charges pursuant to the terms of this Lease.

Tenant's Initials
© Stephen J Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

29.9    Notices.

(a)    All notices to be given by one party to the other under this Lease shall be in writing, mailed or delivered to the other party at the addresses specified in Item 10 of the Basic Lease Provisions.

(b)    Mailed notices shall be sent by United States Postal Service, certified or registered mail, with return receipt requested, postage prepaid, or by other comparable commercial means, and shall be deemed to have been given two (2) days after the date posted by the United States Postal Service or on the date signed as received by such other comparable commercial service.

(c)    Either party may, by proper notice, at any time designate a different party and/or address to which notices shall be sent.

29.10    Brokers.    Tenant warrants that it has had no dealings with any real estate broker or agent in connection with the negotiation and/or execution of the Lease, except the broker identified in Item 11 of the Basic Lease Provisions

29.11    No Partnership.    Notwithstanding any other provision of this Lease, Landlord does not by this Lease, in any manner nor for any purpose, become a partner or joint venturer of Tenant in the conduct of its business or otherwise. The provisions of this Lease relating to Percentage Rent and Additional Rent are included solely for the purpose of providing a method whereby such rent is to be measured and ascertained.

29.12    Fees and Permits.    Tenant is responsible for the application, payment and approval of all fees, licenses and permits necessary to prepare for and complete the opening and continued operation of its business.

29.13    Rules and Regulations.    Landlord reserves the right to make such reasonable rules and regulations as it deems appropriate, in its sole discretion, to provide for a more efficient and orderly operation of the Property. Tenant covenants and agrees to be bound by and to abide by all such rules and regulations immediately upon receipt of written notice of such rules and regulations from Landlord.

29.14    General Interpretation.    The terms of this Lease have been negotiated by the parties hereto and the language used in this Lease shall be deemed to be the language chosen by the parties hereto to express their mutual intent.  This Lease shall be construed without regard to any presumption or rule requiring construction against the party causing such instrument or any portion thereof to be drafted, or in favor of the party receiving a particular benefit under the Agreement.  No rule of strict construction will be applied against any person.

29.15    Counterpart Signatures.    This Lease may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Lease shall not be effective until the execution and delivery between each of the parties of at least one set of counterparts  The parties authorize each other to detach and combine original signature pages and consolidate them into a single identical original  Any one of such completely executed counterparts shall be sufficient proof of this Lease.

29.16    Business Day Defined    "Business Day" means a day other than a Saturday, Sunday, or holiday on which banks, County offices, or U.S. Post Offices are closed in San Diego County; if a date or time period provided for in this Lease is or ends on a day other than a Business Day, then such date shall automatically be extended until the next Business Day.

30.    SPECIAL PROVISIONS:

30.1    Not An Offer.    THE SUBMISSION OF THIS LEASE BY LANDLORD IS NOT AN OFFER AND THERE SHALL BE NO AGREEMENT OF ANY NATURE BETWEEN THE PARTIES THAT IS BINDING UPON ANY PARTY HERETO UNTIL THIS LEASE IS FULLY EXECUTED AND LANDLORD

LEASE – OFFICE BUILDING

Tenant's Initials
© Stephen J Fitch

Landlord's Initials

HAS CLOSED ESCROW TO PURCHASE PROPERTY. LANDLORD IS IN ESCROW TO PURCHASE THE PROPERTY ESCROW # SA-4983365 AT FIRST AMERICAN TITLE COMPANY. UPON LANDLORD CLOSING ESCROW TO PURCHASE THE PROPERTY THE COMMENCEMENT DATE SHALL BE MODIFIED TO BE THE DATE TITLE TO THE PROPERTY IS RECORDED IN THE NAME OF LANDLORD AND ALL DATES SHALL THEREAFTER RELATE TO REVISED COMMENCEMENT DATE.

30.2    Legal Representation. Landlord and Tenant each acknowledge, warrant and represent to the other that it has had an adequate opportunity to seek the advice of legal counsel of its choice prior to entering into this Lease, that such opportunity was undertaken or waived by the free and voluntary act of such party, and that each party waives and covenants to forego and/or forebear from the assertion of any claim or defense that this Lease is not a valid and binding obligation upon it by reason of the failure to secure or receive adequate legal representation

30.3    General. By insertion of numbers in the following blanks, Landlord and Tenant acknowledge that Paragraph(s) N/A_ is/are attached hereto and made a part hereof. If numbers have not been set forth in the blank in this Paragraph 34.3, it is conclusive that no additional provisions are a part of this Lease.

30.4    Non-Discrimination. The Tenant herein covenants by and for itself, its officers, directors, successors and assigns and all persons claiming under or through it, and this Lease is made and accepted upon and subject to the following conditions:

There shall be no discrimination against or segregation of, any person or group of persons on account of race, color, creed, religion, sex, marital status, ancestry or national origin in the leasing, subleasing, transferring, use, occupancy, tenure, or enjoyment of the land herein leased nor shall the Tenant itself, or any person claiming under or through it, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, use or company of tenants, lessees, sublessees, subtenants or vendees in the Premises herein leased.

30.5    Accessibility Inspection.   Landlord ☐ has or ☒ has not had the Demised Premises inspected for disability access by a Certified Access Specialist ("CASp"). The CASp determined that the Property ☐ met or ☐ did not meet all applicable construction-related accessibility standards pursuant to California Civil Code Section 55.53.

30.6    Energy Disclosure. Tenant acknowledges that the Premises are a newly constructed building and as such Landlord has no historical energy use for the Premises.

[Signatures on next page]

Tenant's Initials
Ð Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

LANDLORD:

DRP Holdings, LLC.,
a California limited liability company

By: _____
Daryl R. Priest, Manager

TENANT:

BORREGO COMMUNITY HEALTH FOUNDATION
a California non-profit public benefit corporation

By: _____
Name: Bruce Hebets
Its: CEO

EXHIBIT "A"

SITE PLAN

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

Page 26 of 27

Landlord's Initials





**EXHIBIT "B"**
**CONFIRMATION OF LEASE**

THIS CONFIRMATION LEASE is made and agreed upon as of this ___ day of _____, 2015, by and between DRP Holdings, LLC, a California limited liability company ("Landlord"), and BORREGO COMMUNITY HEALTH FOUNDATION, a California non-profit public benefit corporation ("Tenant").

**WITNESSETH.**

Landlord and Tenant have previously entered into a certain lease agreement dated August __, 2015 ("Lease"), covering certain premises located at 590 N. D Street, San Bernardino, California, as more particularly described in the Lease ("Premises").

NOW, THEREFORE, in connection with the foregoing, the parties hereto mutually agree as follows:

1.      For the purpose of confirming the establishment of the Commencement Date, as required by the provisions of the Lease, Landlord and Tenant hereby agree that:

        a.      The date of _Oct 1_ , ~~2015~~ 2016, is hereby established as the "Commencement Date" referred to in the Lease;

        b.      The date of _Oct 1_ , ~~2015~~ 2016, is hereby established as the "Rent Commencement Date" referred to in the Lease, upon which Rent and all other items of payment commence to accrue;

        c.      The date of _Sept 30_ , ~~2045~~ 2046, is hereby established as the "Expiration Date" of the term of the Lease; and

2.      This Confirmation Agreement and each and all provisions hereof shall inure to the benefit of, or bind, as the case may require, the parties hereto and their respective heirs, successors and assigns.

        IN WITNESS WHEREOF, the parties hereto have executed this instrument as of the date and year first written above.

LANDLORD:                               TENANT:

DRP Holdings, LLC.,                     BORREGO COMMUNITY HEALTH FOUNDATION
a California limited liability company   a California non-profit public benefit corporation

By _____            By: _____
Daryl R. Priest, Manager                Name: _Bruce Hebets_
                                        Its: _CEO_

# EXHIBIT C

## BASIC LEASE PROVISIONS

The following Basic Lease Provisions constitute a part of the Lease to which they are attached.

1. <u>Landlord:</u>    DRP Holdings, LLC., a California limited liability company

2. <u>Tenant:</u>    Borrego Community Health Foundation, a California non-profit public benefit corporation

3. <u>Premises:</u>
   (a)   Area: Approximately 15,000 sq. ft. office building including approximately 60 parking spaces ("Office Building" or "Premises").

   (b)   Location: The Premises commonly referred to as 750 East Main Street, Barstow, California, are depicted on <u>Exhibit</u> "A" attached hereto ("Property").

4. <u>Lease Term:</u>  The term of this Lease shall be 30 years and 0 months from the Commencement Date.

5. <u>Condition of Premises:</u>    The Premises are accepted "as is", "where is", and with all faults.

6. <u>Rent:</u>

   (a)   Base Monthly Rent: $60,000.00 per month, subject to adjustment as provided in Article 3.

   (b)   Additional Rent: Taxes, Utilities, Insurance, Maintenance, Management and other Expenses shall be based on direct cost or consumption by Tenant or upon Tenant's share of such Expenses.

   (c)   The "Rent Commencement Date" shall be earlier of (i) four (4) months from the date that Landlord acquires title to the Property or (ii) the date Tenant opens for business.

   (d)   "Tenant's Share" – 63%

7. <u>Prepaid Base Monthly Rent:</u> $-0-.

8. <u>Security Deposit:</u> $ -0-.

9. <u>Permitted Use:</u> The Premises shall be used solely for a general office and medical office use including a pharmacy and for any other lawful purpose.

10. <u>Addresses for Notices and Payment of Rent:</u>

   (a)   If to Landlord:   DRP Holdings, LLC.,
a California limited liability company
124 Main Street, Suite 240
El Cajon, Ca 92020
Fax: (619) 444-8597
Attn:  Daryl R. Priest
Email: darly@priesthomes.com

Tenant's Initials
© Stephen J Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

Page 1 of 27

|   |   |   |   |
|---|---|---|---|

Copy of notices to:   Fitch Law Firm, APC
                      Stephen J. Fitch, Esq.
                      3465 Camino Del Rio South, Ste. 250
                      San Diego, CA 92108
                      Telephone No. (619) 282-8100
                      Email: steve@fitchlawfirm.com

(b)  If to Tenant:    Borrego Community Health Foundation
                      P.O. Box 2369
                      Borrego Springs, CA 920004
                      Attn: Bruce Hebets
                      Fax: (760) 767-5051
                      Email: bhebets@borregomedical.org

Copy to:              Borrego Community Health Foundation
                      P.O. Box 2369
                      Borrego Springs, CA  920004
                      Attn: Mikia Wallis, Chief Legal Officer
                      Fax: (760) 767-6722
                      Email: mwallis@borregomedical.org

11.  **Broker(s):**

Landlord:             NONE

Tenant:               NONE

12.  **Certificate of Insurance:** Tenant acknowledges that a certificate of insurance with endorsements attached, as required by Paragraph 8.2(b), must be provided to Landlord prior to delivery of the keys to Premises to Tenant.

13.  **Guarantor:** NONE

The foregoing Basic Lease Provisions are incorporated into and made a part of the Lease. Each reference in the Lease to any of the Basic Lease Provisions shall mean the respective information above and shall be construed to incorporate all of the terms provided under the particular Lease paragraph pertaining to such information. In the event of any conflict between the Basic Lease Provisions and the Lease, the Basic Lease Provisions shall control. Unless otherwise defined in the Lease, all initially-capitalized terms used in the Lease shall have the meanings ascribed to them in the Basic Lease Provisions.

Tenant's Initials
© Stephen J Fitch

LEASE -- OFFICE BUILDING

Landlord's Initials

Page 2 of 27

# BUILDING LEASE

This BUILDING LEASE ("Lease") is executed as of the 2nd day of February, 2016 ("Effective Date"), by and between DRP Holdings, LLC, a California limited liability company ("Landlord"), and BORREGO COMMUNITY HEALTH FOUNDATION, a California corporation ("Tenant"). Landlord and Tenant are also referred to herein individually as a "Party" and collectively as the "Parties". The Basic Lease Provisions attached to this Lease are incorporated herein and made a part of this Lease.

1.   PREMISES:

1.1   Premises.   Subject to all the terms and conditions of this Lease, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, pursuant to the terms, covenants, conditions and uses herein set forth, the Premises, as more particularly described in Item 3 of the Basic Lease Provisions. The Property and the Office Building are more particularly depicted on Exhibit "A" attached hereto and incorporated by reference herein.

1.2   Condition of Premises.   Tenant accepts the Premises "as is", "where is", and with all faults. The square footage of the Premises, at Landlord's or Tenant's election, is subject to verification by Landlord's space planner or architect at any time within 90 days of the Commencement Date—with the stated square footage stated in the Basic Lease Provisions being deemed mutually agreed-upon and controlling if no such verification is done during such timeframe.

1.3   Tenant Improvement Allowance.   Landlord shall provide a Tenant Improvement Allowance ("TI Allowance") in an amount not to exceed One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00) for the construction of Tenant's improvements of the Premises, which are to be fixed in the Premises and shall remain with the Premises. All such tenant improvements shall be pursuant to plans approved by Landlord. Tenant shall provide, at its sole cost, to Landlord upon execution of this Lease space plans for the Premises. Any revisions to the space plan shall be mutually agreed upon by the Parties.

a.   Construction of Improvements. The construction of Tenant's improvements in the Premises shall be done in accordance with Section 5.1 of this Lease by licensed and insured contractors approved by Landlord.

b.   Payment of TI Allowance. The TI Allowance shall be paid by Landlord to Tenant based on a mutually agreed upon construction draw schedule to be submitted by Tenant to Landlord for approval. Any amount not drawn under the draw schedule shall be paid to Tenant within thirty (30) days from the later to occur of: (1) Tenant opens for business in the Building; (2) the period allowed for the filing of mechanic's liens has expired or duly executed unconditional lien waivers from all contractors, subcontractors and material men who have performed work on behalf of Tenant at the Premises are presented to Landlord; and (3) the Tenant has provided to Landlord a Certificate of Occupancy, a copy of Tenant's Recorded Notice of Completion and a complete set of "as-built" construction documents for all work performed by Tenant and/or Tenant's contractors and subcontractors.

In Landlord's sole discretion, Landlord may satisfy its obligations under this Section 1.3 by contracting with and paying directly a contractor of Landlord's choosing to complete the tenant improvements.

2.   TERM:

2.1   General.

(a)   The term of this Lease shall be as specified in Item 4 of the Basic Lease Provisions, commencing on the earliest of (1) the date Landlord acquires title to the Property, or (2) the date on which Landlord and Tenant execute the Confirmation of Lease (in the form attached hereto as Exhibit "B"), or (3) the date

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

upon which Tenant actually occupies the Premises for any reason. The date on which the Lease term commences is hereafter referred to as the "Commencement Date".

IN THE EVENT LANDLORD FAILS TO ACQUIRE THE PROPERTY UPON WHICH THE PREMISES IS LOCATED THEN LANDLORD SHALL NOTIFY TENANT AND THIS LEASE WILL TERMINATE.

3.   RENT:

3.1   Base Monthly Rent.

(a)   Tenant shall pay to Landlord at the address provided for in Item 10 of the Basic Lease Provisions (subject to the provisions of Section 1.1.1 above), without deduction or prior notice or demand, and Landlord shall accept, as rent for the Premises the "Base Monthly Rent" specified in Item 6(a) of the Basic Lease Provisions. The Base Monthly Rent shall be payable in advance in lawful money of the United States on the first day of each month of the Lease term. The first installment of the Base Monthly Rent shall be due and payable on the Rent Commencement Date.

(b)   In the event that the Rent Commencement Date is not the first day of the month, Tenant shall pay to Landlord prior to the first day of the first full calendar month which is ninety (90) days after the commencement date, an amount equal to the Base Monthly Rent multiplied by a factor having as its numerator the number of days remaining in the first month and as its denominator the number thirty (30). Thereafter, the Base Monthly Rent shall be payable in accordance with the terms of this Paragraph 3.1.

(c)   Tenant's obligation to pay rent, including Base Monthly Rent and Additional Rent shall commence as set forth in the Basic Lease Provisions.

3.2   Adjustments to Base Monthly Rent.   The Base Monthly Rent for the Lease term shall adjust (in addition to the adjustment in Paragraph 3.3 below), as follows:

a.   Commencing on the first anniversary date of the Lease term, and then annually thereafter on each Adjustment Date, the Base Monthly Rent during the Lease Term shall be adjusted to an amount equal to the greater of (a) two (2) percent or (b) the product obtained by multiplying the Base Monthly Rent in effect immediately prior to the Adjustment Date by the annual percentage increase in Consumer Price Index All Urban Consumers U.S. City Average (1982-84 = 100) published by the Bureau of Labor Statistics of the U.S. Department of Labor ("Index"), i.e., Index published 30 days prior to each new Adjustment Date ("New Extension Index") divided by the Index (in effect for the immediately preceding Lease Year) published 30 days prior to the preceding Adjustment Date ("Current Extension Index"). Landlord shall give written notice to Tenant indicating the amount of the adjustment and manner of computation of same as soon as the information becomes available to Landlord.

3.3   Additional Rent. Tenant shall pay as "Additional Rent" its pro rata share of the cost of operation and maintenance of the Property, i.e., the cost of utilities (if not separately metered), taxes, insurance provided by Landlord, roof and structural repairs, and Common Area Expenses, or other charges, as described and in the manner provided in Article 11 (Common Areas). The Base Monthly Rent, the Additional Rent, rental adjustments and any and all other amounts, however designated, required to be paid or reimbursed by Tenant under this Lease are sometimes collectively referred to as, and shall constitute, "rent.".

3.4   Interest on Past Due Obligations. In the event of default by Tenant in payment of any items of rent, Tenant shall pay, as Additional Rent, interest at the rate of two (2) points over the published prime rate of Citi Bank or the maximum rate permitted by law, whichever is less, on each such obligation from the day it is due until received by Landlord. Notwithstanding the foregoing, no interest shall accrue on any Late Charges under this Lease as defined in Paragraph 3.5 below.

Tenant's Initials
© Stephen J Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

Page 4 of 27

3.5     Late Charges. Tenant acknowledges that late payment by Tenant to Landlord of rent will cause Landlord to incur costs not contemplated by this Lease, the exact amount of such costs being extremely difficult and impractical to fix. Such costs include, without limitation, processing, administration and accounting charges. If any installment of any item of rent due from Tenant is not received by Landlord within five (5) business days of when due, Tenant shall pay to Landlord an additional sum equal to six percent (6%) of the overdue rent as a late charge. The parties agree that this late charge represents a fair and reasonable estimate of the costs that the Landlord will incur by reason of late payment by Tenant. Acceptance of any late charge shall not constitute a waiver of Tenant's default with respect to the overdue amounts, nor prevent the Landlord from exercising any of the other rights and remedies available to Landlord hereunder. The payment of a late charge shall be in addition to any interest payable by Tenant under Paragraph 3.4 (Interest on Past Due Obligations). In addition to the charges provided for above, Tenant shall pay a charge of Fifty Dollars ($50.00) to Landlord for each check returned for insufficient funds and One Hundred Fifty Dollars ($150.00) for each "three (3) day pay or quit" notice

3.6     Intentionally Deleted

4.     USE.

4.1     Permitted Use. The Premises shall be used and occupied by Tenant and for the use and purpose(s) specified in Item 9 of the Basic Lease Provisions and under no other trade names and for no other use or purposes, including, but not limited to, unlawful, immoral, "second hand" or used merchandise, distress goods, surplus stores or auctions. Tenant shall not permit any act to be done in, upon or about the Premises which would increase the existing rate of insurance upon the Premises, or cause the cancellation of any insurance policy covering the Premises, nor shall Tenant sell or permit to be kept, used or sold in, upon or about the Premises any article which may be prohibited by a standard form policy of fire insurance. In the event that Tenant's use increases said rate or causes the cancellation of a policy of insurance, Landlord may charge Tenant, as Additional Rent, the additional cost of insurance; or Landlord, at its option may cancel the Lease. Landlord does not represent nor warrant that the Premises can be used for any specific use or purpose, and it is incumbent upon Tenant to ascertain from the proper governmental authorities whether the Premises may be used for Tenant's intended use.

4.2     Hazardous Materials Indemnity.

(a)     Tenant shall not cause or permit the presence, use, generation, release, discharge, storage, disposal or transportation of any "Hazardous Materials" on, under, in, about, to or from, the Premises and/or the Property; provided that the presence or use of Hazardous Materials (a) in products required for the prudent and ordinary management and operation of the Premises as a car wash and auto detail facility and (b) held and used strictly in accordance with (i) all applicable federal, state or local laws, regulations or orders, (ii) guidelines issued by any national or regional board of insurance underwriters, and (iii) prudent standards of practice shall not be deemed in violation of this provision.

(b)     As used herein, the term "Hazardous Materials" shall mean any toxic or hazardous substance, material or waste or any pollutant or contaminant or infectious or radioactive material, including but not limited to those substances, materials or wastes regulated now or in the future under any of the following statutes or regulations promulgated thereto: (a) any "hazardous substance" within the meaning of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA") 42 U.S.C. § 9601, et seq. or the California Hazardous Substance Account Act, Cal. Health and Safety Code § 25300 et seq. or the Porter-Cologne Water Quality Act, Cal. Water Code § 13000 et seq. or the Hazardous Materials Transportation Act, 49 U.S.C. § 1801, et seq.; (b) any "hazardous waste" within the meaning of the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq.; (c) any "pesticide" or "economic poison" as defined in California Food & Agricultural Code § 12753 and any regulations promulgated in connection therewith; or (d) any other substance, chemical, waste, toxicant, pollutant, pesticide or contaminate regulated by any federal, state or local law, statute, rule, regulation or ordinance for the protection of health or the environment ("Environmental Laws"), including, without limitation, methane and any petroleum products or fractions thereof and any asbestos-containing materials.

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

(c)  If Tenant's use of the Premises may involve the storage and/or use of Hazardous Materials as defined herein, Tenant, in addition to its covenants defined above, further covenants, agrees, warrants and represents that it will comply with all Environmental Laws, rules, regulations, court decisions, municipal codes and ordinances regulating such storage and/or use of Hazardous Materials, including without limitation Chapter 6.95 of the California Health and Safety Code; and to permit Landlord to monitor such compliance, without the assumption of any liability by Landlord nor any obligation of Landlord to so monitor, Tenant covenants and agrees to provide to and/or permit Landlord:

(1)  To review and approve prior to submission to any governmental agency all applications with respect to the handling, storage and/or use of Hazardous Materials in, on or about the Premises, including without limitation applications to the County Hazardous Materials Management Division ("HMMD") and/or to Air Pollution Control District ("APCD"), and after such submission to provide Landlord with a copy of all responses, notices, comments or other communications with said governmental agencies; and

(2)  To receive and review a copy of all completed and approved "Business Plans", as defined by the statutes, and all updates, renewals, or replacement "Business Plans" when submitted and all responses, notices, comments or communications with any governmental agencies regarding same; and

(3)  To receive and review a copy of all notices, reports, comments or communications relating to any governmental inspection, complaint, investigation or other matter relating to Tenant's storage, handling or use of Hazardous Materials at, on, in or about the Premises; and

(4)  To receive and review a copy of any and all E.P.A. numbers, County Health Department permits, APCD permits, contracts with certified hazardous waste handlers (and all credentials and certifications of such handlers), and all schedules for delivery, pick-up and disposal of Hazardous Materials to or from the Premises; and

(5)  To immediately notify Landlord of any leaks, spills, emissions, release or suspected release of any Hazardous Materials at, on, in, under, above or about the Premises from any cause or source whatsoever; and

(6)  To receive and review a copy of all records of every nature that are required by law, regulations, ordinance or court order to be maintained by Tenant with respect to the storage, handling or use of any Hazardous Materials at, on, in, under, above or about the Premises.

(d)  Tenant shall exonerate, indemnify, pay and protect, defend (with counsel reasonably approved by Landlord) and save Landlord, and its directors, trustees, beneficiaries, officers, shareholders, partners, members, employees, agents, and invitees and of those of the other tenants of the Property (collectively, the "Related Parties"), harmless from and against any claims (including, without limitation, third party claims for personal injury or real or personal property damage, actions, administrative proceedings (including informal proceedings), judgments, damages, punitive damages, penalties, fines, costs, taxes, assessments, liabilities (including sums paid in settlements of claims), interest or losses, including reasonable attorneys' fees and expenses (including any such fees and expenses incurred in enforcing this Lease or collecting any sums due hereunder), consultant fees, and expert fees, together with all other costs and expenses of any kind or nature (collectively, the "Costs") that arise directly or indirectly in connection with the presence, or release, caused by Tenant of any Hazardous Materials in or into the air, soil, ground water, surface water or improvements at, on, about, under or within the Property, or any portion thereof, or elsewhere in connection with the transportation of Hazardous Materials to or from the Property or the Premises by or on behalf of Tenant. The indemnification provided in this Paragraph shall specifically apply to and include claims or actions brought by or on behalf of employees of Tenant. In the event that Landlord or any of the Related Parties shall suffer or incur any such Costs, Tenant shall pay to Landlord or such Related Parties, the total of all such Costs suffered or incurred upon demand therefor, which demand shall be accompanied by an accounting and copies of back up documentation for such Costs. Without limiting the generality of the foregoing, the indemnification provided herein shall specifically cover Costs including,

LEASE– OFFICE BUILDING

Tenant's Initials
© Stephen J. Fitch

Landlord's Initials

Page 6 of 27

without limitation, capital, operating and maintenance costs, incurred in connection with any investigation or monitoring of site conditions, any clean-up, containment, remedial, removal or restoration work required or performed by any federal, state or local governmental agency or political subdivision or performed by any non-governmental entity or person because of the presence, or release, caused by Tenant of any Hazardous Materials in or into the air, soil, ground water, surface water or improvements at, on, about, under or within the Property (or any portion thereof), or elsewhere in connection with the transportation of Hazardous Materials to or from the Property or the Premises by or on behalf of Tenant, and any claims of third parties for loss or damage due to such Hazardous Materials. This indemnification shall survive the termination of this Lease and shall be binding upon the Tenantand its successors in interest whenever such threat, claim, or cause of action may arise. Tenant expressly waives any defense concerning constructive eviction or rent abatement with respect to such claims arising from the act or omission of Tenant.

4.3     Compliance with Laws. Tenant and Landlord shall promptly comply with all laws, ordinances, zoning restrictions, rules, regulations, orders and any requirements of any duly constituted public authorities now or hereafter affecting the use, safety, cleanliness or occupation of the Premises. Tenant's use of the Premises shall not adversely affect Landlord's use of the Property and the use of the Property by other tenants. Any alteration or improvement to the Premises or the providing of any auxiliary aids or services required by any statute, ordinance, governmental regulation or court order in order for Tenant to conduct business shall be undertaken at Tenant's sole cost and expense in the manner provided in Article 5 below. Landlord shall have the absolute right to cancel this Lease, upon thirty (30) days written notice to Tenant, in the event that Tenant's plans for construction or subsequent use of the Premises shall adversely affect the allocation of available energy requirements or other utility services to Landlord or other tenants within the Property.

4.4     No Nuisances. Tenant shall not commit or permit any nuisance, act or other thing which may disturb the quiet enjoyment of the other tenants of the Property.

5.     ALTERATIONS AND ADDITIONS:

5.1     General. Tenant shall not make any non-structural interior alterations, improvements or additions to the Premises without obtaining Landlord's prior written consent, which shall not be unreasonably withheld. Any such improvements, excepting movable furniture and trade fixtures, shall become part of the realty and belong to Landlord upon their completion of construction. Tenant shall, at its sole cost and expense, obtain all necessary governmental permits and approvals, and pay for all assessments, taxes and charges associated with such work. All alterations and improvements shall be in conformity with the laws of all applicable duly constituted public authorities and shall be done in a good workmanlike manner. Tenant shall not make any structural changes or changes to the exterior of the Premises including but not limited to penetration of roof or alteration or relocation of windows or doorways or exterior walls or the affixing or setting of satellite dishes, antennae, lighting, electronic or other devices without Landlord's prior written consent, which may be withheld in its sole and absolute discretion. All alterations, additions, repairs or changes to be made to the Premises which require Landlord's approval shall be under the supervision of a competent licensed architect and/or competent licensed structural engineer and made in accordance with plans and specifications submitted to and approved by Landlord before commencement of work. Landlord reserves the right to retain or hire an architect or engineer to review said plans and specifications, and the reasonable cost of such professional fees shall be reimbursed by Tenant to Landlord. All such work shall be performed by a licensed and insured contractor, approved by Landlord, and if requested by Landlord, a completion bond naming Landlord as the beneficiary shall be provided by Tenant.

5.2     No Liens. Prior to commencing any work relating to any alterations, improvements or additions approved byLandlord, Tenant shall notify Landlord in writing of the expected date of commencement. Tenant shall not commence the making of any approved alterations until after Landlord shall have received notice of the commencement date thereof, in order that Landlord may post and record any appropriate Notice of Non-Responsibility. Landlord shall have the right at any time to post and maintain on the Premises such notices as Landlord reasonably deems necessary to protect Landlord and the Premises from mechanic's liens, material men's

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

liens or any other liens. In performing the work on any such alterations, improvements or additions, Tenant agrees to cooperate with Landlord in arranging and undertaking such work so as to minimize any adverse impact and business interruption of Tenant, Landlord or any other occupant of the Property, and to diligently complete all such work. In no event shall such work be performed in a manner that obstructs access to the Property or to the Premises of any other occupant of the Property. Tenant shall pay, when due, all claims for labor or materials furnished to or for Tenant for use in improving the Premises. Tenant shall not permit any mechanic's or material men's liens to be levied against the Premises arising out of work performed, materials furnished, or obligations to have been performed on the Premises by or at the request of Tenant. Should any mechanic's or other lien be filed against the Premises, Property, or any part thereof by reason of Tenant's acts or omissions or because of a claim against Tenant, Tenant shall cause the same to be canceled and discharged of record by bond or otherwise within ten (10) business days after notice by Landlord. Tenant hereby agrees to indemnify, hold harmless, defend and protect Landlord against loss, damage, attorney's fees and all other expenses on account of claims of lien of laborers or material men or others for work performed or materials or supplies furnished for Tenant or personsclaiming under it.

5.3     Trade Fixtures. Tenant shall install trade fixtures, machinery or other trade equipment in conformance with the ordinances of all applicable duly constituted public authorities and for a first class operation of Tenant's business, and Tenant shall maintain its operation in such first class condition. Tenant may and upon Landlord's request shall, at Tenant's sole cost and expense, remove any of such trade fixtures or machinery upon the termination of this Lease, provided Tenant is not then in default under the terms and conditions of this Lease.

6.     UTILITIES:

6.1     Responsibility for Payment. Tenant shall pay for all water, sewer, gas, heat, light, power, telephone service and any other services or utility provided to the Premises.

6.2     Tenant's Share. In the event that any utilities are furnished by Landlord, Tenant shall pay to Landlord its pro rata share of the cost thereof in the manner set forth in Paragraphs 11 2 and 11.3 (payment of Common Area Expenses). Tenant's pro rata share shall be based upon the percentage set forth in the Item 3(e) of the Basic Lease Provisions and (b) any extraordinary use which may be made by Tenant, as reasonably determined by Landlord in its sole and absolute discretion. If any utilities are furnished by Landlord directly or indirectly through joint metering, Landlord shall not be obligated to continue to provide such service if Tenant is in default under the terms hereof.

6.3     Non-liability of Landlord. Landlord shall not be liable for any failure or interruption for any reason of any utility service being furnished to the Premises.

6.4     Separate Metering. Tenant may elect, subject to Landlord's reasonable approval, to install and maintain its own meter for any utilities which are jointly metered by written notice delivered to Landlord thirty(30) days prior to the initiation by Tenant of any work to effectuate such change. All separate meters shall be installed and maintained at Tenant's sole cost and expense.

7.     INDEMNIFICATION:

7.1     Tenant's Indemnity Obligation. Tenant does hereby agree to indemnify, hold harmless, defend, and protect Landlord, its employees, agents, partners, contractors, invitees and licensees from and against any and all suits, actions, damages, claims, liability and expense in connection with loss by reason of injury to person or property from caused by the negligent act or omission of Tenant, its employees, agents or contractors, invitees, or licensees, arising from or out of any occurrence in, upon, at or from the Premises, or the occupancy or use by Tenant of the Premises or any part thereof, including without limitation acts or omissions relating to the sidewalks and Common Areas, as hereafter defined, within the Property.

7 2     Landlord's Indemnity Obligation. Landlord does hereby agree to indemnify, hold harmless, defend, and protect Tenant, its employees, agents, partners, contractors, invitees and licensees fromand against any

and all suits, actions, damages, claims, liability and expense in connection with loss by reason of injury to person or property from caused by the negligent act or omission of Landlord, its employees, agents or contractors, invitees, or licensees, arising from or out of any occurrence in, upon, at or from the Premises, or the occupancy or use by Landlord of the Premises or any part thereof, including without limitation acts or omissions relating to the sidewalks and Common Areas, as hereafter defined, within the Property.

7.3     Release of Landlord. Except for loss or damages arising from the acts or omissions of Landlord or Landlord's Related Parties constituting sole negligence, gross negligence, or willful misconduct, Landlord shall not be responsible or liable at any time for any loss or damage to Tenant's merchandise, equipment, fixtures or other personal property or to Tenant's business, including without limitation any loss or damage to either the person or property of Tenant or loss of profits or otherwise that may be occasioned by or through the acts or omissions of persons occupying adjacent, connecting, adjoining or other space in the Property or by or through the acts or omissions of Landlord, its employees, agents, contractors, invitees or licensees. Tenant shall store its property in and shall use and enjoy the Premises and the Common Areas of the Property at its own risk, and hereby releases Landlord, its employees, agents, contractors, partners, invitees, and licensees, to the fullest extent permitted by law, from all claims of every kind, including without limitation, leakage of any nature, resulting in loss of life, personal or bodily injury, or property damage, except for loss or damages arising from the acts or omissions of Landlord or Landlord's Related Parties constituting sole negligence, gross negligence or willful misconduct.

7.4     Notice of Loss. Tenant shall give prompt notice to Landlord in case of fire or accidents or other losses in the Premises or in the building of which the Premises are a part or in the Common Area as well as of any defects therein or in any fixtures or equipment located therein.

7.5     Survival of Lease Termination. Tenant's obligations under Paragraphs 4.2, 7.1-7.5 inclusive, 21.1, and 27.1 shall survive the termination of this Lease for any reason whatsoever, if the incident requiring such defense occurred during the Lease term or otherwise directly or indirectly relates to the performance of any party under this Lease. None of the indemnity obligations provided for in these Paragraphs 7.1-7.5 inclusive, or in Paragraph 4.2 shall require any payment as a condition precedent to recovery.

8.     INSURANCE:

8.1     Insurance Coverage by Landlord.

(a)     Landlord shall maintain, at Tenant's expense as provided in Paragraph 8.1(b), a policy or policies of insurance protecting against the following:

(1)     Fire and other perils normally included in extended coverage insurance to the extent of at least ninety percent (90%) of the replacement value of the Premises, exclusive of personal property, trade fixtures and equipment belonging to Tenant and improvements and betterments made to the Premises by Tenant for which Tenant shall maintain fire and other perils insurance, which shall also name Landlord and its lenders as additional insureds.

(2)     Public liability and property damage insurance with respect to the Common Areas in an amount not less than Two Million Dollars ($2,000,000) combined single limit for both bodily injury and property damage.

(b)     Tenant shall pay to Landlord, as Additional Rent in the manner set forth in Paragraph 11.3 (Payment of Common Area Expenses), Tenant's pro rata share of the cost of the insurance required in Paragraph 8.1 (a). Tenant's pro rata share of such cost shall be that proportion of the annual premiums for insurance based upon the percentage set forth in Item 3(e) of the Basic Lease Provisions.

8.2      Insurance Coverage by Tenant.

(a)      Contents Insurance. Tenant shall maintain in force a policy or policies of special peril contents insurance, including without limitation vandalism and malicious mischief coverage, sprinkler leakage coverage and plate glass coverage for the Premises, with respect to Tenant's personal property, trade fixtures and equipment located in the Premises and all improvements and betterments to the Premises made by Tenant to the extent of at least ninety percent (90%) of their insurable value. During the term of this Lease, the proceeds of any such policy or policies of contents insurance shall be used solely for the repair or replacement of the property so insured. Landlord shall have no claim or interest in said insurance and will sign all documents necessary to effectuate the settlement of any claim or loss by Tenant.

(b)      Liability Insurance. Tenant shall maintain during the term of this Lease worker's compensation insurance as required by applicable law and commercial liability insurance with respect to the Premises, all assumed liabilities by Tenant pursuant to Paragraphs 4.2 and 7.1-7.5 inclusive, product liability and all owned or non-owned and hired vehicles utilized in Tenant's business, adequate to protect Landlord as provided hereinafter. Such policy or policies of liability insurance shall add as additional insureds, Landlord and each of its partners, affiliates, directors, agents, employees, and lenders, and shall expressly provide that the interest of Landlord therein shall not be affected by any breach by Tenant of any policy provisions. Initially, such policy of liability insurance shall be in an amount not less than Three Million Dollars ($3,000,000.00) combined single limit for both bodily injury and property damage. The amounts of such liability insurance shall be increased from time to time, as Landlord or Landlord's mortgagee or beneficiary may reasonably determine. All insurance policies required hereunder shall be obtained upon an "occurrence" basis and not as "claims made" policies (except for any professional liability insurance which may be on a "claims made" basis). All liability, property damage, and other liability policies of Tenant shall be written as primary policies, not contributing with and not in excess of coverage which Landlord may carry. All such policies shall contain a provision that Landlord, and its lenders, although additional insureds, shall nevertheless be named as loss payees and be entitled to recover under said policies for any loss occasioned to it, its employees, agents, contractors, invitees and licensees by reason of the negligence of Tenant, its employees, agents, contractors, invitees and licensees. Tenant shall furnish Landlord with a certificate of insurance with attached endorsements with respect to such policies prior to Tenant's entry into the Premises. Such policies shall be secured from insurance companies with a Best's rating of A: Class VII or better and provide by endorsement that they may not be canceled or altered without sixty (60) days prior written notice delivered by the insurer to Landlord and/or its lenders.

8.3      Waiver of Subrogation. Landlord and Tenant hereby release and relieve each other from liability and waive all right to recover against each other for any loss or damage arising out of or incident to the perils covered under their respective policies of insurance, which perils occur in, on or about the Premises, as a result of the negligence of Landlord or Tenant or their respective agents, employees, contractors and/or invitees. Landlord and Tenant shall, upon obtaining the policies of insurance required under this Lease, give notice to their respective insurance carrier(s) that the foregoing mutual waiver of subrogation is contained in this Lease, and shall provide to the other appropriate endorsements of such waiver from the insurers.

9.      CARE OF THE PREMISES:

9.1      Tenant's Obligations.

(a)      General. Tenant shall, at its expense, keep the Premises and exterior and interior portions thereof, including without limitation windows, doors, and all other glass or plate glass fixtures, in a neat, clean, sanitary and safe condition, and shall keep the Premises free from trash, rubbish and dirt. Tenant shall be solely responsible for glass breakage in the Premises, whether due to vandalism or otherwise. Tenant shall immediately make all repairs or replacements thereon or thereto, whether ordinary or extraordinary. If Tenant fails to keep the Premises neat, clean or in reasonable repair, Landlord may, in its sole discretion, enter the Premises during reasonable hours in order to clean or repair same. Tenant shall immediately pay to Landlord its actual cost thereof as set forth in Landlord's statement submitted to Tenant for payment, provided, however, any such payment shall not

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

be deemed a cure of Tenant's default and Landlord shall have all remedies available to it under Article 18 herein.

     (b)    Equipment and Fixtures. Tenant shall, at its sole cost, keep and maintain all utilities, fixtures and mechanical equipment used by Tenant in good order, condition and repair. Said items shall include, but are not limited to, all plumbing or sewage facilities, doors, locks and closing devices, windows (including glass), lights, electric systems and equipment of every kind. Tenant shall pay to Landlord in the manner set forth in Paragraph 11.3 (Payment of Common Area Expenses), Tenant's pro rata share of the cost of any maintenance agreement for the Property. Tenant's pro rata share shall be the proportion of the cost of any maintenance agreement based on the percentage share set forth in Item 3 (e) of the Basic Lease Provisions.

    9.2    Landlord's Obligations

     (a)    General. Landlord shall keep in good condition and repair the roof and structural components of the Premises, but the cost thereof shall be prorated based upon the percentage share set forth in Item 3 (e) of the Basic Lease Provisions and shall be paid by Tenant in the manner set forth in Paragraph 11.3 (Payment of Common Area Expenses). Landlord shall have no obligation to make any such repairs until Landlord has received written notice from Tenant with respect to the need for such repairs. Landlord shall not be deemed to be in default with respect to its obligation to repair unless and until Landlord has (1) received said written notice and (2) failed to make such repairs within a reasonable period following receipt of said notice. Landlord shall, after receiving written notice, exercise due diligence in making such repairs.

     (b)    Landlord's Right of Access. In order to perform any of its obligations under this Lease, Landlord hereby reserves to itself and its successors the right of access to the exterior walls and roof of the Premises and the right to install, maintain, use, repair and replace pipes, ducts, conduits, and wires through the Premises in locations which will not materially interfere with Tenant's use thereof.

10.    TAXES:

    10.1    Personal Property Taxes. Tenant shall pay prior to delinquency all taxes, assessments, license fees, and other public charges levied, assessed or imposed or which become payable during the term of this Lease upon any trade fixtures, furnishings, equipment and all other personal property of Tenant installed or located in the Premises. Whenever possible, Tenant shall cause said trade fixtures, furnishings, equipment and personal property to be separately assessed. If, however, any or all of said items shall be assessed and taxed with the Premises' real property, Tenant shall pay to Landlord such taxes as are attributable to Tenant's trade fixtures, furnishings, equipment and personal property within fifteen (15) days after receipt of any invoice from Landlord advising Tenant of the taxes applicable to Tenant's property.

    10.2    Real Estate Taxes. Tenant shall also pay in the manner set forth in Paragraphs 11.2 and 11.3 any and all "real estate taxes" (as hereafter deemed) assessed or imposed, or which become a lien upon or become chargeable against or payable in connection with the Premises, including Tenant's pro rata share of such real estate taxes which are attributable to the Common Areas. Real estate taxes for the last year of the term of this Lease shall be prorated between Landlord and Tenant as of the expiration date of the Lease term. With respect to any assessments which may be levied against or upon the Premises, or which under the laws then in force may be evidenced by improvements or other bonds and may be paid in annual installments, only the amount of such annual installment, with appropriate proration for any partial year, and interest thereon, shall be included within a computation of taxes and assessments levied against the Premises. Tenant shall be responsible for all increases in real estate taxes attributable to or caused by any organization, re-organization, purchase, sale, merger, acquisition or consolidation of Tenant, Tenant's assets or Tenant's business or by reason of any sale, assignment or recording of any transfer of interest in the Premises or the Property by Landlord, but only to the extent of Tenant's share as set forth in this Paragraph 10.2 herein.

10.3   Definition of Real Estate Taxes.

(a)   "Real estate taxes" shall mean and include each of the following:

(1)   Any form of assessment, license fee, license tax, business license fee, business license tax, commercial rental tax levy, charge, penalty, bond or tax, imposed by authority having the direct power to tax, including any city, county, state or federal government, or any school, agricultural, lighting, drainage or other improvement or special district thereof, as against any legal or equitable interest of Landlord in the Premises or in the real property of which the Premises are a part.

(2)   Any tax on Landlord's right to rent or other income from the Premises or as against Landlord's business or leasing the Premises.

(3)   Any assessment, tax, fee, levy or charge in substitution, partially or totally, or any assessment, tax, fee, levy or charge previously included within the definition of real property tax, it being acknowledged by Tenant and Landlord that Proposition 13 was adopted by the voters of the State of California in the June 1978 election and that assessments, taxes, fees, levies and charges may be imposed by governmental agencies for such services as are protection, street, sidewalk and road maintenance, refuse removal and for other governmental services formerly provided without charge to property Owners or Occupants. It is the intention of Tenant and Landlord that all such new and increased assessments, taxes, fees, levies and charges, and similar assessments, taxes, fees, levies and charges be included within the definition of "real property taxes for purposes of this Lease.

(4)   Any tax allocable to or measured by the Gross Floor Area of the Premises or the rent payable hereunder, including without limitation, any gross income tax or excise tax levied by the State of California, any political subdivision thereof, city, or federal government, with respect to the receipt of such rent, or upon with respect to the possession, leasing, operating, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises, or any portion thereof.

(5)   Any tax upon this transaction or any document to which Tenant is a party, creating or transferring an interest or an estate in the Premises.

(b)   "Real estate taxes" shall not include Landlord's federal or state income, franchise, inheritance or estate taxes.

11.   COMMON AREAS:

11.1   Definition of Common Areas.   The term "Common Area" shall include all areas within the Property outside the exterior boundaries of the buildings situated thereon, including, but not limited to, streets, tunnels, driveways, parking areas, truck ways, delivery passages, access roads, loading doors, sidewalks, ramps, open and closed courts and malls, landscaped and planted areas, slopes, comfort and first aid stations, washrooms and parcel pick-up stations, exterior stairways, bus stops, retaining and decorative walls and planters, and other areas provided by Landlord and/or other Owners of portions of the Property, their employees and invitees. Landlord reserves the right to install kiosks and other free-standing structures within the Common Areas, and also reserves the right to make changes, alterations or additions at any time and from time to time in the size, shape, location, number and extent of the Common Areas, or any of them, so long as such changes, alterations or additions do not materially interfere with the Tenant's use and quiet enjoyment of the Premises, and no such change shall entitle Tenant to any abatement of rent, claim or allowance for any damages for injury or inconvenience to Tenant occasioned thereby.

11.2   Maintenance of Common Areas.   Landlord shall maintain the Common Areas in a neat, clean and orderly condition, properly lighted and landscaped as Landlord, in its reasonable discretion, shall determine. Tenant shall pay to Landlord in the manner set forth in Paragraph 11.3 (Payment of Common Areas Expenses) Tenant's pro rata share of the expenses (hereafter "Common Areas Expenses") in connection with the maintenance and operation of the Common Areas. Tenant's pro rata share of Common Areas Expenses shall be the percentage share set forth in

Tenant's Initials
Ⅾ Stephen J. Fitch

LEASE—OFFICE BUILDING

Landlord's Initials

Page 12 of 27

Item 3(e) of the Basic Lease Provisions. If applicable, those common area charges that are attributable to retail operations shall be allocated solely among the retail spaces in the Property as opposed to the office spaces. Tenant's share of Common Areas Expenses shall also include any additional costs arising from special requirements created by Tenant's use of the Premises. Common Areas Expenses shall include, but shall not be limited to, (a) all sums expended and costs incurred in connection with the Common Areas for maintenance, landscaping, pest control, lighting, cleaning, trash removal, painting, restriping, repaving, resurfacing, sweeping, security, fire protection, sprinkler and irrigation systems; maintenance and repair of sidewalks, curbs and signs (which Tenant or other occupants of the Property are not obligated to repair); (b) operating, managing, policing, insuring, repairing and maintaining the Property and maintaining repairing and replacing roofs of the buildings in the Property; (c) operating, insuring, repairing, replacing and maintaining the "Common Utility Facilities" defined to include, but not limited to, sanitary sewer lines and systems, gas lines and systems, water lines and systems, fire protection lines and systems, electric power, telephone and communication main lines and systems, HVAC equipment and systems, storm drainage and retention facilities and all other utility main lines and systems not exclusively serving the premises of any specific tenant; (d) parking charges, surcharges and other levies, assessments, or any other costs imposed or assessed by any local, state or federal government agencies in connection with the use of the parking facilities and/or the Common Utility Facilities, real and personal property taxes and assessments on the improvements and land comprising the Common Areas, depreciation and maintenance on operating machinery and equipment (if owned) and rental paid for such machinery and equipment (if rented) which machinery and equipment is used solely for the operation and maintenance of the Property; and (e) public liability and property damage insurance on the Common Areas and Common Facilities, fire with extended coverage insurance with vandalism and malicious mischief endorsements with, at Owner's option, earthquake damage and/or hazardous waste endorsements, rental loss coverage and any additional coverages required pursuant to Paragraph 8.1. In the event that any alteration, removal, replacement or repair is required to be made to any equipment or any portion of the Property pursuant to governmental authority, statute, law or court order, all expenses associated therewith shall be included in Common Areas Expenses unless such expenses are born by a specific tenant or occupant of the Property. Common Area Expenses shall include property management costs; Property Management Costs shall not exceed ten percent (10%) of the gross base rents received for the entire Property.

11.3  Payment of Common Areas Expenses. Prior to the commencement of each lease year or such other annual accounting period as Landlord shall utilize from time to time, Landlord shall give Tenant a written estimate of the Additional Rent payable by Tenant during the coming year. Tenant shall pay such estimated amount to Landlord in equal monthly installments, in advance, at the same time the Base Monthly Rent is paid. Within ninety (90) days after the end of each lease year, or such other annual accounting period as Landlord shall utilize from time to time, Landlord shall furnish to Tenant a statement showing in reasonable detail the actual costs incurred by Landlord for the operation and maintenance of the Property during the year then ended, and Tenant shall pay to Landlord Tenant's proportionate share of the cost incurred in excess of the payments of Additional Rent made by Tenant within ten (10) days of receipt of such statement In the event that the payments of Additional Rent made by Tenant exceed Tenant's share of the actual cost of the operation and maintenance of the Property, the amount of any such excess shall be credited by Landlord to the Additional Rent next due and owing; provided, however, that, if the Lease term has expired, Landlord shall accompany said statement with the amount due to Tenant. Notwithstanding the foregoing, Landlord shall have the right to submit statements to Tenant for unbudgeted Common Area Expenses incurred on an emergency basis, and Tenant shall remit payment on such statements for its pro rata share of such Common Area Expenses within thirty (30) days of receipt of same. Tenant hereby acknowledges that major tenants and tenants of kiosks and similar structures, may not pay Common Area Expenses and other Additional Rent charges on the same basis as Tenant herein.

11.4  Use of Common Areas. Tenant shall have for its use and benefit the nonexclusive right in common with Landlord and future Owners, other Occupants of the Property, and their agents, employees, customers, invitees, licensees and sublessees to use the Common Areas from time to time existing during the entire term of this Lease, or any extension thereof, for ingress and egress, roadway, automobile parking and sidewalks. Tenant shall not use any portion of the Common Area for any purpose, other than as set forth herein, without the prior written consent of Landlord, which consent may be withheld in its sole and absolute discretion.

Tenant's Initials
© Stephen J Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

12.    SIGNS AND ADVERTISING:

    12.1    Tenant shall not place any sign upon the Premises or the Office Building or any roof thereof, without Landlord's prior written consent. Notwithstanding the foregoing, Tenant shall have the right, subject to Landlords written approval of the plans, at Tenant's sole cost and expense, to install a sign on the exterior of the top of the Office Building, provided Tenant complies with all laws, orders, rules and regulations of all governmental authorities having jurisdiction and otherwise complies with all of the covenants, agreements, terms, provisions and conditions of this Lease. Tenant shall send a copy to Landlord, for Landlord's files, any and all permits necessary for the above.

    12.2    Prohibited Advertising.

        (a)    Tenant shall not, without Landlord's written consent, install any exterior lighting, amplifiers or similar devices or use in, upon or about the Premises any advertising media which maybe heard or seen outside the Premises, such as flashing lights, search lights, loudspeakers, phonographs or radio broadcasts. Landlord may withhold its consent in its sole and absolute discretion.

        (b)    Tenant shall not, without Landlord's written consent, which may be withheld in its sole and absolute discretion, solicit business in the Common Areas, nor distribute any hand bills or other advertising matter in the Common Areas.

13.    ENTRY BY LANDLORD:

    13.1    Permitted Entry by Landlord. Landlord and its agents may enter the Premises at any reasonable time upon reasonable notice to Tenant, or immediately in the case of an emergency, for the purpose of inspecting the same, for the purpose of maintaining the Property and for the purpose of making repairs, alterations, or additions to any portion of the Property, including the erection and maintenance of such scaffolding, canopies, fences, and props as may be required, or for the purpose of posting notices of non-responsibility for alterations, additions, or repairs. Landlord may, at any time during the last sixty (60) days of the term of this Lease, enter the Premises during normal business hours to place any usual or ordinary "For Leases" signs and/or to show the Premises to prospective lessees.

14.    ASSIGNMENT AND SUBLETTING:

    14.1    Consent Required. Notwithstanding anything to the contrary contained in this Lease, Tenant shall not assign this Lease or any interest herein or sublet, license, grant any concession or otherwise give permission to anyone other than Tenant to use or occupy all or any part of the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld. Any attempted assignment, subletting, license or concession agreement or change of ownership without Landlord's written consent shall be void and shall confer no rights upon any third person. Without in any way limiting Landlord's right to refuse to give such consent for any other reason or reasons, Tenant agrees that it would not be commercially unreasonable to withhold consent, if in Landlord's reasonable business judgment (a) the financial worth as adjusted for inflation and/or net current assets of the proposed new Tenant is less than that of the Tenant executing this Lease or of Tenant and Tenant's Guarantor, as the case may be, (b) the transferee is not of a character or is not engaged in a business which is in keeping with the standards of Landlord for the Premises or the Property, (c) the operation of the transferee's business will interfere with or be in competition to or violate any restriction or exclusive right given in or contrary to any lease or use of any other tenant or occupant in the Property, or potential tenant with whom Landlord is negotiating, or (d) the use of the proposed new Tenant may increase the risk of the use, release or mishandling of Hazardous Materials; or (e) the purpose for which the transferee intends to use the Premises is different from that of Tenant in violation of this Lease or other requirements of the Property. Landlord shall require a reasonable payment, including attorney's fees, of not less than One Thousand Five Hundred Dollars ($1,500.00), to cover its handling charges for each assignment or sublease it is requested to approve. The sale, assignment, transfer or disposition, whether for value, by operation of law, gift, will or intestacy, of (i) twenty-five percent (25%) or more of the issued and outstanding stock of Tenant if Tenant is a corporation, or (ii) the interest of any general partner, joint venturer, associate or co-tenant, if Tenant is

Tenant's Initials
© Stephen J. Fitch

a partnership, joint venture, association or co-tenancy, or (iii) the alienation, hypothecation, encumbrance, mortgaging or other transfer of Tenant's interest in this Lease or in the Premises, shall be deemed an assignment of this Lease under this Paragraph. Notwithstanding the foregoing Tenant shall have a onetime right during the first three years of the Lease to an assignment of this Lease as part of a merger of Tenant with another non-profit corporation.

14.2    General Conditions. In the event of any approved assignment or sublease of this Lease, Tenant shall remain primarily liable on its covenants hereunder for the entire term of any approved sublease. In the event of any assignment or sublease, the assignee or sublessee shall agree in writing to perform and be bound by all of the covenants of this Lease required to be performed by Tenant, including without limitation all prior, past due and future obligations of Tenant. Tenant agrees that any options to extend the term of this Lease are not assignable to a subtenant and further agrees that Tenant cannot exercise any option to extend the term of this Lease if a sublessee is in possession of the Premises at the time of the exercise of the option. If Landlord so elects during the term of this Lease, Landlord may require, and Tenant hereby consents to assignee or subtenant paying the Base Monthly Rent and Additional Rent, and in the event of sublease the Landlord's portion of the above-mentioned increase, directly to Landlord. Notwithstanding the foregoing, the receipt and retention by Landlord of any rent payment by a proposed assignee or subtenant shall not constitute consent to such assignment or sublease unless specified in writing by Landlord.

14.3    Requirements. If Tenant desires at any time to assign this Lease or to sublet the Premises or any portion thereof, it shall notify Landlord of its desire to do so and shall submit in writing to Landlord (a) the name of the proposed subtenant or assignee; (b) the nature of the proposed subtenant's or assignee's business to be carried on in the Premises; (c) the terms and provisions of the proposed sublease or assignment, including copies of any and all documents and instruments; (d) a current financial statement of the proposed subtenant or assignee and of any additional guarantor proposed for such assignment or subletting; (e) a business plan prepared by the proposed subtenant or assignee for the remainder of the term of the Lease; (f) a drawing depicting the proposed sign; and (g) such other information, financial or otherwise, as Landlord may request concerning the proposed subtenant or assignee. As provided in Paragraph 14.1, any request for Landlord's approval of a sublease or assignment shall be accompanied with a check in such reasonable amount as Landlord shall advise for the cost of review and/or preparation of any documents relating to such proposed transfer. Furthermore, Tenant and the proposed subtenant or assignee shall agree that Landlord shall have the right to enforce any and all of the terms of the sublease, as well as of the Lease, directly against such subtenant or assignee.

14.4    Election. At any time within fifteen (15) days after Landlord's receipt of the information specified in Paragraph 14.3 above, Landlord may by written notice to Tenant elect to either: (a) accept the proposed assignment or sublease to the Premises or the portion thereof as shall be specified in said notice upon the same terms as those offered to the proposed subtenant or assignee, as the case may be; or (b) disapprove and reject the proposed assignment or sublease. If Landlord does not provide notice or rejection or disapproval within said fifteen (15) day period, then the proposed assignment or sublease shall be deemed approved. If Landlord rejects the proposed assignment or sublease, Landlord shall have the right to terminate this Lease; provided, however, Tenant shall have the right to withdraw the proposed assignment or sublease assignment within ten (10) days of Landlord's notice of rejection and termination given pursuant to this Paragraph 14.4, and Tenant shall remain in possession under the terms of this Lease. Any consent given to a proposed assignment or sublease shall not be deemed to be a consent to any future assignment or sublease.

14.5    Bankruptcy.

        (a)    If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. Section 101, et seq. (the "Bankruptcy Code"), any and all monies or other consideration payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, shall be the exclusive property of Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code. Any and all monies or other consideration constituting Landlord's property under the preceding sentence not be paid or delivered to Landlord, shall be held in trust for the

Tenant's Initials
© Stephen J Fitch

*LEASE – OFFICE BUILDING*

Landlord's Initials

benefit of Landlord and shall be promptly paid or delivered to Landlord.

(b)     Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment. Any such assignee shall upon demand execute and deliver to Landlord an instrument confirming such assumption.

(c)     This is a lease of real property in a center within the meaning of Section 365(b)(3) of the Bankruptcy Code.

14.6     Limitation of Remedy. Tenant acknowledges and agrees that each of the rights of Landlord set forth in Paragraphs 14.1-14.5 are reasonable restrictions on subletting and assignment for purposes of California Civil Code Section 1951.4, and Landlord shall have no liability to Tenant or to any proposed transferee of Tenant for any damages if it is adjudicated that Landlord's consent has been unreasonably withheld. Tenant's sole remedy shall be to have the proposed assignment or sublease declared valid.

15.     ABANDONMENT:

15.1     Tenant's Abandonment Prohibited. Absent Tenant's prior written notice to Landlord and Landlord's written approval thereof, which may be withheld in its sole and absolute discretion, Tenant shall not vacate or abandon the Premises any time during the term of this Lease nor permit the Premises to remain unoccupied for a period of longer than fifteen (15) consecutive days during the term of this Lease. If Tenant shall abandon, vacate, or surrender the Premises, or be dispossessed by process of law, or otherwise, any personal property or trade fixtures belonging to Tenant and left on the Premises shall, at the option of Landlord, be deemed abandoned. In such case, Landlord may dispose of said personal property in any manner as permitted by applicable law and is hereby relieved of all liability for doing so. These provisions shall not apply if the Premises should be closed and business temporarily discontinued therein on account of strikes, lockouts, or similar causes (other than those of a financial nature) beyond the reasonable control of Tenant.

16.     BREACH BY TENANT:

16.1     Events of Default. The occurrence of any of the following shall constitute a default, and if such default is not timely cured shall constitute a material breach of this Lease, by Tenant:

(a)     The failure of Tenant to pay or cause to be paid when due any rent, monies, or charges required by this Lease to be paid by Tenant when such failure continues for a period of three (3) days after written notice thereof from Landlord to Tenant; or

(b)     The abandonment of the Premises by Tenant within the meaning of Paragraph 15.1; or

(c)     The failure of Tenant to do or cause to be done any material act, other than payment of rent, monies or charges, required by this Lease; or

(d)     Tenant causing, permitting, or suffering, without the prior written consent of Landlord, any material act when this Lease requires Landlord's prior written consent or prohibits such act; or

(e)     The occurrence of any event of insolvency or bankruptcy with respect to Tenant, including any of the following by way of illustration:

(1)     Any general assignment or general arrangement for the benefit of creditors;

(2)     The filing of any petition by or against Tenant to have Tenant adjudged a bankrupt or a petition for reorganization or arrangement under any law relating to bankruptcy, unless such petition is

LEASE – OFFICE BUILDING

Tenant's Initials
© Stephen J Fitch

Landlord's Initials

filed against Tenant and the same is dismissed within sixty (60) days;

(3)    The appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located in the Premises or of Tenant's interest in this Lease; or;

(4)    The attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease.

(f)    The falsification of any written report or statement required to be given by Tenant to Landlord under this Lease.

16.2    No Waiver. The acceptance by Landlord of any partial payment of rent due hereunder after breach by Tenant will not constitute a waiver of such breach, unless a written statement to that effect signed by Landlord has been delivered to Tenant.

17.    REMEDIES UPON BREACH:

17.1    Landlord's Remedies. In the event of any breach by Tenant, in addition to other rights or remedies of Landlord at law or in equity, Landlord shall have the right to exercise any one or more of the following remedies:

(a)    Collect Rent Without Terminating Lease Landlord may recover from Tenant the rent as it becomes due and any other amount necessary to compensate Landlord for all detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom. Landlord may sue monthly, annually or after such equal or unequal periods as Landlord desires for amounts due under this subparagraph (a). The right to collect rent as it becomes due shall terminate upon the termination by Landlord of Tenant's right to possession of the Premises. Tenant's right to possession shall not be terminated unless and until Landlord delivers to Tenant written notice thereof.

(b)    Terminate Lease. Landlord an alternative to exercising the remedies set forth in Paragraph 17.1 (a), may terminate Tenant's right to possession of the Premises by and upon delivery to Tenant of written notice of termination. Landlord shall then immediately reenter the Premises and take possession thereof pursuant to legal proceedings and remove all persons and property from the Premises. Such property may be removed and stored in a public warehouse or elsewhere at the cost of and for the account of Tenant. No notice of termination shall be necessary in the event that Tenant has abandoned the Premises. In the event that Landlord elects to terminate Tenant's right of possession, Landlord may recover all of the following:

(1)    The worth at the time of award of the unpaid rent which had been earned at the time of termination. "Worth at the time of award" shall be computed by allowing interest at ten percent (10%) per annum, or the highest rate allowed at law, whichever is less, from the first day the breach occurs;

(2)    The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Tenant proves could have been reasonably avoided. Worth at the time of award" shall be determined by allowing interest at the rate of ten percent (10%) per annum, or the highest rate allowed at law, whichever is less, from the first day a breach occurs;

(3)    The worth at the time of award by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Tenant proves could be reasonably avoided. "Worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award, plus one percent (1%);

(4)    Any other amount necessary to compensate Landlord for all detriment proximately caused by Tenant's failure to perform its obligations under the Lease or which in the ordinary course of events would be likely to result therefrom including, but not limited to, expenses of reletting, attorney's fees, costs of

LEASE – OFFICE BUILDING

Tenant's Initials
D Stephen J Fitch

Landlord's Initials

Page 17 of 27

alterations and repairs, recording fees, filing fees and any other expenses customarily resulting from obtaining possession of leased Premises and releasing.

17.2     Landlord's Right to Cure. In the event of breach, default, or noncompliance under this Lease by Landlord, Tenant shall, before exercising any right or remedy available to it, give Landlord written notice of the claimed breach, or noncompliance in reasonable detail, setting forth the necessary actions to be taken to cure such default. If, prior to its giving such notice, Tenant has been noticed in writing (by way of Notice of Assignment of Rents and Leases or otherwise) of the address of a lender which has furnished any financing to Landlord or is a beneficiary of any deed of trust recorded against the Premises or the Property, then concurrently with giving the aforesaid notice to Landlord, Tenant shall, pursuant to the manner of giving notice set forth in Paragraph 30.9 below, transmit a copy thereof to such lender or lenders. For thirty (30) days following the receipt of the notice by Landlord, Landlord shall have the right to cure such breach or to commence the cure if more than thirty (30) days is reasonably required to affect such cure, so long as Landlord shall thereafter diligently pursue such cure to a completion. If Landlord has failed to commence the cure within such thirty (30) day period, then Tenant shall so notify Landlord's lender or lenders and provide any such lender with an additional thirty (30) days to effect such cure, so long as any such lender shall thereafter diligently pursue such cure to a completion, (including, but not limited to, commencement and prosecution of proceedings to foreclose or otherwise exercise its rights under its mortgage or other security instrument, if necessary to effect such cure), in which event this Lease shall not be terminated by Tenant so long as such actions or remedies are being diligently pursued by said lender. If the default is cured by Landlord or lender as provided above, Tenant shall have no other remedy available to it and this Lease shall remain in full force and effect. If Landlord, or lender as provided herein, fails to cure the breach, default or noncompliance as set forth herein Tenant shall have the right to terminate the Lease upon sixty (60) day notice to Landlord and lender after the expiration of the applicable time frames to cure.

18.     DAMAGE OR DESTRUCTION:

18.1     Destruction in Whole or Part  In the event that the Premises is partially or completely damaged or destroyed or declared unsafe or unfit for occupation by any authorized public authority for any reason other than Tenant's acts, use or occupation, which declaration requires repairs to either the Premises or the building in which the Premises are located, the rights and obligations of Tenant and Landlord shall be as follows:

        (a)     If the damage is covered under the form of property insurance carried by Landlord, and sufficient insurance proceeds are available to make all necessary repairs, Landlord shall repair such damage as soon as is reasonably possible and this Lease shall continue in full force and effect.

        (b)     In the event that such damage is not covered, or is "under insured" by the form of property insurance carried by Landlord, Landlord shall repair such damage; provided, however, that if such damage or destruction exceeds thirty percent (30%) of the then replacement value of the improvements on the Premises (exclusive of trade fixtures, equipment and foundations), Landlord shall have no obligation to repair such damage. If Landlord elects not to repair such damage Tenant shall have the right to terminate the Lease upon sixty (60) day notice to Landlord and lender.

        (c)     Notwithstanding anything contained herein above, (1) if the Premises are damaged or destroyed to any extent during the last twelve (12) months of the term of this Lease, (2) if the uninsured portion of such damage exceeds thirty percent (30%) of the then replacement value of the building of which the Premises constitute all or a part, or (3) if over fifty percent (50%) of the Premises shall be damaged or destroyed at any time whether such casualty is insured or not, Landlord may, at Landlord's option, cancel and terminate this Lease by delivery of written notice to Tenant to so terminate. Said written notice shall be made within ninety (90) days after the date of occurrence of such damage or destruction and shall be effective as of the date of such notice. If notice is not given within said ninety (90) day period, Landlord shall be deemed to have elected to restore the damage or destruction and shall repair such damage as soon as reasonably possible. If the above occurs and Landlord does not elect to terminate or repair than Tenant shall have the right to terminate the Lease upon sixty (60) day notice to Landlord and lender.

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

18.2    Rent Abatement. If Landlord elects or is required to make repairs to the Premises, pursuant to Paragraph 18.1 above, Tenant shall be entitled to a reduction in the Base Monthly Rent during the time in which the repairs are being made to the extent to which Tenant's use of the Premises is impaired. Wherever the Lease provides for rent abatement, that phrase shall mean Base Monthly Rent and Additional Rent. All rent abatement shall terminate upon the substantial completion of such repair or restoration.

18.3    Restoration of Tenant's Property. Landlord's obligation to restore shall not include the restoration or replacement of Tenant's trade fixtures, equipment, merchandise or any improvements or alterations made by Tenant to the Premises. Tenant shall restore and replace the same in the event that Landlord is obligated or elects to repair any damage or destruction of the Premises.

19.    CONDEMNATION:

19.1    General. If the Premises or any portion thereof are taken under the power of eminent domain, or sold by Landlord under the threat of the exercise of such power, this Lease shall terminate as to the part so taken as of the date that the condemning authority takes possession of the Premises. If more than twenty-five percent (25%) of the Premises is taken or sold under threat, either Landlord or Tenant may terminate this Lease as of the date that the condemning authority takes possession by delivery of written notice of such election within twenty (20) days after such party has been notified of the taking or, in the absence thereof, within twenty (20) days after the condemning authority shall have taken possession.

19.2    Continuation of Lease After Condemnation. If this Lease is not terminated by Landlord or Tenant, it shall remain in full force and effect as to the portion of the Premises remaining; provided, however, that the Base Monthly Rent and Tenant's share of Common Areas Expenses shall be reduced in proportion to the reduction of the Gross Floor Area of the Premises. In such event, Landlord shall, at Landlord's expense, restore the Premises to a complete unit of like quality and character, except as to size, as existed prior to the date on which the condemning authority took possession. If more than twenty-five percent (25%) of the Premises is taken under the power of eminent domain, or sold by Landlord under the threat of the exercise of such power than Tenant shall have the right to terminate the Lease upon sixty (60) day notice to Landlord and lender.

19.3    Allocation of Condemnation Award. All awards for the taking of any part of the Premises or proceeds from the sale made under the threat of the exercise of the Power of eminent domain shall be the property of Landlord, whether made as compensation for diminution of value of the leasehold estate, for the taking of the fee, or as severance damage; provided, however, that Tenant shall be entitled to any award for loss of or damage to Tenant's trade fixtures, and removable personal property which is separately stated within such award. Any other claim of Tenant relative to this Paragraph 19.3 shall not diminish Landlord's recovery in any respect.

20.    SURRENDER OF LEASE:

20.1    Effect of Surrender. The voluntary or other surrender or a mutual cancellation of this Lease by Tenant shall not work a merger, and shall, at the election of Landlord, either terminate all or any existing subleases or sub-tenancies or may operate as an assignment to it of any or all of such subleases or sub-tenancies. Landlord shall exercise its election within thirty (30) days of the event so requiring.

21.    ATTORNEY'S FEES:

21.1    Attorney's Fees. If Landlord is involuntarily made a party defendant to any litigation relating to this Lease or the Premises by reason of any act or omission of Tenant, then Tenant shall defend, protect and hold Landlord harmless from any loss, cost or expense, including reasonable attorney's fees, arising out of or relating to any such litigation. In the event of any legal action or proceeding between the parties, the ultimately prevailing party shall be entitled to reasonable attorney's fees and expenses as a part of the judgment resulting therefrom.

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

I andlord's Initials

22.    SALE, EXCHANGE OR MASTER LEASE OF THE PREMISES BY LANDLORD:

    22.1    Landlord's Residual Liability. Notwithstanding any other provisions of this Lease, Landlord may assign, in whole or in part, Landlord's interest in this Lease and may sell, exchange or master lease all or part of the real estate of which the Premises are a part. In the event of any sale or exchange of the Premises by Landlord and assignment by Landlord of this Lease, Landlord shall be and is hereby entirely freed and relieved of all liability under any and all covenants and obligations contained in or derived from this Lease or arising out of any act, occurrence or omission relating to the Premises which occurs after the consummation of such sale, exchange, or assignment. Landlord shall provide Tenant with notice of any assignment, sale, exchange or master lease.

23.    QUIET ENJOYMENT·

    23.1    Landlord's Covenant. If Tenant is not in breach under the covenants made in this Lease and has satisfactorily attorned to any successor in interest to Landlord or any lender of Landlord as provided in Article 25, Landlord covenants that Tenant shall have peaceful and quiet enjoyment of the Premises without hindrance on the part of Landlord. Landlord will defend Tenant in the peaceful and quiet enjoyment of the Premises against claims of all persons claiming through or under the Landlord.

24.    ESTOPPEL CERTIFICATES:

    24.1    Tenant's Obligation. Tenant shall at any time during the term of this Lease, within five (5) business days of receipt of written notice from Landlord, execute and deliver to Landlord a statement in a form acceptable to Landlord in writing certifying that this Lease is unmodified and in full force and effect or, if modified, stating the nature of such modification. Tenant's statement shall include other commercially reasonable information and details requested by Landlord, such as the date to which rent and other charges are paid, Tenant's knowledge concerning any uncured defaults with respect to Landlord's obligations under this Lease and the nature of such defaults if they are claimed. Any such statement may be relied upon conclusively by any prospective purchaser or lender of the Premises. Should Tenant shall fail to timely deliver such estoppel certificate to Landlord, Tenant agrees that such failure shall be conclusive upon Tenant that this Lease is in full force and effect, except to the extent any modification has been represented by Landlord, and that there are no uncured defaults in the Landlord's performance, and that not more than one month's rent has been paid in advance.

25.    SUBORDINATION; ATTORNMENT; NON-DISTURBANCE:

    25.1    Subordination of Lease to Landlord's Financing. Except as otherwise provided herein, this Lease is hereby made subordinate to the lien of any mortgage or deed of trust to any bank, insurance company or other lending institution, now or hereafter in force against the real property of which the Premises constitute a part, and to all advances made or hereafter made upon the security thereof ("Security Instrument"). Any holder of a Security Interest at any time existing or encumbering the Landlord's interest in the Property may, at its option, subordinate its Security Interest to this Lease.

    25.2    Attornment by Tenant. In the event of the sale or assignment of Landlord's interest in the Property of which the Premises are a part, or in the event any proceedings are brought for foreclosure, or in the event of the exercise of the power of sale under any mortgage or deed of trust made by Landlord covering the Premises, Tenant shall, subject to the non-disturbance provisions of Paragraph 25.5 below, attorn to the purchaser or assignee upon any such foreclosure or sale or assignment and recognize such purchaser or assignee as Landlord under this Lease.

    25.3    Subordination of Lease to Certain Agreements with Third Parties. Tenant hereby subordinates its rights hereunder to any Declaration of Restrictions and Grant of Easements or any other operation and reciprocal easement agreement, or any amendments thereto, for access and parking between Landlord and the Owner(s) of any property located within or adjacent to the Property whenever, in the reasonable discretion of Landlord, it is determined that any such agreement would be beneficial to the use and operation of the Property.

LEASE – OFFICE BUILDING

Tenant's Initials
© Stephen J Fitch

Landlord's Initials

Page 20 of 27

25.4     Execution of Documents. Tenant, upon request of any party in interest, shall execute promptly such instruments and certificates, to carry out the intent of Articles 24 and 25. If, within ten (10) days after the date of a written request by Landlord to execute such instruments, Tenant shall not have executed the same, Tenant shall be deemed to have irrevocably appointed Landlord as attorney-in-fact for Tenant with full power and authority to execute and deliver in the name of Tenant any such instruments, certificates, and/or documents.

25.5     Non-Disturbance. With respect to any Security Instrument entered into by Landlord after execution of this Lease, and with respect to any requested attornment by Tenant per Paragraph 25.2 above, Tenant's subordination of this Lease, and Tenant's attornment, shall be subject to receiving a commercially reasonable non-disturbance agreement ("Non-Disturbance Agreement") from the holder of such Security Instrument, or purchaser or assignee of Landlord, which Non-Disturbance Agreement shall provide that Tenant's possession of the Premises, and this Lease and options to extend the term hereof, will not be disturbed so long as Tenant is not in breach under the Lease and attorns to the record owner of the Premises.

## 26.     HOLDING OVER; SURRENDER:

26.1     Effect of Holding Over. If Tenant remains in possession of the Premises after the expiration of the term of this Lease, including options, if applicable, without executing a new Lease, or after Landlord has declared a forfeiture by reason of a material breach by Tenant, then such holding over shall be construed as a tenancy from month to month, subject to all the conditions, provisions and obligations of this Lease insofar as they are applicable to a month-to-month tenancy. The Base Monthly Rent payable during any period of holding over should be equal to one hundred five percent (105%) of the Base Monthly Rent payable during the period immediately preceding Tenant's holding over, and all Percentage Rent and Additional Rent payments shall also be made as specified within this Lease.

26.2     Surrender of Premises. At the expiration of this Lease, Tenant shall surrender the Premises in the same condition as it was upon delivery of possession thereto under this Lease, reasonable wear and tear excepted, and shall deliver all keys to Landlord. Before surrendering the Premises, Tenant shall, at its sole cost and expense, remove all of its personal property and trade fixtures and such alterations or additions to the Premises made by Tenant as may be specified for removal by Landlord, and shall repair any damage caused by such property or the removal thereof. If Tenant fails to remove its personal property and fixtures upon the expiration of this Lease, the same shall be deemed abandoned and shall become the property of Landlord.

## 27.     LIMITATION OF LIABILITY:

### 27.1     Agreement by Tenant.

(a)     In consideration of the execution of this Lease by Landlord, Tenant agrees in the event of any actual or alleged failure, breach, or default hereunder by Landlord: (1) The sole and exclusive remedy shall be against the partnership and its partnership assets; (2) no partner of Landlord should be sued or named as a party in any suit or action (except as may be necessary to secure jurisdiction of the partnership); and (3) no judgment will be taken against any partner of Landlord. These covenants and agreements are enforceable both by Landlord and also by any partner of Landlord.

(b)     Tenant agrees that each of the foregoing covenants and agreements shall be applicable to any covenant or agreement either expressly contained in this Lease or imposed by statute or at common law.

## 28.     LIABILITY OF SUCCESSORS:

28.1     Inurement. The covenants and conditions herein contained shall, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators and assigns of all of the parties hereto and all of the parties hereto shall be jointly and severally liable for the covenants contained herein.

Tenant's Initials
© Stephen J. Pitch

LEASE – OFFICE BUILDING

Landlord's Initials

29.    MISCELLANEOUS PROVISIONS:

29.1    Gender and Number. Whenever the singular number is used in this Lease, the same shall include the plural, and the masculine shall include the feminine and neuter gender; and the word "person" shall include corporation, form or association, when required by the context.

29.2    Captions. The headings or titles to the articles and paragraphs of this Lease are for convenience only and do not in any way define, limit or construe the contents of such articles and paragraphs.

29.3    Entire Agreement This Lease and its exhibits contain all of the agreements and conditions made between the parties with respect to the leasing of the Premises. Landlord and Landlord's Real Estate Brokers make no warranty or representation with respect to any other tenants or owners which may or may not construct improvements, occupy or conduct business within the Property, and Tenant hereby acknowledges and agrees that it is not relying on any warranty or representation relating thereto in entering into this Lease. Landlord specifically disavows any oral representations made by or on behalf of its employees, agents, and independent contractors, other than the express terms of this Lease. Tenant hereby acknowledges and agrees that it is not relying on and will not rely on any oral representations in entering into this Lease. References upon the exhibits to potential tenants within the Property are to be considered generic and are not to be considered as specific representations that any particular company, firm, business enterprise will occupy a specific area within the Property. This Lease may not be amended, modified, or any of its provisions waived except by a written instrument signed by all the parties to this Lease.

29.4    Governing Law. The laws of the State of California shall govern the validity, performance and enforcement of this Lease.

29.5    Invalidity; Construction. If any provision of this Lease is determined to be void by any court of competent jurisdiction, such determination shall not affect any other provision of this Lease and such other provisions shall remain in full force and effect. If any provision of this Lease is capable of two constructions, one which would render the provision void and one which would render the provision valid, the provision shall be interpreted in the manner which would render it valid.

29.6    Payments. Except as may otherwise be expressly stated, each payment required to be made by Tenant shall be in addition to and not in substitution for other payments to be made by Tenant.

29.7    Time of Essence.  Time is of the essence of each and every provision of this Lease.

29.8    Force Majeure. Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefore, governmental restrictions, regulations, or controls, enemy or hostile government action, civil commotion, fire or other casualty, and other causes (other than financial) beyond the reasonable control of the party obligated to perform, shall excuse the performance by such party for a period equal to that resulting from such prevention, delay or stoppage, except those obligations of Tenant to pay rent and other charges pursuant to the terms of this Lease.

29.9    Notices.

(a)    All notices to be given by one party to the other under this Lease shall be in writing, mailed or delivered to the other party at the addresses specified in Item 10 of the Basic Lease Provisions.

(b)    Mailed notices shall be sent by United States Postal Service, certified or registered mail, with return receipt requested, postage prepaid, or by other comparable commercial means, and shall be deemed to have been given two (2) days after the date posted by the United States Postal Service or on the date signed as received by such other comparable commercial service.

LEASE – OFFICE BUILDING

Tenant's Initials
© Stephen J Fitch

Landlord's Initials

(c)     Either party may, by proper notice, at any time designate a different party and/or address to which notices shall be sent.

29.10     Brokers. Tenant warrants that it has had no dealings with any real estate broker or agent in connection with the negotiation and/or execution of the Lease, except the broker identified in Item 11 of the Basic Lease Provisions.

29.11     No Partnership. Notwithstanding any other provision of this Lease, Landlord does not by this Lease, in any manner nor for any purpose, become a partner or joint venturer of Tenant in the conduct of its business or otherwise. The provisions of this Lease relating to Percentage Rent and Additional Rent are included solely for the purpose of providing a method whereby such rent is to be measured and ascertained.

29.12     Fees and Permits. Tenant is responsible for the application, payment and approval of all fees, licenses and permits necessary to prepare for and complete the opening and continued operation of its business.

29.13     Rules and Regulations. Landlord reserves the right to make such reasonable rules and regulations as it deems appropriate, in its sole discretion, to provide for a more efficient and orderly operation of the Property. Tenant covenants and agrees to be bound by and to abide by all such rules and regulations immediately upon receipt of written notice of such rules and regulations from Landlord.

29.14     General Interpretation. The terms of this Lease have been negotiated by the parties hereto and the language used in this Lease shall be deemed to be the language chosen by the parties hereto to express their mutual intent. This Lease shall be construed without regard to any presumption or rule requiring construction against the party causing such instrument or any portion thereof to be drafted, or in favor of the party receiving a particular benefit under the Agreement. No rule of strict construction will be applied against any person.

29.15     Counterpart Signatures. This Lease may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Lease shall not be effective until the execution and delivery between each of the parties of at least one set of counterparts. The parties authorize each other to detach and combine original signature pages and consolidate them into a single identical original. Any one of such completely executed counterparts shall be sufficient proof of this Lease

29.16     Business Day Defined. "Business Day" means a day other than a Saturday, Sunday, or holiday on which banks, County offices, or U.S. Post Offices are closed in San Diego County; if a date or time period provided for in this Lease is or ends on a day other than a Business Day, then such date shall automatically be extended until the next Business Day.

30.     SPECIAL PROVISIONS:

30.1     Not An Offer. THE SUBMISSION OF THIS LEASE BY LANDLORD IS NOT AN OFFER AND THERE SHALL BE NO AGREEMENT OF ANY NATURE BETWEEN THE PARTIES THAT IS BINDING UPON ANY PARTY HERETO UNTIL THIS LEASE IS FULLY EXECUTED AND LANDLORD HAS CLOSED ESCROW TO PURCHASE PROPERTY. LANDLORD IS IN ESCROW TO PURCHASE THE PROPERTY ESCROW # SA-4983365 AT FIRST AMERICAN TITLE COMPANY. UPON LANDLORD CLOSING ESCROW TO PURCHASE THE PROPERTY THE COMMENCEMENT DATE SHALL BE MODIFIED TO BE THE DATE TITLE TO THE PROPERTY IS RECORDED IN THE NAME OF LANDLORD AND ALL DATES SHALL THEREAFTER RELATE TO REVISED COMMENCEMENT DATE.

30.2     Legal Representation. Landlord and Tenant each acknowledge, warrant and represent to the other that it has had an adequate opportunity to seek the advice of legal counsel of its choice prior to entering into this Lease, that such opportunity was undertaken or waived by the free and voluntary act of such party, and that each

LEASE – OFFICE BUILDING

Tenant's Initials
© Stephen J Fitch

Landlord's Initials

party waives and covenants to forego and/or forebear from the assertion of any claim or defense that this Lease is not a valid and binding obligation upon it by reason of the failure to secure or receive adequate legal representation.

     30.3    General. By insertion of numbers in the following blanks, Landlord and Tenant acknowledge that Paragraph(s) N/A is/are attached hereto and made a part hereof. If numbers have not been set forth in the blank in this Paragraph 34.3, it is conclusive that no additional provisions are a part of this Lease.

     30.4    Non-Discrimination. The Tenant herein covenants by and for itself, its officers, directors, successors and assigns and all persons claiming under or through it, and this Lease is made and accepted upon and subject to the following conditions.

     There shall be no discrimination against or segregation of, any person or group of persons on account of race, color, creed, religion, sex, marital status, ancestry or national origin in the leasing, subleasing, transferring, use, occupancy, tenure, or enjoyment of the land herein leased nor shall the Tenant itself, or any person claiming under or through it, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, use or company of tenants, lessees, sublessees, subtenants or vendees in the Premises herein leased.

     30.5    Accessibility Inspection.   Landlord ☐ has or ☒ has not had the Demised Premises inspected for disability access by a Certified Access Specialist ("CASp"). The CASp determined that the Property ☐ met or ☐ did not meet all applicable construction-related accessibility standards pursuant to California Civil Code Section 55.53.

     30.6    Energy Disclosure. Tenant acknowledges that the Premises are a newly constructed building and as such Landlord has no historical energy use for the Premises.

[Signatures on next page]

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

LANDLORD:

TENANT:

DRP Holdings, LLC.,
a California limited liability company

BORREGO COMMUNITY HEALTH FOUNDATION
a California non-profit public benefit corporation

By: _____
    Daryl R. Priest, Manager

By: _____
Name: _Bruce Hebets_____
Its: _CED_____

LEASE – OFFICE BUILDING

Tenant's Initials
© Stephen J. Fitch

Landlord's Initials

Page 25 of 27

EXHIBIT "A"

SITE PLAN

## EXHIBIT "B"
## CONFIRMATION OF LEASE

THIS CONFIRMATION LEASE is made and agreed upon as of this____day of_____, 2016, by and between DRP Holdings, LLC, a California limited liability company ("Landlord"), and BORREGO COMMUNITY HEALTH FOUNDATION, a California non-profit public benefit corporation ("Tenant").

### WITNESSETH:

Landlord and Tenant have previously entered into a certain lease agreement dated December , 2015 ("Lease"), covering certain premises located at 750 East Main Street, Barstow, California, as more particularly described in the Lease ("Premises").

NOW, THEREFORE, in connection with the foregoing, the parties hereto mutually agree as follows:

1.      For the purpose of confirming the establishment of the Commencement Date, as required by the provisions of the Lease, Landlord and Tenant hereby agree that:

    a.      The date of_____, 2016, is hereby established as the "Commencement Date" referred to in the Lease;

    b.      The date of_____, 2016, is hereby established as the "Rent Commencement Date" referred to in the Lease, upon which Rent and all other items of payment commence to accrue;

    c.      The date of_____, 2046, is hereby established as the "Expiration Date" of the term of the Lease; and

2.      This Confirmation Agreement and each and all provisions hereof shall inure to the benefit of, or bind, as the case may require, the parties hereto and their respective heirs, successors and assigns.

IN WITNESS WHEREOF, the parties hereto have executed this instrument as of the date and year first written above.

LANDLORD:                                          TENANT:

DRP Holdings, LLC.,                                BORREGO COMMUNITY HEALTH FOUNDATION
a California limited liability company             a California non-profit public benefit corporation

By: _____                              By: _____
Daryl R. Priest, Manager                           Name: _____ Bruce Heberts
                                                   Its: _____ CEO

## AMENDMENT NO. 1 TO LEASE

This AMENDMENT NO. 1 TO LEASE (this "Amendment No. 1") is made as of the 3rd day of April, 2016, by and between DRP Holdings, LLC, a California limited liability company ("Landlord"), and BORREGO COMMUNITY HEALTH FOUNDATION, a California corporation ("Tenant").

### RECITALS

A.    Landlord and Tenant previously entered into that certain Commercial Lease dated as of February 2nd, 2016 ("Lease") with respect to the lease of 750 East Main Street, Barstow, California 92311 ("Premises").

B.    Landlord and Tenant desire to amend the terms of the Lease to increase the square footage of the lease, rent, and other terms as specifically set forth in this Amendment No. 1.

C.    All defined terms used herein but not defined herein shall have the meaning ascribed to such terms in the Lease.

D.    Landlord and Tenant now desire to enter into this Amendment No. 1 to amend the Lease as hereinafter provided.

### AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, notwithstanding anything in the Original Lease to the contrary:

1.    Section 3 of the BASIC LEASE PROVISIONS. Section 3 of the BASIC LEASE PROVISIONS - Premises shall be deleted in its entirety and replaced with the following:

*3. Premises*

    *(a)    Area: Approximately 26,205 sq. ft. office building including approximately 100 parking spaces ("Office Building" or "Premises").*

    *(b)    Location: The Premises commonly referred to as 750 East Main Street, Barstow, California, are depicted on Exhibit "A" attached hereto ("Property")*

2.    Section 6 of the BASIC LEASE PROVISIONS. Section 6 of the BASIC LEASE PROVISIONS - Rent shall be deleted in its entirety and replaced with the following:

*6  Rent:*

    *(a)    Base Monthly Rent: $104,820 00 per month, subject to adjustment as provided in Article 3.*

    *(b)    Additional Rent. Taxes, Utilities, Insurance, Maintenance, Management and other Expenses shall be based on direct cost or consumption by Tenant or upon Tenant's share of such Expenses.*

    *(c)    The "Rent Commencement Date" shall be earlier of (i) four (4) months from the date that Landlord acquires title to the Property or (ii) the date Tenant opens for business*

    *(d)    "Tenant's Share" – 100%*

1


Tenant's Initials

Landlord's Initials

3.     Section 1.3.     Section 1.3 of the Lease is hereby deleted and the following new Section 1.3 is hereby added in its place:

> *1.3 Tenant Improvement Allowance*     *Landlord shall provide a Tenant Improvement Allowance ("TI Allowance") in an amount not to exceed Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) for the construction of Tenant's Improvements of the Premises, which are to be fixed in the Premises and shall remain with the Premises. All such tenant improvements shall be pursuant to plans approved by Landlord. Tenant shall provide, at its sole cost, to Landlord upon execution of this Lease space plans for the Premises. Any revisions to the space plan shall be mutually agreed upon by the Parties.*

*a     Construction of Improvements. The construction of Tenant's improvements in the Premises shall be done in accordance with Section 5.1 of this Lease by licensed and insured contractors approved by Landlord.*

*b.     Payment of TI Allowance. The TI Allowance shall be paid by Landlord to Tenant based on a mutually agreed upon construction draw schedule to be submitted by Tenant to Landlord for approval. Any amount not drawn under the draw schedule shall be paid to Tenant within thirty (30) days from the later to occur of: (1) Tenant opens for business in the Building; (2) the period allowed for the filing of mechanic's liens has expired or duly executed unconditional lien waivers from all contractors, subcontractors and material men who have performed work on behalf of Tenant at the Premises are presented to Landlord; and (3) the Tenant has provided to Landlord a Certificate of Occupancy, a copy of Tenant's Recorded Notice of Completion and a complete set of "as-built" construction documents for all work performed by Tenant and/or Tenant's contractors and subcontractors.*

*In Landlord's sole discretion, Landlord may satisfy its obligations under this Section 1.3 by contracting with and paying directly a contractor of Landlord's choosing to complete the tenant improvements.*

4.     Conflict.     In the event of any conflict between the Lease and this Amendment No. 1, this Amendment No. 1 shall prevail.  Except to the extent herein modified, the Lease, as modified by the Lease Amendments shall continue in full force and effect.

5.     Terms.     Except as specifically provided in this Amendment No. 1 all capitalized terms shall have the same meaning as defined in the Lease.

6.     Counterparts.     This Amendment No. 1 may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Amendment No. 1 as of the date first above written.

Landlord                                    Tenant

DRP Holdings, LLC.,                         BORREGO COMMUNITY HEALTH FOUNDATION
a California limited liability company       a California corporation

By:                                         By:
Daryl R. Priest, Manager                    Name:  Bruce Hebets
                                            Its:   CEO

Tenant's Initials                    2                    Landlord's Initials

## LEASE ASSIGNMENT NO. 1

This LEASE ASSSIGNMENT NO.1 ("**Lease Assignment No. 1**") is executed the 29th day of
August 2017 by and between DRP HOLDINGS, LLC, a California limited liability company
("**Assignor**") and INLAND VALLEY INVESTMENTS, LLC, a California limited liability
company ("**Assignee**") for the Building Lease dated February 2, 2016 and further amended by
Lease Amendment No. 1 dated April 3, 2016 collectively herein referred to as the Lease
("**Lease**") for the building located at 750 E. Main Street, Barstow, CA 92311 leased to
BORREGO COMMUNITY HEALTH FOUNDATION, a California corporation ("**Tenant**").

### Agreement

Pursuant to section 22.1 of the Building Lease, Assignor hereby assigns its interest as Landlord
in the lease to Assignee. This Lease Assignment No. 1 shall serve as notice to Tenant.

**Addresses for Notices and Payment of Rent:**

(a)    If to Landlord:          Inland Valley Investments, LLC
                                             a California limited liability company
                                           124 W. Main Street, Suite 240
                                           El Cajon, CA 92020
                                           Fax: (619) 444-8597
                                           Attn: Daryl R. Priest
                                           Email: daryl@dphomes.com

All other terms and conditions of the Lease remain the same.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Leas as of the day and
year first above written.

ASSIGNOR:                                   ASSIGNEE:

DRP HOLDINGS, LLC,                        INLAND VALLEY INVESTMENTS, LLC,
a California limited liability company         a California limited liability company

By:                                         By:
           Daryl R. Priest, Manager                 Daryl R. Priest, Manager

## AMENDMENT NO. 1 TO LEASE

This AMENDMENT NO. 1 TO LEASE (this "<u>Amendment No. 1</u>") is made as of the 3rd day of April, 2016, by and between DRP Holdings, LLC, a California limited liability company ("<u>Landlord</u>"), and BORREGO COMMUNITY HEALTH FOUNDATION, a California corporation ("<u>Tenant</u>").

## R E C I T A L S

A.   Landlord and Tenant previously entered into that certain Commercial Lease dated as of February 2nd, 2016 ("<u>Lease</u>") with respect to the lease of 750 East Main Street, Barstow, California 92311 ("<u>Premises</u>").

B.   Landlord and Tenant desire to amend the terms of the Lease to increase the square footage of the lease, rent, and other terms as specifically set forth in this Amendment No. 1.

C.   All defined terms used herein but not defined herein shall have the meaning ascribed to such terms in the Lease.

D.   Landlord and Tenant now desire to enter into this Amendment No. 1 to amend the Lease as hereinafter provided.

## AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, notwithstanding anything in the Original Lease to the contrary:

1.   <u>Section 3 of the BASIC LEASE PROVISIONS.</u> Section 3 of the BASIC LEASE PROVISIONS - Premises shall be deleted in its entirety and replaced with the following:

   *3. Premises:*

   *(a)   Area: Approximately 26,205 sq. ft. office building including approximately 100 parking spaces ("Office Building" or "Premises").*

   *(b)   Location: The Premises commonly referred to as 750 East Main Street, Barstow, California, are depicted on Exhibit "A" attached hereto ("Property").*

2.   <u>Section 6 of the BASIC LEASE PROVISIONS.</u> Section 6 of the BASIC LEASE PROVISIONS - Rent shall be deleted in its entirety and replaced with the following:

   *6. Rent:*

   *(a)   Base Monthly Rent: $104,820.00 per month, subject to adjustment as provided in Article 3.*

   *(b)   Additional Rent: Taxes, Utilities, Insurance, Maintenance, Management and other Expenses shall be based on direct cost or consumption by Tenant or upon Tenant's share of such Expenses.*

   *(c)   The "Rent Commencement Date" shall be earlier of (i) four (4) months from the date that Landlord acquires title to the Property or (ii) the date Tenant opens for business.*

   *(d)   "Tenant's Share" – 100%*

Tenant's Initials

1

Landlord's Initials

3. _Section 1.3._ Section 1.3 of the Lease is hereby deleted and the following new Section 1.3 is hereby added in its place:

_1.3 Tenant Improvement Allowance._ _Landlord shall provide a Tenant Improvement Allowance ("TI Allowance") in an amount not to exceed Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) for the construction of Tenant's improvements of the Premises, which are to be fixed in the Premises and shall remain with the Premises. All such tenant improvements shall be pursuant to plans approved by Landlord. Tenant shall provide, at its sole cost, to Landlord upon execution of this Lease space plans for the Premises. Any revisions to the space plan shall be mutually agreed upon by the Parties._

_a._ _Construction of Improvements. The construction of Tenant's improvements in the Premises shall be done in accordance with Section 5.1 of this Lease by licensed and insured contractors approved by Landlord._

_b._ _Payment of TI Allowance. The TI Allowance shall be paid by Landlord to Tenant based on a mutually agreed upon construction draw schedule to be submitted by Tenant to Landlord for approval. Any amount not drawn under the draw schedule shall be paid to Tenant within thirty (30) days from the later to occur of: (1) Tenant opens for business in the Building; (2) the period allowed for the filing of mechanic's liens has expired or duly executed unconditional lien waivers from all contractors, subcontractors and material men who have performed work on behalf of Tenant at the Premises are presented to Landlord; and (3) the Tenant has provided to Landlord a Certificate of Occupancy, a copy of Tenant's Recorded Notice of Completion and a complete set of "as-built" construction documents for all work performed by Tenant and/or Tenant's contractors and subcontractors._

_In Landlord's sole discretion, Landlord may satisfy its obligations under this Section 1.3 by contracting with and paying directly a contractor of Landlord's choosing to complete the tenant improvements._

4. _Conflict._ In the event of any conflict between the Lease and this Amendment No. 1, this Amendment No. 1 shall prevail. Except to the extent herein modified, the Lease, as modified by the Lease Amendments shall continue in full force and effect.

5. _Terms._ Except as specifically provided in this Amendment No. 1 all capitalized terms shall have the same meaning as defined in the Lease.

6. _Counterparts._ This Amendment No. 1 may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Amendment No. 1 as of the date first above written.

Landlord

DRP Holdings, LLC.,
a California limited liability company

By: _____
Daryl R. Priest, Manager

Tenant

BORREGO COMMUNITY HEALTH FOUNDATION
a California corporation

By: _____
Name: _Bruce Hebets_
Its: _CEO_

Tenant's Initials

2

Landlord's Initials

1

**PROOF OF SERVICE**
**STATE OF CALIFORNIA, COUNTY OF ORANGE**

2

3          I am employed in the County of Orange, State of California.  I am over the age of 18 and not a
party to the within action. My business address is 12 Journey, Suite 255, Aliso Viejo, CA  92656.

4
          On the date indicated below, I served the foregoing document described as:

5

6                              SECOND AMENDED COMPLAINT

7   on interested parties in this action by placing a true and correct copy thereof enclosed in a sealed
envelope addressed as follows:

8

9     Jeffrey B. Harris                               Attorneys for Defendants INLAND VALLEY
      John S. Kyle                                    INVESTMENTS, LLC, DRP HOLDINGS,
10    Laura K. Gantney                                LLC, and PROMENADE SQUARE, LLC
      KYLE HARRIS LLP
11    2305 Historic Decatur Road, Suite 100
      San Diego, CA 92106
12

13    Email courtesy copy to:
      Frank Stevens, DHCS Independent Monitor
14

15  (BY OVERNIGHT DELIVERY) On the date below, I placed the above-described envelope for
collection in a box regularly serviced by overnight mail delivery carrier GSO at Aliso Viejo,
16  California, postage prepaid, addressed as indicated above.

17

18          I declare under penalty of perjury under the laws of the State of California that the above is true
and correct.  Executed July 30, 2021.

19

20

21

22                              Marni Soza

23

24

25

26

27

28

**PROOF OF SERVICE**
**STATE OF CALIFORNIA, COUNTY OF ORANGE**

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action. My business address is 12 Journey, Suite 255, Aliso Viejo, CA  92656.

On the date indicated below, I served the foregoing document described as:

<u>NOTICE OF ERRATA RE: SECOND AMENDED COMPLAINT</u>

on interested parties in this action by placing a true and correct copy thereof enclosed in a sealed envelope addressed as follows:

| | |
|---|---|
| Jeffrey B. Harris | Attorneys for Defendants INLAND VALLEY |
| John S. Kyle | INVESTMENTS, LLC, DRP HOLDINGS, |
| Laura K. Gantney | LLC, and PROMENADE SQUARE, LLC |
| KYLE HARRIS LLP | |
| 2305 Historic Decatur Road, Suite 100 | |
| San Diego, CA 92106 | |
| jharris@klhipbiz.com | |
| jkyle@klhipbiz.com | |
| lgantney@klhipbiz.com | |

Email courtesy copy to:
Frank Stevens, DHCS Independent Monitor

(BY OVERNIGHT DELIVERY) On the date below, I placed the above-described envelope for collection in a box regularly serviced by overnight mail delivery carrier GSO at Aliso Viejo, California, postage prepaid, addressed as indicated above.

(BY ELECTRONIC SERVICE) On the date below, I caused the foregoing document to be presented to this firm's electronic filing service OneLegal.com for filing and electronic service. In accordance with OneLegal.com's filing system, OneLegal.com will send email notification of such filing and service to all attorneys described above.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.  Executed August 4, 2021.

Digitally signed
by Dan E. Heck
Date: 2021.08.04
11:17:10 -07'00'

_____
Dan E. Heck