1    **HATTON, PETRIE & STACKLER APC**
Attorneys at Law
2    12 Journey, Ste. 255
Aliso Viejo, CA 92656
3    Telephone: (949) 474-4222

4    **GREGORY M. HATTON, SBN 119810**
**ARTHUR R. PETRIE, II, SBN 158654**
5    **DAN E. HECK, SBN 210383**

6    Attorneys for Plaintiff
BORREGO COMMUNITY HEALTH FOUNDATION
7

8                UNITED STATES DISTRICT COURT
9          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10    BORREGO COMMUNITY HEALTH    Case No.: 3:21-cv-01417-L-AGS

11    FOUNDATION, a California non-
profit public benefit corporation,    Hon. M. James Lorenz,
12    Courtroom 5B

13              Plaintiff,    OPPOSITION TO MOTION TO
DISMISS
14
       vs.    [Fed. Rules Civ.Proc., rule 12(b)(6)]
15
     Date:      September 20, 2021
16    INLAND VALLEY INVESTMENTS,    Time:      10:30 a.m.
LLC, a California limited liability    Courtroom:   5B
17    company; DRP HOLDINGS, LLC, a
California limited liability company;    Related to docket # 6
18    PROMENADE SQUARE, LLC, a
California limited liability company;    **ORAL ARGUMENT REQUESTED,**
19    WILL LIGHTBOURNE, Director,    **SUBJECT TO DISCRETION OF**
**COURT UNDER Civ. L.R. 7.1(d)(1)**
20    CALIFORNIA DEPARTMENT OF
HEALTH CARE SERVICES; and    [FILED CONCURRENTLY WITH
21    DOES 1 through 50, inclusive,    RESPONSE AND OBJECTIONS TO
DEFENDANTS' REQUEST FOR
22    JUDICIAL NOTICE]

23             Defendants.
24

25

26

27

28

1

2

## TABLE OF CONTENTS

3

4    I.   SUMMARY. ...................................................................................1

5    II.  THE SAC DETAILS THE FRAUD UNDERLYING ALL OF THE CLAIMS..............6

6    III. BORREGO'S SAC GIVES THE WHO, WHAT, WHEN, AND WHERE OF THE
         SCHEME; IT MEETS THE REQUIREMENTS OF RULE 9.........................9
7
     IV. BECAUSE THE FRAUD WAS HIDDEN FROM BORREGO BY A
8        FIDUCIARY, THE STATE LAW CLAIMS' STATUTES OF LIMITATION
         WERE TOLLED. .................................................................13
9
         A.  CALIFORNIA IMPOSES NO OBLIGATION TO LOOK PAST A
10           FIDUCIARY'S ASSURANCES. ...........................................13

11   V.  THE RICO STATUTE OF LIMITATIONS RAN FROM THE OCTOBER 2020
         RAIDS, OR IS EQUITABLY TOLLED BY HEBETS AND OTHERS' ACTIVE
12       EFFORTS TO KEEP THE FACTS OF THE UNREASONABLE LEASES FROM
         THE BOARD. .................................................................14
13
     VI. OTHER MISCELLANEOUS ISSUES RAISED BY DEFENDANTS DO NOT
14       JUSTIFY DISMISSAL. ...........................................................15

15       A.  THE FIRST CAUSE OF ACTION AIMS TO IMPOSE A CONSTRUCTIVE
             TRUST ON PROCEEDS OF THE FRAUD, NOT OBTAIN A DAMAGES
16           AWARD. .................................................................15

17       B.  THE 2ND, 3RD, 4TH, AND 6TH CAUSES OF ACTION, FOR
             REFORMATION, RESCISSION, MONEY HAD AND RECEIVED, AND
18           DECLARATORY RELIEF, RESPECTIVELY, ALL STATE PLENTY OF
             PARTICULARS, AND ARE WELL WITHIN THE STATUTE OF
19           LIMITATIONS. .................................................................16

20       C.  BORREGO ADEQUATELY AND TIMELY PLEADS DEFENDANTS'
             UNFAIR COMPETITION. ...........................................................17
21
         D.  INTERPLEADER NEED NOT CONSIST SOLELY OF MULTIPLE CLAIMS
22           TO A SINGLE IDENTIFIABLE FUND; AND THE INJUNCTION PRAYER
             IS PROOF AGAINST DEFENDANTS FILING OTHER ACTIONS. .................17
23
         E.  THERE IS PLENTY IN THE SAC TO SUPPORT THE RICO CLAIMS,
24           INCLUDING ONE UNDER 1962(D); AND IF NEED BE PLAINTIFF CAN
             ALLEGE AN ALTERNATIVE ENTERPRISE. ...............................20
25
             1.  Plaintiffs have repeatedly alleged details of defendants' scheme to steal
26               money from Borrego, which stolen funds were regularly replenished by the
                 United States on account of inflated expense reports.........................20
27

28

- i -

2.   The predicate acts consisted of entry into, and amendment of, the several leases resulting in the submission of inflated expense reports to the United States, which in turn kept the supply of stealable cash flowing to Borrego.......21

3.   Conspiracy under 1962(d) does not require that each participant controlled the enterprise. ........................................................................................22

4.   Three leases, multiple amendments, collection of unlawful rent, and resulting submission of fraudulent cost reports to the United States constitutes a pattern of racketeering activity. .......................................23

5.   Under the "injury discovery" rule, Borrego did not discover the scheme until October 2020; and that is when the conspiracy came to light as well. ......24

6.   Borrego's theory of enterprise may be amended if necessary...........................24

VII.    THE COURT MUST DENY THIS MOTION BECAUSE BORREGO TIMELY FILED A SAC AMPLY DETAILING DEFENDANTS' PART IN BILKING BORREGO OF OVER $11 MILLION.........................................................25

TABLE OF CONTENTS

1

## TABLE OF AUTHORITIES

### Federal Cases

*Beaver v. Tarsadia Hotels* (9th Cir. 2016) 816 F.3d 1170 ..................................17

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*
(S.D.Cal. 2009) 601 F.Supp.2d 1201 ......................................................9, 12

*In re Countrywide, supra,* 601 F.Supp.2d at p. 1212 ............................................11

*In re Stac Electronics Securities Litig.* (9th Cir. 1996) 89 F.3d 1399.................12

*Lee v. West Coast Life Ins. Co.* (9th Cir. 2012) 688 F.3d 1004 ...........................17

*Murphy v. Travelers Ins. Co.* (5th Cir. 1976) 534 F.2d 1155..............................18

*Odom v. Microsoft Corp.* (9th Cir. 2007) 486 F.3d 541......................................12

*Perfect 10, Inc. v. Visa Intern. Service Ass'n* (9th Cir. 2007) 494
F.3d 788 ............................................................................................................11

*Pincay v. Andrews* (9th Cir. 2001) 238 F.3d 1106 ..............................................14

*Pinkerton v. United States* (1946) 328 U.S. 640 ...............................................23

*United States v. Tisdale* (6th Cir. 2020) 980 F.3d 1089 .....................................22

*United States v. Wilkerson* (D.C. Cir. 2020) 966 F.3d 828 ................................14

*Wausau Ins. Companies v. Gifford* (5th Cir. 1992) 954 F.2d 1098....................17

### Statutes

42 C.F.R. § 413.9 ..................................................................................................20

Cal. Bus. & Prof. Code, § 17208 ..........................................................................17

Code Civ. Proc., § 386 ..........................................................................................18

### California Cases

*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185.......................17

*Calistoga Civic Club v. City of Calistoga* (1983) 143 Cal.App.3d
111 ....................................................................................................................16

*Church v. Bailey* (1949) 90 Cal.App.2d 501 .......................................................16

*City of Morgan Hill v. Brown* (1999) 71 Cal.App.4th 1114................................18

*Davis v. Kahn* (1970) 7 Cal.App.3d 868 .............................................................13

*Douglas v. Superior Court* (1989) 215 Cal.App.3d 155 .....................................16

- i -

*Family Health Centers of San Diego v. State Dept. of Health Care Services* (2021) 67 Cal.App.5th 356 ...................................................7, 20

*Fidelity Sav. & L. Ass'n v. Rodgers* (1919) 180 Cal. 683 ...................................19

*Ford v. Cournale* (1973) 36 Cal.App.3d 172 ......................................................13

*Fuller v. First Franklin Financial Corp.* (2013) 216 Cal.App.4th 955 ...........................................................................................................13

*Greenfield v. Insurance Inc.* (1971) 19 Cal.App.3d 803 ....................................13

*Hancock Oil Co. v. Hopkins* (1944) 24 Cal.2d 497................................................18

*Hood v. Gonzales* (2019) 43 Cal.App.5th 57 ......................................................19

*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326 ................................................13

*Lucas v. Associacao Protectora Uniao Madeirense* (1943) 61 Cal.App.2d 344............................................................................................16

*Mangini v. Aerojet-Gen. Corp.* (1991) 230 Cal.App.3d 1125.............................17

*Moe v. Transamerica Title Ins. Co.* (1971) 21 Cal.App.3d 289..........................13

*Montoya v. McLeod* (1985) 176 Cal.App.3d 57 ..................................................13

*Nguyen v. Scott* (1988) 206 Cal.App.3d 725 ......................................................16

*Placer Foreclosure, Inc. v. Aflalo* (2018) 23 Cal.App.5th 1109 ........................19

*Robert F. Kennedy Medical Ctr. v. Belshe* (1996) 13 Cal.4th 748 ......................7

*Southern California Gas Co. v. Flannery* (2014) 232 Cal.App.4th 477 ...........................................................................................................19

*St. James Armenian Church of L.A. v. Kurkjian* (1975) 47 Cal.App.3d 547...........................................................................................13

*Weiss v. Marcus* (1975) 51 Cal.App.3d 590........................................................16

## Rules

Fed. Rules Civ.Proc., rule 9................................................................................11

## Other Authorities

Congressional Research Service (2021) RICO: A Brief Sketch ..14, 21, 22, 23, 24

I.    **Summary**.

As detailed in the body of this brief, the Second Amended Complaint ("SAC") alleges facts which, if proved, would support the following:

Recent FBI raids and administrative action by the California Department of Health Care Services (DHCS) revealed a long-running embezzlement and Medicaid and Medi-Cal fraud scheme under which, *inter alia*, more than $11.5 million unlawfully flowed to the defendants. Defendants claim they don't understand the charges against them, that plaintiff waited too long to file this case, and that plaintiff should be paying rent to them instead of to this court.  Defendants' averments are factually and legally unavailing.

Former Borrego Community Health Foundation ("Borrego") CEO Bruce Hebets ("Hebets," now deceased), and the defendant landlord LLCs—under the direction and participation of their sole owner, Darryl Priest ("Priest")—utilized Borrego to steal millions of dollars of federal Medicaid funds from Medi-Cal as follows:

(1) Hebets and Priest committed Borrego to a series of grossly over-market (up to 400% fair market rent) 30-year-plus (*sic*) leases with each of the three Priest-owned LLC landlords who are the defendants in this matter.

(2) Hebets then allowed Borrego to make the monthly over-market rent payments to each of the Priest LLCs.

(3) Hebets knew payment of the leases automatically resulted in the inclusion of over-market lease "expenses" in Borrego's annual cost reports to the United States Center for Medicare Services ("CMS"). The over-market leases inflated the annual CMS cost reports.

(4) Borrego's Medicaid reimbursement rates are premised in large part on its annual cost reports to CMS. Thus, inflated cost reports based on over-market lease payments operate to unlawfully inflate reimbursement rates for state administered Medicaid funds to Borrego.

//

OPPOSITION TO MOTION TO DISMISS

Case No. 3:21-cv-01417-L-AGS

(5) By including the inflated lease payments in annual cost reports to CMS, Hebets was able to obtain wrongfully inflated reimbursement rates for Borrego sufficient to "cover" Borrego's monthly overmarket lease payments to the three Priest LLC landlords (defendants herein), thereby passing along the cost of the scheme to the state of California (Medi-Cal) and to the taxpayers of the United States of America (Medicaid) --- a violation of both state and federal law involving interstate commerce.

The three defendant LLCs (through Priest) and Hebets knew the leases were far outside the range of commercial reasonableness.[1]  Borrego CEO Hebets nonetheless signed the leases without disclosing this to the Borrego Board of Directors ("Board").

The FBI's and DHCS' interruption of this scheme is not window dressing. Without the intervention of federal law enforcement and state administrative action: (1) Defendants would have continued corrupting Borrego as the "enterprise" utilized to violate RICO; (2) the few insiders at Borrego who did this with defendants without disclosing it to the non-profit's Board of directors would still be working at Borrego; and (3) the taxpayers would still be paying millions of dollars for the scheme that is the subject of the SAC.

These facts beg the obvious question: Why does Borrego have to pursue wrongdoers in what is otherwise a textbook case of Medicaid fraud? The answer is simple. Borrego provides essential healthcare services to underserved communities in Southern California. Over 90% of its funding comes from healthcare benefit programs funded primarily by Medicaid and therefore administered by the state. Borrego's reimbursement rates from these government funded and operated programs are based in large part on the data Borrego submits in mandatory cost reports to CMS. The funds

---

[1] While Hebets concealed the fact that the leases were unreasonable in both price and duration from the Board, no state cause of action pled in the complaint is premised on a conspiracy to commit fraud by a fiduciary. See points and authorities below.

1   stolen by defendants herein were and, but for law enforcement intervention, would

2   continue to be included in cost reports upon which the federal government bases its

3   reimbursement for healthcare services provided by Borrego. Thus, under the scheme

4   described in the SAC, "the bigger the lease costs, the bigger the reimbursement" the

5   government paid Borrego.

6          As long as law enforcement never caught on, Borrego could pay defendants

7   anything it wanted to on the subject leases.  The unreasonably over-market lease

8   payments would be included on cost reports to CMS and would be recovered by

9   Borrego via correspondingly inflated reimbursement rates paid to Borrego—a "perfect

10   crime" that would cost victim Borrego nothing, since it would be funded by other

11   victims, the taxpayers.

12          As explained below, the law does not care who caused Borrego's inflated cost

13   reports and the resulting overpayments of federally funded healthcare reimbursements

14   administered by the state and collected by Borrego.  The law generally requires the

15   government funded healthcare facility to "make the government whole" in cases of

16   over-reimbursements. It is then up to the federally funded healthcare facility to pursue

17   the wrongdoers to "get the money back."  And that is precisely what is happening

18   here. Borrego is "getting the money back" from the three LLCs who received $11.5

19   million in over-market facility leases.

20          Defendants nonetheless grasp for the cash flow created by their fraudulent

21   scheme.  They claim plaintiff is wrongfully seeking to interplead rent with this Court.

22   Defendants are wrong.

23          The reason Borrego must pay the Court is premised on the DHCS' prohibition

24   on payment of over-market rent, and simple math:

25       (1) Qualified independent experts have determined that the over-market rent

26              payments collected by defendants to date exceed $11.5 million.

27   //

28   //

- 3 -

(2) The State of California has mandated Borrego *never* pay defendants over-market rents. (See Exh. 1. to defendants' request for judicial notice, Corrective Action Plan ("CAP")).

(3) According to the experts' FMR analysis and the State of California's CAP mandate, rent payments already paid defendants under the subject leases are currently $11.5 million "ahead" of fair market rents ("FMR").

(4) Under these circumstances, the State's CAP mandate appears *on its face* to prevent Borrego from paying defendants a single penny until the $11.5 million in FMR overpayments have been recouped.

(5) Accordingly, until the Court decides how the $11.5 million in over FMR rent payments should be recovered, Borrego's interpleading of FMR rents to the Court must occur.

(6) Borrego cannot be the one to resolve the debate between defendants ("pay the rent") and the state of California DHCS ("Don't pay rent over FMV"). Until directed by this Court to do otherwise, Borrego must interplead the FMR to this Court *or risk noncompliance with the state's prohibition on payment of overmarket rents stated in the CAP.*

The notion that over market rents at issue here are the result of an arms-length transaction by *Borrego* is at best inconsistent with the facts alleged in the SAC. Hebets never presented the 30-year leases for Board approval, and never counseled the Board about the leases' substantial departure from fair market standards.

As detailed in paragraph 104 of the SAC, Hebets and the sole owner of the three LLC defendants Darryl Priest ("Priest") began implementation of the scheme in September 2012. Their activities continued past Hebets' death and into 2020, until Borrego suspended lease payments after the FBI raids and the suspension of all reimbursements by the DHCS. By then, defendants had extracted over $11.5 million in excess rent from Borrego (and through Borrego, from the United States, under the CMS cost reporting and related reimbursement procedures described above and, in the

SAC,).  Borrego learned details of the scheme during an investigation that followed the October 2020 law enforcement raids and DHCS suspension.  It filed this suit in June 2021, less than a year later.

The defendants nonetheless seek to escape responsibility for their part in the conspiracy by blaming the Borrego Board for remaining "hoodwinked" by Hebets and other insiders and invoking statutes of limitation.  They also claim they cannot understand the claims against them because the pleading lacks the particularity required by Federal Rules of Civil Procedure, rule 9(b):

> Plaintiff…alleges that its former and now deceased CEO, Bruce Hebets…engaged in an elaborate scheme of fraud and concealment with Defendants for nearly nine years, while the entire Board of BCHF performed no diligence and remained blissfully unaware of the scheme until the FBI raided BCHF's own premises and obtained BCHF's own documents that revealed the fraud.  BCHF, however, does not – and cannot – plead particularized facts to substantiate this scheme as Rule 9(b) requires.  Further, all of BCHF's claims except interpleader are barred by applicable statutes of limitation….

(See Def. Memo. Of Points and Auth. ("MPA") 1:6-14.)

First, defendants' argument asks the Court to decide plaintiff's fact allegations in its Complaint are false. This is not a basis to grant defendants' motion. At this point in this matter, the Court is required to presume the SAC's allegations are true.

Equally important, defendants misrepresent Borrego's pleading. After the law enforcement raids and DHCS suspension put it on inquiry notice, Borrego investigated and discovered defendants' fraud by having a premier nationwide real estate services firm conduct a survey of market rents and rental practices. Notably, Borrego's post-raid investigation is the "due diligence" Hebets (or any other Board member presenting defendants' 30-year over-market leases to the Board) was required by law to develop and present to the Board in order to seek the Borrego Boards' approval of each of the leases.  Moreover, defendants ignore black-letter law that Borrego's Board was entitled to rely on the guidance of its fiduciary (Hebets) without further

1   investigation.  Finally, Borrego provides ample "particularized facts" to give

2   defendants "adequate notice" to defend against the charges – all the more adequate in

3   light of the fact that the transactions that form the basis for plaintiff's SAC are

4   "peculiarly within" defendants' knowledge.

5       For these and the reasons detailed below, defendants' motion must be denied

6   and defendants must be ordered to answer the SAC.

7   **II.    <u>The SAC details the fraud underlying all of the claims.</u>**

8       Bruce Hebets ("Hebets") and Darryl Priest ("Priest") were long-time friends.

9   (SAC ¶ 6, 16, 61(a), 83, 101.)

10      Hebets was CEO of plaintiff Borrego.  (SAC ¶ 16, 37.)  Consequently, Hebets

11  was a Borrego fiduciary.  Borrego is a non-profit Federally Qualified Health Center

12  ("FQHC") governed by a Board of Trustees ("Board").  (SAC ¶ 1, 2.)

13      Under Hebets' management Borrego rapidly expanded.  (SAC ¶ 28.)

14      Hebets and Priest conspired to loot Borrego by having Borrego enter a series of

15  leases, which incorporated rents far above market value over excessively long terms.

16  (SAC ¶ 6, et seq.)  Priest specially formed several Limited Liability Companies for the

17  purposes of the scheme – Inland Valley Investments ("Inland Valley"), DRP Holdings

18  (DRP"), and Promenade Square ("Promenade"), the defendants in this case

19  (collectively, these LLCs are referred to as the "Priest entities").  (SAC ¶ 10-15.)

20      Priest is an experienced real estate investor and developer.  (SAC ¶ 51.)  As to

21  each of the lengthy leases, Priest would have had to perform due diligence for

22  presentation to his financiers.  (*Id.*)  Defendants are therefore presumed to have

23  known, from the beginning, that the lease rates grossly exceeded fair market rent, and

24  the terms were unreasonably long.  (*Id.*)

25      As is relevant here, over a period of several years Hebets caused Borrego to

26  enter three leases:

27          (1) The "El Cajon" lease, with Promenade;

28          (2) The "San Bernardino" lease, with DRP; and,

1       (3) The "Barstow" lease, initially with DRP, later assigned by DRP to Inland

2           Valley.

3 (SAC ¶ 6, 10-15, 104.)

4       Major facilities leases like these require express Board approval.  (SAC ¶ 8.)

5 But Hebets and Priest knew that any reasonable due diligence as to fair market rents

6 and terms would show these leases were grossly unreasonable.[2]  (SAC ¶ 6.)  So Hebets

7 never presented any such materials to the Board.  Indeed, he never presented the

8 leases.  (*Id.*)  And for years Hebets kept the unreasonable nature of the leases from the

9 Board; in this he was assisted by other Borrego executives (fiduciaries).  (SAC ¶ 112.)

10       Hebets "retired" from Borrego in 2018.  He died in 2019.  (SAC 111.)

11       In October 2020 law enforcement authorities raided Borrego facilities in support

12 of an investigation into healthcare fraud.  (SAC ¶ 30.)  During the ensuing

13 investigation by law enforcement and DHCS, the nature of the Hebets-Priest scheme

14 came to light after Borrego retained a national commercial real estate services firm to

15 report on the "fair market value" of the El Cajon, San Bernardino, and Barstow leases.

16 That report supports Borrego's claim to $11,565,067.95 in overpaid rent.  (SAC ¶ 31-

17 32.)

18       The California Department of Health Care Services ("DHCS") exercises

19 regulatory and funding control over Borrego and is participating in the investigation.

20 (SAC ¶ 7, 30.)  DHCS has directed Borrego to stop paying above market rent on the

21 three leases.  (SAC ¶ 7(a).)

22       Borrego's funding is dependent on its submittal of annual reports to CMS

23 regarding its costs and overhead, which in turn allows DHCS to continue to reimburse

24 Borrego with federal health care funds sufficient to cover reasonable reported costs.

25 Those reported costs and overhead specifically include reasonable rents as a basis for

26

27

28

---

[2] The Priest entities admit that, as to two of the properties, Priest and Hebets signed leases **before** the Priest entities even owned the underlying properties.  This suggests the Priest LLCs may have presented the leases to their lenders to support financing applications.

Case No. 3:21-cv-01417-L-AGS

1   the cost reports upon which the government sets Borrego's reimbursement rates.

2   (*Robert F. Kennedy Medical Ctr. v. Belshe* (1996) 13 Cal.4th 748, 752 ("Kennedy");

3   *see also Family Health Centers of San Diego v. State Dept. of Health Care Services*

4   (2021) 67 Cal.App.5th 356, 360:  "In general, to be reimbursable, claimed costs 'must

5   be based on the reasonable cost of [covered] services' and 'related to the care of

6   beneficiaries.'")  In turn these reported costs are factored into reimbursement rates

7   DHCS pays Borrego for health care services.[3]

8        In the CAP attached as Exhibit 1 to defendants' request for judicial notice,

9   DHCS has informed Borrego it will be required to do two things which require

10  Borrego to take action against the perpetrators of the scheme here:

11  (1) **File amended costs and overhead reports reflecting only the payment of**

12      **market rent.**  The filing of amended cost reports that substantially reduce

13      prior reported costs typically leads to retroactive downward reimbursement

14      rate adjustments.  This can support a reimbursement demand upon Borrego

15      to recover over-payments of healthcare plan benefits paid to Borrego, or, in

16      some instances possibly subject Borrego to an ongoing "credit" against

17      future reimbursements. (SAC ¶ 7(b).)

18  (2) **Cease payment of over-market rent.** (SAC ¶ 34.) Borrego has already paid

19      $11.5 million in over-market rents to the defendants. Thus, payment of *any*

20      amount of rent at this time under the leases will only cause a further payment

21      of over-market rent, which the DHCS's CAP prohibits. Thus, in addition to

22      seeking recovery of over-market rents as damages herein, Borrego is paying

23      an amount equal to monthly fair market rental values to the court, where the

24      money should remain  until the court decides when, under what conditions,

25      and to whom the money should be released.

26  //

27

28  [3]  *Kennedy* explains "in detail" the method by which DHCS reimburses providers.
    (*Family Health, supra,* 67 Cal.App.5th at p. 361.)

This action was also prompted by defendants' concerted attempt to compel Borrego to continue to pay over-market rents to defendants. If Borrego, at DHCS' instance, stopped payment of the over-market rent on any one of the three leases, the three Priest entities, working in concert, threatened to evict Borrego from *all three* leased facilities at issue here, should Borrego fail to pay full "contract" rent on even one of them. (SAC ¶ 35.)

Thereafter Borrego filed this action to:

(1) Seek recovery of overpaid rent by alternative means, including imposition of a constructive trust on the proceeds of the embezzlement, rescission, common counts, and disgorgement (SAC 1st, 3rd, 4th, and 5th causes of action);

(2) Reform the leases to reflect reasonable, market value rent (SAC 2nd cause of action);

(3) Obtain the court's declaration of the rights and responsibilities of the parties (SAC 6th cause of action);

(4) Seek resolution, by way of interpleader, of competing claims posed by the DHCS directive to stop paying above-market rent, and the Priest entities' threat to evict Borrego if it does so (interpleader requires DHCS and Borrego to litigate their claims herein, and empowers the court to enjoin other court action including eviction – SAC 7th and 8th causes of action); and

(5) Seek relief under the RICO statute for the Priest entities' work with Hebets to corrupt Borrego's operation into a vehicle for stealing federal health care funds.

## III.   <u>Borrego's SAC gives the who, what, when, and where of the scheme; it meets the requirements of Rule 9</u>.

Dismissal pursuant to Rule 12(b)(6) is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory. In deciding a 12(b)(6) motion, all material factual allegations of the complaint

1  are accepted as true, as well as all reasonable inferences to be drawn from them.  (*In re*

2  *Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.* (S.D.Cal. 2009) 601

3  F.Supp.2d 1201, 1211.)

4      Defendants summarize their Rule 9 attack on the SAC as follows: "Simply put,

5  BCHF makes a series of conclusory allegations which do not name the who, what,

6  where and when of the fraud."

7      Not so.  The SAC runs to 35 pages (not including exhibits).  It exhaustively

8  details what defendants did, when they did it, and how it harmed Borrego (and by

9  extension, the United States).  A prime example is found in paragraph 104:[4]

10      104.  Here is a detailed description of the pattern of racketeering activities
         for this RICO claim:

12         a.  Here is a list of predicate acts and the specific statutes that were
             violated;

14         i.  DRP & IVI – On February 2, 2016, Priest and Hebets entered into a
             lease obliging BCHF to pay above-market rents for 30 years on
             property located on East Main Street in Barstow.  Initially, Priest
             signed on behalf of DRP as landlord.  Base monthly rent was set at
             $60,000.  On April 3, 2016, Priest and Hebets executed an
             amendment to the lease, raising the monthly rent to $104,820.  On
             August 29, 2017, Priest (acting for DRP) assigned all landlord rights
             in the lease to IVI (Priest signed for IVI).  At all times the fair
             market rent for this property never exceeded $25,000.  BCHF
             calculates that DRP or IVI or both of them have thus collected
             $5,041,590.75 in unlawful rent.

         ii.  DRP – On September 15, 2015, Priest and Hebets entered into a
             lease obliging BCHF to pay above-market rents for 30 years on
             property located on North D Street in San Bernardino.  Priest signed
             on behalf of DRP as landlord.  Base monthly rent was set at
             $62,704.  At all times the fair market rent for this property never

---

[4] SAC paragraphs 100 through 117 generally track this district's "Rico Case Statement
Standing Order."

exceeded $25,000.  BCHF calculates that DRP has thus collected $2,534,792.70 in unlawful rent.

iii.   PS -- On September 21, 2012, Priest and Hebets entered into a lease obliging BCHF to pay above-market rents for 20 years on property located on West Main Street in El Cajon.  Priest signed on behalf of PS as landlord.  Base monthly rent was set at $41,749.52.  In March 2013 Priest and Hebets executed Amendment 1 to the lease substantially increasing monthly rent in future years.  On or about September 13, 2013, Priest and Hebets executed Amendment 2 to the lease increasing the monthly rent to $52,000, and substantially increasing monthly rent in future years.  On April 3, 2015, Priest and Hebets executed Amendment 3 to the lease increasing the square footage, the term by 30 years, and the monthly rent to $97,912.50.  On March 22, 2016, Priest and Hebets executed Amendment 4 to the lease increasing the monthly rent to $111,900.  At all times the fair market rent for this property never exceeded $73,000.  BCHF calculates that PS has thus collected $3,988,684.50 in unlawful rent.

iv.   Defendants, Priest, and Hebets' acts in entering into these leases, hiding their terms from the BCHF Board, and causing unlawful and inaccurate expense reports be submitted to the United States violated each of the following statutes, from time to time:

1. 18 USC § 669 ("Theft or embezzlement in connection with health care");
2. 18 USC § 1035 ("False statements relating to health care matters");
3. 18 USC § 1347 ("Health care fraud");
4. 18 USC § 287 ("False, fictitious or fraudulent claims");
5. 18 USC § 371 ("Conspiracy to commit offense or to defraud United States);
6. 18 USC § 666 ("Theft or bribery concerning programs receiving Federal funds");
7. 18 USC § 1001 (False "Statements or entries generally"); and,
8. 18 USC § 1349 ("Attempt and conspiracy").

***

A claim should "not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  (*In re Countrywide, supra,* 601 F.Supp.2d at p. 1212, citing *Perfect 10, Inc. v. Visa Intern. Service Ass'n* (9th Cir. 2007) 494 F.3d 788, 794.)

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  (Fed. Rules Civ.Proc., rule 9(b).) This Rule:

> Serves to give defendants adequate notice to allow them to defend against the charge and to deter the filing of complaints "as a pretext for the discovery of unknown wrongs," to protect professionals from the harm that comes from being subject to fraud charges, and to "prohibit [ ] plaintiff[s] from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis."

(*In re Countrywide, supra,* 601 F.Supp.2d at p. 1215, citing *In re Stac Electronics Securities Litig.* (9th Cir. 1996) 89 F.3d 1399, 1405.)

Importantly, "[T]he requirements of Rule 9(b) relax 'as to matters peculiarly within the opposing party's knowledge.'"  (*In re Countrywide, supra*, at p. 1216, citing *Odom v. Microsoft Corp.* (9th Cir. 2007) 486 F.3d 541, 555.)

Pertinent to all claims plaintiff has alleged the:

(1) Who – Hebets (Borrego CEO and fiduciary), Priest (experienced real estate lessor, with constructive or actual knowledge how the subject leases diverged from reasonable terms), and the three defendants (LLCs under Priest's sole ownership and control);

(2) What – conspiring to have Hebets commit, and actually committing, Borrego to lengthy, above market leases, while keeping the Borrego Board in the dark as to the nature of fair market rental rates and terms in the relevant area; concurrently submitting correspondingly inflated cost reports to the DHCS and the United States which would ultimately cause the cost of the over-market lease payments to "passed through" to the taxpayers in the form of inflated reimbursements resulting from the inflated cost reports;

(3) Where – in this judicial district;

//

//

- 12 -

OPPOSITION TO MOTION TO DISMISS

(4) When – the dates of the various leases, and related amendments are plead with specificity, as is the date when Borrego was put on inquiry notice as to the embezzlement – October 2020.

Borrego's pleading meets the letter and intent of Rule 9.

## IV.   Because the fraud was hidden from Borrego by a fiduciary, the state law claims' statutes of limitation were tolled.

### A.   California imposes no obligation to look past a fiduciary's assurances.

The existence of a fiduciary relationship such as that between a stockbroker and his or her customers, title insurance company and client, attorney and client, or any principal-agent relationship gives rise to a duty to disclose material facts.  (*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 336–337; *see also St. James Armenian Church of L.A. v. Kurkjian* (1975) 47 Cal.App.3d 547, 551.)

Wherever there is a confidential relationship, there is a duty to make full disclosure of all material facts within the agent's knowledge relating to the transaction. (*Montoya v. McLeod* (1985) 176 Cal.App.3d 57, 64; *Ford v. Cournale* (1973) 36 Cal.App.3d 172, 182.)

The suppression or concealment of a material fact by a fiduciary constitutes actionable fraud.  (*Moe v. Transamerica Title Ins. Co.* (1971) 21 Cal.App.3d 289, 306.)

A principal has the right to rely on representations made to it by a fiduciary without any duty of further inquiry.  (*Davis v. Kahn* (1970) 7 Cal.App.3d 868, 878; *see Greenfield v. Insurance Inc.* (1971) 19 Cal.App.3d 803, 811 (insurance agent representing he had obtained coverage that he had not obtained).).

If the plaintiff has the right, due to the existence of a fiduciary relationship, to rely on the fiduciary's statements without further inquiry, the statute of limitations does not run merely because the means of discovery were available, and the plaintiff is not compelled to disprove that the means existed. The plaintiff need only establish

- 13 -

1   facts sufficient to show that it made an actual discovery of unknown information

2   within three years before the filing of the action.  (*Davis v. Kahn* (1970) 7 Cal.App.3d

3   868, 878; *see, e.g.*, *Fuller v. First Franklin Financial Corp.* (2013) 216 Cal.App.4th

4   955, 964–965.)

5        Hebets, the "inside man," was a Borrego fiduciary.  His failure to disclose, and

6   concealment of, the leases' departure from reasonable fair market terms tolls the

7   statute until Borrego had reason to investigate.  And Borrego had no reason to do so

8   until the October 2020 FBI raids and DHCS suspension.

9

10  **V.    The RICO statute of limitations ran from the October 2020 raids, or is**

11  **equitably tolled by Hebets and others' active efforts to keep the facts of the**

12  **unreasonable leases from the Board**.

13       The statute of limitations for civil RICO actions is four years.  (*Pincay v.*

14  *Andrews* (9th Cir. 2001) 238 F.3d 1106, 1108.)  Under the so-called "injury

15  discovery" rule, the statute begins to run "when a plaintiff knows or should know of

16  the injury that underlies" its cause of action.  (*Id.* at p. 1109.)

17       Borrego alleges that until it received relevant analysis from certified commercial

18  real estate appraisers (following the DHCS suspension and FBI raids), it did not know

19  that the terms of the several leases departed from the kinds of reimbursable reasonable

20  costs allowed under state and federal regulations.  (SAC ¶ 31-33.)

21       Borrego does not dispute that the law enforcement raids of October 2020 put it

22  on inquiry notice regarding the propriety of Hebets' (and others') management

23  practices.  So, the RICO statute would run from October 2020.  Borrego filed this

24  action in June 2021, well within the four year-statute.

25       Moreover, plaintiff alleges defendants participated in a conspiracy under

26  Section 1962(d).  (SAC ¶ 110.)  "The statute of limitations for a RICO conspiracy runs

27  until the scheme's objectives are accomplished or abandoned, or until the defendant

28

1  withdraws." (Congressional Research Service (2021) RICO: A Brief Sketch,[5] p. 9,

2  citing *United States v. Wilkerson* (D.C. Cir. 2020) 966 F.3d 828, 840.) The

3  government brought the scheme to a halt in October 2020. This action was filed less

4  than a year later.

5      Finally, defendants' statute of limitations argument necessarily presumes the

6  Borrego Board knew the leases were as much as 400% over market value and 30 years

7  in duration, but just "didn't care" and allowed Borrego to keep paying roughly $2

8  million per year in over-market rents. There is nothing alleged in the SAC that might

9  support such a conclusion.

10

11  **VI.  Other miscellaneous issues raised by defendants do not justify dismissal.**

12      A. The first cause of action aims to impose a constructive trust on proceeds of

13          the fraud, not obtain a damages award.

14  As discussed, Borrego provides plenty of the what, when, where, and how to

15  satisfy the requirements of Rule 9. Defendants cannot possibly be in the dark as to the

16  nature of the charges they are defending.

17      Contrary to defendants' motion, Borrego does not seek to hold them liable for

18  damages for "conspiracy to breach a duty owed only by a fiduciary, or for conspiracy

19  to commit constructive fraud." (MPA 11:5-7.)[6] Rather Borrego seeks to impose a

20  constructive trust on the $11.5 million proceeds of the constructive fraud perpetrated

21  by Hebets, albeit perpetrated with the defendants' full knowledge.

22      California Civil Code section 2224 provides that "One who gains a thing by

23  fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act

24  //

25  _____

[5] Available at crsreports.congress.gov/product/pdf/rl/96-950.

26  [6] Again, the fact that the fiduciary concealed the over-market price and unreasonable

27  duration of the leases from the Borrego board simply explains why Borrego was
   ignorant of the scheme until the FBI raids and the DHCS suspension.

28

1    is, unless he or she has some other and better right thereto, an involuntary trustee of

2    the thing gained, for the benefit of the person who would otherwise have had it."

3        A constructive trust may be imposed in practically any case when there is a

4    wrongful acquisition or detention of property to which another is entitled.  (*Weiss v.*

5    *Marcus* (1975) 51 Cal.App.3d 590, 600; *see, e.g., Douglas v. Superior Court* (1989)

6    215 Cal.App.3d 155, 160—cause of action for constructive trust that incorporated

7    allegations of causes of action for fraud, conspiracy, and racketeering was sufficient.)

8        The wrongful act giving rise to a constructive trust need not amount to fraud or

9    intentional misrepresentation.  All that must be shown is that the acquisition of the

10   property was wrongful and that the keeping of the property by the defendant would

11   constitute unjust enrichment.  (*Nguyen v. Scott* (1988) 206 Cal.App.3d 725, 737–740;

12   *Calistoga Civic Club v. City of Calistoga* (1983) 143 Cal.App.3d 111, 116.)

13       For example, if an employee embezzles money from his employer, the employer

14   may impose a constructive trust on proceeds, or property purchased with the proceeds,

15   held by a third party.  (*Church v. Bailey* (1949) 90 Cal.App.2d 501, 503–504.)

16       Transferees who take with knowledge of the trust are liable even if they acted in

17   good faith or without the intention of perpetrating a wrong.  (*Lucas v. Associacao*

18   *Protectora Uniao Madeirense* (1943) 61 Cal.App.2d 344, 351–352.)

19       Of course, here there is no evidence of good faith.  And there are plenty of

20   alleged facts, presumed true, to support defendants' acquisition of wrongfully acquired

21   property.

22       B.    The 2nd, 3rd, 4th, and 6th causes of action, for reformation, rescission,

23       money had and received, and declaratory relief, respectively, all state plenty of

24       particulars, and are well within the statute of limitations.

25       Defendants' arguments as to these causes of action are all the same: they lack

26   Rule 9 particularity, and they were filed too late.

27       For all the reasons set out above the SAC more than meets Rule 9 requirements,

28   and, especially in light of the fraud by a fiduciary, was timely filed.

- 16 -

1    C.    Borrego adequately and timely pleads defendants' unfair competition.

2        The particulars of defendants' scheme, in concert with Priest and Hebets, is

3    amply detailed in the SAC.

4        Generally, an action based on unfair competition must be commenced within

5    four years after the cause of action accrued.  (Cal. Bus. & Prof. Code, § 17208; *see*

6    *Mangini v. Aerojet-Gen. Corp.* (1991) 230 Cal.App.3d 1125, 1156.) This limitation

7    period applies even when the basis for the unfair completion claim is the alleged

8    violation of another statute, even a federal statute, that provides a shorter limitations

9    period.  (*Beaver v. Tarsadia Hotels* (9th Cir. 2016) 816 F.3d 1170, 1177–1178.)

10       The California Supreme Court has held that a cause of action under the unfair

11   competition statute is governed by common law accrual rules to the same extent as any

12   other statute, rejecting prior court of appeal decisions that had reached a contrary

13   conclusion.  (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1196.)

14   For example, while a cause of action will generally accrue on the occurrence of the

15   last element essential to the cause of action, the common law delayed discovery rule

16   may, under the appropriate circumstances, delay the triggering of the statute of

17   limitations until a reasonable person would have discovered the factual basis for the

18   claim.  (*See Aryeh, supra,* 55 Cal.4th at pps. 1194–1196.)

19       Again, due to concealment by Hebets and others, Borrego was not on inquiry

20   notice of the potential fraud until the October 2020 law enforcement raids.  This

21   lawsuit was filed eight months later.

22   D.    Interpleader need not consist solely of multiple claims to a single

23        identifiable fund; and the injunction prayer is proof against defendants filing

24        other actions.

25       Defendants cite several federal cases in support of the assertion that

26   "courts…have uniformly held that a single, identifiable fund is a prerequisite to an

27   interpleader action."  (MPA 19:5-6, citing *Wausau Ins. Companies v. Gifford* (5th Cir.

28   1992) 954 F.2d 1098, *Lee v. West Coast Life Ins. Co.* (9th Cir. 2012) 688 F.3d 1004,

OPPOSITION TO MOTION TO DISMISS

1  1009, and *Murphy v. Travelers Ins. Co.* (5th Cir. 1976) 534 F.2d 1155.)  But all of

2  these cases are inapt: they involve federal interpleader actions under 28 USC 1335.[7]

3       Plaintiff's interpleader arises under California, not federal, law.

4       Notwithstanding the technical restrictions on interpleader that existed historically

5  or that prevail in other jurisdictions, the California remedy of interpleader as codified

6  under Code of Civil Procedure sections 386 through 386.6, is to be broadly interpreted

7  to give effect to the remedial nature of the statutes and to promote justice.

8       Thus, the conditions under which interpleader may be utilized are limited only

9  by the codifying provisions, which broaden and enlarge the historic equitable remedy.

10  (*See Hancock Oil Co. v. Hopkins* (1944) 24 Cal.2d 497, 508; *City of Morgan Hill v.*

11  *Brown* (1999) 71 Cal.App.4th 1114, 1122–1123.)  This includes claims made by

12  adverse claimants on a tenant for rent due under lease.

13       It bears repeating: interpleader is proper where a tenant pleads that the lessor

14  (here, defendants) and a third party (here, the DHCS) assert conflicting claims

15  concerning the tenant's obligation to pay the rent.  (*See Hancock, supra,* 24 Cal.2d at

16  pps. 504–505.)  Again, the state says Borrego must not pay over market rent.  Borrego

17  has already paid $11.5 million in over market rent to date. Yet the defendants have

18  demanded Borrego pay even more rent *before* the $11.5 million overpayment has been

19  paid back to Borrego as damages in this case.

20       Further, of the two types of interpleader remedies, the second, set out in Code of

21  Civil Procedure section 386(b), provides that any person, firm, corporation,

22  association, or other entity against whom double or multiple claims are made, *or may*

23  *be made*, by two or more persons that are such that they may give rise to double or

24  multiple liability may bring an action against the claimants to compel them to

25  interplead and litigate their claims.  (Code Civ. Proc., § 386, subd. (b); *Placer*

---

26  [7]  Defendants ignore other types of federal interpleader, including an action in the

27  nature of interpleader under Federal Rules of Civil Procedure, rule 22.  (*See, e.g.,*
   *Underwriters at Lloyd's v. Nichols* (8th Cir. 1966) 363 F.2d 357.)  Had it wanted to

28  file in federal court plaintiff could have made out a Rule 22 case for interpleader.

Case No. 3:21-cv-01417-L-AGS

1   *Foreclosure, Inc. v. Aflalo* (2018) 23 Cal.App.5th 1109, 1113; *Hood v. Gonzales*

2   (2019) 43 Cal.App.5th 57, 71.)  This second type of remedy was added in 1975,

3   broadening the prior codified interpleader remedy.

4        A defendant may not object to a complaint in interpleader because it failed to

5   show that the interpleaded claims were well founded since, by necessity, some of the

6   claims are not well founded. It is sufficient to allege that the plaintiff cannot safely

7   determine which claim is right and lawful.  (*Fidelity Sav. & L. Ass'n v. Rodgers*

8   (1919) 180 Cal. 683, 684.)

9        Interpleader is appropriate, therefore, when an obligor is subject to possible

10  double vexation with respect to its single liability to pay the agreed settlement amount,

11  even though those liabilities would not have had a common origin.  (*Southern*

12  *California Gas Co. v. Flannery* (2014) 232 Cal.App.4th 477, 486–488.)

13       Section 386 abrogates two essential elements of the historic equitable remedy of

14  interpleader. These two requirements were: (1) that the same thing, debt, or duty must

15  be claimed by both or all the parties against whom the relief of interpleader was

16  demanded, and (2) that all of the adverse titles or claims must be dependent, or be

17  derived from a common source.  (*See Hancock, supra,* 24 Cal.2d 497, 502–503; *Hood,*

18  *supra,* 43 Cal.App.5th 57, 72.)

19       Plaintiff pleads it is a tenant between two entities demanding contrary

20  performance: the DHCS is telling Borrego not to pay above-market rent (and, indeed,

21  to recover over $11 million in such rent already paid), while the defendants

22  collectively threaten that payment short of full contract rent on any one of the leases

23  will trigger Borrego's eviction from all of them.  Borrego therefore interpleads the fair

24  market rent and awaits the court's instruction on how it is ultimately to proceed.

25       Related thereto is the authority interpleader gives the court to enjoin defendants

26  from filing other state or federal court actions.

27

28

Case No. 3:21-cv-01417-L-AGS

E.    <u>There is plenty in the SAC to support the RICO claims, including one under 1962(d); and if need be plaintiff can allege an alternative enterprise</u>.

The Priest LLC defendants complain Borrego does not adequately allege specifics, predicate acts, that they controlled the enterprise, that there was a pattern of racketeering activity, or avoidance of a four-year statute of limitations.  None of these arguments carry the day.

1.    <u>Plaintiffs have repeatedly alleged details of defendants' scheme to steal money from Borrego, which stolen funds were regularly replenished by the United States on account of inflated expense reports.</u>

Defendants conspired with Hebets and Priest to oblige Borrego to extremely long-term leases, at rates far above the market.  They did this knowing that substantially all of Borrego's money comes from the United States government.  In turn, the United States decides how much to pay Borrego based on annual reports detailing Borrego's costs and overhead.  But lawfully Borrego can only submit reasonable costs:

> "[I]f the provider's operating costs include amounts not related to patient care, specifically not reimbursable under the program, or flowing from the provision of luxury items or services (that is those items or services substantially in excess of or more expensive than those generally considered necessary for the provision of needed health services) such amounts will not be allowable."  The regulations define necessary and proper costs as "costs that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities.  They are usually costs that are common and accepted occurrences in the field of the provider's activity."

(*Family Health, supra,* 67 Cal.App.5th at p. 360-361, citing 42 C.F.R. § 413.9(c)(3) (2021).)  Again, Borrego could continue to pay unreasonable rents far above market, because the over-market rent payments would be included in Borrego's cost reports to the United States, thereby increasing reimbursements correspondingly to "cover" the over-market rents.

2.      <u>The predicate acts consisted of entry into, and amendment of, the several leases resulting in the submission of inflated expense reports to the United States, which in turn kept the supply of stealable cash flowing to Borrego.</u>

"The heart of most RICO violations is a pattern of racketeering activities, that is, the patterned commission of *two or more* designated state or federal crimes." (RICO: A Brief Sketch, *supra*, at p. 9, italics added.)

Paragraphs 115-116 of the SAC detail how defendants' actions qualify:

The embezzlement scheme, including the several leases and related concealment, constitutes a pattern of racketeering activity as described in 18 USC § 1961(1)(B), as an act indictable under 18 USC § 1957 ("Engaging in monetary transactions in property derived from specified unlawful activity"). "Specified unlawful activity" is, in turn, defined in 18 USC § 1956 as including "any act or activity constituting an offense involving a Federal health care offense." 18 USC § 24 defines "Federal health care offense" as including "a violation of, or a criminal conspiracy to violate" any of the following:
  ➢ 18 USC § 669 ("Theft or embezzlement in connection with health care");
  ➢ 18 USC § 1035 ("False statements relating to health care matters");
  ➢ 18 USC § 1347 ("Health care fraud");
  ➢ 18 USC § 287 ("False, fictitious or fraudulent claims");
  ➢ 18 USC § 371 ("Conspiracy to commit offense or to defraud United States");
  ➢ 18 USC § 666 ("Theft or bribery concerning programs receiving Federal funds");
  ➢ 18 USC § 1001 (False "Statements or entries generally"); and,
  ➢ 18 USC § 1349 ("Attempt and conspiracy").
But for the embezzlement scheme [described in the SAC] [Borrego] would have leased properties at fair market value, and for reasonable terms

The unlawful leases led to the *recurring annual* submission of fraudulent cost reports, which violated (some or all of) the listed statutes (predicate offenses).

3. <u>Conspiracy under 1962(d) does not require that each participant controlled the enterprise.</u>

Allegations that the Priest LLC defendants conspired with Hebets and Priest to steal money from the United States, through Borrego, and to keep stealing it, run throughout the SAC:

Paragraph 23: each was the "co-conspirator" of the others;

Paragraph 25: "there is such unity of interest and ownership between the Priest LLCs that the separate personalities of the limited liability companies no longer exist and that if the acts are treated as those of the individual limited liability companies alone an inequitable result will follow";

Paragraph 55: "In committing the acts and omissions alleged above, Hebets, acting as BCHF's Chief Executive Officer at the time, knowingly acted in concert with each of the Priest LLCs to enter into 30+ year leases at more than twice FMR";

Paragraph 65: "[E]ach of the Priest LLCs knowingly and willfully conspired and agreed with Hebets and Does 1-50, inclusive, to damage BCHF by and through Hebets' and others' fraud and deceit as described in detail above."

Paragraph 102: detailing wrongdoing of non-defendants; and, finally

Paragraph 110: "The facts described herein demonstrate the existence of a conspiracy between Hebets, Priest, and the defendants. (18 USC 1962(d).)"

Under 1962(d) "[t]he heart of the crime lies in the agreement rather than any completed, concerted violation of the other three RICO subsections." (RICO: A Brief Sketch, *supra*, at p. 8, citing *United States v. Tisdale* (6th Cir. 2020) 980 F.3d 1089, 1096.)

A conspirator is liable not only for the conspiracy but for any foreseeable substantive offenses committed by any of the conspirators in furtherance

- 22 -

> of the common scheme, until the objectives of the plot are achieved, abandoned, or the conspirator withdraws.

(RICO: A Brief Sketch, *supra*, at p. 9, citing *Pinkerton v. United States* (1946) 328 U.S. 640, 646-647; cf. SAC ¶¶ 65, 66.)

As noted the life-support system for defendants' leases was continuing federal reimbursements to Borrego founded on regular submission of fraudulent cost reports to CMS that included the over-market lease payments which generated the $11.5 million in over-market rent to the defendants.

4. <u>Three leases, multiple amendments, collection of unlawful rent, and resulting submission of fraudulent cost reports to the United States constitutes a pattern of racketeering activity.</u>

"The commission of predicate offenses forms the requisite related pattern if the 'criminal acts…have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." (RICO: A Brief Sketch, *supra*, at p. 13, esp. fn 65.)

**The criminal acts here were:**

(1) **Defendants' monthly embezzlement of money from Borrego via the inflated leases,**

(2) **Which sums defendants knew would be included in Borrego's annual cost reports to the United States,**

(3) **Thereby inflating government healthcare reimbursement rates every year in amounts sufficient to replenish the money that had been embezzled from Borrego in prior years under the leases, and**

(4) **Repeating the same actions every year so Borrego could continue to be embezzled each month utilizing the leases, year after year after year.**

**This is a textbook "pattern" of racketeering activity under RICO.**

5.    <u>Under the "injury discovery" rule, Borrego did not discover the scheme until October 2020; and that is when the conspiracy came to light as well.</u>

Borrego was reasonably unable to discover what was going on until an investigation after the October 2020 raids. Moreover, under rules applicable to RICO conspiracy, the statute does not even begin to run until the conspiracy is completed. "The statute of limitations for a RICO conspiracy runs until the scheme's objectives are accomplished or abandoned, or until the defendant withdraws." (RICO: A Brief Sketch, *supra,* at p. 9, citing *Wilkerson, supra,* 966 F.3d at p. 840.)

Again, the scheme ended when it was discovered in October 2020. The SAC was timely filed.

6.    <u>Borrego's theory of enterprise may be amended if necessary.</u>

Borrego pleads that Borrego itself was the enterprise, its lawful business corrupted by the racketeering activities of the defendants, among others.

But Borrego could plead an alternative, "associated in fact" enterprise, consisting of Hebets, Priest, the Priest LLCs, and some or all of the Doe defendants. That enterprise certainly was in or affected interstate commerce: it charged exorbitant unlawful rents, which it ensured were paid by United States funds made available for redundant acts of embezzlement by fraudulent cost reports to CMS.

"There are three criteria for establishing an associated-in-fact enterprise under RICO: (1) "'a common purpose of engaging in a course of conduct[,]'" (2) "'an ongoing organization, formal or informal,'" and (3) "'evidence that the various associates function as a continuing unit.'".… "[A]n associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise." (*In re Countrywide, supra,* 601 F.Supp.2d at p. 1212-1213, citing *Odom, supra,* 486 F.3d at p. 551-552.)

1
2

**VII.** **The court must deny this motion because Borrego timely filed a SAC amply detailing defendants' part in bilking Borrego of over $11 million**.

3   Defendants, together with Hebets and Priest, and as-yet unknown others,

4   hatched an evergreen scheme to embezzle federal funds by way of obligating Borrego

5   to leases at multiples of fair market rent, and for unreasonably extensive duration.

6   Their scheme came to light.  Under its SAC, Borrego seeks to recover the stolen funds,

7   ultimately for benefit of state and federal health plans whose reimbursements funded

8   the defendants' scheme.

9   Respectfully submitted,

10   Dated:  September 6, 2021

11                     HATTON, PETRIE & STACKLER

12                                  /s/ Gregory M. Hatton
                      By:_____
13                          Gregory M. Hatton
                            Arthur R. Petrie, II
14                          Dan E. Heck
                            Attorneys for Plaintiff
15                          BORREGO COMMUNITY HEALTH
                            FOUNDATION
16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2

3          I certify that on September 6, 2021, I caused the foregoing document to be
presented to the Clerk of the Court for electronic filing and uploading to the CM/ECF

4     system. In accordance with the ECF registration agreement and the Court's rules, the
Clerk of the Court will send email notification of such filing to all attorneys and

5     parties of record.

6

7                                    /s/ Gregory M. Hatton

8                                    _____

9                                    Gregory M. Hatton
                                     HATTON, PETRIE & STACKLER APC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28