**HATTON, PETRIE & STACKLER APC**
Attorneys at Law
12 Journey, ~~Suite~~Ste, 255
Aliso Viejo, ~~Ca. 92625~~CA 92656
Telephone: (949) 474-4222

**GREGORY M. HATTON,** ~~CAL. BAR NO.~~SBN **119810**
**ARTHUR R. PETRIE, II,** ~~CAL. BAR NO.~~SBN **158654**
**DAN E. HECK,** ~~CAL. BAR NO.~~SBN **210383**
~~JOHN A. McMAHON, CAL. BAR NO. 237261~~

Attorneys for Plaintiff
BORREGO COMMUNITY HEALTH FOUNDATION

~~SUPERIOR~~

UNITED STATES DISTRICT COURT ~~OF~~
FOR THE ~~STATE~~SOUTHERN DISTRICT OF CALIFORNIA

~~IN AND FOR THE COUNTY OF SAN DIEGO – CENTRAL DIVISION~~

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 1 -

BORREGO COMMUNITY HEALTH FOUNDATION, a California non-profit public benefit corporation,

    Plaintiff,

vs.

INLAND VALLEY INVESTMENTS, LLC, a California limited liability company; DRP HOLDINGS, LLC, a California limited liability company; PROMENADE SQUARE, LLC, a California limited liability company; WILL LIGHTBOURNE, Director, CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES, and DOES 1 through 50, inclusive,

    Defendants.

Case No. 37-2021-00024676-CU-FR-CTL; 3:21-cv-01417-E-AGS

SECONDHon. M. James Lorenz, Courtroom 5B

THIRD AMENDED COMPLAINT FOR:

(1) FRAUD
(2) REFORMATION
(3) RESCISSION (in the alternative)
(4) MONEY HAD AND RECEIVED
(5) UNFAIR BUSINESS PRACTICES
(6) DECLARATORY RELIEF
(7) INTERPLEADER;
(8) INJUNCTION; and
(9) RICO

[DEMAND FOR JURY TRIAL]

Case assigned for all purposes to:

Hon. Katherine Bacal
Dept. C-69

Complaint filed 6/4/2021

# # #

- 2 -


1  ####

2  ####

3  ####

4  ####

5

6      ###

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



- 3 -

BORREGO COMMUNITY HEALTH FOUNDATION'S ~~SECOND~~THIRD AMENDED COMPLAINT

Plaintiff Borrego Community Health Foundation ("BCHF") alleges as follows:

**I.   Parties and their Respective Roles in Relevant Transactions.**

    A.   Plaintiff BCHF.

        1.   Plaintiff BCHF is, and at all times mentioned herein was, a California non-profit public benefit corporation. BCHF is a Federally Qualified Health Center ("FQHC") with a mission to provide high quality, comprehensive, compassionate primary healthcare to people in their communities, regardless of their ability to pay. BCHF operates 26 clinics, primarily in underserved desert and inland communities throughout San Diego, Riverside, and San Bernardino Counties. BCHF provides essential services in Family Practice, Pediatrics, OB/GYN, Internal Medicine, Podiatry, Dermatology, Cardiology, HIV/Hepatitis C and Covid 19 related testing and vaccinations to over 200,000 patients, most of whom cannot find affordable comprehensive primary care from other sources. During the recent pandemic, BCHF tested ~~more than 80,000~~tens of thousands of Californians for Covid-19 infections, and has ~~thus far~~ vaccinated ~~over 18,000~~tens of thousands of people. BCHF's continued operation is in the public interest.

        2.   Like all non-profit public benefit corporations, BCHF has no owners or shareholders. It is governed by a Board of Trustees ("Board") and managed by salaried executives who report to the Board.

        3.   As a FQHC, BCHF operates pursuant to a comprehensive scheme of state and federal laws and regulations under which:

        a.   Rates for federally funded medical services paid by the State of California are set for each BCHF clinic based in part on mandatory cost reports submitted to the United States Center for Medicare & Medicaid Services ("CMS");

        b.   Utilization of medical services is regulated; and,

        c.   Provider services are invoiced, reviewed, audited, and paid.

        4.   As a non-profit public benefit corporation providing essential medical services to underserved communities, BCHF is generally prohibited from intentionally entering into contracts

- 4 -

1   for employment, facilities, goods, or services priced above fair market values without good cause.

2   Numerous laws and regulations prohibit and/or penalize the "use" of a non-profit FQHC as a

3   "conduit" to unlawfully siphon federal health care funds into the hands of third parties by way of

4   third-party contracts intentionally and without good cause set above fair market values. Billions of

5   dollars of federally funded health program funds flow through FQHCs nationally every year.  Over

6   $100 million of these funds are paid to BCHF each year.

7        5.     Because there are no owners or shareholders to report to, a FQHC's Board of Trustees

8   (typically made up of individuals untrained to detect so-called "white collar" crime) provides a thin

9   line of defense against unscrupulous board members, executives, and employees who would

10  circumvent the Board of Trustees' oversight and unlawfully divert federal health program funds to

11  third parties.  One vehicle for the diversion of federal health program funds is contracts between the

12  non-profit FQHC and providers of facilities, goods, or services that are unreasonably in excess of fair

13  market value. When a diversion of funds like this occurs, the non-profit FQHC is not a perpetrator of

14  the fraud; it is a victim of it.  So are the underserved men, women, and children who rely on the

15  continued operation of the FQHC to provide them with essential primary healthcare services.

16       6.     As is relevant here, BCHF was victimized by three grossly over-priced 30-year term

17  facility leases engineered by its deceased former CEO and his long-time friend, who develops, owns,

18  and leases commercial property.  The total combined full-term price of these three leases is **over**

19  **$100 million dollars**. As further detailed below, these leases were never subject to due diligence.

20  Nor were they submitted to the BCHF Board for analysis, review, and informed consent and

21  approval. They couldn't be. Even if it were marginally reasonable for a non-profit FQHC to enter

22  into a 30-year facility lease (which it is not), recent independent appraisals show the total combined

23  lease prices are **$58 million over fair market rent** ("FMR"). No informed rational FQHC board

24  could lawfully approve these leases.

25       7.     The leases were paid because BCHF's former CEO Bruce Hebets personally directed

26  and controlled the activities of BCHF's former business manager (his wife) and its former chief legal

27  officer, and because Hebets worked with his friend Darry Priest and the three Priest-owned LLC

28  defendants herein to take over operations and management control of BCHF's facilities procurement

BORREGO COMMUNITY HEALTH FOUNDATION'S SECOND THIRD AMENDED COMPLAINT

1  to enable the creation and implementation of the three leases that are the subject of this lawsuit.   The

2  scheme victimized BCHF and its patients in at least three ways:

3  7.

4        a.    Exposure to State Suspensions and Federal Disqualification: In California,

5              government funded health program funds flow to FQHCs under the oversight of

6              the California Department of Health Care Services ("DHCS").  DHCS is

7              empowered to suspend all reimbursement for the provision of health care services

8              to Medi-Cal members in accordance with, *inter alia*, Welfare and Institutions

9              Code section 14107.11 and Title 42 of the Code of Federal Regulations section

10             455.23.[1] Further, the United States Health Resources and Services Administration

11             (HRSA)/Bureau of Primary Health Care (BPHC) monitors FQHCs and can

12             suspend and/or disqualify BCHF from the FQHC program, including, *inter alia*,

13             an action by HRSA requiring BCHF to cease all activities in the program pending

14             corrective action (45 CFR 75.375) and possible suspension under HHS regulations

15             (2 CFR Part 376, 45 CFR 75.2). (As detailed below, DHCS is presently allowing

16             BCHF to continue operations under the guidance, oversight, and direction of a

17             DCHS appointed independent monitor. DCHS and its monitor have directed

18             BCHF to suspend payment of rent over FMR on the three leases that are the

19             subject of this action.)

20        b.    Reimbursement rate adjustments: The cost of owning, renting, maintaining, and

21             upgrading clinic facilities is a substantial cost center for FQHCs providing

22             primary health care services of the type described above.  As such, CMS

23             recognizes the fair market value of facility costs reasonably incurred and

24             truthfully reported by FQHCs in determining the reimbursement rates to be paid

25  _____

26  [1] It is public knowledge that BCHF is currently under investigation by the California Attorney
    General's Division of Medi-Cal Fraud and Elder Abuse for fraud against the Medi-Cal program

27  partly as the result of unauthorized contracts signed by BCHF's former CEO, including contracts
    other than the facilities leases herein at issue.

28

- 6 -

Formatted:  No bullets or numbering

Formatted: Bullets and Numbering

1   clinics operated by the FQHC. Cost reporting in excess of fair market value

2   inflates the FQHC's mandatory cost reports required under title 42 of the United

3   States Code section 1395g, and exposes BCHF to an order that it retroactively

4   amend its cost reports, potentially leading to a reduction in reimbursement rates

5   paid by federally funded health programs. (DHCS and its monitor recently

6   indicated that DHCS will require BCHF to amend its CMS mandated cost reports

7   to reflect the fair market value of the three subject leases, and not the over market

8   rents actually paid on them.)

9   c.   Non-profit 501(c)(3) tax status: Contract payments to disqualified persons in

10  excess of fair market values (or other unlawful diversion of a non-profit entity's

11  revenue to falsely disguise profits as operating expenses) can result in tax liability

12  and/or loss of non-profit tax status. (*See*, e.g., Internal Revenue Code sections

13  4958(c)(1) and 4958(f)(1) and related Treasury Department Regulations in section

14  53.4958-3.)

15  8.   Board oversight of executive action is therefore essential to BCHF's placement of

16  facility leases, which must be: (1) Entered into for a lawful purpose; (2) Sought competitively, and

17  subjected to a diligent market value analysis; and, (3) To the extent reasonably possible, for no more

18  than FMR and reasonable duration.  The leases must also include reasonable terms under which the

19  FQHC can terminate the lease.

20  9.   Facility leases created by and entered into by a BCHF executive intentionally above

21  FMR, without good cause, and without the fully informed consent of the Board, are *per se* unlawful

22  *ab initio*, because, *inter alia*, they are entered into for an unlawful purpose—to defraud BCHF for

23  thousands or even, as here, millions of dollars, while at the same time exposing BCHF to regulatory

24  sanctions and related adverse financial and tax consequences.

25  B.   Defendant Promenade Square, LLC.

26  10.   Defendant Promenade Square, LLC ("Promenade") is a California limited liability

27  company whose primary place of business is in El Cajon, California. Promenade is engaged in the

28  commercial real estate business.  BCHF is informed and believes that Promenade's sole member and

- 7 -

manager is Daryl Priest ("Priest").

11.     Promenade is the owner and lessor of the structures and appurtenances located at 133 and 155 West Main Street, El Cajon, County of San Diego, California, of which BCHF is the lessee ("Promenade Lease").

C.  Defendant DRP Holdings, LLC.

12.     Defendant DRP Holdings, LLC ("DRP") is a California limited liability company whose primary place of business is in El Cajon, California.  DRP is engaged in the commercial real estate business.  Plaintiff is informed and believes that DRP's sole member and manager is Priest. ###

13.     DRP is the owner and lessor of the structures and appurtenances located at 590 North D Street, City of San Bernardino, County of San Bernardino, California, of which BCHF is the lessee ("DRP Lease").

D.  Defendant Inland Valley Investments, LLC.

14.     Defendant Inland Valley Investments, LLC ("Inland Valley") is a California limited liability company whose primary place of business is in El Cajon, California.  Inland Valley is engaged in the commercial real estate business.  Plaintiff is informed and believes that Inland Valley's sole member and manager is Priest.

15.     By way of assignment from DRP, Inland Valley is now the lessor of the structures and appurtenances located at 750 East Main Street, City of Barstow, County of San Bernardino, California, of which BCHF is the lessee ("Inland Valley Lease").

E.  Allegations Common to Defendants Promenade, DRP, and Inland Valley.

16.     BHCF is informed and believes, and on that basis alleges, Priest is a longtime personal friend of former BCHF CEO Bruce Hebets ("Hebets").  Priest also owned and operated a management service organization, which had managerial control over discrete portions of BCHF, including but not limited to provider relations, claims management, management of information related systems, quality assurance management, data reporting, and general administration of

- 8 -

1  ~~BCHF's contract dental program. For these and other reasons, Promenade, DRP, and Inland Valley~~

2  ~~are more likely than not "disqualified persons" under the Internal Revenue Code and Treasury~~

3  ~~regulations referenced above.~~

4         17.    For the sake of brevity, and because BCHF is informed and believes that Priest is the

5  sole owner, member, and manager of Promenade, DRP, and Inland Valley:

6          a.    Promenade, DRP, and Inland Valley are also referred to collectively as the "Priest

7              LLCs"; and,

8          b.    The three leases BCHF entered into with the Priest LLCs are referred to

9              collectively as the "Priest Leases."

10  ~~#~~

11  ~~#~~

12  ~~F.   California Department of Health Care Services.~~

13  ~~18.    Defendant California Department of Health Care Services ("DHCS") administers the~~

14  ~~California Medicaid program, called "Medi-Cal." DHCS is the state agency responsible for the~~

15  ~~administration of the Medi-Cal program. As noted above, government health program funds flow to~~

16  ~~FQHCs under the oversight of the DHCS, and the DHCS is empowered to suspend all~~

17  ~~reimbursement for the provision of health care services to Medi-Cal members.~~

18  ~~19.    Defendant Will Lightbourne is DHCS' current Director and is sued in his official capacity~~

19  ~~solely for the purpose of naming the DHCS as a defendant in this action as an interested party to the~~

20  ~~interpleader cause of action. Director Lightbourne is responsible for directing, organizing, and~~

21  ~~administering the Medi-Cal program in accordance with all applicable laws and regulations. As~~

22  ~~such, he is responsible for DHCS' compliance with state and federal laws governing the Medi-Cal~~

23  ~~program.~~

24  ~~20.As further alleged below, DHCS has a direct, immediate, and ongoing interest in monitoring and~~

25  ~~directing BCHF's performance of its leases with the Priest LLCs, including the prevention of~~

26  ~~payment of rent in excess of FMR. (Through no fault of its own, BCHF has already paid the Priest~~

27  ~~LLCs approximately $11,500,000 **over** FMR under the Priest Leases. DHCS' interest in the~~

28  ~~disposition of funds deposited under the interpleader is therefore current and valid under law.)~~

**Formatted:** Normal,  No bullets or numbering, Hyphenate

**Formatted:** Bullets and Numbering

1  ~~G.~~F.    Fictitious Defendant, Agency, and Alter Ego Allegations.

2  ~~21.~~18.  The true names or capacities, whether individual, corporate, associate, or otherwise,

3  of those identified herein as DOES 1 through 50, inclusive, are unknown to BCHF, who therefore

4  sues said defendants by such fictitious names.  BCHF is informed and believes, and based thereon

5  alleges, each of the defendants designated herein as a DOE is legally responsible in some manner for

6  the events and happenings herein referred to, and legally caused injury and damage to BCHF as

7  alleged herein.  BCHF is informed and believes, and based on that alleges, DOES are business

8  entities or individuals who:

9        a.  Are individually responsible in some manner for the damages arising from

10            transactions, acts, omissions, and/or occurrences that relate to matters referred to

11            in this complaint;

12       b.  Are in privity of contract;

13       c.  Have ratified and adopted the conduct of another person or entity (who is

14            responsible in some manner for the damages alleged herein) as their own;

15       d.  Are the principals, agents, guarantors, owners, alter egos, joint venturers, or

16            partners of another person or entity who is responsible in some manner for the

17            damages alleged herein; or,

18       e.  Are pooling participants with, or are otherwise jointly liable with another person

19            or entity who is responsible in some manner for the damages alleged herein

20            (whether based on *Delos v. Farmers Insurance Group* (1979) 93 Cal.App.3d 642,

21            *Downey Savings & Loan v. Ohio Casualty* (1987) 189 Cal.App.3d 1072, or any

22            similar joint liability theory).

23 ~~22.~~19.  BCHF will amend this Complaint to insert the true names and capacities of said DOE

24 individuals or entities when they become known to BCHF.

25 20.    ~~With the exception of DHCS and its director Will Lightbourne, each~~Each defendant

26 sued herein is the agent, co-conspirator, joint venturer, partner, employer, guarantor, ratifier, or

27 employee of every other defendant and non-party participant in the wrongful acts alleged herein, and

28 has been acting within the course and scope of said agency,

- 10 -

23. conspiracy, joint venture, partnership, guarantee, or employment, with the knowledge or consent of co-defendants and non-party participants, and each of them.

24.21.  BCHF is informed and believes, and based thereon alleges, that each defendant (other than DHCS and its director Will Lightbourne) has authorized or ratified the wrongful activities of each of the remaining defendants, and of the non-party participants in the wrongful acts alleged herein.

25.22.  BCHF is informed and believes, and on that basis alleges, there is such unity of interest and ownership between the Priest LLCs that the separate personalities of the limited liability companies no longer exist and that if the acts are treated as those of the individual limited liability companies alone an inequitable result will follow (based on the factors set forth in *Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.3d 825 and *Arnold v. Browne* (1972) 27 Cal.App.3d 386, 394-395, and other applicable law).

**II.  Venue and Jurisdiction.**

26.23.  Venue in the above-entitled Court is proper because: (1) the acts and omissions occurred in the County of San Diego; (2) the liability sued upon arose in the County of San Diego; and, (3) all of the defendants reside in or have their principal place of business in the County of San Diego, or did so reside at the time they committed the acts giving rise to this Complaint. (Cal. Code Civ. Proc., § 395.5.)

27.     BCHF filed this matter in the Central Division pursuant to San Diego Superior Court Rules, rule 1.2.2.

24.     Jurisdiction is by defendants' removal to this court under federal subject matter jurisdiction (now the seventh cause of action under RICO).

**III.  Relevant Transactions.**

A.  Overview.

28.25.  BCHF received its first grant award from the HRSA in 2003, designating the organization as a FQHC in light of its commitment to increase access to medical services to the

- 11 -

1   underserved communities surrounding BCHF. BCHF experienced substantial growth as a FQHC in

2   the years that followed, expanding to over 20 clinic locations in three counties.  Annual federally

3   funded health program revenues thereafter reached nine figures.

4       29.26.  Beginning no later than 2012, certain (now former) BCHF executivesCEO and Board

5   membersdefendants' owner, Daryl Priest caused BCHF to enter into contractsa series of facilities

6   leases with companies owned in whole or in part bythree Priest entities.  None of these

7   contractsleases were entered into with the informed consent of the BCHF Board.  All of them were

8   priced substantially above fair market value.  Three of these contracts are the Priest Leases that are

9   the subject of this action.

10      30.27.  Late in 2020, following October 2020 raids by state and federal law enforcement

11  authorities, DHCS suspended payment of federal funds to BCHF in conjunction with an investigation

12  relating in part to contracts with Priest-owned entities *other than* the Priest LLCs.  BCHF is a victim

13  of unlawful contracting practices that are a subject of DHCS' investigation.  BCHF has cooperated,

14  and continues to cooperate, with DCHS and law enforcement. unrelated to the leases that are the

15  subject of this lawsuit.

16  # # #

17  # # #

18      31.28.  In the course of the investigation, numerous contracts were reviewed, including the

19  Priest Leases. Independent certified commercial real estate appraisers made the following findings:

20          a.    On the lease with Promenade (El Cajon location), BCHF was paying $39,104.75 a

21                month above FMR, or $469,257 above FMR per year;

22          b.    On the lease with DRP (San Bernardino location), BCHF was paying $38,405.95

23                a month above FMR, or $460,871.40 above FMR per year; and,

24          c.    On the lease with Inland Valley (Barstow location), BCHF was paying $80,025.25

25                a month above FMR, or $960,303 above FMR per year.

26      32.29.  In sum, BCHF has been paying the Priest LLCs $1,890,431.40 a year above FMR,

27  and has paid over $11,500,000 above FMR cumulatively since inception of the Priest Leases. Here is

28  a summary of the appraiser's findings:

*Formatted:* Normal, Indent: First line:  0.5", Hyphenate, Tab stops: Not at  0.75"

*Formatted:* Bullets and Numbering

*Formatted:* Normal, Indent: First line:  0.5", Hyphenate, Tab stops: Not at  0.75"

*Formatted:* Bullets and Numbering

| | El Cajon | San Bernardino | Barstow | Overpayments |
|---|---|---|---|---|
| Lessor | Promenade | DRP | Inland Valley | |
| Current Rent - Month | $ 111,686.00 | $ 62,704.00 | $ 104,920.00 | |
| FMR | $ 72,581.25 | $ 24,298.05 | $ 24,894.75 | |
| Monthly Overpayment | $ 39,104.75 | $ 38,405.95 | $ 80,025.25 | $ 157,535.95 |
| Yearly Overpayment | $ 469,257.00 | $ 460,871.40 | $ 960,303.00 | $ 1,890,431.40 |
| Initiation | 9/21/2012 | 9/15/2015 | 2/2/2016 | |
| Years (to date) | 8.5 | 5.5 | 5.25 | |
| Cumulative | $ 3,988,684.50 | $ 2,534,792.70 | $ 5,041,590.75 | **$ 11,565,067.95** |

33.30.  Additionally, the lease terms of 30 to 33 years on the Priest Leases is unreasonably over market as well. A reasonable fair market term for these commmercial leases is 3 to 5 years.

34.31.  In order to remain in operation, BCHF signed an agreement with DHCS in February 2021 under which an independent monitor selected by DHCS would institute a robust corporate integrity and compliance program at BCHF.  As is relevant here, DHCS' monitor has directed BCHF to: (1) stop paying above FMR on the Priest Leases; and, (2) take action to address over-FMR payments, excessive 30-year lease terms, and the failure to include lease provisions under which BCHF may terminate the leases. This lawsuit is BCHF's good faith attempt to comply with those directives.

// // //

// // //

35.32.  In response, the Priest LLCs are now actingacted in unison. The Priest LLCs have demanded that BCHF continue to make over-FMR rent payments under the Priest Leases.  In a May 25, 2021, email the Priest LLCs threatened that BCHF failure to pay the demanded rent on **any one** of the Priest Leases will result in immediate eviction proceedings **as to all** three locations that are the subject of the Priest Leases. The DHCS monitor says DHCS will not allow BCHF to pay the rent currently demanded.  Under BCHF's agreement with DHCS, BCHF must comply with those directives.

36.     For these and other reasons detailed below, BCHF seeks the relief requested below.

B.   The Hebets/Priest Relationship "Disqualifies" the Priest LLCs Under the Internal Revenue

- 13 -

Formatted: Indent: First line:  0.5", Tab stops: Not at  0.75"

Formatted: Bullets and Numbering

Formatted: Indent: First line:  0.5", Tab stops: Not at  0.75"

Formatted: Bullets and Numbering

1    Code and Related Treasury Regulations.

2    37.    As noted above, Hebets (now deceased) was BCHF's CEO from 2004 until his retirement

3    in 2018.  BCHF is informed and believes, and based thereon alleges, Hebets and Priest knew each

4    other dating to their high school years. Beginning in 2012 and continuing through December 2016,

5    Hebets and Priest caused BCHF and several Priest-owned entities to enter into various contracts

6    under which millions of dollars of federal healthcare program funds were unlawfully diverted to the

7    Priest-owned entities.  Concurrently, Priest also owned and operated a management service

8    organization, which had managerial control over discrete portions of BCHF's operations, including

9    but not limited to provider relations, claims management, management of information related

10   systems, quality assurance management, data reporting, and general administration of BCHF's

11   contract dental program.  For these and other reasons, the Priest LLCs are more likely than not

12   "disqualified persons" under the Internal Revenue Code and Treasury regulations.

13   # # #

14   # # #

15   # # #

16   # # #

17   # # #

18   # # #

19   B.  How Hebets and the Defendants (operating through Priest) Created, Implemented, and

20        Maintained the Three Priest Leases.

21   33.    BCHF owns none of its own facilities. One of the key roles of BCHF's management

22   and operations is therefore the procurement of facilities in order to carry out its mission, as described

23   above. Ordinary and regular operations and management of facilities procurement is performed by

24   BCHF executives who venture into the marketplace and secure facility leases in Southern California

25   in an arm's length transaction at market prices, and submit the proposed leases to the BCHF Board of

26   Trustees for approval.  No one executive is authorized to unilaterally bind BCHF to a facilities lease.

27   All such leases require Board of Trustee's approval.

28   34.    Because of BCHF's non-profit status and its duty to report operational costs to the

- 14 -

federal government, and because all facility lease terms must be presented to the Board of Trustees for review, landlords cannot work with individual BCHF's executives in drawing up leases that are substantially above fair market value, and then put those leases into operation. The only means of obtaining such a lease is for the landlord to:

    a.    Work hand in glove with the BCHF executive(s) in charge of facilities procurement; and

    b.    Participate in the operation and management of facilities procurement at BCHF; and

    c.    Work with a BCHF insider to exert enough control over BCHF's ordinary facilities procurement operations and management to initiate an over-market lease without seeking Board approval, and then maintain the lease so that over-market rent payments will continue every month thereafter, for the duration of the lease. Here are how the defendants worked with BCHF insiders to get this done:

35. Hebets, acting as BCHF's Chief Executive Officer at the time, knowingly acted in ~~38.~~ concert with each of the Priest LLCs to enter into 30+ year leases at more than twice fair market rent. The Priest Leases were never presented to the BCHF Board for authorization or approval. As noted, In breach of his fiduciary duties, Hebets signed each of these contracts without:

    ~~a.~~    Approval from the Board;

    ~~b.~~    Disclosing their terms to the Board;

    ~~c.~~    Disclosing to the Board his relationship with Priest;

    ~~d.~~    Presenting the Board with any evidence of due diligence in determining the fair ~~market value of the contracts; and,~~ market value of the contracts; and without,

    ~~e.~~    A Board resolution approving any of the Priest Leases.

36. ~~BCHF is the victim of~~ Hebets also knew that the ~~undisclosed~~ all-volunteer BCHF Board members would review only those contracts presented to them, and that they would never have reason to see the Priest LLC leases unless the BCHF executive managing the relationship ~~between~~ with Priest ~~and~~ LLCs decided to present the leases.

- 15 -

a.  As BCHF's CEO, Hebets, knew that financial reports presented to the Board did not include or otherwise call out the individual facility rents in a way that might suggest that they were over market or had unreasonably long (i.e., 30 year) lease terms.  Financial reports to the Board include only the aggregate rents paid on all 25 facilities.

b.  Hebets also knew that BCHF's accounts payable personnel would make monthly rent payments as requested, without questioning the reasonableness of those monthly rent payments.

c.  Thus, unless the leases themselves were presented to the Board of Trustees for vetting and approval, there was absolutely no way that BCHF would be put on notice of any potential financial or other injury associated with, or caused in whole or in part by over-market leases. Nor would the Board have any access to facts that might put them on inquiry notice that Hebets was working with Priest and their scheme, via/or his senior executive Travis Lyons, and, through them, the three leases, to Priest LLCs, to make all management and operations decisions for BCHF pertaining to the Priest leases, in a manner contrary to BCHF's ordinary operations and management of facilities procurement, and contrary to BCHF's financial and regulatory compliance interests. These irregular management and operations decisions were then carried out under Hebets' direction, resulting directly in the monthly mailing of rent checks from BCHF to Priest's headquarters in El Cajon, California over an eight-year period.

d.  Hebets' continued concealment of the leases from BCHF was a separate breach of fiduciary duty in furtherance of the scheme to steal money from BCHF every time a monthly rent check was mailed to BCHF.

e.  Each time Hebets stood mute while management presented a financial report to the board that failed to call out overmarket rents and 30-year lease terms of the Priest LLC leases was also a separate breach of fiduciary duty in furtherance of the scheme to steal money from BCHF.

- 16 -

Formatted: Font color: Custom Color(RGB(32,33,36)), Pattern: Clear (White)

Formatted: Font color: Custom Color(RGB(32,33,36)), Pattern: Clear (White)

Formatted: Font color: Custom Color(RGB(32,33,36)), Pattern: Clear (White)

37. Until his retirement from BCHF for health reasons, Hebets ensured that the over-market rents and 30-year terms of the Priest Leases were never reported to BCHF's Board of Trustees. Throughout his final years as CEO, Hebets was in communication with Darryl Priest and Priest's senior executive in charge of operations of the Priest LLCs, Travis Lyons. Priest leases were amended, again without notice to the Board or to anyone who might possibly report the leases to the Board. Through this relationship, Priest and Lyons, acting in their respective capacities as the owner and the chief of operations of the Priest LLCs, maintained direct involvement in the operational and management decisions of BCHF essential to the continuation of the grossly overpriced leases, and also carried out the directives of Hebets relating thereto.

39.38. Priest owns the three Priest LLCs. At all times, the three Priest LLCs acted through Priest and his employed senior executive Travis Lyons. Priest and Hebets devised a scheme under which Priest would utilize BCHF as a conduit of federal healthcare funds embezzled from BCHF to the Priest LLCs to pay for the overpriced clinic facilities at issue here. In order to make the scheme work for the Priest LLCs, Priest, in his capacity as the owner of the Priest LLCs, worked with Hebets to devise management and operational decisions at BCHF which Hebets alone could not engineer or devise due to his lack of experience and expertise in facilities leasing. The Priest entities then carried out those activities under Hebets' direction.

39. As an example, Priest and Hebets decided to have BCHF sign the lease for the Barstow facility (the Inland Valley Investments, LLC lease) before the facility even existed. On information and belief, Priest then presented the over-market lease to a federally insured lending institution to help obtain financing for the facility (making BCHF in essence a participant in the development and financing of the Barstow facility). Priest then converted a defunct bowling alley in Barstow into a clinic. Hebets, whose pre-BCHF job training was in law enforcement, could not alone develop the operational or management decisions required to enable BCHF to engage in this activity without Priest's assistance. Through Darry Priest, defendant Inland Valley Investments LLC took part in BCHF's operations and management decisions essential to the commencement and maintenance of this lease. Once the plan was put in place, the Priest LLC (IVI) then carried out the

- 17 -

1  plan under Hebets' direction, who initiated and maintained the lease relationship without its

2  disclosure to the BCHF Board of Trustees.

3      40.      Travis Lyons is Priest's senior executive and right-hand man, who functions as the

4  chief of operations for the Priest LLCs. As Hebets was departing BCHF, Lyons began having regular,

5  often weekly private meetings with Hebets' successor as CEO, BCHF's then Chief Legal Officer,

6  Mikia Wallis (currently the subject of an ongoing criminal investigation). Lyons and Wallis met

7  privately in regard to BCHF's operations and management of the Priest owned entities, including the

8  three Priest LLCs leased to BCHF and the Priest-owned management services organization contracted

9  to BCHF. As an experienced commercial real estate development and management executive, Lyons

10  was aware of fair market rent prices for the three subject Priest LLCs and would therefore be expected

11  to know that the leases were far above market value in terms of both price and duration.

12      41.      Lyons and, on information and belief, Wallis were aware of the exorbitant terms in all

13  Priest-owned entity contracts with BCHF and, under Wallis' direction, worked together in private to

14  continue to operate the relationship and activities of those entities with BCHF without BCHF Board

15  knowledge of the enormous over-market sums of money BCHF paid the Priest LLCs and other Priest-

16  owned entities (i.e., two management services organizations not at issue here). Through Lyons'

17  regular private meetings with Wallis, the Priest LLCs regularly continued their participation in

18  BCHF's operations and management decisions pertaining to the Priest LLCs set up by Hebets and

19  Priest. The decisions were then carried out under Wallis' direction.

20      42.      Until the investigation initiated by law enforcement in October 2020 brought

21  her activities with the Priest entities to light, Wallis was BCHF's Chief Legal Officer (CLO), and then

22  its CEO. Wallis operated with the Priest entities (through Lyons) out of sight of both the BCHF Board

23  of Trustees and other BCHF executives. Importantly, Wallis knew what was contained in reports to

24  the BCHF Board, and more importantly, what was not. As relevant here, Wallis knew BCHF leased

25  over 20 facilities throughout Southern California and would therefore know that it would be easy to

26  continue to conceal the overmarket rents paid the three Priest LLCs in the financial report line item

27  aggregated for all facility rents, which were not broken out individually by facility.

28      43.      Wallis also knew that volunteer BCHF Board members would review only those

- 18 -

contracts presented to them, and that they would never have reason to see the Priest LLC leases unless the BCHF executive managing the relationship with Priest LLCs decided to present the leases. Thus, unless the leases themselves were presented to the Board of Trustees for vetting and approval, there was absolutely no way that BCHF would be put on notice of any potential financial or other injury associated with, or caused in whole or in part by over-market leases. Nor would the Board have any access to facts that might put them on inquiry notice that Lyons, and through him, the Priest LLCs were working with Wallis to continue the Priest LLCs participation in the irregular facilities procurement and mamgement decisions made by Hebets and Darryl Priest. These decisions were then carried out under Wallis' direction.

C.  The Leases.

C.          1.      *The Promenade Lease.*

40.44.   Attached hereto as Exhibit A and incorporated as though set forth in full at this point is a true and correct copy of the 2012 Promenade Lease.  It was amended to extend the term to 2045 (a total of 33 years).

41.45.   The Promenade Lease was never presented to the BCHF Board for authorization or approval.  In breach of his fiduciary duties, Hebets engaged in the conduct described above with respect to the Promenade Lease.

42.46.   There has been no action by the Board to ratify Hebets' signing of the Promenade Lease or any of its amendments post signature.

D.          2.      *The DRP Lease.*

43.          Attached hereto as Exhibit B and incorporated as though set forth in full at this point is a true and correct copy of the 2015 DRP Lease.  The DRP Lease was amended to change the commencement date to October 2016.  The DRP Lease has a term of 30 years, to 2046.

- 19 -

44.47.   The DRP Lease was never presented to the BCHF Board for authorization or approval. In breach of his fiduciary duties, Hebets engaged in the conduct described above with respect to the Promenade Lease.

*###*

45.48.   There has been no action by the Board to ratify Hebets' signing of the lease or any of its amendments post signature.

E.      3.      The *Inland Valley Lease*.

46.49.   Attached hereto as Exhibit C and incorporated as though set forth in full at this point is a true and correct copy of the 2016 Inland Valley Lease.  The Inland Valley Lease was initially made between DRP and BCHF.  DRP promptly assigned it to Inland Valley in 2017, in an assignment signed by Hebets and Priest. It has a term of 30 years, to 2046.

47.50.   The Inland Valley Lease was never presented to the BCHF Board for authorization or approval. In breach of his fiduciary duties, Hebets engaged in the conduct described above with respect to the Promenade Lease.

48.51.   There has been no action by the Board to ratify Bruce Hebets' signing of the lease or any of its amendments post signature.

F.D.      Allegations Common to the Promenade, DRP, and Inland Valley Leases.

49.52.   With minimum due diligence, the over-FMR price and excessive duration of the Promenade, DRP, and Inland Valley Leases, combined with the absence of any term allowing BCHF to terminate a lease prior to their respective lease terms[2], would have been readily apparent. The Promenade, DRP, and Inland Valley Leases and a due diligence report relating to them therefore could not be presented to the Board.

50.53.   No rational, informed Board of Trustees for a non-profit FQHC would have, or could

---

[2] Promenade: 2045 (33 years); DRP: 2046 (30 years); and, Inland Valley: 2046 (30 years).

have, lawfully approved the Promenade, DRP, or Inland Valley Leases for, *inter alia*, the following reasons:

    a.    The lease terms are unconscionable, and would result in the diversion of millions of "over-FMR" dollars of federal health program money to entities owned by an accomplice of the CEO;

    b.    As set forth above:

        i.    The Promenade Lease calls for payment of nearly $40,000 **per month** over FMR, or more than $15,000,000 over FMR over the 33-year life of the lease;

        ii.    The DRP Lease calls for payment of nearly $39,000 **per month** over FMR, or approximately $14,000,000 over FMR over the 30-year life of the lease;

        iii.    The Inland Valley Lease calls for payment of more than $80,000 **per month** over FMR, or approximately $29,000,000 above FMR over the 30-year life of the lease;

    c.    Approximately 90% of the revenue received by BCHF is paid by government funded health programs (Medi-Cal and Medicare), and therefore:

        i.    If the Promenade Lease was enforceable, then $13,500,000 of the over-FMR dollars paid to Promenade could be government health program money;

        ii.    If the DRP Lease was enforceable, $12,600,000 of the over-FMR dollars paid DRP could be government health program money; and,

        iii.    If the Inland Valley Lease was enforceable, nearly $26,000,000 of the over-FMR dollars paid Inland Valley could be government health program money;

    d.    The over-FMR facility lease payments expose BCHF to reductions in the allowed reimbursements paid BCHF in prior years; and,

    e.    The close relationship between Hebets and Priest exposes the non-profit FQHC to adverse federal tax consequences.

51. 54.   Priest is the sole manager and member of Promenade, DRP, and Inland Valley.  Priest is an experienced owner and lessor of commercial properties.  Promenade, DRP, and Inland Valley must each present their commercial leases to banks providing them with mortgages and other funding

1  related to their leased properties. Promenade, DRP, and Inland Valley must perform due diligence

2  regarding their lessees, before entering into a 30+ year lease that will be reviewed by lenders

3  providing millions of dollars of financing to Promenade, DRP, and Inland Valley. Promenade, DRP,

4  and Inland Valley are therefore presumed to know BCHF's business, including that it is a non-profit

5  health care provider doing business with federally funded health programs. Promenade, DRP, and

6  Inland Valley are presumed to know FMR for their respective leases, that the stated rent is over FMR,

7  and that the lease terms of 30+ years are far beyond fair market lease terms (in the absence of terms

8  allowing BCHF to terminate the lease on reasonable notice). Priest signed the Promenade, DRP, and

9  Inland Valley Leases and presented them to Hebets for his signature. Under these facts and

10  circumstances, Promenade, DRP, and Inland Valley are charged with knowledge that they were each

11  entering into an over-FMR lease with a non-profit FQHC.

12  ~~52.~~55.   BCHF has performed all of its obligations and duties under the Priest Leases, except

13  those excused by law and equity.

14

15  ~~G.~~E.        Combined Effect of the Priest Leases.

16  ~~53.~~56.   If enforceable, the Priest Leases would ~~siphon~~have siphoned $58 million in over-FMR

17  money from BCHF over the life of the leases.  (~~This is~~Two of the leases (IVI in ~~addition to the near~~

18  ~~catastrophic harm caused by other unauthorized contracts between other Priest entities~~Barstow and

19  DRP in Berardino) have been terminated.  Promenade Square in El Cajon remians in operation

20  with BCHF~~, which are not~~ paying twice fair market rent under protest, with ppermission of ~~the subject~~

21  ~~of this Complaint.)~~DHCS monitor overseeing BCHF's operations since late 2020. Without judicial

22  intervention on the ~~Priest Leases~~Promenade Square lease, and without recovery of the $11.8 million

23  in overpaid rent to date, the actions of Hebets and a handful of Priest entities that took place prior to

24  Hebets' death will continue to present an immediate threat to disable an essential provider of primary

25  healthcare services to underserved inland communities in San Diego, San Bernardino, and Riverside

26  Counties. ~~The Priest Leases therefore cry out for the relief requested below.~~

27

28      F.   The accrual date applicable to RICO claims under the discovery rule (and to all other causes

- 22 -

**Formatted:** Attorney Name, Don't hyphenate

**Formatted:** Indent: Left:  -0.06", First line:  0.5", Tab stops: Not at  0.75"

**Formatted:** Bullets and Numbering

1  of action pled above) is October, 2020; and plaintiff may sue to recover for the entire 8 years
2  of losses.
3  57.    The concealment of the scheme detailed above and of the fact of injury resulting there
4  from worked to perfection until it came to light in October 2020 during a government investigation
5  unrelated to BCHF's facilities procurement.  But for that unrelated investigation, the scheme that is
6  the subject of this complaint would likely remain undiscovered because the information that might
7  reveal it to persons with oversight responsibility (i.e., the Board of Trustees) was never placed in a
8  form under which the over-market price and unreasonable terms of each of the three subject Priest
9  LLC leases might be communicated to them.
10  58.    Because plaintiff had no constructive or inquiry notice of the fact of injury throughout
11  the eight-year life of the scheme, plaintiffs' right to recover money stolen by defendants extends back
12  to the commencement of each lease.
13  59.    Accrual is the date on which the statute of limitations begins to run. It is not the date
14  on which the wrong that injures the plaintiff occurs, but the date on which the plaintiff discovers that
15  it has been injured. This is the "discovery rule" of federal common law, which is read into statutes of
16  limitations in federal-question cases (even when those statutes of limitations are borrowed from state
17  law) in the absence of a contrary directive from Congress. There is no such contrary directive from
18  Congress applicable here that might limit application of the discovery rule.  Thus, the success of
19  Hebets and, on information and belief Wallis' successful concealment of the over-market leases from
20  BCHF and the fact of injury resulting from operates to delay the accrual date of any statute of
21  limitation to October, 2020.
22  60.    Insiders Hebets and Wallis knew that volunteer BCHF Board members would review
23  only those contracts presented to them, and that they would never have reason to see the Priest LLC
24  leases unless the BCHF executive managing the relationship with Priest LLCs decided to present the
25  leases.
26  61.    As noted, the amounts paid every month in rent on each of the three leases would not
27  be reported to the BCHF Board of Trustees.  Rather, the amount paid each moth would be melded into
28  a line item on financial reports of all facility lease expenses combined for all 20+ Southern California

- 23 -

1   facilities leased by BCHF.

2       62.     Thus, unless disclosed by Hebets or Wallis, there was no way that BCHF would be

3   put on notice of the terms of the three subject leases, or that Hebets and Wallis were working with

4   Priest, Lyons, and, through them, the three Priest LLC to make all management and operations

5   decisions pertaining to the over-market leases for BCHF, and in a manner contrary to BCHF's

6   financial and compliance interests. The fact of injury from the leases and from the defendants'

7   participation in BCHF's facilities procurement and operations and therefore could not be discovered.

8                                    FIRST CAUSE OF ACTION

9               (Imposition of a Constructive Trust Against Priest LLCs and Does 1-50)

10      54.63.   BCHF incorporates by reference Paragraphs 1 through 53 aboveall prior paragraphs in

11  this complaint as though fully set forth herein. in this cause of action.

12      55.64.   In committing the acts and omissions alleged above, Hebets, acting as BCHF's Chief

13  Executive Officer at the time, knowingly acted in concert with each of the Priest LLCs to enter into

14  30+ year leases at more than twice FMR.  The Priest Leases were never presented to the BCHF Board

15  for authorization or approval.

16  ###

17  ###

18      56.65.   In breach of his fiduciary duties, Hebets signed each of these contracts **without**:

19          a.   Approval from the Board;

20          b.   Disclosing their terms to the Board;

21          c.   Disclosing to the Board his relationship with Hebets;

22          d.   Presenting the Board with any evidence of due diligence in determining the fair

23              market value of the contracts; and,

24          e.   A Board resolution approving any of the Priest Leases.

25      57.66.   There has been no action by the Board to ratify Hebets' signing of the Priest Leases or

26  any of their amendments post signature.

27      58.67.   After Hebets signed the Priest Leases, Hebets and other former BCHF executives

28  under Hebets' direct control, who had knowledge that the terms of the Priest Leases were over FMR,

                                          - 24 -

Formatted: Indent: Left:  -0.06", First line:  0.5", Tab stops: Not at  0.75"

Formatted: Bullets and Numbering

Formatted: Indent: Left:  -0.06", First line:  0.5", Tab stops: Not at  0.75"

Formatted: Bullets and Numbering

Formatted: Indent: Left:  -0.06", First line:  0.5", Tab stops: Not at  0.75"

Formatted: Bullets and Numbering

suppressed disclosure of those lease terms to the Board. The misrepresentations and failures to disclose information and suppression of information concerning the Priest Leases were made with the intent to induce BCHF to pay and continue to pay the Priest LLCs over-FMR, and to act in the manner herein alleged in reliance thereon.

59.68.   At all relevant times, Hebets was BCHF's chief executive officer, standing in a position of trust with respect to BCHF.  At all times, Hebets owed plaintiff a fiduciary duty.

60.69.   At the time Hebets' failure to disclose and suppression of facts occurred, and at the time the BCHF took actions in reliance thereon, BCHF was ignorant of the existence of the facts that Hebets and executives under his direct control suppressed and failed to disclose to the BCHF Board as detailed above. If the BCHF Board had been aware of the existence of the facts not disclosed by the Priest LLCs, the BCHF would not have, as it did, paid substantial sums above market rent in violation of law and regulations pertaining to its governance.

61.70.   Concealment of the terms of the Promenade, DRP, and Inland Valley Leases from the BCHF Board, and prevention of due diligence in regard to the Priest Leases, was essential to success of the scheme. With a minimum of due diligence, the over-FMR price and excessive duration of the Priest Leases, combined with the absence of any terms allowing BCHF to terminate any of the Priest Leases prior to 2046 would have been readily apparent. The Priest Leases and due diligence reports relating to those leases therefore could not be presented to the Board. No rational, informed Board of Trustees for a non-profit FQHC would have, or could have lawfully approved any of the Priest Leases, for, inter alia, the following reasons:

    a.   The lease terms are unconscionable, and would result in the diversion of millions of "over-FMR" dollars of federal health program money to entities owned by a friend and accomplice of the CEO;

    b.   As set forth above:

        i.   The Promenade Lease calls for payment of nearly $40,000 **per month** over FMR, or more than $15,000,000 over FMR over the 33-year life of the lease;

        ii.   The DRP Lease calls for payment of nearly $39,000 **per month** over FMR, or approximately $14,000,000 over FMR over the 30-year life of the lease; and,

**Formatted:** Numbered + Level: 3 + Numbering Style: i, ii, iii, … + Start at: 1 + Alignment: Right + Aligned at:  1.38" + Indent at:  1.5"

iii.  The Inland Valley Lease calls for payment of more than $80,000 **per month** over FMR, or approximately $29,000,000 above FMR over the 30-year life of the lease.

c.  Approximately 90% of the revenue received by BCHF is paid by government funded health programs (Medi-Cal and Medicare), and therefore:

i.  If the Promenade Lease was enforceable, then $13,500,000 of the over-FMR dollars paid to Promenade could be considered government funded health program money;

ii.  If the DRP Lease was enforceable, $12,600,000 of the over-FMR dollars paid DRP could be considered government funded health program money; and,

iii.  If the Inland Valley Lease was enforceable, nearly $26,000,000 of the over-FMR dollars paid Inland Valley could be considered government funded health program mone.;

d.  FQHC reimbursement rates are directly affected by the FQHC's annual operating cost reports submitted to CMS. Over-FMR facility lease payments result in inflated CMS cost reports (unless there is a reasonable basis for payment of over-FMR). Inflated cost reports expose BCHF to a demand that it amend and correct its prior cost reports to reflect FMR.  Amended cost reports showing $11,500,000 in reduced operating costs can result in retroactive rate adjustments. Retroactive rate adjustments resulting from amended cost reports showing FMR (as opposed to the over-FMR rent paid on the Priest leases) further expose BCHF to claims that it refund claims overpayments resulting from inflated cost reports in prior years.

e.  The close relationship between Hebets and Priest exposes the non-profit FQHC to adverse federal tax consequences as detailed above in regard to Internal Revenue Code and related Treasury Department regulations.

62.71.  The fraud and deceit alleged herein were not discovered by BCHF until law enforcement raids on or about October 20, 2020, a date within three years before the commencement

- 26 -

1  of this action. BCHF could not with due diligence have discovered the fraud and deceit of the Priest

2  LLCs until on or about this date because the true facts were suppressed by Hebets, and others acting

3  in concert with him even after his death, as detailed above.

4  63.72.   In contrast, the Priest LLCs were always aware that the Priest Leases called for

5  payment of rent by a non-profit FQHC so far in excess of FMR that no reasonable Board would

6  consider their approval, much less approve them.

7  64.73.   As alleged above, Priest is the sole manager and member of Promenade, DRP, and

8  Inland Valley.  Priest is an experienced owner and successful lessor of commercial properties.

9  Promenade, DRP, and Inland Valley must each present its commercial leases to banks providing

10  Promenade, DRP, and Inland Valley with mortgages and other funding on their leased properties.

11  Promenade, DRP, and Inland Valley must perform due diligence regarding their lessees, before

12  entering into a 30+ year lease that will be reviewed by lenders of Promenade, DRP, and Inland

13  Valley. Promenade, DRP, and Inland Valley are therefore presumed to know BCHF's business,

14  including that it is a non-profit health care provider doing business with federally funded health

15  programs. Promenade, DRP, and Inland Valley are presumed to know FMR for their respective

16  leases, that the rent is far in excess of FMR, and that the lease term of 30+ years is far beyond fair

17  market lease terms (in the absence of a term allowing BCHF to terminate the lease on reasonable

18  notice). Priest signed the Promenade, DRP, and Inland Valley Leases and presented them to Hebets

19  for his signature. Under these facts and circumstances, Promenade, DRP, and Inland Valley are each

20  charged with knowledge that they were entering into over-FMR leases with a non-profit FQHC.

21  65.74.   Accordingly, each of the Priest LLCs knowingly and willfully conspired and agreed

22  with Hebets and Does 1-50, inclusive, to damage BCHF by and through Hebets' and others' fraud and

23  deceit as described in detail above.

24  66.75.   TheAs noted above, the Priest LLCs are now actingacted in concert in an effort to

25  compel BCHF to continue to pay over-FMR rent on all three leases.  As such, by adoption,

26  ratification, and joint enforcement of the fraudulently induced and maintained Priest Leases, each of

27  the Priest LLCs has joined with the other Priest LLCs in the conspiracy to defraud BCHF.

28  67.76.   By virtue of defendants' wrongful acts they hold stolen and embezzled funds totaling

- 27 -

1    over $11.5 million, or real or personal property purchased with such funds, as constructive trustees for

2    the benefit of plaintiff.

3

4                                    SECOND CAUSE OF ACTION

5                          (Reformation Based on Fraud Against Priest LLCs)

6        68.77.   BCHF incorporates ~~by reference Paragraphs 1 through 67 above~~all prior paragraphs in

7    this complaint as though fully set forth herein in this cause of action.

8        69.78.   In each of the Priest Leases (Exhibits A, B, and C) the parties thereto express their

9    intention that the Priest Leases be interpreted so as to make and maintain performance thereunder

10   lawful.  The unlawful purpose of the leases is self-evident. As explained above, each of the Priest

11   Leases were entered into without the informed consent of BCHF's Board. Each of the leases call for a

12   non-profit FQHC to pay and to report as operating expenses to CMS rent that is millions of dollars in

13   excess of FMR, thereby resulting in the diversion of millions of dollars of federal health care funds to

14   the Priest LLCs, and the inflation of reimbursement rates paid by the DHCS to the FQHC.

15       70.79.   The above-described failure of the Priest Leases to reflect the true intent of the parties

16   (i.e., that performance under the lease be only lawful) resulted from Hebets' concealment from BCHF

17   that, despite its express promise to the contrary, BCHF's performance of the pricing terms and

18   duration of the above-mentioned written instruments would be unlawful.

19       71.80.   Without knowledge of the true facts and in reliance on Hebets' false representations,

20   BCHF was deceived and misled into performing under a lease that differed materially from the

21   expressed intent of the parties that performance thereunder be lawful. BCHF's reliance on Hebets'

22   fraudulent omissions was reasonable and justified in that he was at all times plaintiff BCHF's Chief

23   Executive Officer and fiduciary.

24

25       72.81.   Fraud, as a basis for reformation, consists of (1) a false representation by one party

26   and (2) justifiable reliance on the false representation by the other party. Here both exist. Civil Code

27   section 3399 codifies the equitable remedy of reformation of written instruments. Section 3399

28   provides that a written contract may be revised on application of the party aggrieved, when, through

                                             - 28 -

                BORREGO COMMUNITY HEALTH FOUNDATION'S ~~SECOND~~THIRD AMENDED COMPLAINT

**Formatted:** Indent: Left:  -0.06", First line:  0.5", Tab stops: Not at  0.75"

**Formatted:** Bullets and Numbering

**Formatted:** Indent: Left:  -0.06", First line:  0.5", Tab stops: Not at  0.75"

**Formatted:** Bullets and Numbering

1   fraud, mutual mistake, or mistake of one party that the other party knew of or suspected at the time, a

2   written contract does not express the true intention of the parties.

3   ~~73.~~82.   Here, the strong public interest in BCHF's continued service of underserved and

4   financially disadvantaged patients throughout the communities of San Diego, San Bernardino, and

5   Riverside Counties, as detailed above, compels the court's exercise of its equitable power to reform

6   the Priest Leases.

7   ~~74.~~83.   Even though the BCHF Board was never given the opportunity give its fully informed

8   consent to any of the Priest Leases, the Board reasonably expects and intends that all BCHF contracts

9   conform with all applicable laws.

10   ~~75.~~84.   For the reasons detailed above, BCHF's intent that the Priest Leases conform with all

11   applicable laws (consistent the terms of the leases) cannot possibly be fulfilled without reformation of

12   the rent prices to FMR, and without reformation of the 30-year lease term to five years or less, and

13   without reformation of the leases to allow the non-profit FQHC tenant to terminate the lease for good

14   cause on reasonable notice.

15   ~~76.~~85.   Plaintiff BCHF respectfully prays for each of the Priest Leases to be so reformed.

16   */ / /*

17   */ / /*

18   */ / /*

19   */ / /*

20   ### THIRD CAUSE OF ACTION

21   (Rescission Based on Fraud Against Priest LLCs)

22   ~~77.~~86.   BCHF incorporates ~~by reference Paragraphs 1 through 76 above~~all prior paragraphs in

23   this complaint as though fully set forth herein in this cause of action.

24   ~~78.~~87.   Alternatively, if the Court cannot exercise its statutory and/or equitable powers to

25   reform the leases, BCHF is entitled to rescind the Priest Leases, and for restitution of all sums paid the

26   Priest LLCs to date, less the reasonable rental value of the premises during BCHF's occupation of

27   them.

28

- 29 -

Formatted: Indent: Left:  -0.06", First line:  0.5", Tab stops: Not at  0.75"

Formatted: Bullets and Numbering

79.88.   BCHF may rescind Priest Leases (1) if the contract is unlawful for causes which do not appear in its terms or conditions, and the parties are not equally at fault (Civ. Code, § 1689, subd. (b)(5)) or (2) if the public interest would be prejudiced by permitting the leases to stand (Civ. Code, § 1689, subd. (b)(6)). A commercial lease is unlawful if its consideration or object is (1) contrary to an express provision of law, (2) contrary to the policy of express law, though not expressly prohibited, or (3) otherwise contrary to good morals (Civ. Code, § 1667). Another ground for rescission and restitution not addressed by Civil Code section 1689, subdivision (b) allows recovery when the parties were ignorant of the illegality at the time they entered into the contract.[3]  Under the facts alleged in this Complaint, each and every one of the aforementioned grounds for rescission are met. In addition, the public interest will be prejudiced if the Priest Leases are permitted to stand, in that BCFH's ability to provide quality healthcare in underserved areas will be undermined by inequitable diversion of funds to defendants.  Further, the fraud described above is grounds for rescission.

80.89.   BCHF therefor prays, in the alternative, and in the event that the Priest Leases cannot be reformed, for judgment rescinding the Priest Leases, and for restitution of all sums paid the Priest LLCs to date, less the reasonable rental value of the premises during BCHF's occupation of the three leased facilities, along with orders providing for the reasonable surrender of the premises in a manner that will protect the interests of the patients BCHF is required to serve.

### FOURTH CAUSE OF ACTION

(Common Count for Money Had and Received Against Priest LLCs)

81.90.   BCHF incorporates by reference Paragraphs 1 through 80 aboveall prior paragraphs in this complaint as though fully set forth herein in this cause of action.

82.91.   A judgment of rescission supports an award of money to BCHF under a common count for money had and received.  In addition to the facts supporting the fraud count pled above, the following facts also support a common count for money had and received.

---

[3] *Adams v. Heinsch* (1948) 89 Cal. App. 2d 300, 302–305, 200 P.2d 796 (also on ground of mistake); *Brashears v. Giannini* (1933) 131 Cal. App. 706, 709–711, 22 P.2d 47; *Restatement (2d) of Contracts*, § 198].

- 30 -

1    83.92.   BCHF is further informed and believes Hebets and Priest were friends. Beginning in

2  2012, and continuing through December 2016, Hebets and Priest caused BCHF and several Priest-

3  owned entities to enter into various contracts under which millions in federal healthcare funds were

4  unlawfully diverted to the Priest-owned entities. Priest owned and operated a management service

5  organization, which exercised control over discrete portions of BCHF, including provider relations,

6  claims management, information systems management, quality assurance, data reporting, and general

7  administration of BCHF's contract dental program. For these and other reasons, the Priest LLCs are

8  more likely than not "disqualified persons" under the Internal Revenue Code and Treasury

9  regulations. Accordingly, rent money BCHF paid the Priest LLCs in excess of FMR is money

10  unlawfully had and received by the Priest LLC's: its return to BCHF is mandatory under law.

11    84.93.   Beginning in 2012, and continuing through 2020, the Priest LLCs became indebted to

12  BCHF in the sum of at least $11.5 million for money had and received by the Priest LLCs. Neither the

13  whole nor any part of this sum has been paid, although demand therefor has been made, and there is

14  now due, owing, and unpaid the sum of at least $11.5 million, with interest thereon, at the legal rate as

15  the court may allow, according to proof at trial.

16    ///

17    ///

18    ///

19    ///

20    ///

21    ///

22                        FIFTH CAUSE OF ACTION

23        (Violation of Business and Professions Code Section 17200, et seq. Against Priest LLCs)

24    85.94.   BCHF incorporates by reference Paragraphs 1 through 84 aboveall prior paragraphs in

25  this complaint as though fully set forth herein in this cause of action.

26    86.95.   The actions described herein constitute unlawful and unfair business practices within

27  the meaning of Business & Professions Code section 17203. BCHF has requested that the Priest LLCs

28  cease the unfair business practices described herein. The Priest LLCs have rejected and continue to

1  reject these requests.

2  87.96.   As a direct, proximate and foreseeable result of the Priest LLCs' unfair business

3  practices, as described herein, BCHF has paid over $11.5 million in over-FMR rent, which is subject

4  to orders of disgorgement and/or restitution under the UCL.

5  88.97.   BCHF is informed and believes, and based thereon alleges, the Priest LLCs' unlawful

6  and unfair business practices, as described herein, are part of a plan to ignore and violate laws, and to

7  compel BCHF to violate laws, applicable to contracts with non-profit FQHCs, as described above.

8  BCHF is informed and believes, and based on that alleges, the Priest LLCs will continue with their

9  unlawful and unfair business practices unless they are enjoined from doing so.

10

11

12

13                    SIXTH CAUSE OF ACTION

14              (Declaratory Relief Against Priest LLCs)

15  89.98.   BCHF incorporates by reference Paragraphs 1 through 88888 above as though fully

16  set forth herein.

17  90.99.   An actual controversy exists in regard to the parties' duties and obligations under the

18  Priest Leases as alleged in this Complaint, and as such, a judicial declaration of the parties' respective

19  duties and obligations is appropriate as to the matters in dispute, as alleged herein.

20  ///

21  ///

22  ///

23  ///

24                   SEVENTH CAUSE OF ACTION

25              (Interpleader Against All Defendants)

26              (RICO against Priest LLCs only)

27  91.100.  BCHF incorporates by reference Paragraphs 1 through 90 above all prior paragraphs

28  in this complaint as though fully set forth herein in this cause of action.

- 32 -

BORREGO COMMUNITY HEALTH FOUNDATION'S SECONDTHIRD AMENDED COMPLAINT

1       **1.**    **The RICO Enterprise:**

2       101.   A detailed description of the RICO enterprise follows. Preliminarily:

3         a.  The Enterprise is BCHF, non-profit corporation in good standing, which

4         defendants and Hebets (now deceased) secretly commandeered for their own

5         criminal purposes. Hebets death in 2019 does not alter the fact of his participation

6         (as a BCHF insider) with defendants in the operation and management of BCHF's

7         facilities procurement, as described below. If Hebets were alive, he would be

8         named as a defendant herein.

9    ~~92.~~   ~~BCHF is a Federally Qualified Health Center engaged in interstate commerce, with a~~

10  ~~mission to provide high quality, comprehensive, compassionate primary healthcare to people in their~~

11  ~~communities, regardless of their ability to pay.~~ BCHF operates over 20 clinics, primarily in

12  underserved desert and inland communities throughout San Diego, Riverside, and San Bernardino

13  Counties. BCHF provides essential services in Family Practice, Pediatrics, OB/GYN, Internal

14  Medicine, Podiatry, Dermatology, Cardiology, HIV/Hepatitis C and Covid 19 related testing and

15  vaccinations to over 200,000 patients, most of whom cannot find affordable comprehensive primary

16  care from other sources. ~~As detailed above, the Priest LLCs, acting in concert, continue to demand~~

17  ~~BCHF pay rent in excess of FMR on all three Priest Leases.  The Priest LLCs threaten BCHF that~~

18  ~~failure to do so will result in immediate eviction proceedings. At the same time, DHCS and its~~

19  ~~appointed monitor have directed BCHF not to pay rent in excess of FMR, and to take immediate~~

20  ~~action to either reform or rescind the Priest Leases (with all attendant remedies), for the reasons~~

21  ~~alleged herein. Further, because the DHCS considers that BCHF has already paid $11.5 million over~~

22  ~~FMR to the Priest LLCs, it is unlikely the Priest LLCs are entitled to payment of further rent until the~~

23  ~~payments in excess of FMR are reconciled and accounted for, and in fact owe BCHF funds far in~~

24  ~~excess FMR due under the leases now, and for any reasonably foreseeable period of time.  As~~

25  ~~roughly 90% of all BCHF revenue is derived directly from federal health plan money paid BCHF~~

26  ~~under DHCS oversight, and considering that DHCS is exercising its right to control payment of~~

27  ~~funds to outside contractors and vendors such as the Priest LLCs, DHCS has a direct and enforceable~~

28  ~~interest in the payment of any funds to the Priest LLCs, including monthly rent for BCHF's use of~~

1   the facilities under those leases.

2   93.   As a result, BCHF faces contrary competing claims on its money, one based on contract

3   (the Priest Leases), and one based on an authorized regulatory agency's mandates (DHCS

4   directives).   Accordingly, plaintiff BCHF has no alternative other than to interplead FMR to this

5   court.

6   94.   The remedy of interpleader is codified under Code of Civil Procedure sections 386- 386.6.

7   The statutes are to be broadly interpreted to give effect to the remedial nature of the codifying

8   provisions and to promote justice. An action of interpleader may be maintained under Code of Civil

9   Procedure section 386, subdivision (b) even though the claims made on the party bringing the action

10  are unliquidated and no liability on the part of such party has arisen.   (Code Civ. Proc., § 386 subd.

11  (b).)  Interpleader actions are also proper under Code of Civil Procedure section 386, subdivision (a),

12  in which the conflicting claims relate to personal property or a contract obligation, liability for which

13  is wholly or partly admitted by the stakeholder. Accordingly, BCHF will deposit with the court the

14  FMR for the three locations leased from the Priest LLCs, and thereafter await the court's ruling on

15  amounts it owes defendants, if anything.

16

17                      EIGHTH CAUSE OF ACTION

18                      (Injunction Against Priest LLCs)

19  95.   BCHF incorporates by reference Paragraphs 1 through 94 above as though fully set forth

20  herein.

21  96.   For clarity and to avoid confusion only, BCHF sets out its claim for injunctive relief

22  separately, even though technically a remedy and not a distinct cause of action.

23  97.   As to the interpleader (count seven, above), BCHF requests the Court make such

24  temporary restraining orders, or issue such preliminary injunctions as necessary to restrain and enjoin

25  defendants until further notice and order of the court from prosecuting any and all proceedings and

26  any and all actions at law now pending, or from bringing any proceeding or action against BCHF

27  affecting the rights and obligations as between the parties in the action with respect to the Priest

28  Leases, and as to any other properties leased by BCHF from any of the Priest LLCs that are not

- 34 -

1  described with specificity in any of the Priest Leases.

2      98.    As to the ongoing UCL violations, BCHF seeks a separate injunction forever terminating

3  the violations.

4  ///

5  ///

6  ///

7  ///

8  ///

9  ///

10  ///

11  ///

12                  NINTH CAUSE OF ACTION

13              (RICO against Priest LLCs only)

14        b.  BCHF incorporates by reference Paragraphs 1During the recent pandemic, BCHF

15          has tested tens of thousands of Californians for Covid-19 infection and has

16          vaccinated tens of thousands of people. BCHF's continued operation is in the

17          public interest.

18        c.  The current defendants are associated with the Enterprise in that they were or are

19          the Enterprise's landlords for 3 locations;

20        d.  The defendants are entities separate from the Enterprise.

21        e.  None of the defendants are alleged to be the Enterprise, or its members.

22      102.    BCHF is both the RICO enterprise and the victim. The unlawful acts detailed above

23  and further alleged below were devised, directed and maintained by the individuals listed below who

24  had control over, and/or participated in (i.e., took part in) BCHF's operations and management as it

25  pertains to facilities procurement. Again:

26        a.  BCHF owns none of its own facilities. One of the key roles of BCHF's

27          management and operations is therefore the procurement of facilities in order to

28          carry out its mission, as described above. Ordinary and regular operations and

management of facilities procurement is performed by BCHF executives who venture into the marketplace and secure facility leases in Southern California in an arm's length transaction at market prices, and submit the proposed leases to the BCHF Board of Trustees for approval.  No one executive is authorized to unilaterally bind BCHF to a facilities lease.  All such leases require Board of Trustee's approval.

b.  Because of BCHF's non-profit status and its duty to report operational costs to the federal government, and because all facility lease terms must be presented to the Board of Trustees for review, landlords cannot work with individual BCHF's executives in drawing up leases that are substantially above fair market value, and then put those leases into operation. The only means of obtaining such a lease is for the landlord to:

   i.  Work hand in glove with the BCHF executive(s) in charge of facilities procurement; and

   ii.  Participate in the operation and management of facilities procurement at BCHF; and

   iii.  Work with a BCHF insider to exert enough control over BCHF's ordinary facilities procurement operations and management to initiate an over-market lease without seeking Board approval, and then maintain the lease so that over-market rent payments will continue every month thereafter, for the duration of the lease. This is what occurred here. The defendants worked with BCHF insiders to get this done as follows.  Again:

   **a.    BCHF's former CEO Bruce Hebets, deceased (BCHF "Insider"):**

103.    Hebets, acting as BCHF's Chief Executive Officer at the time, knowingly acted in concert with each of the Priest LLCs to enter into 30+ year leases at more than twice fair market rent. The Priest Leases were never presented to the BCHF Board for authorization or approval. In breach of his fiduciary duties, Hebets signed each of these contracts without:

   ➢    Approval from the Board;

- 36 -

➢      Disclosing their terms to the Board;

➢      Disclosing to the Board his relationship with Priest;

➢      Presenting the Board with any evidence of due diligence in determining the fair
         market value of the contracts; and without,

➢      A Board resolution approving any of the Priest Leases.

104.    Hebets also knew that the all-volunteer BCHF Board members would review only those contracts presented to them, and that they would never have reason to see the Priest LLC leases unless the BCHF executive managing the relationship with Priest LLCs decided to present the leases.

    a.   As BCHF's CEO, Hebets knew that financial reports presented to the Board did not include or otherwise call out the individual facility rents in a way that might suggest that they were over market or had unreasonably long (i.e., 30 year) lease terms.  Financial reports to the Board include only the aggregate rents paid on all 25 facilities.

    b.   Hebets also knew that BCHF's accounts payable personnel would make monthly rent payments as requested, without questioning the reasonableness of those monthly rent payments.

    c.   Thus, unless the leases themselves were presented to the Board of Trustees for vetting and approval, there was absolutely no way that BCHF would be put on notice of any potential financial or other injury associated with, or caused in whole or in part by over-market leases. Nor would the Board have any access to facts that might put them on inquiry notice that Hebets was working with Priest and/or his senior executive Travis Lyons, and, through them, the three Priest LLCs, to make all management and operations decisions for BCHF pertaining to the Priest leases, in a manner contrary to BCHF's ordinary operations and management of facilities procurement, and contrary to BCHF's financial and regulatory compliance interests. These irregular management and operations decisions were then carried out under Hebets' direction, resulting directly in the

- 37 -

1    monthly mailing of rent checks from BCHF to Priest's headquarters in El Cajon,

2    California over an eight-year period.

3        d.  Hebets' continued concealment of the leases from BCHF was a separate breach of

4            fiduciary duty in furtherance of the scheme to steal money from BCHF every time

5            a monthly rent check was mailed to BCHF.

6        e.  Each time Hebets stood mute while management presented a financial report to

7            the board that failed to call out overmarket rents and 30-year lease terms of the

8            Priest LLC leases was also a separate breach of fiduciary duty in furtherance of

9            the scheme to steal money from BCHF.

10    105.    Until his retirement from BCHF for health reasons, Hebets ensured that the over-

11    market rents and 30-year terms of the Priest Leases were never reported to BCHF's Board of

12    Trustees. Throughout his final years as CEO, Hebets was in communication with Darryl Priest and

13    Priest's senior executive in charge of operations of the Priest LLCs, Travis Lyons. Priest leases were

14    amended, again without notice to the Board or to anyone who might possibly report the leases to the

15    Board. Through this relationship, Priest and Lyons, acting in their respective capacities as the owner

16    and the chief of operations of the Priest LLCs, maintained direct involvement in the operational and

17    management decisions of BCHF essential to the continuation of the grossly overpriced leases, and

18    also carried out the directives of Hebets relating thereto.

19        **b.    The Priest Entities, through 99 Darryl Priest ("Outsiders"):**

20    106.    Priest owns the three Priest LLCs. At all times, the three Priest LLCs acted through

21    Priest and his employed senior executive Travis Lyons. Priest and Hebets devised a scheme under

22    which Priest would utilize BCHF as a conduit of federal healthcare funds to pay for the overpriced

23    clinic facilities at issue here.  In order to make the scheme work for the Priest LLCs, Priest, in his

24    capacity as the owner of the Priest LLCs, worked with Hebets to devise management and operational

25    decisions at BCHF which Hebets alone could not engineer or devise due to his lack of experience and

26    expertise in facilities leasing. The Priest entities then carried out those activities under Hebets'

27    direction.

28    107.    As an example, Priest and Hebets decided to have BCHF sign the lease for the

- 38 -

Formatted: Font: Bold, Font color: Custom Color(RGB(32,33,36)), Pattern: Clear (White)

1  Barstow facility (the Inland Valley Investments, LLC lease) before the facility even existed. On

2  information and belief, Priest then presented the over-market lease to a federally insured lending

3  institution to help obtain financing for the facility (making BCHF in essence a participant in the

4  development and financing of the Barstow facility). Priest then converted a defunct bowling alley in

5  Barstow into a clinic. Hebets, whose pre-BCHF job training was in law enforcement, could not alone

6  develop the operational or management decisions required to enable BCHF to engage in this activity

7  without Priest's assistance.  Through Darry Priest, defendant Inland Valley Investments LLC took

8  part in BCHF's operations and management decisions essential to the commencement and

9  maintenance of this lease. Once the plan was put in place, the Priest LLC (IVI) then carried out the

10  plan under Hebets' direction, who initiated and maintained the lease relationship without its

11  disclosure to the BCHF Board of Trustees.

12        **c.**    **The Priest Entities, through Travis Lyons ("Outsiders"):**

13       **108.**    Travis Lyons is Priest's senior executive and right-hand man, who functions as the

14  chief of operations for the Priest LLCs. As Hebets was departing BCHF, Lyons began having regular,

15  often weekly private meetings with Hebets' successor as CEO, BCHF's then Chief Legal Officer,

16  Mikia Wallis (currently the subject of an ongoing criminal investigation). Lyons and Wallis met

17  privately in regard to BCHF's operations and management of the Priest owned entities, including the

18  three Priest LLCs leased to BCHF and the Priest-owned management services organization contracted

19  to BCHF. As an experienced commercial real estate development and management executive, Lyons

20  was aware of fair market rent prices for the three subject Priest LLCs and would therefore be expected

21  to know that the leases were far above market value in terms of both price and duration.

22       **109.**    Lyons and, on information and belief, Wallis were aware of the exorbitant terms in all

23  Priest-owned entity contracts with BCHF and, under Wallis' direction, worked together in private to

24  continue to operate the relationship and activities of those entities with BCHF without BCHF Board

25  knowledge of the enormous over-market sums of money BCHF paid the Priest LLCs and other Priest-

26  owned entities (i.e., two management services organizations not at issue here). Through Lyons'

27  regular private meetings with Wallis, the Priest LLCs regularly continued their participation in

28  BCHF's operations and management decisions pertaining to the Priest LLCs set up by Hebets and

**Formatted:** Font color: Custom Color(RGB(32,33,36)), Pattern: Clear (White)

1   Priest. The decisions were then carried out under Wallis' direction.

2          **d.      Mikia Wallis (BCHF "Insider"):**

3          110.    Until the investigation initiated by law enforcement in October 2020 brought her

4   activities with the Priest entities to light, Wallis was BCHF's Chief Legal Officer (CLO), and then its

5   CEO. Wallis operated the Priest entities (through Lyons) out of sight of both the BCHF Board of

6   Trustees and other BCHF executives. Importantly, Wallis knew what was contained in reports to the

7   BCHF Board, and more importantly, what was not. As relevant here, Wallis knew BCHF leased over

8   20 facilities throughout Southern California and would therefore know that it would be easy to

9   continue to conceal the overmarket rents paid the three Priest LLCs in the financial report line item

10  aggregated for all facility rents, which were not broken out individually by facility.

11         111.    Wallis also knew that volunteer BCHF Board members would review only those

12  contracts presented to them, and that they would never have reason to see the Priest LLC leases unless

13  the BCHF executive managing the relationship with Priest LLCs decided to present the leases. Thus,

14  unless the leases themselves were presented to the Board of Trustees for vetting and approval, there

15  was absolutely no way that BCHF would be put on notice of any potential financial or other injury

16  associated with, or caused in whole or in part by over-market leases. Nor would the Board have any

17  access to facts that might put them on inquiry notice that Lyons, and through him, the Priest LLCs

18  were working with Wallis to continue the Priest LLCs participation in the irregular facilities

19  procurement operations and mamgement decisions made by Hebets and Darryl Priest. These decisions

20  were then carried out under Wallis' direction.

21         **e.      Racketeering Activity Distinct from Enterprise:**

22         112.    The pattern of racketeering described herein is separate and distinct from the

23  Enterprise, due to both the relationship between the activities of the Enterprise and the pattern of

24  racketeering activity, and how the racketeering activity differs from the usual daily activities of the

25  enterprise is as follows:

26             a.   BCHF, the Enterprise, is engaged in interstate commerce acting as a FQHC.

27                 Defendants, together with Hebets and Priest, worked together to perpetrate a

28                 scheme to steal money from the Enterprise paid to the Enterprise by state and

- 40 -

federal payers utilizing primarily federal funds (Medicaid).

b.  Rental of real estate is ancillary to the primary mission of the FQHC, which is the provision of healthcare to under-served communities.  All efforts of BCHF are to be directed at the efficient accomplishment of this mission.  as though fully set forth

c.  The manner in which the Priest LLC leases were procured is contrary to the ordinary and regular operations and management of BCHF in facilities procurement, and occurred only because the defendants, acting through Hebets' friend Darryl Priest, successfully participated with Hebets in taking over the management and operations of BCHF's facilities procurement for the purpose of entering into and then maintaining a series of overmarket monthly payments under them.

d.  Again, BCHF owns none of its own facilities. One of the key roles of BCHF's management and operations is therefore the procurement of facilities in order to carry out its mission, as described above. Ordinary and regular operations and management of facilities procurement is performed by BCHF executives who venture into the marketplace and secure facility leases in Southern California in an arm's length transaction at market prices, and submit the proposed leases to the BCHF Board of Trustees for approval.  No one executive is authorized to unilaterally bind BCHF to a facilities lease.  All such leases require Board of Trustee's approval.

e.  Instead of following BCHF's ordinary management and operations, Hebets and Priest commandeered the mamgement and operations of BCHF's facilities procurement and secretly caused BCHF to enter into the three unauthorized, over market 30-year facility leases.

2.  **RICO Liability:**

99.  **18 USC §§1962 (c) and (d).** As detailed herein.

100.113.  Defendants'-, defendants' conduct described herein is unlawful under 18

- 41 -

U.S.C. 1962(c), and is also unlawful as a conspiracy under 18 U.S.C. 1962(d).

~~101.   The defendants, their misconduct and basis~~**18 USC §1341 (Mail Fraud):** Again, the purpose ~~of~~ ~~liability are as follows:~~

~~a.   Inland Valley Investments, LLC ("IVI")~~the scheme ~~was a receiver of monies embezzled~~to steal money from ~~Borrego Community Health Foundation ("BCHF")~~ by ~~the efforts of its former CEO Bruce Hebets ("Hebets") and his friend and accomplice Daryl Priest ("Priest"). Priest is the sole member and manager of IVI.  The embezzlement took the form of Hebets, in concert with Priest, executing extremely lengthy leases (30 years more or less) obliging BCHF to pay extremely above~~concealing unauthorized over-~~market~~ rents to the defendant LLC.  This violates multiple statutes prohibiting "federal healthcare offenses."~~

~~b.   DRP Holdings, LLC ("DRP") was a receiver of monies embezzled~~leases from ~~BCHF by the efforts of Hebets and his friend and accomplice Priest. Priest is the sole member and manager of DRP.  The embezzlement took the form of Hebets, in concert with Priest, executing unreasonably lengthy leases (30 years more or less) obliging BCHF to pay extremely above market rents to the defendant LLC.  This violates multiple statutes prohibiting "federal healthcare offenses."~~

~~c.   Promenade Square, LLC ("PS") was a receiver of monies embezzled from BCHF by the efforts of Hebets and his friend and accomplice Priest. Priest is the sole member and manager of PS.  The embezzlement took the form of Hebets, in concert with Priest, executing extremely lengthy leases (30 years more or less) obliging BCHF to pay extremely above market rents to the defendant LLC.  This violates multiple statutes prohibiting "federal healthcare offenses."~~

~~102.   Wrongdoers, other than the defendants listed above, and their misconduct, are as follows:~~

~~a.~~114.   Bruce Hebets, former BCHF CEO, now deceased.  In concert with Priest, Hebets committed BCHF to unreasonably long-term leases, at rental rates far above market value.  Hebets did not present these leases for review or approval by the ~~BCHF~~BCHF's Board of Trustees.  ~~The Board only learned of the unlawful~~ and any other person who might report the egregious lease ~~terms~~ of these

- 42 -

1 ~~leases after law enforcement teams raided BCHF and Priest facilities in October 2020.~~to the Board. In

2 the manned detailed above, defendants participated in devising and/or intending to devise a scheme to

3 perform the fraudulent acts described herein.

4       ~~b.  Daryl Priest, sole member and manager of each defendant LLC. Priest worked with~~

5       ~~Hebets to oblige BCHF on unlawful leases, without the knowledge or consent of the~~

6       ~~BCHF Board. Priest's LLCs received the unlawful, above-market rents embezzled by~~

7       ~~Hebets.~~

8    ~~c.  Former executives of BCHF, who cooperated with Hebets in keeping information~~

9       ~~about the unlawful leases from the Board, including after Hebets' 2018 "retirement."~~

10    ~~d.  Currently unknown executives and agents of each of the Priest LLCs, who knowingly~~

11       ~~took possession of funds embezzled from BCHF.~~

12      ~~a.  BCHF, the United States, and the State of~~The scheme could not work without the

13       use of the United States Mail, which was used for the purpose of executing the

14       scheme.

15      b.  Among other things, the mail was used to deliver monthly rent checks for each of

16       the three over-market leases described herein, from BCHF's headquarters in

17       Borrego Springs, California ~~are victims here. BCHF~~ to the Priest LLC's corporate

18       headquarters in El Cajon, California.

19      c.  These checks were mailed every month, from the commencement of the leases

20       described herein, until the terms of the leases were revealed to the BCHF board of

21       Trustees late in 2020.

22

23      d.  Each individual check mailing was an individual act essential to the success of the

24       scheme (and therefore material) and constitutes a separate loss the victim suffered

25       as of the date of mailing. This constitutes hundreds of predicate acts under 18

26       USC 1341 (Mail Fraud).

27    115.   **18 USC §1343 (Wire Fraud):** Again, the purpose of the scheme was to steal money

28 from BCHF by concealing unauthorized over-market leases from BCHF's Board of Trustees and any

**Formatted:** Font color: Custom Color(RGB(32,33,36)), Pattern: Clear (White)

1   other person who might report the egregious lease terms to the Board. In the manned detailed above,

2   defendants participated in devising and/or intending to devise a scheme to perform the fraudulent acts

3   described herein, and to use the interstate electronic transmission of documents for the purpose of

4   executing, or attempting to execute, the scheme. The scheme was used to steal funds from a federally

5   funded and regulated FQHC, which in turn would result in the inflation of reimbursement rates the

6   Federal Government would pay to the FQHC (BCHF) for thousands of patient encounters, as follows:

7       a.   BCHF is largely funded by federal health care dollars (~~largely~~primarily

8       Medicaid), administered by and through the California ~~DHCS, and it~~ Department

9       of Healthcare Services. BCHF must account ~~to the United States~~ for its lawful

10      operating expenditures~~.~~ every year to the Center for Medicare and Medicaid

11      Services (CMS), a federal agency within the United States department of Health

12      and Human Services.

13       b.  The amount of funds stolen through the scheme described herein are accounted for

14      and included as facilities operating expenses reported to CMS. These stolen funds

15      would not be reported as individual line items on an annual CMD cost report.

16      Rather, the stolen funds would then be melded into and combined and aggregated

17      with all other facilities operating costs of over 20 Southern California clinics

18      operated by BCHF, and then reported as an unidentified part of BCHF's annual

19      cost reports submitted to CMS.

20       c.   In turn, the United States uses ~~those~~BCHF's annual cost reports ~~to CMS~~ in

21      calculating the proper level of federal health care funding (a.k.a. "reimbursement

22      rates") to direct to BCHF. ~~In light of the unlawful scheme described above,~~

23      ~~improperly high~~Thus, inflated CMS cost reports, unless detected, inevitably result

24      in increases in federally funded reimbursement rates for an FQHC such as BCHF.

25      This has the effect of compounding the crime by causing to federal government to

26      cover some or all of the cost of the crime by way of increased reimbursement rates

27      paid BCHF based on inflated facility cost reports that include the unlawful over

28      market rents paid defendants herein.

103.d.  Under the unlawful scheme described above, inflated operating costs were reported to the United States, resulting in improperly high funding levels.  The United States and DHCS expect this improper funding either to be returned, or credited against future funding.  It is as yet unknown the size of the reimbursement of overpayments claim on BCHF.  via electronic interstate transmissions of annual cost reports. This constitutes predicate acts under 18 USC §1343 (Wire Fraud) that are a material part of the scheme that BCHF could not avoid.* As to each of the individual defendants, here is an accounting of the damages ascribed to each: noted, no one at BCHF except Hebets and then , on information and belief, Wallis were aware that the rents paid the three Priest entities were grossly over market, and neither Hebets nor Wallis reported that fact to anyone at BCHF or to CMS.  As a direct and foreseeable result of the scheme detailed herein,  the overmarket rents paid defendants wound up on BCHF's annual cost reports to CMS.

a.   IVI billed BCHF $960,303 in unlawful yearly rent, over the course of the last 5.25 years, resulting in damages no less than $5,041,590.75;

116.    **Racketeering activity as described in 18 USC §1961(1)(B), as an act indictable under 18 USC §1957 (Engaging in monetary transactions in property derived from specified unlawful activity that includes Federal healthcare offenses.)**  In addition to Mail Fraud and Wire Fraud, the scheme, including the several leases, the related concealment, and hundreds of individual, monthly over-market rent payments, constitutes a pattern of racketeering activity as described in **18 USC §1961(1)(B)**, as acts indictable under **18 USC § 1957** ("Engaging in monetary transactions in property derived from specified unlawful activity").  "Specified unlawful activity" is, in turn, defined in **18 USC §1956** as including **"any act or activity constituting an offense involving a 'Federal health care offense.'"  18 USC §24** defines "Federal health care offense" as including "a violation of, or a criminal conspiracy to violate" any of the following:

a.   **18 USC §669 (Theft or embezzlement in connection with health care):**  Whoever knowingly and willfully *embezzles, steals, or otherwise without*

- 45 -

1       *authority converts to the use of any person other than the rightful owner*, or

2       intentionally misapplies any of the moneys, funds, securities, premiums, credits,

3       property, or other assets of a health care benefit program, shall be fined under this

4       title or imprisoned not more than 10 years, or both. ("Health care benefit

5       program" means any public or private plan or contract, affecting commerce, under

6       which any medical benefit, item, or service is provided to any individual, and

7       includes any individual or entity who is providing a medical benefit, item, or

8       service for which payment may be made under the plan or contract.) The over-

9       market leases described herein are the means by which defendants, and each of

10      them stole, and converted to their own use public healthcare benefits paid BCHF

11      by state and federal agencies at a time BCHF was the rightful owner of those

12      funds. In addition, in this particular statute, BCHF itself qualifies under the broad

13      definition of "health care benefit program."  BCHF is an "entity who is providing

14      a medical benefit, item, or service for which payment may be made under the plan

15      or contract." Here, the theft and from BCHF exceeds $11,000,000.

16    b.  **Under 18 USC §1347 (Health care fraud),** whoever knowingly and willfully

17      executes, or attempts to execute, a scheme or artifice (1) to defraud any healthcare

18      benefit program; or (2) to obtain, by means of false or fraudulent pretenses,

19      representations, or promises, any of the money or property owned by, or under the

20      custody or control of, any healthcare benefit program, in connection with the

21      delivery of or payment for healthcare benefits, items, or services, shall be fined

22      under this title or imprisoned not more than 10 years, or both.

23       i.   BCHF itself qualifies under the broad definition of "health care benefit

24         program."  BCHF is an "entity who is providing a medical benefit, item, or

25         service for which payment may be made under the plan or contract."

26       ii.   Here, the defendants defrauded BCHF by entering into the over-market

27         leases with an entity they knew was a non-profit charitable corporation

28         providing publicly funded health care to financially disadvantaged citizens

in underserved communities.  As such, defendants knew that BCHF could not lawfully enter into contracts obligating BCHF to pay two to five times fair market value for defendants' facilities under 30-year leases that contain no terms allowing BCHF to terminate the leases in a commercially reasonable manner based on BCHFs needs.

   iii.   Defendants' owner (Darryl Priest) and top executive (Travis Lyons) are sophisticated and experienced in the field of commercial property ownership and leasing.   They therefore knew that the terms of the leases at issue here were grossly "over-market" and unreasonable, and that no non-profit entity could enter into them after full disclosure to its Board of Trustees.  Their work with BCHF's facilities procurement operations and management to develop facility leases for a non-profit FQHC with terms that were two to five times fair market rent, combined with Hebets' concealment of the lease terms from BCHF's Board was, at minimum, a false pretense that was a substantial factor in and direct cause of the theft of  $11,000,000 of funds under the custody and control of BCHF.

  c.   **18 USC §1001 (False Statements or entries generally)**: Section 1001 is violated if someone knowingly or willfully conceals or covers up by any trick, scheme or device a material fact, which act is within the jurisdiction of a department or agency of the United States.  Here, defendants were involved in a scheme that meets the elements of section 1001.

   i.   The preparation, signing, and concealment from the BCHF Board of Trustees of leases that ultimately called for nearly $60 million in over-market lease payments over the 30+ year life of the leases is concealment of a material fact, since the leases had to be approved by the BCHF Board --- and never would have been approved by the Board, due to the egregious lease terms detailed above.

   ii.   This cannot occur "by mistake." The failure to bring contracts of this

1    magnitude to the BCHF Board of Trustees, and the successful concealment of

2    the amounts paid for them month after month after month from the Board (for

3    nearly eight years since the inception of the first over-market lease) is

4    evidence that defendants participated in a scheme to "knowingly or willfully

5    conceal or cover up by any trick, scheme or device a material fact."  To

6    continue this scheme for 8 months, undetected, requires a diligent and

7    consistent effort to commit the same crime repeatedly, month after month.

8    iii.  Those diligent in the commission of this crime were Hebets (now deceased),

9    Priest, Lyons, the Priest LLCs and, on information and belief, Wallis. The

10   scheme was used to steal funds from a federally funded and regulated FQHC.

11   iv.  As noted, the amount of funds stolen would then be melded into overall

12   facilities operating costs of over 20 Southern California clinics operated by

13   BCHF and published in the annual cost reports submitted to the Centers for

14   Medicare & Medicaid Services, (CMS) of the Department of Health and

15   Human Services (HHS). There is no way to determine from a CMS cost report

16   that the reported facilities costs for BCHF included three grossly over-market

17   leases, as the amount paid every month on the three Priest leases would be part

18   of, and not individually identified in, a much larger facilities cost line item

19   reflecting leasing costs for all 20-plus Southern California BCHF facilities.

20   v.  Inflated CMS cost reports, unless detected, result in increases in federally

21   funded reimbursement rates for an FQHC such as BCHF.  This has the effect

22   of compounding the crime by causing to federal government to cover some or

23   all of the cost of the crime by way of increased reimbursement rates paid

24   BCHF.  All of the transactions described above fall within the jurisdiction of

25   the United States, which can enforce BCHF's compliance with CMS cost

26   reporting regulations and rules.

27   d.  **Other federal healthcare offenses:** In addition, the facts alleged herein also

28   amount to "federal healthcare offenses" under the following statutes: 18 USC

- 48 -

1   §371 ("Conspiracy to commit offense or to defraud United States"); 18 USC

2   §1035 ("False statements relating to health care matters"); 18 USC §1035 ("False

3

4   statements relating to health care matters"); 18 USC §287 ("False, fictitious or

5   fraudulent claims"); 18 USC §1349 ("Attempt and conspiracy").

6   117.   The specific contracts entered into in furtherance of the scheme to steal money from

7   BCHF are these:

8   b.i.DRP billed BCHF $460,871.40 in unlawful yearly rent, over the course

9   of the last 5.5 years, resulting in damages no less than $2,534,792.70;

10   c.i.PS billed BCHF $469,257 in unlawful yearly rent, over the course of the

11   last 8.5 years, resulting in damages no less than $3,988,684.50.

12   ####

13   104.   Here is a detailed description of the pattern of racketeering activities for this RICO claim:

14   a.   Here is a list of predicate acts and the specific statutes that were violated:

15   i.a.   **DRP & IVI** – On February 2, 2016, Priest and Hebets entered intocreated a lease

16   obliging BCHF to pay above-market rents for 30 years on property located on

17   East Main Street in Barstow.  Initially, Priest signed on behalf of DRP as landlord.

18   Base monthly rent was set at $60,000.  On April 3, 2016, Priest and Hebets

19   executed an amendment to the lease, raising the monthly rent to $104,820.  On

20   August 29, 2017, Priest (acting for DRP) assigned all landlord rights in the lease

21   to IVI (Priest signed for IVI).  At all times, the fair market rent for this property

22   never exceeded $25,000.  BCHF calculates that DRP or IVI or both of them have

23   thus collected $5,041,590.75 in unlawful rent.

24   ii.b.   **DRP** – On September 15, 2015, Priest and Hebets entered intocreated a lease

25   obliging BCHF to pay above-market rents for 30 years on property located on

26   North D Street in San Bernardino.  Priest signed on behalf of DRP as landlord.

27   Base monthly rent was set at $62,704.  At all times, the fair market rent for this

28   property never exceeded $25,000.  BCHF calculates that DRP has thus collected

- 49 -

Formatted: Tab stops:  -0.06", Left

Formatted: Bullets and Numbering

Formatted: Font: Bold

Formatted: Normal, Add space between paragraphs of the same style, Numbered + Level: 1 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at:  1" + Indent at:  1.25", Adjust space between Latin and Asian text, Adjust space between Asian text and numbers, Tab stops:  0.75", Left + Not at  0.5"

Formatted: Bullets and Numbering

Formatted: Font: Bold

1   $2,534,792.70 in unlawful rent.

2   ~~iii.~~c.   **PS** -- On September 21, 2012, Priest and Hebets ~~entered into~~created a lease

3   obliging BCHF to pay above-market rents for 20 years on property located on

4   West Main Street in El Cajon.  Priest signed on behalf of PS as landlord.  Base

5   monthly rent was set at $41,749.52.  In March 2013 Priest and Hebets executed

6   Amendment 1 to the lease substantially increasing monthly rent in future years.

7   On or about September 13, 2013, Priest and Hebets executed Amendment 2 to the

8   lease increasing the monthly rent to $52,000, and substantially increasing monthly

9   rent in future years.  On April 3, 2015, Priest and Hebets executed Amendment 3

10  to the lease increasing the square footage, the term by 30 years, and the monthly

11  rent to $97,912.50.  On March 22, 2016, Priest and Hebets executed Amendment

12  4 to the lease increasing the monthly rent to $111,900.  At all times, the fair

13  market rent for this property never exceeded $73,000.  BCHF calculates that PS

14  has thus collected $3,988,684.50 in unlawful rent.

15  118.   **The accrual date applicable to RICO claims under the discovery rule (and to all**

16  **other causes of action pled above) is October, 2020; and plaintiff may sue to recover for the**

17  **entire 8 years of losses.  Again:**

18      a.  The concealment of the scheme detailed above and of the fact of injury resulting

19          therefrom worked to perfection until it came to light in October 2020 during a

20          government investigation unrelated to facilities procurement.  But for that

21          unrelated investigation, the scheme that is the subject of this complaint would

22          likely remain undiscovered because the information that might reveal it to persons

23          with oversight responsibility (i.e., the Board of Trustees) was never placed in a

24          form under which the over-market price and unreasonable terms of each of the

25          three subject Priest LLC leases might be communicated to them.

26      b.  Because plaintiff had no constructive or inquiry notice of the fact of injury

27          throughout the eight-year life of the scheme, plaintiffs' right to recover money

28          stolen by defendants extends back to the commencement of each lease.

- 50 -

> **Formatted:** Font: Bold

c.  Accrual is the date on which the statute of limitations begins to run. It is not the date on which the wrong that injures the plaintiff occurs, but the date on which the plaintiff discovers that it has been injured. This is the "discovery rule" of federal common law, which is read into statutes of limitations in federal-question cases (even when those statutes of limitations are borrowed from state law) in the absence of a contrary directive from Congress. There is no such contrary directive from Congress applicable here that might limit application of the discovery rule. Thus, the success of Hebets and, on information and belief Wallis' successful concealment of the over-market leases from BCHF and the fact of injury resulting

from operates to delay the accrual date of any statute of limitation to October, 2020.

d.  Insiders Hebets and Wallis knew that volunteer BCHF Board members would review only those contracts presented to them, and that they would never have reason to see the Priest LLC leases unless the BCHF executive managing the relationship with Priest LLCs decided to present the leases.

e.  As noted, the amounts paid every month in rent on each of the three leases would not be reported to the BCHF Board of Trustees.  Rather, the amount paid each moth would be melded into a line item on financial reports of all facility lease expenses combined for all 20+ Southern California facilities leased by BCHF.

f.  Thus, unless disclosed by Hebets or Wallis, there was no way that BCHF would be put on notice of the terms of the three subject leases, or that Hebets and Wallis were working with Priest, Lyons, and, through them, the three Priest LLC to make all management and operations decisions pertaining to the over-market leases for BCHF, and in a manner contrary to BCHF's financial and compliance interests. The fact of injury from the leases and from the defendants' participation in BCHF's facilities procurement and operations and therefore could not be discovered.

- 51 -

119.   **Four Year RICO "Reach Back:"** Even if the over-market rents and unreasonably long terms of any of the three Priest LLC leases was somehow communicated to persons who would ordinarily provide that information to the Board, Plaintiff is still entitled to recover funds stolen under the leases going back four years prior to the filing of the complaint, since each lease payment constitutes a separate wrongful act.

120.   **Victims and Damages:** BCHF, the United States, and the State of California are victims here.

   a.   BCHF was victimized by the amount of money stolen.  As to each of the individual defendants, here is an accounting of the damages ascribed to each through 2021:

      i.   IVI billed BCHF $960,303 in unlawful yearly rent, over the course of the prior 5.25 years, resulting in damages no less than $5,041,590.75;

      ii.   DRP billed BCHF $460,871.40 in unlawful yearly rent, over the course of the last 5.5 years, resulting in damages no less than $2,534,792.70;

      iii.   PS billed BCHF $469,257 in unlawful yearly rent, over the course of the last 8.5 years, resulting in damages no less than $3,988,684.50.

      iv.   Defendants, Priest, and Hebets' acts in entering into these leases, hiding their terms from the BCHF Board, and causing unlawful and inaccurate expense reports be submitted to the United States violated each of the following statutes, from time to time:

        1.   18 USC § 669 ("Theft or embezzlement in connection with health care");

        2.   18 USC § 1035 ("False statements relating to health care matters");

        3.   18 USC § 1347 ("Health care fraud");

        4.   18 USC § 287 ("False, fictitious or fraudulent claims");

        5.   18 USC § 371 ("Conspiracy to commit offense or to defraud United States");

6. 18 USC § 666 ("Theft or bribery concerning programs receiving Federal funds");

7. 18 USC § 1001 (False "Statements or entries generally"); and,

8. 18 USC § 1349 ("Attempt and conspiracy").

iv. Here is a table summarizing the amounts stolen from BCHF throught the three Priest leases through 2021:

| | El Cajon | San Bernardino | Barstow | Overpayments |
|---|---|---|---|---|
| Lessor | Promenade | DRP | Inland Valley | |
| Rent - Month | $ 111,686.00 | $ 62,704.00 | $ 104,920.00 | |
| FMR | $ 72,581.25 | $ 24,298.05 | $ 24,894.75 | |
| Monthly Overpayment | $ 39,104.75 | $ 38,405.95 | $ 80,025.25 | $ 157,535.95 |
| Yearly Overpayment | $ 469,257.00 | $ 460,871.40 | $ 960,303.00 | $ 1,890,431.40 |
| Initiation | 9/21/2012 | 9/15/2015 | 2/2/2016 | |
| Years (to date) | 8.5 | 5.5 | 5.25 | |
| Cumulative | $ 3,988,684.50 | $ 2,534,792.70 | $ 5,041,590.75 | $ 11,565,067.95 |

b. The Federal Government is a victim to the extent the inflated annual cost reports to CMS (described above) that included some of the overmarket rents in the table above resulted in increased reimbursement rates, and therefore additional federal funds being improperly paid BCHF.

c. The State of California is a victim to the extent the inflated annual cost reports to CMS (described above) that included some of the overmarket rents in the table above resulted in increased reimbursement rates, and therefore causing additional state Medicaid funds being improperly paid BCHF.

b. The predicate acts form a "pattern of racketeering activity": Execution of each of the documents listed above, and collection of the unlawful monthly rents, constitute a pattern of Federal health care offenses as detailed in the cited statutes;

c.121. The predicate acts described above relate to each other as part of a common plan. The predicate acts are a part of a common plan to steal money from BCHF; each. Each act is related as to its purpose, results, participants, victims and method of commission. The predicates form a closed-

- 53 -

Formatted: Condensed by 0.1 pt
Formatted: Condensed by 0.1 pt
Formatted: Normal, Indent: Left: -0.06", First line: 0.5", Add space between paragraphs of the same style, Adjust space between Latin and Asian text, Adjust space between Asian text and numbers, Tab stops: Not at 0.5"
Formatted: Bullets and Numbering

1  end series of related predicates extending over a substantial period.

2  ###

3  ###

4  ###

5  105.    A detailed description of the RICO enterprise follows, including: (a) the name of the

6  individuals, partnerships, corporations, associations, or other legal entities, which allegedly

7  constitute the enterprise; (b) a description of the structure, purpose, function and course of

8  conduct of the enterprise; (c) whether any defendants are employees, officers or directors of

9  the enterprise; (d) whether any defendants are associated with the enterprise; (e) whether

10  plaintiff is alleging that the defendants are individuals or entities separate from the enterprise

11  or that the defendants are the enterprise itself, or members of the enterprise; (f) if any

12  defendants are alleged to be the enterprise itself, or members of the enterprise, an explanation

13  of whether such defendants are perpetrators, passive instruments, or victims of the alleged

14  racketeering activity.

15  a.   The Enterprise is BCHF, a legitimate non-profit corporation which defendants and

16  Hebets commandeered for their own criminal purposes;

17  b.   BCHF is a Federally Qualified Health Center with a mission to provide high quality,

18  comprehensive, compassionate primary healthcare to people in their communities,

19  regardless of their ability to pay. BCHF operates 26 clinics, primarily in underserved

20  desert and inland communities throughout San Diego, Riverside, and San Bernardino

21  Counties. BCHF provides essential services in Family Practice, Pediatrics, OB/GYN,

22  Internal Medicine, Podiatry, Dermatology, Cardiology, HIV/Hepatitis C and Covid-19

23  related testing and vaccinations to over 200,000 patients, most of whom cannot find

24  affordable comprehensive primary care from other sources. During the recent

25  pandemic, BCHF tested more than 80,000 Californians for Covid-19 infection, and

26  has vaccinated over 18,000 people. BCHF's continued operation is in the public

27  interest;

28  c.   None of the current defendants are employees, officers or directors of the Enterprise;

- 54 -

1       d. The current defendants are associated with the Enterprise in that they are the

2       Enterprise's landlords for 3 locations;

3       e. The defendants are entities separate from the Enterprise;

4 # # #

5       f. None of the defendants are alleged to be the Enterprise itself, or members of the

6       Enterprise.

7    106. BCHF, the Enterprise, is engaged in interstate commerce acting as a FQHC. Defendants,

8 together with Hebets and Priest, worked together to perpetrate an embezzlement scheme to steal

9 money from the Enterprise, and to utilize the Enterprise as their tool to steal money from

10 governmental entities. The pattern of racketeering described above is separate and distinct from the

11 Enterprise.

12    107. The relationship between the activities of the enterprise and the pattern of racketeering

13 activity and how the racketeering activity differs from the usual daily activities of the enterprise is as

14 follows: Rental of real estate is ancillary to the primary mission of the FQHC, which is the provision

15 of healthcare to under-served communities. All efforts of BCHF are to be directed at the efficient

16 accomplishment of this mission. Significant contracts necessary to BCHF's operation are to be

17 reviewed and approved by the BCHF Board of Trustees. In this case, as an essential part of the

18 racketeering activity, Hebets and other BCHF executives and employees under Hebets' control kept

19 the leases from Board review. No competent Board would, or could, have approved these extremely

20 long leases at extremely high prices.

21    108. Although BCHF enjoys occupancy of the several properties, it would not have done so

22 had a rational exercise of due diligence taken place. Priest, Hebets, and others under Hebets' control

23 ensured that would not take place.

24    109. Hebets and the other BCHF executives under his control were employed by the

25 Enterprise (BCHF) during the commission of the predicate acts. The liable persons (i.e., the

26 defendants) are not the Enterprise.

27    110.122. The facts described herein also demonstrate the existence of a conspiracy

28 between Hebets, Priest, and the defendants.defendants (acting through Priest and Lyons) Hebets, and

- 55 -

BORREGO COMMUNITY HEALTH FOUNDATION'S SECONDTHIRD AMENDED COMPLAINT

1   on information and belief, Wallis.  **(18 USC § 1962(d).)**

2   111.   Hebets retired from BCHF in 2018.  He died in January 2019.

3   ###

4   ###

5   ###

6   112.   Hebets and his accomplices managed to keep the "lease arrangement" with the Priest LLCs

7   hidden from Board oversight until raids by state and federal law enforcement authorities in October

8   2020.  Thereafter, real estate experts calculated BCHF funds totaling more than $11.5 million had been

9   stolen, as follows:

|  | El Cajon | San Bernardino | Barstow | Overpayments |
|---|---|---|---|---|
| Lessor | Promenade | DRP | Inland Valley |  |
| Current Rent - Month | $ 111,686.00 | $ 62,704.00 | $ 104,920.00 |  |
| FMR | $ 72,581.25 | $ 24,298.05 | $ 24,894.75 |  |
| Monthly Overpayment | $ 39,104.75 | $ 38,405.95 | $ 80,025.25 | $ 157,535.95 |
| Yearly Overpayment | $ 469,257.00 | $ 460,871.40 | $ 960,303.00 | $ 1,890,431.40 |
| Initiation | 9/21/2012 | 9/15/2015 | 2/2/2016 |  |
| Years (to date) | 8.5 | 5.5 | 5.25 |  |
| Cumulative | $ 3,988,684.50 | $ 2,534,792.70 | $ 5,041,590.75 | $ 11,565,067.95 |

16

17   113.   Hebets and his BCHF fiduciary accomplices' Federal health care offenses unlawfully

18   directed over $11.5 million in BCHF money to the Priest LLCs over the last nine years.  BCHF is

19   entitled to trace this money, and have the court impose a constructive trust for the stolen funds and

20   their proceeds on the Priest LLCs or other recipients.  Moreover, the Priest LLCs were willing,

21   knowing participants in, and beneficiaries of, the scheme.

22   114.123.   By way of their knowing participation in the scheme, the Priest LLCs are

23   culpable persons for purposes of **18 U.S.C. § 1964**.

24   115.   The embezzlement scheme, including the several leases and related concealment,

25   constitutes a pattern of racketeering activity as described in 18 USC § 1961(1)(B), as an act

26   indictable under 18 USC § 1957 ("Engaging in monetary transactions in property derived from

27   specified unlawful activity").  "Specified unlawful activity" is, in turn, defined in 18 USC § 1956 as

28   including "any act or activity constituting an offense involving a "Federal health care offense." 18

1   ~~USC § 24 defines "Federal health care offense" as including "a violation of, or a criminal conspiracy~~
2   ~~to violate" any of the following:~~
3   ➢ ~~18 USC § 669 ("Theft or embezzlement in connection with health care");~~
4   ➢ ~~18 USC § 1035 ("False statements relating to health care matters");~~
5   ➢ ~~18 USC § 1347 ("Health care fraud");~~
6   ➢ ~~18 USC § 287 ("False, fictitious or fraudulent claims");~~
7   ➢ ~~18 USC § 371 ("Conspiracy to commit offense or to defraud United States");~~
8   ➢ ~~18 USC § 666 ("Theft or bribery concerning programs receiving Federal funds");~~
9   ➢ ~~18 USC § 1001 (False "Statements or entries generally"); and,~~
10  ➢ ~~18 USC § 1349 ("Attempt and conspiracy").~~
11  ~~116.~~124.    But for the ~~embezzlement~~ scheme detailed above, BCHF would have leased
12  properties at fair market value, and for reasonable terms.  Accordingly, BCHF has been damaged by
13  performing under the unlawful leases in an amount susceptible to proof, by no less than $11.5 million.
14  ~~117.~~125.    Accordingly, plaintiff is entitled to $11.5 million in damages, trebled pursuant
15  to statute, together with reasonable attorney's fees and costs, and interest.
16
17
18                              PRAYER FOR RELIEF
19        WHEREFORE, BCHF prays for judgment against defendants, and each of them, as follows:
20  1.  With respect to the First Cause of Action—Constructive Trust (As to Priest LLCs only):
21      a.  For imposition of a constructive trust in an amount subject to proof at trial, but no less
22          than $11.5 million and on any real or personal property purchased with a portion of
23          that amount; and,
24      b.  Pre-judgment and post-judgment interest.
25  2.  With respect to the Second Cause of Action—Reformation Due to Fraud (Priest LLCs only):
26      a.  Order reforming the payments under the Priest Leases to reflect only FMR as rent due
27          and owing, and further, to limit the term of the leases as commercially reasonable to
28          no more than five years;

- 57 -

1      b.  Order of restitution that all money paid to Priest LLCs in excess of the amount of rent in

2          the reformed Priest Leases be returned to BCHF; and

3      c.  Pre-judgment and post-judgment interest on all sums ordered returned.

4

5

6    3.  With respect to the Third Cause of Action—Rescission Due to Fraud (As to Priest LLCs

7  only):

8      a.  Rescission of the Priest Leases;

9      b.  For actual and consequential damages in an amount subject to proof at trial, but in an

10         amount no less than $11.5 million or, in the alternative, restitution of all sums

11         unlawfully paid, less the reasonable rental value of the premises during BCHF's

12         occupation of the three leased facilities;

13      c.  Punitive damages as allowed by law;

14      d.  Order providing for the reasonable surrender of the premises in a manner that will protect

15         the interests, safety, and health of BCHF's patients; and

16      e.  Pre-judgment and post-judgment interest.

17    4.  With respect to the Fourth Cause of Action—Money Had and Received (As to Priest LLCs

18  only):

19      a.  Order that money had and received by Priest LLCS be returned to BCHF, subject to proof

20         at trial, but in an amount no less than $11.5 million; and

21      b.  Pre-judgment and post-judgment interest.

22    5.  With respect to the Fifth Cause of Action—UCL Violations (As to Priest LLCs only):

23      a.  Restitution of all sums unlawfully paid, less the reasonable rental value of the premises

24         during BCHF's occupation of the three leased facilities; and

25      b.  Pre-judgment and post-judgment interest.

26    6.  With respect to the Sixth Cause of Action—Declaratory Relief (As to Priest LLCs only):

27      a.  A declaration of the rights and liabilities of the parties to the attached Priest leases, as to

28         the matters alleged in dispute herein.

7.   With respect to the Seventh Cause of Action—Interpleader (As to All Defendants):

    a.   Order that defendants to take whatever action they believe appropriate in this lawsuit to establish their right to control or direct distribution of the money deposited by BCHF herein, to issue such decrees and orders of payment appropriate thereto. During the pendency of this action, to make such temporary restraining orders, or issue such preliminary injunctions as necessary restrained and enjoining defendants until further notice and order of the court from prosecuting any and all proceedings and any and all actions at law now pending, or from bringing any proceeding or action against BCHF affecting the rights and obligations as between the parties in the action with respect to the Priest Leases attached hereto.

8.   With respect to the Eighth Cause of Action—Injunction (As to Priest LLCs only):

    a.   That the Court make such temporary restraining orders, or issue such preliminary injunctions as necessary to restrain and enjoin the Priest LLCs until further notice and order of the court from prosecuting any and all proceedings and any and all actions at law now pending, or from bringing any proceeding or action against BCHF affecting the rights and obligations as between the parties in the action with respect to the Priest Leases referenced above, and as to any other properties leased by BCHF from any of the Priest LLCs that are not described with specificity in any of the Priest Leases; and

    b.   As to the ongoing UCL violations, BCHF seeks a separate injunction forever terminating the violations.

9.7.   With respect to the Ninth Cause of Action---RICO (As to Priest LLCs only)

    a.   For damages of $11.5 million, trebled to $34.5 million pursuant to statute;

    b.   Pre-judgment and post-judgment interest; and,

    c.   Reasonable attorney's fees and costs.

10.8.   With respect to all causes of action:

    a.   Costs of suit;

    b.   Reasonable attorney's fees and costs as allowed by law; and

**Formatted:** Font color: Black

c.   Such other and further relief the Court deems just and proper.

Dated:  March 22, 2022                          ————HATTON, PETRIE & STACKLER

                                         /s/  Gregory M. Hatton

                              By:_____
                                    Gregory M. Hatton
                                    Arthur R. Petrie, II
                                    Dan E. Heck
                                    John McMahon
                                    Attorneys for Plaintiff
                                    BORREGO COMMUNITY HEALTH FOUNDATION


                     DEMAND FOR JURY TRIAL

        BCHF hereby demands a jury trial in this matter.

Dated:  July 30, 2021  March 22, 2022                 HATTON, PETRIE & STACKLER

                                         /s/   Gregory M. Hatton

                              By:_____
                                    Gregory M. Hatton
                                    Arthur R. Petrie, II
                                    Dan E. Heck
                                    John McMahon
                                    Attorneys for Plaintiff
                                    BORREGO COMMUNITY HEALTH FOUNDATION

**Formatted:** Body Text, Centered, Indent: Left: 0", Line spacing:  Exactly 12 pt, Don't keep with next, Tab stops: Not at  6.15"

- 60 -

**CERTIFICATE OF SERVICE**

I, John McMahon, certify that on March 22, 2022, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to those attorneys of record registered on the CM/ECF system.

/s/ John A. McMahon

When you are going to create your table of contents and your table of authorities you need to make sure that you use a section break—not a page break.  To insert a section break, go to insert and choose break and then section break and next page.  The reason for this is because you are going to want to change your footer page number to roman numerals.  You will not be able to do this if you do a page break because it will change all the pages.

To create a table of contents you will type your **title**

**TABLE OF CONTENTS**

**Page**

To insert your table of contents you go to Insert and choose index and tables.

You go to Table of Contents and press okay.  If you want to modify the formatting you to options.  To update the Table after changes have been made you put your cursor in the middle of the table (make sure it is highlighted gray) and press F-9 (Choose update entire table).  That should update the Table.

1. INTRODUCTION—CTRL-ALT 1 ............ **ERROR! BOOKMARK NOT DEFINED.**

   A. CTRL-ALT 2 ........................................... **ERROR! BOOKMARK NOT DEFINED.**

      1. Ctrl-Alt 3 ............................................................. **Error! Bookmark not defined.**

2. THIS IS HEADING II—CTRL-ALT 1 ...... **ERROR! BOOKMARK NOT DEFINED.**

Now if you are going to put in a Table of Authorities you use a page break. The reason why is because it will be a break from the previous page which was the table of contents (i.e., roman numeral ii.)  Note, that there are some glitches with the table of authorities and you need to make sure that you check all the references.  You have to mark all of your authorities

*

1   (go to insert - table of authorities and mark them) You can update it the same way you update

2   your table of contents To insert the Table of Authorities you go to insert and then choose index

3   and tables and choose table of authorities.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

Page

Cases

*Lewis v. State of California*, 1985 Cal. App 4th
    (1961) 245, 246, 257 ........................................................ 1

John McMahon, Attorney

iii