**HATTON, PETRIE & STACKLER APC**
Attorneys at Law
12 Journey, Ste. 255
Aliso Viejo, CA 92656
Telephone: (949) 474-4222

**GREGORY M. HATTON, SBN 119810**
**ARTHUR R. PETRIE, II, SBN 158654**
**DAN E. HECK, SBN 210383**

Attorneys for Plaintiff
BCHF COMMUNITY HEALTH FOUNDATION

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BORREGO COMMUNITY HEALTH FOUNDATION, a California non-profit public benefit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>INLAND VALLEY INVESTMENTS, LLC, a California limited liability company; DRP HOLDINGS, LLC, a California limited liability company; PROMENADE SQUARE, LLC, a California limited liability company; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.:  3:21-cv-01417-L-AGS<br><br>Hon. M. James Lorenz,<br>Courtroom 5B<br><br>**OPPOSITION TO MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT**<br>**[Fed. Rules Civ.Proc., rule 12(b)(6)]**<br><br>Date:  May 9, 2022<br>Time:  10:30 a.m.<br>Courtroom:  5B<br><br>Related to docket # 19<br><br>**ORAL ARGUMENT REQUESTED, SUBJECT TO DISCRETION OF COURT UNDER CIV. L.R. 7.1(d)(1)**<br><br>[FILED CONCURRENTLY WITH RESPONSE AND OBJECTIONS TO DEFENDANTS' REQUEST FOR JUDICIAL NOTICE]<br><br>***Demand for Jury Trial*** |

As more fully set forth below, and to summarize plaintiff's arguments pursuant to LR 7.1(f)(3)(b), defendants' motion to dismiss should be denied because, 1) all causes of action state a claim for relief; 2) all requirements of pleading particularity are met; and 3) no claim is barred by any applicable statute of limitations.

## TABLE OF CONTENTS

**I.   BCHF Properly and Timely Pleads Defendants' RICO Liability.............1**

   a)   Structure of the Scheme ................................................................1

   b)   The Statute of Limitations Defense Fails.....................................2

   c)   Plaintiff Alleges an Actionable RICO Enterprise ........................4

   d)   Further facts and background ........................................................6

**II.  Litigation History.........................................................................8**

**III. The RICO Claim Cannot be Dismissed Based on Statutes of Limitations**
**............................................................................................................9**

   a)   No Dismissal Under Injury Discovery Rule ................................11

   b)   No Dismissal Under Equitable Tolling/Estoppel or Fraudulent
Concealment....................................................................................12

   c)   No Dismissal Based on Separate Accrual for New Injuries ......13

   d)   Application of the Statute of Limitations Under the facts Here Would
Invite Similar Criminal Activity ....................................................15

**IV. None of Defendants' Anti-RICO Arguments Carry the Day .................15**

   a)   Defendants' Argument that the Statute of Limitations on BCHF's RICO
Claim Accrued in 2012, 2015 and 2016 Fails..................................15

   b)   Defendants' Allegation that BCHF Failed to Plead Facts to Support
Equitable Tolling of the Statute of Limitation is False ....................17

   c)   Defendants' Allegation BCHF Fails to Plead RICO With Rule 9(b)
Particularity is False .......................................................................18

   d)   BCHF Plausibly Alleges the Conduct Element of its RICO Claim..........18

   e)   BCHF Properly Alleges Defendants Engaged in a Pattern of Racketeering
Activity ..........................................................................................19

*1.   18 USC § 669 (Theft or embezzlement in connection with health care) 19*

*2.   Under 18 USC §1347 (Health care fraud)* ..............................................20

*3.   18 USC §1001 (False Statements or entries generally)* ..........................20

*4.   Other federal healthcare offenses* ..........................................................20

f)   Defendants' contention BCHF Fails To Adequately Plead RICO Conspiracy Under 18 U.S.C. § 1962(d) is False ................................................20

**V.   The TAC States a Claim for a Constructive Trust Based on Fraud.......21**

**VI. The 2nd (Reformation), 3rd (Rescission), 4th (Money had and Received), and 6th (Declaratory Relief) Causes of Action State Claims Well Within the Statute of Limitations....................................................................22**

**VII.   The TAC States a Claim for Unfair Competition ...............................23**

**VIII.  State Law Claims Cannot Be Dismissed Based on Statute of Limitations Because California Law Imposes no Obligation to Look Past a Fiduciary's Assurances ...........................................................................................23**

**IX. Conclusion .................................................................................................24**

# TABLE OF AUTHORITIES

<u>Cases</u>

*AVCO Corp. v. Precision Air Parts, Inc.,* 676 F2d 494 (11th Cir. 1982) ............10

*Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988) .............................14

*Bingham v. Zolt*, 66 F.3d 553 (2d Cir. 1995) ......................................................14

*Brownmark Films, LLC v. Comedy Partners,* 682 F.3d 687, 690 (7th Cir. 2012)
........................................................................................................................10

*Calistoga Civic Club v. City of Calistoga* (1983) 143 Cal.App.3d 111 ..............22

*Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494 (3d Cir. 2006)............................11

*Church v. Bailey* (1949) 90 Cal.App.2d 501 ......................................................22

*Davis v. Kahn* (1970) 7 Cal.App.3d 868 .......................................................23, 24

*Dayton Monetary Assocs. v. Donaldson, Lufkin, & Jenrette Secs. Corp.,* No. 91-
CV-2050, 1993 WL 410503 (S.D.N.Y. Oct. 14, 1993) ....................................5

*Douglas v. Superior Court* (1989) 215 Cal.App.3d 155 ....................................22

*Edison Elec. Inst. v. Henwood*, 832 F. Supp. 413 (D.D.C. 1993) ........................5

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc*., 385 F.3d 159, 176 (2d Cir.
2004)..................................................................................................................5

*Ford v. Cournale* (1973) 36 Cal.App.3d 172 ......................................................23

*Friends of Riverside Airport LLC v. Dep't of the Army*, No. EDCV 19-1103-
MWF (KKx) 2020 U.S.Dist.LEXIS 261453 (C.D. Cal. 2020)........................12

*Fuller v. First Franklin Financial Corp.* (2013) 216 Cal.App.4th 955 ..............24

*Gray v. Evercore Restructuring L.L.C.*, 544 F.3d 320 (1st Cir. 2008)................10

*Greenfield v. Insurance Inc.* (1971) 19 Cal.App.3d 803 ....................................23

*Grimmett v. Brown*, 75 F.3d 506 (9th Cir. 1996) ................................................12

*Hennegan v. Pacifico Creative Service, Inc*., 787 F.2d 1299, 1301-02 (9th Cir.
1986)................................................................................................................13

*Hernandez v. Coffey*, 582 F.3d 303 (2nd Cir. 2009) ...........................................11

- iii -

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.* 601
F.Supp.2d 1201 (S.D. Cal. 2009) .................................................... 9

*Joseph v. Bach & Wasserman, L.L.C.*, 487 F. App'x 173 (5th Cir. 2012) ........... 14

*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326 .................................. 23

*Lucas v. Associacao Protectora Uniao Madeirense* (1943) 61 Cal.App.2d 344 . 22

*Menard v. CSX Transp., Inc.,* 698 F3d 40 (1st Cir. 2012) ........................ 11

*Moe v. Transamerica Title Ins. Co.* (1971) 21 Cal.App.3d 289 ................... 23

*Montoya v. McLeod* (1985) 176 Cal.App.3d 57 .................................... 23

*Nebraska Sec. Bank v. Dain Bosworth, Inc.*, 838 F. Supp. 1362 (D. Neb. 1993) .. 6

*Nguyen v. W. Digital Corp.*, 229 Cal. App. 4th 1522 (2014) ................... 12, 22

*Odom v. Microsoft Corp.* 486 F.3d 541 (9th Cir. 2007) ........................... 9

*Peflalbert-Rosa v. Fortuflo-Burset,* 631 F3d 592 (1st Cir. 2011) ............... 11

*Pincay v. Andrews*, 238 F.3d 1106 (9th Cir. 2001) ............................... 12

*Reves v. Ernst and Young* (1993) 507 U.S. 170 ....................... 4, 5, 6, 18

*Shuttlesworth v. Housing Opportunities Made Equal*, 873 F. Supp. 1069 (S.D.
Ohio 1994) ....................................................................... 6

*St. James Armenian Church of L.A. v. Kurkjian* (1975) 47 Cal.App.3d 547 ....... 23

*State Farm Mut. Auto. Ins. Co. v. Ammann*, 828 F.2d 4 (9th Cir. 1987) ......... 13

*Supermail Cargo, Inc. v. United States,* 68 F3d 1204 (9th Cir. 1995) .......... 10

*United Nat'l Ins. Co. v. Equipment Ins. Managers, Inc.*, No. 95-CV-0116, 1995
WL 631709 (E.D. Pa. Oct. 27, 1995 ............................................... 6

*Weiss v. Marcus* (1975) 51 Cal.App.3d 590 ..................................... 21

*Williams v. County of Alameda*, 26 F.Supp.3d 925 (ND CA 2014) ................ 11

*Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F3d 899 (7th Cir. 2004) ........ 10

<u>Statutes</u>

18 USC § 1341 .................................................................. 19

18 USC § 1956 .................................................................. 19

TABLE OF AUTHORITIES

18 USC § 1957............................................................................................19

18 USC § 1961............................................................................................19

18 USC § 1962.....................................................................................4, 14, 20

18 USC § 24...............................................................................................19

18 USC § 669.........................................................................................19, 20

18 USC §1001.............................................................................................20

18 USC §1035.............................................................................................20

18 USC §1347.............................................................................................20

18 USC §1349.............................................................................................20

18 USC §287..............................................................................................20

18 USC §371..............................................................................................20

Cal. Civ. Code, § 2224...................................................................................21

<u>Rules</u>

Fed. R Civ. Proc.12......................................................................................11

TABLE OF AUTHORITIES

ANSWERING MEMORANDUM OF POINTS AND AUTHORITIES

## I.    **BCHF Properly and Timely Pleads Defendants' RICO Liability**

a)  Structure of the Scheme

This RICO case involves Borrego Community Health Foundation's (BCHF) "insiders" (Bruce Hebets and Mikia Wallis) conspiring with "outsiders" (Daryl Priest, Travis Lyon, and Priest's solely owned Priest LLC defendants) to take control over and corrupt BCHF's ordinary, regular facilities procurement process in order to bind BCHF to leases including grossly over-market rents, for grossly over-market terms exceeding thirty years.

BCHF leases over two dozen facilities in Southern California, some with annual rents exceeding a million dollars.  Accordingly, BCHF's ordinary, regular facilities procurement procedures require a disinterested BCHF executive to identify a desirable area, research market rates and terms for the desired real estate, contact landlords with available space, negotiate proposed leases, then present the proposed lease with the pertinent research (contextualizing due diligence materials) to the BCHF board of trustees for approval.  Importantly, no single BCHF executive is authorized to commit BCHF to a lease.  Express board approval is required for BCHF to enter into any lease.

The conspirators instead worked together to identify available Priest-owned LLC properties (with Priest, on behalf of his LLCs, guiding Hebets).  If no Priest-owned entity was available, Priest would go so far as to present Hebets with a "BCHF lease" of a property neither Priest nor any of his solely owned LLCs had yet purchased.  Hebets would obligingly sign for BCHF.  Priest would then use documentation of this lucrative "lease" to obtain financing for the purchase and re-development of the subject property as well as other portions of his real estate empire. The "lease" was 300% to 400% over reasonable market value, with 30-year-plus-lease terms, and no clause allowing BCHF to unilaterally reduce the length of term for business reasons.  Hebets, Priest, Lyon, and Wallis all knew no sane Board of Directors would ever approve of any of the Priest LLC leases if the leases and

- 1 -

1    supporting materials were presented to it. Thus, Hebets (and later Wallis) on behalf of

2    the RICO enterprise, ensured no due diligence materials or lease documentation was

3    ever presented to the board.  They also ensured that BCHF's accounting functions

4    would regularly pay the rent and make reports to governmental agencies based solely

5    on the lease dollar amounts entered into BCHF's electronic accounting system.

6         Under the Priest leases, BCHF paid the Priest LLCs more than $11.5 million

7    over fair rental value in the six years before the scheme was uncovered following

8    October 2020 law enforcement raids.

9         Defendants proffer two bases for their motion to dismiss the Third amended

10   Complaint.  Both are meritless.

11             b)  <u>The Statute of Limitations Defense Fails</u>

12        Defendants claim the Third Amended Complaint is time barred because BCHF

13   is charged with constructive knowledge of the lease terms before June 4, 2017, four

14   years prior to filing its original complaint.  The alleged basis for knowledge

15   chargeable to the corporation is insufficient to establish anything close to "inquiry

16   notice" of the "fact of injury."  Defendants' argument has three parts:

17        (1)  Because the unauthorized leases were signed by Hebets, BCHF had

18             "access" to the leases but failed to read them;

19        (2) Accounts payable personnel who issued the monthly rent checks knew the

20            dollar amounts paid on each of the Priest leases; and,

21        (3) Accounting personnel reported to governmental agencies the amount of rent

22            paid on the three Priest leases.

23        Nothing in the TAC suggests any subordinate BCHF accounting personnel who

24   issued and mailed the rent checks or who entered the dollar amount of the rent on

25   government reports had actual or constructive knowledge that:

26        (1) Hebets (and later Wallis) had smuggled the unauthorized leases in through

27            BCHF's back door (instead of bringing the leases through the front door and

28            into the Boardroom for approval);

(2) BCHF had never authorized, approved, signed in the manner required by law, or ratified any of the leases;

(3) The rent numbers entered into the accounts payable system and onto government reports were as much as 400% over fair market value; and,

(4) The leases upon which the rent was being paid were subject to 30-35 year terms with no "out" clauses allowing BCHF to shorten the term in response to business reasons.

Indeed, there is nothing to suggest that the actual lease documents were ever shown to anyone in the accounting, reporting, or accounts payable department (or to anyone else at BCHF other than Hebets or Wallis). And the leases certainly were not shown to BCHF's Board of Trustees.

Rather, as alleged in the Third Amended Complaint, October 2020 law enforcement raids alerted BCHF to problems with Hebets and Wallis' stewardship of BCHF. Further investigation revealed the unauthorized Priest LLC leases.

Despite these realities, the defendants say BCHF should be charged with "constructive knowledge" of the terms of the leases merely because Hebets signed them, and because the dollar amounts of monthly rent got "into the system" and were later used to create rent checks and to fill in blanks on reports to government entities.

In essence, defendants claim they got away with the conspiracy for so long that there is now nothing BCHF can do about it.

Defendants' defense is too clever by half – all embezzlements involve an "insider" with knowledge about the scheme (even if only the embezzler). And most, if not all, corporate embezzlements involve getting the corporation's regular accounts payable function to issue checks to the benefit of the embezzlers. Indeed, under defendants' theory, any embezzler who managed to avoid detection for three or four years would get a pass simply because the money being stolen was "on the books" (without any indication of untoward activity), and the contract used to steal the money was signed by an executive involved in the scam and then tucked away in a file or on

1   the corporate computer system.  That cannot be, and thankfully will never be, the law.

2   Any such extension of the concept of "constructive knowledge" would operate as an

3   open invitation to criminal activity of the type engaged in here.

4       At best, the arguments made by defendants suggest there may be a triable issue

5   of fact about "who knew what and when" about the three Priest leases.[1]

6       c) <u>Plaintiff Alleges an Actionable RICO Enterprise</u>

7       Defendants' second line of defense is that BCHF has failed to allege sufficient

8   "conduct," or sufficient particularity with respect to racketeering activity. Details of

9   defendants' racketeering activity are adequately pled, as discussed at length below.

10       With respect to "conduct," pertinent allegations in the TAC track the United

11   States Supreme Court's analysis in *Reves v. Ernst and Young* (1993) 507 U.S. 170.

12       In *Reves*, the Supreme Court noted that liability attaches to corporate

13   "outsiders" when those outsiders work with corporate "insiders" to take control of and

14   corrupt ordinary corporate management in order to commit offenses of the type that

15   give rise to civil RICO liability:  "Of course, 'outsiders' may be liable under § 1962(c)

16   if they are 'associated with' an enterprise and participate in the conduct of *its* affairs –

17   that is participate in the operation or management of the enterprise itself…." (*Id.* at p.

18   185, original emphasis.)

19       This is precisely pled in paragraphs 7, and 33-43 of the Third Amended

20   Complaint.

21       Hebets and Priest worked together to "take over operations and management

22   control of BCHF" facility procurement process.  (¶ 7)[2]  Normal BCHF practice in

23   facilities procurement was directed at obtaining arms-length, market-rate proposed

24   leases for Board consideration and approval.  (¶ 33)  Hebets and Priest worked

25   together to get the BCHF payments flowing under the three unauthorized leases:

26

27     [1] Of course, this is a Rule 12 motion to dismiss, not a Rule 56 motion for summary judgment.

28     [2] ¶ refer to paragraphs in the Third Amended Complaint ("TAC"), docket number 16.

> ➢ Hebets signed the leases without authority (¶ 35);
> ➢ Hebets concealed the leases and any contextual due diligence materials from the Board (¶ 36);
> ➢ Hebets had BCHF accounting personnel set up the lease payments in BCHF's accounting system (¶ 36);
> ➢ Hebets, Priest, and Lyon regularly amended the unauthorized leases without Board knowledge (¶ 37);
> ➢ Priest, and Priest's right-hand man Lyon led Hebets in identifying or purchasing Priest facilities to tie to the unauthorized leases (¶ 38, 39);
> ➢ After Hebets retired, Lyon worked closely with successor CEO Mikia Wallis to continue covert operation of the conspiracy (¶ 40, 41, 42, 43).

Importantly, the operation or management test is a fact-intensive inquiry not subject to resolution on a motion to dismiss.

In *Dayton Monetary Assocs. v. Donaldson, Lufkin, & Jenrette Secs. Corp.,* No. 91-CV-2050, 1993 WL 410503, at *3 (S.D.N.Y. Oct. 14, 1993), investors in limited partnerships sued securities traders who allegedly engaged in fraudulent transactions with the limited partnerships.  The defendants moved to dismiss, arguing under *Reves* they did not participate in the operation or management of the limited partnerships. The court denied the motion, concluding that plaintiffs' allegations were sufficient to demonstrate that the defendants played a significant role in directing the affairs of the association-in-fact enterprise.

Similarly, the Second Circuit confirmed that the operation or management test poses "a relatively low hurdle for plaintiffs to clear, especially at the pleading stage." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc*., 385 F.3d 159, 176 (2d Cir. 2004) (citations omitted).

In *Edison Elec. Inst. v. Henwood*, 832 F. Supp. 413, 416-17 (D.D.C. 1993) (a pre-*Reves* decision) the court upheld a RICO claim under the "operation or management" test.  Edison Electric alleged that the defendant, an outside vendor, had

- 5 -

bribed one of Edison's key employees into diverting lucrative contracts to the defendant. The court concluded that the plaintiff's allegations established that the vendor exercised control over the employee who, in turn, exercised control over a substantial portion of the company's budget, thereby exercising the <u>necessary level</u> of participation in the management of the enterprise.  Also instructive here are: *United Nat'l Ins. Co. v. Equipment Ins. Managers, Inc.*, No. 95-CV-0116, 1995 WL 631709, at *4-5 (E.D. Pa. Oct. 27, 1995) (plaintiff insurance companies properly alleged that defendants operated or managed association-in-fact enterprise consisting of defendants and plaintiffs through alleged scheme in which defendants collected audit premiums from insureds, and through fraudulent means, failed to account for premiums and remit moneys to plaintiffs); *Shuttlesworth v. Housing Opportunities Made Equal*, 873 F. Supp. 1069, 1075-76 (S.D. Ohio 1994) (plaintiff sufficiently alleged attorney defendants' role in the operation or management of the enterprise where affidavits portrayed attorney defendants as actively soliciting plaintiff's tenants to bring sexual harassment complaints against him and offering payment for any such complaints); *Nebraska Sec. Bank v. Dain Bosworth, Inc.*, 838 F. Supp. 1362, 1367-68 (D. Neb. 1993) (plaintiffs must establish that defendant had some control over RICO enterprise, regardless of whether such control is acquired legally or by bribery or other means).

At this early stage of the proceedings, the allegations in the Third Amended Complaint are presumed true.  They are sufficient to allege an actionable RICO enterprise under the *Reves* analysis because, *inter alia*, they allege the "necessary level" of participation in the "management or operation" of the enterprise. Defendants' averments do not render allegations in the operative complaint untrue. They simply indicate the possible existence of triable issues of fact.

d) <u>Further facts and background</u>

BCHF provides healthcare services to underserved Southern California communities.  It operates over 20 facilities.  Over 90% of its funding comes from Medicare and Medicaid.  BCHF's reimbursement rates from these programs are

1  largely based on the data BCHF submits in mandatory cost reports to the Centers for

2  Medicare & Medicaid Services ("CMS").  [¶ 1, 3, 53 sub. c.]

3      In 2020, BCHF came under investigation by the California Attorney General for

4  defrauding Medi-Cal.  [¶ 4, fn. 1.]  In October 2020, BCHF was raided by state and

5  federal law enforcement authorities.  [¶ 27, 71.]  Although initially not a part of the

6  government investigation, the government reviewed each of BCHF's facility leases.

7  [¶ 27-28.]  Independent certified commercial real estate appraisers found:

8          a. On the lease with Promenade Square, LLC ("Promenade") for BCHF's El

9              Cajon location BCHF was paying $39,104.75 ***a month*** above Fair Market

10             Rent ("FMR"), or $469,257 above FMR per year;

11         b. On the lease with DRP Holdings, LLC ("DRP"), for BCHF's San Bernardino

12             location, BCHF was paying $38,405.95 ***a month*** above FMR, or

13             $460,871.40 above FMR per year; and,

14         c. On the lease with Inland Valley Investments, LLC ("IVI"), for BCHF's

15             Barstow location, BCHF was paying $80,025.25 ***a month*** above FMR, or

16             $960,303 above FMR per year.[3]

17  [¶ 29.]  In sum, BCHF paid the Priest LLCs $1,890,431.40 a year above FMR and has

18  paid over $11,500,000 above FMR cumulatively since inception of the Priest Leases.

19      Additionally, and importantly, the Priest Leases have terms of 30-33 years,

20  which are grossly over market as well.  A reasonable fair market term for these

21  commercial leases is 3 to 5 years.  [¶ 30.]

22      Priest is an experienced owner and lessor of commercial properties.  The Priest

23  LLCs are presumed to know that BCHF is a non-profit health care provider doing

24  business with federally funded health programs.  The Priest LLCs are presumed to

25  know FMR for their properties, that the stated rent in the subject leases far exceeds

26  FMR, and that the 30+ year terms are commercially unreasonable (especially in the

27

28  _____

[3] As the LLCs are all owned by Daryl Priest these three defendants are collectively referred to herein as the Priest LLCs, and the leases as the Priest Leases.

1   absence of terms allowing BCHF to terminate the leases for reasonable business

2   purposes). In short, Priest and his LLCs are charged with knowledge that they were

3   working with Hebets on over-FMR leases with a non-profit FQHC.  [¶ 54.]

4           As drafted, the Priest Leases would have received $58 million in over-FMR

5   from BCHF over the life of the leases.  Two of the leases (IVI in Barstow and DRP in

6   San Bernardino) have been terminated.  Promenade Square in El Cajon remains in

7   operation with BCHF paying twice FMR under protest, with permission of the DHCS

8   monitor overseeing BCHF's operations since late 2020.  [¶ 55-56.]

9           Without judicial intervention on the Promenade Square lease, and without

10   recovery of the $11.8 million in overpaid rent to date, Hebets, Wallis, Priest, and the

11   Priest entities' actions will continue to present an immediate threat to disable an

12   essential provider of primary healthcare services to underserved inland communities in

13   San Diego, San Bernardino, and Riverside Counties.  [¶ 56.]

14   **II.   <u>Litigation History</u>**

15           This lawsuit was filed in San Diego Superior Court on June 4, 2021, within

16   months of discovery of the over-priced and over-length Priest Leases.  [Dkt No. 1.]

17   To recover the overpayments to the Priest LLCs it seeks to impose a constructive trust

18   on the Priest LLCs and the revenue resulting from the scheme, based on fraud,

19   reformation, recission, money had and received, unfair business practices, declaratory

20   relief and civil RICO violation.  [Dkt No. 19.]  The defendants removed to this Court

21   based on the RICO federal question. [Dkt No. 1.]  This Court previously dismissed the

22   RICO claim, without prejudice, and declined to exercise supplemental jurisdiction

23   over the other causes of action.  [Dkt No. 5.]

24           The defendants again move to dismiss, seeking to escape responsibility by

25   blaming the BCHF Board for remaining "hoodwinked" by the scheme, and invoking

26   statutes of limitation.  They also claim they cannot understand the claims against them

27   because the pleading lacks the particularity required by Federal Rules of Civil

28   Procedure, rule 9(b).  [Dkt No. 19.] Defendants' also ask the Court to prematurely

1   decide that allegations of fact in the Complaint are false. That is no basis to grant

2   defendants' motion. At this point the Court is obliged to presume the TAC's

3   allegations are true.

4        Equally important, defendants misrepresent BCHF's pleading.  They argue

5   BCHF's "Board could have readily uncovered the purported fraud had it exercised any

6   due diligence" (DKT 19-1 at 1:9-10) and "BCHF regularly, publicly reported its rents

7   *and lease terms* to regulatory agencies."  (Dkt 19-1 at 1:10-11, emphasis added.)

8   These claims are false and shown to be so by the TAC.

9        After law enforcement raids and DHCS suspension put it on notice, BCHF

10  discovered defendants' fraud by commissioning a survey of market rents and rental

11  practices.  Notably, the product of this survey is the "due diligence" Hebets was

12  required by law to develop and present to the Board to support the Board's advance

13  approval of each lease but failed to do so in furtherance of the scheme.  [¶ 118.]

14  Moreover, in urging dismissal of the entire complaint defendants ignore black-letter

15  law that BCHF's Board was entitled to rely on the guidance of its fiduciaries (Hebets,

16  and later, Wallis) without further investigation.  Finally, BCHF provides ample

17  "particularized facts" giving defendants "adequate notice" to defend the charges – all

18  the more adequate in light of the fact that the transactions that form the basis for

19  plaintiff's TAC are "peculiarly within" defendants' knowledge.  (*In re Countrywide*

20  *Fin. Corp. Mortg. Mktg. & Sales Practices Litig.* 601 F.Supp.2d 1201, 1216 (S.D.Cal.

21  2009), citing *Odom v. Microsoft Corp.* 486 F.3d 541, 555 (9th Cir. 2007).)  For these

22  and the reasons detailed below, defendants' motion must be denied and they must be

23  ordered to answer the TAC.

24  **III.   The RICO Claim Cannot be Dismissed Based on Statutes of Limitations**

25       Defendants argue BCHF was negligent in failing to spot the scheme earlier

26  because BCHF accounting and compliance personnel knew the Priest facilities were

27  leased, they paid the fraudulent rents, and reported those rent numbers to the

28

government, and BCHF had unspecified "access" to the leases themselves.  Whether this is sufficient to establish "inquiry notice" of a "fact of injury" is a question of fact.

The statute of limitations is an affirmative defense.  Ordinarily, a Rule 12(b)(6) motion cannot be used to raise an affirmative defense.  (*Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F3d 899, 901 (7th Cir. 2004); see *Brownmark Films, LLC v. Comedy Partners,* 682 F3d 687, 690 (7th Cir. 2012) ("courts should usually refrain from granting Rule 12(b)(6) motions on affirmative defenses").)  The choice for defendants wishing to address an affirmative defense before trial is to file a Rule 56 motion for summary judgment.  To grant a Rule 12(b)(6) motion based on an affirmative defense, the facts establishing that defense must (i) "be definitively ascertainable from the complaint and other allowable sources of information," and (ii) "suffice to establish the affirmative defense with certitude."  (*Gray v. Evercore Restructuring L.L.C.*, 544 F.3d 320, 324 (1st Cir. 2008), internal quotes omitted.)  Where the expiration of the statute of limitations cannot be determined from the face of the complaint, a motion for summary judgment is the proper procedure.  (See *AVCO Corp. v. Precision Air Parts, Inc.,* 676 F2d 494, 495 (11th Cir. 1982); *Supermail Cargo, Inc. v. United States,* 68 F3d 1204, 1206 (discovery rule or tolling doctrines usually not amenable to resolution on Rule 12(b)(6) motion).)

There is nothing in the complaint to suggest that the leases themselves were ever shown to anyone at BCHF other than perpetrators Hebets and Wallis.  There is certainly no allegation that would support the conclusion that anyone in the accounting or compliance departments was aware of any lease term other than a bare dollar figure.  There is no allegation suggesting any subordinate BCHF accounting personnel who issued and mailed rent checks, or who entered the dollar amount of the rent on government reports, had actual or constructive knowledge that:

> ➢ Hebets (and later Wallis) had smuggled the unauthorized Priest LLC leases through BCHF's back door (instead of bringing the leases through the front door and into the Boardroom for approval) (¶ 26, 35, 41);

➢ BCHF had never authorized, approved, signed in the manner required by law, or ratified any of the Priest LLC leases (¶ 26, 36, 41);

➢ The rent numbers entered into the accounts payable system and onto government reports were as much as 400% over fair market value (¶ 29); and,

➢ The leases upon which the rent was being paid contained 30-33 year lease terms with no "out" clauses allowing the tenant to shorten the lease term for business reasons (¶ 30).

There are no facts alleged in the complaint that would put anyone (other than the perpetrators) on inquiry notice of a fact of injury relating to the leases.  (¶ 37)

Finally, the motion to dismiss raises matters outside of the TAC and asks the Court to make inferences and deductions from such evidence.  To do so would convert this motion into a motion for summary judgment.  If the Court is inclined to do so, plaintiff requests discovery and the opportunity to submit evidence.  (FRCP 12(d); *Hernandez v. Coffey*, 582 F.3d 303 (2nd Cir. 2009); *Williams v. County of Alameda*, 26 F.Supp.3d 925, 936 (ND CA 2014).)  Moreover, as the complaint indicates a plausible claim and much of the required information is solely in the hands of the defendants, plaintiff requests to do limited discovery before the Court rules on the motion to dismiss.  (*Menard v. CSX Transp., Inc.,* 698 F3d 40, 45 (1st Cir. 2012); *Peflalbert-Rosa v. Fortuflo-Burset,* 631 F3d 592,596-597 (1st Cir. 2011).)

a)  <u>No Dismissal Under Injury Discovery Rule</u>

The facts pled show no awareness of injury until less than a year before filing. Dismissal is therefore inappropriate.

Consistent with the injury discovery rule a RICO claim filed within four years of plaintiff's discovery of injury may still be time-barred if a reasonable person exercising due diligence would have discovered the injury more than four years before the suit was filed.  (*Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 506-09 (3d Cir. 2006).)  But again, the existence of inquiry notice is a fact question.

> There are no hard and fast rules for determining what facts or circumstances will compel inquiry by the injured party and render him chargeable with knowledge. ***It is a question for the trier of fact***." (*Nguyen v. W. Digital Corp.*, 229 Cal. App. 4th 1522, 1552, 178 Cal. Rptr. 3d 897 (2014) (internal citation and quotation marks omitted, emphasis added).)  Resolving the issue of accrual on a motion to dismiss is only appropriate when a 'court could determine as a matter of law that failure to discover was due to failure to investigate or to act without diligence.'  (Id. (citation omitted).

(*Friends of Riverside Airport LLC v. Dep't of the Army* (C.D. Cal. Nov. 24, 2020, No. EDCV 19-1103-MWF (KKx) 2020 U.S.Dist.LEXIS 261453, at *10 (C.D. Cal. Nov. 24, 2020) (emphasis added.).)

As amply stated in the TAC, Hebets and Wallis kept the board in the dark about the leases.  Dollar figures for rent, *without more*, were passed to accounting personnel who would have no reason to suspect the figures presented were three or four times FMR, or that the leases incorporated 30-year lease terms with no "out" clauses allowing BCHF to terminate the 30-year leases for reasonable business reasons.  [¶ 26-41.]

### b)  No Dismissal Under Equitable Tolling/Estoppel or Fraudulent Concealment

These doctrines either toll the statute of limitations or estop defendants from enforcing it where, "(1) the defendant wrongfully concealed material facts relating to the defendant's wrongdoing; [and] (2) the concealment prevented plaintiff's 'discovery of the nature of the claim within the limitations period'; and (3) the plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled.'"  (*Pincay v. Andrews*, 238 F.3d 1106, 1110 (9th Cir. 2001); *Grimmett v. Brown*, 75 F.3d 506, 514 (9th Cir. 1996).)

Concealment of the scheme detailed above and of the injury resulting therefrom worked to perfection until it came to light after October 2020 because of a government investigation *unrelated to BCHF's facilities procurement*.  But for that fortunate

1   coincidence, the conspiracy detailed in the TAC would likely have remained

2   undiscovered because information that might disclose it to persons with oversight

3   responsibility (i.e., the Board of Trustees) was never put in a form revealing the over-

4   priced and excessively long terms of each of the three leases.  [¶ 57.]

5          Hebets and Wallis' successful concealment of the over-market leases and the

6   resulting injury operates to delay accrual of any statute of limitation to October 2020.

7   They knew that volunteer BCHF Board members would review only those contracts

8   presented to them, and that they would never have reason to see the Priest LLC leases

9   and contextualizing information unless Hebets or Wallis decided to present the

10  information.  [¶ 59-60.]  Thus, unless disclosed by Hebets or Wallis, there was no way

11  that BCHF would be put on notice of the terms of the three subject leases, or that

12  Hebets and Wallis were working with Priest, Lyon, and, through them, the three Priest

13  LLCs to make BCHF management and operations decisions pertaining to the over-

14  market leases, in a manner contrary to BCHF's financial and compliance interests.

15  The fact of injury from the leases and defendants' participation in BCHF's facilities

16  procurement and operations was fraudulently concealed by Hebets and Wallis and

17  could not be discovered.  [¶ 57-62; also see ¶ 25-56 and 101-112.]

18         Because plaintiff had no constructive or inquiry notice of the fact of injury

19  throughout the eight-year operation of the conspiracy, plaintiff's right to recover

20  money stolen by defendants extends back to the commencement of each lease.  [¶ 58.]

21              c)  <u>No Dismissal Based on Separate Accrual for New Injuries</u>

22         A cause of action accrues when new overt acts occur within the limitations

23  period, even if a conspiracy was formed and other acts were committed outside the

24  limitations period. A corollary rule is that damages may not be recovered for injuries

25  sustained as a result of acts committed outside the limitations period.  (*State Farm*

26  *Mut. Auto. Ins. Co. v. Ammann*, 828 F.2d 4, 5 (9th Cir. 1987), Kennedy, J. concurring;

27  *Hennegan v. Pacifico Creative Service, Inc.*, 787 F.2d 1299, 1301-02 (9th Cir. 1986).)

28

Every time BCHF paid over FMR rent it was injured.  Every time Wallis and Hebets took the Priest's LLC's direction to not disclose the leases, BCHF was harmed. Hebets' and Wallis' continued concealment of the leases from BCHF, under the control and direction of the Priest LLCs, was a separate breach of fiduciary duty in furtherance of the scheme to steal money from BCHF every time a monthly rent check was mailed to the Priest LLCs.  Each time they stood mute, at the direction of the Priest LLCs, while management presented a financial report to the board that failed to call out overmarket rents and 30-year lease terms of the Priest LLC leases, was also a separate breach of fiduciary duty in furtherance of the scheme to steal money from BCHF.  [¶ 104, d.-e; 114, d., 119.]

Even were the Court to credit defendants' limitations argument the most it could do is limit BCHF's damages to the four years preceding the filing of the complaint. (*Bingham v. Zolt*, 66 F.3d 553, 559-561 (2d Cir. 1995) (holding that because different diversions of royalties due estate constituted new and independent injuries, plaintiffs could recover for each diversion that occurred within four years of the filing of the RICO action)*; Joseph v. Bach & Wasserman, L.L.C.*, 487 F. App'x 173, 176-78 (5th Cir. 2012) ("[w]hen a pattern of RICO activity causes a continuing series of separate injuries, the 'separate accrual' rule allows a civil RICO claim to accrue for each injury when the plaintiff discovers, or should have discovered, that injury.'"); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1103-05 (2d Cir. 1988) ("Under this [separate accrual] rule, each time plaintiff discovers or should have discovered an injury caused by defendant's violation of § 1962, a new cause of action arises as to that injury, regardless of when the actual violation occurred.").)

Here, as alleged in the complaint, there is a new wrongful act in furtherance of the scheme every time the scheme resulted in the monthly mailing of a rent check to one of the three defendants. [¶ 104, 114] This redundant monthly act of mail fraud is a "pattern and practice." Thus, BCHF is entitled to four years of damages under the separate accrual rule.  [¶ 36, d.-e.; 104, d.-e; 119.]

d) <u>Application of the Statute of Limitations Under the facts Here Would Invite Similar Criminal Activity</u>

Defendants' arguments focus on BHCF having "access to the records related to the leases and submitted annual cost reports, which included rent, to government agencies…."  [See also prior Order, Dkt. 15 at 5.]  This is contrary to facts in the TAC.

This argument also ignores common knowledge about embezzlement:  it typically occurs by inducing corporate accounts payable departments to unknowingly make fraudulent payments that appear in the corporation's records to be ordinary and regular.  Nonetheless, defendants' argument urges the court to exonerate successful embezzlement based on an two issues that are necessarily for the trier of fact:  (1) The money stolen "shows on the books" and therefore the plaintiff should have figured out that that money was in fact "stolen" and not paid for a lawful purpose; and (2) the unauthorized contracts (here, leases) that generated the theft of the money are "somewhere" in BCHF's physical or electronic files, and therefore BCHF had "access" to the contracts and should have read them.

If, as defendants urge, the statute of limitations applies here as a matter of law any embezzler who remained undetected for four years would be "home free."

**IV.   <u>None of Defendants' Anti-RICO Arguments Carry the Day</u>**

a) <u>Defendants' Argument that the Statute of Limitations on BCHF's RICO Claim Accrued in 2012, 2015 and 2016 Fails</u>

The three leases were effective September 21, 2012 (Promenade), September 15, 2015 (DRP), and October 1, 2016 (IVI).  Absent the discovery rule, four years after their effective dates would have been September 21, 2016, September 15, 2019, and October 1, 2020.  The case was filed June 4, 2021.  Four years before filing the lawsuit was June 4, 2017.  Thus, the inquiry on the discovery rule should be whether BCHF reasonably was on notice of its damages prior to June 4, 2017.  At that time the DRP lease was less than two years old and the IVI lease less than one year old.

It has been pled that the Priest LLCs engaged with Hebets and Willis to surreptitiously bind BCHF to the leases and thereafter conceal their import from the Board.  There is nothing in the TAC suggesting BCHF's controller knew the leases were vastly over FMR.  And the length of the leases was buried from day one.

If credited, the attachments to the RFJN[4] merely demonstrate that BCHF submitted a yearly "Annual Utilization Report of Primary Care Clinics" that showed a line item for the subject facilities – there is nothing to show the controller preparing the reports had any inkling the sums represented over market rent.

There are numerous facts alleged to show why BCHF did not discover its injury until 2021.  There are numerous facts alleged to show why defendants should be estopped from asserting a statute of limitations argument.  There is, however, nothing but bald conjecture from defendants as to how or why BCHF knew or should have known of its injuries before June 4, 2017.

The motion to dismiss argues BCHF's Board of Trustees has a duty to review the leases when it procures such facilities (Id. ¶8); and that the Board did not use due diligence to review these three leases (Id. ¶6). BCHF alleges that the leases were in its records in October 2020. (Id. ¶7, 61)."  [Dkt. 19-1 at p. 6:5-7.]

First, there is no such admission in the TAC.  The TAC pleads the Priest entities (through Priest executives Priest and Lyon) participated in the management and control of BCHF to actively work with insiders Hebets and Wallis to conceal the over-market terms of the Priest leases from BCHF's board of directors.  The TAC states, "these leases were never subject to due diligence.  Nor were they submitted to the BCHF Board for analysis, review, and informed consent and approval."  (¶ 6)

As noted, "BCHF's former CEO Bruce Hebets personally directed and controlled the activities of BCHF's former business manager (his wife) and its former chief legal officer, and because Hebets worked with his friend [Daryl] Priest and the

---

[4] See separate objection to the RFJN.

1   three Priest-owned LLC defendants herein to take over operations and management
2   control of BCHF's facilities procurement to enable the creation and implementation of
3   the three leases that are the subject of this lawsuit."  (¶ 7)

4       Finally, "unless disclosed by Hebets or Wallis, there was no way that BCHF
5   would be put on notice of the terms of the three subject leases, or that Hebets and
6   Wallis were working with Priest, Lyon, and, through them, the three Priest LLC to
7   make all management and operations decisions pertaining to the over-market leases
8   for BCHF….  The fact of injury from the leases and from the defendants' participation
9   in BCHF's facilities procurement and operations and therefore could not be
10  discovered."  (¶ 62)

11      Defendants falsely assert BCHF was "undeniably" aware of the lease terms
12  from the inception of the leases.  The facts alleged in the TAC, which are presumed
13  true, say just the opposite: Under defendants' scheme, there could be no awareness
14  until the leases were, by the fortuity described above, independently evaluated.

15      BCHF does not "admit" there are regulations under which it operates that
16  obligated the Board to see these leases.  And whether a Board member should have
17  approved and vetted the leases or exercised oversight of executives misses the point.
18  Hebets and Wallis conspired with defendants to take over that role (i.e., to engage in
19  the operation and management of BCHF's ordinary lease procurement functions) in
20  executing the leases without Board approval or oversight.  And they did so in a
21  manner that succeeded in hiding the radically "over-market" terms from the Board.

22      As alleged in the TAC, discovery of information suggesting an injury in fact
23  occurred in 2021.  There is nothing in the TAC that establishes as a matter of fact or
24  law an earlier inquiry notice of a fact of injury, either by actual or constructive notice.

25          b)  <u>Defendants' Allegation that BCHF Failed to Plead Facts to Support</u>
26              <u>Equitable Tolling of the Statute of Limitation is False</u>

27      As detailed several times in this brief, BCHF pled that defendants intentionally
28  and surreptitiously "bound" BCHF to the leases and hid their import from the Board.

c) <u>Defendants' Allegation BCHF Fails to Plead RICO With Rule 9(b) Particularity is False</u>

BCHF does not improperly lump all defendants together as the "Priest LLCs." Rather, at ¶ 10-11, 12-13, 14-15, 44-46, 47-48, 49-51, 52-56, BCHF separately describes each entity and attaches its lease and describes the property it owned. Each of the LLCs is described jointly as the Priest LLCs because they acted in unison in carrying out the RICO scheme in the manner set forth in the TAC. [See TAC: ¶ 1-17; 25-62; 101-125.] At paragraph 22 the TAC alleges that, "there is such unity of interest and ownership between the Priest LLCs that the separate personalities of the limited liability companies no longer exist."

Plaintiff's allegations concerning defendants do not "solely" assert that defendants entered into the three leases and collected rent. The truth is that the TAC alleges conduct committed by the Priest LLCs in conspiracy with BCHF executives. The TAC pleads "the who, what, when, where, and how of the misconduct charged."

BCHF alleges that the RICO conspirators concealed the leases from BCHF's Board and BCHF in general. BCHF alleges that defendants collected rents in such a way as to conceal their gross inflation and that defendants constructively misrepresented the terms of the leases. BCHF alleges which management and operational decisions of BCHF the defendants devised or participated in, and when. BCHF alleges how each Defendant devised and participated in operational and management decisions. BCHF alleges how Priest and Lyon worked to take over operations and management control of BCHF's procurement of facilities. (See ¶ 1-17; 25-62; 101-125.)

d) <u>BCHF Plausibly Alleges the Conduct Element of its RICO Claim</u>

This *Reves* argument is disposed of above. There are numerous facts alleged that Priest, his right-hand-man Lyon, and the Priest entities engaged in operation or management of the Enterprise. (See ¶ 1-17; 25-62; 101-125.)

e) <u>BCHF Properly Alleges Defendants Engaged in a Pattern of</u>
<u>Racketeering Activity</u>

Plaintiff details defendants' pattern of racketeering activity at paragraphs 114 (mail fraud), 115 (wire fraud) and 116 (various forms of Federal health care offenses).

The scheme could not work without using the United States mail.  Among other things, the mail was used to send monthly rent checks to defendants for each of the three over-market leases described herein.  Each mailing was an individual act essential to the success of the scheme (and therefore material) and constituted a separate loss the victim suffered as of the date of mailing.  This constitutes hundreds of predicate acts under 18 USC § 1341 (Mail Fraud).  [¶ 114.]

Defendants also used interstate electronic transmission of documents for the purpose of executing, or attempting to execute, the scheme.  The scheme was used to steal funds from a federally funded and regulated FQHC, which in turn would result in the inflation of reimbursement rates the Federal Government would pay to the FQHC (BCHF) for thousands of patient encounters, thereby causing the United States Government to finance defendants' crime.  [¶ 115.]

The scheme detailed in plaintiff's complaint constitutes a pattern of racketeering activity as described in 18 USC § 1961(1)(B), as acts indictable under 18 USC § 1957 ("Engaging in monetary transactions in property derived from <u>specified unlawful</u> <u>activity</u>").  "Specified unlawful activity" is, in turn, defined in 18 USC § 1956 as including "any act or activity constituting an offense involving a 'Federal health care offense.'"  18 USC § 24 defines "Federal health care offense" as follows. [¶ 116.]

1. <u>*18 USC § 669 (Theft or embezzlement in connection with health*</u>
<u>*care)*</u>

The over-market leases are the means by which defendants stole and converted to their own use public healthcare benefits paid BCHF by state and federal agencies at a time BCHF was the rightful owner of those funds.  In addition, in this particular statute, BCHF itself qualifies under the broad definition of "health care benefit

1  program."  BCHF is an "entity who is providing a medical benefit, item, or service for

2  which payment may be made under the plan or contract."  The scheme constituted

3  theft or embezzlement in connection with health care under 18 USC § 669.  [¶ 116, a.]

4        *2.*   <u>Under 18 USC §1347 (Health care fraud)</u>

5       BCHF itself qualifies as a "health care benefit program."  BCHF is an "entity

6  who is providing a medical benefit, item, or service for which payment may be made

7  under the plan or contract."  The scheme constituted health care fraud under 18 USC

8  §1347.  [¶ 116, b.]

9        *3.*   <u>18 USC §1001 (False Statements or entries generally)</u>

10       Section 1001 is violated if someone knowingly or willfully conceals or covers

11  up by any trick, scheme or device a material fact, which act is within the jurisdiction

12  of a department or agency of the United States.  Here, by causing unlawfully inflated

13  rents to be reported to the government, resulting in inflated reimbursement payments,

14  defendants' scheme meets the elements of section 1001.  [¶ 116, c.]

15        *4.*   <u>Other federal healthcare offenses</u>

16       In addition the facts alleged in the TAC also amount to "federal healthcare

17  offenses" under the following statutes: 18 USC §371 ("Conspiracy to commit offense

18  or to defraud United States"); 18 USC §1035 ("False statements relating to health care

19  matters"); 18 USC §287 ("False, fictitious or fraudulent claims"); 18 USC §1349

20  ("Attempt and conspiracy").  [¶ 116, d.]

21        f)  <u>Defendants' contention BCHF Fails To Adequately Plead RICO</u>

22            <u>Conspiracy Under 18 U.S.C. § 1962(d) is False</u>

23       BCHF properly alleges agreements as to each defendant, the actions of each

24  defendant taken in furtherance of the agreement, and the harm caused thereby.  BCHF

25  also adequately pleads substantive violations of RICO by defendants.  Plaintiff also

26  adequately alleges a conspiracy to violate RICO.  (TAC, *passim*, ¶ 113, 122.)

27

28

**V.    The TAC States a Claim for a Constructive Trust Based on Fraud**

Pertinent to all claims plaintiff has alleged the:

(1) Who – Hebets (BCHF CEO and fiduciary), Wallis (BCHF CEO and fiduciary), Priest (experienced real estate lessor, with constructive or actual knowledge how the subject leases diverged from reasonable terms), Lyon (chief executive of the three defendants), and the three defendants (LLCs under Priest's sole ownership and control);

(2) What – conspiring to have Hebets and Wallis surreptitiously commit BCHF to lengthy, above market leases, while keeping the BCHF Board in the dark as to the nature of fair market rental rates and terms in the relevant area; causing concurrently submitted inflated cost reports to the DHCS and the United States which would ultimately cause the cost of the over-market lease payments to be "passed through" to the taxpayers in the form of inflated reimbursements resulting from the inflated cost reports;

(3) Where – in this judicial district;

(4) When – the dates of the various leases, and related amendments are pled with specificity, as are the monthly use of the U.S. Mail, and the date when BCHF was put on inquiry notice as to the embezzlement – October 2020.

Put simply, BCHF's pleading meets Rule 9's requirements.  [¶ 1-17; 25-62; 63-76.]

Moreover, BCHF's "fraud" claim does not seek damages.  Rather it seeks to impose a constructive trust on the $11.5 million proceeds of the fraud perpetrated by Hebets and Wallis, (with defendants' full knowledge and participation). [¶ 63-76.]

"One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."  (Cal. Civ. Code, § 2224.)

A constructive trust may be imposed in practically any case when there is a wrongful acquisition or detention of property to which another is entitled.  (*Weiss v.*

*Marcus* (1975) 51 Cal.App.3d 590, 600; *see, e.g., Douglas v. Superior Court* (1989) 215 Cal.App.3d 155, 160—cause of action for constructive trust that incorporated allegations of causes of action for fraud, conspiracy, and racketeering was sufficient.)

The wrongful act giving rise to a constructive trust need not amount to fraud or intentional misrepresentation.  All that must be shown is that the acquisition of the property was wrongful and that the keeping of the property by the defendant would constitute unjust enrichment.  (*Nguyen v. Scott* (1988) 206 Cal.App.3d 725, 737–740; *Calistoga Civic Club v. City of Calistoga* (1983) 143 Cal.App.3d 111, 116.)

For example, if an employee embezzles money from his employer, the employer may impose a constructive trust on proceeds, or property purchased with the proceeds, held by a third party.  (*Church v. Bailey* (1949) 90 Cal.App.2d 501, 503–504.)

Transferees who take with knowledge of the trust are liable even if they acted in good faith or without the intention of perpetrating a wrong.  (*Lucas v. Associacao Protectora Uniao Madeirense* (1943) 61 Cal.App.2d 344, 351–352.)

The first cause of action states a claim. There are plenty of alleged facts, presumed true, to support the truth here: Defendants wrongfully acquired plaintiff's and others' property.  [¶ 63-76]

## VI.   The 2nd (Reformation), 3rd (Rescission), 4th (Money had and Received), and 6th (Declaratory Relief) Causes of Action State Claims Well Within the Statute of Limitations

Defendants' arguments as to these causes of action are all the same: they lack Rule 9 particularity, and they were filed too late.  For all the reasons set out above the TAC more than meets Rule 9 requirements, and, especially in light of the fraud by a fiduciary (see Section IX, below), the complaint was timely filed.  [¶ 77-85/86-89/90-93/98-99.]  For Reformation, the complaint sets forth that the intention of the parties was for a lease within the confines of FMR and for a reasonable length.  [¶ 77-85.]

## VII.  The TAC States a Claim for Unfair Competition

Defendants aver that plaintiff does not meet its pleading burden here because it did not adequately allege unlawful, unfair, or fraudulent activity on the part of defendants.  As is detailed above, plaintiff has adequately pled all three theories of recovery.  [¶ 94-97.]  The UCL claim is not subject to dismissal.

## VIII.  State Law Claims Cannot Be Dismissed Based on Statute of Limitations Because California Law Imposes no Obligation to Look Past a Fiduciary's Assurances

The state law claims cannot be dismissed on statute of limitations grounds for the same general reasons that the RICO action cannot be dismissed and, more particularly, because BCHF had no obligation to investigate the representations (or as here, the concealments) of its fiduciaries, Hebets and Wallis.

The existence of a fiduciary relationship such as any principal-agent relationship gives rise to a duty to disclose material facts.  (*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 336–337; *see also St. James Armenian Church of L.A. v. Kurkjian* (1975) 47 Cal.App.3d 547, 551.)  Wherever there is a confidential relationship, there is a duty to make full disclosure of all material facts within the agent's knowledge relating to the transaction.  (*Montoya v. McLeod* (1985) 176 Cal.App.3d 57, 64; *Ford v. Cournale* (1973) 36 Cal.App.3d 172, 182.)

The suppression or concealment of a material fact by a fiduciary constitutes actionable fraud.  (*Moe v. Transamerica Title Ins. Co.* (1971) 21 Cal.App.3d 289, 306.)  A principal has the right to rely on representations made to it by a fiduciary without any duty of further inquiry.  (*Davis v. Kahn* (1970) 7 Cal.App.3d 868, 878; *see Greenfield v. Insurance Inc.* (1971) 19 Cal.App.3d 803, 811 (insurance agent representing he had obtained coverage that he had not obtained).)

If the plaintiff has the right, due to the existence of a fiduciary relationship, to rely on the fiduciary's statements (or, as here, the failure to make statements required of s fiduciary) without further inquiry, the statute of limitations does not run merely

1   because the means of discovery were "available" to plaintiff. Equally important, the

2   plaintiff is not compelled to disprove that the means existed. The plaintiff need only

3   establish facts sufficient to show that it made an actual discovery of unknown

4   information within three years before the filing of the action. (*Davis v. Kahn* (1970) 7

5   Cal.App.3d 868, 878; *see, e.g.*, *Fuller v. First Franklin Financial Corp.* (2013) 216

6   Cal.App.4th 955, 964–965.)

7         Hebets and Wallis ("insiders") were BCHF fiduciaries. Their concealment of

8   their failure to follow BCHF's ordinary facilities procurement procedure and the

9   concomitant concealed departure from reasonable fair market terms tolls the statute

10  until BCHF had reason to investigate. And BCHF had no reason to do so until the

11  October 2020 FBI raids and DHCS suspension.

12  **IX.**   **Conclusion**

13        Based on the foregoing, the motion to dismiss should be denied in its entirety.

14  If the Court is inclined to grant any of defendants' motion, plaintiff asks for leave to

15  amend. In the alternative, if the Court dismisses the RICO action without leave, it is

16  requested that the matter be remanded to state court for consideration of the remaining

17  causes of action independently.

18

19        Respectfully submitted,

20  Dated: April 25, 2022           HATTON, PETRIE & STACKLER

21                            /s/ Gregory M. Hatton

              By:_____

22                   Gregory M. Hatton

23                   Arthur R. Petrie, II

                 Dan E. Heck

24                   Attorneys for Plaintiff

                 BORREGO COMMUNITY HEALTH

25                   FOUNDATION

26

27

28

<u>CERTIFICATE OF SERVICE</u>

   I certify that on April 25, 2022, I caused the foregoing document to be presented to the Clerk of the Court for electronic filing and uploading to the CM/ECF system. In accordance with the ECF registration agreement and the Court's rules, the Clerk of the Court will send email notification of such filing to all attorneys and parties of record.

        /s/ Gregory M. Hatton

        _____

        Gregory M. Hatton
        HATTON, PETRIE & STACKLER APC