# EXHIBIT 1

EXHIBIT 1

JOSEPH R. LAMAGNA (State Bar No. 246850)
JORDAN KEARNEY (State Bar No. 305483)
**HOOPER, LUNDY & BOOKMAN, P.C.**
101 W. Broadway, Suite 1200
San Diego, California 92101
Telephone: (619) 744-7300
Facsimile: (619) 230-0987
E-Mail: jlamagna@health-law.com
         jkearney@health-law.com

DEVIN M. SENELICK (State Bar No. 221478)
TARYN A. REID (State Bar No. 328772)
**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East, Suite 1600
Los Angeles, California 90067
Telephone: (310) 551-8111
Facsimile: (310) 551-8181
E-Mail: dsenelick@health-law.com
         treid@health-law.com

Attorneys for Plaintiff Borrego
Community Health Foundation

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BORREGO COMMUNITY HEALTH FOUNDATION, a California nonprofit public benefit corporation; | Case No. 3:21-cv-01417-AJB-AGS |
| | Hon. Anthony J. Battaglia |
| Plaintiff, | |
| vs. | **FOURTH AMENDED COMPLAINT** |
| INLAND VALLEY INVESTMENTS, LLC, a California limited liability company; DRP HOLDINGS, LLC, a California limited liability company; PROMENADE SQUARE, LLC, a California limited liability company; KAREN HEBETS, an individual; MIKIA WALLIS, an individual; DIANA THOMPSON, f/k/a DIANA TRONCOSO, an individual; HARRY ILSLEY, an individual; DENNIS NOURSE, an individual; MIKE HICKOK, an individual; CHUCK KIMBALL, an individual; | Trial Date:        None Set |

1  PREMIER HEALTHCARE
2  MANAGEMENT, INC., a California
   Corporation; SUMMIT HEALTHCARE
3  MANAGEMENT, INC., a California
   Corporation; DARYL PRIEST, an
4  individual; NICHOLAS PRIEST, an
   individual; TRAVIS LYON, an
5  individual; HUSAM E. ALDAIRI,
   D.D.S., an individual; ALDAIRI DDS,
6  INC., a California corporation; AYED
7  HAWATMEH, D.D.S., an individual;
   HAWATMEH DENTAL GROUP, P.C.,
8  a California Corporation; ALBORZ
   MEHDIZADEH, D.D.S., an individual;
9  ALBORZ MEHDIZADEH, INC., a
10 California Corporation; JILBERT
   BAKRAMIAN, D.D.S., an individual;
11 MOHAMMED ALTEKREETI, D.D.S.,
   an individual; MAGALY VELASQUEZ,
12 D.D.S., an individual; MAGALY M.
13 VELASQUEZ DDS PROFESSIONAL
   DENTAL CORP., a California
14 Corporation; ARAM ARAKELYAN,
   D.D.S., an individual; NEW
15 MILLENNIUM DENTAL GROUP OF
   ARAM ARAKELYAN, INC., a
16 California Corporation; MICHAEL
17 HOANG, D.M.D., an individual;
   WALEED STEPHAN, D.D.S., an
18 individual; W.A. STEPHAN, A
   DENTAL CORPORATION,
19 a California Corporation; SANTIAGO
   ROJO, D.D.S., an individual;
20 SANTIAGO A. ROJO, D.D.S., INC., a
   California Corporation; MARCELO
21 TOLEDO, D.D.S., an individual;
22 MARCELO TOLEDO, D.D.S., INC., a
   California corporation; MARLENE
23 THOMPSON, D.D.S., an individual;
   MARLENE THOMPSON, D.D.S., INC.,
24 a California Corporation; DOUGLAS
25 NESS, D.D.S., an individual; NESS
   DENTAL CORPORATION, a California
26 Corporation; GEORGE JARED, D.D.S.,
   an individual; GEORGE JARED, D.D.S.,
27 INC., a California corporation; JAMES
28 HEBETS, an individual; THE HEBETS

FOURTH AMENDED COMPLAINT

1 | COMPANY, a Missouri Corporation;
2 | KBH HEALTHCARE CONSULTING, LLC and DOES 1-250, inclusive.
3 |
4 | Defendants.

FOURTH AMENDED COMPLAINT

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION/SUMMARY ........................................................ 8

II.     JURISDICTION AND VENUE.................................................... 9

III.    CAST OF CHARACTERS ........................................................... 10

        A.      BORREGO COMMUNITY HEALTH FOUNDATION .................... 10

        B.      FORMER BORREGO INSIDERS ....................................... 11

        C.      PREMIER, PRIESTS AND OTHER PRIEST-RELATED
                ENTITIES ................................................................... 13

        D.      DEFENDANT DENTISTS.................................................. 14

        E.      JAMES HEBETS AND HIS COMPANIES ........................... 18

        F.      OTHERS ..................................................................... 19

        G.      ALTER EGO AND DOE ALLEGATIONS........................... 20

IV.     RULE 9(b) REQUIREMENTS ..................................................... 22

V.      THE SCHEMES THAT DAMAGED BORREGO HEALTH ..................... 23

        A.      The Scheme to Form and Sell Entities Formed by Borrego
                Insiders to Borrego Health (the "Borrego MSO/IPA Scheme").......... 23

        B.      The Scheme to Contract with Premier Allowing Premier to Get
                Paid Tens of Millions of Dollars to Purportedly Provide
                "Management Services" It Was Not Capable of Providing (the
                "Premier Scheme") ......................................................... 25

                i.      The Contract Dental Program Is Formed ................... 25

                ii.     Hebets Proposes an MSO Idea, Which Is Rejected by
                        Borrego Health.................................................... 26

                iii.    The Borrego Health Insiders Enter into a Management
                        Services Agreement on Borrego Health's Behalf Anyway........ 29

                iv.     The Damages Suffered by Borrego Health Due to the
                        Premier Scheme .................................................. 40

        C.      Certain Contract Dentists Submitted Fraudulent Bills with the
                Knowledge and Support of Premier and the Borrego Insiders (the
                "Fraudulent Dental Billing Scheme")..................................... 43

                i.      Husam E. Aldairi, D.D.S. ..................................... 48

                ii.     Ayed Hawatmeh, D.D.S. ....................................... 54

FOURTH AMENDED COMPLAINT

|  |  | iii. | Alborz Mehdizadeh, D.D.S. ................................................... 58 |
|  |  | iv. | Magaly M. Velasquez, D.D.S. ................................................ 61 |
|  |  | v. | Aram Arakelyan, D.D.S .......................................................... 65 |
|  |  | vi. | Michael Hoang, D.M.D. .......................................................... 67 |
|  |  | vii. | Waleed Stephan, D.D.S. .......................................................... 69 |
|  |  | viii. | Santiago Rojo, D.D.S................................................................ 70 |
|  |  | ix. | Mohammed Al Tekreeti, D.D.S............................................... 72 |
|  |  | x. | Jilbert Bakramian, D.D.S......................................................... 73 |
|  |  | xi. | Marcelo Toledo, D.D.S ............................................................ 76 |
|  |  | xii. | Marlene Thompson, D.D.S........................................................ 79 |
|  |  | xiii. | Douglas Ness, D.D.S. ............................................................... 82 |
|  |  | xiv. | George Jared, D.D.S. ................................................................ 84 |

D. Since Premier Was Unable and Unwilling To, a Program Integrity Process is Implemented by Borrego Health........................... 86

E. Premier and the Borrego Insiders Coverup Fraudulent Billing (the "Coverup Scheme") .................................................................... 90

F. The Borrego Insiders Entered into Leases with Daryl Priest-Owed Entities for Above Market Rents and Terms Many Times the Market Amount (the "Priest Leases Scheme") .............................. 98

G. The Borrego Insiders Paid Themselves Above-Market Compensation and Granted Themselves Improper Benefits and Covered It Up (the "Compensation/Benefits Scheme") .................... 107

H. The Borrego Insiders Used Nepotism and Cronyism to Funnel Money to their Friends and Family (the "Nepotism and Cronyism Scheme") ................................................................................ 110

I. The Borrego Insiders Tried To Purchase a Country Club to Personally Benefit Themselves (the "De Anza Country Club Scheme") ............................................................................................... 112

J. The Borrego Insiders Attempted to Pay Bruce Hebets a $5 Million Payout (the "Payout Scheme")................................................ 115

K. The Borrego Insiders Funneled Money to Bruce Hebets' Brother, Jim Hebets, and Jim Hebets' Firm (the "Jim Hebets Scheme").......... 118

L. Borrego Insider Chuck Kimball Leased a Barn to Borrego Health (the "Julian Barn Scheme")............................................................... 121

M.   Borrego Insider Dennis Nourse Sold Property to Borrego Health to be Developed by Priest (the "Property Development Scheme")....124

N.   Bruce Hebets and Karen Hebets Create a Sham "Consulting" Company and Contract with Premier To Obtain Payments From Premier for the Various Schemes Which Benefited the Premier Defendants (the "KBH Healthcare Consulting Scheme")...................128

VI.    CLEANING HOUSE ................................................................................ 131

VII.   CHAPTER 11 BANKRUPTCY.................................................................. 134

VIII.  THE RICO ENTERPRISE .......................................................................... 135

A.   Facts Common To RICO Cause of Action .......................................... 138

B.   Racketeering Activity Distinct from Enterprise ................................. 139

C.   RICO Liability ..................................................................................... 140

D.   Issuance of Constructive Trusts .......................................................... 147

FOURTH AMENDED COMPLAINT

7288673.3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# APPENDIX OF EXHIBITS

| EXHIBIT | PAGES | DESCRIPTION |
|---|---|---|
| A | 197-206 | PHCM Management Agreement dated (Effective Date "ED" 3/1/16) |
| B | 207-209 | PHCM Amendment No. 1 to Management Agreement (ED 12/22/16) |
| C | 210-212 | PHCM Amendment No. 2 to Management Agreement (ED 7/1/17) |
| D | 213-229 | Summit Healthcare Management Contract (ED 9/8/17) |
| E | 230-258 | Aldairi Agreement (ED 5/27/16) |
| F | 259-289 | Aldairi DDS, Inc. Agreement (ED 5/29/18) |
| G | 290-317 | Hawatmeh Dental Group Agreement (ED 10/18/17) |
| H | 318-346 | Alborz Mehdizadeh, Inc. Agreement (ED 9/28/16) |
| I | 347-379 | Long Beach Care Dental, Inc. Agreement (ED 12/11/18) |
| J | 380-408 | Velasquez Agreement (ED 11/5/14) |
| K | 409-436 | Arakelyan Agreement (ED 11/17/16) |
| L | 437-467 | Arakelyan DDS. Inc. Agreement (ED 11/29/18) |
| M | 468-530 | Arakelyan DDS. Inc. Agreements (ED 11/29/18) |
| N | 531-561 | Hoang Agreement (ED 11/28/18) |
| O | 562-590 | W.A Stephan Agreement (ED 10/1/16) |
| P | 591-618 | Rojo D.D.S., Inc. Agreement (ED 3/29/17) |
| Q | 619-650 | Toledo D.D.S., Inc. Agreement (ED 6/16/15) |
| R | 651-681 | Thompson, D.D.S., Inc. Agreement (ED 4/18/13) |
| S | 682-710 | Ness Dental Agreement (ED 5/2/16) |
| T | 711-740 | Jared, D.D.S. Agreement (ED 4/19/16) |
| U | 741-807 | Promenade Square LLC Lease |
| V | 808-837 | DRP Holdings, LLC Lease |
| W | 838-870 | Inland Valley Investments, LLC Lease |

1   Plaintiff Borrego Community Health Foundation ("Borrego Health"), hereby

2   complains and alleges as follows:

3   **I.      INTRODUCTION/SUMMARY**

4   1.      Borrego Health is a California nonprofit public benefit corporation

5   operating a Federally Qualified Health Center (also known as a FQHC).  Borrego

6   Health provides primary and related healthcare services to historically underserved

7   areas of San Diego, Riverside, and—until recently—San Bernadino counties.

8   2.      While Borrego Health was attempting to complete its mission of

9   providing healthcare to underserved communities, certain individuals and entities,

10  both inside and outside of Borrego Health, siphoned off money from Borrego Health

11  that should have benefitted to the community it serves.  The schemes of those

12  various individuals and entities are set forth in detail below.  The schemes include

13  selling useless assets to Borrego Health at inflated prices, entering into one-sided

14  agreements with Borrego Health to its detriment, committing and/or covering up

15  healthcare fraud though improper billing of dental services, entering into leases with

16  Borrego Health that were many times fair market rates and terms, paying themselves

17  above-market salaries and benefits, hiring friends and family members to work for

18  Borrego Health and paying them above-market salaries, and attempting to use

19  Borrego Health to purchase a country club.  Those same individuals and entities

20  worked tirelessly to cover up their misdeeds, and, until recently, were successful is

21  doing so.

22  3.      The insiders were motivated by various forms of personal benefit.

23  First, they used the excessive revenue generated by the schemes to set over-market

24  salaries for themselves and create other forms of compensation, such as automotive

25  benefits, retirement benefits, and free healthcare goods and services from Borrego

26  Health.  Second, they used the excessive services and attendant revenue from Medi-

27  Cal to justify employing friends and family members at Borrego Health, also at

28  inflated salaries.  Third, on information and belief, the insiders allowed the outsiders

7288673.3

to participate in the fleecing of Borrego Health in exchange for kickbacks and/or other benefits to the insiders.  For instance, Bruce Hebets and Karen Hebets set up a sham "consulting" company which entered into a sham agreement which paid them $2 million of funds that had been previously stolen from Borrego Health.  Each and every one of the Defendants received one or more improper benefits and/or payments as a result of the schemes described below, and was incentivized to act in furtherance of those schemes, actively seek to conceal those schemes and/or breached their duties to prevent or stop those schemes.

4.     The false and fraudulent billing of dental services has resulted in Borrego Health's suspension by California's Medicaid Program, Medi-Cal.  The state and federal government are also investigating Borrego Health for tax issues, its non-profit status, among many other things, due to these schemes.

5.     Fortunately, Borrego Health, through a newly constituted Board of Trustees, has spent considerable time and effort trying to discover and unravel the prior bad conduct to rehabilitate Borrego Health and ensure Borrego Health's viability and compliance going forward.

6.     However, Borrego Health has been severely damaged and this action seeks to illuminate the various schemes, to seek financial compensation to recoup funds wrongly siphoned away from Borrego Health, and to hold the wrongdoers responsible for their actions.

## II.     JURISDICTION AND VENUE

7.     Venue is proper in this District pursuant to 31 USC section 3732(a) and 28 USC section 1391(c).  During the relevant time period, a substantial portion of the events complained of that give rise to Borrego Health's claims occurred in this District.

/ / /

/ / /

/ / /

7288673.3

### III.    CAST OF CHARACTERS

####    A.    BORREGO COMMUNITY HEALTH FOUNDATION

8.    Plaintiff Borrego Community Health Foundation ("Borrego Health"), is a nonprofit 501(c)(3) Federally Qualified Health Center ("FQHC").  Borrego Health provides high quality, comprehensive, compassionate primary health care to the people in their communities, regardless of their ability to pay, by partnering with licensed medical professionals across Southern California.  Borrego Health operates 33 clinics, primarily in underserved desert and inland communities throughout San Diego, Riverside, and—until recently—San Bernardino counties.  Borrego Health provides essential services in Family Practice, Pediatrics, OB/GYN, Internal Medicine, Podiatry, Dermatology, Cardiology, HIV/Hepatitis C and Covid-19 related testing and vaccinations to over 200,000 patients, most of whom cannot obtain affordable comprehensive primary care from other sources.  During the recent pandemic, Borrego Health tested tens of thousands of Californians for Covid-19 infections, and vaccinated tens of thousands of people against Covid-19. Borrego Health's continued operation is in the public interest and, despite the harm it has suffered and the way it has been manipulated by its former executives and trustees, it delivers quality health care to people who need it.

9.    Much of the services Borrego Health provides to the community is funded by grants, including without limitation grants from the U.S. Health Resources and Services Administration ("HRSA").  Borrego Health received its first HRSA grant in 2003.

10.    Following the initial HRSA grant in 2003, Borrego Health experienced massive growth, expanding its services to what they are today, inclusive of dental, mental health and chiropractic services.  The majority of these services are provided through Borrego Health's internal programs, including brick-and-mortar medical and dental clinics and mobile units.  Borrego Health also operates a contract medical

7288673.3

1  program in which it contracts with private practice providers to serve members of

2  the community.

3      11.    As a non-profit public benefit corporation, Borrego Health does not

4  have individual shareholders, but rather is operated by a Board of Trustees, all of

5  whom currently serve on a volunteer basis.

6      **B.    FORMER BORREGO INSIDERS**

7      12.    <u>Bruce Hebets</u> was a longtime resident of San Diego County and had

8  been a Sergeant with the San Diego Harbor Police Department prior to becoming

9  CEO of Borrego Health Foundation in or around 2004.  Bruce Hebets served as

10  Borrego Health's CEO beginning in 2004 until his retirement in September 2018.

11  Following a decline in Bruce Hebets' health, Borrego Health's Executive/Finance

12  Committee – with Bruce Hebets' approval – appointed the then Chief Legal Officer,

13  Mikia Wallis, as President of Borrego Health in December 2017, and later as interim

14  CEO following Bruce Hebets' decision to take an extended medical leave, effective

15  June 28, 2018.  Following Bruce Hebets' retirement, effective September 1, 2018,

16  Mikia Wallis was appointed to the position of Borrego Health's CEO.  Bruce Hebets

17  passed away in January 2019.  In light of his death and the settlement of his estate,

18  Bruce Hebets is not named as a defendant in this action though he would have been,

19  if possible.

20      13.    <u>Defendant Karen Hebets</u> is an individual with her place of residence in

21  Borrego Springs, California.  Karen Hebets was the Vice President of Business

22  Services at Borrego Health.  Karen Hebets was also the wife of Bruce Hebets.

23      14.    <u>Defendant KBH Healthcare Consulting, LLC</u> was a California Limited

24  Liability Company with its principal place of business in Borrego Springs,

25  California.  Bruce Hebets and Karen Hebets were its only members, sharing a 50-50

26  interest.

27      15.    <u>Defendant Mikia Wallis, Esq.</u> is an individual with her place of

28  residence in Julian, California.  Mikia Wallis is an attorney.  She graduated from the

7288673.3

University of San Diego School of Law, and was admitted to the California Bar on or about June 1, 2007.  Mikia Wallis was Chief Legal Officer of Borrego Health, and was named interim CEO in June 2018 and CEO in September 2018.  Mikia Wallis was also on Borrego Health's Board of Trustees until October 2, 2020.  Mikia Wallis was placed on administrative leave from Borrego Health on October 9, 2020, and terminated by Borrego Health on December 15, 2020.

16.   Defendant Diana Thompson, formerly Diana Troncoso, is an individual with her place of residence in San Diego County, California.  Diana Thompson was Borrego Health's Chief Financial Officer from March 2013, and was terminated as of March 2021.  One of Diana Thompson's children is married to one of Bruce Hebets' and Karen Hebets' child, and she shares one or more grandchildren with Bruce Hebets and Karen Hebets.

17.   Defendant Harry Ilsley is an individual with his place of residence in Sheridan, Wyoming.  Harry Ilsley also owns or owned a house in Borrego Springs (near the De Anza Country Club golf course).  Harry Ilsley was a member of Borrego Health's Board of Trustees and was the Chair of the Board until 2017.  He was also on the Board's Executive/Finance Committee.

18.   Defendant Dennis Nourse in an individual with his place of residence in Cedarburg, Wisconsin.  Dennis Nourse was a former administrator of Borrego Health, and later hired Bruce Hebets to be CEO.  Dennis Nourse was a member of Borrego Health's Board of Trustees from mid-2012 until his resignation, and was a member of the Board's Executive/Finance Committee.

19.   Defendant Mike Hickok in an individual with his place of residence in Borrego Springs, California (near the De Anza Country Club golf course).  Mike Hickok was a member of Borrego Health's Board of Trustees, and was a member of the Board's Executive/Finance Committee.

20.   Defendant Chuck Kimball an individual with his place of residence in Julian, California.  Chuck Kimball was a member of Borrego Health's Board of

Trustees starting in approximately 2011, and was the Chair of the Board from 2017 to mid-2019 and Secretary from 2019 until his removal.  Chuck Kimball was also a member of the Board's Executive/Finance Committee.

21.     Karen Hebets, Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball are collectively referred to as "Borrego Insiders."  A subset of Borrego Insiders who served as members of the Borrego Health Board of Trustee are Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball, collectively referred to herein as "Board Insiders."

22.     While some may have described themselves as volunteers, each of the Board Insiders was compensated for his service on the Board, including with free medical care and other benefits.  Moreover, the Board Insiders are being sued not only for their negligent acts and omissions, but their intentional misconduct, including fraud, and their breaches of their fiduciary duties to Borrego Health.

## C.     PREMIER, PRIESTS AND OTHER PRIEST-RELATED ENTITIES

23.     Defendant Premier Healthcare Management, Inc. ("Premier") is a California corporation with its principal place of business in El Cajon, California.

24.     Defendant Summit Healthcare Management, Inc. ("Summit") was a California corporation with its principal place of business in El Cajon, California. Summit merged with Premier in 2019.

25.     Defendant Daryl Priest in an individual with his place of residence in El Cajon, California.  Daryl Priest is the owner of Premier.  Prior to starting Premier Daryl Priest had no material healthcare experience.

26.     Defendant Nicholas ("Nick") Priest, Esq. in an individual with his place of residence in San Diego, California.  Nick Priest was the Chief Executive Officer of Premier.  Nick Priest is the son of Daryl Priest.  Nick Priest is also an attorney.  He graduated from California Western School of Law and was admitted to

7288673.3

1  the California Bar on or about June 21, 2016.  Prior to working at Premier Nick

2  Priest had no material healthcare experience.

3       27.    Defendant Travis Lyon in an individual with his place of residence in

4  Alpine, California.  Travis Lyon was the President and Chief Operating Officer of

5  Premier.  He is also currently the President of Real Estate Operations at Priest

6  Development Corporation.

7       28.    Premier, Summit, Daryl Priest, Nick Priest, Travis Lyon, Promenade

8  (see ¶338), DRP (see ¶339) and Inland Valley (see ¶340) are collectively referred to

9  herein as the "Premier Defendants."

10      **D.**    **DEFENDANT DENTISTS**

11       29.    Defendant Husam E. Aldairi, D.D.S. is a licensed dentist in California

12  with whom Borrego Health partnered through its contract dental program. Dr.

13  Aldairi, both individually and through his company Defendant Aldairi DDS, Inc.,

14  operated several private dental practices, including 40/30 Dental Inc., located at

15  6175 El Cajon Blvd., San Diego, CA 92215 and 40/30 Dental 2, located at 1166

16  East Main Street, El Cajon, CA 92021.  Husam Aldairi resides in San Diego County.

17  Aldairi DDS, Inc., is a California corporation with its principal place of business in

18  El Cajon, California.

19       30.    Defendant Ayed Hawatmeh, D.D.S. is a licensed dentist in California

20  with whom Borrego Health partnered through its contract dental program. Dr.

21  Hawatmeh, both individually and through his company Defendant Hawatmeh

22  Dental Group, P.C., operated several private dental practices, including Bravo

23  Dental Group of Corona located at 1185 Magnolia Avenue #K & #L, Corona, CA

24  92879, and White Smile Dental, located at 3495 East Concours Street, Suite A,

25  Corona, CA 91764.  Ayed Hawatmeh resides in San Bernardino County.  Hawatmeh

26  Dental Group, P.C. is a California corporation, with its principal place of business in

27  Ontario, California.

28

1      31.    Defendant Alborz Mehdizadeh, D.D.S. is a licensed dentist in

2  California with whom Borrego Health partnered through its contract dental program.

3  Dr. Mehdizadeh, both individually and through his company Defendant Alborz

4  Mehdizadeh, Inc., operated several private dental practices, located at 15080 7th

5  Street, Suite 7, Victorville, CA 92395 and 286 N. San Jacinto Street, Hemet, CA

6  92543.  Alborz Mehdizadeh resides in San Bernardino County in Victorville,

7  California.  Alborz Mehdizadeh, Inc., is a California corporation with its principal

8  place of business in Long Beach, California.

9      32.    Defendant Jilbert Bakramian, D.D.S. is a licensed dentist in California

10  with whom Borrego Health partnered through its contract dental program.  He

11  operated as a sub-provider (i.e., though an arrangement with Dr. Aram Arakelyan

12  but without a direct agreement with Borrego Health).  Jilbert Bakramian resides in

13  Glendale, California.

14      33.    Defendant Mohammed Al Tekreeti, D.D.S. is a licensed dentist in

15  California with whom Borrego Health partnered through its contract dental program.

16  He operated as a sub-provider under Dr. Husam Aldairi.  Mohammed Al Tekreeti

17  resides in San Diego, California.

18      34.    Defendant Magaly Velasquez, D.D.S. is a licensed dentist in California

19  with whom Borrego Health partnered through its contract dental program.  Dr.

20  Velasquez, both individually and through her company, Defendant Magaly M.

21  Velasquez DDS Professional Dental Corp., operated a private dental practice, called

22  U-First Dental Care, located at 9130 Foothill Blvd., Rancho Cucamonga, CA 91730.

23  Magaly Velasquez resides in Rancho Cucamonga, California.  Magaly M.

24  Velasquez DDS Professional Dental is a California corporation with its principal

25  place of business in Rancho Cucamonga, California.

26      35.    Defendant Aram Arakelyan, D.D.S. is a licensed dentist in California

27  with whom Borrego Health partnered through its contract dental program.  Dr.

28  Arakelyan, both individually and through his company, Defendant New Millennium

Dental Group Of Aram Arakelyan, Inc., operated several private dental practices, including practices located at 19523 E. Cypress Street, Covina, CA 91724 and 10917 Paramount Blvd., Downey, CA 90241.  Aram Arakelyan resides in Rancho Cucamonga, California.  New Millennium Dental Group Of Aram Arakelyan, Inc. is a California corporation with its principal place of business in Rancho Cucamonga, California.

36.   Defendant Michael Hoang, D.M.D. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program.  He operated a private dental practice, located at 13672 Hawthorne Blvd., Hawthorne, CA 90250.  Michael Hoang resides in Long Beach, California.

37.   Defendant Waleed Stephan, D.D.S. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program.  Dr. Stephan, both individually and through his company, Defendant W.A. Stephan, a Dental Corporation, operated a private dental practice, called Stephan Family Dental, located at 860 Jamacha Road, Suite 201, El Cajon, CA 92019.  Waleed Stephan resides in El Cajon, California.  W.A. Stephan, a Dental Corporation is a California corporation with its principal place of business in San Diego, California.

38.   Defendant Santiago Rojo, D.D.S. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program.  Dr. Rojo, both individually and through his company Defendant Santiago A. Rojo, D.D.S., Inc., operated a private dental practice, called Family Dentistry Inc., located at 22435 Alessandro Blvd., Suite 106, Moreno Valley, CA 92553.  Santiago Rojo resides in Orlando, Florida.  Santiago A. Rojo, D.D.S., Inc., is a California corporation with its principal place of business in Moreno Valley, California.

39.   Defendant Marcelo Toledo, D.D.S. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program.  Dr. Toledo, both individually and through his company Defendant Marcelo Toledo D.D.S., Inc., operated private dental practices located at 1701 Palm Canyon Drive,

1  Palm Springs, CA 92262 and 326 N. Riverside Avenue, Rialto, CA 92376.  Marcelo

2  Toledo resides in Grand Terrace, California.  Marcelo Toledo, D.D.S., Inc., is a

3  California corporation with its principal place of business in Rialto, California.

4        40.    Defendant Marlene Thompson, D.D.S. is a licensed dentist in

5  California with whom Borrego Health partnered through its contract dental program.

6  Dr. Thompson, both individually and through her company Defendant Marlene M.

7  Thompson, D.D.S., Inc., operated a private dental practice located at 988 El Norte

8  Parkway, Escondido, CA 92026.  Marlene Thompson resides in Temecula,

9  California.  Marlene Thompson, D.D.S., Inc., is a California corporation with its

10 principal place of business in Escondido, California.

11       41.    Defendant Douglas Ness, D.D.S. is a licensed dentist in California with

12 whom Borrego Health partnered through its contract dental program.  Dr. Ness, both

13 individually and through his company Defendant Ness Dental Corporation, operated

14 a private dental practice, Crown Dental Group, located at 2405 Transportation

15 Avenue, National City, CA 91950.  Douglas Ness resides in Bonita, California.

16 Ness Dental Corporation is a California corporation with its principal place of

17 business in National City, California.

18       42.    Defendant George Jared, D.D.S. is a licensed dentist in California with

19 whom Borrego Health partnered through its contract dental program.  Dr. Jared,

20 both individually and through his company Defendant George C. Jared, D.D.S., Inc.,

21 operated a private dental practice, East County Family Dental, located at 13465

22 Camino Canada Road, Suite 110-A, El Cajon, CA 92021.  George Jared resides in

23 San Diego, California.  George Jared, D.D.S., Inc., is a California corporation with

24 its principal place of business in El Cajon, California.

25       43.    Other dentists formerly contracted with Borrego Health may have also

26 engaged in actions and omissions that constitute a breach or breaches of their

27 contracts with Borrego Health and/or make material misrepresentations to Borrego

28 Health.  However, the names and identities of those dentists are currently unknown

1  to Borrego Health, and are therefore sued here as Does 1-100.  They are unknown,

2  in part, because Borrego Health does not currently have access to their medical

3  records, patient charts, scheduling information, and other business records to

4  evaluate their care and documentation of services that Borrego Health billed as a

5  result of invoices from the dentists.  Borrego Health intends to seek discovery of

6  such information to evaluate other partner dentists and their sub-providers.

7       44.     Husam E. Aldairi, D.D.S., Aldairi DDS, Inc., Ayed Hawatmeh, D.D.S.,

8  Hawatmeh Dental Group, P.C., Alborz Mehdizadeh, D.D.S., Alborz Mehdizadeh,

9  Inc., Jilbert Bakramian, D.D.S., Mohammed Al Tekreeti, D.D.S., Magaly

10  Velasquez, D.D.S., Magaly M. Velasquez DDS, Professional Dental Corp., Aram

11  Arakelyan, D.D.S., New Millennium Dental Group of Aram Arakelyan, Inc.,

12  Michael Hoang, DMD, Waleed Stephan, D.D.S., W.A. Stephan, a Dental

13  Corporation, Santiago Rojo, D.D.S., Santiago A. Rojo, D.D.S., Inc., Marcelo

14  Toledo, D.D.S., Marcelo Toledo, D.D.S., Inc., Marlene M. Thompson, D.D.S.,

15  Marlene Thompson, D.D.S., Inc., Douglas Ness, D.D.S., Ness Dental Corporation,

16  George Jared, D.D.S. and George C. Jared, D.D.S., Inc. and Does 1-100 are

17  collectively referred to herein as the "Dentist Defendants."

18       **E.     JAMES HEBETS AND HIS COMPANIES**

19       45.     <u>Defendant James "Jim" Hebets</u> in an individual with his place of

20  residence in Scottsdale, Arizona.  Jim Hebets is Bruce Hebets' brother.

21       46.     <u>Defendant The Hebets Company</u> is a Missouri Corporation with its

22  principal place of business in Phoenix, Arizona.  Jim Hebets is President and

23  Founder of The Hebets Company, and has or had an ownership interest in The

24  Hebets Company.  The Hebets Company provides accounting and consulting

25  services and hold themselves out as experts in executive compensation to healthcare

26  providers, including other FQHCs, in California and San Diego County.  The Hebets

27  Company is a subsidiary of NFP Corp.  NFP is a network of independent financial

28  advisors that includes over 175 firms in 41 states and Puerto Rico, specializing in

1  life insurance and wealth transfer, corporate and executive benefits, and provides

2  services across the state of California and San Diego County.

3       **F.**   **OTHERS**

4       47.   <u>Julian Medical Foundation</u> is a California nonprofit corporation, with

5  its principal place of business in Julian, California.

6       48.   <u>Timothy Martinez, D.D.S.</u> graduated from the Harvard School of

7  Dental Medicine in 1986 with a concentration in Health Care Administration.

8  Throughout his 30 year career, he has had extensive experience in FQHC dental

9  programs, state dental Medicaid administration, private practice, and academic

10  positions at the Associate Dean level.  Prior to joining Borrego Health, Dr. Martinez

11  served as the Associate Dean for Community Partnerships and Access to Care for

12  two dental schools, Western University of Health Sciences and the University of

13  New England, and before that, he served as the Massachusetts Medicaid Dental

14  Director as well as the Dental Director for three large FQHCs in the greater Boston

15  area, including the first FQHC in the nation Geiger-Gibson Community Health

16  Center, Boston Health Care for the Homeless, and the South End Community Health

17  Center.  Timothy Martinez spearheaded the Program Integrity unit for Borrego

18  Health, designed to detect and address potential false or fraudulent billing.

19       49.   <u>Maura Tuso, D.D.S.</u> was a licensed dentist in California.  She lost her

20  license and was suspended by Medi-Cal.  Despite this, she provided services for

21  various dentists that were contracted with Borrego Health.  She has since provided

22  documents, evidence, and statements that she observed and engaged in fraudulent

23  practices at the direction of Defendants Husam Aldairi, Mohammed Al Tekreeti,

24  Marlene Thompson, Douglas Ness, and George Jared.

25       50.   <u>Dr. Alfredo Ratniewski</u> is the former Chief Medical Officer of Borrego

26  Health.

27  / / /

28  / / /

### G.   ALTER EGO AND DOE ALLEGATIONS

51.   Borrego Health is informed and believes that at all relevant times each of the Premier Defendants was the agent and employee of each of the remaining Premier Defendants, and in doing the things hereinafter alleged was acting within the course and scope of such agency and employment.  The Premier Defendants operated in such a way as to make their individual identities indistinguishable, and therefore are mere alter-egos of one another.  The acts and omissions of the Premier Defendants were done in concert with one another in furtherance of their common design and agreement to accomplish a particular result, namely extracting money from Borrego Health.  Moreover, the Premier Defendants aided and abetted each other in accomplishing the acts and omissions alleged herein.  (*See* Restatement (SECOND) of Torts §876 (1979)).  The Premier Defendants, and each of them, fail to recognize the uniqueness and independence of each other.  At all times relevant hereto, there was a such a unity of interest and ownership between the Premier Defendants such that the individual distinctions between them had ceased and that the facts as alleged herein are such that an adherence to the fiction of the separate existence of the Premier Defendants would, under the particular circumstances alleged herein, sanction a fraud and/or promote injustice.

52.   Borrego Health is informed and believes that at all relevant times Jim Hebets and the Hebets Company were the agent and employee of each other, and in doing the things hereinafter alleged were acting within the course and scope of such agency and employment.  Jim Hebets and The Hebets Company operated in such a way as to make their individual identities indistinguishable, and therefore are mere alter-egos of one another.  The acts and omissions of the Jim Hebets and The Hebets Company were done in concert with one another in furtherance of their common design and agreement to accomplish a particular result, namely extracting money from Borrego Health.  Moreover, Jim Hebets and The Hebets Company aided and abetted each other in accomplishing the acts and omissions alleged herein. (*See*

7288673.3

Restatement (SECOND) of Torts §876 (1979)).  Jim Hebets and The Hebets Company, and each of them, fail to recognize the uniqueness and independence of each other.  At all times relevant hereto, there was a such a unity of interest and ownership between Jim Hebets and The Hebets Company such that the individual distinctions between them had ceased and that the facts as alleged herein are such that an adherence to the fiction of their separate existence would, under the particular circumstances alleged herein, sanction a fraud and/or promote injustice.

53.     Borrego Health is informed and believes that at all relevant times each of the individual defendant dentists and their affiliated defendant professional corporation(s) were the agent and employee of each other, and in doing the things hereinafter alleged were acting within the course and scope of such agency and employment.  The individual dentists and their affiliated professional corporation(s) operated in such a way as to make their individual identities indistinguishable, and therefore are mere alter-egos of one another.  The acts and omissions of the individual dentists and their affiliated professional corporation(s) were done in concert with one another in furtherance of their common design and agreement to accomplish a particular result, namely extracting money from Borrego Health. Moreover, the individual dentists and their affiliated professional corporation(s) aided and abetted each other in accomplishing the acts and omissions alleged herein. (*See* Restatement (SECOND) of Torts §876 (1979)).  The individual dentists and their affiliated professional corporation(s), and each of them, fail to recognize the uniqueness and independence of each other.  At all times relevant hereto, there was a such a unity of interest and ownership between the individual dentists and their affiliated professional corporation(s) such that the individual distinctions between them had ceased and that the facts as alleged herein are such that an adherence to the fiction of the separate existence of the individual dentists and their affiliated professional corporation(s) would, under the particular circumstances alleged herein, sanction a fraud and/or promote injustice.  However, Borrego Health pleads in the

1  alternative that the individual dentists and their affiliated professional corporation(s)

2  may not have been agents of one another for purposes of the interference causes of

3  action set forth below.

4       54.    Borrego Health is ignorant of the true names and capacities of those

5  defendants sued herein as DOES 101 through 250, and for that reason has sued such

6  defendants by fictitious names.  Borrego Health will seek leave of the Court to

7  amend this Complaint to identify said defendants when their identities are

8  ascertained.

9  **IV.**    **<u>RULE 9(b) REQUIREMENTS</u>**

10       55.    Several of Borrego Health's claims are subject to Federal Rules of Civil

11  Procedure Rule 9(b). Federal Rules of Civil Procedure Rule 9(b) states, "In alleging

12  fraud or mistake, a party must state with particularity the circumstances constituting

13  fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind

14  may be alleged generally." Fed. R. Civ. P. 9(b). Notably, "[u]nder Ninth Circuit law,

15  a pleading is sufficient for purposes of Rule 9(b) if it identifies the circumstances

16  constituting fraud so that the defendant can prepare an adequate answer. While

17  conclusory allegations will not suffice, statements which provide the time, place and

18  nature of the alleged fraudulent activities will." *Zatkin v. Primuth*, 551 F.Supp. 39,

19  42 (S.D. Cal. 1982) (*citing Bosse v. Crowell, Collier and MacMillan*, 565 F.2d 602,

20  611 (9th Cir.1977); *Walling v. Beverly Enterprises*, 476 F.2d 393, 397 (9th

21  Cir.1973)). For claims subject to Rule 9(b), the complaint must include "the who,

22  what, when, where, and the how of the misconduct charged." *Aton Center, Inc. v.

23  Northwest Administrators, Inc.*, No. 21CV1843-L-MSB, 2022 WL 4229307 *4

24  (Sept. 13, 2022 S.D. Cal.) (*quoting Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097,

25  1106 (9th Cir. 2003)). Importantly, however, a plaintiff need not plead every

26  instance of fraud in order to "plead with particularity." Any assertion that only

27  offering a sampling of alleged misconduct does not comply with Rule 9(b) is

28  "unsupported by law." *Satmodo, LLC v. Whenever Communications*, No. 17-CV-

7288673.3

1   0192, 2017 WL 637132 *2 (Dec. 8, 2017 S.D.C.A.). "The Ninth Circuit has stated

2   Rule 9(b)'s particularity requirement can be met through use of sampling."

3   *Satmodo, LLC v. Whenever Communications*, No. 17-CV-0192, 2017 WL 637132

4   *2 (Dec. 8, 2017 S.D.C.A.) (*citing Edeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993,

5   998-99 (9th Cir. 2010). "Although it is not mandatory that [Plaintiff] provide

6   representative examples, such examples would go a long way in providing the

7   necessary particularity under Rule 9(b)." *Satmodo, LLC v. Whenever*

8   *Communications*, No. 17-CV-0192, 2017 WL 637132 *2 (Dec. 8, 2017 S.D.C.A.)

9   (*quoting Frazier ex rel. U.S. v. Iasis Healthcare Corp.*, 392 Fed.Appx. 535, 537 (9th

10  Cir. 2010)).  The below allegations and representative examples provide the "who,

11  what, when, where, and how" of the alleged misconduct to put all Defendants on

12  proper notice and is therefore sufficiently pled under Rule 9(b).

13  **V.     THE SCHEMES THAT DAMAGED BORREGO HEALTH**

14      **A.      The Scheme to Form and Sell Entities Formed by Borrego Insiders**

15          **to Borrego Health (the "Borrego MSO/IPA Scheme")**

16      56.     One of the earliest discovered schemes concocted by the Borrego

17  Insiders to the detriment of Borrego Health is the formation of Borrego Management

18  Services Organization, LLC ("Borrego MSO") and Borrego Independent Physicians

19  Association, A Professional Medical Corporation ("Borrego IPA"), and the sale of

20  those entities to Borrego Health.

21      57.     While CEO of Borrego Health, Bruce Hebets devised a scheme to have

22  Borrego Health incur unnecessary costs by providing physician services and

23  administrative services to Borrego Health through companies that he and other

24  Borrego Insiders would create and control.  This allowed the Borrego Insiders to

25  improperly profit from those companies at the expense of Borrego Health.

26      58.     Both Borrego MSO and Borrego IPA were formed on or about July 19,

27  2010 through the assistance of Mikia Wallis, in-house counsel at Borrego Health.

28  Mikia Wallis provided this service without charge to Borrego MSO or Borrego IPA,

7288673.3

1   using Borrego Health resources to benefit some of the Borrego Insiders. Borrego

2   MSO and Borrego IPA were potential referral sources for Medi-Cal beneficiaries.

3   Mikia Wallis was listed as the agent for service of process for both entities.

4        59.    As Bruce Hebets and other Borrego Insiders were not medical

5   professionals, their ownership in Borrego IPA, which was a professional medical

6   corporation, was constrained.  Thus, other friends, cronies, and referral sources

7   became investors, including Dr. Alfredo Ratniewski and his daughter.  Dr. Alfredo

8   Ratniewski was motivated to cooperate, in part, by the Borrego Insiders' decision to

9   overcompensate him as Borrego Health's Chief Medical Officer and to

10  overcompensate his family members who also worked at Borrego Health.

11       60.    Borrego MSO, on the other hand, is a lay entity, which was supposed to

12  manage the Borrego IPA practice.  Bruce Hebets was sophisticated enough to try to

13  avoid scrutiny of the obvious conflict problems by keeping his name away from

14  Borrego MSO.  Instead, Karen Hebets (Bruce Hebets' wife) was a shareholder, and

15  was named as Borrego MSO's Chief Executive Officer.  Karen Hebets had no

16  experience managing an IPA and was not qualified to do so.

17       61.    Through Borrego MSO's purported "management" services, Borrego

18  MSO could charge Borrego IPA for unnecessary services, and funnel the funds to

19  Karen Hebets and other Borrego Insiders.

20       62.    Borrego MSO and Borrego IPA were then contracted with Borrego

21  Health to provide physician and administrative services to Borrego Health.

22  However, these services were already being provided without the unnecessary

23  expense of contracting with outside companies.  Tellingly, Borrego MSO and

24  Borrego IPA did not do business with any other healthcare providers, only Borrego

25  Health.

26       63.    Eventually, a plan was developed by Bruce Hebets and other Borrego

27  Insiders for Borrego Health to buy Borrego MSO and Borrego IPA.  The entities

28  had no valuable assets to sell to Borrego Health.  The transaction was a sham

transaction meant to obscure the self-dealing of Bruce Hebets and other Borrego Insiders.  Mikia Wallis facilitated the transaction, which was culminated with a November 1, 2012 purchase agreement whereby Borrego Health paid $2,000,000 to acquire Borrego MSO and Borrego IPA.

64.     On information and belief, the plan was to take some of that money and pay it to the investors of Borrego IPA.  Thus, all of the investors at Borrego MSO and Borrego IPA would profit at the expense of Borrego Health.

65.     On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.

**B.     The Scheme to Contract with Premier Allowing Premier to Get Paid Tens of Millions of Dollars to Purportedly Provide "Management Services" It Was Not Capable of Providing (the "Premier Scheme")**

**i.      The Contract Dental Program Is Formed**

66.     Borrego Health began a contract dental program in 2014.  In general, the Medi-Cal program recognizes the value of a FQHC expanding the availability of its services, so it allows FQHCs to enter into contracts with private practice healthcare professionals to provide services to the FQHC's members.

67.     In general, "contract dental" describes the arrangement where Borrego Health expanded its service area by entering into contracts with individual dentists and/or their practices.  Under those contracts, the contracted dentists agreed to provide certain dental services to eligible patients of Borrego Health.  Those services would then be billed to Medi-Cal by Borrego Health.  Borrego Health, in turn, pays the dentist a fee for the dental services rendered.

68.     Importantly, the fees that Borrego Health paid to the dentists were far greater than what the dentists would have been paid if they had billed Medi-Cal for the services directly.  Therefore, the dentists were motivated to contract with

Borrego Health.  As a result, some dentists were taking their existing patients and converting them to "Borrego Health patients."

69.     The contract dental program expanded so quickly because Medi-Cal paid Borrego Health based a fixed rate for each service that Borrego Health (or its contracted dentists) provided.  The billing is known as "encounter" billing, and each "encounter" or visit Borrego Health (or its contracted dentists) has with a patient is reimbursed the fixed fee amount based on Borrego Health's historic costs.

70.     If the dentists were not contracted with Borrego Health and provided dental services to a Medi-Cal beneficiary, then the dentist would be paid under the Medi-Cal fee schedule, a per service billing method, that is described by many dentists as very low.

71.     The fixed fee, encounter-based payment was high relative to the costs of providing dental services.  This allowed Borrego Health to pay the contracted dentists more than what Medi-Cal would have paid to the dentist directly under the Medi-Cal fee schedule, and still retain a handsome profit.

72.     In each instance Borrego Health was billing Medi-Cal for the services that the contract dentist billed Borrego Health.

73.     Borrego initially managed the contract dental program on its own.

74.     By fall 2015, Borrego Health's contract dental program comprised approximately 20 to 25 percent of Borrego Health's total revenue.

### ii.     Hebets Proposes an MSO Idea, Which Is Rejected by Borrego Health

75.     Sometime in 2015, Bruce Hebets, possibly due to his experience with Borrego MSO and Borrego IPA, identified a significant business opportunity for an outside organization to provide management services for dental programs in FQHCs.  Specifically, he proposed the idea of Borrego Health contracting with a MSO to provide management services for its contract dental program.

76.     Bruce Hebets originally proposed that he would own 100 percent of the MSO, then sell 90-95 percent of it to Daryl Priest and/or others.  This would have resulted in a large, direct payment by Daryl Priest and/or others to Bruce Hebets, and then ongoing payments by Borrego Health to Bruce Hebets through the MSO due to Bruce Hebets' retained ownership of 5-10 percent.

77.     During an Executive/Finance Committee meeting on August 27, 2015, Bruce Hebets discussed his proposal to form an MSO that would contract with Borrego Health to provide management services for the contract dental program. Borrego Insiders Harry Ilsley, Dennis Nourse, and Mike Hickok were present at this meeting, along with Mikia Wallis and Diana Thompson.  These Borrego Insiders supported the proposal.  However, Mikia Wallis identified the risk of Bruce Hebets staring a competing company.

78.     On September 22, 2015, in an email to Mikia Wallis, outside counsel for Borrego Health warned that any potential MSO arrangement involving Bruce Hebets implicated conflict-of-interest laws, would have to be an arms-length transaction and that any compensation paid to Bruce Hebets under the deal must be at the fair market value.  As detailed below, this advice was later ignored.

79.     The discussion of the MSO proposal carried over into the next meeting of the Executive/Finance Committee meeting that took place on September 24, 2015.  The minutes from the meeting clearly document the attempt by Bruce Hebets, Mikia Wallis and Diana Thompson to convince the Executive/Finance Committee that Bruce Hebets' proposal was a good idea despite the conflict of interest issue being identified.

80.     For example, the Executive/Finance Committee members were told how no other company could provide this type of novel management services to FQHCs specific to their contract dental program needs.  The Executive/Finance Committee also discussed how Borrego Health could be a part-owner of the MSO. Ultimately, the discussion was tabled for presentation to the entire Board at its

1   October meeting, pending an analysis by outside counsel regarding Bruce Hebets'

2   clear conflict of interest issue.

3       81.    On October 21, 2015, Bruce Hebets arranged a phone call with Diana

4   Thompson, Mikia Wallis, and Dennis Nourse. Upon information and belief, the

5   nature of this call was to further discuss the proposed MSO.

6       82.    Ultimately, on or about October 29, 2015, the full Borrego Health

7   Board rejected Bruce Hebets' proposal to enter into an arrangement with a MSO in

8   which he held ownership interest as a result of the inherent conflict of interest.[1]

9   Some Board members who were present at that meeting recall that the Board went

10  as far as rejecting wholesale the idea that Borrego Health use an MSO to manage the

11  contract dental program, regardless of who owned or operated it.  The non-Borrego

12  Insider Board members believed the issue was settled; the MSO would not go

13  forward.  The Borrego Health Board did not approve moving forward with a MSO

14  at all.

15      83.    Outside counsel for Borrego Health attended the next meeting of the

16  full Borrego Health board.  The Board took no action while they were in the

17  meeting.  On or about December 11, 2015, Mikia Wallis told outside counsel that

18  "the Finance Committee" was reviewing the issue and she would get back to the

19  lawyers.  Mikia Wallis told outside counsel that the issue was put off until the next

20  Board meeting on December 17, 2015.  Outside counsel was prepared to attend that

21  meeting.  However, on December 16, 2015, Mikia Wallis called one of the outside

22  lawyers and said something to the effect of "it appears we will not need you after

23  all."

24

25

26  [1] This experience of the full Board rejecting his proposal likely influences

27  subsequent actions by Bruce Hebets and others to avoid taking issues to the Board
    again and instead reach deals among Bruce Hebets and the Borrego Insiders.

28

7288673.3

84.     On December 26, 2015, one of the outside counsel lawyers sent an email to Mikia Wallis asking if she needed anything more on the MSO issue.  Mikia Wallis falsely said that the Borrego Health decided not to move forward with the MSO plan.  In fact, the MSO plan was going forward, albeit in a modified form.

### iii.     The Borrego Health Insiders Enter into a Management Services Agreement on Borrego Health's Behalf Anyway

85.     Notwithstanding the full Board's rejection of the very idea of an MSO and unbeknownst to Borrego Health, on March 1, 2016, Bruce Hebets and Premier executed a Management Services Agreement for Borrego Health's contract dental program ("Dental MSA").  None of the Borrego Insiders ever brought the Dental MSA to Borrego Health's full Board for consideration or approval.  Instead, the Borrego Insiders negotiated the terms of the arrangement with Premier and Mikia Wallis drafted the Dental MSA.  The Borrego Insiders then proceeded to enter into the agreement on Borrego Health's behalf, without any notice whatsoever to the full Board (whom they knew had already rejected the proposal).  A true and correct copy of the Dental MSA is attached hereto as Exhibit A.

86.     The existence of the Dental MSA was kept concealed by the Borrego Insiders.  In 2016, the person in charge of the contract dental program was Cynthia Preciado.  Cynthia Preciado was in charge of developing a team to manually scrub dental claims.  When the program became too large for her staff, Cynthia Preciado began developing a relationship with a vendor that would charge a total of $500,000 to develop and implement a process for scrubbing and submitting contract dental claims.

87.     Cynthia Preciado had this plan in motion and had even traveled to Utah to meet with the vendor to develop the process.  Then, in February 2016, she got a call from Bruce Hebets who told her that, effective immediately, she was no longer in charge of the contract dental program.  She drove to the office to speak with Bruce Hebets and Diana Thompson, but both refused to discuss the matter with her.

7288673.3

1  Only later was Cynthia Preciado informed of the arrangement with Daryl Priest.

2  She was instructed to hand everything over to Daryl Priest's son, Nick Priest, who

3  was running Premier.

4      88.    What followed was essentially a "hostile takeover" of contract dental,

5  spearheaded by Travis Lyon.  Cynthia Preciado was not included in any

6  conversations, but was told to hand over all relevant documents.  Cynthia Preciado's

7  access to the ShareDrive (the system which allowed her and her team to review

8  claims) was terminated. All of Cynthia Preciado's team was fired.

9      89.     Even before the execution of the Dental MSA on March 1, 2016, there

10  were ongoing discussions between the Board Insiders, Bruce Hebets, and the

11  Premier Defendants in order to ensure the Dental MSA moved forward. Indeed,

12  Cynthia Preciado documented her concerns in emails. On February 11, 2016 (weeks

13  before the Dental MSA was signed) Cynthia Preciado e-mailed Bruce Hebets

14  expressing her concerns. She stated:

15      "…there has been comments made that Daryl [Priest] and Travis [Lyon] are
16      highly integrated with upper management and the Board of Directors
        interpreted as a measure of intimidation. There is a tone of 'better than you.'"
17

18      90.    Cynthia Preciado expressed her concerns later on to both Bruce Hebets

19  and the other Borrego Insiders, but her concerns were promptly disregarded and

20  concealed by the Borrego Insiders whenever such concerns were raised.

21      91.    Just as they kept Cynthia Preciado in the dark, Bruce Hebets and the

22  Borrego Insiders never informed the entire Borrego Health Board of the Dental

23  MSA, meaning that the Premier Defendants were highly integrated with the Borrego

24  Insiders long before the Dental MSA was even signed.

25      92.    Pursuant to the terms of the Dental MSA, Borrego Health was to pay

26  Premier $5 per participating patient visit to any contract dentist for the first 8,000

27  visits, then $25 per participating patient visit thereafter.  In return, Premier agreed to

28  provide the services to Borrego Health, including without limitation provider

1  contracting (marketing and negotiating) and relations, claims management and

2  processing (including "scrubbing" the contract dental claims for documentation

3  errors or inconsistencies and ensuring claims are in such a format as Borrego Health

4  may bill and submit to DHCS), management information system, quality

5  management, patient management, reporting, and other general administrative

6  services.

7        93.    The Dental MSA underwent two amendments – Amendment 1 and

8  Amendment 2.  The Premier Defendants were able to manipulate and control

9  Borrego Health to such a degree that there were able to take what was an already

10 unreasonable, one-sided agreement and amend it to make it even more unreasonable

11 and one-sided, without offering anything in return.  The first Amendment was

12 effective on or about December 22, 2016 ("Amendment 1") and the second on or

13 about July 1, 2017 ("Amendment 2").  A true and correct copy of Amendment 1 is

14 attached herein as Exhibit B.  A true and correct copy of Amendment 2 is attached

15 herein as Exhibit C.

16        94.    Amendment 1 of the Dental MSA was signed again by Bruce Hebets

17 and Daryl Priest.  Amendment 1 amended the term of the Dental MSA to extend for

18 the five year period beginning January 1, 2017, subject to an automatic renewal of

19 five years.  Amendment 1 also removed provision 3.B. from the Dental MSA which

20 permitted Borrego Health to terminate the Dental MSA without cause.  Amendment

21 1 was completely one-sided to the benefit of Premier, and Borrego Health received

22 no additional consideration.  The Borrego Insiders negotiated the terms of

23 Amendment 1 to the Dental MSA, Mikia Wallis drafted it, and the Borrego Insiders

24 entered into Amendment 1 to the Dental MSA on Borrego Health's behalf, without

25 any notice whatsoever to the full Board.

26        95.    Amendment 2 of the Dental MSA was signed by Mikia Wallis as

27 "Executive Vice President" of Borrego and Daryl Priest.  Amendment 2 to the

28 Dental MSA changed the compensation provisions of the original Dental MSA.  As

7288673.3

1    a result, Amendment 2 obligated Borrego Health to pay Premier $25 per visit,

2    starting at the first visit rather than the previous term of $5 per visit for the first

3    8,000 visits.  Amendment 2 did not obligate Premier to perform any additional

4    services in exchange for increasing their payment fivefold.  In essence, Amendment

5    2 conferred a benefit (worth $160,000) to Premier without any corresponding

6    consideration to Borrego Health.  Again, Amendment 2 was completely one-sided to

7    the benefit of Premier, and Borrego Health received no additional consideration.

8    The lack of consideration and other reasons makes Amendment 2 unenforceable,

9    and the Premier Defendants must return the overpaid funds.  The Borrego Insiders

10   negotiated the terms of Amendment 2 to the Dental IPA, Mikia Wallis drafted it,

11   and the Borrego Insiders entered into Amendment 2 to the Dental IPA on Borrego

12   Health's behalf, without any notice whatsoever to the full Board.

13         96.    The Dental MSA and Amendments should have been provided to the

14   Board for review and approval, but that was avoided by the Borrego Insiders.

15         97.    On September 8, 2017, Bruce Hebets and Daryl Priest entered into

16   another Management Services Agreement – this time for Borrego's Contract

17   Medical Program ("Medical MSA").  Another of Daryl Priest's companies, Summit

18   Healthcare Management, Inc. (which has subsequently been merged into Premier),

19   agreed to provide services similar to Premier's obligations under the Dental MSA.

20   The terms of the Medical MSA required Borrego Health to pay $25 per patient visit

21   to Summit in exchange for the management services provided.  The Borrego

22   Insiders negotiated the terms of the arrangement with Premier, Mikia Wallis drafted

23   the agreement and the Borrego Insiders entered into the agreement on Borrego

24   Health's behalf, without any notice whatsoever to the full Board.  A true and correct

25   copy of the Medical MSA is attached herein as Exhibit D.

26         98.    As part of both the Dental MSA and Medical MSA, Premier and

27   Summit, through Daryl Priest, represented that they had the skill and experience

28   necessary to fulfill their obligations under the Dental MSA and Medical MSA.

1  Specifically, among other things, they represented they had skilled clinical providers

2  to review and evaluate the claims.

3      99.    As part of the Dental MSA and corresponding Amendments, Premier

4  Defendants represented to Borrego Health that it was qualified and competent to

5  provide necessary administrative and management services for a FQHC.  The

6  Premier Defendants further represented they would comply with all guidelines, laws

7  and regulations governing transactions and security of electronic health records and

8  other patient information.  The Premier Defendants further represented they would

9  both maintain and allow auditing of all bills generated which related to dental

10  services provided under any agreement between Borrego Health and a contract

11  dental provider.

12      100.   Exhibit "A" to the Dental MSA further outlines that Premier

13  Defendants represented that they would market and negotiate new contract dental

14  agreements for the benefit of Borrego Health, provide ongoing education and

15  training to contract dental service providers and their staff, and address contract

16  dental service provider eligibility and claims inquiries.  The Premier Defendants

17  represented, among other things: (1) that they would obtain information from the

18  contract dental providers to insure Borrego Health had all information that was

19  required in order to properly and correctly bill Medi-Cal for such claims, (2) that

20  they would monitor the claims, bills and payments to dentists to the benefit of

21  Borrego Health to ensure compliance with all applicable statutes, regulations and

22  laws, (3) that they would provide ongoing education to contracted dental providers

23  to ensure compliance with Borrego Health policies and procedures, (4) regarding

24  patient eligibility, that they would actively track whether or not the services

25  rendered were eligible for reimbursement for each participating patient, and (5) that

26  they would, for the benefit of Borrego Health, perform both short and long-term

27  financial and strategic planning, and manage Borrego Health's relationship with

28  applicable regulatory agencies.

101.   As part of the Medical MSA, the Premier Defendants represented they would comply with all guidelines, laws and regulations governing transactions and security of electronic health records and patient information.  Premier Defendants further represented that they would provide any and all necessary staff, information systems, and support services needed to perform the services outlined in the Medical MSA.  The Premier Defendants represented, among other things: (1) that they would provide ongoing education to contracted providers to ensure compliance with Borrego Health policies and procedures, (2) that they would obtain information from contracted providers necessary for Borrego Health to properly bill for such claims, (3) that they would monitor claims, billing and payment for contracted providers to ensure Borrego Health's billing practices were compliance with applicable law, (4) as part of monitoring claims, that they would validate the eligibility and completeness of the claims submitted, and (5) that they would assist Borrego Health in verifying the credentials of healthcare providers requesting to partner with Borrego Health.

102.   The Premier Defendants did not perform the obligations set forth in the Dental MSA and Medical MSA.  Rather, once the Dental MSA and Amendments were executed, the Premier Defendants trained dentists how to maximize their revenue at the expense of Borrego Health, which also increased Premier's revenue because Premier received $25 per claim.  The Premier Defendants represented that they were reviewing and scrubbing dental claims for accuracy, however, as outlined herein, thousands of unsubstantiated, duplicate and/or fraudulent claims were paid to dentists.  For each of these claims, Premier wrongfully received payment.  Further details of Premier Defendants' conduct and breaches are alleged below.

103.   Bruce Hebets and the Borrego Insiders knew that $25 per claim was an unreasonably high price.  Before the Dental MSA was signed, Cynthia Preciado told them that $5 per claim would be reasonable.

7288673.3

104.   At the time the Premier Defendants made these representations, they knew they lacked the knowledge, experience and skill to do these things, and that they would not be able to fulfill these promises.  Accordingly, the Premier Defendants did not intend to perform these promises.

105.   At the time the Premier Defendants made these representations, they knew these representations were false or had no reasonable grounds for believing the representations to be true.

106.   Payment to the dentists was typically initiated within 24 hours of receiving a bill from the dentists, and well before any payment had been made by Medi-Cal.  Further, the payments from Borrego Health to the dentists were not recouped by Premier if Medi-Cal never paid Borrego Health.The Borrego Insiders Concealed the Premier Scheme from Borrego Health

107.   The Borrego Insiders concealed the Dental MSA, along with Amendment 1 and Amendment 2 thereto, and the Medical MSA from the full Borrego Health Board.  In fact, in August 2017, when the Borrego Insiders met to discuss expanding Borrego Health's relationship with Premier (or another Daryl Priest entity) to manage Borrego Health's nascent contract medical program, the Borrego Insiders (in a recorded conversation) acknowledge that they intentionally kept the 2016 Dental MSA from the full Board and that they intended to do the same with any future arrangement (which turned out to the Medical MSA).

108.   At a meeting of Borrego Insiders on August 31, 2017, Chuck Kimball asked with respect to the contemplated Medical MSA with the Premier Defendants, "…can we just do that in the Executive Committee [i.e. Borrego Insiders only], because I can think of a couple of people that are going to object to that."  Indeed, the Board had already rejected prior efforts for a dental MSO.  Because the Borrego Insiders knew that non-Borrego Insiders would object, the Borrego Insiders ultimately chose to conceal it from the rest of Borrego Health.  After Chuck Kimball asked his question, the following discussion took place (emphasis added):

7288673.3

BRUCE HEBETS: I guess the way I would answer that is, does this Committee want me to take this to the Board? Or does it feel comfortable enough without it?

MIKE HICKOK: Take what specifically?

CHUCK KIMBALL: The idea?

BRUCE HEBETS: The idea of working with Daryl on the contract.

CHUCK KIMBALL: I think they should be advised about it. I don't know if it's a up or down, we do it or don't do it. But I think --

BRUCE HEBETS: It could be handled however this Committee wants. I can take this to the Board as an up-or-down decision, or just an advisement -- by the way, we are doing this.

CHUCK KIMBALL: I'm wondering if we can get away with doing -- literally, get away with not explaining the details, but saying we are now moving forward on adding Contract Medical to the Contract Dental load that we have, and it should be a great deal and all that sort of thing. If you don't have to go into details, and nobody says, "Well, who's going to run it?"

BRUCE HEBETS: That's fine.

CHUCK KIMBALL: Then, are we in trouble there with (indiscernible) at all? An idea?

MIKIA WALLIS: No. I believe that's already part of the strategic plan, so I don't know if that report even needs approval. But just as a, you know, operational FYI.

CHUCK KIMBALL: An operational FYI is probably -- then I think there wouldn't be any problem presenting it. I think, in my mind, but Dennis and Mike?

MIKE HICKOK: I don't think the Board approved Daryl in the first place.

CHUCK KIMBALL: I think you're right.

MIKE HICKOK: I don't recall ever being asked.  I mean, we discussed it.

CHUCK KIMBALL: I think that was a slam dunk thing. It just happened, didn't it?

DENNIS NOURSE: I think what was discussed was, was it going to be your participation.

[OVERLAPPING SPEAKERS]

7288673.3

DENNIS NOURSE: It might come as a surprise to some to know that Daryl is out there doing this. That was never a part of the vote. And neither should be Contract Medical.

BRUCE HEBETS: The opportunity I put together -- trust me, I really wish that I had a piece of it, or that I received some kind of commission on it.

MIKE HICKOK: Don't we all.

BRUCE HEBETS: Because this is going to be off the (indiscernible) -- is still the only MSO that exists in the country doing this.

DENNIS NOURSE: Can we make that a conditional approval by the --

[OVERLAPPING SPEAKERS]

CHUCK KIMBALL: I was thinking, we are going to retire, like you and I. We could retire and draw a little salary.

MIKIA WALLIS: None of this goes in the minutes.

[OVERLAPPING SPEAKERS]

BRUCE HEBETS: If you were to analyze (indiscernible), he's at like $14- or $15 million a year revenue.

HARRY ILSLEY: Chuck?

CHUCK KIMBALL: Yeah?

HARRY ILSLEY: As I remember, and Bruce, you can correct me if I'm wrong, but when we first talked about, regarding Daryl, we got approval through the Executive Committee only. We did not take that to the Board.

CHUCK KIMBALL: I believe you're right.

HARRY ILSLEY: That's the same with Contract Dental. That was not approved by the Board. That was approved by the Executive Committee. So, I don't think you need to take this matter to the Board. I think the Executive Committee can approve it and go from there on it.

MIKE HICKOK: And Harry, I agree with you; it wouldn't be an up or down decision to the Board, but how about just advising them that this is going to be another program?

HARRY ILSLEY: And that's what we did before. We just advised them what we had done.

7288673.3

109.   Ultimately, the Borrego Insiders determined that Bruce Hebets would "share with the board [his] thoughts of going into contract medical, and just leave it at that."  And ultimately, the Borrego Insiders only told the full Board that they were expanding into "contract medical."  The Borrego Insiders continued to conceal that there was a third party involved.

110.   At the August 30, 2017 Borrego Health Board meeting, the minutes reflect that "Borrego Health will be pursuing a contract medical program," along with the notation "Information only."

111.   Beyond intentionally omitting information about the Dental MSA and Medical MSA from the full Borrego Health Board, the Borrego Insiders also implemented several internal mechanisms to conceal the Premier Scheme. One example of this is seen through Diana Thompson and Karen Hebets' significant violations of the nepotism policy (see the below "Nepotism and Cronyism Scheme"). Diana Thompson and Karen Hebets hired several family members to place in the billing and accounting department at Borrego Health. These family members did not have any prior experience in the healthcare industry, let alone FQHC experience.  Karen Hebets and Diana Thompson then created a training protocol, in which the two "trained" their family members how to review the EOBs and claims submissions for errors and duplications.  As a direct result of Karen Hebets' and Diana Thompson's training, their family members allowed thousands of duplicate claims to be improperly processed.

112.   When non-familial employees requested to receive more broad departmental trainings, Diana Thompson instead ensured that employees were only trained for isolated projects.  This allowed the process of reviewing the fraudulent claims to be insulated and hidden from Borrego Health as a whole.

113.   Further, prior to 2020, Mikia Wallis ensured that the details included in Board and Executive Committee meeting minutes were kept to a minimum.  After these meetings, Mikia Wallis would request her assistant send her the draft minutes

1    so she could redline, edit, amend and delete information. That way, any subsequent

2    requests for minutes would not reveal any details about what was discussed as it

3    related to the alleged Schemes. For example, during the August 31, 2017 Executive

4    Committee meeting, the Borrego Insiders were discussing the ongoing agreement

5    with Daryl Priest and Premier. During the discussion, Mikia Wallis stated: "None of

6    this goes in the minutes."

7         114.   On January 20, 2017, Travis Lyon told employees in Borrego Health's

8    finance department that any communication regarding the Dental MSA needed to

9    solely be directed to Travis Lyon.  This was to conceal from other Borrego Health

10   employees what total monthly revenue Premier was receiving as a result of the

11   Dental MSA.

12        115.   Mike Hickok would present monthly financial reports at each Board

13   meeting.  At its highest, the compensation paid to Premier was $20 million in fiscal

14   year 2019.  During fiscal year 2020, Borrego Health paid $18.15 million to Premier.

15   However, despite Premier being Borrego Health's highest paid vendor, Mike

16   Hickok failed to mention the arrangement in his reports.

17        116.   During the January 31, 2019 Executive Committee meeting, Mike

18   Hickok admitted to Chuck Kimball that the Borrego Insiders had been keeping the

19   full Borrego Health Board "out of the loop" (his words) as it pertained to Borrego

20   Health's growth and the contract dental program.

21        117.   It was not until the summer of 2020 that Borrego Health Board

22   members other than the Borrego Insiders became aware of the arrangement.

23        118.   By email on or about July 23, 2020, Borrego Insider Mike Hickok

24   admitted, "As long as I have been on the board our dealings with them [Premier]

25   have been secretive mysterious and above all off limits to board members."  Mike

26   Hickok's email went on to report the basic terms of the Dental MSA and Medical

27   MSA (along with the total fees paid to Premier the prior year), demonstrating that he

28   was familiar with the arrangement and its terms.  The email also admitted that,

among other things, the Dental MSA and Medical MSA were never approved by the full Borrego Health Board, were never put out for competitive bidding, and were never reported on 990 forms.  Mike Hickok also stated that the arrangement with Premier "was hardly the extent of [Borrego Health's] involvement with the principals of Premier Healthcare" and that "no board member has ever seen the agreement or any other financial documents relating to this entity."  Mike Hickok did not explain why, since he knew about these arrangements, he had never raised them prior to this time.  Mike Hickok acknowledged "I have a fiduciary responsibility…" and that "each and every Board member can potentially be held accountable legally and financially for allowing an improper (and perhaps illegal) relationship to continue."

119.   It is clear that the Borrego Insiders were using contract dental as a source of money to fund their own enrichment. And others were in on this Scheme. When Jim Hebets (who was not employed by Borrego Health) was approached about possible cuts to the above-market, lucrative 162B plans the he sold to Borrego Health (alleged below), Jim Hebets responded on August 1, 2018, "Are you really sure that the board will actually want to cut these benefits given the good news about Contract Dental."

120.   Further, at a September 24, 2020 Finance Committee Meeting, the Dental MSA was discussed. Trustee Keenan Freeman indicated that billing software companies usually charge between $3-6 per claim, and that $25 per claim was outside of fair market value. Diana Thompson reassured Keenan Freeman that when the Dental MSA was entered into, several other vendors quoted 10%-12% of total revenue, which equated to approximately $25 per claim.

### iv.   <u>The Damages Suffered by Borrego Health Due to the Premier Scheme</u>

121.   Following the discovery of the Dental MSA and Medical MSA and the relationship with Premier by the full Borrego Health Board, Borrego Health retained

7288673.3

1    a valuation expert to determine the maximum fair market value of the services

2    Premier provided to Borrego Health, if those services were valuable at all.

3        122.   The valuation, conducted by BKD, determined that the fair market

4    value of the contract dental services Premier was supposed to perform totaled $19

5    million over the term of the Dental MSA (at that point).  However, Borrego Health

6    paid over $60 million for those services, meaning the Borrego Health overpaid by at

7    least $40 million.  The fair market value of the contract medical services was

8    $145,000 over the term of the Medical MSA (at that point).  Borrego Health paid

9    over $383,000 for those services, meaning the Borrego Health overpaid by over

10   double, or around $238,000.  Moreover, neither of these valuations take into account

11   the various breaches of contract set forth herein, which would reduce the value of

12   the services.

13       123.   The Dental MSA provides, in pertinent part, that Premier shall "defend,

14   indemnify and hold Borrego Health free and harmless from any obligations, costs,

15   claims, judgments, attorney's fees, or attachments arising from Premier's negligence

16   in the performance of the services contemplated under this Agreement." (*See*

17   Exhibit A, Section 6.)  The Medical MSA states that Summit (now Premier) "shall

18   defend, indemnify and hold Borrego Health, its officers, employees and agents

19   harmless from and against any and all liability, loss, expense (including reasonable

20   attorney's fees) or claims for injury or damages arising out of the performance of

21   this Agreement." (*See* Exhibit D, Section 8.)

22       124.   Borrego Health provided notice of Premier's indemnification

23   obligation, but Premier has not provided any financial support.

24       125.   Separate and distinct from Premier's contractual duty to indemnify

25   Borrego Health, Premier is also obligated to indemnify Borrego Health under equity

26   principles, if either agreement were not enforceable.  "Equitable indemnity applies

27   in cases in which one party pays a debt for which another is primarily liable and

28   which in equity and good conscience should have been paid by the latter party."

1    *United Services Auto. Ass'n v. Alaska Ins. Co.* (2001) 94 Cal. App. 4th 638, 644-645

2    (emphasis added); *see also Prince v. Pacific Gas & Elec. Co.* (2009) 45 Cal. 4th

3    1151, 1163.  As such, even if Premier were not contractually bound to indemnify

4    Borrego Health, it still owes Borrego Health a duty of indemnification.  *See*

5    *Crawford v. Weather Shield Mfg., Inc.* (2008) 44 Cal. 4th 541, 551

6    ("[C]ontractual promise to 'defend' another against specified claims clearly

7    connotes an obligation of active responsibility, from the outset, for the promisee's

8    defense against such claims.  The duty promised is to render, or fund, the service of

9    providing a defense on the promisee's behalf—a duty that necessarily arises as soon

10   as such claims are made against the promisee, and may continue until they have

11   been resolved." [emphasis added]); Civil Code § 2778.  As such, Premier is under

12   an obligation to cover the expense of Borrego Health's defense against any claims

13   subject to the Dental MSA and Medical MSA.

14          126.   On information and belief, the Borrego Insiders were compensated for

15   this access and control through kickbacks or other payments or remuneration.  As

16   Bruce Hebets stated at an August 31, 2017 meeting of the Borrego Insiders, "we've

17   already made Daryl rich, but Daryl has made us richer."

18          127.   In addition, when the fraud related to the contract dental program was

19   uncovered, both the contract dental and in-house dental programs were treated as

20   fraudulent by the Department of Health Care Services and payments were

21   suspended in amount to be proven at trial.  Under the payment suspension, Borrego

22   Health has not been paid for the in-house dental services since the suspension was

23   implemented in November 2020.

24          128.   In addition, Borrego Health was also forced to hire an independent

25   monitor pursuant to the terms of the November 2020 partial Medi-Cal suspension.

26   These monitors have cost Borrego Health $2.7 million thus far.

27          129.   In addition, Borrego Health has also been forced to close both its

28   Riverside and Barstow clinics.

130.   In addition, Borrego Health has also been forced to incur significant legal and consulting fees, in an amount to be proven at trial.

131.   In addition, Borrego Health has also lost a significant numbers of staff, and continues to have difficulty retaining employees.

C.   **Certain Contract Dentists Submitted Fraudulent Bills with the Knowledge and Support of Premier and the Borrego Insiders (the "Fraudulent Dental Billing Scheme")**

132.   Based on both Medi-Cal and Borrego Health's billing and payment structure, some of the dentists were also motivated to provide as many services to Borrego Health patients as possible, in some instances even where the services were not medically unnecessary.  Even more egregious, some dentists split services that could have been done in one encounter to multiple encounters so that they could collect multiple times.  More egregious than that, some dentists provided multiple services during a single encounter, but billed the services as multiple encounters. Finally, most egregious of all, some dentists billed for services they never provided.

133.   Unbeknownst to Borrego Health, certain contract dentists and dental practices, Premier and the Borrego Insiders schemed to maximize their profits at the expense of the Medi-Cal program and Borrego Health.  Since the dentists were paid on a "per encounter" basis, certain contract dentists, with the knowledge and support of Premier and the Borrego Insiders, among other things (1) provided services were not medically unnecessary, (2) split services that could have been done in one encounter to multiple encounters so that they could collect multiple times, (3) provided multiple services during a single encounter, but billed the services as multiple encounters, and/or (4) billed for services they never provided.  This scheme is detailed below.

134.   As part of the Dental MSA, Premier, through the Premier Defendants, were involved in the engagement and outreach of new dental providers for the contract dental program. Once the Premier Defendants found potential contract

7288673.3

1   dental providers, the Premier Defendants provided the dentists with a copy of their

2   original Contract Dental Agreement.  The Premier Defendants then reviewed the

3   terms and conditions of the agreements with the dentists, including reviewing and

4   explaining the addendums which addressed the billing and payment structure under

5   Medi-Cal.  (*See i.e.* Ex. L, Addendum E.)  The Premier Defendants did this for all

6   Dental Defendants with the exception of Velasquez and Thompson.

7        135.   Under the Dental MSA, Premier was also responsible for training the

8   Dental Defendants on how to properly submit their claims to Premier for payment.

9   Premier employee, Maria Elena Fernandez, and Travis Lyon provided training to the

10   Dental Defendants. The Borrego Insiders were also involved in ensuring Premier

11   Defendants trained the contract dental providers in a way to maximize profits from

12   the schemes.  For example, on February 20, 2018, Karen Hebets and Travis Lyon

13   had an afternoon phone call to discuss training protocols.

14        136.   Under the Dental MSA, Premier was responsible for claims monitoring,

15   which involved review of claims received by contract dental providers to ensure that

16   claims were compliant with federal and state regulation prior to submission to

17   Borrego Health for final submission to Medi-Cal for payment.  Prior to the Program

18   Integrity implementation (discussed below), Borrego Insider Karen Hebets had

19   responsibility for billing audits and identifying billing discrepancies.

20        137.   Under the Dental MSA, Premier was also responsible for implementing

21   quality management measures to address patient grievances, audit and survey

22   contract dental providers and provide Borrego Health with the findings of such

23   surveys and audits, and provide education and training to contract dental providers

24   who did not meet the requirements under the quality measures implemented.

25        138.   The Premier Defendants completely abdicated their responsibilities

26   under the Dental MSA, because effective performance would have undermined the

27   scheme to facilitate contract dentists overbilling Borrego Health for services.  The

28   Premier Defendants understood that the more claims that were submitted benefitted

7288673.3

the Premier Defendants, because Premier was compensated by Borrego Health based on the volume of claims.

139.   While it is true that the Premier Defendants were derelict in their duties, their conduct went much further.  The Premier Defendants actively supported the fraud described below.  On information and belief, the Premier Defendants coached dentists on how to fraudulently bill Borrego Health, including coaching them on "claim splitting" and fraudulently billing for non-covered bridges.

140.   Dentists were paid on a per-encounter basis, so in the event that a dentist performed multiple procedures in one encounter, they were still paid for one encounter.  The Premier Defendants coached dentists to split these claims, *i.e.*, bill one encounter on the day it occurred and the next day, so that the dentist could get paid for both.  This is a fraud on Borrego Health and on the government.  It is clear from the following paragraphs that the dentists took this practice to the extreme, sometimes billing for dozens of patient visits for one patient in a single month.

141.   Another way the Dentist Defendants, supported by the Premier Defendants and Borrego Insiders, submitted false and fraudulent bills was through improper billing for bridges.  Dental bridges literally bridge a gap for a missing tooth.  A connected bridge covers both sides of the teeth next to the missing tooth to hold a false tooth in the missing spot.  A bridge is generally not covered by Medi-Cal.  To avoid this non-coverage, on information and belief, the Premier Defendants coached dentists to bill for three crowns – one for missing tooth and one for each tooth beside it – instead of billing for a bridge, and to bill three separate encounters. In this way, rather than billing for one non-covered service (and one visit), the dentist falsely documented three covered services and fraudulently billed for all three.

142.   Premier routinely approved of services that could not have possibly occurred.  Dentists were required to upload a progress note and an x-ray for Borrego Health to pay the dentists for certain claims.  Borrego Health has also identified

dozens of examples in which x-rays clearly demonstrate that the claimed service could not have occurred (e.g., because the x-ray submitted to Premier shows that the tooth supposedly receiving the service is no longer in the mouth of the patient), yet employees from Premier still signed their names to approve the services.

143.    After the Premier Defendants received the claims from the Dental Defendants, they would e-mail the bills to Diana Thompson, Karen Hebets, Julian Thompson, and other family members Borrego Insiders hired to Borrego Health's finance department.  Premier would electronically submit the Dental Defendants' claims to Borrego Health then e-mail its invoices for the claims it processed.  This occurred on a monthly basis.  For example, on December 10, 2019, Travis Lyon e-mailed Diana Thompson with Premier's November 2019 invoice.  The invoice included a total of 79,217 claims.  Of those claims, Aldairi billed 2,190 claims, which was nearly ten times higher than the average claims billed by other contract dental providers that month.  To put this further into perspective, Aldairi would have needed to see over 115 patients every business day that month to reach that total. During that same month, Stephan billed for 1,195 claims, over five times the average claims billed by other contract dental providers that month.  The Premier Defendants did not flag these billing practices as suspicious to Borrego Health. Rather, Premier Defendants pushed these claims forward, represented it reviewed the claims to confirm they were legitimate and had the required supporting documentation, and demanded $25 per claim they allegedly reviewed.  And despite these clear outliers, once the invoices were sent to Diana Thompson, she did not take any action to bring attention to these discrepancies, instead pushing them through Borrego Health's finance department for her step-son Julian Thompson to process Premier's payment.  Julian Thompson then mailed Premier a check for $1,980,425.00.  Additionally, the greater number of claims, the more staff Borrego Health's finance department would need to keep the scheme concealed, allowing

7288673.3

1  Diana Thompson more opportunities to hire more of her family for positions in
2  which they lacked the qualifications.

3       144.   In another example, on January 20, 2020, Travis Lyon e-mailed Diana
4  Thompson with Premier's invoice for the December 2019 claims, which totaled
5  58,437 contract dental claims.  In the December 2019 invoice, a single office run by
6  Aldairi submitted 1,680 claims alone, over ten times the average number of claims
7  of the other dental providers.  Another dentist, Stephan, billed 1,062 claims during
8  that one month for one of his offices, over six times the average number of claims
9  submitted by the other contract dental providers.  The Premier Defendants did not
10 flag these billing practices as suspicious to Borrego Health. Rather, the Premier
11 Defendants pushed these claims forward, represented it reviewed the claims to
12 confirm they were legitimate and had the required supporting documentation, and
13 demanded $25 per claim they allegedly reviewed.  And despite these clear outliers,
14 once the invoices were sent to Diana Thompson, she did not take any action to bring
15 attention to these discrepancies, instead pushing them through Borrego Health's
16 finance department for her step-son to process Premier's payment and mail Premier
17 a check for $1,460,925.00.  Additionally, the greater number of claims, the more
18 staff Borrego Health's finance department would need to keep the scheme
19 concealed, allowing Diana Thompson more opportunities to hire more of her family
20 for positions in which they lacked the qualifications.

21      145.   In another example, on March 16, 2020, Travis Lyon e-mailed Diana
22 Thompson with Premier's invoice for the February 2020 claims, which totaled
23 67,928 contract dental claims. In the February 2020 invoice, a single office run by
24 Aldairi submitted 2,042 claims alone, over ten times the average number of claims
25 of the other dental providers.  Another dentist, Arakelyan, billed 1,072 claims during
26 that one month for one of his offices, over five times the average number of claims
27 submitted by the other contract dental providers.  Another dentist, Stephan, billed
28 1,291 claims during that one month for one of his offices, over six times the average

7288673.3

number of claims submitted by the other contract dental providers.  The Premier Defendants did not flag these billing practices as suspicious to Borrego Health. Rather, Premier pushed these claims forward, represented it reviewed the claims to confirm they were legitimate and had the required supporting documentation, and demanded $25 per claim they allegedly reviewed.  And despite these clear outliers, once the invoices were sent to Diana Thompson, she did not take any action to bring attention to these discrepancies, instead pushing them through Borrego Health's finance department for her step-son to process Premier's payment and mail Premier a check for $1,698,200.00. Additionally, the greater number of claims, the more staff Borrego Health's finance department would need to keep the scheme concealed, allowing Diana Thompson more opportunities to hire more of her family for positions in which they lacked the qualifications.

i.      **Husam E. Aldairi, D.D.S.**

146.   On or about May 27, 2016 and May 29, 2018, Husam Aldairi, D.D.S., both individually and through his company Aldairi DDS, Inc. (collectively, "Aldairi") entered into written dental services agreements (the "Aldairi Agreements") whereby Aldairi agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Aldairi for those services.  Husam Aldairi is the sole officer and director of Husam Aldairi, D.D.S. Husam Aldairi also operates as the Chief Executive Officer, Secretary and Chief Financial officer of Husam Aldairi, D.D.S. Husam Aldairi is also the agent for service of process for Husam Aldairi, D.D.S. Husam Aldairi maintains complete ownership, management and control of Husam Aldairi, D.D.S. As such, while the parties to the Aldairi Agreements are Borrego Health and Husam Aldairi, D.D.S., Husam Aldairi, as the alter ego and/or sole owner of Husam Aldairi, D.D.S. and as signatory of the Aldairi Agreements, is capable of being held personally liable under the Aldairi Agreements. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.) A true and correct copy of the 2016 Aldairi Agreement is attached herein as Exhibit E, and

7288673.3

1    a true and correct copy of the 2018 Aldairi Agreement is attached herein as Exhibit

2    F.

3        147.   As a participant in Borrego Health's contract dental program, Aldairi

4    was involved in Borrego Health's operations by providing dental services to

5    Borrego Health patients.

6        148.   Among other things, the Aldairi Agreements required that Aldairi

7    practice dentistry in accordance with all Federal, State and local laws, regulations,

8    and generally accepted principles applicable to the practice of dentistry, and  to

9    prepare, establish, and maintain administrative records, financial records, records

10   pertaining to patient diagnosis and treatment, and information pertaining to the

11   services provided.

12       149.   Aldairi submitted false and fraudulent bills and made other statements

13   which Aldairi knew to be false or had no reasonable grounds for believing their

14   representations were true, which also constitute a breach of the Aldairi Agreement.

15   A non-exhaustive list of examples is set forth below.  The below examples are

16   demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

17       150.   On May 21, 2020, the Executive Officer of the Dental Board of

18   California (the "Dental Board"), Karen M. Fischer, issued an Accusation against

19   Husam Aldairi alleging Husam Aldairi, dating back to December 2016, committed

20   gross negligence, "repeated acts of professional negligence," and failed to properly

21   document patient treatment, surgical procedures, diagnosis, and clinical findings.

22   The Accusation sought to revoke or suspend Husam Aldairi's dentist license to

23   practice in California.

24       151.   On May 25, 2021, the Dental Board and Husam Aldairi agreed to a

25   Stipulated Settlement and Disciplinary Order in which Husam Aldairi "voluntarily,

26   knowingly, and intelligently waive[d] and [gave] up" his legal rights, including a

27   right to hearing on the charges and allegation.  Under the order, Husam Aldairi's

28   dental license to practice in California was revoked, but the revocation was stayed

1  pending  a two-year probationary period.  The Dental Board adopted the order,

2  effective June 24, 2021.

3       152.   Husam Aldairi never informed Borrego Health of the ongoing Dental

4  Board investigation on his license or the issued Accusation.

5       153.   Husam Aldairi's failure to inform Borrego Health of the ongoing

6  Dental Board investigation on his license or the issued Accusation, made the First

7  Agreement subject to suspension until the Dental Board issued its final

8  determination on April 29, 2021.

9       154.   Husam Aldairi's failure to inform Borrego Health of the ongoing

10  Dental Board investigation on his license or the issued Accusation, made the Second

11  Agreement subject to suspension until the Dental Board issued its final

12  determination on April 29, 2021.

13       155.   In September 2020, Borrego Health conducted a compliance re-audit of

14  Husam Aldairi.  Husam Aldairi had failed his prior audit with Borrego Health, but

15  Borrego Health provided Husam Aldairi another opportunity to obtain compliance

16  with Borrego Health's policies.  Borrego Health even offered Husam Aldairi one-

17  on-one compliance trainings.  For the September 2020 audit, out of the sampled

18  dental record documents pulled for his private practice at the San Diego location,

19  none of them met the documentation requirements under the Aldairi Agreements

20  and Borrego Health's policies for contract dental providers.  Out of the sampled

21  dental record documents pulled for Aldairi DDS, Inc. at the El Cajon location, only

22  three out of 30 claims met the documentation requirements under the Aldairi

23  Agreements and Borrego Health's policies for contract dental providers.

24       156.   The results of Borrego Health's audit from September 2020 of Husam

25  Aldairi indicated that Husam Aldairi had clearly violated the terms of the Aldairi

26  Agreements by his actions, including but not limited to: (1) billing excessive patient

27  visits, including falsifying appointment schedules; (2) failing to maintain adequate

28  documentation to support billing; (3) falsification of medical records; (4) performing

services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered, upcoding, inappropriately splitting services, and billing for services rendered by another provider and/or providers not enrolled in Medi-Cal.

157.   For example, patient charts with Husam Aldairi demonstrated in multiple instances that patients presented to his office on several consecutive days to receive dental services, however, patient scheduling did not support such frequent visits.  In some instances, patient charts would have notes for services rendered on days in which Husam Aldairi's offices were closed.[2] Program Integrity calculated a 65% rate of potentially falsely billed appointments (meaning no face-to-face encounter).  As an example, the audit found that there were notes written and procedures billed by Husam Aldairi indicating that a face-to-face visit occurred on dates when the office was closed for the Thanksgiving holiday.

158.   Further examples include: (1) on or about June 2020, a patient in which Husam Aldairi billed Borrego Health for telehealth and emergency dental services completely absent from the patient's chart; (2) on or about July 2019, Husam Aldairi's office billed Borrego for several crowns when x-rays demonstrated a bridge had been placed on the patient; (3) on or about May 2019, Husam Aldairi billed Borrego Health for a partial denture which was never prepared; and (4) on or about February 2020, Husam Aldairi billed Borrego Health as though a patient's

---

[2] To protect patient private health information ("PHI") as well as personally identifiable information ("PII"), the names of the patients in the examples throughout the complaint will not be included.  The specific information, including names, dates of service, and all other information, are already available to the Dentist Defendants, as they maintain custody of the patient charts.  Borrego Health alleges that each claim referenced throughout this FAC represents a specific claim the dentist submitted to Borrego Health.  Borrego Health can produce the specific information for each alleged claim to the Dentist Defendants.

7288673.3

1  root canal was completed over the course of several visits, when x-rays

2  demonstrated it was completed in one visit.  Dr. Aldairi billed Borrego for patient

3  visits that either did not occur or that were provided by providers that were not

4  disclosed to or credentialed by Borrego Health.  One example of extreme excess

5  billing occurred on July 22, 2019. Dr. Aldairi billed Borrego Health for 147 patient

6  visits that he claimed occurred that day.

7  159.   In October 2019, Dr. Aldairi billed 15 different encounters for a single

8  patient, despite the fact that there are only 23 business days in October.  In May

9  2020, Dr. Aldairi billed 16 different encounters to a single patient, despite only

10  having 21 business days in that month.  Further, in June 2020, one of Dr. Aldairi's

11  subproviders billed 18 different encounters during the month of June 2020. That

12  same subprovider then billed 34 different encounters for a single patient from the

13  time period of May 2020 to June 2020.  Again, Premier did not flag these bills and

14  took no steps to counsel or discipline this dentist.

15  160.   Review of Aldairi's claims data indicates he carried out his excessive

16  visits scheme to great effect.  Aldairi billed for more than five visits for the same

17  patient in a seven day period 6,340 times between February 2017 and January 2021.

18  It would be unusual for an individual ever to require dental service every weekday

19  for an entire week.  However, during the approximately five year span, Aldairi

20  represented that he had that unusual occurrence happen 6,340 times.  During that

21  same period, he billed for twelve or more visits in a 30-day period for the same

22  patient more than 3,837 times.

23  161.   Aldairi submitted these claims to the Premier Defendants seeking

24  payment.  The Premier Defendants, under the Dental MSA, were obligated to

25  perform their due diligence in reviewing the claims for accuracy and ensuring

26  supporting documentation was submitted alongside the claims.  The Premier

27  Defendants allowed these excessive, unsubstantiated, and duplicative claims to be

28  submitted to Borrego Health for processing and payment, because Premier received

7288673.3

1   $25 per claim submitted to Borrego Health.  Further, once the claims had reached

2   Borrego Health, Karen Hebets and Diana Thompson had trained their family

3   members not to flag these claims as potentially fraudulent.

4        162.   Further, at the beginning of the COVID-19 pandemic, when most

5   dental offices were closed or working at near-zero capacity, Aldairi's office

6   continued to be hyper-productive.  To do this, Aldairi increased his billing of

7   teledentistry (D9995) and emergency visits (D9430).  However, Borrego Health's

8   recent review of the charts indicated that these visit types were not documented in

9   the progress notes for the patients, calling into question whether they actually

10  occurred.

11       163.   In addition to the above, Aldairi hired Maura Tuso in September 2017

12  to work as a dentist at his dental practice. Dr. Tuso was employed by Dr. Aldairi

13  from September 2017 to January 2018. During the time Dr. Tuso worked for

14  Aldairi, Dr. Tuso was suspended from providing dental services to Medi-Cal

15  patients.  Aldairi was aware that Dr. Tuso was suspended at the time Aldairi hired

16  Dr. Tuso.  Nevertheless, Aldairi allowed Dr. Tuso to see Borrego Health patients

17  and bill Borrego Health for the services Dr. Tuso provided to Medi-Cal patients.

18       164.   Aldairi also hired other dental providers, in addition to Dr. Tuso, who

19  lacked California dental licenses to provide dental services to Borrego Health

20  patients.  Upon information and belief, Aldairi billed Borrego Health for the services

21  that unlicensed dental providers provided to Medi-Cal patients.

22       165.   As a result of Aldairi's conduct, Borrego Health paid Aldairi and/or for

23  services which were not rendered, that were provided by other physicians, and/or

24  services which were provided during a period of time where the parties' agreements

25  would have otherwise been suspended or terminated.

26       166.   As alleged above, the Premier Defendants and the Borrego Insiders

27  worked diligently to ensure that Aldairi's fraudulent practices could continue,

28

7288673.3

1    preventing every effort by Program Integrity to terminate Aldairi, even going as far

2    as only allowing Travis Lyon to speak directly to Aldairi.

3                        **ii.    <u>Ayed Hawatmeh, D.D.S.</u>**

4         167.   On or about October 18, 2017, Ayed Hawatmeh, D.D.S., both

5    individually and through his company Hawatmeh Dental Group, P.C. (collectively

6    "Hawatmeh") entered into a written dental services agreement (the "Hawatmeh

7    Agreement") whereby Hawatmeh agreed to provide primary dental services to

8    participating Borrego Health patients, and Borrego Health agreed to pay Hawatmeh

9    for those services. Ayed Hawatmeh is the sole officer, Chief Executive Officer, and

10   the agent for service of process for Hawatmeh Dental Group, P.C. As such, while

11   the parties to the Hawatmeh Agreement are Borrego Health and Hawatmeh Dental

12   Group, P.C., Ayed Hawatmeh, as the alter ego and/or sole owner of Hawatmeh

13   Dental Group, P.C. and as signatory of the Hawatmeh Agreement, is capable of

14   being held personally liable under the Hawatmeh Agreement. (*See i.e. Irey v. Len*

15   (1961) 191 Cal. App. 2d 13.)

16        168.   A true and correct copy of the Hawatmeh Agreement is attached herein

17   as Exhibit G.

18        169.   As a participant in Borrego Health's contract dental program,

19   Hawatmeh was involved in Borrego Health's operations by providing dental

20   services to Borrego Health patients.

21        170.   Among other things, the Hawatmeh Agreement required that

22   Hawatmeh practice dentistry in accordance with all Federal, State and local laws,

23   regulations, and generally accepted principles applicable the practice of dentistry,

24   and to prepare, establish, and maintain administrative records, financial records,

25   records pertaining to patient diagnosis and treatment, and information pertaining to

26   the services provided.

27        171.   Hawatmeh submitted false and fraudulent bills and made other

28   statements which Hawatmeh knew to be false or had no reasonable grounds for

1  believing their representations were true, which also constitute a breach of the

2  Hawatmeh Agreement.  A non-exhaustive list of examples is set forth below.  The

3  below examples are demonstrative of a larger pattern and practice of fraudulent

4  and/or unlawful conduct.

5       172.   Hawatmeh routinely employed the scheme, described above, whereby

6  he would bill for several crowns instead of a single, non-covered bridge.  For

7  example, on or about February 2018, Hawatmeh billed Borrego Health for several

8  crowns were placed over the course of several days when documentation indicated a

9  single bridge was used.

10       173.   Hawatmeh also billed for services that the x-rays he submitted to

11  Premier to get his claim approved clearly demonstrate could not have possibly

12  occurred.  For example, on or about May and June of 2018, Hawatmeh billed

13  Borrego Health for services performed on a tooth the patient no longer had at the

14  time of service.  Hawatmeh billed Borrego Health for a visit on February 22, 2018

15  for preparing a tooth for a crown, which requires shaving down the tooth.  However,

16  x-rays of that patient from May 2017 clearly demonstrate that tooth had an implant

17  in that spot, meaning there was no natural tooth for Hawatmeh to prepare to receive

18  a crown. (*See, supra,* n. 2).

19       174.   In late 2018, Borrego Health became concerned that Hawatmeh was

20  billing for excessive visits when it identified that he had billed for 26 visits for one

21  patient in one month. Borrego Health put a hold on paying Hawatmeh's invoices.

22       175.   On November 26, 2018, Dr. Hawatmeh confirmed via email that a

23  biller in his office was responsible for "billing discrepancies." On November 29,

24  2018, Dr. Hawatmeh sent an email to Premier staff identifying dozens of visits for

25  20 patients that were improperly billed.

26       176.   That same day, Mr. Lyon emailed Dr. Martinez an excel file with

27  patient visits for which Hawatmeh billed, which stated:

28

1
2
3
4
5

"In just a quick cursory review of one of the patients (REDACTED) I can see that there are a handful of claims that were billed to Borrego, that do not exist in the patient chart.  It looks like the 2952 visits were fabricated and some of the visits where multiple teeth were surgically extracted, they were billed as showing they happened in multiple visits."

6
7
8
9

177.   Despite knowing of these improper visits, on November 30, 2018, Travis Lyon emailed Dr. Martinez and Dr. Venugopal that the billing issue was "isolated," argued Hawatmeh should be allowed to self-audit, and encouraged Program Integrity to only audit three additional charts.

10
11
12
13
14

178.   The Premier Defendants allowed these excessive, unsubstantiated, and duplicative claims to be submitted to Borrego Health for processing and payment, because Premier received $25 per claim submitted to Borrego Health.  Further, once the claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained their family members not to flag these claims as potentially fraudulent.

15
16
17
18
19
20
21

179.   Program Integrity then sought to terminate Hawatmeh's provider contract, but this effort was stopped by Travis Lyon and the Premier Defendants. On December 7, 2018, the Premier Defendants pushed back on immediately terminating Hawatmeh's provider contract under the pretext that such a move would complicate the ongoing Program Integrity audit.  Premier's lawyer, Erin Minelli, advised Borrego Health against terminating Hawatmeh and told Borrego Health to pay outstanding invoices.

22
23
24
25
26
27

180.   The same week, Travis Lyon sent an email to Dr. Martinez with a list of Hawatmeh's patients who received six or more crowns.  Travis Lyon used this example of gross over-utilization to justify *continuing* to pay Hawatmeh, claiming: "If we can continue to keep Dr. Hawatmeh's cooperation I believe we can facilitate an audit of all the patient charts in this list…." and that "We believe it is critical to encourage continued cooperation with Dr. Hawatmeh to facilitate continued audits

28

7288673.3

1 and investigations necessary to determine the extent of Borrego's potential

2 liability."

3    181.   Travis Lyon continued to put pressure on Program Integrity to release

4 the hold on Hawatmeh's invoices. On December 10, 2018, Mr. Lyon emailed Dr.

5 Martinez acknowledging that there are "phantom claims" and "potential over-

6 utilization" in the set of invoices, but that Borrego Health should go ahead and pay

7 half of the invoices.  On December 11, 2018, Karen Hebets sent an email, copying

8 Diana Thompson, instructing staff to pay Hawatmeh.  Diana Thompson then

9 emailed Travis Lyon to assure him Hawatmeh's check was forthcoming. Travis

10 Lyon responded that he "just spoke with Hawatmeh" and asks that the checks be

11 sent FedEx overnight rather than via courier.

12    182.   Ultimately, Program Integrity completed a full-file review of each of

13 Dr. Hawatmeh's offices. The results of this audit lead to Program Integrity

14 recommending his termination. Hawatmeh was terminated from the contract dental

15 program on September 17, 2019. The significant delay in terminating Hawatmeh

16 (and the harm caused during that period) is attributable to the Premier Defendants

17 and Borrego Insiders, who prolonged Hawatmeh's tenure so that they (and

18 Hawatmeh) could continue to benefit from his fraudulent billing.

19    183.   Subsequent review of Hawatmeh's billing patterns demonstrate the

20 extent of his excessive billing, which was of course confirmed through the 2019

21 audit of his patient charts.  During his time billing to Borrego Health, Hawatmeh

22 billed for twelve or more visits for the same patient in a 30-day period more than

23 6,500 times.  He billed five or more visits for the same patient in a 7-day period

24 more than 6,600 times.  It would be unusual for an individual ever to require dental

25 services every weekday for an entire week.  However, during the approximately five

26 year span, Hawatmeh represented that he had that unusual occurrence happen over

27 6,600 times.

28

7288673.3

### iii.   **Alborz Mehdizadeh, D.D.S.**

184.   On September 28, 2016 and December 11, 2018, Alborz Mehdizadeh, both individually and through his company Alborz Mehdizadeh, Inc. (collectively, "Mehdizadeh") entered into written dental services agreements (the "Mehdizadeh Agreements") whereby Mehdizadeh agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Mehdizadeh for those services. Alborz Mehdizadeh is the sole officer and director of Alborz Mehdizadeh, Inc. Alborz Mehdizadeh also operates as the Chief Executive Officer, Secretary and Chief Financial officer of Alborz Mehdizadeh, Inc. Alborz Mehdizadeh is also the agent for service of process for Alborz Mehdizadeh, Inc. Alborz Mehdizadeh maintains complete ownership, management and control of Alborz Mehdizadeh, Inc. As such, while the parties to the original Mehdizadeh Agreement are Borrego Health and Alborz Mehdizadeh, Inc., Alborz Mehdizadeh, as the alter ego and/or sole owner of Alborz Mehdizadeh, Inc. and as signatory of the Mehdizadeh Agreements, is capable of being held personally liable under the Mehdizadeh Agreements. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.)

185.   A true and correct copy of the 2016 Mehdizadeh Agreement is attached herein as Exhibit H, and a true and correct copy of the 2018 Mehdizadeh Agreement is attached herein as Exhibit I.

186.   As a participant in Borrego Health's Contract Dental program, Mehdizadeh was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

187.   Among other things, the Mehdizadeh Agreements required that Mehdizadeh practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

7288673.3

188.   Mehdizadeh submitted false and fraudulent bills and made other statements which Mehdizadeh knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Mehdizadeh Agreements.  A non-exhaustive list of examples is set forth below.  The below examples are demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

189.   Dr. Mehdizadeh billed Borrego Health for patient visits that either did not occur or that were provided by a providers that were not disclosed to or credentialed by Borrego Health.  For example, he billed for 146 patient visits he claimed to have performed on Saturday, November 16, 2019.

190.   From the period of October 23, 2018 to February 5, 2019, Dr. Mehdizadeh purportedly performed—and billed for—29 surgical extractions on one patient. There are two methods for extractions:  simple extraction (pull the tooth) or surgical extractions (cut the gum).  At the outset, it is unlikely a patient would ever need 29 surgical extractions (as opposed to simple extractions).  Further, even if this were the case, this would never occur in 29 different sittings.  For surgical extractions, the area around the extraction site is numb and the gum is cut open to allow for the extraction. The standard practice when surgically extracting several teeth is to numb and extract several teeth within the same quadrant.  Instead, Dr. Mehdizadeh's billing practices indicate one patient came in for 29 surgical extractions over a six month period.  If these extractions occurred at all, one can only hope that this is a fraudulent billing practice, rather than grotesquely substandard care to subject a patient to this treatment.

191.   This was not an isolated incident. Mehdizadeh's billing records showed that he regularly billed contiguous dates of service (*i.e.,* multiple days in a row) for surgical extractions. These are either fraudulent claim-splitting or substandard care, either of which would make the claims unpayable.

192.   Dr. Mehdizadeh further submitted duplicate bills in order to receive reimbursement for the same services multiple times. For example:

- On April 2, 2018, Patient 1 received dental services under Dental Code D2392 for tooth number 14, which involves adding a resin based composite to the tooth. Dr. Mehdizadeh submitted bills for this service on both April 26, 2018 and May 1, 2018.  Premier Defendants reviewed and approved both claims submitted.

- On April 4, 2018, Patient 1 also received dental services under Dental Code D2391 for tooth number 18, which involves adding a resin based composite to the tooth.  Dr. Mehdizadeh submitted bills for this service on both April 26, 2018 and May 1, 2018.  Premier Defendants reviewed and approved both claims submitted.

- On October 31, 2018, Patient 2 received dental services under Dental Code D2392 for tooth number 15, which involves adding a resin based composite to the tooth.  Dr. Mehdizadeh submitted bills for this service on both November 8, 2018 and November 30, 2018.  Premier Defendants reviewed and approved both claims submitted.

193.   On August 11, 2018, Patient 3 received dental services under Dental Code D2391 for tooth number 29, which involves adding a resin based composite to the tooth.  Dr. Mehdizadeh submitted bills for this service on both August 14, 2018 and April 18, 2019.  Premier Defendants reviewed and approved both claims submitted. On February 24, 2020, Borrego Health conducted a re-audit of Dr. Medizadeh.  Upon arrival, Borrego Health's auditor, Dr. Elias Koutros, requested a sample of specific patient charts. Dr. Mehdizadeh's office informed the auditor that some charts were unavailable because they were taken out of the office. Of the charts available, the charts included exact photocopies from periodontal charting in multiple patient charts.  Periodontal charting includes six measurements per tooth. It is it nearly impossible that multiple patients would have six exactly identical

1  measurements for all of their teeth.  Dr. Koutros indicated to Dr. Medizadeh that he

2  believed the photocopies constituted fraudulent charting given the lack of change in

3  status. Dr. Medizadeh did not deny Dr. Koutros' allegations, and instead informed

4  Dr. Koutros that he wanted the audit to go well, so the charting was prepared with

5  that in mind.

6       194.   Review of Mehdizadeh's claims data indicates he carried out his

7  excessive visits scheme to great effect.  Mehdizadeh billed for more than five visits

8  for the same patient in a seven day period 4,091 times between February 2017 and

9  January 2021.  It would be unusual for an individual ever to require dental service

10  every weekday for an entire week.  However, during the approximately five year

11  span, Mehdizahdeh represented that he had that unusual occurrence happen over

12  4,000 times.  During that same period, he billed for twelve or more visits for the

13  same patient in a 30-day period more than 5,902 times.

14       195.   Medizadeh submitted these claims and others to the Premier

15  Defendants seeking payment.  The Premier Defendants, under the Dental MSA,

16  were obligated to perform their due diligence in reviewing the claims for accuracy

17  and ensuring supporting documentation was submitted alongside the claims.  The

18  Premier Defendants allowed these excessive, unsubstantiated, and duplicative

19  claims to be submitted to Borrego Health for processing and payment, because

20  Premier received $25 per claim submitted to Borrego Health.  Further, once the

21  claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained

22  their family members not to flag these claims as potentially fraudulent.

23             **iv.   Magaly M. Velasquez, D.D.S.**

24       196.   On or about November 5, 2014, Magaly M. Velasquez, both

25  individually and through her company Magaly M. Velasquez DDS, Professional

26  Dental Corp. (collectively, "Velasquez") entered into a written dental services

27  agreement (the "Velasquez Agreement") whereby Velasquez agreed to provide

28  primary dental services to participating Borrego Health patients, and Borrego Health

agreed to pay Velasquez for those services. Magaly Velasquez is the sole officer and director of Magaly M. Velasquez DDS, Professional Dental Corp. Magaly Velasquez also operates as the Chief Executive Officer, Secretary and Chief Financial officer of Magaly M. Velasquez DDS, Professional Dental Corp. Magaly Velasquez is also the agent for service of process for Magaly M. Velasquez DDS, Professional Dental Corp. Magaly Velasquez maintains complete ownership, management and control of Magaly M. Velasquez DDS, Professional Dental Corp. As such, while the parties to the Velasquez Agreement are Borrego Health and Magaly M. Velasquez DDS, Professional Dental Corp., Magaly Velasquez, as the alter ego and/or sole owner of Magaly M. Velasquez DDS, Professional Dental Corp., and as signatory of the Velasquez Agreement, is capable of being held personally liable under the Velasquez Agreement. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.)

197.   A true and correct copy of the Velasquez Agreement is attached herein as Exhibit J.

198.   As a participant in Borrego Health's contract dental program, Velasquez was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

199.   Among other things, the Velasquez Agreement required that Velasquez practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

200.   Velasquez submitted false and fraudulent bills and made other statements which Velasquez knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Velasquez Agreement.  A non-exhaustive list of examples is set forth below.  The

below examples are demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

201.   As part of Borrego Health's efforts to clean house, it conducted an audit to evaluate the duplicate claims submitted by Velasquez. The audit found 150 claims were duplicative. For example:

- On April 20, 2019, Patient 4 received dental services under Dental Code D2392 for tooth number 21, which involves adding a resin based composite to the tooth.  Dr. Velasquez submitted bills for this service on both April 26, 2019 and April 27, 2019.  Premier Defendants reviewed and approved both claims submitted.

- On May 28, 2019, Patient 4 also received dental services under Dental Codes D0220, D0270, and D2751 for teeth numbers 12, 13, and 14. D0220 is one of the billing codes for  initial x-rays, D0270 is the billing code for single films, and D2751 is the billing code intended for porcelain crowns.  Dr. Velasquez submitted bills for these services on June 3, 2019 and June 27, 2019.  Premier Defendants reviewed and approved both claims submitted.

- On September 17, 2018, Patient 5 received dental services under Dental Code D2391 for tooth number 21, which involves adding a resin based composite to the tooth.  Dr. Velasquez submitted bills for this service on both September 18, 2018 and October 10, 2018.  Premier Defendants reviewed and approved both claims submitted.

- On July 11, 2018, Patient 6 received dental services under Dental Codes D2391 and D2392 for tooth number 4, which involves adding a resin based composite to the tooth. Dr. Velasquez submitted bills for this service on both July 16, 2018 and July 27, 2018.  Premier Defendants reviewed and approved both claims submitted.

7288673.3

- On January 31, 2019, Patient 7 received dental services under Dental Codes D2391 and D2392 for tooth number 5, which involves adding a resin based composite to the tooth. Dr. Velasquez submitted bills for this service twice on February 4, 2019. Premier Defendants reviewed and approved both claims submitted.

- In May 2019, Dr. Velasquez billed Borrego Health as though Patient 8 received dental services 26 days in the month, despite there only being 22 business days in May 2019. Dr. Velasquez then billed Borrego Health for 22 visits in June 2019 for that same patient, totaling 48 visits for the same patient over a two month period.

202.   Review of Velasquez's claims data indicates she carried out the excessive visits scheme to great effect. Velasquez billed for more than five visits for the same patient in a seven day period 4,552 times between February 2017 and January 2021. It would be unusual for an individual ever to require dental service every weekday for an entire week. However, during the approximately five year span, Velasquez represented that he had that unusual occurrence happen 4,552 times. During that same period, she billed for twelve or more visits for the same patient in a 30-day period more than 2,656 times.

203.   Velasquez then submitted these claims and others to the Premier Defendants seeking payment. The Premier Defendants, under the Dental MSA, were obligated to perform their due diligence in reviewing the claims for accuracy and ensuring supporting documentation was submitted alongside the claims. The Premier Defendants allowed these excessive, unsubstantiated, and duplicative claims to be submitted to Borrego Health for processing and payment, because Premier received $25 per claim submitted to Borrego Health. Further, once the claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained their family members not to flag these claims as potentially fraudulent.

### v.    Aram Arakelyan, D.D.S.

204.   On November 17, 2016, November 18, 2018, and November 29, 2018, Aram Arakelyan, both individually and through his company New Millennium Dental Group of Aram Arakelyan, Inc. (collectively, "Arakelyan"), entered into written dental services agreements (the "Arakelyan Agreements") whereby Arakelyan agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Arakelyan for those services. A true and correct copy of the 2016 Arakelyan Agreement is attached herein as Exhibit K.  A true and correct copy of the November 18, 2018 Arakelyan Agreement is attached herein as Exhibit L.  A true and correct copy of the November 29, 2018 Arakelyan Agreements are attached herein as Exhibit M.

205.   Aram Arakelyanis the sole officer and director of New Millennium Dental Group. Aram Arakelyan also operates as the Chief Executive Officer, Secretary and Chief Financial officer of New Millennium Dental Group. Aram Arakelyan is also the agent for service of process of New Millennium Dental Group. Aram Arakelyan maintains complete ownership, management and control of New Millennium Dental Group.

206.   As a participant in Borrego Health's contract dental program, Arakelyan was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

207.   Among other things, the Arakelyan Agreements required that Arakelyan practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

208.   Arakelyan submitted false and fraudulent bills and made other statements which Arakelyan knew to be false or had no reasonable grounds for

believing their representations were true, which also constitute a breach of the Arakelyan Agreements.  A non-exhaustive list of examples is set forth below.  The below examples are demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.  For example, (1) on or about January 2019, Dr. Arakelyan's office billed Borrego Health for a filling on a tooth which x-rays noted the patient did not have at the time of service; (2) on or about July 2019, Dr. Arakelyan's office billed Borrego Health for a root canal performed on a tooth which x-rays noted the patient did not have at the time of service; and (3) on or about March 2019, Dr. Arakelyan's office fraudulently submitted multiple claims to Borrego Health for multiple crowns when the supporting documentation attached to the claim indicated the patient actually received a singular bridge.

209.   In November 2019, Dr. Arakelyan billed 18 different encounters for a single patient, despite the fact that there are only 20 business days in November, meaning the bills showed this patient came in for dental services nearly every day in November.  Even more shocking, the dentist also billed for 11 additional encounters in August 2019, 13 in September 2019, 13 in October 2019 and—for good measure—three in December 2019, for a total of 58 separate encounters in the course of five months.  Premier did not flag these bills and took no steps to counsel or discipline this dentist.  As a result of Premier Defendants' failings, Borrego Health's Program Integrity program conducted its own audit into Dr. Arakelyan's billing practices.  When these egregious billing practices were discovered, Dr. Arakelyan informed Borrego Health's auditor that it was Premier Defendants who told him to bill in this manner.

210.   In January 2020, Dr. Venugopal attempted to conduct an on-site audit of Arakelyan's office. However, upon arrival, Dr. Venugopal was denied access to the office. Premier's attorney later called Dr. Venugopal and indicated that audits needed to go through Premier and that surprise audits were not allowed by law. Dr.

7288673.3

Venugopal informed Mikia Wallis of this issue, and Mikia Wallis did not challenge Premier's false position. This allowed egregious billing practices to continue.

211.   In February 2020, one of Dr. Arakelyan's subproviders billed 16 different encounters for a single patient, despite the fact that there were only 19 business days in February 2020, meaning the bills showed this patient came in for dental services almost every day in February 2020.  Premier did not flag these bills and took no steps to counsel or discipline this dentist.

212.   Premier and the Borrego insiders worked diligently to ensure that Arakelyan's fraudulent practices could continue to fund their scheme, preventing every effort by Program Integrity to terminate him, even going as far as only allowing Travis Lyon to speak directly to Arakelyan.

213.   Review of Arakelyan's claims data indicates he carried out his excessive visits scheme to great effect.  Arakelyan billed for more than five visits for the same patient in a seven day period 8,919 times between February 2017 and January 2021, which is more than any other provider.  It would be unusual for an individual ever to require dental service every weekday for an entire week.  However, during the approximately five year span, Arakelyan represented that he had that unusual occurrence happen 8,919 times.  During that same period, he billed for twelve or more visits for the same patient in a 30-day period more than 5,988 times.

### vi.    Michael Hoang, D.M.D.

214.   On or about November 28, 2018, Michael Hoang, D.M.D. entered into a written dental services agreement (the "Hoang Agreement") whereby Hoang agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Hoang for those services.  A true and correct copy of the Hoang Agreement is attached herein as Exhibit N.

7288673.3

1    215.   As a participant in Borrego Health's contract dental program, Hoang

2    was involved in Borrego Health's operations by providing dental services to

3    Borrego Health patients.

4    216.   Among other things, the Hoang Agreement required that Hoang

5    practice dentistry in accordance with all Federal, State and local laws, regulations,

6    and generally accepted principles applicable the practice of dentistry, and  to

7    prepare, establish, and maintain administrative records, financial records, records

8    pertaining to patient diagnosis and treatment, and information pertaining to the

9    services provided.

10   217.   Hoang submitted false and fraudulent bills and made other statements

11   which Hoang knew to be false or had no reasonable grounds for believing their

12   representations were true, which also constitute a breach of the Hoang Agreement.

13   Upon information and belief, Hoang's conduct alleged herein is demonstrative of a

14   larger pattern and practice of fraudulent and/or unlawful conduct.

15   218.   Hoang then submitted these claims to the Premier Defendants seeking

16   payment.  The Premier Defendants, under the Dental MSA, were obligated to

17   perform their due diligence in reviewing the claims for accuracy and ensuring

18   supporting documentation was submitted alongside the claims.  The Premier

19   Defendants allowed these fraudulent claims to be submitted to Borrego Health for

20   processing and payment, because Premier received $25 per claim submitted to

21   Borrego Health.  Further, once the claims had reached Borrego Health, Karen

22   Hebets and Diana Thompson had trained their family members not to flag these

23   claims as potentially fraudulent.

24   219.   Borrego Health removed Dr. Hoang from its contract dental program in

25   2019 because he was billing the same claims *both* to Borrego Health and straight to

26   Denti-Cal.  Dr. Hoang was terminated from Borrego Health's contract dental

27   program in July 2019.

28

7288673.3

vii.   **Waleed Stephan, D.D.S.**

220.   On October 1, 2016, Waleed Stephan, both individually and through his company W.A. Stephan, A Dental Corporation (collectively, "Stephan"), entered into a written dental services agreement (the "Stephan Agreement") whereby Stephan agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Stephan for those services.  Waleed Stephan is the sole director and Chief Executive Officer of W.A. Stephan, A Dental Corporation. Waleed Stephan maintains complete ownership and control of W.A. Stephan, A Dental Corporation. As such, while the parties to the Stephan Agreement are Borrego Health and W.A. Stephan, A Dental Corporation, Waleed Stephan, as the alter ego and/or sole owner of W.A. Stephan, A Dental Corporation, and as signatory of the Stephan Agreement, is capable of being held personally liable under the Stephan Agreement. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.)  A true and correct copy of the Stephan Agreement is attached herein as Exhibit O.

221.   As a participant in Borrego Health's contract dental program, Stephan was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

222.   Among other things, the Stephan Agreement required that Stephan practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

223.   Stephan submitted false and fraudulent bills and made other statements which Stephan knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Stephan Agreement. A non-exhaustive list of examples is set forth below.  The below examples are demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

For example, on August 13, 2019, Dr. Stephan billed Borrego Health for crowns on teeth numbers 12, 13 and 14 over the course of multiple days.  However, the patient care plan documents that a singular bridge was put in place during the course of one appointment.

224.   Stephan also fraudulently represented that he purchased porcelain crowns for patients, when in fact, he made ceramic crowns himself in his own office.  Program Integrity staff became suspicious when Dr. Stephan was able to place crowns in only a day or two, when the lab that Dr. Stephan documented he was using had a much slower turnaround.  Program Integrity called the lab that Dr. Stephan documented he was using, and that lab confirmed that it would take 14 days to make a crown.  On further investigation, it was determined that, rather than purchasing the crowns, Dr. Stephan was making them himself out of ceramic with a CEREC machine.  To hide his scheme, he was falsifying documentation to say that he purchased porcelain crowns from a lab.

225.   Stephan then submitted these claims and others to the Premier Defendants seeking payment.  The Premier Defendants, under the Dental MSA, were obligated to perform their due diligence in reviewing the claims for accuracy and ensuring supporting documentation was submitted alongside the claims.  The Premier Defendants allowed these claims to be submitted to Borrego Health for processing and payment, because Premier received $25 per claim submitted to Borrego Health.  Further, once the claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained their family members not to flag these claims as potentially fraudulent.

### viii.   Santiago Rojo, D.D.S.

226.   On March 29, 2017, Santiago Rojo, both individually and through his company Santiago A. Rojo, D.D.S., Inc. (collectively, "Rojo"), entered into a written dental services agreement (the "Rojo Agreement") whereby Rojo agreed to provide primary dental services to participating Borrego Health patients, and

1   Borrego Health agreed to pay Rojo for those services. Santiago Rojo is the sole
2   officer and director of Santiago A. Rojo, D.D.S., Inc. Santiago Rojo also operates as
3   the Chief Executive Officer, Secretary and Chief Financial officer of Santiago A.
4   Rojo, D.D.S., Inc. Santiago Rojo maintains complete ownership, management and
5   control of Santiago A. Rojo, D.D.S., Inc. As such, while the parties to the Rojo
6   Agreement are Borrego Health and Santiago A. Rojo, D.D.S., Inc., Santiago Rojo,
7   as the alter ego and/or sole owner of Santiago A. Rojo, D.D.S., Inc., and as
8   signatory of the Rojo Agreement, is capable of being held personally liable under
9   the Rojo Agreement. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.)  A true and
10  correct copy of the Rojo Agreement is attached herein as Exhibit P.

11      227.   As a participant in Borrego Health's contract dental program, Rojo was
12  involved in Borrego Health's operations by providing dental services to Borrego
13  Health patients.

14      228.   Among other things, the Rojo Agreement required that Rojo practice
15  dentistry in accordance with all Federal, State and local laws, regulations, and
16  generally accepted principles applicable to the practice of dentistry, and prepare,
17  establish, and maintain administrative records, financial records, records pertaining
18  to patient diagnosis and treatment, and information pertaining to the services
19  provided.

20      229.   Rojo submitted false and fraudulent bills and made other statements
21  which Rojo knew to be false or had no reasonable grounds for believing their
22  representations were true, which also constitute a breach of the Rojo Agreement.  A
23  non-exhaustive list of examples is set forth below.  The below examples are
24  demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

25      230.   Dr. Rojo billed for visits in California even though he was living in
26  Florida and could not supervise subproviders or directly provide care.  For example,
27  on November 11, 2020, a representative from Borrego Health was onsite at Dr.
28  Rojo's office for an audit.  On that date, Dr. Rojo's staff indicated that Dr. Rojo was

in Florida and had been in Florida for almost the entire year of 2020.  Nonetheless, Dr. Rojo submitted claims for services performed in California throughout 2020. Most egregiously, Dr. Rojo subsequently billed for patient visits that he claimed were performed in California on November 11, 2020, a date on which a Borrego employee had physically been in his office and confirmed he was not there.

231.   Rather than performing the services himself and completing the documentation, Dr. Rojo regularly had his office manager entering and signing off on patient claims.  Dr. Rojo's patient charts were also largely duplicative, even going so far as to contain duplicate notes regarding patients' response to anesthesia.

### ix.   <u>Mohammed Al Tekreeti, D.D.S.</u>

232.   On or about August 7, 2017, Hussam Aldairi requested to employ an additional dentist, Mohammed Al Tekreeti, to provide primary dental services to Borrego Health patients.  Aldairi represented that Al Tekreeti would be under Aldairi's supervision and that Al Tekreeti would act in accordance with the Aldairi Agreements.  Aldairi hired Al Tekreeti shortly after Aldairi's request to Borrego Health.

233.   As a sub-provider in Borrego Health's contract dental program, Al Tekreeti was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

234.   Al Tekreeti submitted false and fraudulent bills and made other statements which Al Tekreeti knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Aldairi Agreements.  A non-exhaustive list of examples is set forth herein.  The below examples are demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.  For example, on or about May 2019, Dr. Al Tekreeti billed Borrego Health for a partial denture for teeth which supporting documentation indicated were never prepared for dentures.

7288673.3

235.   Like Dr. Aldairi, Dr. Al Tekreeti billed Borrego for patient visits that either did not occur or that were provided by a providers that were not disclosed to or credentialed by Borrego Health.  For example, Dr. Al Tekreeti billed for 135 patient visits that he claimed he performed on Tuesday, June 25, 2019.

236.   Review of Al Tekreeti's claims data indicates he carried out his excessive visits scheme to great effect.  Al Tekreeti billed for more than five visits for the same patient in a seven day period 576 times between February 2017 and January 2021, which is more than any other provider.  It would be unusual for an individual ever to require dental service every weekday for an entire week.  However, during the approximately five year span, Al Tekreeti represented that he had that unusual occurrence happen 576 times.  During that same period, he billed for twelve or more visits for the same patient in a 30-day period more than 1,169 times.

237.   Al Tekreeti then submitted these claims and others to the Premier Defendants seeking payment.  The Premier Defendants, under the Dental MSA, were obligated to perform their due diligence in reviewing the claims for accuracy and ensuring supporting documentation was submitted alongside the claims.  The Premier Defendants allowed these excessive, unsubstantiated, and duplicative claims to be submitted to Borrego Health for processing and payment, because Premier received $25 per claim submitted to Borrego Health.  Further, once the claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained their family members not to flag these claims as potentially fraudulent.

### x.   Jilbert Bakramian, D.D.S.

238.   On or about February 5, 2018, Aram Arakelyan requested to employ an additional dentist, Jilbert Bakramian, to provide primary dental services to Borrego Health patients.  Arakelyan represented that Bakramian would be under Arakelyan's supervision and that Bakramian would act in accordance with the Arakelyan

1  Agreements.  Arakelyan hired Bakramian shortly after Arakelyan's request to

2  Borrego Health.

3       239.   As a sub-provider in Borrego Health's contract dental program,

4  Bakramian was involved in Borrego Health's operations by providing dental

5  services to Borrego Health patients.

6       240.   Bakramian submitted false and fraudulent bills and made other

7  statements which Bakramian knew to be false or had no reasonable grounds for

8  believing their representations were true, which also constitute a breach of the

9  Arakelyan Agreements.  A non-exhaustive list of examples is set forth herein. The

10 below examples are demonstrative of a larger pattern and practice of fraudulent

11 and/or unlawful conduct.  For example, (1) on or about January 2019, Dr.

12 Bakramian billed Borrego Health for a filling on a tooth which x-rays noted that the

13 patient did not have at the time of service; (2) on or about July 2019, Dr. Bakramian

14 billed Borrego Health for a root canal performed on a tooth which x-rays noted that

15 the patient did not have at the time of service; (3) on or about March 2019, Dr.

16 Bakramian billed Borrego Health for multiple crowns when the patient actually

17 received a singular bridge, and (4) on or about May 31, 2019 and June 14, 2019, Dr.

18 Bakramian billed for preparing a tooth for a crown, which requires shaving down

19 the tooth when x-rays clearly demonstrate that tooth had an implant in that spot,

20 meaning there was no natural tooth for Bakramian to prepare to receive a crown.

21      241.   The Premier Defendants allowed Bakramian's fraudulent practices to

22 continue.  Obviously improper claims were regularly approved.  For example, to

23 approve a crown, a Premier reviewer was required to affirmatively review the x-ray

24 and progress notes and click, "Reviewer approved," and Premier's software

25 maintains a log of which reviewer approved claims and when.  On January 20, 2020,

26 Premier reviewer J.D. approved a crown for a patient on tooth #30, when the x-rays

27 submitted to Premier clearly showed that the tooth already had an implant with a

28 restoration.  Worse still, on January 28, 2020, Premier reviewer S.N. approved the

1  same claim a *second time* (same code, same date of service, same tooth #30).  Both

2  times, Premier looked the other way in furtherance of its scheme.

3      242.   From July 2019 to August 2019, Dr. Bakramian billed 29 different

4  encounters for a single patient out of the 43 business days during that period.

5  Again, Premier did not flag these bills and took no steps to counsel or discipline this

6  dentist.

7      243.   Dr. Bakramian regularly billed for more visits in a day than is humanly

8  possible, leading to the conclusion that these visits were either not performed or

9  were performed by unknown and uncredentialed persons.  For example, he billed for

10  111 patient visits he claimed he performed on July 16, 2019.

11      244.   Bakramian's excessive visits were a pattern, not an isolated incident.

12  Bakramian billed for more than five visits for the same patient in a seven day period

13  3,470 times between February 2017 and January 2021.  It would be unusual for an

14  individual ever to require dental service every weekday for an entire week.

15  However, during the approximately five year span, Bakramian represented that he

16  had that unusual occurrence happen 3,470 times.  During that same period, he billed

17  for twelve or more visits in a 30-day period for the same patient more than 4,538

18  times.

19      245.   Bakramian then submitted these claims and others to the Premier

20  Defendants seeking payment.  The Premier Defendants, under the Dental MSA,

21  were obligated to perform their due diligence in reviewing the claims for accuracy

22  and ensuring supporting documentation was submitted alongside the claims.  The

23  Premier Defendants allowed these excessive, unsubstantiated, and duplicative

24  claims to be submitted to Borrego Health for processing and payment, because

25  Premier received $25 per claim submitted to Borrego Health.  Further, once the

26  claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained

27  their family members not to flag these claims as potentially fraudulent.

28

7288673.3

xi.   **Marcelo Toledo, D.D.S.**

246.   On June 16, 2015, Marcelo Toledo, both individually and through his company Marcelo Toledo, D.D.S., Inc. (collectively, "Toledo"), entered into a written dental services agreement (the "Toledo Agreement") whereby Toledo agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Toledo for those services. Marcelo Toledo is the sole officer and director of Marcelo Toledo, D.D.S., Inc. Marcelo Toledo also operates as the Chief Executive Officer, Secretary and Chief Financial officer of Marcelo Toledo, D.D.S., Inc. Marcelo Toledo maintains complete ownership, management and control of Marcelo Toledo, D.D.S., Inc. As such, while the parties to the Toledo Agreement are Borrego Health and Marcelo Toledo, D.D.S., Inc., Marcelo Toledo, as the alter ego and/or sole owner of Marcelo Toledo, D.D.S., Inc., and as signatory of the Toledo Agreement, is capable of being held personally liable under the Toledo Agreement. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.)  A true and correct copy of the Toledo Agreement is attached herein as Exhibit Q.

247.   As a participant in Borrego Health's contract dental program, Toledo was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

248.   Among other things, the Toledo Agreement required that Toledo practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

249.   Toledo submitted false and fraudulent bills and made other statements which Toledo knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Toledo Agreement.

7288673.3

A non-exhaustive list of examples is set forth below.  The below examples are demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

250.   For example, (1) on or about July 2018, Dr. Toledo billed for services rendered to a patient during one scheduled visit as though they occurred over the court of four visits, (2) on or about June 2018, Dr. Toledo performed restoration on eight teeth which x-rays demonstrated was not medically necessary, (3) on or about July and August 2018, Dr. Toledo billed for tooth restoration services rendered during single visits as though they were performed over multiple visits, (4) on or about November and December 2018, Dr. Toledo billed for fillings on teeth where the patient already had existing fillings, and (5) billing in excess of 20 patient visits a day, including billing Borrego Health for 97 patient visits that he claimed occurred that day.  Toledo also regularly engaged in the "claim splitting" scheme.  For example, on August 20, 2018, Dr. Toledo charted and billed for a tooth restoration on tooth 19.  In submitting the claim, Toledo submitted old x-rays dated July 23, 2018 and August 13, 2018.  Those x-rays indicate the restoration of both tooth 18 and tooth 19 had already been completed prior to the August 20, 2018 claim submission.  The x-ray from August 20, 2018 also demonstrates that no further restoration occurred during that patient visit.  Despite this, the claims were billed as two separate visits.  For the same patient, Dr. Toledo billed for identical services rendered to four different teeth.  The patient schedule indicates the patient was not seen on all the days billed between November 7, 2019 and November 13, 2018,

251.   For visits in July 2018 for the same patient, the treatment notes are a obviously copied and pasted, including identical blood pressure readings, because the patient had only one visit on July 16, 2018, but it was billed as four separate visits.

252.   For visits in October 2018, again there are five identical blood pressure readings documented in a row.  These visits involved a surface restorations for

FOURTH AMENDED COMPLAINT

7288673.3

1 | adjacent teeth, but were billed separately even though they should have been done
2 | together.

3 |     253.   In another instance, there were restorations on eight separate teeth, and
4 | each was billed separately, but there is no imaging to support the need for the
5 | restorations.  In such a situation, the dentist is required to secure supplemental
6 | documentation to demonstrate medical necessity.

7 |     254.   On or about August 20, 2018, Toledo charted and billed for services
8 | provided on tooth 19.  X-rays dated July 23 and August 13, 2018 were provided to
9 | support the restoration, but the x-rays show that there was a restoration already done
10 | by August 13.  There is no evidence of further restoration or any restoration on
11 | August 20.  All the work was completed on August 7, but split into two separate
12 | dates of billing.

13 |     255.   For one patient with dates of service November 7-13, 2018, there are
14 | four identical notes with only the tooth number changed, and the schedule does not
15 | show the patient was seen (only that the patient was on the schedule).  This is
16 | another example of claim splitting and false billing.

17 |     256.   For another patient, there is no evidence that the fillings for teeth 4 and
18 | 5 were done as billed on November 4 and 14, 2018, respectively.  The pre-procedure
19 | x-ray shows existing fillings and is dated October 18, 2018.  The post-procedure x-
20 | rays dated December 13, 2018 does not show any change to the fillings for teeth 4
21 | and 5.

22 |     257.   Toledo's excessive visits were a pattern, not an isolated incident.
23 | Toledo billed for more than five visits for the same patient in a seven day period 582
24 | times between February 2017 and January 2021.  It would be unusual for an
25 | individual ever to require dental service every weekday for an entire week.
26 | However, during the approximately five year span, Toledo represented that he had
27 | that unusual occurrence happen 582 times.  During that same period, he billed for
28 | twelve or more visits in a 30-day period for the same patient more than 410 times.

258.   Toledo then submitted these claims and others to the Premier Defendants seeking payment.  The Premier Defendants, under the Dental MSA, were obligated to perform their due diligence in reviewing the claims for accuracy and ensuring supporting documentation was submitted alongside the claims.  The Premier Defendants allowed these excessive, unsubstantiated, and duplicative claims to be submitted to Borrego Health for processing and payment, because Premier received $25 per claim submitted to Borrego Health.  Further, once the claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained their family members not to flag these claims as potentially fraudulent.

### xii.   Marlene Thompson, D.D.S.

259.   On or about April 18, 2013, Marlene M. Thompson, D.D.S., both individually and through her company Marlene M. Thompson, D.D.S., Inc. (collectively, "Thompson") entered into a written dental services agreement (the "Thompson Agreement") whereby Thompson agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Thompson for those services. Marlene Thompson is the sole officer and director of Marlene M. Thompson, D.D.S., Inc. Marlene Thompson also operates as the Chief Executive Officer, Secretary and Chief Financial officer of Marlene M. Thompson, D.D.S., Inc. Marlene Thompson is also the designated agent for service of process for Marlene M. Thompson, D.D.S., Inc. Marlene Thompson maintains complete ownership, management and control of Marlene M. Thompson, D.D.S., Inc. As such, while the parties to the Thompson Agreement are Borrego Health and Marlene M. Thompson, D.D.S., Inc., Marlene Thompson, as the alter ego and/or sole owner of Marlene M. Thompson, D.D.S., Inc., and as signatory of the Thompson Agreement, Marlene Thompson is capable of being held personally liable under the Thompson Agreement. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.) A true and correct copy of the Thompson Agreement is attached herein as Exhibit R.

7288673.3

260.   As a participant in Borrego Health's contract dental program, Thompson was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

261.   Among other things, the Thompson Agreement required that Thompson practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, and to prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Thompson submitted false and fraudulent bills and made other statements which Thompson knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Thompson Agreement.  A non-exhaustive list of examples is set forth below.  The below examples demonstrate a larger pattern and practice of fraudulent and/or unlawful conduct.  For example:

- After Dr. Tuso left Dr. Aldairi's office, Thompson hired Maura Tuso to work as a dentist in her Escondido dental practice. During the time Dr. Tuso worked for Thompson, Dr. Tuso was suspended from participating in Medi-Cal in any capacity. When Thompson hired Dr. Tuso, the generally accepted practice for employers receiving federal and state healthcare funds was to check the suspended and ineligible provider lists prior to hiring employees. Thompson failed to check the suspended and ineligible provider lists for Dr. Tuso before hiring her. Thompson then allowed Dr. Tuso to provide dental services to Borrego and Medi-Cal patients. As a suspended provider, all the treatment provided by Dr. Tuso was not subject to payment by Borrego or Medi-Cal. (*See* Welf. & Institutions Code section 14043.61; *see also* 22 C.C.R. section 51303.) On October 12, 2018, Thompson placed a patient on the schedule who received services the day prior.  Thompson

FOURTH AMENDED COMPLAINT

7288673.3

did this to make it appear that the services rendered were spread out over several days, when in fact the patient only received services on June 23, 2018.

- On July 5, 2018, Dr. Tuso provided two fillings to a patient, but was asked to leave the dates blank in her charts. The patient chart was then filled in to show the services rendered occurred over the course of two visits instead of one.

- On July 10, 2018, Dr. Tuso provided dental services to a Borrego Health patient, but was asked to leave the dates blank in her charts. The patient chart was then filled in to show the services rendered occurred over the course of two visits instead of one. The second visit was documented on a day Dr. Tuso was not staffed to work at Thompson's office. Despite this, the second visit in the patient chart indicates she provided the patient with services that day.

262. To avoid detection, Thompson submitted bills for Dr. Tuso's services in her own name. In other words, Thompson submitted claims to Borrego Health for services she did not perform. Further, Thompson submitted claims to Borrego Health for services performed by a suspended provider. Borrego Health then paid Thompson for services Thompson should not have been paid for. Thompson, through her conduct and misrepresentations, led Borrego Health to improperly submit claims to Medi-Cal which were not subject to reimbursement.

263. Thompson also instructed Dr. Tuso and other dentists in her office to perform as many services as possible in one visit, then leave the dates on the patient charts blank to allow for the services to be billed over multiple days (as alleged in the above examples.

264. The above mentioned conduct ties directly into the greater Fraudulent Dental Billing Scheme, as Thompson was submitting fraudulent bills for all services rendered by Dr. Tuso.

7288673.3

### xiii.   __Douglas Ness, D.D.S.__

265.   On or about May 2, 2016, Douglas Ness, D.D.S., both individually and through his company Ness Dental Corporation (collectively, "Ness") entered into a written dental services agreement (the "Ness Agreement") whereby Ness agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Ness for those services. Doug Ness is the sole officer and director of Ness Dental Corporation. Doug Ness also operates as the Chief Executive Officer, Secretary and Chief Financial officer of the Ness Dental Corporation. Doug Ness is also the designated agent for service of process for the Ness Dental Corporation. Doug Ness maintains complete ownership, management and control of Ness Dental Corporation. As such, while the parties to the Ness Agreement are Borrego Health and Ness Dental Corporation, Doug Ness, as the alter ego and/or sole owner of the Ness Dental Corporation, and as signatory of the Ness Agreement, Ness is capable of being held personally liable under the Ness Agreement. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.) A true and correct copy of the Ness Agreement is attached herein as Exhibit S.

266.   As a participant in Borrego Health's contract dental program, Ness was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

267.   Among other things, the Ness Agreement required that Ness practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, and to prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

268.   Ness submitted false and fraudulent bills and made other statements which Ness knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Ness Agreement.

The alleged conduct is demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

269. In 2018, Ness hired Maura Tuso to work as a dentist at Ness' dental office, Crown Dental Group. During the time Dr. Tuso worked for Ness, Dr. Tuso was suspended from participating in Medi-Cal in any capacity. When submitting her new hire paperwork to Ness, Dr. Tuso told Ness that she was on the suspended provider list. In spite of this, Ness allowed Dr. Tuso to continue to work for him and to provide dental services to Borrego and Medi-Cal patients. As a suspended provider, the treatment and services provided by Dr. Tuso was not subject to payment by Borrego Health or Medi-Cal. (*See* Welf. & Institutions Code section 14043.61; *see also* 22 C.C.R. section 51303.)

270. To avoid detection, Ness submitted bills for Dr. Tuso's services in his own name. In other words, Ness submitted claims to Borrego Health for services he did not perform. Further, Ness submitted claims to Borrego Health for services performed by a suspended provider. Borrego Health then paid Ness for services Ness should not have been paid for. Ness, through his conduct and misrepresentations, led Borrego Health to improperly submit claims to Medi-Cal which were not subject to reimbursement. Ness also instructed Dr. Tuso and other dentists in his office to perform as many services as possible in one visit, then leave the dates on the patient charts blank to allow for the services to be billed over multiple days.

271. Ness also hired other dental providers, in addition to Dr. Tuso, who lacked California dental licenses to provide dental services to Borrego Health patients. These hires included a husband and wife pair. These individuals were not licensed to practice dentistry in California and performed services on Borrego Health patients. Upon information and belief, Ness billed Borrego Health for these services in the same manner Ness did for Dr. Tuso. The above mentioned conduct ties directly into the greater Fraudulent Dental Billing Scheme, as Ness was

7288673.3

1  submitting fraudulent bills for all services rendered by Dr. Tuso and the other

2  unlicensed dental providers that were employed by Ness.

3          xiv.    **George Jared, D.D.S.**

4          272.   On or On or about April 19, 2016, George C. Jared, D.D.S., both

5  individually and through his company George C. Jared, D.D.S., Inc. (collectively,

6  "Jared") entered into a written dental services agreement (the "Jared Agreement")

7  whereby Jared agreed to provide primary dental services to participating Borrego

8  Health patients, and Borrego Health agreed to pay Jared for those services. George

9  Jared is the Chief Executive Officer and sole director of George C. Jared, D.D.S.

10  Inc. As such, while the parties to the Jared Agreement are Borrego Health and

11  George C. Jared, D.D.S., Inc., George Jared, as the alter ego and/or sole owner of

12  George C. Jared, D.D.S., Inc., and as signatory of the Jared Agreement, Jared is

13  capable of being held personally liable under the Jared Agreement. (*See i.e. Irey v.*

14  *Len* (1961) 191 Cal. App. 2d 13.) A true and correct copy of the Jared Agreement is

15  attached herein as Exhibit T.

16          273.   As a participant in Borrego Health's contract dental program, Jared was

17  involved in Borrego Health's operations by providing dental services to Borrego

18  Health patients.

19          274.   Among other things, the Jared Agreement required that Jared practice

20  dentistry in accordance with all Federal, State and local laws, regulations, and

21  generally accepted principles applicable the practice of dentistry, and to prepare,

22  establish, and maintain administrative records, financial records, records pertaining

23  to patient diagnosis and treatment, and information pertaining to the services

24  provided.

25          275.   Jared submitted false and fraudulent bills and made other statements

26  which Jared knew to be false or had no reasonable grounds for believing their

27  representations were true, which also constitute a breach of the Jared Agreement.

28

7288673.3

1   Upon information and belief, the alleged conduct is demonstrative of a larger pattern

2   and practice of fraudulent and/or unlawful conduct.

3       276.   Jared hired Maura Tuso to work as a dentist at his dental practice.

4   During the time Dr. Tuso worked for Jared, Dr. Tuso was suspended from

5   participating in Medi-Cal in any capacity. When Jared hired Dr. Tuso, the generally

6   accepted practice for employers receiving federal and state healthcare funds was to

7   check the suspended and ineligible provider lists prior to hiring employees. Jared

8   failed to check the suspended and ineligible provider lists for Dr. Tuso before hiring

9   her. Jared then allowed Dr. Tuso to provide dental services to Borrego and Medi-Cal

10  patients. As a suspended provider, all the treatment provided by Dr. Tuso was not

11  subject to payment by Borrego or Medi-Cal. (*See* Welf. & Institutions Code section

12  14043.61; *see also* 22 C.C.R. section 51303.)

13      277.

14      278.   Jared also hired other dental providers, in addition to Dr. Tuso, who

15  lacked California dental licenses to provide dental services to Borrego Health

16  patients.  Upon information and belief, Jared billed Borrego Health for the services

17  that unlicensed dental providers provided to Medi-Cal patients.

18      279.   To avoid detection, Jared submitted bills for Dr. Tuso's services in his

19  own name. In other words, Jared submitted claims to Borrego Health for services he

20  did not perform. Further, Jared submitted claims to Borrego Health for services

21  performed by a suspended provider. Borrego Health then paid Jared for services

22  Jared should not have been paid for. Jared, through his conduct and

23  misrepresentations, led Borrego Health to improperly submit claims to Medi-Cal

24  which were not subject to reimbursement.

25      280.   Jared also instructed Dr. Tuso and other dentists in his office to perform

26  as many services as possible in one visit, then leave the dates on the patient charts

27  blank to allow for the services to be billed over multiple days.

28

7288673.3

281.   The above mentioned conduct ties directly into the greater Fraudulent Dental Billing Scheme, as Jared was submitting fraudulent bills for all services rendered by Dr. Tuso.

**D.     Since Premier Was Unable and Unwilling To, a Program Integrity Process is Implemented by Borrego Health**

282.   Despite its promises to do so, its representations that it could do so, and its concealment of the fact that it could not do so, Premier completely lacked the ability to appropriately conduct claims monitoring.

283.   In fact, it was not until 2019 that Premier hired its first and only employee with any clinical experience whatsoever.  At that point, Premier hired a 2016 dental graduate, Nicholas Tapp, D.D.S.  Unsurprisingly, Nicholas Tapp was related to other employees at Premier.  Nicholas Tapp did not even receive his dental license until October 2017.  Indeed, staff from Borrego Health were largely responsible for training Nicholas Tapp due his lack of knowledge and experience.

284.   Even after hiring Nicholas Tapp, Premier continuously failed to properly review the contract dental claims.  For example, and without limitation, Premier approved claims (and caused Borrego Health to pay for claims (1) where no supporting documentation was provided, (2) for services performed on teeth which—based on x-rays submitted with the claims—were no longer in the patients' mouth, (3) which were duplicate (i.e. same claims, submitted multiple times), and (4) that were facially and obviously not legitimate.

285.   For example, in February 2020, one dentist billed 18 different encounters for a single patient, despite the fact that there were only 19 business days in February 2020, meaning the bills showed this patient came in for dental services all but one business day in February 2020.  Premier did not flag these bills and took no steps to counsel or discipline this dentist.  Between June 2020 and July 2020, one dentist billed 30 different encounters for a single patient, meaning the bills showed

7288673.3

1   this patient came in for dental services every other day during that time period.

2   Premier did not flag these bills and took no steps to counsel or discipline this dentist.

3       286.   As a result, Borrego Health was forced to hire its own employees and

4   develop a Program Integrity program to review and audit contract dental claims and

5   providers, tasks which Premier Defendants were supposed to perform under the

6   Dental MSA.

7       287.   In May 2017, Borrego Health hired Timothy Martinez, D.D.S. to be its

8   Chief Dental Officer.  In this role, Dr. Timothy Martinez was tasked with

9   developing a "Program Integrity" team for Borrego Health's contract dental

10   program and providing practice management oversight for its in-house dental

11   programs.  To assist in these efforts, Borrego Health and Dr. Martinez hired Nithya

12   Venugopal, DDS, in January 2018 as Borrego Health's Dental Director of Program

13   Integrity.

14      288.   Among other things, Dr. Timothy Martinez and Dr. Nithya Venugopal

15   were tasked to create a system that would identify patterns on the "back-end" of

16   claims submission (*i.e.* after the claims had been submitted).  Specifically, Dr.

17   Timothy Martinez and Dr. Nithya Venugopal were supposed to identify:  (1)

18   utilization of non-covered services; (2) overutilization of services; (3) incomplete,

19   substandard, unnecessary treatment rendered by providers; and (4) billing

20   discrepancies. The team also sought to develop and implement necessary steps to

21   correct and prevent such issues.

22      289.   On May 5, 2017, the Program Integrity team set up initial evidence-

23   based key references and questions for the new program integrity unit.  The key

24   references and questions were based on the National Medicaid Guidelines the

25   Deputy Inspector General for Evaluation and Inspections May 15, 2015 report

26   authored by Suzanne Murrin, titled: "QUESTIONABLE BILLING FOR

27   MEDICAID PEDIATRIC DENTAL SERVICES IN CALIFORNIA."  The Murrin

28   report reviewed claims submitted by dentists in California to DHCS and found that

87

7288673.3

1   approximately 8% of the dental providers were billing outliers in terms of CDT

2   codes billed, and of those identified outliers, only approximately 1.8% (or six out of

3   329 dentists) were disciplined by the California Dental Board for failing to meet

4   quality of care standards.  Dr. Timothy Martinez used the Murrin report and its

5   findings, as well as guidance from the 2017 National Medicaid and CHIP Oral

6   Health Symposium (as organized by the Medicaid, Medicare, CHIP Services Dental

7   Association), for reference when developing Borrego Health's internal compliance

8   metrics.  Critically, at the time, there was no other guidance, data or reports setting

9   out proper or improper billing and documentation protocols in the state for FQHCs

10  contracting with private dental offices.

11       290.   The Program Integrity efforts began with a utilization review system

12  which developed an algorithm for analyzing and sorting out outliers, particularly by

13  focusing on high-billing providers among the contract dentists.  As the Program

14  Integrity team's utilization review and claims data analytics capabilities became

15  more robust and sophisticated, the team was soon able to also review for over-

16  utilization of high-cost codes/services (dental providers with a standard deviation of

17  one or more from the mean as far as individual high-cost codes, such as crowns and

18  surgical extractions), percentage of preventive services and under-utilization of

19  preventive services, as well as billing discrepancies, and lack of medical necessity.

20  Over time, the Program Integrity team also developed a mechanism to view visit

21  count and examine excessive visits.

22       291.   Additionally, around mid-2019, the Program Integrity team built in

23  certain parameters, referred to as the "enhanced review" parameters, to identify

24  problematic claims during the claims monitoring process, in large part after

25  recognition that Premier was not properly vetting claims during the claims

26  monitoring process, despite Premier's contractual obligation to do so.

27       292.   Once the utilization review analysis was conducted, the Program

28  Integrity team would conduct site visits and chart reviews to directly assess

1   compliance and suspected fraud, waste, and/or abuse among any dental practices

2   and providers identified as outliers within the contract dental network (meaning

3   providers who were one or more above the standard deviation in the different

4   categories being reviewed).

5   293.   Specifically, Dr. Nithya Venugopal would receive a report and conduct

6   a closer examination of any outlier practices or providers.  Then, Dr. Nithya

7   Venugopal would work with Borrego Health's utilization management analyst to

8   pull around ten to 15 charts from patients based on excessive patients visits and/or

9   CDT code criteria under question for these providers.

10   294.   Next, a member of the Program Integrity team would collect

11   information from the patient records regarding visits and services during an actual

12   on-site visit, including supportive documentation such as radiographs, charts, and

13   schedules.  The peer review process was designed to be objective through the use of

14   a template peer review worksheet examining specific criteria.

15   295.   Based on the results of these findings, the Program Integrity team

16   members would conduct comprehensive records review and assess compliance with

17   Program Integrity rubric, consistent with the Medi-Cal Dental Provider Handbook.

18   296.   Following the chart reviews and site audits, the Program Integrity team

19   would develop provider report cards and issue a "corrective action plan" to any

20   provider whose practice was identified as deficient across certain criteria.  These

21   plans would detail exactly what deficiencies were identified and how a provider was

22   required to correct and improve his or her practice.  The Program Integrity team

23   aimed to conduct re-audits of providers who had been issued a corrective action plan

24   within 90 days to confirm whether or not the provider had corrected identified

25   deficiencies by again obtaining records from the provider and assessing compliance

26   under the same rubric.

27

28

7288673.3

297.   Any follow-up action by the team depended on the results of these peer review and compliance audits.  For example, if the score improved, then the provider would be audited on an annual basis thereafter.

298.   Alternatively, if the score worsened, Dr. Timothy Martinez or Dr. Nithya Venugopal would escalate the matter to Borrego Health's Chief Compliance Officer, Gabriela Alvarado, and Mikia Wallis for determination of further action, up to and including termination of Borrego Health's agreement with the dentist.

299.   Additionally, where the Program Integrity team found evidence suggesting potential provider fraud, waste, and/or abuse, Dr. Timothy Martinez would meet with Gabriela Alvarado to discuss possible recoupment and recovery of funds, notification to DHCS and other state authorities, and submission of a claims inquiry form to DHCS to request an adjustment for either an underpayment or overpayment of claims.

300.   The Program Integrity team, once it came online and established processes after Dr. Timothy Martinez's arrival in 2017, reviewed back-end claims and identified outliers and other billing discrepancies.

**E.     Premier and the Borrego Insiders Coverup Fraudulent Billing (the "Coverup Scheme")**

301.   The Borrego Insiders and the Premier Defendants were aware of the conduct and had received complaints and information, but did nothing to stop the practice.  Instead, the Premier Defendants worked with Borrego Insiders, including without limitation Mikia Wallis, Diana Thompson, and Karen Hebets to stop further inquiries and protect the dentists from both detection and/or consequences.  As stated herein, the Premier Defendants were incentivized to allow providers to bill as many claims as possible, since Premier was paid on a per claim basis.  The Premier Defendants were further incentivized to cover up for fraudulently billing dentists (including—and especially—the most egregious dentists), since those were the

FOURTH AMENDED COMPLAINT

7288673.3

1    dentists that submitted the highest number of claims and directly increased the

2    amount that Premier was paid.

3        302.   The Borrego Insiders were incentivized to cover up for the fraudulently

4    billing dentist since those billings allowed the other Schemes discussed herein to

5    take place and/or resulted in kickback payments to the Borrego Insiders. For

6    example, as an alleged above, Diana Thompson and Karen Hebets hired several

7    family members to place in the billing and accounting department at Borrego

8    Health. These family members were trained to ignore errors and duplications in the

9    claims submitted by the Dental Defendants through the Premier Defendants. .

10       303.   The Premier Defendants and the Borrego Insiders used a number of

11   different methods to cover up for fraudulently billing dentists, including without

12   limitation the Dentist Defendants, as outlined below, including without limitation

13   interference with audits, failing and refusing to reverse false/fraudulent claims,

14   refusal to take action, general avoidance and unavailability and undue pressure.

15       304.   The Premier Defendants, supported by the Borrego Insiders, would not

16   permit Program Integrity audits to be random.  It required Program Integrity to

17   provide advance notice to dentists, so that the dentists could be more prepared and

18   take steps to avoid detection of problems by the Program Integrity team.

19       305.   While typically the Program Integrity team would book any compliance

20   review appointments with contract dental providers through one of Premier's

21   administrative staff, for reasons unknown to Borrego Health, any appointments with

22   Husam Aldairi and Aram Arakelyan (both identified by the Program Integrity team

23   as high-billing providers for certain costly services) were required to be set up by

24   Travis Lyon personally.

25       306.   Occasionally, the Program Integrity team would identify claims that

26   were falsely or fraudulently billed, and should have been reversed (*i.e.* the dentists

27   should have refunded the money they received from Borrego Health, and Premier

28   should have returned or credited the per visit fee back to Borrego Health).

1  However, the Premier Defendants and Borrego Insiders, including without

2  limitation Karen Hebets and Diana Thompson, would not follow through on claims

3  reversals.

4          307.   On several occasions, based on suspicious or outright fraudulent claims

5  activity, Borrego Health's Program Integrity team would recommend and/or request

6  that a contract dental provider have their provider contract with Borrego Health

7  terminated.  The Premier Defendants and Borrego Insiders would regularly support

8  the contract dental providers over Borrego Health and override decisions made by

9  Borrego Health, and would refuse to take action against fraudulently billing

10 providers.

11         308.   On several occasions in 2019, during Program Integrity's

12 communications with contract dentists, Dr. Venugopal and Dr. Koutros were

13 informed by contract dental providers that the Premier Defendants told dentists that

14 if they did not bill for specific conditions, regardless of the patients' true health

15 status. Program Integrity was also informed that the Premier Defendants were

16 training and/or encouraging contract dental providers to split the claims up in certain

17 manners, asserting that if the contract dental providers did not bill for specific

18 conditions over multiple days, that the contract dental provider would not receive

19 payment from Borrego Health. When Program Integrity brought these concerns to

20 Travis Lyon, he denied the assertions and reassured Program Integrity that re-

21 training would take place to address confusion from the contract dental providers.

22 After this, the Premier Defendants became more proactive in taking steps to conceal

23 their schemes, working alongside Borrego Insiders Diana Thompson and Karen

24 Hebets to ensure duplicative claims would continue to be submitted for billing.

25         309.   Both Dr. Timothy Martinez and Dr. Nithya Venugopal reported that,

26 whenever they raised issues about Premier to Mikia Wallis, they would immediately

27 receive a call or email from Travis Lyon or Nick Priest.  Clearly, Mikia Wallis was

28 sharing their internal concerns directly with the Premier Defendants.  More often

7288673.3

1   than not, however, neither Premier nor Mikia Wallis actually addressed the

2   underlying issue Dr. Timothy Martinez or Dr. Nithya Venugopal identified with

3   Premier.

4       310.   Mikia Wallis made herself generally unavailable for meetings with the

5   Program Integrity team.  At most, Program Integrity staff were only allowed to

6   block 15-minute intervals with her.  As stated by Dr. Venugopal, "[Mikia Wallis]

7   knew what we were doing but hated what we were finding."

8       311.   Program Integrity team members repeatedly raised issues about certain

9   high-billing providers who they identified as committing "suspect fraud" to Mikia

10   Wallis and Borrego Health's former Chief Compliance Officer, but usually no

11   action was ever taken against providers, who would remain eligible to continue

12   providing and billing for improper services rendered to Borrego Health's patients.

13       312.   Mikia Wallis would routinely push back or throw up barriers whenever

14   they tried to implement some sort of final audit process for the contract dental

15   providers.  There was also an ongoing push-and-pull in terms of adding new

16   contract dental providers to Borrego Health's network between the Program

17   Integrity team and credentialing committee on one side and Premier and Mikia

18   Wallis on the other.  There were a number of instances where Travis Lyon,

19   supported by Mikia Wallis, attempted to ram a number of new contract dental

20   providers through Borrego Health's credentialing process, despite Dr. Timothy

21   Martinez's insistence that the providers needed to be thoroughly vetted before

22   approving them.

23       313.   Mikia Wallis defended contract dental providers unreasonably, even

24   after Program Integrity team members informed her of these providers' documented

25   history of problematic billing practices and poor quality.  Mikia Wallis herself

26   reported that she encouraged staff to treat contract dental providers as part of

27   Borrego Health's internal workforce and "to the extent that we feel the dentists have

28   high quality of care, we need to defend them."

7288673.3

314.    At the June 2017 Credentialing Committee, Dr. Timothy Martinez noted and the minutes reflected that Bruce Hebets, along with Premier's Travis Lyon and Nick Priest, all personally attended the meeting.  Usually, credentialing committees are autonomous bodies free from inadvertent pressure of having administration involvement.

315.    There are numerous, specific examples of the Premier Defendants and Borrego Insiders working to cover up for fraudulently billing dentists.  A few of these examples are outlined below.

316.    On April 12, 2017, Dr. Timothy Martinez emailed Travis Lyon to note his concerns with the contract dental program as a result of the HMS/CMS audit findings: "I can start to review with you and your team the three most common pitfalls that Borrego was cited for: EXCESSIVE VISITS, INSUFFICIENT DOCUMENTATION, NOT MEDICALLY NECESSARY.  We can start with catching "EXCESSIVE VISIT" at the time the claim (called a superbill) is scanned by the private dental offices and entered into your data banks."  Thus, the Premier Defendants were aware of issues with excessive visit billing, yet did nothing to detect or prevent such billing, despite their contractual obligation to do so.

317.    Dr. Venugopal noted that dentists as a rule could not be terminated for Program Integrity issues alone.  To terminate a dentist, Dr. Venugopal and Dr. Martinez would have to also raise a quality or credentialing issue.  Even this, though, was insufficient to terminate certain "untouchable" dentists, including Dr. Aldairi, Dr. Arakelyan, Dr. Mehdizadeh and Dr. Hawatmeh (all of whom Program Integrity identified as outlier providers).

318.    In February 2018, some of the Program Integrity team met with the Premier Defendants to review the newly developed contract dental patient forms, which had been created to ensure consistent and accurate documentation across providers.  Though these were Borrego Health forms, Travis Lyon nevertheless

1  retained final say on how and when they were communicated to the contract dental

2  providers – if ever.

3      319.   Husam Aldairi received "Provider Compliance Reports" on June 14,

4  2018 and September 13, 2018 following a series of audits conducted by the Program

5  Integrity team during which he received scores of zero (the lowest possible score) in

6  the following categories: proper documentation, eligible provider (meaning that the

7  provider's signature on the claims matches the dental superbill and clinical progress

8  notes as required by the Medi-Cal Dental Provider Hand-book), and medically

9  necessary (meaning that the documentation supports the level of services rendered).

10 To address the clear deficiencies identified in the June 2018 audit, the Program

11 Integrity team also put together a corrective action plan listing out each deficiency

12 in detail and providing actionable steps Husam Aldairi was requested to take to

13 correct the issues.  Husam Aldairi received the corrective action plan and returned a

14 signed copy acknowledging it to the Program Integrity team but never actually

15 worked on improving.  Husam Aldairi also failed multiple peer review audits

16 conducted by Program Integrity team members on March 31 and July 25, 2019, and

17 most recently on August 31, 2020.  The Premier Defendants and the Borrego

18 Insiders, including Mikia Wallis, refused to terminate Husam Aldairi.

19     320.   When Husam Aldairi was up for re-credentialing, Dr. Timothy

20 Martinez recommended against re-credentialing Husam Aldairi but he was

21 overruled by the Premier Defendants and Borrego Insiders, including without

22 limitation Travis Lyon and Mikia Wallis.  Despite the poor performance, the

23 Premier Defendants and Borrego Insiders submitted a "special license" to HRSA to

24 allow Husam Aldairi to have a satellite intermittent dental clinic with Borrego

25 Health (in space owned by another Daryl Priest entity that Borrego Health leased).

26 Husam Aldairi was not actually terminated until the Board Insiders were no longer

27 involved in the matter.

28

7288673.3                    FOURTH AMENDED COMPLAINT

321.    In both July and September 2018, Dr. Timothy Martinez notified Mikia Wallis in her capacity as Borrego Health's Chief Legal Officer about the results of the Program Integrity team's first analytics ran on the contract dentists, including those identified as outliers within the program.  Mikia Wallis did not do anything to address the outliers.

322.   Mikia Wallis was informed of billing issues with Dr. Tina Cho.  For example, Dr. Martinez emailed Mikia Wallis on July 2, 2019 acknowledging "aberrant billing behavior" and attaching a document titled, "tina cho.docx," which included examples of problematic claims.  However, on October 6, 2020, Mikia Wallis sent a letter to Special Agent Supervisor Craig Eastep which (falsely) stated that Borrego Health had no knowledge of potential billing discrepancies for services provided by Dr. Tina Cho.

323.   On October 12, 2019, a member of the Program Integrity team instructed that Borrego Health will deny claims for issues that he considers to be "black and white issues."  Travis Lyon responded, "Is Koutros and Venugopal aware that Ms. Wallis does not want us to use the Denti-Cal regulations as a reason to deny claims?"

324.   In March 2019, dentist Maura Tuso called Borrego Health's compliance hotline.  She left a message indicating that she wanted to report fraud.  Dr. Timothy Martinez facilitated a telephone conference to respond to Maura Tuso, which took place on March 18, 2019.  Travis Lyon joined Dr. Timothy Martinez on the call.

325.   Maura Tuso alleged that there was fraud occurring, including manipulating charts.  Dr. Timothy Martinez asked Maura Tuso to email any details.  When these allegations were reported to Mikia Wallis, Mikia Wallis stated that Maura Tuso had lost her license and was not credible, and to cease any further investigation.  Shockingly, despite knowledge that Maura Tuso had lost her license (and, thus, was suspended from Medi-Cal) and using this information in an attempt

1    to discredit her, the Premier Defendants and Borrego Insiders did nothing to prevent

2    Maura Tuso from continuing to provide services through other contract dentists (and

3    billing for them) or to remedy prior improper bills where Mauro Tuso provided

4    services.

5        326.    On January 27, 2020, a member of the Program Integrity team

6    conducted a surprise compliance audit of Dr. Aram Arakelyan.  Dr. Aram Arakelyan

7    refused to allow staff to audit the charts and called Travis Lyon to intervene.  This

8    resulted in a meeting with Mikia Wallis, Travis Lyon, and Dr. Timothy Martinez,

9    and a subsequent meeting with Premier's counsel.

10       327.    Following this meeting, on March 2, 2020, counsel for Premier

11   informed a member of the Program Integrity team over the phone that such surprise

12   audits of the contract dental providers were unlawful and that all audits required

13   written notice to contract dental providers at least five days before any audit.  This is

14   false.

15       328.    Borrego Health requested and harangued Premier repeatedly to activate

16   a "Prior Authorization" requirement, which required outlier providers and practices

17   to obtain prior authorization from Borrego Health before performing certain high-

18   cost services.  In a meeting on May 21, 2020, the Program Integrity team was told

19   by Travis Lyon that he promised it would be turned on by June 1, 2020.  It was

20   never activated.

21       329.    In a quality meeting on June 16, 2020, Dr. Venugopal told Travis Lyon

22   that individual dentists were billing bridges as single unit crowns, and directed him

23   to send a communication to providers that this practice must stop.  Travis Lyon

24   refused.

25       330.    As late as September 2020, when questioned about the accusation from

26   the California Dental Board against Husam Aldairi, Mikia Wallis continued to

27   defend him.  She asserted that an external reviewer said Husam Aldairi's care was

28   "exquisite" and that he was a "QI [Quality Improvement] success story."  This

1  directly contradicts what Program Integrity and credentialing staff reported to Mikia
2  Wallis regarding the poor quality of care by Husam Aldairi.

3      331.   On October 7, 2020, Dr. Nithya Venugopal presented audit findings
4  regarding Husam Aldairi to Mikia Wallis, Dr. Timothy Martinez, Dr. Edgar Bulloch
5  (Borrego Health's former CMO and CEO), and Mark Connelly (Borrego Health's
6  Chief Operations Officer).  The presentation focused on the fact that Husam Aldairi
7  had most likely falsely billed for excessive visits, in particular where no face-to-face
8  encounter occurred, and improperly documented or falsified records, and finally
9  often provided services below the standard of care or that lacked medical necessity.
10 Within the first ten minutes of the presentation, Mikia Wallis walked out.

11     332.   Borrego Health requested that Premier run a report on 2020 claims and
12 identify any duplicates.  In September 2020, Premier provided a report identifying
13 over 600 claims that were duplicated, meaning they were billed by Premier on
14 behalf of the dentists multiple times.  Borrego Health was not aware of the
15 duplication at the time it paid the invoices of both the dentists and Premier for the
16 duplicate claims.  Despite notice of the duplication the Premier Defendants and the
17 Borrego Insiders did not reverse the claims, and the dentists did not repay the
18 claims.  Although this report was only for 2020, Borrego Health is informed and
19 believes that the same issues would exist in years prior to 2020.

20     333.   As a result, Borrego Health was forced to pay both Premier and several
21 contract dental providers for services which should not have been paid or for
22 services which were never rendered.

23     334.   On information and belief, the Borrego Insiders were compensated for
24 this access and control through kickbacks or other payments or remuneration.

25     **F.     The Borrego Insiders Entered into Leases with Daryl Priest-Owed**
26          **Entities for Above Market Rents and Terms Many Times the**
27          **Market Amount (the "Priest Leases Scheme")**

28

7288673.3

335.   Borrego Health only owns two of its facilities.  Therefore, Borrego Health must otherwise procure real property for its facilities.  This is accomplished by going to into the marketplace and securing facility leases in Southern California. The resulting leases should be from an arm's length transaction at market prices, and the leases should be submitted to the Borrego Health Board of Trustees for approval. Borrego Health's facility leases must be: (1) entered into for a lawful purpose; (2) sought competitively, and subjected to a diligent market value analysis; and (3) to the extent reasonably possible, for no more than fair market rent and reasonable duration.  The leases must also include reasonable terms under which the FQHC can terminate the lease.

336.   Yet, the next scheme involved Borrego Health leasing certain real property from the Premier Defendants or entities related to the Premier Defendants at rents and terms that were well above market.  Borrego Health was victimized by three grossly over-priced, 30-plus-year term facility leases engineered by the Borrego Insiders and the Premier Defendants or entities related to the Premier Defendants.  The total combined full-term price of these three leases is over $100 million dollars.  As detailed below, these leases were never subject to due diligence and were executed by the Borrego Insiders, without submitting them to the full Board for analysis, review, and informed consent and approval.  Once in place, the leases were concealed from the full Borrego Health Board.  The reason for hiding them from the full Board is clear:  recent independent appraisals by CBRE show the total combined lease prices are $58 million over fair market rent.

337.   The leases at issue that are above fair market rent, without good cause, and without the fully informed consent of the Board, are per se unlawful *ab initio*, because, *inter alia*, they are entered into for an unlawful purpose, namely to defraud Borrego Health for millions of dollars, while at the same time exposing Borrego Health to regulatory sanctions and related adverse financial and tax consequences.

7288673.3

338.   Defendant Promenade Square, LLC ("Promenade") is a California limited liability company whose primary place of business is in El Cajon, California. Promenade is engaged in the commercial real estate business.  Borrego Health is informed and believes that Promenade's sole member and manager is Daryl Priest. Promenade is the owner and lessor of the structures and appurtenances located at 133 and 155 West Main Street, El Cajon, County of San Diego, California, of which Borrego Health is the lessee ("Promenade Lease").  Attached hereto as Exhibit U and incorporated as though set forth in full herein is a true and correct copy of the Promenade Lease.

339.   Defendant DRP Holdings, LLC ("DRP") is a California limited liability company whose primary place of business is in El Cajon, California.  DRP is engaged in the commercial real estate business.  Plaintiff is informed and believes that DRP's sole member and manager is Daryl Priest.  DRP is the owner and lessor of the structures and appurtenances located at 590 North D Street, City of San Bernardino, County of San Bernardino, California, of which Borrego Health is the lessee ("DRP Lease").  Attached hereto as Exhibit V and incorporated as though set forth in full herein is a true and correct copy of the DRP Lease.

340.   Defendant Inland Valley Investments, LLC ("Inland Valley") is a California limited liability company whose primary place of business is in El Cajon, California. Inland Valley is engaged in the commercial real estate business. Plaintiff is informed and believes that Inland Valley's sole member and manager is Daryl Priest.  By way of assignment from DRP, Inland Valley is now the lessor of the structures and appurtenances located at 750 East Main Street, City of Barstow, County of San Bernardino, California, of which Borrego Health is the lessee ("Inland Valley Lease").  Attached hereto as Exhibit W and incorporated as though set forth in full herein is a true and correct copy of the Inland Valley Lease.  The Borrego Insiders and Premier Defendants decided to have Borrego Health sign the lease for the Barstow facility before the facility even existed. On information and

belief, the Premier Defendants then presented the over-market lease to a federally insured lending institution to help obtain financing for the facility (making Borrego Health in essence a participant in the development and financing of the Barstow facility). As further demonstration of the interconnectedness of this Scheme, Travis Lyon, who was the CEO of Premier (a healthcare company), was the broker for the construction loan in connection with the Barstow deal and personally collected signatures from Bruce Hebets and Diana Thompson (then, Troncoso).

341.   For the sake of brevity, and because Borrego Health is informed and believes that Daryl Priest is the sole owner, member, and manager of Promenade, DRP, and Inland Valley:  (a) Promenade, DRP, and Inland Valley are also referred to collectively as the "Priest LLCs"; and (b) the three leases Borrego Health entered into with the Priest LLCs are referred to collectively as the "Priest Leases."

342.   Daryl Priest (who owns the three Priest LLCs), Travis Lyon and the Borrego Insiders worked together to devise a scheme under which Borrego Health was a conduit of federal healthcare funds to pay for the overpriced Priest Leases. Daryl Priest, Travis Lyons and the Borrego Insiders worked together to make management and operational decisions at Borrego Health to allow the Priest Leases to be entered and to remain in operation undisclosed to Borrego Health's full board.

343.   Daryl Priest is an experienced owner and lessor of commercial properties.  Travis Lyon is an experienced commercial real estate development and management executive.  Daryl Priest and Travis Lyon, on behalf of Promenade, DRP, and Inland Valley, must each present their commercial leases to banks providing them with mortgages and other funding related to their leased properties. Daryl Priest and Travis Lyon, on behalf of Promenade, DRP, and Inland Valley, must perform due diligence regarding their lessees, before entering into a 30+ year lease that will be reviewed by lenders providing millions of dollars of financing to Promenade, DRP, and Inland Valley.  Daryl Priest and Travis Lyon are therefore presumed to know Borrego Health's business, including that it is a non-profit health

care provider doing business with federally-funded health programs.  Daryl Priest and Travis Lyon are presumed to know fair market rent, that the stated rent in the Priest Leases is over fair market rent, and that the lease terms of 30+ years are far beyond fair market lease terms (especially in the absence of terms allowing Borrego Health to terminate the lease on reasonable notice).  Under these facts and circumstances, Daryl Priest and Travis Lyon, on behalf of Promenade, DRP, and Inland Valley, are charged with knowledge that they were each entering into an over-fair market rent lease with a non-profit FQHC.

344.   Mikia Wallis and the Borrego Insiders knew or should have known that the Priest Leases were well above market rents and terms.

345.   Mikia Wallis and the Borrego Insiders knew or should have known that the Priest Leases would need to be approved by the full Board of Trustees.

346.   With minimum due diligence, the over-fair market rent price and excessive duration of the Promenade Lease, DRP Lease, and Inland Valley Lease, combined with the absence of any term allowing Borrego Health to terminate a lease prior to their respective lease terms, would have been readily apparent.

347.   No rational, informed Board of Trustees for a non-profit FQHC would have, or could have, lawfully approved the Promenade Lease, DRP Lease, or Inland Valley Lease for, inter alia, the following reasons:

a.       The lease terms are unconscionable, and would result in the diversion of millions of "over-fair market rent" dollars of federal health program money to the Priest-owned entities;

b.       The Promenade Lease calls for payment of nearly $40,000 per month over fair market rent, or more than $15,000,000 over fair market rent over the 33-year life of the lease;

c.       The DRP Lease calls for payment of nearly $39,000 per month over fair market rent, or approximately $14,000,000 over fair market rent over the 30-year life of the lease;

1        d.      The Inland Valley Lease calls for payment of more than $80,000

2 per month over fair market rent, or approximately $29,000,000 above fair market

3 rent over the 30-year life of the lease;

4        e.      Approximately 90% of the revenue received by Borrego Health is

5 paid by government funded health programs (Medi-Cal and Medicare), and therefore

6 if the Priest Leases are enforceable, the vast majority of the over-fair market rent

7 dollars paid could be government health program money;

8        f.      The over-fair market rent facility lease payments expose Borrego

9 Health to reductions in the allowed reimbursements paid Borrego Health in prior

10 years; and

11        g.      The close relationship between the Borrego Insiders and Daryl

12 Priest and Travis Lyon (and, by extension, the Priest-owned LLCs) exposes the non-

13 profit FQHC to adverse federal and state tax consequences.  The fact that the rent

14 money would inure to insiders meant Borrego Health could be found to be failing in

15 its obligations to ensure that its assets were being used predominantly for charitable

16 purposes, exposing it to possible revocation of its 501(c)(3) status.

17     348.  If enforceable, the Priest Leases would have siphoned $58 million in

18 over-fair market rent money from Borrego Health over the life of the leases.  Two of

19 the leases (Inland Valley Lease in Barstow and DRP Lease in San Bernardino) have

20 been terminated.  The Promenade Lease in El Cajon remains in operation with

21 Borrego Health paying twice fair market rent under protest, with permission of the

22 DHCS monitor overseeing Borrego Health's operations since late 2020.  Without

23 judicial intervention on the Promenade Square lease, and without recovery of the

24 $11.8 million in overpaid rent to date, the actions of the Borrego Insiders and a

25 handful of Priest entities will continue to present an immediate threat to disable an

26 essential provider of primary healthcare services to underserved inland communities

27 in San Diego, San Bernardino, and Riverside Counties.

28

349.   The Priest Leases were concealed from the full Borrego Health Board. Mikia Wallis and the Borrego Insiders knew what was contained in regular reports to the full Borrego Health board, and more importantly, what was not.  The Borrego Insiders knew that financial reports presented to the full board did not include or otherwise call out the individual facility rents in a way that might suggest that they were over market or had unreasonably long lease terms.  Financial reports to the full Borrego Health Board include only the aggregate rents paid on all facilities.  The Borrego Insiders knew that Borrego Health's personnel would make monthly rent payments as requested, without questioning the reasonableness of those monthly rent payments.  Thus, unless the Priest Leases themselves were presented to the full Board of Trustees for vetting and approval, there was absolutely no way that Borrego Health would be put on notice of any potential financial or other injury associated with, or caused in whole or in part by over-market leases.

350.   The Borrego Insiders knew that full Board of Borrego Health would review only those contracts presented to them, and that they would never have reason to see the Priest LLC leases unless the Borrego Insiders managing the relationship with Priest LLCs decided to present the leases.  Thus, unless disclosed by the Borrego Insiders, there was no way that Borrego Health would be put on notice of the terms of the three subject leases, or that the Borrego Insiders were working with Daryl Priest, Travis Lyon, and, through them, the three Priest LLC to make all management and operations decisions pertaining to the over-market leases for Borrego Health, and in a manner contrary to Borrego Health's financial and compliance interests.  The fact of injury from the leases and from the defendants' participation in Borrego Health's facilities procurement and operations and therefore could not be discovered.

351.   The Borrego Insiders' continued concealment of the leases from Borrego Health was a separate breach of fiduciary duty and/or duty of care in

7288673.3

1   furtherance of the scheme to steal money from Borrego Health every time a monthly

2   rent check was mailed to Borrego Health.

3       352.   The Priest Leases Scheme victimized Borrego Health in at least three

4   ways:

5           a.   <u>Exposure to State Suspensions and Federal Disqualification</u>: In

6   California, government funded health program funds flow to FQHCs under the

7   oversight of the California Department of Health Care Services ("DHCS").  DHCS

8   is empowered to suspend all reimbursement for the provision of health care services

9   to Medi-Cal members in accordance with, *inter alia,* Welfare and Institutions Code

10  section 14107.11 and Title 42 of the Code of Federal Regulations section 455.23.

11  Further, HRSA/Bureau of Primary Health Care ("BPHC") monitors FQHCs and can

12  suspend and/or disqualify Borrego Health from the FQHC program, including, *inter*

13  *alia,* an action by HRSA requiring Borrego Health to cease all activities in the

14  program pending corrective action (45 CFR 75.375) and possible suspension under

15  HHS regulations (2 CFR Part 376, 45 CFR 75.2).  DHCS is presently allowing

16  Borrego Health to continue operations under the guidance, oversight, and direction

17  of a DHCS-appointed independent monitor.

18          b.   <u>Reimbursement rate adjustments</u>: The cost of owning, renting,

19  maintaining, and upgrading clinic facilities is a substantial cost center for FQHCs

20  providing primary health care services.  As such, CMS recognizes the fair market

21  value of facility costs reasonably incurred and truthfully reported by FQHCs in

22  determining the reimbursement rates to be paid clinics operated by the FQHC.  Cost

23  reporting in excess of fair market value inflates the FQHC's mandatory cost reports

24  required under title 42 of the United States Code section 1395g, and exposes

25  Borrego Health to an order that it retroactively amend its cost reports, potentially

26  leading to a reduction in reimbursement rates paid by federally funded health

27  programs.

28

FOURTH AMENDED COMPLAINT

7288673.3

c.     Non-profit 501(c)(3) tax status:  Contract payments to disqualified persons in excess of fair market values (or other unlawful diversion of a non-profit entity's revenue to falsely disguise profits as operating expenses) can result in tax liability and/or loss of non-profit tax exemption status at both the federal and state levels.  (*See,* e.g., Internal Revenue Code sections 4958(c)(1) and 4958(f)(1) and related Treasury Department Regulations in section 53.4958-3.)

353.   The concealment of the Priest Leases Scheme detailed above and of the fact of injury resulting therefrom worked to perfection until it came to light in late 2020.  At that time, following October 2020 raids by state and federal law enforcement authorities, DHCS suspended payment of federal funds to Borrego Health in conjunction with an investigation unrelated to the Priest Leases.  In the course of the investigation, numerous contracts were reviewed, including the Priest Leases.

354.   Independent certified commercial real estate appraisers made the following findings:  (a) on the Promenade Lease (El Cajon location), Borrego Health was paying $39,104.75 a month above fair market rent, or $469,257 above fair market rent per year; (b) on the DRP Lease (San Bernardino location), Borrego Health was paying $38,405.95 a month above fair market rent, or $460,871.40 above fair market rent per year; and (c) on the Inland Valley Lease (Barstow location), Borrego Health was paying $80,025.25 a month above fair market rent, or $960,303 above fair market rent per year.  Additionally, the lease terms of 30 to 33 years on the Priest Leases is unreasonably over market as well.  A reasonable fair market term for these commercial leases is three to five years.

355.   In order to remain in operation, Borrego Health signed an agreement with DHCS in February 2021 under which an independent monitor selected by DHCS would institute a robust corporate integrity and compliance program at Borrego Health.  As is relevant here, DHCS' monitor directed Borrego Health to: (1) stop paying above fair market rent on the Priest Leases; and (2) take action to

7288673.3

address over-fair market rent payments, excessive 30-year lease terms, and the failure to include lease provisions under which Borrego Health may terminate the leases.

356.   In response, the Priest LLCs acted in unison.  The Priest LLCs demanded that Borrego Health continue to make over-fair market rent payments under the Priest Leases.  In a May 25, 2021 email, the Priest LLCs threatened that Borrego Health's failure to pay the demanded rent on any one of the Priest Leases will result in immediate eviction proceedings as to all three locations that are the subject of the Priest Leases.

357.   The Priest Leases are the subject of a related litigation pending as Case 3:21-cv-04117-L-AGS, entitled *Borrego Community Health Foundation v. Inland Valley Investments, LLC, et al*.

358.   Because Borrego Health had no constructive or inquiry notice of the fact of injury throughout the eight-year life of the Priest Leases Scheme, Borrego Health's right to recover money stolen by defendants extends back to the commencement of each lease.  The accrual date applicable to RICO claims under the discovery rule (and to all other causes of action pled herein) is at the earliest October 2020, and Borrego Health may sue to recover for the entire eight years of losses.

359.   On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.

**G.      The Borrego Insiders Paid Themselves Above-Market Compensation and Granted Themselves Improper Benefits and Covered It Up (the "Compensation/Benefits Scheme")**

360.   <u>Bruce Hebets</u> received a high salary from Borrego Health.  For instance, in 2016, Bruce Hebets received more than $383,000 in salary, plus over $126,000 in "bonus," in addition to a "car allowance" of $1,000 per month and a "cell allowance" of $350 per month.  In 2017, Bruce Hebets received more than

$529,000 in salary, plus over $87,000 in "bonus," in addition to the car and cell allowance.  The decision to increase Bruce Hebets' salary in 2017 was made by Harry Ilsley, Dennis Nourse, and Mike Hickok without conducting any compensation study to determine what a fair market salary would be for a FQHC. The three Borrego Insiders then represented to the full Borrego Health Board that this salary was fair market and was in line with other comparable FQHCs (which would later be refuted when an actual compensation study was conducted). In 2018 (partial year), Bruce Hebets received more than $467,000 in salary, plus over $321,000 in "bonus," in addition to the car and cell allowance.

361.   <u>Karen Hebets</u> also received a high salary from Borrego Health.  For instance, in 2016, Karen Hebets received more than $227,000 in salary, plus over $40,000 in "bonus".  In 2017, Karen Hebets received more than $228,000 in salary, plus over $51,000 in "bonus".  In 2018 and 2019, Karen Hebets received more than $228,000 in salary, plus over $41,000 in "bonus".  In 2020, these salaries were reduced to more than $205,000 with a bonus of over $10,000.

362.   <u>Diana Thompson, formerly Diana Troncoso</u>, also received a high salary from Borrego Health.  For instance, in 2017, Diana Thompson was paid nearly $338,000.

363.   <u>Mikia Wallis</u> also received a high salary from Borrego Health.  For instance, in 2017, Mikia Wallis was paid over $440,000.

364.   The Borrego Insiders then proceeded to disguise their above-market salary and benefits by using improper evaluations.  For instance, the Borrego Insiders used Jim Hebets and his companies to create a bogus evaluation of the compensation packages, concluding—unsurprisingly—that they were appropriate.

365.   One Borrego Insider even stated that the executives kept their base salary low but took additional payments as "bonuses" and received other benefits "to avoid scrutiny."

366.   The Board Insiders also received compensation and other improper benefits.  In July 2015, Bruce Hebets inquired from counsel whether or not a FQHC can pay or compensate board members, but counsel informed him that payments were prohibited, other than very narrow exceptions.  Nevertheless, the Board Insiders received remuneration and benefits from Borrego Health, and were therefore effectively compensated by Borrego Health and incentivized to keep these Schemes going.

367.   For instance, the Board Insiders received free access to Borrego Health programs, benefits, prescription drugs and even hearing aids.

368.   An email from Mike Hickok dated August 31, 2020, confirmed the practice of improper remuneration and benefits to Board Insiders:

> This policy has existed since Borrego Health was founded.  I asked about this once myself (I currently get my pharmacy prescriptions  as a perk) and was told this was an acceptable practice. My understanding is staff and families get the same perk plus no charge for medical and dental care. As far as the missive that the  cost of these items should be put back into the healthcare of the community is almost too laughable to be taken seriously in view of the tens of millions of dollars we waste with double paying Providers or paying them for doing little to no work or paying firms like Premier Healthcare millions of dollars that in-house staff could do and much less expensively or the many (probably most) real estate leases that we pay exorbitantly over market rent and for well in excess of typical lease terms. I've been trying to call attention to these issues for *years* and gotten nowhere until the Borrego Sun stared to expose them. Alan Kuehn has been blowing the whistle for years about medicare fraud in the contract dental practice and the only thing that this board chose to do regarding him was blackball him as a board member because he was threatening to Makia and Tim Martinez and the ongoing scam with Premier Healthcare.
>
> So now calling attention to Trustees getting a perk of free pharmacy as some sort of impropriety is (on second thought) not *almost*  laughable it takes the cake ….

369.   Later, as discussed below, when this arrangement was revealed, the Borrego Health Board ended the practice.  However, in a September 2, 2020 e-mail between Mikia Wallis and the 2020 Board of Directors, it was clear that Mikia Wallis had never looked into the legality of such a practice during her tenure at

Borrego Health. Further, none of the Board Insiders evaluated whether it was consistent with the by-laws or HRSA guidelines to allow such a practice.

370.   In 2019, Compensation Resources, Inc. ("CRI") was retained by Borrego Health to review and analyze the compensation of 15 Borrego Health executives.  CRI issued its report on or about July 19, 2019.  In sum, of the 15 executives reviewed, the CRI report concluded that the "Total Compensation Package (TCP) for eleven (11) of the Borrego officers is currently above the high end of their respective Market Ranges of Reasonableness."  In early 2020, a second CRI analysis was conducted for the other employees of Borrego Health, which also found excessive salaries.

371.   Mikia Wallis and the Borrego Insiders failed to raise the issues of nepotism, cronyism and above-market compensation to the full Borrego Health Board, and took steps to conceal the issues.  When asked by the full Borrego Health Board to investigate and report on the compensation, Mikia Wallis' submitted multiple reports which lacked the necessary information to make any appropriate decisions.

372.   For instance, in one version of Mikia Wallis' report she used the salaries that had recently been reduced by an "equitable" adjustment, effectively attempting to conceal the past problems.

On top of that, Bruce Hebets and Jim Hebets schemed to create a 162B Executive Bonus Plan that would pay Bruce Hebets and others additional compensation (a tax-free payment of $5,000 per month) while also siphoning millions to Jim Hebets' insurance company.

373.   On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.

**H.    The Borrego Insiders Used Nepotism and Cronyism to Funnel Money to their Friends and Family (the "Nepotism and Cronyism Scheme")**

374.   Bruce Hebets and Karen Hebets hired their family members to work at Borrego Health.  The nepotistic hires benefited The Hebets family, so that they were encouraged to keep the above-described Schemes operating.  This included Bruce and Karen's daughter Tiffany Hebets (Collections Clerk, paid approximately $46,700/year and daughter Amanda Troncoso (Lead Billing Internal Auditor, base salary $49,920/year).  Amanda Troncoso is also the daughter-in-law of Diana Thompson.

375.   Mikia Wallis created a position for her husband, Jeremy Noble, at Borrego Health.  Jeremy Noble was hired to be Director of Site Facility Compliance for Borrego Health in exchange for an annual base salary of $120,000, despite the fact that he lacked the skills needed for the position.  Jeremy Noble was later arrested and charged with illegal firearms possession.  Borrego Health is informed and believes that the criminal case (Case No. SCN420059) is ongoing.

376.   Diana Thompson hired her family members to work in Borrego Health's billing department and elsewhere.  The nepotistic hires benefited Diana Thompson and her family, so that she was encouraged to keep the above-described schemes operating.  Moreover, by populating her department with family members, it effectively eliminated any meaningful oversight.  These family members included: (1) her brother Jose Alfredo Villafana, IT Technician (base salary $45,760/year); (2) her brother Luis Troncoso, Facilities Maintenance Worker 3 (base salary: $57,200/year); (3) her sister Breanda Troncoso, Biller 2 (base salary $40,352/year); (4) her step-son Julian Thompson, Accounting Clerk 1 (base salary $45,739/year); (5) her step-son Jordan Thompson, Biller 2 (base salary $35,360); and (6) her daughter-in-law Amanda Troncoso, Lead Billing Internal Auditor (base salary $49,920/year).  Borrego Health even hired Diana Thompson's father to provide gardening services for Borrego Health.

377.   By hiring family members, as well as individuals that lacked experience in the healthcare industry and FQHC space, Borrego Insiders were able

7288673.3

1  to conceal Schemes and the funds being funneled between and amongst the
2  Defendants.  As already alleged herein, Diana Thompson and Karen Hebets trained
3  their family members in the accounting department on how to review and process
4  claims. While this task was supposed to be performed by the Premier Defendants,
5  they failed to do so. As a result, the Dental Defendants provided incorrect and
6  fraudulent claims to Premier, who then submitted the claims to Borrego Health.  The
7  Borrego Insiders' family members failed to recognize the issues with the claims due
8  to inexperience and the deceptive training provided by Karen Hebets and Diana
9  Thompson.

10      378.   On information and belief, the Borrego Insiders were compensated for
11  this access and control through kickbacks or other payments or remuneration.

12  **I.      The Borrego Insiders Tried To Purchase a Country Club to**
13  **Personally Benefit Themselves (the "De Anza Country Club**
14  **Scheme")**

15      379.   The October 2017 Executive/Finance Committee meeting was
16  recorded.  In that meeting, the Board Insiders and staff attendees (including Bruce
17  Hebets, Mikia Wallis, and Diana Thompson) discussed a proposal to purchase the
18  De Anza Country Club located in Borrego Springs.  According to the meeting
19  discussions: (1) the country club was not performing well economically and was
20  contemplating selling its assets or filing for bankruptcy, (2) some Borrego Insiders
21  own or owned homes nearby whose property values would face decline, and (3)
22  some Borrego Insiders were creditors of the country club through a limited liability
23  company.

24      380.   Three of the four Board Insiders (Mike Hickok, Dennis Nourse, and
25  Harry Ilsley) were members and nearby homeowners at De Anza Country Club
26  during a period when the club was financially distressed and looking for a purchaser.
27  Mike Hickok was on the De Anza Board of Trustees and headed a committee at De
28  Anza to arrange a purchaser for the country club.

7288673.3

381.   Mike Hickok mentioned that he wanted Borrego Health to buy the club so that Borrego Health would pay membership fees and subsequently offer "free" membership and free golf course access to the medical and dental providers Borrego Health partnered with.  Hickok admitted that most Borrego Health employees would not want this service, but that it made sense for Borrego Health to buy the country club since there was a "fire sale."

382.   Borrego Insiders decided not to present the plan to purchase the country club to the full Borrego Health Board.  Specifically, Chuck Kimball indicated several times during the meeting that if the issue were presented to the full Borrego Health Board, the Board would "f**k it up." (Explicative removed.) Kimball went on to state that the purpose of the Executive Committee was to make decisions without consulting the full Borrego Health Board.

383.   Following the October 2017 meeting, Borrego Health made a formal offer to purchase the country club, including paying earnest money on the deal.  As usual, the Borrego Insiders did not take the De Anza transaction to the full Board for its review or approval.

384.   Borrego Insiders sent a letter of intent and a "good-faith deposit" to De Anza, without the knowledge or approval of the full Board.  It was only after De Anza shared the letter with its shareholders that this scheme was discovered by others.

385.   In fact, in the recorded October 2017 Executive/Finance Committee meeting, the Borrego Insiders explicitly acknowledge that members of the full Board would disapprove of such a purchase.  Borrego Health does not know why the Borrego Insiders wanted a FQHC—*i.e*., a healthcare provider for underserved communities—to purchase a country club, though Borrego Health suspects that some or all of those individuals would personally benefit from such a transaction, at the expense of Borrego Health.

7288673.3

386.   By email dated November 18, 2017, outside counsel for Borrego Health advised Mikia Wallis that there were potentially "severe consequences" to Borrego Health from the proposed transaction, outlining some of the major potential issues.

387.   The Borrego Insiders continued to pursue this deal into 2018, even after telling the full Board that it was "dead," and to hide that fact from the full Board. Diana Thompson stated, in an Executive Committee meeting in 2018, "when we left the last meeting with the board, the full board, we said or the executive committee, we said, we're not going to pursue this. We do have the obligation to notify them that we're discussing this."

388.   The Borrego Insiders acknowledged that they were interested parties. At one point, in a 2018 Executive Committee meeting, Harry Ilsley said, "But do we really -- the three of you have got to recuse yourself from voting. That you have ownership in the LLC, you have homes that may be devalued if De Anza goes away."  It is not clear which three individuals or what LLC he was referencing.

389.   The Borrego Insiders actively sought to conceal this proposed transaction, with one Borrego Insider stating at a 2018 Executive Committee meeting, "someone has offered to partner with us but the details are totally unknown. I personally don't want that information to leak out anywhere, but it's in the community already, I suppose, and you may hear about it and I don't want to have you have to call me to find out what's going on, okay?"

390.   It appears that Mike Hickok and Harry Illsley were unable to obtain a written favorable vote from a majority of the equity members at the De Anza club. Therefore, despite the Borrego Insider's efforts, the deal did not move forward, and de Anza returned the earnest money.

/ / /

/ / /

/ / /

7288673.3

**J.**   **The Borrego Insiders Attempted to Pay Bruce Hebets a $5 Million Payout (the "Payout Scheme")**

391.   In or about March 2018, Bruce Hebets suffered from a worsening illness and decided to step down from his position as CEO.  Without putting it on the agenda, the Borrego Insiders proposed a $5 million payout for Bruce Hebets as part of a "transition agreement."  Around that time, the idea was first presented to the full Board of Trustees.  At that time it was first presented to the full Board, an agreement had already been created, which was drafted by Mikia Wallis.

392.   Mikia Wallis drafted the agreement at Bruce Hebets' request.  Mikia Wallis did not advise Borrego Health to get separate counsel with respect to the agreement, and told a Borrego Health Board member on or about April 5, 2018 that she "represented no one" in the transaction, despite that fact that she was Borrego Health's Chief Legal Officer and would shortly become Borrego Health's CEO.  The Board member encouraged Mikia Wallis to do her own research about to whom she owes a duty of loyalty as general counsel for Borrego Health.  Mikia Wallis argued that she was not required to represent the best interests of the organization (which is wrong), that she did not represent anyone with respect to this transaction, and that there was nothing wrong with having drafted the contract for Bruce Hebets.

393.   Despite her protestations to the Board, Mikia Wallis was aware of her conflict.  At one Executive Committee meeting in 2018, Mikia Wallis discussed presenting a proposed agreement to the full Board.  She said, "My concern is, I don't know that's best coming from me, considering the inherent conflict of interest."

394.   The Borrego Insiders did not do any diligence or get an independent analysis with respect to a proper amount for a buyout under the circumstances.  Two other Board members, who were not Board Insiders, objected to the payout, stated that additional diligence was required and asked for the vote to be delayed to allow for additional evaluation.

395.   During the discussion of the transition agreement, the Borrego Insiders argued that the extremely high buyout was appropriate due to the fact that Bruce Hebets had not received retirement benefits.  However, this was false as Bruce Hebets had a 162B plan.  (The existence of the 162B plan was concealed by the Borrego Insiders, including from the auditor retained to evaluate the appropriate amount of Bruce Hebets' payout.)

396.   The vote on the "transition agreement" and buyout was postponed to a later meeting.

397.   At the April 5, 2018 Borrego Health Board meeting, the issue was discussed.  The Borrego Insiders brought a man named Frank Church, who was supposedly an "independent auditor," to appear by phone in the meeting.  Frank Church did not appear to have any expertise or knowledge regarding the reasonableness of the payout.

398.   On July 13, 2018, Chuck Kimball e-mailed Mikia Wallis and Diana Thompson, stating that Bruce Hebets indicated that he would retire, but wanted to remain on payroll at a "reduced rate" for 5 years at a rate from his $500,000 annual salary. Chuck Kimball proceeded to state that after Bruce Hebets retired, Mikia Wallis and the Board Insiders would be completely in charge of Borrego Health.

399.   Later, still needing an independent evaluation of the payout amount, at the insistence of the non-Borrego Insider Board Trustees, Borrego Health retained FW Cook to conduct an evaluation.  FW Cook employee Marty Katz provided the results.  After reviewing salaries and payouts for other CEOs, FW Cook concluded that an appropriate payout would be $2 million, not the $5 million that Bruce Hebets and Mikia Wallis proposed.  The analysis was provided without knowledge of the 162B plan and benefits, and was therefore fundamentally flawed.

400.   During the valuation process, Chuck Kimball and Mikia Wallis exchanged several e-mails, including an e-mail on September 27, 2018 which

7288673.3

1  indicates an intent to exclude non-Borrego Insiders from Bruce Hebets' retirement
2  negotiations.

3      401.   After this valuation occurred, Chuck Kimball proposed offering an
4  accelerated payment structure to ensure Bruce Hebets received the full amount
5  before his passing. During these e-mail exchanges with Mikia Wallis, Chuck
6  Kimball admitted that the Borrego Insiders were making decisions about Borrego
7  Health which involved "dodging the law."

8      402.   This $2 million payout amount was eventually agreed to by the full
9  Borrego Health Board and Bruce Hebets.

10     403.   Months after the $2 million payout had already been completed,
11 Borrego Health once again consulted with FW cook about the propriety of the 162B
12 plan.  At that time, Marty Katz explained that he was told by Mikia Wallis that
13 payments made to a 162B plan for Bruce Hebets' benefits were performance-based
14 bonuses, which was false.  In actuality, this was a part of Bruce Hebets' regular
15 compensation.  Marty Katz told a Borrego Health Board member that if he had
16 known this information, the payout amount would have been lower.

17     404.   The Borrego Insiders also attempted to conceal the impropriety of the
18 generous 162B plan offered to some Borrego Insiders.  In spring or summer 2019,
19 certain Borrego Health Board Trustees asked Mikia Wallis to evaluate the current
20 162B plan and, if necessary, find alternative plans.  Mikia Wallis invited an
21 individual to address the issue with the full Borrego Health board.  The individual
22 identified himself as "Jim" without providing a last name.  He proceeded to praise
23 the 162B plan.  It was only when a non-Borrego Insider Board member asked for his
24 last name did Jim disclose that he was, in fact, Jim Hebets.

25     405.   Minutes from a meeting of Borrego Insiders from June 12, 2020
26 indicate that Borrego Health received a 20% remittance payment penalty from the
27 IRS as a result of the Board Insider's decision to pay Bruce Hebets an excess of $1
28 million in 2018.

7288673.3

406.   On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.

**K.     The Borrego Insiders Funneled Money to Bruce Hebets' Brother, Jim Hebets, and Jim Hebets' Firm (the "Jim Hebets Scheme")**

407.   The Borrego Insiders entered into an arrangements, on behalf of Borrego Health, with Jim Hebets and/or companies owned or controlled by Jim Hebets, The Hebets Company, funneling additional Borrego Health funds to Borrego Insider cronies and family members.

408.   For instance, the Borrego Insiders collaborated to have Jim Hebets and/or his companies review and approve sham, inflated salaries for Borrego Health executives, including the Borrego Insiders.

409.   Jim Hebets directed the review and approval process through The Hebets Company.  However, when the sham fair market value analyses were presented to the Borrego Health Board, Jim Hebets ensured that his name was removed by the masthead and documents were carefully drafted to avoid reference to Jim Hebets and to conceal his involvement and obvious conflict of interest, even neglecting to mention his last name when introducing himself.

410.   Jim Hebets' firm, The Hebets Company, is located in Phoenix, Arizona.  On the website (www.hebetsco.com), he boasts of specializing in FQHCs and creating ways to increase executive compensation/benefits beyond what is specified in IRS code for qualified 403(b) or 457(b) plans.

411.   The Hebets Company's current website makes it perfectly clear that their agenda is to maximize executive compensation:

> Today's competitive labor market makes it increasingly difficult for businesses to hire and retain highly skilled employees. The Hebets Company's Executive Compensation and Supplemental Fringe Benefits division assists these enterprises in designing and implementing innovative compensation and benefit programs for purposes of recruiting and rewarding those key executives who are instrumental to the profitability of the company. Legislative changes over the years have repeatedly reduced the qualified plan benefits that can be allocated to this select group of highly compensated

employees resulting in "reverse discrimination". But there are many worthwhile solutions.

412.   Jim Hebets' firm also boasts that it provides "Estate planning for the 'exceptionally wealthy,'" a seeming mismatch for Borrego as a non-profit, but perhaps exactly what Bruce Hebets sought and why Jim Hebets was involved.

413.   Bruce Hebets, Diana Thompson, and Mikia Wallis also schemed with The Hebets Company to increase executive compensation through contributions through automatic "bonuses" that were paid to 162B plans.  These automatic bonuses paid to many Borrego Insiders, including Bruce Hebets, Diana Thompson, Mikia Wallis, and Karen Hebets.

414.   Though the 162B plans appeared at first glance to be life insurance plans, they were never intended as such but were instead a strategy to pay above market to insiders without added scrutiny or tax liability.  Bruce Hebets and Karen Hebets worked directly with the Vice President and General Manager of The Hebets Company to "borrow" from their 162B accounts and transfer the funds from their respective 162B plans into their checking account.

415.   These were significant payments.  As of 2015, Bruce Hebets was receiving $3,500 per month for his 162B plan, and by 2017, he was receiving $5,000 per month.  These amounts were free of taxes, as on top of these payments, Borrego Health was also paying a tax true up.  As a result of this scheme, Bruce Hebets, Karen Hebets, and other Borrego Insiders got tax free bonuses every month, which they subsequently cashed out.

416.   Even after the loans, the value of these plans was substantial.  As of July 9, 2018, Bruce Hebets' 162B life insurance value was $1,236,000.  It appears this approximate value was paid out to Bruce Hebets' estate at the time of his death after a long illness in January 2019.

417.   Jim Hebets and The Hebets Company actively attempted to persuade Borrego Health to continue to use the 162B plans through The Hebets Company.

7288673.3

For example, in July 2019, Jim Hebets e-mailed Mikia Wallis explaining the nature of the 162B program and the benefits of the plan. During these discussions, Jim Hebets made several misrepresentations. For example, Jim Hebets represented that the 162B would not subject Borrego Health to tax penalties. However, as alleged herein by way of example, the 162B plan in fact subjected Borrego Health to a tax penalty due to Bruce Hebets total compensation exceeding $1 million.

418.   These 162B plan payments also created a windfall for Jim Hebets and The Hebets Company, which sold and managed the plan.  As of July 2020, Borrego Health was paying $240,000 per month for the 162B plans.  This is immensely disproportionate.

419.   For scale, Borrego Health paid in full for a bridge life insurance policy that would allow staff losing their 162B plan benefit to retain up to two-times their salary, up to $500,000, in group term life insurance until they could select their own insurance at their own cost via annual open enrollment.  The cost of that plan was $15,420 per month.

420.   The Borrego Insiders, Jim Hebets, and The Hebets Company knew that the Borrego Health Board members would rely on the compensation analyses and would have no other resource to question them. Thus, the compensation analyses were presented to the Board of Trustees for vetting and approval, but there was no way that Borrego Health would be put on notice of Jim Hebets' and his company's involvement or of any potential financial or other injury associated with, or caused in whole or in part by the flawed compensation analyses.  Nor would the Board have any access to facts that might put them on inquiry notice that the Borrego Insiders, Jim Hebets, and The Hebets Company were working together to siphon funds from Borrego Health.

421.   There is little doubt that Borrego Health has only begun to scratch the surface of Jim Hebets' involvement in these Schemes.  Jim Hebets met repeatedly alone and away from the Borrego Health offices with Bruce Hebets and Daryl

7288673.3

Priest.  Because Jim Hebets lived in Arizona, he would have had to travel for these in-person meetings with Daryl Priest.  For example, Jim Hebets, Bruce Hebets, Jim Hebets' son, and Daryl Priest met at Coasterra Mexican Restaurant in San Diego on March 18, 2016.  On February 27, 2018, they met in the lobby of Loews Resort in Coronado.

422.   On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.  For example, each time Bruce Hebets would give Jim Hebets access to his contacts at other FQHCs, Jim Hebets executed a "Compensation Split Arrangement between The Hebets Company and Bruce Hebets" that falsely listed Bruce Hebets as the "Insurance Agent" and paid Bruce 10% of the proceeds.  Jim Hebets and Bruce Hebets executed such arrangements after Jim Hebets made sales to Rural Health Care, Inc., San Ysidro Health Center, Tony Weber (CEO of Golden Valley Health Centers), and Francisco Castellon (CEO of Omni Family Health).  It is likely that discovery will uncover similar arrangements in which the money Jim Hebets siphoned off from Borrego Health would make it back to Bruce Hebets and/or Defendants.

**L.    Borrego Insider Chuck Kimball Leased a Barn to Borrego Health (the "Julian Barn Scheme")**

423.   Julian Medical Foundation, Inc. is a 501(c)(3) organization.  Its stated mission is "To foster the presence and availability of high quality health and medical care within the Julian area including being the owner of a rural health clinic in Julian and the promotion and sponsorship of activities addressing community-wide issues of health and safety."

424.   Julian Medical Foundation sought out property in Julian, California and solicited Bruce Hebets to operate a clinic in Julian.  Chuck Kimball led the efforts while he was Vice President of Julian Medical Foundation.

7288673.3

425.   Bruce Hebets and Chuck Kimball were acquaintances prior to their relationship at Borrego Health.

426.   Chuck Kimball repeatedly emailed Bruce Hebets starting in April 2009 regarding acquiring a barn to serve as a site for a future clinic operated by Borrego Health in Julian.  The target property identified by Chuck Kimball was a horse barn and surrounding land located at 2717 A Street in Julian, California (the "Horse Barn").

427.   Chuck Kimball saw an opportunity to benefit the Julian Medical Foundation to the detriment of Borrego Health.  Julian Medical Foundation could acquire the property, but it was not in a position to utilize it, finance it without subsidization, or develop it.  Chuck Kimball wanted Borrego Health to subsidize the acquisition and development of the property and insulate Julian Medical Foundation from any risk from acquiring the property.

428.   Thus, Julian Medical Foundation would acquire a property that was not useable in its current state, but Borrego Health would bear the risk of the acquisition by paying all costs of acquisition and ongoing financing to Julian Medical Foundation, including incurring liability for any mortgages secured by Julian Medical Foundation.

429.   In July and August 2009, Chuck Kimball began a fundraising drive for Julian Medical Foundation to acquire a property in Julian for a medical clinic.

430.   Even before Julian Medical Foundation was able to acquire the Horse Barn, Chuck Kimball coordinated the drafting of a lease between the Horse Barn owners and Borrego Health.

431.   Later, Chuck Kimball proposed that Julian Medical Foundation lease the Horse Barn to Borrego Health with Julian Medical Foundation as the landlord.

432.   Borrego Health agreed to lease the Horse Barn without even considering whether there was a market for the services should the Horse Barn be

FOURTH AMENDED COMPLAINT

7288673.3

1  remodeled to accommodate a new clinic.  Instead, market analyses were conducted

2  years later with the Horse Barn remaining unused by Borrego Health.

3      433.   In October 2010, Borrego Health entered into an agreement with Julian

4  Medical Foundation and Chuck Kimball to lease the Horse Barn.  The lease terms

5  were one-sided and the product of Julian Medical Foundation and Chuck Kimball

6  exerting control over Borrego Health.

7      434.   The leased space was not necessary and the Horse Barn was unneeded

8  and unusable.

9      435.   Initially, there was no specific lease amount specified.  Instead, it was

10 set at whatever expenses Julian Medical Foundation had to own the property.  As a

11 result of the ambiguity of the monthly rent, the Borrego Insiders and Julian Medical

12 Foundation could manipulate the amount of rent for Borrego Health to pay to the

13 Julian Medical Foundation.

14      436.   The Horse Barn was unusable by Borrego Health, but it paid the full

15 rent to Julian Medical Foundation and then subleased the Horse Barn back to the

16 original owners at a significant loss to Borrego Health, only reinforcing that the fair

17 market rent for the Horse Barn was far less than Borrego Health was paying.

18      437.   The Borrego Insiders and Julian Medical Foundation were all aware

19 that Borrego Health had no use for a barn and no intention to utilize it.  Yet, they set

20 the term of the lease at 20 years in duration, with no termination clause for Borrego

21 Health, not even if the property was never developed into a medical clinic.  If the

22 lease were to be terminated or abandoned, Borrego Health agreed to pay off all

23 mortgages on the Horse Barn.

24      438.   Later, by First Amendment to the lease dated November 7, 2013,

25 Borrego Health agreed to Julian Medical Foundation's demand to increase the rent

26 from at least $6,284 per month to $7,179, despite no additional consideration being

27 offered by Julian Medical Foundation and Chuck Kimball.  The only justification

28

7288673.3

1  was increased costs incurred by Julian Medical Foundation due to a property tax

2  increase.

3      439.   Ultimately, the Horse Barn lease was so unsustainable that Borrego

4  Health had to negotiate with Chuck Kimball to release Borrego Health from the

5  lease, but that did not occur until 2022.  At that point, Chuck Kimball was aware of

6  government scrutiny.

7      440.   Neither Chuck Kimball nor the Julian Medical Foundation has returned

8  or forgiven any rent for the Horse Barn.

9      441.   The Borrego Insiders knew that Borrego Health Board members would

10  review only those contracts presented to them, and that they would never have

11  reason to see The Horse Barn lease unless it was presented to them.  Thus, unless

12  the Horse Barn lease itself was presented to the Board for vetting and approval,

13  there was absolutely no way that Borrego Health would be put on notice of any

14  potential financial or other injury associated with, or caused in whole or in part by

15  over-market leases.  Nor would the Board have any access to facts that might put

16  them on inquiry notice that the Borrego Insiders were working together to siphon

17  funds from Borrego Health.

18      442.   On information and belief, the Borrego Insiders were compensated for

19  this access and control through kickbacks or other payments or remuneration.

20      **M.   Borrego Insider Dennis Nourse Sold Property to Borrego Health to**

21      **be Developed by Priest (the "Property Development Scheme")**

22      443.   Bruce Hebets and Dennis Nourse were friends prior to their

23  relationship at Borrego Health.

24      444.   Dennis Nourse owned commercial property located on Palm Canyon

25  Drive in Borrego, Springs with Assessor Parcel Number ("APN") 198-010-23-00

26  ("Palm Canyon Parcel"), which fronts on Palm Canyon Drive just west of Country

27  Club Road.

28

7288673.3

445.   Dennis Nourse saw an opportunity to benefit himself by facilitating a sale the Palm Canyon Parcel and involving Borrego Health.

446.   Dennis Nourse approached Bruce Hebets to discuss a sale.  Bruce Hebets saw an opportunity to involve Daryl Priest to develop the property, who he had familiarity with after two other clinic leases.

447.   Dennis Nourse, Bruce Hebets, and Daryl Priest collaborated so that Daryl Priest would acquire the commercially worthless parcel from Dennis Nourse, and then have it developed by Daryl Priest and his affiliated companies.  Once it was developed, the property would then be leased to Borrego Health at commercially unreasonable terms.

448.   Thus, the scheme was hatched whereby Dennis Nourse would be overpaid for the Palm Canyon Parcel, half of which was undevelopable foothills. Daryl Priest and his entities would overpay, but make up any loss by overcharging Borrego Health for development and the lease of the property.  The Borrego Insiders would sacrifice Borrego Health's interests could further ingratiate himself with Daryl Priest and to keep Dennis Nourse cooperative on the Executive/Finance Committee and to buy off Dennis Nourse as a future collaborator.

449.   Daryl Priest, though a wholly owned subsidiary created to purchase the Palm Canyon Parcel, Inland Development, LLC, entered into a contract with Dennis Nourse for the purchase.

450.   Contemporaneously, Bruce Hebets negotiated lease terms with Daryl Priest that were disadvantageous to Borrego Health.

451.   Dennis Nourse and Bruce Hebets brought the proposal to the Executive/Finance Committee, which was controlled by Borrego Insiders, including Dennis Nourse.

452.   Bruce Hebets and Mikia Wallis knew that such a business arrangement blatantly involved conflicts of interests.  As a result, Bruce Hebets directed Mikia

Wallis to perform an analysis demonstrating how the transaction could proceed with Dennis Nourse recusing himself from a vote.

453.   Rather than conduct an impartial and independent analysis, Mikia Wallis endeavored to perform an outcome-oriented and flawed "analysis" that would give the Executive/Finance Committee poor legal advice that the arrangement was acceptable, at the expense of Borrego Health.

454.   Mikia Wallis brought the cursory analysis supporting the transaction to Bruce Hebets to ask him if she "was on the right track."  Thus, she was not exercising proper independence as Borrego Health's attorney, and was instead being controlled and directed by and agreeing to be nothing more than an instrument of Bruce Hebets.

455.   Mikia Wallis completed her internal analysis to the satisfaction of Bruce Hebets, and then sent it to outside counsel, who did not practice in the area of real estate transactions or conflict of interests issues for review and approval.  With minor modification, outside counsel approved the analysis, and the matter was brought to the Executive/Finance Committee for approval.

456.   The Board Insiders approved the proposed transaction with little questioning or scrutiny, including agreeing to the one-sided lease terms that Bruce Hebets had negotiated with Daryl Priest.

457.   Daryl Priest then immediately negotiated a lease with Borrego Health (the "Nourse Parcel Lease"), even though there was no land yet acquired by Daryl Priest and no structure to lease.

458.   The lease terms were not commercially reasonable, and included an agreement that Borrego Health would start paying full rent after Daryl Priest secured approved building plans, even though no one realistically expected to be able to occupy a finished structure for more than a year later.

/ / /

/ / /

FOURTH AMENDED COMPLAINT

7288673.3

459.   In other words, Borrego Health would be paying full rent for no property and still paying for much of the construction costs with no building to even use.

460.   The development of the land, however, still had to go through the local government approval process, including its design review committee.  At the design review committee, the development was met with resistance.

461.   Rather than counter the resistance, Daryl Priest sought to modify the terms of the deal to further his interests and make Borrego Health's position even less desirable.

462.   Daryl Priest proposed that Borrego Health purchase the Palm Canyon Parcel directly from Dennis Nourse, and that Daryl Priest would then develop the property under contract with Borrego Health.

463.   Thus it was agreed that the purchase agreement negotiated by Daryl Priest would be assigned to Borrego Health.  Borrego Health would return Daryl Priest's earnest money, and Borrego Health would pay $400,000 Dennis Nourse to purchase the Palm Canyon Parcel.

464.   This time, Bruce Hebets and Dennis Nourse decided not to go back to the full Borrego Health Board of Trustees or even the Board Insiders.

465.   Instead, Bruce Hebets and Denis Nourse brought Borrego Insider Harry Ilsley into the fold.  Harry Ilsley knew that the Board should have been involved, but agreed to work with Bruce Hebets and Denis Nourse to get the deal closed.

466.   Harry Ilsley, Dennis Nourse, and Bruce Hebets knew that Borrego Health Board members would review only those contracts presented to them, and that they would never have reason to see acquisition documents unless he or Bruce Hebets presented them.  Thus, unless the deal documents were presented to the Board of Trustees for vetting and approval, they would not know of any potential financial or other injury associated with, or caused in whole or in part by the real property transaction.  Nor would the Board have any access to facts that might put

1  them on inquiry notice that Harry Ilsley, Bruce Hebets, and Dennis Nourse were

2  working together to siphon funds from Borrego Health to Dennis Nourse and Daryl

3  Priest.

4       467.   As usual, Bruce Hebets and Mikia Wallis facilitated and directed the

5  actions necessary to execute the deal documents without knowledge of Borrego

6  Health's full Board.

7       468.   On information and belief, the Borrego Insiders were compensated for

8  this access and control through kickbacks or other payments or remuneration.

9  **N.     Bruce Hebets and Karen Hebets Create a Sham "Consulting"**

10      **Company and Contract with Premier To Obtain Payments From**

11      **Premier for the Various Schemes Which Benefited the Premier**

12      **Defendants (the "KBH Healthcare Consulting Scheme")**

13      469.   As discussed herein, various schemes were implemented which

14  benefited Premier and the Premier Defendants which were hatched with the

15  participation of support of the Borrego Insiders, including without limitation Bruce

16  Hebets and Karen Hebets.  This fact begs the question:  what was in it for Bruce

17  Hebets and Karen Hebets?

18      470.   Although Borrego Health alleges on information and belief that the

19  Borrego Insiders were compensated for their participation in the various schemes

20  through kickbacks or other payments or remuneration, the KBH Healthcare

21  Consulting Scheme is one example which Borrego Health has recently discovered.

22      471.   KBH Healthcare Consulting was created in February 2017.  The

23  business address listed with the California Secretary of State is 3283 Broken Arrow

24  Road, Borrego Springs, California 92004.  At the time, this address is also listed as

25  the home address for Bruce Hebets and Karen Hebets.

26      472.   The Operating Agreement for KBH Healthcare Consulting was drafted

27  by Mikia Wallis and the Articles of Incorporation for KBH Healthcare Consulting

28  were created and filed by Mikia Wallis, at the same time she was Chief Legal

Officer for Borrego Health.  The Operating Agreement states that Bruce Hebets and Karen Hebets will each of 50 percent ownership, and each will contribute $500 of capital.

473.    On or about February 1, 2017, KBH Healthcare Consulting entered into a written contract with Premier entitled "Consulting Agreement" (the KBH/Premier Contract").  The "services" that KBH Healthcare Consulting agreed to provide pertained to OMNI Family Health, which Premier apparently wanted to contract with to manage their dental services.  KBH Healthcare Consulting was supposed to "assist [Premier] in the procurement of a management contract regarding management of dental services with OMNI Family Health," to "consult on a weekly basis on the current status of the management agreement between [Premier] and OMNI Family Health," to "advise and  assist [Premier] with compliance of regulations relating to the operation of FQHCs as to dental services," to "advice [sic] [Premier] on changes to laws and regulations relating to FQHC," and to "advise and assist [Premier] as to best practices related to management of dental services for a FQHC."

474.    Under the KBH/Premier Contract, KBH Healthcare was to be paid a retainer of $200,000 and 5 percent of the "adjusted net income" from amounts received from Premier's contract with OMNI Family Health.  Notably, other than describing the type of services that may be provided, the Premier/KBH Contract Amendment does not have any requirements that KBH Helathcare Consultant spend any minimum number of hours, accomplish any minimum number of tasks or have any preconditions to payment of $2 million whatsoever.

475.    Bruce Hebets and Karen Hebets sent the signed KBH/Premier Contract to Daryl Priest on February 10, 2017.  By email the same day, Bruce Hebets sent an email to Daryl Priest which read, "Here is the signed contract what time can I get the check" [sic].

7288673.3

476.   Apparently, Premier never was able to contract with OMNI, so the sham contract designed to funnel money from Premier and the Premier Defendants to Bruce Hebets and Karen Hebets failed to work as intended.  Undeterred, the Scheme was modified.

477.   In May 2017, the Premier/KBH Contract was amended (the "Premier/KBH Contract Amendment").  The Premier/KBH Contract Amendment stated that the "services" KBH Healthcare Consulting was to provide was to assist Premier in the "procurement of management services agreements regarding management of dental services with FQHC's in the State of California and in other states," "to consult on a weekly basis on the current status of the management services agreement between [Premier] and any FQHC," to "advise and assist [Premier] with compliance matters," and "to advice [sic] [Premier] on changes to laws and regulations relating to the operation of FQHC," and "to advise and assist [Premier] as to the best practices related to management of dental services for a FQHC."

478.   The Premier/KBH Contract Amendment noted that a $200,000 retainer had already been paid to KBH Healthcare Consultants (owed 50-50 by Bruce Hebets and Karen Hebets).  The Premier/KBH Contract Amendment also required Premier to pay KBH Healthcare Consultants (owed 50-50 by Bruce Hebets and Karen Hebets) the sums of $75,000 per month for a term of 24 months (*i.e.* a total of $2 million).  Notably, other than describing the type of services that may be provided, the Premier/KBH Contract Amendment does not have any requirements that KBH Healthcare Consultant spend any minimum number of hours, accomplish any minimum number of tasks or have any preconditions to payment of $2 million whatsoever.

479.   KBH Healthcare Consulting had a bank account with Chase, including a debit card.

480.   On or about February 13, 2017, a deposit of $200,000 was made to that account, which corresponds to the retainer amount due under the KBH/Premier Contract.

481.   On or about August 23, 2017, the debit card was used to obtain cash advances at Barona Resort and Casino for over $5,000.

482.   Between August 26 and September 1, 2017. the debit card was used to obtain cash advances at Barona Resort and Casino for over $20,000.

483.   On or about September 20, 2017, the debit card was used to obtain cash advances at Barona Resort and Casino for over $5,000.  The following day, attempts were made to withdraw money in excess of $5,000.

484.   Between October 11 and 12, 2017, the debit card was used to obtain cash advances at Barona Resort and Casino for over $9,000.  On October 12, 2017, two attempts to withdraw $1,000 each were declined.

485.   On or about June 8, 2019, the debit card was used to obtain cash advances at Barona Resort and Casino for over $4,000.

## VI.   <u>CLEANING HOUSE</u>

486.   After Bruce Hebets' death, the Borrego Health board found themselves picking up the pieces of a highly disorganized organization.  Since that time, the current Board (all of whom serve on a volunteer basis) has undertaken monumental efforts to identify and correct a number of issues in the organization.  Some of those efforts are set forth below.

487.   All of the Board Insiders have resigned or have removed been from the Borrego Health Board, including most recently the removal of Mike Hickok (Treasurer) and Chuck Kimball (Secretary) on October 2, 2020.  Ten new and diverse members were also added to the board between 2019 and 2020 and the Board was expanded to 13 members.

488.   The Board also began the process of a governance overhaul, including compiling a governance policy and making updates to Borrego Health's Bylaws and

7288673.3

1    other key policies (through the progress was slow due to actions of both Chuck

2    Kimball and Mikia Wallis, who blocked a number of reform efforts before their

3    removals).

4        489.   The Board retained outside counsel to complete governance overhaul,

5    including Bylaws and policies, and develop Committees with clear committee

6    charters.

7        490.   A Board Policy Manual consisting of updated organization Bylaws and

8    key governance policies was compiled by Board members and presented in April

9    2019.  The electronic Board Policy Book was officially adopted by the Board in

10   June 2020.

11       491.   Current Board members are now required to complete a 3.5-hour Board

12   training by Compensation Resources, Inc. and NACH, and Borrego Health has

13   developed materials for on-boarding new Board members.  Board members are also

14   required to complete 3 hours of on-line trainings and Borrego Health has offered

15   additional NACH Board Governance Training to Board members.

16       492.   Borrego Health created and staffed the position of Governance

17   Manager to assist the Board and committees in producing clear Board minutes,

18   agendas, and helping to keep Board committees on track.

19       493.   Borrego Health retained Compensation Resources Inc. ("CRI") to

20   analyze executive officer compensation and benefits and complete an Executive

21   Compensation study (July 2019) and expanded CRI contract to look at total

22   compensation system-wide (2020).  CRI also conducted Board training on

23   governance with a focus on Board responsibility for oversight with respect to

24   compensation (2019).

25       494.   In 2019, Borrego Health retained another company to review retirement

26   benefits and develop new retirement plan.  The new company also will assist

27   Borrego Health in developing more equitable total compensation plan, including

28   performance bonus structure.

7288673.3

495.   Borrego Health also created new mechanisms to prevent improper arrangements, including overhauling the delegation of authority and procurement policies, creating the Board Audit Committee (2019), hiring new auditors (2020), and conducting a detailed review of IRS Form 990 (2019).

496.   Mikia Wallis was removed as CEO on October 8, 2020.  All other staff in any way implicated by DHCS or DOJ to be involved in misconduct have been removed.  The entire executive leadership team was replaced.

497.   In October 2020, Borrego Health closed its contract dental program and replaced staff employed within the program who had been identified by DOJ and DHCS.

498.   Borrego Health terminated its relationship with Priest-related entities, terminating its leases at the Barstow and D Street locations, seeking amendment in Federal Court of its lease at the El Cajon site, and terminating its contracts with Premier.

499.   Borrego Health invested significantly in its compliance program. Borrego Health established a Compliance Department led by an experienced Chief Compliance Officer, and staffed the department to include a Director of Compliance, Director of Program Integrity, Compliance Auditor and Compliance Analyst.  At the Board level, Borrego Health created the Audit and Compliance Committee in January 2022, which hears detailed monthly compliance reports.

500.   Borrego Health also created a Compliance Program Manual and Compliance Hotline to assist with effectively identifying and resolving compliance concerns.  Borrego Health instituted a series of compliance trainings, including monthly staff compliance education, bimonthly billing and coding compliance trainings (instituted April 2022), code of conduct training, compliance team site visits (instituted January 2022), and executive training on fraud and abuse topics.

/ / /

/ / /

501.   Borrego Health engaged external auditing services from to evaluate its current claims, identify areas for improvement, and train staff and providers on those issues.

502.   Borrego Health has also invested in internal fraud prevention efforts aimed at individuals.  Borrego Health retained a compensation review company to review executive compensation, with the result of review leading to executive compensation reform.  Borrego Health also implemented new conflict of interest policies, a restrictive employment of relatives policy, and has limited the Board's delegated authority to Borrego Health staff.

503.   Borrego Health has also implemented efforts to increase transparency of financials.  Borrego Health has ensured that management reports are now available at the clinic level and are incorporated into Board reports available to the full board and has instituted a provider dashboard to monitor financial metrics.

## VII.   CHAPTER 11 BANKRUPTCY

504.   Borrego Health filed for bankruptcy under Chapter 11 of the Bankruptcy Code on September 12, 2022 in the Southern District of California.

505.   The bankruptcy filing was necessary because of a lack of liquidity.

506.   The most significant financial exposure was related to obligations to DHCS, as a result of the "Premier Scheme" and the "Fraudulent Dental Billing Scheme."  However, all of the Schemes described herein had a material financial impact of either increasing liabilities or decreasing revenue or both.

507.   For example, the manipulation of Borrego Health to invest in an unnecessary 162B plan diverted funds from operations to an unnecessary benefits plan that provided financial benefits for Jim Hebets, The Hebets Company and Bruce Hebets to the detriment of Borrego Health.

508.   Had the Defendants not taken advantage of Borrego Health as described herein, Borrego Health would not have the liquidity issues it is currently experiencing.

509.   Borrego Health also would not have been subjected to oversight by an expensive monitor or been subject to a payment suspension by DHCS, including the ongoing dental payment suspension, which is causing it not to be paid for in-house dental services.

510.   Uncompensated in-house dental services are resulting in a loss of approximately $350,000 per month of revenue.

## VIII.   **THE RICO ENTERPRISE**

511.   "The elements of a civil RICO claim are simple enough: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to the plaintiff's 'business or property.'" *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996) (*citing* 18 U.S.C. §§ 1964(c), 1962(c); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

512.   For the purpose of additional clarity and for the convenience of Defendants and the Court, below is further detail of the RICO allegation which is pled with particularity in conformity with FRCP Rule 9(b).

513.   **Conduct**:  "To satisfy the 'conduct' element of a Section 1962(c) claim, a plaintiff must allege facts that the defendant had 'some part in directing [the enterprise's] affairs.' *LD v. United Behavioral Health*, 508 F. Supp.3d 583, 602 (N.D.C.A. 2020) (*citing Walter v. Dravson*, 538 F.3d 1244, 1249 (9th Cir. 2008)). Notably, "Relevant considerations to whether this element is met include whether the defendant 'occup[ies] a position in the chain of command ... through which the affairs of the enterprise are conducted,' whether it 'knowingly implement[ed] [the] decisions of upper management,' and whether its 'participation was vital to the mission's success.'" *LD v. United Behavioral Health*, 508 F. Supp.3d 583, 602 (N.D.C.A. 2020) (*citing Walter v. Dravson*, 538 F.3d 1244, 1249 (9th Cir. 2008)). "In the Ninth Circuit, to assess whether a defendant had a sufficient role in operation or management to meet the standard of § 1962(c) [and *Reves*], courts consider whether the defendant (1) gave or took directions; (2) occupied a position in the

1  'chain of command' through which the affairs of the enterprise are conducted; (3)

2  knowingly implemented decisions of upper management; or (4) was indispensable

3  to achievement of the enterprise's goal in that the defendant's position is 'vital' to

4  the mission's success." *Ketayi v. Health Enrollment Group*, 516 F. Supp.3d 1092,

5  1136 (S.D.C.A, 2021) (*quoting Tatung Co., Ltd. v. Hsu*, No. SA-CV-13-1743, 2015

6  WL 11072178, at *20 (C.D. Cal. Apr. 23, 2015) (*quoting Walter v. Drayson*, 538

7  F.3d 1244, 1249 (9th Cir. 2008)) (citations omitted)).

8      **Of an Enterprise**: "The definition of 'enterprise' in the text of RICO is

9  fairly straightforward. In its entirety, the definition is as follows: ' "enterprise"

10  includes any individual, partnership, corporation, association, or other legal entity,

11  and any union or group of individuals associated in fact although not a legal

12  entity.'" *Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir. 2007) (*citing* 18

13  U.S.C. § 1961(4)). "As is evident from the text, this definition is not very

14  demanding. A single 'individual' is an enterprise under RICO. Similarly, a single

15  'partnership,' a single 'corporation,' a single 'association,' and a single 'other legal

16  entity' are all enterprises." *Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir.

17  2007). In *Odom v. Microsoft Corp.*, the Ninth Circuit explained, "We take this

18  opportunity to join the circuits that hold that an associated-in-fact enterprise under

19  RICO does not require any particular organizational structure, separate or otherwise.

20  *Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007) (citation and internal

21  quotation marks omitted). The *Odom* Court turned to the Supreme Court decision in

22  the *United States v. Turkette*, to note the criteria for an associated-in-fact enterprise,

23  "The Supreme Court in *Turkette* articulated the criteria for an associated-in-fact

24  enterprise under RICO. According to the Court, an associated-in-fact enterprise is 'a

25  group of persons associated together for a common purpose of engaging in a course

26  of conduct.' To establish the existence of such an enterprise, a plaintiff must provide

27  both 'evidence of an ongoing organization, formal or informal,' and 'evidence that

28

7288673.3

the various associates function as a continuing unit.'" *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007) (citation and internal quotation marks omitted).

515. **Through a Pattern**:  The Supreme Court in *H.J. Inc. v. Northwestern Bell Telephone Co.* settled the long held debate of what constituted a "pattern" for RICO. The Court held, "To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240 (1989). The Court continued, continuity is, " … centrally a temporal concept – and particularly so in the RICO context, where what must be continuous, RICO's predicate acts or offenses, and the relationship these predicates must bear one to another, are distinct requirements." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 241 (1989). Importantly, "A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 241 (1989).

516. **Racketeering / Predicate Acts**:  Predicate acts, "… involve conduct that is 'chargeable' or 'indictable,' and 'offense[s]' that are 'punishable,' under various criminal statutes. As defined in the statute, racketeering activity consists not of acts for which the defendant has been convicted, but of acts for which he could be." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 488 (1985) (*citing* § 1961(1)).

517. **Causing Injury**:  "Where the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise. Those acts are, when committed in the circumstances delineated in § 1962(c), "an activity which RICO was designed to deter." Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts."

7288673.3

*Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497 (1985). Importantly, "RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes.' The statute's 'remedial purposes' are nowhere more evident than in the provision of a private action for those injured by racketeering activity." (citation and internal quotation marks omitted). *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497-98 (1985).

### A. Facts Common To RICO Cause of Action

518.   The "Enterprise" is Borrego Health, a non-profit corporation in good standing, which the Defendants secretly commandeered for their own criminal purposes.  Bruce Hebets' death in 2019 does not alter the fact of his participation (as a Borrego Health insider) with Defendants in the operation and management of Borrego Health, as described below.  If Bruce Hebets were alive, he would be named as a defendant herein.

519.   Borrego Health is a FQHC engaged in interstate commerce, with a mission to provide high quality, comprehensive, compassionate primary healthcare to people in their communities, regardless of their ability to pay.  Borrego Health operated over 20 clinics, and continues to operate more than a dozen, primarily in underserved desert and inland communities throughout San Diego, Riverside, and San Bernardino counties.  Borrego Health provides essential services in Family Practice, Pediatrics, OB/GYN, Internal Medicine, Podiatry, Dermatology, Cardiology, and HIV/Hepatitis C, most of whom cannot obtain affordable comprehensive primary care from other sources.  During the recent pandemic, Borrego Health has tested tens of thousands of Californians for Covid-19 infection and has vaccinated tens of thousands of people for Covid-19.  Borrego Health's continued operation is in the public interest.

520.   Although all of the Defendants named in this action are defendants in the RICO cause of action, Daryl Priest, Nick Priest, Travis Lyon, Premier, Summit,

Jim Hebets, The Hebets Company, The Julian Medical Foundation, and Husam Aldairi, D.D.S., Aram Arakelyan, D.D.S., Ayed Hawatmeh, D.D.S., Magaly Velasquez, D.D.S., Marcelo Toledo, D.D.S., Michael Hoang, D.M.D., Santiago Rojo, D.D.S., Waleed Stephan, D.D.S., Mohammed Al Tekreeti, D.D.S., Jilbert Bakramian, D.D.S., Marlene Thompson, D.D.S., George Jared, D.D.S., Douglas Ness, D.D.S., and Alborz Mehdizadeh, D.D.S., and DOES 1-250, are "Outsiders" to Borrego Health.

521.   The Defendants are associated with the Enterprise in that they were either (1) Borrego Health executives or Board members, (2) the Enterprise's landlords, (3) contracted dental providers, or (4) other outside vendors.

522.   The Defendants are entities and individuals separate from the Enterprise, and none of the Defendants is alleged to be the Enterprise, or its members.

523.   Borrego Health is both the RICO enterprise and the victim.  Borrego Health has lost tens of millions of dollars as a result of the Defendants' fraudulent conduct and suffered other damages, including without limitation an inability to be paid by Medi-Cal for in-house dental services, an inability to provide contract dental services, and an exposure for repayment to the Medi-Cal program for claims that were caused to be submitted by defendants and contract dentists that were not payable.

524.   The unlawful acts described herein were devised, directed and maintained by the Defendants who had control over, participated in, and/or took part in Borrego Health's operations and management.

**B.    Racketeering Activity Distinct from Enterprise**

525.   The pattern of racketeering described herein is separate and distinct from the Enterprise, due to both the relationship between the activities of the Enterprise and the pattern of racketeering activity, and how the racketeering activity differs from the usual daily activities of the enterprise is as follows:

526.   Borrego Health, the Enterprise, is engaged in interstate commerce acting as a FQHC.  It acquires good and products from across the country, including medical supplies.  It utilizes the internet and United States banking system to facilitate its operations, including using electronic billing to bill and receive payment from Medi-Cal.  Borrego Health also regularly uses mail to pay vendors and acquire good and products, including medical supplies and medications.

527.   Defendants worked together to perpetrate a number of schemes to steal money from the Enterprise paid to the Enterprise by state and federal payers utilizing primarily state and federal funds paid by Medi-Cal.  The schemes that Borrego Health in currently aware of are described above as the "Borrego MSO/IPA Scheme", the "Premier Scheme", "Fraudulent Dental Billing Scheme", the "Coverup Scheme", the "Priest Leases Scheme", the "Compensation/Benefits Scheme", the "Nepotism and Cronyism Scheme", the "De Anza Country Club Scheme", the "Payout Scheme", the "Jim Hebets Scheme", the "Julian Barn Scheme," the "Property Development Scheme" and the "KBH Healthcare Consulting Scheme."

528.   Each of these Schemes was contrary to the ordinary and regular operations and management of Borrego Health, and involved Outsider Defendants effectively taking over the management and operations of Borrego Health in furtherance of these Schemes.

529.   The primary mission of Borrego Health, as a FQHC, is the provision of healthcare to under-served communities.  All efforts of Borrego Health are to be directed at the efficient accomplishment of this mission.

## C.   RICO Liability

530.   <u>18 USC §§1962 (c) and (d)</u>:  As detailed herein, Defendants' conduct is unlawful under 18 U.S.C. 1962(c), and is also unlawful as a conspiracy under 18 U.S.C. § 1962(d).

7288673.3

531.   18 USC § 1341 (Mail Fraud):  The purpose of the "Borrego MSO/IPA Scheme", the "Premier Scheme", "Fraudulent Dental Billing Scheme", the "Coverup Scheme", the "Priest Leases Scheme", the "Compensation/Benefits Scheme", the "Nepotism and Cronyism Scheme", the "De Anza Country Club Scheme", the "Payout Scheme", the "Jim Hebets Scheme", the "Julian Barn Scheme", the "Property Development Scheme" and the KBH Healthcare Consulting Scheme was to effectively steal money from Borrego Health.

532.   In the manner detailed above, Defendants participated in devising and/or intending to devise the Schemes to perform the fraudulent acts described herein.

533.   The Schemes could not work without the use of the United States Mail, which was used for the purpose of executing the Schemes.

534.   Among other things and without limitation, the mail and e-mail was used to send correspondence and payments under the Premier Scheme, to send bills and payments for the Fraudulent Dental Billing Scheme, to send rent checks under the Priest Leases Scheme, and to send rent checks under the Julian Barn Scheme.

535.   Each individual mailing was an individual act essential to the success of the scheme (and therefore material) and constitutes a separate loss the victim suffered as of the date of mailing.  This constitutes hundreds of predicate acts under 18 USC 1341 (Mail Fraud).

536.   18 USC § 1343 (Wire Fraud):  The purpose of the "Borrego MSO/IPA Scheme", the "Premier Scheme", "Fraudulent Dental Billing Scheme", the "Coverup Scheme", the "Priest Leases Scheme", the "Compensation/Benefits Scheme", the "Nepotism and Cronyism Scheme", the "De Anza Country Club Scheme", the "Payout Scheme", the "Jim Hebets Scheme", the "Julian Barn Scheme", the "Property Development Scheme" and the KBH Healthcare Consulting Scheme was to effectively steal money from Borrego Health.

7288673.3

537.   In the manned detailed above, Defendants participated in devising and/or intending to devise the Schemes to perform the fraudulent acts described herein, and to use the interstate electronic transmission of documents for the purpose of executing, or attempting to execute, the Schemes.  The Schemes were used to steal funds from a federally funded and regulated FQHC, which in turn would result in the inflation of reimbursement rates the Federal Government would pay to the FQHC (Borrego Health) for thousands of patient encounters, as follows:

538.   Borrego Health is largely funded by state and federal health care dollars (primarily Medi-Cal), administered by and through the California Department of Healthcare Services.  Borrego Health must account for its lawful operating expenditures every year to the Center for Medicare and Medicaid Services (CMS), a federal agency within the United States department of Health and Human Services.

539.   The amount of funds stolen through the Schemes described herein are accounted for and included as facilities operating expenses reported to CMS.  These stolen funds would not be reported as individual line items on an annual CMD cost report.  Rather, the stolen funds would then be melded into and combined and aggregated with all other facilities operating costs of over 20 Southern California clinics operated by Borrego Health, and then reported as an unidentified part of Borrego Health's annual cost reports submitted to CMS.

540.   In turn, the United States uses Borrego Health's annual cost reports to CMS in calculating the proper level of federal health care funding (or "reimbursement rates") to direct to Borrego Health.  Thus, inflated CMS cost reports, unless detected, inevitably result in increases in federally funded reimbursement rates for a FQHC such as Borrego Health.  This has the effect of compounding the crime by causing to federal government to cover some or all of the cost of the crime by way of increased reimbursement rates paid Borrego Health based on inflated expenses incurred by Borrego Health as a result of the Schemes.

7288673.3

541.   In addition, false or fraudulent bills were submitted electronically to Medi-Cal (and Borrego Health) under the Fraudulent Dental Services Scheme.

542.   The unlawful Schemes described above, including the electronic communications described above, constitutes predicate acts under 18 USC §1343 (Wire Fraud) that are a material part of the Schemes that Borrego Health could not avoid.

543.   Racketeering activity as described in 18 USC § 1961(1)(B), as an act indictable under 18 USC § 1957 (engaging in monetary transactions in property derived from specified unlawful activity that includes Federal healthcare offenses). In addition to Mail Fraud and Wire Fraud, the Schemes constitute a pattern of racketeering activity as described in 18 USC § 1961(1)(B), as acts indictable under 18 USC § 1957 ("Engaging in monetary transactions in property derived from specified unlawful activity").

544.   "Specified unlawful activity" is, in turn, defined in 18 USC § 1956 as including "any act or activity constituting an offense involving a 'Federal health care offense.'" 18 USC § 24 defines "Federal health care offense" as including "a violation of, or a criminal conspiracy to violate" any of the statutes set forth herein.

545.   18 USC § 669 (Theft or embezzlement in connection with health care): Whoever knowingly and willfully embezzles, steals, or otherwise without authority converts to the use of any person other than the rightful owner, or intentionally misapplies any of the moneys, funds, securities, premiums, credits, property, or other assets of a health care benefit program, shall be fined under this title or imprisoned not more than 10 years, or both. "Health care benefit program" means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract. The Schemes described herein are the means by which Defendants, and each of them, stole and converted to their own use public

7288673.3

1   healthcare benefits paid Borrego Health by state and federal agencies at a time

2   Borrego Health was the rightful owner of those funds.  In addition, in this particular

3   statute, Borrego Health itself qualifies under the broad definition of "health care

4   benefit program." Borrego Health is an "entity who is providing a medical benefit,

5   item, or service for which payment may be made under the plan or contract."  The

6   theft and from Borrego Health exceeds $20,000,000.

7          546.   18 USC § 1347 (Health care fraud):  Whoever knowingly and willfully

8   executes, or attempts to execute, a scheme or artifice (1) to defraud any healthcare

9   benefit program; or (2) to obtain, by means of false or fraudulent pretenses,

10  representations, or promises, any of the money or property owned by, or under the

11  custody or control of, any healthcare benefit program, in connection with the

12  delivery of or payment for healthcare benefits, items, or services, shall be fined

13  under this title or imprisoned not more than 10 years, or both.  Here, by the Schemes

14  described herein, Defendants, and each of them, defrauded Borrego Health and

15  obtained money and/or property owned by and/or under the custody or control of

16  Borrego Health.  These Schemes were substantial factor in and direct cause of the

17  theft of funds under the custody and control of Borrego Health.  The Schemes were a

18  substantial factor in and direct cause of the theft of more than $20,000,000 of funds

19  under the custody and control of Borrego Health and Medi-Cal.

20         547.   18 USC § 1001 (False Statements or entries generally):  Section 1001 is

21  violated if someone knowingly or willfully conceals or covers up by any trick,

22  scheme or device a material fact, which act is within the jurisdiction of a department

23  or agency of the United States.  Here, Defendants were involved in the Schemes

24  that, as described herein, meet the elements of section 1001, in that the Defendants

25  "knowingly or willfully conceal or cover up by any trick, scheme or device a

26  material fact."  The Schemes were used, in part, to steal funds from a federally

27  funded and regulated FQHC.

28

7288673.3

548.   <u>Other federal healthcare offenses</u>:  In addition, the facts alleged herein also amount to "federal healthcare offenses" under the following statutes: 18 USC § 371 ("Conspiracy to commit offense or to defraud United States"); 18 USC §1035 ("False statements relating to health care matters"); 18 USC §1035 ("False statements relating to health care matters"); 18 USC § 287 ("False, fictitious or fraudulent claims"); 18 USC §1349 ("Attempt and conspiracy").

549.   The specific contracts entered into in furtherance of the scheme to steal money from Borrego Health are the: Borrego MSO, Borrego IPA, Dental MSA, Medical MSA, Aldairi Agreements, Hawatmeh Agreement, Mehdizadeh Agreements, Velasquez Agreement, Arakelyan Agreements, Hoang Agreement, Stephan Agreement, Rojo Agreement, Toledo Agreement, Thompson Agreement, Ness Agreement, Jared Agreement, Nourse Parcel Lease, CRI Contract, Julian Barn Lease, transition agreement, KHB/Premier Contract and Amendment and Priest Leases.

550.   The Schemes were concealed by Defendants and most did not come to light until, at the earliest, October 2020 during a government investigation.  But for that unrelated investigation, the Schemes may have remained undiscovered.

551.   Because Borrego Health plaintiff had no constructive or inquiry notice of the fact of injury throughout the life of the Schemes, its right to recover money stolen by Defendants extends back to the commencement of each of the Schemes.

552.   **Four Year RICO "Reach Back:"**  Even if the Schemes were somehow communicated to persons who would ordinarily provide that information to the Borrego Health Board, it is still entitled to recover funds stolen under the Schemes going back four years prior to the filing of the complaint, since each lease payment constitutes a separate wrongful act.

553.   Borrego Health, the United States, and the State of California are victims of the Schemes here.  Borrego Health was victimized by the amount of money stolen.  The Federal Government is a victim to the extent the inflated

expenses incurred by Borrego Health as a result of the Schemes were included on annual cost reports to CMS (described above) that resulted in increased reimbursement rates, and therefore additional federal funds being improperly paid Borrego Health.  The Federal Government may have also been harmed if it provided federal matching dollars for any duplicative, unnecessary and unsupported dental services paid by Medi-Cal.

554.   The State of California is a victim to the extent to the extent the inflated expenses incurred by Borrego Health as a result of the Schemes were included on annual cost reports to CMS (described above) that resulted in increased reimbursement rates, and therefore causing additional state Medicaid funds being improperly paid Borrego Health.  The State of California may have also been harmed if it paid Borrego Health for any duplicative, unnecessary and unsupported dental services.

555.   The predicate acts described above relate to each other as part of a common plan.  The predicate acts are a part of a common plan to steal money from Borrego Health.  Each act is related as to its purpose, results, participants, victims and method of commission.  The predicates form a closed-end series of related predicates extending over a substantial period.

556.   The facts described herein also demonstrate the existence of a conspiracy between Defendants.  **(18 USC § 1962(d).)**

557.    By way of their knowing participation in the scheme, each of the Defendants is a culpable person for purposes of **18 U.S.C. § 1964.**

558.   But for the Schemes detailed above, Borrego Health would not have entered into improper and above-market leases and other transactions, would have had a compliant and properly billed contract dental program, would not have attempted to buy a country club, etc.  Accordingly, Borrego Health has been damaged by the Schemes in an amount to be proven at trial.

559.   Accordingly, Borrego Health is entitled to damages in an amount to be proven at trial, trebled pursuant to statute, together with reasonable attorneys' fees and costs, and interest.

**D.     Issuance of Constructive Trusts**

560.   As outlined in detail herein, Borrego Health provided payment to various Defendants.  Those Defendants committed wrongful acts to receive money that they were not entitled to.

561.   Borrego Health has a right to the money wrongfully taken by Defendants.

562.   As such, Borrego Health seeks to have any and all funds wrongfully paid to Defendants placed in a constructive trust.

## **FIRST CAUSE OF ACTION**

(Violations under the Racketeer Influenced and Corrupt

Organizations ("RICO") Act)

Against All Defendants

563.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.  This is due to the fact that Borrego Health believes that each and every one of the actions and omissions described above are part of the same, far-reaching and widespread racketeering enterprise designed and carried out to steal money from Borrego Health and funnel that money, directly or indirectly, to the Defendants. However, in the alternative, any one of or any combination of the above-listed Schemes would be sufficient to state a claim against the Defendants alleged to be involved in that Scheme or those Schemes.

564.   As set forth herein, Defendants improperly engaged in a pattern of prohibited racketeering activity.

565.   As set forth herein, Defendants conduct gives rise to a cause of action for violation of RICO, and that unlawful conduct was the proximate cause of the Borrego Health's injury.

**SECOND CAUSE OF ACTION**

(Breach of Contract)

Against Premier

566.   Borrego Health reincorporates paragraphs 1 through 54, 66 through 334, inclusive, as though fully set forth herein.

567.   Borrego Health and Premier entered into the Dental MSA, including amendments thereto, and the Medical MSA.

568.   Borrego Health did all, or substantially all, of the significant things that the Dental MSA and Medical MSA required it to do, or was excused from doing so,

569.   As set forth herein, Premier breached the Dental MSA and Medical MSA.

570.   As a result of Premier's breaches of the MSAs, Borrego Health was damaged in an amount to be proven at trial.  Premier's failures to fulfill its obligations was a substantial factor in causing Borrego Health's harm.

**THIRD CAUSE OF ACTION**

(Breach of Contract)

Against Husam Aldairi, D.D.S. and Aldairi D.D.S., Inc.

571.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 146 through 166, inclusive, as though fully set forth herein.

572.   Borrego Health, Husam Aldairi, D.D.S. and Aldairi D.D.S., Inc. entered into the Aldairi Agreements.

573.   Borrego Health did all, or substantially all, of the significant things that the Aldairi Agreements required or Borrego Health was excused from doing so.

574.   Aldairi violated the terms of the Aldairi Agreements through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and

1    (7) generating inaccurate billing records, including billing for services not rendered,

2    including billing for services performed on teeth which the patients no longer had at

3    the time of service, upcoding, and inappropriately splitting services.

4        575.   As a result of Aldairi's conduct, Borrego Health was damaged in an

5    amount to be proven at trial.

6                        **FOURTH CAUSE OF ACTION**

7                            (Breach of Contract)

8            Against Ayed Hawatmeh, D.D.S. and Hawatmeh Dental Group, P.C.

9        576.   Borrego Health reincorporates paragraphs 1 through 54, 132 through

10   145, 167 through 183, inclusive, as though fully set forth herein.

11       577.   Borrego Health, Ayed Hawatmeh, D.D.S. and Hawatmeh Dental

12   Group, P.C. entered into the Hawatmeh Agreements.

13       578.   Borrego Health did all, or substantially all, of the significant things that

14   the Hawatmeh Agreements required or Borrego Health was excused from doing so.

15       579.   Hawatmeh violated the terms of the Hawatmeh Agreements through

16   their conduct, including but not limited to: (1) billing excessive patient visits; (2)

17   failing to maintain adequate documentation to support billing; (3) falsification of

18   medical records; (4) performing services that lacked medical necessity; (5)

19   providing services that fell below the standard of care; (6) providing excessive

20   services; and (7) generating inaccurate billing records, including billing for services

21   not rendered, including billing for services performed on teeth which the patients no

22   longer had at the time of service, upcoding, and inappropriately splitting services.

23       580.   As a result of Hawatmeh's conduct, Borrego Health was damaged in an

24   amount to be proven at trial.

25                        **FIFTH CAUSE OF ACTION**

26                            (Breach of Contract)

27           Against Alborz Mehdizadeh, D.D.S. and Alborz Mehdizadeh, Inc.

28

581.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 184 through 195, inclusive, as though fully set forth herein.

582.   Borrego Health, Alborz Mehdizadeh, D.D.S. and Alborz Mehdizadeh, Inc. entered into the Mehdizadeh Agreements.

583.   Borrego Health did all, or substantially all, of the significant things that the Mehdizadeh Agreements required or Borrego Health was excused from doing so.

584.   Mehdizadeh violated the terms of the Mehdizadeh Agreements through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered, including billing for services performed on teeth the patients no longer had at the time of service, upcoding, and inappropriately splitting services.

585.   As a result of Mehdizadeh's conduct, Borrego Health was damaged in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

(Breach of Contract)

Against Magaly Velasquez, D.D.S. and Magaly M. Velasquez DDS, Professional Dental Corp.

586.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 196 through 203, inclusive, as though fully set forth herein.

587.   Borrego Health, Magaly Velasquez, D.D.S. and Magaly M. Velasquez DDS, Professional Dental Corp. entered into the Velasquez Agreement.

588.   Borrego Health did all, or substantially all, of the significant things that the Velasquez Agreement required or Borrego Health was excused from doing so.

FOURTH AMENDED COMPLAINT

7288673.3

589.   Velasquez violated the terms of the Velasquez Agreement through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered, including billing for services performed on teeth the patients no longer had at the time of service, upcoding, and inappropriately splitting services.

590.   As a result of Velasquez's conduct, Borrego Health was damaged in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

(Breach of Contract)

Against Aram Arakelyan, D.D.S. and New Millennium Dental Group of Aram Arakelyan, Inc.

591.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 204 through 213, inclusive, as though fully set forth herein.

592.   Borrego Health, Aram Arakelyan, D.D.S. and New Millennium Dental Group of Aram Arakelyan, Inc. entered into the Arakelyan Agreements.

593.   Borrego Health did all, or substantially all, of the significant things that the Arakelyan Agreements required or Borrego Health was excused from doing so.

594.   Arakelyan violated the terms of the Arakelyan Agreements through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered, including billing for services performed on teeth the patients no longer had at the time of service, upcoding, and inappropriately splitting services.

FOURTH AMENDED COMPLAINT

7288673.3

1    595.   As a result of Arakelyan's conduct, Borrego Health was damaged in an
2    amount to be proven at trial.

3    **EIGHTH CAUSE OF ACTION**

4    (Breach of Contract)

5    Against Michael Hoang, D.M.D.

6    596.   Borrego Health reincorporates paragraphs 1 through 54, 132 through
7    145, 214 through 219, inclusive, as though fully set forth herein.

8    597.   Borrego Health and Michael Hoang, D.M.D. entered into the Hoang
9    Agreement.

10   598.   Borrego Health did all, or substantially all, of the significant things that
11   the Hoang Agreement required or Borrego Health was excused from doing so.

12   599.   Hoang violated the terms of the Hoang Agreement through his conduct,
13   including but not limited to: (1) billing excessive patient visits; (2) failing to
14   maintain adequate documentation to support billing; (3) falsification of medical
15   records; (4) performing services that lacked medical necessity; (5) providing
16   services that fell below the standard of care; (6) providing excessive services; and
17   (7) generating inaccurate billing records, including billing for services not rendered,
18   including billing for services performed on teeth the patients no longer had at the
19   time of service, upcoding, and inappropriately splitting services.

20   600.   As a result of Hoang's conduct, Borrego Health was damaged in an
21   amount to be proven at trial.

22   **NINTH CAUSE OF ACTION**

23   (Breach of Contract)

24   Against Waleed Stephan, D.D.S. and W.A. Stephan, a Dental Corporation

25   601.   Borrego Health reincorporates paragraphs 1 through 54, 132 through
26   145, 220 through 225, inclusive, as though fully set forth herein.

27   602.   Borrego Health, Waleed Stephan, D.D.S. and W.A. Stephan, a Dental
28   Corporation entered into the Stephan Agreement.

FOURTH AMENDED COMPLAINT

7288673.3

603.   Borrego Health did all, or substantially all, of the significant things that the Stephan Agreement required or Borrego Health was excused from doing so.

604.   Stephan violated the terms of the Stephan Agreement through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered, including billing for services performed on teeth the patients no longer had at the time of service, upcoding, and inappropriately splitting services.

605.   As a result of Stephan's conduct, Borrego Health was damaged in an amount to be proven at trial.

## TENTH CAUSE OF ACTION

### (Breach of Contract)

#### Against Santiago Rojo, D.D.S. and Santiago A. Rojo, D.D.S., Inc.

606.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 226 through 231, inclusive, as though fully set forth herein.

607.   Borrego Health, Santiago Rojo, D.D.S. and Santiago A. Rojo, D.D.S., Inc. entered into the Rojo Agreement.

608.   Borrego Health did all, or substantially all, of the significant things that the Rojo Agreement required or Borrego Health was excused from doing so.

609.   Rojo violated the terms of the Rojo Agreement through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered,

FOURTH AMENDED COMPLAINT

7288673.3

1  including billing for services performed on teeth the patients no longer had at the

2  time of service, upcoding, and inappropriately splitting services.

3      610.   As a result of Rojo's conduct, Borrego Health was damaged in an

4  amount to be proven at trial.

5  **ELEVENTH CAUSE OF ACTION**

6  (Breach of Contract)

7  Against Marcelo Toledo, D.D.S. and Marcelo Toledo, D.D.S., Inc.

8      611.   Borrego Health reincorporates paragraphs 1 through 54, 132 through

9  145, 246 through 258, inclusive, as though fully set forth herein.

10      612.   Borrego Health, Marcelo Toledo, D.D.S. and Marcelo Toledo, D.D.S.,

11  Inc. entered into the Toledo Agreement.

12      613.   Borrego Health did all, or substantially all, of the significant things that

13  the Toledo Agreement required or Borrego Health was excused from doing so.

14      614.   Toledo violated the terms of the Toledo Agreement through their

15  conduct, including but not limited to: (1) billing excessive patient visits; (2) failing

16  to maintain adequate documentation to support billing; (3) falsification of medical

17  records; (4) performing services that lacked medical necessity; (5) providing

18  services that fell below the standard of care; (6) providing excessive services; and

19  (7) generating inaccurate billing records, including billing for services not rendered,

20  including billing for services performed on teeth the patients no longer had at the

21  time of service, upcoding, and inappropriately splitting services.

22      615.   As a result of Toledo's conduct, Borrego Health was damaged in an

23  amount to be proven at trial.

24  **TWELFTH CAUSE OF ACTION**

25  (Breach of Contract)

26  Against Marlene M. Thompson, D.D.S. and Marlene M. Thompson, D.D.S., Inc.

27      616.   Borrego Health reincorporates paragraphs 1 through 54, 132 through

28  145, 259 through 264, inclusive, as though fully set forth herein.

7288673.3

617. Borrego Health, Marlene Thompson, D.D.S. and Marlene Thompson, D.D.S., Inc. entered into the Thompson Agreement.

618. Borrego Health did all, or substantially all, of the significant things that the Thompson Agreement required or Borrego Health was excused from doing so.

619. Thompson violated the terms of the Thompson Agreement through their conduct, including but not limited to, generating inaccurate billing records, including billing for services not rendered, and billing for services performed by unlicensed and suspected dental providers.

620. As a result of Thompson's conduct, Borrego Health was damaged in an amount to be proven at trial.

## THIRTEENTH CAUSE OF ACTION

(Breach of Contract)

Against Douglas Ness, D.D.S. and Ness Dental Corporation

621. Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 265 through 271, inclusive, as though fully set forth herein.

622. Borrego Health, Douglas Ness, D.D.S. and Ness Dental Corporation entered into the Ness Agreement.

623. Borrego Health did all, or substantially all, of the significant things that the Ness Agreement required or Borrego Health was excused from doing so.

624. Ness violated the terms of the Ness Agreement through their conduct, including but not limited to, generating inaccurate billing records, including billing for services performed by unlicensed and suspected dental providers.

625. As a result of Ness's conduct, Borrego Health was damaged in an amount to be proven at trial.

## FOURTEENTH CAUSE OF ACTION

(Breach of Contract)

Against George C. Jared, D.D.S. and George C. Jared, D.D.S., Inc.

FOURTH AMENDED COMPLAINT

7288673.3

626.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 272 through 281, inclusive, as though fully set forth herein.

627.   Borrego Health, George Jared, D.D.S. and George Jared, D.D.S., Inc. entered into the Jared Agreement.

628.   Borrego Health did all, or substantially all, of the significant things that the Jared Agreement required or Borrego Health was excused from doing so.

629.   Jared violated the terms of the Jared Agreement through their conduct, including but not limited to, generating inaccurate billing records, including billing for services not rendered, and billing for services performed by unlicensed and suspected dental providers.

630.   As a result of Jared's conduct, Borrego Health was damaged in an amount to be proven at trial.

## FIFTEENTH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Premier Defendants

631.   Borrego Health reincorporates paragraphs 1 through 54, 66 through 334, inclusive, as though fully set forth herein.

632.   The Premier Defendants represented to Borrego Health that they were qualified and capable of reviewing, "scrubbing," and processing contract dental claims on Borrego Health's behalf.  The Premier Defendants further represented they had qualified and experienced staff to develop their own quality management team to oversee Borrego Health's contract dental program.

633.   The Premier Defendants' representations were false at the time they were made. At the time Borrego Health entered into the Dental MSA with Premier, Premier lacked any clinical staff to properly review claims and develop a quality management system. Upon information and belief, The Premier Defendants knew their representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

7288673.3

634.   Borrego Health reasonably relied on the Premier Defendants' representations, believing it was capable of evaluating contract dental program claims for necessity and accuracy.

635.   Borrego Health's reliance on the Premier Defendants' representation regarding their qualifications and representations that they would properly review and process the claims was a substantial factor in causing Borrego Health's harm.

636.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

## SIXTEENTH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Husam Aldairi, D.D.S. and Aldairi DDS, Inc.

637.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 146 through 166, inclusive, as though fully set forth herein.

638.   In part, Aldairi misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Aldairi also represented they would submit accurate claims information to Borrego Health for reimbursement.

639.   Aldairi's representations were false at the time they were made.  Upon information and belief, Aldairi knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

640.   As set forth herein, Aldairi made various misrepresentations, including without limitation the misrepresentations made in connection with the Aldairi

1  Agreements and the false and fraudulent bills submitted by Aldairi (and any related
2  communication) to Borrego Health.

3      641.   Borrego Health reasonably relied on Aldairi's representations.

4      642.   As a direct and proximate result, Borrego Health was harmed in an
5  amount to be proven at trial.

6  ## SEVENTEENTH CAUSE OF ACTION

7  (Intentional Misrepresentation)

8  Against Ayed Hawatmeh, D.D.S. and Hawatmeh Dental Group, P.C.

9      643.   Borrego Health reincorporates paragraphs 1 through 54, 132 through
10  145, 167 through 183, inclusive, as though fully set forth herein.

11      644.   In part, Hawatmeh misrepresented to Borrego Health that they would
12  practice dentistry in accordance with all Federal, State and local laws, regulations,
13  and generally accepted principles applicable the practice of dentistry, hire qualified
14  and licensed dental professionals to provide dental services to Borrego Health
15  patients, and prepare, establish, and maintain administrative records, financial
16  records, records pertaining to patient diagnosis and treatment, and information
17  pertaining to the services provided. Hawatmeh also represented they would submit
18  accurate claims information to Borrego Health for reimbursement.

19      645.   Hawatmeh's representations were false at the time they were made.
20  Upon information and belief, Ayed Hawatmeh, D.D.S. and Hawatmeh Dental
21  Group, P.C. knew the representations were false at the time they were made, or that
22  the representations where made recklessly without regard for their truth.

23      646.   As set forth herein, Hawatmeh made various misrepresentations,
24  including without limitation the misrepresentations made in connection with the
25  Hawatmeh Agreement and the false and fraudulent bills submitted by Hawatmeh
26  (and any related communication) to Borrego Health.

27      647.   Borrego Health reasonably relied on Hawatmeh's representations.

28

7288673.3

648.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

## EIGHTEENTH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Alborz Mehdizadeh, D.D.S. and Alborz Mehdizadeh, Inc.

649.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 184 through 195, inclusive, as though fully set forth herein.

650.   In part, Alborz Mehdizadeh misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Mehdizadeh also represented they would submit accurate claims information to Borrego Health for reimbursement.

651.   Mehdizadeh's representations were false at the time they were made. Upon information and belief, Mehdizadeh knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

652.   As set forth herein, Aldairi made various misrepresentations, including without limitation the misrepresentations made in connection with the Mehdizadeh Agreement and the false and fraudulent bills submitted by Mehdizadeh (and any related communication) to Borrego Health.

653.   Borrego Health reasonably relied on Mehdizadeh'S representations.

654.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

## NINETEENTH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Magaly Velasquez D.D.S. and Magaly M. Velasquez DDS, Professional Dental Corp.

655.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 196 through 203, inclusive, as though fully set forth herein.

656.   In part, Velasquez misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.  Velasquez also represented they would submit accurate claims information to Borrego Health for reimbursement.

657.   Velasquez's representations were false at the time they were made. Upon information and belief, Velasquez knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

658.   As set forth herein, Velasquez made various misrepresentations, including without limitation the misrepresentations made in connection with the Velasquez Agreement and the false and fraudulent bills submitted by Velasquez (and any related communication) to Borrego Health.

659.   Borrego Health reasonably relied on Velasquez's representations.

660.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

/ / /

/ / /

/ / /

7288673.3

# **TWENTIETH CAUSE OF ACTION**

(Intentional Misrepresentation)

Against Aram Arakelyan, D.D.S. and New Millennium Dental Group of Aram Arakelyan, Inc.

661. Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 204 through 213, inclusive, as though fully set forth herein.

662. In part, Arakelyan misrepresented to Borrego Health that he would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Arakelyan also represented they would submit accurate claims information to Borrego Health for reimbursement.

663. Arakelyan representations were false at the time they were made. Upon information and belief, Arakelyan knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

664. As set forth herein, Arakelyan made various misrepresentations, including without limitation the misrepresentations made in connection with the Arakelyan Agreements and the false and fraudulent bills submitted by Arakelyan (and any related communication) to Borrego Health.

665. Borrego Health reasonably relied on Arakelyan's representations.

666. As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

/ / /

/ / /

/ / /

FOURTH AMENDED COMPLAINT

7288673.3

## TWENTY-FIRST CAUSE OF ACTION

(Intentional Misrepresentation)

Against Michael Hoang, D.M.D.

667.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 214 through 219, inclusive, as though fully set forth herein.

668.   In part, Michael Hoang, D.M.D. misrepresented to Borrego Health that he would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health  patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Hoang also represented they would submit accurate claims information to Borrego Health for reimbursement.

669.   Michael Hoang, D.M.D.'s representations were false at the time they were made. Upon information and belief, Michael Hoang, D.M.D. knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

670.   As set forth herein, Hoang made various misrepresentations, including without limitation the misrepresentations made in connection with the Hoang Agreement and the false and fraudulent bills submitted by Hoang (and any related communication) to Borrego Health.

671.   Borrego Health reasonably relied on Michael Hoang, D.M.D.'s representations.

672.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

## TWENTY-SECOND CAUSE OF ACTION

(Intentional Misrepresentation)

Against Waleed Stephan, D.D.S. and W.A. Stephan, a Dental Corporation

FOURTH AMENDED COMPLAINT

7288673.3

673. Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 220 through 225, inclusive, as though fully set forth herein.

674. In part, Stephan misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Stephan also represented they would submit accurate claims information to Borrego Health for reimbursement.

675. Stephan's representations were false at the time they were made. Upon information and belief, Stephan knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

676. As set forth herein, Stephan made various misrepresentations, including without limitation the misrepresentations made in connection with the Stephan Agreement and the false and fraudulent bills submitted by Stephan (and any related communication) to Borrego Health.

677. Borrego Health reasonably relied on Stephan's representations.

678. As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

## TWENTY-THIRD CAUSE OF ACTION

(Intentional Misrepresentation)

Against Santiago Rojo, D.D.S. and Santiago Rojo, D.D.S., Inc.

679. Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 226 through 231, inclusive, as though fully set forth herein.

680. In part, Rojo misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and

7288673.3

generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Rojo also represented they would submit accurate claims information to Borrego Health for reimbursement.

681.   Rojo's representations were false at the time they were made. Upon information and belief, Rojo knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

682.   As set forth herein, Rojo made various misrepresentations, including without limitation the misrepresentations made in connection with the Rojo Agreement and the false and fraudulent bills submitted by Rojo (and any related communication) to Borrego Health.

683.   Borrego Health reasonably relied on Rojo's representations.

684.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

## TWENTY-FOURTH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Marcelo Toledo, D.D.S. and Marcelo Toledo, D.D.S., Inc.

685.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 246 through 258, inclusive, as though fully set forth herein.

686.   In part, Toledo misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information

1   pertaining to the services provided. Toledo also represented they would submit

2   accurate claims information to Borrego Health for reimbursement.

3       687.   Toledo's representations were false at the time they were made. Upon

4   information and belief, Toledo knew the representations were false at the time they

5   were made, or that the representations where made recklessly without regard for

6   their truth.

7       688.   As set forth herein, Toledo made various misrepresentations, including

8   without limitation the misrepresentations made in connection with the Toledo

9   Agreement and the false and fraudulent bills submitted by Toledo (and any related

10  communication) to Borrego Health.

11      689.   Borrego Health reasonably relied on Toledo's representations.

12      690.   As a direct and proximate result, Borrego Health was harmed in an

13  amount to be proven at trial.

14      **TWENTY-FIFTH CAUSE OF ACTION**

15      (Intentional Misrepresentation)

16  Against Marlene M. Thompson, D.D.S. and Marlene M. Thompson, D.D.S., Inc.

17      691.   Borrego Health reincorporates paragraphs 1 through 54, 132 through

18  145, 259 through 264, inclusive, as though fully set forth herein.

19      692.   In part, Thompson misrepresented to Borrego Health that they would

20  practice dentistry in accordance with all Federal, State and local laws, regulations,

21  and generally accepted principles applicable the practice of dentistry, hire qualified

22  and licensed dental professionals to provide dental services to Borrego Health

23  patients, and prepare, establish, and maintain administrative records, financial

24  records, records pertaining to patient diagnosis and treatment, and information

25  pertaining to the services provided. Thompson also represented they would submit

26  accurate claims information to Borrego Health for reimbursement.

27      693.   Thompson's representations were false at the time they were made.

28  Upon information and belief, Thompson knew the representations were false at the

1 time they were made, or that the representations where made recklessly without

2 regard for their truth.

3    694.   Borrego Health reasonably relied on Thompson's representations.

4    695.   As a direct and proximate result, Borrego Health was harmed in an

5 amount to be proven at trial.

6    **TWENTY-SIXTH CAUSE OF ACTION**

7    (Intentional Misrepresentation)

8    Against Douglas Ness, D.D.S. and Ness Dental Corporation

9    696.   Borrego Health reincorporates paragraphs 1 through 54, 132 through

10 145, 265 through 271, inclusive, as though fully set forth herein.

11    697.   In part, Ness misrepresented to Borrego Health that they would practice

12 dentistry in accordance with all Federal, State and local laws, regulations, and

13 generally accepted principles applicable the practice of dentistry, hire qualified and

14 licensed dental professionals to provide dental services to Borrego Health patients,

15 and prepare, establish, and maintain administrative records, financial records,

16 records pertaining to patient diagnosis and treatment, and information pertaining to

17 the services provided. Ness also represented they would submit accurate claims

18 information to Borrego Health for reimbursement.

19    698.   Ness' representations were false at the time they were made. Upon

20 information and belief, Ness knew the representations were false at the time they

21 were made, or that the representations where made recklessly without regard for

22 their truth.

23    699.   Borrego Health reasonably relied on Ness' representations.

24    700.   As a direct and proximate result, Borrego Health was harmed in an

25 amount to be proven at trial.

26    **TWENTY-SEVENTH CAUSE OF ACTION**

27    (Intentional Misrepresentation)

28    Against George C. Jared, D.D.S. and George C. Jared, D.D.S., Inc.

7288673.3

701.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 272 through 281, inclusive, as though fully set forth herein.

702.   In part, Jared misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Jared also represented they would submit accurate claims information to Borrego Health for reimbursement.

703.   Jared's representations were false at the time they were made.  Upon information and belief, Jared knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

704.   Borrego Health reasonably relied on Jared's representations.

705.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

## TWENTY-EIGHTH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Premier Defendants

706.   Borrego Health reincorporates paragraphs 1 through 54, 66 through 334, inclusive, as though fully set forth herein.

707.   The Premier Defendants represented to Borrego Health that it was qualified and capable of reviewing, "scrubbing," and processing contract dental claims on Borrego Health's behalf.  The Premier Defendants further represented that Premier had qualified and experienced staff to develop its own quality management team to oversee Borrego Health's contract dental program.

7288673.3

708.   The Premier Defendants had no reasonable grounds for believing their representations were true at the time they were made. At the time Borrego Health entered into the MSAs with Premier, Premier lacked any clinical staff to properly review claims and develop a quality management system.

709.   The Premier Defendants intended for Borrego Health to rely on its representations to persuade Borrego Health to retain Premier's services.

710.   Borrego Health reasonably relied on the Premier Defendants' representations, believing Premier was capable of evaluating contract dental program claims for necessity and accuracy.

711.   Borrego Health's reliance on the Premier Defendants' representation regarding their qualifications and representations that they would properly review and process the claims was a substantial factor in causing Borrego Health harm.

712.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

### TWENTY-NINTH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Husam Aldairi, D.D.S. and Aldairi DDS, Inc.

713.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 146 through 166, inclusive, as though fully set forth herein.

714.   As outlined above, Aldairi made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Aldairi also represented to Borrego Health that the claims submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

715.   As set forth herein, Aldairi made various misrepresentations, including without limitation the misrepresentations made in connection with the Aldairi Agreements and the false and fraudulent bills submitted by Aldairi (and any related communication) to Borrego Health.

7288673.3

716.   Aldairi had no reasonable grounds for believing their representations were true at the time they were made.

717.   Aldairi intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Husam Aldairi, D.D.S. and Aldairi DDS, Inc.

718.   Borrego Health reasonably relied on Aldairi's representations.

719.   As a result of relying on Aldairi's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Aldairi for services that should not have been paid.

720.   Borrego Health's reliance on Aldairi's representations was a substantial factor in causing Borrego Health harm.

## THIRTIETH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Ayed Hawatmeh, D.D.S. and Hawatmeh Dental Group, P.C.

721.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 167 through 183, inclusive, as though fully set forth herein.

722.   As outlined above, Hawatmeh made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Hawatmeh also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

723.   As set forth herein, Hawatmeh made various misrepresentations, including without limitation the misrepresentations made in connection with the Hawatmeh Agreement and the false and fraudulent bills submitted by Hawatmeh (and any related communication) to Borrego Health.

724.   Hawatmeh had no reasonable grounds for believing their representations were true at the time they were made.

725.   Hawatmeh intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Hawatmeh.

726.   Borrego Health reasonably relied on Hawatmeh's representations.

727.   As a result of relying on Hawatmeh's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Hawatmeh for services that should not have been paid.

728.   Borrego Health's reliance on Hawatmeh's representations was a substantial factor in causing Borrego Health harm.

### THIRTY-FIRST CAUSE OF ACTION

(Negligent Misrepresentation)

Against Alborz Mehdizadeh, D.D.S. and Alborz Mehdizadeh, Inc.

729.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 184 through 195, inclusive, as though fully set forth herein.

730.   As outlined above, Mehdizadeh made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients.  Mehdizadeh also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

731.   As set forth herein, Mehdizadeh made various misrepresentations, including without limitation the misrepresentations made in connection with the Mehdizadeh Agreement and the false and fraudulent bills submitted by Mehdizadeh (and any related communication) to Borrego Health.

732.   Mehdizadeh had no reasonable grounds for believing their representations were true at the time they were made.

733.   Mehdizadeh intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Mehdizadeh.

734.   Borrego Health reasonably relied on Mehdizadeh's representations.

735.   As a result of relying on Mehdizadeh's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid MehdizadeH for services that should not have been paid.

736.   Borrego Health's reliance on Mehdizadeh's representations was a substantial factor in causing Borrego Health harm.

## THIRTY-SECOND CAUSE OF ACTION

(Negligent Misrepresentation)

Against Magaly Velasquez, D.D.S. and Magaly M. Velasquez DDS, Professional Dental Corp.

737.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 196 through 203, inclusive, as though fully set forth herein.

738.   As outlined above, Velasquez made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients.  Velasquez also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

739.   As set forth herein, Velasquez made various misrepresentations, including without limitation the misrepresentations made in connection with the Velasquez Agreement and the false and fraudulent bills submitted by Velasquez (and any related communication) to Borrego Health.

740.   Velasquez had no reasonable grounds for believing their representations were true at the time they were made.

741.   Velasquez intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Velasquez.

742.   Borrego Health reasonably relied on Velasquez's representations.

743.   As a result of relying on Velasquez's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Velasquez for services that should not have been paid.

744.   Borrego Health's reliance on Velasquez's representations was a substantial factor in causing Borrego Health harm.

/ / /

/ / /

7288673.3

## **THIRTY-THIRD CAUSE OF ACTION**

(Negligent Misrepresentation)

Against Aram Arakelyan, D.D.S. and New millennium Dental Group of Aram Arakelyan, Inc.

745.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 204 through 213, inclusive, as though fully set forth herein.

746.   As outlined above, Arakelyan made several representations to Borrego Health regarding the scope and nature of the services he would provide to Borrego Health patients.  Arakelyan also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

747.   As set forth herein, Arakelyan made various misrepresentations, including without limitation the misrepresentations made in connection with the Arakelyan Agreements and the false and fraudulent bills submitted by Arakelyan (and any related communication) to Borrego Health.

748.   Arakelyan had no reasonable grounds for believing his representations were true at the time they were made.

749.   Arakelyan intended for Borrego Health to rely on his representations to persuade Borrego Health to continue to contract with Arakelyan.

750.   Borrego Health reasonably relied on Arakelyan's representations.

751.   As a result of relying on Arakelyan's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Arakelyan for services that should not have been paid.

752.   Borrego Health's reliance on Arakelyan's representations was a substantial factor in causing Borrego Health harm.

/ / /

/ / /

/ / /

/ / /

FOURTH AMENDED COMPLAINT

7288673.3

## **THIRTY-FOURTH CAUSE OF ACTION**

(Negligent Misrepresentation)

Against Michael Hoang, D.M.D.

753.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 214 through 219, inclusive, as though fully set forth herein.

754.   As outlined above, Michael Hoang, D.M.D. made several representations to Borrego Health regarding the scope and nature of the services he would provide to Borrego Health patients.  Hoang also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

755.   As set forth herein, Hoang made various misrepresentations, including without limitation the misrepresentations made in connection with the Hoang Agreement and the false and fraudulent bills submitted by Hoang (and any related communication) to Borrego Health.

756.   Michael Hoang, D.M.D. had no reasonable grounds for believing their representations were true at the time they were made.

757.   Michael Hoang, D.M.D. intended for Borrego Health to rely on his representations to persuade Borrego Health to continue to contract with Michael Hoang, D.M.D.

758.   Borrego Health reasonably relied on Michael Hoang, D.M.D.'s representations.

759.   As a result of relying on Michael Hoang, D.M.D.'s representations, Borrego Health  submitted claims to Medi-Cal that were not supportable and paid Michael Hoang, D.M.D. for services that should not have been paid.

760.   Borrego Health's reliance on Michael Hoang, D.M.D.'s representations was a substantial factor in causing Borrego Health harm.

/ / /

/ / /

/ / /

7288673.3

**THIRTY-FIFTH CAUSE OF ACTION**

(Negligent Misrepresentation)

Against Waleed Stephan, D.D.S. and W.A. Stephan, a Dental Corporation

761.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 220 through 225, inclusive, as though fully set forth herein.

762.   As outlined above, Stephan made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Stephan also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

763.   As set forth herein, Stephan made various misrepresentations, including without limitation the misrepresentations made in connection with the Stephan Agreement and the false and fraudulent bills submitted by Stephan (and any related communication) to Borrego Health.

764.   Stephan had no reasonable grounds for believing their representations were true at the time they were made.

765.   Stephan intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Stephan.

766.   Borrego Health reasonably relied on Stephan's representations.

767.   As a result of relying on Stephan's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Stephan for services that should not have been paid.

768.   Borrego Health's reliance on Stephan's representations was a substantial factor in causing Borrego Health harm.

**THIRTY-SIXTH CAUSE OF ACTION**

(Negligent Misrepresentation)

Against Santiago Rojo, D.D.S. and Santiago Rojo, D.D.S., Inc.

769.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 226 through 231, inclusive, as though fully set forth herein.

770.   As outlined above, Rojo made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients.  Rojo also represented to Borrego Health that the claims submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

771.   As set forth herein, Rojo made various misrepresentations, including without limitation the misrepresentations made in connection with the Rojo Agreement and the false and fraudulent bills submitted by Rojo (and any related communication) to Borrego Health.

772.   Rojo had no reasonable grounds for believing their representations were true at the time they were made.

773.   Rojo intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Rojo.

774.   Borrego Health reasonably relied on Rojo's representations.

775.   As a result of relying on Santiago Rojo, D.D.S. and Santiago Rojo, D.D.S., Inc.'s representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Rojo for services that should not have been paid.

776.   Borrego Health's reliance on Rojo's representations was a substantial factor in causing Borrego Health harm.

## THIRTY-SEVENTH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Marcelo Toledo, D.D.S. and Marcelo Toledo, D.D.S., Inc.

777.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 246 through 258, inclusive, as though fully set forth herein.

778.   As outlined above, Toledo made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Toledo also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

7288673.3

779.   As set forth herein, Toledo made various misrepresentations, including without limitation the misrepresentations made in connection with the Toledo Agreement and the false and fraudulent bills submitted by Toledo (and any related communication) to Borrego Health.

780.   Toledo had no reasonable grounds for believing their representations were true at the time they were made.

781.   Toledo intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Toledo.

782.   Borrego Health reasonably relied on Toledo's representations.

783.   As a result of relying on Toledo's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Toledo for services that should not have been paid.

784.   Borrego Health's reliance on Toledo's representations was a substantial factor in causing Borrego Health harm.

### THIRTY-EIGHTH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Marlene M. Thompson, D.D.S. and Marlene M. Thompson, D.D.S., Inc.

785.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 259 through 264, inclusive, as though fully set forth herein.

786.   As outlined above, Thompson made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Thompson also represented to Borrego Health that the claims submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

787.   Thompson had no reasonable grounds for believing their representations were true at the time they were made.

788.   Thompson. intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Thompson.

7288673.3

789.   Borrego Health reasonably relied on Thompson's representations.

790.   As a result of relying on Thompson's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Thompson for services that should not have been paid.

791.   Borrego Health's reliance on Thompson's representations was a substantial factor in causing Borrego Health harm.

## THIRTY-NINTH CAUSE OF ACTION

### (Negligent Misrepresentation)

### Against Douglas Ness, D.D.S. and Ness Dental Corporation

792.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 265 through 271, inclusive, as though fully set forth herein.

793.   As outlined above, Ness made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Ness also represented to Borrego Health that the claims submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

794.   Ness had no reasonable grounds for believing their representations were true at the time they were made.

795.   Ness intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Ness.

796.   Borrego Health reasonably relied on Ness' representations.

797.   As a result of relying on Ness' representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Ness for services that should not have been paid.

798.   Borrego Health's reliance on Ness' representations was a substantial factor in causing Borrego Health harm.

/ / /

/ / /

7288673.3

**FORTIETH CAUSE OF ACTION**

(Negligent Misrepresentation)

Against George C. Jared, D.D.S. and George C. Jared, D.D.S., Inc.

799.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 272 through 281, inclusive, as though fully set forth herein.

800.   As outlined above, Jared made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Jared also represented to Borrego Health that the claims submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

801.   Jared had no reasonable grounds for believing their representations were true at the time they were made.

802.   Jared intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Jared.

803.   Borrego Health reasonably relied on Jared's representations.

804.   As a result of relying on Jared's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Jared for services that should not have been paid.

805.   Borrego Health's reliance on Jared's representations was a substantial factor in causing Borrego Health harm.

**FORTY-FIRST CAUSE OF ACTION**

(Legal Malpractice)

Against Defendant Mikia Wallis

806.   Borrego Health reincorporates paragraphs 1 through 145, 282 through 503, inclusive, as though fully set forth herein.

807.   Mikia Wallis was originally hired by Borrego Health to serve as its Chief Legal Officer.  Mikia Wallis later served in a dual capacity as the President and interim CEO of Borrego Health.  As Borrego Health's attorney, agent and

178

7288673.3

1 fiduciary, Mikia Wallis has a duty to act with reasonable care and to act for the
2 benefit of Borrego Health.

3    808.   As outlined herein, Mikia Wallis breached her legal duties to Borrego
4 Health.

5    809.   As a direct and proximate result of Mikia Wallis' breaches, Borrego
6 Health was damaged in an amount to be proven at trial.

7                    **FORTY-SECOND CAUSE OF ACTION**
8                          (Fraudulent Concealment)
9            Against Borrego Insiders, the Premier Defendants, Jim Hebets,
10                           and The Hebets Company

11    810.   Borrego Health reincorporates paragraphs 1 through 485, inclusive, as
12 though fully set forth herein.

13    811.   The Borrego Insiders, the Premier Defendants, Jim Hebets, and The
14 Hebets Company owed duties to Borrego Health.

15    812.   As outlined herein, the Borrego Insiders, the Premier Defendants, Jim
16 Hebets, and The Hebets Company intentionally failed to disclose pertinent facts to
17 Borrego Health regarding Borrego Health's business operations and took actions to
18 conceal such facts from Borrego Health.

19    813.   Borrego Health was not aware of the facts Borrego Insiders, the
20 Premier Defendants, Jim Hebets, and The Hebets Company concealed from Borrego
21 Health.

22    814.   The Borrego Insiders, the Premier Defendants, Jim Hebets, and The
23 Hebets Company intended to deceive Borrego Health by failing to
24 disclose/concealing such facts.

25    815.   Had the Borrego Insiders, the Premier Defendants, Jim Hebets, and The
26 Hebets Company disclosed the withheld and concealed information, Borrego Health
27 would have taken different actions then it did.

28

7288673.3

816. Borrego Health was harmed as a result of the Borrego Insiders, the Premier Defendants, Jim Hebets, and The Hebets Company's conduct.

817. The Borrego Insiders, the Premier Defendants, Jim Hebets, and The Hebets Company's concealment was a substantial factor in causing Borrego Health's harm.

## FORTY-THIRD CAUSE OF ACTION

### (False Promise)

### Against All Defendants

818. Borrego Health reincorporates paragraphs 1 through 485, inclusive, as though fully set forth herein.

819. As outlined herein, each and every Defendant made promises to Borrego Health.

820. Defendants did not intend to perform on the promises made at the time they made those promises to Borrego Health.

821. Defendants intended for Borrego Health to rely on those promises.

822. Borrego Health reasonably relied on Defendants' promises.

823. Defendants did not perform the actions they promised to perform.

824. Borrego Health was harmed as a result of Defendants' failures to perform the actions promised.

825. Borrego Health's reliance on Defendants' promises was a substantial factor in causing Borrego Health harm.

## FORTY-FOURTH CAUSE OF ACTION

### (Conversion)

### Against All Defendants

826. Borrego Health reincorporates paragraphs 1 through 485, inclusive, as though fully set forth herein.

827. As set forth herein, Defendants substantially interfered with Borrego Health's personal property by knowingly taking money from Borrego Health for

1   which Defendants were not entitled to, or at least prevented Borrego Health from

2   receiving the full funds to which it was entitled.

3       828.   As set forth herein, Borrego Health did not consent to Defendants

4   improper withholding of funds that were rightfully owned by Borrego Health.

5       829.   As set forth herein, Borrego Health was harmed.

6       830.   As set forth herein, Defendants' conduct was a substantial factor in

7   causing plaintiff's harm.

8                    **<u>FORTY-FIFTH CAUSE OF ACTION</u>**

9                       (Inducing Breach of Contract)

10                        Against All Defendants

11      831.   Borrego Health reincorporates paragraphs 1 through 54, 66 through

12  334, inclusive, as though fully set forth herein.

13      832.   Borrego Health had a contract with Medi-Cal.

14      833.   Borrego Health had contracts with its contract dental providers,

15  including the corporate entities of the individually named Dentist Defendants.

16      834.   Defendants knew of Borrego Health's contracts with Medi-Cal, the

17  corporate Dentist Defendants, and Borrego Health's contract dental providers.

18      835.   Through the conduct alleged herein, Defendants intended to cause the

19  contracted dental providers to breach the terms of their contract with Borrego

20  Health.

21      836.   Defendants' conduct did cause the contracted dental providers to

22  breach their contracts with Borrego Health.

23      837.   As a result of Defendants' conduct, Borrego Health was harmed.

24      838.   Defendants' conduct was a substantial factor in causing Borrego

25  Health's harm.

26  / / /

27  / / /

28  / / /

FOURTH AMENDED COMPLAINT

## FORTY-SIXTH CAUSE OF ACTION

(Intentional Interference with Contractual Relations)

Against All Defendants

839.   Borrego Health reincorporates paragraphs 1 through 54, 66 through 334, inclusive, as though fully set forth herein.

840.   Borrego Health had a contract with Medi-Cal.

841.   Borrego Health had contracts with its contract dental providers, including the corporate entities of the individually named Dentist Defendants.

842.   Defendants knew of Borrego Health's contracts with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers.

843.   Through the conduct alleged herein, Defendants intended to cause the contracted dental providers to breach the terms of their contract with Borrego Health, which thereby impacted Borrego Health's contract with Medi-Cal.

844.   Defendants' conduct made Borrego Health's performance under their contracts expensive and difficult.

845.   Defendants intended to disrupt performance of the contracts or at least knew that disruption of performance was substantially certain to occur by their conduct.

846.   As a result of Defendants' conduct, Borrego Health was harmed.

847.   Defendants' conduct was a substantial factor in causing Borrego Health's harm.

## FORTY-SEVENTH CAUSE OF ACTION

(Intentional Interference with Prospective Economic Relations)

Against All Defendants

848.   Borrego Health reincorporates paragraphs 1 through 46, 66 through 334, inclusive, as though fully set forth herein.

849.   Borrego Health was in an economic relationship with Medi-Cal, which provided an economic benefit to Borrego Health.

850. Borrego Health was in economic relationships with its contract dental providers, including the corporate entities of the individually named Dentist Defendants, which provided an economic benefit to Borrego Health.

851. Defendants knew of Borrego Health's economic relationship with Medi-Cal.

852. Defendants knew of Borrego Health's economic relationships with the corporate Dentist Defendants, as well as the contracts with individual contract dental providers.

853. As outlined herein, Defendants engaged in wrongful conduct that was intended to disrupt Borrego Health's relationships with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers.

854. Borrego Health's relationships with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers were disrupted.

855. As a result of Defendants' conduct, Borrego Health was harmed.

856. Defendants' conduct was a substantial factor in causing Borrego Health's harm.

### FORTY-EIGHTH CAUSE OF ACTION

(Negligent Interference with Prospective Economic Relations)

Against All Defendants

857. Borrego Health reincorporates paragraphs 1 through 46, 66 through 334, inclusive, as though fully set forth herein.

858. Borrego Health was in an economic relationship with Medi-Cal, which provided an economic benefit to Borrego Health.

859. Borrego Health was in economic relationships with its contract dental providers, including the corporate entities of the individually named Dentist Defendants, which provided an economic benefit to Borrego Health.

860. Defendants knew or should have known of Borrego Health's contract with Medi-Cal.

FOURTH AMENDED COMPLAINT

7288673.3

861.   Defendants knew or should have known of Borrego Health's contracts with the corporate Dentist Defendants, as well as the contracts with individual contract dental providers.

862.   As outlined herein, Defendants knew or should have known Borrego Health's relationships with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers would be disrupted if they failed to act with reasonable care.

863.   As outlined herein, Defendants failed to act with reasonable care when they engaged in wrongful conduct that was intended to disrupt Borrego Health's relationships with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers.

864.    Borrego Health's relationships with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers were disrupted.

865.   As a result of Defendants' conduct, Borrego Health was harmed.

866.   Defendants' conduct was a substantial factor in causing Borrego Health's harm.

## FORTY-NINTH CAUSE OF ACTION

(Violations of Business & Professions Code § 17200, *et seq.*)

Against All Defendants

867.   Borrego Health reincorporates paragraphs 1 through 485, inclusive, as though fully set forth herein.  This is due to the fact that Borrego Health believes that each and every one of the actions and omissions described above are part of the same, far-reaching and widespread unfair and/or fraudulent business activities designed and carried out to steal money from Borrego Health and funnel that money, directly or indirectly, to the Defendants. However, in the alternative, any one of or any combination of the above-listed Schemes would be sufficient to state a claim against the Defendants alleged to be involved in that Scheme or those Schemes.

7288673.3

868.   The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

869.   The UCL imposes strict liability. Borrego Health need not prove that defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices – but only that such practices occurred.

870.   A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

871.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

872.   As outlined herein, Defendants' actions were unfair.

873.   As outlined herein, Defendants' acts and practices constitute fraudulent business acts or practices as they have deceived Borrego Health and are highly likely to deceive members of the consuming public, including members of the contract dental program and/or members of the relevant state agencies.

## **FIFTIETH CAUSE OF ACTION**

### (Conspiracy)

### Against All Defendants

874.   Borrego Health reincorporates paragraphs 1 through 485, inclusive, as though fully set forth herein.  This is due to the fact that Borrego Health believes that each and every one of the actions and omissions described above are part of the same, far-reaching and widespread conspiracy designed and carried out to steal money from Borrego Health and funnel that money, directly or indirectly, to the Defendants.  However, in the alternative, any one of or any combination of the

7288673.3

1  above-listed Schemes would be sufficient to state a claim against the Defendants

2  alleged to be involved in that Scheme or those Schemes.

3       875.   As set forth herein, the facts involving the multiple Schemes described

4  above demonstrate the existence of a conspiracy between and among the Defendants

5  to act in furtherance of those Schemes, all of whom acted as co-conspirators of

6  another.

7       876.   Borrego Health was harmed by Defendants' actions.

8       877.   Defendants were responsible for Borrego Health's harm.

9       878.   Defendants were aware of each other's plans and agreed/intended such

10  wrongful acts to be committed.

11                    **FIFTY-FIRST CAUSE OF ACTION**

12                         (Breach of Fiduciary Duty)

13                         Against Borrego Insiders

14       879.   Borrego Health reincorporates paragraphs 1 through 510, inclusive, as

15  though fully set forth herein.

16       880.   The Borrego Insiders owed fiduciary duties to Borrego Health.

17       881.   As outlined herein, the Borrego Insiders breached their duties to

18  Borrego Health.

19       882.   Borrego Health was damaged by the Borrego Insiders' breaches.

20                    **FIFTY-SECOND CAUSE OF ACTION**

21                         (Constructive Fraud)

22            Against Borrego Insiders and Premier Defendants

23       883.   Borrego Health reincorporates paragraphs 1 through 562, inclusive, as

24  though fully set forth herein.

25       884.   The Borrego Insiders and the Premier Defendants acted as Borrego

26  Health's agents, corporate officers and/or fiduciaries.

27       885.   The Borrego Insiders and the Premier Defendants acted on Borrego

28  Health's behalf in several transactions as outlined above.

FOURTH AMENDED COMPLAINT

886.   As outlined above, the Borrego Insiders and the Premier Defendants knew, or should have known, pertinent information to the transactions.

887.   The Borrego Insiders and the Premier Defendants misled Borrego Health by failing to disclose such pertinent information and/or omitting such pertinent information from Borrego Health.

888.   As a result of the Borrego Insiders' and the Premier Defendants' failure to disclose such information, Borrego Health was harmed.

889.   The Borrego Insiders' and the Premier Defendants' conduct was a substantial factor in causing Borrego Health's harm.

## FIFTY-THIRD CAUSE OF ACTION

(Unjust Enrichment/Restitution)

Against all Defendants

890.   Borrego Health reincorporates paragraphs 1 through 562, inclusive, as though fully set forth herein.

891.   As outlined herein, Defendants unjustly received a benefit at the expense of Borrego Health.

## FIFTY-FOURTH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Jim Hebets and The Hebets Company

892.   Borrego Health reincorporates paragraphs 1 through 46, 360 through 422, inclusive, as though fully set forth herein.

893.   Jim Hebets and The Hebets Company represented to Borrego Health, among other things, that the 162B plans would not subject Borrego Health to tax penalties, and that the 162B plan provided a fair market benefit package that was superior to other options.

894.   Jim Hebets and The Hebets Company's representations were false at the time they were made. For example, Borrego Health suffered a tax penalty from the IRS as a direct result of Bruce Hebets' 162B plan.

895. Borrego Health reasonably relied on Jim Hebets' and The Hebets Company's representations.

896. As a result of relying on Jim Hebets' and The Hebets Company's representations, Borrego Health suffered harm.

897. Borrego Health's reliance on Jim Hebets' and The Hebets Company's representations was a substantial factor in causing Borrego Health's harm.

### FIFTY-FIFTH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Jim Hebets and The Hebets Company

898. Borrego Health reincorporates paragraphs 1 through 46, 360 through 422, inclusive, as though fully set forth herein.

899. As outlined above, Jim Hebets and The Hebets Company made several representations to Borrego Health regarding the scope and nature of the services they would provide and the benefits Borrego Health would receive from those services.

900. Jim Hebets and The Hebets Company had no reasonable grounds for believing their representations were true at the time they were made.

901. Jim Hebets and The Hebets Company intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Jim Hebets and The Hebets Company.

902. Borrego Health reasonably relied on Jim Hebets' and The Hebets Company's representations.

903. As a result of relying on Jim Hebets' and The Hebets Company's representations, Borrego Health was harmed.

904. Borrego Health's reliance on Jim Hebets and The Hebets Company's representations were a substantial factor in causing Borrego Health harm.

/ / /

/ / /

7288673.3

## FIFTY-SIXTH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Mohammed Al Tekreeti, D.D.S.

905.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 232 through 237, inclusive, as though fully set forth herein.

906.   In part, Al Tekreeti misrepresented to Borrego Health that he would submit accurate claims information to Borrego Health for reimbursement.

907.   Al Tekreeti's representations were false at the time they were made. Upon information and belief, Al Tekreeti knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

908.   Borrego Health reasonably relied on Al Tekreeti's representations.

909.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

## FIFTY-SEVENTH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Jilbert Bakramian, D.D.S.

910.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 238 through 245, inclusive, as though fully set forth herein.

911.   In part, Bakramian misrepresented to Borrego Health that he would submit accurate claims information to Borrego Health for reimbursement.

912.   Bakramian's representations were false at the time they were made. Upon information and belief, Bakramian knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

913.   Borrego Health reasonably relied on Bakramian's representations.

914.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

7288673.3

## FIFTY-EIGHTH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Mohammed Al Tekreeti, D.D.S.

915.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 232 through 237, inclusive, as though fully set forth herein.

916.   As outlined above, Al Tekreeti made several representations to Borrego Health, including that the claims he submitted for reimbursement would be accurate and for the services performed by a dental provider eligible to serve Medi-Cal patients.

917.   Al Tekreeti had no reasonable grounds for believing his representations were true at the time they were made.

918.   Al Tekreeti intended for Borrego Health to rely on his representations.

919.   Borrego Health reasonably relied on Al Tekreeti's representations.

920.   As a result of relying on Al Tekreeti's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Al Tekreeti for services that should not have been paid.

921.   Borrego Health's reliance on Al Tekreeti's representations was a substantial factor in causing Borrego Health harm.

## FIFTY-NINTH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Jilbert Bakramian, D.D.S.

922.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 238 through 245, inclusive, as though fully set forth herein.

923.   As outlined above, Bakramian made several representations to Borrego Health, including that the claims he submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

924.   Bakramian had no reasonable grounds for believing their representations were true at the time they were made.

7288673.3

925.   Bakramian intended for Borrego Health to rely on their representations.

926.   Borrego Health reasonably relied on Bakramian's representations.

927.   As a result of relying on Bakramian's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Bakramian for services that should not have been paid.

928.   Borrego Health's reliance on Bakramian's representations was a substantial factor in causing Borrego Health harm.

### SIXTIETH CAUSE OF ACTION

### (Reformation Based on Fraud Against Priest LLCs)

929.   Borrego Health reincorporates paragraphs 1 through 54, 335 through 359, 511 through 562, inclusive, as though fully set forth herein.

930.   In each of the Priest Leases (Exhibits U, V, and W) the parties thereto express their intention that the Priest Leases be interpreted so as to make and maintain performance thereunder lawful. The unlawful purpose of the leases is self-evident. As explained above, each of the Priest Leases were entered into without the informed consent of Borrego Health's Board. Each of the leases call for a non-profit FQHC to pay and to report as operating expenses to CMS rent that is millions of dollars in excess of fair market rate, thereby resulting in the diversion of millions of dollars of federal health care funds to the Priest LLCs, and the inflation of reimbursement rates paid by the DHCS to the FQHC.

931.   The above-described failure of the Priest Leases to reflect the true intent of the parties (i.e., that performance under the lease be only lawful) resulted from Bruce Hebets and Borrego Insiders' concealment from Borrego Health that, despite its express promise to the contrary, Borrego Health's performance of the pricing terms and duration of the above-mentioned written instruments would be unlawful.

932.   Without knowledge of the true facts and in reliance on Bruce Hebets and Borrego Insiders false representations, Borrego Health was deceived and misled

into performing under a lease that differed materially from the expressed intent of the parties that performance thereunder be lawful. Borrego Health's reliance on Bruce Hebets and Borrego Insiders' fraudulent omissions was reasonable and justified in that he was Borrego Health's Chief Executive Officer and fiduciary.

933.   Fraud, as a basis for reformation, consists of (1) a false representation by one party and (2) justifiable reliance on the false representation by the other party. Here both exist. Civil Code section 3399 codifies the equitable remedy of reformation of written instruments. Section 3399 provides that a written contract may be revised on application of the party aggrieved, when, through fraud, mutual mistake, or mistake of one party that the other party knew of or suspected at the time, a written contract does not express the true intention of the parties.

934.   Here, the strong public interest in Borrego Health's continued service of underserved and financially disadvantaged patients throughout the communities of San Diego, San Bernardino, and Riverside Counties, as detailed above, compels the court's exercise of its equitable power to reform the Priest Leases.

935.   Even though the Borrego Health Board was never given the opportunity give its fully informed consent to any of the Priest Leases, the Board reasonably expects and intends that all Borrego Health contracts conform with all applicable laws.

936.   For the reasons detailed above, Borrego Health's intent that the Priest Leases conform with all applicable laws (consistent the terms of the leases) cannot possibly be fulfilled without reformation of the rent prices to fair market rate, and without reformation of the 30-year lease term to five years or less, and without reformation of the leases to allow the non-profit FQHC tenant to terminate the lease for good cause on reasonable notice.

937.   Plaintiff Borrego Health respectfully prays for each of the Priest Leases to be so reformed.

7288673.3

## SIXTY-FIRST CAUSE OF ACTION

### (Rescission Based on Fraud Against Priest LLCs)

938.   Borrego Health reincorporates paragraphs 1 through 54, 335 through 359, 511 through 562, inclusive, as though fully set forth herein.

939.   Alternatively, if the Court cannot exercise its statutory and/or equitable powers to reform the leases, Borrego Health is entitled to rescind the Priest Leases, and for restitution of all sums paid the Priest LLCs to date, less the reasonable rental value of the premises during Borrego Health's occupation of them.

940.   Borrego Health may rescind Priest Leases (1) if the contract is unlawful for causes which do not appear in its terms or conditions, and the parties are not equally at fault (Civ. Code, § 1689, subd. (b)(5)) or (2) if the public interest would be prejudiced by permitting the leases to stand (Civ. Code, § 1689, subd. (b)(6)). A commercial lease is unlawful if its consideration or object is (1) contrary to an express provision of law, (2) contrary to the policy of express law, though not expressly prohibited, or (3) otherwise contrary to good morals (Civ. Code, § 1667). Another ground for rescission and restitution not addressed by Civil Code section 1689, subdivision (b) allows recovery when the parties were ignorant of the illegality at the time they entered into the contract.[3]  Under the facts alleged in this Complaint, each and every one of the aforementioned grounds for rescission are met. In addition, the public interest will be prejudiced if the Priest Leases are permitted to stand, in that Borrego Health's ability to provide quality healthcare in underserved areas will be undermined by inequitable diversion of funds to defendants. Further, the fraud described above is grounds for rescission.

941.   Borrego Health therefore prays, in the alternative, and in the event that the Priest Leases cannot be reformed, for judgment rescinding the Priest Leases, and

---

[3] *Adams v. Heinsch* (1948) 89 Cal. App. 2d 300, 302–305, 200 P.2d 796 (also on ground of mistake); *Brashears v. Giannini* (1933) 131 Cal. App. 706, 709–711, 22 P.2d 47; *Restatement (2d) of Contracts,* § 198].

1   for restitution of all sums paid the Priest LLCs to date, less the reasonable rental

2   value of the premises during Borrego Health's occupation of the three leased

3   facilities, along with orders providing for the reasonable surrender of the premises in

4   a manner that will protect the interests of the patients Borrego Health is required to

5   serve.

6                    **SIXTY-SECOND CAUSE OF ACTION**

7           **(Common Count for Money Had and Received Against Priest LLCs)**

8           942.   Borrego Health reincorporates paragraphs 1 through 54, 335 through

9   359, 511 through 562, inclusive, as though fully set forth herein.

10          943.   A judgment of rescission supports an award of money to Borrego

11  Health under a common count for money had and received. In addition to the facts

12  supporting the fraud count pled above, the following facts also support a common

13  count for money had and received.

14          944.   Beginning in 2012, and continuing through December 2016, Bruce

15  Hebets, Borrego Insiders, and Daryl Priest caused Borrego Health and several

16  Priest-owned entities to enter into various contracts under which millions in federal

17  healthcare funds were unlawfully diverted to the Priest-owned entities.

18          945.   Beginning in 2012, and continuing through 2020, the Priest LLCs

19  became indebted to Borrego Health in the sum of at least $11.5 million for money

20  had and received by the Priest LLCs. Neither the whole nor any part of this sum has

21  been paid, although demand therefor has been made, and there is now due, owing,

22  and unpaid the sum of at least $11.5 million, with interest thereon, at the legal rate

23  as the court may allow, according to proof at trial.

24                    **SIXTY-THIRD CAUSE OF ACTION**

25                    **(Declaratory Relief Against Priest LLCs)**

26          946.   Borrego Health reincorporates paragraphs 1 through 54, 335 through

27  359, 511 through 562, inclusive, as though fully set forth herein.

28          947.   An actual controversy exists in regard to the parties' duties and

7288673.3

obligations under the Priest Leases as alleged in this Complaint, and as such, a judicial declaration of the parties' respective duties and obligations is appropriate as to the matters in dispute, as alleged herein.

## **PRAYER**

With respect to the First Cause of Action—RICO (As to All Defendants):

    a.    For damages in an amount to be proven at trial, trebled pursuant to statute;

    b.    Pre-judgment and post-judgment interest; and

    c.    Reasonable attorney's fees and costs.

With respect to the RICO, Intentional Misrepresentation, Negligent Misrepresentation, False Promise, Fraudulent Concealment, Constructive Fraud, Conspiracy, and Violations of the UCL Causes of Action (As to All Defendants):

    a.    For imposition of a constructive trust in an amount subject to be proven at trial and on any real or personal property purchased with a portion of that amount;

    b.    For punitive damages where allowed by law; and

    c.    Pre-judgment and post-judgment interest.

With respect to the Sixtieth Cause of Action—Reformation Due to Fraud (Priest LLCs only):

    a.    Order reforming the payments under the Priest Leases to reflect only fair market rate as rent due and owing, and further, to limit the term of the leases as commercially reasonable to no more than five years;

    b.    Order of restitution that all money paid to Priest LLCs in excess of the amount of rent in the reformed Priest Leases be returned to Borrego Health; and

    c.    Pre-judgment and post-judgment interest on all sums ordered returned.

7288673.3

1

2   With respect to the Sixty-First Cause of Action—Rescission Due to Fraud (As to

3   Priest LLCs only):

4       a.   Rescission of the Priest Leases;

5       b.   For actual and consequential damages in an amount subject to proof at

6            trial, but in an amount no less than $11.5 million or, in the alternative,

7            restitution of all sums unlawfully paid, less the reasonable rental value

8            of the premises during Borrego Health's occupation of the three leased

9            facilities;

10      c.   Punitive damages as allowed by law;

11      d.   Order providing for the reasonable surrender of the premises in a

12           manner that will protect the interests, safety, and health of Borrego

13           Health's patients; and

14      e.   Pre-judgment and post-judgment interest.

15

16  With respect to all other causes of action:

17      a.   For damages in an amount to be proven at trial;

18      b.   Reasonable attorney's fees and costs as allowed by law;

19      c.   For punitive damages where allowed by law; and

20      d.   Such other and further relief the Court deems just and proper.

21

22  DATED: _____, 2022         HOOPER, LUNDY & BOOKMAN, P.C.

23

24

25                                    By: _____

26                                         DEVIN M. SENELICK
                                      Attorneys for Plaintiff Borrego Community
27                                    Health Foundation

28

FOURTH AMENDED COMPLAINT

# EXHIBIT A

## MANAGEMENT AGREEMENT

This MANAGEMENT AGREEMENT is made and entered into as of this 1st day of March, 2016, by and between BORREGO COMMUNITY HEALTH FOUNDATION ("BCHF"), a California Non-Profit Corporation, and PREMIER HEALTH CARE MANAGEMENT, INC. ("PHCM"), a California Corporation.

## RECITALS

WHEREAS, BCHF is a 501(c)(3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Health Centers ("FQHC"). BCHF currently operates FQHCs throughout Riverside, San Bernardino and San Diego Counties. The FQHCs provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS"). The approved scope includes performance of primary dental services;

WHEREAS, BCHF desires to contract with PHCM to obtain various management services relating to BCHF's Contract Dental Program, whereby BCHF contracts with private dental practices to provide covered dental services to BCHF patients ("Participating Patients"); and

WHEREAS, PHCM desires to contract with BCHF to provide those management services.

NOW, THEREFORE, in consideration of the recitals, covenants, conditions and promises herein contained, the parties agree as follows:

1. **DUTIES AND SERVICES**

    A. BCHF agrees and covenants:

        i. To take actions as necessary to meet its obligations under any existing and/or future agreements with contract dentists or other professionals performing contract dental services for BCHF ("Dental Agreements").

        ii. BCHF shall maintain a Care Coordinator Specialist and Dental Director as set forth in the Dental Agreements and shall notify PHCM of the name and contact information for each position.

        iii. Where required under the Dental Agreements and this Agreement, BCHF shall cooperate and timely provide PHCM with all required information to allow PHCM to timely fulfill all of its obligations under this Agreement. BCHF shall provide PHCM access to its Electronic Health Records ("EHR") to allow PHCM to determine if a particular patient is a "Participating Patient" as that term is defined in the Dental Agreements.

        iv. BCHF shall timely and fully bill the appropriate payor for payment of all dental services performed by dentists under the Dental Agreements.

        v. BCHF shall be responsible for and shall timely pay all sums owing to dentists under any Dental Agreements providing PHCM with a copy of all such payments.

        vi. Comply with all guidelines, laws and regulations which govern transactions and security of electronic health records and other patient information.



EXHIBIT A
PAGE 198

> vii. Provide feedback on PHCM's proposed contract dental services management plan and work diligently with PHCM to determine mutually agreeable terms for any such management plan.
>
> viii. To coordinate with PHCM regarding quality management/peer review and compliance with terms of Dental Agreements.
>
> ix. To provide copies of all Dental Agreements between BCHF and contract dental service providers to PHCM.
>
> x. To be financially responsible for the following:
>
>> 1. All fees due and payable to contract dentists and other contract dental service providers for services provided under any Dental Agreements.
>>
>> 2. Cost of all insurance policies in the name of BCHF, as required by this agreement.
>>
>> 3. All fees due PHCM under the terms of this Agreement.

B. PHCM agrees and covenants:

> i. To provide the managerial and other related services to BCHF as described in Exhibit "A", attached hereto and incorporated herein by reference, in furtherance of BCHF's contract dental programs. The duties listed on Exhibit "A" are considered by both parties to be material components of this Agreement. Any breach of such duties will be considered a material breach of this Agreement.
>
> ii. Comply with all guidelines, laws and regulations which govern transactions and security of electronic health records and other patient information.

## 2. **COMPENSATION AND BILLING**

A. Compensation. In consideration for the services to be provided by PHCM pursuant to this agreement as described in Exhibit "A" and as reasonably contemplated thereby, BCHF shall compensate PHCM the sum of five dollars ($5.00) per visit for the first 8,000 participating patient visits to any contract dentist pursuant to any active Dental Agreement.

BCHF shall compensate PHCM the sum of twenty-five dollars ($25.00) per visit in excess of 8,000 visits for any calendar month.

For purposes of this section, a "patient visit" shall be a visit for which (i) PHCM provides BCHF with a complete and clean claim, including all pertinent treatment and demographic information; and (ii) for which BCHF receives payment from the appropriate payor for the participating patient visit.

B. Billing. PHCM shall bill BCHF monthly for its services and remit to BCHF a statement during each month. Payments contemplated under this agreement shall reflect services performed in the current month, not monthly in arrears unless otherwise mutually agreed to in writing. Payment of all monies due PHCM for its fees shall be paid on or before the 10th calendar day of each month.

C. PHCM, upon two (2) days written notice to BCHF, shall have the right to review, copy and audit if desired the billing and payment records relating to dental services under all



EXHIBIT A
PAGE 199

Dental Agreements. This right to review, copy and audit if desired shall include access to all electronic and paper copies of (i) all bills generated related to dental services under any Dental Agreement; (ii) all payments or funds received relating to dental services under any Dental Agreement including but not limited to any payments or funds received from patients or dentists.

## 3. **TERMS OF CONTRACT**

A. Term. The term of this agreement shall be three (3) years commencing from the date of execution set forth above unless terminated pursuant in accordance with this agreement.

B. Termination. This Agreement may be terminated by either party, without cause, by either party providing the other party with one-hundred eighty (180) days written notice.

C. Termination for Cause. Either party may terminate this agreement for cause. Cause shall be considered the failure of either party to perform, keep or fulfill any material covenant, undertaking, obligation, or condition set forth in this agreement and the continuance of any such default for a period of thirty (30) days after written notice of such failure.

Notwithstanding the foregoing, BCHF shall be entitled to terminate this Agreement immediately, with or without notice, upon determination by the Health Resources and Services Administration ("HRSA") or any other federal or state agency with regulatory or advisory authority over BCHF that this Agreement violates any rule or program requirement pertaining to a FQHC.

D. Renewal. This agreement will automatically renew on the third anniversary for an additional three (3) years under the same terms and conditions as at the renewal date.

## 4. **ASSIGNMENT**

Neither PHCM nor BCHF may assign its rights or obligations under this agreement without the prior written consent of the other party.

## 5. **INDEPENDENT CONTRACTORS**

PHCM and BCHF are independent contracting parties and the relationship between them is that of independent contractors. Nothing in this agreement shall be construed to create a principal-agent, employer-employee, master-servant or any relationship other than that of independent contractors.

## 6. **INDEMNITY**

PHCM shall defend, indemnify and hold BCHF free and harmless from any obligations, costs, claims, judgments, attorney's fees, or attachments arising from PHCM's negligence in the performance of the services contemplated under this Agreement.

## 7. **INSURANCE**

A. Each Party, at its sole cost and expense, will obtain and maintain in full force and effect during the term of this Agreement, and all renewals and extensions thereof, comprehensive general liability insurance covering the Party, its employees, agents, servants, and independent contractors, against loss in the nature of fire, theft, business interruption, general liability, and negligence, with a minimum liability limit of Two



Million Dollars ($2,000,000) per occurrence and Two Million Dollars ($2,000,000) in the annual aggregate. Each Party shall provide the other Party with written notice at least thirty (30) days prior to any cancellation or amendment of the Party's policy.

B. Each Party shall, at its sole cost and expense, obtain and maintain in full force and effect during the term of this Agreement, and all renewals and extensions thereof, workers' compensation insurance as required by the laws of the State of California.

## 8. **MISCELLANEOUS PROVISIONS**

A. This Agreement shall be upheld in accordance with the laws of the State of California.

B. Notices to either party shall be in writing and sent by registered or certified mail, addressed to the party at the addresses set forth at the conclusion of this agreement. Any notice given in accordance with this Section shall be effective upon the receipt of said notice or five (5) calendar days following haven given said notice, whichever is earlier. Notice shall be given as follows:

| | |
|---|---|
| If to BCHF: | Borrego Community Health Foundation<br>P.O. Box 2369<br>Borrego Springs, CA  920004<br>Attn: Bruce Hebets<br>Fax:  (760) 767-1135<br>Email:  bhebets@borregomedical.org |
| Copy of notices to: | Borrego Community Health Foundation<br>P.O. Box 2369<br>Borrego Springs, CA  920004<br>Attn: Mikia Wallis, Chief Legal Officer<br>Fax:  (858) 634-6989<br>Email: mwallis@borregomedical.org |
| If to PHCM: | Premier Health Care Management, Inc.<br>124 Main Street, Suite 240<br>El Cajon, CA 92020<br>Fax: (619) 444-8597<br>Attn:  Daryl R. Priest<br>Email: daryl@priesthomes.com |
| Copy of notices to: | Fitch Law Firm, APC<br>Stephen J. Fitch, Esq.<br>3465 Camino Del Rio South, Ste. 250<br>San Diego, CA 92108<br>Telephone No. (619) 282-8100<br>Email: steve@fitchlawfirm.com |

C. This agreement may not be modified except by written amendment signed by both parties.

D. If any provision of this agreement shall be determined to be illegal or invalid for any reason, the remaining provisions shall continue in full force and effect unless the illegality or invalidity prevents the accomplishments of the objectives and purposes of




EXHIBIT A
PAGE 201

this agreement.

E. This agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

F. The headings contained in this agreement are for reference purposes only and shall not affect the meaning or interpretation of this agreement.

G. If any action at law or in equity is necessary to enforce or interpret the terms of this agreement, the prevailing party in any such action shall be entitled to payment of its reasonable attorney's fees and costs from the other party.

H. Each party to this agreement warrants, authorizes, and represents that the individual executing this agreement is acting within the course and scope of their employment, is authorized to enter this agreement, and has the authority to bind the business entity by executing this agreement.

I. All parties shall comply with all applicable laws, ordinances, codes and regulations of federal, state, and local governments.

J. No waiver of any of the provisions of this Agreement shall constitute a waiver of any other provision of this agreement. No waiver shall be considered binding unless executed by the parties.

K. This is a wholly integrated Agreement. This Agreement sets forth the entire agreement between all parties with regard to the subject matter hereof. No other agreements, covenants, representations, or warranties, express or implied, oral or written, have been made by either party to the other with respect to the subject matter of this agreement. All prior and contemporaneous conversations, negotiations, possible and alleged agreements, and representations, covenants, and warranties, with respect to the subject matter hereof are hereby waived, merged herein and superseded hereby.

L. In order to perform functions as identified in Exhibit "A", and which are necessary to enable BCHF's compliance with all relevant privacy, security and other legal requirements, the parties hereby agree that PHCM is a Business Associate as defined in the appropriate regulations, as noted in Exhibit "B", executed by both parties and incorporated herein.

IN WITNESS WHEREOF, the Parties hereto have executed this agreement as set forth on the first page.

For BCHF:                                                    For PHCM:

Bruce Hebets, CEO                                     Daryl Priest, President

Dated: _____2·24·16_____              Dated: 2-24-16

EXHIBIT A
PAGE 202

## Exhibit "A"

### Scope of Management and Other Services of PHCM

The purpose of this list of services is to identify and delineate services to be provided by PHCM in furtherance of its duties under this agreement with BCHF concerning BCHF's contract dental program and care of BCHF's participating patients. PHCM shall provide any and all necessary staff, office space, information systems, and support services set forth below and all services reasonably contemplated as necessary to perform any such services.

I. CONTRACT DENTAL MANAGEMENT

   a. PROVIDER CONTRACTING

      i. Market and negotiate new Dental Agreements between BCHF and new Contract Dentists throughout the service areas in which BCHF operates FQHCs. Currently, BCHF operates FQHCs in Riverside, San Diego and San Bernardino Counties. Further, PHCM may market and negotiate new Dental Agreements in any other service area in which BCHF is otherwise authorized to provide dental services.

      ii. Amend current Dental Agreements at the direction of BCHF

      iii. Maintain files containing current and historical Dental Agreements

      iv. Track renewal dates of Dental Agreements.

   b. PROVIDER RELATIONS

      i. Maintain database of contract dental service providers and contract dental service provider demographics.

      ii. Monitor contract dental service providers' ability to speak additional languages

      iii. Provide contract dental service provider roster as necessary

      iv. Assist with development and updates of contract dental service provider manuals

      v. Produce and distribute contract dental service provider manuals

      vi. Provide ongoing communication, education, and training to contract dental service provider and their staffs regarding BCHF policies and procedures

      vii. Provide ongoing communication, education, and training to contract dental service provider and their staff regarding any changes in scope of services and fee schedules.

      viii. Provide telephone line for contract dental service provider inquiries

      ix. Answer contract dental service provider eligibility inquiries

      x. Answer contract dental service provider claims inquiries

      xi. Create and distribute administrative forms

      xii. Develop and distribute contract dental service provider newsletter

II. CLAIM MANAGEMENT

      i. PHCM shall obtain from contracted dentists such information relating to claims and submit the same to BCHF in a format that enables BCHF to



1

EXHIBIT A
PAGE 203

bill for such claims. As part of this service and based on a receipt of information from BCHF, PHCM shall monitor claims, billing and payment to dentists.

III. MANAGEMENT INFORMATION SYSTEM

    a. Provide a computerized management information system to process and store data pertaining to demographics of and services provided to Participating Patients;

    b. Provide appropriate data security and, among other necessary functions:

        i. Restrict access to data security in compliance with applicable federal and state laws and regulations

        ii. Restrict access to data of participating patients

        iii. Restrict access to data by user and security classification

        iv. Compliance with HIPAA and any other regulations concerning participating patient data

        v. Provide physical security at all buildings that house data

    c. Provide BCHF-maintained Web-based access to data for contract dental providers and their staff for its hardware, Internet connectivity and web-browsing for the following, but not limited functions:

        i. Claims inquiries

        ii. Claims submission

        iii. Eligibility inquiries

        iv. Authorization inquiries

        v. Authorization submission

    d. Help Desk and Support

        i. Provide, maintain and support issues related to data access

        ii. Maintain all servers and network connections for PHCM systems

        iii. Provide and maintain all desktop systems/hardware at PHCM operations center(s)

        iv. Provide and maintain all software (including licensing and troubleshooting) at PHCM operations center(s)

        v. Provide training and support to contract dental service users and their staff remotely

        vi. Provide and maintain phone system for calls directed to PHCM operations center(s)

    e. Remote System Access

        i. Provide remote access to management information system

        ii. Support remote access connectivity

IV. QUALITY MANAGEMENT ("QM")





2

a. QM PLAN, POLICIES AND PROCEDURES

    i. Assist with the implementation of a QM plan after reviewing BCHF's operation of its contract dental services

    ii. Implement a standard QM Policy and Procedure Manual that meets appropriate standards and regulations

    iii. Resolve participating patient grievance and appeals issues as outlined in PHCM's QM plan

b. QM MEETINGS

    i. Schedule and prepare agenda, meeting minutes, and material for monthly QM Committee meetings

    ii. Attend QM Committee meetings

    iii. Coordinate and prepare for any contract dental program audits from any regulatory agencies

c. QM REPORTING

    i. Provide reports for QM Committee meetings

    ii. Provide reports as required for QM delegation reporting

    iii. Track and report participating patient grievance and appeals issues

    iv. Perform contract dental service provider surveys and report survey's findings

    v. Perform participating patient surveys and report survey's findings

V. PARTICIPATING PATIENT MANAGEMENT

a. ELIGIBILITY VERIFICATION

    i. Reconcile eligibility data to load into management information system

    ii. Maintain participating patient eligibility database

    iii. Identify each participating patient by using established identification number

    iv. Assist with determination of participating patient eligibility for services prior to provision of services

    v. Maintain and track eligibility of services for each participating patient

b. PARTICIPATING PATIENT SERVICES

    i. Provide telephone line for participating patient inquiries

    ii. Answer participating patient eligibility inquiries

    iii. Answer participating patient claims inquiries

    iv. Generate telephone tracking reports

VI. REPORTING – Data is reported on a per month basis and compared to BCHF and



3

industry benchmarks when available

    a.  Patient and Encounter information as required to be reported in the aggregate on
        BCHF's Uniform Data System (UDS) Report
    b.  Claim and Payment data

## VII.   GENERAL ADMINISTRATION

    a.  Monitor all components of BCHF's Contract Dental Program
    b.  Coordinate printing of all forms and letterhead (as needed) on BCHF stationery
    c.  Process participating patient and contract dental service provider-related mail,
        both incoming and outgoing
    d.  Short and long-range financial and strategic planning
    e.  Contract dental service provider and regulatory agency/agencies relationship
        management

4

# EXHIBIT B

## AMENDMENT NO. 1 TO MANAGEMENT AGREEMENT

This **AMENDMENT NO. 1 TO MANAGEMENT AGREEMENT** (this "Amendment No. 1") is made as of this **22** day of December, 2016, by and between **BORREGO COMMUNITY HEALTH FOUNDATION.**, a California Non-Profit Corporation ("BCHF"), and **PREMIER HEALTH CARE MANAGEMENT, INC.**, a California Corporation ("PHCM"). BCHF and PHCM are sometimes hereinafter referred to as the "Parties" collectively or a "Party" individually.

## R E C I T A L S

A.      BCHF and PHCM entered into that certain Management Agreement dated March 1, 2016, ("Management Agreement") covering various management services relating to BCHF's Contract Dental Program, whereby BCHF contracts with private dental practices to provide covered dental services to BCHF patients.

B.      All defined terms used herein but not defined herein shall have the meaning ascribed to such terms in the Management Agreement.

C.      BCHF and PHCM now wish to amend the Management Agreement to, among other things, extend the Term of the Management Agreement upon the terms, covenants, and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the mutual covenants, promises and conditions hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, as of the Effective Date the Parties agree as follows:

## AGREEMENT

1.      <u>Section 3A</u>.      Section 3A of the Management Agreement is hereby amended as follows:

3A.      TERM.  The term of this agreement shall be extended as follows: The extended term of this agreement shall be five (5) years commencing from January 1, 2017 unless terminated pursuant in accordance with this agreement.

2.      <u>Section 3B</u>.      Section 3B of the Management Agreement is hereby deleted in its entirety.

3.      <u>Section 3D</u>.      Section 3D of the Management Agreement is herby amended as follows:

3D.      Renewal. This agreement will automatically renew on January 1, 2022 for an additional five (5) years under the same terms and conditions as at the renewal date.

4.      Miscellaneous.

4.1      Capitalized Terms/Definitions. Each capitalized term used in this Amendment No. 1 and not defined herein shall be deemed to have the same meaning ascribed to it in the Management Agreement.

4.2      Continuing Effect. Except as specifically provided in this Amendment No. 1, the provisions of the Management Agreement shall remain unchanged and in full force and effect. In the event of a conflict between the Management Agreement and this Amendment No. 1, this Amendment No. 1 shall control.

4.3      Authority. Each person executing this Amendment No. 1 on behalf of a Party represents and warrants that it has the full power, authority, and legal right to execute and deliver this Amendment No. 1 on behalf of such Party and that this Amendment No. 1 constitutes the legal, valid and binding obligations of such Party, its representatives, successors and assigns, enforceable against such Party or Parties in accordance with its terms.

1

4.4     Approvals.   BCHF warrants and represents to PHCM that BCHF has obtained any approvals from any third parties, that are necessary to make this Amendment No. 1 enforceable against BCHF and all such third parties, their heirs, representatives, successors and assigns. BCHF shall defend, indemnify and save harmless PHCM from and against all losses, claims, demands, damages, liabilities, costs and attorneys' fees resulting from a breach of, or inaccuracy in, any of the representations and warranties set forth in this section.

4.5     Counterparts. To facilitate execution of this Amendment No. 1, this Amendment No. 1 may be executed in one or more counterparts as may be convenient or required, and an executed copy of this Amendment No. 1 delivered electronically by facsimile or e-mail shall have the effect of an original, executed instrument. All counterparts of this Amendment No. 1 shall collectively constitute a single instrument; but, in making proof of this Amendment No. 1 it shall not be necessary to produce or account for more than one such counterpart executed by each Party hereto. It shall not be necessary for the signature of, or on behalf of, each Party hereto, or that the signature of all persons required to bind any such Party appear on each counterpart of this Amendment No. 1.

4.6     No Construction Against Draftsman. No inference in favor of or against any Party shall be drawn from the fact that such Party has drafted any provision of this Amendment No. 1 or that such provisions have been drafted on behalf of said Party.

IN WITNESS WHEREOF, the Parties hereto have executed this agreement as set forth on the first page.

For BCHF:                                              For PHCM:

_____                            _____

Bruce Hebets, CEO                                   Daryl Priest, President

Dated: 12-22-16                                     Dated: 12-22-2016

EXHIBIT B
PAGE 209

# EXHIBIT C

EXHIBIT C
PAGE 210

## AMENDMENT NO. 2 TO MANAGEMENT AGREEMENT

This AMENDMENT NO. 2 TO MANAGEMENT AGREEMENT ("**Amendment No. 2**") is made as of July 1, 2017, by and between BORREGO COMMUNITY HEALTH FOUNDATION., a California Non-Profit Corporation ("**BCHF**"), and PREMIER HEALTH CARE MANAGEMENT, INC., a California Corporation ("**PHCM**"). BCHF and PHCM are sometimes hereinafter referred to as the "Parties" collectively or a "Party" individually.

### RECITALS

A.      BCHF and PHCM entered into that certain Management Agreement dated March 1, 2016 as amended by Amendment No.1 ("**Management Agreement**") covering various management services relating to BCHF's Contract Dental Program, whereby BCHF contracts with private dental practices to provide covered dental services to BCHF patients.

B.      BCHF and PHCM now wish to amend the Management Agreement upon the terms, covenants, and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the mutual covenants, promises and conditions hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, as of the Effective Date the Parties agree as follows:

1.      Article 2 of the Management Agreement is hereby deleted and the following Article 6 is added as follows:

A.      <u>Compensation</u>. In consideration for the services to be provided by PHCM pursuant to this agreement as described in Exhibit "A" and as reasonably contemplated thereby, BCHF shall compensate PHCM the sum of twenty-five dollars ($25.00) per "patient visit" processed in any given month, less returned claims for incompleteness, for participating patient visits to any contracted or sub-contracted dentist pursuant to any active Dental Agreement.   For purposes of this section, a "patient visit" shall be a visit for which (i) PHCM provides BCHF with a complete and clean claim, including all pertinent treatment and demographic information; and (ii) for which BCHF receives payment from the appropriate payor for the participating patient visit.

B.      <u>Billing</u>. PHCM shall bill BCHF monthly for its services and remit to BCHF a statement by the 10th of each month for visits processed for the preceding month less any returned visits as a credit against the total.  Payment of all monies due PHCM for its fees shall be paid on or before the 20th calendar day of each month.

C.      <u>Review</u>.  PHCM, upon two (2) days written notice to BCHF, shall have the right to review, copy and audit if desired the billing and payment records relating to dental services under all Dental Agreements.  This right to review, copy and audit if desired shall include access to all electronic and paper copies of (i) all bills generated related to dental services under any Dental Agreement; (ii) all payments or funds received relating to dental services under any Dental Agreement including but not limited to any payments or funds received from patients or dentists.

D.      <u>No Referral</u>.      It is specifically agreed and understood between the parties that

1

EXHIBIT C

PAGE 211

nothing in this Agreement is intended to provide payment or benefit of any kind (directly or indirectly), for the referral of patients to BCHF but compensation hereunder is for management services provided.

2.     This Amendment No. 2 may be executed simultaneously or in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Amendment No. 2.

3.     Any conflict between the terms of this Amendment No. 2 and the Management Agreement the terms of this Amendment No. 2 shall control.

4.     Except as specifically provided herein all terms shall have the same meaning as defined in the Management Agreement.

5.     Except as specifically amended herein, the Management Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the undersigned have executed this Amendment No. 2 effective as of the date first written above.

PHCM:                                              BCHF:

Premier Health Care Management, Inc.               Borrego Community Health Foundation
a California corporation                           a California non-profit public benefit corporation


By: _____                      By: _____
     Daryl R. Priest, President                    Name: MIKIA WALLIS
                                                   Its: EXECUTIVE VP

2

EXHIBIT C
PAGE 212

# EXHIBIT D

## MANAGEMENT SERVICES AGREEMENT
## CONTRACT MEDICAL PROPGRAM

THIS MANAGEMENT SERVICES AGREEMENT ("**Agreement**") is made as of September 8, 2017 ("**Effective Date**"), by and between BORREGO COMMUNITY HEALTH FOUNDATION, A CALIFORNIA NON-PROFIT CORPORATION ("**BCHF**") and SUMMIT HEALTHCARE MANAGEMENT, INC A CALIFORNIA CORPORATION ("**SHM**"). BCHF or SHM may sometimes also be individually referred to as the "Party" or collectively as the "Parties"

### RECITALS

**WHEREAS**, BCHF is a 501(c)(3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Health Centers ("**FQHC**"). BCHF currently operates FQHCs in San Diego County. The FQHCs provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("**BPHC**") within the United States Department of Health and Human Services ("**DHHS**"),

**WHEREAS**, BCHF in order to increase access to primary health care for underserved populations and improve health outcomes, while preserving and enhancing its integrity and autonomy, has entered into Medical Service And Establishment of Intermittent Clinic Agreements with qualified doctors and clinics to provide medical services in underserved areas and BCHF desires to enter into other additional agreements with other doctors and clinics ("**Contract Medical Program**"); and

**WHEREAS**, BCHF desires to contract with SHM to obtain various management services relating to BCHF's Contract Medical Program; and

**WHEREAS**, SHM desires to contract with BCHF to provide those management services

### AGREEMENT

NOW, THEREFORE, in consideration of the recitals, covenants, conditions and promises herein contained, the parties agree as follows:

1     **RETENTION OF SHM**

1 01     BCHF hereby appoints and retains SHM for management services relating to the Contract Medical Program and hereby grants to SHM the authority and responsibility, as specifically set forth herein, to manage certain aspects of the administrative, financial, billing and operational activities relating to the Contract Medical Program in all counties where BCHF operates a FQHC, currently or at any time during the term of this Agreement, or is otherwise authorized to provide medical services.

2     **DESIGNATED REPRESENTATIVE**

2.01     SHM will designate one or more representatives who will act as the primary point of contact for BCHF for matters related to this Agreement and who shall make themselves available to consult with the directors, officers and department heads of BCHF, at reasonable times upon request of BCHF, concerning all matters relating to this Agreement. BCHF will designate one or more representatives who will act as the primary point of contact for SHM for matters related to this Agreement and who will have the authority to provide instructions, clarifications or make decisions when so requested by SHM  Either Party may replace such representative with an individual of comparable qualification and experience by notifying the other Party in writing of such new appointment



EXHIBIT D
PAGE 214

3       **DUTIES AND SERVICES**

    3.01   <u>BCHF agrees and covenants</u>:

        3.01.1   To take actions as necessary to meet its obligations under any existing and/or future agreements with contract doctors and clinics or other professionals performing contract medical services for BCHF (**"Medical Services Agreements"** or singularly **"Medical Service Agreement"**).  A form Medical Services Agreement is attached hereto as **<u>Exhibit "C"</u>** and by this reference made a part hereof.

        3.01.2   BCHF shall maintain a Care Coordinator Specialist and Medical Director and shall notify SHM of the name and contact information for each position.

        3.01.3   BCHF shall cooperate and timely provide SHM with all required information to allow SHM to timely fulfill all of its obligations under this Agreement. BCHF shall provide SHM full access to its Electronic Health Records ("EHR").   BCHF shall coordinate and cooperate with SHM in the interface of its EHR to SHM's systems including claims, scheduling, credentialing and education   BCHF shall cooperate with SHM in considering system upgrades and changes that more effective and economical result in the providing the services contemplated under this Agreement.

        3 01 4   BCHF shall under the terms of this Agreement provide access to SHM to its sites and operating systems to assist SHM in integrating its systems with BCHF and to better provide the service contemplated under this Agreement

        3.01.5   To better assist in the communication with doctors and clinics or other professionals performing contract medical services under the Medical Services Agreements, BCHF shall coordinate the SHM on the method and means of as to the flow of information and questions between BCHF and the contract medical providers.

        3.01.6   BCHF shall timely and fully bill the appropriate payor for payment of all medical services performed by doctors under the Medical Services Agreements

        3.01.7   BCHF shall be responsible for and shall timely pay all sums owing to doctors and clinics under any Medical Services Agreements providing SHM with a copy of all such payments.

        3.01.8   To comply with all guidelines, laws and regulations which govern transactions and security of electronic health records and other patient information.

        3.01.9   To provide feedback on SHM's proposed contract medical services management plan and work diligently with SHM to determine mutually agreeable terms for any such management plan

        3.01.10  To provide copies of all Medical Services Agreements between BCHF and contract medical service providers to SHM.

        3.01.11  To be financially responsible for the following:

        a      Pay all fees due and payable to contract doctors and clinics and other contract medical service providers for services provided under any Medical Services Agreements

        b.      Cost of all insurance policies in the name of BCHF, as required by this agreement.

        c.      All fees due SHM under the terms of this Agreement.

    3.02   <u>SHM agrees and covenants</u>

        3.02.1   To provide the managerial and other related services to BCHF as described in Exhibit "A", attached hereto and incorporated herein by reference, in furtherance of BCHF's Contract Medical Services Programs (**"Management Services"**)   Said Management Services shall be provided in two phases as set forth in **<u>Exhibit "A"</u>**.



3 02 2    Comply with all guidelines, laws and regulations which govern transactions and security of electronic health records and other patient information.

4    **COMPENSATION AND BILLING**

4 01    Compensation    In consideration for services to be provided by SHM pursuant to this agreement as described in **Exhibit "A"** and as reasonably contemplated thereby, BCHF shall compensate SHM the sum of twenty-five dollars ($25.00) per visit processed in any given month, less returned claims for incompleteness, for participating patient visits to any contracted or sub-contracted doctors pursuant to any active Medical Services Agreement

For purposes of this section, a "patient visit" shall be a visit for which (i) SHM provides BCHF with a complete and clean claim, including all pertinent treatment and demographic information; and (ii) for which BCHF receives payment from the appropriate payor for the participating patient visit.

4.02    Billing    SHM shall bill BCHF monthly for its services and remit to BCHF a statement by the 10th of each month for visits processed for the preceding month less any returned visits as a credit against the total Payment of all monies due SHM for its fees shall be paid on or before the 20th calendar day of each month.

4 03    Review.    SHM, upon two (2) days written notice to BCHF, shall have the right to review, copy and audit if desired the billing and payment records relating to medical services under all Medical Services Agreements. This right to review, copy and audit if desired shall include access to all electronic and paper copies of (i) all bills generated related to medical services under any Medical Services Agreement; (ii) all payments or funds received relating to medical services under any Medical Services Agreement including but not limited to any payments or funds received from patients or doctors.

4 04    No Referral    It is specifically agreed and understood between the parties that nothing in this Agreement is intended to provide payment or benefit of any kind (directly or indirectly), for the referral of patients to BCHF but compensation hereunder is for the Management Services provided hereunder

5    **TERM AND TERMINATION**

5 01    The term of this Agreement shall be for a period of five (5) years, commencing on the Effective Date  This Agreement shall automatically renew for succeeding terms of five (5) year terms unless either Party, at least one hundred eighty (180) days prior to the expiration of any term, gives written notice of its intention not to renew said Agreement.

5.02    This Agreement may be terminated by either Party upon thirty (30) days prior written notice for any of the following reasons:

a.    Institution by a Party of proceedings of any nature under any laws of the United States or of any state, whether now existing or subsequently enacted or amended, for the relief of debtors wherein such Party is seeking relief as a debtor,

b.    A general assignment by a Party for the benefit of creditors;

c    The institution by a Party, in the capacity of a debtor, of a proceeding in which such Party seeks relief from its indebtedness under any section or chapter of the Federal Bankruptcy Act as now existing or hereafter amended or becoming effective,

d    The institution against a Party, by one or more of its creditors, of a proceeding under any section or chapter of the Federal Bankruptcy Act as now existing or hereafter amended or becoming effective, which proceeding is not dismissed, stayed or discharged within a period of sixty (60) days after the filing thereof or if stayed, which stay is thereafter lifted without a contemporaneous discharge or dismissal of such proceeding;

   e. A proposed plan of arrangement or other action by a Party's creditors taken as a result of a general meeting of the creditors of such Party,

   f. The appointment of a receiver, trustee or like officer, to take possession of a Party's assets, which receivership remains undischarged for a period of thirty (30) days from the date of its imposition;

   g. The material breach of this Agreement by either Party, provided that such breach continues uncured for a period of thirty (30) days after written notice thereof has been given by one of the Parties to the other;

   h The issuance of a final order of any governmental agency or court which has competent jurisdiction over Parties hereto which order requires the termination of this Agreement

  5.03 Notwithstanding the foregoing, BCHF shall be entitled to terminate this Agreement immediately, with or without notice, upon determination by the Health Resources and Services Administration ("**HRSA**") or any other federal or state agency with regulatory or advisory authority over BCHF that this Agreement violates any rule or program requirement pertaining to a FQHC provided the Agreement cannot be modified to correct the violation.

6. **ASSIGNMENT**

  6 01 Neither SHM nor BCHF may assign its rights or obligations under this agreement without the prior written consent of the other party

7 **INDEPENDENT CONTRACTOR**

  7.01 The relationship between SHM and BCHF is that of independent contractors. Neither SHM nor BCHF is a member, partner, agent, representative, employee, employer, or joint venturer of the other. Each Party expressly denies any obligation to compensate the other's employees, contractors, or agents As independent contractors, each Party shall be liable for that Party's own debt, obligations, acts and omissions. SHM is responsible for the payment of all withholding, social security and other taxes and benefits for SHM and SHM's agents or employees. SHM is responsible for filing all necessary tax returns on SHM's own behalf SHM, its agents, employees and independent contractors shall not be eligible for any employee benefit plan offered by BCHF. BCHF is responsible for the payment of all withholding, social security and other taxes and benefits for BCHF and BCHF's agents or employees. BCHF is responsible for filing all necessary tax returns on BCHF's own behalf. BCHF, its agents, employees and independent contractors shall not be eligible for any employee benefit plan offered by SHM

8. **INDEMNITY**

  8.01 SHM shall defend, indemnify and hold BCHF, its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement To the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of BCHF, its officers, agents, or employees, said indemnification attributable to SHM may be reduced proportionally, provided the negligent or intentional acts or omissions of BCHF, its officers, agents or employees rises to the level of a clear and convincing standard.

9 **INSURANCE**

  9 01 Each Party, at its sole cost and expense, will obtain and maintain in full force and effect during the term of this Agreement, and all renewals and extensions thereof, comprehensive general liability insurance covering the Party, its employees, agents, servants, and independent contractors, against loss in the nature of fire, theft, business interruption, general liability, and negligence, with a minimum liability limit of Two Million Dollars

MANAGEMENT SERVICES AGREEMENT<br/>
CONTRACT MEDICAL PROGRAM<br/>
BORREGO COMMUNITY HEALTH FOUNDATION<br/>
4

EXHIBIT D<br/>
PAGE 217

($2,000,000) per occurrence and Two Million Dollars ($2,000,000) in the annual aggregate Each Party shall provide the other Party with written notice at least thirty (30) days prior to any cancellation or amendment of the Party's policy.

9.02    Each Party shall, at its sole cost and expense, obtain and maintain in full force and effect during the term of this Agreement, and all renewals and extensions thereof, workers' compensation insurance as required by the laws of the State of California

## 10    CONFIDENTIALITY AND INTELLECTUAL PROPERTY

10.01    The Parties acknowledge that during the term of this Agreement, the Parties will acquire or have access to information regarding the business operations of the other Party including, but not limited to, information regarding pricing, billing, claims, compensation, patient lists, provider lists, business operations, provider agreements, trade secrets and business and technical manuals ("**Confidential Information**"). The Parties acknowledge that the non-violating Party would suffer financial harm if such Confidential Information were to be disclosed to third Parties  As a condition of this Agreement, the Parties agree not to disclose to, or otherwise discuss such Confidential Information with any third party without the express written consent of the other Party or as expressly required by law  The provisions of this Section shall survive the termination of this Agreement.

10.02    The Parties acknowledges that each Party, in connection with its business, has developed certain operating manuals, symbols, trademarks, trade names, service marks, designs, patient lists, procedures, processes, and other copyrighted, patented, trademarked, or legally protectable information which is confidential and proprietary to the Party that constitute its trade secrets. The Parties shall not use any name, symbol, mark, or other proprietary information of the other Party except as expressly permitted.

10.03    SHM and its employees, agents and independent contractors shall safeguard the confidentiality of all medical information pertaining to patients of BCHF and shall comply with all federal and state laws and regulations and all BCHF rules or policies with respect to the use and disclosure of such information, including but not limited to the provisions of the Business Associate Agreement as set forth in **Exhibit "B"** of this Agreement, attached hereto and made a part hereof

10.04    During the course of this Agreement SHM as part of its business may collect, correlate, extract and compile data including but not limited to statistical data that does not constitute "Protected Health Information". SHM shall retain ownership of all such data and may use same as SHM determines in its sole business judgment.

10.05    SHM has and will develop software and other inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets (collectively "**Intellectual Property**") in its performance of its duties under this Agreement.  Said Intellectual Property is and shall remain owned by SHM or one of its affiliated companies  No such Intellectual Property, whether or not patentable or registrable under copyright or similar laws shall be deemed "works made for hire," as that term is defined in the United States Copyright Act and BCHF shall not acquire nor claim any interest in any such Intellectual Property

## 11    MISCELLANEOUS

11.01    This Agreement shall be governed by and construed in accordance with the laws of the State of California  Any actions, arbitration or proceedings instituted by either Party with respect to any matters arising under or growing out of this Agreement shall be brought and tried only in the courts located in the San Diego County, and each of the Parties hereto expressly waives its rights under any applicable statute to cause any such action or proceeding to be brought or tried elsewhere

11 02    This Agreement supersedes any and all other agreements either oral or written or implied between the Parties  Each party acknowledges that no representation, inducements, policies or agreements have been made



by any party or anyone acting on behalf of any party which is not embodied herein and that no other agreements, statement or promise not contained in this contract shall be valid or binding on either party except as provided herein

11.03    Time is expressly of essence with respect to this Agreement.

11.04    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement shall not be effective until the execution and delivery between each of the parties of at least one set of counterparts  The parties authorize each other to detach and combine original signature pages and consolidate them into a single identical original  Any one of such completely executed counterparts shall be sufficient proof of this Agreement.

11.05    No amendment or modification of the terms or conditions of this Agreement shall be valid unless in writing and signed by the parties hereto.

11.06    If any term or provision of this Agreement is determined to be illegal, unenforceable, or invalid in whole or in part for any reason, such illegal, unenforceable, or invalid provisions or part thereof shall be stricken from this Agreement and such provision shall not affect the legality, enforceability, or validity of the remainder of this Agreement.  If any provision or part thereof of this Agreement is stricken in accordance with the provisions of this section, then this stricken provision shall be replaced, to the extent possible, with a legal, enforceable, and valid provision that is as similar in tenor to the stricken provision as is legally possible.

11.07    The terms of this Agreement have been negotiated by the parties hereto and the language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent  This Agreement shall be construed without regard to any presumption or rule requiring construction against the party causing such instrument or any portion thereof to be drafted, or in favor of the party receiving a particular benefit under the Agreement.  No rule of strict construction will be applied against any person

11.08    The recitals set forth at the beginning of this Agreement of any matters or facts shall be conclusive proof of the truthfulness thereof and the terms and conditions set forth in the recitals, if any, shall be deemed a part of the Agreement

11 09    Each person signing this Agreement represents and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Agreement.

11.10    Any titles, captions or paragraphs contained in this Agreement are for convenience only and shall not be deemed part of the contents of this Agreement, and shall in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

11.11    The terms and conditions of this Agreement shall be binding upon and inure to the benefit of the Parties hereto, their successors, assigns, and legal representatives, except that no Party may assign or transfer its rights or obligations under this Agreement in any manner other than as provided in this Agreement.

11.12    The rights and obligations of each Party to this Agreement shall inure solely to the benefit of the Parties hereto, and no persons or entity, including a doctor under a Medical Services Agreement, shall be a third party beneficiary of this Agreement.

11.13    A waiver of any of the terms and conditions hereof shall not be construed as a waiver of any other terms and conditions hereof.

11.14    Any notice required or permitted by this Agreement shall be given in writing sent by overnight delivery, personal delivery or United States registered or certified mail, return receipt requested, all of which shall be properly addressed, with postage or delivery charges prepaid as follows·



| If to BCHF. | Borrego Community Health Foundation<br>P O Box 2369<br>Borrego Springs, CA 920004<br>Attn: Bruce Hebets<br>Fax: (760) 767-5051<br>Email: bhebets@borregomedical.org |
| --- | --- |
| Copy of notices to: | Borrego Community Health Foundation<br>P.O. Box 2369<br>Borrego Springs, CA 920004<br>Attn: Mikia Wallis, Chief Legal Officer<br>Fax (760) 767-6722<br>Email. mwallis@borregomedical org |
| If to SHM | Summit Healthcare Management, Inc.<br>124 Main Street, Suite 240<br>El Cajon, Ca 92020<br>Fax: (619) 444-8597<br>Attn Daryl R Priest<br>Email: darly@priesthomes.com |
| Copy of notices to | Fitch Law Firm, APC<br>Stephen J Fitch, Esq<br>3465 Camino Del Rio South, Ste. 250<br>San Diego, CA 92108<br>Telephone No. (619) 282-8100<br>Email steve@fitchlawfirm.com |

11.15.   In the event of default by a party in payment of any items owing to the other party, the defaulting party shall pay interest at the rate of two (2) points over the published prime rate of Bank of America or the maximum rate permitted by law, whichever is less, on each such obligation from the day it is due until received by non-defaulting party

11 16   ALTERNATIVE DISPUTE RESOLUTION.

11.16.1 Claims Subject to Judicial Reference, Selection of Referee   All Claims (defined below), including any and all questions of law or fact relating thereto, shall, at the written request of any party, be determined by Reference ("**Reference**") pursuant to Section 638 et. seq. of the California Code of Civil Procedure, as the same may be amended from time to time, except as set forth herein.

11.16.2 Referee.   The parties, by mutual written agreement, shall select a single neutral referee, who shall be a retired state or federal court judge or justice with substantial experience in the relevant matters to be determined   In the event that the parties cannot agree upon a referee within ten (10) days of a written request to do so by any party, then either party may file a lawsuit in the county in which the Property is located for purposes of appointment of a referee under California Code of Civil Procedure sections 638 and 640, as the same may be amended by any successor statutes thereto   A request for appointment of a referee may be heard on an ex parte or expedited basis, and the parties agree that irreparable harm would result if ex parte relief is not granted.  The parties shall equally bear the fees and expenses of the referee unless the referee otherwise provides in the statement of decision

11 16.3   Time is of the Essence.   The parties agree that time is of the essence in conducting the Reference proceedings   Accordingly, the referee shall be requested, subject to change in the time periods specified herein for good cause shown, to (a) set the matter for a status and trial-setting conference within fifteen (15) days



after the date of selection of the referee, (b) if practicable, try all issues of law or fact within one hundred twenty (120) days after the date of said conference, and (c) report a statement of decision within twenty (20) days after the matter has been submitted for decision

11 16 4    Conduct of Reference    Except as provided in this Agreement, the Reference shall be conducted pursuant to Applicable State Law (defined below)   The referee shall determine all issues relating to the applicability, interpretation, legality and enforceability of this Agreement.   Except as expressly set forth in this Agreement, the referee shall determine the manner in which the reference proceeding is conducted including the time and place of hearings, the order of presentation of evidence, and all other questions that arise with respect to the course of the reference proceeding.  All proceedings and hearings conducted before the referee, except for trial, shall be conducted without a court reporter, except that when any party so requests, a court reporter will be used at any hearing conducted before the referee, and the referee will be provided a courtesy copy of the transcript   The party making such a request shall have the obligation to arrange for and pay the court reporter   Subject to the referee's power to award costs to the prevailing party, the parties will equally share the cost of the referee and the court reporter at trial   The referee shall be empowered to enter equitable as well as legal relief, enter equitable orders that will be binding on the parties and rule on any motion which would be authorized in a court proceeding, including without limitation motions for summary judgment or summary adjudication.  The referee shall issue a decision pursuant to Section 644 of the California Code of Civil Procedure, as the same may be amended from time to time.  The referee's decision shall be entered by the court as a judgment or an order in the same manner as if the action had been tried by the court   The final judgment or order from any appealable decision or order entered by the referee shall be fully appealable as provided by law.   The parties reserve the right to findings of fact, conclusions of laws, a written statement of decision, and the right to move for a new trial or a different judgment, which new trial, if granted, is also to be a Reference proceeding under this provision.

11.16.5    Severability.   In the event that any provision of this Section 8 16 is found to be illegal or unenforceable, the remainder of this Agreement shall remain in full force and effect.   In the event that the enabling legislation which provides for the appointment of a referee is repealed and no successor statute is enacted, any dispute between the parties that otherwise would be determined by Reference shall be resolved and determined by binding arbitration in accordance with the California Arbitration Act, Sections 1280 through 1294 2 of the California Code of Civil Procedure, as the same may be amended from time to time   The provisions of this Agreement with respect to a Reference proceeding shall apply to any such arbitrator, who shall have the same qualifications as the referee and who shall be selected in the same manner as the referee stated herein.

11 16 6    Miscellaneous.   In the event that multiple Claims are asserted, some of which are found not subject to this Agreement, the parties agree to stay the proceedings of the Claims not subject to this Agreement until all other Claims are resolved in accordance with this Agreement   In the event that Claims are asserted against multiple parties, some of whom are not subject to this Agreement, the parties agree to sever the Claims subject to this Agreement and resolve them in accordance with this Agreement

11.16.7    Definitions.   As used in this Section 11.16 only.

"Applicable State Law" shall mean the laws of the State of California.

"Claim" shall mean any claim, cause of action, action, dispute or controversy between or among the parties, whether sounding in contract, tort or otherwise, which arises out of or relates to. (i) this Agreement or any document related to this Agreement, (ii) any negotiations or communications relating to any of this Agreement, whether or not incorporated into this Agreement or any indebtedness evidenced thereby; or (iii) any alleged agreements, promises, representations or transactions in connection therewith.  "Claim" shall exclude any claim, cause of action, dispute or controversy between or among the parties (a) any matter which is within the jurisdiction of a probate or small claims court, or (b) an action for bodily injury or wrongful death   The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction or other



EXHIBIT D
PAGE 221

provisional remedies, shall not constitute a waiver of the right to have all Claims determined by Reference under this provision

IN WITNESS WHEREOF, the undersigned have executed this Management Services Agreement effective as of the date first written above

SHM:

Summit Healthcare Management, Inc.
a California corporation


By _____
    Daryl R. Priest, President

BCHF:

Borrego Community Health Foundation
a California non-profit public benefit corporation


By: _____
Name: _BRUCE  HEBETS_
Its: ___CEO_____

EXHIBIT D
PAGE 222

**EXHIBIT A**
**SHM'S SCOPE OF SERVICES**

The purpose of this list of services is to identify and delineate services to be provided by SHM in furtherance of its duties under this agreement with BCHF. SHM shall provide any and all necessary staff, office space, information systems, and support services set forth below and all services reasonably contemplated as necessary to perform any such services.

I.      CONTRACT DOCTOR MANAGEMENT
   a.   PROVIDER CONTRACTING
      i.   Market and negotiate new Medical Services Agreements between BCHF and new contract doctors and clinics throughout the service area in which BCHF operates FQHCs. Currently, BCHF operates FQHCs in San Diego County
      ii   Amend current Medical Service Agreements at the direction of BCHF
      iii. Maintain files containing current and historical Medical Service Agreements.
      iv.  Track renewal dates of Medical Service Agreements.

   b.   PROVIDER RELATIONS
      i.   Maintain database of contract doctors and service providers and contract doctor service provider demographics.
      ii.  Monitor contract doctor service providers' ability to speak additional languages
      iii. Provide contract doctor service provider roster to contain Contract Provider and/or Sub-Contractor Provider Name, Office Name, Office Address, Tax Reporting Name, Tax Reporting Address, TIN, W-9 Effective Date, Contract Date and shall be provided within 48 hour request of BCHF staff as necessary
      iv   Assist with development and updates of contract doctor service provider manuals
      v.   Produce and distribute contract doctor service provider manuals
      vi.  Provide ongoing communication, education, and training to contract doctor service provider and their staffs regarding BCHF policies and procedures
      vii. Provide ongoing communication, education, and training to contract doctor service provider and their staff regarding any changes in scope of services and fee schedules.
      viii. Provide telephone line for contract doctor service provider inquiries
      ix.  Answer contract doctor service provider eligibility inquiries
      x.   Answer contract doctor service provider claims inquiries
      xi   Create and distribute administrative forms

II.     CLAIM MANAGEMENT

   a.   SHM shall obtain from contracted doctors such information relating to claims and submit the same to BCHF in a format that enables BCHF to bill for such claims As part of this service and based on a receipt of information from BCHF, SHM shall monitor claims, billing and payment to doctors.

   b.   SHM will track visit, to receipt of superbill claim, to validation of eligibility and completeness of visit, to transfer to BCHF Billing Department for submission to Third Party Payor, to validation of invoice creation and payment with notation of check date and check number associated to each visit processed, with the ability to cross reference and provide documentation and reporting to provide proof of payment for each visit and that each visit is invoiced and paid only once, and potentially that each visit has been processed and paid by third party payor.

III.    MANAGEMENT INFORMATION SYSTEM

   a.   Provide a computerized management information system to process and store data pertaining to demographics of and services provided to Participating Patients;



**EXHIBIT D**
**PAGE 223**

    b.   Provide appropriate data security and, among other necessary functions:

        i   Restrict access to data security in compliance with applicable federal and state laws and regulations

        ii.   Restrict access to data of participating patients

        iii.   Restrict access to data by user and security classification

        iv.   Compliance with HIPAA and any other regulations concerning participating patient data

        v.   Provide physical security at all buildings that house data

    c.   Provide BCHF-maintained Web-based access to data for BCHF staff as determined appropriate, such as Billing and Finance staff, and contract medical providers and their staff for its hardware, Internet connectivity and web-browsing for the following, but not limited functions:

        i.   Claims inquiries, including payment status

        ii   Claims submission

        iii   Eligibility inquiries

        iv   Authorization inquiries

        v.   Authorization submission

    d   Help Desk and Support

        i.   Provide, maintain and support issues related to data access

        ii.   Maintain all servers and network connections for SHM systems

        iii   Provide and maintain all desktop systems/hardware at SHM operations center(s)

        iv.   Provide and maintain all software (including licensing and troubleshooting) at SHM operations center(s)

        v.   Provide training and support to BCHF staff and contract medical service users and their staff remotely

        vi.   Provide and maintain phone system for calls directed to SHM operations center(s)

    e.   Remote System Access

        i.   Provide remote access to management information system

        ii   Support remote access connectivity

## IV    PARTICIPATING PATIENT MANAGEMENT

    a.   ELIGIBILITY VERIFICATION

        i.   Reconcile eligibility data to load into management information system

        ii.   Maintain participating patient eligibility database

        iii.   Identify each participating patient by using established identification number

        iv.   Assist with determination of participating patient eligibility for services prior to provision of services

        v.   Maintain and track eligibility of services for each participating patient

    b.   PARTICIPATING PATIENT SERVICES

        i.   Provide telephone line for participating patient inquiries

        ii.   Answer participating patient eligibility inquiries

        iii.   Answer participating patient claims inquiries

        iv.   Generate telephone tracking reports.

## V.    GENERAL ADMINISTRATION

    a.   Monitor all components of BCHF's Contract Medical Program

    b.   Coordinate printing of all forms and letterhead (as needed) on BCHF stationery

    c   Process participating patient and contract medical service provider-related mail, both incoming and outgoing

    d.   Short and long-range financial and strategic planning in conjunction with BCHF staff and departments to include Finance department.



EXHIBIT D
PAGE 224

e   Contract medical service provider and regulatory agency/agencies relationship management

VI.      CREDENTIALING

SHM shall assist BCHF in the collection, organization, and tracking of documents necessary for verifying credentials of health care practitioners and definition of their privileges as required for increased patient safety, reduction of medical errors and the provision of high quality health care services. Services shall be performed to the standards set forth in BPHC Policy Information Notice 2001-16.



EXHIBIT D
PAGE 225

## EXHIBIT B

### BUSINESS ASSOCIATE AGREEMENT

In order to comply with the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPPA") and the regulations promulgated there under by the U S Department of Health and Human Services ("HIPAA Regulations"), including, but not limited to 45 CFR Parts 160 and 164 relating to the privacy and security of Protected Health Information, and notwithstanding any contrary provisions of the underlying agreement, the Parties agree to the following:

A   <u>DEFINITIONS</u>

**"Designated Record Set"** shall mean a group of records maintained by or for BCHF that is (i) the medical records and billing records about individuals maintained by or for BCHF, (ii) the enrollment, payment, claims adjudication, and case or medical management record systems maintained by or for a health plan; or (iii) used, in whole or in part, by or for BCHF to make decisions about individuals. As used herein the term "Record" means any item, collection, or grouping of information that includes Protected Health Information and is maintained, collected, used, or disseminated by or for BCHF.

**"Electronic Transaction Rule"** shall mean the standards for processing standard transactions and code sets at 45 C.F.R Parts 160 and 162.

**"Privacy Standards"** shall mean the Standard for Privacy of Individually Identifiable Health Information, 45 C.F.R. Parts 160 and 164.

**"Protected Health Information"** shall mean any information, whether oral or recorded in any form or medium: (i) that relates to the past, present, or future physical or mental condition of an individual, the provision of health care to an individual; or the past, present or future payment for the provision of health care to an individual, and (ii) that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual, and shall have the meaning given to such term under Health Insurance Portability and Accountability Act of 1996, ("HIPAA") and the regulations promulgated there under by the U S Department of Health and Human Services ("HIPAA Regulations"), including, but not limited to 45 CFR Parts 160 and 164

**"Secretary"** shall mean the Secretary of the Department of Health and Human Services.

**"Security Rule"** shall mean the security standards for the protection of electronic Protected Health Information at 45 C F R Parts 160 and 164.

B.   <u>OBLIGATIONS OF SHM</u>

1.   <u>Use of Protected Health Information</u>  SHM shall not use Protected Health Information received from BCHF in any manner that would constitute a violation of the Privacy Standards if used by BCHF, except that SHM may use Protected Health Information (i) as permitted or required pursuant to the Agreement between BCHF and SHM, (ii) for SHM's proper management and administrative services, (iii) to carry out the legal responsibilities of SHM, or (iv) as required by law. As between SHM and BCHF, BCHF is the owner of all Protected Health Information

2.   <u>Disclosure of Protected Health Information</u>.  SHM shall not disclose Protected Health Information received from BCHF that would constitute a violation of the Privacy Standards if disclosed by BCHF, except that SHM may disclose Protected Health Information (i) in a manner permitted pursuant to this Agreement, (ii) for SHM's proper management and administrative services, or (iii) as required by law. To the extent SHM discloses Protected Health Information to a third party as permitted in accordance with this Agreement, SHM must obtain, prior to making any such disclosure, (a) reasonable assurances from such third party that such Protected Health Information will be held confidential as provided pursuant to this Agreement and only used or disclosed as required by law or for the lawful purposes for which it was disclosed to such third party, and (b) an agreement from such



EXHIBIT D
PAGE 226

third party to immediately notify SHM of any breaches of the confidentiality of the Protected Health Information, to the extent it has obtained knowledge of such breach  Notwithstanding the foregoing, SHM shall refer all requests for Protected Health Information pursuant to subpoena or any other discovery request or judicial or administrative order mandating disclosure to BCHF within two (2) business days of receipt. It shall be BCHF's responsibility to make all determinations regarding compliance with any such mandated disclosure.

3.      Accounting of Disclosures.  SHM agrees to document disclosures of Protected Health Information and information related to such disclosures as would be required for BCHF to respond to a request by an individual for an accounting of disclosures of Protected Health Information in accordance with 45 CFR § 164 528

4.      Safeguards Against Misuse of Information  SHM agrees that it will implement appropriate safeguards to prevent the use or disclosure of Protected Health Information other than pursuant to the terms and conditions of this Agreement. SHM further agrees to implement administrative, physical and technical safeguards consistent with the requirements of the Security Rule that reasonably and appropriately protect the confidentiality, integrity and availability of electronic Protected Health Information that it creates, receives, maintains or transmits on behalf of BCHF.

5      Reporting of Disclosures of Protected Health Information.  SHM shall within five (5) days of becoming aware of a disclosure of Protected Health Information in violation of this Agreement by SHM, its officers, directors, employees, contractors, or agents or by a third party to which SHM disclosed Protected Health Information pursuant to Section 2 of this Exhibit, report any such disclosure to BCHF.  SHM further agrees to report to BCHF any security incident of which it becomes aware as required by the Security Rule.

6      Mitigation.  SHM agrees to mitigate, to the extent practicable, any harmful effect that is known to SHM of a use or disclosure of Protected Health Information by SHM in violation of the requirements of this Agreement

7      Agreements by Third Parties.  SHM shall enter into an agreement with any agent or subcontractor that will have access to Protected Health Information that is received from, or created or received by SHM on behalf of BCHF pursuant to which such agent or subcontractor agrees to be bound by the same restrictions, terms and conditions that apply to SHM pursuant to this Agreement with respect to such Protected Health Information.

8.      Access to Information.  Within five (5) days of a request by BCHF for access to Protected Health Information about an individual contained in a Designated Record Set, SHM shall make available to BCHF such Protected Health Information for so long as such information is maintained in the Designated Record Set  In the event any individual requests access to Protected Health Information directly from SHM, SHM shall within two (2) business days forward such request to BCHF. It shall be BCHF's responsibility to make all determinations regarding granting or denying any such access requested

9.      Availability of Protected Health Information for Amendment  Within ten (10) days of receipt of a request from BCHF for the amendment of an individual's Protected Health Information or a record regarding an individual contained in a Designated Record Set (for so long as the Protected Health Information is maintained in the Designated Record Set), SHM shall provide such information to BCHF for amendment and incorporate any such amendments in the Protected Health Information as required by 45 C.F.R. § 164.526. In the event the request for an amendment is delivered directly to SHM, SHM shall within two (2) business days forward such request to BCHF.  It shall be BCHF's responsibility to make any determinations regarding granting or denying any such amendment requested.

10      Requests for Accounting of Disclosures.  Within ten (10) days of notice by BCHF to SHM that it has received a request for an accounting of disclosures of Protected Health Information regarding an individual during the six (6) years prior to the date on which the accounting was requested, SHM shall make available to BCHF such information as is in SHM's possession and is required for BCHF to make the accounting required by 45 C.F.R. § 164 528  At a minimum, SHM shall provide BCHF with the following information: (i) the date of the disclosure, (ii) the name of the entity or person who received the Protected Health Information, and if known, the address of such entity or person, (iii) a brief description of the Protected Health Information disclosed, and (iv) a brief statement of the purpose of such disclosure which includes an explanation of the basis for such disclosure  In the



event the request for an accounting is delivered directly to SHM, SHM shall within two (2) business days forward such request to BCHF  It shall be BCHF's responsibility to prepare and deliver any such accounting requested by an individual, subject to SHM's obligations set forth in this Section. SHM hereby agrees to implement an appropriate recordkeeping process to enable it to comply with the requirements of this Section.

11     Electronic Transactions. If SHM conducts any Standard Transaction for or on behalf of BCHF, SHM shall comply with the requirements under the Electronic Transaction Rule

12     Availability of Books and Records. SHM hereby agrees to make its internal practices, books and records, including policies and procedures, relating to the use and disclosure of Protected Health Information received from, or created or received by SHM on behalf of BCHF available to BCHF or to the Secretary for purposes of the Secretary determining the BCHF's and SHM's compliance with the Privacy Standards

C.     TERMINATION OF AGREEMENT WITH SHM

1.     Termination Upon Breach of Provision to Protected Health Information  Any other provision of this Agreement notwithstanding, this Agreement may be terminated by BCHF upon thirty (30) days written notice to SHM in the event that SHM breaches any provision contained in this Agreement and such breach is not cured within such thirty (30) day period; provided, however, that in the event that termination of this Agreement is not feasible in BCHF's sole discretion, SHM hereby acknowledges that BCHF shall have the right to report the breach to the Secretary  In addition, BCHF retains the right to seek injunction and other legal and equitable rights and remedies available under the law as necessary to prevent unauthorized use and disclosure of Protected Health Information.

2     Return or Destruction of Protected Health Information upon Termination. Upon termination of the Agreement, SHM shall either return or destroy all Protected Health Information received from BCHF or created or received by SHM on behalf of BCHF and which SHM or any subcontractor still maintains in any form  SHM shall notify BCHF of any such destruction. SHM shall not retain any copies of such Protected Health Information  In the event that BCHF and SHM mutually agree that it is not feasible to return or destroy such Protected Health Information, the terms and provisions of Article B shall survive termination of this Agreement and such Protected Health Information shall be used and disclosed solely for such purpose or purposes, which prevented the return or destruction of such Protected Health Information



EXHIBIT D
PAGE 228

**EXHIBIT C**

**TEMPLATE OF MEDICAL SERVICES AGREEMENT**

EXHIBIT D
PAGE 229

# EXHIBIT E

## AGREEMENT BETWEEN
## HUSAM E. ALDAIRI, DDS
## AND
## BORREGO COMMUNITY HEALTH FOUNDATION
## FOR
## DENTAL SERVICES

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of May 27, 2016 between Borrego Community Health Foundation ("BCHF") and Husam E. Aldairi, DDS. ("Dentist"), collectively the "Parties".

## RECITALS

**WHEREAS,** BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC).  BCHF operates clinics throughout Riverside and San Diego Counties including Centro Medico El Cajon located at: 133 Main Street, El Cajon, CA 92020. The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS").  The approved scope includes performance of primary dental services; and

**WHEREAS,** "BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement.  The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS,** "Dentist" operates and administers a private practice in the San Diego, area of California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

## AGREEMENT

**NOW, THEREFORE,** in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.   **DEFINITIONS**

A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to received dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

B. **SCOPE OF SERVICES.** Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

II. **ACKNOWLEDGEMENT**

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

III. **INDEPENDENT RELATIONSHIP**

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement. Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other. This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

IV. **PROFESSIONAL SERVICES**

A. **COVERED SERVICES.** Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

B. **SERVICE AVAILABILITY.** "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director. "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement. Such facilities must meet standards of practice expected of a licensed facility. Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

C. **DOCUMENTATION AND DESCRIPTION OF SERVICES.** "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes. In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records. "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

D. **PRIOR AUTHORIZATION.**  For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E. **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

F. **SLIDING FEE.**  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G. **NON-DISCRIMINATION.**  "Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's  ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

V. **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A. **QUALITY OF CARE**.  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility

and record review in keeping with "BCHF" standards and applicable regulations. "BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

B. **POLICIES AND PROCEDURES.** The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures. Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

C. **PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

D. **AUTHORITY.** "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above. In particular, "BCHF" shall retain ultimate authority over the following:

   1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

   2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

   3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

   4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

E. **NOTIFICATION. "Dentist"** shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services. "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

VI. **NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

A. It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of

EXHIBIT E
PAGE 234

any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

**B.** "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF."

**C.** "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement. For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k) (3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.   COMPENSATION

**A. FEE SCHEDULE.** "Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

**B. ENCOUNTER SUBMISSION.** Dentist will complete a superbill for every visit. The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation. Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C. TIMING OF PAYMENT.** Payment will be made on claims that are paid to "BCHF" by third party payors. The payment will be processed and made on the 15th day of each month to the "Dentist" with a detailed explanation of reimbursement. Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

**A. AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.** "Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours. "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need.

The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF". "Dentist" will provide occasional after hour sessions to provide expanded availability. These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary. As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

**B.   VERIFICATION OF PATIENT STATUS.** "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist. "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist". If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment. If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

**C.   REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES.** The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such. The information will be made available in a timely manner according to established policies and procedures. "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

**D.   REFUSAL TO PROVIDE SERVICES.** The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients. "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

**E.   REFERRAL FOR SPECIALTY SERVICES.** "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care. "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

**X.   LEGAL**

**A.   LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.** Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to

entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement. "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement.  The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification.  Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

B. **COMPLIANCE WITH THE LAW.**  "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

C. **MISREPRESENTATION**. "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

D. **COMPLIANCE WITH OTHER LAWS**.  In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply  with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination,  as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned  firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply  with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution  Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply  with the certification  and disclosure requirements of the Byrd Anti-Lobbying  Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify  that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

XI.    **RECORD KEEPING AND REPORTING**

EXHIBIT E

PAGE 237

A. **PROGRAMMATIC RECORDS**.  "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested.  In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

B. **FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated.  If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription,  and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained.  This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

C. **PARTICIPATING PATIENT RECORDS**.  "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist"  and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

D. **RETENTION OF PATIENT RECORDS**.  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law.  In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".  Record retention obligations survive the termination of this Agreement.

E. **OWNERSHIP OF PATIENT RECORDS**.  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent  with  applicable  Federal and State laws and regulations  and "BCHF's" policies and procedures regarding the privacy and

confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

## XII.   INSURANCE

A.   **PROOF OF COVERAGE.**  The "Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

B.   "Dentist" will provide "BCHF" with sufficient  evidence of professional liability coverage in the amount of at least:

1.   General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2.   Workers' Compensation, as required under California State law.

3.   Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

C.   It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

D.   Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or

omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

**E. INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.   CONFIDENDIALITY

**A.** Except as is necessary in the performance  of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer  diskettes)  as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors)  also agree not to disclose, except to each other, any proprietary information, professional secrets or other information  obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

**B.** The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.   TERM AND TERMINATION

**A.** **TERM.** This Agreement begins on May 27, 2016 and  shall be automatically and
**B.**  Successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other sixty (60) days in advance of termination.  Renewal is subject to "BCHF's"

determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

C.   **TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

D.   **TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

E.   **TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

F.   **IMMEDIATE TERMINATION.**  In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

G.   **SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement.  "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

A.   **AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.  Amendments will take effect upon the date of execution of both parties.

B.   **ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

C.   **EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

D.   **EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless

otherwise agreed.

**E.   NOTICE.**  Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

**F.   DISPUTE RESOLUTION.**  Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

**G.   CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

**H.   ENTIRE AGREEMENT.**  This Agreement represents the complete understanding  of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

**Bruce Hebets, CEO**                              **Dr. Husam E.  Aldairi, DDS.**

Borrego Community Health Foundation

Date: ___6-10-16___                              Date: ___6/6/16.___

Address:  PO Box 2369                            Address: 6175 El Cajon Blvd,
                Borrego Springs, CA 92004                       San Diego, CA 92115

Phone: (619) 444-5704                            Phone: 619-583-4030

Contact: Travis Lyon                             Contact: Rawaa, Office Manager

E-mail: cdtlyon@borregomedical.org               E-mail:  4030dental@gmail.com

EXHIBIT E

PAGE 242

Addendum "A"

Scope of Services

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal. These are outlined in Section 5 of the Provider Manual under "Maximum Allowances". Limitations of commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

Addendum "B"
Compensation of Dental Services
Medi-Cal

"Dentist" will be reimbursed according to patient's insurance type.  Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |
| Extractions – simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |

| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $165 |
|---|---|---|---|---|
| Root Canal – Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee. | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

Addendum C

Location of Service

All dental services under this agreement will be rendered at:

Dr. Husam E. Aldairi, DDS
40-30 Dental
6175 El Cajon Blvd
San Diego, CA 92215

**PHONE:** 619-583-4030
**Fax:**

**During the hours of:**

| | |
|---|---|
| **Monday---** | **10-8** |
| **Tuesday** | **10-8** |
| **Wednesday—** | **10-8** |
| **Thursday** | **10-8** |
| **Friday** | **10-8** |
| **Saturday** | |

**Tax ID**

**NPI number Entity type Code   1053301291**

**NPI number Entity type Code**

EXHIBIT E
PAGE 246

**CONFIDENTIALITY OF STUDENT INFORMATION /**
**PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the 27th day of May, 2016 by and between, Borrego Health, hereinafter referred to as "Covered Entity", and Husam E. Aldairi, DDS. Hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated May 27, 2016 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.      DEFINITIONS

   A.   Catch-all definition:
        The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident,

Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control. Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule, but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B. <u>Specific definitions</u>:

    1. <u>Business Associate</u>. "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Dr. Husam E. Aldairi, DDS.

        <u>Covered Entity</u>. "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

    2. <u>HIPAA Rules</u>. "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

    3. <u>Protected Health Information</u>. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual. "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

    4. <u>Electronic Protected Health Information</u>. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.    <u>CONFIDENTIALITY AND SECURITY REQUIREMENTS</u>

A. Business Associate agrees:

    1. Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

    2. To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

3. To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary

EXHIBIT E

PAGE 249

policies and procedures.

4. Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5. Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6. Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7. Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8. Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C. Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement. Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D. The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E. Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware. Business Associate shall report to Covered Entity any Security Incident of which it becomes aware. Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system. In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

EXHIBIT E

PAGE 250

III.    <u>AVAILABILITY OF PHI</u>

A.   Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity. Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule. If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual. Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule. In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act. Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.    <u>TERM/TERMINATION</u>

A.   <u>Term.</u> The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B.   <u>Termination.</u> Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement. If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

C.   <u>Obligations of Business Associate Upon Termination.</u> Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity that the business associate still maintains in any form. Business associate shall retain no copies of the protected health information.

D.   <u>Survival</u>. The obligations of business associate under this Section shall survive the termination of this Agreement.

V.    <u>MISCELLANEOUS</u>

A.   <u>Third Parties; Survival.</u> Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third

EXHIBIT E

PAGE 251

parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B. <u>Amendment; Independent Parties.</u> This Agreement may be amended or modified only in a writing signed by the Parties.  No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship.  This Agreement will be governed by the laws of the State of California.  No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. <u>Minimum Requirements.</u> The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control.  The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. <u>Severability.</u> In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect.  In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing.  For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**                                **BUSINESS ASSOCIATE:**

By:_____              By:_____
   **Bruce Hebets, CEO**                        **Dr. Husam E. Aldairi, DDS**

## Addendum "D"
## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F".

Bruce Hebets, CEO
Borrego Community Health Foundation

Husam E. Aldairi, DDS

6-10-16
Date

6 6 16
Date

EXHIBIT E
PAGE 253

Addendum "E"

## COMPENSATION OF DENTAL SERVICES
### ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below.  Crowns, root canals and bridges are subject to prior review and approval by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit  for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions – simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal – Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal – Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Bridge (3 Unit) | D6211, D6241, D6245, D6740 D6751 | 3 or more | | $500 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |

EXHIBIT E

PAGE 255

**Addendum "F"**

DENTAL SERVICES SLIDING FEE SCALE SUMMARY OF BENEFITS

Eligibility:
The application process and eligibility requirements are the same as for all other services. The levels of poverty are also the same as published by the Federal Government every year and implemented by April 1st. The poverty level is calculated using the established guidelines for family size and income.

All of the requirements of non-discrimination apply to the Dental Services Sliding Fee Scale. Patients with family income at or below 100% of Federal Poverty Level (FPL) pay a nominal fee of $50 per visit. If the family size and income is between 101% and 200%, the charges are based on the percent discount approved for each level of eligibility.

Benefits:
This is a limited benefit program that provides discounted rates for services rendered within Borrego Health Dental Services sites only. It does not extend to services rendered by specialists to whom Borrego Health dentists may need to refer patients for additional care from time to time. The scope of benefits is limited to the scope outlined in Section 5 of the Denti-Cal Handbook.

Adults and children with commercial insurance may apply for the sliding fee to assist with the cost of co-payments and deductibles. The percentage allowed per level of eligibility is deducted from the
balance owed by the patient. For patients with family income at or below 100% and the deductible or the co-payment is less than the nominal fee of $50, the less of the two will be collected.

Adults and children eligible determined eligible for Share of Cost (SOC), they may apply for the sliding fee. The first visit will include treatment planning to determine their eligibility for full scope Medi-Cal. Policies and procedures for managing SOC will be followed prior to initiating treatment.

The program includes:
- Exams and x-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (limited to scope of General Dentistry)
- Root Canals (limited to scope of General Dentistry)
- Crowns (limited to non-precious metal)
- Dentures (Co-payment of $150)
- Bridges (Co-payment of 50% of cost)
- Crowns (noble metals excluded)

Exclusions:
- Referrals to any specialists including but not limited to:
  - Oral surgeons
  - Endodontists
  - Periodontists
  - Orthodontists
  - Pedodontists
- Teeth whitening
- Orthotics not listed above
- Orthodontics
- Nobel metal crowns

EXHIBIT E
PAGE 256

- Cosmetic procedures
- Mouth guards

Dental Sliding Fee Discount
2016

| Sliding Fee | A | B | C | D | E |
|---|---|---|---|---|---|
| | | | | | |
| Level of Poverty | 0-100% | 101-125% | 126-150% | 151-175% | 176 -200% |
| Maximum Discount | $50 | 25% | 20% | 15% | 10% |

Bruce Hebets, CEO
Borrego Community Health Foundation

6-10-16
Date

Husam E. Aldairi, DDS

6 6 16
Date

EXHIBIT E
PAGE 257

**Addendum "G"**

**HITRUST CERTIFICATION HIPAA COMPLIANT DATA STORAGE FEE**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to maintain patient records and data associated with patient visits to i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. Dentists are also required maintain these records.

An online system for claim submissions and patient record storage for the contract dental program is currently in development. Upon implementation of this system all patient records will also be stored online on Health Insurance Portability and Accountability Act (HIPAA) compliant servers. Dentist will have secure access to the system for all Dentist's patients under the contract dental program.

**HITRUST Certification:** In order to safely maintain the integrity of your patient data and meet HIPAA compliance, Premier Health Care Management (PHCM) conducts quarterly audits in order to maintain HITRUST Certification. A team of third party auditors conduct a three-tiered audit to achieve the highest HIPAA certification available. In addition to the technical audit, Dentist understands that PHCM will request semiannual access to computers running licensed software to ensure physical security standards are being maintained. PHCM will request access a week in advance unless a specific risk is determined.

Dentist agrees to pay One Hundred and Fifty Dollars ($150.00) per month for costs associated with record storage and HITRUST certification audits of the system. This monthly fee will only be assessed once the online storage system is implemented. Dentist will be provided notice of no less than 21 days prior to implementation and commencement of the monthly fee.

Nothing in this Addendum "G" relieves Dentist of its obligation to maintain patient records under the contract. All other terms and conditions remain the same.

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

Husam E. Aldairi, DDS,

Date    6-10-16

Date    6/6/16

EXHIBIT E
PAGE 258

# EXHIBIT F

**AGREEMENT BETWEEN**
**ALDAIRI DDS INC**
**AND**
**BORREGO COMMUNITY HEALTH FOUNDATION**
**FOR**
**DENTAL SERVICES**

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of May 29, 2018 between Borrego Community Health Foundation ("BCHF") and Aldairi DDS Inc. ("Dentist"), collectively the "Parties".

## RECITALS

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC).  BCHF operates clinics throughout San Diego, San Bernardino, and Riverside Counties.  The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS").  The approved scope includes performance of primary dental services; and

**WHEREAS, "**BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist"  is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement.  The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS**, "Dentist" operates and administers a private practice in the El Cajon area of California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

## AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.   **DEFINITIONS**

   A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

   B.   **SCOPE OF SERVICES.**  Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are

authorized to be rendered by BCHF to residents of the specified service area.

## II.    ACKNOWLEDGEMENT

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

## III.    INDEPENDENT RELATIONSHIP

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

## IV.    PROFESSIONAL SERVICES

**A.    COVERED SERVICES.**  Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

**B.    SERVICE AVAILABILITY.**   "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

**C.    DOCUMENTATION AND DESCRIPTION OF SERVICES.**  "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

**D.    PRIOR AUTHORIZATION.**   For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior

to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E.   **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

F.   **SLIDING FEE**.  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G.   **NON-DISCRIMINATION.  "**Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

V.   **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A.   **QUALITY OF CARE**.  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations. "BCHF" will communicate in writing any corrective action that must be resolved in a

timely manner.

**B.   POLICIES AND PROCEDURES.**  The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

**C.   PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

**D.   AUTHORITY.**  "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular,  "BCHF" shall retain ultimate authority over the following:

1.  Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2.  Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3.  Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4.  The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

**E.   NOTIFICATION.  "**Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

**VI.   NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

**A.**   It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

**B.** "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected.

**C.** "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes  of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether  by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.   COMPENSATION

**A.   FEE SCHEDULE.  "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

**B.   ENCOUNTER SUBMISSION.**  Dentist will complete a superbill every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C.   TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed and made on the 15th day of each month to the "Dentist" with a detailed explanation of reimbursement.  Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

**A.   AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.  "**Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.  "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need.

The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF". "Dentist" will provide occasional after hour sessions to provide expanded availability. These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary. As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

**B.   VERIFICATION OF PATIENT STATUS.**   "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist.   "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist". If it is determined that the Participating Patient is not a "BCHF" patient  on the date of service,  "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment. If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

**C.   REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES**. The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such. The information will be made available in a timely manner according to established policies and procedures. "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

**D.   REFUSAL TO PROVIDE SERVICES.**  The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients. "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

**E.   REFERRAL FOR SPECIALTY SERVICES.**  "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care. "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

**X.   LEGAL**

**A.   LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**  Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to

entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement. "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement. The same requirements apply to "Dentist" employees and staff. No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification. Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

B. **COMPLIANCE WITH THE LAW.** "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

C. **MISREPRESENTATION**. "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

D. **COMPLIANCE WITH OTHER LAWS**. In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

## XI.    RECORD KEEPING AND REPORTING

A. **PROGRAMMATIC RECORDS**.  "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested.  In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

B. **FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated.  If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation,  or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription,  and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained.  This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

C. **PARTICIPATING PATIENT RECORDS**.  "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist"  and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

D. **RETENTION OF PATIENT RECORDS**.  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law.  In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".  Record retention obligations survive the termination of this Agreement.

E. **OWNERSHIP OF PATIENT RECORDS**.  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent  with  applicable  Federal and State laws and regulations  and "BCHF's" policies and procedures regarding the privacy and

EXHIBIT F
PAGE 267

confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

## XII.   INSURANCE

**A.   PROOF OF COVERAGE.**  The **"**Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

**B.**   "Dentist" will provide "BCHF" with sufficient  evidence of professional liability coverage in the amount of at least:

1.   General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2.   Workers' Compensation, as required under California State law.

3.   Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

**C.**   It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

**D.**   Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or

omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

**E. INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.   CONFIDENTIALITY

**A.**   Except as is necessary in the performance  of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer  diskettes)  as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors)  also agree not to disclose, except to each other, any proprietary information, professional secrets or other information  obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

**B.**   The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.   TERM AND TERMINATION

**A.**   **TERM.**  This Agreement begins on May 29, 2018 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other sixty (60) days in advance of termination.  Renewal is subject to "BCHF's"

determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

**B.** **TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

**C.** **TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

**D.** **TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

**E.** **IMMEDIATE TERMINATION.**  In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

**F.** **SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement.  "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

**A.** **AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.  Amendments will take effect upon the date of execution of both parties.

**B.** **ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

**C.** **EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

**D.** **EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless

otherwise agreed.

**E.   NOTICE.** Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

**F.   DISPUTE RESOLUTION.** Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

**G.   CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

**H.   ENTIRE AGREEMENT.** This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

Date: _____5 · 31 · 2018_____

Address: PO Box 2369
Borrego Springs, CA 92004

Phone: (619) 444-5704

Contact: Travis Lyon

E-mail: tlyon@borregohealth.org

Aldairi DDS Inc

Date: __5/31/18__

Address:        1166 E. Main St.
                      El Cajon, Ca.  92021

Phone:   (619) 478-4030

Contact: Ahmed Alobaidi

E-mail: HusamAldairi@borregomedical.onmicrosoft.com

EXHIBIT F
PAGE 271

**Addendum "A"**

**Scope of Services**

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

Addendum "B"
**Compensation of Dental Services**
**Pediatric Medi-Cal**

Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and  D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $140 per |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $150 per |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride application | D1120 in combo with D1206, D1208 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings - Amalgam | D2140, D2150, | 1 or more | Per quadrant | $120 per visit |

| | D2160, D2161 | | | |
|---|---|---|---|---|
| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $150 per visit |
| Prefabricated Crowns (Stainless Steel / Resin) | D2930, D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $175 global $280 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpotomy / Pulpal Debridement | D3220, D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $305 global |
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration.  Open | $365 global |

|  |  |  | & Med and Finished RCT included in global fee. |  |
|---|---|---|---|---|
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | None | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Incision and Drainage of Abcess | D7510, D7520 | 1 | None | $115 |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |
| Inhalation of Nitrous Oxide | D9230 | 1 | Additional payment in combo with other procedures | $35 |

**Addendum "C"**

**Location of Service**

All dental services under this agreement will be rendered at:

Aldairi DDS Inc.

40/30 Dental 2
1166 East Main Street
El Cajon, Ca.    92021

---

Phone: (619) 478-4030

During the hours of:

Monday,     Tuesday,    Wednesday,  Thursday,   Friday,
9-6pm         9-6           9-6          9-6          9-6

---

NPI Number - Organization _____

NPI Number- Individual        1053301291

Copies attached

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the _____ day of May, 2018 by and between Borrego Health, hereinafter referred to as "Covered Entity", and Aldairi DDS Inc. hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated May 29, 2018 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.    DEFINITIONS

    A.   Catch-all definition:
        The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident,

Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule, but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B. <u>Specific definitions</u>:

    1.    <u>Business Associate</u>.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Aldairi DDS Inc.

    2.    <u>Covered Entity</u>.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

    3.    <u>HIPAA Rules</u>.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

    4.    <u>Protected Health Information</u>. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

    5.    <u>Electronic Protected Health Information</u>. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.    <u>CONFIDENTIALITY AND SECURITY REQUIREMENTS</u>

A. Business Associate agrees:

    1.    Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

    2.    To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

    3.    To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR

164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures.

4.  Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5.  Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6.  Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7.  Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8.  Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C.  Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement.  Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D.  The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E.  Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware.  Business Associate shall report to Covered Entity any Security Incident of which it becomes aware.  Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.  In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

EXHIBIT F

PAGE 280

III.   AVAILABILITY OF PHI

A.   Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   TERM/TERMINATION

A.   Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B.   Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

C.   Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

D.   Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.   MISCELLANEOUS

A.   Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement

and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B. <u>Amendment; Independent Parties.</u> This Agreement may be amended or modified only in a writing signed by the Parties. No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship. This Agreement will be governed by the laws of the State of California. No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. <u>Minimum Requirements.</u> The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control. The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. <u>Severability.</u> In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect. In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing. For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_____5 · 31 · 2018_____
Date

**BUSINESS ASSOCIATE:**

_____
Aldairi DDS Inc.

_____5/31/18_____
Date

## Addendum "D"
### ADDITION OF MEDI-CAL ADULT DENTAL
### AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum E"

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_____
Aldairi DDS Inc.

5 · 31 · 2018
_____
Date

5/31/18
_____
Date

EXHIBIT F
PAGE 283

Addendum "E"
### COMPENSATION OF DENTAL SERVICES
### ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns and root canals are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per visit |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per visit |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and  D1110 | 1 | Refer to Denti-Cal manual. | $140 per visit |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1110 | 1 | Refer to Denti-Cal manual. | $150 per visit |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride application | D1110 in combo with D1206, D1208 | 1 | Must be in combination. | $110 per visit |
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Treatment to be completed per quadrant, unless documented | $120 per visit |

| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Treatment to be completed per quadrant, unless documented | $150 per visit |
|---|---|---|---|---|
| Prefabricated Crowns (Stainless Steel / Resin) | D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Extractions - simple | D7111, D7140 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpal Debridement | D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $305 global |
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
| Root Canal - | D3320 | 2 or more | Excludes final | $365 global |

| Bicuspid | | | restoration.  Open & Med and Finished RCT included in global fee. | |
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | All treatments must be after 12 months of initial visit | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Gingivectomy or Gingivoplasty | D4211 | 1 | 1 to 3 teeth, per quadrant | $110 |
| Incision and Drainage of Abscess | D7510, D7520 | 1 | None | $115 |
| Dentures (Includes | D5110, D5120 | 6 or more | Maxillary and | $635 each |

| first 2 adjustments) | | | Mandibular | denture – global |
|---|---|---|---|---|
| Removable Partial – Cast Metal (Includes first 2 adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $660 each partial – global |
| Removable Partial – Resin Based | D5211, D5212 | 3 or more | Maxillary and Mandibular | $360 each partial - global |
| Repairs | D5510, D5520 D5610, D5640 D5650, D5660 | 1 or more | Maxillary and Mandibular | $110 each visit |
| Repair Cast Framework | D5620 | 1 | None | $325 per visit |
| Repair/Replace Broke Clasp | D5630 | 1 | None | $140 per visit |
| Adjustments only (not following delivery) | D5410, D5411 D5421, D5422 | 1 | Maxillary and Mandibular | $70 per visit |
| Reline (in office) | D5730, D5731 D5740, D5741 | 1 | Maxillary and Mandibular | $120 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $225 - global |
| Tissue Conditioning | D5850, D5851 | 1 | Maxillary and Mandibular | $120 per visit |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |

**Addendum "F"**

**DENTAL SLIDING FEE SCALE**
**SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.
As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these

programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
  - ➢ Oral Surgery
  - ➢ Endodontist
  - ➢ Periodontist
  - ➢ Orthodontist
  - ➢ Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

### Dental Sliding Fee Discount

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| | | | | | | |
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

Bruce Hebets, CEO
Borrego Community Health Foundation

5· 31· 2018

Date

Aldairi DDS Inc.

5· 31· 18

Date

# EXHIBIT G

## AGREEMENT BETWEEN
## HAWATMEH DENTAL GROUP P.C.
## AND
## BORREGO COMMUNITY HEALTH FOUNDATION
## FOR
## DENTAL SERVICES

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of October _____, 2017 between Borrego Community Health Foundation ("BCHF") and Hawatmeh Dental Group P.C. ("Dentist"), collectively the "Parties".

## RECITALS

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC). BCHF operates clinics throughout San Diego, San Bernardino, and Riverside Counties. The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS"). The approved scope includes performance of primary dental services; and

**WHEREAS,** "BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement. The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS,** "Dentist" operates and administers a private practice in the Corona, Ontario and Rancho Cucamonga area of California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

## AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I. **DEFINITIONS**

    A. **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

    B. **SCOPE OF SERVICES.** Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are

authorized to be rendered by BCHF to residents of the specified service area.

**II.    ACKNOWLEDGEMENT**

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

**III.    INDEPENDENT RELATIONSHIP**

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

**IV.    PROFESSIONAL SERVICES**

**A.    COVERED SERVICES.**  Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

**B.    SERVICE AVAILABILITY.**   "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

**C.    DOCUMENTATION AND DESCRIPTION OF SERVICES.**  "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

**D.    PRIOR AUTHORIZATION.**   For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior

to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E.   **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

F.   **SLIDING FEE**.  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G.   **NON-DISCRIMINATION.**  "Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

V.   **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A.   **QUALITY OF CARE**.  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations. "BCHF" will communicate in writing any corrective action that must be resolved in a

EXHIBIT G

PAGE 293

timely manner.

**B.   POLICIES AND PROCEDURES.**  The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

**C.   PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

**D.   AUTHORITY.**  "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular,  "BCHF" shall retain ultimate authority over the following:

1.  Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

**E.   NOTIFICATION.  "**Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

**VI.    NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

**A.**   It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

EXHIBIT G

PAGE 294

**B.** "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected.

**C.** "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes  of this paragraph, a "patient  of BCHF" shall mean any patient seen or treated by "BCHF" (whether  by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.  CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.  COMPENSATION

**A.  FEE SCHEDULE.**  "Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

**B.  ENCOUNTER SUBMISSION.**  Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C.  TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed and made on the 15th day of each month to the "Dentist" with a detailed explanation of reimbursement.  Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.  CASE MANAGEMENT

**A.  AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.**  "Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.  "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need.

The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF". "Dentist" will provide occasional after hour sessions to provide expanded availability. These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary. As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

B. **VERIFICATION OF PATIENT STATUS.** "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist. "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist". If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment. If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

C. **REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES.** The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such. The information will be made available in a timely manner according to established policies and procedures. "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

D. **REFUSAL TO PROVIDE SERVICES.** The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients. "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

E. **REFERRAL FOR SPECIALTY SERVICES.** "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care. "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

X. **LEGAL**

A. **LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.** Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to

EXHIBIT G
PAGE 296

entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement. "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement. The same requirements apply to "Dentist" employees and staff. No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification. Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

B. **COMPLIANCE WITH THE LAW.** **"**Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

C. **MISREPRESENTATION**. "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

D. **COMPLIANCE WITH OTHER LAWS**. In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

**XI.    RECORD KEEPING AND REPORTING**

A. **PROGRAMMATIC RECORDS**.  "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested.  In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

B. **FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated.  If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation,  or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription,  and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained.  This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

C. **PARTICIPATING PATIENT RECORDS**.  "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist"  and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

D. **RETENTION OF PATIENT RECORDS**.  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law.  In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".  Record retention obligations survive the termination of this Agreement.

E. **OWNERSHIP OF PATIENT RECORDS**.  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent  with  applicable  Federal and State laws and regulations  and "BCHF's" policies and procedures regarding the privacy and

confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

## XII.   INSURANCE

**A.   PROOF OF COVERAGE.** The "Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

**B.**   "Dentist" will provide "BCHF" with sufficient  evidence of professional liability coverage in the amount of at least:

1.   General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2.   Workers' Compensation, as required under California State law.

3.   Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

**C.**   It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

**D.**   Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or

omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

E. **INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.  CONFIDENTIALITY

A. Except as is necessary in the performance of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors) also agree not to disclose, except to each other, any proprietary information, professional secrets or other information obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

B. The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.  TERM AND TERMINATION

A. **TERM.** This Agreement begins on October __18__, 2017 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other sixty (60) days in advance of termination.  Renewal is subject to "BCHF's"

EXHIBIT G

PAGE 300

determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

B. **TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

C. **TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

D. **TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

E. **IMMEDIATE TERMINATION.**  In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

F. **SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement.  "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

A. **AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.  Amendments will take effect upon the date of execution of both parties.

B. **ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

C. **EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

D. **EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless

otherwise agreed.

E.   **NOTICE.**  Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F.   **DISPUTE RESOLUTION.**  Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G.   **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H.   **ENTIRE AGREEMENT.**  This Agreement represents the complete understanding  of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

Date: ___10/20/2017___

Address: PO Box 2369
Borrego Springs, CA 92004

Phone: (619) 444-5704

Contact: Travis Lyon

E-mail: tlyon@borregohealth.org

Hawatmeh Dental Group P.C.

Date: ___Oct 18/2017___

Address:  1185 Magnolia Ave. #K, #L
              Corona, Ca.   92879

Phone:   Dr. Hawatmeh / Teresa (Mgr.)

Contact: (951) 898-9223 / (951)790-9975

E-mail:  bravodentalcorona@hotmail.com

EXHIBIT G

**Addendum "A"**

**Scope of Services**

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal. These are outlined in Section 5 of the Provider Manual under "Maximum Allowances". Limitations of commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

EXHIBIT G
PAGE 303

## Addendum "B"

### Compensation of Dental Services
### Medi-Cal

"Dentist" will be reimbursed according to patient's insurance type.  Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not | $100 |

EXHIBIT G

PAGE 304

| | | | in scope. | |
|---|---|---|---|---|
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee. | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

## Addendum "C"
### Location of Service

All dental services under this agreement will be rendered at the following 3 locations:

**Location #1 – Hawatmeh Dental Group P.C.**

Bravo Dental Group of Corona

Address:     1185 Magnolia Avenue, #K & #L

Corona, Ca.   92879

Phone:     (951) 898-9223

During the hours of:

| Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|
| 9:00-6:00pm | 9:00-6:00pm | 9:00-6:00pm | 9:00-6:00pm | 9:00-3:00pm | Closed | Closed |

NPI Number - Organization     1649704347

NPI Number- Individual     1043515653

---

**Location #2 – ~~Hawatmeh Dental Group P.C.~~**     *AYED Hawatmeh D.D.S Inc*

Address:     White Smile Dental   *D.B.A*

3495 East Concours Street, Suite A

Ontario, Ca.   91764

Phone:     (909) 483-1379

During the hours of:

| Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|
| 9:00-6:00pm | 9:00-6:00pm | 9:00-6:00pm | 9:00-6:00pm | 9:00-2:00pm | Closed | Closed |

NPI Number - Organization     1831613645

NPI Number- Individual     1043515653

---

**Location #3 – ~~Hawatmeh Dental Group P.C.~~**     *AYED Hawatmec D.D.S In.*

Address:   *D.B.A* Rancho Family Dentistry

8977 East Foothill Blvd. Suite E - F

Rancho Cucamonga, Ca.   92879

Phone:     (909) 581-0244

During the hours of:

| Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|
| 9:00-6:00pm | 9:00-6:00pm | 9:00-6:00pm | 9:00-6:00pm | 9:00-3:30pm | Closed | Closed |

NPI Number - Organization     *1831613645*

NPI Number- Individual     1043515653

Copies attached

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the ___i K___ day of October, 2017 by and between Borrego Health, hereinafter referred to as "Covered Entity", and Hawatmeh Dental Group P.C. hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated October ___iθ___, 2017 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.   <u>DEFINITIONS</u>

   A. <u>Catch-all definition</u>:
      The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy

Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule, but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B.  <u>Specific definitions</u>:

 1. <u>Business Associate</u>.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Hawatmeh Dental Group P.C.

 2. <u>Covered Entity</u>.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

 3. <u>HIPAA Rules</u>.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

 4. <u>Protected Health Information</u>. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

 5. <u>Electronic Protected Health Information</u>. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II. <u>CONFIDENTIALITY AND SECURITY REQUIREMENTS</u>

A.  Business Associate agrees:

 1. Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

 2. To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

3. To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary

policies and procedures.

4.  Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5.  Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6.  Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7.  Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8.  Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C.  Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement.  Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D.  The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E.  Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware.  Business Associate shall report to Covered Entity any Security Incident of which it becomes aware.  Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.  In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

III.   AVAILABILITY OF PHI

A.   Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   TERM/TERMINATION

A.   Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B.   Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

C.   Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

D.   Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.   MISCELLANEOUS

A.   Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third

parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B. <u>Amendment; Independent Parties.</u> This Agreement may be amended or modified only in a writing signed by the Parties. No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship.  This Agreement will be governed by the laws of the State of California.  No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. <u>Minimum Requirements.</u> The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control.  The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. <u>Severability.</u> In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect.  In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing.  For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_____10/20/2017_____
Date

**BUSINESS ASSOCIATE:**

_____
Hawatmeh Dental Group P.C.

_____Oct 18/2017_____
Date

**Addendum "D"**
**ADDITION OF MEDI-CAL ADULT DENTAL**
**AND SLIDING FEE**

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

## SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

## EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

## SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_____
Hawatmeh Dental Group P.C.

_____10/20/2017_____
Date

_____Oct 18/17_____
Date

**Addendum "E"**

**COMPENSATION OF DENTAL SERVICES**
**ADULT MEDI-CAL**

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns, root canals and bridges are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions - simple | D7111, D7140 | 1 | Per visit - multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit - multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

EXHIBIT G
PAGE 314

| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
|---|---|---|---|---|
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| | | | | |
| | | | | |

**Addendum "F"**

**DENTAL SLIDING FEE SCALE
SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these

programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
    - Oral Surgery
    - Endodontist
    - Periodontist
    - Orthodontist
    - Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

**Dental Sliding Fee Discount**

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| | | | | | | |
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_10/20/2017_
Date

_____
Hawatmeh Dental Group P.C.

_Oct 18/2017_
Date

EXHIBIT G
PAGE 317

# EXHIBIT H

**AGREEMENT BETWEEN**
ALBORZ MEHDIZADEH, INC.
**AND**
**BORREGO COMMUNITY HEALTH**
**FOUNDATION FOR DENTAL SERVICES**

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of Sept. 28th 2016 between Borrego Community Health Foundation ("BCHF") and ALBORZ MEHDIZADEH, INC. ("Dentist"), collectively the "Parties".

## RECITALS

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC). BCHF operates clinics throughout San Bernardino, Riverside and San Diego Counties. The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS"). The approved scope includes performance of primary dental services; and

**WHEREAS,** "BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement. The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS,** "Dentist" operates and administers a private practice in Victorville, area of California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

## AGREEMENT

**NOW, THEREFORE,** in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I. **DEFINITIONS**

 A. **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

 B. **SCOPE OF SERVICES.** Those services approved by the Health Resource and

EXHIBIT H
PAGE 319

Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

## II. ACKNOWLEDGEMENT

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

## III. INDEPENDENT RELATIONSHIP

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement. Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other. This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

## IV. PROFESSIONAL SERVICES

**A. COVERED SERVICES.** Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

**B. SERVICE AVAILABILITY.** "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director. "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement. Such facilities must meet standards of practice expected of a licensed facility. Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

**C. DOCUMENTATION AND DESCRIPTION OF SERVICES.** "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes. In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records. "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

**D. PRIOR AUTHORIZATION.** For dental services needing individual consideration

or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

**E.   AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

**F.   SLIDING FEE.**  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

**G.   NON-DISCRIMINATION.**  "Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

**V.   QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

**A.   QUALITY OF CARE.** "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations.

"BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

**B.**   **POLICIES AND PROCEDURES.**  The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

**C.**   **PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

**D.**   **AUTHORITY.**  "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular,  "BCHF" shall retain ultimate authority over the following:

1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

**E.**   **NOTIFICATION.**  "Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

**VI.**   **NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

**A.**   It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either

party by the other party.

B.    "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected.

C.    "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.    CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.    COMPENSATION

A.    **FEE SCHEDULE.** "Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

B.    **ENCOUNTER SUBMISSION.** Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

C.    **TIMING OF PAYMENT.**    Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed and made on the 15th day of each month to the "Dentist" with a detailed explanation of reimbursement.  Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.    CASE MANAGEMENT

A.    **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.** "Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.  "Dentist" will communicate with BCHF management as to appointment

availability so that adjustments can be made to accommodate the identified need. The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF". "Dentist" will provide occasional after hour sessions to provide expanded availability. These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary. As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

B. **VERIFICATION OF PATIENT STATUS.** "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist. "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist". If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment. If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

C. **REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES.** The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such. The information will be made available in a timely manner according to established policies and procedures. "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

D. **REFUSAL TO PROVIDE SERVICES.** The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients. "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

E. **REFERRAL FOR SPECIALTY SERVICES.** "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care. "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

X. **LEGAL**

A. **LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.** Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any

other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement. "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement. The same requirements apply to "Dentist" employees and staff. No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification. Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

**B. COMPLIANCE WITH THE LAW.** "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

**C. MISREPRESENTATION.** "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

**D. COMPLIANCE WITH OTHER LAWS.** In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

## XI.   RECORD KEEPING AND REPORTING

A.   **PROGRAMMATIC RECORDS.**  "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested.  In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

B.   **FINANCIAL RECORDS.** "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated.  If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation,  or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription,  and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained.  This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

C.   **PARTICIPATING PATIENT RECORDS.**  "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist"  and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

D.   **RETENTION OF PATIENT RECORDS.**  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law.  In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".  Record retention obligations survive the termination of this Agreement.

E.   **OWNERSHIP OF PATIENT RECORDS.**  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent with  applicable Federal and State

laws and regulations  and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

XII.   **INSURANCE**

A.   **PROOF OF COVERAGE.** The "Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

B.   "Dentist" will provide "BCHF" with sufficient  evidence of professional liability coverage in the amount of at least:

1.   General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2.   Workers' Compensation, as required under California State law.

3.   Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

C.   It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

D.   Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however,

shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

E. **INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

XIII.  **CONFIDENTIALITY**

A. Except as is necessary in the performance of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors) also agree not to disclose, except to each other, any proprietary information, professional secrets or other information obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

B. The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

XIV.  **TERM AND TERMINATION**

A. **TERM.** This Agreement begins on  Sept. 28th , 2016 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to

the other sixty (60) days in advance of termination. Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

**B.   TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

**C.   TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

**D.   TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

**E.   IMMEDIATE TERMINATION.**  In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

**F.   SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement.  "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

**A.   AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.  Amendments will take effect upon the date of execution of both parties.

**B.   ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

**C.   EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

**D.   EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this

Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

E.   **NOTICE.**  Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F.   **DISPUTE RESOLUTION.**  Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G.   **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H.   **ENTIRE AGREEMENT.**  This Agreement represents the complete understanding  of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

Date: __10/7/2016__

Address: PO Box 2369

Borrego Springs, CA 92004

Phone: (619) 444-5704

Contact: Travis Lyon

E-mail: cdtlyon@borregomedical.org

_____ALBORZ MEHDIZADEH, INC._____

*A.Mehdizadeh*
A.Mehdizadeh (Sep 29, 2016)

Date: 09/28/2016

Address: 15080 7th Street Suite #7    Victorv

 2nd Location: 286 N. San Jacinto St   Heme

Phone: (818)913-8097

Contact: Dr. Alborz Mehdizadeh

E-mail almediza@gmail.com

EXHIBIT H

PAGE 330

## Addendum "A"

### Scope of Services

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of  commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

## Addendum "B"

### Compensation of Dental Services
### Medi-Cal

"Dentist" will be reimbursed according to patient's insurance type. Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below. Crowns and root canals are subject to prior review and authorization by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not | $100 |

| | | | in scope. | |
|---|---|---|---|---|
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee. | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

EXHIBIT H

## Addendum "C"

### Location of Service

All dental services under this agreement will be rendered at:

DBA VICTORVILLE DENTAL OFFICE OF ALBORZ MEHDIZADEH, INC.

Address 15080 7th Street Suite #7   Victorville, CA 92395

2nd Location: 286 N. San Jacinto St   Hemet, CA 92395

Phone: (818)913-8097

During the hours of:

Victorville, CA = Monday - Tuesday - Thursday - Friday: 10AM - 7PM   Wed/Sat/Sun: Closed

Hemet, CA = Monday & Wednesday & Friday 11AM - 7PM   Saturday 10AM-5PM

NPI Number - Organization 1427437516

NPI Number- Individual 1184058984

Copies attached

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the <u>Sept. 28th</u>, 2016 by and between Borrego Health, hereinafter referred to as "Covered Entity", and <u>ALBORZ MEHDIZADEH, INC.</u> hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated <u>Sept. 28th</u>, 2016 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.    <u>DEFINITIONS</u>

    A.  <u>Catch-all definition</u>:
       The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy

Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule, but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B.  <u>Specific definitions</u>:

    1.   <u>Business Associate</u>.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean <u>ALBORZ MEHDIZADEH, INC.</u>

    2.   <u>Covered Entity</u>.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

    3.   <u>HIPAA Rules</u>.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

    4.   <u>Protected Health Information</u>. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual. "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

    5.   <u>Electronic Protected Health Information</u>. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.    <u>CONFIDENTIALITY AND SECURITY REQUIREMENTS</u>

A.  Business Associate agrees:
    1.  Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

    2.  To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

3. To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary

policies and procedures.

4.  Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5.  Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6.  Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7.  Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8.  Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C.  Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement.  Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D.  The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E.  Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware.  Business Associate shall report to Covered Entity any Security Incident of which it becomes aware.  Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.  In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

EXHIBIT H

PAGE 338

III. <u>AVAILABILITY OF PHI</u>

A. Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity. Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule. If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual. Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule. In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act. Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV. <u>TERM/TERMINATION</u>

A. <u>Term.</u> The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B. <u>Termination.</u> Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement. If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

C. <u>Obligations of Business Associate Upon Termination.</u> Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form. Business associate shall retain no copies of the protected health information.

D. <u>Survival.</u> The obligations of business associate under this Section shall survive the termination of this Agreement.

V. <u>MISCELLANEOUS</u>

A. <u>Third Parties; Survival.</u> Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third

parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B. <u>Amendment; Independent Parties.</u> This Agreement may be amended or modified only in a writing signed by the Parties. No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship. This Agreement will be governed by the laws of the State of California. No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. <u>Minimum Requirements.</u> The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control. The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. <u>Severability.</u> In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect. In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing. For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**                                    **BUSINESS ASSOCIATE:**

_____            _A.Mehdizadeh_____
                                                                            A.Mehdizadeh (Sep 29, 2016)
Bruce Hebets, CEO                                        Dentist
Borrego Community Health Foundation        ALBORZ MEHDIZADEH, INC.

____10/7/20 16_____                 _09/28/2016_____
Date                                                              Date

EXHIBIT H
PAGE 340

**Addendum "D"**
**ADDITION OF MEDI-CAL ADULT DENTAL**
**AND SLIDING FEE**

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

## SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

## EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

## SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_____
*A. Mehdizadeh*
A. Mehdizadeh (Sep 29, 2016)
Dentist
ALBORZ MEHDIZADEH, INC.

**10/7/2016**
_____
Date

09/28/2016
_____
Date

EXHIBIT H
PAGE 341

## Addendum "E"

### COMPENSATION OF DENTAL SERVICES
### ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns, root canals and bridges are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions - simple | D7111, D7140 | 1 | Per visit - multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit - multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

EXHIBIT H
PAGE 342

| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
|---|---|---|---|---|
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |
| | | | | |

Addendum "F"

## DENTAL SLIDING FEE SCALE
## SUMMARY OF BENEFITS

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these

programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
  - ➢ Oral Surgery
  - ➢ Endodontist
  - ➢ Periodontist
  - ➢ Orthodontist
  - ➢ Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

**Dental Sliding Fee Discount**

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

Bruce Hebets, CEO
Borrego Community Health Foundation

10/7/2016
Date

A.Mehdizadeh (Sep 29, 2016)
Dentist
ALBORZ MEHDIZADEH, INC.

09/28/2016
Date

EXHIBIT H
PAGE 345

## Addendum "G"

### HITRUST CERTIFICATION HIPAA COMPLIANT DATA STORAGE FEE

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to maintain patient records and data associated with patient visits to i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law.  Dentists are also required maintain these records.

An online system for claim submissions and patient record storage for the contract dental program is currently in development.  Upon implementation of this system all patient records will also be stored online on Health Insurance Portability and Accountability Act (HIPAA) compliant servers.  Dentist will have secure access to the system for all Dentist's patients under the contract dental program.

**HITRUST Certification:** In order to safely maintain the integrity of your patient data and meet HIPAA compliance, Premier Health Care Management (PHCM) conducts quarterly audits in order to maintain HITRUST Certification.  A team of third party auditors conduct a three-tiered audit to achieve the highest HIPAA certification available. In addition to the technical audit, Dentist understands that PHCM will request semiannual access to computers running licensed software to ensure physical security standards are being maintained.  PHCM will request access a week in advance unless a specific risk is determined.

Dentist agrees to pay One Hundred and Fifty Dollars ($150.00) per month for costs associated with record storage and HITRUST certification audits of the system.  This monthly fee will only be assessed once the online storage system is implemented.  Dentist will be provided notice of no less than 21 days prior to implementation and commencement of the monthly fee.

Nothing in this Addendum "G" relieves Dentist of its obligation to maintain patient records under the contract.  All other terms and conditions remain the same.


**SIGNATURES:**

| | |
|---|---|
| _M_ | _A.Mehdizadeh_ |
| Bruce Hebets, CEO | A.Mehdizadeh (Sep 29, 2016) |
| Borrego Community Health Foundation | Dentist |
| | ALBORZ MEHDIZADEH, INC. |
| _10/7/2016_ | _09/28/2016_ |
| Date | Date |

EXHIBIT H
PAGE 346

# EXHIBIT I

EXHIBIT I
PAGE 347

## AGREEMENT BETWEEN
## Long Beach Care Dental Inc.
## AND
## BORREGO COMMUNITY HEALTH FOUNDATION
## FOR
## DENTAL SERVICES

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of December 11, 2018 between Borrego Community Health Foundation ("BCHF") and Long Beach Care Dental Inc. ("Dentist"), collectively the "Parties".

### RECITALS

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC). BCHF operates clinics throughout San Diego, San Bernardino, and Riverside Counties. The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS"). The approved scope includes performance of primary dental services; and

**WHEREAS, "**BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement. The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS**, "Dentist" operates and administers a private practice in Long Beach, California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

### AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I. **DEFINITIONS**

A. **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

B. **SCOPE OF SERVICES.** Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

EXHIBIT I
PAGE 348

II.   **ACKNOWLEDGEMENT**
The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

III.  **INDEPENDENT RELATIONSHIP**
None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

IV.   **PROFESSIONAL SERVICES**

   A.   **COVERED SERVICES.**  Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

   B.   **SERVICE AVAILABILITY.**   "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well-being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

   C.   **DOCUMENTATION AND DESCRIPTION OF SERVICES.**   "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

   D.   **PRIOR AUTHORIZATION.**   For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third-party payors, an additional list of

2

EXHIBIT I
PAGE 349

services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

**E.   AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

**F.   SLIDING FEE**.   Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

**G.   NON-DISCRIMINATION.  "**Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

**V.    QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

**A.   QUALITY OF CARE**.  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services.   The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations.   "BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

**B.   POLICIES AND PROCEDURES.** The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this

3

EXHIBIT I
PAGE 350

agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC).  "BCHF" will provide "Dentist with such requirements, policies, procedures and standards.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

C.   **PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

D.   **AUTHORITY.**  "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular, "BCHF" shall retain ultimate authority over the following:

   1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

   2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

   3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

   4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

E.   **NOTIFICATION.  "**Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

## VI.   NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS

A.   It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

B.   "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two

4

EXHIBIT I
PAGE 351

(2) years following termination, however such termination is affected.

**C.**   "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.   COMPENSATION

**A.**   **FEE SCHEDULE.  "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

**B.**   **ENCOUNTER SUBMISSION.**  Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C.**   **TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed within 35 days of receipt of a superbill and adequate supporting documentation for each visit.  Payment will be made on a weekly basis to the "Dentist" with a detailed explanation of reimbursement.  Both Dentist and BCHF will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

**A.**   **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.  "**Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.   "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need.  The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF".   "Dentist" will provide occasional after hour sessions to provide expanded availability.  These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary.

5

EXHIBIT I
PAGE 352

**B.  VERIFICATION OF PATIENT STATUS.**   "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist.    "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist".  If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment.  If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

**C.  REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES**. The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such.   The information will be made available in a timely manner according to established policies and procedures.  "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

**D.  REFUSAL TO PROVIDE SERVICES.**   The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients.  "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

**E.  REFERRAL FOR SPECIALTY SERVICES.**   "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training.  "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care.  "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

**X.    LEGAL**

**A.  LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**   Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement.  "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement.  The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other

EXHIBIT I
PAGE 353

support staff who have not provided proper licensing and certification.  Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

**B. COMPLIANCE WITH THE LAW.  "**Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

**C. MISREPRESENTATION**.  "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency and will be cause for immediate termination under XIV of this Agreement.

**D.  COMPLIANCE WITH OTHER LAWS**.  In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

## XI.    RECORD KEEPING AND REPORTING

**A. PROGRAMMATIC RECORDS**.    "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested.  In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its

EXHIBIT I
PAGE 354

Section 330 grant.

**B. FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated.  If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription, and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained. This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

**C.  PARTICIPATING PATIENT RECORDS**.  "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist" and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

**D. RETENTION OF PATIENT RECORDS**.  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law.  In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".  Record retention obligations survive the termination of this Agreement.

**E. OWNERSHIP OF PATIENT RECORDS**.  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent  with  applicable  Federal and State laws and regulations  and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

EXHIBIT I
PAGE 355

**XII.    INSURANCE**

**A.  PROOF OF COVERAGE.**  The **"**Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

**B.**  "Dentist" will provide "BCHF" with sufficient evidence of professional liability coverage in the amount of at least:

1.  General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2.  Workers' Compensation, as required under California State law.

3.  Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

**C.**  It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

**D.**  Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

**E.  INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such

9

EXHIBIT I
PAGE 356

liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.    CONFIDENTIALITY

**A.**    Except as is necessary in the performance of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors)  also agree not to disclose, except to each other, any proprietary information, professional secrets or other information  obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

**B.**    The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.    TERM AND TERMINATION

**A.**    **TERM.**  This Agreement begins on December 11, 2018 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other  sixty (60) days in advance of termination.  Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

**B.**    **TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

**C.**    **TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

**D.**    **TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any

EXHIBIT I
PAGE 357

term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

**E.   IMMEDIATE TERMINATION.**   In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

**F.   SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement.   "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

**A.   AMENDMENT/MODIFICATION.**   This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.   Amendments will take effect upon the date of execution of both parties.

**B.   ASSIGNMENT.**   This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

**C.   EFFECT OF WAIVER.**   A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

**D.   EFFECT OF INVALIDITY.**   The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

**E.   NOTICE.**   Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

**F.   DISPUTE RESOLUTION.**   Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has

EXHIBIT I
PAGE 358

**B. ASSIGNMENT.** This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

**C. EFFECT OF WAIVER.** A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

**D. EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

**E. NOTICE.** Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

**F. DISPUTE RESOLUTION.** Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

**G. CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

**H. ENTIRE AGREEMENT.** This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Mikia Wallis, CEO
Borrego Community Health Foundation

x _____

Date: 12/19/2018

PO Box 2369
Borrego Springs, CA 92004

Long Beach Care Dental Inc.

_____

Date: 12-18-18

Address: 2800 Pacific Ave. Suite B
Long Beach, CA 90806

12

EXHIBIT I
PAGE 359

Phone: (619) 444-5704

Phone:   562-989-3030

Contact: Dr. Mehdizadeh

E-mail: almediza@gmail.com

13

EXHIBIT I
PAGE 360

**Addendum "A"**
**Scope of Services**

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

EXHIBIT I
PAGE 361

**Addendum "B"**
**Compensation of Dental Services**
**Pediatric Medi-Cal**

Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | CDT Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and  D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $140 per |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $150 per |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride application | D1120 in combo with D1206, D1208 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Per quadrant | $120 per visit |

14

EXHIBIT I
PAGE 362

| | | | | |
|---|---|---|---|---|
| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $150 per visit |
| Prefabricated Crowns (Stainless Steel / Resin) | D2930, D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $175 global $280 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpotomy / Pulpal Debridement | D3220, D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $305 global |
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration. Open & Med and | $365 global |

15

EXHIBIT I
PAGE 363

| | | | Finished RCT included in global fee. | |
|---|---|---|---|---|
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | None | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Incision and Drainage of Abcess | D7510, D7520 | 1 | None | $115 |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |
| Inhalation of Nitrous Oxide | D9230 | 1 | Additional payment in combo with other procedures | $35 |

EXHIBIT I
PAGE 364

## Addendum "C"

### Location of Service

All dental services under this agreement will be rendered at:

Long Beach Care Dental Inc.

Address

2800 Pacific Ave, Suite B, Long Beach, CA 90806

_____

Phone:  562-989-3030

During the hours of:

Monday, Tuesday, Wednesday, Thursday, Friday, Saturday
Closed    10-6       Closed       10-6    10-6:30    9-3
10 - 6

_____


_____


NPI Number - Organization 1265981369

NPI Number- Individual 1184058984 - Mehdizadeh

Copies attached

19

EXHIBIT I
PAGE 365

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the 11th day of December, 2018 by and between Borrego Health, hereinafter referred to as "Covered Entity", and Long Beach Care Dental Inc. hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated December 11, 2018 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.      DEFINITIONS

A.   Catch-all definition:
The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident,

EXHIBIT I
PAGE 366

Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B.  <u>Specific definitions</u>:

    1.  <u>Business Associate</u>.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Long Beach Care Dental Inc..

    2.  <u>Covered Entity</u>.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

    3.  <u>HIPAA Rules</u>.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

    4.  <u>Protected Health Information</u>. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

    5.  <u>Electronic Protected Health Information</u>. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.  <u>CONFIDENTIALITY AND SECURITY REQUIREMENTS</u>

A.  Business Associate agrees:

    1.  Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

    2.  To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

    3.  To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including

EXHIBIT I
PAGE 367

breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures.

EXHIBIT I
PAGE 368

4. Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5. Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6. Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7. Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8. Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C. Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement.  Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D. The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E. Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware.  Business Associate shall report to Covered Entity any Security Incident of which it becomes aware.  Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.  In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

21

EXHIBIT I
PAGE 369

III.   AVAILABILITY OF PHI

A.   Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   TERM/TERMINATION

A.   Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B.   Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

C.   Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

D.   Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.   MISCELLANEOUS

A.   Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement

EXHIBIT I
PAGE 370

V.    MISCELLANEOUS

   A.  Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

   B.  Amendment; Independent Parties. This Agreement may be amended or modified only in a writing signed by the Parties.  No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship.  This Agreement will be governed by the laws of the State of California.  No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

   C.  Minimum Requirements. The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control.  The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

   D.  Severability. In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect.  In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing.  For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

   IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

COVERED ENTITY:                              BUSINESS ASSOCIATE:

x _____                     _____

Mikia Wallis, CEO                            Long Beach Care Dental Inc.

25

EXHIBIT I
PAGE 371

Borrego Community Health Foundation

12/19/2018
Date

12-18-18
Date

26

EXHIBIT I
PAGE 372

## Addendum "D"
## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

x _____

Mikia Wallis, CEO
Borrego Community Health Foundation

_____
Long Beach Care Dental Inc.

12/19/2018
_____
Date
27

_____
12-18-18
Date

EXHIBIT I
PAGE 373

**Addendum "E"**
**COMPENSATION OF DENTAL SERVICES**
**ADULT MEDI-CAL**

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns and root canals are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per visit |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per visit |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and  D1110 | 1 | Refer to Denti-Cal manual. | $140 per visit |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1110 | 1 | Refer to Denti-Cal manual. | $150 per visit |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride application | D1110 in combo with D1206, D1208 | 1 | Must be in combination. | $110 per visit |
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Treatment to be completed per quadrant, unless documented | $120 per visit |

25

EXHIBIT I
PAGE 374

| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Treatment to be completed per quadrant, unless documented | $150 per visit |
|---|---|---|---|---|
| Prefabricated Crowns (Stainless Steel / Resin) | D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Extractions - simple | D7111, D7140 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpal Debridement | D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $305 global |
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
|  |  |  |  |  |

EXHIBIT I
PAGE 375

| | | | | |
|---|---|---|---|---|
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $365 global |
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | All treatments must be after 12 months of initial visit | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Gingivectomy or Gingivoplasty | D4211 | 1 | 1 to 3 teeth, per quadrant | $110 |
| Incision and Drainage of Abscess | D7510, D7520 | 1 | None | $115 |

EXHIBIT I
PAGE 376

| Dentures (Includes first 2 adjustments) | D5110, D5120 | 6 or more | Maxillary and Mandibular | $635 each denture – global |
| Removable Partial – Cast Metal (Includes first 2 adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $660 each partial – global |
| Removable Partial – Resin Based | D5211, D5212 | 3 or more | Maxillary and Mandibular | $360 each partial - global |
| Repairs | D5510, D5520 D5610, D5640 D5650, D5660 | 1 or more | Maxillary and Mandibular | $110 each visit |
| Repair Cast Framework | D5620 | 1 | None | $325 per visit |
| Repair/Replace Broke Clasp | D5630 | 1 | None | $140 per visit |
| Adjustments only (not following delivery) | D5410, D5411 D5421, D5422 | 1 | Maxillary and Mandibular | $70 per visit |
| Reline (in office) | D5730, D5731 D5740, D5741 | 1 | Maxillary and Mandibular | $120 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $225 - global |
| Tissue Conditioning | D5850, D5851 | 1 | Maxillary and Mandibular | $120 per visit |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |

28

EXHIBIT I
PAGE 377

**Addendum "F"**
**DENTAL SLIDING FEE SCALE**
**SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these programs if deemed eligible.

EXHIBIT I
PAGE 378

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
  - Oral Surgery
  - Endodontist
  - Periodontist
  - Orthodontist
  - Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

### Dental Sliding Fee Discount

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| | | | | | | |
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

x _____

Mikia Wallis, CEO
Borrego Community Health Foundation

12/19/2018
Date

_____
Long Beach Care Dental Inc.

12-18-18
Date

33

EXHIBIT I
PAGE 379

# EXHIBIT J

**AGREEMENT BETWEEN**
**MAGALY M. VELASQUEZ DDS,**
**PROFESSIONAL DENTAL CORP.**
**AND**
**BORREGO COMMUNITY HEALTH FOUNDATION**
**FOR**
**DENTAL SERVICES**

    **THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of November 5, 2014  between Borrego Community Health Foundation ("BCHF") and Magaly M. Velasquez DDS, Professional Dental Corp   ("Dentist"), collectively the "Parties"

## RECITALS

    **WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC)   BCHF operates clinics throughout Riverside and San Diego Counties including Centro Medico Cathedral City located at  69175 Ramon Rd  Cathedral City CA 92234 The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS")   The approved scope includes performance of primary dental services; and

    **WHEREAS, "BCHF"** desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC

    **WHEREAS,** "Dentist"  is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement   The "Dentist" provides the desired scope of services that meet the FQHC criteria, and

    **WHEREAS,** "Dentist" operates and administers a private practice in the Rancho Cucamonga City area of California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients  (Refer to Addendum "C" for dental office address and contact information )

## AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows
    I.   **DEFINITIONS**

        A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

        B.   <u>SCOPE</u> **OF SERVICES.**  Those services approved by the Health Resource and

Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

II.   **ACKNOWLEDGEMENT**
The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

III.   **INDEPENDENT RELATIONSHIP**
None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

IV.   **PROFESSIONAL SERVICES**

A.   **COVERED SERVICES.**  Dentist agrees to provide primary care dental services described in Addendum "A" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services

B.   **SERVICE AVAILABILITY.**  "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

C.   **DOCUMENTATION AND DESCRIPTION OF SERVICES.**  "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

D.   **PRIOR AUTHORIZATION.**  For dental services needing individual consideration

EXHIBIT J
PAGE 382

or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service. In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF". As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E.   **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt

F.   **SLIDING FEE.** Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C F R §51c 303(f).  "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G.   **NON-DISCRIMINATION.** "Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

V.   **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A.   **QUALITY OF CARE.** "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.  Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.  Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations.

EXHIBIT J
PAGE 383

"BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

**B.    POLICIES AND PROCEDURES.**  The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

**C.    PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

**D.    AUTHORITY.**  "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular,  "BCHF" shall retain ultimate authority over the following.

  1.  Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

  2.  Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

  3.  Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

  4.  The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

**E.    NOTIFICATION.**  "Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

**VI.    NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

**A.    It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either**

party by the other party.

**B.** "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected.

**C.** "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement. For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.   COMPENSATION

**A.   FEE SCHEDULE. "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

**B.   ENCOUNTER SUBMISSION.** Dentist will complete a superbill every visit. The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation. Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C.   TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors   The payment will be processed and made three weeks from the date of receipt by BCHF the "Dentist" with a detailed explanation of reimbursement Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

**A.   AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES. "**Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours. "Dentist" will communicate with BCHF management as to appointment

availability so that adjustments can be made to accommodate the identified need. The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF". "Dentist" will provide occasional after hour sessions to provide expanded availability. These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary. As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

**B.  VERIFICATION OF PATIENT STATUS.** "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist. "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist". If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment. If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

**C.  REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES.** The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such. The information will be made available in a timely manner according to established policies and procedures. "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

**D.  REFUSAL TO PROVIDE SERVICES.** The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients. "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient

**E.  REFERRAL FOR SPECIALTY SERVICES.** "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care. "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

## X.  LEGAL

**A.  LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.** Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any

other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement. The same requirements apply to "Dentist" employees and staff. No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification. Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

**B. COMPLIANCE WITH THE LAW.** "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

**C. MISREPRESENTATION.** "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

**D. COMPLIANCE WITH OTHER LAWS.** In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U S. Department of Labor regulations at 41 C.F. R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

## XI.   RECORD KEEPING AND REPORTING

A. **PROGRAMMATIC RECORDS**. "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested. In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

B. **FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated. If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is later. "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription, and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained. This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

C. **PARTICIPATING PATIENT RECORDS**. "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF". "Dentist" and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

D. **RETENTION OF PATIENT RECORDS**. Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law. In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF". Record retention obligations survive the termination of this Agreement.

E. **OWNERSHIP OF PATIENT RECORDS**. "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed. "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent with applicable Federal and State

laws and regulations  and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

## XII.   INSURANCE

A.   **PROOF OF COVERAGE.**  The **"Dentist"** , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

B.   "Dentist" will provide "BCHF" with sufficient  evidence of professional liability coverage in the amount of at least:

1.   General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate, and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate

2.   Workers' Compensation, as required under California State law

3.   Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement

C.   It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

D.   Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however,

shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees  Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements  Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages

E. **INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students

## XIII. CONFIDENDIALITY

A. Except as is necessary in the performance  of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer  diskettes)  as a result of performing obligations under this Agreement, or of which it is otherwise aware  The parties (and their directors, officers, employees, agents, and contractors)  also agree not to disclose, except to each other, any proprietary information, professional secrets or other information  obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law

B. The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV. TERM AND TERMINATION

A. **TERM.**  This Agreement begins on November 5, 2014 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other

sixty (60) days in advance of termination.  Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

**B.  TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

**C.  TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

**D.  TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

**E.  IMMEDIATE TERMINATION.**  In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

**F.  SURVIVAL.**  Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement   "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

**A.  AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.  Amendments will take effect upon the date of execution of both parties.

**B.  ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

**C.  EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

**D.  EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this

EXHIBIT J
PAGE 391

Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed

E.   **NOTICE.**  Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F.   **DISPUTE RESOLUTION.**  Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G.   **CHOICE OF LAW.**  This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H.   **ENTIRE AGREEMENT.**  This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

Date._____ 11-14-14

Address: 4343 Yaqui Pass Road

Borrego Springs, CA 92004

Phone: 760-767-5051

Contact. Cynthia Preciado

E-mail cpreciado@borregomedical.org

Magaly Velasquez, DDS

Date·_____ 11 - 5 - 14

Address:  9130 Foothill Blvd.

Rancho Cucamonga, CA 91730

Phone 909-466-4999

Contact: Martha_____

E-mail:_____

EXHIBIT J
PAGE 392

Addendum "A"

## Scope of Services

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of  commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

Addendum "B"
Compensation of Dental Services
Medi-Cal

"Dentist" will be reimbursed according to patient's insurance type.  Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |

| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $165 |
|---|---|---|---|---|
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee. | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

EXHIBIT J

PAGE 395

Addendum C

Location of Service

All dental services under this agreement will be rendered at:

9130 Foothill Blvd

Rancho Cucamonga, CA 91730

Phone.  909-466-4999

During the hours of:

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This HIPAA Business Associate Addendum ("Addendum") supplements and is made a part of the agreement ("Agreement") be and between Borrego Community Health Foun dation, ("BCHF") and Magaly M Velasquez, DDS,Professional Dental Corp (" Dentist" and Business Associate") and is effective as of the date of the original agreement (the "Addendum Effective Date")

RECITALS

WHEREAS, "BCHF", pursuant to the terms of the Agreement, wishes to disclose to Business Associate certain information, some of which may constitute Protected Health Information ("PHI") for the purpose of providing Dental Services to Participating Patients, and

WHEREAS, PHI means any information, whether oral or recorded in any form or medium (i) that relates to the past, present, or future physical or mental condition of an individual, the provision of health care to an individual, or the past, present or future payment for the provision of health care to an individual, and (ii) that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual, and shall have the meaning given to such term under Health Insurance Portability and Accountability Act of 1996, ("HIPAA") and the regulations promulgated there under by the U S Department of Health and Human Services ("HIPAA Regulations"), including, but not limited to 45 CFR Parts 160 and 164, and

WHEREAS, Business Associate is an individual or entity which provides services, arranges, performs or assists in the performance or activities of "BCHF" and who uses or discloses PHI, pursuant to the HIPAA Regulations, 45 CFR Section 160 103, and

WHEREAS, BCHF and Business Associate desire to protect the privacy and provide for the security of PHI disclosed to Business Associate in compliance with HIPAA and the HIPAA Regulations and other applicable laws and regulations, and

WHEREAS, the purpose of this Addendum is to satisfy certain standards and requirements of HIPAA and the HIPAA Regulations, including, but not limited to, Title 45 CFR Section 164 504(e), as the same may be amended from time to time

NOW, THEREFORE, in consideration of the mutual promises made below and the exchange of information pursuant to the Agreement, this Addendum (herein collectively the "Agreement"), the Parties agree as follows

1.  Responsibilities of Business Associate

    a_ Permitted Uses and Disclosures Business Associate may use and/or disclose PHI received by Business Associate pursuant to the Agreement and this Addendum solely for the purpose of performing its obligations under the Agreement and this Addendum

**EXHIBIT J
PAGE 397**

b.  <u>Restrictions of PHI.</u> Business Associate shall notify "BCHF" in writing within twenty-four (24) hours of receipt of any request by residents, Students or their representatives to restrict the use and disclosure of the PHI Business Associate maintains for or on behalf of "BCHF" Upon written notice from "BCHF", Business Associate agrees to comply with any instructions to modify, delete or otherwise restrict the use and disclosure of PHI it maintains for or on behalf of "BCHF".

c.  <u>Use and Disclosure of PHI.</u> Business Associate may, if necessary, use and disclose PHI (i) for the proper management and administration of Business Associate's business or (ii) to carry out Business Associate's legal responsibilities.

d.  <u>Nondisclosure.</u> Business Associate is not authorized and shall not use or further disclose "BCHF's" PHI other than as permitted under the Agreement or this Addendum, or as required by law or regulation

e   <u>Data Aggregation.</u> Except as otherwise limited by this Addendum and upon "BCHF's" request, Business Associate may use PHI to provide data aggregation services relating to BCHF's healthcare operations as permitted by 45 CFR Section 164.504.

f.  <u>Safeguards.</u> Business Associate shall use appropriate administrative, technical and physical safeguards to prevent any use or disclosure of "BCHF's" PHI other than as provided for by the Agreement and this Addendum.

g.  <u>Notification of Breach.</u> Business Associate shall notify "BCHF" in writing within one (1) working day of any suspected or actual breach of security, intrusion, or unauthorized use or disclosure of PHI and/or any actual or suspected use or disclosure Of PHI in violation of the Agreement, this Addendum, HIPAA, the HIPAA regulations, or any applicable federal and state laws and regulations. Business Associate shall take (i) prompt corrective action to cure any such deficiencies and (ii) any other action pertaining to such unauthorized disclosure as may be required by all applicable federal and state laws and regulations.

h.  <u>Compliance with Law.</u> Business Associate shall comply with all applicable federal and state laws and regulations, including, if applicable under the terms and requirements of the Agreement, the HIPAA Standards for Electronic Transactions, 45 CFR Parts 160 and 162

i.  <u>Business Associate's Agents.</u> Business Associate shall ensure that its employees, agents, and subcontractors who receive "BCHF's" PHI from Business Associate will agree to the same restrictions and conditions that apply to Business Associate with respect to such PHI. Additionally, all employees, agents, and subcontractors shall promptly notify Business Associate of any instances of which it is aware in which the confidentiality of the PHI has been breached.

j.  <u>Inspection of Information.</u> Business Associate shall, within twenty-four (24) hours, excluding weekends and holidays, of receipt of a written or oral request

EXHIBIT J

PAGE 398

allow "BCHF" and, if authorized in writing by "BCHF", allow the subject of the PHI to inspect records as may be required to fulfill "BCHF's" obligations to provide access to "BCHF's" PHI pursuant to HIPAA, the HIPAA Regulations, including, but not limited to 45 CFR Section 164.524, and other applicable federal and state laws and regulations.

k.  Copies of Information. Business Associate shall, within two (2) calendar days of receipt of a written or oral request, make available to "BCHF", and if authorized in writing by BCHF, to the subject of the PHI, such information as may be required to fulfill "BCHF's" obligations to provide a copy of "BCHF's" PHI pursuant to HIPAA, the HIPAA Regulations, including, but not limited to, 45 CFR Section 164.524, and other applicable federal and state laws and regulations.

l.  Accounting of Information. Business Associate shall, within twenty (20) calendar days of receipt of a written request, make available to "BCHF" and, if authorized in writing by "BCHF", to the subject of the PHI, such information as may be required to fulfill "BCHF's" obligations to provide an accounting of disclosures of "BCHF's" PHI pursuant to HIPAA, the HIPAA Regulations, including, but not limited to, 45 CFR Section 164.524. The accounting shall include a listing of PHI disclosures that occurred during the past six (6) years, commencing April 14, 2003. Each accounting entry shall include. (1) the date of the disclosure; (ii) the name and address of the entity or person who received the PHI; (iii) a brief description of the PHI disclosed; and (iv) a brief statement of the purpose and basis for the disclosure, a copy of a written authorization for the disclosure pursuant to 45 CFR Section 164.508, or a copy of a written request for the disclosure pursuant to 45 CFR Sections 164.502 and/or 164 512.

m   Business Associate shall inform "BCHF" within five (5) working days of receipt of any request by or on behalf of the subject of the PHI to amend the PHI Business Associate maintains for or on behalf of "BCHF". Business Associate shall, within twenty (20) calendar days of receipt of a written request, make the subject's PHI available to "BCHF" as may be required to fulfill "BCHF's" obligations to amend PHI pursuant to HIPAA, the HIPAA Regulations, including, but not limited to, 45 CFR Section 164.526, and other applicable federal and state laws and regulations Business Associate shall, as directed by "BCHF", incorporate any Addendums to "BCHF's" PHI into copies of such PHI maintained and disclosed by Business Associate.

n.  Chain of Trust. If applicable, Business Associate shall protect the integrity and confidentiality of any "BCHF" PHI electronically exchanged between Business Associate, "BCHF", and others pursuant to 45 SCR Part 142

o.  Regulatory Compliance  Business Associate shall make its internal practices, books and records relating to the use and disclosure of PHI received from "BCHF" (or
created or received by Business Associate on behalf of "BCHF") available to any state or federal agency, including the U S. Department of Health and Human Services, for purposes of determining "BCHF's" compliance with the HIPAA Regulations

p. <u>Record Retention:</u> Business Associate shall retain all HIPAA-related documentation pertaining to "BCHF's" PHI for a period of six (6) years, as required by HIPAA and the HIPAA regulations.

q. <u>Audits, Inspection, and Enforcement.</u> Upon reasonable notice "BCHF" may inspect the facilities, systems, books, and records of Business Associate to monitor compliance with the Agreement and this Addendum. Business Associate shall promptly remedy any violation of any terms of the Agreement of this Addendum and shall certify such remedy in writing to "BCHF".

2   <u>Termination</u>

a. <u>Material Breach.</u> A breach by Business Associate of any material provision of this Addendum, as determined by "BCHF", shall constitute a material breach of the Agreement, and shall provide grounds for immediate termination of the Agreement by "BCHF".

b. <u>Effect of Termination</u> Upon termination of the Agreement for any reason, Business Associate shall return or, at the option of "BCHF", destroy all PHI received from "BCHF", or created and received by Business Associate on behalf of "BCHF", that Business Associate still maintains in any form, and shall retain no copies of such PHI If return or destruction is not feasible, as determined by "BCHF", Business Associate shall continue to extend indefinitely the protections of this Addendum to such PHI, and immediately terminate any further use or disclosure of such PHI.

3.   <u>Changes to the Addendum</u>

a. <u>Compliance with Law.</u> The "Parties" acknowledge that state and federal laws relating to electronic data security and privacy are rapidly evolving and that changes to this Addendum may be required to ensure compliance with such developments. The "Parties" specifically agree to take such action as may be necessary to implement the standards and requirements of HIPAA, the HIPAA Regulations and other applicable federal and state laws and regulations relating to the security or confidentiality of PHI.

b. <u>Negotiations.</u> In the event that a federal or state law, statue, or regulation materially affects the Agreement or this Addendum, the "Parties" agree to negotiate immediately in good faith any necessary or appropriate revisions to the Agreement or this Addendum. If the "Parties" are unable to reach an agreement concerning such revisions within the earlier of sixty (60) calendar days after the date of notice seeking negotiations or the effective date of a change in law or regulation, or if the change is effective immediately, then "BCHF" may immediately terminate this Agreement upon written notice to Business Associate.

4.   <u>Insurance and Indemnification</u>

a. <u>Insurance.</u> Each Party, at its sole cost and expense, shall insure its activities in connection with this Addendum. Specifically, Business Associate and "BCHF" shall each obtain, keep in force and maintain insurance or equivalent programs of self-insurance with appropriate limits that shall cover losses that may arise

from breach of this Addendum, breach of security, or any unauthorized use of disclosure of PHI. It should be expressly understood, however, that the insurance required herein shall in no way limit the liability of Business Associate or "BCHF" with respect to its activities in connection with this Addendum

b.  <u>Indemnification by Business Associate</u>  Business Associate agrees to defend at BCHF's election, indemnify, and hold harmless "BCHF", its officers, agents and employees from and against any and all claims, liabilities, demands, damages, losses, costs and expenses, (including costs and reasonable attorneys' fees) or claims for injury or damages that are caused by or result from the acts or omissions of Business Associate, its officers, agents or employees with respect to the use and disclosure of "BCHF's" PHI.

c.  <u>Indemnification by "BCHF".</u>  "BCHF" agrees to defend at Business Associate's election, indemnify, and hold harmless Business Associate, its officers, agents and employees from and against any and all claims, liabilities, demands, damages, losses, costs and expenses, (including costs and reasonable attorneys' fees) or claims for injury or damages that are caused by or result from the acts or omissions of "BCHF", its officers, agents or employees with respect to the use and disclosure of "BCHF's" PHI.

5.  <u>Miscellaneous Provisions</u>

a.  <u>Assistance in Litigation or Administrative Proceedings.</u> Business Associate shall make itself, and any subcontractors, employees or agents assisting Business Associate in the performance of its obligations under the Agreement and this Addendum, available to "BCHF" at no cost to "BCHF" to testify as witnesses, or otherwise, in the event of litigation or administrative proceedings against "BCHF", its directors, officers, agents or employees based upon claimed violation of HIPAA, the HIPAA Regulations or other federal and state laws and regulations relating to security and privacy and arising out of the Agreement or this Addendum.

b.  <u>No Third Party Beneficiaries.</u> Nothing express or implied in this Addendum is intended to confer, nor shall anything herein confer upon any person other than "BCHF", Business Associate and their respective successors or assignees, any rights, remedies, obligations or liabilities whatsoever.

c.  <u>Notice to Secretary.</u> If "BCHF" knows of a pattern of activity or practice of Business Associate that constitutes a material breach or violation of Business Associate's obligation under this Addendum, if the breach or violation continues, and if termination of this Addendum is not feasible, "BCHF" is required by HIPAA and the HIPAA Regulations to report the problem to the Secretary of Health and Human Services

d.  <u>Survival.</u> The obligations of Business Associate under Sections 1(j), 1(k), 1(1), 1(m), 1(p), 2(b), 4(b), 4(c) and 5(a) of this Addendum shall survive the termination of this Agreement.

e.  <u>Notices.</u> Any notices to be given to either party shall be made via U.S. Mail or express courier to the addresses given below:

BCHF:    Borrego Community Health Foundation

Attn. Bruce Hebets, Chief Executive Officer

Corporate Office

4343 Yaqui Pass Road

P.O. Box 2369

Borrego Springs, CA 92004-2369

Phone. (760) 767-6433


Dentist.    Magaly Velasquez, DDS

9130 Foothill Blvd

Rancho Cucamonga, CA 91730

Phone· 909-466-4999


f. <u>Interpretation.</u> Any Each Party may change its address and that of its representative for notice by giving notice in the manner provided above.

g. Interpretation. Any ambiguity in this Addendum shall be resolved in favor of a meaning that permits "BCHF" to comply with HIPAA, the HIPAA Regulations, and other applicable federal and state laws and regulations.

**SIGNATURES:**

Bruce Hebets, CEO

Borrego Community Health Foundation

Date:_____ 11.14-14

Magaly Velasquez, DDS

Dentist _____

Date:_____ 11- 5 - 14.

EXHIBIT J

PAGE 402

Addendum "D"

## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in *California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013))* allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

Bruce Hebets CEO        Dentist: *Magaly Velasquez. DDS*

Date: _____11-14-14_____      Date: _____11-5-14_____

Addendum "E"

## COMPENSATION OF DENTAL SERVICES
## ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below.  Crowns, root canals and bridges are subject to prior review and approval by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit  for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

EXHIBIT J
PAGE 404

| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
|---|---|---|---|---|
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 ~tn plate~ | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Bridge (3 Unit) | D6211, D6241, D6245, D6740 D6751 | 3 or more | | $500 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |

Addendum "F"
### DENTAL SLIDING FEE SCALE
### SUMMARY OF BENEFITS

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**
The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook -- Manual of Criteria (Section 5).

The program includes:
- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**
The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

**Program Exclusions:**

- Referrals to all specialists including but not limited to:
  - Oral Surgery
  - Endodontist
  - Periodontist
  - Orthodontist
  - Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

Bruce Hebets CEO

Date: _____ 11 7 14

Dentist: Magaly Velasquez, DDS

Date: _____ 11-5-14.

## Dental Sliding Fee Discount

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176 -200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

Revised 10/16/2012

EXHIBIT J
PAGE 408

# EXHIBIT K

## AGREEMENT BETWEEN
## NEW MILLENNIUM DENTAL GROUP OF ARAM ARAKELYAN, INC
## AND
## BORREGO COMMUNITY HEALTH FOUNDATION FOR
## DENTAL SERVICES

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of November 17th, 2016 between Borrego Community Health Foundation ("BCHF") and New Millennium Dental Group of Aram Arakelyan, Inc. ("Dentist"), collectively the "Parties".

## RECITALS

**WHEREAS,** BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC). BCHF operates clinics throughout Riverside, San Bernardino, and San Diego Counties. The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS"). The approved scope includes performance of primary dental services; and

**WHEREAS,** "BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement. The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS,** "Dentist" operates and administers a private practice in the San Bernardino area of California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

## AGREEMENT

**NOW, THEREFORE,** in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.  **DEFINITIONS**

   A.  **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

   B.  **SCOPE OF SERVICES.** Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

II. **ACKNOWLEDGEMENT**
The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

III. **INDEPENDENT RELATIONSHIP**
None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement. Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other. This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

IV. **PROFESSIONAL SERVICES**

A. **COVERED SERVICES.** Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

B. **SERVICE AVAILABILITY.** "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director. "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement. Such facilities must meet standards of practice expected of a licensed facility. Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

C. **DOCUMENTATION AND DESCRIPTION OF SERVICES.** "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes. In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records. "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

D. **PRIOR AUTHORIZATION.** For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service. In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF". As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the

dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E. **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement. If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

F. **SLIDING FEE.** Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f). "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G. **NON-DISCRIMINATION.** "Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

V. **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A. **QUALITY OF CARE.** "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements. Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization. Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations. "BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

B. **POLICIES AND PROCEDURES.** The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and

procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

C.   **PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

D.   **AUTHORITY.** "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above. In particular, "BCHF" shall retain ultimate authority over the following:

1.   Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2.   Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3.   Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4.   The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

E.   **NOTIFICATION.** "Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services. "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

VI.   **NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

A.   It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

B.   "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected.

C.   "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or

attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement. For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.   COMPENSATION

A.   **FEE SCHEDULE.** "Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

B.   **ENCOUNTER SUBMISSION.** Dentist will complete a superbill for every visit. The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation. Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

C. **TIMING OF PAYMENT.** Payment will be made on claims that are paid to "BCHF" by third party payors. The payment will be processed and made on the $15_{th}$ day of each month to the "Dentist" with a detailed explanation of reimbursement. Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

A.   **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.** "Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours. "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need. The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF". "Dentist" will provide occasional after hour sessions to provide expanded availability. These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary. As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

B. **VERIFICATION OF PATIENT STATUS.** "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist.  "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist".  If it is determined that the Participating

Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment. If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

C. **REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES.** The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such. The information will be made available in a timely manner according to established policies and procedures. "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

D. **REFUSAL TO PROVIDE SERVICES.** The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients. "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

E. **REFERRAL FOR SPECIALTY SERVICES.** "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care. "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

X. **LEGAL**

A. **LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.** Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement. "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement. The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification. Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

B. **COMPLIANCE WITH THE LAW.** "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is

grounds for immediate termination under Section XIV of this Agreement.

C. **MISREPRESENTATION.** "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

D. **COMPLIANCE WITH OTHER LAWS.** In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

   1. To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F.R. Part 60;

   2. To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

   3. To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

   4. To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

   5. To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

XI.   **RECORD KEEPING AND REPORTING**

A. **PROGRAMMATIC RECORDS.** "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested. In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

B. **FINANCIAL RECORDS.** "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated. If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is

later. "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription, and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained. This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

C. **PARTICIPATING PATIENT RECORDS.** "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement. All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF". "Dentist" and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

D. **RETENTION OF PATIENT RECORDS.** Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law. In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF". Record retention obligations survive the termination of this Agreement.

E. **OWNERSHIP OF PATIENT RECORDS.** "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed. "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent with applicable Federal and State laws and regulations and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

XII. **INSURANCE**

A. **PROOF OF COVERAGE.** The "Dentist", at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

B. "Dentist" will provide "BCHF" with sufficient evidence of professional liability coverage in the amount of at least:

1. General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000)   in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars  ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the  aggregate.

2. Workers' Compensation, as required under California State law.

3. Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

C. It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

D. Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or  omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

E. **INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and  all  liability,  loss, expense (including reasonable attorney's fees) or claims for injury or  damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or  employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees  and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent  such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

XIII.   **CONFIDENTIALITY**

A. Except as is necessary in the performance of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or

its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors) also agree not to disclose, except to each other, any proprietary information, professional secrets or other information obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

B.   The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.   TERM AND TERMINATION

A.   **TERM.**  This Agreement begins on November 17th, 2016 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other sixty (60) days in advance of termination. Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

B.   **TERMINATION WITHOUT CAUSE.** Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

C.   **TERMINATION FOR CONVENIENCE.** This Agreement may be terminated at any time upon the mutual agreement of the parties.

D.   **TERMINATION FOR BREACH.** This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

E.   **IMMEDIATE TERMINATION.** In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

F.   **SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by

"BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement. "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

A.   **AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed. Amendments will take effect upon the date of execution of both parties.

B.   **ASSIGNMENT.** This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

C.   **EFFECT OF WAIVER.** A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

D.   **EFFECT OF INVALIDITY.** The invalidity or un-enforceability of any provision of this Agreement in no way affects the validity or enforceability of any other provision, unless otherwise agreed.

E.   **NOTICE.** Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F.   **DISPUTE RESOLUTION.** Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G.   **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H.   **ENTIRE AGREEMENT.** This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

Date: 11-18-2016

Address: PO Box 2369
Borrego Springs, CA 92004

Phone: (619) 444-5704

Contact: Travis Lyon

E-mail: cdtlyon@borregomedical.org

New Millennium Dental Group of Aram
Arakelyan, Inc

Date: 11/17/2016

Address: 599 Inland Center Drive, #110
San Bernardino, CA 94808

Phone: 909-383-1600

Contact: Hilda

E-mail: aramdds@prodigy.net

EXHIBIT K
PAGE 421

## Addendum "A"

### Scope of Services

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal. These are outlined in Section 5 of the Provider Manual under "Maximum Allowances". Limitations of commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

## Addendum "B"

### Compensation of Dental Services
### Medi-Cal

"Dentist" will be reimbursed according to patient's insurance type. Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below. Crowns and root canals are subject to prior review and authorization by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150,  D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140,  D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160,  D2161 D2330, D2331, D2332,  D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |

| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |
|---|---|---|---|---|
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee. | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

**Addendum "C"**

**Location of Service**

All dental services under this agreement will be rendered at:

New Millennium Dental Group of Aram Arakelyan, Inc.


599 Inland Center Drive, #110
San Bernardino, CA 94808

Phone:       909-383-1600
Cellular:    ███████████

During the hours of:

Monday, Tuesday, Wednesday, Thursday,   Friday
  10-6      10-6      10-6       10-6        10-6


NPI Individual – ___1710036181___

NPI Corporation -- 1528189388

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the November 17, 2016 by and between Borrego Health, hereinafter referred to as "Covered Entity", and New Millennium Dental Group of Aram Arakelyan, Inc. hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated November 17, 2016 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.  **DEFINITIONS**

A.  <u>Catch-all definition</u>:
The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the

HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control. Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule, but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B.   Specific definitions:

1.   Business Associate. "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean New Millennium Dental Group of Aram Arakelyan, Inc.

2.   Covered Entity. "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

3.   HIPAA Rules.   "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

4.   Protected Health Information. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual. "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

5.   Electronic Protected Health Information. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.   CONFIDENTIALITY AND SECURITY REQUIREMENTS

A.   Business Associate agrees:

1.   Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

2.   To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

3.   To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the

time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(II) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures.

4. Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5. Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered

entity.

6. Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7. Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8. Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C. Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement. Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D. The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E. Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware. Business Associate shall report to Covered Entity any Security Incident of which it becomes aware. Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system. In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

III.   AVAILABILITY OF PHI

A. Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available

Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule. If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual. Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act. Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   TERM/TERMINATION

A.  Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B.  Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement. If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

C.  Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form. Business associate shall retain no copies of the protected health information.

D.  Survival. The obligations of business associate under this Section shall survive the termination of this Agreement.

V.   MISCELLANEOUS

A.  Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B.  Amendment; Independent Parties. This Agreement may be amended or modified only in a writing signed by the Parties. No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create

any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship. This Agreement will be governed by the laws of the State of California. No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. <u>Minimum Requirements.</u> The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control. The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. <u>Severability.</u> In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect. In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing. For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**

Bruce Hebets, CEO
Borrego Community Health Foundation

Date **11-18-2016**

**BUSINESS ASSOCIATE:**

New Millennium Dental Group of Aram Arakelyan, Inc.

Date **11/17/2016**

## Addendum "D"
## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

Bruce Hebets, CEO
Borrego Community Health Foundation

New Millennium Dental Group of Aram Arakelyan, Inc.

11 - 18 - 2016
Date

11/17/2016
Date

## Addendum "E"

### COMPENSATION OF DENTAL SERVICES
### ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns, root canals and bridges are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions - simple | D7111, D7140 | 1 | Per visit - multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit - multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

| | | | | |
|---|---|---|---|---|
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |
| | | | | |

**Addendum "F"**

DENTAL SERVICES SLIDING FEE SCALE SUMMARY OF BENEFITS

Eligibility:
The application process and eligibility requirements are the same as for all other services. The levels of poverty are also the same as published by the Federal Government every year and implemented by April 1st. The poverty level is calculated using the established guidelines for family size and income.

All of the requirements of non-discrimination apply to the Dental Services Sliding Fee Scale. Patients with family income at or below 100% of Federal Poverty Level (FPL) pay a nominal fee of $50 per visit. If the family size and income is between 101% and 200%, the charges are based on the percent discount approved for each level of eligibility.

Benefits:
This is a limited benefit program that provides discounted rates for services rendered within Borrego Health Dental Services sites only. It does not extend to services rendered by specialists to whom Borrego Health dentists may need to refer patients for additional care from time to time. The scope of benefits is limited to the scope outlined in Section 5 of the Denti-Cal Handbook.

Adults and children with commercial insurance may apply for the sliding fee to assist with the cost of co-payments and deductibles. The percentage allowed per level of eligibility is deducted from the
balance owed by the patient. For patients with family income at or below 100% and the deductible or the co-payment is less than the nominal fee of $50, the less of the two will be collected.

Adults and children eligible determined eligible for Share of Cost (SOC), they may apply for the sliding fee. The first visit will include treatment planning to determine their eligibility for full scope Medi-Cal. Policies and procedures for managing SOC will be followed prior to initiating treatment.

The program includes:
- Exams and x-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (limited to scope of General Dentistry)
- Root Canals (limited to scope of General Dentistry)
- Crowns (limited to non-precious metal)
- Dentures (Co-payment of $150)
- Bridges (Co-payment of 50% of cost)
- Crowns (noble metals excluded)

Exclusions:
- Referrals to any specialists including but not limited to:
  - Oral surgeons
  - Endodontists
  - Periodontists
  - Orthodontists
  - Pedodontists
- Teeth whitening
- Orthotics not listed above
- Orthodontics
- Nobel metal crowns

- Cosmetic procedures
- Mouth guards

Dental Sliding Fee Discount
2016

| Sliding Fee | A | B | C | D | E |
|---|---|---|---|---|---|
| Level of Poverty | 0-100% | 101-125% | 126-150% | 151-175% | 176 -200% |
| Maximum Discount | $50 | 25% | 20% | 15% | 10% |

Bruce Hebets, CEO
Borrego Community Health Foundation

11-18-2016
Date

New Millennium Dental Group of Aram
Arakelyan, Inc.

11/17/2016
Date

# EXHIBIT L

EXHIBIT L
PAGE 437

**AGREEMENT BETWEEN**
**ARAM ARAKELYAN DDS, INC.**
**AND**
**BORREGO COMMUNITY HEALTH FOUNDATION**
**FOR**
**DENTAL SERVICES**

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of November 29, 2018 between Borrego Community Health Foundation ("BCHF") and Aram Arakelyan DDS, Inc. ("Dentist"), collectively the "Parties".

**RECITALS**

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC).  BCHF operates clinics throughout San Diego, San Bernardino, and Riverside Counties.  The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS").  The approved scope includes performance of primary dental services; and

**WHEREAS, "**BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement.  The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS**, "Dentist" operates and administers a private practice in Los Angeles, California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.  **DEFINITIONS**

A.  **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

B.  **SCOPE OF SERVICES.**  Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

1

EXHIBIT L
PAGE 438

## II.    ACKNOWLEDGEMENT

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

## III.   INDEPENDENT RELATIONSHIP

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

## IV.   PROFESSIONAL SERVICES

**A.   COVERED SERVICES.**   Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

**B.   SERVICE AVAILABILITY.**   "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well-being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

**C.   DOCUMENTATION AND DESCRIPTION OF SERVICES.**   "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

**D.   PRIOR AUTHORIZATION.**   For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third-party payors, an additional list of

2

EXHIBIT L
PAGE 439

services requiring prior approval may be provided by "BCHF". As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

**E.  AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement. If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

**F.  SLIDING FEE.** Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f). "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

**G.  NON-DISCRIMINATION. "**Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

**V.  QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

**A.  QUALITY OF CARE.** "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements. Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization. Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations. "BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

**B.  POLICIES AND PROCEDURES.** The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this

EXHIBIT L
PAGE 440

agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures. Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

C. **PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

D. **AUTHORITY.** "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above. In particular, "BCHF" shall retain ultimate authority over the following:

1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

E. **NOTIFICATION.** "Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services. "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

VI. **NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

A. It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

B. "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two

4

EXHIBIT L
PAGE 441

(2) years following termination, however such termination is affected.

**C.**   "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.   COMPENSATION

**A.**   **FEE SCHEDULE.  "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

**B.**   **ENCOUNTER SUBMISSION.**  Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C.**   **TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed within 35 days of receipt of a superbill and adequate supporting documentation for each visit.  Payment will be made on a weekly basis to the "Dentist" with a detailed explanation of reimbursement.  Both Dentist and BCHF will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

**A.**   **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.  "**Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.   "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need.  The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF".   "Dentist" will provide occasional after hour sessions to provide expanded availability.  These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary.

EXHIBIT L

PAGE 442

B. **VERIFICATION OF PATIENT STATUS.**    "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist.    "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist".  If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment.  If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

C. **REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES**. The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such.   The information will be made available in a timely manner according to established policies and procedures.   "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

D. **REFUSAL TO PROVIDE SERVICES.**  The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients.  "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

E. **REFERRAL FOR SPECIALTY SERVICES.**  "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training.  "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care.   "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

X. **LEGAL**

A. **LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**  Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement.  "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement.  The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other

EXHIBIT L
PAGE 443

support staff who have not provided proper licensing and certification.  Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

**B.  COMPLIANCE WITH THE LAW.  "**Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

**C.  MISREPRESENTATION**.  "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency and will be cause for immediate termination under XIV of this Agreement.

**D.  COMPLIANCE WITH OTHER LAWS**.  In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

**XI.     RECORD KEEPING AND REPORTING**

**A.  PROGRAMMATIC RECORDS**.   "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested.  In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its

EXHIBIT L
PAGE 444

Section 330 grant.

**B. FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated.  If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription, and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained.  This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

**C.  PARTICIPATING PATIENT RECORDS**.  "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist" and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

**D. RETENTION OF PATIENT RECORDS**.  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law.  In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".  Record retention obligations survive the termination of this Agreement.

**E. OWNERSHIP OF PATIENT RECORDS**.  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent  with  applicable  Federal and State laws and regulations  and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

8

EXHIBIT L

PAGE 445

**XII.   INSURANCE**

**A.  PROOF OF COVERAGE.**  The **"**Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

**B.**  "Dentist" will provide "BCHF" with sufficient evidence of professional liability coverage in the amount of at least:

1.  General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2.  Workers' Compensation, as required under California State law.

3.  Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

**C.**  It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

**D.**  Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

**E.  INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such

9

EXHIBIT L
PAGE 446

liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.   CONFIDENTIALITY

**A.**   Except as is necessary in the performance of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors) also agree not to disclose, except to each other, any proprietary information, professional secrets or other information obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

**B.**   The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.   TERM AND TERMINATION

**A.**   **TERM.**  This Agreement begins on November 29, 2018 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other sixty (60) days in advance of termination.  Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

**B.**   **TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

**C.**   **TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

**D.**   **TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any

EXHIBIT L
PAGE 447

term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

**E.   IMMEDIATE TERMINATION.**   In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

**F.   SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement.   "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

**A.   AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.   Amendments will take effect upon the date of execution of both parties.

**B.   ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

**C.   EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

**D.  EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

**E.   NOTICE.**  Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

**F.   DISPUTE RESOLUTION.**  Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has

EXHIBIT L
PAGE 448

failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G.  **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H.  **ENTIRE AGREEMENT.** This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Mikia Wallis, CEO
Borrego Community Health Foundation

x _____

Date:___12/06/2018_____

PO Box 2369
Borrego Springs, CA 92004

Phone: (619) 444-5704

Aram Arakelyan DDS, Inc

_____

Date:____ 12/06/2018_____

Address: 5165 Whittier Blvd.
         Los Angeles, Ca 90022

Phone:   (323) 981-7104

Contact: Dr. Arakelyan

E-mail: aramdds@prodigy.net

12

EXHIBIT L
PAGE 449

**Addendum "A"**
**Scope of Services**

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".   Limitations of commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

EXHIBIT L
PAGE 450

**Addendum "B"**
**Compensation of Dental Services**
**Pediatric Medi-Cal**

Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | CDT Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and  D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $140 per |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $150 per |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride application | D1120 in combo with D1206, D1208 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Per quadrant | $120 per visit |

14

EXHIBIT L

| | | | | |
|---|---|---|---|---|
| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $150 per visit |
| Prefabricated Crowns (Stainless Steel / Resin) | D2930, D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $175 global $280 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpotomy / Pulpal Debridement | D3220, D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $305 global |
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration.  Open & Med and | $365 global |

EXHIBIT L
PAGE 452

| | | | Finished RCT included in global fee. | |
|---|---|---|---|---|
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | None | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Incision and Drainage of Abcess | D7510, D7520 | 1 | None | $115 |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |
| Inhalation of Nitrous Oxide | D9230 | 1 | Additional payment in combo with other procedures | $35 |

EXHIBIT L
PAGE 453

**Addendum "C"**

**Location of Service**

All dental services under this agreement will be rendered at:

Aram Arakelyan DDS, Inc
5165 Whittier Blvd.
Los Angeles, Ca 90022

_____

Phone:  (323) 981-7104

During the hours of:

Monday, Wednesday, Thursday, Saturday: 10:00 am – 7:00 pm

_____

NPI Number - Organization _____

NPI Number- Individual: 1710036181

Copies attached

EXHIBIT L
PAGE 454

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the 29th day of November, 2018 by and between Borrego Health, hereinafter referred to as "Covered Entity", and Aram Arakelyan DDS, Inc hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").
**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated  November 29, 2018 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.     DEFINITIONS

    A.   Catch-all definition:
        The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use. In the event of an

EXHIBIT L
PAGE 455

inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B. <u>Specific definitions</u>:

    1.    <u>Business Associate</u>.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Aram Arakelyan DDS, Inc.

    2.    <u>Covered Entity</u>.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

    3.    <u>HIPAA Rules</u>.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

    4.    <u>Protected Health Information</u>. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

    5.    <u>Electronic Protected Health Information</u>. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.    <u>CONFIDENTIALITY AND SECURITY REQUIREMENTS</u>

A. Business Associate agrees:

    1.    Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

    2.    To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

    3.    To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR

EXHIBIT L
PAGE 456

164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures.

EXHIBIT L
PAGE 457

4.  Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5.  Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6.  Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7.  Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8.  Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C.  Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement.  Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D.  The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E.  Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware.  Business Associate shall report to Covered Entity any Security Incident of which it becomes aware.  Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.  In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

EXHIBIT L
PAGE 458

III.  AVAILABILITY OF PHI

A.  Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.  TERM/TERMINATION

A.  Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B.  Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

C.  Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

D.  Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.  MISCELLANEOUS

A.  Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement

EXHIBIT L
PAGE 459

and/or the business relationship of the Parties. and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B. <u>Amendment; Independent Parties.</u> This Agreement may be amended or modified only in a writing signed by the Parties. No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship. This Agreement will be governed by the laws of the State of California. No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. <u>Minimum Requirements.</u> The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control. The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. <u>Severability.</u> In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect. In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing. For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**                          **BUSINESS ASSOCIATE:**

x _____               _____

**Mikia Wallis, CEO**                        Aram Arakelyan DDS, Inc
**Borrego Community Health Foundation**

12/06/2018                                   12/07/2018
_____               _____
Date                                         Date

23

EXHIBIT L
PAGE 460

## Addendum "D"
## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

_____
Mikia Wallis, CEO
Borrego Community Health Foundation

Aram Arakelyan DDS, Inc

12/06/2018
_____
Date

12/06/2018
_____
Date

24

EXHIBIT L
PAGE 461

**Addendum "E"**
**COMPENSATION OF DENTAL SERVICES**
**ADULT MEDI-CAL**

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns and root canals are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per visit |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per visit |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and  D1110 | 1 | Refer to Denti-Cal manual. | $140 per visit |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1110 | 1 | Refer to Denti-Cal manual. | $150 per visit |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride application | D1110 in combo with D1206, D1208 | 1 | Must be in combination. | $110 per visit |
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Treatment to be completed per quadrant, unless documented | $120 per visit |

25

EXHIBIT L
PAGE 462

| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Treatment to be completed per quadrant, unless documented | $150 per visit |
|---|---|---|---|---|
| Prefabricated Crowns (Stainless Steel / Resin) | D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Extractions - simple | D7111, D7140 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpal Debridement | D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $305 global |
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
| | | | | |

EXHIBIT L
PAGE 463

| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $365 global |
|---|---|---|---|---|
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | All treatments must be after 12 months of initial visit | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Gingivectomy or Gingivoplasty | D4211 | 1 | 1 to 3 teeth, per quadrant | $110 |
| Incision and Drainage of Abscess | D7510, D7520 | 1 | None | $115 |

EXHIBIT L
PAGE 464

| Dentures (Includes first 2 adjustments) | D5110, D5120 | 6 or more | Maxillary and Mandibular | $635 each denture – global |
| Removable Partial – Cast Metal (Includes first 2 adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $660 each partial – global |
| Removable Partial – Resin Based | D5211, D5212 | 3 or more | Maxillary and Mandibular | $360 each partial - global |
| Repairs | D5510, D5520 D5610, D5640 D5650, D5660 | 1 or more | Maxillary and Mandibular | $110 each visit |
| Repair Cast Framework | D5620 | 1 | None | $325 per visit |
| Repair/Replace Broke Clasp | D5630 | 1 | None | $140 per visit |
| Adjustments only (not following delivery) | D5410, D5411 D5421, D5422 | 1 | Maxillary and Mandibular | $70 per visit |
| Reline (in office) | D5730, D5731 D5740, D5741 | 1 | Maxillary and Mandibular | $120 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $225 - global |
| Tissue Conditioning | D5850, D5851 | 1 | Maxillary and Mandibular | $120 per visit |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |

28

EXHIBIT L
PAGE 465

**Addendum "F"**
**DENTAL SLIDING FEE SCALE**
**SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these programs if deemed eligible.

EXHIBIT L
PAGE 466

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
  - Oral Surgery
  - Endodontist
  - Periodontist
  - Orthodontist
  - Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

### Dental Sliding Fee Discount

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

x _____

Mikia Wallis, CEO
Borrego Community Health Foundation

12/06/2018
Date

_____
Aram Arakelyan DDS, Inc

12/06/2018
Date

30

EXHIBIT L
PAGE 467

# EXHIBIT M

**AGREEMENT BETWEEN
ARAM ARAKELYAN, DDS
AND
BORREGO COMMUNITY HEALTH FOUNDATION
FOR
DENTAL SERVICES**

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of November 29, 2018 between Borrego Community Health Foundation ("BCHF") and Aram Arakelyan, DDS ("Dentist"), collectively the "Parties".

RECITALS

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC).  BCHF operates clinics throughout San Diego, San Bernardino, and Riverside Counties.  The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS").   The approved scope includes performance of primary dental services; and

**WHEREAS, "**BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement.   The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS**, "Dentist" operates and administers a private practice in Covina and Downey, California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.   **DEFINITIONS**

 A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

 B.   **SCOPE OF SERVICES.**  Those services approved by the Health Resource and

1

Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

II.   **ACKNOWLEDGEMENT**

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

III.   **INDEPENDENT RELATIONSHIP**

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

IV.   **PROFESSIONAL SERVICES**

A.   **COVERED SERVICES.**   Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

B.   **SERVICE AVAILABILITY.**   "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well-being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

C.   **DOCUMENTATION AND DESCRIPTION OF SERVICES.**   "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.   "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

D.   **PRIOR AUTHORIZATION.**   For dental services needing individual consideration

2

or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service. In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third-party payors, an additional list of services requiring prior approval may be provided by "BCHF". As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E. **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement. If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

F. **SLIDING FEE.** Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f). "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G. **NON-DISCRIMINATION. "**Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

V. **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A. **QUALITY OF CARE.** "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements. Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization. Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations.

3

EXHIBIT M

PAGE 471

"BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

**B. POLICIES AND PROCEDURES.** The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures. Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

**C. PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

**D. AUTHORITY.** "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above. In particular, "BCHF" shall retain ultimate authority over the following:

1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

**E. NOTIFICATION.** "Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services. "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

**VI. NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

**A.** It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either

4

party by the other party.

**B.** "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected.

**C.** "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.    CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.    COMPENSATION

**A.** **FEE SCHEDULE.**  "Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

**B.** **ENCOUNTER SUBMISSION.**  Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C.** **TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed within 35 days of receipt of a superbill and adequate supporting documentation for each visit.   Payment will be made on a weekly basis to the "Dentist" with a detailed explanation of reimbursement. Both Dentist and BCHF will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.    CASE MANAGEMENT

**A.** **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.**  "Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business

5

hours.   "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need. The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF".   "Dentist" will provide occasional after hour sessions to provide expanded availability.   These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary.

B. **VERIFICATION OF PATIENT STATUS.**     "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist.   "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist".   If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment.  If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

C. **REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES**. The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such.  The information will be made available in a timely manner according to established policies and procedures.   "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

D. **REFUSAL TO PROVIDE SERVICES.**  The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients.  "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

E. **REFERRAL FOR SPECIALTY SERVICES.**  "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services.   Participating Patients will be provided information as to available specialists that are available in the community for such care.  "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

X.    **LEGAL**

A. **LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**  Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any

6

other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement.  "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement.  The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification.  Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

**B.** **COMPLIANCE WITH THE LAW.  "**Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

**C.** **MISREPRESENTATION**.  "Dentist"  acknowledges  and  agrees  that  willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency and will be cause for immediate termination under XIV of this Agreement.

**D.** **COMPLIANCE WITH OTHER LAWS**.  In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

7

XI.   **RECORD KEEPING AND REPORTING**

A. **PROGRAMMATIC RECORDS**.   "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested.  In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

B. **FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated.  If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription, and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained.  This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

C. **PARTICIPATING PATIENT RECORDS**.  "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist" and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

D. **RETENTION OF PATIENT RECORDS**.  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law.  In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".  Record retention obligations survive the termination of this Agreement.

E. **OWNERSHIP OF PATIENT RECORDS**.  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent  with  applicable  Federal and State

8

laws and regulations  and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

## XII.   INSURANCE

**A.  PROOF OF COVERAGE.**  The **"**Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

**B.**  "Dentist" will provide "BCHF" with sufficient evidence of professional liability coverage in the amount of at least:

1.  General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2.  Workers' Compensation, as required under California State law.

3.  Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

**C.**  It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

**D.**  Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however,

9

shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

E. **INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.   CONFIDENTIALITY

A. Except as is necessary in the performance  of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer  diskettes)  as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors)  also agree not to disclose, except to each other, any proprietary information, professional secrets or other information  obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

B. The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.   TERM AND TERMINATION

A. **TERM.**  This Agreement begins on November 29, 2018 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other sixty (60) days  in  advance  of  termination.   Renewal  is  subject  to  "BCHF's"

10

determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

**B.   TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

**C.   TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

**D.   TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

**E.   IMMEDIATE TERMINATION.**  In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

**F.   SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement.  "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

**A.   AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.  Amendments will take effect upon the date of execution of both parties.

**B.   ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

**C.   EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

**D.   EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless

11

EXHIBIT M

otherwise agreed.

**E.   NOTICE.**  Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

**F.   DISPUTE RESOLUTION.**  Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

**G.   CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

**H.   ENTIRE AGREEMENT.**  This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Mikia Wallis, CEO
Borrego Community Health Foundation

x _____

Date:___12/06/2018_____

PO Box 2369
Borrego Springs, CA 92004

Phone: (619) 444-5704

Aram Arakelyan, DDS

_____

Date:____12/06/2018_____

Address: 19523 E. Cypress Street
               Covina, CA 91724

Phone:    (626) 331-4538

Contact: Aram Arakelyan, DDS

E-mail: aramdds@prodigy.net

12

EXHIBIT M
PAGE 480

**Addendum "A"**
**Scope of Services**

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

13

**Addendum "B"**
**Compensation of Dental Services**
**Pediatric Medi-Cal**

Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below. Crowns and root canals are subject to prior review and authorization by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | CDT Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $140 per |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $150 per |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and | D1120 in combo with | 1 | Must be in | $100 per visit |

14

| Fluoride application | D1206, D1208 | | combination. | |
|---|---|---|---|---|
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Per quadrant | $120 per visit |
| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $150 per visit |
| Prefabricated Crowns (Stainless Steel / Resin) | D2930, D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $175 global $280 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpotomy / Pulpal Debridement | D3220, D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $305 global |
| Retreatment of a | D3346 | 1 or more | All treatments | $305 global |

15

EXHIBIT M

| Root Canal - Anterior | | | must be after 12 months of initial visit | |
|---|---|---|---|---|
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $365 global |
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | None | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Incision and Drainage of Abcess | D7510, D7520 | 1 | None | $115 |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |
| Inhalation of | D9230 | 1 | Additional | $35 |

16

EXHIBIT M

PAGE 484

| Nitrous Oxide | | | payment in combo with other procedures | |
|---|---|---|---|---|

17

EXHIBIT M
PAGE 485

## Addendum "C"

### Location of Service

All dental services under this agreement will be rendered at:

Aram Arakelyan, DDS

NPI Number- Individual 1710036181

Address: 19523 E. Cypress Street               NPI Number – Organization _____
         Covina, CA 91724
Phone:  (626) 331-4538
Hours: Tue 10am-7pm
       Thur 10am-7pm
       Fri 10am-7pm

Address: 10917 Paramount Blvd.               NPI Number – Organization _____
         Downey, CA 90241
Phone:  (562) 659-7246
Hours: Mon 10am-7pm
       Wed 10am-7pm
       Fri 10am-7pm
       Sat 10am-7pm

Copies attached

18

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective November 29, 2018 by and between Borrego Health, hereinafter referred to as "Covered Entity", and Aram Arakelyan, DDS hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated November 29, 2018 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.     DEFINITIONS

A.   Catch-all definition:
The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident,

19

Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B.  Specific definitions:

1.  Business Associate.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Aram Arakelyan, DDS.

2.  Covered Entity.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

3.  HIPAA Rules.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

4.  Protected Health Information. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

5.  Electronic Protected Health Information. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.   CONFIDENTIALITY AND SECURITY REQUIREMENTS

A.  Business Associate agrees:
1.  Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

20

EXHIBIT M

2. To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

3. To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

21

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures.

4. Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5. Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6. Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7. Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8. Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C. Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement.  Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D. The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

22

EXHIBIT M

E. Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware.  Business Associate shall report to Covered Entity any Security Incident of which it becomes aware.  Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.  In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

III.   <u>AVAILABILITY OF PHI</u>

A. Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   <u>TERM/TERMINATION</u>

A. <u>Term.</u> The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B. <u>Termination.</u> Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this

23

Agreement.

C.  Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

D.  Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.      MISCELLANEOUS

A.  Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B.  Amendment; Independent Parties. This Agreement may be amended or modified only in a writing signed by the Parties.  No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship.  This Agreement will be governed by the laws of the State of California.  No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C.  Minimum Requirements. The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control.  The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D.  Severability. In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect.  In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing.  For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance.  If, after such thirty-day period, the Agreement fails to comply with the

24

EXHIBIT M
PAGE 492

HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**

x _____

Mikia Wallis, CEO
Borrego Community Health Foundation

12/06/2018
_____
Date

**BUSINESS ASSOCIATE:**

_____
Aram Arakelyan, DDS

_____
Date   12/06/2018

25

EXHIBIT M
PAGE 493

## Addendum "D"
## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

## SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

## EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

## SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

x _____

Mikia Wallis, CEO
Borrego Community Health Foundation

_____
Aram Arakelyan, DDS

12/06/2018
_____
Date

12/06/2018
_____
Date

26

**Addendum "E"**
**COMPENSATION OF DENTAL SERVICES**
**ADULT MEDI-CAL**

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns and root canals are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per visit |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per visit |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1110 | 1 | Refer to Denti-Cal manual. | $140 per visit |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1110 | 1 | Refer to Denti-Cal manual. | $150 per visit |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride | D1110 in combo with D1206, D1208 | 1 | Must be in combination. | $110 per visit |

27

| application | | | | |
|---|---|---|---|---|
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Treatment to be completed per quadrant, unless documented | $120 per visit |
| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Treatment to be completed per quadrant, unless documented | $150 per visit |
| Prefabricated Crowns (Stainless Steel / Resin) | D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Extractions - simple | D7111, D7140 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpal Debridement | D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $305 global |

28

| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
|---|---|---|---|---|
| | | | | |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $365 global |
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | All treatments must be after 12 months of initial visit | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |

29

| Gingivectomy or Gingivoplasty | D4211 | 1 | 1 to 3 teeth, per quadrant | $110 |
|---|---|---|---|---|
| Incision and Drainage of Abscess | D7510, D7520 | 1 | None | $115 |
| Dentures (Includes first 2 adjustments) | D5110, D5120 | 6 or more | Maxillary and Mandibular | $635 each denture – global |
| Removable Partial – Cast Metal (Includes first 2 adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $660 each partial – global |
| Removable Partial – Resin Based | D5211, D5212 | 3 or more | Maxillary and Mandibular | $360 each partial - global |
| Repairs | D5510, D5520 D5610, D5640 D5650, D5660 | 1 or more | Maxillary and Mandibular | $110 each visit |
| Repair Cast Framework | D5620 | 1 | None | $325 per visit |
| Repair/Replace Broke Clasp | D5630 | 1 | None | $140 per visit |
| Adjustments only (not following delivery) | D5410, D5411 D5421, D5422 | 1 | Maxillary and Mandibular | $70 per visit |
| Reline (in office) | D5730, D5731 D5740, D5741 | 1 | Maxillary and Mandibular | $120 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $225 - global |
| Tissue Conditioning | D5850, D5851 | 1 | Maxillary and Mandibular | $120 per visit |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |

30

EXHIBIT M
PAGE 498

**Addendum "F"**
**DENTAL SLIDING FEE SCALE**
**SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal

31

EXHIBIT M
PAGE 499

fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
  - Oral Surgery
  - Endodontist
  - Periodontist
  - Orthodontist
  - Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

### Dental Sliding Fee Discount

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

x _____

Mikia Wallis, CEO
Borrego Community Health Foundation

12/06/2018
_____
Date

_____
Aram Arakelyan, DDS

12/06/2018
_____
Date

32

**AGREEMENT BETWEEN**
**RESEDA DENTAL OFFICE OF ARAM YELIAZYAN AND ARAM ARAKELYAN, INC.**
**AND**
**BORREGO COMMUNITY HEALTH FOUNDATION**
**FOR**
**DENTAL SERVICES**

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of November 29, 2018 between Borrego Community Health Foundation ("BCHF") and Reseda Dental Office of Aram Yeliazyan and Aram Arakelyan, Inc. ("Dentist"), collectively the "Parties".

**RECITALS**

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC).  BCHF operates clinics throughout San Diego, San Bernardino, and Riverside Counties.  The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS").  The approved scope includes performance of primary dental services; and

**WHEREAS, "**BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement.  The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS**, "Dentist" operates and administers a private practice in Reseda, California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.   **DEFINITIONS**

A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

B.   **SCOPE OF SERVICES.**  Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

EXHIBIT M
PAGE 501

II.   **ACKNOWLEDGEMENT**
The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

III.   **INDEPENDENT RELATIONSHIP**
None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

IV.   **PROFESSIONAL SERVICES**

A.   **COVERED SERVICES.**  Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

B.   **SERVICE AVAILABILITY.**   "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well-being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

C.   **DOCUMENTATION AND DESCRIPTION OF SERVICES.**   "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

D.   **PRIOR AUTHORIZATION.**   For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third-party payors, an additional list of

2

services requiring prior approval may be provided by "BCHF". As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

**E.   AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

**F.   SLIDING FEE**.  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).  "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

**G.   NON-DISCRIMINATION.  "**Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

**V.   QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

**A.   QUALITY OF CARE**.  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.  Services shall be within the scope of practice outlined in Addendum B for primary care dental services.  The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.  Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations.  "BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

**B.   POLICIES AND PROCEDURES.**  The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this

3

EXHIBIT M
PAGE 503

agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC).  "BCHF" will provide "Dentist with such requirements, policies, procedures and standards.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

C. **PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

D. **AUTHORITY.**  "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular, "BCHF" shall retain ultimate authority over the following:

1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

E. **NOTIFICATION.  "**Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

VI. **NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

A. It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

B. "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two

4

EXHIBIT M

PAGE 504

(2) years following termination, however such termination is affected.

**C.** "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.  CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.  COMPENSATION

**A.** **FEE SCHEDULE.  "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

**B.** **ENCOUNTER SUBMISSION.**  Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C.** **TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed within 35 days of receipt of a superbill and adequate supporting documentation for each visit.  Payment will be made on a weekly basis to the "Dentist" with a detailed explanation of reimbursement.  Both Dentist and BCHF will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.  CASE MANAGEMENT

**A.** **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.  "**Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.   "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need.  The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF".   "Dentist" will provide occasional after hour sessions to provide expanded availability.  These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary.

5

**B.   VERIFICATION OF PATIENT STATUS.**   "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist.   "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist".  If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment.  If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

**C.   REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES**. The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such.   The information will be made available in a timely manner according to established policies and procedures.   "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

**D.   REFUSAL TO PROVIDE SERVICES.**  The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients.  "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

**E.   REFERRAL FOR SPECIALTY SERVICES.**  "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training.  "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care.   "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

**X.   LEGAL**

**A.   LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**  Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement.  "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement.  The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other

EXHIBIT M
PAGE 506

support staff who have not provided proper licensing and certification.  Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

**B. COMPLIANCE WITH THE LAW.** "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

**C. MISREPRESENTATION**. "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency and will be cause for immediate termination under XIV of this Agreement.

**D. COMPLIANCE WITH OTHER LAWS**.  In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

**XI.    RECORD KEEPING AND REPORTING**

**A. PROGRAMMATIC RECORDS**.   "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested.  In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its

Section 330 grant.

**B. FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated. If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is later. "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription, and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained. This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

**C. PARTICIPATING PATIENT RECORDS**. "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement. All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF". "Dentist" and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

**D. RETENTION OF PATIENT RECORDS**. Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law. In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF". Record retention obligations survive the termination of this Agreement.

**E. OWNERSHIP OF PATIENT RECORDS**. "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed. "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent with applicable Federal and State laws and regulations and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

8

EXHIBIT M
PAGE 508

**XII.   INSURANCE**

    **A.   PROOF OF COVERAGE.**  The **"**Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

    **B.**   "Dentist" will provide "BCHF" with sufficient evidence of professional liability coverage in the amount of at least:

        1.   General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

        2.   Workers' Compensation, as required under California State law.

        3.   Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

    **C.**   It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

    **D.**   Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

    **E.   INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such

liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.   CONFIDENTIALITY

A. Except as is necessary in the performance of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors)  also agree not to disclose, except to each other, any proprietary information, professional secrets or other information  obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

B. The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.   TERM AND TERMINATION

A. **TERM.**  This Agreement begins on November 29, 2018 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other  sixty (60) days in advance of termination.  Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

B. **TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

C. **TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

D. **TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any

EXHIBIT M
PAGE 510

term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

E.   **IMMEDIATE TERMINATION.**   In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

F.   **SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement.   "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

A.   **AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.   Amendments will take effect upon the date of execution of both parties.

B.   **ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

C.   **EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

D.   **EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

E.   **NOTICE.**  Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F.   **DISPUTE RESOLUTION.**  Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has

failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G. **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H. **ENTIRE AGREEMENT.**  This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Mikia Wallis, CEO
Borrego Community Health Foundation

x_____

Date:_____12/06/2018_____

PO Box 2369
Borrego Springs, CA 92004

Phone: (619) 444-5704

Reseda Dental Office of Aram Yeliazyan
and Aram Arakelyan, Inc.

_____

Date:_____12/06/2018_____

Address: 18554 Sherman Way
         Reseda, Ca 91335

Phone:    (818) 708-9919

Contact: Dr. Arakelyan

E-mail: aramdds@prodigy.net

12

EXHIBIT M
PAGE 512

**Addendum "A"**
**Scope of Services**

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

EXHIBIT M
PAGE 513

**Addendum "B"**
**Compensation of Dental Services**
**Pediatric Medi-Cal**

Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | CDT Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and  D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $140 per |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $150 per |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride application | D1120 in combo with D1206, D1208 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Per quadrant | $120 per visit |

14

| | | | | |
|---|---|---|---|---|
| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $150 per visit |
| Prefabricated Crowns (Stainless Steel / Resin) | D2930, D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $175 global $280 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpotomy / Pulpal Debridement | D3220, D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $305 global |
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration.  Open & Med and | $365 global |

EXHIBIT M
PAGE 515

| | | | Finished RCT included in global fee. | |
|---|---|---|---|---|
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | None | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Incision and Drainage of Abcess | D7510, D7520 | 1 | None | $115 |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |
| Inhalation of Nitrous Oxide | D9230 | 1 | Additional payment in combo with other procedures | $35 |

16

EXHIBIT M
PAGE 516

**Addendum "C"**

**Location of Service**

All dental services under this agreement will be rendered at:

Reseda Dental Office of Aram Yeliazyan and Aram Arakelyan, Inc.

18554 Sherman Way
Reseda, Ca 91335

_____

Phone:  (818) 708-9919

During the hours of:

Tuesday, Thursday and Saturday: 10:00 am – 7:00 pm_____

_____

_____

NPI Number - Organization _____

NPI Number- Individual: 1710036181

Copies attached

17

EXHIBIT M
PAGE 517

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the 29th day of November, 2018 by and between Borrego Health, hereinafter referred to as "Covered Entity", and Reseda Dental Office of Aram Yeliazyan and Aram Arakelyan, Inc. hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated  November 29, 2018 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.    DEFINITIONS

A.  Catch-all definition:
The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy

EXHIBIT M
PAGE 518

Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control. Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B.  Specific definitions:

1.  Business Associate.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Reseda Dental Office of Aram Yeliazyan and Aram Arakelyan, Inc..

2.  Covered Entity.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

3.  HIPAA Rules.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

4.  Protected Health Information. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

5.  Electronic Protected Health Information. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.  CONFIDENTIALITY AND SECURITY REQUIREMENTS

A.  Business Associate agrees:

1.  Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

2.  To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

19

3. To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary

20

policies and procedures.

4. Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5. Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6. Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7. Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8. Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C. Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement. Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D. The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E. Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware. Business Associate shall report to Covered Entity any Security Incident of which it becomes aware. Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system. In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

21

EXHIBIT M
PAGE 521

III.   AVAILABILITY OF PHI

A.   Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   TERM/TERMINATION

A.   Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B.   Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

C.    Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

D.   Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.   MISCELLANEOUS

A.   Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third

EXHIBIT M
PAGE 522

parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B. <u>Amendment; Independent Parties.</u> This Agreement may be amended or modified only in a writing signed by the Parties. No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship. This Agreement will be governed by the laws of the State of California. No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. <u>Minimum Requirements.</u> The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control. The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. <u>Severability.</u> In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect. In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing. For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**                                    **BUSINESS ASSOCIATE:**

x _____                         _____

Mikia Wallis, CEO                                      Reseda Dental Office of Aram Yeliazyan
Borrego Community Health Foundation       and Aram Arakelyan, Inc.

12/06/2018

_____                            12/07/2018
Date                                                            _____
                                                                   Date

23

## Addendum "D"
### ADDITION OF MEDI-CAL ADULT DENTAL
### AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

## SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

## EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

## SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

Mikia Wallis, CEO
Borrego Community Health Foundation

Reseda Dental Office of Aram Yeliazyan and Aram Arakelyan, Inc.

12/06/2018
Date

12/06/2018
Date

24

**Addendum "E"**
**COMPENSATION OF DENTAL SERVICES**
**ADULT MEDI-CAL**

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns and root canals are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per visit |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per visit |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and  D1110 | 1 | Refer to Denti-Cal manual. | $140 per visit |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1110 | 1 | Refer to Denti-Cal manual. | $150 per visit |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride application | D1110 in combo with D1206, D1208 | 1 | Must be in combination. | $110 per visit |
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Treatment to be completed per quadrant, unless documented | $120 per visit |

25

EXHIBIT M
PAGE 525

| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Treatment to be completed per quadrant, unless documented | $150 per visit |
|---|---|---|---|---|
| Prefabricated Crowns (Stainless Steel / Resin) | D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Extractions - simple | D7111, D7140 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpal Debridement | D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $305 global |
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
| | | | | |

| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $365 global |
|---|---|---|---|---|
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | All treatments must be after 12 months of initial visit | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Gingivectomy or Gingivoplasty | D4211 | 1 | 1 to 3 teeth, per quadrant | $110 |
| Incision and Drainage of Abscess | D7510, D7520 | 1 | None | $115 |

EXHIBIT M
PAGE 527

| Dentures (Includes first 2 adjustments) | D5110, D5120 | 6 or more | Maxillary and Mandibular | $635 each denture – global |
|---|---|---|---|---|
| Removable Partial – Cast Metal (Includes first 2 adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $660 each partial – global |
| Removable Partial – Resin Based | D5211, D5212 | 3 or more | Maxillary and Mandibular | $360 each partial - global |
| Repairs | D5510, D5520 D5610, D5640 D5650, D5660 | 1 or more | Maxillary and Mandibular | $110 each visit |
| Repair Cast Framework | D5620 | 1 | None | $325 per visit |
| Repair/Replace Broke Clasp | D5630 | 1 | None | $140 per visit |
| Adjustments only (not following delivery) | D5410, D5411 D5421, D5422 | 1 | Maxillary and Mandibular | $70 per visit |
| Reline (in office) | D5730, D5731 D5740, D5741 | 1 | Maxillary and Mandibular | $120 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $225 - global |
| Tissue Conditioning | D5850, D5851 | 1 | Maxillary and Mandibular | $120 per visit |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |

28

EXHIBIT M
PAGE 528

**Addendum "F"**
**DENTAL SLIDING FEE SCALE**
**SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these programs if deemed eligible.

EXHIBIT M
PAGE 529

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
  - Oral Surgery
  - Endodontist
  - Periodontist
  - Orthodontist
  - Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

### Dental Sliding Fee Discount

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| | | | | | | |
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

x _____

Mikia Wallis, CEO
Borrego Community Health Foundation

12/06/2018

Date

_____

Reseda Dental Office of Aram Yeliazyan
and Aram Arakelyan, Inc.

12/06/2018

Date

30

# EXHIBIT N

**AGREEMENT BETWEEN**
**MICHAEL HOANG, DMD**
**AND**
**BORREGO COMMUNITY HEALTH FOUNDATION**
**FOR**
**DENTAL SERVICES**

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of November 28 2018 between Borrego Community Health Foundation ("BCHF") and Michael Hoang, DMD ("Dentist"), collectively the "Parties".

**RECITALS**

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC).  BCHF operates clinics throughout San Diego, San Bernardino, and Riverside Counties.  The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS").  The approved scope includes performance of primary dental services; and

**WHEREAS, "**BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement.  The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS**, "Dentist" operates and administers a private practice in Hawthorne, California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.   **DEFINITIONS**

A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

B.   **SCOPE OF SERVICES.**  Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

EXHIBIT N
PAGE 532

II.   **ACKNOWLEDGEMENT**
The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

III.   **INDEPENDENT RELATIONSHIP**
None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

IV.   **PROFESSIONAL SERVICES**

A.   **COVERED SERVICES.**   Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

B.   **SERVICE AVAILABILITY.**   "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well-being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

C.   **DOCUMENTATION AND DESCRIPTION OF SERVICES.**   "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

D.   **PRIOR AUTHORIZATION.**   For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third-party payors, an additional list of

EXHIBIT N
PAGE 533

services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

**E.**   **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

**F.**   **SLIDING FEE**.   Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

**G.**   **NON-DISCRIMINATION.  "**Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

**V.**     **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

**A.**   **QUALITY OF CARE**.  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services.  The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.  Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations.    "BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

**B.**   **POLICIES AND PROCEDURES.** The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this

EXHIBIT N

PAGE 534

agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC).  "BCHF" will provide "Dentist with such requirements, policies, procedures and standards.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

C. **PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

D. **AUTHORITY.**  "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular, "BCHF" shall retain ultimate authority over the following:

1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

E. **NOTIFICATION.  "**Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

## VI.  **NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

A. It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

B. "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two

(2) years following termination, however such termination is affected.

**C.** "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.   COMPENSATION

**A.** **FEE SCHEDULE.  "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

**B.** **ENCOUNTER SUBMISSION.**  Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C.** **TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed within 35 days of receipt of a superbill and adequate supporting documentation for each visit.  Payment will be made on a weekly basis to the "Dentist" with a detailed explanation of reimbursement.  Both Dentist and BCHF will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

**A.** **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.  "**Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.   "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need.  The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF".   "Dentist" will provide occasional after hour sessions to provide expanded availability.  These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary.

EXHIBIT N
PAGE 536

B. **VERIFICATION OF PATIENT STATUS.**   "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist.   "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist".  If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment.  If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

C. **REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES**. The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such.  The information will be made available in a timely manner according to established policies and procedures.  "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

D. **REFUSAL TO PROVIDE SERVICES.**  The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients. "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

E. **REFERRAL FOR SPECIALTY SERVICES.**  "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training.  "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care.   "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

X. **LEGAL**

A. **LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**  Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement.  "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement.  The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other

6

support staff who have not provided proper licensing and certification.  Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

**B.  COMPLIANCE WITH THE LAW.  "**Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

**C.  MISREPRESENTATION**.  "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency and will be cause for immediate termination under XIV of this Agreement.

**D.   COMPLIANCE WITH OTHER LAWS**.  In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1.  To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2.  To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3.  To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4.  To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5.  To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

**XI.    RECORD KEEPING AND REPORTING**

**A.  PROGRAMMATIC RECORDS**.    "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested.  In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its

Section 330 grant.

**B. FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated.  If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription, and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained. This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

**C.  PARTICIPATING PATIENT RECORDS**.  "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist" and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

**D. RETENTION OF PATIENT RECORDS**.  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law.  In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".  Record retention obligations survive the termination of this Agreement.

**E. OWNERSHIP OF PATIENT RECORDS**.  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent  with  applicable  Federal and State laws and regulations  and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

**XII.   INSURANCE**

    **A.  PROOF OF COVERAGE.**  The **"**Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

    **B.**  "Dentist" will provide "BCHF" with sufficient evidence of professional liability coverage in the amount of at least:

        1.  General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

        2.  Workers' Compensation, as required under California State law.

        3.  Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

    **C.**  It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

    **D.**  Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

    **E.  INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such

liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.   CONFIDENTIALITY

**A.**   Except as is necessary in the performance of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors)  also agree not to disclose, except to each other, any proprietary information, professional secrets or other information  obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

**B.**   The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.   TERM AND TERMINATION

**A.**   **TERM.**  This Agreement begins on November 28, 2018 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other  sixty (60) days in advance of termination.  Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

**B.**   **TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

**C.**   **TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

**D.**   **TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any

term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

E. **IMMEDIATE TERMINATION.** In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

F. **SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement. "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

A. **AMENDMENT/MODIFICATION.** This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed. Amendments will take effect upon the date of execution of both parties.

B. **ASSIGNMENT.** This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

C. **EFFECT OF WAIVER.** A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

D. **EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

E. **NOTICE.** Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F. **DISPUTE RESOLUTION.** Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution procedure may endanger the health and safety of the Participating Patients). Any dispute that has

failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G.   **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H.   **ENTIRE AGREEMENT.** This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Mikia Wallis, CEO
Borrego Community Health Foundation

x _____

Date: 12/06/2018

PO Box 2369
Borrego Springs, CA 92004

Phone: (619) 444-5704

Michael Hoang, DMD

Date: 11/29/18

Address: 13672 Hawthorne Blvd.
             Hawthorne, CA 90250-5810

Phone:   310-644-5097

Contact: Dr. Michael Hoang

E-mail: mkhoangdmd@gmail.com

12

**Addendum "A"**
**Scope of Services**

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".   Limitations of commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

EXHIBIT N
PAGE 544

**Addendum "B"**
**Compensation of Dental Services**
**Pediatric Medi-Cal**

Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | CDT Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and  D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $140 per |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $150 per |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride application | D1120 in combo with D1206, D1208 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Per quadrant | $120 per visit |

14

| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $150 per visit |
|---|---|---|---|---|
| Prefabricated Crowns (Stainless Steel / Resin) | D2930, D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $175 global $280 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpotomy / Pulpal Debridement | D3220, D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $305 global |
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration. Open & Med and | $365 global |

15

| | | | Finished RCT included in global fee. | |
|---|---|---|---|---|
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | None | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Incision and Drainage of Abcess | D7510, D7520 | 1 | None | $115 |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |
| Inhalation of Nitrous Oxide | D9230 | 1 | Additional payment in combo with other procedures | $35 |

## Addendum "C"

### Location of Service

All dental services under this agreement will be rendered at:

Michael Hoang, DMD

Address: 13672 Hawthorne Blvd., Hawthorne, CA 90250-5810

---

Phone:  310-644-5097

During the hours of:

Monday – Friday, 9a-5p

---

---

---

NPI Number - Organization 1407232507

NPI Number- Individual 1407232507

Copies attached

EXHIBIT N

PAGE 548

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the 28 day of November, 2018 by and between Borrego Health, hereinafter referred to as "Covered Entity", and Michael Hoang, DMD. hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated November 28, 2018 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.   DEFINITIONS

A.   Catch-all definition:
The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident,

Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B. <u>Specific definitions</u>:

1. <u>Business Associate</u>.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Michael Hoang, DMD.

2. <u>Covered Entity</u>.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

3. <u>HIPAA Rules</u>.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

4. <u>Protected Health Information</u>. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

5. <u>Electronic Protected Health Information</u>. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.   <u>CONFIDENTIALITY AND SECURITY REQUIREMENTS</u>

A. Business Associate agrees:
1. Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

2. To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

3. To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR

19

164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures.

EXHIBIT N

PAGE 551

4.  Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5.  Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6.  Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7.  Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8.  Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C.  Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement.  Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D.  The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E.  Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware.  Business Associate shall report to Covered Entity any Security Incident of which it becomes aware.  Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.  In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

21

III.   AVAILABILITY OF PHI

A.   Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   TERM/TERMINATION

A.   Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B.   Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

C.   Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

D.   Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.   MISCELLANEOUS

A.   Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement

and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B. **Amendment; Independent Parties.** This Agreement may be amended or modified only in a writing signed by the Parties. No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship. This Agreement will be governed by the laws of the State of California. No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. **Minimum Requirements.** The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control. The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. **Severability.** In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect. In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing. For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**

x _____

Mikia Wallis, CEO
Borrego Community Health Foundation

12/06/2018
_____
Date

**BUSINESS ASSOCIATE:**

_____

Michael Hoang, DMD

11/29/18
_____
Date

23

EXHIBIT N
PAGE 554

## Addendum "D"
### ADDITION OF MEDI-CAL ADULT DENTAL
### AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

x _____
**Mikia Wallis, CEO**
**Borrego Community Health Foundation**

_____
**Michael Hoang, DMD**

12/06/2018
**Date**

11/29/18
**Date**

24

**Addendum "E"**
**COMPENSATION OF DENTAL SERVICES**
**ADULT MEDI-CAL**

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns and root canals are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per visit |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per visit |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and  D1110 | 1 | Refer to Denti-Cal manual. | $140 per visit |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1110 | 1 | Refer to Denti-Cal manual. | $150 per visit |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride application | D1110 in combo with D1206, D1208 | 1 | Must be in combination. | $110 per visit |
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Treatment to be completed per quadrant, unless documented | $120 per visit |

25

EXHIBIT N
PAGE 556

| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Treatment to be completed per quadrant, unless documented | $150 per visit |
|---|---|---|---|---|
| Prefabricated Crowns (Stainless Steel / Resin) | D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Extractions - simple | D7111, D7140 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpal Debridement | D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $305 global |
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
| | | | | |

EXHIBIT N
PAGE 557

| | | | | |
|---|---|---|---|---|
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration. Open & Med and Finished RCT included in global fee. | $365 global |
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration. Open & Med and Finished RCT included in global fee. | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | All treatments must be after 12 months of initial visit | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Gingivectomy or Gingivoplasty | D4211 | 1 | 1 to 3 teeth, per quadrant | $110 |
| Incision and Drainage of Abscess | D7510, D7520 | 1 | None | $115 |

EXHIBIT N
PAGE 558

| Dentures (Includes first 2 adjustments) | D5110, D5120 | 6 or more | Maxillary and Mandibular | $635 each denture – global |
| Removable Partial – Cast Metal (Includes first 2 adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $660 each partial – global |
| Removable Partial – Resin Based | D5211, D5212 | 3 or more | Maxillary and Mandibular | $360 each partial - global |
| Repairs | D5510, D5520 D5610, D5640 D5650, D5660 | 1 or more | Maxillary and Mandibular | $110 each visit |
| Repair Cast Framework | D5620 | 1 | None | $325 per visit |
| Repair/Replace Broke Clasp | D5630 | 1 | None | $140 per visit |
| Adjustments only (not following delivery) | D5410, D5411 D5421, D5422 | 1 | Maxillary and Mandibular | $70 per visit |
| Reline (in office) | D5730, D5731 D5740, D5741 | 1 | Maxillary and Mandibular | $120 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $225 - global |
| Tissue Conditioning | D5850, D5851 | 1 | Maxillary and Mandibular | $120 per visit |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |

28

EXHIBIT N
PAGE 559

**Addendum "F"**
**DENTAL SLIDING FEE SCALE**
**SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these programs if deemed eligible.

29

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
  - ➢ Oral Surgery
  - ➢ Endodontist
  - ➢ Periodontist
  - ➢ Orthodontist
  - ➢ Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

### Dental Sliding Fee Discount

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

x _____

**Mikia Wallis, CEO**
**Borrego Community Health Foundation**

12/06/2018

Date

_____

Michael Hoang, DMD

11/29/18

Date

30

# EXHIBIT O

**AGREEMENT BETWEEN**
W. A. STEPHAN, A DENTAL CORPORATION
**AND**
**BORREGO COMMUNITY HEALTH**
**FOUNDATION FOR DENTAL SERVICES**


**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of 10/01/2016_____2016 between Borrego Community Health Foundation ("BCHF") and A. STEPHAN, A DENTAL CORPORATI ("Dentist"), collectively the "Parties".

### RECITALS

**WHEREAS,** BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC). BCHF operates clinics throughout San Bernardino, Riverside and San Diego Counties. The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS"). The approved scope includes performance of primary dental services; and

**WHEREAS, "**BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement. The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS,** "Dentist" operates and administers a private practice in El Cajon_____, area of California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

### AGREEMENT

**NOW, THEREFORE,** in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.   **DEFINITIONS**

   A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

   B.   **SCOPE OF SERVICES.** Those services approved by the Health Resource and

Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

**II.   ACKNOWLEDGEMENT**

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

**III.   INDEPENDENT RELATIONSHIP**

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

**IV.   PROFESSIONAL SERVICES**

**A.   COVERED SERVICES.**  Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

**B.   SERVICE AVAILABILITY.**  "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director. "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

**C.   DOCUMENTATION AND DESCRIPTION OF SERVICES.**  "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

**D.   PRIOR AUTHORIZATION.**  For dental services needing individual consideration

EXHIBIT O

PAGE 564

or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E.   **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

F.   **SLIDING FEE.**  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G.   **NON-DISCRIMINATION.**  "Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

V.   **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A.   **QUALITY OF CARE.**  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations.

EXHIBIT O

PAGE 565

"BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

**B. POLICIES AND PROCEDURES.** The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures. Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

**C. PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

**D. AUTHORITY.** "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above. In particular, "BCHF" shall retain ultimate authority over the following:

1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

**E. NOTIFICATION.** "Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services. "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

**VI.   NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

**A.** It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either

party by the other party.

**B.** "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected.

**C.** "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes of this paragraph, a "patient  of BCHF" shall mean any patient seen or treated by "BCHF" (whether  by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.   COMPENSATION

**A.   FEE SCHEDULE.  "Dentist"** will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

**B.   ENCOUNTER SUBMISSION.**  Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C.   TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed and made on the 15th day of each month to the "Dentist" with a detailed explanation of reimbursement.  Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

**A.   AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.  "Dentist"** agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.  "Dentist" will communicate with BCHF management as to appointment

availability so that adjustments can be made to accommodate the identified need. The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF". "Dentist" will provide occasional after hour sessions to provide expanded availability. These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary. As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

**B.  VERIFICATION OF PATIENT STATUS.**  "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist.  "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist". If it is determined that the Participating Patient is not a "BCHF" patient  on the date of service,  "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment. If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

**C.  REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES.**  The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such.  The information will be made available in a timely manner according to established policies and procedures.  "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

**D.  REFUSAL TO PROVIDE SERVICES.**  The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients.  "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

**E.  REFERRAL FOR SPECIALTY SERVICES.**  "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services.  Participating Patients will be provided information as to available specialists that are available in the community for such care.  "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

**X.   LEGAL**

**A.  LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**  Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any

other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement. "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement.  The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification.  Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

B. **COMPLIANCE WITH THE LAW.**  "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

C. **MISREPRESENTATION**. "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

D. **COMPLIANCE WITH OTHER LAWS**.  In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply  with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination,  as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned  firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply  with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution  Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply  with the certification  and disclosure requirements of the Byrd Anti-Lobbying  Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify  that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

XI.   **RECORD KEEPING AND REPORTING**

A. **PROGRAMMATIC RECORDS.**  "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested.  In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

B. **FINANCIAL RECORDS.** "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated.  If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation,  or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription,  and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained.  This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

C. **PARTICIPATING PATIENT RECORDS.**  "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist"  and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

D. **RETENTION OF PATIENT RECORDS.**  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law.  In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".  Record retention obligations survive the termination of this Agreement.

E. **OWNERSHIP OF PATIENT RECORDS.**  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent with  applicable Federal and State

laws and regulations and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

## XII. INSURANCE

**A. PROOF OF COVERAGE.** The "Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

**B.** "Dentist" will provide "BCHF" with sufficient evidence of professional liability coverage in the amount of at least:

1. General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2. Workers' Compensation, as required under California State law.

3. Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

**C.** It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

**D.** Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however,

shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

E. **INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.   CONFIDENTIALITY

A. Except as is necessary in the performance of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors) also agree not to disclose, except to each other, any proprietary information, professional secrets or other information obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

B. The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.   TERM AND TERMINATION

A. **TERM.** This Agreement begins on ___10/01/2016_____, 2016 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to

the other sixty (60) days in advance of termination. Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

**B.** **TERMINATION WITHOUT CAUSE.** Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

**C.** **TERMINATION FOR CONVENIENCE.** This Agreement may be terminated at any time upon the mutual agreement of the parties.

**D.** **TERMINATION FOR BREACH.** This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

**E.** **IMMEDIATE TERMINATION.** In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

**F.** **SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement. "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

**XV.** **GENERAL PROVISIONS**

**A.** **AMENDMENT/MODIFICATION.** This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed. Amendments will take effect upon the date of execution of both parties.

**B.** **ASSIGNMENT.** This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

**C.** **EFFECT OF WAIVER.** A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

**D.** **EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this

Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

E. **NOTICE.** Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F. **DISPUTE RESOLUTION.** Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G. **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H. **ENTIRE AGREEMENT.** This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

Date: _10·21·2016_

Address: PO Box 2369

Borrego Springs, CA 92004

Phone: (619) 444-5704

Contact: Travis Lyon

E-mail: cdtlyon@borregomedical.org

W. A. STEPHAN, A DENTAL CORPORATION

_waleed stephan_
waleed stephan (Sep 30, 2016)

Date: 10/01/2016

Address: 860 JAMACHA ROAD SUITE 201

EL CAJON CA 92019

Phone: 619-593-3000

Contact: Athra Stephan

E-mail stephandental@gmail.com

EXHIBIT O
PAGE 574

## Addendum "A"

### Scope of Services

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of  commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

EXHIBIT O
PAGE 575

## Addendum "B"

### Compensation of Dental Services
### Medi-Cal

"Dentist" will be reimbursed according to patient's insurance type.  Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not | $100 |

| | | | in scope. | |
|---|---|---|---|---|
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit -- multiple extractions under anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee. | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

EXHIBIT O

PAGE 577

**Addendum "C"**

**Location of Service**

All dental services under this agreement will be rendered at:

DBA Stephan Family Dental

Address 860 JAMACHA ROAD SUITE 201

EL CAJON CA 92019

Phone: 619-593-3000

During the hours of:

Monday thru Friday: 9am - 6pm

Saturday: 8am - 2pm

Sunday: Closed

NPI Number - Organization 1336565092

NPI Number- Individual 1841477387

Copies attached

EXHIBIT O
PAGE 578

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the <u>10/01/2016</u>, 2016 by and between Borrego Health, hereinafter referred to as "Covered Entity", and <u>W. A. STEPHAN, A DENTAL CORP</u> hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated <u>10/01/2016</u>, 2016 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.   DEFINITIONS

   A.   Catch-all definition:
      The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy

EXHIBIT O
PAGE 579

Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule, but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B. <u>Specific definitions</u>:

1. <u>Business Associate</u>.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean
<u>W. A. STEPHAN, A DENTAL CORPORATION</u>

2. <u>Covered Entity</u>.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

3. <u>HIPAA Rules</u>.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

4. <u>Protected Health Information</u>. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

5. <u>Electronic Protected Health Information</u>. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.   <u>CONFIDENTIALITY AND SECURITY REQUIREMENTS</u>

A. Business Associate agrees:
1. Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

2. To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

EXHIBIT O

PAGE 580

3.  To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4.  In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5.  To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6.  To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7.  To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8.  To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9.  To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B.  Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1.  As necessary to perform the services set forth in the underlying Service Agreement; and/or

2.  As required by law.

3.  Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary

EXHIBIT O
PAGE 581

policies and procedures.

4. Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5. Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6. Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7. Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8. Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C. Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement. Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D. The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E. Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware. Business Associate shall report to Covered Entity any Security Incident of which it becomes aware. Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system. In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

III.   AVAILABILITY OF PHI

A. Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity. Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule. If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual. Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule. In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act. Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   TERM/TERMINATION

A. Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B. Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement. If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

C. Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form. Business associate shall retain no copies of the protected health information.

D. Survival. The obligations of business associate under this Section shall survive the termination of this Agreement.

V.   MISCELLANEOUS

A. Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third

parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B. <u>Amendment; Independent Parties.</u> This Agreement may be amended or modified only in a writing signed by the Parties.  No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship.  This Agreement will be governed by the laws of the State of California.  No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. <u>Minimum Requirements.</u> The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control.  The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. <u>Severability.</u> In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect.  In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing.  For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

___10-21-2016_____
Date

**BUSINESS ASSOCIATE:**

_waleed stephan_____
waleed stephan (Sep 30, 2016)
Dentist
W. A. STEPHAN, A DENTAL CORP

10/01/2016_____
Date

EXHIBIT O
PAGE 584

### Addendum "D"
### ADDITION OF MEDI-CAL ADULT DENTAL
### AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

| | |
|---|---|
| Bruce Hebets, CEO | Dentist |
| Borrego Community Health Foundation | W. A. STEPHAN, A DENTAL CORP |

| | |
|---|---|
| 10 - 21 - 2016 | 10/01/2016 |
| Date | Date |

EXHIBIT O
PAGE 585

## Addendum "E"

### COMPENSATION OF DENTAL SERVICES
### ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns, root canals and bridges are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions - simple | D7111, D7140 | 1 | Per visit - multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit - multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

EXHIBIT O

PAGE 586

| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
|---|---|---|---|---|
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |
| | | | | |

EXHIBIT O

PAGE 587

**Addendum "F"**

**DENTAL SLIDING FEE SCALE**
**SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these

programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
  - ➢ Oral Surgery
  - ➢ Endodontist
  - ➢ Periodontist
  - ➢ Orthodontist
  - ➢ Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

**Dental Sliding Fee Discount**

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| | | | | | | |
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

_[signature]_
Bruce Hebets, CEO
Borrego Community Health Foundation

_10-21-2016_
Date

_waleed stephan_
waleed stephan (Sep 30, 2016)
Dentist
W. A. STEPHAN, A DENTAL CORP

10/01/2016
Date

EXHIBIT O
PAGE 589

**Addendum "G"**

**HITRUST CERTIFICATION HIPAA COMPLIANT DATA STORAGE FEE**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to maintain patient records and data associated with patient visits to i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law.  Dentists are also required maintain these records.

An online system for claim submissions and patient record storage for the contract dental program is currently in development.  Upon implementation of this system all patient records will also be stored online on Health Insurance Portability and Accountability Act (HIPAA) compliant servers.  Dentist will have secure access to the system for all Dentist's patients under the contract dental program.

**HITRUST Certification:** In order to safely maintain the integrity of your patient data and meet HIPAA compliance, Premier Health Care Management (PHCM) conducts quarterly audits in order to maintain HITRUST Certification.  A team of third party auditors conduct a three-tiered audit to achieve the highest HIPAA certification available. In addition to the technical audit, Dentist understands that PHCM will request semiannual access to computers running licensed software to ensure physical security standards are being maintained.  PHCM will request access a week in advance unless a specific risk is determined.

Dentist agrees to pay One Hundred and Fifty Dollars ($150.00) per month for costs associated with record storage and HITRUST certification audits of the system.  This monthly fee will only be assessed once the online storage system is implemented.  Dentist will be provided notice of no less than 21 days prior to implementation and commencement of the monthly fee.

Nothing in this Addendum "G" relieves Dentist of its obligation to maintain patient records under the contract.  All other terms and conditions remain the same.

**SIGNATURES:**

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_waleed stephan_
waleed stephan (Sep 30, 2016)
Dentist
W. A. STEPHAN, A DENTAL CORP

_10-21-2016_
Date

_10/01/2016_
Date

EXHIBIT O

PAGE 590

# EXHIBIT P

## AGREEMENT BETWEEN
## SANTIAGO A. ROJO, D.D.S., INC
## AND
## BORREGO COMMUNITY HEALTH FOUNDATION
## FOR
## DENTAL SERVICES

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of March 29, 2017 between Borrego Community Health Foundation ("BCHF") and Santiago A. Rojo, D.D.S., Inc. ("Dentist"), collectively the "Parties".

### RECITALS

**WHEREAS,** BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC). BCHF operates clinics throughout San Diego, San Bernardino, and Riverside Counties. The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS"). The approved scope includes performance of primary dental services; and

**WHEREAS,** "BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement. The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS,** "Dentist" operates and administers a private practice in the Moreno Valley area of California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

### AGREEMENT

**NOW, THEREFORE,** in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I. **DEFINITIONS**

A. **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

B. **SCOPE OF SERVICES.** Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are

authorized to be rendered by BCHF to residents of the specified service area.

## II. ACKNOWLEDGEMENT

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

## III. INDEPENDENT RELATIONSHIP

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement. Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other. This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

## IV. PROFESSIONAL SERVICES

A. **COVERED SERVICES.** Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

B. **SERVICE AVAILABILITY.** "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director. "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement. Such facilities must meet standards of practice expected of a licensed facility. Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

C. **DOCUMENTATION AND DESCRIPTION OF SERVICES.** "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes. In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records. "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

D. **PRIOR AUTHORIZATION.** For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior

to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E.   **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

F.   **SLIDING FEE.**  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G.   **NON-DISCRIMINATION.**  "Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

V.   **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A.   **QUALITY OF CARE.** "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations. "BCHF" will communicate in writing any corrective action that must be resolved in a

timely manner.

**B.   POLICIES AND PROCEDURES.**  The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

**C.   PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

**D.   AUTHORITY.**  "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular,  "BCHF" shall retain ultimate authority over the following:

1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

**E.   NOTIFICATION.**  "Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

**VI.   NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

**A.   It is** specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

EXHIBIT P

PAGE 595

B.   "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected.

C.   "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes  of this paragraph, a "patient  of BCHF" shall mean any patient seen or treated by "BCHF" (whether  by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.   COMPENSATION

A.   **FEE SCHEDULE.  "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

B.   **ENCOUNTER SUBMISSION.**  Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

C.   **TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed and made on the 15th day of each month to the "Dentist" with a detailed explanation of reimbursement.  Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

A.   **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.**  "Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.  "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need.

EXHIBIT P

PAGE 596

The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF". "Dentist" will provide occasional after hour sessions to provide expanded availability. These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary. As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

B. **VERIFICATION OF PATIENT STATUS.** "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist. "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist". If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment. If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

C. **REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES**. The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such. The information will be made available in a timely manner according to established policies and procedures. "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

D. **REFUSAL TO PROVIDE SERVICES.** The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients. "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

E. **REFERRAL FOR SPECIALTY SERVICES.** "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care. "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

X. **LEGAL**

A. **LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.** Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to

EXHIBIT P
PAGE 597

entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement. "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement. The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification.  Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

B. **COMPLIANCE WITH THE LAW.**  "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

C. **MISREPRESENTATION.** "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

D. **COMPLIANCE WITH OTHER LAWS.**  In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply  with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination,  as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned  firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply  with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution  Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply  with the certification  and disclosure requirements of the Byrd Anti-Lobbying  Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify  that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

XI.  **RECORD KEEPING AND REPORTING**

A. **PROGRAMMATIC RECORDS.** "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested. In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

B. **FINANCIAL RECORDS.** "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated. If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is later. "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription, and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained. This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

C. **PARTICIPATING PATIENT RECORDS.** "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement. All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF". "Dentist" and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

D. **RETENTION OF PATIENT RECORDS.** Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law. In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF". Record retention obligations survive the termination of this Agreement.

E. **OWNERSHIP OF PATIENT RECORDS.** "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed. "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent with applicable Federal and State laws and regulations and "BCHF's" policies and procedures regarding the privacy and

confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

## XII.   INSURANCE

A.   **PROOF OF COVERAGE.**  The "Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

B.   "Dentist" will provide "BCHF" with sufficient  evidence of professional liability coverage in the amount of at least:

1.   General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2.   Workers' Compensation, as required under California State law.

3.   Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

C.   It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

D.   Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or

EXHIBIT P

PAGE 600

omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

E. **INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.  CONFIDENTIALITY

A.  Except as is necessary in the performance  of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes)  as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors)  also agree not to disclose, except to each other, any proprietary information, professional secrets or other information  obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

B.  The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.  TERM AND TERMINATION

A.  **TERM.**  This Agreement begins on March _29_, 2017 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other sixty (60) days in advance of termination.  Renewal is subject to "BCHF's"

determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

B. **TERMINATION WITHOUT CAUSE.** Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

C. **TERMINATION FOR CONVENIENCE.** This Agreement may be terminated at any time upon the mutual agreement of the parties.

D. **TERMINATION FOR BREACH.** This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

E. **IMMEDIATE TERMINATION.** In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

F. **SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement. "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV. GENERAL PROVISIONS

A. **AMENDMENT/MODIFICATION.** This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed. Amendments will take effect upon the date of execution of both parties.

B. **ASSIGNMENT.** This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

C. **EFFECT OF WAIVER.** A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

D. **EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless

EXHIBIT P

PAGE 602

otherwise agreed.

E. **NOTICE.** Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F. **DISPUTE RESOLUTION.** Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G. **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H. **ENTIRE AGREEMENT.** This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

Date: 3-31-2017

Address: PO Box 2369

Borrego Springs, CA 92004

Phone: (619) 444-5704

Contact: Travis Lyon

E-mail: cdtlyon@borregomedical.org

Santiago A. Rojo, D.D.S., Inc.

Date: 3/29/2017

Address: 22435 Alessandro Blvd., Ste. 106

Moreno Valley, Ca. 92553

Phone: (951) 656-3100

Contact: Dr. Rojo

E-mail: rojodental@gmail.com

**Addendum "A"**

**Scope of Services**

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of  commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

EXHIBIT P
PAGE 604

## Addendum "B"

### Compensation of Dental Services
### Medi-Cal

"Dentist" will be reimbursed according to patient's insurance type.  Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not | $100 |

| | | | in scope. | |
|---|---|---|---|---|
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee. | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

EXHIBIT P

## Addendum "C"

### Location of Service

All dental services under this agreement will be rendered at:

Santiago A. Rojo, D.D.S., Inc.

Family Dentistry Inc.
22435 Alessandro Blvd., Suite 106
Moreno Valley, Ca.  92553

Phone;   (951) 656-3100

---

During the hours of;

| | |
|---|---|
| Monday | 9-6pm |
| Tuesday | 9-6pm |
| Wednesday | 9-6pm |
| Thursday | 9-6pm |
| Friday | 9-6pm |
| Saturday | 8-3pm |
| Sunday | Closed |

---

NPI Number - Organization   1659621613

NPI Number- Individual          1073744389

Copies attached

## CONFIDENTIALITY OF STUDENT INFORMATION /
## PROTECTED HEALTH INFORMATION (PHI)

### HIPAA BUSINESS ASSOCIATE ADDENDUM

This Agreement is made effective the **29** day of March, 2017 by and between Borrego Health, hereinafter referred to as "Covered Entity", and Santiago A. Rojo, D.D.S., Inc.hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

### RECITALS:

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated March **29**, 2017 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.    DEFINITIONS

    A.   Catch-all definition:
        The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident,

EXHIBIT P
PAGE 608

Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule, but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B.  Specific definitions:

   1.  <u>Business Associate</u>.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Santiago A. Rojo, D.D.S., Inc.

   2.  <u>Covered Entity</u>.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

   3.  <u>HIPAA Rules</u>.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

   4.  <u>Protected Health Information</u>. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

   5.  <u>Electronic Protected Health Information</u>. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.  <u>CONFIDENTIALITY AND SECURITY REQUIREMENTS</u>

A.  Business Associate agrees:
   1.  Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

   2.  To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

   3.  To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including

EXHIBIT P

PAGE 609

breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures.

EXHIBIT P

PAGE 610

4. Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5. Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6. Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7. Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8. Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C. Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement. Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D. The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E. Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware. Business Associate shall report to Covered Entity any Security Incident of which it becomes aware. Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system. In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

EXHIBIT P
PAGE 611

III.    AVAILABILITY OF PHI

A.  Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.    TERM/TERMINATION

A.  Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B.  Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

C.  Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

D.  Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.    MISCELLANEOUS

A.  Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement

EXHIBIT P
PAGE 612

and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B. **Amendment; Independent Parties.** This Agreement may be amended or modified only in a writing signed by the Parties. No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship. This Agreement will be governed by the laws of the State of California. No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. **Minimum Requirements.** The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control. The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. **Severability.** In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect. In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing. For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:** 　　　　　　　　　　　　　　　**BUSINESS ASSOCIATE:**

_____　　　　　　　　　_____
Bruce Hebets, CEO　　　　　　　　　　　　　　Santiago A. Rojo D.D.S., Inc.
Borrego Community Health Foundation

3 - 31 - 2017　　　　　　　　　　　　　　　3/29/2017
_____　　　　　　　　　_____
Date　　　　　　　　　　　　　　　　　　　　Date

**Addendum "D"**
**ADDITION OF MEDI-CAL ADULT DENTAL**
**AND SLIDING FEE**

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

**SCOPE OF BENEFITS**

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

**EMERGENCY COVERAGE**

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

**SLIDING FEE**

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_____
Santiago A. Rojo, D.D.S., Inc.

**3 - 31 - 2017**
_____
Date

**3/29/2017**
_____
Date

EXHIBIT P
PAGE 614

**Addendum "E"**

**COMPENSATION OF DENTAL SERVICES**
**ADULT MEDI-CAL**

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns, root canals and bridges are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions - simple | D7111, D7140 | 1 | Per visit - multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit - multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510,  D5520, D5610,  D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730,  D5731, D5740,  D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750,  D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |
| | | | | |

**Addendum "F"**

**DENTAL SLIDING FEE SCALE**
**SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these

programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
  - ➤ Oral Surgery
  - ➤ Endodontist
  - ➤ Periodontist
  - ➤ Orthodontist
  - ➤ Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

### Dental Sliding Fee Discount

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

Bruce Hebets, CEO
Borrego Community Health Foundation

3-31-2017
Date

Santiago A. Rojo, D.D.S., Inc.

Date

# EXHIBIT Q

**AGREEMENT BETWEEN**
**MARCELO TOLEDO D.D.S. INC**
**AND**
**BORREGO COMMUNITY HEALTH FOUNDATION**
**FOR**
**DENTAL SERVICES**

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of June 16,2015 between Borrego Community Health Foundation ("BCHF") and Marcelo Toledo, D.D.S. INC. ("Dentist"), collectively the "Parties"

**RECITALS**

**WHEREAS,** BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC)   BCHF operates clinics throughout Riverside and San Diego Counties including Centro Medico Cathedral City 69175 Ramon Rd, Cathedral City, CA 92234 The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS")   The approved scope includes performance of primary dental services; and

**WHEREAS, "**BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement.  The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS,** "Dentist" operates and administers a private practice in the Palm Springs and Rialto, California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information )

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.   **DEFINITIONS**

   A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

   B.   <u>**SCOPE**</u> **OF SERVICES.**  Those services approved by the Health Resource and

Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

## II.   ACKNOWLEDGEMENT

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement

## III.   INDEPENDENT RELATIONSHIP

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other   This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value

## IV.   PROFESSIONAL SERVICES

**A.   COVERED SERVICES.**  Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services

**B.   SERVICE AVAILABILITY.**  "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director   "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy  "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients

**C.   DOCUMENTATION AND DESCRIPTION OF SERVICES.**  "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any)  The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes   In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records   "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

D.  **PRIOR AUTHORIZATION.**  For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF"  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval  This does not apply to treatment paid directly by Denti-Cal

E.  **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF"  Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt

F.  **SLIDING FEE**.  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C F R.§51c 303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt  "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G.  **NON-DISCRIMINATION.** **"**Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered  This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80 3-80 4, and Civil Rights Act of 2007.

V.  **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A.  **QUALITY OF CARE**   "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services  The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility

and record review in keeping with "BCHF" standards and applicable regulations "BCHF" will communicate in writing any corrective action that must be resolved in a timely manner

**B. POLICIES AND PROCEDURES.** The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures. Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards   Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

**C. PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

**D. AUTHORITY.** "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above   In particular,  "BCHF" shall retain ultimate authority over the following.

1   Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist"

3   Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards

4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below

**E. NOTIFICATION. "**Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services   "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation

**VI.    NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

**A.** It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of

any kind (directly or indirectly), for the referral of individuals or business to either party by the other party

**B.** "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected

**C.** "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive  "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care

## VIII.   COMPENSATION

**A.   FEE SCHEDULE.  "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B"

**B.   ENCOUNTER SUBMISSION.**  Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C.   TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed and made on the 15th day of each month to the "Dentist" with a detailed explanation of reimbursement  Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

**A.   AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.  "**Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business

EXHIBIT Q
PAGE 624

hours   "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF".  "Dentist" will provide occasional after hour sessions to provide expanded availability   These sessions may include weekend clinics or after 5.00 p m  schedules. "Dentist" will accommodate dental emergencies as necessary   As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week

**B.   VERIFICATION OF PATIENT STATUS.**   "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist    "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist"   If it is determined that the Participating Patient is not a "BCHF" patient  on the date of service,  "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment.  If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement

**C.   REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES**. The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such   The information will be made available in a timely manner according to established policies and procedures.  "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such

**D.   REFUSAL TO PROVIDE SERVICES.**  The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients   "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist"  In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient

**E.   REFERRAL FOR SPECIALTY SERVICES.**  "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services.  Participating Patients will be provided information as to available specialists that are available in the community for such care   "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

**X.   LEGAL**

**A.   LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**  Dentist will provide

"BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF " Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement. The same requirements apply to "Dentist" employees and staff   No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification   Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

B. **COMPLIANCE WITH THE LAW.** "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry  Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement

C. **MISREPRESENTATION** "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

D. **COMPLIANCE WITH OTHER LAWS**. In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable

1   To comply  with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination,  as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U S  Department of Labor regulations at 41 C.F  R. Part 60,

2.  To make positive efforts to utilize small businesses, minority-owned  firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3   To comply  with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S C  §7401 et. seq ) and the Federal Water Pollution  Control Act (33 U S C. § 1251 et seq.), as amended,

4   To comply  with the certification  and disclosure requirements of the Byrd Anti-Lobbying  Amendment (31 U S C. § 1352), and any applicable implementing regulations, as may be applicable; and

5   To certify  that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations

XI.   **RECORD KEEPING AND REPORTING**

A.  **PROGRAMMATIC RECORDS**   "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested   In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

B.  **FINANCIAL RECORDS**  "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated   If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription,  and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained   This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value

C.  **PARTICIPATING PATIENT RECORDS**   "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement   All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF"   "Dentist"  and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

D.  **RETENTION OF PATIENT RECORDS**.  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law   In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".   Record retention obligations survive the termination of this Agreement.

E.  **OWNERSHIP OF PATIENT RECORDS**.  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist",

EXHIBIT Q
PAGE 627

upon reasonable notice to "BCHF" and consistent with applicable Federal and State laws and regulations and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent, and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records

## XII.   INSURANCE

**A.   PROOF OF COVERAGE.**   The **"Dentist"** , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter

**B.**   "Dentist" will provide "BCHF" with sufficient evidence of professional liability coverage in the amount of at least

1   General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate, Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate, Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate

2.   Workers' Compensation, as required under California State law

3   Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement

**C.**   It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party

EXHIBIT Q
PAGE 628

**D.** Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages

**E. INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students

## XIII. CONFIDENTIALITY

**A.** Except as is necessary in the performance of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors) also agree not to disclose, except to each other, any proprietary information, professional secrets or other information obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

**B.** The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV. TERM AND TERMINATION

**A. TERM.** This Agreement begins on June 16, 2015 and shall be automatically and

successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other sixty (60) days in advance of termination. Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

**B.   TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

**C.   TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties

**D.   TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period

**E.   IMMEDIATE TERMINATION.**  In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement, or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

**F.   SURVIVAL.**  Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement   "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

**A.   AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.  Amendments will take effect upon the date of execution of both parties.

**B.   ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action

**C.   EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

D.   **EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

E.   **NOTICE.** Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page

F.   **DISPUTE RESOLUTION.** Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i e , circumstances under which an extended resolution procedure may endanger the health and safety of the Participating Patients) Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G.   **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H.   **ENTIRE AGREEMENT.** This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

Date  6/19/2015

Address  955 Harbor Island Drive, Suite 110

  San Diego, CA 92101

Phone:   619-873-3555

Contact   Cynthia Preciado

  E-mail  cpreciado@borregomedical org

Marcelo Toledo, DDS

Date   6/16/2015

Address   1701 Palm Canyon Dr

  Palm Springs, CA  92262

Phone   760-~~422-5613~~  864- 8793

Contact  Debbie

E-mail  Marcelotoledsddsinc@ hotmail.com

EXHIBIT Q
PAGE 631

Addendum "A"

Scope of Services

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of sliding fee are provided by "BCHF" guidelines

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals
Crowns
Partials
Dentures

EXHIBIT Q
PAGE 632

Addendum "B"
Compensation of Dental Services
Medi-Cal

"Dentist" will be reimbursed according to patient's insurance type.  Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below   Crowns and root canals are subject to prior review and authorization by the Dental Director   If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope | $100 |

EXHIBIT Q
PAGE 633

| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope | $165 |
|---|---|---|---|---|
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

EXHIBIT Q

Addendum C

Location of Service

All dental services under this agreement will be rendered at.

1701 Palm Canyon Drive
Palm Springs, CA 92262
Phone:  760-422-5613

During the hours of

Tuesdays
8 00 am – 5.00 pm

AND AT

326 N Riverside Avenue
Rialto, CA 92376
Phone: 909-875-1464

During the hours of.

Monday, Wednesdays and Fridays
8 00 am - 5:00 pm

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the 16th day of June, 2015 by and between Borrego Health, hereinafter referred to as "Covered Entity", and Marcelo Toledo, D.D S. Inc. hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties")
**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated June 16, 2015 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement,
NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I      DEFINITIONS

    A   Catch-all definition
       The following terms used in this Agreement shall have the same meaning as those
       terms in the HIPAA Rules  Breach, Data Aggregation, Designated Record Set,
       Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy

Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use  In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control. Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule, but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control

    B  <u>Specific definitions</u>

        1  <u>Business Associate</u>.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Marcelo Toledo, D.D S. Inc

        2  <u>Covered Entity</u>.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160 103, and in reference to the party to this agreement, shall mean Borrego Health

        3  <u>HIPAA Rules</u>.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

        4  <u>Protected Health Information</u>  "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual, and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below

        5  <u>Electronic Protected Health Information</u>  "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media

II    <u>CONFIDENTIALITY AND SECURITY REQUIREMENTS</u>

  A.  Business Associate agrees
      1.  Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law,

      2.  To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement,

      3.  To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including

EXHIBIT Q
PAGE 637

breaches of unsecured protected health information as required at 45 CFR 164 410, and any security incident of which it becomes aware  Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach,

4. In accordance with 45 CFR 164 502(e)(1)(ii) and 164 308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information,

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164 524;

6  To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164 526;

7  To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164 528,

8  To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s), and

9  To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10  Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement

B   Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows.

1   As necessary to perform the services set forth in the underlying Service Agreement; and/or

2   As required by law

3   Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures

EXHIBIT Q

PAGE 638

4    Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5    Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6.   Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate

7    Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached

8.   Business associate may provide data aggregation services relating to the health care operations of the covered entity

C.  Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement   Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule

D.  The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule

E.  Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware   Business Associate shall report to Covered Entity any Security Incident of which it becomes aware   Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system   In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement

EXHIBIT Q
PAGE 639

III.    AVAILABILITY OF PHI

    A.  Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164 522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164 526 of the HIPAA Security and Privacy Rule   In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164 528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis

IV.    TERM/TERMINATION

    A  Term  The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

    B  Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement   If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately  Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

    C   Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form   Business associate shall retain no copies of the protected health information.

    D  Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement

V    MISCELLANEOUS

    A  Third Parties, Survival  Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third parties  The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement

and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B  Amendment, Independent Parties. This Agreement may be amended or modified only in a writing signed by the Parties   No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship.  This Agreement will be governed by the laws of the State of California.  No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C.  Minimum Requirements. The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control   The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information

D  Severability. In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect.  In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing.  For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above

COVERED ENTITY                               BUSINESS ASSOCIATE.

By _____               By _____
       Bruce Hebets, CEO                              Marcelo Toledo, DDS

EXHIBIT Q
PAGE 641

Addendum "E"

## COMPENSATION OF DENTAL SERVICES
## ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns, root canals and bridges are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual | $130 per |
| Office visit for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under general anesthesia are not in scope | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Bridge (3 Unit) | D6211, D6241, D6245, D6740 D6751 | 3 or more | | $500 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |

EXHIBIT Q
PAGE 643

Addendum "D"

## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in *California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013))* allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook. Section 5, "Manual of Criteria and Schedule of Maximum Allowances " A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E" Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

Bruce Hebets/CEO

Date: 6-19-2015

Dentist *Marcelo Toledo DDS*

Date 6-16-2015

Addendum "E"

## COMPENSATION OF DENTAL SERVICES
## ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below.  Crowns, root canals and bridges are subject to prior review and approval by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit  for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions – simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal – Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal – Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
|---|---|---|---|---|
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Bridge (3 Unit) | D6211, D6241, D6245, D6740 D6751 | 3 or more | | $500 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |

EXHIBIT Q

PAGE 646

Addendum "F"
### DENTAL SLIDING FEE SCALE
### SUMMARY OF BENEFITS

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice

**Benefits:**
The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only   It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook – Manual of Criteria (Section 5)

The program includes·
- Exam and X-rays ·
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**
The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply  Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office  Your office may be required to provide limited assistance (e g  emailing an application or referring the applicant to one of our local clinics for assistance)  Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these programs if deemed eligible

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit  All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum  Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However BCHF will pay an additional $5 00 upon receipt of a super bill for services rendered.

**Program Exclusions:**

- Referrals to all specialists including but not limited to
  - Oral Surgery
  - Endodontist
  - Periodontist
  - Orthodontist
  - Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

Bruce Hebets CEO

Date. 06\19\15

Dentist _Marcelo Toledo DDS_

Date 06\16\15

## Dental Sliding Fee Discount

| Sliding Fee | A | | B | C | D |
|---|---|---|---|---|---|
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% |

Revised 10/16/2012

EXHIBIT Q
PAGE 649

| E |
| --- |
| 176 -200% |
| 10% |

# EXHIBIT R

# AGREEMENT BETWEEN
## MARLENE M. THOMPSON, D.D.S., INC.
## AND
## BORREGO COMMUNITY HEALTH FOUNDATION
## FOR
## DENTAL SERVICES

**THIS DENTAL SERVICES AGREEMENT** ( "Agreement") is entered into as of April 18, 2013 between Borrego Community Health Foundation ("BCHF") and Marlene M. Thompson, D D S., Inc ("Dentist"), collectively the "Parties"

## RECITALS

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC)   BCHF operates clinics throughout Riverside and San Diego Counties including Centro Medico Escondido located at  1151 Washington Avenue Suite C Escondido CA 92220   The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS")   The approved scope includes performance of primary dental services, and

**WHEREAS, "**BCHF" desires to increase access to dental services for pediatric and adolescent  patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC

**WHEREAS,** "Dentist"  is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement   The "Dentist" provides the desired scope of services that meet the FQHC criteria, and

**WHEREAS**, "Dentist" operates and administers a private practice in the Escondido area of California and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients (Refer to Addendum "C" for dental office address and contact information )

## AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows

I.   **DEFINITIONS**

   A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF"

   B.   **SCOPE OF SERVICES.**  Those services approved by the Health Resource and

Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

II. **ACKNOWLEDGEMENT**

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

III. **INDEPENDENT RELATIONSHIP**

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other   This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

IV. **PROFESSIONAL SERVICES**

A. **COVERED SERVICES.**  Dentist agrees to provide primary care dental services described in Addendum "A" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII  "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services

B. **SERVICE AVAILABILITY.**   "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C"   Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement   Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

C. **DOCUMENTATION AND DESCRIPTION OF SERVICES.**  "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any)  The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

D. **PRIOR AUTHORIZATION.**   For dental services needing individual consideration

EXHIBIT R
PAGE 653

or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service   In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E.   **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF"  Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement   If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

F.   **SLIDING FEE**.  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R §51c 303(f)    "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G.   **NON-DISCRIMINATION. "**Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status  Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80 3-80.4, and Civil Rights Act of 2007.

V.   **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A.   **QUALITY OF CARE**.  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations.

EXHIBIT R
PAGE 654

"BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

**B.   POLICIES AND PROCEDURES.**  The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards   Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

**C.   PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

**D.   AUTHORITY.**  "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above   In particular,  "BCHF" shall retain ultimate authority over the following·

1   Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4  The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below

**E.   NOTIFICATION.**  **"**Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

**VI.   NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

**A.**   It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either

party by the other party.

**B.** "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected

**C.** "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement   For purposes  of this paragraph, a "patient  of BCHF" shall mean any patient seen or treated by "BCHF" (whether  by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.   COMPENSATION

**A.** **FEE SCHEDULE.  "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

**B.** **ENCOUNTER SUBMISSION.** Dentist will complete a superbill for every visit   The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C.** **TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed and made on the 15th day of each month to the "Dentist" with a detailed explanation of reimbursement   Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances

## IX.   CASE MANAGEMENT

**A.** **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES. "**Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours   "Dentist" will communicate with BCHF management as to appointment

availability so that adjustments can be made to accommodate the identified need. The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF". "Dentist" will provide occasional after hour sessions to provide expanded availability. These sessions may include weekend clinics or after 5 00 p.m schedules. "Dentist" will accommodate dental emergencies as necessary. As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

**B.    VERIFICATION OF PATIENT STATUS.**   "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist    "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist". If it is determined that the Participating Patient is not a "BCHF" patient  on the date of service,  "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment. If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

**C.    REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES**. The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such. The information will be made available in a timely manner according to established policies and procedures. "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

**D.    REFUSAL TO PROVIDE SERVICES.**  The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients. "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist"  In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient

**E.    REFERRAL FOR SPECIALTY SERVICES.**  "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services   Participating Patients will be provided information as to available specialists that are available in the community for such care   "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application

**X.    LEGAL**

**A.    LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**  Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any

other certification or qualification necessary to provide the services specified prior to entering into this Agreement, *and annually upon request of "BCHF."* Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement. "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement.  The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification   Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

**B. COMPLIANCE WITH THE LAW.** "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement

**C. MISREPRESENTATION** "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

**D. COMPLIANCE WITH OTHER LAWS**.  In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1   To comply  with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination,  as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U S. Department of Labor regulations at 41 C F  R  Part 60,

2   To make positive efforts to utilize small businesses, minority-owned  firms and women's business enterprises in connection with the work performed hereunder, whenever possible,

3   To comply  with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U S.C. §7401 et. seq.) and the Federal Water Pollution  Control Act (33 U S C. § 1251 et seq.), as amended;

4.  To comply  with the certification  and disclosure requirements of the Byrd Anti-Lobbying  Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5.  To certify  that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations

## XI.    RECORD KEEPING AND REPORTING

**A. PROGRAMMATIC RECORDS**.  "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested   In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

**B. FINANCIAL RECORDS** "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated.  If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation,  or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription,  and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained   This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value

**C.  PARTICIPATING PATIENT RECORDS**   "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist"  and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

**D. RETENTION OF PATIENT RECORDS**.  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law   In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF"   Record retention obligations survive the termination of this Agreement.

**E. OWNERSHIP OF PATIENT RECORDS**.  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent  with  applicable  Federal and State

laws and regulations  and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

## XII.  INSURANCE

**A.   PROOF OF COVERAGE.**  The **"Dentist"** , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter

**B.**   "Dentist" will provide "BCHF" with sufficient  evidence of professional liability coverage in the amount of at least:

1.  General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate

2.  Workers' Compensation, as required under California State law.

3.  Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement

**C.**  It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

**D.**  Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however,

shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

E. **INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.  CONFIDENDIALITY

A.  Except as is necessary in the performance  of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer  diskettes)  as a result of performing obligations under this Agreement, or of which it is otherwise aware  The parties (and their directors, officers, employees, agents, and contractors)  also agree not to disclose, except to each other, any proprietary information, professional secrets or other information  obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

B.  The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.  TERM AND TERMINATION

A.  **TERM.**  This Agreement begins on April 18, 2013 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other

sixty (60) days in advance of termination   Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

**B.**   **TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

**C.**   **TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

**D.**   **TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

**E.**   **IMMEDIATE TERMINATION.**  In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement, or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement

**F.**   **SURVIVAL.**  Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement   "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination

**XV.**   **GENERAL PROVISIONS**

**A.**   **AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties  Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed   Amendments will take effect upon the date of execution of both parties.

**B.**   **ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

**C.**   **EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

**D.**   **EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this

Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

E.   **NOTICE.**  Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F.   **DISPUTE RESOLUTION.**  Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e , circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients)  Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available

G.   **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H.   **ENTIRE AGREEMENT.**  This Agreement represents the complete understanding  of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

MARLENE THOMPSON, DDS.

_Marlene Thompson_

Date:  _4-26 – 13_

Date  _4/18/13_

Address: _955 Harbor Island Drive Suite 110 San Diego CA · 92101_

Address   988 EL NORTE PARKWAY
ESCONDIDO, CALIFORNIA. 92026

Phone  _760 - 767 - 4633_

Phone:___760-740-2595

Contact: _Cynthia Preciado_

Contact  _HENA - front office_

E-mail _c.preciado@borregomedical.org_
_619-398-2405 ext 4811_

E-mail: _TOOTHNUT 99@yahoo.com_

EXHIBIT R
PAGE 663

Addendum "A"

Scope of Services

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of  commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

EXHIBIT R
PAGE 664

Addendum "B"
Compensation of Dental Services
Medi-Cal

"Dentist" will be reimbursed according to patient's insurance type.  Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below   Crowns and root canals are subject to prior review and authorization by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |

| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $165 |
|---|---|---|---|---|
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee. | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

Addendum C

Location of Service

All dental services under this agreement will be rendered at:

988 el norte parkway
Escondido, California 92026


Phone:  (760)740-2595


During the hours of    Monday    tuesday    Wednesday    thursday —    friday
                       10·7       10-7       9-6          8.5          closed

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This HIPAA Business Associate Addendum ("Addendum") supplements and is made a part of the agreement ("Agreement") be and between Borrego Community Health Foundation, ("BCHF") and Marlene M. Thompson, DDS, Inc (" Dentist" and Business Associate") and is effective as of the date of the original agreement (the "Addendum Effective Date")

RECITALS

WHEREAS, "BCHF", pursuant to the terms of the Agreement, wishes to disclose to Business Associate certain information, some of which may constitute Protected Health Information ("PHI") for the purpose of providing Dental Services to Participating Patients, and

WHEREAS, PHI means any information, whether oral or recorded in any form or medium (i) that relates to the past, present, or future physical or mental condition of an individual, the provision of health care to an individual, or the past, present or future payment for the provision of health care to an individual, and (ii) that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual, and shall have the meaning given to such term under Health Insurance Portability and Accountability Act of 1996, ("HIPAA") and the regulations promulgated there under by the U S Department of Health and Human Services ("HIPAA Regulations"), including, but not limited to 45 CFR Parts 160 and 164, and

WHEREAS, Business Associate is an individual or entity which provides services, arranges, performs or assists in the performance or activities of "BCHF" and who uses or discloses PHI, pursuant to the HIPAA Regulations, 45 CFR Section 160 103, and

WHEREAS, BCHF and Business Associate desire to protect the privacy and provide for the security of PHI disclosed to Business Associate in compliance with HIPAA and the HIPAA Regulations and other applicable laws and regulations, and

WHEREAS, the purpose of this Addendum is to satisfy certain standards and requirements of HIPAA and the HIPAA Regulations, including, but not limited to, Title 45 CFR Section 164 504(e), as the same may be amended from time to time

NOW, THEREFORE, in consideration of the mutual promises made below and the exchange of information pursuant to the Agreement, this Addendum (herein collectively the "Agreement"), the Parties agree as follows

1.    Responsibilities of Business Associate

   a_    Permitted Uses and Disclosures  Business Associate may use and/or disclose PHI received by Business is Associate pursuant to the Agreement and this Addendum solely for the purpose of performing its obligations under the Agreement and this Addendum

EXHIBIT R
PAGE 668

b.  <u>Restrictions of PHI</u>  Business Associate shall notify "BCHF" in writing within twenty-four (24) hours of receipt of any request by residents, Students or their representatives to restrict the use and disclosure of the PHI Business Associate maintains for or on behalf of "BCHF". Upon written notice from "BCHF", Business Associate agrees to comply with any instructions to modify, delete or otherwise restrict the use and disclosure of PHI it maintains for or on behalf of "BCHF".

c.  <u>Use and Disclosure of PHI.</u> Business Associate may, if necessary, use and disclose PHI (i) for the proper management and administration of Business Associate's business or (ii) to carry out Business Associate's legal responsibilities.

d.  <u>Nondisclosure</u>  Business Associate is not authorized and shall not use or further disclose "BCHF's" PHI other than as permitted under the Agreement or this Addendum, or as required by law or regulation

e.  <u>Data Aggregation.</u> Except as otherwise limited by this Addendum and upon "BCHF's" request, Business Associate may use PHI to provide data aggregation services relating to BCHF's healthcare operations as permitted by 45 CFR Section 164 504.

f.  <u>Safeguards</u>  Business Associate shall use appropriate administrative, technical and physical safeguards to prevent any use or disclosure of "BCHF's" PHI other than as provided for by the Agreement and this Addendum

g.  <u>Notification of Breach</u>  Business Associate shall notify "BCHF" in writing within one (1) working day of any suspected or actual breach of security, intrusion, or unauthorized use or disclosure of PHI and/or any actual or suspected use or disclosure Of PHI in violation of the Agreement, this Addendum, HIPAA, the HIPAA regulations, or any applicable federal and state laws and regulations Business Associate shall take (i) prompt corrective action to cure any such deficiencies and (ii) any other action pertaining to such unauthorized disclosure as may be required by all applicable federal and state laws and regulations

h.  <u>Compliance with Law</u>  Business Associate shall comply with all applicable federal and state laws and regulations, including, if applicable under the terms and requirements of the Agreement, the HIPAA Standards for Electronic Transactions, 45 CFR Parts 160 and 162

i.  <u>Business Associate's Agents</u>  Business Associate shall ensure that its employees, agents, and subcontractors who receive "BCHF's" PHI from Business Associate will agree to the same restrictions and conditions that apply to Business Associate with respect to such PHI. Additionally, all employees, agents, and subcontractors shall promptly notify Business Associate of any instances of which it is aware in which the confidentiality of the PHI has been breached.

j.  <u>Inspection of Information.</u> Business Associate shall, within twenty-four (24) hours, excluding weekends and holidays, of receipt of a written or oral request

allow "BCHF" and, if authorized in writing by "BCHF", allow the subject of the PHI to inspect records as may be required to fulfill "BCHF's" obligations to provide access to "BCHF's" PHI pursuant to HIPAA, the HIPAA Regulations, including, but not limited to 45 CFR Section 164.524, and other applicable federal and state laws and regulations.

k   Copies of Information. Business Associate shall, within two (2) calendar days of receipt of a written or oral request, make available to "BCHF", and if authorized in writing by BCHF, to the subject of the PHI, such information as may be required to fulfill "BCHF's" obligations to provide a copy of "BCHF's" PHI pursuant to HIPAA, the HIPAA Regulations, including, but not limited to, 45 CFR Section 164.524, and other applicable federal and state laws and regulations.

l   Accounting of Information  Business Associate shall, within twenty (20) calendar days of receipt of a written request, make available to "BCHF" and, if authorized in writing by "BCHF", to the subject of the PHI, such information as may be required to fulfill "BCHF's" obligations to provide an accounting of disclosures of "BCHF's" PHI pursuant to HIPAA, the HIPAA Regulations, including, but not limited to, 45 CFR Section 164.524. The accounting shall include a listing of PHI disclosures that occurred during the past six (6) years, commencing April 14, 2003  Each accounting entry shall include  (1) the date of the disclosure; (ii) the name and address of the entity or person who received the PHI; (iii) a brief description of the PHI disclosed, and (iv) a brief statement of the purpose and basis for the disclosure, a copy of a written authorization for the disclosure pursuant to 45 CFR Section 164 508, or a copy of a written request for the disclosure pursuant to 45 CFR Sections 164 502 and/or 164.512.

m   Business Associate shall inform "BCHF" within five (5) working days of receipt of any request by or on behalf of the subject of the PHI to amend the PHI Business Associate maintains for or on behalf of "BCHF". Business Associate shall, within twenty (20) calendar days of receipt of a written request, make the subject's PHI available to "BCHF" as may be required to fulfill "BCHF's" obligations to amend PHI pursuant to HIPAA, the HIPAA Regulations, including, but not limited to, 45 CFR Section 164 526, and other applicable federal and state laws and regulations. Business Associate shall, as directed by "BCHF", incorporate any Addendums to "BCHF's" PHI into copies of such PHI maintained and disclosed by Business Associate

n.   Chain of Trust. If applicable, Business Associate shall protect the integrity and confidentiality of any "BCHF" PHI electronically exchanged between Business Associate, "BCHF", and others pursuant to 45 SCR Part 142.

o.   Regulatory Compliance. Business Associate shall make its internal practices, books and records relating to the use and disclosure of PHI received from "BCHF" (or
created or received by Business Associate on behalf of "BCHF") available to any state or federal agency, including the U.S. Department of Health and Human Services, for purposes of determining "BCHF's" compliance with the HIPAA Regulations.

p. Record Retention: Business Associate shall retain all HIPAA-related documentation pertaining to "BCHF's" PHI for a period of six (6) years, as required by HIPAA and the HIPAA regulations.

q Audits, Inspection, and Enforcement. Upon reasonable notice "BCHF" may inspect the facilities, systems, books, and records of Business Associate to monitor compliance with the Agreement and this Addendum. Business Associate shall promptly remedy any violation of any terms of the Agreement of this Addendum and shall certify such remedy in writing to "BCHF".

2  Termination

a. Material Breach. A breach by Business Associate of any material provision of this Addendum, as determined by "BCHF", shall constitute a material breach of the Agreement, and shall provide grounds for immediate termination of the Agreement by "BCHF".

b Effect of Termination. Upon termination of the Agreement for any reason, Business Associate shall return or, at the option of "BCHF", destroy all PHI received from "BCHF", or created and received by Business Associate on behalf of "BCHF", that Business Associate still maintains in any form, and shall retain no copies of such PHI. If return or destruction is not feasible, as determined by "BCHF", Business Associate shall continue to extend indefinitely the protections of this Addendum to such PHI, and immediately terminate any further use or disclosure of such PHI

3.  Changes to the Addendum

a. Compliance with Law The "Parties" acknowledge that state and federal laws relating to electronic data security and privacy are rapidly evolving and that changes to this Addendum may be required to ensure compliance with such developments The "Parties" specifically agree to take such action as may be necessary to implement the standards and requirements of HIPAA, the HIPAA Regulations and other applicable federal and state laws and regulations relating to the security or confidentiality of PHI.

b. Negotiations In the event that a federal or state law, statue, or regulation materially affects the Agreement or this Addendum, the "Parties" agree to negotiate immediately in good faith any necessary or appropriate revisions to the Agreement or this Addendum. If the "Parties" are unable to reach an agreement concerning such revisions within the earlier of sixty (60) calendar days after the date of notice seeking negotiations or the effective date of a change in law or regulation, or if the change is effective immediately, then "BCHF" may immediately terminate this Agreement upon written notice to Business Associate.

4.  Insurance and Indemnification

a. Insurance. Each Party, at its sole cost and expense, shall insure its activities in connection with this Addendum. Specifically, Business Associate and "BCHF" shall each obtain, keep in force and maintain insurance or equivalent programs of self-insurance with appropriate limits that shall cover losses that may arise

EXHIBIT R
PAGE 671

from breach of this Addendum, breach of security, or any unauthorized use of disclosure of PHI. It should be expressly understood, however, that the insurance required herein shall in no way limit the liability of Business Associate or "BCHF" with respect to its activities in connection with this Addendum

b.   Indemnification by Business Associate. Business Associate agrees to defend at BCHF's election, indemnify, and hold harmless "BCHF", its officers, agents and employees from and against any and all claims, liabilities, demands, damages, losses, costs and expenses, (including costs and reasonable attorneys' fees) or claims for injury or damages that are caused by or result from the acts or omissions of Business Associate, its officers, agents or employees with respect to the use and disclosure of "BCHF's" PHI.

c.   Indemnification by "BCHF".   "BCHF" agrees to defend at Business Associate's election, indemnify, and hold harmless Business Associate, its officers, agents and employees from and against any and all claims, liabilities, demands, damages, losses, costs and expenses, (including costs and reasonable attorneys' fees) or claims for injury or damages that are caused by or result from the acts or omissions of "BCHF", its officers, agents or employees with respect to the use and disclosure of "BCHF's" PHI.

5.   Miscellaneous Provisions

a   Assistance in Litigation or Administrative Proceedings  Business Associate shall make itself, and any subcontractors, employees or agents assisting Business Associate in the performance of its obligations under the Agreement and this Addendum, available to "BCHF" at no cost to "BCHF" to testify as witnesses, or otherwise, in the event of litigation or administrative proceedings against "BCHF", its directors, officers, agents or employees based upon claimed violation of HIPAA, the HIPAA Regulations or other federal and state laws and regulations relating to security and privacy and arising out of the Agreement or this Addendum.

b.   No Third Party Beneficiaries  Nothing express or implied in this Addendum is intended to confer, nor shall anything herein confer upon any person other than "BCHF", Business Associate and their respective successors or assignees, any rights, remedies, obligations or liabilities whatsoever

c.   Notice to Secretary. If "BCHF" knows of a pattern of activity or practice of Business Associate that constitutes a material breach or violation of Business Associate's obligation under this Addendum, if the breach or violation continues, and if termination of this Addendum is not feasible, "BCHF" is required by HIPAA and the HIPAA Regulations to report the problem to the Secretary of Health and Human Services.

d   Survival. The obligations of Business Associate under Sections 1(j), 1(k), 1(1), 1(m), 1(p), 2(b), 4(b), 4(c) and 5(a) of this Addendum shall survive the termination of this Agreement

e.   Notices  Any notices to be given to either party shall be made via U S  Mail or express courier to the addresses given below:

EXHIBIT R
PAGE 672

BCHF     Borrego Community Health Foundation
Attn.  Bruce Hebets, Chief Executive Officer
Corporate Office
P.O. Box 2369
Borrego Springs, CA  92004-2369

Dentist·    MARLENE THOMPSON, DDS.
988 EL NONRTE PARKWAY
ESCONDIDO, CALLIFORNIA. 92026
760-740-2595

Each Party may change its address and that of its representative for notice by giving notice in the manner provided above.

f_   Interpretation   Any ambiguity in this addendum shall be resolved in favor of a meaning that permits "BCHF" to comply with HIPAA, the HIPAA Regulations, and other applicable federal and state laws and regulations.

**SIGNATURES:**           Marlene Thompson, DDS

**Bruce Hebets, CEO**

DATE__*4-26-13*____    DATE____*4/18/13*_____

Borrego Community Health Foundation

EXHIBIT R
PAGE 673

Addendum "D"

## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in *California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013))* allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances."  A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

Bruce Hebets CEO

Dentist: _Marlene Thompson DDS_

_Marlene Thompson DDS_

Date: _5/9/14_

Date: _5 1 1 14_

Addendum "E"

## COMPENSATION OF DENTAL SERVICES
## ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below.  Crowns, root canals and bridges are subject to prior review and approval by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit  for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
|---|---|---|---|---|
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Bridge (3 Unit) | D6211, D6241, D6245, D6740 D6751 | 3 or more | | $500 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |

EXHIBIT R

PAGE 676

Addendum "F"
### DENTAL SLIDING FEE SCALE
### SUMMARY OF BENEFITS

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**
The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only.  It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook – Manual of Criteria (Section 5).

The program includes:
- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**
The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit.  All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum.  Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

EXHIBIT R
PAGE 677

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

**Program Exclusions:**

- Referrals to all specialists including but not limited to:
    - Oral Surgery
    - Endodontist
    - Periodontist
    - Orthodontist
    - Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

Bruce Hebets CEO

Date: _____ 5/9/14 _____

Dentist: **Marlene Thompson DDS**

Date: _____ 5 1 14 _____

## Dental Sliding Fee Discount

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176 -200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

Revised 10/16/2012

Addendum "E"

## ADDITION OF SERVICE LOCATION
## TO THE
## AGREEMENT BETWEEN
## MARLENE THOMPSON, D.D.S, INC.
## AND
## BORREGO COMMUNITY HEALTH FOUNDATION

This addendum to the standing Dental Services Agreement between Marlene Thompson, D.D.S., INC. documents the full and complete understanding between the two organizations in regard to the request to add a second dental office that will provide preventive and additional dental services on behalf of Borrego Community Health Foundation (BCHF) at the following address:

126 W El Norte Parkway
Escondido, CA 92026

Phone: 760-480-5622

Hours of Operation: _Mon - Thurs   9AM - 6 PM_

It is agreed and fully understood that this location will be subject to all of the terms and conditions of the original agreement and that it is operating under contract to provide services to patients of a Federally Qualified Health Center. This site is subject to all licensing and quality standards and oversight as outlined in the original agreement and the records are subject to audit as records of this contractual agreement.

All requirements for malpractice and liability insurance must be adhered to and evidence of coverage provided.

Bruce Hebets, CEO
Borrego Community Health Foundation

Date: ___3-4-16___

Dentist: Marlene Thompson
Marlene Thompson, D.D.S., INC

Date: ___02-25-2016___

Addendum "F"

**ADDITION OF SERVICE LOCATION
TO THE
AGREEMENT BETWEEN
MARLENE THOMPSON, D.D.S, INC.
AND
BORREGO COMMUNITY HEALTH FOUNDATION**

This addendum to the standing Dental Services Agreement between Marlene Thompson, D.D.S., INC. documents the full and complete understanding between the two organizations in regard to the request to add a second dental office that will provide preventive and additional dental services on behalf of Borrego Community Health Foundation (BCHF) at the following address:

191 North El Camino Real
Encinitas, CA 920224-5360

Phone: 760-436-0100

Hours of Operation: Mon - Thurs 9 AM - 6 PM

It is agreed and fully understood that this location will be subject to all of the terms and conditions of the original agreement and that it is operating under contract to provide services to patients of a Federally Qualified Health Center. This site is subject to all licensing and quality standards and oversight as outlined in the original agreement and the records are subject to audit as records of this contractual agreement.

All requirements for malpractice and liability insurance must be adhered to and evidence of coverage provided.

Bruce Hebets, CEO
Borrego Community Health Foundation

Date: 3-4-16

Dentist: Marlene Thompson
Marlene Thompson, D.D.S, INC

Date: 02-25-2016

# EXHIBIT S

## AGREEMENT BETWEEN
## _____NESS DENTAL CORPORATION_____
## AND
## BORREGO COMMUNITY HEALTH FOUNDATION
## FOR
## DENTAL SERVICES

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of May 2nd 2016 between Borrego Community Health Foundation ("BCHF") and Ness Dental Corporation dba Crown Dental Group ("Dentist"), collectively the "Parties".

## RECITALS

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC). BCHF operates clinics throughout Riverside and San Diego Counties including Centro Medico El Cajon at 133 Main Street, El Cajon, CA 92020.   The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS"). The approved scope includes performance of primary dental services; and

**WHEREAS, "BCHF"** desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC. .

**WHEREAS**, "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement. The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS**, "Dentist" operates and administers a private practice in the National City, area of California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

## AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.   **DEFINITIONS**

A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

B.   **SCOPE OF SERVICES.** Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

EXHIBIT S

PAGE 683

II.  **ACKNOWLEDGEMENT**
The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

III.  **INDEPENDENT RELATIONSHIP**
None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

IV.  **PROFESSIONAL SERVICES**

A.  **COVERED SERVICES.**  Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

B.  **SERVICE AVAILABILITY.**  "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

C.  **DOCUMENTATION AND DESCRIPTION OF SERVICES.**  "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

D. **PRIOR AUTHORIZATION.**  For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the

dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E.   **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

F.   **SLIDING FEE.**  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G.   **NON-DISCRIMINATION.** **"**Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

V.   **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A.   **QUALITY OF CARE**.  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations. "BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

B.   **POLICIES AND PROCEDURES.**  The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and

procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

C. **PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

D. **AUTHORITY.** "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above. In particular, "BCHF" shall retain ultimate authority over the following:

   1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

   2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

   3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

   4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

E. **NOTIFICATION.** "Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services. "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

VI. **NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

A. It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

B. "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected.

C. "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or

attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes  of this paragraph, a "patient  of BCHF" shall mean any patient seen or treated by "BCHF" (whether  by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.   COMPENSATION

A.   **FEE SCHEDULE.  "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

B.   **ENCOUNTER SUBMISSION.**  Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

C.   **TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed and made within 3-4 weeks from submittal date to the "Dentist" with a detailed explanation of reimbursement.  Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

A.   **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.  "**Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.  "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need.  The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF".  "Dentist" will provide occasional after hour sessions to provide expanded availability.  These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary.  As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

B.   **VERIFICATION OF PATIENT STATUS.**   "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist.  "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist".  If it is determined that the Participating

Patient is not a "BCHF" patient  on the date of service,  "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment. If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

C. **REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES.** The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such.  The information will be made available in a timely manner according to established policies and procedures.  "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

D. **REFUSAL TO PROVIDE SERVICES.**  The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients.  "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

E. **REFERRAL FOR SPECIALTY SERVICES.**  "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services.  Participating Patients will be provided information as to available specialists that are available in the community for such care.  "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

X.   **LEGAL**

A. **LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**  Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement. "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement.  The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification.  Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

B. **COMPLIANCE WITH THE LAW.**  "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is

grounds for immediate termination under Section XIV of this Agreement.

C. **MISREPRESENTATION**. "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

D. **COMPLIANCE WITH OTHER LAWS**. In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

XI. **RECORD KEEPING AND REPORTING**

A. **PROGRAMMATIC RECORDS**. "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested. In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

B. **FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated. If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is

later. "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription, and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained. This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

C. **PARTICIPATING PATIENT RECORDS.** "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement. All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF". "Dentist" and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

D. **RETENTION OF PATIENT RECORDS.** Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law. In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF". Record retention obligations survive the termination of this Agreement.

E. **OWNERSHIP OF PATIENT RECORDS.** "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed. "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent with applicable Federal and State laws and regulations and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

XII. **INSURANCE**

A. **PROOF OF COVERAGE.** The **"Dentist"**, at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

B. "Dentist" will provide "BCHF" with sufficient evidence of professional liability coverage in the amount of at least:

1. General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2. Workers' Compensation, as required under California State law.

3. Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

C. It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

D. Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

E. **INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

XIII. **CONFIDENTIALITY**

EXHIBIT S
PAGE 691

A.   Except as is necessary in the performance of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors) also agree not to disclose, except to each other, any proprietary information, professional secrets or other information obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

B.   The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.   TERM AND TERMINATION

A.   **TERM.**  This Agreement begins on _May 2nd__, 2016 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other sixty (60) days in advance of termination.  Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

B.   **TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

C.   **TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

D.   **TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

E.   **IMMEDIATE TERMINATION.**  In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

F.   **SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by

EXHIBIT S

PAGE 692

"BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement. "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

XV.     **GENERAL PROVISIONS**

A.   **AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.  Amendments will take effect upon the date of execution of both parties.

B.   **ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

C.   **EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

D.   **EFFECT OF INVALIDITY.** The invalidity or un-enforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

E.   **NOTICE.**  Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F.   **DISPUTE RESOLUTION.**  Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G.   **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H.   **ENTIRE AGREEMENT.**  This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

Date: 5 - 6 - 2016

Address: PO Box 2369

Borrego Springs, CA 92004

Phone: (619) 444-5704

Contact: Travis Lyon
Contact:_____

E-mail: cdtlyon@borregomedical.org

_____NESS DENTAL CORPORATION___

x

Date:____5/2/2016_____

Address:__2405 Transportation Ave_____

_____National City, CA 91950_____

Phone:____619-649-8239_____

Norma: office manager

E-mail____crowndentalinc@gmail.com _NO_

OK → dental2405 @ gmail .com

### Addendum "A"

### Scope of Services

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of  commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)

EXHIBIT S

PAGE 694

Crowns (prior review required by the "BCHF" Dental Director)

EXHIBIT S
PAGE 695

**Addendum "B"**

**Compensation of Dental Services**
**Medi-Cal**

"Dentist" will be reimbursed according to patient's insurance type.  Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |

| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |
|---|---|---|---|---|
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee. | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

**Addendum "C"**

**Location of Service**

All dental services under this agreement will be rendered at:

DBA _CROWN DENTAL GROUP_

Address _2405 TRANSPORTATION AVE._

_NATIONAL CITY, CA 91950_

Phone: _619-474-6200_

During the hours of:

_MONDAY THRU SATURDAY - 8:00 AM - 5 PM_

NPI Number - Organization _1760869796_

NPI Number- Individual _1821105446_

Copies attached

1760869796
Corp.
**CROWN DENTAL GROUP
2405 TRANSPORTATION AVE
NATIONAL CITY CA 91950**

1821105446 -
Ind.

EXHIBIT S
PAGE 698

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the May 2nd, 2016 by and between Borrego Health, hereinafter referred to as "Covered Entity", and Ness Dental Corporation dba Crown Dental Group hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated May 2, 2016 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.   DEFINITIONS

   A.   <u>Catch-all definition</u>:
The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the

EXHIBIT S
PAGE 699

HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control. Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule, but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B. Specific definitions:

1. Business Associate. "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Ness Dental Corporation dba Crown Dental Group.

2. Covered Entity. "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

3. HIPAA Rules. "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

4. Protected Health Information. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual. "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

5. Electronic Protected Health Information. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II. CONFIDENTIALITY AND SECURITY REQUIREMENTS

A. Business Associate agrees:

1. Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

2. To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

3. To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the

EXHIBIT S
PAGE 700

time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures.

4. Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5. Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered

EXHIBIT S
PAGE 701

entity.

6. Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7. Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8. Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C. Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement. Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D. The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E. Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware. Business Associate shall report to Covered Entity any Security Incident of which it becomes aware. Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system. In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

III.   AVAILABILITY OF PHI

A. Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity. Business Associate agrees to make available

Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   TERM/TERMINATION

A. Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B. Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

C.  Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

D. Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.   MISCELLANEOUS

A. Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B. Amendment; Independent Parties. This Agreement may be amended or modified only in a writing signed by the Parties. No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create

EXHIBIT S
PAGE 703

any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship. This Agreement will be governed by the laws of the State of California. No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. <u>Minimum Requirements.</u> The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control. The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. <u>Severability.</u> In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect. In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing. For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

5-6-2016
_____
Date

**BUSINESS ASSOCIATE:**

_____
Dr. Douglas G. Ness
NESS DENTAL CORPORATION

_____5/2/16_____
Date

EXHIBIT S
PAGE 704

## Addendum "D"
## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F".

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_____
Dr. Douglas G. Ness
NESS DENTAL CORPORATION

5-6-2016
_____
Date

5/2/16
_____
Date

Addendum "E"

## COMPENSATION OF DENTAL SERVICES
### ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns, root canals and bridges are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions - simple | D7111, D7140 | 1 | Per visit -- multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit -- multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

EXHIBIT S

PAGE 706

| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70  per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Bridge (3 Unit) | D6211, D6241, D6245, D6740 D6751 | 3 or more | | $500 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |

**Addendum "F"**

**DENTAL SLIDING FEE SCALE**
**SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal

EXHIBIT S
PAGE 708

fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
  - ➤ Oral Surgery
  - ➤ Endodontist
  - ➤ Periodontist
  - ➤ Orthodontist
  - ➤ Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

**Dental Sliding Fee Discount**

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| | | | | | | |
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200 |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

Bruce Hebets, CEO
Borrego Community Health Foundation

5-6-2016

Date

Dr. Douglas G. Ness
NESS DENTAL CORPORATION

5/2/16

Date

EXHIBIT S

PAGE 709

**Addendum "G"**

**HITRUST CERTIFICATION HIPAA COMPLIANT DATA STORAGE FEE**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to maintain patient records and data associated with patient visits to i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law.  Dentists are also required maintain these records.

An online system for claim submissions and patient record storage for the contract dental program is currently in development.  Upon implementation of this system all patient records will also be stored online on Health Insurance Portability and Accountability Act (HIPAA) compliant servers.  Dentist will have secure access to the system for all Dentist's patients under the contract dental program.

**HITRUST Certification:** In order to safely maintain the integrity of your patient data and meet HIPAA compliance, Premier Health Care Management (PHCM) conducts quarterly audits in order to maintain HITRUST Certification.  A team of third party auditors conduct a three-tiered audit to achieve the highest HIPAA certification available. In addition to the technical audit, Dentist understands that PHCM will request semiannual access to computers running licensed software to ensure physical security standards are being maintained.   PHCM will request access a week in advance unless a specific risk is determined.

Dentist agrees to pay One Hundred and Fifty Dollars ($150.00) per month for costs associated with record storage and HITRUST certification audits of the system.  This monthly fee will only be assessed once the online storage system is implemented.  Dentist will be provided notice of no less than 21 days prior to implementation and commencement of the monthly fee.

Nothing in this Addendum "G" relieves Dentist of its obligation to maintain patient records under the contract.  All other terms and conditions remain the same.

**SIGNATURES:**

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_5-6-2016_
_____
Date

_____
Dr. Douglas G. Ness
NESS DENTAL CORPORATION

_5-2-16_
_____
Date

EXHIBIT S

PAGE 710

# EXHIBIT T

AGREEMENT BETWEEN

GEORGE C. JARED, DDS, INC.

AND

BORREGO COMMUNITY HEALTH FOUNDATION

FOR

DENTAL SERVICES

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of April 19, 2016 between Borrego Community Health Foundation ("BCHF") and George C. Jared, DDS, Inc. ("Dentist"), collectively the "Parties".

## RECITALS

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC). BCHF operates clinics throughout Riverside and San Diego Counties including Centro Medico El Cajon located at: 133 Main Street, El Cajon, CA 92020. The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS"). The approved scope includes performance of primary dental services; and

**WHEREAS**, "BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS**, "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement. The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS**, "Dentist" operates and administers a private practice in the El Cajon, City area of California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

## AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.   **DEFINITIONS**

A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to received dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the

FQHC operated by "BCHF".

**B. SCOPE OF SERVICES.** Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

## II. ACKNOWLEDGEMENT

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

## III. INDEPENDENT RELATIONSHIP

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement. Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other. This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

## IV. PROFESSIONAL SERVICES

**A. COVERED SERVICES.** Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

**B. SERVICE AVAILABILITY.** "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director. "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement. Such facilities must meet standards of practice expected of a licensed facility. Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

**C. DOCUMENTATION AND DESCRIPTION OF SERVICES.** "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes. In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records. "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable

laws or regulations.

**D.   PRIOR AUTHORIZATION.**   For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

**E.   AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

**F.   SLIDING FEE.**  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

**G.   NON-DISCRIMINATION.**  "Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

**V.   QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

**A.   QUALITY OF CARE.**  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services.

EXHIBIT T
PAGE 714

The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations. "BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

B.   **POLICIES AND PROCEDURES.**  The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

C.   **PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

D.   **AUTHORITY.**  "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular,  "BCHF" shall retain ultimate authority over the following:

1.  Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2.  Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3.  Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4.  The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

E.   **NOTIFICATION.**  **"Dentist"** shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

VI.   **NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

A. It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

B. "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected.

C. "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement. For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII. CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k )(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII. COMPENSATION

A. **FEE SCHEDULE.** "Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

B. **ENCOUNTER SUBMISSION.** Dentist will complete a superbill for every visit. The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation. Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

C. **TIMING OF PAYMENT.** Payment will be made on claims that are paid to "BCHF" by third party payors. The payment will be processed and made on the 15th day of each month to the "Dentist" with a detailed explanation of reimbursement. Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX. CASE MANAGEMENT

A. **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.** "Dentist"

EXHIBIT T
PAGE 716

agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours. "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need. The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF". "Dentist" will provide occasional after hour sessions to provide expanded availability. These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary. As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

B. **VERIFICATION OF PATIENT STATUS.** "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist. "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist". If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment. If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

C. **REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES.** The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such. The information will be made available in a timely manner according to established policies and procedures. "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

D. **REFUSAL TO PROVIDE SERVICES.** The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients. "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

E. **REFERRAL FOR SPECIALTY SERVICES.** "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care. "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

X. **LEGAL**

EXHIBIT T
PAGE 717

**A.   LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.** Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement. "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement.  The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification.  Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

**B. COMPLIANCE WITH THE LAW.** "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

**C. MISREPRESENTATION.** "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

**D. COMPLIANCE WITH OTHER LAWS.** In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply  with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination,  as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned  firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply  with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution  Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply  with the certification  and disclosure requirements of the Byrd Anti-Lobbying  Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify  that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance

EXHIBIT T
PAGE 718

with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

## XI.   RECORD KEEPING AND REPORTING

A. **PROGRAMMATIC RECORDS**. "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested. In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

B. **FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated. If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is later. "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription, and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained. This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

C. **PARTICIPATING PATIENT RECORDS**. "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement. All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF". "Dentist" and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

D. **RETENTION OF PATIENT RECORDS**. Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law. In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF". Record retention obligations survive the termination of this Agreement.

E. **OWNERSHIP OF PATIENT RECORDS**. "Dentist" and "BCHF" agree that "BCHF" shall

retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.  "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent with applicable Federal and State laws and regulations and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

## XII.   INSURANCE

### A.   PROOF OF COVERAGE.

The "Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

### B.

"Dentist" will provide "BCHF" with sufficient evidence of professional liability coverage in the amount of at least:

1. General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2. Workers' Compensation, as required under California State law.

3. Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

### C.

It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

EXHIBIT T

PAGE 720

**D.** Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

**E. INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.  CONFIDENDIALITY

**A.** Except as is necessary in the performance  of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer  diskettes)  as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors)  also agree not to disclose, except to each other, any proprietary information, professional secrets or other information  obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

**B.** The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.  TERM AND TERMINATION

**A.   TERM.**  This Agreement begins on April 19, 2016 and  shall be automatically and
**B.**   Successively renewed and extended for one year periods from and after the
expiration date unless either party provides written notice of termination to the other
sixty (60) days in advance of termination.  Renewal is subject to "BCHF's"
determination that "Dentist" performed satisfactorily and successful re-negotiation by
the parties of key terms, as applicable.

**C.   TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this
agreement, for any reason, at any time upon sixty (60) days written notice.

**D.   TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any
time upon the mutual agreement of the parties.

**E.   TERMINATION FOR BREACH.**  This Agreement may be terminated by either party
upon written notice to the other party of such other party's material breach of any
term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to
cure by the end of the sixty (60) day period.

**F.   IMMEDIATE TERMINATION.**  In addition, "BCHF" may terminate this Agreement
immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability
to comply with, his or her obligations set forth in this Agreement; or (2) the good faith
determination of "BCHF" that the health, welfare and/or safety of Participating
Patients receiving care from "Dentist" is or will be jeopardized by the continuation of
this Agreement.

**G.   SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF"
under this Agreement will terminate, except as otherwise noted in this Agreement.
Termination, however, will not release "Dentist" from his or her obligation to complete
any multi-step dental treatment which "Dentist" began prior to the effective date of the
termination, provided that such termination did not result from a determination by
"BCHF" that the health, welfare and/or safety of Participating Patients would be
jeopardized by continuing this Agreement.  "Dentist" is not obligated to provide any
other services. Termination of this Agreement does not release "BCHF" from its
obligation to reimburse "Dentist" for any dental services provided on or before the
effective date of the termination.

## XV.   GENERAL PROVISIONS

**A.   AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified
from time to time upon the mutual written agreement of the parties. Any
amendment or modification shall not affect the remaining provisions of the
Agreement and, except for the specific provision amended or modified, this
Agreement shall remain in full force and effect as originally executed.  Amendments
will take effect upon the date of execution of both parties.

**B.   ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by
either party without the express written consent and authorization of the other party,
provided prior to such action.

**C.   EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's
breach of a provision of this Agreement, but such a waiver does not constitute a

EXHIBIT T
PAGE 722

waiver of any future breaches.

**D.   EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

**E.   NOTICE.**  Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

**F.   DISPUTE RESOLUTION.**  Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

**G.   CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

**H.   ENTIRE AGREEMENT.**  This Agreement represents the complete understanding  of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

**Bruce Hebets, CEO**
Borrego Community Health Foundation

Date:  **5-6-2016**

Address: PO Box 2369
 Borrego Springs, CA 92004

Phone: 619.444.5704

Contact: Travis Lyon

E-mail: cdtlyon@borregomedical.org

**George C. Jared, DDS, INC.**

Date:  4-26-16

Address: 13465 Camino Canada Rd, 110-A
 El Cajon, CA 92021

Phone: 619-390-3669

Contact: Rose Jared, Mgr.

E-mail: eastcountydental@aol.com

EXHIBIT T
PAGE 723

Addendum "A"

Scope of Services

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

EXHIBIT T
PAGE 724

Addendum "B"
Compensation of Dental Services
Medi-Cal

"Dentist" will be reimbursed according to patient's insurance type.  Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |
| Extractions – simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |

EXHIBIT T
PAGE 725

| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $165 |
| Root Canal – Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee. | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70  per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

EXHIBIT T

PAGE 726

Addendum C

Location of Service

All dental services under this agreement will be rendered at:

George C. Jared, DDS, INC.
East County Family Dental

13465 Camino Canada Road, Sute 110-A
El Cajon, CA 92021

Office Phone: 619-390-3669
Fax:

During the hours of:

 Monday---9:30 am to 6:30 pm
Tuesday      10:00am 8:00 pm
Wednesday   9:00am to 6:00 pm
Thursday      9:30am to 6:30 pm
Friday        Closed

NPI number Entity type Code Organization

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the 19th day of April, 2016 by and between, Borrego Health, hereinafter referred to as "Covered Entity", and George C. Jared, DDS, Inc. Hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated April 19, 2016 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.   DEFINITIONS

    A.   Catch-all definition:
        The following terms used in this Agreement shall have the same meaning as those
        terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set,
        Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy
        Practices, Protected Health Information, Required By Law, Secretary, Security Incident,

Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule, but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B. <u>Specific definitions</u>:

   1. <u>Business Associate</u>.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean George C. Jared, DDS, Inc.

   2. <u>Covered Entity</u>.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

   3. <u>HIPAA Rules</u>.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

   4. <u>Protected Health Information</u>. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

   5. <u>Electronic Protected Health Information</u>. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.   <u>CONFIDENTIALITY AND SECURITY REQUIREMENTS</u>

A. Business Associate agrees:

   1. Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

   2. To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

EXHIBIT T
PAGE 729

3. To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary

EXHIBIT T
PAGE 730

policies and procedures.

4. Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5. Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6. Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7. Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8. Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C. Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement.  Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D. The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E. Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware.  Business Associate shall report to Covered Entity any Security Incident of which it becomes aware.  Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.  In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

EXHIBIT T
PAGE 731

III.   <u>AVAILABILITY OF PHI</u>

A. Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity. Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule. If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual. Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule. In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act. Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   <u>TERM/TERMINATION</u>

A. <u>Term.</u> The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B. <u>Termination.</u> Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement. If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

C. <u>Obligations of Business Associate Upon Termination.</u> Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity that the business associate still maintains in any form. Business associate shall retain no copies of the protected health information.

D. <u>Survival.</u> The obligations of business associate under this Section shall survive the termination of this Agreement.

V.   <u>MISCELLANEOUS</u>

A. <u>Third Parties; Survival.</u> Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third

EXHIBIT T
PAGE 732

parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B. <u>Amendment; Independent Parties.</u> This Agreement may be amended or modified only in a writing signed by the Parties. No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship. This Agreement will be governed by the laws of the State of California. No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. <u>Minimum Requirements.</u> The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control. The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. <u>Severability.</u> In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect. In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing. For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

COVERED ENTITY:

By: _____
       Bruce Hebets, CEO

BUSINESS ASSOCIATE:

By: _____
       George C. Jared, DDS, Inc.

EXHIBIT T

PAGE 733

Addendum "E"

## COMPENSATION OF DENTAL SERVICES
## ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below.  Crowns, root canals and bridges are subject to prior review and approval by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions – simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal – Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal – Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

EXHIBIT T

PAGE 734

| Root Canal – Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70  per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Bridge (3 Unit) | D6211, D6241, D6245, D6740 D6751 | 3 or more | | $500 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |

EXHIBIT T

PAGE 735

Addendum "F"
**DENTAL SLIDING FEE SCALE**
**SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**
The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook -- Manual of Criteria (Section 5).

The program includes:
- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**
The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

EXHIBIT T
PAGE 736

Addendum "D"

## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in *California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013))* allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements In include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances."  A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

Bruce Habets CEO

Date: 5-6-2016

Dentist:

Date: 4-27-16

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

## Program Exclusions:

- Referrals to all specialists including but not limited to:
    - Oral Surgery
    - Endodontist
    - Periodontist
    - Orthodontist
    - Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

Bruce Hebets CEO

Dentist: _George C. Qfred_, D.D.S. pelme,

Date: __5-6-2016__

Date: __4-27-16__

### Dental Sliding Fee Discount

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176 -200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

Revised 10/16/2012

EXHIBIT T
PAGE 739

Addendum "G"

## HITRUST CERTIFICATION HIPAA COMPLIANT DATA STORAGE FEE

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to maintain patient records and data associated with patient visits to i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. Dentists are also required maintain these records.

An online system for claim submissions and patient record storage for the contract dental program is currently in development. Upon implementation of this system all patient records will also be stored online on Health Insurance Portability and Accountability Act (HIPAA) compliant servers. Dentist will have secure access to the system for all Dentist's patients under the contract dental program.

**HITRUST Certification:** In order to safely maintain the integrity of your patient data and meet HIPAA compliance, Premier Health Care Management (PHCM) conducts quarterly audits in order to maintain HITRUST Certification. A team of third party auditors conduct a three-tiered audit to achieve the highest HIPAA certification available. In addition to the technical audit, Dentist understands that PHCM will request semiannual access to computers running licensed software to ensure physical security standards are being maintained. PHCM will request access a week in advance unless a specific risk is determined.

Dentist agrees to pay One Hundred and Fifty Dollars ($150.00) per month for costs associated with record storage and HITRUST certification audits of the system. This monthly fee will only be assessed once the online storage system is implemented. Dentist will be provided notice of no less than 21 days prior to implementation and commencement of the monthly fee.

Nothing in this Addendum "G" relieves Dentist of its obligation to maintain patient records under the contract. All other terms and conditions remain the same.

**SIGNATURES:**

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_____
Dentist

_____
5-6-2016
Date

_____
4-26-16
Date

EXHIBIT T
PAGE 740

# EXHIBIT U

# LEASE

BETWEEN

## PROMENADE SQUARE LLC.
LANDLORD

AND

## BORREGO COMMUNITY HEALTH FOUNDATION
TENANT

DATED

SEPTEMBER 21, 2012
**LEASE**

© Stephen J Fitch

0

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | BASIC LEASE PROVISIONS | 1 |
| 2. | PREMISES, PARKING AND COMMON AREAS | 1 |
| 3 | TERM | 2 |
| 4. | RENT | 3 |
| 5 | SECURITY DEPOSIT | 3 |
| 6. | USE | 4 |
| 7. | MAINTENANCE, REPAIRS, ALTERATIONS AND COMMON AREA SERVICES | 4 |
| 8. | INSURANCE; INDEMNITY; RELEASE | 6 |
| 9. | DAMAGE OF DESTRUCTION | 9 |
| 10. | REAL PROPERTY TAXES | 11 |
| 11. | UTILITIES | 12 |
| 12. | ASSIGNMENT AND SUBLETTING | 12 |
| 13. | DEFAULT REMEDIES | 14 |
| 14. | CONDEMNATION | 16 |
| 15. | BROKER'S FEE | 16 |
| 16. | ESTOPPEL CERTIFICATE | 16 |
| 17. | LANDLORD'S TRANSFER OF OWNERSHIP | 17 |
| 18. | SEVERABILITY | 17 |
| 19 | INTEREST ON PAST-DUE OBLIGATIONS | 17 |
| 20. | TIME OF ESSENCE | 17 |
| 21. | ADDITIONAL RENT | 17 |
| 22. | INCORPORATION OF PRIOR AGREEMENTS; AMENDMENTS | 17 |
| 23. | NOTICES | 18 |
| 24. | WAIVERS | 18 |
| 25. | RECORDING | 18 |
| 26. | HOLDING OVER | 18 |
| 27. | CUMULATIVE REMEDIES | 18 |
| 28. | COVENANTS AND CONDITIONS | 18 |
| 29 | BINDING EFFECT; CHOICE OF LAW | 18 |
| 30. | SUBORDINATION | 19 |
| 31. | ATTORNEY'S FEES | 19 |
| 32 | LANDLORD'S ACCESS | 19 |
| 33. | AUCTIONS | 20 |

EXHIBIT U
PAGE 743

| | | |
|---|---|---|
| 34. | SIGNS | 20 |
| 35. | MERGER | 20 |
| 36. | LANDLORD'S CONSENT | 20 |
| 37. | QUIET POSSESSION | 20 |
| 38. | SECURITY MEASURES-LANDLORD'S RESERVATIONS | 20 |
| 39. | EASEMENTS | 21 |
| 40. | LIMITATION OF LANDLORD'S LIABILITY | 21 |
| 41. | AUTHORITY | 21 |
| 42. | CONFLICT | 21 |
| 43. | NO OFFER | 21 |
| 44 | LENDER MODIFICATION | 21 |
| 45. | OPTION TO RENEW | 22 |
| 46. | TENANT IMPROVEMENT ALLOWANCE | 22 |
| 47 | MULTIPLE PARTIES | 22 |
| 48. | LIMITATIONS OF LIABILITY | 22 |
| 49. | SPECIAL PROVISIONS | 22 |
| 50. | ATTACHMENTS | 24 |
| | Signatures | 24 |

2

12 1007.3

EXHIBIT U
PAGE 744

# LEASE

### I.    BASIC LEASE PROVISIONS

1.1     Parties. This Lease dated as of this 21st day of September, 2012 by and between PROMENADE SQUARE, LLC., a California limited liability company having an address at 124 West Main Street, Ste 240, El Cajon, CA 92020, (hereinafter called "Landlord") and BORREGO COMMUNITY HEALTH FOUNDATION, a California corporation, having an address at P.O Box 2369, Borrego Springs, CA 920004 (hereinafter called "Tenant").

1.2     Premises.          16,383 rentable square feet of space comprising the first and third floors, of the Building (as hereinafter defined) and shown on Exhibit "A" hereto (the "Premises").

1.3     Building. The structure and appurtenances commonly known as 193 West Main Street in the City of El Cajon, County of San Diego, State of California, and as defined in paragraph 2.1.

1.4     Use.     General medical and dental offices for the operation of the Borrego Community Health Foundation and for no other use.

1.5     Term.  Commencing on January 1, 2013 (the "Commencement Date") and terminating on December 31, 2033  As soon as the Commencement Date has been established, if different from January 1, 2013 Landlord and Tenant shall enter into a Commencement Date Agreement in the form attached hereto as Schedule "A".

1.6     Rent.   Years 1-5, $501,114.24 per annum payable in equal monthly installments of $41,749.52 on the first day of each calendar month occurring during the term without demand, set-off, deduction or abatement of any kind, except as may otherwise be set forth herein  Rent shall commence on the Commencement Date.

1.7     Rent Increase. The Rent shall adjust on January 1, 2018 and thereafter as follows:

a.     Years 6-10     $530,537.64 per annum payable in equal monthly installments of $44,211.47.

b.     Years 11-15    $560,081.04 per annum payable in equal monthly installments of $46,673.42

c.     Years 16-20    $589,624.44 per annum payable in equal monthly installments of $49,135.37.

1.8     **Rent Paid Upon Execution.**      First two months- $83,499.04

1.9     **Security Deposit.**     $46,673.42

1.10    **Tenant's Share.**  [Intentionally omitted]

### 2.    PREMISES, PARKING AND COMMON AREAS

2.1     Premises.  The Premises are a portion of the Building identified in paragraph 1.3 hereof. "Building" shall include adjacent parking. The Premises, the Building, the Common Areas, the land upon which the same are located, thereon or thereunder, are herein collectively referred to as the "Building Project"  Landlord hereby leases to Tenant, and Tenant hires from Landlord, for the term, at the rental, and upon all of the conditions set forth herein, the Premises referred to in paragraph 1.2 hereof, including non-exclusive rights to the Common Areas as hereinafter specified.

2.1.1    Construction. Landlord agrees that, after execution of this Lease by both parties, it will, at its sole cost and expense, commence and pursue to completion the construction of the improvements to be erected by Landlord pursuant to the List of Improvements ("Exhibit F") with a not to exceed cost to Landlord of

© Stephen J. Fiich

$1,065,000.00 Any costs over $1,065,000.00 shall be reimbursed by Tenant to Landlord upon written demand Landlord shall provide Tenant with five (5) day written notice prior to incurring any costs for which reimbursement will be sought. Upon completion of the List of Improvements Tenant accepts the Premises "as is". Tenant shall provide, at its sole cost, to Landlord upon execution of this Lease space plans for the Premises. Any revisions to the space plan shall be mutually agreed upon by the Parties. Any increase in the cost to complete the List of Improvements resulting from the modification of the space plan shall be reimbursed by Tenant to Landlord upon written demand.

2.2 **Vehicle Parking.** So long as Tenant is not in default hereunder, and subject to the rules and regulations attached hereto or as otherwise may be established by Landlord from time to time, Tenant shall be entitled to have for its use a total of thirty (30) parking space of which twenty (20) shall be on a non-exclusive shared basis and ten (10) shall be designated as for the exclusive use of Tenant. It is understood that Landlord has no effective means of control as to use of parking spaces.

2.2.1 If Tenant commits or allows any of the prohibited activities described in the Lease or the rules then in effect, Landlord shall have the right, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Tenant, which cost shall be immediately payable as additional rent upon demand by Landlord, landlord shall give Tenant notice of any such action under this provision.

2.3 **Common Areas-Definition.** The term "Common Areas" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Office Building Project that are provided and designated by Landlord from time to time for the general non-exclusive use of Landlord, Tenant and other tenants of the Office Building Project and their respective employees, suppliers, shippers, customers and invitee, including, but not limited to common entrances, lobbies, corridors, stairways and stairwells, public rest rooms, elevators, parking areas to the extent not otherwise prohibited by this Lease, loading and unloading areas, trash areas, roadways, sidewalks, walkways, parkways, ramps, driveways, landscape areas and decorative walls.

2.4 **Common Areas-Rules and Regulations.** Tenant agrees that Tenant, its employees, agents, visitors and licensees shall abide by and conform to the rules and regulations attached hereto as Exhibit "B". Landlord or such person(s) as Landlord may appoint shall have the exclusive control and management of the Common Areas and shall have the right, from time to time, to modify, amend and enforce said rules and regulations. Landlord shall not be responsible to Tenant for the non-compliance with said rules and regulations by others.

2.5 **Common Areas-Changes.** Landlord shall have the right, in Landlord's sole discretion, from time to time, to:

(a) make changes to the Building interior and exterior and Common Areas, including size, shape, number and appearance thereof, but not limited to the lobbies, windows, stairways, air shafts, elevators, escalators, restrooms, doveways, entrances, parking spaces, parking areas, loading and unloading areas, egress, direction of traffic, decorative walls, signs, landscaped area and walkways;

(b) close temporarily any of the Common Areas for maintenance purposes;

(c) designate other land and improvements outside the boundaries of the Office Building Project to be a part of the Common Areas, provided that such other land and improvements have a reasonable and functional relationship to the Office Building Project;

(d) add improvements to the Common Areas;

(e) use the Common Areas while engaged in making additional improvements, repairs or alterations to the Office Building Project, or any portion thereof; and

(f) do and perform such other acts and make such other changes in, to, or with respect to the Common Areas and Office Building Project as Landlord may deem to be appropriate.

© Stephen J. Fiott

2

13.1087.3

EXHIBIT U
PAGE 746

3.    TERM

3.1    Term.  The term of this Lease and Commencement Date of such term shall be as specified in paragraph 1.5 hereof.

3.2    Delay in Possession.  Notwithstanding the Commencement Date herein before specified, if for any reason, Landlord cannot deliver possession of the Premises to Tenant on the Commencement Date, but subject to paragraph 3.2.2, Landlord shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or the obligations of Landlord or Tenant hereunder or extend the term hereof; but, in such case, Tenant shall not be obligated to pay rent or perform any other obligation of Tenant under the terms of this Lease, except as may be otherwise provided in this Lease, until possession of the Premises is tendered to Tenant, as hereinafter provided. The parties hereto agree that this constitutes an express provision as to the time at which Landlord shall deliver possession of the Premises to Tenant, and Tenant hereby waives any rights to rescind this Lease which Tenant might otherwise have pursuant to law now or hereafter in force.

3.2.1    Possession Tendered-Defined.  Possession of the Premises shall be deemed tendered to Tenant when (1) all utilities are ready for use in the Premises (2) Tenant has reasonable access to the Premises, and (3) five (5) days shall have expired following advance written notice to Tenant of the occurrence of the matters described in (1) and (2) above of this paragraph 3.2.1. The Premises shall not be deemed to be unready for Tenant's occupancy or incomplete if only minor or insubstantial details of construction, decoration or mechanical adjustments remain to be done in the Premises.

3.2.2    Delays Caused by Tenant.  If the delay in the availability of the Premises for occupancy shall be due to special work, changes, alterations or additions required or made by Tenant in the layout or finish of the Premises or any part thereof, or shall be caused in whole or in part by Tenant through the delay of Tenant in submitting any plans and/or specifications, supplying information, approving plans, specifications or estimates, giving authorization or otherwise, or shall be caused in whole or in part by the acts, conduct, failure, breach or default on the part of Tenant, there shall be no postponement of the Commencement Date.

4.    RENT

4.1    Rent.  Except as may be otherwise expressly provided in this Lease, Tenant shall pay to Landlord the Rent set forth in paragraph 1.6, in equal monthly installments, without demand, set-off, deduction or abatement of any kind except as may otherwise be set forth herein. Rent, additional rent and any other sums or charges payable by Tenant for any period during the term hereof which is for less than one (1) month shall be prorated based upon the actual number of days of the calendar month. Each month's rent shall be payable, in advance, on the first day of each month, in lawful money of the United States to Landlord at the address stated herein or to such other persons or at such other places as Landlord may designate in writing.

4.2    Operating Expenses.    [Intentionally omitted]

5.    SECURITY DEPOSIT

Tenant shall deposit with Landlord the Security Deposit set forth in paragraph 1.9 as security for Tenant's faithful performance of Tenant's obligations hereunder. If Tenant fails to pay rent or other charges due hereunder, or otherwise defaults with respect to any provision of this Lease, Landlord may use, apply or retain all or any portion of the Security Deposit for the payment of any rent or other sum to which Tenant is then in default of or for the payment of any other sum to which Landlord may become obligated by reason of Tenant's default, or to compensate Landlord for any loss or damage which Landlord may suffer thereby. If Landlord so uses or applies all or any portion of said deposit, Tenant shall, within five (5) days after written demand therefor, deposit cash with Landlord in an amount sufficient to restore the Security Deposit separate from its general accounts. If Tenant performs all of Tenant's obligations hereunder, the Security Deposit shall be returned, without payment of interest or other increment for its use, to Tenant (or, at Landlord's option to the last assignee, if any, of Tenant's interest hereunder) at the expiration of the term hereof, and after Tenant has vacated the Premises. No trust relationship is created herein between Landlord and Tenant with respect to the Security Deposit.

© Stephen J. Fitch

3

121097.1

6.    USE

6.1    Use.  The Premises shall be used and occupied only for the purpose set forth in paragraph 1 4 and for no other purpose.

6.2    Compliance With Law.  Tenant shall, at Tenant's expense, promptly comply with all applicable laws, statutes, ordinances, rules regulations, orders, covenants and restrictions of record, and requirements of any fire insurance underwriters or rating bureaus, now or hereafter in effect, whether or not they reflect a change in policy from that now existing, during the term, or any part of the term hereof, relating in any manner to the Premises or the occupation and use by Tenant of the Premises  Tenant shall conduct its business in a lawful manner and shall not use or permit the use of the Premises or the Common Areas in any manner that will create or tend to create waste or a nuisance, or shall disturb or tend to disturb other occupants of the Office Building Project.  Throughout the term, Tenant shall procure and maintain any and all licenses or permits necessary for Tenant to conduct its business and shall, ask Landlord's request, furnish Landlord with certified copies thereof.

6.3    Condition of Premises.  Except as may otherwise be provided in this Lease, Tenant hereby accepts the Premises and the Office Building Project in their "as is" condition subject to all applicable zoning, municipal, county, state and federal laws, ordinances and regulations governing and regulating the Office Building Project, including the Premises, and any easements, covenants or restrictions of record, and accepts this Lease subject thereto and to all matters disclosed thereby and by any Exhibit attached hereto.  Tenant acknowledges that it has caused and is satisfied by its own independent investigation that the Premises are suitable for its intended use and that neither Landlord nor Landlord's agent or agents has made any representation or warranty as to the present or future suitability of the Premises, Common Areas, or Office Building Project for the conduct of Tenant's business.

7.    MAINTENANCE, REPAIRS, ALTERATIONS AND COMMON AREA SERVICE

7 1    Landlord's Obligations.

(a)    Landlord shall keep the exterior wall and roof of the Building and the Common Areas in good condition and repair; provided, however, Landlord shall not be obligated to paint, repair or replace wall coverings, or to repair or replace any improvements that are not ordinarily a part of the Building or are above then Building standard.  Except as provided in paragraph 9 5, there shall be no abatement of rent or any other sum payable under the Lease or liability to Tenant on account of any injury or interference with Tenant's business with respect to any improvements, alterations or repairs made by Landlord to the Office Building Project or any part thereof.

(b)    In the event Landlord makes any repair or alteration on behalf of Tenant, those repairs will be at like kind to the standard of workmanship in the building.

(c)    Landlord represents that the plumbing, electrical, gas and HVAC servicing shall be in good working condition and order on the Commencement Date.

7 2    Tenant's Obligations.

(a)    Tenant shall pay, as additional rent, for Landlord's cost of any maintenance and repair of the Premises or any equipment (wherever located that serves only Tenant or the Premises) to the extent such cost is attributable to causes beyond ordinary wear and tear  Tenant shall be responsible for the cost of painting, repairing or replacing wall coverings and to repair or replace any Premises improvements that are not ordinarily a part of the Building or that are above than Building standard.  After the Commencement Date, Tenant shall be responsible for the cost of repairing, maintaining and replacing the plumbing, electrical, gas and HVAC.  Landlord may, at its option, upon reasonable notice, elect to have Tenant perform any particular item of maintenance or repair, the cost of which is otherwise Tenant's responsibility hereunder.

(b)    On the last day of the term hereof, or on any sooner termination, Tenant shall surrender

4

© Stephen J  Pitch

72 1009.3

the Premises to Landlord in good repair, order and condition, ordinary wear and tear excepted. Tenant shall repair any damage to the Premises occasioned by the installation or removal of Tenant's trade fixtures, alterations, furnishings and equipment and, if necessary, restore the Premises. Except as otherwise set forth in this Lease, Tenant shall leave the airlines, power panels, electrical distributions systems, lighting fixtures, air-conditioning, window coverings, wall coverings, carpets, wall paneling, ceilings and plumbing on the Premises.

7.3     **Alterations and Additions.**

(a)     Tenant shall not, without Landlord's prior written consent, make any alterations, improvements, additions, utility installations (hereinafter collectively referred to as "Alterations") or repairs in, to or about the Premises. As used in this paragraph 7.3, the term "utility installation" shall mean carpeting, window and wall coverings, power panels, electrical distribution systems, lighting fixtures, air-conditioning and plumbing. At the expiration of the term, Landlord may require the removal by Tenant, at Tenant's expense, of any or all of said Alterations and the restoration of the Premises to the condition existing prior to the making of said Alterations. If Landlord permits Tenant to make any Alterations, Tenant shall use only such contractors as have been expressly approved in writing by Landlord, and Landlord may require Tenant to provide Landlord, at Tenant's sole cost and expense, a lien and completion bond, in an amount equal to one and one-half (1 ½) times the estimated cost of such Alterations, to insure Landlord against any liability for mechanic's and material men's liens and to insure completion of the Alterations. If Tenant makes any Alterations without the prior written approval of Landlord, Landlord may, at any time during the term of this Lease, require that Tenant remove any part or all of same.

(b)     Any Alterations in, to, or about the Premises that Tenant shall desire to make shall be presented to Landlord in written form, with proposed detailed plans and specifications. If Landlord shall give its consent to Tenant's making such Alterations, the consent shall be deemed conditioned upon Tenant acquiring all necessary permits required to do so from the applicable governmental agencies, furnishing a copy thereof to Landlord prior to the commencement of the work and compliance by Tenant with all conditions of said permits and all requirements of law in a prompt and expeditious manner.

(c)     Tenant shall not permit any mechanic's or material men's lien to be filed against the Premises or Office Building Project or any part thereof or interest therein. Tenant shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Tenant at or for use in the Premises.

(d)     Tenant shall give Landlord not less than ten (10) days notice prior to the commencement of any work in the Premises by Tenant, and Landlord shall have the right to post notices of non-responsibility in or on the Premises, the Building or Office Building Project as provided by law. If Tenant shall, in good faith, contest the validity of any such lien, claim or demand, then Tenant shall, at its sole expense, defend itself and Landlord, with counsel selected by Landlord, against any such lien, claim or demand filed against Landlord or the Premises, the Building or the Landlord in an amount equal to such contested lien, claim or demand indemnifying Landlord against liability for the same and holding the Premises, the Building and the Office Building Project free from the effect of such lien, claim or demand. In addition, Landlord may require Tenant to pay Landlord's reasonable attorney's fees and costs in participating in such action if Landlord shall decide it is in Landlord's best interest so to do. Landlord, at its sole option, shall have the right, but not the obligation, to satisfy any such lien, claim or demand filed against the Premises, the Building or Office Building Project, at Tenant's expense.

(e)     All Alterations (and whether or not utility installations constitute trade fixtures of Tenant), which may be made in, to or on the Premises by Tenant including, but not limited to, floor coverings, panels, doors, drapes, built-ins, communication systems conduit, wiring and outlets, shall be made and done in a good and workmanlike manner and be of good quality and remain upon and be surrendered with the Premises at the expiration of the Lease term, unless Landlord requires their removal pursuant to paragraph 7.3(a). Provided Tenant is not in default, notwithstanding the provisions of this paragraph 7.3(e), Tenant's personal property and equipment, other than that which is affixed to the Premises, so that it cannot be removed without damage to the Premises or the Building, and other than utility installations, shall remain the property of Tenant and may be removed by Tenant subject to the provisions of paragraph 7.2.

(f)     Tenant shall provide Landlord with as-built plans and specifications for any Alterations.

EXHIBIT U
PAGE 749

7.4    Utility Additions. Landlord reserves the right to install new or additional utility facilities throughout the Office Building Project for the benefit of Landlord or Tenant, or any other tenant of the Office Building Project, including, but not by way of limitation, such utilities as plumbing, electrical systems, security systems, communication systems and fire protection and detection systems.

## 8.   INSURANCE; INDEMNITY

8.1    Liability Insurance-Tenant. Tenant shall, at Tenant's expense, obtain and keep in force during the term of this Lease, a policy of General Commercial Liability insurance utilizing an Insurance Service Office standard form with Broad Form General Liability Endorsement, or equivalent, in an amount of not less than $5,000,000 per occurrence of bodily injury and property damage combined or in a greater amount as reasonably determined by Landlord and shall insure Tenant, Landlord and any lender whose name shall have been given by Landlord to Tenant as additional insureds against liability arising out of, under or in connection with the use, occupancy or maintenance of the Premises on this Lease. Compliance with the above requirement shall not, however, limit the liability of Tenant hereunder. Tenant's insurance company shall be subject to the reasonable approval of Landlord and shall be licensed to do business in the State of California

8.2    Property Insurance-Tenant. Tenant shall, at Tenant's expense, obtain, and keep in force during the term of this Lease, for the benefit of Tenant, replacement cost fire and extended coverage insurance, with vandalism and malicious mischief, sprinkler leakage and in an amount sufficient to cover not less than 100% of the full replacement cost, as the same may exist from time to time, of all of Tenant's personal property, fixtures and equipment.

8.3    Property-Insurance-Landlord. Landlord may obtain, and keep in force during term of this Lease, a policy or policies of insurance covering loss or damage to the Office Building Project, but not Tenant's personal property, fixtures, equipment or Tenant's improvements, and rent loss insurance in the amount of the full replacement cost thereof, as the same may exist from time to time, utilizing an Insurance Services Office standard for or equivalent providing protection against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, plate glass, and such other perils as Landlord deems advisable or may be required by a lender having a lien on the Office Building Project. In addition, Landlord may obtain, and keep in force during the term of this Lease, a policy of rental value insurance covering a period of one (1) year with loss payable to Landlord, which insurance shall also cover all Operating Expenses for said period. Tenant will not be named in any such policies carried by Landlord and shall have no right to any proceeds therefrom. The policies referred to in these paragraph 8.2 and 8.4 shall contain such deductibles as Landlord or its lender may determine. In the event that the Premises shall suffer an insured loss as defined in paragraph 9 1(f) hereof, the deductible amounts under the applicable insurance policies shall be deemed an Operating Expense. Tenant shall pay the entirety of any increase in the property insurance premium for the Office Building Project over what it was immediately prior to the commencement of the term of this Lease if the increase is specified by Landlord's insurance carrier as being caused by the nature of Tenant's occupancy or any act or omission of Tenant. Landlord shall furnish Tenant with any written notice given to Landlord by any insurance carrier notifying Landlord that Tenant has, or Tenant's activities from the Premises or other acts or conduct have, caused an increase in the property insurance premium.

8.4    Insurance Policies. Tenant shall deliver to Landlord copies of liability insurance policies required under Paragraphs 8.1 and 8.3 or certificates evidencing the existence and amounts of such insurance not later than ten (10) business days prior to the Commencement Date. No such policy shall be cancelable or subject to reduction of coverage or other modification except after thirty (30) days prior written notice to Landlord. Tenant shall furnish Landlord with renewal certificates at least ten (10) business days prior to the expiration of any applicable policy.

8.5    Waiver of Subrogation. Tenant and Landlord each hereby release and relive the other, and waive their entire right of recovery against the other, for direct or consequential loss or damage arising out of or incident to the perils covered by property insurance carried by such party, whether due to negligence of Landlord or Tenant or their agents, employees, contractors, and/or invitee. All property insurance policies required under this Lease shall be endorsed to so provide.

6

© Stephen J. Pitch

12 1007 3

8.6    Indemnity.  Tenant shall indemnify, defend (at Tenant's sole cost and expense and with legal counsel approved by Landlord, which approval shall not be unreasonably withheld) and hold harmless Landlord and its officers, directors, employees successors and assigns, and any lender of Landlord with an interest in the Premises, from and against any and all losses, costs, damages, expenses, claims, actions or causes of action arising, directly or indirectly, out of, under or in connection with this Lease or from Tenant's business or from any activity, work or thing done, permitted or suffered by Tenant in, to, on or about the Premises, Building or Office Building Project or elsewhere and shall further indemnify and hold harmless Landlord from any breach or default by Tenant in the performance of any covenant, agreement, term, provision, condition or obligation on Tenant's part to be kept or performed under this Lease, or arising, directly or indirectly, from any act or omission of Tenant or any of Tenant's agents, contractors, employees or invitee and from and against all costs, attorney's fees, expenses and liabilities incurred by Landlord as the result of any use, conduct, activity, work, thing done, permitted or suffered, breach, default or negligence, and in case any action or proceeding be brought against Landlord by reason of anything or matter referred to in this Paragraph 8.6. Tenant understands and acknowledges that the indemnification obligation hereunder is intended to constitute a "Type I" indemnity under California law and extends to and includes Claims arising from the active or passive negligence of Landlord. Notwithstanding the foregoing, nothing herein shall be construed to require Tenant to indemnify Landlord from any Claim arising from the sole negligence or willful misconduct of Landlord. The duty to defend hereunder is wholly independent of and separate from the duty to indemnify and such duty to defend exists regardless of any ultimate liability of Landlord or Tenant. Such defense obligation shall arise immediately upon presentation of a Claim by any party and written notice of such Claim being provided to Tenant. Tenant, as a material part of the consideration to Landlord for entering into this lease, hereby assumes all risk of damage to property of Tenant, or injury to persons, in, upon or about the Premises, Building or Office Building Project arising from any cause whatsoever and Tenant hereby waives all claims in respect thereto against Landlord except for those arising from the negligence of Landlord or its agents or employees.

8.7    Release of Landlord.  Landlord shall not be responsible or liable at any time for any loss or damage to Tenant's merchandise, equipment, fixtures or other personal property or to Tenant's business, including without limitation any loss or damage to either the person or property of Tenant or loss of profits or otherwise that may be occasioned by or through the acts or omissions of persons occupying adjacent, connecting, adjoining or other space in the Center or by or through the acts or omissions of Landlord, its employees, agents, contractors, invitees or licensees, other than actions of Landlord constituting gross negligence or willful misconduct. Tenant shall store its property in and shall use and enjoy the Premises and the Common Areas of the Center at its own risk, and hereby releases Landlord, its employees, agents, contractors, partners, invitees, and licensees, to the fullest extent permitted by law, from all claims of every kind, including without limitation, leakage of any nature, resulting in loss of life, personal or bodily injury, or property damage.

8.8    No Representation of Adequate Coverage.  Landlord makes no representation that the limits or forms of coverage of insurance specified in this Paragraph 8 are adequate to cover Tenant's property or obligations under this Lease.

8.9    Hazardous Materials Indemnity.

(a)  Tenant shall not cause or permit the presence, use, generation, release, discharge, storage, disposal or transportation of any "Hazardous Materials" on, under, in, about, to or from, the Premises and/or the Center; provided that the presence or use of Hazardous Materials (a) in products required for the prudent and ordinary management and operation of the Premises as a medical facility and (b) held and used strictly in accordance with (i) all applicable federal, state or local laws, regulations or orders, (ii) guidelines issued by any national or regional board of insurance underwriters, and (iii) prudent standards of practice shall not be deemed in violation of this provision.

(b)  As used herein, the term "Hazardous Materials" shall mean any toxic or hazardous substance, material or waste or any pollutant or contaminant or infectious or radioactive material, including but not limited to those substances, materials or wastes regulated now or in the future under any of the following statutes or regulations promulgated thereto: (a) any "hazardous substance" within the meaning of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA") 42 U.S.C. § 9601, et seq. or the California Hazardous Substance Account Act, Cal. Health and Safety Code § 25300 et seq. or the Porter-Cologne Water Quality Act, Cal. Water Code § 13000 et seq. or the Hazardous Materials Transportation

7

© Stephen J. Fitch                                                                                                                12 1007 3

Act, 49 U.S.C. § 1801, et seq.; (b) any "hazardous waste" within the meaning of the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq.; (c) any "pesticide" or "economic poison" as defined in California Food & Agricultural Code § 12753 and any regulations promulgated in connection therewith, or (d) any other substance, chemical, waste, toxicant, pollutant, pesticide or contaminate regulated by any federal, state or local law, statute, rule, regulation or ordinance for the protection of health or the environment ("Environmental Laws"), including, without limitation, methane and any petroleum products or fractions thereof and any asbestos-containing materials.

(c) If Tenant's use of the Premises may involve the storage and/or use of Hazardous Materials as defined herein, Tenant, in addition to its covenants defined above, further covenants, agrees, warrants and represents that it will comply with all Environmental Laws, rules, regulations, court decisions, municipal codes and ordinances regulating such storage and/or use of Hazardous Materials, including without limitation Chapter 6.95 of the California Health and Safety Code; and to permit Landlord to monitor such compliance, without the assumption of any liability by Landlord nor any obligation of Landlord to so monitor, Tenant covenants and agrees to provide to and/or permit Landlord:

(1)     To review and approve prior to submission to any governmental agency all applications with respect to the handling, storage and/or use of Hazardous Materials in, on or about the Premises, including without limitation applications to the County Hazardous Materials Management Division ("HMMD") and/or to Air Pollution Control District ("APCD"), and after such submission to provide Landlord with a copy of all responses, notices, comments or other communications with said governmental agencies; and

(2)     To receive and review a copy of all completed and approved "Business Plans", as defined by the statutes, and all updates, renewals, or replacement "Business Plans" when submitted and all responses, notices, comments or communications with any governmental agencies regarding same; and

(3)     To receive and review a copy of all notices, reports, comments or communications relating to any governmental inspection, complaint, investigation or other matter relating to Tenant's storage, handling or use of Hazardous Materials at, on, in or about the Premises; and

(4)     To receive and review a copy of any and all E.P.A. numbers, County Health Department permits, APCD permits, contracts with certified hazardous waste handlers (and all credentials and certifications of such handlers), and all schedules for delivery, pick-up and disposal of Hazardous Materials to or from the Premises; and

(5)     To immediately notify Landlord of any leaks, spills, emissions, release or suspected release of any Hazardous Materials at, on, in, under, above or about the Premises from any cause or source whatsoever; and

(6)     To receive and review a copy of all records of every nature that are required by law, regulations, ordinance or court order to be maintained by Tenant with respect to the storage, handling or use of any Hazardous Materials at, on, in, under, above or about the Premises.

(d)  Tenant shall exonerate, indemnify, pay and protect, defend (with counsel reasonably approved by Landlord) and save Landlord, and its directors, trustees, beneficiaries, officers, shareholders, partners, members, employees, agents, and invitees and of those of the other tenants of the Center (collectively, the "Related Parties"), harmless from and against any claims (including, without limitation, third party claims for personal injury or real or personal property damage, actions, administrative proceedings (including informal proceedings), judgments, damages, punitive damages, penalties, fines, costs, taxes, assessments, liabilities (including sums paid in settlements of claims), interest or losses, including reasonable attorneys' fees and expenses (including any such fees and expenses incurred in enforcing this Lease or collecting any sums due hereunder), consultant fees, and expert fees, together with all other costs and expenses of any kind or nature (collectively, the "Costs") that arise directly or indirectly in connection with the presence, suspected presence, release or suspected release of any Hazardous Materials in or into the air, soil, ground water, surface water or improvements at, on, about, under or within the Center, or any portion thereof, or elsewhere in connection with the transportation of Hazardous Materials to or from the Center by or on behalf of Tenant or with respect to the Premises. The indemnification provided in this paragraph shall specifically apply to and include claims or actions brought by or on behalf of employees of Tenant. In the event

8

© Stephen J. Fitch                                                                      12.1007.3

that any of the Related Parties shall suffer or incur any such Costs, Tenant shall pay to Landlord or such Related Parties, the total of all such Costs suffered or incurred upon demand therefor. Without limiting the generality of the foregoing, the indemnification provided herein shall specifically cover Costs including, without limitation, capital, operating and maintenance costs, incurred in connection with any investigation or monitoring of site conditions, any clean-up, containment, remedial, removal or restoration work required or performed by any federal, state or local governmental agency or political subdivision or performed by any non-governmental entity or person because of the presence, suspected presence, release or suspected release of any Hazardous Materials in or into the air, soil, ground water, surface water or improvements at, on, about, under or within the Center (or any portion thereof), or elsewhere in connection with the transportation of Hazardous Materials to or from the Center and any claims of third parties for loss or damage due to such Hazardous Materials. This indemnification shall survive the termination of this Lease and shall be binding upon the Tenant and its successors in interest whenever such threat, claim, or cause of action may arise. Tenant expressly waives any defense concerning laches or the statute of limitations, constructive eviction or rent abatement with respect to such claims.

9. **DAMAGE OR DESTRUCTION**

    9.1   Definitions.

        (a)   "Premises Damage" shall mean the Premises are damages or destroyed to any extent

        (b)   "Premises Building Partial Damage" shall mean the Building of which the Premises are a part is damages or destroyed to the extent that the cost of repair is fifty percent (50%) or more of the then Replacement Cost of the Building.

        (c)   "Premises Building Total Destruction" shall mean the Building of which the Premises are a part is damaged or destroyed to the extent that the cost of repair is fifty percent (50%) or more of the then Replacement of Cost of the Building.

        (d)   "Office Building Project Buildings" shall mean all of the buildings on the Office Buildings Project site.

        (e)   "Office Building Project Buildings Total Destruction" shall mean the Office Building Project Buildings are damaged or destroyed to the extent that the cost of the repair is fifty percent (50%) or more of the then Replacement Code of the Office Building Project Buildings

        (f)   "Insured Loss" shall mean damage or destruction which was caused by an event covered by the insurance described in Paragraph 8. The fact that an Insured Loss has a deductible amount shall not make the loss and Uninsured Loss.

        (g)   "Replacement Cost" shall mean the amount necessary to be spent in order to repair or rebuild the damaged area to the condition that existed immediately prior to the damage occurring, excluding all improvements made by tenants, other than those installed by Landlord at Tenant's expense.

    9.2   Premises Damage: Premises Building Partial Damage.

        (a)   Insured Loss. Subject to the provisions of Paragraphs 9.4 and 9.5, if, at any time during the term of this Lease, there is Premises Damage or Premises Building Partial Damage which is an Insured Loss, Landlord shall, (subject to the terms of any mortgage covering the Office Building Project), as soon as reasonably possible (but not before collection of any applicable insurance proceeds), and to the extent that the required materials and labor are readily available through usual commercial channels, at Landlord's expense, repair such damage (but not Tenant's fixtures, equipment or Tenant improvements originally paid for by Tenant) to the condition existing immediately prior to the damage, and this Lease shall continued in full force and effect. Landlord shall not be required to expend more than the amount of insurance proceeds received by it.

        (b)   Uninsured Loss. Subject to the provisions of Paragraphs 9.4 and 9.5, if, at any time during the term of this Lease, there is Premises Damage or Premises Building Partial Damage which is not an

9

Insured Loss, then, unless caused by the negligent or other act of Tenant (in which event Tenant shall make the repairs at Tenant's expense), and, as a result thereof, Tenant is prevented from making any substantial use of the Premises, Landlord may, at Landlord's option, either (i) repair such damage as soon as reasonably possible at Landlord's expense, in which event this Lease shall continue in full force and effect or (ii) give written notice to Tenant within sixty (60) days after the date of the occurrence of such damage of Landlord's intention to cancel and terminate this Lease as of a date set forth in Landlord's notice which date shall not be more than thirty (30) days following the giving of such notice by Landlord. Any cancellation pursuant to the provisions hereof shall be subject to the covenants, agreements, terms, provisions and conditions of this Lease to be kept and performed by Tenant.

### 9.3  Premises Building Total Destruction; Office Building Project Buildings Total Destruction.

(a)  Subject to the provisions of Paragraphs 9.4 and 9.5, if, at any time during the term of this Lease, there is damage, whether or not an Insured Loss, which falls into the classification of either (i) Premises Building Total Destruction or (ii) Office Building Project Building Total Destruction, then, Landlord may, at Landlord's option, either (a) repair such damage or destruction as soon as reasonably possible (but not before collection of any insurance proceeds, if applicable) at Landlord's expense (which shall not be more than the amount of insurance proceeds received by it), to the extent the required materials are readily available through usual commercial channels, to its condition existing at the time of the damage, but not Tenant's fixtures, equipment or tenant improvements, and this Lease shall continue in full force and effect, or (b) give written notice to Tenant within sixty (60) days after the date of the occurrence of such damage of Landlord's intention to cancel and terminate this Lease, in which case this Lease shall be canceled and terminated as of a date set forth in Landlord's notice which date shall not be more than thirty (30) days following the giving of such notice by Landlord. Any cancellation pursuant to the provisions hereof shall be subject to the covenants, agreements, terms, provisions and conditions of this Lease to be kept and performed by Tenant.

(b)  Notwithstanding (a) above, in the event the demised premises becomes uninhabitable for a period of greater than thirty (30) days, this Lease may be terminated at the option of Tenant.

### 9.4  Damage Near End of Term.

(a)  Subject to Paragraph 9.4(b), if, at any time during the last twelve (12) months of the term of this Lease, there is, in Landlord's option, substantial damage to the Premises, Landlord, may at Landlord's option, within sixty (60) days after the date of the occurrence of such damage, cancel and terminate this Lease as of a date set forth in Landlord's notice which date shall not be more than thirty (30) days following the giving of such notice by Landlord. Any such cancellation and termination shall be subject to all of the covenants, agreements, terms, provisions and conditions of this Lease on the part of Tenant to be kept and performed.

(b)  Notwithstanding Paragraph 9.4(a), in the event that Tenant has an option to extend or renew this Lease, and the time in which said option may be exercised has not yet expired, Tenant shall exercise such option, if it is to be exercised at all, no later than twenty (20) days after the occurrence of an Insured Loss falling within the classification of Premises Damage during the last twelve (12) months of the term of this Lease. If Tenant exercises such option during said twenty (20) day period, Landlord shall (subject to the terms of any mortgage covering the Office Building Project), at Landlord's expense (which shall not be more than the amount of insurance proceeds received by it), repair such damage, but not Tenant's fixtures, equipment or tenant improvements, as soon as reasonably possible (but not before collection of any applicable insurance proceeds) and this Lease shall continue in full force and effect. If Tenant fails to exercise such option during said twenty (20) day period, then Landlord may, at Landlord's option, cancel and terminate this Lease as of the expiration of said twenty (20) day period, by giving written notice to Tenant of Landlord's election to do so within ten (10) days after the expiration of said twenty (20) day period, notwithstanding any term or provision in the grant of option to the contrary. Any such cancellation and termination shall be subject to all of the covenants, agreements, terms, provisions and conditions of this Lease on Tenant's part to be kept and performed.

### 9.5  Abatement of Rent; Tenant's Remedies:

(a)  In the event Landlord repairs or restores the Building or Premises pursuant to the provisions of this paragraph 9, and any party of the Premises are not usable, Base Rent payable hereunder for the

10

© Stephen J. Plich

[2.1007 3]

period during which such repair or restoration continues shall be abated, provided (1) the damage was not caused by Tenant, and (2) such abatement shall only be to the extent the Premises are not actually usable. Except for said abatement of Base Rent, if any, Tenant shall have no claim against Landlord for any damage suffered by reason of any such damage, destruction, repair or restoration.

(b)  Tenant agrees to cooperate with Landlord in connection with any such restoration and repair, including, but not limited to, the approval and/or execution of plans and specifications required therefor.

9.6  **Termination-Advance Payments.**  Upon termination of this Lease pursuant to this paragraph 9, so long as Tenant is not in default of any covenant, agreement, term, provision or condition of this Lease on its part to be kept and performed, an equitable adjustment shall be made concerning advance rent and any advance payments made by Tenant to Landlord. Landlord shall, in addition, return to Tenant so much of the Security Deposit as has not theretofore been applied Landlord or may then be applied by Landlord

9.7  **Waiver.**  Landlord and Tenant waive the provisions of any statute which relates to termination of leases when leased property is destroyed and agree that such event shall governed by the terms of this Lease.

9.8  **No Release of Tenant.**  No cancellation or termination of this Lease as provided herein, or elsewhere in this Lease, shall release or relieve Tenant of any liability, responsibility or obligation accrued or incurred or outstanding or unsatisfied as of the date of such cancellation and termination.

9.9  **Tenant's Waiver.**  Tenant hereby waives the right to make repairs at Landlord's expense under provisions of Section 1941 and 1942 of the Civil Code of California. With respect to any partial destruction which Landlord is obligated to repair or may repair under any of the provisions of this Lease, the provisions of Section 1932 (2) and Section 1933 (4), of the Civil Code of California are hereby waived by Tenant. Nothing contained in this Lease shall constitute a waiver by Landlord of Tenant's obligations pursuant to California Civil Code Section 1941.2, or otherwise.

## 10.  REAL PROPERTY TAXES

10.1  **Payment of Taxes.**  [Intentionally omitted]

10.2  **Additional Improvements by Tenant.**  Tenant shall pay to Landlord, upon demand, the entirety of any increases in Real Property Tax assessed solely by reason of additional improvements placed in, on or to the Premises by Tenant or at Tenant's request

10.3  **Definition of "Real Property Tax".**  As used herein, the term "Real Property Tax" shall include any and all forms of real estate tax or assessment, general or special, ordinary or extraordinary and any license fee, commercial rental tax, improvement bond or bonds, levy or other similar or dissimilar tax of any kind or nature whatsoever (other than inheritance, personal income or estate taxes) imposed on the Building Project or any portion thereof by any authority having the direct or indirect power to tax, including any city, county, state or federal government, or any school, agricultural, sanitary, fire, street drainage, or other improvement district thereof, as against any legal or equitable interest of Landlord in the Building Project or in any portion thereof, as against Landlord's right to rent or other income therefrom, and as against Landlord's business of leasing the Building Project. The term Real Property Tax shall also include any tax, fee, bond, levy, assessment or similar or dissimilar charge (i) in definition of Real Property Tax, or (ii) the nature of which was hereinbefore included within the definition of Real Property Tax, or (iii) which is imposed as a Building Project or which is added as a tax or charge herein above included within the definition of Real Property Tax by reason of such change of ownership, or (iv) which is imposed by reason of this transaction or any modifications or changes hereto or any transfer hereof.

10.4  **Joint Assessment.**  If the improvements or property, the taxes for which are to be paid separately by Tenant under paragraphs 10.2 or 10.5, are not separately assessed, Tenant's portion of that tax shall be equitably determined by Landlord from the respective valuations assigned in the assessor's work sheets or such other information (which may include the cost of construction) as may be reasonably available. Landlord's reasonable determination thereof, in good faith, shall be conclusive

© Stephen J. Pitch

11

12 1007 3

10.5  Personal Property Taxes.

(a)  Tenant shall pay, prior to delinquency, all taxes assessed against and levied upon the trade fixtures, furnishings, equipment and all other personal property of Tenant contained in the Premises or elsewhere.

(b)  If any Tenant's personal property shall be assessed with Landlord's real property, Tenant shall pay to Landlord the taxes attributable to such personal property within ten (10) days after receipt of a written statement setting forth the taxes applicable to Tenant's personal property.

## 11.  UTILITIES AND SERVICES

11.1  Services Provided by Landlord.  So long as Tenant is not in default hereunder, Landlord shall provide heating, ventilation, air conditioning and water for reasonable drinking and lavatory use.

11.2  Services Exclusive to Tenant.  Tenant shall pay for all water, gas, heat, light, power, telephone and other utilities and services supplied and/or metered exclusively to the Premises or to Tenant, together with any taxes thereon. Tenant shall be solely responsible for the installation and maintenance of any meter used exclusively for the Premises. If any such services are not separately metered to the Premises, Tenant shall pay, at Landlord's option, either Tenant's Shares or a reasonable proportion to be determined by Landlord of any charges jointly metered with other premises in the Building.

11.3  Hours of Service.  So long as Tenant is not in default hereunder, the services and utilities described in paragraph 11.1 shall be provided during generally accepted Business Days, i.e., Monday through Friday, from 7:00 a.m. to 8:00 p.m., 8:00 a.m. to 5:00 p.m. on Saturdays. Any services provided to Tenant pursuant to the terms of this Article 11 and not otherwise paid for by Tenant in accordance with the provisions of paragraph 11.2 hereof shall, nevertheless, be paid for by Tenant. Utilities and services required at other times shall be subject to advance request and payment by Tenant to Landlord of Landlord's charges therefor.

11.4  Excess Usage by Tenant.  Tenant shall not install or use any machinery or equipment in or about the Premises that uses excess water, lighting or power, or suffer or permit any act that, in Landlord's opinion, causes or would cause extra burden upon the utilities or services, including, but not limited to, security services, over standard office usage for the Office Building Project. Tenant shall pay Landlord for any excess expenses or costs that may arise out of a breach of this subparagraph by Tenant. Landlord may, in its sole discretion, install, at Tenant's expense, supplemental equipment and/or separate metering applicable to Tenant's excess usage or loading. Landlord acknowledges that Tenant will use as standard office equipment computers, copiers and fax machines.

11.5  Interruptions.  There shall be no abatement of rent and Landlord shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or any other cause of any kind or nature whatsoever or in cooperation with governmental request or direction

## 12.  ASSIGNMENT AND SUBLETTING

12.1  Landlord's Consent Required.  Tenant shall not voluntarily or by operation of law assign or mortgage, sublet, or otherwise transfer or encumber all or any part of this Lease or in the Premises, without Landlord's prior written consent, which consent shall not be unreasonably withheld in accordance with paragraph 12.6, and any attempt thereat shall be void and of no force or effect and shall constitute a material default and breach of this Lease without the need for notice to Tenant under paragraph 13.1. "Transfer", within the meaning of this paragraph 12, shall include the transfer or transfers aggregating fifty percent or more of the outstanding stock of tenant

12.2  Tenant Affiliate.  Notwithstanding the provisions of paragraph 12.1 hereof, Tenant may assign this Lease or sublet the Premises, or any portion thereof, without Landlord's consent, to any corporation which controls, is controlled by or is under common control with Tenant, or to any corporation resulting from the merger

12

© Stephen J. Pheh                                                                 12 1007 3

or consolidation with Tenant, or to any person or entity which acquires all of the assets of Tenant as a going concern of the business that is being conducted on the Premises, all of which are referred to as "Tenant Affiliate"; provided that before an assignment shall be effective, (a)the assignee shall, in writing, assume, in full, the obligations of Tenant under this Lease and (b)Landlord shall be given written notice of such assignment and assumption. Any such assignment shall not, in any way, affect or limit the liability of Tenant under the terms of this Lease even if after such assignment the terms of this Lease are materially changed or altered without the consent of Tenant whose consent shall not be necessary therefor.

      12.3      <u>Terms and Conditions Applicable to Assignment and Subletting.</u>

      (a)      No assignment or subletting shall release Tenant of Tenant's obligations hereunder, including, but not limited to, Tenant's share of Operating Expenses, and to perform all covenants, agreements, terms, provisions and conditions to be kept and performed by Tenant hereunder.

      (b)      Landlord may accept rent from any person other than Tenant pending approval or disapproval of an assignment. The acceptance of such rent shall not constitute acceptance of the proposed assignment.

      (c)      Neither a delay in the approval or disapproval of an assignment or subletting nor an acceptance of rent, shall constitute a waiver or estoppel of Landlord's right to exercise its remedies for the breach of any of the covenants, agreements, terms, provisions or conditions of this paragraph 12.

      (d)      If Tenant's obligations under this Lease have been guaranteed by third parties, an assignment of this Lease or a sublease, and Landlord's consent thereto, at Tenant's request as required herein, shall not require the prior consent of such guarantors to such assignment or sublease.

      (e)      The consent by Landlord to any assignment or subletting shall not constitute consent to any subsequent assignment or subletting by Tenant or to any subsequent or successive assignment or subletting by an assignee or subtenant.

      (f)      In the event of any default under this Lease, Landlord may proceed directly against Tenant, any guarantors or anyone else responsible for the performance of this Lease, including any assignee or subtenant, without first exhausting Landlord's remedies against any other person or entity responsible thereto to Landlord, or any security held by Landlord or Tenant.

      (g)      Landlord's written consent to any assignment or subletting by Tenant shall not constitute an acknowledgment that no default then exists under this Lease of any of the obligations to be performed by Tenant, nor shall such consent be deemed a waiver of any then existing fault.

      (h)      The discovery that any financial statement relied upon by Landlord in granting its consent to as assignment or subletting was false shall, at Landlord's election, render Landlord's consent null and void and of no force or effect.

      12.4      <u>Additional Terms and Conditions Applicable to Subletting.</u> The following terms and conditions shall apply to any subletting by Tenant of all or any part of the Premises and shall be deemed included in all subleases whether or not expressly incorporated therein:

      (a)      Tenant hereby assigns and transfers to Landlord all of Tenant's interest in any and all rentals and income arising from any sublease heretofore or hereafter made by Tenant, and Landlord may collect such rent and income and apply same toward Tenant's obligations under this Lease provided, however, that until a default shall occur in the performance of Tenant's obligations under this Lease, Tenant may receive and collect the rent accruing under such sublease; provided, Landlord shall not, by reason of the collection of the rents from a subtenant, be deemed liable to the subtenant for any failure of Tenant to perform and comply with any of Tenant's obligations to such subtenant under such sublease. Tenant hereby irrevocably authorizes and directs any such subtenant, upon receipt of a written notice from Landlord stating that a default exists in the performance of Tenant's obligations under this Lease, to pay to landlord the rents due and to become due under the sublease. Tenant agrees

EXHIBIT U
PAGE 757

that such subtenant shall have the right to rely upon any such statement and request from Landlord and that such subtenant shall pay such rents to Landlord without any obligation or right to inquire as to whether such default exists and notwithstanding any notice from or claim from Tenant to the contrary, Tenant shall have no right or claim against said subtenant or Landlord for any such rents so paid by said subtenant to Landlord.

(b)　No sublease entered into by Tenant shall be effective unless and until it has been approved in writing by Landlord. In entering into any sublease, Tenant shall use only such form of sublease as is satisfactory to Landlord. Such sublease shall not be changed or modified without Landlord's prior written consent. Any subtenant shall, by reason of entering into a sublease under this Lease, be deemed, for the benefit of Landlord, to have assumed and agreed to conform and comply with each and every obligation herein to be performed by Tenant other than such obligations as are contrary to or inconsistent with provisions contained in sublease to which Landlord has expressly consented in writing; however, nothing contained herein or in such sublease shall create any privity between Landlord and such subtenant

12.5　**Landlord's Expenses.**　In the event Tenant shall assign this Lease or sublet the Premises or request the consent of Landlord to any assignment or subletting or if Tenant shall request the consent of Landlord for anything or matter or in connection with this Lease, including, but not limited to, this paragraph 12, then Tenant shall pay Landlord's costs and expenses incurred in connection therewith, including attorneys', architects', engineers', consultants' or other fees and an amount not to exceed the actual amount of billing for services required by Tenant's rights hereunder, or Seven Hundred Fifty Dollars ($750.00), whichever the greater.

12.6　**Conditions to Consent.**　Landlord reserves the right to condition any approval to assign this Lease or sublet all or a portion of the Premises upon Landlord's determination that (a)the proposed assignee or proposed subtenant shall conduct a business at the Premises consistent with the general character of the other occupants of the Office Building Project and not in violation of any exclusive or rights then held by other tenants or occupants and (b)the proposed assignee or proposed subtenant be, in Landlord's opinion, at least as financially responsible as Tenant was expected to be at the time of the execution of this Lease or of such assignment or subletting, whichever is greater. Provided, in the reasonable judgment of Landlord, a proposed assignee or a proposed subtenant is financially responsible with respect to its proposed obligations and is of a character and engaged in a business which is in keeping with the standards of the Office Building Project, Landlord agrees it will not unreasonably withhold or delay its consent to such proposed assignment or proposed subletting upon, and subject, however to all the provisions of this paragraph 12.

13.　**DEFAULT; REMEDIES**

13.1　**Default.**　The occurrence of any one or more of the following events shall constitute a default of this Lease by Tenant

(a)　The vacation or abandonment of the Premises by Tenant shall be defined as the failure by Tenant to occupy the Premises for a continuous period of fifteen (15) days or more whether or not rent is paid.

(b)　The breach by Tenant of any of the covenants, conditions or provisions of paragraphs 7.3(a),(b), or (d), 12.1, 13.1(f), 16(a), 30.2, 33, or 40.1, all of which are hereby deemed to be material, non-curable defaults without the necessity of any notice, except as otherwise provided by this Lease

(c)　The failure of Tenant to pay or cause to be paid when due any rent, monies, or charges required by this Lease to be paid by Tenant when such failure continues for a period of three (3) days after written notice thereof from Landlord to Tenant.

(d)　The failure by Tenant to observe or perform any of the covenants, agreements, terms, conditions or provisions of this Lease to be observed or performed by Tenant other than those referenced in subparagraphs (a),(b) and (c), above, where such failure shall continue for a period of ten (10) days after written notice thereof from Landlord to Tenant; provided, however, that if the nature of Tenant's noncompliance is such that more than ten (10) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within said ten (10) day period and thereafter diligently pursues such cure to completion within thirty (30) days after such written notice from Landlord. To the extent permitted by law, such lien

14

(10) days notice shall constitute the sole and exclusive notice required to be given to Tenant under applicable Unlawful Detainer statutes.

(e)     (i)The making by Tenant of any general arrangement or general assignment for the benefit of creditors; (ii)Tenant becoming a "debtor" as defined in 11 U.S.C. 101 or any successor statute thereto [unless, in the case of a petition filed against Tenant, the same is dismissed within sixty (60) days of this filing of such petition]; (iii)The appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Premises of Tenant's interest in this Lease, where such seizure is not discharged within thirty (30) days. In the event that any provision of this paragraph 13.1(e) is contrary to any applicable law, such provision shall be of no force or effect.

(f)     The discovery by Landlord that any financial statement given to Landlord by Tenant, or its successor in interest, or by any guarantor of Tenant's obligation hereunder was false.

13.2     Remedies.   In the event of any default or breach of this Lease by Tenant, Landlord may, at any time thereafter, with or without notice or demand, and without limiting Landlord in the exercise of any right or remedy which Landlord may have by reason of such default:

(a)     Terminate Tenant's right to possession of the Premises by any lawful means, in which case this Lease and the term hereon shall terminate and Tenant shall immediately surrender possession of the Premises to Landlord. In such event, Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of Tenant's default including, but not limited to: (i) the cost of recovering possession of the Premises; (ii) the expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees and any real estate commission actually paid; (iii) the worth, at the time of the award, of the unpaid rent that had been earned at the time of the termination of this Lease; (iv) the worth, at the time of the award, of the amount by which the unpaid rent would have been earned after the time of termination of this Lease until the time of the award exceeds the amount of the loss of rent that Tenant proves could have been reasonably avoided, (v) the worth, at the time of the award, of the amount by which the unpaid rent for the balance of the Lease Term after the time of award exceeds the amount of the loss of rent that Tenant proves could have been reasonably avoided; and (vi) that part of the leasing commission paid by Landlord pursuant to paragraph 15 applicable to the unexpired term of this Lease.

(b)     Maintain Tenant's right to possession in which case this Lease shall continue in effect whether or not Tenant shall have vacated or abandoned the Premises. In such event, Landlord shall be entitled to enforce all of Landlord's rights and remedies under this Lease, including the right to recover rent as it become due hereunder.

(c)     Pursue any other remedy now or hereafter available to Landlord under the laws or judicial decisions of the state wherein the Premises are located.

13.3     The Worth at Time of The Award.   "The worth at the time of the award", as used in subparagraphs (a) (iii) and (a) (iv) above, is to be computed by allowing interest at the rate of ten (10%) percent per annum. "The worth at the time of the award", as referred to in subparagraph (a)(v) above is to be computed by discounting the amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award plus two (2%) percent.

13.4     Late Charges.   Tenant hereby acknowledges that late payment by Tenant to Landlord of rent, Tenant's Share of Operating Expenses or any other sum due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount which will be difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges and late charges which may be imposed on Landlord by the terms of any mortgage or trust deed covering the Office Building Project. Accordingly, if any installment of rent, Operating Expenses, or any other sums due from Tenant shall not be received by Landlord or Landlord's designee within ten (10) days of the date upon which it is due, Tenant shall pay to Landlord a late charge equal to Ten (10%) percent of such overdue amount. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of late payment by Tenant.

15

14.    CONDEMNATION

If the Premises or the Office Building Project, or any portion thereof, are taken under the power of eminent domain, or sold under the threat of the exercise of said power (all of which are herein called "Condemnation"), this Lease shall terminate as to the part so taken as of the date of the condemning authority takes title or possession, whichever first occurs; provided, if more than fifty (50%) percent of the Premises are taken by Condemnation, Tenant shall have the option, to be exercised in writing within thirty (30) days after Landlord shall have given Tenant written notice of such taking (or in the absence of such notice, within thirty (30) days after the condemning authority shall have taken possession), to terminate this Lease as of the date the condemning authority takes such possession  If Tenant does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the premises remaining, except that the rent and Tenant's Share shall be reduced in the proportion that the floor area of the Premises taken bears to the total floor area of the Premises. Common Areas taken shall be excluded from the Common Area usable by Tenant and no reduction of rent shall occur with respect thereto or by reason thereof. In the event of a Condemnation, landlord shall have the option, in its sole discretion, to terminate this Lease as of the date of the taking of possession by the condemning authority, by giving written notice to Tenant of such election within thirty (30) days after receipt of notice of a taking by Condemnation of any part of the Premises or the Office Building Project. As aware for the taking of all or any part of the Premises or the Office Building Project under the power of eminent domain or any payment made under threat of the exercise of such power shall be the property of Landlord, whether such award shall be made as compensation for diminution in value for the leasehold or for the taking of the fee or as severance damages. Tenant shall be entitled to make a separate claim and receive an award for (i)the unamortized value of improvements to the Premises made by Tenant, at Tenant's sole cost and expense, and which are removable by Tenant at the expiration of the term hereof pursuant to the terms of this Lease; (ii)an amount equal to any excess in the market value of the Premises, exclusive of Tenant's improvements or alterations for which Tenant is compensated pursuant to provisions hereof, for the remainder of the term, over the present value at the date of taking of the minimum monthly rent payable for the remainder of the term; and (iii)an amount determined to be equal to the loss of good will; provided, however, no such separate claim by Tenant shall reduce the award to which Landlord would be entitled if Tenant had not made such separate claim. In the event that this Lease is not terminated by reason of such Condemnation, Landlord shall, to the extent of severance damage received by Landlord in connection with such Condemnation, repair any damage to the Premises caused by such Condemnation.

15.    BROKER'S FEE

Tenant warrants that Tenant has had no dealing with any broker or agent in connection with this Lease other than Travis Lyon of Sperry Van Ness Valley Commercial Real Estate  Tenant covenants and agrees to indemnify and hold Landlord harmless from and against any and all loss, cost, damage, expense or liability for any compensation, commissions or charges of any kind of nature whatsoever claimed by any broker or agent (licensed or otherwise) other than Sperry Van Ness Valley Commercial Real Estate  with respect to this Lease or the procurement, negotiation or execution thereof  Landlord shall compensate Travis Lyon of Sperry Van Ness Valley Commercial Real Estate pursuant to a separate written agreement.

16.    ESTOPPEL CERTIFICATE

(a)    Tenant shall, upon not less than five (5) days prior written notice from Landlord, execute, acknowledge and deliver to Landlord a statement in writing, in the form attached hereto as Exhibit "E", (i)certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect) and the date to which the rent and other sums of charges are paid in advance, if any, and (ii)acknowledging that there are no uncured defaults on the part of Landlord, or specifying any defaults that are claimed  Any such statement may be conclusively relied upon by any prospective purchaser or mortgagee of the Office Building Project or any part thereof or to any other who Landlord shall have delivered such statement to.

(b)    The failure to deliver such statement within such time shall be a material default by Tenant under this Lease, without any further notice to Tenant, or it shall be conclusive upon Tenant that (i) this Lease is in full force and effect, without modification except as may be represented by Landlord (ii) there are no uncured defaults of Landlord and (iii) not more than one month's rent has been paid in advance.

16

© Stephen J. Filch                    {2 1007.3

(c)     In the event Tenant does not comply with Landlord's request for the execution of an estoppel
certificate, Landlord shall be deemed to be Tenant's attorney-in-fact to execute such certificate on Tenant's behalf.

(d)     If Landlord desires to finance, refinance, or otherwise encumber the Office Building Project, or
any part thereof, Tenant hereby agrees to deliver to any lender or other entity or individual designated by Landlord
such financial statements of Tenant as may be reasonably required by such lender or other entity or individual.

## 17.     LANDLORD'S TRANSFER OF OWNERSHIP

(a)     The term "Landlord" as used herein shall mean only the owner or owners of the fee title
or a lessee's interest in a ground lease of the Office Building Project.

(b)     Notwithstanding any other provisions of this Lease, Landlord may assign, in whole or in
part, Landlord's interest in this Lease and may sell, exchange or master lease all or part of the real estate of which
the Premises are a part. In the event of any sale or exchange of the Premises by Landlord and assignment by
Landlord of this Lease, Landlord shall be and is hereby entirely freed and relieved of all liability under any and all
covenants and obligations contained in or derived from this Lease or arising out of any act, occurrence or omission
relating to the Premises which occurs after the consummation of such sale, exchange, or assignment.

## 18.     SEVERABILITY

The invalidity of any provision of this Lease as determined by a court of competent jurisdiction shall in no
way affect the validity of this Lease or any other provisions hereof.

## 19.     INTEREST ON PAST-DUE OBLIGATIONS

Except as expressly herein provided, any amount due Landlord or Tenant not paid when due shall bear
interest at the maximum rate permitted by law from the date such payment was due until the date such payment is
actually received. Payment of such interest shall not excuse or cure any default by Tenant under this Lease.

## 20.     TIME OF ESSENCE

Time is of the essence with respect to the performance by Tenant of its obligations under this Lease

## 21.     ADDITIONAL RENT

All monetary obligations of Tenant to Landlord under the terms of this Lease, including any other sums
charges payable by Tenant hereunder, shall be deemed to be additional rent and Landlord may recover same in the
same manner as recovery of rent.

## 22.     INCORPORATION OF PRIOR AGREEMENTS; AMENDMENTS

This Lease contains all of the agreements of the parties with respect to any matter mentioned herein. NO
prior or contemporaneous agreement or understanding pertaining to any such matter shall be effective. This Lease
may be modified in writing only signed by the parties in interest at the time of the modification. Except as
otherwise stated in this Lease, Tenant hereby acknowledges that neither the real estate broker listed in paragraph 15
hereof nor any cooperating broker on this transaction nor the Landlord or any employee or agents of any said
persons had made any oral or written warranties or representations to Tenant relative to the condition or use by
Tenant of the Premises or the Office Building Project and Tenant acknowledges that Tenant assumed all
responsibility regarding the Occupational Safety Health Act, the legal use and adaptability of the Premises and
compliance thereof with all applicable laws and regulations in effect during the term of this Lease

## 23.     NOTICES

Any notice, consent, approval, request, bill demand or statement hereunder by either party to the other party shall be in writing and shall be deemed to have been duly given when mailed if sent by registered or certified mail, return receipt requested, addressed to such other party, which address for Landlord shall be 124 W Main Street, Suite 240, El Cajon, CA 92020, and for Tenant shall be the Premises (or Tenant's address as hereinbefore set forth if mailed prior to Tenant's occupancy of the Premises), or if to the address of such other party for such notices, consents, approvals, requests, bills, demands or statements shall have been duly changed as hereinafter provided, if mailed, as aforesaid, to such other party at such changed address.

Either party may at any time change the address for such notices, consents, approvals, requests, bills, demands or statements by delivering or mailing, as aforesaid, to the other party a notice stating the change and setting forth the changed address. If the term "Tenant" as used in this Lease refers to more than one person, any notice, consent, approval, request, bill, demand or statement given as aforesaid to any one of such persons shall be deemed to have been duly given to Tenant. Notwithstanding the foregoing, bills and statements by Landlord to Tenant for rent, additional rent, Common Area charges or other sums or charges payable to Tenant to Landlord may be delivered personally r sent by regular mail.

24.   WAIVERS

No waiver by Landlord of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by Tenant of the same or any other provision. Landlord's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any subsequent act by Tenant. The acceptance of rent hereunder by Landlord shall not be a waiver of any breach by Tenant of any provision hereof regardless of Landlord's knowledge of such breach at the time of acceptance of such rent

25.   RECORDING

Tenant shall not record this Lease or any memorandum thereof and any attempt thereat shall be void and of no force or effect.

26.   HOLDING OVER

If Tenant, without Landlord's consent, remains in possession of the Premises or any part thereof after the expiration of the term hereof, such occupancy shall be deemed to be a tenancy from month to month upon all the provisions of this Lease pertaining to the obligations of Tenant, except that the rent payable shall be one hundred and fifty (150%) percent of the rent and additional rent payable immediately preceding the termination date of this Lease and all options, if any, granted under the terms of this Lease shall be deemed terminated and be of no further effect during said month to month Tenant; provided, however, nothing contained herein shall be deemed to prevent or preclude Landlord from recovery from Tenant of such damages that Landlord may suffer, directly or indirectly, as a result of such holding over.

27.   CUMULATIVE REMEDIES

No remedy or election by Landlord hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity

28.   COVENANTS AND CONDITIONS

Each provision of this Lease to be performed by Tenant shall be deemed both a covenant and a condition.

29.   BINDING EFFECT; CHOICE OF LAW

Subject to any provisions hereof restricting assignment or subletting by Tenant and subject to the provisions of paragraph 17, this Lease shall bind the parties, their personal representatives, and successors and permitted assigns  This Lease shall be governed by the laws of the State of California and any litigation concerning this Lease between the parties hereto shall be initiated in the Superior Court for the County of San Diego.

18

EXHIBIT U
PAGE 762

30.    SUBORDINATION

30.1    This Lease is subject and subordinate in all respects to all ground leases and/or underlying leases now or hereafter covering the Building or the Office Building Project of which the Premises forms a part and to all mortgages which may now or hereafter be placed on or affect such leases and/or Building and/or Office Building Project and/or Landlord's interest therein, and to each advance made and/or hereafter to be made under any such mortgage, and to all renewals, modifications, consolidations, replacements, assignments and extensions thereof and all substitutions of and for such ground leases and/or underlying leases and/or mortgages. This paragraph 30.1 shall be self-operative and no further instrument of subordination shall be required. In confirmation of such subordination, Tenant shall execute and deliver promptly any certificate that Landlord and/or any mortgagee and/or the lessor under any ground or underlying lease and/or their respective successors in interest may request. Tenant hereby constitutes and appoints landlord and/or any mortgagee and/or the lessor under any ground or underlying lease and/or their respective successors in interest Tenant's attorney-in-fact to execute and deliver any such certificate or certificates for and on half of Tenant.

30.2    Without limitation of any of the provisions of this Lease, if, at any time during the term of this Lease, Landlord shall be the holder of a leasehold estate covering the Building or Office Building Project of which the Premises forms a part and if such leasehold estate shall terminate or be terminated for any reason, Tenant agrees, at the election and upon demand of any owner of the Building or Office Building Project of which the Premises form a part, or of any mortgagee in possession thereof, or of any holder of a leasehold hereafter affecting the Building or Office Building Project of which the Premises form a part, to attorn, from time to time, to any such owner, mortgagee or holder, upon the terms and conditions set forth herein for the remainder of the term demised in this Lease. The foregoing provisions shall endure to the benefit of any such owner, mortgagee or holder, shall apply to the tenancy of Tenant notwithstanding that this Lease may terminate upon the termination of any such leasehold estate, and shall be self-operative upon any such demand, without requiring any further instrument to give effect to said provisions. Tenant, however, upon demand of any such owner, mortgagee or holder, agrees to execute, from time to time, an instrument in confirmation of the foregoing provisions, satisfactory to such owner, mortgagee or holder, in which same as those set forth herein and shall apply for the remainder of the term originally demised in this Lease. Nothing contained in this paragraph 30.2 shall be construed to impair any right, privilege or option of any such owner, mortgagee or holder.

30.3    The term "mortgage(s)" as used in this Lease shall include any mortgage or any deed of trust. The term "mortgagee(s)" as used in this Lease shall include any mortgagee or any trustee under a deed of trust. The term "mortgagor(s)" as used in this Lease shall include any mortgagor or any grantor under a deed of trust.

31.    ATTORNEY'S FEES

31.1    If either Party brings action to enforce the terms hereof or declare rights hereunder, and shall prevail in any such action, trial, or appeal thereof, the prevailing Party shall be entitled to attorney's fees to be paid by other Party whether or not such action is pursued to decision or judgment.

31.2    The attorney's fee award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees incurred.

31.3    Landlord shall be entitled to attorney's fees and all other costs and expenses incurred in the preparation and service of notice of default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such default.

32.    LANDLORD'S ACCESS

32.1    Landlord and Landlord's agents shall have the right to enter the Premises at reasonable times upon twenty-four (24) hours prior notice (which notice may be oral) for the purpose of inspecting the same, performing any services required of Landlord, showing the same prospective purchasers, lenders, or tenants, taking such safety measures, erecting such scaffolding or other necessary structures, making such alterations, repairs, improvements or

© Stephen J. Hitch

19

13 1007.3

additions to the Premises or to the Office Building Project as Landlord may deem necessary, appropriate or desirable and the erecting, using and maintaining of utilities, service, pipes and conduits through the Premises and/or other premises. Landlord may, at any time, place on or about the Premises or the Office Building Project any ordinary "For Sale" signs and Landlord may during the last twelve (12) months of the term hereof place on or about the Premises ordinary "For Lease" signs. Landlord shall have the right to enter the Premises at any time during an emergency.

        32.2    Landlord shall have the right to retain keys to the Premises and to unlock all doors in or upon the Premises other than to files, vaults or safes, and, in the case of emergency, to enter the Premises by any appropriate means and Landlord shall not be liable to Tenant for any loss or damage as a result of Landlord's retention of such keys or any entry by Landlord into the Premises.

        32.3    No entry by Landlord pursuant to the provisions hereof shall constitute an eviction or constructive eviction.

### 33.   AUCTION

Tenant shall not conduct, nor permit to be conducted either voluntarily or involuntarily, any auction upon the Premises or the Common Areas. The holding of any auction on the Premises or Common Areas in violation of this paragraph shall constitute a material default of this Lease

### 34.   SIGNS

Tenant shall not place any sign upon the Premises or the Office Building Project or any roof thereof, without Landlord's prior written consent. Notwithstanding the foregoing, Tenant shall have the right, subject to Landlords written approval of the plans, at Tenant's sole cost and expense, to install a sign on the exterior of the top east facing side of the Building in accordance with Exhibit "D" attached hereto, provided Tenant complies with all laws, orders, rules and regulations of all governmental authorities having jurisdiction and otherwise complies with all of the covenants, agreements, terms, provisions and conditions of this Lease. Tenant shall send a copy to Landlord, for landlord's files, any and all permits necessary for the above.

### 35.   MERGER

The voluntary or other surrender of this Lease by Tenant, or a mutual cancellation thereof, or a termination by Landlord, shall not work a merger, and shall, at the option of the Landlord, terminate all or any existing subtenancies or may, at the option of Landlord, operate as an assignment to Landlord of any such subtenancies.

### 36.   LANDLORD'S CONSENT

If, pursuant to any provision of this Lease, Landlord shall withhold its consent or approval to anything or matter requested by Tenant, Tenant shall not be entitled to bring or institute any action or other proceeding for damages or for any other remedy of any kind or nature whatsoever and Tenant agrees to waive, and does hereby waive, any rights that it may have to bring any such action or other proceeding.

### 37.   QUIET POSSESSION

Upon Tenant paying the rent for the Premises and observing and performing all of the covenants, agreements, terms provisions and conditions of this Lease on Tenant's part to be observed and performed hereunder, Tenant shall have quiet possession of the Premises for the entire term hereof subject to the provisions of this Lease and to any and all present or future mortgages, deeds of trust and ground or underlying leases.

### 38.   SECURITY MEASURES-LANDLORD'S RESERVATIONS

        38.1    Landlord may, but is not obligated under the terms of this Lease, to provide security measures for the benefit of the Premises or the Building. Tenant may provide security measures approved by Landlord at no cost to Landlord;

30

© Stephen J. Fitch

12 10073

38 2    Without limiting any other right of Landlord, Landlord shall have the right to do the following:

(a)    To change the name or title of the Building in which the Premises are located and the Office Building Project.

(b)    At Landlord's expense, to provide and install Building Standard graphics at the entry of the Premises and such portion of the Common Areas as Landlord shall deem appropriate.

(c)    To permit any tenant the exclusive right to conduct any business as long as such exclusive right does not conflict with any rights expressly given herein.

(d)    To place such signs, notice or displays as Landlord deems necessary, appropriate or desirable upon the roof, exterior of the Building or the Office Building Project or on pole signs in the Common Areas.

38.3    Tenant shall not suffer or permit anyone to go upon the roof of the Building.

## 39.    EASEMENTS

39.1    Landlord reserves to itself the right, from time to time, to grant such easements, rights and dedications that Landlord deems necessary, appropriate or desirable, and to cause the recordation of Parcel Maps and restrictions. Tenant shall execute any documents required in connection with the foregoing upon request of Landlord and failure to do so shall constitute a material default of this Lease by Tenant without the need for further notice to Tenant. Tenant hereby constitutes Landlord as Tenant's attorney-in-fact to execute any such documents if Tenant fails to do so.

39.2    The obstruction of Tenant's view, air, or light by a structure erected in the vicinity of the Building, whether the Landlord or third parties, shall in no way affect this Lease or impose any liability upon Landlord.

## 40.    LIMITATION OF LANDLORD'S LIABILITY

Tenant shall look solely to the estate and interest of Landlord, its successors and assigns in the Building for the collection of a judgment or other judicial process requiring the payment of damages or money by Landlord or in the event of any default by Landlord hereunder and no other property or assets of Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under and with respect to this Lease, the relationship of Landlord and Tenant hereunder, Tenant's use and occupancy of the Premises or otherwise.

## 41.    AUTHORITY

If Tenant is a corporation, trust or general or limited partnership, Tenant, and each individual executing this Lease on behalf of such entity, represent and warrant that such individual is duly authorized to execute and deliver this Lease on behalf of said entity. If Tenant is a corporation, trust or partnership, Tenant shall, within thirty (30) days after execution of this Lease, deliver to Landlord evidence of such authority.

## 42.    CONFLICT

Any conflict between the printed provisions, Exhibits or Addenda of this Lease and the typewritten or handwritten provisions, if any, shall be controlled by the typewritten or handwritten provisions.

## 43.    NO OFFER

This Lease shall become binding upon Landlord and Tenant only when fully executed by both parties and a fully executed counterpart hereof is delivered by Landlord and Tenant.

## 44.    LENDER MODIFICATION

21

© Stephen J. Fitch

12 1007.3

Tenant agrees to make such reasonable modifications to this Lease as may be required by an institutional lender in connection with the obtaining of financing or refinancing of the Office Building Project, but not those affecting term or rent payable.

45.   OPTION TO RENEW.   [Intentionally omitted]

46.   TENANT IMPROVEMENT ALLOWANCE. [Intentionally omitted]

47.   MULTIPLE PARTIES

If more than one person or entity is named as either Landlord or Tenant herein, except as otherwise expressly provided herein, the obligations of the Landlord or Tenant herein shall be joint and several responsibility of all persons or entities named herein as such Landlord or Tenant respectively.

48.   LIMITATION OF LIABILITY.

48.1   Agreement by Tenant.

(a)   In consideration of the execution of this Lease by Landlord, Tenant agrees in the event of any actual or alleged failure, breach, or default hereunder by Landlord: (1) The sole and exclusive remedy shall be against the partnership and its partnership assets; (2) no partner of Landlord should be sued or named as a party in any suit or action (except as may be necessary to secure jurisdiction of the partnership); and (3) no judgment will be taken against any partner of Landlord. These covenants and agreements are enforceable both by Landlord and also by any partner of Landlord.

(b)   Notwithstanding anything to the contrary in this Lease, any judgment obtained by Tenant against Landlord shall be satisfied only out of Landlord's interest in the Center of which the Premises form a part and the rents receivable by Landlord therefrom. Neither Landlord nor any of its general or limited partners, officers, directors, shareholders, beneficiaries or employees shall have any personal liability for any matter in connection with this Lease or its obligations as Landlord of the Premises, except as provided above. Tenant shall not institute, seek or enforce any personal or deficiency judgment against Landlord or any of its general or limited partners, officers, directors, shareholders, beneficiaries, or employees, and none of their property, except the Center, shall be available to satisfy any judgment hereunder.

(c)   Tenant agrees that each of the foregoing covenants and agreements shall be applicable to any covenant or agreement either expressly contained in this Lease or imposed by statute or at common law.

49.   SPECIAL PROVISIONS.

49.1   Legal Representation.  Landlord and Tenant each acknowledge, warrant and represent to the other that it has had an adequate opportunity to seek the advice of legal counsel of its choice prior to entering into this Lease, that such opportunity was undertaken or waived by the free and voluntary act of such party, and that each party waives and covenants to forego and/or forebear from the assertion of any claim or defense that this Lease is not a valid and binding obligation upon it by reason of the failure to secure or receive adequate legal representation.

49.2   General.  By insertion of numbers in the following blanks, Landlord and Tenant acknowledge that Paragraph(s) N/A  is/are attached hereto and made a part hereof. If numbers have not been set forth in the blank in this Paragraph 49.3, it is conclusive that no additional provisions are a part of this Lease.

49.3   Non-Discrimination.  The Tenant herein covenants by and for itself, its officers, directors, successors and assigns and all persons claiming under or through it, and this Lease is made and accepted upon and subject to the following conditions:

There shall be no discrimination against or segregation of, any person or group of persons on account of race, color, creed, religion, sex, marital status, ancestry or national origin in the leasing, subleasing, transferring, use,

22

occupancy, tenure, or enjoyment of the land herein leased nor shall the Lessee itself, or any person claiming under or through it, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, use or company of tenants, lessees, sublessees, subtenants or vendees in the premises herein leased.

49.4     Condition Precedent.    Tenant acknowledges that the a portion of the Premises (i.e. the third floor) is subject to a Right of First Offer on Additional Space held by PUBLIC CONSULTING GROUP, INC., a Massachusetts corporation. Landlord has provided notice to PUBLIC CONSULTING GROUP, INC. pursuant to the terms of their lease regarding the lease offer represented by the terms of this Lease. PUBLIC CONSULTING GROUP, INC. did not exercise its right to lease the additional space. A copy of said action by PUBLIC CONSULTING GROUP, INC. shall be provided to Tenant. Should this Lease not be executed within the required time frame set forth in the Right of First Offer on Additional Space held by PUBLIC CONSULTING GROUP, INC. or the terms set forth in the notice provided by Landlord to PUBLIC CONSULTING GROUP, INC. are materially changed then Tenant further acknowledges that Landlord will be required to provide to PUBLIC CONSULTING GROUP, INC. a new notice pursuant to the Right of First Offer on Additional Space. Should Landlord be required to provide such new notice and should PUBLIC CONSULTING GROUP, INC exercise their right and sign a lease for such additional space (i.e. the third floor) than this Lease shall at the option of Tenant (i) terminate upon written notice from Tenant to Landlord or (ii) remain in affect with the Premises being reduced to the 1st floor and the Rent shall be adjusted accordingly. In the event Tenant elects to continue to lease the reduced square footage, Landlord and Tenant shall execute a lease amendment setting forth the reduced square footage and the new rent.

[Remainder of page left intentionally blank]

33

EXHIBIT U
PAGE 767

50.    **ATTACHMENTS**

Attached hereto are the following documents which constitute a part of this Lease.

| | |
|---|---|
| SCHEDULE "A" | Lease Commencement |
| EXHIBIT "A" | Demised Premises |
| EXHIBIT "B" | Rules and Regulations |
| EXHIBIT "C" | Parking Rules |
| EXHIBIT "D" | Sign Criteria |
| EXHIBIT "E" | Estoppel Certificate |
| EXHIBIT "F" | List of Improvements |

LANDLORD AND TENANT HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN AND, BY EXECUTION OF THIS LEASE, SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LANDLORD AND TENANT WITH RESPECT TO THE PREMISES.

THIS LEASE HAS BEEN FILLED IN AND PREPARED FOR SUBMISSION TO YOUR ATTORNEY FOR HIS/HER APPROVAL. NO REPRESENTATION OR RECOMMENDATION IS MADE AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION RELATING THERETO THE PARTIES SHALL RELY SOLELY UPON THE ADVICE OF THEIR OWN LEGAL COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.

**Landlord**

PROMENADE SQUARE, LLC.,
a California limited liability company

By
Daryl R. Priest, Manager

**Tenant**

BORREGO COMMUNITY HEALTH FOUNDATION
a California corporation

By: _____
Name: _____
Its: _____

EXHIBIT U
PAGE 768

50.   **ATTACHMENTS**

Attached hereto are the following documents which constitute a part of this Lease.

| | |
|---|---|
| SCHEDULE "A" | Lease Commencement |
| EXHIBIT "A" | Demised Premises |
| EXHIBIT "B" | Rules and Regulations |
| EXHIBIT "C" | Parking Rules |
| EXHIBIT "D" | Sign Criteria |
| EXHIBIT "E" | Estoppel Certificate |
| EXHIBIT "F" | List of Improvements |

LANDLORD AND TENANT HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN AND, BY EXECUTION OF THIS LEASE, SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LANDLORD AND TENANT WITH RESPECT TO THE PREMISES.

THIS LEASE HAS BEEN FILLED IN AND PREPARED FOR SUBMISSION TO YOUR ATTORNEY FOR HIS/HER APPROVAL. NO REPRESENTATION OR RECOMMENDATION IS MADE AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION RELATING THERETO THE PARTIES SHALL RELY SOLELY UPON THE ADVICE OF THEIR OWN LEGAL COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.

**Landlord**

PROMENADE SQUARE, LLC ,
a California limited liability company

By: _____
    Daryl R. Priest, Manager

**Tenant**

BORREGO COMMUNITY HEALTH FOUNDATION
a California corporation

By: _____
Name: _____
Its: _____

© Stephen J. Fuch

24

12 1007 3

SCHEDULE "A"

ATTACHED HERETO AND MADE A PART OF THIS LEASE DATED SEPTMBER __, 2012, ENTERED INTO BY AND BETWEEN PROMENADE SQUARE, LLC., a California limited liability company, LANDLORD, AND BORREGO COMMUNITY HEALTH FOUNDATION, a California corporation, TENANT, SCHEDULE "A" IS SET FORTH IN AGREEMENT BY THE PARTIES AS FOLLOWS:

Landlord and Tenant declare the possession of the Premises, Suite 300 of the Building Project was accepted by Tenant on _____, 2013. That the Lease commencement date is hereby established to be_____, 2013; that the Lease term expires _____, 2033; the Lease is as of the date below in full force and effect; and that Landlord and Tenant have fulfilled all their respective obligations as to the commencement of this Lease

Landlord and Tenant hereby acknowledge that the total rentable square feet of the demised premises is 16,383; the monthly rent is $41,749.52 and the Security Deposit in Landlord's possession is $46,673 42

LANDLORD

PROMENADE SQUARE, LLC.,
a California limited liability company

By. _____
    Daryl R. Priest, Manager

Dated: _____, 2013

TENANT

BORREGO COMMUNITY HEALTH FOUNDATION
a California corporation

By: _____
Name: _____
Its: _____

Dated· _____, 2013

EXHIBIT U
PAGE 770

EXHIBIT "A"
DEMISED PREMISES

See Floor Plan of 1st and 3rd floors attached.

© Stephen J Fitch

26

12 1007.3



PRIEST DEVELOPMENT
CORNERS PROMENADE

EXHIBIT U
PAGE 772



PRIEST DEVELOPMENT
CORNERS PROMENADE

## EXHIBIT "B"

### RULES AND REGULATIONS
### FOR STANDARD OFFICE LEASE

#### GENERAL RULES

1.     Tenant shall not suffer or permit the obstruction of any Common Areas, including driveways, walkways and stairways.

2.     Landlord reserves the right to refuse access to any person Landlord, in good faith, judges to be a threat to safety, reputation, or property of the Office Building Project

3.     Tenant shall not make or permit any noise odors that annoy or interfere with other lessees or person having business within the Office Building Project.

4.     Tenant shall not keep animals or birds within the Office Building Project, and shall not bring bicycles, motorcycles or other vehicles into areas not designated as authorized for same.

5.     Tenant shall not make, suffer or permit litter except in appropriate receptacles for that purpose.

6     Tenant shall not alter any lock or install new or additional locks or bolts.

7.     Tenant shall be responsible for its inappropriate use of any toilet rooms, plumbing or other utilities. No foreign substances of any kind are to be inserted therein.

8.     Tenant shall not deface the walls, partitions or other surfaces of the Premises or Office Building Project.

9.     Tenant shall not suffer or permit anything in or around the Premises of Building that causes excessive vibration floor loading in any part of the Office Building Project.

10.     Furniture, freight and equipment shall be moved into or out of the Building only with the Landlord's knowledge and consent, and subject to such reasonable limitations, techniques and timing, as may be designated by Landlord. Tenant shall be responsible for any damage to the Office Building Project arising from any such activity.

11.     Tenant shall not employ any service or contractor for services or work to be performed in or on the Building except as approved by Landlord.

12.     Landlord reserves the right to close and lock the Building on Saturdays, Sundays and legal holidays and on other days between the hours of 8 p.m. and 6 a.m. of the following day  If Tenant uses the Premises during such periods, Tenant shall be responsible for security and for locking any doors it may have opened for entry.

13     Tenant shall return all keys at the termination of its tenancy and shall be responsible for the cost of replacing any keys that are lost.

14.     No window coverings, shades or awnings shall be installed or use by Tenant.

15     No lessee, employee or invitee shall go upon the roof of the Building.

16.     Tenant shall not suffer or permit smoking or carrying of lighted cigars or cigarettes in any part of the building.

© Stephen J. Fitch

27

12 1007 3

EXHIBIT U
PAGE 774

17.　　Tenant shall not use any method of heating or air conditioning other than as provided by Landlord

18.　　Tenant shall not install, maintain or operate any vending machines upon the Premises without Landlord's written consent.

19.　　The Premises shall not be used for lodging or manufacturing, cooking or food preparation.

20　　Tenant shall comply with all safety, fire protection and evacuation regulations established by Landlord or any applicable governmental agency.

21.　　Landlord reserves the right to waive any one of these rules or regulations, and/or as to any particular lessee, and any such waiver shall not constitute a waiver of any other rule or regulation or any subsequent application thereof to such lessee.

22.　　Tenant assumes all risks from theft or vandalism and agrees to keep its Premises locked as may be required.

23.　　Landlord reserves the right to make such other reasonable rules and regulations as it may from time to time deem necessary for the appropriate operation and safety of the Office Building Project and its occupants  Tenant agrees to abide by these and such rules or regulations

© Stephen J Fitch

28

12 1007.3

EXHIBIT U
PAGE 775

## EXHIBIT "C"

### PARKING RULES

1.     Parking areas shall be used only for parking by vehicles no longer than full size, passenger automobiles herein called "Permitted Size Vehicles"   Vehicles other than Permitted Size Vehicles are herein referred to as "Oversized Vehicles".

2.     Tenant shall not permit or allow any vehicles that belong to or are controlled by Tenant or Tenant's employees, suppliers, shippers, customers, or invitee to be loaded, unloaded, or parked in areas other than those designated by Landlord for such activities.

3.     Landlord reserves the right to refuse the sale of monthly identification devices to any person or entity that willfully refuses to comply with the applicable rules, regulations, laws and/or agreements.

4.     Users of the parking area will obey all posted signs and park only in the area designated for vehicle parking.

5     Unless otherwise instructed, every person using the parking area is required to park and lock his own vehicle.  Landlord will not be responsible for any damage to vehicles, injury to persons or loss or property, all of which risks are assumed by the party using the parking area.

6.     The maintenance, washing, waxing or cleaning of vehicles in the parking structure or Common Areas is prohibited.

7.     Tenant shall be responsible for seeing that all of its employees, agents and invitee comply with the applicable parking rules.

8.     Landlord reserves the right to modify these rules and/or adopt such other reasonable and non-discriminatory rules and regulations as it may deem necessary for the proper operation of the parking area.

9.     Such parking use as is herein provided is intended merely as a license only and no bailment is intended or shall be created hereby.

© Stephen J Fuch

29

12,10073

**EXHIBIT "D"**
**SIGN CRITERIA**

Tenant shall submit to Landlord plans for an exterior sign in conformity with the standards of the City of El Cajon. Said plans shall show the size, color, proposed location, materials and manner of affixing to building Landlord shall review and approve, reject or modify the plans in its sole discretion in accordance with the design, aesthetics of the Building taking into to consideration the new construction of the Building

All interior signs must be pre-approved in writing by Landlord.

© Stephen J Fitch

12.1007 3

EXHIBIT U
PAGE 777

## EXHIBIT "E"

### ESTOPPEL CERTIFICATE

RE: Date of Lease:
Dates of Amendments to Lease:
Landlord:
Tenant:
Premises:

Gentlemen:

The undersigned, as Tenant under the referenced Lease including all amendments (the "Lease") does hereby certify to _____, as follows:

1. The Lease is now in full force and effect and has not been modified or amended, except as noted above.

2. The Premises have been completed (including all repairs, replacements and maintenance obligations) in accordance with the terms of the Lease; all obligations and conditions of Landlord under the Lease, including those pertaining to construction and tenant improvements, have been satisfied; Tenant has accepted possession of said premises; and Tenant now occupies the same.

3. No rent, additional rent or other charges of any nature have been paid more than thirty (30) days in advance; all payments to be made shall be made strictly in accordance with the Lease; there is no charge, lien or claims of offset against future rents or other sums to become due under the Lease.

4. The current monthly base rent under the Lease is $_____.

5. The current basic additional rent and other charges payable under the Lease is $_____ per annum.

6. Tenant has paid $_____ to Landlord as a security deposit.

7. All rent, additional rent and other charges payable under the Lease to the date hereof are current; and the undersigned is not in default of the performance of any of its obligations, monetary or otherwise, under the Lease and the undersigned has received no notice of any such default. There are no agreements or understandings, written or verbal, allowing the undersigned any abatement or reduction of rent, or allowing the payment of rent in other than cash.

8. There exists no defenses or offsets to enforcement of the Lease by the Landlord; and there are, as of the date hereof, regardless of the giving of notice or passage of time or both, no defaults or breaches on the part of the Landlord under the Lease which are known to the undersigned.

9. Tenant has not conducted nor in the future shall conduct any activity upon the Premises or upon the property of which the Premises neither are a part (the "Property") nor used the Premises or the Property in violation of any federal, state or local environmental or hazardous waste law, ordinance, rule or regulation.

This Estoppel Certificate shall be binding upon Tenant and its successors and assigns, and shall inure to the benefit of Landlord and its successors and assigns.

Dated: _____, 20

By:

© Stephen J. Fitch

3)

12 1007.3

EXHIBIT "F"

LIST OF IMPROVEMENTS

Landlord shall provide the work for a turnkey build out reflecting the space plan to be provided by Tenant. Tenant shall provide Landlord, within thirty (30) days of the execution of this Lease, a detailed space plan sufficient to bid, permit and construct the required build out. Notwithstanding the preceding sentence any delivery of the space plan more than ten (10) days following execution of this Lease shall allow Landlord one day extension for each day, after 10 days, to complete the build out.   Landlord's work shall include but not be limited to the cost of materials, labor cost, contingency fees, architectural and engineering design fees, cost of drawings and printing, permitting fees, construction management fees and other all other necessary work and related cost and or fees for the Premises to be delivered both code compliant and substantially complete subject to the provisions of Section 2.1.1 of the Lease.

Work to include:

- Construction of all walls and corridors inside the premises
- Construction of lobby/reception area
- Construction of all exam rooms including one sink & cabinetry per room
- Construction of all provider offices
- Construction of all restrooms, break rooms, kitchen, etc.
- Installation of all carpet and vinyl flooring, dropped ceilings, textured drywall, and finished paint throughout the premises
- Construction to include all necessary lighting, plumbing, electrical service, data wiring, sprinkler systems, heating, ventilation, and air conditioning systems.

EXHIBIT U
PAGE 779

## AMENDMENT NO. 1 TO LEASE

This AMENDMENT NO. 1 TO LEASE (this "Amendment No.1") is made as of the ____ day of March, 2013, by and between PROMENADE SQUARE, LLC., a California limited liability company ("Landlord"), and BORREGO COMMUNITY HEALTH FOUNDATION, a California corporation ("Tenant").

## RECITALS

A.    Landlord and Tenant previously entered into that certain Commercial Lease dated as of September 21, 2012 ("Lease") with respect to the lease of 133 West Main Street Floors 1 and 3 El Cajon, CA ("Premises").

B.    All defined terms used herein but not defined herein shall have the meaning ascribed to such terms in the Original Lease.

C,    Landlord and Tenant now desire to enter into this Amendment No. 1 to amend the Lease as hereinafter provided.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, notwithstanding anything in the Original Lease to the contrary:

1.    Section 1.5.    Section 1.5 of the Lease is hereby deleted and the following new Section 1.5 is hereby added in its place:

1.5    *Term.*    *Commencing on January 1, 2013 (the "Commencement Date") and terminating on December 31, 2032*

2.    Section 1.6.    Section 1.6 of the Lease is hereby deleted and the following new Section 1.6 is hereby added in its place:

1.6    *Rent.*    *Years 1-5, $560,897.04 per annum payable in equal monthly installments of $46,741.42 on the first day of each calendar month occurring during the term without demand, set-off, deduction or abatement of any kind, except as may otherwise be set forth herein. Rent shall commence on the Commencement Date (January 1, 2013).*

3.    Section 1.7.    Section 1.7 of the Lease is hereby deleted and the following new Section 1.7 is hereby added in its place:

1.7    *Rent Increase.*    *The Rent shall adjust on January 1, 2018 and thereafter as follows.*

| | | |
|---|---|---|
| a. | *Years 6-10 of $49,203.37.* | *$590,440.44 per annum payable in equal monthly installments* |
| b. | *Years 11-15 of $51,665.32.* | *$619,983.84 per annum payable in equal monthly installments* |
| c. | *Years 16-20 of $54,127.27.* | *$649,527.24 per annum payable in equal monthly installments.* |

1

4.      Section 2.1.1.      Section 2.1.1 of the Lease is hereby deleted and the following new Section 2.1.1 is hereby added in its place.

    *2.1.1      Acceptance of Premises. Tenant accepts the Premises "as is". Further Tenant agrees that possession of the Premises was delivered to Tenant on January 1, 2013.*

5.      Article 46.      A new Article 46 entitled TENANT IMPROVEMENT ALLOWANCE is added as follows:

### 46.      *TENANT IMPROVEMENT ALLOWANCE*

    *46.1      Tenant Improvement Allowance. Landlord shall provide a Tenant Improvement Allowance ("TI Allowance") in the amount of Eight Hundred Twenty-one Thousand and 10/100 Dollars ($821,309.10) for the construction of Tenant's improvements in the Premises, which are to be fixed in the Premises and shall remain with the Premises.*

    *46.2      Construction of Improvements. The construction of Tenant's improvements in the Premises shall be done in accordance with Section 7.3 of this Lease by licensed and insured contractors.*

    *46.3      Payment of TI Allowance      The TI Allowance shall be paid by Landlord to Tenant based on a mutually agreed upon construction draw schedule to be submitted by Tenant to Landlord for approval. Any amount not drawn under the draw schedule shall be paid to Tenant within thirty (30) days from the later to occur of: (1) Tenant opens for business in the Building; (2) the period allowed for the filing of mechanic's liens has expired or duly executed unconditional lien waivers from all contractors, subcontractors and material men who have performed work on behalf of Tenant at the Premises are presented to Landlord; and (3) the Tenant has provided to Landlord a Certificate of Occupancy, a copy of Tenant's Recorded Notice of Completion and a complete set of "as-built" construction documents for all work performed by Tenant and/or Tenant's contractors and subcontractors.*

6.      Section 49.5      A new Section 49.5 is added as follows:

    *49.5      Rent Abatement. Landlord shall abate rent payable by Tenant as follows: $4,991.90 for January 2013; $4,991.90 for February 2013; $46,741.42 for May 2013, $46,741.42 for June 2013; $46,741.42 for July 2013, $46,741.42 for August 2013 and $46,741.42 for September 2013.*

7      Conflict.      In the event of any conflict between the Lease and this Amendment No. 1, this Amendment No. 1 shall prevail. Except to the extent herein modified, the Lease, as modified by the Lease Amendment, shall continue in full force and effect.

8.      Terms.      Except as specifically provided in this Amendment No. 1 all capitalized terms shall have the same meaning as defined in the Lease.

9      Counterparts.      This Amendment No. 1 may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument.

[Signatures on next page]

2

EXHIBIT U
PAGE 781

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Amendment No. 1 as of the date first above written.

<u>Landlord</u>

PROMENADE SQUARE, LLC.,
a California limited liability company

By: _____
Daryl R. Priest, Manager

<u>Tenant</u>

BORREGO COMMUNITY HEALTH FOUNDATION
a California corporation

By: _____
Name: _MARGARET SMITH_
Its: _CEO_

3

EXHIBIT U
PAGE 782

## AMENDMENT NO. 2 TO LEASE

This AMENDMENT NO. 2 TO LEASE (this "Amendment No.2") is made as of the ____ day of September, 2013, by and between PROMENADE SQUARE, LLC., a California limited liability company ("Landlord"), and BORREGO COMMUNITY HEALTH FOUNDATION, a California corporation ("Tenant").

## R E C I T A L S

A. Landlord and Tenant previously entered into that certain Commercial Lease dated as of September 21, 2012 as amended by Amendment No. 1 to Lease ("Lease") with respect to the lease of 133 West Main Street Floors 1 and 3 El Cajon, CA ("Premises").

B. Landlord and Tenant desire to amend the terms of the Lease to increase the tenant improvement allowance, increase rent effective October 1, 2013 and to convert the lease to a NNN lease whereby Tenant shall pay its prorate share of all operating costs including but not limited to common area expenses, insurance and taxes.

C. All defined terms used herein but not defined herein shall have the meaning ascribed to such terms in the Lease.

C. Landlord and Tenant now desire to enter into this Amendment No. 2 to amend the Lease as hereinafter provided.

## AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, notwithstanding anything in the Original Lease to the contrary.

1. _Section 1.6_ Section 1.6 of the Lease is hereby deleted and the following new Section 1.6 is hereby added in its place:

> _1.6 Rent._ Rent from Commencement Date (January 1, 2013) thru September 30, 2013, $560,897.04 per annum payable in equal monthly installments of $46,741.42. Rent from October 1, 2013 of year 1-5, $624,000 per annum payable in equal monthly installments of $52,000 on the first day of each calendar month occurring during the term without demand, set-off, deduction or abatement of any kind, except as may otherwise be set forth herein. Monthly rent shall also be known as "Base Monthly Rent" Base Monthly Rent shall commence on the Commencement Date (January 1, 2013).

2. _Section 1.7_ Section 1.7 of the Lease is hereby deleted and the following new Section 1.7 is hereby added in its place:

> _1.7 Rent Increase._ The Rent shall adjust on January 1, 2018 and thereafter as follows:

| | | |
|---|---|---|
| a | _Years 6-10 of $55,000.00._ | _$660,000.00 per annum payable in equal monthly installments_ |
| b. | _Years 11-15 of $58,000.00._ | _$696,000.00 per annum payable in equal monthly installments_ |
| c. | _Years 16-20 of $61,000.00._ | _$732,000.00 per annum payable in equal monthly installments_ |

////

1

3.    Section 1.10    Section 1.10 of the Lease is hereby deleted and the following new Section 1.10 is hereby added in its place:

    *1.10    Additional Rent    Tenant shall pay as "Additional Rent" its pro rata share of the cost of operation and maintenance of the Building Project, i.e., the cost of utilities (if not separately metered), taxes, insurance provided by Landlord, roof and structural repairs, and Common Area Expenses, and all other charges, as described and in the manner provided in Section 2.7. The Base Monthly Rent, the Additional Rent, rental adjustments and any and all other amounts, however designated, required to be paid or reimbursed by Tenant under this Lease are sometimes collectively referred to as and shall constitute "rent".*

4.    Section 2.3    Section 2.3 of the Lease is hereby deleted and the following new Section 2.3 is hereby added in its place:

    *2.3    Common Areas- Definition    The term "Common Area" shall include all areas within the Office Building and Building Project outside the exterior boundaries of the buildings situated thereon, including, but not limited to, streets, tunnels, driveways, parking areas, truck ways, delivery passages, access roads, loading doors, sidewalks, ramps, open and closed courts and malls, landscaped and planted areas, slopes, comfort and first aid stations, washrooms and parcel pick-up stations, exterior stairways, bus stops, retaining and decorative walls and planters, and other areas provided by Landlord and/or other Owners of portions of the Building Project, their employees and invitees. Landlord reserves the right to install kiosks and other free-standing structures within the Common Areas, and also reserves the right to make changes, alterations or additions at any time and from time to time in the size, shape, location, number and extent of the Common Areas, or any of them, and no such change shall entitle Tenant to any abatement of rent, claim or allowance for any damages for injury or inconvenience to Tenant occasioned thereby.*

5.    Section 2.6.    Section 2.6 is hereby added as follows:

    *2.6    Maintenance of Common Areas.    Landlord shall maintain the Common Areas in a neat, clean and orderly condition, properly lighted and landscaped as Landlord, in its reasonable discretion, shall determine. Tenant shall pay to Landlord in the manner set forth in Section 2.7 (Payment of Common Areas Expenses) Tenant's pro rata share of the expenses (hereafter "Common Areas Expenses") in connection with the maintenance and operation of the Common Areas. Tenant's pro rata share of Common Areas Expenses shall be that amount which is a fraction (or expressed as a percentage), the numerator of which shall be the total floor area of the Premises and the denominator of which shall be the total floor area of the buildings in the Building Project (or portion thereof relating to the expense). Tenant's share of Common Areas Expenses shall also include any additional costs arising from special requirements created by Tenant's use of the Premises. Common Areas Expenses shall include, but shall not be limited to, (a) all sums expended and costs incurred in connection with the Common Areas for maintenance, landscaping, pest control, lighting, cleaning, trash removal, painting, restriping, repaving, resurfacing, sweeping, security, fire protection, sprinkler and irrigation systems, maintenance and repair of sidewalks, curbs and signs (which Tenant or other occupants of the Building Project are not obligated to repair), (b) operating, managing, policing, insuring, repairing and maintaining the Building Project and, if applicable, the security offices, management offices and any non-profit community buildings located in the Building Project from time to time, and maintaining repairing and replacing roofs of the buildings in the Building Project, (c) operating, insuring, repairing, replacing and maintaining the "Common Utility Facilities" defined to include, but not limited to, sanitary sewer lines and systems, gas lines and systems, waterlines and systems, fire protection lines and systems, electric power, telephone and communication main lines and systems, HVAC equipment and systems, storm drainage and retention facilities and all other utility main lines and systems not exclusively serving the premises of any specific tenant; (d) parking charges, surcharges and other levies, assessments, or any other costs imposed or assessed by any local, state or federal government agencies in connection with the use of the parking facilities and/or the Common Utility Facilities, real and personal property taxes and assessments on the improvements and land comprising the Common Areas, depreciation and maintenance on operating machinery and equipment (if owned) and rental paid for such machinery and equipment (if rented) which machinery and equipment is used solely for*

2

the operation and maintenance of the Building Project; and (e) public liability and property damage insurance on the Common Areas and Common Facilities, fire with extended coverage insurance with vandalism and malicious mischief endorsements with, at Owner's option, earthquake damage and/or hazardous waste endorsements, rental loss coverage and any additional coverages required pursuant to Section 8.3. In the event that any alteration, removal, replacement or repair is required to be made to any equipment or any portion of the Building Project pursuant to governmental authority, statute, law or court order, all expenses associated therewith shall be included in Common Areas Expenses unless such expenses are born by a specific tenant or occupant of the Building Project. Common Area Expenses shall include property management costs, Property Management Costs shall not exceed ten percent (10%) of the gross base rents received for the entire Building Project

Section 2.7.   Section 2.7 is hereby added as follows:

2.7   *Payment of Common Areas Expenses*   Prior to the commencement of each lease year or such other annual accounting period as Landlord shall utilize from time to time, Landlord shall give Tenant a written estimate of the Additional Rent payable by Tenant during the coming year. Tenant shall pay such estimated amount to Landlord in equal monthly installments, in advance, at the same time the Base Monthly Rent is paid. Within ninety (90) days after the end of each lease year, or such other annual accounting period as Landlord shall utilize from time to time, Landlord shall furnish to Tenant a statement showing in reasonable detail the actual costs incurred by Landlord for the operation and maintenance of the Building Project during the year then ended, and Tenant shall pay to Landlord Tenant's proportionate share of the cost incurred in excess of the payments of Additional Rent made by Tenant within ten (10) days of receipt of such statement. In the event that the payments of Additional Rent made by Tenant exceed Tenant's share of the actual cost of the operation and maintenance of the Building Project, the amount of any such excess shall be credited by Landlord to the Additional Rent next due and owing; provided, however, that, if the Lease term has expired, Landlord shall accompany said statement with the amount due to Tenant. Notwithstanding the foregoing, Landlord shall have the right to submit statements to Tenant for unbudgeted Common Area Expenses incurred on an emergency basis, and Tenant shall remit payment on such statements for its pro rata share of such Common Area Expenses within thirty (30) days of receipt of same. Tenant hereby acknowledges that major tenants (First Citizen Bank) and tenants of kiosks and similar structures, may not pay Common Area Expenses and other Additional Rent charges at all or on the same basis as Tenant herein. The estimate for Additional Rent commencing on October 1 of the first lease year is $6,500 per month.

6.   Section 7.1.   Section 7.1 of the Lease is hereby deleted and the following new Section 7.1 is hereby added in its place:

7.1   *Landlord's Obligations.*

(a)   General Landlord shall keep in good condition and repair the roof and structural components of the Premises and Building Project, but the cost thereof shall be prorated based upon that proportion which the Gross Floor Area of the Premises bears to the total number of leasable square feet in the building in which the Premises are located and shall be paid by Tenant in the manner set forth in Section 2.7 (Payment of Common Area Expenses). Landlord shall have no obligation to make any such repairs until Landlord has received written notice from Tenant with respect to the need for such repairs. Landlord shall not be deemed to be in default with respect to its obligation to repair unless and until Landlord has (1) received said written notice and (2) failed to make such repairs within a reasonable period following receipt of said notice. Landlord shall, after receiving written notice, exercise due diligence in making such repairs. Tenant hereby waives any provisions of law permitting Tenant to make repairs at Landlord's expense. Landlord shall enforce any construction warranties for the benefit of Tenant to the extent that they are available.

(b)   Landlord's Right of Access. In order to perform any of its obligations under this Lease, Landlord hereby reserves to itself and its successors the right of access to the exterior walls and roof of the Premises and the right to install, maintain, use, repair and replace pipes, ducts, conduits, and

3

EXHIBIT U
PAGE 785

*wires through the Premises in locations which will not materially interfere with Tenant's use thereof*

7.  Section 8.3  Section 8.3 of the Lease is hereby deleted and the following new Section 8.3 is hereby added in its place:

8.3  *Insurance Coverage by Landlord*

(a)  *Landlord shall maintain, at Tenant's expense as provided in Paragraph 8.1(b), a policy or policies of insurance protecting against the following:*

(1)  *Fire and other perils normally included in extended coverage insurance to the extent of at least ninety percent (90%) of the replacement value of the Premises, exclusive of personal property, trade fixtures and equipment belonging to Tenant and improvements and betterments made to the Premises by Tenant for which Tenant shall maintain fire and other perils insurance, which shall also name Landlord and its lenders as additional insureds.*

(2)  *Loss of rental income insurance to the extent of at least sixty percent (60%) of the annual gross rentals received by Landlord from the Building Project.*

(3)  *Public liability and property damage insurance with respect to the Common Areas in an amount not less than Two Million Dollars ($2,000,000) combined single limit for both bodily injury and property damage.*

(4)  *Catastrophic, flood and additional insurance coverages as Landlord may deem appropriate in its sole and absolute discretion.*

(b)  *Tenant shall pay to Landlord, as Additional Rent in the manner set forth in Section 2.7 (Payment of Common Area Expenses), Tenant's pro rata share of the cost of the insurance required in subparagraph (a). Tenant's pro rata share of such cost shall be that proportion of the annual premiums for insurance which the Gross Floor Area of the Premises bears to the total Gross Floor Area of the premises in the Building Project covered by such insurance.*

8.  Section 10.1  Section 10.1 of the Lease is hereby deleted and the following new Section 10.1 is hereby added in its place:

10.1  *Real Estate Taxes  Tenant shall also pay in the manner set forth in Sections 2.6 and 2.7 any and all "real estate taxes" (as hereafter deemed) assessed or imposed, or which become a lien upon or become chargeable against or payable in connection with the Premises, including Tenant's pro rata share of such real estate taxes which are attributable to the Common Areas. Real estate taxes for the last year of the term of this Lease shall be prorated between Landlord and Tenant as of the expiration date of the Lease term. With respect to any assessments which may be levied against or upon the Premises, or which under the laws then in force may be evidenced by improvements or other bonds and may be paid in annual installments, only the amount of such annual installment, with appropriate proration for any partial year, and interest thereon, shall be included within a computation of taxes and assessments levied against the Premises. Tenant shall be responsible for all increases in real estate taxes attributable to or caused by any organization, re-organization, purchase, sale, merger, acquisition or consolidation of Tenant, Tenant's assets or Tenant's business or by reason of any sale, assignment or recording of any transfer of interest in the Premises or the Building Project by Landlord.*

9.  Section 10.3.  Section 10.3 of the Lease is hereby deleted and the following new Section 10.3 is hereby added in its place:

10.3  *Definition of Real Estate Taxes*

(a)  *"Real estate taxes" shall mean and include each of the following:*

4

(1)     Any form of assessment, license fee, license tax, business license fee, business license tax, commercial rental tax levy, charge, penalty, bond or tax, imposed by any authority having the direct power to tax, including any city, county, state or federal government, or any school, agricultural, lighting, drainage or other improvement or special district thereof, as against any legal or equitable interest of Landlord in the Premises or in the real property of which the Premises are a part.

(2)     Any tax on Landlord's right to rent or other income from the Premises or as against Landlord's business or leasing the Premises.

(3)     Any assessment, tax, fee, levy or charge in substitution, partially or totally, or any assessment, tax, fee, levy or charge previously included within the definition of real property tax, it being acknowledged by Tenant and Landlord that Proposition 13 was adopted by the voters of the State of California in the June 1978 election and that assessments, taxes, fees, levies and charges may be imposed by governmental agencies for such services as are protection, street, sidewalk and road maintenance, refuse removal and for other governmental services formerly provided without charge to property owners or occupants; it is the intention of Tenant and Landlord that all such new and increased assessments, taxes, fees, levies and charges, and similar assessments, taxes, fees, levies and charges be included within the definition of "real property taxes for purposes of this Lease.

(4)     Any tax allocable to or measured by the Gross Floor Area of the Premises or the rent payable hereunder, including without limitation, any gross income tax or excise tax levied by the State of California, any political subdivision thereof, city, or federal government, with respect to the receipt of such rent, or upon with respect to the possession, leasing, operating, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises, or any portion thereof;

(5)     Any tax upon this transaction or any document to which Tenant is a party, creating or transferring an interest or an estate in the Premises;

(b)     "Real estate taxes" shall not include Landlord's federal or state income, franchise, inheritance or estate taxes.

10     Article 46.     Article 46 of the Lease is hereby deleted and the following new Article 46 is hereby added in its place:

## 46.     TENANT IMPROVEMENT ALLOWANCE

46.1     *Tenant Improvement Allowance.* Landlord shall provide a Tenant Improvement Allowance ("TI Allowance") in the amount of One Million Four Hundred Thousand and 00/100 Dollars ($1,400,000.00) for the construction of Tenant's improvements in the Premises, which are to be fixed in the Premises and shall remain with the Premises.

46.2     *Construction of Improvements.* The construction of Tenant's improvements in the Premises shall be done in accordance with Section 7.3 of this Lease by licensed and insured contractors

46.3     *Payment of TI Allowance.* The TI Allowance shall be paid by Landlord to Tenant based on a mutually agreed upon construction draw schedule to be submitted by Tenant to Landlord for approval. Any amount not drawn under the draw schedule shall be paid to Tenant within thirty (30) days from the later to occur of: (1) Tenant opens for business in the Building; (2) the period allowed for the filing of mechanic's liens has expired or duly executed unconditional lien waivers from all contractors, subcontractors and material men who have performed work on behalf of Tenant at the Premises are presented to Landlord; and (3) the Tenant has provided to Landlord a Certificate of Occupancy, a copy of Tenant's Recorded Notice of Completion and a complete set of "as-built" construction documents for all work performed by Tenant and/or Tenant's contractors and subcontractors

EXHIBIT U
PAGE 787

11.     Conflict.    In the event of any conflict between the Lease and this Amendment No. 2, this Amendment No. 2 shall prevail.  Except to the extent herein modified, the Lease, as modified by the Lease Amendment, shall continue in full force and effect.

8.      Terms.    Except as specifically provided in this Amendment No. 2 all capitalized terms shall have the same meaning as defined in the Lease.

9.      Counterparts.    This Amendment No. 1 may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument.


IN WITNESS WHEREOF, Landlord and Tenant have entered into this Amendment No. 2 as of the date first above written.

**Landlord**

PROMENADE SQUARE, LLC.,
a California limited liability company

By: _____
     Daryl R. Priest, Manager

**Tenant**

BORREGO COMMUNITY HEALTH FOUNDATION
a California corporation

By: _____
Name: _Bruce Hebets_
Its: _9/13/13_

6

EXHIBIT U
PAGE 788

## AMENDMENT NO. 3 TO LEASE

This AMENDMENT NO 3 TO LEASE (this "Amendment No.3") is made as of the 3rd day of April, 2015, by and between PROMENADE SQUARE, LLC., a California limited liability company ("Landlord"), and BORREGO COMMUNITY HEALTH FOUNDATION, a California corporation ("Tenant").

## RECITALS

A. Landlord and Tenant previously entered into that certain Commercial Lease dated as of September 21, 2012 as amended by Amendment No 1 to Lease and Amendment No. 2 to Lease ("Lease") with respect to the lease of 133 West Main Street, El Cajon, CA 92020 ("Premises")

B Landlord and Tenant desire to amend the terms of the Lease to increase the square footage of the lease, rent, length of term and other terms as specifically set forth in this Amendment No 3

C. All defined terms used herein but not defined herein shall have the meaning ascribed to such terms in the Lease

D. Landlord and Tenant now desire to enter into this Amendment No. 3 to amend the Lease as hereinafter provided

## AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, notwithstanding anything in the Original Lease to the contrary

1 Section 1.2. Section 1,2 of the Lease is hereby deleted and the following new Section 1,2 is hereby added in its place·

*1.2 Premises. 27,975 rentable square feet of space comprising the entire Building (as hereinafter defined) and shown on Exhibit "A" hereto (the "Premises")*

1. Section 1 5 Section 1.5 of the Lease is hereby deleted and the following new Section 1 5 is hereby added in its place

*1.5 Term. Possession of the second floor of the Building will commence on August 1, 2015 and the Lease shall terminate on July 31, 2045*

2 Section 1.6. Section 1 6 of the Lease is hereby deleted and the following new Section 1.6 is hereby added in its place·

*1.6 Rent. Effective August 1, 2015 the rent ("Rent") shall be $1,174,950 per annum payable in equal monthly installments of $97,912 50 on the first day of each calendar month occurring during the term without demand, set-off, deduction or abatement of any kind, except as may otherwise be set forth herein. Monthly rent shall also be known as "Base Monthly Rent" or "Rent". Rent shall be subject to annual adjustments as set forth in Section 1 7.*

////

////

3      Section 1.7      Section 1.7 of the Lease is hereby deleted and the following new Section 1.7 is hereby added in its place:

1.7      *Rent Increase.*      *The Rent for the Lease term shall adjust (in addition to the adjustment in Section 1.10), as follows:*

*a      Commencing on August 1, 2016 and then annually thereafter ("Adjustment Date") the Rent during the Lease Term shall be adjusted to an amount equal to the product obtained by multiplying the Rent in effect immediately prior to the Adjustment Date by the annual percentage increase in Consumer Price Index All Urban Consumers U.S. City Average (1982-84 = 100) published by the Bureau of Labor Statistics of the U.S. Department of Labor ("Index"), i.e., Index published 30 days prior to each new Adjustment Date ("New Extension Index") divided by the Index (in effect for the immediately preceding Lease Year) published 30 days prior to the preceding Adjustment Date ("Current Extension Index"). Landlord shall give written notice to Tenant indicating the amount of the adjustment and manner of computation of same as soon as the information becomes available to Landlord.*

4      Section 2.2      Section 2.2 of the Lease is hereby deleted and the following new Section 2.2 is hereby added in its place:

2.2      *Vehicle Parking.      So long as Tenant is not in default hereunder, and subject to the rules and regulations attached hereto or as otherwise may be established by Landlord from time to time, Tenant shall be entitled to use a total of forty-eight (48) general parking spaces and four (4) Handicap parking spaces. It is understood that Landlord has no effective means of control as to use of parking spaces*

*2.2.1      If Tenant commits or allows any of the prohibited activities described in the Lease or the rules then in effect, Landlord shall have the right, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Tenant, which cost shall be immediately payable as additional rent upon demand by Landlord, landlord shall give Tenant notice of any such action under this provision*

5      Section 2.6.      Section 2.6 is amended to provide that Tenant's pro rata share of the Common Area Expenses shall be 100% of the Common Area Expenses attributable to the Building and 83.32% of the Common Area Expenses for the remainder of the Building Project. The estimate for Additional Rent commencing on August 1, 2015 is $11,500 per month

6      Section 46      Article 46 of the Lease is hereby deleted and the following new Article 46 is hereby added in its place

46      TENANT IMPROVEMENT ALLOWANCE

*46.1      Tenant Improvement Allowance. Landlord shall provide a Tenant Improvement Allowance ("TI Allowance") in the amount not to exceed Nine Hundred Eighty-five thousand and 00/100 Dollars ($985,000 00) for the construction of Tenant's improvements on the second floor of the Premises, which are to be fixed in the Premises and shall remain with the Premises. All such tenant improvements shall be pursuant to plans approved by both Landlord and Tenant*

*46.2      Construction of Improvements. The construction of Tenant's improvements in the Premises shall be done in accordance with Section 7.3 of this Lease by licensed and insured contractor(s) selected by Landlord*

*46.3      Payment of TI Allowance      The TI Allowance shall be paid by Landlord to Tenant based on a mutually agreed upon construction draw schedule to be submitted by Tenant to Landlord for approval. In Landlord's sole discretion, Landlord may satisfy its obligations under this*

2

EXHIBIT U
PAGE 790

*Section 46 by contracting with and paying directly a contractor of Landlord's choosing to complete the tenant improvements.*

7.      Section 50      A new Section 50 is added as follows

*50      RIGHT OF FIRST REFUSAL:*

*50.1      Landlord hereby grants to Tenant a right of first refusal to purchase the Building Project on the following terms ("RFR")*

*50.1.1.   Subject to the rights set forth in Paragraph 50.1.2 below, in the event Landlord desires to sell the Building Project, or any portion of its interest in the Building Project, and shall have received an acceptable bona fide offer to purchase the Building Project or such interest (the "Offer"), Landlord shall give written notice of its intent to sell (the "Notice of Intent to Sell") to Tenant, together with an executed copy of the Offer setting forth all of the terms of the proposed purchase and identifying the prospective purchaser. Tenant shall then have an option to purchase the Building Project on the same terms and conditions as set forth in the Offer; provided that if the terms and conditions of the Offer provide for an exchange of like kind real property as payment of all or a portion of the purchase price, Tenant may exercise its option to purchase by stating in its written notice of exercise its willingness to participate in an exchange transaction in which Landlord shall identify certain real property which Tenant, at no additional cost or expense to Tenant, shall acquire and exchange with Landlord for the Building Project on terms and conditions otherwise consistent with the Offer. If no exchange is contemplated in the Offer, Tenant shall have the further option of paying Landlord in cash at closing the full amount of the purchase price of the Building Project or Landlord's interest in the Building Project, notwithstanding any non-cash terms set forth in the Offer. If Tenant elects to exercise its option, it shall give Landlord written notice of such election within twenty (20) days after receipt of the Notice of Intent to Sell and Tenant shall provide to Landlord evidence reasonably acceptable to Landlord that Tenant has the financial resources readily available for Tenant to purchase the Building Project under the terms of the Offer. If Tenant fails to deliver to Landlord its written exercise of the option (with evidence of financial resources) within the twenty day period Tenant shall be deemed to have not exercised its option. If Tenant fails to exercise its option within such twenty-day period or is deemed to not have exercised its option, (i) Landlord shall be free to accept an offer to sell the Building Project or interest therein on the terms set forth in the Offer (sale price no less than ninety percent (90%) of that contained in the Offer) at any time within one-hundred twenty (120) days after the expiration of such twenty-day period and (ii) Tenant shall, upon request, deliver to Landlord an acknowledgment of Tenant's failure to exercise the option and Landlord's right to sell the Building Project or interest therein pursuant to this Paragraph 50.1.1*

*50.1.2   Notwithstanding the foregoing, Landlord shall be free to convey, transfer or assign the Building Project or any portion of its interest in the Building Project without compliance with Paragraph 50.1.1 above (a) in the event that such conveyance, transfer or assignment is either (i) made to any holder of a Security Interest in Landlord's fee estate in the Building Project, provided that the lien of any fee mortgage or other security instrument shall expressly remain subordinate to Tenant's leasehold interest hereby created, or (ii) made to any trust under which the Landlord is the Trustor and beneficiary, or (iii) made to any entity controlled by Landlord, or (iv) made to any lineal descendants (natural or adopted) of Landlord, the spouses of such lineal descendants or any trust the total beneficial interest of which is held by such lineal descendants or their spouses, or (v) made as part of a merger, consolidation, conversion or liquidation of Landlord*

*50.1.3   This Right of First Refusal shall terminate and be of no further force or effect upon the termination of the Lease.   The Right of First Refusal is personal to Tenant and may not be exercised or assigned voluntarily or involuntarily, by or to any person or entity other than Tenant or an entity controlled by Tenant, provided, however, the Right of First Refusal shall be assignable with this Lease to any assignee of Tenant with the prior written consent of Landlord, as provided for in this Lease. The Right of First Refusal granted to Tenant is not assignable separate and apart from this Lease*

*50.1.4   If Tenant is in default on the date of the Notice of Intent to Sell or the exercise by*

3

EXHIBIT U

PAGE 791

*Tenant of its option, or has been late on the payment of rent which has resulted in a late charge being imposed more than four (4) times during the Lease term, the Tenant's right to exercise its option and this RFR shall be void and Tenant shall have no right to purchase the Property and the RFR shall become null and void.*

8       Section 51       A new Section 51 is added as follows.

51       Accessibility Inspection.       Landlord ☐ has or ☒ has not had the Demised Premises inspected for disability access by a Certified Access Specialist ("CASp")  The CASp determined that the Property ☐ met or ☐ did not meet all applicable construction-related accessibility standards pursuant to California Civil Code Section 55 53

9.       Condition Precedent.       Tenant acknowledges that a portion of the Premises (i.e. the second floor) is currently leased to PUBLIC CONSULTING GROUP, INC., a Massachusetts corporation under a lease dated June 8, 2010 ("PCG Lease"). The initial term of the PCG Lease is to expire on July 31, 2015. Under the terms of the PCG Lease the tenant has an option to extend their lease.  Should PUBLIC CONSULTING GROUP, INC. exercise their option to extend the PCG Lease than this Amendment No. 3 shall immediately become null and void.

10       Conflict       In the event of any conflict between the Lease and this Amendment No 3, this Amendment No, 3 shall prevail  Except to the extent herein modified, the Lease, as modified by the Lease Amendments shall continue in full force and effect.

11       Terms.       Except as specifically provided in this Amendment No. 3 all capitalized terms shall have the same meaning as defined in the Lease

12.       Counterparts.       This Amendment No  3 may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Amendment No 3 as of the date first above written.

Landlord                                       Tenant

PROMENADE SQUARE, LLC.,        BORREGO COMMUNITY HEALTH FOUNDATION
a California limited liability company        a California corporation

By                                              By:
Daryl R  Priest, Manager                    Name
                                              Its.

## AMENDMENT NO. 4 TO LEASE

This AMENDMENT NO. 4 TO LEASE (this "Amendment No. 4") is made as of the 27 day of March, 2016, by and between PROMENADE SQUARE, LLC., a California limited liability company ("Landlord"), and BORREGO COMMUNITY HEALTH FOUNDATION, a California non-profit corporation ("Tenant").

## RECITALS

A.  Landlord and Tenant previously entered into that certain Commercial Lease dated as of September 21, 2012 as amended by Amendment No. 1 to Lease, Amendment No. 2 to Lease and Amendment No. 3 to Lease ("Lease") with respect to the lease of 133 West Main Street El Cajon, CA ("Premises").

B.  Landlord and Tenant desire to amend the terms of the Lease.

C.  All defined terms used herein but not defined herein shall have the meaning ascribed to such terms in the Lease.

D.  Landlord and Tenant now desire to enter into this Amendment No. 4 to amend the Lease as hereinafter provided.

## AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, notwithstanding anything in the Original Lease to the contrary:

1.  Section 1.6.     Section 1.6 of the Lease is hereby deleted and the following new Section 1.6 is hereby added in its place:

1.6     Rent.     Effective April 1, 2016 the rent ("Rent") shall be $1,342,800 per annum payable in equal monthly installments of $111,900.00 on the first day of each calendar month occurring during the term without demand, set-off, deduction or abatement of any kind, except as may otherwise be set forth herein. Monthly rent shall also be known as "Base Monthly Rent" or "Rent". Rent shall be subject to annual adjustments as set forth in Section 1.7. Tenant has been paying rent from September 2015 thru March 2016 in the monthly amount of $57,340.50 (instead of the agreed upon rent of $97,912.50 per month, current rent arrearages of $284,004.00. Provided Tenant is not in default beyond any applicable cure periods for the reminder of the Lease Term the balance of the rent owing for the period September 2015 through March 2016 shall be abated.

2.  Section 1.7.     Section 1.7 of the Lease is hereby deleted and the following new Section 1.7 is hereby added in its place:

1.7     Rent Increase.     The Rent for the Lease term shall adjust (in addition to the adjustment in Section 1.10), as follows:

a     Commencing on October 1, 2016 and then annually thereafter("Adjustment Date") the Rent during the Lease Term shall be adjusted to an amount equal to the greater of (a) two (2) percent or (b) the product obtained by multiplying the Rent in effect immediately prior to the Adjustment Date by the annual percentage increase in Consumer Price Index All Urban Consumers U.S. City Average (1982-84 = 100) published by the Bureau of Labor Statistics of the U.S. Department of Labor ("Index"), i.e., Index published 30 days prior to each new Adjustment Date ("New Extension Index") divided by the Index (in effect for the immediately preceding Lease Year) published 30 days prior to the preceding Adjustment Date ("Current Extension Index") Landlord shall give written notice to Tenant indicating

1



EXHIBIT U
PAGE 793

*the amount of the adjustment and manner of computation of same as soon as the information becomes available to Landlord.*

3.  <u>Conflict</u>.  In the event of any conflict between the Lease and this Amendment No. 4, this Amendment No. 4 shall prevail.  Except to the extent herein modified, the Lease, as modified by the Lease Amendments shall continue in full force and effect.

4.  <u>Terms</u>.  Except as specifically provided in this Amendment No. 4 all capitalized terms shall have the same meaning as defined in the Lease.

5.  <u>Counterparts</u>.  This Amendment No. 4 may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Amendment No. 3 as of the date first above written.

<u>Landlord</u>                                       <u>Tenant</u>

PROMENADE SQUARE, LLC.,              BORREGO COMMUNITY HEALTH FOUNDATION
a California limited liability company       a California non-profit corporation

By: _____         By: _____
Daryl R. Priest, Manager                     Name: _Bruce Hebets_
                                             Its: _CEO_

2

EXHIBIT U
PAGE 794

1

## AMENDMENT NO. 5 TO LEASE

This AMENDMENT NO. 5 TO LEASE (this "**Amendment No. 5**") is made as of the 4th day of December 2019, by and between PROMENADE SQUARE, LLC, a California limited liability company ("**Landlord**"), and BORREGO COMMUNITY HEALTH FOUNDATION, a California corporation ("**Tenant**").

R E C I T A L S

A.      Landlord and Tenant previously entered into that certain Commercial Lease dated as of September 21, 2012 as amended by Amendment No. 1 to Lease, Amendment No. 2 to Lease, Amendment No. 3 to Lease and Amendment No. 4 to Lease ("**Lease**") with respect to the lease of 133 West Main Street, El Cajon, CA ("**Premises**").

B.      Landlord and Tenant desire to amend the terms of the Lease.

C.      All defined terms used herein but not defined herein shall have the meaning ascribed to such terms in the Lease.

D.      Landlord and Tenant now desire to enter into this Amendment No. 5 to amend the Lease as hereinafter provided.

AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, notwithstanding anything in the Original Lease to the contrary:

1.      Section 1.2      Section 1.2 of the Lease is hereby deleted in its entirety and the following new Section 1.2 is hereby added in its place:

*1.2. Premises:   27,975 rentable square feet of space comprising the entire Building located at 133 West Main Street and 1,650 rentable square feet of space comprising the entire Building at 155 West Main Street (as hereinafter defined) and as shown on Exhibit "A" hereto (the "**Premises**").*

2.      Section 1.3      Section 1.3 of the Lease is hereby deleted in its entirety and the following new Section 1.3 is hereby added in its place:

*1.3 Building:   The structures and appurtenances commonly known as 133 West Main Street and 155 West Main Street in the City of El Cajon, County of San Diego, State of California, and as defined in paragraph 2.1.*

3.      Section 1.5.      Section 1.5 of the Lease is hereby amended to reflect Tenant's possession of 155 West Main Street will commence on February 1, 2020.  There are no additional changes to this section.

4.      Section 1.6.      Section 1.6 of the Lease is hereby amended to establish effective February 1, 2020, or at the time possession of 155 W. Main Street is delivered to Tenant, the monthly base rent shall increase based on the following formula: the then current monthly rental rate per square foot times 1650 square feet. There are no additional changes to this section.

EXHIBIT U
PAGE 795

2

5.      Section 2.2      Section 2.2 is amended to reflect an increase in general parking spaces for a new total of 50 parking spaces in the Building Project allocated for Tenant's use. There are no additional changes to this section.

6.      Section 2.6.      Section 2.6 is amended to provide that Tenant's pro rata share of the Common Area Expenses shall be 100% of the Common Area Expenses attributable to the Buildings at 133 and 155 West Main Street and 88.23% of the Common Area Expenses for the remainder of the Building Project.

7.      Conflict.      In the event of any conflict between the Lease and this Amendment No. 1, this Amendment No. 1 shall prevail. Except to the extent herein modified, the Lease, as modified by the Lease Amendments shall continue in full force and effect.

8.      Terms.      Except as specifically provided in this Amendment No. 5 all capitalized terms shall have the same meaning as defined in the Lease.

9.      Counterparts.      This Amendment No. 5 may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Amendment No. 5 as of the date first above written.

**Landlord**                                          **Tenant**

Promenade Square, LLC,                       BORREGO COMMUNITY HEALTH FOUNDATION
a California limited liability company        a California corporation

By: _____          By: _____
    Daryl R. Priest, Manager                   Name: Mikia Wallis, Esq
                                              Its: Chief Executive Officer

EXHIBIT U
PAGE 796

## STATEMENT FOR PHARMACY ACCESS

**Borrego Community Health Foundation Pharmacy**

**155 WEST  MAIN STREET**

**El Cajon, California,  92020**

A: Business and Professions Code 4116 states that no person shall be permitted enter into a premises licensed by the Board of Pharmacy unless a registered pharmacist is present at all times.

B: Title 16, Section 114(d) of California Code of regulations provides that only a licensed pharmacist may have a key to an area where dangerous drugs and controlled substances are stored.

C: The California State Board of Pharmacy requires that no lease for a licensed premises contain a provision inconsistent with Sections 4116 or 1714(d).

D: The landlord and the tenant hereby clarify the lease with respect to the Landlord's ability to access the premises by affixing their signatures below. The signatories agree to the adhering to Sections 4116 or 1714(d).

**Landlord**

Promenade Square, LLC

124 West Main Suite 240

El Cajon, California 92020

_signature_ 2/6/2020

Signature            Date

**Tenant**

Borrego Community Health Foundation

P.O. Box 2369

Borrego Springs, California 92004

_signature_ 2/6/2020

Signature            Date

Page 1 of 1

EXHIBIT U
PAGE 797

## TENANT ESTOPPEL CERTIFICATE

TO:  KINECTA FEDERAL CREDIT UNION, a Federal Credit Union, its successors and/or assigns (the "Lender")

THE UNDERSIGNED HEREBY CERTIFIES THAT AS OF THE DATE OF SIGNATURE BELOW:

1. Tenant: Borrego Community Health Foundation, a California Corporation

   Landlord: Promenade Square, LLC, a California limited liability company

   Lease Date: September 21, 2012     Lease Commenced: January 1, 2013  Lease Ends: July 31, 2045

   Modification Date(s):
   1st amendment – March 15, 2013
   2nd amendment – September 13, 2013
   3rd amendment – April 3rd, 2015

   Address: 133 West Main Street, El Cajon, CA 92020     Suite No.: 1st, 2nd, and 3rd floor    # of Parking Spaces: 48

   Current Annual Base Rent: $1,174,950     Paid through: July 31, 2015     Security Deposit: $ 46,673.42

   Additional Rents (base year), If applicable:
   Lease is a fully NNN lease. The current NNN/CAM charges are paid by tenant at a monthly estimated rate of $11,500, with annual reconciliation of overage/underage.

2. Tenant has accepted possession of and is currently open for business. No one other than Landlord, Tenant and Tenant's employees occupies or has any right to occupy any part of the Leased Premises. Tenant's obligation to pay all rents and other payments required under the Lease have been satisfied. Tenant agrees that no such rents or other payments will in the future be paid, more than one (1) month in advance of their due date. Tenant is not entitled to any concession, rebate, allowance or free rent for any period after the date of this Tenant Estoppel Certificate.

3. The Lease is in full force and effect and is the only agreement between Landlord and Tenant relating in any way to the Leased Premises. The "Lease Ends" date shown above is the earliest date that the Lease expires or may be terminated, subject to any renewal or cancellation rights specified in the Lease. The undersigned does not have any option or right to renew or cancel the Lease and does not have the option to lease additional space except as specified in the Lease. The interest of the undersigned in the Lease has not been assigned or encumbered.

4. There is no existing default or claimed default by either Landlord or Tenant under the Lease. No event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default by either Landlord or Tenant under the Lease. Tenant has no existing defenses or offsets against Landlord's enforcement of the Lease.

5. Since the date of the Lease, there has been no material adverse change in the financial condition of Tenant. There are no actions, voluntary or otherwise, pending against Tenant or any of its general partners and/or principals under any bankruptcy, receivership, insolvency or similar laws of the United States or any state thereof.

6. To the best of Tenant's knowledge, its use, maintenance and operation of the Leased Premises complies with, and will at all times comply with, all applicable federal, state, county or local statutes, laws, rules and regulations of any governmental authorities relating to environmental, health or safety matters. Tenant does not and will not engage in any activity which would involve the use of the Leased Premises for the storage, generation, use, treatment, transportation or disposal of any chemical, material or substance which is regulated as toxic or hazardous or exposure to which is prohibited, limited or regulated by any federal, state, county, regional, local or other governmental authority or which, even if not so regulated, may or could pose a hazard to the health and safety of the other tenants and occupants of Landlord's property.

EXHIBIT U
PAGE 798

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

Kinecta Federal Credit Union
2100 Park Place
El Segundo, CA  90245
Attn:  Business Services CU/88

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (the "**Agreement**") is made as of June 12, 2015, between **Borrego Community Health Foundation, a California corporation** ("**Tenant**"), having an address at 124 West Main Street, Suite 240, El Cajon, CA 92020  and  **KINECTA FEDERAL CREDIT UNION, a Federal Credit Union**, its successors and/or assigns ("**Lender**"), with a mailing address at 1440 Rosecrans Avenue, Manhattan Beach, CA 90266.

### RECITALS:

A.  Tenant is the tenant under that certain lease (the "**Original Lease**") dated September 21, 2012, by and between Tenant and **Promenade Square, LLC, a California limited liability company**  (the "**Landlord**"), as landlord (together with any amendments, modifications, renewals, or extensions attached hereto and made a part hereof, whether now or hereafter existing) (the "**Lease**"), wherein Landlord leased to Tenant certain premises known as Promenade Plaza (the "**Premises**") and located on that certain land described in Exhibit A attached hereto and made a part hereof (the "**Land**");

B.  Landlord is about to make, execute and deliver its Promissory Note (the "**Note**") to Lender which Note shall be secured by, among other security, a mortgage lien or Deed of Trust encumbering the Land pursuant to a "**Security Instrument**" (as defined in the Note) (such Security Instrument and all other documents securing the Note are herein collectively called the "Loan Documents");

C.  Tenant desires to be assured of continued occupancy of the Premises under the terms of the Lease, subject to the terms of the Security Instrument and to the terms hereof;

D.  Lender is willing to make the Loan on the condition that the Security Instrument is a lien and charge upon the Premises prior and superior to the Lease and provided that Tenant specifically subordinates the Lease to the lien and charge of the Security Instrument;

E.  Tenant is agreeable to the Security Instrument constituting a lien or charge upon the Premises which shall be prior and superior to the Lease, subject to the terms hereof, and is willing to attorn to Lender provided Lender grants Tenant a non-disturbance agreement as provided herein.

F.  Lender and Tenant desire to confirm their agreements with respect to the Lease and the Loan Documents.

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual covenants and agreements herein contained, and in order to induce Lender to make a loan to Landlord, Lender and Tenant hereby agree and covenant as follows:

1.  Lease.  As used in this Agreement, "Lease" includes, without limitation, all right, title and interest that Tenant may have in all or any portion of the Premises, whether granted by the terms of the Lease, by a separate written agreement or otherwise, including without limitation, all options, purchase rights, rights of first refusal provided for in the Lease or by separate agreement between Landlord and Tenant.

EXHIBIT U
PAGE 799

2.  Subordination.   The Lease and all right, title and interest in the Land created thereby (including without limitation, any purchase options, rights of first refusal or similar rights possessed by Tenant with respect to the Premises) are, shall be and shall at all times remain and continue to be subject and subordinate in all respects to the liens, terms, covenants, provisions and conditions of the Security Instrument and the Loan Documents, including renewals, modifications, consolidations, replacements, and extensions of such lien rights, in the same manner and to the same extent as if the Lease were executed subsequent to the execution, delivery, and recording of the Security Instrument in creation of the lien rights.

3.  Non-Disturbance.   So long as the Lease is in full force and effect and Tenant is not in default under the Lease (beyond any period given Tenant to cure such default) or under this Agreement:

    a.   Tenant's possession of the Premises, and Tenant's rights and privileges under the Lease (other than any purchase options, rights of first refusal or similar rights possessed by Tenant with respect to the Premises), shall not be diminished or interfered with by Lender, and Tenant's occupancy of the Premises shall not be disturbed by Lender for any reason whatsoever during the term of the Lease or any extensions or renewals thereof; and

    b.   Lender will not join Tenant as a party defendant in any action or proceeding to foreclose the Security Instrument or to enforce any rights or remedies of Lender under the Security Instrument which would cut-off, destroy, terminate or extinguish the Lease or Tenant's interest and estate under the Lease.

Notwithstanding the foregoing provisions of this paragraph, if it would be procedurally disadvantageous for Lender not to name or join Tenant as a party in a foreclosure proceeding with respect to the Security Instrument, Lender may so name or join Tenant without in any way diminishing or otherwise affecting the rights and privileges granted to, or inuring to the benefit of, Tenant under this Agreement.

4.  Attornment.

    a.   After notice is given by Lender that a default has occurred under the Security Instrument and that the rentals and all other payments to be made by Tenant under the Lease should be paid to Lender, Tenant will attorn to Lender and pay to Lender, or in accordance with the directions of Lender, all rentals and other monies due and to become due to Landlord under the Lease or otherwise in respect to the Premises; such payments will be made regardless of any right of set-off, counterclaim or other defense which Tenant may have against Landlord (or any prior landlord), whether as tenant under the Lease or otherwise; and

    b.   In addition, if Lender (or its nominee or designee) shall succeed to the rights of Landlord under the Lease through possession or foreclosure action, delivery of a deed or otherwise, or another person purchases the Premises upon or following foreclosure of the Security Instrument, then at the request of Lender (or its nominee or designee) or such purchaser (Lender, its nominees and designees, and such purchaser, each being a "Successor-Landlord"), Tenant shall attorn to and recognize Successor-Landlord as Tenant's landlord under the Lease.  Such attornment shall be effective and self-operative without the execution of any other instruments on the part of any of the parties hereto; provided, however, Tenant agrees to promptly execute and deliver any instrument that Successor-Landlord may reasonably request to evidence such attornment.  Upon such attornment, the Lease shall continue in full force and effect as, or as if it were, a direct lease between Successor-Landlord and Tenant upon all terms, conditions and covenants as are set forth in the Lease, except that Successor-Landlord shall not:

        (i)    be liable for any previous act or omission of Landlord (or any prior landlord) under the Lease;

        (ii)   be subject to any off-set, defense or counterclaim, which shall have previously accrued to Tenant against Landlord (or any prior landlord);

        (iii)  be bound by any modification of the Lease or by any previous prepayment of rent or additional rent for more than one month which Tenant might have paid to Landlord (or any prior landlord), unless such modification or prepayment shall have been expressly approved in writing by Lender;

        (iv)   be bound by any purchase options, rights of first refusal or similar rights possessed by Tenant with respect to the Premises; or

EXHIBIT U
PAGE 800

(v)    be liable for any security deposited under the Lease unless such security has been physically delivered to Lender.

5.    Lease Modifications.    Tenant agrees that without the prior written consent of Lender, it shall not: (a) amend or modify the Lease or any extensions or renewals thereof; (b) terminate, cancel or tender a surrender of the Lease; (c) make a prepayment of any rent or additional rent in excess of one (1) month; or (d) subordinate or permit the subordination of the Lease to any lien subordinate to the Security Instrument. Any such purported action without such consent shall be void as against the holder of the Security Instrument. Except as may be expressly permitted by the Lease, Tenant shall not assign the Lease, nor sublet any portion of the Premises, and Landlord shall not consent to any such assignment or subletting other than as expressly permitted by the terms of the Lease, without Lender's prior written consent, which consent shall not be unreasonably withheld.

6.    Notice of Default; Opportunity to Cure.

a.    Any notice required or permitted to be given by Tenant to Landlord shall be simultaneously given also to Lender, and any right of Tenant dependent upon notice shall take effect only after such notice to Lender is so given. Performance by Lender shall satisfy any conditions of the Lease requiring performance by Landlord, and Lender shall have a reasonable time to complete such performance as provided in section (b) below.

b.    Without limiting the generality of the foregoing, Tenant shall promptly notify Lender of any default, act or omission of Landlord which would give Tenant the right, immediately or after the lapse of a period of time, to cancel or terminate the Lease or to claim a partial or total eviction (a "**Landlord Default**"). In the event of a Landlord Default, Tenant shall not exercise any rights available to it: i) until it has given written notice of such Landlord Default to Lender; and ii) unless Lender has failed, within thirty (30) days after Lender receives such notice, to cure or remedy the Landlord Default or, if the same is not reasonably capable of being remedied by Lender within such thirty (30) day period, until a reasonable period for remedying such Landlord Default has elapsed following the giving of such notice and following the time when Lender shall have become entitled under the Loan Documents to remedy the same (which reasonable period shall in no event be less than the period to which Landlord would be entitled under the Lease or otherwise, after similar notice, to effect such remedy); provided that Lender shall with due diligence commence and prosecute a remedy for such Landlord Default. If Lender cannot reasonably remedy a Landlord Default until after Lender obtains possession of the Land, Tenant may not terminate or cancel the Lease or claim a partial or total eviction by reason of such Landlord Default until the expiration of a reasonable period necessary for the remedy after Lender institutes proceedings to obtain possession of the Land through a foreclosure or otherwise, or for the appointment of a receiver for the Land, provided that Lender institutes and prosecutes such proceedings with due diligence. Lender shall have no obligation hereunder to remedy any Landlord Default.

7.    Application of Casualty Insurance Proceeds and Condemnation Awards.    Tenant hereby agrees that, notwithstanding anything to the contrary contained in the Lease, the terms and provisions of the Security Instrument shall control with respect to the application of casualty insurance proceeds and condemnation awards.

8.    Notice of Lien.    To the extent that the Lease entitles Tenant to notice of the existence of any mortgage lien or Deed of Trust and the identity of any lender, this Agreement shall constitute such notice to Tenant with respect to the Security Instrument.

9.    Remedies.    Upon and after the occurrence of a default under the Security Instrument, Lender shall be entitled, but not obligated, to exercise the claims, rights, powers, privileges and remedies of Landlord under the Lease and shall be further entitled to the benefits of, and to receive and enforce performance of, all of the covenants to be performed by Tenant under the Lease as though Lender were named therein as Landlord. Landlord agrees that this Agreement does not constitute a waiver by Lender of any of its rights under the Security Instrument or the Loan Documents, and that the Security Instrument and the Loan Documents remain in full force and effect and shall be complied with in all respects by the Landlord.

10.    Limitation of Liability.    Except as specifically provided in this Agreement, Lender shall not, by virtue of this Agreement, the Security Instrument or any other instrument to which Lender may be a party, be or become subject to any liability or obligation to Tenant under the Lease or otherwise.

11.    Priority.

a.   Tenant acknowledges and agrees that this Agreement supersedes (but only to the extent inconsistent with) any provisions of the Lease relating to the priority or subordination of the Lease and the interests or estates created thereby to the Security Instrument.

b.   Tenant agrees to enter into a subordination, non-disturbance and attornment agreement with any entity which shall succeed Lender with respect to the Land, or any portion thereof, provided such agreement is substantially similar to this Agreement.

12.   <u>Notices.</u>   Any notice, consent, request or other communication required or permitted to be given hereunder shall be in writing and shall be: (a) personally delivered; (b) delivered by Federal Express or other comparable overnight delivery service (collectively, a "**Delivery Service**") ; or (c) transmitted by postage prepaid registered or certified mail, return receipt requested. All such notices, consents, requests or other communications shall be addressed to Landlord, Lender or Tenant at the following addresses, or to such other address as Landlord, Lender or Tenant shall in like manner designate in writing. All notices and other communications shall be deemed to have been duly given on the first to occur of actual receipt of the same or: (i) the date of delivery if personally delivered; (ii) one (1) business day after depositing the same with the Delivery Service if by Delivery Service; and (iii) five (5) days following posting if transmitted by mail. Any party may change its address for purposes hereof by notice to the other parties given in accordance with the provisions hereof.

If to Tenant:
> **Borrego Community Health Foundation**
> 124 West Main Street
> El Cajon, CA 92020

If to Landlord:
> **Promenade Square, LLC**
> 124 West Main Street, Ste 240
> El Cajon, CA 92020

If to Lender:
> **Kinecta Federal Credit Union**
> 2100 Park Place
> El Segundo, CA 90245
> Attn: Business Services CU/88

13.   <u>General.</u>   This Agreement may not be modified or terminated orally. This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors and assigns. The term "**Lender**" shall mean the then holder of any interest in the Security Instrument. The term "**Landlord**" shall mean the then holder of the lessor's interest in the Lease. The term "**person**" shall mean any individual, joint venture, corporation, partnership, trust, unincorporated association or other entity. All references herein to the Lease shall mean the Lease as modified by this Agreement and any amendments or modifications to the Lease which are consented to in writing by the Lender. In the event there is any inconsistency between the Lease and the provisions of this Agreement, the provisions of this Agreement shall be controlling. In the event any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

14.   <u>Tenant Representations and Warranties.</u>   Tenant hereby represents and warrants that there is no known defects or defaults on the part of the Landlord. The Lease is a complete statement of the Agreement of the parties thereto with respect to the leasing of the Premises.

15.   <u>No Warranties by Lender.</u>   Lender shall have no obligations nor incur any liability with respect to any warranties of any nature whatsoever, whether pursuant to the Lease or otherwise, including, without limitation, any warranties respecting use, compliance with zoning, Landlord's title, Landlord's authority, habitability, fitness for purpose, or possession.

16.   <u>Limitation on Lender's Liability.</u>   If Lender shall acquire title to the Premises or the Property, Lender shall have no obligation, nor incur any liability, beyond Lender's then equity interest, if any, in the Premises, and Tenant shall look exclusively to such equity interest of Lender, if any, in the Premises for the payment and discharge of any obligations imposed upon Lender hereunder or under the Lease, and Lender is hereby released and relieved of any other obligations hereunder and under the Lease.

17.     Attorneys' Fees.     If any action or proceeding is brought by any party against any other party arising from or related to this Agreement, the prevailing party shall be entitled to recover its reasonable costs and attorneys' fees. Attorneys' fees shall include, without limitation, such amounts as may then be charged by Lender for legal services provided by attorneys in the employ of Lender, at rates not exceeding those that would be charged by outside attorneys for comparable services.

18.     Governing Law.     This Agreement shall be governed by and construed in accordance with the laws of the state in which the Land is located.

19.     Counterparts.    This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which when taken together shall constitute one and the same Agreement. The separate signature pages and notary acknowledgements may be combined into a single original document for recordation.

        IN WITNESS WHEREOF, the parties hereto have executed this Subordination, Non-Disturbance and Attornment Agreement to be effective as of the day and year first stated above.

LENDER:                                              TENANT:

KINECTA FEDERAL CREDIT UNION, a Federal Credit Union     Borrego Community Health Foundation, a California corporation

                                                     By: _____

By: _____                 Print Name: _Bruce Hebets_
        Robert Farrington, Vice President            Title: _CEO_


AGREED AND CONSENTED TO:

LANDLORD:

Promenade Square, LLC, a California limited liability company

By: _____
        Daryl R. Priest, Manager

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO     ss.

On JULY 15, 2015 before me, RITA M. ANDERSEN NOTARY PUBLIC

[insert name and title of the officer]

personally appeared BRUCE HEBETS

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

RITA M. ANDERSEN
COMM. #2077973
Notary Public - California
San Diego County
My Comm. Expires Sep, 12, 2018

Signature

RITA M. ANDERSEN

Printed/Typed Name of Notary

[seal]

My Commission Expires: SEPT. 12, 2018

EXHIBIT U
PAGE 804

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

THE STATE OF CALIFORNIA

ss.

COUNTY OF _____

On _____ before me, _____

[insert name and title of the officer]

personally appeared _____

_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

_____

Signature

_____

Printed/Typed Name of Notary

[seal]                               My Commission Expires:  _____

EXHIBIT "A"

LEGAL DESCRIPTION

The land referred to herein is situated in the State of California, County of San Diego, City of El Cajon and described as follows:

PARCEL A: (APN: 488-152-47)

LOTS 1 & 2 AND A PORTION OF LOT 4 OF PROMENADE SQUARE, IN THE CITY OF EL CAJON, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 14421, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY ON AUGUST 6, 2002, AMENDED PURSUANT TO THAT CERTAIN CERTIFICATE OF CORRECTION RECORDED ON MARCH 09, 2012 AS INSTRUMENT NO. 2012-0142345 OF OFFICIAL RECORDS, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY LINE OF LOT 4 OF MAP 14421, SAID POINT BEING DISTANT THEREON SOUTH 02° 52' 18" EAST 5.99 FEET FROM THE SOUTHEAST CORNER OF LOT 1 OF MAP 14421, THENCE ALONG THE EASTERLY LINE OF SAID LOT 4 AND SAID LOT 1; NORTH 02° 52' 18" WEST 64.34 FEET TO THE BEGINNING OF A TANGENT 25.00 FOOT RADIUS CURVE, CONCAVE SOUTHWESTERLY, THENCE ALONG THE ARC OF SAID CURVE, THROUGH A CENTRAL ANGLE OF 87° 06' 27"; NORTHWESTERLY 38.01 FEET; THENCE ALONG THE NORTHERLY LINE OF SAID LOTS 1, 2 & 4; NORTH 89° 58' 45" WEST 137.06 FEET TO A POINT ON THE NORTHERLY LINE OF LOT 4, SAID POINT BEING DISTANT THEREON NORTH 89° 58' 45" WEST 3.64 FEET FROM THE NORTHWEST CORNER OF SAID LOT 2, THENCE SOUTH 00° 01' 15" WEST 88.00 FEET; THENCE SOUTH 89° 58' 45" EAST 165.27 FEET TO THE POINT OF BEGINNING.

PARCEL B: (APN: 488-152-48)

PORTION OF LOTS 3 & 4 OF PROMENADE SQUARE, IN THE CITY OF EL CAJON, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 14421, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY ON AUGUST 6, 2002, AMENDED PURSUANT TO THAT CERTAIN CERTIFICATE OF CORRECTION RECORDED ON MARCH 09, 2012 AS INSTRUMENT NO. 2012-0142345 OF OFFICIAL RECORDS, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY LINE OF LOT 4 OF MAP 14421, SAID POINT BEING DISTANT THEREON NORTH 89° 58' 45" WEST 3.64 FEET FROM THE NORTHWEST CORNER OF LOT 2 OF MAP 14421, THENCE ALONG THE NORTHERLY LINE OF SAID LOT 4 AND SAID LOT 3; NORTH 89° 58' 45" WEST 60.90 FEET TO A POINT ON THE NORTHERLY LINE OF LOT 3, SAID POINT BEING DISTANT THEREON NORTH 89° 58' 45" WEST 11.66 FEET FROM THE NORTHEAST CORNER OF SAID LOT 3; THENCE SOUTH 00° 01' 15" WEST 44.00 FEET; THENCE SOUTH 89° 58' 45" EAST 60.90 FEET; THENCE NORTH 00 Degrees 01' 15" EAST 44.00 FEET TO THE POINT OF BEGINNING.

PARCEL C: (APN: 488-152-50)

PORTION OF LOT 4 OF PROMENADE SQUARE, IN THE CITY OF EL CAJON, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 14421, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY ON AUGUST 6, 2002, AMENDED PURSUANT TO THAT CERTAIN CERTIFICATE OF CORRECTION RECORDED ON MARCH 09, 2012 AS INSTRUMENT NO. 2012-0142345 OF OFFICIAL RECORDS, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF LOT 4 OF MAP 14421; THENCE ALONG THE EASTERLY LINE OF SAID LOT 4; NORTH 02° 52' 18" WEST 70.13 FEET; THENCE NORTH 89 Degrees 58' 45" WEST 165.27 FEET; THENCE NORTH 00 Degrees 11' 15" EAST 44.00 FEET; THENCE NORTH 89° 58' 45" WEST 60.90 FEET; THENCE SOUTH 00° 01' 15" WEST 42.00 FEET;

EXHIBIT U
PAGE 806

THENCE NORTH 89° 58' 45" WEST 69.10 FEET TO THE WESTERLY LINE OF SAID LOT 4; THENCE ALONG SAID WESTERLY LINE; SOUTH 00 Degrees 00' 49" EAST 72.09 FEET TO THE SOUTHWEST CORNER OF SAID LOT 4; THENCE ALONG THE SOUTHERLY LINE OF SAID LOT 4; SOUTH 89° 59' 22" EAST 298.76 FEET TO THE POINT OF BEGINNING. APN: 488-152-47-00, 488-152-48-00, and 488-152-50-00

# EXHIBIT V

EXHIBIT V
PAGE 808

## BASIC LEASE PROVISIONS

The following Basic Lease Provisions constitute a part of the Lease to which they are attached.

1.  **Landlord:**    DRP Holdings, LLC, a California limited liability company

2.  **Tenant.**    Borrego Community Health Foundation, a California non-profit public benefit corporation

3.  **Premises:**
    (a)    Area: Approximately 15,676 sq. ft. office building including approximately 80 parking spaces ("Office Building" or "Premises").

    (b)    Location: The Premises commonly referred to as 590 N. D Street, San Bernardino, California, are depicted on Exhibit "A" attached hereto ("Property").

4.  **Lease Term:** The term of this Lease shall be 30 years and 0 months from the Commencement Date.

5.  **Condition of Premises:**    The Premises are accepted "as is", "where is", and with all faults.

6.  **Rent:**

    (a)    Base Monthly Rent: $62,704.00 per month, subject to adjustment as provided in Article 3.

    (b)    Additional Rent· Taxes, Utilities, Insurance, Maintenance, Management and other Expenses shall be based on direct cost or consumption by Tenant or upon Tenant's share of such Expenses.

    (c)    The "Rent Commencement Date" shall be earlier of (i) four (4) months from the date that Landlord acquires title to the Property or (ii) the date Tenant opens for business.

    (d)    "Tenant's Share" – 100%

7.  **Prepaid Base Monthly Rent: $-0-**

8.  **Security Deposit: $ -0-.**

9.  **Permitted Use:** The Premises shall be used solely for a general office and medical office use including a pharmacy and for any other lawful purpose.

10.  **Addresses for Notices and Payment of Rent:**

    (a)    If to Landlord·        DRP Holdings, LLC.,
                                   a California limited liability company
                                   124 Main Street, Suite 240
                                   El Cajon, Ca 92020
                                   Fax: (619) 444-8597
                                   Attn: Daryl R Priest
                                   Email: darly@priesthomes.com

Tenant's Initials
© Stephen J Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

Page 1 of 27

EXHIBIT V
PAGE 809

|   | Copy of notices to· | Fitch Law Firm, APC<br>Stephen J. Fitch, Esq.<br>3465 Camino Del Rio South, Ste. 250<br>San Diego, CA 92108<br>Telephone No. (619) 282-8100<br>Email: steve@fitchlawfirm.com |
|---|---|---|
| (b) | If to Tenant: | Borrego Community Health Foundation<br>P.O. Box 2369<br>Borrego Springs, CA 920004<br>Attn: Bruce Hebets<br>Fax: (760) 767-5051<br>Email: bhebets@borregomedical.org |
|   | Copy to: | Borrego Community Health Foundation<br>P.O. Box 2369<br>Borrego Springs, CA 920004<br>Attn: Mikia Wallis, Chief Legal Officer<br>Fax: (760) 767-6722<br>Email: mwallis@borregomedical.org |

11. **Broker(s)**.

Landlord:        NONE

Tenant:          NONE

12.    **Certificate of Insurance**: Tenant acknowledges that a certificate of insurance with endorsements attached, as required by Paragraph 8.2(b), must be provided to Landlord prior to delivery of the keys to Premises to Tenant.

13.    **Guarantor**: NONE

The foregoing Basic Lease Provisions are incorporated into and made a part of the Lease. Each reference in the Lease to any of the Basic Lease Provisions shall mean the respective information above and shall be construed to incorporate all of the terms provided under the particular Lease paragraph pertaining to such information. In the event of any conflict between the Basic Lease Provisions and the Lease, the Basic Lease Provisions shall control. Unless otherwise defined in the Lease, all initially-capitalized terms used in the Lease shall have the meanings ascribed to them in the Basic Lease Provisions.

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

Page 2 of 27

EXHIBIT V
PAGE 810

# BUILDING LEASE

This BUILDING LEASE ("Lease") is executed as of the 15th day of September, 2015 ("Effective Date"), by and between DRP Holdings, LLC, a California limited liability company ("Landlord"), and BORREGO COMMUNITY HEALTH FOUNDATION, a California corporation ("Tenant"). Landlord and Tenant are also referred to herein individually as a "Party" and collectively as the "Parties". The Basic Lease Provisions attached to this Lease are incorporated herein and made a part of this Lease.

1.   PREMISES:

1.1   Premises.   Subject to all the terms and conditions of this Lease, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, pursuant to the terms, covenants, conditions and uses herein set forth, the Premises, as more particularly described in Item 3 of the Basic Lease Provisions. The Property and the Office Building are more particularly depicted on Exhibit "A" attached hereto and incorporated by reference herein.

1.1.1   Current Tenant.   Landlord and Tenant acknowledge that 1,320 sq. ft. of the Premises are currently subject to a lease with TW TELECOM OF CALIFORNIA, L.P. ("Adjoining Tenant"). The lease to Adjoining Tenant expires on September 14, 2017 (Adjoining Tenant has a three (3) option which Landlord has the right to terminate based on its purchase of the Property). Until September 14, 2017 or earlier termination of the lease with Adjoining Tenant the following modifications to the Lease shall be applicable:

| | | |
|---|---|---|
| a. | Premises – | 14,356 sq. ft. |
| b. | Rent – | $57,424.00 |
| c | Tenants Share – | 92% |

Except as modified in this Section 1.1.1 all other terms of the Lease shall remain the same. Landlord shall give Tenant a thirty (30) day notice of its ability and obligation to occupy the portion of the Premises subject to the Adjoining Tenant lease. Upon termination of the Adjoining Tenant lease all terms contained in the Basis Lease Provisions shall be applicable for the remaining Lease Term

1.2   Condition of Premises.   Tenant accepts the Premises "as is", "where is", and with all faults. The square footage of the Premises, at Landlord's or Tenant's election, is subject to verification by Landlord's space planner or architect at any time within 90 days of the Commencement Date—with the stated square footage stated in the Basic Lease Provisions being deemed mutually agreed-upon and controlling if no such verification is done during such timeframe.

1.3   Tenant Improvement Allowance.   Landlord shall provide a Tenant Improvement Allowance ("TI Allowance") in an amount not to exceed One Million and 00/100 Dollars ($1,000,000.00) for the construction of Tenant's improvements of the Premises, which are to be fixed in the Premises and shall remain with the Premises. All such tenant improvements shall be pursuant to plans approved by Landlord. Tenant shall provide, at its sole cost, to Landlord upon execution of this Lease space plans for the Premises. Any revisions to the space plan shall be mutually agreed upon by the Parties.

a   Construction of Improvements. The construction of Tenant's improvements in the Premises shall be done in accordance with Section 5 1 of this Lease by licensed and insured contractors approved by Landlord.

b.   Payment of TI Allowance. The TI Allowance shall be paid by Landlord to Tenant based on a mutually agreed upon construction draw schedule to be submitted by Tenant to Landlord for approval  Any amount not drawn under the draw schedule shall be paid to Tenant within thirty (30) days from the later to occur of: (1) Tenant opens for business in the Building; (2) the period allowed for the filing of mechanic's liens has expired or duly executed unconditional lien waivers from all contractors, subcontractors and material men who have performed work on behalf of Tenant at the Premises are presented to Landlord, and (3) the Tenant has

LEASE – OITICE BUILDING

Tenant's Initials
O Stephen J Fitch

Landlord's Initials

Page 3 of 27

EXHIBIT V
PAGE 811

provided to Landlord a Certificate of Occupancy, a copy of Tenant's Recorded Notice of Completion and a complete set of "as-built" construction documents for all work performed by Tenant and/or Tenant's contractors and subcontractors.

In Landlord's sole discretion, Landlord may satisfy its obligations under this Section 1.3 by contracting with and paying directly a contractor of Landlord's choosing to complete the tenant improvements.

2.      TERM:

2.1     General

(a)     The term of this Lease shall be as specified in Item 4 of the Basic Lease Provisions, commencing on the earliest of (1) the date Landlord acquires title to the Property, or (2) the date on which Landlord and Tenant execute the Confirmation of Lease (in the form attached hereto as Exhibit "B"), or (3) the date upon which Tenant actually occupies the Premises for any reason. The date on which the Lease term commences is hereafter referred to as the "Commencement Date".

3.      RENT:

3.1     Base Monthly Rent

(a)     Tenant shall pay to Landlord at the address provided for in Item 10 of the Basic Lease Provisions (subject to the provisions of Section 1.1.1 above), without deduction or prior notice or demand, and Landlord shall accept, as rent for the Premises the "Base Monthly Rent" specified in Item 6(a) of the Basic Lease Provisions The Base Monthly Rent shall be payable in advance in lawful money of the United States on the first day of each month of the Lease term. The first installment of the Base Monthly Rent shall be due and payable on the Rent Commencement Date.

(b)     In the event that the Rent Commencement Date is not the first day of the month, Tenant shall pay to Landlord prior to the first day of the first full calendar month which is ninety (90) days after the commencement date, an amount equal to the Base Monthly Rent multiplied by a factor having as its numerator the number of days remaining in the first month and as its denominator the number thirty (30). Thereafter, the Base Monthly Rent shall be payable in accordance with the terms of this Paragraph 3.1.

(c)     Tenant's obligation to pay rent, including Base Monthly Rent and Additional Rent shall commence as set forth in the Basic Lease Provisions.

3.2     Adjustments to Base Monthly Rent.    The Base Monthly Rent for the Lease term shall adjust (in addition to the adjustment in Paragraph 3.3 below), as follows:

a.      Commencing on the first anniversary date of the Lease term, and then annually thereafter on each Adjustment Date, the Base Monthly Rent during the Lease Term shall be adjusted to an amount equal to the greater of (a) two (2) percent or (b) the product obtained by multiplying the Base Monthly Rent in effect immediately prior to the Adjustment Date by the annual percentage increase in Consumer Price Index All Urban Consumers U S. City Average (1982-84 = 100) published by the Bureau of Labor Statistics of the U.S. Department of Labor ("Index"), i.e., Index published 30 days prior to each new Adjustment Date ("New Extension Index") divided by the Index (in effect for the immediately preceding Lease Year) published 30 days prior to the preceding Adjustment Date ("Current Extension Index"). Landlord shall give written notice to Tenant indicating the amount of the adjustment and manner of computation of same as soon as the information becomes available to Landlord.

3.3     Additional Rent.    Tenant shall pay as "Additional Rent" its pro rata share of the cost of operation and maintenance of the Property, i.e., the cost of utilities (if not separately metered), taxes, insurance provided by Landlord, roof and structural repairs, and Common Area Expenses, or other charges, as described and in the manner

Tenant's Initials
© Stephen J Fitch

LEASE – OFFICE BUILDING

Landlord s Initials

EXHIBIT V
PAGE 812

provided in Article 11 (Common Areas). The Base Monthly Rent, the Additional Rent, rental adjustments and any and all other amounts, however designated, required to be paid or reimbursed by Tenant under this Lease are sometimes collectively referred to as, and shall constitute, "rent.".

3.4    Interest on Past Due Obligations.  In the event of default by Tenant in payment of any items of rent, Tenant shall pay, as Additional Rent, interest at the rate of two (2) points over the published prime rate of Citi Bank or the maximum rate permitted by law, whichever is less, on each such obligation from the day it is due until received by Landlord. Notwithstanding the foregoing, no interest shall accrue on any Late Charges under this Lease as defined in Paragraph 3.5 below.

3.5    Late Charges   Tenant acknowledges that late payment by Tenant to Landlord of rent will cause Landlord to incur costs not contemplated by this Lease, the exact amount of such costs being extremely difficult and impractical to fix  Such costs include, without limitation, processing, administration and accounting charges. If any installment of any item of rent due from Tenant is not received by Landlord within five (5) business days of when due, Tenant shall pay to Landlord an additional sum equal to six percent (6%) of the overdue rent as a late charge The parties agree that this late charge represents a fair and reasonable estimate of the costs that the Landlord will incur by reason of late payment by Tenant. Acceptance of any late charge shall not constitute a waiver of Tenant's default with respect to the overdue amounts, nor prevent the Landlord from exercising any of the other rights and remedies available to Landlord hereunder. The payment of a late charge shall be in addition to any interest payable by Tenant under Paragraph 3.4 (Interest on Past Due Obligations). In addition to the charges provided for above, Tenant shall pay a charge of Fifty Dollars ($50.00) to Landlord for each check returned for insufficient funds and One Hundred Fifty Dollars ($150.00) for each "three (3) day pay or quit" notice

3.6    Intentionally Deleted

4.    USE:

4.1    Permitted Use.  The Premises shall be used and occupied by Tenant and for the use and purpose(s) specified in Item 9 of the Basic Lease Provisions and under no other trade names and for no other use or purposes, including, but not limited to, unlawful, immoral, "second hand" or used merchandise, distress goods, surplus stores or auctions. Tenant shall not permit any act to be done in, upon or about the Premises which would increase the existing rate of insurance upon the Premises, or cause the cancellation of any insurance policy covering the Premises, nor shall Tenant sell or permit to be kept, used or sold in, upon or about the Premises any article which may be prohibited by a standard form policy of fire insurance. In the event that Tenant's use increases said rate or causes the cancellation of a policy of insurance, Landlord may charge Tenant, as Additional Rent, the additional cost of insurance; or Landlord, at its option may cancel the Lease. Landlord does not represent nor warrant that the Premises can be used for any specific use or purpose, and it is incumbent upon Tenant to ascertain from the proper governmental authorities whether the Premises may be used for Tenant's intended use.

4.2    Hazardous Materials Indemnity.

(a)    Tenant shall not cause or permit the presence, use, generation, release, discharge, storage, disposal or transportation of any "Hazardous Materials" on, under, in, about, to or from, the Premises and/or the Property; provided that the presence or use of Hazardous Materials (a) in products required for the prudent and ordinary management and operation of the Premises as a car wash and auto detail facility and (b) held and used strictly in accordance with (i) all applicable federal, state or local laws, regulations or orders, (ii) guidelines issued by any national or regional board of insurance underwriters, and (iii) prudent standards of practice shall not be deemed in violation of this provision

(b)    As used herein, the term "Hazardous Materials" shall mean any toxic or hazardous substance, material or waste or any pollutant or contaminant or infectious or radioactive material, including but not limited to those substances, materials or wastes regulated now or in the future under any of the following statutes or regulations promulgated thereto: (a) any "hazardous substance" within the meaning of the Comprehensive

Tenant's Initials.
© Stephen J  Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

EXHIBIT V
PAGE 813

Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA") 42 U.S.C. § 9601, et seq. or the California Hazardous Substance Account Act, Cal. Health and Safety Code § 25300 et seq. or the Porter-Cologne Water Quality Act, Cal. Water Code § 13000 et seq. or the Hazardous Materials Transportation Act, 49 U.S.C. § 1801, et seq.; (b) any "hazardous waste" within the meaning of the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq.; (c) any "pesticide" or "economic poison" as defined in California Food & Agricultural Code § 12753 and any regulations promulgated in connection therewith; or (d) any other substance, chemical, waste, toxicant, pollutant, pesticide or contaminate regulated by any federal, state or local law, statute, rule, regulation or ordinance for the protection of health or the environment ("Environmental Laws"), including, without limitation, methane and any petroleum products or fractions thereof and any asbestos-containing materials

(c) If Tenant's use of the Premises may involve the storage and/or use of Hazardous Materials as defined herein, Tenant, in addition to its covenants defined above, further covenants, agrees, warrants and represents that it will comply with all Environmental Laws, rules, regulations, court decisions, municipal codes and ordinances regulating such storage and/or use of Hazardous Materials, including without limitation Chapter 6.95 of the California Health and Safety Code; and to permit Landlord to monitor such compliance, without the assumption of any liability by Landlord nor any obligation of Landlord to so monitor, Tenant covenants and agrees to provide to and/or permit Landlord:

(1) To review and approve prior to submission to any governmental agency all applications with respect to the handling, storage and/or use of Hazardous Materials in, on or about the Premises, including without limitation applications to the County Hazardous Materials Management Division ("HMMD") and/or to Air Pollution Control District ("APCD"), and after such submission to provide Landlord with a copy of all responses, notices, comments or other communications with said governmental agencies; and

(2) To receive and review a copy of all completed and approved "Business Plans", as defined by the statutes, and all updates, renewals, or replacement "Business Plans" when submitted and all responses, notices, comments or communications with any governmental agencies regarding same; and

(3) To receive and review a copy of all notices, reports, comments or communications relating to any governmental inspection, complaint, investigation or other matter relating to Tenant's storage, handling or use of Hazardous Materials at, on, in or about the Premises, and

(4) To receive and review a copy of any and all E.P.A. numbers, County Health Department permits, APCD permits, contracts with certified hazardous waste handlers (and all credentials and certifications of such handlers), and all schedules for delivery, pick-up and disposal of Hazardous Materials to or from the Premises; and

(5) To immediately notify Landlord of any leaks, spills, emissions, release or suspected release of any Hazardous Materials at, on, in, under, above or about the Premises from any cause or source whatsoever; and

(6) To receive and review a copy of all records of every nature that are required by law, regulations, ordinance or court order to be maintained by Tenant with respect to the storage, handling or use of any Hazardous Materials at, on, in, under, above or about the Premises.

(d) Tenant shall exonerate, indemnify, pay and protect, defend (with counsel reasonably approved by Landlord) and save Landlord, and its directors, trustees, beneficiaries, officers, shareholders, partners, members, employees, agents, and invitees and of those of the other tenants of the Property (collectively, the "Related Parties"), harmless from and against any claims (including, without limitation, third party claims for personal injury or real or personal property damage, actions, administrative proceedings (including informal proceedings), judgments, damages, punitive damages, penalties, fines, costs, taxes, assessments, liabilities (including sums paid in settlements of claims), interest or losses, including reasonable attorneys' fees and expenses (including any such fees and expenses incurred in enforcing this Lease or collecting any sums due hereunder),

Tenant's Initials
☉ Stephen J Filch

LEASE – OFFICE BUILDING

Landlord's Initials

EXHIBIT V
PAGE 814

consultant fees, and expert fees, together with all other costs and expenses of any kind or nature (collectively, the "Costs") that arise directly or indirectly in connection with the presence, or release, caused by Tenant of any Hazardous Materials in or into the air, soil, ground water, surface water or improvements at, on, about, under or within the Property, or any portion thereof, or elsewhere in connection with the transportation of Hazardous Materials to or from the Property or the Premises by or on behalf of Tenant. The indemnification provided in this Paragraph shall specifically apply to and include claims or actions brought by or on behalf of employees of Tenant. In the event that Landlord or any of the Related Parties shall suffer or incur any such Costs, Tenant shall pay to Landlord or such Related Parties, the total of all such Costs suffered or incurred upon demand therefor, which demand shall be accompanied by an accounting and copies of back up documentation for such Costs. Without limiting the generality of the foregoing, the indemnification provided herein shall specifically cover Costs including, without limitation, capital, operating and maintenance costs, incurred in connection with any investigation or monitoring of site conditions, any clean-up, containment, remedial, removal or restoration work required or performed by any federal, state or local governmental agency or political subdivision or performed by any non-governmental entity or person because of the presence, or release, caused by Tenant of any Hazardous Materials in or into the air, soil, ground water, surface water or improvements at, on, about, under or within the Property (or any portion thereof), or elsewhere in connection with the transportation of Hazardous Materials to or from the Property or the Premises by or on behalf of Tenant, and any claims of third parties for loss or damage due to such Hazardous Materials. This indemnification shall survive the termination of this Lease and shall be binding upon the Tenant and its successors in interest whenever such threat, claim, or cause of action may arise. Tenant expressly waives any defense concerning constructive eviction or rent abatement with respect to such claims arising from the act or omission of Tenant.

4.3     Compliance with Laws.  Tenant and Landlord shall promptly comply with all laws, ordinances, zoning restrictions, rules, regulations, orders and any requirements of any duly constituted public authorities now or hereafter affecting the use, safety, cleanliness or occupation of the Premises. Tenant's use of the Premises shall not adversely affect Landlord's use of the Property and the use of the Property by other tenants. Any alteration or improvement to the Premises or the providing of any auxiliary aids or services required by any statute, ordinance, governmental regulation or court order in order for Tenant to conduct business shall be undertaken at Tenant's sole cost and expense in the manner provided in Article 5 below. Landlord shall have the absolute right to cancel this Lease, upon thirty (30) days written notice to Tenant, in the event that Tenant's plans for construction or subsequent use of the Premises shall adversely affect the allocation of available energy requirements or other utility services to Landlord or other tenants within the Property.

4.4     No Nuisances   Tenant shall not commit or permit any nuisance, act or other thing which may disturb the quiet enjoyment of the other tenants of the Property.

5.     ALTERATIONS AND ADDITIONS:

5.1     General   Tenant shall not make any non-structural interior alterations, improvements or additions to the Premises without obtaining Landlord's prior written consent, which shall not be unreasonably withheld. Any such improvements, excepting movable furniture and trade fixtures, shall become part of the realty and belong to Landlord upon their completion of construction. Tenant shall, at its sole cost and expense, obtain all necessary governmental permits and approvals, and pay for all assessments, taxes and charges associated with such work. All alterations and improvements shall be in conformity with the laws of all applicable duly constituted public authorities and shall be done in a good workmanlike manner. Tenant shall not make any structural changes or changes to the exterior of the Premises including but not limited to penetration of roof or alteration or relocation of windows or doorways or exterior walls or the affixing or setting of satellite dishes, antennas, lighting, electronic or other devices without Landlord's prior written consent, which may be withheld in its sole and absolute discretion. All alterations, additions, repairs or changes to be made to the Premises which require Landlord's approval shall be under the supervision of a competent licensed architect and/or competent licensed structural engineer and made in accordance with plans and specifications submitted to and approved by Landlord before commencement of work. Landlord reserves the right to retain or hire an architect or engineer to review said plans and specifications, and the reasonable cost of such professional fees shall be reimbursed by Tenant to Landlord. All such work shall be

Tenant's Initials
© Stephen J Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

Page 7 of 27

EXHIBIT V
PAGE 815

performed by a licensed and insured contractor, approved by Landlord, and if requested by Landlord, a completion bond naming Landlord as the beneficiary shall be provided by Tenant.

5.2 No Liens. Prior to commencing any work relating to any alterations, improvements or additions approved by Landlord, Tenant shall notify Landlord in writing of the expected date of commencement. Tenant shall not commence the making of any approved alterations until after Landlord shall have received notice of the commencement date thereof, in order that Landlord may post and record any appropriate Notice of Non-Responsibility. Landlord shall have the right at any time to post and maintain on the Premises such notices as Landlord reasonably deems necessary to protect Landlord and the Premises from mechanic's liens, material men's liens or any other liens. In performing the work on any such alterations, improvements or additions, Tenant agrees to cooperate with Landlord in arranging and undertaking such work so as to minimize any adverse impact and business interruption of Tenant, Landlord or any other occupant of the Property, and to diligently complete all such work. In no event shall such work be performed in a manner that obstructs access to the Property or to the Premises of any other occupant of the Property. Tenant shall pay, when due, all claims for labor or materials furnished to or for Tenant for use in improving the Premises. Tenant shall not permit any mechanic's or material men's liens to be levied against the Premises arising out of work performed, materials furnished, or obligations to have been performed on the Premises by or at the request of Tenant. Should any mechanic's or other lien be filed against the Premises, Property, or any part thereof by reason of Tenant's acts or omissions or because of a claim against Tenant, Tenant shall cause the same to be canceled and discharged of record by bond or otherwise within ten (10) business days after notice by Landlord. Tenant hereby agrees to indemnify, hold harmless, defend and protect Landlord against loss, damage, attorney's fees and all other expenses on account of claims of lien of laborers or material men or others for work performed or materials or supplies furnished for Tenant or persons claiming under it

5.3 Trade Fixtures. Tenant shall install trade fixtures, machinery or other trade equipment in conformance with the ordinances of all applicable duly constituted public authorities and for a first class operation of Tenant's business, and Tenant shall maintain its operation in such first class condition Tenant may and upon Landlord's request shall, at Tenant's sole cost and expense, remove any of such trade fixtures or machinery upon the termination of this Lease, provided Tenant is not then in default under the terms and conditions of this Lease.

6. UTILITIES:

6.1 Responsibility for Payment. Tenant shall pay for all water, sewer, gas, heat, light, power, telephone service and any other services or utility provided to the Premises.

6.2 Tenant's Share In the event that any utilities are furnished by Landlord, Tenant shall pay to Landlord its pro rata share of the cost thereof in the manner set forth in Paragraphs 11.2 and 11.3 (payment of Common Area Expenses). Tenant's pro rata share shall be based upon the percentage set forth in the Item 3(e) of the Basic Lease Provisions and (b) any extraordinary use which may be made by Tenant, as reasonably determined by Landlord in its sole and absolute discretion. If any utilities are furnished by Landlord directly or indirectly through joint metering, Landlord shall not be obligated to continue to provide such service if Tenant is in default under the terms hereof.

6.3 Non-liability of Landlord Landlord shall not be liable for any failure or interruption for any reason of any utility service being furnished to the Premises.

6.4 Separate Metering Tenant may elect, subject to Landlord's reasonable approval, to install and maintain its own meter for any utilities which are jointly metered by written notice delivered to Landlord thirty (30) days prior to the initiation by Tenant of any work to effectuate such change. All separate meters shall be installed and maintained at Tenant's sole cost and expense.

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

Page 8 of 27

EXHIBIT V
PAGE 816

7.    INDEMNIFICATION:

7 1    Tenant's Indemnity Obligation.  Tenant does hereby agree to indemnify, hold harmless, defend, and protect Landlord, its employees, agents, partners, contractors, invitees and licensees from and against any and all suits, actions, damages, claims, liability and expense in connection with loss by reason of injury to person or property from caused by the negligent act or omission of Tenant, its employees, agents or contractors, invitees, or licensees, arising from or out of any occurrence in, upon, at or from the Premises, or the occupancy or use by Tenant of the Premises or any part thereof, including without limitation acts or omissions relating to the sidewalks and Common Areas, as hereafter defined, within the Property

7.2    Landlord's Indemnity Obligation  Landlord does hereby agree to indemnify, hold harmless, defend, and protect Tenant, its employees, agents, partners, contractors, invitees and licensees from and against any and all suits, actions, damages, claims, liability and expense in connection with loss by reason of injury to person or property from caused by the negligent act or omission of Landlord, its employees, agents or contractors, invitees, or licensees, arising from or out of any occurrence in, upon, at or from the Premises, or the occupancy or use by Landlord of the Premises or any part thereof, including without limitation acts or omissions relating to the sidewalks and Common Areas, as hereafter defined, within the Property.

7.3    Release of Landlord.  Except for loss or damages arising from the acts or omissions of Landlord or Landlord's Related Parties constituting sole negligence, gross negligence, or willful misconduct, Landlord shall not be responsible or liable at any time for any loss or damage to Tenant's merchandise, equipment, fixtures or other personal property or to Tenant's business, including without limitation any loss or damage to either the person or property of Tenant or loss of profits or otherwise that may be occasioned by or through the acts or omissions of persons occupying adjacent, connecting, adjoining or other space in the Property or by or through the acts or omissions of Landlord, its employees, agents, contractors, invitees or licensees  Tenant shall store its property in and shall use and enjoy the Premises and the Common Areas of the Property at its own risk, and hereby releases Landlord, its employees, agents, contractors, partners, invitees, and licensees, to the fullest extent permitted by law, from all claims of every kind, including without limitation, leakage of any nature, resulting in loss of life, personal or bodily injury, or property damage, except for loss or damages arising from the acts or omissions of Landlord or Landlord's Related Parties constituting sole negligence, gross negligence or willful misconduct.

7.4    Notice of Loss.  Tenant shall give prompt notice to Landlord in case of fire or accidents or other losses in the Premises or in the building of which the Premises are a part or in the Common Area as well as of any defects therein or in any fixtures or equipment located therein.

7.5    Survival of Lease Termination.  Tenant's obligations under Paragraphs 4.2, 7.1-7.5 inclusive, 21.1, and 27.1 shall survive the termination of this Lease for any reason whatsoever, if the incident requiring such defense occurred during the Lease term or otherwise directly or indirectly relates to the performance of any party under this Lease.  None of the indemnity obligations provided for in these Paragraphs 7 1-7.5 inclusive, or in Paragraph 4.2 shall require any payment as a condition precedent to recovery.

8.    INSURANCE:

8.1    Insurance Coverage by Landlord

(a)    Landlord shall maintain, at Tenant's expense as provided in Paragraph 8.1(b), a policy or policies of insurance protecting against the following.

(1)    Fire and other perils normally included in extended coverage insurance to the extent of at least ninety percent (90%) of the replacement value of the Premises, exclusive of personal property, trade fixtures and equipment belonging to Tenant and improvements and betterments made to the Premises by Tenant for which Tenant shall maintain fire and other perils insurance, which shall also name Landlord and its lenders as additional insureds.

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

EXHIBIT V
PAGE 817

(2)     Public liability and property damage insurance with respect to the Common Areas in an amount not less than Two Million Dollars ($2,000,000) combined single limit for both bodily injury and property damage.

(b)     Tenant shall pay to Landlord, as Additional Rent in the manner set forth in Paragraph 11.3 (Payment of Common Area Expenses), Tenant's pro rata share of the cost of the insurance required in Paragraph 8.1 (a). Tenant's pro rata share of such cost shall be that proportion of the annual premiums for insurance based upon the percentage set forth in Item 3(e) of the Basic Lease Provisions.

8.2     Insurance Coverage by Tenant.

(a)     Contents Insurance. Tenant shall maintain in force a policy or policies of special peril contents insurance, including without limitation vandalism and malicious mischief coverage, sprinkler leakage coverage and plate glass coverage for the Premises, with respect to Tenant's personal property, trade fixtures and equipment located in the Premises and all improvements and betterments to the Premises made by Tenant to the extent of at least ninety percent (90%) of their insurable value. During the term of this Lease, the proceeds of any such policy or policies of contents insurance shall be used solely for the repair or replacement of the property so insured. Landlord shall have no claim or interest in said insurance and will sign all documents necessary to effectuate the settlement of any claim or loss by Tenant.

(b)     Liability Insurance. Tenant shall maintain during the term of this Lease worker's compensation insurance as required by applicable law and commercial liability insurance with respect to the Premises, all assumed liabilities by Tenant pursuant to Paragraphs 4 2 and 7.1-7.5 inclusive, product liability and all owned or non-owned and hired vehicles utilized in Tenant's business, adequate to protect Landlord as provided hereinafter. Such policy or policies of liability insurance shall add as additional insureds, Landlord and each of its partners, affiliates, directors, agents, employees, and lenders, and shall expressly provide that the interest of Landlord therein shall not be affected by any breach by Tenant of any policy provisions. Initially, such policy of liability insurance shall be in an amount not less than Three Million Dollars ($3,000,000.00) combined single limit for both bodily injury and property damage. The amounts of such liability insurance shall be increased from time to time, as Landlord or Landlord's mortgagee or beneficiary may reasonably determine. All insurance policies required hereunder shall be obtained upon an "occurrence" basis and not as "claims made" policies (except for any professional liability insurance which may be on a "claims made" basis). All liability, property damage, and other liability policies of Tenant shall be written as primary policies, not contributing with and not in excess of coverage which Landlord may carry. All such policies shall contain a provision that Landlord, and its lenders, although additional insureds, shall nevertheless be named as loss payees and be entitled to recover under said policies for any loss occasioned to it, its employees, agents, contractors, invitees and licensees by reason of the negligence of Tenant, its employees, agents, contractors, invitees and licensees. Tenant shall furnish Landlord with a certificate of insurance with attached endorsements with respect to such policies prior to Tenant's entry into the Premises  Such policies shall be secured from insurance companies with a Best's rating of A- Class VII or better and provide by endorsement that they may not be canceled or altered without sixty (60) days prior written notice delivered by the insurer to Landlord and/or its lenders.

8.3     Waiver of Subrogation  Landlord and Tenant hereby release and relieve each other from liability and waive all right to recover against each other for any loss or damage arising out of or incident to the perils covered under their respective policies of insurance, which perils occur in, on or about the Premises, as a result of the negligence of Landlord or Tenant or their respective agents, employees, contractors and/or invitees  Landlord and Tenant shall, upon obtaining the policies of insurance required under this Lease, give notice to their respective insurance carrier(s) that the foregoing mutual waiver of subrogation is contained in this Lease, and shall provide to the other appropriate endorsements of such waiver from the insurers.

Tenant's Initials
© Stephen J  Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

EXHIBIT V
PAGE 818

9       CARE OF THE PREMISES:

9.1     Tenant's Obligations

(a)     General. Tenant shall, at its expense, keep the Premises and exterior and interior portions thereof, including without limitation windows, doors, and all other glass or plate glass fixtures, in a neat, clean, sanitary and safe condition, and shall keep the Premises free from trash, rubbish and dirt. Tenant shall be solely responsible for glass breakage in the Premises, whether due to vandalism or otherwise. Tenant shall immediately make all repairs or replacements thereon or thereto, whether ordinary or extraordinary. If Tenant fails to keep the Premises neat, clean or in reasonable repair, Landlord may, in its sole discretion, enter the Premises during reasonable hours in order to clean or repair same. Tenant shall immediately pay to Landlord its actual cost thereof as set forth in Landlord's statement submitted to Tenant for payment, provided, however, any such payment shall not be deemed a cure of Tenant's default and Landlord shall have all remedies available to it under Article 18 herein.

(b)     Equipment and Fixtures. Tenant shall, at its sole cost, keep and maintain all utilities, fixtures and mechanical equipment used by Tenant in good order, condition and repair. Said items shall include, but are not limited to, all plumbing or sewage facilities, doors, locks and closing devices, windows (including glass), lights, electric systems and equipment of every kind. Tenant shall pay to Landlord in the manner set forth in Paragraph 11.3 (Payment of Common Area Expenses), Tenant's pro rata share of the cost of any maintenance agreement for the Property. Tenant's pro rata share shall be the proportion of the cost of any maintenance agreement based on the percentage share set forth in Item 3 (e) of the Basic Lease Provisions.

9.2     Landlord's Obligations.

(a)     General. Landlord shall keep in good condition and repair the roof and structural components of the Premises, but the cost thereof shall be prorated based upon the percentage share set forth in Item 3 (e) of the Basic Lease Provisions and shall be paid by Tenant in the manner set forth in Paragraph 11.3 (Payment of Common Area Expenses). Landlord shall have no obligation to make any such repairs until Landlord has received written notice from Tenant with respect to the need for such repairs. Landlord shall not be deemed to be in default with respect to its obligation to repair unless and until Landlord has (1) received said written notice and (2) failed to make such repairs within a reasonable period following receipt of said notice. Landlord shall, after receiving written notice, exercise due diligence in making such repairs.

(b)     Landlord's Right of Access. In order to perform any of its obligations under this Lease, Landlord hereby reserves to itself and its successors the right of access to the exterior walls and roof of the Premises and the right to install, maintain, use, repair and replace pipes, ducts, conduits, and wires through the Premises in locations which will not materially interfere with Tenant's use thereof

10.     TAXES:

10.1     Personal Property Taxes. Tenant shall pay prior to delinquency all taxes, assessments, license fees, and other public charges levied, assessed or imposed or which become payable during the term of this Lease upon any trade fixtures, furnishings, equipment and all other personal property of Tenant installed or located in the Premises. Whenever possible, Tenant shall cause said trade fixtures, furnishings, equipment and personal property to be separately assessed. If, however, any or all of said items shall be assessed and taxed with the Premises' real property, Tenant shall pay to Landlord such taxes as are attributable to Tenant's trade fixtures, furnishings, equipment and personal property within fifteen (15) days after receipt of any invoice from Landlord advising Tenant of the taxes applicable to Tenant's property.

10.2     Real Estate Taxes. Tenant shall also pay in the manner set forth in Paragraphs 11.2 and 11.3 any and all "real estate taxes" (as hereafter deemed) assessed or imposed, or which become a lien upon or become chargeable against or payable in connection with the Premises, including Tenant's pro rata share of such real estate taxes which are attributable to the Common Areas. Real estate taxes for the last year of the term of this Lease shall

Tenant's Initials
☉ Stephen J Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

EXHIBIT V
PAGE 819

be prorated between Landlord and Tenant as of the expiration date of the Lease term With respect to any assessments which may be levied against or upon the Premises, or which under the laws then in force may be evidenced by improvements or other bonds and may be paid in annual installments, only the amount of such annual installment, with appropriate proration for any partial year, and interest thereon, shall be included within a computation of taxes and assessments levied against the Premises Tenant shall be responsible for all increases in real estate taxes attributable to or caused by any organization, re-organization, purchase, sale, merger, acquisition or consolidation of Tenant, Tenant's assets or Tenant's business or by reason of any sale, assignment or recording of any transfer of interest in the Premises or the Property by Landlord, but only to the extent of Tenant's share as set forth in this Paragraph 10.2 herein.

      10.3    Definition of Real Estate Taxes

          (a)    "Real estate taxes" shall mean and include each of the following:

             (1)    Any form of assessment, license fee, license tax, business license fee, business license tax, commercial rental tax levy, charge, penalty, bond or tax, imposed by any authority having the direct power to tax, including any city, county, state or federal government, or any school, agricultural, lighting, drainage or other improvement or special district thereof, as against any legal or equitable interest of Landlord in the Premises or in the real property of which the Premises are a part.

             (2)    Any tax on Landlord's right to rent or other income from the Premises or as against Landlord's business or leasing the Premises.

             (3)    Any assessment, tax, fee, levy or charge in substitution, partially or totally, or any assessment, tax, fee, levy or charge previously included within the definition of real property tax, it being acknowledged by Tenant and Landlord that Proposition 13 was adopted by the voters of the State of California in the June 1978 election and that assessments, taxes, fees, levies and charges may be imposed by governmental agencies for such services as are protection, street, sidewalk and road maintenance, refuse removal and for other governmental services formerly provided without charge to property Owners or Occupants. It is the intention of Tenant and Landlord that all such new and increased assessments, taxes, fees, levies and charges, and similar assessments, taxes, fees, levies and charges be included within the definition of "real property taxes for purposes of this Lease

             (4)    Any tax allocable to or measured by the Gross Floor Area of the Premises or the rent payable hereunder, including without limitation, any gross income tax or excise tax levied by the State of California, any political subdivision thereof, city, or federal government, with respect to the receipt of such rent, or upon with respect to the possession, leasing, operating, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises, or any portion thereof.

             (5)    Any tax upon this transaction or any document to which Tenant is a party, creating or transferring an interest or an estate in the Premises.

          (b)    "Real estate taxes" shall not include Landlord's federal or state income, franchise, inheritance or estate taxes.

11.    COMMON AREAS:

      11.1    Definition of Common Areas  The term "Common Area" shall include all areas within the Property outside the exterior boundaries of the buildings situated thereon, including, but not limited to, streets, tunnels, driveways, parking areas, truck ways, delivery passages, access roads, loading doors, sidewalks, ramps, open and closed courts and malls, landscaped and planted areas, slopes, comfort and first aid stations, washrooms and parcel pick-up stations, exterior stairways, bus stops, retaining and decorative walls and planters, and other areas provided by Landlord and/or other Owners of portions of the Property, their employees and invitees  Landlord reserves the right to install kiosks and other free-standing structures within the Common Areas, and also reserves the

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

EXHIBIT V
PAGE 820

right to make changes, alterations or additions at any time and from time to time in the size, shape, location, number
and extent of the Common Areas, or any of them, so long as such changes, alterations or additions do not materially
interfere with the Tenant's use and quiet enjoyment of the Premises, and no such change shall entitle Tenant to any
abatement of rent, claim or allowance for any damages for injury or inconvenience to Tenant occasioned thereby.

     11.2    Maintenance of Common Areas.  Landlord shall maintain the Common Areas in a neat, clean and
orderly condition, properly lighted and landscaped as Landlord, in its reasonable discretion, shall determine. Tenant
shall pay to Landlord in the manner set forth in Paragraph 11.3 (Payment of Common Areas Expenses) Tenant's pro
rata share of the expenses (hereafter "Common Areas Expenses") in connection with the maintenance and operation
of the Common Areas. Tenant's pro rata share of Common Areas Expenses shall be the percentage share set forth in
Item 3(e) of the Basic Lease Provisions. If applicable, those common area charges that are attributable to retail
operations shall be allocated solely among the retail spaces in the Property as opposed to the office spaces. Tenant's
share of Common Areas Expenses shall also include any additional costs arising from special requirements created
by Tenant's use of the Premises. Common Areas Expenses shall include, but shall not be limited to, (a) all sums
expended and costs incurred in connection with the Common Areas for maintenance, landscaping, pest control,
lighting, cleaning, trash removal, painting, restriping, repaving, resurfacing, sweeping, security, fire protection,
sprinkler and irrigation systems; maintenance and repair of sidewalks, curbs and signs (which Tenant or other
occupants of the Property are not obligated to repair); (b) operating, managing, policing, insuring, repairing and
maintaining the Property and maintaining repairing and replacing roofs of the buildings in the Property; (c)
operating, insuring, repairing, replacing and maintaining the "Common Utility Facilities" defined to include, but not
limited to, sanitary sewer lines and systems, gas lines and systems, waterlines and systems, fire protection lines and
systems, electric power, telephone and communication main lines and systems, HVAC equipment and systems,
storm drainage and retention facilities and all other utility main lines and systems not exclusively serving the
premises of any specific tenant; (d) parking charges, surcharges and other levies, assessments, or any other costs
imposed or assessed by any local, state or federal government agencies in connection with the use of the parking
facilities and/or the Common Utility Facilities, real and personal property taxes and assessments on the
improvements and land comprising the Common Areas, depreciation and maintenance on operating machinery and
equipment (if owned) and rental paid for such machinery and equipment (if rented) which machinery and equipment
is used solely for the operation and maintenance of the Property; and (e) public liability and property damage
insurance on the Common Areas and Common Facilities, fire with extended coverage insurance with vandalism and
malicious mischief endorsements with, at Owner's option, earthquake damage and/or hazardous waste
endorsements, rental loss coverage and any additional coverages required pursuant to Paragraph 8.1. In the event
that any alteration, removal, replacement or repair is required to be made to any equipment or any portion of the
Property pursuant to governmental authority, statute, law or court order, all expenses associated therewith shall be
included in Common Areas Expenses unless such expenses are born by a specific tenant or occupant of the Property.
Common Area Expenses shall include property management costs, Property Management Costs shall not exceed ten
percent (10%) of the gross base rents received for the entire Property.

     11.3    Payment of Common Areas Expenses.  Prior to the commencement of each lease year or such
other annual accounting period as Landlord shall utilize from time to time, Landlord shall give Tenant a written
estimate of the Additional Rent payable by Tenant during the coming year. Tenant shall pay such estimated amount
to Landlord in equal monthly installments, in advance, at the same time the Base Monthly Rent is paid. Within
ninety (90) days after the end of each lease year, or such other annual accounting period as Landlord shall utilize
from time to time, Landlord shall furnish to Tenant a statement showing in reasonable detail the actual costs
incurred by Landlord for the operation and maintenance of the Property during the year then ended, and Tenant shall
pay to Landlord Tenant's proportionate share of the cost incurred in excess of the payments of Additional Rent made
by Tenant within ten (10) days of receipt of such statement. In the event that the payments of Additional Rent made
by Tenant exceed Tenant's share of the actual cost of the operation and maintenance of the Property, the amount of
any such excess shall be credited by Landlord to the Additional Rent next due and owing; provided, however, that, if
the Lease term has expired, Landlord shall accompany said statement with the amount due to Tenant.
Notwithstanding the foregoing, Landlord shall have the right to submit statements to Tenant for unbudgeted
Common Area Expenses incurred on an emergency basis, and Tenant shall remit payment on such statements for its
pro rata share of such Common Area Expenses within thirty (30) days of receipt of same. Tenant hereby

Tenant's Initials
☉Stephen J Flitch

LEASE – OFFICE BUILDING

Landlord's Initials

Page 13 of 27

EXHIBIT V
PAGE 821

acknowledges that major tenants and tenants of kiosks and similar structures, may not pay Common Area Expenses and other Additional Rent charges on the same basis as Tenant herein.

11.4    Use of Common Areas    Tenant shall have for its use and benefit the nonexclusive right in common with Landlord and future Owners, other Occupants of the Property, and their agents, employees, customers, invitees, licensees and sublessees to use the Common Areas from time to time existing during the entire term of this Lease, or any extension thereof, for ingress and egress, roadway, automobile parking and sidewalks. Tenant shall not use any portion of the Common Area for any purpose, other than as set forth herein, without the prior written consent of Landlord, which consent may be withheld in its sole and absolute discretion.

## 12.    SIGNS AND ADVERTISING:

12.1    Tenant shall not place any sign upon the Premises or the Office Building or any roof thereof, without Landlord's prior written consent. Notwithstanding the foregoing, Tenant shall have the right, subject to Landlord's written approval of the plans, at Tenant's sole cost and expense, to install a sign on the exterior of the top of the Office Building, provided Tenant complies with all laws, orders, rules and regulations of all governmental authorities having jurisdiction and otherwise complies with all of the covenants, agreements, terms, provisions and conditions of this Lease. Tenant shall send a copy to Landlord, for Landlord's files, any and all permits necessary for the above.

12.2    Prohibited Advertising.

(a)    Tenant shall not, without Landlord's written consent, install any exterior lighting, amplifiers or similar devices or use in, upon or about the Premises any advertising media which may be heard or seen outside the Premises, such as flashing lights, search lights, loudspeakers, phonographs or radio broadcasts. Landlord may withhold its consent in its sole and absolute discretion.

(b)    Tenant shall not, without Landlord's written consent, which may be withheld in its sole and absolute discretion, solicit business in the Common Areas, nor distribute any hand bills or other advertising matter in the Common Areas

## 13.    ENTRY BY LANDLORD:

13.1    Permitted Entry by Landlord.    Landlord and its agents may enter the Premises at any reasonable time upon reasonable notice to Tenant, or immediately in the case of an emergency, for the purpose of inspecting the same, for the purpose of maintaining the Property and for the purpose of making repairs, alterations, or additions to any portion of the Property, including the erection and maintenance of such scaffolding, canopies, fences, and props as may be required, or for the purpose of posting notices of non-responsibility for alterations, additions, or repairs Landlord may, at any time during the last sixty (60) days of the term of this Lease, enter the Premises during normal business hours to place any usual or ordinary "For Leases" signs and/or to show the Premises to prospective lessees.

## 14.    ASSIGNMENT AND SUBLETTING:

14.1    Consent Required.    Notwithstanding anything to the contrary contained in this Lease, Tenant shall not assign this Lease or any interest herein or sublet, license, grant any concession or otherwise give permission to anyone other than Tenant to use or occupy all or any part of the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld. Any attempted assignment, subletting, license or concession agreement or change of ownership without Landlord's written consent shall be void and shall confer no rights upon any third person. Without in any way limiting Landlord's right to refuse to give such consent for any other reason or reasons, Tenant agrees that it would not be commercially unreasonable to withhold consent, if in Landlord's reasonable business judgment (a) the financial worth as adjusted for inflation and/or net current assets of the proposed new Tenant is less than that of the Tenant executing this Lease or of Tenant and Tenant's Guarantor, as the case may be, (b) the transferee is not of a character or is not engaged in a business which is in keeping with the

Tenant's Initials
© Stephen J Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

Page 14 of 27

EXHIBIT V
PAGE 822

standards of Landlord for the Premises or the Property, (e) the operation of the transferee's business will interfere with or be in competition to or violate any restriction or exclusive right given in or contrary to any lease or use of any other tenant or occupant in the Property, or potential tenant with whom Landlord is negotiating, or (d) the use of the proposed new Tenant may increase the risk of the use, release or mishandling of Hazardous Materials, or (e) the purpose for which the transferee intends to use the Premises is different from that of Tenant in violation of this Lease or other requirements of the Property. Landlord shall require a reasonable payment, including attorney's fees, of not less than One Thousand Five Hundred Dollars ($1,500.00), to cover its handling charges for each assignment or sublease it is requested to approve. The sale, assignment, transfer or disposition, whether for value, by operation of law, gift, will or intestacy, of (i) twenty-five percent (25%) or more of the issued and outstanding stock of Tenant if Tenant is a corporation, or (ii) the interest of any general partner, joint venturer, associate or co-tenant, if Tenant is a partnership, joint venture, association or co-tenancy, or (iii) the alienation, hypothecation, encumbrance, mortgaging or other transfer of Tenant's interest in this Lease or in the Premises, shall be deemed an assignment of this Lease under this Paragraph  Notwithstanding the foregoing Tenant shall have a onetime right during the first three years of the Lease to an assignment of this Lease as part of a merger of Tenant with another non-profit corporation.

14.2    General Conditions.  In the event of any approved assignment or sublease of this Lease, Tenant shall remain primarily liable on its covenants hereunder for the entire term of any approved sublease.  In the event of any assignment or sublease, the assignee or sublessee shall agree in writing to perform and be bound by all of the covenants of this Lease required to be performed by Tenant, including without limitation all prior, past due and future obligations of Tenant. Tenant agrees that any options to extend the term of this Lease are not assignable to a subtenant and further agrees that Tenant cannot exercise any option to extend the term of this Lease if a sublessee is in possession of the Premises at the time of the exercise of the option. If Landlord so elects during the term of this Lease, Landlord may require, and Tenant hereby consents to assignee or subtenant paying the Base Monthly Rent and Additional Rent, and in the event of sublease the Landlord's portion of the above-mentioned increase, directly to Landlord. Notwithstanding the foregoing, the receipt and retention by Landlord of any rent payment by a proposed assignee or subtenant shall not constitute consent to such assignment or sublease unless specified in writing by Landlord.

14.3    Requirements.  If Tenant desires at any time to assign this Lease or to sublet the Premises or any portion thereof, it shall notify Landlord of its desire to do so and shall submit in writing to Landlord (a) the name of the proposed subtenant or assignee; (b) the nature of the proposed subtenant's or assignee's business to be carried on in the Premises; (c) the terms and provisions of the proposed sublease or assignment, including copies of any and all documents and instruments; (d) a current financial statement of the proposed subtenant or assignee and of any additional guarantor proposed for such assignment or subletting; (e) a business plan prepared by the proposed subtenant or assignee for the remainder of the term of the Lease; (f) a drawing depicting the proposed sign, and (g) such other information, financial or otherwise, as Landlord may request concerning the proposed subtenant or assignee. As provided in Paragraph 14.1, any request for Landlord's approval of a sublease or assignment shall be accompanied with a check in such reasonable amount as Landlord shall advise for the cost of review and/or preparation of any documents relating to such proposed transfer  Furthermore, Tenant and the proposed subtenant or assignee shall agree that Landlord shall have the right to enforce any and all of the terms of the sublease, as well as of the Lease, directly against such subtenant or assignee.

14.4    Election  At any time within fifteen (15) days after Landlord's receipt of the information specified in Paragraph 14 3 above, Landlord may by written notice to Tenant elect to either  (a) accept the proposed assignment or sublease to the Premises or the portion thereof as shall be specified in said notice upon the same terms as those offered to the proposed subtenant or assignee, as the case may be; or (b) disapprove and reject the proposed assignment or sublease  If Landlord does not provide notice or rejection or disapproval within said fifteen (15) day period, then the proposed assignment or sublease shall be deemed approved.  If Landlord rejects the proposed assignment or sublease, Landlord shall have the right to terminate this Lease; provided, however, Tenant shall have the right to withdraw the proposed assignment or sublease assignment within ten (10) days of Landlord's notice of rejection and termination given pursuant to this Paragraph 14.4, and Tenant shall remain in possession under the terms of this Lease.  Any consent given to a proposed assignment or sublease shall not be deemed to be a consent to

Tenant's Initials
© Stephen J Fitch

Landlord's Initials

EXHIBIT V
PAGE 823

any future assignment or sublease.

    14.5    Bankruptcy.

        (a)    If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, 11 U.S.C Section 101, et seq. (the "Bankruptcy Code"), any and all monies or other consideration payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, shall be the exclusive property of Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code. Any and all monies or other consideration constituting Landlord's property under the preceding sentence not be paid or delivered to Landlord, shall be held in trust for the benefit of Landlord and shall be promptly paid or delivered to Landlord.

        (b)    Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment. Any such assignee shall upon demand execute and deliver to Landlord an instrument confirming such assumption.

        (c)    This is a lease of real properly in a center within the meaning of Section 365(b)(3) of the Bankruptcy Code.

    14.6    Limitation of Remedy. Tenant acknowledges and agrees that each of the rights of Landlord set forth in Paragraphs 14.1-14.5 are reasonable restrictions on subletting and assignment for purposes of California Civil Code Section 1951 4, and Landlord shall have no liability to Tenant or to any proposed transferee of Tenant for any damages if it is adjudicated that Landlord's consent has been unreasonably withheld. Tenant's sole remedy shall be to have the proposed assignment or sublease declared valid.

## 15.    ABANDONMENT:

    15.1    Tenant's Abandonment Prohibited. Absent Tenant's prior written notice to Landlord and Landlord's written approval thereof, which may be withheld in its sole and absolute discretion, Tenant shall not vacate or abandon the Premises any time during the term of this Lease nor permit the Premises to remain unoccupied for a period of longer than fifteen (15) consecutive days during the term of this Lease. If Tenant shall abandon, vacate, or surrender the Premises, or be dispossessed by process of law, or otherwise, any personal property or trade fixtures belonging to Tenant and left on the Premises shall, at the option of Landlord, be deemed abandoned. In such case, Landlord may dispose of said personal property in any manner as permitted by applicable law and is hereby relieved of all liability for doing so. These provisions shall not apply if the Premises should be closed and business temporarily discontinued therein on account of strikes, lockouts, or similar causes (other than those of a financial nature) beyond the reasonable control of Tenant.

## 16.    BREACH BY TENANT:

    16.1    Events of Default. The occurrence of any of the following shall constitute a default, and if such default is not timely cured shall constitute a material breach of this Lease, by Tenant:

        (a)    The failure of Tenant to pay or cause to be paid when due any rent, monies, or charges required by this Lease to be paid by Tenant when such failure continues for a period of three (3) days after written notice thereof from Landlord to Tenant; or

        (b)    The abandonment of the Premises by Tenant within the meaning of Paragraph 15 1; or

        (c)    The failure of Tenant to do or cause to be done any material act, other than payment of rent, monies or charges, required by this Lease, or

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

Page 16 of 27

EXHIBIT V
PAGE 824

(d)     Tenant causing, permitting, or suffering, without the prior written consent of Landlord, any material act when this Lease requires Landlord's prior written consent or prohibits such act; or

(e)     The occurrence of any event of insolvency or bankruptcy with respect to Tenant, including any of the following by way of illustration:

(1)     Any general assignment or general arrangement for the benefit of creditors;

(2)     The filing of any petition by or against Tenant to have Tenant adjudged a bankrupt or a petition for reorganization or arrangement under any law relating to bankruptcy, unless such petition is filed against Tenant and the same is dismissed within sixty (60) days;

(3)     The appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located in the Premises or of Tenant's interest in this Lease; or ;

(4)     The attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease.

(f)     The falsification of any written report or statement required to be given by Tenant to Landlord under this Lease.

16.2     No Waiver.  The acceptance by Landlord of any partial payment of rent due hereunder after breach by Tenant will not constitute a waiver of such breach, unless a written statement to that effect signed by Landlord has been delivered to Tenant.

17.     REMEDIES UPON BREACH:

17.1     Landlord's Remedies  In the event of any breach by Tenant, in addition to other rights or remedies of Landlord at law or in equity, Landlord shall have the right to exercise any one or more of the following remedies:

(a)     Collect Rent Without Terminating Lease. Landlord may recover from Tenant the rent as it becomes due and any other amount necessary to compensate Landlord for all detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom. Landlord may sue monthly, annually or after such equal or unequal periods as Landlord desires for amounts due under this subparagraph (a). The right to collect rent as it becomes due shall terminate upon the termination by Landlord of Tenant's right to possession of the Premises. Tenant's right to possession shall not be terminated unless and until Landlord delivers to Tenant written notice thereof.

(b)     Terminate Lease. Landlord an alternative to exercising the remedies set forth in Paragraph 17.1 (a), may terminate Tenant's right to possession of the Premises by and upon delivery to Tenant of written notice of termination. Landlord shall then immediately reenter the Premises and take possession thereof pursuant to legal proceedings and remove all persons and property from the Premises. Such property may be removed and stored in a public warehouse or elsewhere at the cost of and for the account of Tenant  No notice of termination shall be necessary in the event that Tenant has abandoned the Premises. In the event that Landlord elects to terminate Tenant's right of possession, Landlord may recover all of the following:

(1)     The worth at the time of award of the unpaid rent which had been earned at the time of termination. "Worth at the time of award" shall be computed by allowing interest at ten percent (10%) per annum, or the highest rate allowed at law, whichever is less, from the first day the breach occurs;

(2)     The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Tenant proves could have been reasonably avoided  Worth at the time of award" shall be determined by allowing

LEASE – OFFICE BUILDING

Tenant's Initials
© Stephen J. Fitch

Landlord's Initials

Page 17 of 27

EXHIBIT V
PAGE 825

interest at the rate of ten percent (10%) per annum, or the highest rate allowed at law, whichever is less, from the first day a breach occurs;

(3)     The worth at the time of award by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Tenant proves could be reasonably avoided "Worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award, plus one percent (1%);

(4)     Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under the Lease or which in the ordinary course of events would be likely to result therefrom, including, but not limited to, expenses of reletting, attorney's fees, costs of alterations and repairs, recording fees, filing fees and any other expenses customarily resulting from obtaining possession of leased Premises and releasing.

17.2     Landlord's Right to Cure.  In the event of breach, default, or noncompliance under this Lease by Landlord, Tenant shall, before exercising any right or remedy available to it, give Landlord written notice of the claimed breach, or noncompliance in reasonable detail, setting forth the necessary actions to be taken to cure such default. If, prior to its giving such notice, Tenant has been noticed in writing (by way of Notice of Assignment of Rents and Leases or otherwise) of the address of a lender which has furnished any financing to Landlord or is a beneficiary of any deed of trust recorded against the Premises or the Property, then concurrently with giving the aforesaid notice to Landlord, Tenant shall, pursuant to the manner of giving notice set forth in Paragraph 30.9 below, transmit a copy thereof to such lender or lenders. For thirty (30) days following the receipt of the notice by Landlord, Landlord shall have the right to cure such breach or to commence the cure if more than thirty (30) days is reasonably required to affect such cure, so long as Landlord shall thereafter diligently pursue such cure to a completion. If Landlord has failed to commence the cure within such thirty (30) day period, then Tenant shall so notify Landlord's lender or lenders and provide any such lender with an additional thirty (30) days to effect such cure, so long as any such lender shall thereafter diligently pursue such cure to a completion, (including, but not limited to, commencement and prosecution of proceedings to foreclose or otherwise exercise its rights under its mortgage or other security instrument, if necessary to effect such cure), in which event this Lease shall not be terminated by Tenant so long as such actions or remedies are being diligently pursued by said lender. If the default is cured by Landlord or lender as provided above, Tenant shall have no other remedy available to it and this Lease shall remain in full force and effect. If Landlord, or lender as provided herein, fails to cure the breach, default or noncompliance as set forth herein Tenant shall have the right to terminate the Lease upon sixty (60) day notice to Landlord and lender after the expiration of the applicable time frames to cure

18.     DAMAGE OR DESTRUCTION:

18.1     Destruction in Whole or Part.  In the event that the Premises is partially or completely damaged or destroyed or declared unsafe or unfit for occupation by any authorized public authority for any reason other than Tenant's acts, use or occupation, which declaration requires repairs to either the Premises or the building in which the Premises are located, the rights and obligations of Tenant and Landlord shall be as follows.

(a)     If the damage is covered under the form of property insurance carried by Landlord, and sufficient insurance proceeds are available to make all necessary repairs, Landlord shall repair such damage as soon as is reasonably possible and this Lease shall continue in full force and effect.

(b)     In the event that such damage is not covered, or is "under insured" by the form of property insurance carried by Landlord, Landlord shall repair such damage; provided, however, that if such damage or destruction exceeds thirty (30%) percent of the then replacement value of the improvements on the Premises (exclusive of trade fixtures, equipment and foundations), Landlord shall have no obligation to repair such damage. If Landlord elects not to repair such damage Tenant shall have the right to terminate the Lease upon sixty (60) day notice to Landlord and lender.

(c)     Notwithstanding anything contained herein above, (1) if the Premises are damaged or

LEASE—OFFICE BUILDING

Tenant's Initials
© Stephen J Fitch

Landlord's Initials

Page 18 of 27

EXHIBIT V
PAGE 826

destroyed to any extent during the last twelve (12) months of the term of this Lease, (2) if the uninsured portion of such damage exceeds thirty percent (30%) of the then replacement value of the building of which the Premises constitute all or a part, or (3) if over fifty percent (50%) of the Premises shall be damaged or destroyed at any time whether such casualty is insured or not, Landlord may, at Landlord's option, cancel and terminate this Lease by delivery of written notice to Tenant to so terminate. Said written notice shall be made within ninety (90) days after the date of occurrence of such damage or destruction and shall be effective as of the date of such notice. If notice is not given within said ninety (90) day period, Landlord shall be deemed to have elected to restore the damage or destruction and shall repair such damage as soon as reasonably possible. If the above occurs and Landlord does not elect to terminate or repair than Tenant shall have the right to terminate the Lease upon sixty (60) day notice to Landlord and lender.

18.2    Rent Abatement.   If Landlord elects or is required to make repairs to the Premises, pursuant to Paragraph 18.1 above, Tenant shall be entitled to a reduction in the Base Monthly Rent during the time in which the repairs are being made to the extent to which Tenant's use of the Premises is impaired. Wherever the Lease provides for rent abatement, that phrase shall mean Base Monthly Rent and Additional Rent. All rent abatement shall terminate upon the substantial completion of such repair or restoration.

18.3    Restoration of Tenant's Property.   Landlord's obligation to restore shall not include the restoration or replacement of Tenant's trade fixtures, equipment, merchandise or any improvements or alterations made by Tenant to the Premises. Tenant shall restore and replace the same in the event that Landlord is obligated or elects to repair any damage or destruction of the Premises.

19.    CONDEMNATION:

19.1    General.   If the Premises or any portion thereof are taken under the power of eminent domain, or sold by Landlord under the threat of the exercise of such power, this Lease shall terminate as to the part so taken as of the date that the condemning authority takes possession of the Premises If more than twenty-five percent (25%) of the Premises is taken or sold under such threat, either Landlord or Tenant may terminate this Lease as of the date that the condemning authority takes possession by delivery of written notice of such election within twenty (20) days after such party has been notified of the taking or, in the absence thereof, within twenty (20) days after the condemning authority shall have taken possession.

19.2    Continuation of Lease After Condemnation   If this Lease is not terminated by Landlord or Tenant, it shall remain in full force and effect as to the portion of the Premises remaining; provided, however, that the Base Monthly Rent and Tenant's share of Common Areas Expenses shall be reduced in proportion to the reduction of the Gross Floor Area of the Premises. In such event, Landlord shall, at Landlord's expense, restore the Premises to a complete unit of like quality and character, except as to size, as existed prior to the date on which the condemning authority took possession. If more than twenty-five percent (25%) of the Premises is taken under the power of eminent domain, or sold by Landlord under the threat of the exercise of such power than Tenant shall have the right to terminate the Lease upon sixty (60) day notice to Landlord and lender

19.3    Allocation of Condemnation Award.   All awards for the taking of any part of the Premises or proceeds from the sale made under the threat of the exercise of the Power of eminent domain shall be the property of Landlord, whether made as compensation for diminution of value of the leasehold estate, for the taking of the fee, or as severance damage; provided, however, that Tenant shall be entitled to any award for loss of or damage to Tenant's trade fixtures, and removable personal property which is separately stated within such award. Any other claim of Tenant relative to this Paragraph 19.3 shall not diminish Landlord's recovery in any respect.

20.    SURRENDER OF LEASE:

20.1    Effect of Surrender.   The voluntary or other surrender or a mutual cancellation of this Lease by Tenant shall not work a merger, and shall, at the election of Landlord, either terminate all or any existing subleases or subtenancies or may operate as an assignment to it of any or all of such subleases or subtenancies. Landlord shall

Tenant's Initials
© Stephen J Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

Page 19 of 27

EXHIBIT V
PAGE 827

exercise its election within thirty (30) days of the event so requiring.

21.     ATTORNEY'S FEES:

21.1    Attorney's Fees.  If Landlord is involuntarily made a party defendant to any litigation relating to this Lease or the Premises by reason of any act or omission of Tenant, then Tenant shall defend, protect and hold Landlord harmless from any loss, cost or expense, including reasonable attorney's fees, arising out of or relating to any such litigation. In the event of any legal action or proceeding between the parties, the ultimately prevailing party shall be entitled to reasonable attorney's fees and expenses as a part of the judgment resulting therefrom

22.     SALE, EXCHANGE OR MASTER LEASE OF THE PREMISES BY LANDLORD:

22.1    Landlord's Residual Liability.  Notwithstanding any other provisions of this Lease, Landlord may assign, in whole or in part, Landlord's interest in this Lease and may sell, exchange or master lease all or part of the real estate of which the Premises are a part. In the event of any sale or exchange of the Premises by Landlord and assignment by Landlord of this Lease, Landlord shall be and is hereby entirely freed and relieved of all liability under any and all covenants and obligations contained in or derived from this Lease or arising out of any act, occurrence or omission relating to the Premises which occurs after the consummation of such sale, exchange, or assignment. Landlord shall provide Tenant with notice of any assignment, sale, exchange or master lease.

23.     QUIET ENJOYMENT:

23.1    Landlord's Covenant  If Tenant is not in breach under the covenants made in this Lease and has satisfactorily attorned to any successor in interest to Landlord or any lender of Landlord as provided in Article 25, Landlord covenants that Tenant shall have peaceful and quiet enjoyment of the Premises without hindrance on the part of Landlord  Landlord will defend Tenant in the peaceful and quiet enjoyment of the Premises against claims of all persons claiming through or under the Landlord.

24.     ESTOPPEL CERTIFICATES:

24.1    Tenant's Obligation.  Tenant shall at any time during the term of this Lease, within five (5) business days of receipt of written notice from Landlord, execute and deliver to Landlord a statement in a form acceptable to Landlord in writing certifying that this Lease is unmodified and in full force and effect or, if modified, stating the nature of such modification. Tenant's statement shall include other commercially reasonable information and details requested by Landlord, such as the date to which rent and other charges are paid, Tenant's knowledge concerning any uncured defaults with respect to Landlord's obligations under this Lease and the nature of such defaults if they are claimed. Any such statement may be relied upon conclusively by any prospective purchaser or lender of the Premises. Should Tenant shall fail to timely deliver such estoppel certificate to Landlord, Tenant agrees that such failure shall be conclusive upon Tenant that this Lease is in full force and effect, except to the extent any modification has been represented by Landlord, and that there are no uncured defaults in the Landlord's performance, and that not more than one month's rent has been paid in advance.

25.     SUBORDINATION; ATTORNMENT; NON-DISTURBANCE:

25.1    Subordination of Lease to Landlord's Financing.  Except as otherwise provided herein, this Lease is hereby made subordinate to the lien of any mortgage or deed of trust on any bank, insurance company or other lending institution, now or hereafter in force against the real property of which the Premises constitute a part, and to all advances now or hereafter made upon the security thereof ("Security Instrument"). Any holder of a Security Interest at any time existing or encumbering the Landlord's interest in the Property may, at its option, subordinate its Security Interest to this Lease.

25.2    Attornment by Tenant.  In the event of the sale or assignment of Landlord's interest in the Property of which the Premises are a part, or in the event any proceedings are brought for foreclosure, or in the event

Tenant's Initials
© Stephen J  Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

EXHIBIT V
PAGE 828

of the exercise of the power of sale under any mortgage or deed of trust made by Landlord covering the Premises, Tenant shall, subject to the non-disturbance provisions of Paragraph 25.5 below, attorn to the purchaser or assignee upon any such foreclosure or sale or assignment and recognize such purchaser or assignee as Landlord under this Lease.

25.3 Subordination of Lease to Certain Agreements with Third Parties. Tenant hereby subordinates its rights hereunder to any Declaration of Restrictions and Grant of Easements or any other operation and reciprocal easement agreement, or any amendments thereto, for access and parking between Landlord and the Owner(s) of any property located within or adjacent to the Property whenever, in the reasonable discretion of Landlord, it is determined that any such agreement would be beneficial to the use and operation of the Property

25.4 Execution of Documents. Tenant, upon request of any party in interest, shall execute promptly such instruments and certificates, to carry out the intent of Articles 24 and 25. If, within ten (10) days after the date of a written request by Landlord to execute such instruments, Tenant shall not have executed the same, Tenant shall be deemed to have irrevocably appointed Landlord as attorney-in-fact for Tenant with full power and authority to execute and deliver in the name of Tenant any such instruments, certificates, and/or documents.

25.5 Non-Disturbance. With respect to any Security Instrument entered into by Landlord after execution of this Lease, and with respect to any requested attornment by Tenant per Paragraph 25.2 above, Tenant's subordination of this Lease, and Tenant's attornment, shall be subject to receiving a commercially reasonable non-disturbance agreement ("Non-Disturbance Agreement") from the holder of such Security Instrument, or purchaser or assignee of Landlord, which Non-Disturbance Agreement shall provide that Tenant's possession of the Premises, and this Lease and options to extend the term hereof, will not be disturbed so long as Tenant is not in breach under the Lease and attorns to the record owner of the Premises.

26 HOLDING OVER; SURRENDER:

26.1 Effect of Holding Over. If Tenant remains in possession of the Premises after the expiration of the term of this Lease, including options, if applicable, without executing a new Lease, or after Landlord has declared a forfeiture by reason of a material breach by Tenant, then such holding over shall be construed as a tenancy from month to month, subject to all the conditions, provisions and obligations of this Lease insofar as they are applicable to a month-to-month tenancy. The Base Monthly Rent payable during any period of holding over should be equal to one hundred five percent (105%) of the Base Monthly Rent payable during the period immediately preceding Tenant's holding over, and all Percentage Rent and Additional Rent payments shall also be made as specified within this Lease.

26.2 Surrender of Premises. At the expiration of this Lease, Tenant shall surrender the Premises in the same condition as it was upon delivery of possession thereto under this Lease, reasonable wear and tear excepted, and shall deliver all keys to Landlord. Before surrendering the Premises, Tenant shall, at its sole cost and expense, remove all of its personal property and trade fixtures and such alterations or additions to the Premises made by Tenant as may be specified for removal by Landlord, and shall repair any damage caused by such property or the removal thereof. If Tenant fails to remove its personal property and fixtures upon the expiration of this Lease, the same shall be deemed abandoned and shall become the property of Landlord.

27. LIMITATION OF LIABILITY:

27.1 Agreement by Tenant.

(a) In consideration of the execution of this Lease by Landlord, Tenant agrees in the event of any actual or alleged failure, breach, or default hereunder by Landlord: (1) The sole and exclusive remedy shall be against the partnership and its partnership assets; (2) no partner of Landlord should be sued or named as a party in any suit or action (except as may be necessary to secure jurisdiction of the partnership); and (3) no judgment will be taken against any partner of Landlord These covenants and agreements are enforceable both by Landlord and also

Tenant's Initials
© Stephen J Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

Page 21 of 27

EXHIBIT V
PAGE 829

by any partner of Landlord.

(b) Tenant agrees that each of the foregoing covenants and agreements shall be applicable to any covenant or agreement either expressly contained in this Lease or imposed by statute or at common law.

28. LIABILITY OF SUCCESSORS:

28.1 Inurement. The covenants and conditions herein contained shall, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators and assigns of all of the parties hereto and all of the parties hereto shall be jointly and severally liable for the covenants contained herein

29. MISCELLANEOUS PROVISIONS:

29.1 Gender and Number. Whenever the singular number is used in this Lease, the same shall include the plural, and the masculine shall include the feminine and neuter gender; and the word "person" shall include corporation, form or association, when required by the context.

29.2 Captions. The headings or titles to the articles and paragraphs of this Lease are for convenience only and do not in any way define, limit or construe the contents of such articles and paragraphs.

29.3 Entire Agreement. This Lease and its exhibits contain all of the agreements and conditions made between the parties with respect to the leasing of the Premises. Landlord and Landlord's Real Estate Brokers make no warranty or representation with respect to any other tenants or owners which may or may not construct improvements, occupy or conduct business within the Property, and Tenant hereby acknowledges and agrees that it is not relying on any warranty or representation relating thereto in entering into this Lease. Landlord specifically disavows any oral representations made by or on behalf of its employees, agents, and independent contractors, other than the express terms of this Lease. Tenant hereby acknowledges and agrees that it is not relying on and will not rely on any oral representations in entering into this Lease. References upon the exhibits to potential tenants within the Property are to be considered generic and are not to be considered as specific representations that any particular company, firm, business enterprise will occupy a specific area within the Property. This Lease may not be amended, modified, or any of its provisions waived except by a written instrument signed by all the parties to this Lease.

29.4 Governing Law. The laws of the State of California shall govern the validity, performance and enforcement of this Lease.

29.5 Invalidity; Construction. If any provision of this Lease is determined to be void by any court of competent jurisdiction, such determination shall not affect any other provision of this Lease and such other provisions shall remain in full force and effect. If any provision of this Lease is capable of two constructions, one which would render the provision void and one which would render the provision valid, the provision shall be interpreted in the manner which would render it valid.

29.6 Payments. Except as may otherwise be expressly stated, each payment required to be made by Tenant shall be in addition to and not in substitution for other payments to be made by Tenant.

29.7 Time of Essence. Time is of the essence of each and every provision of this Lease.

29.8 Force Majeure Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, regulations, or controls, enemy or hostile government action, civil commotion, fire or other casualty, and other causes (other than financial) beyond the reasonable control of the party obligated to perform, shall excuse the performance by such party for a period equal to that resulting from such prevention, delay or stoppage, except those obligations of Tenant to pay rent and other charges pursuant to the terms of this Lease.

Tenant's Initials
© Stephen J Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

EXHIBIT V
PAGE 830

29.9    Notices.

(a)    All notices to be given by one party to the other under this Lease shall be in writing, mailed or delivered to the other party at the addresses specified in Item 10 of the Basic Lease Provisions.

(b)    Mailed notices shall be sent by United States Postal Service, certified or registered mail, with return receipt requested, postage prepaid, or by other comparable commercial means, and shall be deemed to have been given two (2) days after the date posted by the United States Postal Service or on the date signed as received by such other comparable commercial service.

(c)    Either party may, by proper notice, at any time designate a different party and/or address to which notices shall be sent.

29.10    Brokers.    Tenant warrants that it has had no dealings with any real estate broker or agent in connection with the negotiation and/or execution of the Lease, except the broker identified in Item 11 of the Basic Lease Provisions.

29.11    No Partnership.    Notwithstanding any other provision of this Lease, Landlord does not by this Lease, in any manner nor for any purpose, become a partner or joint venturer of Tenant in the conduct of its business or otherwise. The provisions of this Lease relating to Percentage Rent and Additional Rent are included solely for the purpose of providing a method whereby such rent is to be measured and ascertained.

29.12    Fees and Permits.    Tenant is responsible for the application, payment and approval of all fees, licenses and permits necessary to prepare for and complete the opening and continued operation of its business.

29.13    Rules and Regulations.    Landlord reserves the right to make such reasonable rules and regulations as it deems appropriate, in its sole discretion, to provide for a more efficient and orderly operation of the Property. Tenant covenants and agrees to be bound by and to abide by all such rules and regulations immediately upon receipt of written notice of such rules and regulations from Landlord.

29.14    General Interpretation.    The terms of this Lease have been negotiated by the parties hereto and the language used in this Lease shall be deemed to be the language chosen by the parties hereto to express their mutual intent. This Lease shall be construed without regard to any presumption or rule requiring construction against the party causing such instrument or any portion thereof to be drafted, or in favor of the party receiving a particular benefit under the Agreement. No rule of strict construction will be applied against any person.

29.15 Counterpart Signatures.    This Lease may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Lease shall not be effective until the execution and delivery between each of the parties of at least one set of counterparts. The parties authorize each other to detach and combine original signature pages and consolidate them into a single identical original. Any one of such completely executed counterparts shall be sufficient proof of this Lease.

29.16 Business Day Defined.    "Business Day" means a day other than a Saturday, Sunday, or holiday on which banks, County offices, or U.S. Post Offices are closed in San Diego County; if a date or time period provided for in this Lease is or ends on a day other than a Business Day, then such date shall automatically be extended until the next Business Day.

30.    SPECIAL PROVISIONS:

30.1    Not An Offer.    THE SUBMISSION OF THIS LEASE BY LANDLORD IS NOT AN OFFER AND THERE SHALL BE NO AGREEMENT OF ANY NATURE BETWEEN THE PARTIES THAT IS BINDING UPON ANY PARTY HERETO UNTIL THIS LEASE IS FULLY EXECUTED AND LANDLORD

LEASE – OFFICE BUILDING

Tenant's Initials
© Stephen J Fitch

Landlord's Initials

Page 23 of 27

EXHIBIT V
PAGE 831

HAS CLOSED ESCROW TO PURCHASE PROPERTY. LANDLORD IS IN ESCROW TO PURCHASE THE PROPERTY ESCROW # SA-4983365 AT FIRST AMERICAN TITLE COMPANY. UPON LANDLORD CLOSING ESCROW TO PURCHASE THE PROPERTY THE COMMENCEMENT DATE SHALL BE MODIFIED TO BE THE DATE TITLE TO THE PROPERTY IS RECORDED IN THE NAME OF LANDLORD AND ALL DATES SHALL THEREAFTER RELATE TO REVISED COMMENCEMENT DATE.

30.2    Legal Representation. Landlord and Tenant each acknowledge, warrant and represent to the other that it has had an adequate opportunity to seek the advice of legal counsel of its choice prior to entering into this Lease, that such opportunity was undertaken or waived by the free and voluntary act of such party, and that each party waives and covenants to forego and/or forebear from the assertion of any claim or defense that this Lease is not a valid and binding obligation upon it by reason of the failure to secure or receive adequate legal representation

30.3    General. By insertion of numbers in the following blanks, Landlord and Tenant acknowledge that Paragraph(s) N/A is/are attached hereto and made a part hereof. If numbers have not been set forth in the blank in this Paragraph 34.3, it is conclusive that no additional provisions are a part of this Lease.

30.4    Non-Discrimination. The Tenant herein covenants by and for itself, its officers, directors, successors and assigns and all persons claiming under or through it, and this Lease is made and accepted upon and subject to the following conditions:

There shall be no discrimination against or segregation of, any person or group of persons on account of race, color, creed, religion, sex, marital status, ancestry or national origin in the leasing, subleasing, transferring, use, occupancy, tenure, or enjoyment of the land herein leased nor shall the Tenant itself, or any person claiming under or through it, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, use or company of tenants, lessees, sublessees, subtenants or vendees in the Premises herein leased.

30.5    Accessibility Inspection. Landlord ☐ has or ☒ has not had the Demised Premises inspected for disability access by a Certified Access Specialist ("CASp"). The CASp determined that the Property ☐ met or ☐ did not meet all applicable construction-related accessibility standards pursuant to California Civil Code Section 55.53.

30.6    Energy Disclosure. Tenant acknowledges that the Premises are a newly constructed building and as such Landlord has no historical energy use for the Premises.

[Signatures on next page]

Tenant's Initials
D Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

EXHIBIT V
PAGE 832

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

LANDLORD:

TENANT:

DRP Holdings, LLC.,
a California limited liability company

BORREGO COMMUNITY HEALTH FOUNDATION
a California non-profit public benefit corporation

By: _____
Daryl R. Priest, Manager

By: _____
Name: _____Bruce Hebets_____
Its: _____CEO_____

Tenant's Initials
© Stephen J. Fitch

LEASE—OFFICE BUILDING

Landlord's Initials

Page 25 of 27

EXHIBIT V
PAGE 833

EXHIBIT "A"

SITE PLAN

LEASE – OFFICE BUILDING

Tenant's Initials
© Stephen J. Fitch


Landlord's Initials

Page 26 of 27

EXHIBIT V
PAGE 834



EXISTING
SAN BERNADINO BRANCH
FIRST FLOOR

EXHIBIT V
PAGE 835



EXHIBIT V

PAGE 836

**EXHIBIT "B"**
**CONFIRMATION OF LEASE**

THIS CONFIRMATION LEASE is made and agreed upon as of this ___ day of _____, 2015, by and between DRP Holdings, LLC, a California limited liability company ("Landlord"), and BORREGO COMMUNITY HEALTH FOUNDATION, a California non-profit public benefit corporation ("Tenant").

WITNESSETH.

Landlord and Tenant have previously entered into a certain lease agreement dated August __, 2015 ("Lease"), covering certain premises located at 590 N. D Street, San Bernardino, California, as more particularly described in the Lease ("Premises").

NOW, THEREFORE, in connection with the foregoing, the parties hereto mutually agree as follows:

1.      For the purpose of confirming the establishment of the Commencement Date, as required by the provisions of the Lease, Landlord and Tenant hereby agree that:

        a.      The date of _OCT 1_, ~~2015~~ 2016, is hereby established as the "Commencement Date" referred to in the Lease;

        b.      The date of _OCT 1_, ~~2015~~ 2016, is hereby established as the "Rent Commencement Date" referred to in the Lease, upon which Rent and all other items of payment commence to accrue;

        c.      The date of _Sept 30_, ~~2045~~ 2046, is hereby established as the "Expiration Date" of the term of the Lease; and

2.      This Confirmation Agreement and each and all provisions hereof shall inure to the benefit of, or bind, as the case may require, the parties hereto and their respective heirs, successors and assigns.

        IN WITNESS WHEREOF, the parties hereto have executed this instrument as of the date and year first written above

LANDLORD:                                       TENANT:

DRP Holdings, LLC.,                             BORREGO COMMUNITY HEALTH FOUNDATION
a California limited liability company          a California non-profit public benefit corporation

By _____                          By: _____
Daryl R. Priest, Manager                        Name: _Bruce Hebets_
                                                Its: _CEO_

EXHIBIT V
PAGE 837

# EXHIBIT W

## BASIC LEASE PROVISIONS

The following Basic Lease Provisions constitute a part of the Lease to which they are attached.

1. **Landlord:**   DRP Holdings, LLC., a California limited liability company

2. **Tenant:**   Borrego Community Health Foundation, a California non-profit public benefit corporation

3. **Premises:**
   (a)   Area: Approximately 15,000 sq. ft. office building including approximately 60 parking spaces ("Office Building" or "Premises").

   (b)   Location: The Premises commonly referred to as 750 East Main Street, Barstow, California, are depicted on Exhibit "A" attached hereto ("Property").

4. **Lease Term:**   The term of this Lease shall be 30 years and 0 months from the Commencement Date.

5. **Condition of Premises:**   The Premises are accepted "as is", "where is", and with all faults.

6. **Rent:**

   (a)   Base Monthly Rent: $60,000.00 per month, subject to adjustment as provided in Article 3.

   (b)   Additional Rent: Taxes, Utilities, Insurance, Maintenance, Management and other Expenses shall be based on direct cost or consumption by Tenant or upon Tenant's share of such Expenses.

   (c)   The "Rent Commencement Date" shall be earlier of (i) four (4) months from the date that Landlord acquires title to the Property or (ii) the date Tenant opens for business.

   (d)   "Tenant's Share" – 63%

7. **Prepaid Base Monthly Rent:** $-0-.

8. **Security Deposit:** $ -0-.

9. **Permitted Use:** The Premises shall be used solely for a general office and medical office use including a pharmacy and for any other lawful purpose.

10. **Addresses for Notices and Payment of Rent:**

    (a)   If to Landlord:          DRP Holdings, LLC.,
                                    a California limited liability company
                                    124 Main Street, Suite 240
                                    El Cajon, Ca 92020
                                    Fax: (619) 444-8597
                                    Attn:  Daryl R. Priest
                                    Email: daily@priesthomes.com

Tenant's Initials
© Stephen J Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

EXHIBIT W
PAGE 839

Copy of notices to:      Fitch Law Firm, APC
Stephen J. Fitch, Esq.
3465 Camino Del Rio South, Ste. 250
San Diego, CA 92108
Telephone No. (619) 282-8100
Email: steve@fitchlawfirm.com

(b)    If to Tenant:      Borrego Community Health Foundation
P.O. Box 2369
Borrego Springs, CA 920004
Attn: Bruce Hebets
Fax: (760) 767-5051
Email: bhebets@borregomedical.org

Copy to:      Borrego Community Health Foundation
P.O. Box 2369
Borrego Springs, CA  920004
Attn: Mikia Wallis, Chief Legal Officer
Fax: (760) 767-6722
Email: mwallis@borregomedical.org

11.   **Broker(s):**

Landlord:      NONE

Tenant:      NONE

12.   **Certificate of Insurance:** Tenant acknowledges that a certificate of insurance with endorsements attached, as required by Paragraph 8.2(b), must be provided to Landlord prior to delivery of the keys to Premises to Tenant.

13.   **Guarantor:** NONE

The foregoing Basic Lease Provisions are incorporated into and made a part of the Lease. Each reference in the Lease to any of the Basic Lease Provisions shall mean the respective information above and shall be construed to incorporate all of the terms provided under the particular Lease paragraph pertaining to such information. In the event of any conflict between the Basic Lease Provisions and the Lease, the Basic Lease Provisions shall control. Unless otherwise defined in the Lease, all initially-capitalized terms used in the Lease shall have the meanings ascribed to them in the Basic Lease Provisions.

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

Page 2 of 27

Landlord's Initials

# BUILDING LEASE

This BUILDING LEASE ("Lease") is executed as of the 2nd day of February, 2016 ("Effective Date"), by and between DRP Holdings, LLC, a California limited liability company ("Landlord"), and BORREGO COMMUNITY HEALTH FOUNDATION, a California corporation ("Tenant"), Landlord and Tenant are also referred to herein individually as a "Party" and collectively as the "Parties". The Basic Lease Provisions attached to this Lease are incorporated herein and made a part of this Lease.

1.    PREMISES:

1.1    Premises.  Subject to all the terms and conditions of this Lease, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, pursuant to the terms, covenants, conditions and uses herein set forth, the Premises, as more particularly described in Item 3 of the Basic Lease Provisions. The Property and the Office Building are more particularly depicted on Exhibit "A" attached hereto and incorporated by reference herein.

1.2    Condition of Premises. Tenant accepts the Premises "as is", "where is", and with all faults. The square footage of the Premises, at Landlord's or Tenant's election, is subject to verification by Landlord's space planner or architect at any time within 90 days of the Commencement Date—with the stated square footage stated in the Basic Lease Provisions being deemed mutually agreed-upon and controlling if no such verification is done during such timeframe.

1.3    Tenant Improvement Allowance.  Landlord shall provide a Tenant Improvement Allowance ("TI Allowance") in an amount not to exceed One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00) for the construction of Tenant's improvements of the Premises, which are to be fixed in the Premises and shall remain with the Premises. All such tenant improvements shall be pursuant to plans approved by Landlord, Tenant shall provide, at its sole cost, to Landlord upon execution of this Lease space plans for the Premises. Any revisions to the space plan shall be mutually agreed upon by the Parties.

a.    Construction of Improvements. The construction of Tenant's improvements in the Premises shall be done in accordance with Section 5.1 of this Lease by licensed and insured contractors approved by Landlord.

b.    Payment of TI Allowance. The TI Allowance shall be paid by Landlord to Tenant based on a mutually agreed upon construction draw schedule to be submitted by Tenant to Landlord for approval. Any amount not drawn under the draw schedule shall be paid to Tenant within thirty (30) days from the later to occur of: (1) Tenant opens for business in the Building; (2) the period allowed for the filing of mechanic's liens has expired or duly executed unconditional lien waivers from all contractors, subcontractors and material men who have performed work on behalf of Tenant at the Premises are presented to Landlord; and (3) the Tenant has provided to Landlord a Certificate of Occupancy, a copy of Tenant's Recorded Notice of Completion and a complete set of "as-built" construction documents for all work performed by Tenant and/or Tenant's contractors and subcontractors.

In Landlord's sole discretion, Landlord may satisfy its obligations under this Section 1.3 by contracting with and paying directly a contractor of Landlord's choosing to complete the tenant improvements.

2.    TERM:

2.1    General.

(a)    The term of this Lease shall be as specified in Item 4 of the Basic Lease Provisions, commencing on the earliest of (1) the date Landlord acquires title to the Property, or (2) the date on which Landlord and Tenant execute the Confirmation of Lease (in the form attached hereto as Exhibit "B"), or (3) the date

Tenant's Initials
© Stephen J. Pitch

LEASE – OFFICE BUILDING

Landlord's Initials

EXHIBIT W
PAGE 841

upon which Tenant actually occupies the Premises for any reason. The date on which the Lease term commences is hereinafter referred to as the "Commencement Date".

IN THE EVENT LANDLORD FAILS TO ACQUIRE THE PROPERTY UPON WHICH THE PREMISES IS LOCATED THEN LANDLORD SHALL NOTIFY TENANT AND THIS LEASE WILL TERMINATE.

3. RENT:

3.1 Base Monthly Rent.

(a) Tenant shall pay to Landlord at the address provided for in Item 10 of the Basic Lease Provisions (subject to the provisions of Section 1.1.1 above), without deduction or prior notice or demand, and Landlord shall accept, as rent for the Premises the "Base Monthly Rent" specified in Item 6(a) of the Basic Lease Provisions. The Base Monthly Rent shall be payable in advance in lawful money of the United States on the first day of each month of the Lease term. The first installment of the Base Monthly Rent shall be due and payable on the Rent Commencement Date.

(b) In the event that the Rent Commencement Date is not the first day of the month, Tenant shall pay to Landlord prior to the first day of the first full calendar month which is ninety (90) days after the commencement date, an amount equal to the Base Monthly Rent multiplied by a factor having as its numerator the number of days remaining in the first month and as its denominator the number thirty (30). Thereafter, the Base Monthly Rent shall be payable in accordance with the terms of this Paragraph 3.1.

(c) Tenant's obligation to pay rent, including Base Monthly Rent and Additional Rent shall commence as set forth in the Basic Lease Provisions.

3.2 Adjustments to Base Monthly Rent. The Base Monthly Rent for the Lease term shall adjust (in addition to the adjustment in Paragraph 3.3 below), as follows:

a. Commencing on the first anniversary date of the Lease term, and then annually thereafter on each Adjustment Date, the Base Monthly Rent during the Lease Term shall be adjusted to an amount equal to the greater of (a) two (2) percent or (b) the product obtained by multiplying the Base Monthly Rent in effect immediately prior to the Adjustment Date by the annual percentage increase in Consumer Price Index All Urban Consumers U.S. City Average (1982-84 = 100) published by the Bureau of Labor Statistics of the U.S. Department of Labor ("Index"), i.e., Index published 30 days prior to each new Adjustment Date ("New Extension Index") divided by the Index (in effect for the immediately preceding Lease Year) published 30 days prior to the preceding Adjustment Date ("Current Extension Index"). Landlord shall give written notice to Tenant indicating the amount of the adjustment and manner of computation of same as soon as the information becomes available to Landlord.

3.3 Additional Rent. Tenant shall pay as "Additional Rent" its pro rata share of the cost of operation and maintenance of the Property, i.e., the cost of utilities (if not separately metered), taxes, insurance provided by Landlord, roof and structural repairs, and Common Area Expenses, or other charges, as described and in the manner provided in Article 11 (Common Areas). The Base Monthly Rent, the Additional Rent, rental adjustments and any and all other amounts, however designated, required to be paid or reimbursed by Tenant under this Lease are sometimes collectively referred to as, and shall constitute, "rent.".

3.4 Interest on Past Due Obligations. In the event of default by Tenant in payment of any items of rent, Tenant shall pay, as Additional Rent, interest at the rate of two (2) points over the published prime rate of Citi Bank or the maximum rate permitted by law, whichever is less, on each such obligation from the day it is due until received by Landlord. Notwithstanding the foregoing, no interest shall accrue on any Late Charges under this Lease as defined in Paragraph 3.5 below.

Tenant's Initials
D Stephen J Fitch

LEASE—OFFICE BUILDING

Landlord's Initials

Page 4 of 27

3.5     Late Charges. Tenant acknowledges that late payment by Tenant to Landlord of rent will cause Landlord to incur costs not contemplated by this Lease, the exact amount of such costs being extremely difficult and impractical to fix. Such costs include, without limitation, processing, administration and accounting charges. If any installment of any item of rent due from Tenant is not received by Landlord within five (5) business days of when due, Tenant shall pay to Landlord an additional sum equal to six percent (6%) of the overdue rent as a late charge. The parties agree that this late charge represents a fair and reasonable estimate of the costs that the Landlord will incur by reason of late payment by Tenant. Acceptance of any late charge shall not constitute a waiver of Tenant's default with respect to the overdue amounts, nor prevent the Landlord from exercising any of the other rights and remedies available to Landlord hereunder. The payment of a late charge shall be in addition to any interest payable by Tenant under Paragraph 3.4 (Interest on Past Due Obligations). In addition to the charges provided for above, Tenant shall pay a charge of Fifty Dollars ($50.00) to Landlord for each check returned for insufficient funds and One Hundred Fifty Dollars ($150.00) for each "three (3) day pay or quit" notice

3.6     Intentionally Deleted

4.     USE.

4.1     Permitted Use. The Premises shall be used and occupied by Tenant and for the use and purpose(s) specified in Item 9 of the Basic Lease Provisions and under no other trade names and for no other use or purposes, including, but not limited to, unlawful, immoral, "second hand" or used merchandise, distress goods, surplus stores or auctions. Tenant shall not permit any act to be done in, upon or about the Premises which would increase the existing rate of insurance upon the Premises, or cause the cancellation of any insurance policy covering the Premises, nor shall Tenant sell or permit to be kept, used or sold in, upon or about the Premises any article which may be prohibited by a standard form policy of fire insurance. In the event that Tenant's use increases said rate or causes the cancellation of a policy of insurance, Landlord may charge Tenant, as Additional Rent, the additional cost of insurance; or Landlord, at its option may cancel the Lease. Landlord does not represent nor warrant that the Premises can be used for any specific use or purpose, and it is incumbent upon Tenant to ascertain from the proper governmental authorities whether the Premises may be used for Tenant's intended use.

4.2     Hazardous Materials Indemnity.

(a)     Tenant shall not cause or permit the presence, use, generation, release, discharge, storage, disposal or transportation of any "Hazardous Materials" on, under, in, about, to or from, the Premises and/or the Property; provided that the presence or use of Hazardous Materials (a) in products required for the prudent and ordinary management and operation of the Premises as a car wash and auto detail facility and (b) held and used strictly in accordance with (i) all applicable federal, state or local laws, regulations or orders, (ii) guidelines issued by any national or regional board of insurance underwriters, and (iii) prudent standards of practice shall not be deemed in violation of this provision.

(b)     As used herein, the term "Hazardous Materials" shall mean any toxic or hazardous substance, material or waste or any pollutant or contaminant or infectious or radioactive material, including but not limited to those substances, materials or wastes regulated now or in the future under any of the following statutes or regulations promulgated thereto: (a) any "hazardous substance" within the meaning of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA") 42 U.S.C. § 9601, et seq. or the California Hazardous Substance Account Act, Cal. Health and Safety Code § 25300 et seq. or the Porter-Cologne Water Quality Act, Cal. Water Code § 13000 et seq. or the Hazardous Materials Transportation Act, 49 U.S.C. § 1801, et seq.; (b) any "hazardous waste" within the meaning of the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq.; (c) any "pesticide" or "economic poison" as defined in California Food & Agricultural Code § 12753 and any regulations promulgated in connection therewith; or (d) any other substance, chemical, waste, toxicant, pollutant, pesticide or contaminate regulated by any federal, state or local law, statute, rule, regulation or ordinance for the protection of health or the environment ("Environmental Laws"), including, without limitation, methane and any petroleum products or fractions thereof and any asbestos-containing materials.

EXHIBIT W
PAGE 843

(c)  If Tenant's use of the Premises may involve the storage and/or use of Hazardous Materials as defined herein, Tenant, in addition to its covenants defined above, further covenants, agrees, warrants and represents that it will comply with all Environmental Laws, rules, regulations, court decisions, municipal codes and ordinances regulating such storage and/or use of Hazardous Materials, including without limitation Chapter 6.95 of the California Health and Safety Code; and to permit Landlord to monitor such compliance, without the assumption of any liability by Landlord nor any obligation of Landlord to so monitor, Tenant covenants and agrees to provide to and/or permit Landlord:

(1)  To review and approve prior to submission to any governmental agency all applications with respect to the handling, storage and/or use of Hazardous Materials in, on or about the Premises, including without limitation applications to the County Hazardous Materials Management Division ("HMMD") and/or to Air Pollution Control District ("APCD"), and after such submission to provide Landlord with a copy of all responses, notices, comments or other communications with said governmental agencies; and

(2)  To receive and review a copy of all completed and approved "Business Plans", as defined by the statutes, and all updates, renewals, or replacement "Business Plans" when submitted and all responses, notices, comments or communications with any governmental agencies regarding same; and

(3)  To receive and review a copy of all notices, reports, comments or communications relating to any governmental inspection, complaint, investigation or other matter relating to Tenant's storage, handling or use of Hazardous Materials at, on, in or about the Premises; and

(4)  To receive and review a copy of any and all E.P.A. numbers, County Health Department permits, APCD permits, contracts with certified hazardous waste handlers (and all credentials and certifications of such handlers), and all schedules for delivery, pick-up and disposal of Hazardous Materials to or from the Premises; and

(5)  To immediately notify Landlord of any leaks, spills, emissions, release or suspected release of any Hazardous Materials at, on, in, under, above or about the Premises from any cause or source whatsoever; and

(6)  To receive and review a copy of all records of every nature that are required by law, regulations, ordinance or court order to be maintained by Tenant with respect to the storage, handling or use of any Hazardous Materials at, on, in, under, above or about the Premises.

(d)  Tenant shall exonerate, indemnify, pay and protect, defend (with counsel reasonably approved by Landlord) and save Landlord, and its directors, trustees, beneficiaries, officers, shareholders, partners, members, employees, agents, and invitees and of those of the other tenants of the Property (collectively, the "Related Parties"), harmless from and against any claims (including, without limitation, third party claims for personal injury or real or personal property damage, actions, administrative proceedings (including informal proceedings), judgments, damages, punitive damages, penalties, fines, costs, taxes, assessments, liabilities (including sums paid in settlements of claims), interest or losses, including reasonable attorneys' fees and expenses (including any such fees and expenses incurred in enforcing this Lease or collecting any sums due hereunder), consultant fees, and expert fees, together with all other costs and expenses of any kind or nature (collectively, the "Costs") that arise directly or indirectly in connection with the presence, or release, caused by Tenant of any Hazardous Materials in or into the air, soil, ground water, surface water or improvements at, on, about, under or within the Property, or any portion thereof, or elsewhere in connection with the transportation of Hazardous Materials to or from the Property or the Premises by or on behalf of Tenant. The indemnification provided in this Paragraph shall specifically apply to and include claims or actions brought by or on behalf of employees of Tenant. In the event that Landlord or any of the Related Parties shall suffer or incur any such Costs, Tenant shall pay to Landlord or such Related Parties, the total of all such Costs suffered or incurred upon demand therefor, which demand shall be accompanied by an accounting and copies of back up documentation for such Costs. Without limiting the generality of the foregoing, the indemnification provided herein shall specifically cover Costs including,

LEASE– OFFICE BUILDING

Tenant's Initials
© Stephen J. Fitch

Landlord's Initials

Page 6 of 27

without limitation, capital, operating and maintenance costs, incurred in connection with any investigation or monitoring of site conditions, any clean-up, containment, remedial, removal or restoration work required or performed by any federal, state or local governmental agency or political subdivision or performed by any non-governmental entity or person because of the presence, or release, caused by Tenant of any Hazardous Materials in or into the air, soil, ground water, surface water or improvements at, on, about, under or within the Property (or any portion thereof), or elsewhere in connection with the transportation of Hazardous Materials to or from the Property or the Premises by or on behalf of Tenant, and any claims of third parties for loss or damage due to such Hazardous Materials. This indemnification shall survive the termination of this Lease and shall be binding upon the Tenant and its successors in interest whenever such threat, claim, or cause of action may arise. Tenant expressly waives any defense concerning constructive eviction or rent abatement with respect to such claims arising from the act or omission of Tenant.

4.3   Compliance with Laws. Tenant and Landlord shall promptly comply with all laws, ordinances, zoning restrictions, rules, regulations, orders and any requirements of any duly constituted public authorities now or hereafter affecting the use, safety, cleanliness or occupation of the Premises. Tenant's use of the Premises shall not adversely affect Landlord's use of the Property and the use of the Property by other tenants. Any alteration or improvement to the Premises or the providing of any auxiliary aids or services required by any statute, ordinance, governmental regulation or court order in order for Tenant to conduct business shall be undertaken at Tenant's sole cost and expense in the manner provided in Article 5 below. Landlord shall have the absolute right to cancel this Lease, upon thirty (30) days written notice to Tenant, in the event that Tenant's plans for construction or subsequent use of the Premises shall adversely affect the allocation of available energy requirements or other utility services to Landlord or other tenants within the Property.

4.4   No Nuisances. Tenant shall not commit or permit any nuisance, act or other thing which may disturb the quiet enjoyment of the other tenants of the Property.

5.   ALTERATIONS AND ADDITIONS:

5.1   General. Tenant shall not make any non-structural interior alterations, improvements or additions to the Premises without obtaining Landlord's prior written consent, which shall not be unreasonably withheld. Any such improvements, excepting movable furniture and trade fixtures, shall become part of the realty and belong to Landlord upon their completion of construction. Tenant shall, at its sole cost and expense, obtain all necessary governmental permits and approvals, and pay for all assessments, taxes and charges associated with such work. All alterations and improvements shall be in conformity with the laws of all applicable duly constituted public authorities and shall be done in a good workmanlike manner. Tenant shall not make any structural changes or changes to the exterior of the Premises including but not limited to penetration of roof or alteration or relocation of windows or doorways or exterior walls or the affixing or setting of satellite dishes, antennae, lighting, electronic or other devices without Landlord's prior written consent, which may be withheld in its sole and absolute discretion. All alterations, additions, repairs or changes to be made to the Premises which require Landlord's approval shall be under the supervision of a competent licensed architect and/or competent licensed structural engineer and made in accordance with plans and specifications submitted to and approved by Landlord before commencement of work. Landlord reserves the right to retain or hire an architect or engineer to review said plans and specifications, and the reasonable cost of such professional fees shall be reimbursed by Tenant to Landlord. All such work shall be performed by a licensed and insured contractor, approved by Landlord, and if requested by Landlord, a completion bond naming Landlord as the beneficiary shall be provided by Tenant.

5.2   No Liens. Prior to commencing any work relating to any alterations, improvements or additions approved by Landlord, Tenant shall notify Landlord in writing of the expected date of commencement. Tenant shall not commence the making of any approved alterations until after Landlord shall have received notice of the commencement date thereof, in order that Landlord may post and record any appropriate Notice of Non-Responsibility. Landlord shall have the right at any time to post and maintain on the Premises such notices as Landlord reasonably deems necessary to protect Landlord and the Premises from mechanic's liens, material men's

LEASE – OFFICE BUILDING

Tenant's Initials
© Stephen J. Fitch

Landlord's Initials

Page 7 of 27

liens or any other liens. In performing the work on any such alterations, improvements or additions, Tenant agrees to cooperate with Landlord in arranging and undertaking such work so as to minimize any adverse impact and business interruption of Tenant, Landlord or any other occupant of the Property, and to diligently complete all such work. In no event shall such work be performed in a manner that obstructs access to the Property or to the Premises of any other occupant of the Property. Tenant shall pay, when due, all claims for labor or materials furnished to or for Tenant for use in improving the Premises. Tenant shall not permit any mechanic's or material men's liens to be levied against the Premises arising out of work performed, materials furnished, or obligations to have been performed on the Premises by or at the request of Tenant. Should any mechanic's or other lien be filed against the Premises, Property, or any part thereof by reason of Tenant's acts or omissions or because of a claim against Tenant, Tenant shall cause the same to be canceled and discharged of record by bond or otherwise within ten (10) business days after notice by Landlord. Tenant hereby agrees to indemnify, hold harmless, defend and protect Landlord against loss, damage, attorney's fees and all other expenses on account of claims of lien of laborers or material men or others for work performed or materials or supplies furnished for Tenant or persons claiming under it.

    5.3    Trade Fixtures. Tenant shall install trade fixtures, machinery or other trade equipment in conformance with the ordinances of all applicable duly constituted public authorities and for a first class operation of Tenant's business, and Tenant shall maintain its operation in such first class condition. Tenant may and upon Landlord's request shall, at Tenant's sole cost and expense, remove any of such trade fixtures or machinery upon the termination of this Lease, provided Tenant is not then in default under the terms and conditions of this Lease.

## 6.    UTILITIES:

    6.1    Responsibility for Payment. Tenant shall pay for all water, sewer, gas, heat, light, power, telephone service and any other services or utility provided to the Premises.

    6.2    Tenant's Share. In the event that any utilities are furnished by Landlord, Tenant shall pay to Landlord its pro rata share of the cost thereof in the manner set forth in Paragraphs 11.2 and 11.3 (payment of Common Area Expenses). Tenant's pro rata share shall be based upon the percentage set forth in the Item 3(e) of the Basic Lease Provisions and (b) any extraordinary use which may be made by Tenant, as reasonably determined by Landlord in its sole and absolute discretion. If any utilities are furnished by Landlord directly or indirectly through joint metering, Landlord shall not be obligated to continue to provide such service if Tenant is in default under the terms hereof.

    6.3    Non-liability of Landlord. Landlord shall not be liable for any failure or interruption for any reason of any utility service being furnished to the Premises.

    6.4    Separate Metering. Tenant may elect, subject to Landlord's reasonable approval, to install and maintain its own meter for any utilities which are jointly metered by written notice delivered to Landlord thirty (30) days prior to the initiation by Tenant of any work to effectuate such change. All separate meters shall be installed and maintained at Tenant's sole cost and expense.

## 7.    INDEMNIFICATION:

    7.1    Tenant's Indemnity Obligation. Tenant does hereby agree to indemnify, hold harmless, defend, and protect Landlord, its employees, agents, partners, contractors, invitees and licensees from and against any and all suits, actions, damages, claims, liability and expense in connection with loss or injury to person or property from caused by the negligent act or omission of Tenant, its employees, agents or contractors, invitees, or licensees, arising from or out of any occurrence in, upon, at or from the Premises, or the occupancy or use by Tenant of the Premises or any part thereof, including without limitation acts or omissions relating to the sidewalks and Common Areas, as hereafter defined, within the Property.

    7.2    Landlord's Indemnity Obligation. Landlord does hereby agree to indemnify, hold harmless, defend, and protect Tenant, its employees, agents, partners, contractors, invitees and licensees from and against any

Tenant's Initials
© Stephen J. Fitch

Landlord's Initials

and all suits, actions, damages, claims, liability and expense in connection with loss by reason of injury to person or property from caused by the negligent act or omission of Landlord, its employees, agents or contractors, invitees, or licensees, arising from or out of any occurrence in, upon, at or from the Premises, or the occupancy or use by Landlord of the Premises or any part thereof, including without limitation acts or omissions relating to the sidewalks and Common Areas, as hereafter defined, within the Property.

7.3     Release of Landlord. Except for loss or damages arising from the acts or omissions of Landlord or Landlord's Related Parties constituting sole negligence, gross negligence, or willful misconduct, Landlord shall not be responsible or liable at any time for any loss or damage to Tenant's merchandise, equipment, fixtures or other personal property or to Tenant's business, including without limitation any loss or damage to either the person or property of Tenant or loss of profits or otherwise that may be occasioned by or through the acts or omissions of persons occupying adjacent, connecting, adjoining or other space in the Property or by or through the acts or omissions of Landlord, its employees, agents, contractors, invitees or licensees. Tenant shall store its property in and shall use and enjoy the Premises and the Common Areas of the Property at its own risk, and hereby releases Landlord, its employees, agents, contractors, partners, invitees, and licensees, to the fullest extent permitted by law, from all claims of every kind, including without limitation, leakage of any nature, resulting in loss of life, personal or bodily injury, or property damage, except for loss or damages arising from the acts or omissions of Landlord or Landlord's Related Parties constituting sole negligence, gross negligence or willful misconduct.

7.4     Notice of Loss. Tenant shall give prompt notice to Landlord in case of fire or accidents or other losses in the Premises or in the building of which the Premises are a part or in the Common Area as well as of any defects therein or in any fixtures or equipment located therein.

7.5     Survival of Lease Termination. Tenant's obligations under Paragraphs 4.2, 7.1-7.5 inclusive, 21.1, and 27.1 shall survive the termination of this Lease for any reason whatsoever, if the incident requiring such defense occurred during the Lease term or otherwise directly or indirectly relates to the performance of any party under this Lease. None of the indemnity obligations provided for in these Paragraphs 7.1-7.5 inclusive, or in Paragraph 4.2 shall require any payment as a condition precedent to recovery.

8.     INSURANCE:

    8.1     Insurance Coverage by Landlord.

        (a)     Landlord shall maintain, at Tenant's expense as provided in Paragraph 8.1(b), a policy or policies of insurance protecting against the following:

        (1)     Fire and other perils normally included in extended coverage insurance to the extent of at least ninety percent (90%) of the replacement value of the Premises, exclusive of personal property, trade fixtures and equipment belonging to Tenant and improvements and betterments made to the Premises by Tenant for which Tenant shall maintain fire and other perils insurance, which shall also name Landlord and its lenders as additional insureds.

        (2)     Public liability and property damage insurance with respect to the Common Areas in an amount not less than Two Million Dollars ($2,000,000) combined single limit for both bodily injury and property damage.

        (b)     Tenant shall pay to Landlord, as Additional Rent in the manner set forth in Paragraph 11.3 (Payment of Common Area Expenses), Tenant's pro rata share of the cost of the insurance required in Paragraph 8.1 (a). Tenant's pro rata share of such cost shall be that proportion of the annual premiums for insurance based upon the percentage set forth in Item 3(e) of the Basic Lease Provisions.

LEASE – OFFICE BUILDING

Tenant's Initials
© Stephen J Fitch

Landlord's Initials

Page 9 of 27

EXHIBIT W
PAGE 847

8.2     Insurance Coverage by Tenant.

(a)     Contents Insurance. Tenant shall maintain in force a policy or policies of special peril contents insurance, including without limitation vandalism and malicious mischief coverage, sprinkler leakage coverage and plate glass coverage for the Premises, with respect to Tenant's personal property, trade fixtures and equipment located in the Premises and all improvements and betterments to the Premises made by Tenant to the extent of at least ninety percent (90%) of their insurable value. During the term of this Lease, the proceeds of any such policy or policies of contents insurance shall be used solely for the repair or replacement of the property so insured. Landlord shall have no claim or interest in said insurance and will sign all documents necessary to effectuate the settlement of any claim or loss by Tenant.

(b)     Liability Insurance. Tenant shall maintain during the term of this Lease worker's compensation insurance as required by applicable law and commercial liability insurance with respect to the Premises, all assumed liabilities by Tenant pursuant to Paragraphs 4.2 and 7.1-7.5 inclusive, product liability and all owned or non-owned and hired vehicles utilized in Tenant's business, adequate to protect Landlord as provided hereinafter. Such policy or policies of liability insurance shall add as additional insureds, Landlord and each of its partners, affiliates, directors, agents, employees, and lenders, and shall expressly provide that the interest of Landlord therein shall not be affected by any breach by Tenant of any policy provisions. Initially, such policy of liability insurance shall be in an amount not less than Three Million Dollars ($3,000,000.00) combined single limit for both bodily injury and property damage. The amounts of such liability insurance shall be increased from time to time, as Landlord or Landlord's mortgagee or beneficiary may reasonably determine. All insurance policies required hereunder shall be obtained upon an "occurrence" basis and not as "claims made" policies (except for any professional liability insurance which may be on a "claims made" basis). All liability, property damage, and other liability policies of Tenant shall be written as primary policies, not contributing with and not in excess of coverage which Landlord may carry. All such policies shall contain a provision that Landlord, and its lenders, although additional insureds, shall nevertheless be named as loss payees and be entitled to recover under said policies for any loss occasioned to it, its employees, agents, contractors, invitees and licensees by reason of the negligence of Tenant, its employees, agents, contractors, invitees and licensees. Tenant shall furnish Landlord with a certificate of insurance with attached endorsements with respect to such policies prior to Tenant's entry into the Premises. Such policies shall be secured from insurance companies with a Best's rating of A; Class VII or better and provide by endorsement that they may not be canceled or altered without sixty (60) days prior written notice delivered by the insurer to Landlord and/or its lenders.

8.3     Waiver of Subrogation. Landlord and Tenant hereby release and relieve each other from liability and waive all right to recover against each other for any loss or damage arising out of or incident to the perils covered under their respective policies of insurance, which perils occur in, on or about the Premises, as a result of the negligence of Landlord or Tenant or their respective agents, employees, contractors and/or invitees. Landlord and Tenant shall, upon obtaining the policies of insurance required under this Lease, give notice to their respective insurance carrier(s) that the foregoing mutual waiver of subrogation is contained in this Lease, and shall provide to the other appropriate endorsements of such waiver from the insurers.

9.     CARE OF THE PREMISES.

9.1     Tenant's Obligations.

(a)     General. Tenant shall, at its expense, keep the Premises and exterior and interior portions thereof, including without limitation windows, doors, and all other glass or plate glass fixtures, in a neat, clean, sanitary and safe condition, and shall keep the Premises free from trash, rubbish and dirt. Tenant shall be solely responsible for glass breakage in the Premises, whether due to vandalism or otherwise. Tenant shall immediately make all repairs or replacements thereon or thereto, whether ordinary or extraordinary. If Tenant fails to keep the Premises neat, clean or in reasonable repair, Landlord may, in its sole discretion, enter the Premises during reasonable hours in order to clean or repair same. Tenant shall immediately pay to Landlord its actual cost thereofas set forth in Landlord's statement submitted to Tenant for payment, provided, however, any such payment shall not

LEASE – OFFICE BUILDING

Tenant's Initials
S Stephen J. Patch

Landlord's Initials

Page 10 of 27

EXHIBIT W
PAGE 848

be deemed a cure of Tenant's default and Landlord shall have all remedies available to it under Article 18 herein.

(b)    Equipment and Fixtures. Tenant shall, at its sole cost, keep and maintain all utilities, fixtures and mechanical equipment used by Tenant in good order, condition and repair. Said items shall include, but are not limited to, all plumbing or sewage facilities, doors, locks and closing devices, windows (including glass), lights, electric systems and equipment of every kind. Tenant shall pay to Landlord in the manner set forth in Paragraph 11.3 (Payment of Common Area Expenses), Tenant's pro rata share of the cost of any maintenance agreement for the Property. Tenant's pro rata share shall be the proportion of the cost of any maintenance agreement based on the percentage share set forth in Item 3 (e) of the Basic Lease Provisions.

9.2    Landlord's Obligations

(a)    General. Landlord shall keep in good condition and repair the roof and structural components of the Premises, but the cost thereof shall be prorated based upon the percentage share set forth in Item 3 (e) of the Basic Lease Provisions and shall be paid by Tenant in the manner set forth in Paragraph 11.3 (Payment of Common Area Expenses). Landlord shall have no obligation to make any such repairs until Landlord has received written notice from Tenant with respect to the need for such repairs. Landlord shall not be deemed to be in default with respect to its obligation to repair unless and until Landlord has (1) received said written notice and (2) failed to make such repairs within a reasonable period following receipt of said notice. Landlord shall, after receiving written notice, exercise due diligence in making such repairs.

(b)    Landlord's Right of Access. In order to perform any of its obligations under this Lease, Landlord hereby reserves to itself and its successors the right of access to the exterior walls and roof of the Premises and the right to install, maintain, use, repair and replace pipes, ducts, conduits, and wires through the Premises in locations which will not materially interfere with Tenant's use thereof.

10.    TAXES:

10.1    Personal Property Taxes. Tenant shall pay prior to delinquency all taxes, assessments, license fees, and other public charges levied, assessed or imposed or which become payable during the term of this Lease upon any trade fixtures, furnishings, equipment and all other personal property of Tenant installed or located in the Premises. Whenever possible, Tenant shall cause said trade fixtures, furnishings, equipment and personal property to be separately assessed. If, however, any or all of said items shall be assessed and taxed with the Premises' real property, Tenant shall pay to Landlord such taxes as are attributable to Tenant's trade fixtures, furnishings, equipment and personal property within fifteen (15) days after receipt of any invoice from Landlord advising Tenant of the taxes applicable to Tenant's property.

10.2    Real Estate Taxes. Tenant shall also pay in the manner set forth in Paragraphs 11.2 and 11.3 any and all "real estate taxes" (as hereafter deemed) assessed or imposed, or which become a lien upon or become chargeable against or payable in connection with the Premises, including Tenant's pro rata share of such real estate taxes which are attributable to the Common Areas. Real estate taxes for the last year of the term of this Lease shall be prorated between Landlord and Tenant as of the expiration date of the Lease term. With respect to any assessments which may be levied against or upon the Premises, or which under the laws then in force may be evidenced by improvements or other bonds and may be paid in annual installments, only the amount of such annual installment, with appropriate proration for any partial year, and interest thereon, shall be included within a computation of taxes and assessments levied against the Premises. Tenant shall be responsible for all increases in real estate taxes attributable to or caused by any organization, re-organization, purchase, sale, merger, acquisition or consolidation of Tenant, Tenant's assets or Tenant's business or by reason of any sale, assignment or recording of any transfer of interest in the Premises or the Property by Landlord, but only to the extent of Tenant's share as set forth in this Paragraph 10.2 herein.

Tenant's Initials
© Stephen J. Pitch

LEASE – OFFICE BUILDING

Landlord's Initials

Page 11 of 27

10.3    Definition of Real Estate Taxes.

(a)    "Real estate taxes" shall mean and include each of the following:

(1)    Any form of assessment, license fee, license tax, business license fee, business license tax, commercial rental tax levy, charge, penalty, bond or tax, imposed by any authority having the direct power to tax, including any city, county, state or federal government, or any school, agricultural, lighting, drainage or other improvement or special district thereof, as against any legal or equitable interest of Landlord in the Premises or in the real property of which the Premises are a part.

(2)    Any tax on Landlord's right to rent or other income from the Premises or as against Landlord's business or leasing the Premises.

(3)    Any assessment, tax, fee, levy or charge in substitution, partially or totally, or any assessment, tax, fee, levy or charge previously included within the definition of real property tax, it being acknowledged by Tenant and Landlord that Proposition 13 was adopted by the voters of the State of California in the June 1978 election and that assessments, taxes, fees, levies and charges may be imposed by governmental agencies for such services as are protection, street, sidewalk and road maintenance, refuse removal and for other governmental services formerly provided without charge to property Owners or Occupants. It is the intention of Tenant and Landlord that all such new and increased assessments, taxes, fees, levies and charges, and similar assessments, taxes, fees, levies and charges be included within the definition of "real property taxes for purposes of this Lease.

(4)    Any tax allocable to or measured by the Gross Floor Area of the Premises or the rent payable hereunder, including without limitation, any gross income tax or excise tax levied by the State of California, any political subdivision thereof, city, or federal government, with respect to the receipt of such rent, or upon with respect to the possession, leasing, operating, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises, or any portion thereof.

(5)    Any tax upon this transaction or any document to which Tenant is a party, creating or transferring an interest or an estate in the Premises.

(b)    "Real estate taxes" shall not include Landlord's federal or state income, franchise, inheritance or estate taxes.

11.    COMMON AREAS:

11.1    Definition of Common Areas.  The term "Common Area" shall include all areas within the Property outside the exterior boundaries of the buildings situated thereon, including, but not limited to, streets, tunnels, driveways, parking areas, truck ways, delivery passages, access roads, loading docks, sidewalks, ramps, open and closed courts and malls, landscaped and planted areas, slopes, comfort and first aid stations, washrooms and parcel pick-up stations, exterior stairways, bus stops, retaining and decorative walls and planters, and other areas provided by Landlord and/or other Owners of portions of the Property, their employees and invitees. Landlord reserves the right to install kiosks and other free-standing structures within the Common Areas, and also reserves the right to make changes, alterations or additions at any time and from time to time in the size, shape, location, number and extent of the Common Areas, or any of them, so long as such changes, alterations or additions do not materially interfere with the Tenant's use and quiet enjoyment of the Premises, and no such change shall entitle Tenant to any abatement of rent, claim or allowance for any damages for injury or inconvenience to Tenant occasioned thereby.

11.2    Maintenance of Common Areas.  Landlord shall maintain the Common Areas in a neat, clean and orderly condition, properly lighted and landscaped as Landlord, in its reasonable discretion, shall determine. Tenant shall pay to Landlord in the manner set forth in Paragraph 11.3 (Payment of Common Areas Expenses) Tenant's pro rata share of the expenses (hereafter "Common Areas Expenses") in connection with the maintenance and operation of the Common Areas. Tenant's pro rata share of Common Areas Expenses shall be the percentage share set forth in

Tenant's Initials
© Stephen J. Patch

LEASE – OFFICE BUILDING

Landlord's Initials

Item 3(e) of the Basic Lease Provisions. If applicable, those common area charges that are attributable to retail operations shall be allocated solely among the retail spaces in the Property as opposed to the office spaces. Tenant's share of Common Areas Expenses shall also include any additional costs arising from special requirements created by Tenant's use of the Premises. Common Areas Expenses shall include, but shall not be limited to, (a) all sums expended and costs incurred in connection with the Common Areas for maintenance, landscaping, pest control, lighting, cleaning, trash removal, painting, restriping, repaving, resurfacing, sweeping, security, fire protection, sprinkler and irrigation systems; maintenance and repair of sidewalks, curbs and signs (which Tenant or other occupants of the Property are not obligated to repair); (b) operating, managing, policing, insuring, repairing and maintaining the Property and maintaining repairing and replacing roofs of the buildings in the Property; (c) operating, insuring, repairing, replacing and maintaining the "Common Utility Facilities" defined to include, but not limited to, sanitary sewer lines and systems, gas lines and systems, water lines and systems, fire protection lines and systems, electric power, telephone and communication main lines and systems, HVAC equipment and systems, storm drainage and retention facilities and all other utility main lines and systems not exclusively serving the premises of any specific tenant; (d) parking charges, surcharges and other levies, assessments, or any other costs imposed or assessed by any local, state or federal government agencies in connection with the use of the parking facilities and/or the Common Utility Facilities, real and personal property taxes and assessments on the improvements and land comprising the Common Areas, depreciation and maintenance on operating machinery and equipment (if owned) and rental paid for such machinery and equipment (if rented) which machinery and equipment is used solely for the operation and maintenance of the Property; and (e) public liability and property damage insurance on the Common Areas and Common Facilities, fire with extended coverage insurance with vandalism and malicious mischief endorsements with, at Owner's option, earthquake damage and/or hazardous waste endorsements, rental loss coverage and any additional coverages required pursuant to Paragraph 8.1. In the event that any alteration, removal, replacement or repair is required to be made to any equipment or any portion of the Property pursuant to governmental authority, statute, law or court order, all expenses associated therewith shall be included in Common Areas Expenses unless such expenses are born by a specific tenant or occupant of the Property. Common Area Expenses shall include property management costs; Property Management Costs shall not exceed ten percent (10%) of the gross base rents received for the entire Property.

11.3    Payment of Common Areas Expenses. Prior to the commencement of each lease year or such other annual accounting period as Landlord shall utilize from time to time, Landlord shall give Tenant a written estimate of the Additional Rent payable by Tenant during the coming year. Tenant shall pay such estimated amount to Landlord in equal monthly installments, in advance, at the same time the Base Monthly Rent is paid. Within ninety (90) days after the end of each lease year, or such other annual accounting period as Landlord shall utilize from time to time, Landlord shall furnish to Tenant a statement showing in reasonable detail the actual costs incurred by Landlord for the operation and maintenance of the Property during the year then ended, and Tenant shall pay to Landlord Tenant's proportionate share of the cost incurred in excess of the payments of Additional Rent made by Tenant within ten (10) days of receipt of such statement. In the event that the payments of Additional Rent made by Tenant exceed Tenant's share of the actual cost of the operation and maintenance of the Property, the amount of any such excess shall be credited by Landlord to the Additional Rent next due and owing; provided, however, that, if the Lease term has expired, Landlord shall accompany said statement with the amount due to Tenant. Notwithstanding the foregoing, Landlord shall have the right to submit statements to Tenant for unbudgeted Common Area Expenses incurred on an emergency basis, and Tenant shall remit payment on such statements for its pro rata share of such Common Area Expenses within thirty (30) days of receipt of same. Tenant hereby acknowledges that major tenants and tenants of kiosks and similar structures, may not pay Common Area Expenses and other Additional Rent charges on the same basis as Tenant herein.

11.4    Use of Common Areas. Tenant shall have for its use and benefit the nonexclusive right in common with Landlord and future Owners, other Occupants of the Property, and their agents, employees, customers, invitees, licensees and sublessees to use the Common Areas from time to time existing during the entire term of this Lease, or any extension thereof, for ingress and egress, roadway, automobile parking and sidewalks. Tenant shall not use any portion of the Common Area for any purpose, other than as set forth herein, without the prior written consent of Landlord, which consent may be withheld in its sole and absolute discretion.

Tenant's Initials
© Stephen J. Fitch

Landlord's Initials

12.    SIGNS AND ADVERTISING:

12.1    Tenant shall not place any sign upon the Premises or the Office Building or any roof thereof, without Landlord's prior written consent. Notwithstanding the foregoing, Tenant shall have the right, subject to Landlord's written approval of the plans, at Tenant's sole cost and expense, to install a sign on the exterior of the top of the Office Building, provided Tenant complies with all laws, orders, rules and regulations of all governmental authorities having jurisdiction and otherwise complies with all of the covenants, agreements, terms, provisions and conditions of this Lease. Tenant shall send a copy to Landlord, for Landlord's files, any and all permits necessary for the above.

12.2    Prohibited Advertising.

(a)    Tenant shall not, without Landlord's written consent, install any exterior lighting, amplifiers or similar devices or use in, upon or about the Premises any advertising media which maybe heard or seen outside the Premises, such as flashing lights, search lights, loudspeakers, phonographs or radio broadcasts. Landlord may withhold its consent in its sole and absolute discretion.

(b)    Tenant shall not, without Landlord's written consent, which may be withheld in its sole and absolute discretion, solicit business in the Common Areas, nor distribute any hand bills or other advertising matter in the Common Areas.

13.    ENTRY BY LANDLORD:

13.1    Permitted Entry by Landlord. Landlord and its agents may enter the Premises at any reasonable time upon reasonable notice to Tenant, or immediately in the case of an emergency, for the purpose of inspecting the same, for the purpose of maintaining the Property and for the purpose of making repairs, alterations, or additions to any portion of the Property, including the erection and maintenance of such scaffolding, canopies, fences, and props as may be required, or for the purpose of posting notices of non-responsibility for alterations, additions, or repairs. Landlord may, at any time during the last sixty (60) days of the term of this Lease, enter the Premises during normal business hours to place any usual or ordinary "For Leases" signs and/or to show the Premises to prospective lessees.

14.    ASSIGNMENT AND SUBLETTING:

14.1    Consent Required. Notwithstanding anything to the contrary contained in this Lease, Tenant shall not assign this Lease or any interest herein or sublet, license, grant any concession or otherwise give permission to anyone other than Tenant to use or occupy all or any part of the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld. Any attempted assignment, subletting, license or concession agreement or change of ownership without Landlord's written consent shall be void and shall confer no rights upon any third person. Without in any way limiting Landlord's right to refuse to give such consent for any other reason or reasons, Tenant agrees that it would not be commercially unreasonable to withhold consent. If in Landlord's reasonable business judgment (a) the financial worth as adjusted for inflation and/or net current assets of the proposed new Tenant is less than that of the Tenant executing this Lease or of Tenant and Tenant's Guarantor, as the case may be, (b) the transferee is not of a character or is not engaged in a business which is in keeping with the standards of Landlord for the Premises or the Property, (c) the operation of the transferee's business will interfere with or be in competition to or violate any restriction or exclusive right given in or contrary to any lease or use of any other tenant or occupant in the Property, or potential tenant with whom Landlord is negotiating, or (d) the use of the proposed new Tenant may increase the risk of the use, release or mishandling of Hazardous Materials; or (e) the purpose for which the transferee intends to use the Premises is different from that of Tenant in violation of this Lease or other requirements of the Property. Landlord shall require a reasonable payment, including attorney's fees, of not less than One Thousand Five Hundred Dollars ($1,500.00), to cover its handling charges for each assignment or sublease it is requested to approve. The sale, assignment, transfer or disposition, whether for value, by operation of law, gift, will or intestacy, of (i) twenty-five percent (25%) or more of the issued and outstanding stock of Tenant if Tenant is a corporation, or (ii) the interest of any general partner, joint venturer, associate or co-tenant, if Tenant is

EXHIBIT W
PAGE 852

a partnership, joint venture, association or co-tenancy, or (iii) the alienation, hypothecation, encumbrance, mortgaging or other transfer of Tenant's interest in this Lease or in the Premises, shall be deemed an assignment of this Lease under this Paragraph. Notwithstanding the foregoing Tenant shall have a onetime right during the first three years of the Lease to an assignment of this Lease as part of a merger of Tenant with another non-profit corporation.

14.2    General Conditions. In the event of any approved assignment or sublease of this Lease, Tenant shall remain primarily liable on its covenants hereunder for the entire term of any approved sublease. In the event of any assignment or sublease, the assignee or sublessee shall agree in writing to perform and be bound by all of the covenants of this Lease required to be performed by Tenant, including without limitation all prior, past due and future obligations of Tenant. Tenant agrees that any options to extend the term of this Lease are not assignable to a subtenant and further agrees that Tenant cannot exercise any option to extend the term of this Lease If a sublessee is in possession of the Premises at the time of the exercise of the option. If Landlord so elects during the term of this Lease, Landlord may require, and Tenant hereby consents to assignee or subtenant paying the Base Monthly Rent and Additional Rent, and in the event of sublease the Landlord's portion of the above-mentioned increase, directly to Landlord. Notwithstanding the foregoing, the receipt and retention by Landlord of any rent payment by a proposed assignee or subtenant shall not constitute consent to such assignment or sublease unless specified in writing by Landlord.

14.3    Requirements. If Tenant desires at any time to assign this Lease or to sublet the Premises or any portion thereof, it shall notify Landlord of its desire to do so and shall submit in writing to Landlord (a) the name of the proposed subtenant or assignee; (b) the nature of the proposed subtenant's or assignee's business to be carried on in the Premises; (c) the terms and provisions of the proposed sublease or assignment, including copies of any and all documents and instruments; (d) a current financial statement of the proposed subtenant or assignee and of any additional guarantor proposed for such assignment or subletting; (e) a business plan prepared by the proposed subtenant or assignee for the remainder of the term of the Lease; (f) a drawing depicting the proposed sign; and (g) such other information, financial or otherwise, as Landlord may request concerning the proposed subtenant or assignee. As provided in Paragraph 14.1, any request for Landlord's approval of a sublease or assignment shall be accompanied with a check in such reasonable amount as Landlord shall advise for the cost of review and/or preparation of any documents relating to such proposed transfer. Furthermore, Tenant and the proposed subtenant or assignee shall agree that Landlord shall have the right to enforce any and all of the terms of the sublease, as well as of the Lease, directly against such subtenant or assignee.

14.4    Election. At any time within fifteen (15) days after Landlord's receipt of the Information specified in Paragraph 14.3 above, Landlord may by written notice to Tenant elect to either: (a) accept the proposed assignment or sublease of the Premises or the portion thereof as shall be specified in said notice upon the same terms as those offered to the proposed subtenant or assignee, as the case may be; or (b) disapprove and reject the proposed assignment or sublease. If Landlord does not provide notice or rejection or disapproval within said fifteen (15) day period, then the proposed assignment or sublease shall be deemed approved. If Landlord rejects the proposed assignment or sublease, Landlord shall have the right to terminate this Lease; provided, however, Tenant shall have the right to withdraw the proposed assignment or sublease assignment within ten (10) days of Landlord's notice of rejection and termination given pursuant to this Paragraph 14.4, and Tenant shall remain in possession under the terms of this Lease. Any consent given to a proposed assignment or sublease shall not be deemed to be a consent to any future assignment or sublease.

14.5    Bankruptcy.

(a)    If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. Section 101, et seq. (the "Bankruptcy Code"), any and all monies or other consideration payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, shall be the exclusive property of Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code. Any and all monies or other consideration constituting Landlord's property under the preceding sentence not be paid or delivered to Landlord, shall be held in trust for the

Tenant's Initials
© Stephen J Futch

LEASE – OFFICE BUILDING

Landlord's Initials

Page 15 of 27

benefit of Landlord and shall be promptly paid or delivered to Landlord.

(b)    Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment. Any such assignee shall upon demand execute and deliver to Landlord an instrument confirming such assumption.

(c)    This is a lease of real property in a center within the meaning of Section 365(b)(3) of the Bankruptcy Code.

14.6    Limitation of Remedy. Tenant acknowledges and agrees that each of the rights of Landlord set forth in Paragraphs 14.1-14.5 are reasonable restrictions on subletting and assignment for purposes of California Civil Code Section 1951.4, and Landlord shall have no liability to Tenant or to any proposed transferee of Tenant for any damages if it is adjudicated that Landlord's consent has been unreasonably withheld. Tenant's sole remedy shall be to have the proposed assignment or sublease declared valid.

15.    ABANDONMENT:

15.1    Tenant's Abandonment Prohibited. Absent Tenant's prior written notice to Landlord and Landlord's written approval thereof, which may be withheld in its sole and absolute discretion, Tenant shall not vacate or abandon the Premises any time during the term of this Lease nor permit the Premises to remain unoccupied for a period of longer than fifteen (15) consecutive days during the term of this Lease. If Tenant shall abandon, vacate, or surrender the Premises, or be dispossessed by process of law, or otherwise, any personal property or trade fixtures belonging to Tenant and left on the Premises shall, at the option of Landlord, be deemed abandoned. In such case, Landlord may dispose of said personal property in any manner as permitted by applicable law and is hereby relieved of all liability for doing so. These provisions shall not apply if the Premises should be closed and business temporarily discontinued therein on account of strikes, lockouts, or similar causes (other than those of a financial nature) beyond the reasonable control of Tenant.

16.    BREACH BY TENANT:

16.1    Events of Default. The occurrence of any of the following shall constitute a default, and if such default is not timely cured shall constitute a material breach of this Lease, by Tenant:

(a)    The failure of Tenant to pay or cause to be paid when due any rent, monies, or charges required by this Lease to be paid by Tenant when such failure continues for a period of three (3) days after written notice thereof from Landlord to Tenant; or

(b)    The abandonment of the Premises by Tenant within the meaning of Paragraph 15.1; or

(c)    The failure of Tenant to do or cause to be done any material act, other than payment of rent, monies or charges, required by this Lease; or

(d)    Tenant causing, permitting, or suffering, without the prior written consent of Landlord, any material act when this Lease requires Landlord's prior written consent or prohibits such act; or

(e)    The occurrence of any event of insolvency or bankruptcy with respect to Tenant, including any of the following by way of illustration:

(1)    Any general assignment or general arrangement for the benefit of creditors;

(2)    The filing of any petition by or against Tenant to have Tenant adjudged a bankrupt or a petition for reorganization or arrangement under any law relating to bankruptcy, unless such petition is

LEASE – OFFICE BUILDING

Tenant's Initials
© Stephen J Fitch

Landlord's Initials

Page 16 of 27

EXHIBIT W
PAGE 854

filed against Tenant and the same is dismissed within sixty (60) days;

(3)     The appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located in the Premises or of Tenant's interest in this Lease; or;

(4)     The attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease.

(f)     The falsification of any written report or statement required to be given by Tenant to Landlord under this Lease.

16.2     No Waiver. The acceptance by Landlord of any partial payment of rent due hereunder after breach by Tenant will not constitute a waiver of such breach, unless a written statement to that effect signed by Landlord has been delivered to Tenant.

17.     REMEDIES UPON BREACH:

17.1     Landlord's Remedies. In the event of any breach by Tenant, in addition to other rights or remedies of Landlord at law or in equity, Landlord shall have the right to exercise any one or more of the following remedies:

(a)     Collect Rent Without Terminating Lease. Landlord may recover from Tenant the rent as it becomes due and any other amount necessary to compensate Landlord for all detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom. Landlord may sue monthly, annually or after such equal or unequal periods as Landlord desires for amounts due under this subparagraph (a). The right to collect rent as it becomes due shall terminate upon the termination by Landlord of Tenant's right to possession of the Premises. Tenant's right to possession shall not be terminated unless and until Landlord delivers to Tenant written notice thereof.

(b)     Terminate Lease. Landlord an alternative to exercising the remedies set forth in Paragraph 17.1 (a), may terminate Tenant's right to possession of the Premises by and upon delivery to Tenant of written notice of termination. Landlord shall then immediately reenter the Premises and take possession thereof pursuant to legal proceedings and remove all persons and property from the Premises. Such property may be removed and stored in a public warehouse or elsewhere at the cost of and for the account of Tenant. No notice of termination shall be necessary in the event that Tenant has abandoned the Premises. In the event that Landlord elects to terminate Tenant's right of possession, Landlord may recover all of the following:

(1)     The worth at the time of award of the unpaid rent which had been earned at the time of termination. "Worth at the time of award" shall be computed by allowing interest at ten percent (10%) per annum, or the highest rate allowed at law, whichever is less, from the first day the breach occurs;

(2)     The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Tenant proves could have been reasonably avoided. Worth at the time of award" shall be determined by allowing interest at the rate of ten percent (10%) per annum, or the highest rate allowed at law, whichever is less, from the first day a breach occurs;

(3)     The worth at the time of award by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Tenant proves could be reasonably avoided. "Worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award, plus one percent (1%);

(4)     Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under the Lease or which in the ordinary course of events would be likely to result therefrom including, but not limited to, expenses of reletting, attorney's fees, costs of

LEASE – OFFICE BUILDING

Tenant's Initials
© Stephen J Pilch

Landlord's Initials

alterations and repairs, recording fees, filing fees and any other expenses customarily resulting from obtaining possession of leased Premises and releasing.

17.2    Landlord's Right to Cure. In the event of breach, default, or noncompliance under this Lease by Landlord, Tenant shall, before exercising any right or remedy available to it, give Landlord written notice of the claimed breach, or noncompliance in reasonable detail, setting forth the necessary actions to be taken to cure such default. If, prior to its giving such notice, Tenant has been noticed in writing (by way of Notice of Assignment of Rents and Leases or otherwise) of the address of a lender which has furnished any financing to Landlord or is a beneficiary of any deed of trust recorded against the Premises or the Property, then concurrently with giving the aforesaid notice to Landlord, Tenant shall, pursuant to the manner of giving notice set forth in Paragraph 30.9 below, transmit a copy thereof to such lender or lenders. For thirty (30) days following the receipt of the notice by Landlord, Landlord shall have the right to cure such breach or to commence the cure if more than thirty (30) days is reasonably required to affect such cure, so long as Landlord shall thereafter diligently pursue such cure to a completion. If Landlord has failed to commence the cure within such thirty (30) day period, then Tenant shall so notify Landlord's lender or lenders and provide any such lender with an additional thirty (30) days to effect such cure, so long as any such lender shall thereafter diligently pursue such cure to a completion, (including, but not limited to, commencement and prosecution of proceedings to foreclose or otherwise exercise its rights under its mortgage or other security instrument, if necessary to effect such cure), in which event this Lease shall not be terminated by Tenant so long as such actions or remedies are being diligently pursued by said lender. If the default is cured by Landlord or lender as provided above, Tenant shall have no other remedy available to it and this Lease shall remain in full force and effect. If Landlord, or lender as provided herein, fails to cure the breach, default or noncompliance as set forth herein Tenant shall have the right to terminate the Lease upon sixty (60) day notice to Landlord and lender after the expiration of the applicable time frames to cure.

18.    DAMAGE OR DESTRUCTION:

18.1    Destruction In Whole or Part  In the event that the Premises is partially or completely damaged or destroyed or declared unsafe or unfit for occupation by any authorized public authority for any reason other than Tenant's acts, use or occupation, which declaration requires repairs to either the Premises or the building in which the Premises are located, the rights and obligations of Tenant and Landlord shall be as follows:

(a)    If the damage is covered under the form of property insurance carried by Landlord, and sufficient insurance proceeds are available to make all necessary repairs, Landlord shall repair such damage as soon as is reasonably possible and this Lease shall continue in full force and effect.

(b)    In the event that such damage is not covered, or is "under insured" by the form of property insurance carried by Landlord, Landlord shall repair such damage; provided, however, that if such damage or destruction exceeds thirty percent (30%) of the then replacement value of the improvements on the Premises (exclusive of trade fixtures, equipment and foundations), Landlord shall have no obligation to repair such damage. If Landlord elects not to repair such damage Tenant shall have the right to terminate the Lease upon sixty (60) day notice to Landlord and lender.

(c)    Notwithstanding anything contained herein above, (1) if the Premises are damaged or destroyed to any extent during the last twelve (12) months of the term of this Lease, (2) if the uninsured portion of such damage exceeds thirty percent (30%) of the then replacement value of the building of which the Premises constitute all or a part, or (3) if over fifty percent (50%) of the Premises shall be damaged or destroyed at any time whether such casualty is insured or not, Landlord may, at Landlord's option, cancel and terminate this Lease by delivery of written notice to Tenant to so terminate. Said written notice shall be made within ninety (90) days after the date of occurrence of such damage or destruction and shall be effective as of the date of such notice. If notice is not given within said ninety (90) day period, Landlord shall be deemed to have elected to restore the damage or destruction and shall repair such damage as soon as reasonably possible. If the above occurs and Landlord does not elect to terminate or repair than Tenant shall have the right to terminate the Lease upon sixty (60) day notice to Landlord and lender.

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

Page 18 of 27

18.2    Rent Abatement. If Landlord elects or is required to make repairs to the Premises, pursuant to Paragraph 18.1 above, Tenant shall be entitled to a reduction in the Base Monthly Rent during the time in which the repairs are being made to the extent to which Tenant's use of the Premises is impaired. Wherever the Lease provides for rent abatement, that phrase shall mean Base Monthly Rent and Additional Rent. All rent abatement shall terminate upon the substantial completion of such repair or restoration.

18.3    Restoration of Tenant's Property. Landlord's obligation to restore shall not include the restoration or replacement of Tenant's trade fixtures, equipment, merchandise or any improvements or alterations made by Tenant to the Premises. Tenant shall restore and replace the same in the event that Landlord is obligated or elects to repair any damage or destruction of the Premises.

19.    CONDEMNATION:

19.1    General. If the Premises or any portion thereof are taken under the power of eminent domain, or sold by Landlord under the threat of the exercise of such power, this Lease shall terminate as to the part so taken as of the date that the condemning authority takes possession of the Premises. If more than twenty-five percent (25%) of the Premises is taken or sold under such threat, either Landlord or Tenant may terminate this Lease as of the date that the condemning authority takes possession by delivery of written notice of such election within twenty (20) days after such party has been notified of the taking or, in the absence thereof, within twenty (20) days after the condemning authority shall have taken possession.

19.2    Continuation of Lease After Condemnation. If this Lease is not terminated by Landlord or Tenant, it shall remain in full force and effect as to the portion of the Premises remaining; provided, however, that the Base Monthly Rent and Tenant's share of Common Areas Expenses shall be reduced in proportion to the reduction of the Gross Floor Area of the Premises. In such event, Landlord shall, at Landlord's expense, restore the Premises to a complete unit of like quality and character, except as to size, as existed prior to the date on which the condemning authority took possession. If more than twenty-five percent (25%) of the Premises is taken under the power of eminent domain, or sold by Landlord under the threat of the exercise of such power than Tenant shall have the right to terminate the Lease upon sixty (60) day notice to Landlord and lender.

19.3    Allocation of Condemnation Award. All awards for the taking of any part of the Premises or proceeds from the sale made under the threat of the exercise of the Power of eminent domain shall be the property of Landlord, whether made as compensation for diminution of value of the leasehold estate, for the taking of the fee, or as severance damage; provided, however, that Tenant shall be entitled to any award for loss of or damage to Tenant's trade fixtures, and removable personal property which is separately stated within such award. Any other claim of Tenant relative to this Paragraph 19.3 shall not diminish Landlord's recovery in any respect.

20.    SURRENDER OF LEASE:

20.1    Effect of Surrender. The voluntary or other surrender or a mutual cancellation of this Lease by Tenant shall not work a merger, and shall, at the election of Landlord, either terminate all or any existing subleases or sub-tenancies or may operate as an assignment to it of any or all of such subleases or sub-tenancies. Landlord shall exercise its election within thirty (30) days of the event so requiring.

21.    ATTORNEY'S FEES:

21.1    Attorney's Fees. If Landlord is involuntarily made a party defendant to any litigation relating to this Lease or the Premises by reason of any act or omission of Tenant, then Tenant shall defend, protect and hold Landlord harmless from any loss, cost or expense, including reasonable attorney's fees, arising out of or relating to any such litigation. In the event of any legal action or proceeding between the parties, the ultimately prevailing party shall be entitled to reasonable attorney's fees and expenses as a part of the judgment resulting therefrom.

Tenant's Initials
© Stephen J. Fitch

Landlord's Initials

22.    SALE, EXCHANGE OR MASTER LEASE OF THE PREMISES BY LANDLORD:

22.1    Landlord's Residual Liability. Notwithstanding any other provisions of this Lease, Landlord may assign, in whole or in part, Landlord's interest in this Lease and may sell, exchange or master lease all or part of the real estate of which the Premises are a part. In the event of any sale or exchange of the Premises by Landlord and assignment by Landlord of this Lease, Landlord shall be and is hereby entirely freed and relieved of all liability under any and all covenants and obligations contained in or derived from this Lease or arising out of any act, occurrence or omission relating to the Premises which occurs after the consummation of such sale, exchange, or assignment. Landlord shall provide Tenant with notice of any assignment, sale, exchange or masterlease.

23.    QUIET ENJOYMENT

23.1    Landlord's Covenant. If Tenant is not in breach under the covenants made in this Lease and has satisfactorily attorned to any successor in interest to Landlord or any lender of Landlord as provided in Article 25, Landlord covenants that Tenant shall have peaceful and quiet enjoyment of the Premises without hindrance on the part of Landlord. Landlord will defend Tenant in the peaceful and quiet enjoyment of the Premises against claims of all persons claiming through or under the Landlord.

24.    ESTOPPEL CERTIFICATES:

24.1    Tenant's Obligation. Tenant shall at any time during the term of this Lease, within five (5) business days of receipt of written notice from Landlord, execute and deliver to Landlord a statement in a form acceptable to Landlord in writing certifying that this Lease is unmodified and in full force and effect or, if modified, stating the nature of such modification. Tenant's statement shall include other commercially reasonable information and details requested by Landlord, such as the date to which rent and other charges are paid, Tenant's knowledge concerning any uncured defaults with respect to Landlord's obligations under this Lease and the nature of such defaults if they are claimed. Any such statement may be relied upon conclusively by any prospective purchaser or lender of the Premises. Should Tenant shall fail to timely deliver such estoppel certificate to Landlord, Tenant agrees that such failure shall be conclusive upon Tenant that this Lease is in full force and effect, except to the extent any modification has been represented by Landlord, and that there are no uncured defaults in the Landlord's performance, and that not more than one month's rent has been paid inadvance.

25.    SUBORDINATION; ATTORNMENT; NON-DISTURBANCE:

25.1    Subordination of Lease to Landlord's Financing. Except as otherwise provided herein, this Lease is hereby made subordinate to the lien of any mortgage or deed of trust to any bank, insurance company or other lending institution, now or hereafter in force against the real property of which the Premises constitute a part, and to all advances made or hereafter made upon the security thereof ("Security Instrument"). Any holder of a Security Interest at any time existing or encumbering the Landlord's interest in the Property may, at its option, subordinate its Security Interest to this Lease.

25.2    Attornment by Tenant. In the event of the sale or assignment of Landlord's interest in the Property of which the Premises are a part, or in the event any proceedings are brought for foreclosure, or in the event of the exercise of the power of sale under any mortgage or deed of trust made by Landlord covering the Premises, Tenant shall, subject to the non-disturbance provisions of Paragraph 25.5 below, attorn to the purchaser or assignee upon any such foreclosure or sale or assignment and recognize such purchaser or assignee as Landlord under this Lease.

25.3    Subordination of Lease to Certain Agreements with Third Parties. Tenant hereby subordinates its rights hereunder to any Declaration of Restrictions and Grant of Easements or any other operation and reciprocal easement agreement, or any amendments thereto, for access and parking between Landlord and the Owner(s) of any property located within or adjacent to the Property whenever, in the reasonable discretion of Landlord, it is determined that any such agreement would be beneficial to the use and operation of the Property.

EXHIBIT W
PAGE 858

25.4    Execution of Documents  Tenant, upon request of any party in interest, shall execute promptly such instruments and certificates, to carry out the intent of Articles 24 and 25. If, within ten (10) days after the date of a written request by Landlord to execute such instruments, Tenant shall not have executed the same, Tenant shall be deemed to have irrevocably appointed Landlord as attorney-in-fact for Tenant with full power and authority to execute and deliver in the name of Tenant any such instruments, certificates, and/or documents.

25.5    Non-Disturbance.  With respect to any Security Instrument entered into by Landlord after execution of this Lease, and with respect to any requested attornment by Tenant per Paragraph 25.2 above, Tenant's subordination of this Lease, and Tenant's attornment, shall be subject to receiving a commercially reasonable non-disturbance agreement ("Non-Disturbance Agreement") from the holder of such Security Instrument, or purchaser or assignee of Landlord, which Non-Disturbance Agreement shall provide that Tenant's possession of the Premises, and this Lease and options to extend the term hereof, will not be disturbed so long as Tenant is not in breach under the Lease and attorns to the record owner of the Premises.

26.    HOLDING OVER; SURRENDER:

26.1    Effect of Holding Over.  If Tenant remains in possession of the Premises after the expiration of the term of this Lease, including options, if applicable, without executing a new Lease, or after Landlord has declared a forfeiture by reason of a material breach by Tenant, then such holding over shall be construed as a tenancy from month to month, subject to all the conditions, provisions and obligations of this Lease insofar as they are applicable to a month-to-month tenancy. The Base Monthly Rent payable during any period of holding over should be equal to one hundred five percent (105%) of the Base Monthly Rent payable during the period immediately preceding Tenant's holding over, and all Percentage Rent and Additional Rent payments shall also be made as specified within this Lease.

26.2    Surrender of Premises.  At the expiration of this Lease, Tenant shall surrender the Premises in the same condition as it was upon delivery of possession thereto under this Lease, reasonable wear and tear excepted, and shall deliver all keys to Landlord. Before surrendering the Premises, Tenant shall, at its sole cost and expense, remove all of its personal property and trade fixtures and such alterations or additions to the Premises made by Tenant as may be specified for removal by Landlord, and shall repair any damage caused by such property or the removal thereof. If Tenant fails to remove its personal property and fixtures upon the expiration of this Lease, the same shall be deemed abandoned and shall become the property of Landlord.

27.    LIMITATION OF LIABILITY:

27.1    Agreement by Tenant.

(a)    In consideration of the execution of this Lease by Landlord, Tenant agrees in the event of any actual or alleged failure, breach, or default hereunder by Landlord: (1) The sole and exclusive remedy shall be against the partnership and its partnership assets; (2) no partner of Landlord should be sued or named as a party in any suit or action (except as may be necessary to secure jurisdiction of the partnership); and (3) no judgment will be taken against any partner of Landlord. These covenants and agreements are enforceable both by Landlord and also by any partner of Landlord.

(b)    Tenant agrees that each of the foregoing covenants and agreements shall be applicable to any covenant or agreement either expressly contained in this Lease or imposed by statute or at common law.

28.    LIABILITY OF SUCCESSORS:

28.1    Inurement.  The covenants and conditions herein contained shall, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators and assigns of all of the parties hereto and all of the parties hereto shall be jointly and severally liable for the covenants contained herein.

Tenant's Initials
© Stephen J. Fitch

LEASE – OFFICE BUILDING

Landlord's Initials

EXHIBIT W
PAGE 859

29.   MISCELLANEOUS PROVISIONS:

29.1   Gender and Number. Whenever the singular number is used in this Lease, the same shall include the plural, and the masculine shall include the feminine and neuter gender; and the word "person" shall include corporation, firm or association, when required by the context.

29.2   Captions. The headings or titles to the articles and paragraphs of this Lease are for convenience only and do not in any way define, limit or construe the contents of such articles and paragraphs.

29.3   Entire Agreement. This Lease and its exhibits contain all of the agreements and conditions made between the parties with respect to the leasing of the Premises. Landlord and Landlord's Real Estate Brokers make no warranty or representation with respect to any other tenants or owners which may or may not construct improvements, occupy or conduct business within the Property, and Tenant hereby acknowledges and agrees that it is not relying on any warranty or representation relating thereto in entering into this Lease. Landlord specifically disavows any oral representations made by or on behalf of its employees, agents, and independent contractors, other than the express terms of this Lease. Tenant hereby acknowledges and agrees that it is not relying on and will not rely on any oral representations in entering into this Lease. References upon the exhibits to potential tenants within the Property are to be considered generic and are not to be considered as specific representations that any particular company, firm, business enterprise will occupy a specific area within the Property. This Lease may not be amended, modified, or any of its provisions waived except by a written instrument signed by all the parties to this Lease.

29.4   Governing Law. The laws of the State of California shall govern the validity, performance and enforcement of this Lease.

29.5   Invalidity; Construction. If any provision of this Lease is determined to be void by any court of competent jurisdiction, such determination shall not affect any other provision of this Lease and such other provisions shall remain in full force and effect. If any provision of this Lease is capable of two constructions, one which would render the provision void and one which would render the provision valid, the provision shall be interpreted in the manner which would render it valid.

29.6   Payments. Except as may otherwise be expressly stated, each payment required to be made by Tenant shall be in addition to and not in substitution for other payments to be made by Tenant.

29.7   Time of Essence. Time is of the essence of each and every provision of this Lease.

29.8   Force Majeure. Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefore, governmental restrictions, regulations, or controls, enemy or hostile government action, civil commotion, fire or other casualty, and other causes (other than financial) beyond the reasonable control of the party obligated to perform, shall excuse the performance by such party for a period equal to that resulting from such prevention, delay or stoppage, except those obligations of Tenant to pay rent and other charges pursuant to the terms of this Lease.

29.9   Notices.

(a)   All notices to be given by one party to the other under this Lease shall be in writing, mailed or delivered to the other party at the addresses specified in Item 10 of the Basic Lease Provisions.

(b)   Mailed notices shall be sent by United States Postal Service, certified or registered mail, with return receipt requested, postage prepaid, or by other comparable commercial means, and shall be deemed to have been given two (2) days after the date posted by the United States Postal Service or on the date signed as received by such other comparable commercial service.

EXHIBIT W
PAGE 860

(c)    Either party may, by proper notice, at any time designate a different party and/or address to which notices shall be sent.

29.10   Brokers. Tenant warrants that it has had no dealings with any real estate broker or agent in connection with the negotiation and/or execution of the Lease, except the broker identified in Item 11 of the Basic Lease Provisions.

29.11   No Partnership. Notwithstanding any other provision of this Lease, Landlord does not by this Lease, in any manner nor for any purpose, become a partner or joint venturer of Tenant in the conduct of its business or otherwise. The provisions of this Lease relating to Percentage Rent and Additional Rent are included solely for the purpose of providing a method whereby such rent is to be measured and ascertained.

29.12   Fees and Permits. Tenant is responsible for the application, payment and approval of all fees, licenses and permits necessary to prepare for and complete the opening and continued operation of its business.

29.13   Rules and Regulations. Landlord reserves the right to make such reasonable rules and regulations as it deems appropriate, in its sole discretion, to provide for a more efficient and orderly operation of the Property. Tenant covenants and agrees to be bound by and to abide by all such rules and regulations immediately upon receipt of written notice of such rules and regulations from Landlord.

29.14   General Interpretation. The terms of this Lease have been negotiated by the parties hereto and the language used in this Lease shall be deemed to be the language chosen by the parties hereto to express their mutual intent. This Lease shall be construed without regard to any presumption or rule requiring construction against the party causing such instrument or any portion thereof to be drafted, or in favor of the party receiving a particular benefit under the Agreement. No rule of strict construction will be applied against any person.

29.15   Counterpart Signatures. This Lease may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Lease shall not be effective until the execution and delivery between each of the parties of at least one set of counterparts. The parties authorize each other to detach and combine original signature pages and consolidate them into a single identical original. Any one of such completely executed counterparts shall be sufficient proof of this Lease

29.16   Business Day Defined. "Business Day" means a day other than a Saturday, Sunday, or holiday on which banks, County offices, or U.S. Post Offices are closed in San Diego County; if a date or time period provided for in this Lease is or ends on a day other than a Business Day, then such date shall automatically be extended until the next Business Day.

30.      SPECIAL PROVISIONS:

30.1   Not An Offer. THE SUBMISSION OF THIS LEASE BY LANDLORD IS NOT AN OFFER AND THERE SHALL BE NO AGREEMENT OF ANY NATURE BETWEEN THE PARTIES THAT IS BINDING UPON ANY PARTY HERETO UNTIL THIS LEASE IS FULLY EXECUTED AND LANDLORD HAS CLOSED ESCROW TO PURCHASE PROPERTY. LANDLORD IS IN ESCROW TO PURCHASE THE PROPERTY ESCROW # SA-4983365 AT FIRST AMERICAN TITLE COMPANY. UPON LANDLORD CLOSING ESCROW TO PURCHASE THE PROPERTY THE COMMENCEMENT DATE SHALL BE MODIFIED TO BE THE DATE TITLE TO THE PROPERTY IS RECORDED IN THE NAME OF LANDLORD AND ALL DATES SHALL THEREAFTER RELATE TO REVISED COMMENCEMENT DATE.

30.2   Legal Representation. Landlord and Tenant each acknowledge, warrant and represent to the other that it has had an adequate opportunity to seek the advice of legal counsel of its choice prior to entering into this Lease, that such opportunity was undertaken or waived by the free and voluntary act of such party, and that each

Tenant's Initials
© Stephen J. Filch

LEASE – OFFICE BUILDING

Landlord's Initials

Page 23 of 27

party waives and covenants to forego and/or forebear from the assertion of any claim or defense that this Lease is not a valid and binding obligation upon it by reason of the failure to secure or receive adequate legal representation.

      30.3     General. By insertion of numbers in the following blanks, Landlord and Tenant acknowledge that Paragraph(s) N/A is/are attached hereto and made a part hereof. If numbers have not been set forth in the blank in this Paragraph 34.3, it is conclusive that no additional provisions are a part of this Lease.

      30.4     Non-Discrimination. The Tenant herein covenants by and for itself, its officers, directors, successors and assigns and all persons claiming under or through it, and this Lease is made and accepted upon and subject to the following conditions.

      There shall be no discrimination against or segregation of, any person or group of persons on account of race, color, creed, religion, sex, marital status, ancestry or national origin in the leasing, subleasing, transferring, use, occupancy, tenure, or enjoyment of the land herein leased nor shall the Tenant itself, or any person claiming under or through it, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, use or company of tenants, lessees, sublessees, subtenants or vendees in the Premises herein leased.

      30.5     Accessibility Inspection. Landlord ☐ has or ☒ has not had the Demised Premises inspected for disability access by a Certified Access Specialist ("CASp"). The CASp determined that the Property ☐ met or ☐ did not meet all applicable construction-related accessibility standards pursuant to California Civil Code Section 55.53.

      30.6     Energy Disclosure. Tenant acknowledges that the Premises are a newly constructed building and as such Landlord has no historical energy use for the Premises.

[Signatures on next page]

Tenant's Initials
© Stephen J. Fitch

Landlord's Initials

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

LANDLORD:                                   TENANT:

DRP Holdings, LLC.,                          BORREGO COMMUNITY HEALTH FOUNDATION
a California limited liability company        a California non-profit public benefit corporation

By: _____                  By: _____
Daryl R. Priest, Manager                      Name: _Bruce Hebets_
                                              Its: _CED_

EXHIBIT W
PAGE 863

EXHIBIT "A"

SITE PLAN

LEASE – OFFICE BUILDING

Tennnt's Initials
© Stephen J. Fitch

Landlord's Initials

EXHIBIT W
PAGE 864

## EXHIBIT "B"
## CONFIRMATION OF LEASE

THIS CONFIRMATION LEASE is made and agreed upon as of this____day of_____, 2016, by and between DRP Holdings, LLC, a California limited liability company ("Landlord"), and BORREGO COMMUNITY HEALTH FOUNDATION, a California non-profit public benefit corporation ("Tenant").

### WITNESSETH:

Landlord and Tenant have previously entered into a certain lease agreement dated December , 2015 ("Lease"), covering certain premises located at 750 East Main Street, Barstow, California, as more particularly described in the Lease ("Premises").

NOW, THEREFORE, in connection with the foregoing, the parties hereto mutually agree as follows:

1.      For the purpose of confirming the establishment of the Commencement Date, as required by the provisions of the Lease, Landlord and Tenant hereby agree that:

    a.      The date of_____, 2016, is hereby established as the "Commencement Date" referred to in the Lease;

    b.      The date of_____, 2016, is hereby established as the "Rent Commencement Date" referred to in the Lease, upon which Rent and all other items of payment commence to accrue;

    c.      The date of_____, 2046, is hereby established as the "Expiration Date" of the term of the Lease; and

2.      This Confirmation Agreement and each and all provisions hereof shall inure to the benefit of, or bind, as the case may require, the parties hereto and their respective heirs, successors and assigns.

IN WITNESS WHEREOF, the parties hereto have executed this instrument as of the date and year first written above.

LANDLORD:                                       TENANT:

DRP Holdings, LLC.,                             BORREGO COMMUNITY HEALTH FOUNDATION
a California limited liability company          a California non-profit public benefit corporation

By:_____                    By:_____
Daryl R. Priest, Manager                        Name:_____Bruce Hebets_____
                                                Its:_____CEO_____

EXHIBIT W
PAGE 865

## AMENDMENT NO. 1 TO LEASE

This AMENDMENT NO. 1 TO LEASE (this "Amendment No. 1") is made as of the 3ʳᵈ day of April, 2016, by and between DRP Holdings, LLC, a California limited liability company ("Landlord"), and BORREGO COMMUNITY HEALTH FOUNDATION, a California corporation ("Tenant").

### RECITALS

A.    Landlord and Tenant previously entered into that certain Commercial Lease dated as of February 2nd, 2016 ("Lease") with respect to the lease of 750 East Main Street, Barstow, California 92311 ("Premises").

B.    Landlord and Tenant desire to amend the terms of the Lease to increase the square footage of the lease, rent, and other terms as specifically set forth in this Amendment No. 1.

C.    All defined terms used herein but not defined herein shall have the meaning ascribed to such terms in the Lease.

D.    Landlord and Tenant now desire to enter into this Amendment No. 1 to amend the Lease as hereinafter provided.

### AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, notwithstanding anything in the Original Lease to the contrary:

1.    Section 3 of the BASIC LEASE PROVISIONS. Section 3 of the BASIC LEASE PROVISIONS - Premises shall be deleted in its entirety and replaced with the following:

*3. Premises*

*(a)    Area: Approximately 26,205 sq. ft. office building including approximately 100 parking spaces ("Office Building" or "Premises").*

*(b)    Location: The Premises commonly referred to as 750 East Main Street, Barstow, California, are depicted on Exhibit "A" attached hereto ("Property")*

2.    Section 6 of the BASIC LEASE PROVISIONS. Section 6 of the BASIC LEASE PROVISIONS - Rent shall be deleted in its entirety and replaced with the following:

*6  Rent:*

*(a)    Base Monthly Rent:  $104,820.00 per month, subject to adjustment as provided in Article 3.*

*(b)    Additional Rent. Taxes, Utilities, Insurance, Maintenance, Management and other Expenses shall be based on direct cost or consumption by Tenant or upon Tenant's share of such Expenses.*

*(c)    The "Rent Commencement Date" shall be earlier of (i) four (4) months from the date that Landlord acquires title to the Property or (ii) the date Tenant opens for business*

*(d)    "Tenant's Share" – 100%*



Tenant's Initials

Landlord's Initials EXHIBIT W
PAGE 866

3.      Section 1.3.      Section 1.3 of the Lease is hereby deleted and the following new Section 1.3 is hereby added in its place:

> 1.3 *Tenant Improvement Allowance*      Landlord shall provide a Tenant Improvement Allowance ("TI Allowance") in an amount not to exceed Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) for the construction of Tenant's Improvements of the Premises, which are to be fixed in the Premises and shall remain with the Premises. All such tenant improvements shall be pursuant to plans approved by Landlord. Tenant shall provide, at its sole cost, to Landlord upon execution of this Lease space plans for the Premises. Any revisions to the space plan shall be mutually agreed upon by the Parties.

> a      *Construction of Improvements.* The construction of Tenant's Improvements in the Premises shall be done in accordance with Section 5.1 of this Lease by licensed and insured contractors approved by Landlord.

> b.      *Payment of TI Allowance.* The TI Allowance shall be paid by Landlord to Tenant based on a mutually agreed upon construction draw schedule to be submitted by Tenant to Landlord for approval. Any amount not drawn under the draw schedule shall be paid to Tenant within thirty (30) days from the later to occur of: (1) Tenant opens for business in the Building; (2) the period allowed for the filing of mechanic's liens has expired or duly executed unconditional lien waivers from all contractors, subcontractors and material men who have performed work on behalf of Tenant at the Premises are presented to Landlord; and (3) the Tenant has provided to Landlord a Certificate of Occupancy, a copy of Tenant's Recorded Notice of Completion and a complete set of "as-built" construction documents for all work performed by Tenant and/or Tenant's contractors and subcontractors.

> In Landlord's sole discretion, Landlord may satisfy its obligations under this Section 1.3 by contracting with and paying directly a contractor of Landlord's choosing to complete the tenant improvements.

4.      Conflict.      In the event of any conflict between the Lease and this Amendment No. 1, this Amendment No. 1 shall prevail.  Except to the extent herein modified, the Lease, as modified by the Lease Amendments shall continue in full force and effect.

5.      Terms.      Except as specifically provided in this Amendment No. 1 all capitalized terms shall have the same meaning as defined in the Lease.

6.      Counterparts.      This Amendment No. 1 may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Amendment No. 1 as of the date first above written.

Landlord

DRP Holdings, LLC.,
a California limited liability company

By: _____
Daryl R. Priest, Manager

Tenant

BORREGO COMMUNITY HEALTH FOUNDATION
n California corporation

By: _____
Name: Bruce Hebets
Its: CEO

Tenant's Initials

2

Landlord's Initials

## LEASE ASSIGNMENT NO. 1

This LEASE ASSSIGNMENT NO.1 ("**Lease Assignment No. 1**") is executed the 29th day of August 2017 by and between DRP HOLDINGS, LLC, a California limited liability company ("**Assignor**") and INLAND VALLEY INVESTMENTS, LLC, a California limited liability company ("**Assignee**") for the Building Lease dated February 2, 2016 and further amended by Lease Amendment No. 1 dated April 3, 2016 collectively herein referred to as the Lease ("**Lease**") for the building located at 750 E. Main Street, Barstow, CA 92311 leased to BORREGO COMMUNITY HEALTH FOUNDATION, a California corporation ("**Tenant**").

### Agreement

Pursuant to section 22.1 of the Building Lease, Assignor hereby assigns its interest as Landlord in the lease to Assignee. This Lease Assignment No. 1 shall serve as notice to Tenant.

**Addresses for Notices and Payment of Rent:**

(a)     If to Landlord:        Inland Valley Investments, LLC
                               a California limited liability company
                               124 W. Main Street, Suite 240
                               El Cajon, CA 92020
                               Fax: (619) 444-8597
                               Attn: Daryl R. Priest
                               Email: daryl@dphomes.com

All other terms and conditions of the Lease remain the same.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Leas as of the day and year first above written.

ASSIGNOR:                                ASSIGNEE:

DRP HOLDINGS, LLC,                       INLAND VALLEY INVESTMENTS, LLC,
a California limited liability company   a California limited liability company

By: _____           By: _____
       Daryl R. Priest, Manager                 Daryl R. Priest, Manager

## AMENDMENT NO. 1 TO LEASE

This AMENDMENT NO. 1 TO LEASE (this "**Amendment No. 1**") is made as of the 3ʳᵈ day of April, 2016, by and between DRP Holdings, LLC, a California limited liability company ("**Landlord**"), and BORREGO COMMUNITY HEALTH FOUNDATION, a California corporation ("**Tenant**").

## R E C I T A L S

A.    Landlord and Tenant previously entered into that certain Commercial Lease dated as of February 2nd, 2016 ("**Lease**") with respect to the lease of 750 East Main Street, Barstow, California 92311 ("**Premises**").

B.    Landlord and Tenant desire to amend the terms of the Lease to increase the square footage of the lease, rent, and other terms as specifically set forth in this Amendment No. 1.

C.    All defined terms used herein but not defined herein shall have the meaning ascribed to such terms in the Lease.

D.    Landlord and Tenant now desire to enter into this Amendment No. 1 to amend the Lease as hereinafter provided.

## AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, notwithstanding anything in the Original Lease to the contrary:

1.    Section 3 of the BASIC LEASE PROVISIONS. Section 3 of the BASIC LEASE PROVISIONS - Premises shall be deleted in its entirety and replaced with the following:

*3. Premises:*

(a)    *Area: Approximately 26,205 sq. ft. office building including approximately 100 parking spaces ("Office Building" or "Premises").*

(b)    *Location: The Premises commonly referred to as 750 East Main Street, Barstow, California, are depicted on Exhibit "A" attached hereto ("Property").*

2.    Section 6 of the BASIC LEASE PROVISIONS. Section 6 of the BASIC LEASE PROVISIONS - Rent shall be deleted in its entirety and replaced with the following:

*6. Rent:*

(a)    *Base Monthly Rent: $104,820.00 per month, subject to adjustment as provided in Article 3.*

(b)    *Additional Rent: Taxes, Utilities, Insurance, Maintenance, Management and other Expenses shall be based on direct cost or consumption by Tenant or upon Tenant's share of such Expenses.*

(c)    *The "Rent Commencement Date" shall be earlier of (i) four (4) months from the date that Landlord acquires title to the Property or (ii) the date Tenant opens for business.*

(d)    *"Tenant's Share" – 100%*


Tenant's Initials

1


Landlord's Initials   EXHIBIT W
PAGE 869

3.     Section 1.3.     Section 1.3 of the Lease is hereby deleted and the following new Section 1.3 is hereby added in its place:

*1.3 Tenant Improvement Allowance.     Landlord shall provide a Tenant Improvement Allowance ("TI Allowance") in an amount not to exceed Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) for the construction of Tenant's improvements of the Premises, which are to be fixed in the Premises and shall remain with the Premises. All such tenant improvements shall be pursuant to plans approved by Landlord. Tenant shall provide, at its sole cost, to Landlord upon execution of this Lease space plans for the Premises. Any revisions to the space plan shall be mutually agreed upon by the Parties.*

*a.     Construction of Improvements. The construction of Tenant's improvements in the Premises shall be done in accordance with Section 5.1 of this Lease by licensed and insured contractors approved by Landlord.*

*b.     Payment of TI Allowance. The TI Allowance shall be paid by Landlord to Tenant based on a mutually agreed upon construction draw schedule to be submitted by Tenant to Landlord for approval. Any amount not drawn under the draw schedule shall be paid to Tenant within thirty (30) days from the later to occur of: (1) Tenant opens for business in the Building; (2) the period allowed for the filing of mechanic's liens has expired or duly executed unconditional lien waivers from all contractors, subcontractors and material men who have performed work on behalf of Tenant at the Premises are presented to Landlord; and (3) the Tenant has provided to Landlord a Certificate of Occupancy, a copy of Tenant's Recorded Notice of Completion and a complete set of "as-built" construction documents for all work performed by Tenant and/or Tenant's contractors and subcontractors.*

*In Landlord's sole discretion, Landlord may satisfy its obligations under this Section 1.3 by contracting with and paying directly a contractor of Landlord's choosing to complete the tenant improvements.*

4.     Conflict.     In the event of any conflict between the Lease and this Amendment No. 1, this Amendment No. 1 shall prevail. Except to the extent herein modified, the Lease, as modified by the Lease Amendments shall continue in full force and effect.

5.     Terms.     Except as specifically provided in this Amendment No. 1 all capitalized terms shall have the same meaning as defined in the Lease.

6.     Counterparts.     This Amendment No. 1 may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Amendment No. 1 as of the date first above written.

Landlord                          Tenant

DRP Holdings, LLC.,               BORREGO COMMUNITY HEALTH FOUNDATION
a California limited liability company      a California corporation

By:                               By:
Daryl R. Priest, Manager          Name:  Bruce Hebets
                                  Its:   CEO

Tenant's Initials                 2                 Landlord's Initials    EXHIBIT W
                                                                           PAGE 870