**EXHIBIT 2**

**E**

**X**

**H**

**I**

**B**

**I**

**T**

**2**

1 | JOSEPH R. LAMAGNA (State Bar No. 246850)
2 | JORDAN KEARNEY (State Bar No. 305483)
  | **HOOPER, LUNDY & BOOKMAN, P.C.**
3 | 101 W. Broadway, Suite 1200
  | San Diego, California 92101
  | Telephone: (619) 744-7300
4 | Facsimile: (619) 230-0987
  | E-Mail: jlamagna@health-law.com
5 |         jkearney@health-law.com

6 | DEVIN M. SENELICK (State Bar No. 221478)
  | TARYN A. REID (State Bar No. 328772)
7 | **HOOPER, LUNDY & BOOKMAN, P.C.**
  | 1875 Century Park East, Suite 1600
8 | Los Angeles, California 90067
  | Telephone: (310) 551-8111
9 | Facsimile: (310) 551-8181
  | E-Mail: dsenelick@health-law.com
10 |        treid@health-law.com

11 | Attorneys for Plaintiff Borrego
   | Community Health Foundation

12 |

13 | **UNITED STATES DISTRICT COURT**

14 | **SOUTHERN DISTRICT OF CALIFORNIA**

15 |

16 | BORREGO COMMUNITY HEALTH          Case No. 3:21-cv-01417-AJB-AGS
17 | FOUNDATION, a California nonprofit
   | public benefit corporation;          Hon. Anthony J. Battaglia

18 |              Plaintiff,

19 |        vs.                            **FOURTH AMENDED COMPLAINT**

20 |
21 | INLAND VALLEY INVESTMENTS,           Trial Date:        None Set
   | LLC, a California limited liability
22 | company; DRP HOLDINGS, LLC, a
   | California limited liability company;
23 | PROMENADE SQUARE, LLC, a
   | California limited liability company;
24 | KAREN HEBETS, an individual;
25 | MIKIA WALLIS, an individual;
   | DIANA THOMPSON, f/k/a DIANA
26 | TRONCOSO, an individual;
   | HARRY ILSLEY, an individual;
27 | DENNIS NOURSE, an individual;
   | MIKE HICKOK, an individual;
28 | CHUCK KIMBALL, an individual;

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PREMIER HEALTHCARE
MANAGEMENT, INC., a California
Corporation; SUMMIT HEALTHCARE
MANAGEMENT, INC., a California
Corporation; DARYL PRIEST, an
individual; NICHOLAS PRIEST, an
individual; TRAVIS LYON, an
individual; HUSAM E. ALDAIRI,
D.D.S., an individual; ALDAIRI DDS,
INC., a California corporation; AYED
HAWATMEH, D.D.S., an individual;
HAWATMEH DENTAL GROUP, P.C.,
a California Corporation; ALBORZ
MEHDIZADEH, D.D.S., an individual;
ALBORZ MEHDIZADEH, INC., a
California Corporation; JILBERT
BAKRAMIAN, D.D.S., an individual;
MOHAMMED ALTEKREETI, D.D.S.,
an individual; MAGALY VELASQUEZ,
D.D.S., an individual; MAGALY M.
VELASQUEZ DDS PROFESSIONAL
DENTAL CORP., a California
Corporation; ARAM ARAKELYAN,
D.D.S., an individual; NEW
MILLENNIUM DENTAL GROUP OF
ARAM ARAKELYAN, INC., a
California Corporation; MICHAEL
HOANG, D.M.D., an individual;
WALEED STEPHAN, D.D.S., an
individual; W.A. STEPHAN, A
DENTAL CORPORATION,
a California Corporation; SANTIAGO
ROJO, D.D.S., an individual;
SANTIAGO A. ROJO, D.D.S., INC., a
California Corporation; MARCELO
TOLEDO, D.D.S., an individual;
MARCELO TOLEDO, D.D.S., INC., a
California corporation; MARLENE
THOMPSON, D.D.S., an individual;
MARLENE THOMPSON, D.D.S., INC.,
a California Corporation; DOUGLAS
NESS, D.D.S., an individual; NESS
DENTAL CORPORATION, a California
Corporation; GEORGE JARED, D.D.S.,
an individual; GEORGE JARED, D.D.S.,
INC., a California corporation; JAMES
HEBETS, an individual; THE HEBETS

| | |
|---|---|
| 1 | COMPANY, a Missouri Corporation; |
| 2 | KBH HEALTHCARE CONSULTING, LLC and DOES 1-250, inclusive. |
| 3 | Defendants. |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

FOURTH AMENDED COMPLAINT

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION/SUMMARY ...................................................... 8

II.    JURISDICTION AND VENUE.................................................... 9

III.   CAST OF CHARACTERS ......................................................... 10

    A.     BORREGO COMMUNITY HEALTH FOUNDATION ................... 10

    B.     FORMER BORREGO INSIDERS ...................................... 11

    C.     PREMIER, PRIESTS AND OTHER PRIEST-RELATED ENTITIES ............................................................... 13

    D.     DEFENDANT DENTISTS............................................ 14

    E.     JAMES HEBETS AND HIS COMPANIES ............................ 18

    F.     OTHERS ............................................................ 19

    G.     ALTER EGO AND DOE ALLEGATIONS............................ 20

IV.    RULE 9(b) REQUIREMENTS ..................................................... 22

V.     THE SCHEMES THAT DAMAGED BORREGO HEALTH ..................... 23

    A.     The Scheme to Form and Sell Entities Formed by Borrego Insiders to Borrego Health (the "Borrego MSO/IPA Scheme").......... 23

    B.     The Scheme to Contract with Premier Allowing Premier to Get Paid Tens of Millions of Dollars to Purportedly Provide "Management Services" It Was Not Capable of Providing (the "Premier Scheme") .................................................... 25

        i.     The Contract Dental Program Is Formed ................... 25

        ii.    Hebets Proposes an MSO Idea, Which Is Rejected by Borrego Health............................................. 26

        iii.   The Borrego Health Insiders Enter into a Management Services Agreement on Borrego Health's Behalf Anyway ........ 29

        iv.    The Damages Suffered by Borrego Health Due to the Premier Scheme ......................................... 40

    C.     Certain Contract Dentists Submitted Fraudulent Bills with the Knowledge and Support of Premier and the Borrego Insiders (the "Fraudulent Dental Billing Scheme")................................ 43

        i.     Husam E. Aldairi, D.D.S. ................................. 48

        ii.    Ayed Hawatmeh, D.D.S. ................................. 54

iii.   Alborz Mehdizadeh, D.D.S. ........................................................58

iv.   Magaly M. Velasquez, D.D.S. ...................................................61

v.   Aram Arakelyan, D.D.S. ...........................................................65

vi.   Michael Hoang, D.M.D. ...........................................................67

vii.   Waleed Stephan, D.D.S. ...........................................................69

viii.   Santiago Rojo, D.D.S. ...............................................................70

ix.   Mohammed Al Tekreeti, D.D.S .................................................72

x.   Jilbert Bakramian, D.D.S. .........................................................73

xi.   Marcelo Toledo, D.D.S. .............................................................76

xii.   Marlene Thompson, D.D.S. .......................................................79

xiii.   Douglas Ness, D.D.S. ................................................................82

xiv.   George Jared, D.D.S. .................................................................84

D.   Since Premier Was Unable and Unwilling To, a Program Integrity Process is Implemented by Borrego Health ...........................86

E.   Premier and the Borrego Insiders Coverup Fraudulent Billing (the "Coverup Scheme") ...................................................................90

F.   The Borrego Insiders Entered into Leases with Daryl Priest-Owed Entities for Above Market Rents and Terms Many Times the Market Amount (the "Priest Leases Scheme") ..............................98

G.   The Borrego Insiders Paid Themselves Above-Market Compensation and Granted Themselves Improper Benefits and Covered It Up (the "Compensation/Benefits Scheme") ....................107

H.   The Borrego Insiders Used Nepotism and Cronyism to Funnel Money to their Friends and Family (the "Nepotism and Cronyism Scheme") ...............................................................110

I.   The Borrego Insiders Tried To Purchase a Country Club to Personally Benefit Themselves (the "De Anza Country Club Scheme") .....................................................................................112

J.   The Borrego Insiders Attempted to Pay Bruce Hebets a $5 Million Payout (the "Payout Scheme") .............................................115

K.   The Borrego Insiders Funneled Money to Bruce Hebets' Brother, Jim Hebets, and Jim Hebets' Firm (the "Jim Hebets Scheme") .........118

L.   Borrego Insider Chuck Kimball Leased a Barn to Borrego Health (the "Julian Barn Scheme") ...................................................121

M.   Borrego Insider Dennis Nourse Sold Property to Borrego Health to be Developed by Priest (the "Property Development Scheme").... 124

N.   Bruce Hebets and Karen Hebets Create a Sham "Consulting" Company and Contract with Premier To Obtain Payments From Premier for the Various Schemes Which Benefited the Premier Defendants (the "KBH Healthcare Consulting Scheme") ................. 128

VI.    CLEANING HOUSE .......................................................................... 131

VII.   CHAPTER 11 BANKRUPTCY .......................................................... 134

VIII.  THE RICO ENTERPRISE .................................................................. 135

A.   Facts Common To RICO Cause of Action .......................................... 138

B.   Racketeering Activity Distinct from Enterprise ................................. 139

C.   RICO Liability ................................................................................. 140

D.   Issuance of Constructive Trusts ....................................................... 147

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

7288673.3

**APPENDIX OF EXHIBITS**

| EXHIBIT | PAGES | DESCRIPTION |
|---|---|---|
| A | 197-206 | PHCM Management Agreement dated (Effective Date "ED" 3/1/16) |
| B | 207-209 | PHCM Amendment No. 1 to Management Agreement (ED 12/22/16) |
| C | 210-212 | PHCM Amendment No. 2 to Management Agreement (ED 7/1/17) |
| D | 213-229 | Summit Healthcare Management Contract (ED 9/8/17) |
| E | 230-258 | Aldairi Agreement (ED 5/27/16) |
| F | 259-289 | Aldairi DDS, Inc. Agreement (ED 5/29/18) |
| G | 290-317 | Hawatmeh Dental Group Agreement (ED 10/18/17) |
| H | 318-346 | Alborz Mehdizadeh, Inc. Agreement (ED 9/28/16) |
| I | 347-379 | Long Beach Care Dental, Inc. Agreement (ED 12/11/18) |
| J | 380-408 | Velasquez Agreement (ED 11/5/14) |
| K | 409-436 | Arakelyan Agreement (ED 11/17/16) |
| L | 437-467 | Arakelyan DDS. Inc. Agreement (ED 11/29/18) |
| M | 468-530 | Arakelyan DDS. Inc. Agreements (ED 11/29/18) |
| N | 531-561 | Hoang Agreement (ED 11/28/18) |
| O | 562-590 | W.A Stephan Agreement (ED 10/1/16) |
| P | 591-618 | Rojo D.D.S., Inc. Agreement (ED 3/29/17) |
| Q | 619-650 | Toledo D.D.S., Inc. Agreement (ED 6/16/15) |
| R | 651-681 | Thompson, D.D.S., Inc. Agreement (ED 4/18/13) |
| S | 682-710 | Ness Dental Agreement (ED 5/2/16) |
| T | 711-740 | Jared, D.D.S. Agreement (ED 4/19/16) |
| U | 741-807 | Promenade Square LLC Lease |
| V | 808-837 | DRP Holdings, LLC Lease |
| W | 838-870 | Inland Valley Investments, LLC Lease |

1    Plaintiff Borrego Community Health Foundation ("Borrego Health"), hereby
2    complains and alleges as follows:
3    **I.      INTRODUCTION/SUMMARY**
4         1.      Borrego Health is a California nonprofit public benefit corporation
5    operating a Federally Qualified Health Center (also known as a FQHC).  Borrego
6    Health provides primary and related healthcare services to historically underserved
7    areas of San Diego, Riverside, and—until recently—San Bernadino counties.
8         2.      While Borrego Health was attempting to complete its mission of
9    providing healthcare to underserved communities, certain individuals and entities,
10   both inside and outside of Borrego Health, siphoned off money from Borrego Health
11   that should have benefitted to the community it serves.  The schemes of those
12   various individuals and entities are set forth in detail below.  The schemes include
13   selling useless assets to Borrego Health at inflated prices, entering into one-sided
14   agreements with Borrego Health to its detriment, committing and/or covering up
15   healthcare fraud though improper billing of dental services, entering into leases with
16   Borrego Health that were many times fair market rates and terms, paying themselves
17   above-market salaries and benefits, hiring friends and family members to work for
18   Borrego Health and paying them above-market salaries, and attempting to use
19   Borrego Health to purchase a country club.  Those same individuals and entities
20   worked tirelessly to cover up their misdeeds, and, until recently, were successful is
21   doing so.
22        3.      The insiders were motivated by various forms of personal benefit.
23   First, they used the excessive revenue generated by the schemes to set over-market
24   salaries for themselves and create other forms of compensation, such as automotive
25   benefits, retirement benefits, and free healthcare goods and services from Borrego
26   Health.  Second, they used the excessive services and attendant revenue from Medi-
27   Cal to justify employing friends and family members at Borrego Health, also at
28   inflated salaries.  Third, on information and belief, the insiders allowed the outsiders

1  to participate in the fleecing of Borrego Health in exchange for kickbacks and/or
2  other benefits to the insiders.  For instance, Bruce Hebets and Karen Hebets set up a
3  sham "consulting" company which entered into a sham agreement which paid them
4  $2 million of funds that had been previously stolen from Borrego Health.  Each and
5  every one of the Defendants received one or more improper benefits and/or
6  payments as a result of the schemes described below, and was incentivized to act in
7  furtherance of those schemes, actively seek to conceal those schemes and/or
8  breached their duties to prevent or stop those schemes.
9       4.    The false and fraudulent billing of dental services has resulted in
10 Borrego Health's suspension by California's Medicaid Program, Medi-Cal.  The
11 state and federal government are also investigating Borrego Health for tax issues, its
12 non-profit status, among many other things, due to these schemes.
13      5.    Fortunately, Borrego Health, through a newly constituted Board of
14 Trustees, has spent considerable time and effort trying to discover and unravel the
15 prior bad conduct to rehabilitate Borrego Health and ensure Borrego Health's
16 viability and compliance going forward.
17      6.    However, Borrego Health has been severely damaged and this action
18 seeks to illuminate the various schemes, to seek financial compensation to recoup
19 funds wrongly siphoned away from Borrego Health, and to hold the wrongdoers
20 responsible for their actions.
21 **II.    JURISDICTION AND VENUE**
22      7.    Venue is proper in this District pursuant to 31 USC section 3732(a) and
23 28 USC section 1391(c).  During the relevant time period, a substantial portion of
24 the events complained of that give rise to Borrego Health's claims occurred in this
25 District.
26 / / /
27 / / /
28 / / /

9
FOURTH AMENDED COMPLAINT

## III.   CAST OF CHARACTERS

### A.   BORREGO COMMUNITY HEALTH FOUNDATION

8.      Plaintiff Borrego Community Health Foundation ("Borrego Health"), is a nonprofit 501(c)(3) Federally Qualified Health Center ("FQHC").  Borrego Health provides high quality, comprehensive, compassionate primary health care to the people in their communities, regardless of their ability to pay, by partnering with licensed medical professionals across Southern California.  Borrego Health operates 33 clinics, primarily in underserved desert and inland communities throughout San Diego, Riverside, and—until recently—San Bernardino counties.  Borrego Health provides essential services in Family Practice, Pediatrics, OB/GYN, Internal Medicine, Podiatry, Dermatology, Cardiology, HIV/Hepatitis C and Covid-19 related testing and vaccinations to over 200,000 patients, most of whom cannot obtain affordable comprehensive primary care from other sources.  During the recent pandemic, Borrego Health tested tens of thousands of Californians for Covid-19 infections, and vaccinated tens of thousands of people against Covid-19. Borrego Health's continued operation is in the public interest and, despite the harm it has suffered and the way it has been manipulated by its former executives and trustees, it delivers quality health care to people who need it.

9.      Much of the services Borrego Health provides to the community is funded by grants, including without limitation grants from the U.S. Health Resources and Services Administration ("HRSA").  Borrego Health received its first HRSA grant in 2003.

10.     Following the initial HRSA grant in 2003, Borrego Health experienced massive growth, expanding its services to what they are today, inclusive of dental, mental health and chiropractic services.  The majority of these services are provided through Borrego Health's internal programs, including brick-and-mortar medical and dental clinics and mobile units.  Borrego Health also operates a contract medical

1   program in which it contracts with private practice providers to serve members of
2   the community.
3        11.    As a non-profit public benefit corporation, Borrego Health does not
4   have individual shareholders, but rather is operated by a Board of Trustees, all of
5   whom currently serve on a volunteer basis.
6   **B.   FORMER BORREGO INSIDERS**
7        12.    Bruce Hebets was a longtime resident of San Diego County and had
8   been a Sergeant with the San Diego Harbor Police Department prior to becoming
9   CEO of Borrego Health Foundation in or around 2004.  Bruce Hebets served as
10   Borrego Health's CEO beginning in 2004 until his retirement in September 2018.
11   Following a decline in Bruce Hebets' health, Borrego Health's Executive/Finance
12   Committee – with Bruce Hebets' approval – appointed the then Chief Legal Officer,
13   Mikia Wallis, as President of Borrego Health in December 2017, and later as interim
14   CEO following Bruce Hebets' decision to take an extended medical leave, effective
15   June 28, 2018.  Following Bruce Hebets' retirement, effective September 1, 2018,
16   Mikia Wallis was appointed to the position of Borrego Health's CEO.  Bruce Hebets
17   passed away in January 2019.  In light of his death and the settlement of his estate,
18   Bruce Hebets is not named as a defendant in this action though he would have been,
19   if possible.
20        13.    Defendant Karen Hebets is an individual with her place of residence in
21   Borrego Springs, California.  Karen Hebets was the Vice President of Business
22   Services at Borrego Health.  Karen Hebets was also the wife of Bruce Hebets.
23        14.    Defendant KBH Healthcare Consulting, LLC was a California Limited
24   Liability Company with its principal place of business in Borrego Springs,
25   California.  Bruce Hebets and Karen Hebets were its only members, sharing a 50-50
26   interest.
27        15.    Defendant Mikia Wallis, Esq. is an individual with her place of
28   residence in Julian, California.  Mikia Wallis is an attorney.  She graduated from the

1 University of San Diego School of Law, and was admitted to the California Bar on
2 or about June 1, 2007.  Mikia Wallis was Chief Legal Officer of Borrego Health,
3 and was named interim CEO in June 2018 and CEO in September 2018.  Mikia
4 Wallis was also on Borrego Health's Board of Trustees until October 2, 2020.
5 Mikia Wallis was placed on administrative leave from Borrego Health on October 9,
6 2020, and terminated by Borrego Health on December 15, 2020.

7        16.    Defendant Diana Thompson, formerly Diana Troncoso, is an individual
8 with her place of residence in San Diego County, California.  Diana Thompson was
9 Borrego Health's Chief Financial Officer from March 2013, and was terminated as
10 of March 2021.  One of Diana Thompson's children is married to one of Bruce
11 Hebets' and Karen Hebets' child, and she shares one or more grandchildren with
12 Bruce Hebets and Karen Hebets.

13        17.    Defendant Harry Ilsley is an individual with his place of residence in
14 Sheridan, Wyoming.  Harry Ilsley also owns or owned a house in Borrego Springs
15 (near the De Anza Country Club golf course).  Harry Ilsley was a member of
16 Borrego Health's Board of Trustees and was the Chair of the Board until 2017.  He
17 was also on the Board's Executive/Finance Committee.

18        18.    Defendant Dennis Nourse in an individual with his place of residence
19 in Cedarburg, Wisconsin.  Dennis Nourse was a former administrator of Borrego
20 Health, and later hired Bruce Hebets to be CEO.  Dennis Nourse was a member of
21 Borrego Health's Board of Trustees from mid-2012 until his resignation, and was a
22 member of the Board's Executive/Finance Committee.

23        19.    Defendant Mike Hickok in an individual with his place of residence in
24 Borrego Springs, California (near the De Anza Country Club golf course).  Mike
25 Hickok was a member of Borrego Health's Board of Trustees, and was a member of
26 the Board's Executive/Finance Committee.

27        20.    Defendant Chuck Kimball an individual with his place of residence in
28 Julian, California.  Chuck Kimball was a member of Borrego Health's Board of

1   Trustees starting in approximately 2011, and was the Chair of the Board from 2017
2   to mid-2019 and Secretary from 2019 until his removal.  Chuck Kimball was also a
3   member of the Board's Executive/Finance Committee.

4       21.    Karen Hebets, Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis
5   Nourse, Mike Hickok, and Chuck Kimball are collectively referred to as "Borrego
6   Insiders."  A subset of Borrego Insiders who served as members of the Borrego
7   Health Board of Trustee are Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck
8   Kimball, collectively referred to herein as "Board Insiders."

9       22.    While some may have described themselves as volunteers, each of the
10  Board Insiders was compensated for his service on the Board, including with free
11  medical care and other benefits.  Moreover, the Board Insiders are being sued not
12  only for their negligent acts and omissions, but their intentional misconduct,
13  including fraud, and their breaches of their fiduciary duties to Borrego Health.

14  **C.    PREMIER, PRIESTS AND OTHER PRIEST-RELATED**
15  **ENTITIES**

16      23.    Defendant Premier Healthcare Management, Inc. ("Premier") is a
17  California corporation with its principal place of business in El Cajon, California.

18      24.    Defendant Summit Healthcare Management, Inc. ("Summit") was a
19  California corporation with its principal place of business in El Cajon, California.
20  Summit merged with Premier in 2019.

21      25.    Defendant Daryl Priest in an individual with his place of residence in
22  El Cajon, California.  Daryl Priest is the owner of Premier.  Prior to starting Premier
23  Daryl Priest had no material healthcare experience.

24      26.    Defendant Nicholas ("Nick") Priest, Esq. in an individual with his
25  place of residence in San Diego, California.  Nick Priest was the Chief Executive
26  Officer of Premier.  Nick Priest is the son of Daryl Priest.  Nick Priest is also an
27  attorney.  He graduated from California Western School of Law and was admitted to
28

FOURTH AMENDED COMPLAINT

7288673.3

1   the California Bar on or about June 21, 2016.  Prior to working at Premier Nick
2   Priest had no material healthcare experience.
3        27.    Defendant Travis Lyon in an individual with his place of residence in
4   Alpine, California.  Travis Lyon was the President and Chief Operating Officer of
5   Premier.  He is also currently the President of Real Estate Operations at Priest
6   Development Corporation.
7        28.    Premier, Summit, Daryl Priest, Nick Priest, Travis Lyon, Promenade
8   (see ¶338), DRP (see ¶339) and Inland Valley (see ¶340) are collectively referred to
9   herein as the "Premier Defendants."
10       **D.    DEFENDANT DENTISTS**
11       29.    Defendant Husam E. Aldairi, D.D.S. is a licensed dentist in California
12  with whom Borrego Health partnered through its contract dental program. Dr.
13  Aldairi, both individually and through his company Defendant Aldairi DDS, Inc.,
14  operated several private dental practices, including 40/30 Dental Inc., located at
15  6175 El Cajon Blvd., San Diego, CA 92215 and 40/30 Dental 2, located at 1166
16  East Main Street, El Cajon, CA 92021.  Husam Aldairi resides in San Diego County.
17  Aldairi DDS, Inc., is a California corporation with its principal place of business in
18  El Cajon, California.
19       30.    Defendant Ayed Hawatmeh, D.D.S. is a licensed dentist in California
20  with whom Borrego Health partnered through its contract dental program. Dr.
21  Hawatmeh, both individually and through his company Defendant Hawatmeh
22  Dental Group, P.C., operated several private dental practices, including Bravo
23  Dental Group of Corona located at 1185 Magnolia Avenue #K & #L, Corona, CA
24  92879, and White Smile Dental, located at 3495 East Concours Street, Suite A,
25  Corona, CA 91764.  Ayed Hawatmeh resides in San Bernardino County.  Hawatmeh
26  Dental Group, P.C. is a California corporation, with its principal place of business in
27  Ontario, California.
28

31.   Defendant Alborz Mehdizadeh, D.D.S. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program. Dr. Mehdizadeh, both individually and through his company Defendant Alborz Mehdizadeh, Inc., operated several private dental practices, located at 15080 7th Street, Suite 7, Victorville, CA 92395 and 286 N. San Jacinto Street, Hemet, CA 92543.  Alborz Mehdizadeh resides in San Bernardino County in Victorville, California.  Alborz Mehdizadeh, Inc., is a California corporation with its principal place of business in Long Beach, California.

32.   Defendant Jilbert Bakramian, D.D.S. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program.  He operated as a sub-provider (i.e., though an arrangement with Dr. Aram Arakelyan but without a direct agreement with Borrego Health).  Jilbert Bakramian resides in Glendale, California.

33.   Defendant Mohammed Al Tekreeti, D.D.S. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program. He operated as a sub-provider under Dr. Husam Aldairi.  Mohammed Al Tekreeti resides in San Diego, California.

34.   Defendant Magaly Velasquez, D.D.S. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program.  Dr. Velasquez, both individually and through her company, Defendant Magaly M. Velasquez DDS Professional Dental Corp., operated a private dental practice, called U-First Dental Care, located at 9130 Foothill Blvd., Rancho Cucamonga, CA 91730. Magaly Velasquez resides in Rancho Cucamonga, California.  Magaly M. Velasquez DDS Professional Dental is a California corporation with its principal place of business in Rancho Cucamonga, California.

35.   Defendant Aram Arakelyan, D.D.S. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program.  Dr. Arakelyan, both individually and through his company, Defendant New Millennium

1   Dental Group Of Aram Arakelyan, Inc., operated several private dental practices,

2   including practices located at 19523 E. Cypress Street, Covina, CA 91724 and

3   10917 Paramount Blvd., Downey, CA 90241.  Aram Arakelyan resides in Rancho

4   Cucamonga, California.  New Millennium Dental Group Of Aram Arakelyan, Inc. is

5   a California corporation with its principal place of business in Rancho Cucamonga,

6   California.

7        36.   Defendant Michael Hoang, D.M.D. is a licensed dentist in California

8   with whom Borrego Health partnered through its contract dental program.  He

9   operated a private dental practice, located at 13672 Hawthorne Blvd., Hawthorne,

10  CA 90250.  Michael Hoang resides in Long Beach, California.

11       37.   Defendant Waleed Stephan, D.D.S. is a licensed dentist in California

12  with whom Borrego Health partnered through its contract dental program.  Dr.

13  Stephan, both individually and through his company, Defendant W.A. Stephan, a

14  Dental Corporation, operated a private dental practice, called Stephan Family

15  Dental, located at 860 Jamacha Road, Suite 201, El Cajon, CA 92019.  Waleed

16  Stephan resides in El Cajon, California.  W.A. Stephan, a Dental Corporation is a

17  California corporation with its principal place of business in San Diego, California.

18       38.   Defendant Santiago Rojo, D.D.S. is a licensed dentist in California with

19  whom Borrego Health partnered through its contract dental program.  Dr. Rojo, both

20  individually and through his company Defendant Santiago A. Rojo, D.D.S., Inc.,

21  operated a private dental practice, called Family Dentistry Inc., located at 22435

22  Alessandro Blvd., Suite 106, Moreno Valley, CA 92553.  Santiago Rojo resides in

23  Orlando, Florida.  Santiago A. Rojo, D.D.S., Inc., is a California corporation with its

24  principal place of business in Moreno Valley, California.

25       39.   Defendant Marcelo Toledo, D.D.S. is a licensed dentist in California

26  with whom Borrego Health partnered through its contract dental program.  Dr.

27  Toledo, both individually and through his company Defendant Marcelo Toledo

28  D.D.S., Inc., operated private dental practices located at 1701 Palm Canyon Drive,

1    Palm Springs, CA 92262 and 326 N. Riverside Avenue, Rialto, CA 92376.  Marcelo

2    Toledo resides in Grand Terrace, California.  Marcelo Toledo, D.D.S., Inc., is a

3    California corporation with its principal place of business in Rialto, California.

4         40.     Defendant Marlene Thompson, D.D.S. is a licensed dentist in

5    California with whom Borrego Health partnered through its contract dental program.

6    Dr. Thompson, both individually and through her company Defendant Marlene M.

7    Thompson, D.D.S., Inc., operated a private dental practice located at 988 El Norte

8    Parkway, Escondido, CA 92026.  Marlene Thompson resides in Temecula,

9    California.  Marlene Thompson, D.D.S., Inc., is a California corporation with its

10   principal place of business in Escondido, California.

11        41.     Defendant Douglas Ness, D.D.S. is a licensed dentist in California with

12   whom Borrego Health partnered through its contract dental program.  Dr. Ness, both

13   individually and through his company Defendant Ness Dental Corporation, operated

14   a private dental practice, Crown Dental Group, located at 2405 Transportation

15   Avenue, National City, CA 91950.  Douglas Ness resides in Bonita, California.

16   Ness Dental Corporation is a California corporation with its principal place of

17   business in National City, California.

18        42.     Defendant George Jared, D.D.S. is a licensed dentist in California with

19   whom Borrego Health partnered through its contract dental program.  Dr. Jared,

20   both individually and through his company Defendant George C. Jared, D.D.S., Inc.,

21   operated a private dental practice, East County Family Dental, located at 13465

22   Camino Canada Road, Suite 110-A, El Cajon, CA 92021.  George Jared resides in

23   San Diego, California.  George Jared, D.D.S., Inc., is a California corporation with

24   its principal place of business in El Cajon, California.

25        43.     Other dentists formerly contracted with Borrego Health may have also

26   engaged in actions and omissions that constitute a breach or breaches of their

27   contracts with Borrego Health and/or make material misrepresentations to Borrego

28   Health.  However, the names and identities of those dentists are currently unknown

1  to Borrego Health, and are therefore sued here as Does 1-100.  They are unknown,

2  in part, because Borrego Health does not currently have access to their medical

3  records, patient charts, scheduling information, and other business records to

4  evaluate their care and documentation of services that Borrego Health billed as a

5  result of invoices from the dentists.  Borrego Health intends to seek discovery of

6  such information to evaluate other partner dentists and their sub-providers.

7  44.    Husam E. Aldairi, D.D.S., Aldairi DDS, Inc., Ayed Hawatmeh, D.D.S.,

8  Hawatmeh Dental Group, P.C., Alborz Mehdizadeh, D.D.S., Alborz Mehdizadeh,

9  Inc., Jilbert Bakramian, D.D.S., Mohammed Al Tekreeti, D.D.S., Magaly

10  Velasquez, D.D.S., Magaly M. Velasquez DDS, Professional Dental Corp., Aram

11  Arakelyan, D.D.S., New Millennium Dental Group of Aram Arakelyan, Inc.,

12  Michael Hoang, DMD, Waleed Stephan, D.D.S., W.A. Stephan, a Dental

13  Corporation, Santiago Rojo, D.D.S., Santiago A. Rojo, D.D.S., Inc., Marcelo

14  Toledo, D.D.S., Marcelo Toledo, D.D.S., Inc., Marlene M. Thompson, D.D.S.,

15  Marlene Thompson, D.D.S., Inc., Douglas Ness, D.D.S., Ness Dental Corporation,

16  George Jared, D.D.S. and George C. Jared, D.D.S., Inc. and Does 1-100 are

17  collectively referred to herein as the "Dentist Defendants."

18  **E.    JAMES HEBETS AND HIS COMPANIES**

19  45.    Defendant James "Jim" Hebets in an individual with his place of

20  residence in Scottsdale, Arizona.  Jim Hebets is Bruce Hebets' brother.

21  46.    Defendant The Hebets Company is a Missouri Corporation with its

22  principal place of business in Phoenix, Arizona.  Jim Hebets is President and

23  Founder of The Hebets Company, and has or had an ownership interest in The

24  Hebets Company.  The Hebets Company provides accounting and consulting

25  services and hold themselves out as experts in executive compensation to healthcare

26  providers, including other FQHCs, in California and San Diego County.  The Hebets

27  Company is a subsidiary of NFP Corp.  NFP is a network of independent financial

28  advisors that includes over 175 firms in 41 states and Puerto Rico, specializing in

7288673.3

1  life insurance and wealth transfer, corporate and executive benefits, and provides

2  services across the state of California and San Diego County.

3  **F.     OTHERS**

4       47.    Julian Medical Foundation is a California nonprofit corporation, with

5  its principal place of business in Julian, California.

6       48.    Timothy Martinez, D.D.S. graduated from the Harvard School of

7  Dental Medicine in 1986 with a concentration in Health Care Administration.

8  Throughout his 30 year career, he has had extensive experience in FQHC dental

9  programs, state dental Medicaid administration, private practice, and academic

10 positions at the Associate Dean level.  Prior to joining Borrego Health, Dr. Martinez

11 served as the Associate Dean for Community Partnerships and Access to Care for

12 two dental schools, Western University of Health Sciences and the University of

13 New England, and before that, he served as the Massachusetts Medicaid Dental

14 Director as well as the Dental Director for three large FQHCs in the greater Boston

15 area, including the first FQHC in the nation Geiger-Gibson Community Health

16 Center, Boston Health Care for the Homeless, and the South End Community Health

17 Center.  Timothy Martinez spearheaded the Program Integrity unit for Borrego

18 Health, designed to detect and address potential false or fraudulent billing.

19      49.    Maura Tuso, D.D.S. was a licensed dentist in California.  She lost her

20 license and was suspended by Medi-Cal.  Despite this, she provided services for

21 various dentists that were contracted with Borrego Health.  She has since provided

22 documents, evidence, and statements that she observed and engaged in fraudulent

23 practices at the direction of Defendants Husam Aldairi, Mohammed Al Tekreeti,

24 Marlene Thompson, Douglas Ness, and George Jared.

25      50.    Dr. Alfredo Ratniewski is the former Chief Medical Officer of Borrego

26 Health.

27 / / /

28 / / /

7288673.3

### G.    ALTER EGO AND DOE ALLEGATIONS

51.    Borrego Health is informed and believes that at all relevant times each of the Premier Defendants was the agent and employee of each of the remaining Premier Defendants, and in doing the things hereinafter alleged was acting within the course and scope of such agency and employment.  The Premier Defendants operated in such a way as to make their individual identities indistinguishable, and therefore are mere alter-egos of one another.  The acts and omissions of the Premier Defendants were done in concert with one another in furtherance of their common design and agreement to accomplish a particular result, namely extracting money from Borrego Health.  Moreover, the Premier Defendants aided and abetted each other in accomplishing the acts and omissions alleged herein.  (*See* Restatement (SECOND) of Torts §876 (1979)).  The Premier Defendants, and each of them, fail to recognize the uniqueness and independence of each other.  At all times relevant hereto, there was a such a unity of interest and ownership between the Premier Defendants such that the individual distinctions between them had ceased and that the facts as alleged herein are such that an adherence to the fiction of the separate existence of the Premier Defendants would, under the particular circumstances alleged herein, sanction a fraud and/or promote injustice.

52.    Borrego Health is informed and believes that at all relevant times Jim Hebets and the Hebets Company were the agent and employee of each other, and in doing the things hereinafter alleged were acting within the course and scope of such agency and employment.  Jim Hebets and The Hebets Company operated in such a way as to make their individual identities indistinguishable, and therefore are mere alter-egos of one another.  The acts and omissions of the Jim Hebets and The Hebets Company were done in concert with one another in furtherance of their common design and agreement to accomplish a particular result, namely extracting money from Borrego Health.  Moreover, Jim Hebets and The Hebets Company aided and abetted each other in accomplishing the acts and omissions alleged herein. (*See*

1    Restatement (SECOND) of Torts §876 (1979)).  Jim Hebets and The Hebets

2    Company, and each of them, fail to recognize the uniqueness and independence of

3    each other.  At all times relevant hereto, there was a such a unity of interest and

4    ownership between Jim Hebets and The Hebets Company such that the individual

5    distinctions between them had ceased and that the facts as alleged herein are such

6    that an adherence to the fiction of their separate existence would, under the

7    particular circumstances alleged herein, sanction a fraud and/or promote injustice.

8         53.    Borrego Health is informed and believes that at all relevant times each

9    of the individual defendant dentists and their affiliated defendant professional

10   corporation(s) were the agent and employee of each other, and in doing the things

11   hereinafter alleged were acting within the course and scope of such agency and

12   employment.  The individual dentists and their affiliated professional corporation(s)

13   operated in such a way as to make their individual identities indistinguishable, and

14   therefore are mere alter-egos of one another.  The acts and omissions of the

15   individual dentists and their affiliated professional corporation(s) were done in

16   concert with one another in furtherance of their common design and agreement to

17   accomplish a particular result, namely extracting money from Borrego Health.

18   Moreover, the individual dentists and their affiliated professional corporation(s)

19   aided and abetted each other in accomplishing the acts and omissions alleged herein.

20   (*See* Restatement (SECOND) of Torts §876 (1979)).  The individual dentists and

21   their affiliated professional corporation(s), and each of them, fail to recognize the

22   uniqueness and independence of each other.  At all times relevant hereto, there was

23   a such a unity of interest and ownership between the individual dentists and their

24   affiliated professional corporation(s) such that the individual distinctions between

25   them had ceased and that the facts as alleged herein are such that an adherence to the

26   fiction of the separate existence of the individual dentists and their affiliated

27   professional corporation(s) would, under the particular circumstances alleged herein,

28   sanction a fraud and/or promote injustice.  However, Borrego Health pleads in the

1  alternative that the individual dentists and their affiliated professional corporation(s)

2  may not have been agents of one another for purposes of the interference causes of

3  action set forth below.

4      54.    Borrego Health is ignorant of the true names and capacities of those

5  defendants sued herein as DOES 101 through 250, and for that reason has sued such

6  defendants by fictitious names.  Borrego Health will seek leave of the Court to

7  amend this Complaint to identify said defendants when their identities are

8  ascertained.

9  **IV.   RULE 9(b) REQUIREMENTS**

10      55.    Several of Borrego Health's claims are subject to Federal Rules of Civil

11  Procedure Rule 9(b). Federal Rules of Civil Procedure Rule 9(b) states, "In alleging

12  fraud or mistake, a party must state with particularity the circumstances constituting

13  fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind

14  may be alleged generally." Fed. R. Civ. P. 9(b). Notably, "[u]nder Ninth Circuit law,

15  a pleading is sufficient for purposes of Rule 9(b) if it identifies the circumstances

16  constituting fraud so that the defendant can prepare an adequate answer. While

17  conclusory allegations will not suffice, statements which provide the time, place and

18  nature of the alleged fraudulent activities will." *Zatkin v. Primuth*, 551 F.Supp. 39,

19  42 (S.D. Cal. 1982) (*citing Bosse v. Crowell, Collier and MacMillan*, 565 F.2d 602,

20  611 (9th Cir.1977); *Walling v. Beverly Enterprises*, 476 F.2d 393, 397 (9th

21  Cir.1973)). For claims subject to Rule 9(b), the complaint must include "the who,

22  what, when, where, and the how of the misconduct charged." *Aton Center, Inc. v.

23  Northwest Administrators, Inc.*, No. 21CV1843-L-MSB, 2022 WL 4229307 *4

24  (Sept. 13, 2022 S.D. Cal.) (*quoting Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097,

25  1106 (9th Cir. 2003)). Importantly, however, a plaintiff need not plead every

26  instance of fraud in order to "plead with particularity." Any assertion that only

27  offering a sampling of alleged misconduct does not comply with Rule 9(b) is

28  "unsupported by law." *Satmodo, LLC v. Whenever Communications*, No. 17-CV-

7288673.3

1  0192, 2017 WL 637132 *2 (Dec. 8, 2017 S.D.C.A.). "The Ninth Circuit has stated

2  Rule 9(b)'s particularity requirement can be met through use of sampling."

3  *Satmodo, LLC v. Whenever Communications*, No. 17-CV-0192, 2017 WL 637132

4  *2 (Dec. 8, 2017 S.D.C.A.) (*citing Edeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993,

5  998-99 (9th Cir. 2010). "Although it is not mandatory that [Plaintiff] provide

6  representative examples, such examples would go a long way in providing the

7  necessary particularity under Rule 9(b)." *Satmodo, LLC v. Whenever*

8  *Communications*, No. 17-CV-0192, 2017 WL 637132 *2 (Dec. 8, 2017 S.D.C.A.)

9  (*quoting Frazier ex rel. U.S. v. Iasis Healthcare Corp.*, 392 Fed.Appx. 535, 537 (9th

10  Cir. 2010)).  The below allegations and representative examples provide the "who,

11  what, when, where, and how" of the alleged misconduct to put all Defendants on

12  proper notice and is therefore sufficiently pled under Rule 9(b).

13  **V.    THE SCHEMES THAT DAMAGED BORREGO HEALTH**

14      **A.    The Scheme to Form and Sell Entities Formed by Borrego Insiders**

15          **to Borrego Health (the "Borrego MSO/IPA Scheme")**

16      56.    One of the earliest discovered schemes concocted by the Borrego

17  Insiders to the detriment of Borrego Health is the formation of Borrego Management

18  Services Organization, LLC ("Borrego MSO") and Borrego Independent Physicians

19  Association, A Professional Medical Corporation ("Borrego IPA"), and the sale of

20  those entities to Borrego Health.

21      57.    While CEO of Borrego Health, Bruce Hebets devised a scheme to have

22  Borrego Health incur unnecessary costs by providing physician services and

23  administrative services to Borrego Health through companies that he and other

24  Borrego Insiders would create and control.  This allowed the Borrego Insiders to

25  improperly profit from those companies at the expense of Borrego Health.

26      58.    Both Borrego MSO and Borrego IPA were formed on or about July 19,

27  2010 through the assistance of Mikia Wallis, in-house counsel at Borrego Health.

28  Mikia Wallis provided this service without charge to Borrego MSO or Borrego IPA,

1   using Borrego Health resources to benefit some of the Borrego Insiders. Borrego
2   MSO and Borrego IPA were potential referral sources for Medi-Cal beneficiaries.
3   Mikia Wallis was listed as the agent for service of process for both entities.

4        59.    As Bruce Hebets and other Borrego Insiders were not medical
5   professionals, their ownership in Borrego IPA, which was a professional medical
6   corporation, was constrained.  Thus, other friends, cronies, and referral sources
7   became investors, including Dr. Alfredo Ratniewski and his daughter.  Dr. Alfredo
8   Ratniewski was motivated to cooperate, in part, by the Borrego Insiders' decision to
9   overcompensate him as Borrego Health's Chief Medical Officer and to
10  overcompensate his family members who also worked at Borrego Health.

11       60.    Borrego MSO, on the other hand, is a lay entity, which was supposed to
12  manage the Borrego IPA practice.  Bruce Hebets was sophisticated enough to try to
13  avoid scrutiny of the obvious conflict problems by keeping his name away from
14  Borrego MSO.  Instead, Karen Hebets (Bruce Hebets' wife) was a shareholder, and
15  was named as Borrego MSO's Chief Executive Officer.  Karen Hebets had no
16  experience managing an IPA and was not qualified to do so.

17       61.    Through Borrego MSO's purported "management" services, Borrego
18  MSO could charge Borrego IPA for unnecessary services, and funnel the funds to
19  Karen Hebets and other Borrego Insiders.

20       62.    Borrego MSO and Borrego IPA were then contracted with Borrego
21  Health to provide physician and administrative services to Borrego Health.
22  However, these services were already being provided without the unnecessary
23  expense of contracting with outside companies.  Tellingly, Borrego MSO and
24  Borrego IPA did not do business with any other healthcare providers, only Borrego
25  Health.

26       63.    Eventually, a plan was developed by Bruce Hebets and other Borrego
27  Insiders for Borrego Health to buy Borrego MSO and Borrego IPA.  The entities
28  had no valuable assets to sell to Borrego Health.  The transaction was a sham

7288673.3

1    transaction meant to obscure the self-dealing of Bruce Hebets and other Borrego
2    Insiders.  Mikia Wallis facilitated the transaction, which was culminated with a
3    November 1, 2012 purchase agreement whereby Borrego Health paid $2,000,000 to
4    acquire Borrego MSO and Borrego IPA.
5         64.    On information and belief, the plan was to take some of that money and
6    pay it to the investors of Borrego IPA.  Thus, all of the investors at Borrego MSO
7    and Borrego IPA would profit at the expense of Borrego Health.
8         65.    On information and belief, the Borrego Insiders were compensated for
9    this access and control through kickbacks or other payments or remuneration.
10        **B.     The Scheme to Contract with Premier Allowing Premier to Get**
11             **Paid Tens of Millions of Dollars to Purportedly Provide**
12             **"Management Services" It Was Not Capable of Providing (the**
13             **"Premier Scheme")**
14             **i.     The Contract Dental Program Is Formed**
15        66.    Borrego Health began a contract dental program in 2014.  In general,
16   the Medi-Cal program recognizes the value of a FQHC expanding the availability of
17   its services, so it allows FQHCs to enter into contracts with private practice
18   healthcare professionals to provide services to the FQHC's members.
19        67.    In general, "contract dental" describes the arrangement where Borrego
20   Health expanded its service area by entering into contracts with individual dentists
21   and/or their practices.  Under those contracts, the contracted dentists agreed to
22   provide certain dental services to eligible patients of Borrego Health.  Those
23   services would then be billed to Medi-Cal by Borrego Health.  Borrego Health, in
24   turn, pays the dentist a fee for the dental services rendered.
25        68.    Importantly, the fees that Borrego Health paid to the dentists were far
26   greater than what the dentists would have been paid if they had billed Medi-Cal for
27   the services directly.  Therefore, the dentists were motivated to contract with
28

1  Borrego Health.  As a result, some dentists were taking their existing patients and
2  converting them to "Borrego Health patients."
3      69.    The contract dental program expanded so quickly because Medi-Cal
4  paid Borrego Health based a fixed rate for each service that Borrego Health (or its
5  contracted dentists) provided.  The billing is known as "encounter" billing, and each
6  "encounter" or visit Borrego Health (or its contracted dentists) has with a patient is
7  reimbursed the fixed fee amount based on Borrego Health's historic costs.
8      70.    If the dentists were not contracted with Borrego Health and provided
9  dental services to a Medi-Cal beneficiary, then the dentist would be paid under the
10  Medi-Cal fee schedule, a per service billing method, that is described by many
11  dentists as very low.
12     71.    The fixed fee, encounter-based payment was high relative to the costs
13  of providing dental services.  This allowed Borrego Health to pay the contracted
14  dentists more than what Medi-Cal would have paid to the dentist directly under the
15  Medi-Cal fee schedule, and still retain a handsome profit.
16     72.    In each instance Borrego Health was billing Medi-Cal for the services
17  that the contract dentist billed Borrego Health.
18     73.    Borrego initially managed the contract dental program on its own.
19     74.    By fall 2015, Borrego Health's contract dental program comprised
20  approximately 20 to 25 percent of Borrego Health's total revenue.
21          ii.    **Hebets Proposes an MSO Idea, Which Is Rejected by**
22                 **Borrego Health**
23     75.    Sometime in 2015, Bruce Hebets, possibly due to his experience with
24  Borrego MSO and Borrego IPA, identified a significant business opportunity for an
25  outside organization to provide management services for dental programs in
26  FQHCs.  Specifically, he proposed the idea of Borrego Health contracting with a
27  MSO to provide management services for its contract dental program.
28

26
FOURTH AMENDED COMPLAINT

1    76.    Bruce Hebets originally proposed that he would own 100 percent of the

2    MSO, then sell 90-95 percent of it to Daryl Priest and/or others.  This would have

3    resulted in a large, direct payment by Daryl Priest and/or others to Bruce Hebets,

4    and then ongoing payments by Borrego Health to Bruce Hebets through the MSO

5    due to Bruce Hebets' retained ownership of 5-10 percent.

6    77.    During an Executive/Finance Committee meeting on August 27, 2015,

7    Bruce Hebets discussed his proposal to form an MSO that would contract with

8    Borrego Health to provide management services for the contract dental program.

9    Borrego Insiders Harry Ilsley, Dennis Nourse, and Mike Hickok were present at this

10   meeting, along with Mikia Wallis and Diana Thompson.  These Borrego Insiders

11   supported the proposal.  However, Mikia Wallis identified the risk of Bruce Hebets

12   staring a competing company.

13   78.    On September 22, 2015, in an email to Mikia Wallis, outside counsel

14   for Borrego Health warned that any potential MSO arrangement involving Bruce

15   Hebets implicated conflict-of-interest laws, would have to be an arms-length

16   transaction and that any compensation paid to Bruce Hebets under the deal must be

17   at the fair market value.  As detailed below, this advice was later ignored.

18   79.    The discussion of the MSO proposal carried over into the next meeting

19   of the Executive/Finance Committee meeting that took place on September 24,

20   2015.  The minutes from the meeting clearly document the attempt by Bruce Hebets,

21   Mikia Wallis and Diana Thompson to convince the Executive/Finance Committee

22   that Bruce Hebets' proposal was a good idea despite the conflict of interest issue

23   being identified.

24   80.    For example, the Executive/Finance Committee members were told

25   how no other company could provide this type of novel management services to

26   FQHCs specific to their contract dental program needs.  The Executive/Finance

27   Committee also discussed how Borrego Health could be a part-owner of the MSO.

28   Ultimately, the discussion was tabled for presentation to the entire Board at its

1   October meeting, pending an analysis by outside counsel regarding Bruce Hebets'

2   clear conflict of interest issue.

3        81.    On October 21, 2015, Bruce Hebets arranged a phone call with Diana

4   Thompson, Mikia Wallis, and Dennis Nourse. Upon information and belief, the

5   nature of this call was to further discuss the proposed MSO.

6        82.    Ultimately, on or about October 29, 2015, the full Borrego Health

7   Board rejected Bruce Hebets' proposal to enter into an arrangement with a MSO in

8   which he held ownership interest as a result of the inherent conflict of interest.[1]

9   Some Board members who were present at that meeting recall that the Board went

10  as far as rejecting wholesale the idea that Borrego Health use an MSO to manage the

11  contract dental program, regardless of who owned or operated it.  The non-Borrego

12  Insider Board members believed the issue was settled; the MSO would not go

13  forward.  The Borrego Health Board did not approve moving forward with a MSO

14  at all.

15       83.    Outside counsel for Borrego Health attended the next meeting of the

16  full Borrego Health board.  The Board took no action while they were in the

17  meeting.  On or about December 11, 2015, Mikia Wallis told outside counsel that

18  "the Finance Committee" was reviewing the issue and she would get back to the

19  lawyers.  Mikia Wallis told outside counsel that the issue was put off until the next

20  Board meeting on December 17, 2015.  Outside counsel was prepared to attend that

21  meeting.  However, on December 16, 2015, Mikia Wallis called one of the outside

22  lawyers and said something to the effect of "it appears we will not need you after

23  all."

24

25

26  [1] This experience of the full Board rejecting his proposal likely influences

27  subsequent actions by Bruce Hebets and others to avoid taking issues to the Board
    again and instead reach deals among Bruce Hebets and the Borrego Insiders.

28

84.     On December 26, 2015, one of the outside counsel lawyers sent an email to Mikia Wallis asking if she needed anything more on the MSO issue.  Mikia Wallis falsely said that the Borrego Health decided not to move forward with the MSO plan.  In fact, the MSO plan was going forward, albeit in a modified form.

### iii.      The Borrego Health Insiders Enter into a Management Services Agreement on Borrego Health's Behalf Anyway

85.     Notwithstanding the full Board's rejection of the very idea of an MSO and unbeknownst to Borrego Health, on March 1, 2016, Bruce Hebets and Premier executed a Management Services Agreement for Borrego Health's contract dental program ("Dental MSA").  None of the Borrego Insiders ever brought the Dental MSA to Borrego Health's full Board for consideration or approval.  Instead, the Borrego Insiders negotiated the terms of the arrangement with Premier and Mikia Wallis drafted the Dental MSA.  The Borrego Insiders then proceeded to enter into the agreement on Borrego Health's behalf, without any notice whatsoever to the full Board (whom they knew had already rejected the proposal).  A true and correct copy of the Dental MSA is attached hereto as Exhibit A.

86.     The existence of the Dental MSA was kept concealed by the Borrego Insiders.  In 2016, the person in charge of the contract dental program was Cynthia Preciado.  Cynthia Preciado was in charge of developing a team to manually scrub dental claims.  When the program became too large for her staff, Cynthia Preciado began developing a relationship with a vendor that would charge a total of $500,000 to develop and implement a process for scrubbing and submitting contract dental claims.

87.     Cynthia Preciado had this plan in motion and had even traveled to Utah to meet with the vendor to develop the process.  Then, in February 2016, she got a call from Bruce Hebets who told her that, effective immediately, she was no longer in charge of the contract dental program.  She drove to the office to speak with Bruce Hebets and Diana Thompson, but both refused to discuss the matter with her.

7288673.3

1  Only later was Cynthia Preciado informed of the arrangement with Daryl Priest.
2  She was instructed to hand everything over to Daryl Priest's son, Nick Priest, who
3  was running Premier.

4      88.   What followed was essentially a "hostile takeover" of contract dental,
5  spearheaded by Travis Lyon.  Cynthia Preciado was not included in any
6  conversations, but was told to hand over all relevant documents.  Cynthia Preciado's
7  access to the ShareDrive (the system which allowed her and her team to review
8  claims) was terminated. All of Cynthia Preciado's team was fired.

9      89.   Even before the execution of the Dental MSA on March 1, 2016, there
10  were ongoing discussions between the Board Insiders, Bruce Hebets, and the
11  Premier Defendants in order to ensure the Dental MSA moved forward. Indeed,
12  Cynthia Preciado documented her concerns in emails. On February 11, 2016 (weeks
13  before the Dental MSA was signed) Cynthia Preciado e-mailed Bruce Hebets
14  expressing her concerns. She stated:

15      "…there has been comments made that Daryl [Priest] and Travis [Lyon] are
16      highly integrated with upper management and the Board of Directors
       interpreted as a measure of intimidation. There is a tone of 'better than you.'"
17

18      90.   Cynthia Preciado expressed her concerns later on to both Bruce Hebets
19  and the other Borrego Insiders, but her concerns were promptly disregarded and
20  concealed by the Borrego Insiders whenever such concerns were raised.

21      91.   Just as they kept Cynthia Preciado in the dark, Bruce Hebets and the
22  Borrego Insiders never informed the entire Borrego Health Board of the Dental
23  MSA, meaning that the Premier Defendants were highly integrated with the Borrego
24  Insiders long before the Dental MSA was even signed.

25      92.   Pursuant to the terms of the Dental MSA, Borrego Health was to pay
26  Premier $5 per participating patient visit to any contract dentist for the first 8,000
27  visits, then $25 per participating patient visit thereafter.  In return, Premier agreed to
28  provide the services to Borrego Health, including without limitation provider

1  contracting (marketing and negotiating) and relations, claims management and
2  processing (including "scrubbing" the contract dental claims for documentation
3  errors or inconsistencies and ensuring claims are in such a format as Borrego Health
4  may bill and submit to DHCS), management information system, quality
5  management, patient management, reporting, and other general administrative
6  services.

7          93.    The Dental MSA underwent two amendments – Amendment 1 and
8  Amendment 2.  The Premier Defendants were able to manipulate and control
9  Borrego Health to such a degree that there were able to take what was an already
10  unreasonable, one-sided agreement and amend it to make it even more unreasonable
11  and one-sided, without offering anything in return.  The first Amendment was
12  effective on or about December 22, 2016 ("Amendment 1") and the second on or
13  about July 1, 2017 ("Amendment 2").  A true and correct copy of Amendment 1 is
14  attached herein as Exhibit B.  A true and correct copy of Amendment 2 is attached
15  herein as Exhibit C.

16          94.    Amendment 1 of the Dental MSA was signed again by Bruce Hebets
17  and Daryl Priest.  Amendment 1 amended the term of the Dental MSA to extend for
18  the five year period beginning January 1, 2017, subject to an automatic renewal of
19  five years.  Amendment 1 also removed provision 3.B. from the Dental MSA which
20  permitted Borrego Health to terminate the Dental MSA without cause.  Amendment
21  1 was completely one-sided to the benefit of Premier, and Borrego Health received
22  no additional consideration.  The Borrego Insiders negotiated the terms of
23  Amendment 1 to the Dental MSA, Mikia Wallis drafted it, and the Borrego Insiders
24  entered into Amendment 1 to the Dental MSA on Borrego Health's behalf, without
25  any notice whatsoever to the full Board.

26          95.    Amendment 2 of the Dental MSA was signed by Mikia Wallis as
27  "Executive Vice President" of Borrego and Daryl Priest.  Amendment 2 to the
28  Dental MSA changed the compensation provisions of the original Dental MSA.  As

1  a result, Amendment 2 obligated Borrego Health to pay Premier $25 per visit,

2  starting at the first visit rather than the previous term of $5 per visit for the first

3  8,000 visits.  Amendment 2 did not obligate Premier to perform any additional

4  services in exchange for increasing their payment fivefold.  In essence, Amendment

5  2 conferred a benefit (worth $160,000) to Premier without any corresponding

6  consideration to Borrego Health.  Again, Amendment 2 was completely one-sided to

7  the benefit of Premier, and Borrego Health received no additional consideration.

8  The lack of consideration and other reasons makes Amendment 2 unenforceable,

9  and the Premier Defendants must return the overpaid funds.  The Borrego Insiders

10  negotiated the terms of Amendment 2 to the Dental IPA, Mikia Wallis drafted it,

11  and the Borrego Insiders entered into Amendment 2 to the Dental IPA on Borrego

12  Health's behalf, without any notice whatsoever to the full Board.

13       96.    The Dental MSA and Amendments should have been provided to the

14  Board for review and approval, but that was avoided by the Borrego Insiders.

15       97.    On September 8, 2017, Bruce Hebets and Daryl Priest entered into

16  another Management Services Agreement – this time for Borrego's Contract

17  Medical Program ("Medical MSA").  Another of Daryl Priest's companies, Summit

18  Healthcare Management, Inc. (which has subsequently been merged into Premier),

19  agreed to provide services similar to Premier's obligations under the Dental MSA.

20  The terms of the Medical MSA required Borrego Health to pay $25 per patient visit

21  to Summit in exchange for the management services provided.  The Borrego

22  Insiders negotiated the terms of the arrangement with Premier, Mikia Wallis drafted

23  the agreement and the Borrego Insiders entered into the agreement on Borrego

24  Health's behalf, without any notice whatsoever to the full Board.  A true and correct

25  copy of the Medical MSA is attached herein as Exhibit D.

26       98.    As part of both the Dental MSA and Medical MSA, Premier and

27  Summit, through Daryl Priest, represented that they had the skill and experience

28  necessary to fulfill their obligations under the Dental MSA and Medical MSA.

1    Specifically, among other things, they represented they had skilled clinical providers

2    to review and evaluate the claims.

3         99.    As part of the Dental MSA and corresponding Amendments, Premier

4    Defendants represented to Borrego Health that it was qualified and competent to

5    provide necessary administrative and management services for a FQHC.  The

6    Premier Defendants further represented they would comply with all guidelines, laws

7    and regulations governing transactions and security of electronic health records and

8    other patient information.  The Premier Defendants further represented they would

9    both maintain and allow auditing of all bills generated which related to dental

10   services provided under any agreement between Borrego Health and a contract

11   dental provider.

12        100.   Exhibit "A" to the Dental MSA further outlines that Premier

13   Defendants represented that they would market and negotiate new contract dental

14   agreements for the benefit of Borrego Health, provide ongoing education and

15   training to contract dental service providers and their staff, and address contract

16   dental service provider eligibility and claims inquiries.  The Premier Defendants

17   represented, among other things: (1) that they would obtain information from the

18   contract dental providers to insure Borrego Health had all information that was

19   required in order to properly and correctly bill Medi-Cal for such claims, (2) that

20   they would monitor the claims, bills and payments to dentists to the benefit of

21   Borrego Health to ensure compliance with all applicable statutes, regulations and

22   laws, (3) that they would provide ongoing education to contracted dental providers

23   to ensure compliance with Borrego Health policies and procedures, (4) regarding

24   patient eligibility, that they would actively track whether or not the services

25   rendered were eligible for reimbursement for each participating patient, and (5) that

26   they would, for the benefit of Borrego Health, perform both short and long-term

27   financial and strategic planning, and manage Borrego Health's relationship with

28   applicable regulatory agencies.

101.   As part of the Medical MSA, the Premier Defendants represented they would comply with all guidelines, laws and regulations governing transactions and security of electronic health records and patient information.  Premier Defendants further represented that they would provide any and all necessary staff, information systems, and support services needed to perform the services outlined in the Medical MSA.  The Premier Defendants represented, among other things: (1) that they would provide ongoing education to contracted providers to ensure compliance with Borrego Health policies and procedures, (2) that they would obtain information from contracted providers necessary for Borrego Health to properly bill for such claims, (3) that they would monitor claims, billing and payment for contracted providers to ensure Borrego Health's billing practices were compliance with applicable law, (4) as part of monitoring claims, that they would validate the eligibility and completeness of the claims submitted, and (5) that they would assist Borrego Health in verifying the credentials of healthcare providers requesting to partner with Borrego Health.

102.   The Premier Defendants did not perform the obligations set forth in the Dental MSA and Medical MSA.  Rather, once the Dental MSA and Amendments were executed, the Premier Defendants trained dentists how to maximize their revenue at the expense of Borrego Health, which also increased Premier's revenue because Premier received $25 per claim.  The Premier Defendants represented that they were reviewing and scrubbing dental claims for accuracy, however, as outlined herein, thousands of unsubstantiated, duplicate and/or fraudulent claims were paid to dentists.  For each of these claims, Premier wrongfully received payment.  Further details of Premier Defendants' conduct and breaches are alleged below.

103.   Bruce Hebets and the Borrego Insiders knew that $25 per claim was an unreasonably high price.  Before the Dental MSA was signed, Cynthia Preciado told them that $5 per claim would be reasonable.

104.   At the time the Premier Defendants made these representations, they knew they lacked the knowledge, experience and skill to do these things, and that they would not be able to fulfill these promises.  Accordingly, the Premier Defendants did not intend to perform these promises.

105.   At the time the Premier Defendants made these representations, they knew these representations were false or had no reasonable grounds for believing the representations to be true.

106.   Payment to the dentists was typically initiated within 24 hours of receiving a bill from the dentists, and well before any payment had been made by Medi-Cal.  Further, the payments from Borrego Health to the dentists were not recouped by Premier if Medi-Cal never paid Borrego Health.The Borrego Insiders Concealed the Premier Scheme from Borrego Health

107.   The Borrego Insiders concealed the Dental MSA, along with Amendment 1 and Amendment 2 thereto, and the Medical MSA from the full Borrego Health Board.  In fact, in August 2017, when the Borrego Insiders met to discuss expanding Borrego Health's relationship with Premier (or another Daryl Priest entity) to manage Borrego Health's nascent contract medical program, the Borrego Insiders (in a recorded conversation) acknowledge that they intentionally kept the 2016 Dental MSA from the full Board and that they intended to do the same with any future arrangement (which turned out to the Medical MSA).

108.   At a meeting of Borrego Insiders on August 31, 2017, Chuck Kimball asked with respect to the contemplated Medical MSA with the Premier Defendants, "…can we just do that in the Executive Committee [i.e. Borrego Insiders only], because I can think of a couple of people that are going to object to that."  Indeed, the Board had already rejected prior efforts for a dental MSO.  Because the Borrego Insiders knew that non-Borrego Insiders would object, the Borrego Insiders ultimately chose to conceal it from the rest of Borrego Health.  After Chuck Kimball asked his question, the following discussion took place (emphasis added):

7288673.3

BRUCE HEBETS: I guess the way I would answer that is, does this Committee want me to take this to the Board? Or does it feel comfortable enough without it?

MIKE HICKOK: Take what specifically?

CHUCK KIMBALL: The idea?

BRUCE HEBETS: The idea of working with Daryl on the contract.

CHUCK KIMBALL: I think they should be advised about it. I don't know if it's a up or down, we do it or don't do it. But I think --

BRUCE HEBETS: It could be handled however this Committee wants. I can take this to the Board as an up-or-down decision, or just an advisement -- by the way, we are doing this.

CHUCK KIMBALL: I'm wondering if we can get away with doing -- literally, get away with not explaining the details, but saying we are now moving forward on adding Contract Medical to the Contract Dental load that we have, and it should be a great deal and all that sort of thing. If you don't have to go into details, and nobody says, "Well, who's going to run it?"

BRUCE HEBETS: That's fine.

CHUCK KIMBALL: Then, are we in trouble there with (indiscernible) at all? An idea?

MIKIA WALLIS: No. I believe that's already part of the strategic plan, so I don't know if that report even needs approval. But just as a, you know, operational FYI.

CHUCK KIMBALL: An operational FYI is probably -- then I think there wouldn't be any problem presenting it. I think, in my mind, but Dennis and Mike?

MIKE HICKOK: I don't think the Board approved Daryl in the first place.

CHUCK KIMBALL: I think you're right.

MIKE HICKOK: I don't recall ever being asked.  I mean, we discussed it.

CHUCK KIMBALL: I think that was a slam dunk thing. It just happened, didn't it?

DENNIS NOURSE: I think what was discussed was, was it going to be your participation.

[OVERLAPPING SPEAKERS]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DENNIS NOURSE: It might come as a surprise to some to know that Daryl is out there doing this. That was never a part of the vote. And neither should be Contract Medical.

BRUCE HEBETS: The opportunity I put together -- trust me, I really wish that I had a piece of it, or that I received some kind of commission on it.

MIKE HICKOK: Don't we all.

BRUCE HEBETS: Because this is going to be off the (indiscernible) -- is still the only MSO that exists in the country doing this.

DENNIS NOURSE: Can we make that a conditional approval by the --

[OVERLAPPING SPEAKERS]

CHUCK KIMBALL: I was thinking, we are going to retire, like you and I. We could retire and draw a little salary.

MIKIA WALLIS: None of this goes in the minutes.

[OVERLAPPING SPEAKERS]

BRUCE HEBETS: If you were to analyze (indiscernible), he's at like $14- or $15 million a year revenue.

HARRY ILSLEY: Chuck?

CHUCK KIMBALL: Yeah?

HARRY ILSLEY: As I remember, and Bruce, you can correct me if I'm wrong, but when we first talked about, regarding Daryl, we got approval through the Executive Committee only. We did not take that to the Board.

CHUCK KIMBALL: I believe you're right.

HARRY ILSLEY: That's the same with Contract Dental. That was not approved by the Board. That was approved by the Executive Committee. So, I don't think you need to take this matter to the Board. I think the Executive Committee can approve it and go from there on it.

MIKE HICKOK: And Harry, I agree with you; it wouldn't be an up or down decision to the Board, but how about just advising them that this is going to be another program?

HARRY ILSLEY: And that's what we did before. We just advised them what we had done.

109.   Ultimately, the Borrego Insiders determined that Bruce Hebets would "share with the board [his] thoughts of going into contract medical, and just leave it at that."  And ultimately, the Borrego Insiders only told the full Board that they were expanding into "contract medical."  The Borrego Insiders continued to conceal that there was a third party involved.

110.   At the August 30, 2017 Borrego Health Board meeting, the minutes reflect that "Borrego Health will be pursuing a contract medical program," along with the notation "Information only."

111.   Beyond intentionally omitting information about the Dental MSA and Medical MSA from the full Borrego Health Board, the Borrego Insiders also implemented several internal mechanisms to conceal the Premier Scheme. One example of this is seen through Diana Thompson and Karen Hebets' significant violations of the nepotism policy (see the below "Nepotism and Cronyism Scheme"). Diana Thompson and Karen Hebets hired several family members to place in the billing and accounting department at Borrego Health. These family members did not have any prior experience in the healthcare industry, let alone FQHC experience.  Karen Hebets and Diana Thompson then created a training protocol, in which the two "trained" their family members how to review the EOBs and claims submissions for errors and duplications.  As a direct result of Karen Hebets' and Diana Thompson's training, their family members allowed thousands of duplicate claims to be improperly processed.

112.   When non-familial employees requested to receive more broad departmental trainings, Diana Thompson instead ensured that employees were only trained for isolated projects.  This allowed the process of reviewing the fraudulent claims to be insulated and hidden from Borrego Health as a whole.

113.   Further, prior to 2020, Mikia Wallis ensured that the details included in Board and Executive Committee meeting minutes were kept to a minimum.  After these meetings, Mikia Wallis would request her assistant send her the draft minutes

1  so she could redline, edit, amend and delete information. That way, any subsequent

2  requests for minutes would not reveal any details about what was discussed as it

3  related to the alleged Schemes. For example, during the August 31, 2017 Executive

4  Committee meeting, the Borrego Insiders were discussing the ongoing agreement

5  with Daryl Priest and Premier. During the discussion, Mikia Wallis stated: "None of

6  this goes in the minutes."

7       114.   On January 20, 2017, Travis Lyon told employees in Borrego Health's

8  finance department that any communication regarding the Dental MSA needed to

9  solely be directed to Travis Lyon.  This was to conceal from other Borrego Health

10  employees what total monthly revenue Premier was receiving as a result of the

11  Dental MSA.

12       115.   Mike Hickok would present monthly financial reports at each Board

13  meeting.  At its highest, the compensation paid to Premier was $20 million in fiscal

14  year 2019.  During fiscal year 2020, Borrego Health paid $18.15 million to Premier.

15  However, despite Premier being Borrego Health's highest paid vendor, Mike

16  Hickok failed to mention the arrangement in his reports.

17       116.   During the January 31, 2019 Executive Committee meeting, Mike

18  Hickok admitted to Chuck Kimball that the Borrego Insiders had been keeping the

19  full Borrego Health Board "out of the loop" (his words) as it pertained to Borrego

20  Health's growth and the contract dental program.

21       117.   It was not until the summer of 2020 that Borrego Health Board

22  members other than the Borrego Insiders became aware of the arrangement.

23       118.   By email on or about July 23, 2020, Borrego Insider Mike Hickok

24  admitted, "As long as I have been on the board our dealings with them [Premier]

25  have been secretive mysterious and above all off limits to board members."  Mike

26  Hickok's email went on to report the basic terms of the Dental MSA and Medical

27  MSA (along with the total fees paid to Premier the prior year), demonstrating that he

28  was familiar with the arrangement and its terms.  The email also admitted that,

1    among other things, the Dental MSA and Medical MSA were never approved by the
2    full Borrego Health Board, were never put out for competitive bidding, and were
3    never reported on 990 forms.  Mike Hickok also stated that the arrangement with
4    Premier "was hardly the extent of [Borrego Health's] involvement with the
5    principals of Premier Healthcare" and that "no board member has ever seen the
6    agreement or any other financial documents relating to this entity."  Mike Hickok
7    did not explain why, since he knew about these arrangements, he had never raised
8    them prior to this time.  Mike Hickok acknowledged "I have a fiduciary
9    responsibility…" and that "each and every Board member can potentially be held
10   accountable legally and financially for allowing an improper (and perhaps illegal)
11   relationship to continue."

12         119.   It is clear that the Borrego Insiders were using contract dental as a
13   source of money to fund their own enrichment. And others were in on this Scheme.
14   When Jim Hebets (who was not employed by Borrego Health) was approached
15   about possible cuts to the above-market, lucrative 162B plans the he sold to Borrego
16   Health (alleged below), Jim Hebets responded on August 1, 2018, "Are you really
17   sure that the board will actually want to cut these benefits given the good news
18   about Contract Dental."

19         120.   Further, at a September 24, 2020 Finance Committee Meeting, the
20   Dental MSA was discussed. Trustee Keenan Freeman indicated that billing software
21   companies usually charge between $3-6 per claim, and that $25 per claim was
22   outside of fair market value. Diana Thompson reassured Keenan Freeman that when
23   the Dental MSA was entered into, several other vendors quoted 10%-12% of total
24   revenue, which equated to approximately $25 per claim.

25              **iv.    The Damages Suffered by Borrego Health Due to the**
26                   **Premier Scheme**

27         121.   Following the discovery of the Dental MSA and Medical MSA and the
28   relationship with Premier by the full Borrego Health Board, Borrego Health retained

1    a valuation expert to determine the maximum fair market value of the services

2    Premier provided to Borrego Health, if those services were valuable at all.

3         122.   The valuation, conducted by BKD, determined that the fair market

4    value of the contract dental services Premier was supposed to perform totaled $19

5    million over the term of the Dental MSA (at that point).  However, Borrego Health

6    paid over $60 million for those services, meaning the Borrego Health overpaid by at

7    least $40 million.  The fair market value of the contract medical services was

8    $145,000 over the term of the Medical MSA (at that point).  Borrego Health paid

9    over $383,000 for those services, meaning the Borrego Health overpaid by over

10   double, or around $238,000.  Moreover, neither of these valuations take into account

11   the various breaches of contract set forth herein, which would reduce the value of

12   the services.

13        123.   The Dental MSA provides, in pertinent part, that Premier shall "defend,

14   indemnify and hold Borrego Health free and harmless from any obligations, costs,

15   claims, judgments, attorney's fees, or attachments arising from Premier's negligence

16   in the performance of the services contemplated under this Agreement." (*See*

17   Exhibit A, Section 6.)  The Medical MSA states that Summit (now Premier) "shall

18   defend, indemnify and hold Borrego Health, its officers, employees and agents

19   harmless from and against any and all liability, loss, expense (including reasonable

20   attorney's fees) or claims for injury or damages arising out of the performance of

21   this Agreement." (*See* Exhibit D, Section 8.)

22        124.   Borrego Health provided notice of Premier's indemnification

23   obligation, but Premier has not provided any financial support.

24        125.   Separate and distinct from Premier's contractual duty to indemnify

25   Borrego Health, Premier is also obligated to indemnify Borrego Health under equity

26   principles, if either agreement were not enforceable.  "Equitable indemnity applies

27   in cases in which one party pays a debt for which another is primarily liable and

28   which in equity and good conscience should have been paid by the latter party."

1    *United Services Auto. Ass'n v. Alaska Ins. Co.* (2001) 94 Cal. App. 4th 638, 644-645

2    (emphasis added); *see also Prince v. Pacific Gas & Elec. Co.* (2009) 45 Cal. 4th

3    1151, 1163.  As such, even if Premier were not contractually bound to indemnify

4    Borrego Health, it still owes Borrego Health a duty of indemnification.  *See*

5    *Crawford v. Weather Shield Mfg., Inc.* (2008) 44 Cal. 4th 541, 551

6    ("[C]ontractual promise to 'defend' another against specified claims clearly

7    connotes an obligation of active responsibility, from the outset, for the promisee's

8    defense against such claims.  The duty promised is to render, or fund, the service of

9    providing a defense on the promisee's behalf—a duty that necessarily arises as soon

10   as such claims are made against the promisee, and may continue until they have

11   been resolved." [emphasis added]); Civil Code § 2778.  As such, Premier is under

12   an obligation to cover the expense of Borrego Health's defense against any claims

13   subject to the Dental MSA and Medical MSA.

14          126.   On information and belief, the Borrego Insiders were compensated for

15   this access and control through kickbacks or other payments or remuneration.  As

16   Bruce Hebets stated at an August 31, 2017 meeting of the Borrego Insiders, "we've

17   already made Daryl rich, but Daryl has made us richer."

18          127.   In addition, when the fraud related to the contract dental program was

19   uncovered, both the contract dental and in-house dental programs were treated as

20   fraudulent by the Department of Health Care Services and payments were

21   suspended in amount to be proven at trial.  Under the payment suspension, Borrego

22   Health has not been paid for the in-house dental services since the suspension was

23   implemented in November 2020.

24          128.   In addition, Borrego Health was also forced to hire an independent

25   monitor pursuant to the terms of the November 2020 partial Medi-Cal suspension.

26   These monitors have cost Borrego Health $2.7 million thus far.

27          129.   In addition, Borrego Health has also been forced to close both its

28   Riverside and Barstow clinics.

7288673.3

1    130.   In addition, Borrego Health has also been forced to incur significant

2  legal and consulting fees, in an amount to be proven at trial.

3    131.   In addition, Borrego Health has also lost a significant numbers of staff,

4  and continues to have difficulty retaining employees.

5    **C.    Certain Contract Dentists Submitted Fraudulent Bills with the**

6    **Knowledge and Support of Premier and the Borrego Insiders (the**

7    **"Fraudulent Dental Billing Scheme")**

8    132.   Based on both Medi-Cal and Borrego Health's billing and payment

9  structure, some of the dentists were also motivated to provide as many services to

10  Borrego Health patients as possible, in some instances even where the services were

11  not medically unnecessary.  Even more egregious, some dentists split services that

12  could have been done in one encounter to multiple encounters so that they could

13  collect multiple times.  More egregious than that, some dentists provided multiple

14  services during a single encounter, but billed the services as multiple encounters.

15  Finally, most egregious of all, some dentists billed for services they never provided.

16    133.   Unbeknownst to Borrego Health, certain contract dentists and dental

17  practices, Premier and the Borrego Insiders schemed to maximize their profits at the

18  expense of the Medi-Cal program and Borrego Health.  Since the dentists were paid

19  on a "per encounter" basis, certain contract dentists, with the knowledge and support

20  of Premier and the Borrego Insiders, among other things (1) provided services were

21  not medically unnecessary, (2) split services that could have been done in one

22  encounter to multiple encounters so that they could collect multiple times, (3)

23  provided multiple services during a single encounter, but billed the services as

24  multiple encounters, and/or (4) billed for services they never provided.  This scheme

25  is detailed below.

26    134.   As part of the Dental MSA, Premier, through the Premier Defendants,

27  were involved in the engagement and outreach of new dental providers for the

28  contract dental program. Once the Premier Defendants found potential contract

43

7288673.3

dental providers, the Premier Defendants provided the dentists with a copy of their original Contract Dental Agreement.  The Premier Defendants then reviewed the terms and conditions of the agreements with the dentists, including reviewing and explaining the addendums which addressed the billing and payment structure under Medi-Cal.  (*See i.e.* Ex. L, Addendum E.)  The Premier Defendants did this for all Dental Defendants with the exception of Velasquez and Thompson.

135.   Under the Dental MSA, Premier was also responsible for training the Dental Defendants on how to properly submit their claims to Premier for payment. Premier employee, Maria Elena Fernandez, and Travis Lyon provided training to the Dental Defendants. The Borrego Insiders were also involved in ensuring Premier Defendants trained the contract dental providers in a way to maximize profits from the schemes.  For example, on February 20, 2018, Karen Hebets and Travis Lyon had an afternoon phone call to discuss training protocols.

136.   Under the Dental MSA, Premier was responsible for claims monitoring, which involved review of claims received by contract dental providers to ensure that claims were compliant with federal and state regulation prior to submission to Borrego Health for final submission to Medi-Cal for payment.  Prior to the Program Integrity implementation (discussed below), Borrego Insider Karen Hebets had responsibility for billing audits and identifying billing discrepancies.

137.   Under the Dental MSA, Premier was also responsible for implementing quality management measures to address patient grievances, audit and survey contract dental providers and provide Borrego Health with the findings of such surveys and audits, and provide education and training to contract dental providers who did not meet the requirements under the quality measures implemented.

138.   The Premier Defendants completely abdicated their responsibilities under the Dental MSA, because effective performance would have undermined the scheme to facilitate contract dentists overbilling Borrego Health for services.  The Premier Defendants understood that the more claims that were submitted benefitted

1    the Premier Defendants, because Premier was compensated by Borrego Health

2    based on the volume of claims.

3          139.   While it is true that the Premier Defendants were derelict in their

4    duties, their conduct went much further.  The Premier Defendants actively supported

5    the fraud described below.  On information and belief, the Premier Defendants

6    coached dentists on how to fraudulently bill Borrego Health, including coaching

7    them on "claim splitting" and fraudulently billing for non-covered bridges.

8          140.   Dentists were paid on a per-encounter basis, so in the event that a

9    dentist performed multiple procedures in one encounter, they were still paid for one

10   encounter.  The Premier Defendants coached dentists to split these claims, *i.e.*, bill

11   one encounter on the day it occurred and the next day, so that the dentist could get

12   paid for both.  This is a fraud on Borrego Health and on the government.  It is clear

13   from the following paragraphs that the dentists took this practice to the extreme,

14   sometimes billing for dozens of patient visits for one patient in a single month.

15         141.   Another way the Dentist Defendants, supported by the Premier

16   Defendants and Borrego Insiders, submitted false and fraudulent bills was through

17   improper billing for bridges.  Dental bridges literally bridge a gap for a missing

18   tooth.  A connected bridge covers both sides of the teeth next to the missing tooth to

19   hold a false tooth in the missing spot.  A bridge is generally not covered by Medi-

20   Cal.  To avoid this non-coverage, on information and belief, the Premier Defendants

21   coached dentists to bill for three crowns – one for missing tooth and one for each

22   tooth beside it – instead of billing for a bridge, and to bill three separate encounters.

23   In this way, rather than billing for one non-covered service (and one visit), the

24   dentist falsely documented three covered services and fraudulently billed for all

25   three.

26         142.   Premier routinely approved of services that could not have possibly

27   occurred.  Dentists were required to upload a progress note and an x-ray for Borrego

28   Health to pay the dentists for certain claims.  Borrego Health has also identified

7288673.3

dozens of examples in which x-rays clearly demonstrate that the claimed service could not have occurred (e.g., because the x-ray submitted to Premier shows that the tooth supposedly receiving the service is no longer in the mouth of the patient), yet employees from Premier still signed their names to approve the services.

143. After the Premier Defendants received the claims from the Dental Defendants, they would e-mail the bills to Diana Thompson, Karen Hebets, Julian Thompson, and other family members Borrego Insiders hired to Borrego Health's finance department. Premier would electronically submit the Dental Defendants' claims to Borrego Health then e-mail its invoices for the claims it processed. This occurred on a monthly basis. For example, on December 10, 2019, Travis Lyon e-mailed Diana Thompson with Premier's November 2019 invoice. The invoice included a total of 79,217 claims. Of those claims, Aldairi billed 2,190 claims, which was nearly ten times higher than the average claims billed by other contract dental providers that month. To put this further into perspective, Aldairi would have needed to see over 115 patients every business day that month to reach that total. During that same month, Stephan billed for 1,195 claims, over five times the average claims billed by other contract dental providers that month. The Premier Defendants did not flag these billing practices as suspicious to Borrego Health. Rather, Premier Defendants pushed these claims forward, represented it reviewed the claims to confirm they were legitimate and had the required supporting documentation, and demanded $25 per claim they allegedly reviewed. And despite these clear outliers, once the invoices were sent to Diana Thompson, she did not take any action to bring attention to these discrepancies, instead pushing them through Borrego Health's finance department for her step-son Julian Thompson to process Premier's payment. Julian Thompson then mailed Premier a check for $1,980,425.00. Additionally, the greater number of claims, the more staff Borrego Health's finance department would need to keep the scheme concealed, allowing

7288673.3

1   Diana Thompson more opportunities to hire more of her family for positions in

2   which they lacked the qualifications.

3        144.   In another example, on January 20, 2020, Travis Lyon e-mailed Diana

4   Thompson with Premier's invoice for the December 2019 claims, which totaled

5   58,437 contract dental claims.  In the December 2019 invoice, a single office run by

6   Aldairi submitted 1,680 claims alone, over ten times the average number of claims

7   of the other dental providers.  Another dentist, Stephan, billed 1,062 claims during

8   that one month for one of his offices, over six times the average number of claims

9   submitted by the other contract dental providers.  The Premier Defendants did not

10   flag these billing practices as suspicious to Borrego Health. Rather, the Premier

11   Defendants pushed these claims forward, represented it reviewed the claims to

12   confirm they were legitimate and had the required supporting documentation, and

13   demanded $25 per claim they allegedly reviewed.  And despite these clear outliers,

14   once the invoices were sent to Diana Thompson, she did not take any action to bring

15   attention to these discrepancies, instead pushing them through Borrego Health's

16   finance department for her step-son to process Premier's payment and mail Premier

17   a check for $1,460,925.00.  Additionally, the greater number of claims, the more

18   staff Borrego Health's finance department would need to keep the scheme

19   concealed, allowing Diana Thompson more opportunities to hire more of her family

20   for positions in which they lacked the qualifications.

21        145.   In another example, on March 16, 2020, Travis Lyon e-mailed Diana

22   Thompson with Premier's invoice for the February 2020 claims, which totaled

23   67,928 contract dental claims. In the February 2020 invoice, a single office run by

24   Aldairi submitted 2,042 claims alone, over ten times the average number of claims

25   of the other dental providers.  Another dentist, Arakelyan, billed 1,072 claims during

26   that one month for one of his offices, over five times the average number of claims

27   submitted by the other contract dental providers.  Another dentist, Stephan, billed

28   1,291 claims during that one month for one of his offices, over six times the average

1  number of claims submitted by the other contract dental providers.  The Premier
2  Defendants did not flag these billing practices as suspicious to Borrego Health.
3  Rather, Premier pushed these claims forward, represented it reviewed the claims to
4  confirm they were legitimate and had the required supporting documentation, and
5  demanded $25 per claim they allegedly reviewed.  And despite these clear outliers,
6  once the invoices were sent to Diana Thompson, she did not take any action to bring
7  attention to these discrepancies, instead pushing them through Borrego Health's
8  finance department for her step-son to process Premier's payment and mail Premier
9  a check for $1,698,200.00. Additionally, the greater number of claims, the more
10 staff Borrego Health's finance department would need to keep the scheme
11 concealed, allowing Diana Thompson more opportunities to hire more of her family
12 for positions in which they lacked the qualifications.

13                   **i.      Husam E. Aldairi, D.D.S.**

14          146.   On or about May 27, 2016 and May 29, 2018, Husam Aldairi, D.D.S.,
15 both individually and through his company Aldairi DDS, Inc. (collectively,
16 "Aldairi") entered into written dental services agreements (the "Aldairi
17 Agreements") whereby Aldairi agreed to provide primary dental services to
18 participating Borrego Health patients, and Borrego Health agreed to pay Aldairi for
19 those services.  Husam Aldairi is the sole officer and director of Husam Aldairi,
20 D.D.S. Husam Aldairi also operates as the Chief Executive Officer, Secretary and
21 Chief Financial officer of Husam Aldairi, D.D.S. Husam Aldairi is also the agent for
22 service of process for Husam Aldairi, D.D.S. Husam Aldairi maintains complete
23 ownership, management and control of Husam Aldairi, D.D.S. As such, while the
24 parties to the Aldairi Agreements are Borrego Health and Husam Aldairi, D.D.S.,
25 Husam Aldairi, as the alter ego and/or sole owner of Husam Aldairi, D.D.S. and as
26 signatory of the Aldairi Agreements, is capable of being held personally liable under
27 the Aldairi Agreements. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.) A true
28 and correct copy of the 2016 Aldairi Agreement is attached herein as Exhibit E, and

1   a true and correct copy of the 2018 Aldairi Agreement is attached herein as Exhibit

2   F.

3       147.   As a participant in Borrego Health's contract dental program, Aldairi

4   was involved in Borrego Health's operations by providing dental services to

5   Borrego Health patients.

6       148.   Among other things, the Aldairi Agreements required that Aldairi

7   practice dentistry in accordance with all Federal, State and local laws, regulations,

8   and generally accepted principles applicable to the practice of dentistry, and  to

9   prepare, establish, and maintain administrative records, financial records, records

10   pertaining to patient diagnosis and treatment, and information pertaining to the

11   services provided.

12       149.   Aldairi submitted false and fraudulent bills and made other statements

13   which Aldairi knew to be false or had no reasonable grounds for believing their

14   representations were true, which also constitute a breach of the Aldairi Agreement.

15   A non-exhaustive list of examples is set forth below.  The below examples are

16   demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

17       150.   On May 21, 2020, the Executive Officer of the Dental Board of

18   California (the "Dental Board"), Karen M. Fischer, issued an Accusation against

19   Husam Aldairi alleging Husam Aldairi, dating back to December 2016, committed

20   gross negligence, "repeated acts of professional negligence," and failed to properly

21   document patient treatment, surgical procedures, diagnosis, and clinical findings.

22   The Accusation sought to revoke or suspend Husam Aldairi's dentist license to

23   practice in California.

24       151.   On May 25, 2021, the Dental Board and Husam Aldairi agreed to a

25   Stipulated Settlement and Disciplinary Order in which Husam Aldairi "voluntarily,

26   knowingly, and intelligently waive[d] and [gave] up" his legal rights, including a

27   right to hearing on the charges and allegation.  Under the order, Husam Aldairi's

28   dental license to practice in California was revoked, but the revocation was stayed

1   pending a two-year probationary period.  The Dental Board adopted the order,
2   effective June 24, 2021.
3          152.   Husam Aldairi never informed Borrego Health of the ongoing Dental
4   Board investigation on his license or the issued Accusation.
5          153.   Husam Aldairi's failure to inform Borrego Health of the ongoing
6   Dental Board investigation on his license or the issued Accusation, made the First
7   Agreement subject to suspension until the Dental Board issued its final
8   determination on April 29, 2021.
9          154.   Husam Aldairi's failure to inform Borrego Health of the ongoing
10  Dental Board investigation on his license or the issued Accusation, made the Second
11  Agreement subject to suspension until the Dental Board issued its final
12  determination on April 29, 2021.
13         155.   In September 2020, Borrego Health conducted a compliance re-audit of
14  Husam Aldairi.  Husam Aldairi had failed his prior audit with Borrego Health, but
15  Borrego Health provided Husam Aldairi another opportunity to obtain compliance
16  with Borrego Health's policies.  Borrego Health even offered Husam Aldairi one-
17  on-one compliance trainings.  For the September 2020 audit, out of the sampled
18  dental record documents pulled for his private practice at the San Diego location,
19  none of them met the documentation requirements under the Aldairi Agreements
20  and Borrego Health's policies for contract dental providers.  Out of the sampled
21  dental record documents pulled for Aldairi DDS, Inc. at the El Cajon location, only
22  three out of 30 claims met the documentation requirements under the Aldairi
23  Agreements and Borrego Health's policies for contract dental providers.
24         156.   The results of Borrego Health's audit from September 2020 of Husam
25  Aldairi indicated that Husam Aldairi had clearly violated the terms of the Aldairi
26  Agreements by his actions, including but not limited to: (1) billing excessive patient
27  visits, including falsifying appointment schedules; (2) failing to maintain adequate
28  documentation to support billing; (3) falsification of medical records; (4) performing

7288673.3

1    services that lacked medical necessity; (5) providing services that fell below the
2    standard of care; (6) providing excessive services; and (7) generating inaccurate
3    billing records, including billing for services not rendered, upcoding, inappropriately
4    splitting services, and billing for services rendered by another provider and/or
5    providers not enrolled in Medi-Cal.
6        157.   For example, patient charts with Husam Aldairi demonstrated in
7    multiple instances that patients presented to his office on several consecutive days to
8    receive dental services, however, patient scheduling did not support such frequent
9    visits.  In some instances, patient charts would have notes for services rendered on
10   days in which Husam Aldairi's offices were closed.[2] Program Integrity calculated a
11   65% rate of potentially falsely billed appointments (meaning no face-to-face
12   encounter).  As an example, the audit found that there were notes written and
13   procedures billed by Husam Aldairi indicating that a face-to-face visit occurred on
14   dates when the office was closed for the Thanksgiving holiday.
15       158.   Further examples include: (1) on or about June 2020, a patient in which
16   Husam Aldairi billed Borrego Health for telehealth and emergency dental services
17   completely absent from the patient's chart; (2) on or about July 2019, Husam
18   Aldairi's office billed Borrego for several crowns when x-rays demonstrated a
19   bridge had been placed on the patient; (3) on or about May 2019, Husam Aldairi
20   billed Borrego Health for a partial denture which was never prepared; and (4) on or
21   about February 2020, Husam Aldairi billed Borrego Health as though a patient's
22
23   [2] To protect patient private health information ("PHI") as well as personally
     identifiable information ("PII"), the names of the patients in the examples
24   throughout the complaint will not be included.  The specific information, including
     names, dates of service, and all other information, are already available to the
25   Dentist Defendants, as they maintain custody of the patient charts.  Borrego Health
     alleges that each claim referenced throughout this FAC represents a specific claim
26   the dentist submitted to Borrego Health.  Borrego Health can produce the specific
27   information for each alleged claim to the Dentist Defendants.
28

1  root canal was completed over the course of several visits, when x-rays
2  demonstrated it was completed in one visit.  Dr. Aldairi billed Borrego for patient
3  visits that either did not occur or that were provided by providers that were not
4  disclosed to or credentialed by Borrego Health.  One example of extreme excess
5  billing occurred on July 22, 2019. Dr. Aldairi billed Borrego Health for 147 patient
6  visits that he claimed occurred that day.

7       159.   In October 2019, Dr. Aldairi billed 15 different encounters for a single
8  patient, despite the fact that there are only 23 business days in October.  In May
9  2020, Dr. Aldairi billed 16 different encounters to a single patient, despite only
10  having 21 business days in that month.  Further, in June 2020, one of Dr. Aldairi's
11  subproviders billed 18 different encounters during the month of June 2020. That
12  same subprovider then billed 34 different encounters for a single patient from the
13  time period of May 2020 to June 2020.  Again, Premier did not flag these bills and
14  took no steps to counsel or discipline this dentist.

15       160.   Review of Aldairi's claims data indicates he carried out his excessive
16  visits scheme to great effect.  Aldairi billed for more than five visits for the same
17  patient in a seven day period 6,340 times between February 2017 and January 2021.
18  It would be unusual for an individual ever to require dental service every weekday
19  for an entire week.  However, during the approximately five year span, Aldairi
20  represented that he had that unusual occurrence happen 6,340 times.  During that
21  same period, he billed for twelve or more visits in a 30-day period for the same
22  patient more than 3,837 times.

23       161.   Aldairi submitted these claims to the Premier Defendants seeking
24  payment.  The Premier Defendants, under the Dental MSA, were obligated to
25  perform their due diligence in reviewing the claims for accuracy and ensuring
26  supporting documentation was submitted alongside the claims.  The Premier
27  Defendants allowed these excessive, unsubstantiated, and duplicative claims to be
28  submitted to Borrego Health for processing and payment, because Premier received

1   $25 per claim submitted to Borrego Health.  Further, once the claims had reached

2   Borrego Health, Karen Hebets and Diana Thompson had trained their family

3   members not to flag these claims as potentially fraudulent.

4           162.   Further, at the beginning of the COVID-19 pandemic, when most

5   dental offices were closed or working at near-zero capacity, Aldairi's office

6   continued to be hyper-productive.  To do this, Aldairi increased his billing of

7   teledentistry (D9995) and emergency visits (D9430).  However, Borrego Health's

8   recent review of the charts indicated that these visit types were not documented in

9   the progress notes for the patients, calling into question whether they actually

10  occurred.

11          163.   In addition to the above, Aldairi hired Maura Tuso in September 2017

12  to work as a dentist at his dental practice. Dr. Tuso was employed by Dr. Aldairi

13  from September 2017 to January 2018. During the time Dr. Tuso worked for

14  Aldairi, Dr. Tuso was suspended from providing dental services to Medi-Cal

15  patients.  Aldairi was aware that Dr. Tuso was suspended at the time Aldairi hired

16  Dr. Tuso.  Nevertheless, Aldairi allowed Dr. Tuso to see Borrego Health patients

17  and bill Borrego Health for the services Dr. Tuso provided to Medi-Cal patients.

18          164.   Aldairi also hired other dental providers, in addition to Dr. Tuso, who

19  lacked California dental licenses to provide dental services to Borrego Health

20  patients.  Upon information and belief, Aldairi billed Borrego Health for the services

21  that unlicensed dental providers provided to Medi-Cal patients.

22          165.   As a result of Aldairi's conduct, Borrego Health paid Aldairi and/or for

23  services which were not rendered, that were provided by other physicians, and/or

24  services which were provided during a period of time where the parties' agreements

25  would have otherwise been suspended or terminated.

26          166.   As alleged above, the Premier Defendants and the Borrego Insiders

27  worked diligently to ensure that Aldairi's fraudulent practices could continue,

28

7288673.3

1    preventing every effort by Program Integrity to terminate Aldairi, even going as far

2    as only allowing Travis Lyon to speak directly to Aldairi.

### ii.    Ayed Hawatmeh, D.D.S.

4        167.   On or about October 18, 2017, Ayed Hawatmeh, D.D.S., both

5    individually and through his company Hawatmeh Dental Group, P.C. (collectively

6    "Hawatmeh") entered into a written dental services agreement (the "Hawatmeh

7    Agreement") whereby Hawatmeh agreed to provide primary dental services to

8    participating Borrego Health patients, and Borrego Health agreed to pay Hawatmeh

9    for those services. Ayed Hawatmeh is the sole officer, Chief Executive Officer, and

10   the agent for service of process for Hawatmeh Dental Group, P.C. As such, while

11   the parties to the Hawatmeh Agreement are Borrego Health and Hawatmeh Dental

12   Group, P.C., Ayed Hawatmeh, as the alter ego and/or sole owner of Hawatmeh

13   Dental Group, P.C. and as signatory of the Hawatmeh Agreement, is capable of

14   being held personally liable under the Hawatmeh Agreement. (*See i.e. Irey v. Len*

15   (1961) 191 Cal. App. 2d 13.)

16       168.   A true and correct copy of the Hawatmeh Agreement is attached herein

17   as Exhibit G.

18       169.   As a participant in Borrego Health's contract dental program,

19   Hawatmeh was involved in Borrego Health's operations by providing dental

20   services to Borrego Health patients.

21       170.   Among other things, the Hawatmeh Agreement required that

22   Hawatmeh practice dentistry in accordance with all Federal, State and local laws,

23   regulations, and generally accepted principles applicable the practice of dentistry,

24   and to prepare, establish, and maintain administrative records, financial records,

25   records pertaining to patient diagnosis and treatment, and information pertaining to

26   the services provided.

27       171.   Hawatmeh submitted false and fraudulent bills and made other

28   statements which Hawatmeh knew to be false or had no reasonable grounds for

1   believing their representations were true, which also constitute a breach of the
2   Hawatmeh Agreement.  A non-exhaustive list of examples is set forth below.  The
3   below examples are demonstrative of a larger pattern and practice of fraudulent
4   and/or unlawful conduct.

5        172.   Hawatmeh routinely employed the scheme, described above, whereby
6   he would bill for several crowns instead of a single, non-covered bridge.  For
7   example, on or about February 2018, Hawatmeh billed Borrego Health for several
8   crowns were placed over the course of several days when documentation indicated a
9   single bridge was used.

10       173.   Hawatmeh also billed for services that the x-rays he submitted to
11  Premier to get his claim approved clearly demonstrate could not have possibly
12  occurred.  For example, on or about May and June of 2018, Hawatmeh billed
13  Borrego Health for services performed on a tooth the patient no longer had at the
14  time of service.  Hawatmeh billed Borrego Health for a visit on February 22, 2018
15  for preparing a tooth for a crown, which requires shaving down the tooth.  However,
16  x-rays of that patient from May 2017 clearly demonstrate that tooth had an implant
17  in that spot, meaning there was no natural tooth for Hawatmeh to prepare to receive
18  a crown. (*See, supra,* n. 2).

19       174.   In late 2018, Borrego Health became concerned that Hawatmeh was
20  billing for excessive visits when it identified that he had billed for 26 visits for one
21  patient in one month. Borrego Health put a hold on paying Hawatmeh's invoices.

22       175.   On November 26, 2018, Dr. Hawatmeh confirmed via email that a
23  biller in his office was responsible for "billing discrepancies." On November 29,
24  2018, Dr. Hawatmeh sent an email to Premier staff identifying dozens of visits for
25  20 patients that were improperly billed.

26       176.   That same day, Mr. Lyon emailed Dr. Martinez an excel file with
27  patient visits for which Hawatmeh billed, which stated:

28

"In just a quick cursory review of one of the patients (REDACTED) I can see that there are a handful of claims that were billed to Borrego, that do not exist in the patient chart.  It looks like the 2952 visits were fabricated and some of the visits where multiple teeth were surgically extracted, they were billed as showing they happened in multiple visits."

177.   Despite knowing of these improper visits, on November 30, 2018, Travis Lyon emailed Dr. Martinez and Dr. Venugopal that the billing issue was "isolated," argued Hawatmeh should be allowed to self-audit, and encouraged Program Integrity to only audit three additional charts.

178.   The Premier Defendants allowed these excessive, unsubstantiated, and duplicative claims to be submitted to Borrego Health for processing and payment, because Premier received $25 per claim submitted to Borrego Health.  Further, once the claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained their family members not to flag these claims as potentially fraudulent.

179.   Program Integrity then sought to terminate Hawatmeh's provider contract, but this effort was stopped by Travis Lyon and the Premier Defendants. On December 7, 2018, the Premier Defendants pushed back on immediately terminating Hawatmeh's provider contract under the pretext that such a move would complicate the ongoing Program Integrity audit.  Premier's lawyer, Erin Minelli, advised Borrego Health against terminating Hawatmeh and told Borrego Health to pay outstanding invoices.

180.   The same week, Travis Lyon sent an email to Dr. Martinez with a list of Hawatmeh's patients who received six or more crowns.  Travis Lyon used this example of gross over-utilization to justify *continuing* to pay Hawatmeh, claiming: "If we can continue to keep Dr. Hawatmeh's cooperation I believe we can facilitate an audit of all the patient charts in this list…." and that "We believe it is critical to encourage continued cooperation with Dr. Hawatmeh to facilitate continued audits

7288673.3

1   and investigations necessary to determine the extent of Borrego's potential

2   liability."

3        181.   Travis Lyon continued to put pressure on Program Integrity to release

4   the hold on Hawatmeh's invoices. On December 10, 2018, Mr. Lyon emailed Dr.

5   Martinez acknowledging that there are "phantom claims" and "potential over-

6   utilization" in the set of invoices, but that Borrego Health should go ahead and pay

7   half of the invoices.  On December 11, 2018, Karen Hebets sent an email, copying

8   Diana Thompson, instructing staff to pay Hawatmeh.  Diana Thompson then

9   emailed Travis Lyon to assure him Hawatmeh's check was forthcoming. Travis

10  Lyon responded that he "just spoke with Hawatmeh" and asks that the checks be

11  sent FedEx overnight rather than via courier.

12       182.   Ultimately, Program Integrity completed a full-file review of each of

13  Dr. Hawatmeh's offices. The results of this audit lead to Program Integrity

14  recommending his termination. Hawatmeh was terminated from the contract dental

15  program on September 17, 2019. The significant delay in terminating Hawatmeh

16  (and the harm caused during that period) is attributable to the Premier Defendants

17  and Borrego Insiders, who prolonged Hawatmeh's tenure so that they (and

18  Hawatmeh) could continue to benefit from his fraudulent billing.

19       183.   Subsequent review of Hawatmeh's billing patterns demonstrate the

20  extent of his excessive billing, which was of course confirmed through the 2019

21  audit of his patient charts.  During his time billing to Borrego Health, Hawatmeh

22  billed for twelve or more visits for the same patient in a 30-day period more than

23  6,500 times.  He billed five or more visits for the same patient in a 7-day period

24  more than 6,600 times.  It would be unusual for an individual ever to require dental

25  services every weekday for an entire week.  However, during the approximately five

26  year span, Hawatmeh represented that he had that unusual occurrence happen over

27  6,600 times.

28

7288673.3

### iii.    Alborz Mehdizadeh, D.D.S.

184.   On September 28, 2016 and December 11, 2018, Alborz Mehdizadeh, both individually and through his company Alborz Mehdizadeh, Inc. (collectively, "Mehdizadeh") entered into written dental services agreements (the "Mehdizadeh Agreements") whereby Mehdizadeh agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Mehdizadeh for those services. Alborz Mehdizadeh is the sole officer and director of Alborz Mehdizadeh, Inc. Alborz Mehdizadeh also operates as the Chief Executive Officer, Secretary and Chief Financial officer of Alborz Mehdizadeh, Inc. Alborz Mehdizadeh is also the agent for service of process for Alborz Mehdizadeh, Inc. Alborz Mehdizadeh maintains complete ownership, management and control of Alborz Mehdizadeh, Inc. As such, while the parties to the original Mehdizadeh Agreement are Borrego Health and Alborz Mehdizadeh, Inc., Alborz Mehdizadeh, as the alter ego and/or sole owner of Alborz Mehdizadeh, Inc. and as signatory of the Mehdizadeh Agreements, is capable of being held personally liable under the Mehdizadeh Agreements. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.)

185.   A true and correct copy of the 2016 Mehdizadeh Agreement is attached herein as Exhibit H, and a true and correct copy of the 2018 Mehdizadeh Agreement is attached herein as Exhibit I.

186.   As a participant in Borrego Health's Contract Dental program, Mehdizadeh was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

187.   Among other things, the Mehdizadeh Agreements required that Mehdizadeh practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

7288673.3

1    188.   Mehdizadeh submitted false and fraudulent bills and made other

2   statements which Mehdizadeh knew to be false or had no reasonable grounds for

3   believing their representations were true, which also constitute a breach of the

4   Mehdizadeh Agreements.  A non-exhaustive list of examples is set forth below.  The

5   below examples are demonstrative of a larger pattern and practice of fraudulent

6   and/or unlawful conduct.

7    189.   Dr. Mehdizadeh billed Borrego Health for patient visits that either did

8   not occur or that were provided by a providers that were not disclosed to or

9   credentialed by Borrego Health.  For example, he billed for 146 patient visits he

10   claimed to have performed on Saturday, November 16, 2019.

11    190.   From the period of October 23, 2018 to February 5, 2019, Dr.

12   Mehdizadeh purportedly performed—and billed for—29 surgical extractions on one

13   patient. There are two methods for extractions:  simple extraction (pull the tooth) or

14   surgical extractions (cut the gum).  At the outset, it is unlikely a patient would ever

15   need 29 surgical extractions (as opposed to simple extractions).  Further, even if this

16   were the case, this would never occur in 29 different sittings.  For surgical

17   extractions, the area around the extraction site is numb and the gum is cut open to

18   allow for the extraction. The standard practice when surgically extracting several

19   teeth is to numb and extract several teeth within the same quadrant.  Instead, Dr.

20   Mehdizadeh's billing practices indicate one patient came in for 29 surgical

21   extractions over a six month period.  If these extractions occurred at all, one can

22   only hope that this is a fraudulent billing practice, rather than grotesquely

23   substandard care to subject a patient to this treatment.

24    191.   This was not an isolated incident. Mehdizadeh's billing records showed

25   that he regularly billed contiguous dates of service (*i.e.,* multiple days in a row) for

26   surgical extractions. These are either fraudulent claim-splitting or substandard care,

27   either of which would make the claims unpayable.

28

7288673.3

192.   Dr. Mehdizadeh further submitted duplicate bills in order to receive reimbursement for the same services multiple times. For example:

- On April 2, 2018, Patient 1 received dental services under Dental Code D2392 for tooth number 14, which involves adding a resin based composite to the tooth. Dr. Mehdizadeh submitted bills for this service on both April 26, 2018 and May 1, 2018.  Premier Defendants reviewed and approved both claims submitted.

- On April 4, 2018, Patient 1 also received dental services under Dental Code D2391 for tooth number 18, which involves adding a resin based composite to the tooth.  Dr. Mehdizadeh submitted bills for this service on both April 26, 2018 and May 1, 2018.  Premier Defendants reviewed and approved both claims submitted.

- On October 31, 2018, Patient 2 received dental services under Dental Code D2392 for tooth number 15, which involves adding a resin based composite to the tooth.  Dr. Mehdizadeh submitted bills for this service on both November 8, 2018 and November 30, 2018.  Premier Defendants reviewed and approved both claims submitted.

193.   On August 11, 2018, Patient 3 received dental services under Dental Code D2391 for tooth number 29, which involves adding a resin based composite to the tooth.  Dr. Mehdizadeh submitted bills for this service on both August 14, 2018 and April 18, 2019.  Premier Defendants reviewed and approved both claims submitted. On February 24, 2020, Borrego Health conducted a re-audit of Dr. Medizadeh.  Upon arrival, Borrego Health's auditor, Dr. Elias Koutros, requested a sample of specific patient charts. Dr. Mehdizadeh's office informed the auditor that some charts were unavailable because they were taken out of the office. Of the charts available, the charts included exact photocopies from periodontal charting in multiple patient charts.  Periodontal charting includes six measurements per tooth. It is it nearly impossible that multiple patients would have six exactly identical

1  measurements for all of their teeth.  Dr. Koutros indicated to Dr. Medizadeh that he
2  believed the photocopies constituted fraudulent charting given the lack of change in
3  status. Dr. Medizadeh did not deny Dr. Koutros' allegations, and instead informed
4  Dr. Koutros that he wanted the audit to go well, so the charting was prepared with
5  that in mind.

6  194.   Review of Mehdizadeh's claims data indicates he carried out his
7  excessive visits scheme to great effect.  Mehdizadeh billed for more than five visits
8  for the same patient in a seven day period 4,091 times between February 2017 and
9  January 2021.  It would be unusual for an individual ever to require dental service
10  every weekday for an entire week.  However, during the approximately five year
11  span, Mehdizahdeh represented that he had that unusual occurrence happen over
12  4,000 times.  During that same period, he billed for twelve or more visits for the
13  same patient in a 30-day period more than 5,902 times.

14  195.   Medizadeh submitted these claims and others to the Premier
15  Defendants seeking payment.  The Premier Defendants, under the Dental MSA,
16  were obligated to perform their due diligence in reviewing the claims for accuracy
17  and ensuring supporting documentation was submitted alongside the claims.  The
18  Premier Defendants allowed these excessive, unsubstantiated, and duplicative
19  claims to be submitted to Borrego Health for processing and payment, because
20  Premier received $25 per claim submitted to Borrego Health.  Further, once the
21  claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained
22  their family members not to flag these claims as potentially fraudulent.

23  **iv.    Magaly M. Velasquez, D.D.S.**

24  196.   On or about November 5, 2014, Magaly M. Velasquez, both
25  individually and through her company Magaly M. Velasquez DDS, Professional
26  Dental Corp. (collectively, "Velasquez") entered into a written dental services
27  agreement (the "Velasquez Agreement") whereby Velasquez agreed to provide
28  primary dental services to participating Borrego Health patients, and Borrego Health

1   agreed to pay Velasquez for those services. Magaly Velasquez is the sole officer and
2   director of Magaly M. Velasquez DDS, Professional Dental Corp. Magaly
3   Velasquez also operates as the Chief Executive Officer, Secretary and Chief
4   Financial officer of Magaly M. Velasquez DDS, Professional Dental Corp. Magaly
5   Velasquez is also the agent for service of process for Magaly M. Velasquez DDS,
6   Professional Dental Corp. Magaly Velasquez maintains complete ownership,
7   management and control of Magaly M. Velasquez DDS, Professional Dental Corp.
8   As such, while the parties to the Velasquez Agreement are Borrego Health and
9   Magaly M. Velasquez DDS, Professional Dental Corp., Magaly Velasquez, as the
10  alter ego and/or sole owner of Magaly M. Velasquez DDS, Professional Dental
11  Corp., and as signatory of the Velasquez Agreement, is capable of being held
12  personally liable under the Velasquez Agreement. (*See i.e. Irey v. Len* (1961) 191
13  Cal. App. 2d 13.)
14      197.   A true and correct copy of the Velasquez Agreement is attached herein
15  as Exhibit J.
16      198.   As a participant in Borrego Health's contract dental program,
17  Velasquez was involved in Borrego Health's operations by providing dental services
18  to Borrego Health patients.
19      199.   Among other things, the Velasquez Agreement required that Velasquez
20  practice dentistry in accordance with all Federal, State and local laws, regulations,
21  and generally accepted principles applicable to the practice of dentistry, and prepare,
22  establish, and maintain administrative records, financial records, records pertaining
23  to patient diagnosis and treatment, and information pertaining to the services
24  provided.
25      200.   Velasquez submitted false and fraudulent bills and made other
26  statements which Velasquez knew to be false or had no reasonable grounds for
27  believing their representations were true, which also constitute a breach of the
28  Velasquez Agreement.  A non-exhaustive list of examples is set forth below.  The

below examples are demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

201.   As part of Borrego Health's efforts to clean house, it conducted an audit to evaluate the duplicate claims submitted by Velasquez. The audit found 150 claims were duplicative. For example:

- On April 20, 2019, Patient 4 received dental services under Dental Code D2392 for tooth number 21, which involves adding a resin based composite to the tooth.  Dr. Velasquez submitted bills for this service on both April 26, 2019 and April 27, 2019.  Premier Defendants reviewed and approved both claims submitted.

- On May 28, 2019, Patient 4 also received dental services under Dental Codes D0220, D0270, and D2751 for teeth numbers 12, 13, and 14. D0220 is one of the billing codes for  initial x-rays, D0270 is the billing code for single films, and D2751 is the billing code intended for porcelain crowns.  Dr. Velasquez submitted bills for these services on June 3, 2019 and June 27, 2019.  Premier Defendants reviewed and approved both claims submitted.

- On September 17, 2018, Patient 5 received dental services under Dental Code D2391 for tooth number 21, which involves adding a resin based composite to the tooth.  Dr. Velasquez submitted bills for this service on both September 18, 2018 and October 10, 2018.  Premier Defendants reviewed and approved both claims submitted.

- On July 11, 2018, Patient 6 received dental services under Dental Codes D2391 and D2392 for tooth number 4, which involves adding a resin based composite to the tooth. Dr. Velasquez submitted bills for this service on both July 16, 2018 and July 27, 2018.  Premier Defendants reviewed and approved both claims submitted.

1   • On January 31, 2019, Patient 7 received dental services under Dental
2      Codes D2391 and D2392 for tooth number 5, which involves adding a
3      resin based composite to the tooth. Dr. Velasquez submitted bills for
4      this service twice on February 4, 2019.  Premier Defendants reviewed
5      and approved both claims submitted.
6   • In May 2019, Dr. Velasquez billed Borrego Health as though Patient 8
7      received dental services 26 days in the month, despite there only being
8      22 business days in May 2019. Dr. Velasquez then billed Borrego
9      Health for 22 visits in June 2019 for that same patient, totaling 48 visits
10     for the same patient over a two month period.
11     202.   Review of Velasquez's claims data indicates she carried out the
12  excessive visits scheme to great effect.  Velasquez billed for more than five visits
13  for the same patient in a seven day period 4,552 times between February 2017 and
14  January 2021.  It would be unusual for an individual ever to require dental service
15  every weekday for an entire week.  However, during the approximately five year
16  span, Velasquez represented that he had that unusual occurrence happen 4,552
17  times.  During that same period, she billed for twelve or more visits for the same
18  patient in a 30-day period more than 2,656 times.
19     203.   Velasquez then submitted these claims and others to the Premier
20  Defendants seeking payment.  The Premier Defendants, under the Dental MSA,
21  were obligated to perform their due diligence in reviewing the claims for accuracy
22  and ensuring supporting documentation was submitted alongside the claims.  The
23  Premier Defendants allowed these excessive, unsubstantiated, and duplicative
24  claims to be submitted to Borrego Health for processing and payment, because
25  Premier received $25 per claim submitted to Borrego Health.  Further, once the
26  claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained
27  their family members not to flag these claims as potentially fraudulent.
28

7288673.3

### v.   Aram Arakelyan, D.D.S.

204.   On November 17, 2016, November 18, 2018, and November 29, 2018, Aram Arakelyan, both individually and through his company New Millennium Dental Group of Aram Arakelyan, Inc. (collectively, "Arakelyan"), entered into written dental services agreements (the "Arakelyan Agreements") whereby Arakelyan agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Arakelyan for those services. A true and correct copy of the 2016 Arakelyan Agreement is attached herein as Exhibit K.  A true and correct copy of the November 18, 2018 Arakelyan Agreement is attached herein as Exhibit L.  A true and correct copy of the November 29, 2018 Arakelyan Agreements are attached herein as Exhibit M.

205.   Aram Arakelyanis the sole officer and director of New Millennium Dental Group. Aram Arakelyan also operates as the Chief Executive Officer, Secretary and Chief Financial officer of New Millennium Dental Group. Aram Arakelyan is also the agent for service of process of New Millennium Dental Group. Aram Arakelyan maintains complete ownership, management and control of New Millennium Dental Group.

206.   As a participant in Borrego Health's contract dental program, Arakelyan was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

207.   Among other things, the Arakelyan Agreements required that Arakelyan practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

208.   Arakelyan submitted false and fraudulent bills and made other statements which Arakelyan knew to be false or had no reasonable grounds for

believing their representations were true, which also constitute a breach of the Arakelyan Agreements.  A non-exhaustive list of examples is set forth below.  The below examples are demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.  For example, (1) on or about January 2019, Dr. Arakelyan's office billed Borrego Health for a filling on a tooth which x-rays noted the patient did not have at the time of service; (2) on or about July 2019, Dr. Arakelyan's office billed Borrego Health for a root canal performed on a tooth which x-rays noted the patient did not have at the time of service; and (3) on or about March 2019, Dr. Arakelyan's office fraudulently submitted multiple claims to Borrego Health for multiple crowns when the supporting documentation attached to the claim indicated the patient actually received a singular bridge.

209.   In November 2019, Dr. Arakelyan billed 18 different encounters for a single patient, despite the fact that there are only 20 business days in November, meaning the bills showed this patient came in for dental services nearly every day in November.  Even more shocking, the dentist also billed for 11 additional encounters in August 2019, 13 in September 2019, 13 in October 2019 and—for good measure—three in December 2019, for a total of 58 separate encounters in the course of five months.  Premier did not flag these bills and took no steps to counsel or discipline this dentist.  As a result of Premier Defendants' failings, Borrego Health's Program Integrity program conducted its own audit into Dr. Arakelyan's billing practices.  When these egregious billing practices were discovered, Dr. Arakelyan informed Borrego Health's auditor that it was Premier Defendants who told him to bill in this manner.

210.   In January 2020, Dr. Venugopal attempted to conduct an on-site audit of Arakelyan's office. However, upon arrival, Dr. Venugopal was denied access to the office. Premier's attorney later called Dr. Venugopal and indicated that audits needed to go through Premier and that surprise audits were not allowed by law. Dr.

7288673.3

1  Venugopal informed Mikia Wallis of this issue, and Mikia Wallis did not challenge

2  Premier's false position. This allowed egregious billing practices to continue.

3  211.   In February 2020, one of Dr. Arakelyan's subproviders billed 16

4  different encounters for a single patient, despite the fact that there were only 19

5  business days in February 2020, meaning the bills showed this patient came in for

6  dental services almost every day in February 2020.  Premier did not flag these bills

7  and took no steps to counsel or discipline this dentist.

8  212.   Premier and the Borrego insiders worked diligently to ensure that

9  Arakelyan's fraudulent practices could continue to fund their scheme, preventing

10  every effort by Program Integrity to terminate him, even going as far as only

11  allowing Travis Lyon to speak directly to Arakelyan.

12  213.   Review of Arakelyan's claims data indicates he carried out his

13  excessive visits scheme to great effect.  Arakelyan billed for more than five visits

14  for the same patient in a seven day period 8,919 times between February 2017 and

15  January 2021, which is more than any other provider.  It would be unusual for an

16  individual ever to require dental service every weekday for an entire week.

17  However, during the approximately five year span, Arakelyan represented that he

18  had that unusual occurrence happen 8,919 times.  During that same period, he billed

19  for twelve or more visits for the same patient in a 30-day period more than 5,988

20  times.

21  **vi.    Michael Hoang, D.M.D.**

22  214.   On or about November 28, 2018, Michael Hoang, D.M.D. entered into

23  a written dental services agreement (the "Hoang Agreement") whereby Hoang

24  agreed to provide primary dental services to participating Borrego Health patients,

25  and Borrego Health agreed to pay Hoang for those services.  A true and correct copy

26  of the Hoang Agreement is attached herein as Exhibit N.

27

28

7288673.3

215.   As a participant in Borrego Health's contract dental program, Hoang was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

216.   Among other things, the Hoang Agreement required that Hoang practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, and  to prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

217.   Hoang submitted false and fraudulent bills and made other statements which Hoang knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Hoang Agreement. Upon information and belief, Hoang's conduct alleged herein is demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

218.   Hoang then submitted these claims to the Premier Defendants seeking payment.  The Premier Defendants, under the Dental MSA, were obligated to perform their due diligence in reviewing the claims for accuracy and ensuring supporting documentation was submitted alongside the claims.  The Premier Defendants allowed these fraudulent claims to be submitted to Borrego Health for processing and payment, because Premier received $25 per claim submitted to Borrego Health.  Further, once the claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained their family members not to flag these claims as potentially fraudulent.

219.   Borrego Health removed Dr. Hoang from its contract dental program in 2019 because he was billing the same claims *both* to Borrego Health and straight to Denti-Cal.  Dr. Hoang was terminated from Borrego Health's contract dental program in July 2019.

### vii.   Waleed Stephan, D.D.S.

220.   On October 1, 2016, Waleed Stephan, both individually and through his company W.A. Stephan, A Dental Corporation (collectively, "Stephan"), entered into a written dental services agreement (the "Stephan Agreement") whereby Stephan agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Stephan for those services.  Waleed Stephan is the sole director and Chief Executive Officer of W.A. Stephan, A Dental Corporation. Waleed Stephan maintains complete ownership and control of W.A. Stephan, A Dental Corporation. As such, while the parties to the Stephan Agreement are Borrego Health and W.A. Stephan, A Dental Corporation, Waleed Stephan, as the alter ego and/or sole owner of W.A. Stephan, A Dental Corporation, and as signatory of the Stephan Agreement, is capable of being held personally liable under the Stephan Agreement. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.)  A true and correct copy of the Stephan Agreement is attached herein as Exhibit O.

221.   As a participant in Borrego Health's contract dental program, Stephan was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

222.   Among other things, the Stephan Agreement required that Stephan practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

223.   Stephan submitted false and fraudulent bills and made other statements which Stephan knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Stephan Agreement. A non-exhaustive list of examples is set forth below.  The below examples are demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

1   For example, on August 13, 2019, Dr. Stephan billed Borrego Health for crowns on

2   teeth numbers 12, 13 and 14 over the course of multiple days.  However, the patient

3   care plan documents that a singular bridge was put in place during the course of one

4   appointment.

5          224.   Stephan also fraudulently represented that he purchased porcelain

6   crowns for patients, when in fact, he made ceramic crowns himself in his own

7   office.  Program Integrity staff became suspicious when Dr. Stephan was able to

8   place crowns in only a day or two, when the lab that Dr. Stephan documented he

9   was using had a much slower turnaround.  Program Integrity called the lab that Dr.

10  Stephan documented he was using, and that lab confirmed that it would take 14 days

11  to make a crown.  On further investigation, it was determined that, rather than

12  purchasing the crowns, Dr. Stephan was making them himself out of ceramic with a

13  CEREC machine.  To hide his scheme, he was falsifying documentation to say that

14  he purchased porcelain crowns from a lab.

15         225.   Stephan then submitted these claims and others to the Premier

16  Defendants seeking payment.  The Premier Defendants, under the Dental MSA,

17  were obligated to perform their due diligence in reviewing the claims for accuracy

18  and ensuring supporting documentation was submitted alongside the claims.  The

19  Premier Defendants allowed these claims to be submitted to Borrego Health for

20  processing and payment, because Premier received $25 per claim submitted to

21  Borrego Health.  Further, once the claims had reached Borrego Health, Karen

22  Hebets and Diana Thompson had trained their family members not to flag these

23  claims as potentially fraudulent.

24              **viii.   Santiago Rojo, D.D.S.**

25         226.   On March 29, 2017, Santiago Rojo, both individually and through his

26  company Santiago A. Rojo, D.D.S., Inc. (collectively, "Rojo"), entered into a

27  written dental services agreement (the "Rojo Agreement") whereby Rojo agreed to

28  provide primary dental services to participating Borrego Health patients, and

1  Borrego Health agreed to pay Rojo for those services. Santiago Rojo is the sole
2  officer and director of Santiago A. Rojo, D.D.S., Inc. Santiago Rojo also operates as
3  the Chief Executive Officer, Secretary and Chief Financial officer of Santiago A.
4  Rojo, D.D.S., Inc. Santiago Rojo maintains complete ownership, management and
5  control of Santiago A. Rojo, D.D.S., Inc. As such, while the parties to the Rojo
6  Agreement are Borrego Health and Santiago A. Rojo, D.D.S., Inc., Santiago Rojo,
7  as the alter ego and/or sole owner of Santiago A. Rojo, D.D.S., Inc., and as
8  signatory of the Rojo Agreement, is capable of being held personally liable under
9  the Rojo Agreement. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.)  A true and
10  correct copy of the Rojo Agreement is attached herein as Exhibit P.

11       227.   As a participant in Borrego Health's contract dental program, Rojo was
12  involved in Borrego Health's operations by providing dental services to Borrego
13  Health patients.

14       228.   Among other things, the Rojo Agreement required that Rojo practice
15  dentistry in accordance with all Federal, State and local laws, regulations, and
16  generally accepted principles applicable to the practice of dentistry, and prepare,
17  establish, and maintain administrative records, financial records, records pertaining
18  to patient diagnosis and treatment, and information pertaining to the services
19  provided.

20       229.   Rojo submitted false and fraudulent bills and made other statements
21  which Rojo knew to be false or had no reasonable grounds for believing their
22  representations were true, which also constitute a breach of the Rojo Agreement.  A
23  non-exhaustive list of examples is set forth below.  The below examples are
24  demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

25       230.   Dr. Rojo billed for visits in California even though he was living in
26  Florida and could not supervise subproviders or directly provide care.  For example,
27  on November 11, 2020, a representative from Borrego Health was onsite at Dr.
28  Rojo's office for an audit.  On that date, Dr. Rojo's staff indicated that Dr. Rojo was

1  in Florida and had been in Florida for almost the entire year of 2020.  Nonetheless,
2  Dr. Rojo submitted claims for services performed in California throughout 2020.
3  Most egregiously, Dr. Rojo subsequently billed for patient visits that he claimed
4  were performed in California on November 11, 2020, a date on which a Borrego
5  employee had physically been in his office and confirmed he was not there.
6        231.   Rather than performing the services himself and completing the
7  documentation, Dr. Rojo regularly had his office manager entering and signing off
8  on patient claims.  Dr. Rojo's patient charts were also largely duplicative, even
9  going so far as to contain duplicate notes regarding patients' response to anesthesia.
10                    **ix.     Mohammed Al Tekreeti, D.D.S.**
11        232.   On or about August 7, 2017, Hussam Aldairi requested to employ an
12  additional dentist, Mohammed Al Tekreeti, to provide primary dental services to
13  Borrego Health patients.  Aldairi represented that Al Tekreeti would be under
14  Aldairi's supervision and that Al Tekreeti would act in accordance with the Aldairi
15  Agreements.  Aldairi hired Al Tekreeti shortly after Aldairi's request to Borrego
16  Health.
17        233.   As a sub-provider in Borrego Health's contract dental program, Al
18  Tekreeti was involved in Borrego Health's operations by providing dental services
19  to Borrego Health patients.
20        234.   Al Tekreeti submitted false and fraudulent bills and made other
21  statements which Al Tekreeti knew to be false or had no reasonable grounds for
22  believing their representations were true, which also constitute a breach of the
23  Aldairi Agreements.  A non-exhaustive list of examples is set forth herein.  The
24  below examples are demonstrative of a larger pattern and practice of fraudulent
25  and/or unlawful conduct.  For example, on or about May 2019, Dr. Al Tekreeti
26  billed Borrego Health for a partial denture for teeth which supporting documentation
27  indicated were never prepared for dentures.
28

1    235.   Like Dr. Aldairi, Dr. Al Tekreeti billed Borrego for patient visits that
2    either did not occur or that were provided by a providers that were not disclosed to
3    or credentialed by Borrego Health.  For example, Dr. Al Tekreeti billed for 135
4    patient visits that he claimed he performed on Tuesday, June 25, 2019.
5    236.   Review of Al Tekreeti's claims data indicates he carried out his
6    excessive visits scheme to great effect.  Al Tekreeti billed for more than five visits
7    for the same patient in a seven day period 576 times between February 2017 and
8    January 2021, which is more than any other provider.  It would be unusual for an
9    individual ever to require dental service every weekday for an entire week.
10   However, during the approximately five year span, Al Tekreeti represented that he
11   had that unusual occurrence happen 576 times.  During that same period, he billed
12   for twelve or more visits for the same patient in a 30-day period more than 1,169
13   times.
14   237.   Al Tekreeti then submitted these claims and others to the Premier
15   Defendants seeking payment.  The Premier Defendants, under the Dental MSA,
16   were obligated to perform their due diligence in reviewing the claims for accuracy
17   and ensuring supporting documentation was submitted alongside the claims.  The
18   Premier Defendants allowed these excessive, unsubstantiated, and duplicative
19   claims to be submitted to Borrego Health for processing and payment, because
20   Premier received $25 per claim submitted to Borrego Health.  Further, once the
21   claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained
22   their family members not to flag these claims as potentially fraudulent.
23        **x.    Jilbert Bakramian, D.D.S.**
24   238.   On or about February 5, 2018, Aram Arakelyan requested to employ an
25   additional dentist, Jilbert Bakramian, to provide primary dental services to Borrego
26   Health patients.  Arakelyan represented that Bakramian would be under Arakelyan's
27   supervision and that Bakramian would act in accordance with the Arakelyan
28

7288673.3

1   Agreements.  Arakelyan hired Bakramian shortly after Arakelyan's request to

2   Borrego Health.

3        239.   As a sub-provider in Borrego Health's contract dental program,

4   Bakramian was involved in Borrego Health's operations by providing dental

5   services to Borrego Health patients.

6        240.   Bakramian submitted false and fraudulent bills and made other

7   statements which Bakramian knew to be false or had no reasonable grounds for

8   believing their representations were true, which also constitute a breach of the

9   Arakelyan Agreements.  A non-exhaustive list of examples is set forth herein. The

10  below examples are demonstrative of a larger pattern and practice of fraudulent

11  and/or unlawful conduct.  For example, (1) on or about January 2019, Dr.

12  Bakramian billed Borrego Health for a filling on a tooth which x-rays noted that the

13  patient did not have at the time of service; (2) on or about July 2019, Dr. Bakramian

14  billed Borrego Health for a root canal performed on a tooth which x-rays noted that

15  the patient did not have at the time of service; (3) on or about March 2019, Dr.

16  Bakramian billed Borrego Health for multiple crowns when the patient actually

17  received a singular bridge, and (4) on or about May 31, 2019 and June 14, 2019, Dr.

18  Bakramian billed for preparing a tooth for a crown, which requires shaving down

19  the tooth when x-rays clearly demonstrate that tooth had an implant in that spot,

20  meaning there was no natural tooth for Bakramian to prepare to receive a crown.

21       241.   The Premier Defendants allowed Bakramian's fraudulent practices to

22  continue.  Obviously improper claims were regularly approved.  For example, to

23  approve a crown, a Premier reviewer was required to affirmatively review the x-ray

24  and progress notes and click, "Reviewer approved," and Premier's software

25  maintains a log of which reviewer approved claims and when.  On January 20, 2020,

26  Premier reviewer J.D. approved a crown for a patient on tooth #30, when the x-rays

27  submitted to Premier clearly showed that the tooth already had an implant with a

28  restoration.  Worse still, on January 28, 2020, Premier reviewer S.N. approved the

1    same claim a *second time* (same code, same date of service, same tooth #30).  Both

2    times, Premier looked the other way in furtherance of its scheme.

3         242.   From July 2019 to August 2019, Dr. Bakramian billed 29 different

4    encounters for a single patient out of the 43 business days during that period.

5    Again, Premier did not flag these bills and took no steps to counsel or discipline this

6    dentist.

7         243.   Dr. Bakramian regularly billed for more visits in a day than is humanly

8    possible, leading to the conclusion that these visits were either not performed or

9    were performed by unknown and uncredentialed persons.  For example, he billed for

10   111 patient visits he claimed he performed on July 16, 2019.

11        244.   Bakramian's excessive visits were a pattern, not an isolated incident.

12   Bakramian billed for more than five visits for the same patient in a seven day period

13   3,470 times between February 2017 and January 2021.  It would be unusual for an

14   individual ever to require dental service every weekday for an entire week.

15   However, during the approximately five year span, Bakramian represented that he

16   had that unusual occurrence happen 3,470 times.  During that same period, he billed

17   for twelve or more visits in a 30-day period for the same patient more than 4,538

18   times.

19        245.   Bakramian then submitted these claims and others to the Premier

20   Defendants seeking payment.  The Premier Defendants, under the Dental MSA,

21   were obligated to perform their due diligence in reviewing the claims for accuracy

22   and ensuring supporting documentation was submitted alongside the claims.  The

23   Premier Defendants allowed these excessive, unsubstantiated, and duplicative

24   claims to be submitted to Borrego Health for processing and payment, because

25   Premier received $25 per claim submitted to Borrego Health.  Further, once the

26   claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained

27   their family members not to flag these claims as potentially fraudulent.

28

### xi.    Marcelo Toledo, D.D.S.

246.   On June 16, 2015, Marcelo Toledo, both individually and through his company Marcelo Toledo, D.D.S., Inc. (collectively, "Toledo"), entered into a written dental services agreement (the "Toledo Agreement") whereby Toledo agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Toledo for those services. Marcelo Toledo is the sole officer and director of Marcelo Toledo, D.D.S., Inc. Marcelo Toledo also operates as the Chief Executive Officer, Secretary and Chief Financial officer of Marcelo Toledo, D.D.S., Inc. Marcelo Toledo maintains complete ownership, management and control of Marcelo Toledo, D.D.S., Inc. As such, while the parties to the Toledo Agreement are Borrego Health and Marcelo Toledo, D.D.S., Inc., Marcelo Toledo, as the alter ego and/or sole owner of Marcelo Toledo, D.D.S., Inc., and as signatory of the Toledo Agreement, is capable of being held personally liable under the Toledo Agreement. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.)  A true and correct copy of the Toledo Agreement is attached herein as Exhibit Q.

247.   As a participant in Borrego Health's contract dental program, Toledo was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

248.   Among other things, the Toledo Agreement required that Toledo practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

249.   Toledo submitted false and fraudulent bills and made other statements which Toledo knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Toledo Agreement.

1   A non-exhaustive list of examples is set forth below.  The below examples are
2   demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.
3          250.   For example, (1) on or about July 2018, Dr. Toledo billed for services
4   rendered to a patient during one scheduled visit as though they occurred over the
5   court of four visits, (2) on or about June 2018, Dr. Toledo performed restoration on
6   eight teeth which x-rays demonstrated was not medically necessary, (3) on or about
7   July and August 2018, Dr. Toledo billed for tooth restoration services rendered
8   during single visits as though they were performed over multiple visits, (4) on or
9   about November and December 2018, Dr. Toledo billed for fillings on teeth where
10  the patient already had existing fillings, and (5) billing in excess of 20 patient visits
11  a day, including billing Borrego Health for 97 patient visits that he claimed occurred
12  that day.  Toledo also regularly engaged in the "claim splitting" scheme.  For
13  example, on August 20, 2018, Dr. Toledo charted and billed for a tooth restoration
14  on tooth 19.  In submitting the claim, Toledo submitted old x-rays dated July 23,
15  2018 and August 13, 2018.  Those x-rays indicate the restoration of both tooth 18
16  and tooth 19 had already been completed prior to the August 20, 2018 claim
17  submission.  The x-ray from August 20, 2018 also demonstrates that no further
18  restoration occurred during that patient visit.  Despite this, the claims were billed as
19  two separate visits.  For the same patient, Dr. Toledo billed for identical services
20  rendered to four different teeth.  The patient schedule indicates the patient was not
21  seen on all the days billed between November 7, 2019 and November 13, 2018,
22         251.   For visits in July 2018 for the same patient, the treatment notes are a
23  obviously copied and pasted, including identical blood pressure readings, because
24  the patient had only one visit on July 16, 2018, but it was billed as four separate
25  visits.
26         252.   For visits in October 2018, again there are five identical blood pressure
27  readings documented in a row.  These visits involved a surface restorations for
28

7288673.3

1  adjacent teeth, but were billed separately even though they should have been done

2  together.

3      253.   In another instance, there were restorations on eight separate teeth, and

4  each was billed separately, but there is no imaging to support the need for the

5  restorations.  In such a situation, the dentist is required to secure supplemental

6  documentation to demonstrate medical necessity.

7      254.   On or about August 20, 2018, Toledo charted and billed for services

8  provided on tooth 19.  X-rays dated July 23 and August 13, 2018 were provided to

9  support the restoration, but the x-rays show that there was a restoration already done

10  by August 13.  There is no evidence of further restoration or any restoration on

11  August 20.  All the work was completed on August 7, but split into two separate

12  dates of billing.

13      255.   For one patient with dates of service November 7-13, 2018, there are

14  four identical notes with only the tooth number changed, and the schedule does not

15  show the patient was seen (only that the patient was on the schedule).  This is

16  another example of claim splitting and false billing.

17      256.   For another patient, there is no evidence that the fillings for teeth 4 and

18  5 were done as billed on November 4 and 14, 2018, respectively.  The pre-procedure

19  x-ray shows existing fillings and is dated October 18, 2018.  The post-procedure x-

20  rays dated December 13, 2018 does not show any change to the fillings for teeth 4

21  and 5.

22      257.   Toledo's excessive visits were a pattern, not an isolated incident.

23  Toledo billed for more than five visits for the same patient in a seven day period 582

24  times between February 2017 and January 2021.  It would be unusual for an

25  individual ever to require dental service every weekday for an entire week.

26  However, during the approximately five year span, Toledo represented that he had

27  that unusual occurrence happen 582 times.  During that same period, he billed for

28  twelve or more visits in a 30-day period for the same patient more than 410 times.

1    258.   Toledo then submitted these claims and others to the Premier

2    Defendants seeking payment.  The Premier Defendants, under the Dental MSA,

3    were obligated to perform their due diligence in reviewing the claims for accuracy

4    and ensuring supporting documentation was submitted alongside the claims.  The

5    Premier Defendants allowed these excessive, unsubstantiated, and duplicative

6    claims to be submitted to Borrego Health for processing and payment, because

7    Premier received $25 per claim submitted to Borrego Health.  Further, once the

8    claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained

9    their family members not to flag these claims as potentially fraudulent.

10           xii.   **Marlene Thompson, D.D.S.**

11    259.   On or about April 18, 2013, Marlene M. Thompson, D.D.S., both

12    individually and through her company Marlene M. Thompson, D.D.S., Inc.

13    (collectively, "Thompson") entered into a written dental services agreement (the

14    "Thompson Agreement") whereby Thompson agreed to provide primary dental

15    services to participating Borrego Health patients, and Borrego Health agreed to pay

16    Thompson for those services. Marlene Thompson is the sole officer and director of

17    Marlene M. Thompson, D.D.S., Inc. Marlene Thompson also operates as the Chief

18    Executive Officer, Secretary and Chief Financial officer of Marlene M. Thompson,

19    D.D.S., Inc. Marlene Thompson is also the designated agent for service of process

20    for Marlene M. Thompson, D.D.S., Inc. Marlene Thompson maintains complete

21    ownership, management and control of Marlene M. Thompson, D.D.S., Inc. As

22    such, while the parties to the Thompson Agreement are Borrego Health and Marlene

23    M. Thompson, D.D.S., Inc., Marlene Thompson, as the alter ego and/or sole owner

24    of Marlene M. Thompson, D.D.S., Inc., and as signatory of the Thompson

25    Agreement, Marlene Thompson is capable of being held personally liable under the

26    Thompson Agreement. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.) A true and

27    correct copy of the Thompson Agreement is attached herein as Exhibit R.

28

79

260.   As a participant in Borrego Health's contract dental program, Thompson was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

261.   Among other things, the Thompson Agreement required that Thompson practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, and to prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Thompson submitted false and fraudulent bills and made other statements which Thompson knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Thompson Agreement.  A non-exhaustive list of examples is set forth below.  The below examples demonstrate a larger pattern and practice of fraudulent and/or unlawful conduct.  For example:

- After Dr. Tuso left Dr. Aldairi's office, Thompson hired Maura Tuso to work as a dentist in her Escondido dental practice. During the time Dr. Tuso worked for Thompson, Dr. Tuso was suspended from participating in Medi-Cal in any capacity. When Thompson hired Dr. Tuso, the generally accepted practice for employers receiving federal and state healthcare funds was to check the suspended and ineligible provider lists prior to hiring employees. Thompson failed to check the suspended and ineligible provider lists for Dr. Tuso before hiring her. Thompson then allowed Dr. Tuso to provide dental services to Borrego and Medi-Cal patients. As a suspended provider, all the treatment provided by Dr. Tuso was not subject to payment by Borrego or Medi-Cal. (*See* Welf. & Institutions Code section 14043.61; *see also* 22 C.C.R. section 51303.) On October 12, 2018, Thompson placed a patient on the schedule who received services the day prior.  Thompson

7288673.3

1    did this to make it appear that the services rendered were spread out
2    over several days, when in fact the patient only received services on
3    June 23, 2018.

4        • On July 5, 2018, Dr. Tuso provided two fillings to a patient, but was
5          asked to leave the dates blank in her charts.  The patient chart was then
6          filled in to show the services rendered occurred over the course of two
7          visits instead of one.

8        • On July 10, 2018, Dr. Tuso provided dental services to a Borrego
9          Health patient, but was asked to leave the dates blank in her charts.
10         The patient chart was then filled in to show the services rendered
11         occurred over the course of two visits instead of one.  The second visit
12         was documented on a day Dr. Tuso was not staffed to work at
13         Thompson's office.  Despite this, the second visit in the patient chart
14         indicates she provided the patient with services that day.

15   262.   To avoid detection, Thompson submitted bills for Dr. Tuso's services
16   in her own name. In other words, Thompson submitted claims to Borrego Health for
17   services she did not perform. Further, Thompson submitted claims to Borrego
18   Health for services performed by a suspended provider. Borrego Health then paid
19   Thompson for services Thompson should not have been paid for. Thompson,
20   through her conduct and misrepresentations, led Borrego Health to improperly
21   submit claims to Medi-Cal which were not subject to reimbursement.

22   263.   Thompson also instructed Dr. Tuso and other dentists in her office to
23   perform as many services as possible in one visit, then leave the dates on the patient
24   charts blank to allow for the services to be billed over multiple days (as alleged in
25   the above examples.

26   264.   The above mentioned conduct ties directly into the greater Fraudulent
27   Dental Billing Scheme, as Thompson was submitting fraudulent bills for all services
28   rendered by Dr. Tuso.

1

### xiii.   Douglas Ness, D.D.S.

2   265.   On or about May 2, 2016, Douglas Ness, D.D.S., both individually and

3   through his company Ness Dental Corporation (collectively, "Ness") entered into a

4   written dental services agreement (the "Ness Agreement") whereby Ness agreed to

5   provide primary dental services to participating Borrego Health patients, and

6   Borrego Health agreed to pay Ness for those services. Doug Ness is the sole officer

7   and director of Ness Dental Corporation. Doug Ness also operates as the Chief

8   Executive Officer, Secretary and Chief Financial officer of the Ness Dental

9   Corporation. Doug Ness is also the designated agent for service of process for the

10   Ness Dental Corporation. Doug Ness maintains complete ownership, management

11   and control of Ness Dental Corporation. As such, while the parties to the Ness

12   Agreement are Borrego Health and Ness Dental Corporation, Doug Ness, as the

13   alter ego and/or sole owner of the Ness Dental Corporation, and as signatory of the

14   Ness Agreement, Ness is capable of being held personally liable under the Ness

15   Agreement. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.) A true and correct

16   copy of the Ness Agreement is attached herein as Exhibit S.

17   266.   As a participant in Borrego Health's contract dental program, Ness was

18   involved in Borrego Health's operations by providing dental services to Borrego

19   Health patients.

20   267.   Among other things, the Ness Agreement required that Ness practice

21   dentistry in accordance with all Federal, State and local laws, regulations, and

22   generally accepted principles applicable the practice of dentistry, and to prepare,

23   establish, and maintain administrative records, financial records, records pertaining

24   to patient diagnosis and treatment, and information pertaining to the services

25   provided.

26   268.   Ness submitted false and fraudulent bills and made other statements

27   which Ness knew to be false or had no reasonable grounds for believing their

28   representations were true, which also constitute a breach of the Ness Agreement.

7288673.3

1    The alleged conduct is demonstrative of a larger pattern and practice of fraudulent
2    and/or unlawful conduct.

3        269.   In 2018, Ness hired Maura Tuso to work as a dentist at Ness' dental
4    office, Crown Dental Group. During the time Dr. Tuso worked for Ness, Dr. Tuso
5    was suspended from participating in Medi-Cal in any capacity. When submitting her
6    new hire paperwork to Ness, Dr. Tuso told Ness that she was on the suspended
7    provider list. In spite of this, Ness allowed Dr. Tuso to continue to work for him and
8    to provide dental services to Borrego and Medi-Cal patients. As a suspended
9    provider, the treatment and services provided by Dr. Tuso was not subject to
10   payment by Borrego Health or Medi-Cal. (*See* Welf. & Institutions Code section
11   14043.61; *see also* 22 C.C.R. section 51303.)

12       270.   To avoid detection, Ness submitted bills for Dr. Tuso's services in his
13   own name. In other words, Ness submitted claims to Borrego Health for services he
14   did not perform. Further, Ness submitted claims to Borrego Health for services
15   performed by a suspended provider. Borrego Health then paid Ness for services
16   Ness should not have been paid for. Ness, through his conduct and
17   misrepresentations, led Borrego Health to improperly submit claims to Medi-Cal
18   which were not subject to reimbursement. Ness also instructed Dr. Tuso and other
19   dentists in his office to perform as many services as possible in one visit, then leave
20   the dates on the patient charts blank to allow for the services to be billed over
21   multiple days.

22       271.   Ness also hired other dental providers, in addition to Dr. Tuso, who
23   lacked California dental licenses to provide dental services to Borrego Health
24   patients. These hires included a husband and wife pair. These individuals were not
25   licensed to practice dentistry in California and performed services on Borrego
26   Health patients. Upon information and belief, Ness billed Borrego Health for these
27   services in the same manner Ness did for Dr. Tuso. The above mentioned conduct
28   ties directly into the greater Fraudulent Dental Billing Scheme, as Ness was

7288673.3

1   submitting fraudulent bills for all services rendered by Dr. Tuso and the other

2   unlicensed dental providers that were employed by Ness.

3                    **xiv.   George Jared, D.D.S.**

4         272.   On or On or about April 19, 2016, George C. Jared, D.D.S., both

5   individually and through his company George C. Jared, D.D.S., Inc. (collectively,

6   "Jared") entered into a written dental services agreement (the "Jared Agreement")

7   whereby Jared agreed to provide primary dental services to participating Borrego

8   Health patients, and Borrego Health agreed to pay Jared for those services. George

9   Jared is the Chief Executive Officer and sole director of George C. Jared, D.D.S.

10  Inc. As such, while the parties to the Jared Agreement are Borrego Health and

11  George C. Jared, D.D.S., Inc., George Jared, as the alter ego and/or sole owner of

12  George C. Jared, D.D.S., Inc., and as signatory of the Jared Agreement, Jared is

13  capable of being held personally liable under the Jared Agreement. (*See i.e. Irey v.*

14  *Len* (1961) 191 Cal. App. 2d 13.) A true and correct copy of the Jared Agreement is

15  attached herein as Exhibit T.

16        273.   As a participant in Borrego Health's contract dental program, Jared was

17  involved in Borrego Health's operations by providing dental services to Borrego

18  Health patients.

19        274.   Among other things, the Jared Agreement required that Jared practice

20  dentistry in accordance with all Federal, State and local laws, regulations, and

21  generally accepted principles applicable the practice of dentistry, and to prepare,

22  establish, and maintain administrative records, financial records, records pertaining

23  to patient diagnosis and treatment, and information pertaining to the services

24  provided.

25        275.   Jared submitted false and fraudulent bills and made other statements

26  which Jared knew to be false or had no reasonable grounds for believing their

27  representations were true, which also constitute a breach of the Jared Agreement.

28

7288673.3

1    Upon information and belief, the alleged conduct is demonstrative of a larger pattern
2    and practice of fraudulent and/or unlawful conduct.
3         276.   Jared hired Maura Tuso to work as a dentist at his dental practice.
4    During the time Dr. Tuso worked for Jared, Dr. Tuso was suspended from
5    participating in Medi-Cal in any capacity. When Jared hired Dr. Tuso, the generally
6    accepted practice for employers receiving federal and state healthcare funds was to
7    check the suspended and ineligible provider lists prior to hiring employees. Jared
8    failed to check the suspended and ineligible provider lists for Dr. Tuso before hiring
9    her. Jared then allowed Dr. Tuso to provide dental services to Borrego and Medi-Cal
10   patients. As a suspended provider, all the treatment provided by Dr. Tuso was not
11   subject to payment by Borrego or Medi-Cal. (*See* Welf. & Institutions Code section
12   14043.61; *see also* 22 C.C.R. section 51303.)
13        277.
14        278.   Jared also hired other dental providers, in addition to Dr. Tuso, who
15   lacked California dental licenses to provide dental services to Borrego Health
16   patients.  Upon information and belief, Jared billed Borrego Health for the services
17   that unlicensed dental providers provided to Medi-Cal patients.
18        279.   To avoid detection, Jared submitted bills for Dr. Tuso's services in his
19   own name. In other words, Jared submitted claims to Borrego Health for services he
20   did not perform. Further, Jared submitted claims to Borrego Health for services
21   performed by a suspended provider. Borrego Health then paid Jared for services
22   Jared should not have been paid for. Jared, through his conduct and
23   misrepresentations, led Borrego Health to improperly submit claims to Medi-Cal
24   which were not subject to reimbursement.
25        280.   Jared also instructed Dr. Tuso and other dentists in his office to perform
26   as many services as possible in one visit, then leave the dates on the patient charts
27   blank to allow for the services to be billed over multiple days.
28

7288673.3

281.   The above mentioned conduct ties directly into the greater Fraudulent Dental Billing Scheme, as Jared was submitting fraudulent bills for all services rendered by Dr. Tuso.

**D.     Since Premier Was Unable and Unwilling To, a Program Integrity Process is Implemented by Borrego Health**

282.   Despite its promises to do so, its representations that it could do so, and its concealment of the fact that it could not do so, Premier completely lacked the ability to appropriately conduct claims monitoring.

283.   In fact, it was not until 2019 that Premier hired its first and only employee with any clinical experience whatsoever.  At that point, Premier hired a 2016 dental graduate, Nicholas Tapp, D.D.S.  Unsurprisingly, Nicholas Tapp was related to other employees at Premier.  Nicholas Tapp did not even receive his dental license until October 2017.  Indeed, staff from Borrego Health were largely responsible for training Nicholas Tapp due his lack of knowledge and experience.

284.   Even after hiring Nicholas Tapp, Premier continuously failed to properly review the contract dental claims.  For example, and without limitation, Premier approved claims (and caused Borrego Health to pay for claims (1) where no supporting documentation was provided, (2) for services performed on teeth which—based on x-rays submitted with the claims—were no longer in the patients' mouth, (3) which were duplicate (i.e. same claims, submitted multiple times), and (4) that were facially and obviously not legitimate.

285.   For example, in February 2020, one dentist billed 18 different encounters for a single patient, despite the fact that there were only 19 business days in February 2020, meaning the bills showed this patient came in for dental services all but one business day in February 2020.  Premier did not flag these bills and took no steps to counsel or discipline this dentist.  Between June 2020 and July 2020, one dentist billed 30 different encounters for a single patient, meaning the bills showed

7288673.3

1   this patient came in for dental services every other day during that time period.

2   Premier did not flag these bills and took no steps to counsel or discipline this dentist.

3        286.   As a result, Borrego Health was forced to hire its own employees and

4   develop a Program Integrity program to review and audit contract dental claims and

5   providers, tasks which Premier Defendants were supposed to perform under the

6   Dental MSA.

7        287.   In May 2017, Borrego Health hired Timothy Martinez, D.D.S. to be its

8   Chief Dental Officer.  In this role, Dr. Timothy Martinez was tasked with

9   developing a "Program Integrity" team for Borrego Health's contract dental

10   program and providing practice management oversight for its in-house dental

11   programs.  To assist in these efforts, Borrego Health and Dr. Martinez hired Nithya

12   Venugopal, DDS, in January 2018 as Borrego Health's Dental Director of Program

13   Integrity.

14        288.   Among other things, Dr. Timothy Martinez and Dr. Nithya Venugopal

15   were tasked to create a system that would identify patterns on the "back-end" of

16   claims submission (*i.e.* after the claims had been submitted).  Specifically, Dr.

17   Timothy Martinez and Dr. Nithya Venugopal were supposed to identify:  (1)

18   utilization of non-covered services; (2) overutilization of services; (3) incomplete,

19   substandard, unnecessary treatment rendered by providers; and (4) billing

20   discrepancies. The team also sought to develop and implement necessary steps to

21   correct and prevent such issues.

22        289.   On May 5, 2017, the Program Integrity team set up initial evidence-

23   based key references and questions for the new program integrity unit.  The key

24   references and questions were based on the National Medicaid Guidelines the

25   Deputy Inspector General for Evaluation and Inspections May 15, 2015 report

26   authored by Suzanne Murrin, titled: "QUESTIONABLE BILLING FOR

27   MEDICAID PEDIATRIC DENTAL SERVICES IN CALIFORNIA."  The Murrin

28   report reviewed claims submitted by dentists in California to DHCS and found that

1    approximately 8% of the dental providers were billing outliers in terms of CDT

2    codes billed, and of those identified outliers, only approximately 1.8% (or six out of

3    329 dentists) were disciplined by the California Dental Board for failing to meet

4    quality of care standards.  Dr. Timothy Martinez used the Murrin report and its

5    findings, as well as guidance from the 2017 National Medicaid and CHIP Oral

6    Health Symposium (as organized by the Medicaid, Medicare, CHIP Services Dental

7    Association), for reference when developing Borrego Health's internal compliance

8    metrics.  Critically, at the time, there was no other guidance, data or reports setting

9    out proper or improper billing and documentation protocols in the state for FQHCs

10   contracting with private dental offices.

11        290.   The Program Integrity efforts began with a utilization review system

12   which developed an algorithm for analyzing and sorting out outliers, particularly by

13   focusing on high-billing providers among the contract dentists.  As the Program

14   Integrity team's utilization review and claims data analytics capabilities became

15   more robust and sophisticated, the team was soon able to also review for over-

16   utilization of high-cost codes/services (dental providers with a standard deviation of

17   one or more from the mean as far as individual high-cost codes, such as crowns and

18   surgical extractions), percentage of preventive services and under-utilization of

19   preventive services, as well as billing discrepancies, and lack of medical necessity.

20   Over time, the Program Integrity team also developed a mechanism to view visit

21   count and examine excessive visits.

22        291.   Additionally, around mid-2019, the Program Integrity team built in

23   certain parameters, referred to as the "enhanced review" parameters, to identify

24   problematic claims during the claims monitoring process, in large part after

25   recognition that Premier was not properly vetting claims during the claims

26   monitoring process, despite Premier's contractual obligation to do so.

27        292.   Once the utilization review analysis was conducted, the Program

28   Integrity team would conduct site visits and chart reviews to directly assess

1  compliance and suspected fraud, waste, and/or abuse among any dental practices
2  and providers identified as outliers within the contract dental network (meaning
3  providers who were one or more above the standard deviation in the different
4  categories being reviewed).

5       293.   Specifically, Dr. Nithya Venugopal would receive a report and conduct
6  a closer examination of any outlier practices or providers.  Then, Dr. Nithya
7  Venugopal would work with Borrego Health's utilization management analyst to
8  pull around ten to 15 charts from patients based on excessive patients visits and/or
9  CDT code criteria under question for these providers.

10       294.   Next, a member of the Program Integrity team would collect
11  information from the patient records regarding visits and services during an actual
12  on-site visit, including supportive documentation such as radiographs, charts, and
13  schedules.  The peer review process was designed to be objective through the use of
14  a template peer review worksheet examining specific criteria.

15       295.   Based on the results of these findings, the Program Integrity team
16  members would conduct comprehensive records review and assess compliance with
17  Program Integrity rubric, consistent with the Medi-Cal Dental Provider Handbook.

18       296.   Following the chart reviews and site audits, the Program Integrity team
19  would develop provider report cards and issue a "corrective action plan" to any
20  provider whose practice was identified as deficient across certain criteria.  These
21  plans would detail exactly what deficiencies were identified and how a provider was
22  required to correct and improve his or her practice.  The Program Integrity team
23  aimed to conduct re-audits of providers who had been issued a corrective action plan
24  within 90 days to confirm whether or not the provider had corrected identified
25  deficiencies by again obtaining records from the provider and assessing compliance
26  under the same rubric.

27

28

7288673.3

297.   Any follow-up action by the team depended on the results of these peer review and compliance audits.  For example, if the score improved, then the provider would be audited on an annual basis thereafter.

298.   Alternatively, if the score worsened, Dr. Timothy Martinez or Dr. Nithya Venugopal would escalate the matter to Borrego Health's Chief Compliance Officer, Gabriela Alvarado, and Mikia Wallis for determination of further action, up to and including termination of Borrego Health's agreement with the dentist.

299.   Additionally, where the Program Integrity team found evidence suggesting potential provider fraud, waste, and/or abuse, Dr. Timothy Martinez would meet with Gabriela Alvarado to discuss possible recoupment and recovery of funds, notification to DHCS and other state authorities, and submission of a claims inquiry form to DHCS to request an adjustment for either an underpayment or overpayment of claims.

300.   The Program Integrity team, once it came online and established processes after Dr. Timothy Martinez's arrival in 2017, reviewed back-end claims and identified outliers and other billing discrepancies.

**E.     Premier and the Borrego Insiders Coverup Fraudulent Billing (the "Coverup Scheme")**

301.   The Borrego Insiders and the Premier Defendants were aware of the conduct and had received complaints and information, but did nothing to stop the practice.  Instead, the Premier Defendants worked with Borrego Insiders, including without limitation Mikia Wallis, Diana Thompson, and Karen Hebets to stop further inquiries and protect the dentists from both detection and/or consequences.  As stated herein, the Premier Defendants were incentivized to allow providers to bill as many claims as possible, since Premier was paid on a per claim basis.  The Premier Defendants were further incentivized to cover up for fraudulently billing dentists (including—and especially—the most egregious dentists), since those were the

7288673.3

1    dentists that submitted the highest number of claims and directly increased the

2    amount that Premier was paid.

3        302.   The Borrego Insiders were incentivized to cover up for the fraudulently

4    billing dentist since those billings allowed the other Schemes discussed herein to

5    take place and/or resulted in kickback payments to the Borrego Insiders. For

6    example, as an alleged above, Diana Thompson and Karen Hebets hired several

7    family members to place in the billing and accounting department at Borrego

8    Health. These family members were trained to ignore errors and duplications in the

9    claims submitted by the Dental Defendants through the Premier Defendants. .

10       303.   The Premier Defendants and the Borrego Insiders used a number of

11   different methods to cover up for fraudulently billing dentists, including without

12   limitation the Dentist Defendants, as outlined below, including without limitation

13   interference with audits, failing and refusing to reverse false/fraudulent claims,

14   refusal to take action, general avoidance and unavailability and undue pressure.

15       304.   The Premier Defendants, supported by the Borrego Insiders, would not

16   permit Program Integrity audits to be random.  It required Program Integrity to

17   provide advance notice to dentists, so that the dentists could be more prepared and

18   take steps to avoid detection of problems by the Program Integrity team.

19       305.   While typically the Program Integrity team would book any compliance

20   review appointments with contract dental providers through one of Premier's

21   administrative staff, for reasons unknown to Borrego Health, any appointments with

22   Husam Aldairi and Aram Arakelyan (both identified by the Program Integrity team

23   as high-billing providers for certain costly services) were required to be set up by

24   Travis Lyon personally.

25       306.   Occasionally, the Program Integrity team would identify claims that

26   were falsely or fraudulently billed, and should have been reversed (*i.e.* the dentists

27   should have refunded the money they received from Borrego Health, and Premier

28   should have returned or credited the per visit fee back to Borrego Health).

1   However, the Premier Defendants and Borrego Insiders, including without

2   limitation Karen Hebets and Diana Thompson, would not follow through on claims

3   reversals.

4       307.   On several occasions, based on suspicious or outright fraudulent claims

5   activity, Borrego Health's Program Integrity team would recommend and/or request

6   that a contract dental provider have their provider contract with Borrego Health

7   terminated.  The Premier Defendants and Borrego Insiders would regularly support

8   the contract dental providers over Borrego Health and override decisions made by

9   Borrego Health, and would refuse to take action against fraudulently billing

10  providers.

11      308.   On several occasions in 2019, during Program Integrity's

12  communications with contract dentists, Dr. Venugopal and Dr. Koutros were

13  informed by contract dental providers that the Premier Defendants told dentists that

14  if they did not bill for specific conditions, regardless of the patients' true health

15  status. Program Integrity was also informed that the Premier Defendants were

16  training and/or encouraging contract dental providers to split the claims up in certain

17  manners, asserting that if the contract dental providers did not bill for specific

18  conditions over multiple days, that the contract dental provider would not receive

19  payment from Borrego Health. When Program Integrity brought these concerns to

20  Travis Lyon, he denied the assertions and reassured Program Integrity that re-

21  training would take place to address confusion from the contract dental providers.

22  After this, the Premier Defendants became more proactive in taking steps to conceal

23  their schemes, working alongside Borrego Insiders Diana Thompson and Karen

24  Hebets to ensure duplicative claims would continue to be submitted for billing.

25      309.   Both Dr. Timothy Martinez and Dr. Nithya Venugopal reported that,

26  whenever they raised issues about Premier to Mikia Wallis, they would immediately

27  receive a call or email from Travis Lyon or Nick Priest.  Clearly, Mikia Wallis was

28  sharing their internal concerns directly with the Premier Defendants.  More often

1  than not, however, neither Premier nor Mikia Wallis actually addressed the
2  underlying issue Dr. Timothy Martinez or Dr. Nithya Venugopal identified with
3  Premier.

4      310.   Mikia Wallis made herself generally unavailable for meetings with the
5  Program Integrity team.  At most, Program Integrity staff were only allowed to
6  block 15-minute intervals with her.  As stated by Dr. Venugopal, "[Mikia Wallis]
7  knew what we were doing but hated what we were finding."

8      311.   Program Integrity team members repeatedly raised issues about certain
9  high-billing providers who they identified as committing "suspect fraud" to Mikia
10  Wallis and Borrego Health's former Chief Compliance Officer, but usually no
11  action was ever taken against providers, who would remain eligible to continue
12  providing and billing for improper services rendered to Borrego Health's patients.

13      312.   Mikia Wallis would routinely push back or throw up barriers whenever
14  they tried to implement some sort of final audit process for the contract dental
15  providers.  There was also an ongoing push-and-pull in terms of adding new
16  contract dental providers to Borrego Health's network between the Program
17  Integrity team and credentialing committee on one side and Premier and Mikia
18  Wallis on the other.  There were a number of instances where Travis Lyon,
19  supported by Mikia Wallis, attempted to ram a number of new contract dental
20  providers through Borrego Health's credentialing process, despite Dr. Timothy
21  Martinez's insistence that the providers needed to be thoroughly vetted before
22  approving them.

23      313.   Mikia Wallis defended contract dental providers unreasonably, even
24  after Program Integrity team members informed her of these providers' documented
25  history of problematic billing practices and poor quality.  Mikia Wallis herself
26  reported that she encouraged staff to treat contract dental providers as part of
27  Borrego Health's internal workforce and "to the extent that we feel the dentists have
28  high quality of care, we need to defend them."

314.    At the June 2017 Credentialing Committee, Dr. Timothy Martinez noted and the minutes reflected that Bruce Hebets, along with Premier's Travis Lyon and Nick Priest, all personally attended the meeting.  Usually, credentialing committees are autonomous bodies free from inadvertent pressure of having administration involvement.

315.   There are numerous, specific examples of the Premier Defendants and Borrego Insiders working to cover up for fraudulently billing dentists.  A few of these examples are outlined below.

316.   On April 12, 2017, Dr. Timothy Martinez emailed Travis Lyon to note his concerns with the contract dental program as a result of the HMS/CMS audit findings: "I can start to review with you and your team the three most common pitfalls that Borrego was cited for: EXCESSIVE VISITS, INSUFFICIENT DOCUMENTATION, NOT MEDICALLY NECESSARY.  We can start with catching "EXCESSIVE VISIT" at the time the claim (called a superbill) is scanned by the private dental offices and entered into your data banks."  Thus, the Premier Defendants were aware of issues with excessive visit billing, yet did nothing to detect or prevent such billing, despite their contractual obligation to do so.

317.   Dr. Venugopal noted that dentists as a rule could not be terminated for Program Integrity issues alone.  To terminate a dentist, Dr. Venugopal and Dr. Martinez would have to also raise a quality or credentialing issue.  Even this, though, was insufficient to terminate certain "untouchable" dentists, including Dr. Aldairi, Dr. Arakelyan, Dr. Mehdizadeh and Dr. Hawatmeh (all of whom Program Integrity identified as outlier providers).

318.   In February 2018, some of the Program Integrity team met with the Premier Defendants to review the newly developed contract dental patient forms, which had been created to ensure consistent and accurate documentation across providers.  Though these were Borrego Health forms, Travis Lyon nevertheless

1   retained final say on how and when they were communicated to the contract dental

2   providers – if ever.

3       319.   Husam Aldairi received "Provider Compliance Reports" on June 14,

4   2018 and September 13, 2018 following a series of audits conducted by the Program

5   Integrity team during which he received scores of zero (the lowest possible score) in

6   the following categories: proper documentation, eligible provider (meaning that the

7   provider's signature on the claims matches the dental superbill and clinical progress

8   notes as required by the Medi-Cal Dental Provider Hand-book), and medically

9   necessary (meaning that the documentation supports the level of services rendered).

10  To address the clear deficiencies identified in the June 2018 audit, the Program

11  Integrity team also put together a corrective action plan listing out each deficiency

12  in detail and providing actionable steps Husam Aldairi was requested to take to

13  correct the issues.  Husam Aldairi received the corrective action plan and returned a

14  signed copy acknowledging it to the Program Integrity team but never actually

15  worked on improving.  Husam Aldairi also failed multiple peer review audits

16  conducted by Program Integrity team members on March 31 and July 25, 2019, and

17  most recently on August 31, 2020.  The Premier Defendants and the Borrego

18  Insiders, including Mikia Wallis, refused to terminate Husam Aldairi.

19      320.   When Husam Aldairi was up for re-credentialing, Dr. Timothy

20  Martinez recommended against re-credentialing Husam Aldairi but he was

21  overruled by the Premier Defendants and Borrego Insiders, including without

22  limitation Travis Lyon and Mikia Wallis.  Despite the poor performance, the

23  Premier Defendants and Borrego Insiders submitted a "special license" to HRSA to

24  allow Husam Aldairi to have a satellite intermittent dental clinic with Borrego

25  Health (in space owned by another Daryl Priest entity that Borrego Health leased).

26  Husam Aldairi was not actually terminated until the Board Insiders were no longer

27  involved in the matter.

28

321.    In both July and September 2018, Dr. Timothy Martinez notified Mikia Wallis in her capacity as Borrego Health's Chief Legal Officer about the results of the Program Integrity team's first analytics ran on the contract dentists, including those identified as outliers within the program.  Mikia Wallis did not do anything to address the outliers.

322.   Mikia Wallis was informed of billing issues with Dr. Tina Cho.  For example, Dr. Martinez emailed Mikia Wallis on July 2, 2019 acknowledging "aberrant billing behavior" and attaching a document titled, "tina cho.docx," which included examples of problematic claims.  However, on October 6, 2020, Mikia Wallis sent a letter to Special Agent Supervisor Craig Eastep which (falsely) stated that Borrego Health had no knowledge of potential billing discrepancies for services provided by Dr. Tina Cho.

323.   On October 12, 2019, a member of the Program Integrity team instructed that Borrego Health will deny claims for issues that he considers to be "black and white issues."  Travis Lyon responded, "Is Koutros and Venugopal aware that Ms. Wallis does not want us to use the Denti-Cal regulations as a reason to deny claims?"

324.   In March 2019, dentist Maura Tuso called Borrego Health's compliance hotline.  She left a message indicating that she wanted to report fraud.  Dr. Timothy Martinez facilitated a telephone conference to respond to Maura Tuso, which took place on March 18, 2019.  Travis Lyon joined Dr. Timothy Martinez on the call.

325.   Maura Tuso alleged that there was fraud occurring, including manipulating charts.  Dr. Timothy Martinez asked Maura Tuso to email any details.  When these allegations were reported to Mikia Wallis, Mikia Wallis stated that Maura Tuso had lost her license and was not credible, and to cease any further investigation.  Shockingly, despite knowledge that Maura Tuso had lost her license (and, thus, was suspended from Medi-Cal) and using this information in an attempt

7288673.3

1    to discredit her, the Premier Defendants and Borrego Insiders did nothing to prevent
2    Maura Tuso from continuing to provide services through other contract dentists (and
3    billing for them) or to remedy prior improper bills where Mauro Tuso provided
4    services.

5          326.   On January 27, 2020, a member of the Program Integrity team
6    conducted a surprise compliance audit of Dr. Aram Arakelyan.  Dr. Aram Arakelyan
7    refused to allow staff to audit the charts and called Travis Lyon to intervene.  This
8    resulted in a meeting with Mikia Wallis, Travis Lyon, and Dr. Timothy Martinez,
9    and a subsequent meeting with Premier's counsel.

10         327.   Following this meeting, on March 2, 2020, counsel for Premier
11   informed a member of the Program Integrity team over the phone that such surprise
12   audits of the contract dental providers were unlawful and that all audits required
13   written notice to contract dental providers at least five days before any audit.  This is
14   false.

15         328.   Borrego Health requested and harangued Premier repeatedly to activate
16   a "Prior Authorization" requirement, which required outlier providers and practices
17   to obtain prior authorization from Borrego Health before performing certain high-
18   cost services.  In a meeting on May 21, 2020, the Program Integrity team was told
19   by Travis Lyon that he promised it would be turned on by June 1, 2020.  It was
20   never activated.

21         329.   In a quality meeting on June 16, 2020, Dr. Venugopal told Travis Lyon
22   that individual dentists were billing bridges as single unit crowns, and directed him
23   to send a communication to providers that this practice must stop.  Travis Lyon
24   refused.

25         330.   As late as September 2020, when questioned about the accusation from
26   the California Dental Board against Husam Aldairi, Mikia Wallis continued to
27   defend him.  She asserted that an external reviewer said Husam Aldairi's care was
28   "exquisite" and that he was a "QI [Quality Improvement] success story."  This

1   directly contradicts what Program Integrity and credentialing staff reported to Mikia

2   Wallis regarding the poor quality of care by Husam Aldairi.

3        331.   On October 7, 2020, Dr. Nithya Venugopal presented audit findings

4   regarding Husam Aldairi to Mikia Wallis, Dr. Timothy Martinez, Dr. Edgar Bulloch

5   (Borrego Health's former CMO and CEO), and Mark Connelly (Borrego Health's

6   Chief Operations Officer).  The presentation focused on the fact that Husam Aldairi

7   had most likely falsely billed for excessive visits, in particular where no face-to-face

8   encounter occurred, and improperly documented or falsified records, and finally

9   often provided services below the standard of care or that lacked medical necessity.

10   Within the first ten minutes of the presentation, Mikia Wallis walked out.

11       332.   Borrego Health requested that Premier run a report on 2020 claims and

12   identify any duplicates.  In September 2020, Premier provided a report identifying

13   over 600 claims that were duplicated, meaning they were billed by Premier on

14   behalf of the dentists multiple times.  Borrego Health was not aware of the

15   duplication at the time it paid the invoices of both the dentists and Premier for the

16   duplicate claims.  Despite notice of the duplication the Premier Defendants and the

17   Borrego Insiders did not reverse the claims, and the dentists did not repay the

18   claims.  Although this report was only for 2020, Borrego Health is informed and

19   believes that the same issues would exist in years prior to 2020.

20       333.   As a result, Borrego Health was forced to pay both Premier and several

21   contract dental providers for services which should not have been paid or for

22   services which were never rendered.

23       334.   On information and belief, the Borrego Insiders were compensated for

24   this access and control through kickbacks or other payments or remuneration.

25   **F.    The Borrego Insiders Entered into Leases with Daryl Priest-Owned**

26   **       Entities for Above Market Rents and Terms Many Times the**

27   **       Market Amount (the "Priest Leases Scheme")**

28

7288673.3

335.   Borrego Health only owns two of its facilities.  Therefore, Borrego Health must otherwise procure real property for its facilities.  This is accomplished by going to into the marketplace and securing facility leases in Southern California.  The resulting leases should be from an arm's length transaction at market prices, and the leases should be submitted to the Borrego Health Board of Trustees for approval.  Borrego Health's facility leases must be: (1) entered into for a lawful purpose; (2) sought competitively, and subjected to a diligent market value analysis; and (3) to the extent reasonably possible, for no more than fair market rent and reasonable duration.  The leases must also include reasonable terms under which the FQHC can terminate the lease.

336.   Yet, the next scheme involved Borrego Health leasing certain real property from the Premier Defendants or entities related to the Premier Defendants at rents and terms that were well above market.  Borrego Health was victimized by three grossly over-priced, 30-plus-year term facility leases engineered by the Borrego Insiders and the Premier Defendants or entities related to the Premier Defendants.  The total combined full-term price of these three leases is over $100 million dollars.  As detailed below, these leases were never subject to due diligence and were executed by the Borrego Insiders, without submitting them to the full Board for analysis, review, and informed consent and approval.  Once in place, the leases were concealed from the full Borrego Health Board.  The reason for hiding them from the full Board is clear:  recent independent appraisals by CBRE show the total combined lease prices are $58 million over fair market rent.

337.   The leases at issue that are above fair market rent, without good cause, and without the fully informed consent of the Board, are per se unlawful *ab initio*, because, *inter alia*, they are entered into for an unlawful purpose, namely to defraud Borrego Health for millions of dollars, while at the same time exposing Borrego Health to regulatory sanctions and related adverse financial and tax consequences.

FOURTH AMENDED COMPLAINT

7288673.3

338.   Defendant Promenade Square, LLC ("Promenade") is a California limited liability company whose primary place of business is in El Cajon, California. Promenade is engaged in the commercial real estate business.  Borrego Health is informed and believes that Promenade's sole member and manager is Daryl Priest. Promenade is the owner and lessor of the structures and appurtenances located at 133 and 155 West Main Street, El Cajon, County of San Diego, California, of which Borrego Health is the lessee ("Promenade Lease").  Attached hereto as Exhibit U and incorporated as though set forth in full herein is a true and correct copy of the Promenade Lease.

339.   Defendant DRP Holdings, LLC ("DRP") is a California limited liability company whose primary place of business is in El Cajon, California.  DRP is engaged in the commercial real estate business.  Plaintiff is informed and believes that DRP's sole member and manager is Daryl Priest.  DRP is the owner and lessor of the structures and appurtenances located at 590 North D Street, City of San Bernardino, County of San Bernardino, California, of which Borrego Health is the lessee ("DRP Lease").  Attached hereto as Exhibit V and incorporated as though set forth in full herein is a true and correct copy of the DRP Lease.

340.   Defendant Inland Valley Investments, LLC ("Inland Valley") is a California limited liability company whose primary place of business is in El Cajon, California. Inland Valley is engaged in the commercial real estate business. Plaintiff is informed and believes that Inland Valley's sole member and manager is Daryl Priest.  By way of assignment from DRP, Inland Valley is now the lessor of the structures and appurtenances located at 750 East Main Street, City of Barstow, County of San Bernardino, California, of which Borrego Health is the lessee ("Inland Valley Lease").  Attached hereto as Exhibit W and incorporated as though set forth in full herein is a true and correct copy of the Inland Valley Lease.  The Borrego Insiders and Premier Defendants decided to have Borrego Health sign the lease for the Barstow facility before the facility even existed. On information and

FOURTH AMENDED COMPLAINT

7288673.3

1   belief, the Premier Defendants then presented the over-market lease to a federally

2   insured lending institution to help obtain financing for the facility (making Borrego

3   Health in essence a participant in the development and financing of the Barstow

4   facility). As further demonstration of the interconnectedness of this Scheme, Travis

5   Lyon, who was the CEO of Premier (a healthcare company), was the broker for the

6   construction loan in connection with the Barstow deal and personally collected

7   signatures from Bruce Hebets and Diana Thompson (then, Troncoso).

8       341.   For the sake of brevity, and because Borrego Health is informed and

9   believes that Daryl Priest is the sole owner, member, and manager of Promenade,

10  DRP, and Inland Valley:  (a) Promenade, DRP, and Inland Valley are also referred

11  to collectively as the "Priest LLCs"; and (b) the three leases Borrego Health entered

12  into with the Priest LLCs are referred to collectively as the "Priest Leases."

13      342.   Daryl Priest (who owns the three Priest LLCs), Travis Lyon and the

14  Borrego Insiders worked together to devise a scheme under which Borrego Health

15  was a conduit of federal healthcare funds to pay for the overpriced Priest Leases.

16  Daryl Priest, Travis Lyons and the Borrego Insiders worked together to make

17  management and operational decisions at Borrego Health to allow the Priest Leases

18  to be entered and to remain in operation undisclosed to Borrego Health's full board.

19      343.   Daryl Priest is an experienced owner and lessor of commercial

20  properties.  Travis Lyon is an experienced commercial real estate development and

21  management executive.  Daryl Priest and Travis Lyon, on behalf of Promenade,

22  DRP, and Inland Valley, must each present their commercial leases to banks

23  providing them with mortgages and other funding related to their leased properties.

24  Daryl Priest and Travis Lyon, on behalf of Promenade, DRP, and Inland Valley,

25  must perform due diligence regarding their lessees, before entering into a 30+ year

26  lease that will be reviewed by lenders providing millions of dollars of financing to

27  Promenade, DRP, and Inland Valley.  Daryl Priest and Travis Lyon are therefore

28  presumed to know Borrego Health's business, including that it is a non-profit health

7288673.3

1  care provider doing business with federally-funded health programs.  Daryl Priest
2  and Travis Lyon are presumed to know fair market rent, that the stated rent in the
3  Priest Leases is over fair market rent, and that the lease terms of 30+ years are far
4  beyond fair market lease terms (especially in the absence of terms allowing Borrego
5  Health to terminate the lease on reasonable notice).  Under these facts and
6  circumstances, Daryl Priest and Travis Lyon, on behalf of Promenade, DRP, and
7  Inland Valley, are charged with knowledge that they were each entering into an
8  over-fair market rent lease with a non-profit FQHC.

9       344.   Mikia Wallis and the Borrego Insiders knew or should have known that
10  the Priest Leases were well above market rents and terms.

11      345.   Mikia Wallis and the Borrego Insiders knew or should have known that
12  the Priest Leases would need to be approved by the full Board of Trustees.

13      346.   With minimum due diligence, the over-fair market rent price and
14  excessive duration of the Promenade Lease, DRP Lease, and Inland Valley Lease,
15  combined with the absence of any term allowing Borrego Health to terminate a lease
16  prior to their respective lease terms, would have been readily apparent.

17      347.   No rational, informed Board of Trustees for a non-profit FQHC would
18  have, or could have, lawfully approved the Promenade Lease, DRP Lease, or Inland
19  Valley Lease for, inter alia, the following reasons:

20       a.    The lease terms are unconscionable, and would result in the
21  diversion of millions of "over-fair market rent" dollars of federal health program
22  money to the Priest-owned entities;

23       b.    The Promenade Lease calls for payment of nearly $40,000 per
24  month over fair market rent, or more than $15,000,000 over fair market rent over the
25  33-year life of the lease;

26       c.    The DRP Lease calls for payment of nearly $39,000 per month
27  over fair market rent, or approximately $14,000,000 over fair market rent over the
28  30-year life of the lease;

7288673.3

1        d.    The Inland Valley Lease calls for payment of more than $80,000

2    per month over fair market rent, or approximately $29,000,000 above fair market

3    rent over the 30-year life of the lease;

4        e.    Approximately 90% of the revenue received by Borrego Health is

5    paid by government funded health programs (Medi-Cal and Medicare), and therefore

6    if the Priest Leases are enforceable, the vast majority of the over-fair market rent

7    dollars paid could be government health program money;

8        f.    The over-fair market rent facility lease payments expose Borrego

9    Health to reductions in the allowed reimbursements paid Borrego Health in prior

10   years; and

11       g.    The close relationship between the Borrego Insiders and Daryl

12   Priest and Travis Lyon (and, by extension, the Priest-owned LLCs) exposes the non-

13   profit FQHC to adverse federal and state tax consequences.  The fact that the rent

14   money would inure to insiders meant Borrego Health could be found to be failing in

15   its obligations to ensure that its assets were being used predominantly for charitable

16   purposes, exposing it to possible revocation of its 501(c)(3) status.

17       348.   If enforceable, the Priest Leases would have siphoned $58 million in

18   over-fair market rent money from Borrego Health over the life of the leases.  Two of

19   the leases (Inland Valley Lease in Barstow and DRP Lease in San Bernardino) have

20   been terminated.  The Promenade Lease in El Cajon remains in operation with

21   Borrego Health paying twice fair market rent under protest, with permission of the

22   DHCS monitor overseeing Borrego Health's operations since late 2020.  Without

23   judicial intervention on the Promenade Square lease, and without recovery of the

24   $11.8 million in overpaid rent to date, the actions of the Borrego Insiders and a

25   handful of Priest entities will continue to present an immediate threat to disable an

26   essential provider of primary healthcare services to underserved inland communities

27   in San Diego, San Bernardino, and Riverside Counties.

28

349.   The Priest Leases were concealed from the full Borrego Health Board. Mikia Wallis and the Borrego Insiders knew what was contained in regular reports to the full Borrego Health board, and more importantly, what was not.  The Borrego Insiders knew that financial reports presented to the full board did not include or otherwise call out the individual facility rents in a way that might suggest that they were over market or had unreasonably long lease terms.  Financial reports to the full Borrego Health Board include only the aggregate rents paid on all facilities.  The Borrego Insiders knew that Borrego Health's personnel would make monthly rent payments as requested, without questioning the reasonableness of those monthly rent payments.  Thus, unless the Priest Leases themselves were presented to the full Board of Trustees for vetting and approval, there was absolutely no way that Borrego Health would be put on notice of any potential financial or other injury associated with, or caused in whole or in part by over-market leases.

350.   The Borrego Insiders knew that full Board of Borrego Health would review only those contracts presented to them, and that they would never have reason to see the Priest LLC leases unless the Borrego Insiders managing the relationship with Priest LLCs decided to present the leases.  Thus, unless disclosed by the Borrego Insiders, there was no way that Borrego Health would be put on notice of the terms of the three subject leases, or that the Borrego Insiders were working with Daryl Priest, Travis Lyon, and, through them, the three Priest LLC to make all management and operations decisions pertaining to the over-market leases for Borrego Health, and in a manner contrary to Borrego Health's financial and compliance interests.  The fact of injury from the leases and from the defendants' participation in Borrego Health's facilities procurement and operations and therefore could not be discovered.

351.   The Borrego Insiders' continued concealment of the leases from Borrego Health was a separate breach of fiduciary duty and/or duty of care in

1    furtherance of the scheme to steal money from Borrego Health every time a monthly

2    rent check was mailed to Borrego Health.

3         352.   The Priest Leases Scheme victimized Borrego Health in at least three

4    ways:

5              a.    Exposure to State Suspensions and Federal Disqualification: In

6    California, government funded health program funds flow to FQHCs under the

7    oversight of the California Department of Health Care Services ("DHCS").  DHCS

8    is empowered to suspend all reimbursement for the provision of health care services

9    to Medi-Cal members in accordance with, *inter alia,* Welfare and Institutions Code

10   section 14107.11 and Title 42 of the Code of Federal Regulations section 455.23.

11   Further, HRSA/Bureau of Primary Health Care ("BPHC") monitors FQHCs and can

12   suspend and/or disqualify Borrego Health from the FQHC program, including, *inter*

13   *alia,* an action by HRSA requiring Borrego Health to cease all activities in the

14   program pending corrective action (45 CFR 75.375) and possible suspension under

15   HHS regulations (2 CFR Part 376, 45 CFR 75.2).  DHCS is presently allowing

16   Borrego Health to continue operations under the guidance, oversight, and direction

17   of a DHCS-appointed independent monitor.

18             b.    Reimbursement rate adjustments: The cost of owning, renting,

19   maintaining, and upgrading clinic facilities is a substantial cost center for FQHCs

20   providing primary health care services.  As such, CMS recognizes the fair market

21   value of facility costs reasonably incurred and truthfully reported by FQHCs in

22   determining the reimbursement rates to be paid clinics operated by the FQHC.  Cost

23   reporting in excess of fair market value inflates the FQHC's mandatory cost reports

24   required under title 42 of the United States Code section 1395g, and exposes

25   Borrego Health to an order that it retroactively amend its cost reports, potentially

26   leading to a reduction in reimbursement rates paid by federally funded health

27   programs.

28

FOURTH AMENDED COMPLAINT

7288673.3

c.      Non-profit 501(c)(3) tax status:  Contract payments to disqualified persons in excess of fair market values (or other unlawful diversion of a non-profit entity's revenue to falsely disguise profits as operating expenses) can result in tax liability and/or loss of non-profit tax exemption status at both the federal and state levels.  (*See,* e.g., Internal Revenue Code sections 4958(c)(1) and 4958(f)(1) and related Treasury Department Regulations in section 53.4958-3.)

353.   The concealment of the Priest Leases Scheme detailed above and of the fact of injury resulting therefrom worked to perfection until it came to light in late 2020.  At that time, following October 2020 raids by state and federal law enforcement authorities, DHCS suspended payment of federal funds to Borrego Health in conjunction with an investigation unrelated to the Priest Leases.  In the course of the investigation, numerous contracts were reviewed, including the Priest Leases.

354.   Independent certified commercial real estate appraisers made the following findings:  (a) on the Promenade Lease (El Cajon location), Borrego Health was paying $39,104.75 a month above fair market rent, or $469,257 above fair market rent per year; (b) on the DRP Lease (San Bernardino location), Borrego Health was paying $38,405.95 a month above fair market rent, or $460,871.40 above fair market rent per year; and (c) on the Inland Valley Lease (Barstow location), Borrego Health was paying $80,025.25 a month above fair market rent, or $960,303 above fair market rent per year.  Additionally, the lease terms of 30 to 33 years on the Priest Leases is unreasonably over market as well.  A reasonable fair market term for these commercial leases is three to five years.

355.   In order to remain in operation, Borrego Health signed an agreement with DHCS in February 2021 under which an independent monitor selected by DHCS would institute a robust corporate integrity and compliance program at Borrego Health.  As is relevant here, DHCS' monitor directed Borrego Health to: (1) stop paying above fair market rent on the Priest Leases; and (2) take action to

7288673.3

1   address over-fair market rent payments, excessive 30-year lease terms, and the

2   failure to include lease provisions under which Borrego Health may terminate the

3   leases.

4        356.   In response, the Priest LLCs acted in unison.  The Priest LLCs

5   demanded that Borrego Health continue to make over-fair market rent payments

6   under the Priest Leases.  In a May 25, 2021 email, the Priest LLCs threatened that

7   Borrego Health's failure to pay the demanded rent on any one of the Priest Leases

8   will result in immediate eviction proceedings as to all three locations that are the

9   subject of the Priest Leases.

10       357.   The Priest Leases are the subject of a related litigation pending as Case

11  3:21-cv-04117-L-AGS, entitled *Borrego Community Health Foundation v. Inland*

12  *Valley Investments, LLC, et al.*

13       358.   Because Borrego Health had no constructive or inquiry notice of the

14  fact of injury throughout the eight-year life of the Priest Leases Scheme, Borrego

15  Health's right to recover money stolen by defendants extends back to the

16  commencement of each lease.  The accrual date applicable to RICO claims under

17  the discovery rule (and to all other causes of action pled herein) is at the earliest

18  October 2020, and Borrego Health may sue to recover for the entire eight years of

19  losses.

20       359.   On information and belief, the Borrego Insiders were compensated for

21  this access and control through kickbacks or other payments or remuneration.

22       **G.    The Borrego Insiders Paid Themselves Above-Market**

23            **Compensation and Granted Themselves Improper Benefits and**

24            **Covered It Up (the "Compensation/Benefits Scheme")**

25       360.   <u>Bruce Hebets</u> received a high salary from Borrego Health.  For

26  instance, in 2016, Bruce Hebets received more than $383,000 in salary, plus over

27  $126,000 in "bonus," in addition to a "car allowance" of $1,000 per month and a

28  "cell allowance" of $350 per month.  In 2017, Bruce Hebets received more than

1   $529,000 in salary, plus over $87,000 in "bonus," in addition to the car and cell
2   allowance.  The decision to increase Bruce Hebets' salary in 2017 was made by
3   Harry Ilsley, Dennis Nourse, and Mike Hickok without conducting any
4   compensation study to determine what a fair market salary would be for a FQHC.
5   The three Borrego Insiders then represented to the full Borrego Health Board that
6   this salary was fair market and was in line with other comparable FQHCs (which
7   would later be refuted when an actual compensation study was conducted). In 2018
8   (partial year), Bruce Hebets received more than $467,000 in salary, plus over
9   $321,000 in "bonus," in addition to the car and cell allowance.

10      361.   Karen Hebets also received a high salary from Borrego Health.  For
11  instance, in 2016, Karen Hebets received more than $227,000 in salary, plus over
12  $40,000 in "bonus".  In 2017, Karen Hebets received more than $228,000 in salary,
13  plus over $51,000 in "bonus".  In 2018 and 2019, Karen Hebets received more than
14  $228,000 in salary, plus over $41,000 in "bonus".  In 2020, these salaries were
15  reduced to more than $205,000 with a bonus of over $10,000.

16      362.   Diana Thompson, formerly Diana Troncoso, also received a high salary
17  from Borrego Health.  For instance, in 2017, Diana Thompson was paid nearly
18  $338,000.

19      363.   Mikia Wallis also received a high salary from Borrego Health.  For
20  instance, in 2017, Mikia Wallis was paid over $440,000.

21      364.   The Borrego Insiders then proceeded to disguise their above-market
22  salary and benefits by using improper evaluations.  For instance, the Borrego
23  Insiders used Jim Hebets and his companies to create a bogus evaluation of the
24  compensation packages, concluding—unsurprisingly—that they were appropriate.

25      365.   One Borrego Insider even stated that the executives kept their base
26  salary low but took additional payments as "bonuses" and received other benefits
27  "to avoid scrutiny."

28

7288673.3

366.   The Board Insiders also received compensation and other improper benefits.  In July 2015, Bruce Hebets inquired from counsel whether or not a FQHC can pay or compensate board members, but counsel informed him that payments were prohibited, other than very narrow exceptions.  Nevertheless, the Board Insiders received remuneration and benefits from Borrego Health, and were therefore effectively compensated by Borrego Health and incentivized to keep these Schemes going.

367.   For instance, the Board Insiders received free access to Borrego Health programs, benefits, prescription drugs and even hearing aids.

368.   An email from Mike Hickok dated August 31, 2020, confirmed the practice of improper remuneration and benefits to Board Insiders:

> This policy has existed since Borrego Health was founded.  I asked about this once myself (I currently get my pharmacy prescriptions  as a perk) and was told this was an acceptable practice. My understanding is staff and families get the same perk plus no charge for medical and dental care. As far as the missive that the  cost of these items should be put back into the healthcare of the community is almost too laughable to be taken seriously in view of the tens of millions of dollars we waste with double paying Providers or paying them for doing little to no work or paying firms like Premier Healthcare millions of dollars that in-house staff could do and much less expensively or the many (probably most) real estate leases that we pay exorbitantly over market rent and for well in excess of typical lease terms. I've been trying to call attention to these issues for *years* and gotten nowhere until the Borrego Sun stared to expose them. Alan Kuehn has been blowing the whistle for years about medicare fraud in the contract dental practice and the only thing that this board chose to do regarding him was blackball him as a board member because he was threatening to Makia and Tim Martinez and the ongoing scam with Premier Healthcare.
>
> So now calling attention to Trustees getting a perk of free pharmacy as some sort of impropriety is (on second thought) not *almost*  laughable it takes the cake ….

369.   Later, as discussed below, when this arrangement was revealed, the Borrego Health Board ended the practice.  However, in a September 2, 2020 e-mail between Mikia Wallis and the 2020 Board of Directors, it was clear that Mikia Wallis had never looked into the legality of such a practice during her tenure at

1  Borrego Health. Further, none of the Board Insiders evaluated whether it was

2  consistent with the by-laws or HRSA guidelines to allow such a practice.

3       370.  In 2019, Compensation Resources, Inc. ("CRI") was retained by

4  Borrego Health to review and analyze the compensation of 15 Borrego Health

5  executives.  CRI issued its report on or about July 19, 2019.  In sum, of the 15

6  executives reviewed, the CRI report concluded that the "Total Compensation

7  Package (TCP) for eleven (11) of the Borrego officers is currently above the high

8  end of their respective Market Ranges of Reasonableness."  In early 2020, a second

9  CRI analysis was conducted for the other employees of Borrego Health, which also

10  found excessive salaries.

11       371.  Mikia Wallis and the Borrego Insiders failed to raise the issues of

12  nepotism, cronyism and above-market compensation to the full Borrego Health

13  Board, and took steps to conceal the issues.  When asked by the full Borrego Health

14  Board to investigate and report on the compensation, Mikia Wallis' submitted

15  multiple reports which lacked the necessary information to make any appropriate

16  decisions.

17       372.  For instance, in one version of Mikia Wallis' report she used the

18  salaries that had recently been reduced by an "equitable" adjustment, effectively

19  attempting to conceal the past problems.

20       On top of that, Bruce Hebets and Jim Hebets schemed to create a 162B

21  Executive Bonus Plan that would pay Bruce Hebets and others additional

22  compensation (a tax-free payment of $5,000 per month) while also siphoning

23  millions to Jim Hebets' insurance company.

24       373.  On information and belief, the Borrego Insiders were compensated for

25  this access and control through kickbacks or other payments or remuneration.

26     **H.**   **The Borrego Insiders Used Nepotism and Cronyism to Funnel**

27           **Money to their Friends and Family (the "Nepotism and Cronyism**

28           **Scheme")**

FOURTH AMENDED COMPLAINT

7288673.3

374.   Bruce Hebets and Karen Hebets hired their family members to work at Borrego Health.  The nepotistic hires benefited The Hebets family, so that they were encouraged to keep the above-described Schemes operating.  This included Bruce and Karen's daughter Tiffany Hebets (Collections Clerk, paid approximately $46,700/year and daughter Amanda Troncoso (Lead Billing Internal Auditor, base salary $49,920/year).  Amanda Troncoso is also the daughter-in-law of Diana Thompson.

375.   Mikia Wallis created a position for her husband, Jeremy Noble, at Borrego Health.  Jeremy Noble was hired to be Director of Site Facility Compliance for Borrego Health in exchange for an annual base salary of $120,000, despite the fact that he lacked the skills needed for the position.  Jeremy Noble was later arrested and charged with illegal firearms possession.  Borrego Health is informed and believes that the criminal case (Case No. SCN420059) is ongoing.

376.   Diana Thompson hired her family members to work in Borrego Health's billing department and elsewhere.  The nepotistic hires benefited Diana Thompson and her family, so that she was encouraged to keep the above-described schemes operating.  Moreover, by populating her department with family members, it effectively eliminated any meaningful oversight.  These family members included: (1) her brother Jose Alfredo Villafana, IT Technician (base salary $45,760/year); (2) her brother Luis Troncoso, Facilities Maintenance Worker 3 (base salary: $57,200/year); (3) her sister Breanda Troncoso, Biller 2 (base salary $40,352/year); (4) her step-son Julian Thompson, Accounting Clerk 1 (base salary $45,739/year); (5) her step-son Jordan Thompson, Biller 2 (base salary $35,360); and (6) her daughter-in-law Amanda Troncoso, Lead Billing Internal Auditor (base salary $49,920/year).  Borrego Health even hired Diana Thompson's father to provide gardening services for Borrego Health.

377.   By hiring family members, as well as individuals that lacked experience in the healthcare industry and FQHC space, Borrego Insiders were able

1   to conceal Schemes and the funds being funneled between and amongst the
2   Defendants.  As already alleged herein, Diana Thompson and Karen Hebets trained
3   their family members in the accounting department on how to review and process
4   claims. While this task was supposed to be performed by the Premier Defendants,
5   they failed to do so. As a result, the Dental Defendants provided incorrect and
6   fraudulent claims to Premier, who then submitted the claims to Borrego Health.  The
7   Borrego Insiders' family members failed to recognize the issues with the claims due
8   to inexperience and the deceptive training provided by Karen Hebets and Diana
9   Thompson.

10      378.   On information and belief, the Borrego Insiders were compensated for
11   this access and control through kickbacks or other payments or remuneration.

12   **I.      The Borrego Insiders Tried To Purchase a Country Club to**
13   **Personally Benefit Themselves (the "De Anza Country Club**
14   **Scheme")**

15      379.   The October 2017 Executive/Finance Committee meeting was
16   recorded.  In that meeting, the Board Insiders and staff attendees (including Bruce
17   Hebets, Mikia Wallis, and Diana Thompson) discussed a proposal to purchase the
18   De Anza Country Club located in Borrego Springs.  According to the meeting
19   discussions: (1) the country club was not performing well economically and was
20   contemplating selling its assets or filing for bankruptcy, (2) some Borrego Insiders
21   own or owned homes nearby whose property values would face decline, and (3)
22   some Borrego Insiders were creditors of the country club through a limited liability
23   company.

24      380.   Three of the four Board Insiders (Mike Hickok, Dennis Nourse, and
25   Harry Ilsley) were members and nearby homeowners at De Anza Country Club
26   during a period when the club was financially distressed and looking for a purchaser.
27   Mike Hickok was on the De Anza Board of Trustees and headed a committee at De
28   Anza to arrange a purchaser for the country club.

7288673.3

381.   Mike Hickok mentioned that he wanted Borrego Health to buy the club so that Borrego Health would pay membership fees and subsequently offer "free" membership and free golf course access to the medical and dental providers Borrego Health partnered with.  Hickok admitted that most Borrego Health employees would not want this service, but that it made sense for Borrego Health to buy the country club since there was a "fire sale."

382.   Borrego Insiders decided not to present the plan to purchase the country club to the full Borrego Health Board.  Specifically, Chuck Kimball indicated several times during the meeting that if the issue were presented to the full Borrego Health Board, the Board would "f**k it up." (Explicative removed.) Kimball went on to state that the purpose of the Executive Committee was to make decisions without consulting the full Borrego Health Board.

383.   Following the October 2017 meeting, Borrego Health made a formal offer to purchase the country club, including paying earnest money on the deal.  As usual, the Borrego Insiders did not take the De Anza transaction to the full Board for its review or approval.

384.   Borrego Insiders sent a letter of intent and a "good-faith deposit" to De Anza, without the knowledge or approval of the full Board.  It was only after De Anza shared the letter with its shareholders that this scheme was discovered by others.

385.   In fact, in the recorded October 2017 Executive/Finance Committee meeting, the Borrego Insiders explicitly acknowledge that members of the full Board would disapprove of such a purchase.  Borrego Health does not know why the Borrego Insiders wanted a FQHC—*i.e*., a healthcare provider for underserved communities—to purchase a country club, though Borrego Health suspects that some or all of those individuals would personally benefit from such a transaction, at the expense of Borrego Health.

7288673.3

386.   By email dated November 18, 2017, outside counsel for Borrego Health advised Mikia Wallis that there were potentially "severe consequences" to Borrego Health from the proposed transaction, outlining some of the major potential issues.

387.   The Borrego Insiders continued to pursue this deal into 2018, even after telling the full Board that it was "dead," and to hide that fact from the full Board. Diana Thompson stated, in an Executive Committee meeting in 2018, "when we left the last meeting with the board, the full board, we said or the executive committee, we said, we're not going to pursue this. We do have the obligation to notify them that we're discussing this."

388.   The Borrego Insiders acknowledged that they were interested parties. At one point, in a 2018 Executive Committee meeting, Harry Ilsley said, "But do we really -- the three of you have got to recuse yourself from voting. That you have ownership in the LLC, you have homes that may be devalued if De Anza goes away."  It is not clear which three individuals or what LLC he was referencing.

389.   The Borrego Insiders actively sought to conceal this proposed transaction, with one Borrego Insider stating at a 2018 Executive Committee meeting, "someone has offered to partner with us but the details are totally unknown. I personally don't want that information to leak out anywhere, but it's in the community already, I suppose, and you may hear about it and I don't want to have you have to call me to find out what's going on, okay?"

390.   It appears that Mike Hickok and Harry Illsley were unable to obtain a written favorable vote from a majority of the equity members at the De Anza club. Therefore, despite the Borrego Insider's efforts, the deal did not move forward, and de Anza returned the earnest money.

/ / /

/ / /

/ / /

**J.    The Borrego Insiders Attempted to Pay Bruce Hebets a $5 Million Payout (the "Payout Scheme")**

391.   In or about March 2018, Bruce Hebets suffered from a worsening illness and decided to step down from his position as CEO.  Without putting it on the agenda, the Borrego Insiders proposed a $5 million payout for Bruce Hebets as part of a "transition agreement."  Around that time, the idea was first presented to the full Board of Trustees.  At that time it was first presented to the full Board, an agreement had already been created, which was drafted by Mikia Wallis.

392.   Mikia Wallis drafted the agreement at Bruce Hebets' request.  Mikia Wallis did not advise Borrego Health to get separate counsel with respect to the agreement, and told a Borrego Health Board member on or about April 5, 2018 that she "represented no one" in the transaction, despite that fact that she was Borrego Health's Chief Legal Officer and would shortly become Borrego Health's CEO.  The Board member encouraged Mikia Wallis to do her own research about to whom she owes a duty of loyalty as general counsel for Borrego Health.  Mikia Wallis argued that she was not required to represent the best interests of the organization (which is wrong), that she did not represent anyone with respect to this transaction, and that there was nothing wrong with having drafted the contract for Bruce Hebets.

393.   Despite her protestations to the Board, Mikia Wallis was aware of her conflict.  At one Executive Committee meeting in 2018, Mikia Wallis discussed presenting a proposed agreement to the full Board.  She said, "My concern is, I don't know that's best coming from me, considering the inherent conflict of interest."

394.   The Borrego Insiders did not do any diligence or get an independent analysis with respect to a proper amount for a buyout under the circumstances.  Two other Board members, who were not Board Insiders, objected to the payout, stated that additional diligence was required and asked for the vote to be delayed to allow for additional evaluation.

FOURTH AMENDED COMPLAINT

7288673.3

395.   During the discussion of the transition agreement, the Borrego Insiders argued that the extremely high buyout was appropriate due to the fact that Bruce Hebets had not received retirement benefits.  However, this was false as Bruce Hebets had a 162B plan.  (The existence of the 162B plan was concealed by the Borrego Insiders, including from the auditor retained to evaluate the appropriate amount of Bruce Hebets' payout.)

396.   The vote on the "transition agreement" and buyout was postponed to a later meeting.

397.   At the April 5, 2018 Borrego Health Board meeting, the issue was discussed.  The Borrego Insiders brought a man named Frank Church, who was supposedly an "independent auditor," to appear by phone in the meeting.  Frank Church did not appear to have any expertise or knowledge regarding the reasonableness of the payout.

398.   On July 13, 2018, Chuck Kimball e-mailed Mikia Wallis and Diana Thompson, stating that Bruce Hebets indicated that he would retire, but wanted to remain on payroll at a "reduced rate" for 5 years at a rate from his $500,000 annual salary. Chuck Kimball proceeded to state that after Bruce Hebets retired, Mikia Wallis and the Board Insiders would be completely in charge of Borrego Health.

399.   Later, still needing an independent evaluation of the payout amount, at the insistence of the non-Borrego Insider Board Trustees, Borrego Health retained FW Cook to conduct an evaluation.  FW Cook employee Marty Katz provided the results.  After reviewing salaries and payouts for other CEOs, FW Cook concluded that an appropriate payout would be $2 million, not the $5 million that Bruce Hebets and Mikia Wallis proposed.  The analysis was provided without knowledge of the 162B plan and benefits, and was therefore fundamentally flawed.

400.   During the valuation process, Chuck Kimball and Mikia Wallis exchanged several e-mails, including an e-mail on September 27, 2018 which

1   indicates an intent to exclude non-Borrego Insiders from Bruce Hebets' retirement
2   negotiations.

3       401.   After this valuation occurred, Chuck Kimball proposed offering an
4   accelerated payment structure to ensure Bruce Hebets received the full amount
5   before his passing. During these e-mail exchanges with Mikia Wallis, Chuck
6   Kimball admitted that the Borrego Insiders were making decisions about Borrego
7   Health which involved "dodging the law."

8       402.   This $2 million payout amount was eventually agreed to by the full
9   Borrego Health Board and Bruce Hebets.

10       403.   Months after the $2 million payout had already been completed,
11   Borrego Health once again consulted with FW cook about the propriety of the 162B
12   plan.  At that time, Marty Katz explained that he was told by Mikia Wallis that
13   payments made to a 162B plan for Bruce Hebets' benefits were performance-based
14   bonuses, which was false.  In actuality, this was a part of Bruce Hebets' regular
15   compensation.  Marty Katz told a Borrego Health Board member that if he had
16   known this information, the payout amount would have been lower.

17       404.   The Borrego Insiders also attempted to conceal the impropriety of the
18   generous 162B plan offered to some Borrego Insiders.  In spring or summer 2019,
19   certain Borrego Health Board Trustees asked Mikia Wallis to evaluate the current
20   162B plan and, if necessary, find alternative plans.  Mikia Wallis invited an
21   individual to address the issue with the full Borrego Health board.  The individual
22   identified himself as "Jim" without providing a last name.  He proceeded to praise
23   the 162B plan.  It was only when a non-Borrego Insider Board member asked for his
24   last name did Jim disclose that he was, in fact, Jim Hebets.

25       405.   Minutes from a meeting of Borrego Insiders from June 12, 2020
26   indicate that Borrego Health received a 20% remittance payment penalty from the
27   IRS as a result of the Board Insider's decision to pay Bruce Hebets an excess of $1
28   million in 2018.

406.   On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.

**K.     The Borrego Insiders Funneled Money to Bruce Hebets' Brother, Jim Hebets, and Jim Hebets' Firm (the "Jim Hebets Scheme")**

407.   The Borrego Insiders entered into an arrangements, on behalf of Borrego Health, with Jim Hebets and/or companies owned or controlled by Jim Hebets, The Hebets Company, funneling additional Borrego Health funds to Borrego Insider cronies and family members.

408.   For instance, the Borrego Insiders collaborated to have Jim Hebets and/or his companies review and approve sham, inflated salaries for Borrego Health executives, including the Borrego Insiders.

409.   Jim Hebets directed the review and approval process through The Hebets Company.  However, when the sham fair market value analyses were presented to the Borrego Health Board, Jim Hebets ensured that his name was removed by the masthead and documents were carefully drafted to avoid reference to Jim Hebets and to conceal his involvement and obvious conflict of interest, even neglecting to mention his last name when introducing himself.

410.   Jim Hebets' firm, The Hebets Company, is located in Phoenix, Arizona.  On the website (www.hebetsco.com), he boasts of specializing in FQHCs and creating ways to increase executive compensation/benefits beyond what is specified in IRS code for qualified 403(b) or 457(b) plans.

411.   The Hebets Company's current website makes it perfectly clear that their agenda is to maximize executive compensation:

Today's competitive labor market makes it increasingly difficult for businesses to hire and retain highly skilled employees. The Hebets Company's Executive Compensation and Supplemental Fringe Benefits division assists these enterprises in designing and implementing innovative compensation and benefit programs for purposes of recruiting and rewarding those key executives who are instrumental to the profitability of the company. Legislative changes over the years have repeatedly reduced the qualified plan benefits that can be allocated to this select group of highly compensated

118

employees resulting in "reverse discrimination". But there are many worthwhile solutions.

412.   Jim Hebets' firm also boasts that it provides "Estate planning for the 'exceptionally wealthy,'" a seeming mismatch for Borrego as a non-profit, but perhaps exactly what Bruce Hebets sought and why Jim Hebets was involved.

413.   Bruce Hebets, Diana Thompson, and Mikia Wallis also schemed with The Hebets Company to increase executive compensation through contributions through automatic "bonuses" that were paid to 162B plans.  These automatic bonuses paid to many Borrego Insiders, including Bruce Hebets, Diana Thompson, Mikia Wallis, and Karen Hebets.

414.   Though the 162B plans appeared at first glance to be life insurance plans, they were never intended as such but were instead a strategy to pay above market to insiders without added scrutiny or tax liability.  Bruce Hebets and Karen Hebets worked directly with the Vice President and General Manager of The Hebets Company to "borrow" from their 162B accounts and transfer the funds from their respective 162B plans into their checking account.

415.   These were significant payments.  As of 2015, Bruce Hebets was receiving $3,500 per month for his 162B plan, and by 2017, he was receiving $5,000 per month.  These amounts were free of taxes, as on top of these payments, Borrego Health was also paying a tax true up.  As a result of this scheme, Bruce Hebets, Karen Hebets, and other Borrego Insiders got tax free bonuses every month, which they subsequently cashed out.

416.   Even after the loans, the value of these plans was substantial.  As of July 9, 2018, Bruce Hebets' 162B life insurance value was $1,236,000.  It appears this approximate value was paid out to Bruce Hebets' estate at the time of his death after a long illness in January 2019.

417.   Jim Hebets and The Hebets Company actively attempted to persuade Borrego Health to continue to use the 162B plans through The Hebets Company.

For example, in July 2019, Jim Hebets e-mailed Mikia Wallis explaining the nature of the 162B program and the benefits of the plan. During these discussions, Jim Hebets made several misrepresentations. For example, Jim Hebets represented that the 162B would not subject Borrego Health to tax penalties. However, as alleged herein by way of example, the 162B plan in fact subjected Borrego Health to a tax penalty due to Bruce Hebets total compensation exceeding $1 million.

418.    These 162B plan payments also created a windfall for Jim Hebets and The Hebets Company, which sold and managed the plan.  As of July 2020, Borrego Health was paying $240,000 per month for the 162B plans.  This is immensely disproportionate.

419.    For scale, Borrego Health paid in full for a bridge life insurance policy that would allow staff losing their 162B plan benefit to retain up to two-times their salary, up to $500,000, in group term life insurance until they could select their own insurance at their own cost via annual open enrollment.  The cost of that plan was $15,420 per month.

420.    The Borrego Insiders, Jim Hebets, and The Hebets Company knew that the Borrego Health Board members would rely on the compensation analyses and would have no other resource to question them. Thus, the compensation analyses were presented to the Board of Trustees for vetting and approval, but there was no way that Borrego Health would be put on notice of Jim Hebets' and his company's involvement or of any potential financial or other injury associated with, or caused in whole or in part by the flawed compensation analyses.  Nor would the Board have any access to facts that might put them on inquiry notice that the Borrego Insiders, Jim Hebets, and The Hebets Company were working together to siphon funds from Borrego Health.

421.    There is little doubt that Borrego Health has only begun to scratch the surface of Jim Hebets' involvement in these Schemes.  Jim Hebets met repeatedly alone and away from the Borrego Health offices with Bruce Hebets and Daryl

FOURTH AMENDED COMPLAINT

1   Priest.  Because Jim Hebets lived in Arizona, he would have had to travel for these

2   in-person meetings with Daryl Priest.  For example, Jim Hebets, Bruce Hebets, Jim

3   Hebets' son, and Daryl Priest met at Coasterra Mexican Restaurant in San Diego on

4   March 18, 2016.  On February 27, 2018, they met in the lobby of Loews Resort in

5   Coronado.

6       422.   On information and belief, the Borrego Insiders were compensated for

7   this access and control through kickbacks or other payments or remuneration.  For

8   example, each time Bruce Hebets would give Jim Hebets access to his contacts at

9   other FQHCs, Jim Hebets executed a "Compensation Split Arrangement between

10  The Hebets Company and Bruce Hebets" that falsely listed Bruce Hebets as the

11  "Insurance Agent" and paid Bruce 10% of the proceeds.  Jim Hebets and Bruce

12  Hebets executed such arrangements after Jim Hebets made sales to Rural Health

13  Care, Inc., San Ysidro Health Center, Tony Weber (CEO of Golden Valley Health

14  Centers), and Francisco Castellon (CEO of Omni Family Health).  It is likely that

15  discovery will uncover similar arrangements in which the money Jim Hebets

16  siphoned off from Borrego Health would make it back to Bruce Hebets and/or

17  Defendants.

18      **L.    Borrego Insider Chuck Kimball Leased a Barn to Borrego Health**

19          **(the "Julian Barn Scheme")**

20      423.   Julian Medical Foundation, Inc. is a 501(c)(3) organization.  Its stated

21  mission is "To foster the presence and availability of high quality health and

22  medical care within the Julian area including being the owner of a rural health clinic

23  in Julian and the promotion and sponsorship of activities addressing community-

24  wide issues of health and safety."

25      424.   Julian Medical Foundation sought out property in Julian, California and

26  solicited Bruce Hebets to operate a clinic in Julian.  Chuck Kimball led the efforts

27  while he was Vice President of Julian Medical Foundation.

28

425.   Bruce Hebets and Chuck Kimball were acquaintances prior to their relationship at Borrego Health.

426.   Chuck Kimball repeatedly emailed Bruce Hebets starting in April 2009 regarding acquiring a barn to serve as a site for a future clinic operated by Borrego Health in Julian.  The target property identified by Chuck Kimball was a horse barn and surrounding land located at 2717 A Street in Julian, California (the "Horse Barn").

427.   Chuck Kimball saw an opportunity to benefit the Julian Medical Foundation to the detriment of Borrego Health.  Julian Medical Foundation could acquire the property, but it was not in a position to utilize it, finance it without subsidization, or develop it.  Chuck Kimball wanted Borrego Health to subsidize the acquisition and development of the property and insulate Julian Medical Foundation from any risk from acquiring the property.

428.   Thus, Julian Medical Foundation would acquire a property that was not useable in its current state, but Borrego Health would bear the risk of the acquisition by paying all costs of acquisition and ongoing financing to Julian Medical Foundation, including incurring liability for any mortgages secured by Julian Medical Foundation.

429.   In July and August 2009, Chuck Kimball began a fundraising drive for Julian Medical Foundation to acquire a property in Julian for a medical clinic.

430.   Even before Julian Medical Foundation was able to acquire the Horse Barn, Chuck Kimball coordinated the drafting of a lease between the Horse Barn owners and Borrego Health.

431.   Later, Chuck Kimball proposed that Julian Medical Foundation lease the Horse Barn to Borrego Health with Julian Medical Foundation as the landlord.

432.   Borrego Health agreed to lease the Horse Barn without even considering whether there was a market for the services should the Horse Barn be

122
FOURTH AMENDED COMPLAINT

remodeled to accommodate a new clinic.  Instead, market analyses were conducted

years later with the Horse Barn remaining unused by Borrego Health.

433.   In October 2010, Borrego Health entered into an agreement with Julian Medical Foundation and Chuck Kimball to lease the Horse Barn.  The lease terms were one-sided and the product of Julian Medical Foundation and Chuck Kimball exerting control over Borrego Health.

434.   The leased space was not necessary and the Horse Barn was unneeded and unusable.

435.   Initially, there was no specific lease amount specified.  Instead, it was set at whatever expenses Julian Medical Foundation had to own the property.  As a result of the ambiguity of the monthly rent, the Borrego Insiders and Julian Medical Foundation could manipulate the amount of rent for Borrego Health to pay to the Julian Medical Foundation.

436.   The Horse Barn was unusable by Borrego Health, but it paid the full rent to Julian Medical Foundation and then subleased the Horse Barn back to the original owners at a significant loss to Borrego Health, only reinforcing that the fair market rent for the Horse Barn was far less than Borrego Health was paying.

437.   The Borrego Insiders and Julian Medical Foundation were all aware that Borrego Health had no use for a barn and no intention to utilize it.  Yet, they set the term of the lease at 20 years in duration, with no termination clause for Borrego Health, not even if the property was never developed into a medical clinic.  If the lease were to be terminated or abandoned, Borrego Health agreed to pay off all mortgages on the Horse Barn.

438.   Later, by First Amendment to the lease dated November 7, 2013, Borrego Health agreed to Julian Medical Foundation's demand to increase the rent from at least $6,284 per month to $7,179, despite no additional consideration being offered by Julian Medical Foundation and Chuck Kimball.  The only justification

1  was increased costs incurred by Julian Medical Foundation due to a property tax

2  increase.

3         439.   Ultimately, the Horse Barn lease was so unsustainable that Borrego

4  Health had to negotiate with Chuck Kimball to release Borrego Health from the

5  lease, but that did not occur until 2022.  At that point, Chuck Kimball was aware of

6  government scrutiny.

7         440.   Neither Chuck Kimball nor the Julian Medical Foundation has returned

8  or forgiven any rent for the Horse Barn.

9         441.   The Borrego Insiders knew that Borrego Health Board members would

10  review only those contracts presented to them, and that they would never have

11  reason to see The Horse Barn lease unless it was presented to them.  Thus, unless

12  the Horse Barn lease itself was presented to the Board for vetting and approval,

13  there was absolutely no way that Borrego Health would be put on notice of any

14  potential financial or other injury associated with, or caused in whole or in part by

15  over-market leases.  Nor would the Board have any access to facts that might put

16  them on inquiry notice that the Borrego Insiders were working together to siphon

17  funds from Borrego Health.

18         442.   On information and belief, the Borrego Insiders were compensated for

19  this access and control through kickbacks or other payments or remuneration.

20  **M.     Borrego Insider Dennis Nourse Sold Property to Borrego Health to**

21  **be Developed by Priest (the "Property Development Scheme")**

22         443.   Bruce Hebets and Dennis Nourse were friends prior to their

23  relationship at Borrego Health.

24         444.   Dennis Nourse owned commercial property located on Palm Canyon

25  Drive in Borrego, Springs with Assessor Parcel Number ("APN") 198-010-23-00

26  ("Palm Canyon Parcel"), which fronts on Palm Canyon Drive just west of Country

27  Club Road.

28

7288673.3

445.   Dennis Nourse saw an opportunity to benefit himself by facilitating a sale the Palm Canyon Parcel and involving Borrego Health.

446.   Dennis Nourse approached Bruce Hebets to discuss a sale.  Bruce Hebets saw an opportunity to involve Daryl Priest to develop the property, who he had familiarity with after two other clinic leases.

447.   Dennis Nourse, Bruce Hebets, and Daryl Priest collaborated so that Daryl Priest would acquire the commercially worthless parcel from Dennis Nourse, and then have it developed by Daryl Priest and his affiliated companies.  Once it was developed, the property would then be leased to Borrego Health at commercially unreasonable terms.

448.   Thus, the scheme was hatched whereby Dennis Nourse would be overpaid for the Palm Canyon Parcel, half of which was undevelopable foothills. Daryl Priest and his entities would overpay, but make up any loss by overcharging Borrego Health for development and the lease of the property.  The Borrego Insiders would sacrifice Borrego Health's interests could further ingratiate himself with Daryl Priest and to keep Dennis Nourse cooperative on the Executive/Finance Committee and to buy off Dennis Nourse as a future collaborator.

449.   Daryl Priest, though a wholly owned subsidiary created to purchase the Palm Canyon Parcel, Inland Development, LLC, entered into a contract with Dennis Nourse for the purchase.

450.   Contemporaneously, Bruce Hebets negotiated lease terms with Daryl Priest that were disadvantageous to Borrego Health.

451.   Dennis Nourse and Bruce Hebets brought the proposal to the Executive/Finance Committee, which was controlled by Borrego Insiders, including Dennis Nourse.

452.   Bruce Hebets and Mikia Wallis knew that such a business arrangement blatantly involved conflicts of interests.  As a result, Bruce Hebets directed Mikia

FOURTH AMENDED COMPLAINT

7288673.3

1  Wallis to perform an analysis demonstrating how the transaction could proceed with
2  Dennis Nourse recusing himself from a vote.

3      453.   Rather than conduct an impartial and independent analysis, Mikia
4  Wallis endeavored to perform an outcome-oriented and flawed "analysis" that
5  would give the Executive/Finance Committee poor legal advice that the arrangement
6  was acceptable, at the expense of Borrego Health.

7      454.   Mikia Wallis brought the cursory analysis supporting the transaction to
8  Bruce Hebets to ask him if she "was on the right track."  Thus, she was not
9  exercising proper independence as Borrego Health's attorney, and was instead being
10  controlled and directed by and agreeing to be nothing more than an instrument of
11  Bruce Hebets.

12      455.   Mikia Wallis completed her internal analysis to the satisfaction of
13  Bruce Hebets, and then sent it to outside counsel, who did not practice in the area of
14  real estate transactions or conflict of interests issues for review and approval.  With
15  minor modification, outside counsel approved the analysis, and the matter was
16  brought to the Executive/Finance Committee for approval.

17      456.   The Board Insiders approved the proposed transaction with little
18  questioning or scrutiny, including agreeing to the one-sided lease terms that Bruce
19  Hebets had negotiated with Daryl Priest.

20      457.   Daryl Priest then immediately negotiated a lease with Borrego Health
21  (the "Nourse Parcel Lease"), even though there was no land yet acquired by Daryl
22  Priest and no structure to lease.

23      458.   The lease terms were not commercially reasonable, and included an
24  agreement that Borrego Health would start paying full rent after Daryl Priest secured
25  approved building plans, even though no one realistically expected to be able to
26  occupy a finished structure for more than a year later.

27  / / /
28  / / /

FOURTH AMENDED COMPLAINT

7288673.3

459.   In other words, Borrego Health would be paying full rent for no property and still paying for much of the construction costs with no building to even use.

460.   The development of the land, however, still had to go through the local government approval process, including its design review committee.  At the design review committee, the development was met with resistance.

461.   Rather than counter the resistance, Daryl Priest sought to modify the terms of the deal to further his interests and make Borrego Health's position even less desirable.

462.   Daryl Priest proposed that Borrego Health purchase the Palm Canyon Parcel directly from Dennis Nourse, and that Daryl Priest would then develop the property under contract with Borrego Health.

463.   Thus it was agreed that the purchase agreement negotiated by Daryl Priest would be assigned to Borrego Health.  Borrego Health would return Daryl Priest's earnest money, and Borrego Health would pay $400,000 Dennis Nourse to purchase the Palm Canyon Parcel.

464.   This time, Bruce Hebets and Dennis Nourse decided not to go back to the full Borrego Health Board of Trustees or even the Board Insiders.

465.   Instead, Bruce Hebets and Denis Nourse brought Borrego Insider Harry Ilsley into the fold.  Harry Ilsley knew that the Board should have been involved, but agreed to work with Bruce Hebets and Denis Nourse to get the deal closed.

466.   Harry Ilsley, Dennis Nourse, and Bruce Hebets knew that Borrego Health Board members would review only those contracts presented to them, and that they would never have reason to see acquisition documents unless he or Bruce Hebets presented them.  Thus, unless the deal documents were presented to the Board of Trustees for vetting and approval, they would not know of any potential financial or other injury associated with, or caused in whole or in part by the real property transaction.  Nor would the Board have any access to facts that might put

FOURTH AMENDED COMPLAINT
7288673.3

1    them on inquiry notice that Harry Ilsley, Bruce Hebets, and Dennis Nourse were

2    working together to siphon funds from Borrego Health to Dennis Nourse and Daryl

3    Priest.

4         467.   As usual, Bruce Hebets and Mikia Wallis facilitated and directed the

5    actions necessary to execute the deal documents without knowledge of Borrego

6    Health's full Board.

7         468.   On information and belief, the Borrego Insiders were compensated for

8    this access and control through kickbacks or other payments or remuneration.

9    **N.    Bruce Hebets and Karen Hebets Create a Sham "Consulting"**

10           **Company and Contract with Premier To Obtain Payments From**

11           **Premier for the Various Schemes Which Benefited the Premier**

12           **Defendants (the "KBH Healthcare Consulting Scheme")**

13        469.   As discussed herein, various schemes were implemented which

14   benefited Premier and the Premier Defendants which were hatched with the

15   participation of support of the Borrego Insiders, including without limitation Bruce

16   Hebets and Karen Hebets.  This fact begs the question:  what was in it for Bruce

17   Hebets and Karen Hebets?

18        470.   Although Borrego Health alleges on information and belief that the

19   Borrego Insiders were compensated for their participation in the various schemes

20   through kickbacks or other payments or remuneration, the KBH Healthcare

21   Consulting Scheme is one example which Borrego Health has recently discovered.

22        471.   KBH Healthcare Consulting was created in February 2017.  The

23   business address listed with the California Secretary of State is 3283 Broken Arrow

24   Road, Borrego Springs, California 92004.  At the time, this address is also listed as

25   the home address for Bruce Hebets and Karen Hebets.

26        472.   The Operating Agreement for KBH Healthcare Consulting was drafted

27   by Mikia Wallis and the Articles of Incorporation for KBH Healthcare Consulting

28   were created and filed by Mikia Wallis, at the same time she was Chief Legal

1  Officer for Borrego Health.  The Operating Agreement states that Bruce Hebets and

2  Karen Hebets will each of 50 percent ownership, and each will contribute $500 of

3  capital.

4        473.   On or about February 1, 2017, KBH Healthcare Consulting entered

5  into a written contract with Premier entitled "Consulting Agreement" (the

6  KBH/Premier Contract").  The "services" that KBH Healthcare Consulting agreed

7  to provide pertained to OMNI Family Health, which Premier apparently wanted to

8  contract with to manage their dental services.  KBH Healthcare Consulting was

9  supposed to "assist [Premier] in the procurement of a management contract

10  regarding management of dental services with OMNI Family Health," to "consult on

11  a weekly basis on the current status of the management agreement between

12  [Premier] and OMNI Family Health," to "advise and  assist [Premier] with

13  compliance  of  regulations  relating  to  the operation of FQHCs as to dental

14  services," to "advice [sic] [Premier] on changes to laws and regulations relating to

15  FQHC," and to "advise and assist [Premier] as to best practices related to

16  management of dental services for a FQHC."

17        474.   Under the KBH/Premier Contract, KBH Healthcare was to be paid a

18  retainer of $200,000 and 5 percent of the "adjusted net income" from amounts

19  received from Premier's contract with OMNI Family Health.  Notably, other than

20  describing the type of services that may be provided, the Premier/KBH Contract

21  Amendment does not have any requirements that KBH Helathcare Consultant spend

22  any minimum number of hours, accomplish any minimum number of tasks or have

23  any preconditions to payment of $2 million whatsoever.

24        475.   Bruce Hebets and Karen Hebets sent the signed KBH/Premier Contract

25  to Daryl Priest on February 10, 2017.  By email the same day, Bruce Hebets sent an

26  email to Daryl Priest which read, "Here is the signed contract what time can I get

27  the check" [sic].

28

476.   Apparently, Premier never was able to contract with OMNI, so the sham contract designed to funnel money from Premier and the Premier Defendants to Bruce Hebets and Karen Hebets failed to work as intended.  Undeterred, the Scheme was modified.

477.   In May 2017, the Premier/KBH Contract was amended (the "Premier/KBH Contract Amendment").  The Premier/KBH Contract Amendment stated that the "services" KBH Healthcare Consulting was to provide was to assist Premier in the "procurement of management services agreements regarding management of dental services with FQHC's in the State of California and in other states," "to consult on a weekly basis on the current status of the management services agreement between [Premier] and any FQHC," to "advise and assist [Premier] with compliance matters," and "to advice [sic] [Premier] on changes to laws and regulations relating to the operation of FQHC," and "to advise and assist [Premier] as to the best practices related to management of dental services for a FQHC."

478.   The Premier/KBH Contract Amendment noted that a $200,000 retainer had already been paid to KBH Healthcare Consultants (owed 50-50 by Bruce Hebets and Karen Hebets).  The Premier/KBH Contract Amendment also required Premier to pay KBH Healthcare Consultants (owed 50-50 by Bruce Hebets and Karen Hebets) the sums of $75,000 per month for a term of 24 months (*i.e.* a total of $2 million).  Notably, other than describing the type of services that may be provided, the Premier/KBH Contract Amendment does not have any requirements that KBH Healthcare Consultant spend any minimum number of hours, accomplish any minimum number of tasks or have any preconditions to payment of $2 million whatsoever.

479.   KBH Healthcare Consulting had a bank account with Chase, including a debit card.

FOURTH AMENDED COMPLAINT

7288673.3

480.   On or about February 13, 2017, a deposit of $200,000 was made to that account, which corresponds to the retainer amount due under the KBH/Premier Contract.

481.   On or about August 23, 2017, the debit card was used to obtain cash advances at Barona Resort and Casino for over $5,000.

482.   Between August 26 and September 1, 2017. the debit card was used to obtain cash advances at Barona Resort and Casino for over $20,000.

483.   On or about September 20, 2017, the debit card was used to obtain cash advances at Barona Resort and Casino for over $5,000.  The following day, attempts were made to withdraw money in excess of $5,000.

484.   Between October 11 and 12, 2017, the debit card was used to obtain cash advances at Barona Resort and Casino for over $9,000.  On October 12, 2017, two attempts to withdraw $1,000 each were declined.

485.   On or about June 8, 2019, the debit card was used to obtain cash advances at Barona Resort and Casino for over $4,000.

## VI.   CLEANING HOUSE

486.   After Bruce Hebets' death, the Borrego Health board found themselves picking up the pieces of a highly disorganized organization.  Since that time, the current Board (all of whom serve on a volunteer basis) has undertaken monumental efforts to identify and correct a number of issues in the organization.  Some of those efforts are set forth below.

487.   All of the Board Insiders have resigned or have removed been from the Borrego Health Board, including most recently the removal of Mike Hickok (Treasurer) and Chuck Kimball (Secretary) on October 2, 2020.  Ten new and diverse members were also added to the board between 2019 and 2020 and the Board was expanded to 13 members.

488.   The Board also began the process of a governance overhaul, including compiling a governance policy and making updates to Borrego Health's Bylaws and

1   other key policies (through the progress was slow due to actions of both Chuck
2   Kimball and Mikia Wallis, who blocked a number of reform efforts before their
3   removals).

4       489.   The Board retained outside counsel to complete governance overhaul,
5   including Bylaws and policies, and develop Committees with clear committee
6   charters.

7       490.   A Board Policy Manual consisting of updated organization Bylaws and
8   key governance policies was compiled by Board members and presented in April
9   2019.  The electronic Board Policy Book was officially adopted by the Board in
10  June 2020.

11      491.   Current Board members are now required to complete a 3.5-hour Board
12  training by Compensation Resources, Inc. and NACH, and Borrego Health has
13  developed materials for on-boarding new Board members.  Board members are also
14  required to complete 3 hours of on-line trainings and Borrego Health has offered
15  additional NACH Board Governance Training to Board members.

16      492.   Borrego Health created and staffed the position of Governance
17  Manager to assist the Board and committees in producing clear Board minutes,
18  agendas, and helping to keep Board committees on track.

19      493.   Borrego Health retained Compensation Resources Inc. ("CRI") to
20  analyze executive officer compensation and benefits and complete an Executive
21  Compensation study (July 2019) and expanded CRI contract to look at total
22  compensation system-wide (2020).  CRI also conducted Board training on
23  governance with a focus on Board responsibility for oversight with respect to
24  compensation (2019).

25      494.   In 2019, Borrego Health retained another company to review retirement
26  benefits and develop new retirement plan.  The new company also will assist
27  Borrego Health in developing more equitable total compensation plan, including
28  performance bonus structure.

495.   Borrego Health also created new mechanisms to prevent improper arrangements, including overhauling the delegation of authority and procurement policies, creating the Board Audit Committee (2019), hiring new auditors (2020), and conducting a detailed review of IRS Form 990 (2019).

496.   Mikia Wallis was removed as CEO on October 8, 2020.  All other staff in any way implicated by DHCS or DOJ to be involved in misconduct have been removed.  The entire executive leadership team was replaced.

497.   In October 2020, Borrego Health closed its contract dental program and replaced staff employed within the program who had been identified by DOJ and DHCS.

498.   Borrego Health terminated its relationship with Priest-related entities, terminating its leases at the Barstow and D Street locations, seeking amendment in Federal Court of its lease at the El Cajon site, and terminating its contracts with Premier.

499.   Borrego Health invested significantly in its compliance program. Borrego Health established a Compliance Department led by an experienced Chief Compliance Officer, and staffed the department to include a Director of Compliance, Director of Program Integrity, Compliance Auditor and Compliance Analyst.  At the Board level, Borrego Health created the Audit and Compliance Committee in January 2022, which hears detailed monthly compliance reports.

500.   Borrego Health also created a Compliance Program Manual and Compliance Hotline to assist with effectively identifying and resolving compliance concerns.  Borrego Health instituted a series of compliance trainings, including monthly staff compliance education, bimonthly billing and coding compliance trainings (instituted April 2022), code of conduct training, compliance team site visits (instituted January 2022), and executive training on fraud and abuse topics.

/ / /

/ / /

FOURTH AMENDED COMPLAINT

1      501.   Borrego Health engaged external auditing services from to evaluate its

2  current claims, identify areas for improvement, and train staff and providers on

3  those issues.

4      502.   Borrego Health has also invested in internal fraud prevention efforts

5  aimed at individuals.  Borrego Health retained a compensation review company to

6  review executive compensation, with the result of review leading to executive

7  compensation reform.  Borrego Health also implemented new conflict of interest

8  policies, a restrictive employment of relatives policy, and has limited the Board's

9  delegated authority to Borrego Health staff.

10      503.   Borrego Health has also implemented efforts to increase transparency

11  of financials.  Borrego Health has ensured that management reports are now

12  available at the clinic level and are incorporated into Board reports available to the

13  full board and has instituted a provider dashboard to monitor financial metrics.

14  **VII.   CHAPTER 11 BANKRUPTCY**

15      504.   Borrego Health filed for bankruptcy under Chapter 11 of the

16  Bankruptcy Code on September 12, 2022 in the Southern District of California.

17      505.   The bankruptcy filing was necessary because of a lack of liquidity.

18      506.   The most significant financial exposure was related to obligations to

19  DHCS, as a result of the "Premier Scheme" and the "Fraudulent Dental Billing

20  Scheme."  However, all of the Schemes described herein had a material financial

21  impact of either increasing liabilities or decreasing revenue or both.

22      507.   For example, the manipulation of Borrego Health to invest in an

23  unnecessary 162B plan diverted funds from operations to an unnecessary benefits

24  plan that provided financial benefits for Jim Hebets, The Hebets Company and

25  Bruce Hebets to the detriment of Borrego Health.

26      508.   Had the Defendants not taken advantage of Borrego Health as

27  described herein, Borrego Health would not have the liquidity issues it is currently

28  experiencing.

509.   Borrego Health also would not have been subjected to oversight by an expensive monitor or been subject to a payment suspension by DHCS, including the ongoing dental payment suspension, which is causing it not to be paid for in-house dental services.

510.   Uncompensated in-house dental services are resulting in a loss of approximately $350,000 per month of revenue.

## VIII.   THE RICO ENTERPRISE

511.   "The elements of a civil RICO claim are simple enough: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to the plaintiff's 'business or property.'" *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996) (*citing* 18 U.S.C. §§ 1964(c), 1962(c); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

512.   For the purpose of additional clarity and for the convenience of Defendants and the Court, below is further detail of the RICO allegation which is pled with particularity in conformity with FRCP Rule 9(b).

513.   **Conduct**:  "To satisfy the 'conduct' element of a Section 1962(c) claim, a plaintiff must allege facts that the defendant had 'some part in directing [the enterprise's] affairs.' *LD v. United Behavioral Health*, 508 F. Supp.3d 583, 602 (N.D.C.A. 2020) (*citing Walter v. Dravson*, 538 F.3d 1244, 1249 (9th Cir. 2008)). Notably, "Relevant considerations to whether this element is met include whether the defendant 'occup[ies] a position in the chain of command ... through which the affairs of the enterprise are conducted,' whether it 'knowingly implement[ed] [the] decisions of upper management,' and whether its 'participation was vital to the mission's success.'" *LD v. United Behavioral Health*, 508 F. Supp.3d 583, 602 (N.D.C.A. 2020) (*citing Walter v. Dravson*, 538 F.3d 1244, 1249 (9th Cir. 2008)). "In the Ninth Circuit, to assess whether a defendant had a sufficient role in operation or management to meet the standard of § 1962(c) [and *Reves*], courts consider whether the defendant (1) gave or took directions; (2) occupied a position in the

1  'chain of command' through which the affairs of the enterprise are conducted; (3)

2  knowingly implemented decisions of upper management; or (4) was indispensable

3  to achievement of the enterprise's goal in that the defendant's position is 'vital' to

4  the mission's success." *Ketayi v. Health Enrollment Group*, 516 F. Supp.3d 1092,

5  1136 (S.D.C.A, 2021) (*quoting Tatung Co., Ltd. v. Hsu*, No. SA-CV-13-1743, 2015

6  WL 11072178, at *20 (C.D. Cal. Apr. 23, 2015) (*quoting Walter v. Drayson*, 538

7  F.3d 1244, 1249 (9th Cir. 2008)) (citations omitted)).

8        514.   **Of an Enterprise**: "The definition of 'enterprise' in the text of RICO is

9  fairly straightforward. In its entirety, the definition is as follows: ' "enterprise"

10  includes any individual, partnership, corporation, association, or other legal entity,

11  and any union or group of individuals associated in fact although not a legal

12  entity.'" *Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir. 2007) (*citing* 18

13  U.S.C. § 1961(4)). "As is evident from the text, this definition is not very

14  demanding. A single 'individual' is an enterprise under RICO. Similarly, a single

15  'partnership,' a single 'corporation,' a single 'association,' and a single 'other legal

16  entity' are all enterprises." *Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir.

17  2007). In *Odom v. Microsoft Corp.*, the Ninth Circuit explained, "We take this

18  opportunity to join the circuits that hold that an associated-in-fact enterprise under

19  RICO does not require any particular organizational structure, separate or otherwise.

20  *Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007) (citation and internal

21  quotation marks omitted). The *Odom* Court turned to the Supreme Court decision in

22  the *United States v. Turkette*, to note the criteria for an associated-in-fact enterprise,

23  "The Supreme Court in *Turkette* articulated the criteria for an associated-in-fact

24  enterprise under RICO. According to the Court, an associated-in-fact enterprise is 'a

25  group of persons associated together for a common purpose of engaging in a course

26  of conduct.' To establish the existence of such an enterprise, a plaintiff must provide

27  both 'evidence of an ongoing organization, formal or informal,' and 'evidence that

28

FOURTH AMENDED COMPLAINT

7288673.3

1  the various associates function as a continuing unit.'" *Odom v. Microsoft Corp.*, 486

2  F.3d 541, 552 (9th Cir. 2007) (citation and internal quotation marks omitted).

3      515.   **Through a Pattern**:  The Supreme Court in *H.J. Inc. v. Northwestern*

4  *Bell Telephone Co.* settled the long held debate of what constituted a "pattern" for

5  RICO. The Court held, "To establish a RICO pattern it must also be shown that the

6  predicates themselves amount to, or that they otherwise constitute a threat of,

7  *continuing* racketeering activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492

8  U.S. 229, 240 (1989). The Court continued, continuity is, " … centrally a temporal

9  concept – and particularly so in the RICO context, where what must be continuous,

10  RICO's predicate acts or offenses, and the relationship these predicates must bear

11  one to another, are distinct requirements." *H.J. Inc. v. Northwestern Bell Telephone*

12  *Co.*, 492 U.S. 229, 241 (1989). Importantly, "A RICO pattern may surely be

13  established if the related predicates themselves involve a distinct threat of long-term

14  racketeering activity, either implicit or explicit." *H.J. Inc. v. Northwestern Bell*

15  *Telephone Co.*, 492 U.S. 229, 241 (1989).

16      516.   **Racketeering / Predicate Acts**:  Predicate acts, "… involve conduct

17  that is 'chargeable' or 'indictable,' and 'offense[s]' that are 'punishable,' under

18  various criminal statutes. As defined in the statute, racketeering activity consists not

19  of acts for which the defendant has been convicted, but of acts for which he could

20  be." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 488 (1985) (*citing*

21  § 1961(1)).

22      517.   **Causing Injury**:  "Where the plaintiff alleges each element of the

23  violation, the compensable injury necessarily is the harm caused by predicate acts

24  sufficiently related to constitute a pattern, for the essence of the violation is the

25  commission of those acts in connection with the conduct of an enterprise. Those acts

26  are, when committed in the circumstances delineated in § 1962(c), "an activity

27  which RICO was designed to deter." Any recoverable damages occurring by reason

28  of a violation of § 1962(c) will flow from the commission of the predicate acts."

1  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497 (1985). Importantly, "RICO

2  is to be read broadly. This is the lesson not only of Congress' self-consciously

3  expansive language and overall approach, but also of its express admonition that

4  RICO is to 'be liberally construed to effectuate its remedial purposes.' The statute's

5  'remedial purposes' are nowhere more evident than in the provision of a private

6  action for those injured by racketeering activity." (citation and internal quotation

7  marks omitted). *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497-98 (1985).

8       **A.     Facts Common To RICO Cause of Action**

9       518.   The "Enterprise" is Borrego Health, a non-profit corporation in good

10  standing, which the Defendants secretly commandeered for their own criminal

11  purposes.  Bruce Hebets' death in 2019 does not alter the fact of his participation (as

12  a Borrego Health insider) with Defendants in the operation and management of

13  Borrego Health, as described below.  If Bruce Hebets were alive, he would be

14  named as a defendant herein.

15       519.   Borrego Health is a FQHC engaged in interstate commerce, with a

16  mission to provide high quality, comprehensive, compassionate primary healthcare

17  to people in their communities, regardless of their ability to pay.  Borrego Health

18  operated over 20 clinics, and continues to operate more than a dozen, primarily in

19  underserved desert and inland communities throughout San Diego, Riverside, and

20  San Bernardino counties.  Borrego Health provides essential services in Family

21  Practice, Pediatrics, OB/GYN, Internal Medicine, Podiatry, Dermatology,

22  Cardiology, and HIV/Hepatitis C, most of whom cannot obtain affordable

23  comprehensive primary care from other sources.  During the recent pandemic,

24  Borrego Health has tested tens of thousands of Californians for Covid-19 infection

25  and has vaccinated tens of thousands of people for Covid-19.  Borrego Health's

26  continued operation is in the public interest.

27       520.   Although all of the Defendants named in this action are defendants in

28  the RICO cause of action, Daryl Priest, Nick Priest, Travis Lyon, Premier, Summit,

7288673.3

Jim Hebets, The Hebets Company, The Julian Medical Foundation, and Husam Aldairi, D.D.S., Aram Arakelyan, D.D.S., Ayed Hawatmeh, D.D.S., Magaly Velasquez, D.D.S., Marcelo Toledo, D.D.S., Michael Hoang, D.M.D., Santiago Rojo, D.D.S., Waleed Stephan, D.D.S., Mohammed Al Tekreeti, D.D.S., Jilbert Bakramian, D.D.S., Marlene Thompson, D.D.S., George Jared, D.D.S., Douglas Ness, D.D.S., and Alborz Mehdizadeh, D.D.S., and DOES 1-250, are "Outsiders" to Borrego Health.

521.   The Defendants are associated with the Enterprise in that they were either (1) Borrego Health executives or Board members, (2) the Enterprise's landlords, (3) contracted dental providers, or (4) other outside vendors.

522.   The Defendants are entities and individuals separate from the Enterprise, and none of the Defendants is alleged to be the Enterprise, or its members.

523.   Borrego Health is both the RICO enterprise and the victim.  Borrego Health has lost tens of millions of dollars as a result of the Defendants' fraudulent conduct and suffered other damages, including without limitation an inability to be paid by Medi-Cal for in-house dental services, an inability to provide contract dental services, and an exposure for repayment to the Medi-Cal program for claims that were caused to be submitted by defendants and contract dentists that were not payable.

524.   The unlawful acts described herein were devised, directed and maintained by the Defendants who had control over, participated in, and/or took part in Borrego Health's operations and management.

**B.     Racketeering Activity Distinct from Enterprise**

525.   The pattern of racketeering described herein is separate and distinct from the Enterprise, due to both the relationship between the activities of the Enterprise and the pattern of racketeering activity, and how the racketeering activity differs from the usual daily activities of the enterprise is as follows:

1     526.   Borrego Health, the Enterprise, is engaged in interstate commerce

2   acting as a FQHC.  It acquires good and products from across the country, including

3   medical supplies.  It utilizes the internet and United States banking system to

4   facilitate its operations, including using electronic billing to bill and receive

5   payment from Medi-Cal.  Borrego Health also regularly uses mail to pay vendors

6   and acquire good and products, including medical supplies and medications.

7     527.   Defendants worked together to perpetrate a number of schemes to steal

8   money from the Enterprise paid to the Enterprise by state and federal payers

9   utilizing primarily state and federal funds paid by Medi-Cal.  The schemes that

10   Borrego Health in currently aware of are described above as the "Borrego MSO/IPA

11   Scheme", the "Premier Scheme", "Fraudulent Dental Billing Scheme", the

12   "Coverup Scheme", the "Priest Leases Scheme", the "Compensation/Benefits

13   Scheme", the "Nepotism and Cronyism Scheme", the "De Anza Country Club

14   Scheme", the "Payout Scheme", the "Jim Hebets Scheme", the "Julian Barn

15   Scheme," the "Property Development Scheme" and the "KBH Healthcare

16   Consulting Scheme."

17     528.   Each of these Schemes was contrary to the ordinary and regular

18   operations and management of Borrego Health, and involved Outsider Defendants

19   effectively taking over the management and operations of Borrego Health in

20   furtherance of these Schemes.

21     529.   The primary mission of Borrego Health, as a FQHC, is the provision of

22   healthcare to under-served communities.  All efforts of Borrego Health are to be

23   directed at the efficient accomplishment of this mission.

24   **C.    RICO Liability**

25     530.   <u>18 USC §§1962 (c) and (d)</u>:  As detailed herein, Defendants' conduct is

26   unlawful under 18 U.S.C. 1962(c), and is also unlawful as a conspiracy under 18

27   U.S.C. § 1962(d).

28

7288673.3

531.   18 USC § 1341 (Mail Fraud):  The purpose of the "Borrego MSO/IPA Scheme", the "Premier Scheme", "Fraudulent Dental Billing Scheme", the "Coverup Scheme", the "Priest Leases Scheme", the "Compensation/Benefits Scheme", the "Nepotism and Cronyism Scheme", the "De Anza Country Club Scheme", the "Payout Scheme", the "Jim Hebets Scheme", the "Julian Barn Scheme", the "Property Development Scheme" and the KBH Healthcare Consulting Scheme was to effectively steal money from Borrego Health.

532.   In the manner detailed above, Defendants participated in devising and/or intending to devise the Schemes to perform the fraudulent acts described herein.

533.   The Schemes could not work without the use of the United States Mail, which was used for the purpose of executing the Schemes.

534.   Among other things and without limitation, the mail and e-mail was used to send correspondence and payments under the Premier Scheme, to send bills and payments for the Fraudulent Dental Billing Scheme, to send rent checks under the Priest Leases Scheme, and to send rent checks under the Julian Barn Scheme.

535.   Each individual mailing was an individual act essential to the success of the scheme (and therefore material) and constitutes a separate loss the victim suffered as of the date of mailing.  This constitutes hundreds of predicate acts under 18 USC 1341 (Mail Fraud).

536.   18 USC § 1343 (Wire Fraud):  The purpose of the "Borrego MSO/IPA Scheme", the "Premier Scheme", "Fraudulent Dental Billing Scheme", the "Coverup Scheme", the "Priest Leases Scheme", the "Compensation/Benefits Scheme", the "Nepotism and Cronyism Scheme", the "De Anza Country Club Scheme", the "Payout Scheme", the "Jim Hebets Scheme", the "Julian Barn Scheme", the "Property Development Scheme" and the KBH Healthcare Consulting Scheme was to effectively steal money from Borrego Health.

537.   In the manned detailed above, Defendants participated in devising and/or intending to devise the Schemes to perform the fraudulent acts described herein, and to use the interstate electronic transmission of documents for the purpose of executing, or attempting to execute, the Schemes.  The Schemes were used to steal funds from a federally funded and regulated FQHC, which in turn would result in the inflation of reimbursement rates the Federal Government would pay to the FQHC (Borrego Health) for thousands of patient encounters, as follows:

538.   Borrego Health is largely funded by state and federal health care dollars (primarily Medi-Cal), administered by and through the California Department of Healthcare Services.  Borrego Health must account for its lawful operating expenditures every year to the Center for Medicare and Medicaid Services (CMS), a federal agency within the United States department of Health and Human Services.

539.   The amount of funds stolen through the Schemes described herein are accounted for and included as facilities operating expenses reported to CMS.  These stolen funds would not be reported as individual line items on an annual CMD cost report.  Rather, the stolen funds would then be melded into and combined and aggregated with all other facilities operating costs of over 20 Southern California clinics operated by Borrego Health, and then reported as an unidentified part of Borrego Health's annual cost reports submitted to CMS.

540.   In turn, the United States uses Borrego Health's annual cost reports to CMS in calculating the proper level of federal health care funding (or "reimbursement rates") to direct to Borrego Health.  Thus, inflated CMS cost reports, unless detected, inevitably result in increases in federally funded reimbursement rates for a FQHC such as Borrego Health.  This has the effect of compounding the crime by causing to federal government to cover some or all of the cost of the crime by way of increased reimbursement rates paid Borrego Health based on inflated expenses incurred by Borrego Health as a result of the Schemes.

541.   In addition, false or fraudulent bills were submitted electronically to Medi-Cal (and Borrego Health) under the Fraudulent Dental Services Scheme.

542.   The unlawful Schemes described above, including the electronic communications described above, constitutes predicate acts under 18 USC §1343 (Wire Fraud) that are a material part of the Schemes that Borrego Health could not avoid.

543.   Racketeering activity as described in 18 USC § 1961(1)(B), as an act indictable under 18 USC § 1957 (engaging in monetary transactions in property derived from specified unlawful activity that includes Federal healthcare offenses). In addition to Mail Fraud and Wire Fraud, the Schemes constitute a pattern of racketeering activity as described in 18 USC § 1961(1)(B), as acts indictable under 18 USC § 1957 ("Engaging in monetary transactions in property derived from specified unlawful activity").

544.   "Specified unlawful activity" is, in turn, defined in 18 USC § 1956 as including "any act or activity constituting an offense involving a 'Federal health care offense.'" 18 USC § 24 defines "Federal health care offense" as including "a violation of, or a criminal conspiracy to violate" any of the statutes set forth herein.

545.   18 USC § 669 (Theft or embezzlement in connection with health care): Whoever knowingly and willfully embezzles, steals, or otherwise without authority converts to the use of any person other than the rightful owner, or intentionally misapplies any of the moneys, funds, securities, premiums, credits, property, or other assets of a health care benefit program, shall be fined under this title or imprisoned not more than 10 years, or both.  "Health care benefit program" means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.  The Schemes described herein are the means by which Defendants, and each of them, stole and converted to their own use public

1  healthcare benefits paid Borrego Health by state and federal agencies at a time

2  Borrego Health was the rightful owner of those funds.  In addition, in this particular

3  statute, Borrego Health itself qualifies under the broad definition of "health care

4  benefit program." Borrego Health is an "entity who is providing a medical benefit,

5  item, or service for which payment may be made under the plan or contract."  The

6  theft and from Borrego Health exceeds $20,000,000.

7      546.  18 USC § 1347 (Health care fraud):  Whoever knowingly and willfully

8  executes, or attempts to execute, a scheme or artifice (1) to defraud any healthcare

9  benefit program; or (2) to obtain, by means of false or fraudulent pretenses,

10  representations, or promises, any of the money or property owned by, or under the

11  custody or control of, any healthcare benefit program, in connection with the

12  delivery of or payment for healthcare benefits, items, or services, shall be fined

13  under this title or imprisoned not more than 10 years, or both.  Here, by the Schemes

14  described herein, Defendants, and each of them, defrauded Borrego Health and

15  obtained money and/or property owned by and/or under the custody or control of

16  Borrego Health.  These Schemes were substantial factor in and direct cause of the

17  theft of funds under the custody and control of Borrego Health.  The Schemes were a

18  substantial factor in and direct cause of the theft of more than $20,000,000 of funds

19  under the custody and control of Borrego Health and Medi-Cal.

20      547.  18 USC § 1001 (False Statements or entries generally):  Section 1001 is

21  violated if someone knowingly or willfully conceals or covers up by any trick,

22  scheme or device a material fact, which act is within the jurisdiction of a department

23  or agency of the United States.  Here, Defendants were involved in the Schemes

24  that, as described herein, meet the elements of section 1001, in that the Defendants

25  "knowingly or willfully conceal or cover up by any trick, scheme or device a

26  material fact."  The Schemes were used, in part, to steal funds from a federally

27  funded and regulated FQHC.

28

548.   <u>Other federal healthcare offenses</u>:  In addition, the facts alleged herein also amount to "federal healthcare offenses" under the following statutes: 18 USC § 371 ("Conspiracy to commit offense or to defraud United States"); 18 USC §1035 ("False statements relating to health care matters"); 18 USC §1035 ("False statements relating to health care matters"); 18 USC § 287 ("False, fictitious or fraudulent claims"); 18 USC §1349 ("Attempt and conspiracy").

549.   The specific contracts entered into in furtherance of the scheme to steal money from Borrego Health are the: Borrego MSO, Borrego IPA, Dental MSA, Medical MSA, Aldairi Agreements, Hawatmeh Agreement, Mehdizadeh Agreements, Velasquez Agreement, Arakelyan Agreements, Hoang Agreement, Stephan Agreement, Rojo Agreement, Toledo Agreement, Thompson Agreement, Ness Agreement, Jared Agreement, Nourse Parcel Lease, CRI Contract, Julian Barn Lease, transition agreement, KHB/Premier Contract and Amendment and Priest Leases.

550.   The Schemes were concealed by Defendants and most did not come to light until, at the earliest, October 2020 during a government investigation.  But for that unrelated investigation, the Schemes may have remained undiscovered.

551.   Because Borrego Health plaintiff had no constructive or inquiry notice of the fact of injury throughout the life of the Schemes, its right to recover money stolen by Defendants extends back to the commencement of each of the Schemes.

552.   **Four Year RICO "Reach Back:"**  Even if the Schemes were somehow communicated to persons who would ordinarily provide that information to the Borrego Health Board, it is still entitled to recover funds stolen under the Schemes going back four years prior to the filing of the complaint, since each lease payment constitutes a separate wrongful act.

553.   Borrego Health, the United States, and the State of California are victims of the Schemes here.  Borrego Health was victimized by the amount of money stolen. The Federal Government is a victim to the extent the inflated

1  expenses incurred by Borrego Health as a result of the Schemes were included on

2  annual cost reports to CMS (described above) that resulted in increased

3  reimbursement rates, and therefore additional federal funds being improperly paid

4  Borrego Health.  The Federal Government may have also been harmed if it provided

5  federal matching dollars for any duplicative, unnecessary and unsupported dental

6  services paid by Medi-Cal.

7  554.   The State of California is a victim to the extent to the extent the inflated

8  expenses incurred by Borrego Health as a result of the Schemes were included on

9  annual cost reports to CMS (described above) that resulted in increased

10  reimbursement rates, and therefore causing additional state Medicaid funds being

11  improperly paid Borrego Health.  The State of California may have also been

12  harmed if it paid Borrego Health for any duplicative, unnecessary and unsupported

13  dental services.

14  555.   The predicate acts described above relate to each other as part of a

15  common plan.  The predicate acts are a part of a common plan to steal money from

16  Borrego Health.  Each act is related as to its purpose, results, participants, victims

17  and method of commission.  The predicates form a closed-end series of related

18  predicates extending over a substantial period.

19  556.   The facts described herein also demonstrate the existence of a

20  conspiracy between Defendants.  **(18 USC § 1962(d).)**

21  557.   By way of their knowing participation in the scheme, each of the

22  Defendants is a culpable person for purposes of **18 U.S.C. § 1964.**

23  558.   But for the Schemes detailed above, Borrego Health would not have

24  entered into improper and above-market leases and other transactions, would have

25  had a compliant and properly billed contract dental program, would not have

26  attempted to buy a country club, etc.  Accordingly, Borrego Health has been

27  damaged by the Schemes in an amount to be proven at trial.

28

559.   Accordingly, Borrego Health is entitled to damages in an amount to be proven at trial, trebled pursuant to statute, together with reasonable attorneys' fees and costs, and interest.

**D.     Issuance of Constructive Trusts**

560.   As outlined in detail herein, Borrego Health provided payment to various Defendants.  Those Defendants committed wrongful acts to receive money that they were not entitled to.

561.   Borrego Health has a right to the money wrongfully taken by Defendants.

562.   As such, Borrego Health seeks to have any and all funds wrongfully paid to Defendants placed in a constructive trust.

**FIRST CAUSE OF ACTION**

(Violations under the Racketeer Influenced and Corrupt

Organizations ("RICO") Act)

Against All Defendants

563.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.  This is due to the fact that Borrego Health believes that each and every one of the actions and omissions described above are part of the same, far-reaching and widespread racketeering enterprise designed and carried out to steal money from Borrego Health and funnel that money, directly or indirectly, to the Defendants. However, in the alternative, any one of or any combination of the above-listed Schemes would be sufficient to state a claim against the Defendants alleged to be involved in that Scheme or those Schemes.

564.   As set forth herein, Defendants improperly engaged in a pattern of prohibited racketeering activity.

565.   As set forth herein, Defendants conduct gives rise to a cause of action for violation of RICO, and that unlawful conduct was the proximate cause of the Borrego Health's injury.

**SECOND CAUSE OF ACTION**

(Breach of Contract)

Against Premier

566.   Borrego Health reincorporates paragraphs 1 through 54, 66 through 334, inclusive, as though fully set forth herein.

567.   Borrego Health and Premier entered into the Dental MSA, including amendments thereto, and the Medical MSA.

568.   Borrego Health did all, or substantially all, of the significant things that the Dental MSA and Medical MSA required it to do, or was excused from doing so,

569.   As set forth herein, Premier breached the Dental MSA and Medical MSA.

570.   As a result of Premier's breaches of the MSAs, Borrego Health was damaged in an amount to be proven at trial.  Premier's failures to fulfill its obligations was a substantial factor in causing Borrego Health's harm.

**THIRD CAUSE OF ACTION**

(Breach of Contract)

Against Husam Aldairi, D.D.S. and Aldairi D.D.S., Inc.

571.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 146 through 166, inclusive, as though fully set forth herein.

572.   Borrego Health, Husam Aldairi, D.D.S. and Aldairi D.D.S., Inc. entered into the Aldairi Agreements.

573.   Borrego Health did all, or substantially all, of the significant things that the Aldairi Agreements required or Borrego Health was excused from doing so.

574.   Aldairi violated the terms of the Aldairi Agreements through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and

1  (7) generating inaccurate billing records, including billing for services not rendered,
2  including billing for services performed on teeth which the patients no longer had at
3  the time of service, upcoding, and inappropriately splitting services.
4      575.   As a result of Aldairi's conduct, Borrego Health was damaged in an
5  amount to be proven at trial.
6  **FOURTH CAUSE OF ACTION**
7  (Breach of Contract)
8  Against Ayed Hawatmeh, D.D.S. and Hawatmeh Dental Group, P.C.
9      576.   Borrego Health reincorporates paragraphs 1 through 54, 132 through
10 145, 167 through 183, inclusive, as though fully set forth herein.
11     577.   Borrego Health, Ayed Hawatmeh, D.D.S. and Hawatmeh Dental
12 Group, P.C. entered into the Hawatmeh Agreements.
13     578.   Borrego Health did all, or substantially all, of the significant things that
14 the Hawatmeh Agreements required or Borrego Health was excused from doing so.
15     579.   Hawatmeh violated the terms of the Hawatmeh Agreements through
16 their conduct, including but not limited to: (1) billing excessive patient visits; (2)
17 failing to maintain adequate documentation to support billing; (3) falsification of
18 medical records; (4) performing services that lacked medical necessity; (5)
19 providing services that fell below the standard of care; (6) providing excessive
20 services; and (7) generating inaccurate billing records, including billing for services
21 not rendered, including billing for services performed on teeth which the patients no
22 longer had at the time of service, upcoding, and inappropriately splitting services.
23     580.   As a result of Hawatmeh's conduct, Borrego Health was damaged in an
24 amount to be proven at trial.
25 **FIFTH CAUSE OF ACTION**
26 (Breach of Contract)
27 Against Alborz Mehdizadeh, D.D.S. and Alborz Mehdizadeh, Inc.
28

581.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 184 through 195, inclusive, as though fully set forth herein.

582.   Borrego Health, Alborz Mehdizadeh, D.D.S. and Alborz Mehdizadeh, Inc. entered into the Mehdizadeh Agreements.

583.   Borrego Health did all, or substantially all, of the significant things that the Mehdizadeh Agreements required or Borrego Health was excused from doing so.

584.   Mehdizadeh violated the terms of the Mehdizadeh Agreements through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered, including billing for services performed on teeth the patients no longer had at the time of service, upcoding, and inappropriately splitting services.

585.   As a result of Mehdizadeh's conduct, Borrego Health was damaged in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**

(Breach of Contract)

Against Magaly Velasquez, D.D.S. and Magaly M. Velasquez DDS, Professional Dental Corp.

586.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 196 through 203, inclusive, as though fully set forth herein.

587.   Borrego Health, Magaly Velasquez, D.D.S. and Magaly M. Velasquez DDS, Professional Dental Corp. entered into the Velasquez Agreement.

588.   Borrego Health did all, or substantially all, of the significant things that the Velasquez Agreement required or Borrego Health was excused from doing so.

FOURTH AMENDED COMPLAINT

589.   Velasquez violated the terms of the Velasquez Agreement through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered, including billing for services performed on teeth the patients no longer had at the time of service, upcoding, and inappropriately splitting services.

590.   As a result of Velasquez's conduct, Borrego Health was damaged in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**

(Breach of Contract)

Against Aram Arakelyan, D.D.S. and New Millennium Dental Group of Aram Arakelyan, Inc.

591.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 204 through 213, inclusive, as though fully set forth herein.

592.   Borrego Health, Aram Arakelyan, D.D.S. and New Millennium Dental Group of Aram Arakelyan, Inc. entered into the Arakelyan Agreements.

593.   Borrego Health did all, or substantially all, of the significant things that the Arakelyan Agreements required or Borrego Health was excused from doing so.

594.   Arakelyan violated the terms of the Arakelyan Agreements through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered, including billing for services performed on teeth the patients no longer had at the time of service, upcoding, and inappropriately splitting services.

1  595.   As a result of Arakelyan's conduct, Borrego Health was damaged in an
2  amount to be proven at trial.

3  ## EIGHTH CAUSE OF ACTION

4  (Breach of Contract)

5  Against Michael Hoang, D.M.D.

6  596.   Borrego Health reincorporates paragraphs 1 through 54, 132 through
7  145, 214 through 219, inclusive, as though fully set forth herein.

8  597.   Borrego Health and Michael Hoang, D.M.D. entered into the Hoang
9  Agreement.

10  598.   Borrego Health did all, or substantially all, of the significant things that
11  the Hoang Agreement required or Borrego Health was excused from doing so.

12  599.   Hoang violated the terms of the Hoang Agreement through his conduct,
13  including but not limited to: (1) billing excessive patient visits; (2) failing to
14  maintain adequate documentation to support billing; (3) falsification of medical
15  records; (4) performing services that lacked medical necessity; (5) providing
16  services that fell below the standard of care; (6) providing excessive services; and
17  (7) generating inaccurate billing records, including billing for services not rendered,
18  including billing for services performed on teeth the patients no longer had at the
19  time of service, upcoding, and inappropriately splitting services.

20  600.   As a result of Hoang's conduct, Borrego Health was damaged in an
21  amount to be proven at trial.

22  ## NINTH CAUSE OF ACTION

23  (Breach of Contract)

24  Against Waleed Stephan, D.D.S. and W.A. Stephan, a Dental Corporation

25  601.   Borrego Health reincorporates paragraphs 1 through 54, 132 through
26  145, 220 through 225, inclusive, as though fully set forth herein.

27  602.   Borrego Health, Waleed Stephan, D.D.S. and W.A. Stephan, a Dental
28  Corporation entered into the Stephan Agreement.

603.   Borrego Health did all, or substantially all, of the significant things that the Stephan Agreement required or Borrego Health was excused from doing so.

604.   Stephan violated the terms of the Stephan Agreement through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered, including billing for services performed on teeth the patients no longer had at the time of service, upcoding, and inappropriately splitting services.

605.   As a result of Stephan's conduct, Borrego Health was damaged in an amount to be proven at trial.

### TENTH CAUSE OF ACTION

(Breach of Contract)

Against Santiago Rojo, D.D.S. and Santiago A. Rojo, D.D.S., Inc.

606.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 226 through 231, inclusive, as though fully set forth herein.

607.   Borrego Health, Santiago Rojo, D.D.S. and Santiago A. Rojo, D.D.S., Inc. entered into the Rojo Agreement.

608.   Borrego Health did all, or substantially all, of the significant things that the Rojo Agreement required or Borrego Health was excused from doing so.

609.   Rojo violated the terms of the Rojo Agreement through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered,

FOURTH AMENDED COMPLAINT

7288673.3

1  including billing for services performed on teeth the patients no longer had at the
2  time of service, upcoding, and inappropriately splitting services.

3      610.   As a result of Rojo's conduct, Borrego Health was damaged in an
4  amount to be proven at trial.

**ELEVENTH CAUSE OF ACTION**

(Breach of Contract)

Against Marcelo Toledo, D.D.S. and Marcelo Toledo, D.D.S., Inc.

611.   Borrego Health reincorporates paragraphs 1 through 54, 132 through
145, 246 through 258, inclusive, as though fully set forth herein.

612.   Borrego Health, Marcelo Toledo, D.D.S. and Marcelo Toledo, D.D.S.,
Inc. entered into the Toledo Agreement.

613.   Borrego Health did all, or substantially all, of the significant things that
the Toledo Agreement required or Borrego Health was excused from doing so.

614.   Toledo violated the terms of the Toledo Agreement through their
conduct, including but not limited to: (1) billing excessive patient visits; (2) failing
to maintain adequate documentation to support billing; (3) falsification of medical
records; (4) performing services that lacked medical necessity; (5) providing
services that fell below the standard of care; (6) providing excessive services; and
(7) generating inaccurate billing records, including billing for services not rendered,
including billing for services performed on teeth the patients no longer had at the
time of service, upcoding, and inappropriately splitting services.

615.   As a result of Toledo's conduct, Borrego Health was damaged in an
amount to be proven at trial.

**TWELFTH CAUSE OF ACTION**

(Breach of Contract)

Against Marlene M. Thompson, D.D.S. and Marlene M. Thompson, D.D.S., Inc.

616.   Borrego Health reincorporates paragraphs 1 through 54, 132 through
145, 259 through 264, inclusive, as though fully set forth herein.

7288673.3

1    617.   Borrego Health, Marlene Thompson, D.D.S. and Marlene Thompson,

2    D.D.S., Inc. entered into the Thompson Agreement.

3    618.   Borrego Health did all, or substantially all, of the significant things that

4    the Thompson Agreement required or Borrego Health was excused from doing so.

5    619.   Thompson violated the terms of the Thompson Agreement through

6    their conduct, including but not limited to, generating inaccurate billing records,

7    including billing for services not rendered, and billing for services performed by

8    unlicensed and suspected dental providers.

9    620.   As a result of Thompson's conduct, Borrego Health was damaged in an

10   amount to be proven at trial.

11                    **THIRTEENTH CAUSE OF ACTION**

12                         (Breach of Contract)

13            Against Douglas Ness, D.D.S. and Ness Dental Corporation

14   621.   Borrego Health reincorporates paragraphs 1 through 54, 132 through

15   145, 265 through 271, inclusive, as though fully set forth herein.

16   622.   Borrego Health, Douglas Ness, D.D.S. and Ness Dental Corporation

17   entered into the Ness Agreement.

18   623.   Borrego Health did all, or substantially all, of the significant things that

19   the Ness Agreement required or Borrego Health was excused from doing so.

20   624.   Ness violated the terms of the Ness Agreement through their conduct,

21   including but not limited to, generating inaccurate billing records, including billing

22   for services performed by unlicensed and suspected dental providers.

23   625.   As a result of Ness's conduct, Borrego Health was damaged in an

24   amount to be proven at trial.

25                    **FOURTEENTH CAUSE OF ACTION**

26                         (Breach of Contract)

27            Against George C. Jared, D.D.S. and George C. Jared, D.D.S., Inc.

28

FOURTH AMENDED COMPLAINT

7288673.3

626.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 272 through 281, inclusive, as though fully set forth herein.

627.   Borrego Health, George Jared, D.D.S. and George Jared, D.D.S., Inc. entered into the Jared Agreement.

628.   Borrego Health did all, or substantially all, of the significant things that the Jared Agreement required or Borrego Health was excused from doing so.

629.   Jared violated the terms of the Jared Agreement through their conduct, including but not limited to, generating inaccurate billing records, including billing for services not rendered, and billing for services performed by unlicensed and suspected dental providers.

630.   As a result of Jared's conduct, Borrego Health was damaged in an amount to be proven at trial.

## FIFTEENTH CAUSE OF ACTION

### (Intentional Misrepresentation)

### Against Premier Defendants

631.   Borrego Health reincorporates paragraphs 1 through 54, 66 through 334, inclusive, as though fully set forth herein.

632.   The Premier Defendants represented to Borrego Health that they were qualified and capable of reviewing, "scrubbing," and processing contract dental claims on Borrego Health's behalf.  The Premier Defendants further represented they had qualified and experienced staff to develop their own quality management team to oversee Borrego Health's contract dental program.

633.   The Premier Defendants' representations were false at the time they were made. At the time Borrego Health entered into the Dental MSA with Premier, Premier lacked any clinical staff to properly review claims and develop a quality management system. Upon information and belief, The Premier Defendants knew their representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

7288673.3

1    634.   Borrego Health reasonably relied on the Premier Defendants'
2    representations, believing it was capable of evaluating contract dental program
3    claims for necessity and accuracy.
4    635.   Borrego Health's reliance on the Premier Defendants' representation
5    regarding their qualifications and representations that they would properly review
6    and process the claims was a substantial factor in causing Borrego Health's harm.
7    636.   As a direct and proximate result, Borrego Health was harmed in an
8    amount to be proven at trial.
9                          **SIXTEENTH CAUSE OF ACTION**
10                          (Intentional Misrepresentation)
11              Against Husam Aldairi, D.D.S. and Aldairi DDS, Inc.
12   637.   Borrego Health reincorporates paragraphs 1 through 54, 132 through
13   145, 146 through 166, inclusive, as though fully set forth herein.
14   638.   In part, Aldairi misrepresented to Borrego Health that they would
15   practice dentistry in accordance with all Federal, State and local laws, regulations,
16   and generally accepted principles applicable the practice of dentistry, hire qualified
17   and licensed dental professionals to provide dental services to Borrego Health
18   patients, and prepare, establish, and maintain administrative records, financial
19   records, records pertaining to patient diagnosis and treatment, and information
20   pertaining to the services provided. Aldairi also represented they would submit
21   accurate claims information to Borrego Health for reimbursement.
22   639.   Aldairi's representations were false at the time they were made.  Upon
23   information and belief, Aldairi knew the representations were false at the time they
24   were made, or that the representations where made recklessly without regard for
25   their truth.
26   640.   As set forth herein, Aldairi made various misrepresentations, including
27   without limitation the misrepresentations made in connection with the Aldairi
28

1   Agreements and the false and fraudulent bills submitted by Aldairi (and any related

2   communication) to Borrego Health.

3        641.   Borrego Health reasonably relied on Aldairi's representations.

4        642.   As a direct and proximate result, Borrego Health was harmed in an

5   amount to be proven at trial.

6                            **SEVENTEENTH CAUSE OF ACTION**

7                               (Intentional Misrepresentation)

8              Against Ayed Hawatmeh, D.D.S. and Hawatmeh Dental Group, P.C.

9        643.   Borrego Health reincorporates paragraphs 1 through 54, 132 through

10  145, 167 through 183, inclusive, as though fully set forth herein.

11       644.   In part, Hawatmeh misrepresented to Borrego Health that they would

12  practice dentistry in accordance with all Federal, State and local laws, regulations,

13  and generally accepted principles applicable the practice of dentistry, hire qualified

14  and licensed dental professionals to provide dental services to Borrego Health

15  patients, and prepare, establish, and maintain administrative records, financial

16  records, records pertaining to patient diagnosis and treatment, and information

17  pertaining to the services provided. Hawatmeh also represented they would submit

18  accurate claims information to Borrego Health for reimbursement.

19       645.   Hawatmeh's representations were false at the time they were made.

20  Upon information and belief, Ayed Hawatmeh, D.D.S. and Hawatmeh Dental

21  Group, P.C. knew the representations were false at the time they were made, or that

22  the representations where made recklessly without regard for their truth.

23       646.   As set forth herein, Hawatmeh made various misrepresentations,

24  including without limitation the misrepresentations made in connection with the

25  Hawatmeh Agreement and the false and fraudulent bills submitted by Hawatmeh

26  (and any related communication) to Borrego Health.

27       647.   Borrego Health reasonably relied on Hawatmeh's representations.

28

7288673.3

648.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

## EIGHTEENTH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Alborz Mehdizadeh, D.D.S. and Alborz Mehdizadeh, Inc.

649.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 184 through 195, inclusive, as though fully set forth herein.

650.   In part, Alborz Mehdizadeh misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Mehdizadeh also represented they would submit accurate claims information to Borrego Health for reimbursement.

651.   Mehdizadeh's representations were false at the time they were made. Upon information and belief, Mehdizadeh knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

652.   As set forth herein, Aldairi made various misrepresentations, including without limitation the misrepresentations made in connection with the Mehdizadeh Agreement and the false and fraudulent bills submitted by Mehdizadeh (and any related communication) to Borrego Health.

653.   Borrego Health reasonably relied on Mehdizadeh'S representations.

654.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

7288673.3

## NINETEENTH CAUSE OF ACTION

### (Intentional Misrepresentation)

### Against Magaly Velasquez D.D.S. and Magaly M. Velasquez DDS, Professional Dental Corp.

655.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 196 through 203, inclusive, as though fully set forth herein.

656.   In part, Velasquez misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.  Velasquez also represented they would submit accurate claims information to Borrego Health for reimbursement.

657.   Velasquez's representations were false at the time they were made. Upon information and belief, Velasquez knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

658.   As set forth herein, Velasquez made various misrepresentations, including without limitation the misrepresentations made in connection with the Velasquez Agreement and the false and fraudulent bills submitted by Velasquez (and any related communication) to Borrego Health.

659.   Borrego Health reasonably relied on Velasquez's representations.

660.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

/ / /

/ / /

/ / /

7288673.3

## TWENTIETH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Aram Arakelyan, D.D.S. and New Millennium Dental Group of Aram Arakelyan, Inc.

661.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 204 through 213, inclusive, as though fully set forth herein.

662.   In part, Arakelyan misrepresented to Borrego Health that he would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Arakelyan also represented they would submit accurate claims information to Borrego Health for reimbursement.

663.   Arakelyan representations were false at the time they were made. Upon information and belief, Arakelyan knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

664.   As set forth herein, Arakelyan made various misrepresentations, including without limitation the misrepresentations made in connection with the Arakelyan Agreements and the false and fraudulent bills submitted by Arakelyan (and any related communication) to Borrego Health.

665.   Borrego Health reasonably relied on Arakelyan's representations.

666.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

/ / /

/ / /

/ / /

FOURTH AMENDED COMPLAINT

7288673.3

**TWENTY-FIRST CAUSE OF ACTION**

(Intentional Misrepresentation)

Against Michael Hoang, D.M.D.

667.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 214 through 219, inclusive, as though fully set forth herein.

668.   In part, Michael Hoang, D.M.D. misrepresented to Borrego Health that he would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health  patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Hoang also represented they would submit accurate claims information to Borrego Health for reimbursement.

669.   Michael Hoang, D.M.D.'s representations were false at the time they were made. Upon information and belief, Michael Hoang, D.M.D. knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

670.   As set forth herein, Hoang made various misrepresentations, including without limitation the misrepresentations made in connection with the Hoang Agreement and the false and fraudulent bills submitted by Hoang (and any related communication) to Borrego Health.

671.   Borrego Health reasonably relied on Michael Hoang, D.M.D.'s representations.

672.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

**TWENTY-SECOND CAUSE OF ACTION**

(Intentional Misrepresentation)

Against Waleed Stephan, D.D.S. and W.A. Stephan, a Dental Corporation

7288673.3

673.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 220 through 225, inclusive, as though fully set forth herein.

674.   In part, Stephan misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Stephan also represented they would submit accurate claims information to Borrego Health for reimbursement.

675.   Stephan's representations were false at the time they were made. Upon information and belief, Stephan knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

676.   As set forth herein, Stephan made various misrepresentations, including without limitation the misrepresentations made in connection with the Stephan Agreement and the false and fraudulent bills submitted by Stephan (and any related communication) to Borrego Health.

677.   Borrego Health reasonably relied on Stephan's representations.

678.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

**TWENTY-THIRD CAUSE OF ACTION**

(Intentional Misrepresentation)

Against Santiago Rojo, D.D.S. and Santiago Rojo, D.D.S., Inc.

679.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 226 through 231, inclusive, as though fully set forth herein.

680.   In part, Rojo misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and

1  generally accepted principles applicable the practice of dentistry, hire qualified and

2  licensed dental professionals to provide dental services to Borrego Health patients,

3  and prepare, establish, and maintain administrative records, financial records,

4  records pertaining to patient diagnosis and treatment, and information pertaining to

5  the services provided. Rojo also represented they would submit accurate claims

6  information to Borrego Health for reimbursement.

7       681.   Rojo's representations were false at the time they were made. Upon

8  information and belief, Rojo knew the representations were false at the time they

9  were made, or that the representations where made recklessly without regard for

10  their truth.

11       682.   As set forth herein, Rojo made various misrepresentations, including

12  without limitation the misrepresentations made in connection with the Rojo

13  Agreement and the false and fraudulent bills submitted by Rojo (and any related

14  communication) to Borrego Health.

15       683.   Borrego Health reasonably relied on Rojo's representations.

16       684.   As a direct and proximate result, Borrego Health was harmed in an

17  amount to be proven at trial.

18  **TWENTY-FOURTH CAUSE OF ACTION**

19  (Intentional Misrepresentation)

20  Against Marcelo Toledo, D.D.S. and Marcelo Toledo, D.D.S., Inc.

21       685.   Borrego Health reincorporates paragraphs 1 through 54, 132 through

22  145, 246 through 258, inclusive, as though fully set forth herein.

23       686.   In part, Toledo misrepresented to Borrego Health that they would

24  practice dentistry in accordance with all Federal, State and local laws, regulations,

25  and generally accepted principles applicable the practice of dentistry, hire qualified

26  and licensed dental professionals to provide dental services to Borrego Health

27  patients, and prepare, establish, and maintain administrative records, financial

28  records, records pertaining to patient diagnosis and treatment, and information

1   pertaining to the services provided. Toledo also represented they would submit
2   accurate claims information to Borrego Health for reimbursement.
3        687.   Toledo's representations were false at the time they were made. Upon
4   information and belief, Toledo knew the representations were false at the time they
5   were made, or that the representations where made recklessly without regard for
6   their truth.
7        688.   As set forth herein, Toledo made various misrepresentations, including
8   without limitation the misrepresentations made in connection with the Toledo
9   Agreement and the false and fraudulent bills submitted by Toledo (and any related
10  communication) to Borrego Health.
11       689.   Borrego Health reasonably relied on Toledo's representations.
12       690.   As a direct and proximate result, Borrego Health was harmed in an
13  amount to be proven at trial.

14                  **TWENTY-FIFTH CAUSE OF ACTION**
15                    (Intentional Misrepresentation)
16   Against Marlene M. Thompson, D.D.S. and Marlene M. Thompson, D.D.S., Inc.

17       691.   Borrego Health reincorporates paragraphs 1 through 54, 132 through
18  145, 259 through 264, inclusive, as though fully set forth herein.
19       692.   In part, Thompson misrepresented to Borrego Health that they would
20  practice dentistry in accordance with all Federal, State and local laws, regulations,
21  and generally accepted principles applicable the practice of dentistry, hire qualified
22  and licensed dental professionals to provide dental services to Borrego Health
23  patients, and prepare, establish, and maintain administrative records, financial
24  records, records pertaining to patient diagnosis and treatment, and information
25  pertaining to the services provided. Thompson also represented they would submit
26  accurate claims information to Borrego Health for reimbursement.
27       693.   Thompson's representations were false at the time they were made.
28  Upon information and belief, Thompson knew the representations were false at the

1  time they were made, or that the representations where made recklessly without

2  regard for their truth.

3      694.   Borrego Health reasonably relied on Thompson's representations.

4      695.   As a direct and proximate result, Borrego Health was harmed in an

5  amount to be proven at trial.

6                     **TWENTY-SIXTH CAUSE OF ACTION**

7                        (Intentional Misrepresentation)

8            Against Douglas Ness, D.D.S. and Ness Dental Corporation

9      696.   Borrego Health reincorporates paragraphs 1 through 54, 132 through

10  145, 265 through 271, inclusive, as though fully set forth herein.

11     697.   In part, Ness misrepresented to Borrego Health that they would practice

12  dentistry in accordance with all Federal, State and local laws, regulations, and

13  generally accepted principles applicable the practice of dentistry, hire qualified and

14  licensed dental professionals to provide dental services to Borrego Health patients,

15  and prepare, establish, and maintain administrative records, financial records,

16  records pertaining to patient diagnosis and treatment, and information pertaining to

17  the services provided. Ness also represented they would submit accurate claims

18  information to Borrego Health for reimbursement.

19     698.   Ness' representations were false at the time they were made. Upon

20  information and belief, Ness knew the representations were false at the time they

21  were made, or that the representations where made recklessly without regard for

22  their truth.

23     699.   Borrego Health reasonably relied on Ness' representations.

24     700.   As a direct and proximate result, Borrego Health was harmed in an

25  amount to be proven at trial.

26                   **TWENTY-SEVENTH CAUSE OF ACTION**

27                        (Intentional Misrepresentation)

28          Against George C. Jared, D.D.S. and George C. Jared, D.D.S., Inc.

701.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 272 through 281, inclusive, as though fully set forth herein.

702.   In part, Jared misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Jared also represented they would submit accurate claims information to Borrego Health for reimbursement.

703.   Jared's representations were false at the time they were made.  Upon information and belief, Jared knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

704.   Borrego Health reasonably relied on Jared's representations.

705.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

**TWENTY-EIGHTH CAUSE OF ACTION**

(Negligent Misrepresentation)

Against Premier Defendants

706.   Borrego Health reincorporates paragraphs 1 through 54, 66 through 334, inclusive, as though fully set forth herein.

707.   The Premier Defendants represented to Borrego Health that it was qualified and capable of reviewing, "scrubbing," and processing contract dental claims on Borrego Health's behalf.  The Premier Defendants further represented that Premier had qualified and experienced staff to develop its own quality management team to oversee Borrego Health's contract dental program.

7288673.3

708.   The Premier Defendants had no reasonable grounds for believing their representations were true at the time they were made. At the time Borrego Health entered into the MSAs with Premier, Premier lacked any clinical staff to properly review claims and develop a quality management system.

709.   The Premier Defendants intended for Borrego Health to rely on its representations to persuade Borrego Health to retain Premier's services.

710.   Borrego Health reasonably relied on the Premier Defendants' representations, believing Premier was capable of evaluating contract dental program claims for necessity and accuracy.

711.   Borrego Health's reliance on the Premier Defendants' representation regarding their qualifications and representations that they would properly review and process the claims was a substantial factor in causing Borrego Health harm.

712.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

## TWENTY-NINTH CAUSE OF ACTION

### (Negligent Misrepresentation)

#### Against Husam Aldairi, D.D.S. and Aldairi DDS, Inc.

713.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 146 through 166, inclusive, as though fully set forth herein.

714.   As outlined above, Aldairi made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Aldairi also represented to Borrego Health that the claims submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

715.   As set forth herein, Aldairi made various misrepresentations, including without limitation the misrepresentations made in connection with the Aldairi Agreements and the false and fraudulent bills submitted by Aldairi (and any related communication) to Borrego Health.

7288673.3

716.   Aldairi had no reasonable grounds for believing their representations were true at the time they were made.

717.   Aldairi intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Husam Aldairi, D.D.S. and Aldairi DDS, Inc.

718.   Borrego Health reasonably relied on Aldairi's representations.

719.   As a result of relying on Aldairi's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Aldairi for services that should not have been paid.

720.   Borrego Health's reliance on Aldairi's representations was a substantial factor in causing Borrego Health harm.

**THIRTIETH CAUSE OF ACTION**

(Negligent Misrepresentation)

Against Ayed Hawatmeh, D.D.S. and Hawatmeh Dental Group, P.C.

721.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 167 through 183, inclusive, as though fully set forth herein.

722.   As outlined above, Hawatmeh made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Hawatmeh also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

723.   As set forth herein, Hawatmeh made various misrepresentations, including without limitation the misrepresentations made in connection with the Hawatmeh Agreement and the false and fraudulent bills submitted by Hawatmeh (and any related communication) to Borrego Health.

724.   Hawatmeh had no reasonable grounds for believing their representations were true at the time they were made.

725.   Hawatmeh intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Hawatmeh.

169

7288673.3

726.   Borrego Health reasonably relied on Hawatmeh's representations.

727.   As a result of relying on Hawatmeh's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Hawatmeh for services that should not have been paid.

728.   Borrego Health's reliance on Hawatmeh's representations was a substantial factor in causing Borrego Health harm.

## THIRTY-FIRST CAUSE OF ACTION

### (Negligent Misrepresentation)

### Against Alborz Mehdizadeh, D.D.S. and Alborz Mehdizadeh, Inc.

729.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 184 through 195, inclusive, as though fully set forth herein.

730.   As outlined above, Mehdizadeh made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients.  Mehdizadeh also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

731.   As set forth herein, Mehdizadeh made various misrepresentations, including without limitation the misrepresentations made in connection with the Mehdizadeh Agreement and the false and fraudulent bills submitted by Mehdizadeh (and any related communication) to Borrego Health.

732.   Mehdizadeh had no reasonable grounds for believing their representations were true at the time they were made.

733.   Mehdizadeh intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Mehdizadeh.

734.   Borrego Health reasonably relied on Mehdizadeh's representations.

735.   As a result of relying on Mehdizadeh's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid MehdizadeH for services that should not have been paid.

1    736.   Borrego Health's reliance on Mehdizadeh's representations was a
2  substantial factor in causing Borrego Health harm.

3             **THIRTY-SECOND CAUSE OF ACTION**

4             (Negligent Misrepresentation)

5  Against Magaly Velasquez, D.D.S. and Magaly M. Velasquez DDS, Professional
6                          Dental Corp.

7    737.   Borrego Health reincorporates paragraphs 1 through 54, 132 through
8  145, 196 through 203, inclusive, as though fully set forth herein.

9    738.   As outlined above, Velasquez made several representations to Borrego
10  Health regarding the scope and nature of the services they would provide to Borrego
11  Health patients.  Velasquez also represented to Borrego Health that the claims
12  submitted for reimbursement would be accurate.

13    739.   As set forth herein, Velasquez made various misrepresentations,
14  including without limitation the misrepresentations made in connection with the
15  Velasquez Agreement and the false and fraudulent bills submitted by Velasquez
16  (and any related communication) to Borrego Health.

17    740.   Velasquez had no reasonable grounds for believing their
18  representations were true at the time they were made.

19    741.   Velasquez intended for Borrego Health to rely on their representations
20  to persuade Borrego Health to continue to contract with Velasquez.

21    742.   Borrego Health reasonably relied on Velasquez's representations.

22    743.   As a result of relying on Velasquez's representations, Borrego Health
23  submitted claims to Medi-Cal that were not supportable and paid Velasquez for
24  services that should not have been paid.

25    744.   Borrego Health's reliance on Velasquez's representations was a
26  substantial factor in causing Borrego Health harm.

27  / / /
28  / / /

**THIRTY-THIRD CAUSE OF ACTION**

(Negligent Misrepresentation)

Against Aram Arakelyan, D.D.S. and New millennium Dental Group of Aram Arakelyan, Inc.

745.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 204 through 213, inclusive, as though fully set forth herein.

746.   As outlined above, Arakelyan made several representations to Borrego Health regarding the scope and nature of the services he would provide to Borrego Health patients.  Arakelyan also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

747.   As set forth herein, Arakelyan made various misrepresentations, including without limitation the misrepresentations made in connection with the Arakelyan Agreements and the false and fraudulent bills submitted by Arakelyan (and any related communication) to Borrego Health.

748.   Arakelyan had no reasonable grounds for believing his representations were true at the time they were made.

749.   Arakelyan intended for Borrego Health to rely on his representations to persuade Borrego Health to continue to contract with Arakelyan.

750.   Borrego Health reasonably relied on Arakelyan's representations.

751.   As a result of relying on Arakelyan's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Arakelyan for services that should not have been paid.

752.   Borrego Health's reliance on Arakelyan's representations was a substantial factor in causing Borrego Health harm.

/ / /

/ / /

/ / /

/ / /

7288673.3

**THIRTY-FOURTH CAUSE OF ACTION**

(Negligent Misrepresentation)

Against Michael Hoang, D.M.D.

753. Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 214 through 219, inclusive, as though fully set forth herein.

754. As outlined above, Michael Hoang, D.M.D. made several representations to Borrego Health regarding the scope and nature of the services he would provide to Borrego Health patients. Hoang also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

755. As set forth herein, Hoang made various misrepresentations, including without limitation the misrepresentations made in connection with the Hoang Agreement and the false and fraudulent bills submitted by Hoang (and any related communication) to Borrego Health.

756. Michael Hoang, D.M.D. had no reasonable grounds for believing their representations were true at the time they were made.

757. Michael Hoang, D.M.D. intended for Borrego Health to rely on his representations to persuade Borrego Health to continue to contract with Michael Hoang, D.M.D.

758. Borrego Health reasonably relied on Michael Hoang, D.M.D.'s representations.

759. As a result of relying on Michael Hoang, D.M.D.'s representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Michael Hoang, D.M.D. for services that should not have been paid.

760. Borrego Health's reliance on Michael Hoang, D.M.D.'s representations was a substantial factor in causing Borrego Health harm.

/ / /

/ / /

/ / /

**THIRTY-FIFTH CAUSE OF ACTION**

(Negligent Misrepresentation)

Against Waleed Stephan, D.D.S. and W.A. Stephan, a Dental Corporation

761.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 220 through 225, inclusive, as though fully set forth herein.

762.   As outlined above, Stephan made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Stephan also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

763.   As set forth herein, Stephan made various misrepresentations, including without limitation the misrepresentations made in connection with the Stephan Agreement and the false and fraudulent bills submitted by Stephan (and any related communication) to Borrego Health.

764.   Stephan had no reasonable grounds for believing their representations were true at the time they were made.

765.   Stephan intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Stephan.

766.   Borrego Health reasonably relied on Stephan's representations.

767.   As a result of relying on Stephan's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Stephan for services that should not have been paid.

768.   Borrego Health's reliance on Stephan's representations was a substantial factor in causing Borrego Health harm.

**THIRTY-SIXTH CAUSE OF ACTION**

(Negligent Misrepresentation)

Against Santiago Rojo, D.D.S. and Santiago Rojo, D.D.S., Inc.

769.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 226 through 231, inclusive, as though fully set forth herein.

FOURTH AMENDED COMPLAINT

7288673.3

770.   As outlined above, Rojo made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients.  Rojo also represented to Borrego Health that the claims submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

771.   As set forth herein, Rojo made various misrepresentations, including without limitation the misrepresentations made in connection with the Rojo Agreement and the false and fraudulent bills submitted by Rojo (and any related communication) to Borrego Health.

772.   Rojo had no reasonable grounds for believing their representations were true at the time they were made.

773.   Rojo intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Rojo.

774.   Borrego Health reasonably relied on Rojo's representations.

775.   As a result of relying on Santiago Rojo, D.D.S. and Santiago Rojo, D.D.S., Inc.'s representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Rojo for services that should not have been paid.

776.   Borrego Health's reliance on Rojo's representations was a substantial factor in causing Borrego Health harm.

### THIRTY-SEVENTH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Marcelo Toledo, D.D.S. and Marcelo Toledo, D.D.S., Inc.

777.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 246 through 258, inclusive, as though fully set forth herein.

778.   As outlined above, Toledo made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Toledo also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

FOURTH AMENDED COMPLAINT

779.   As set forth herein, Toledo made various misrepresentations, including without limitation the misrepresentations made in connection with the Toledo Agreement and the false and fraudulent bills submitted by Toledo (and any related communication) to Borrego Health.

780.   Toledo had no reasonable grounds for believing their representations were true at the time they were made.

781.   Toledo intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Toledo.

782.   Borrego Health reasonably relied on Toledo's representations.

783.   As a result of relying on Toledo's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Toledo for services that should not have been paid.

784.   Borrego Health's reliance on Toledo's representations was a substantial factor in causing Borrego Health harm.

## THIRTY-EIGHTH CAUSE OF ACTION

### (Negligent Misrepresentation)

Against Marlene M. Thompson, D.D.S. and Marlene M. Thompson, D.D.S., Inc.

785.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 259 through 264, inclusive, as though fully set forth herein.

786.   As outlined above, Thompson made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Thompson also represented to Borrego Health that the claims submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

787.   Thompson had no reasonable grounds for believing their representations were true at the time they were made.

788.   Thompson. intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Thompson.

7288673.3

789.   Borrego Health reasonably relied on Thompson's representations.

790.   As a result of relying on Thompson's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Thompson for services that should not have been paid.

791.   Borrego Health's reliance on Thompson's representations was a substantial factor in causing Borrego Health harm.

## THIRTY-NINTH CAUSE OF ACTION

### (Negligent Misrepresentation)

Against Douglas Ness, D.D.S. and Ness Dental Corporation

792.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 265 through 271, inclusive, as though fully set forth herein.

793.   As outlined above, Ness made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Ness also represented to Borrego Health that the claims submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

794.   Ness had no reasonable grounds for believing their representations were true at the time they were made.

795.   Ness intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Ness.

796.   Borrego Health reasonably relied on Ness' representations.

797.   As a result of relying on Ness' representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Ness for services that should not have been paid.

798.   Borrego Health's reliance on Ness' representations was a substantial factor in causing Borrego Health harm.

/ / /

/ / /

## FORTIETH CAUSE OF ACTION

### (Negligent Misrepresentation)

### Against George C. Jared, D.D.S. and George C. Jared, D.D.S., Inc.

799.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 272 through 281, inclusive, as though fully set forth herein.

800.   As outlined above, Jared made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Jared also represented to Borrego Health that the claims submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

801.   Jared had no reasonable grounds for believing their representations were true at the time they were made.

802.   Jared intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Jared.

803.   Borrego Health reasonably relied on Jared's representations.

804.   As a result of relying on Jared's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Jared for services that should not have been paid.

805.   Borrego Health's reliance on Jared's representations was a substantial factor in causing Borrego Health harm.

## FORTY-FIRST CAUSE OF ACTION

### (Legal Malpractice)

### Against Defendant Mikia Wallis

806.   Borrego Health reincorporates paragraphs 1 through 145, 282 through 503, inclusive, as though fully set forth herein.

807.   Mikia Wallis was originally hired by Borrego Health to serve as its Chief Legal Officer.  Mikia Wallis later served in a dual capacity as the President and interim CEO of Borrego Health.  As Borrego Health's attorney, agent and

178

1  fiduciary, Mikia Wallis has a duty to act with reasonable care and to act for the

2  benefit of Borrego Health.

3      808.   As outlined herein, Mikia Wallis breached her legal duties to Borrego

4  Health.

5      809.   As a direct and proximate result of Mikia Wallis' breaches, Borrego

6  Health was damaged in an amount to be proven at trial.

7  **FORTY-SECOND CAUSE OF ACTION**

8  (Fraudulent Concealment)

9  Against Borrego Insiders, the Premier Defendants, Jim Hebets,

10  and The Hebets Company

11      810.   Borrego Health reincorporates paragraphs 1 through 485, inclusive, as

12  though fully set forth herein.

13      811.   The Borrego Insiders, the Premier Defendants, Jim Hebets, and The

14  Hebets Company owed duties to Borrego Health.

15      812.   As outlined herein, the Borrego Insiders, the Premier Defendants, Jim

16  Hebets, and The Hebets Company intentionally failed to disclose pertinent facts to

17  Borrego Health regarding Borrego Health's business operations and took actions to

18  conceal such facts from Borrego Health.

19      813.   Borrego Health was not aware of the facts Borrego Insiders, the

20  Premier Defendants, Jim Hebets, and The Hebets Company concealed from Borrego

21  Health.

22      814.   The Borrego Insiders, the Premier Defendants, Jim Hebets, and The

23  Hebets Company intended to deceive Borrego Health by failing to

24  disclose/concealing such facts.

25      815.   Had the Borrego Insiders, the Premier Defendants, Jim Hebets, and The

26  Hebets Company disclosed the withheld and concealed information, Borrego Health

27  would have taken different actions then it did.

28

816.   Borrego Health was harmed as a result of the Borrego Insiders, the Premier Defendants, Jim Hebets, and The Hebets Company's conduct.

817.   The Borrego Insiders, the Premier Defendants, Jim Hebets, and The Hebets Company's concealment was a substantial factor in causing Borrego Health's harm.

## FORTY-THIRD CAUSE OF ACTION

### (False Promise)

### Against All Defendants

818.   Borrego Health reincorporates paragraphs 1 through 485, inclusive, as though fully set forth herein.

819.   As outlined herein, each and every Defendant made promises to Borrego Health.

820.   Defendants did not intend to perform on the promises made at the time they made those promises to Borrego Health.

821.   Defendants intended for Borrego Health to rely on those promises.

822.   Borrego Health reasonably relied on Defendants' promises.

823.   Defendants did not perform the actions they promised to perform.

824.   Borrego Health was harmed as a result of Defendants' failures to perform the actions promised.

825.   Borrego Health's reliance on Defendants' promises was a substantial factor in causing Borrego Health harm.

## FORTY-FOURTH CAUSE OF ACTION

### (Conversion)

### Against All Defendants

826.   Borrego Health reincorporates paragraphs 1 through 485, inclusive, as though fully set forth herein.

827.   As set forth herein, Defendants substantially interfered with Borrego Health's personal property by knowingly taking money from Borrego Health for

1  which Defendants were not entitled to, or at least prevented Borrego Health from

2  receiving the full funds to which it was entitled.

3       828.   As set forth herein, Borrego Health did not consent to Defendants

4  improper withholding of funds that were rightfully owned by Borrego Health.

5       829.   As set forth herein, Borrego Health was harmed.

6       830.   As set forth herein, Defendants' conduct was a substantial factor in

7  causing plaintiff's harm.

8                    **FORTY-FIFTH CAUSE OF ACTION**

9                       (Inducing Breach of Contract)

10                        Against All Defendants

11       831.   Borrego Health reincorporates paragraphs 1 through 54, 66 through

12  334, inclusive, as though fully set forth herein.

13       832.   Borrego Health had a contract with Medi-Cal.

14       833.   Borrego Health had contracts with its contract dental providers,

15  including the corporate entities of the individually named Dentist Defendants.

16       834.   Defendants knew of Borrego Health's contracts with Medi-Cal, the

17  corporate Dentist Defendants, and Borrego Health's contract dental providers.

18       835.   Through the conduct alleged herein, Defendants intended to cause the

19  contracted dental providers to breach the terms of their contract with Borrego

20  Health.

21       836.   Defendants' conduct did cause the contracted dental providers to

22  breach their contracts with Borrego Health.

23       837.   As a result of Defendants' conduct, Borrego Health was harmed.

24       838.   Defendants' conduct was a substantial factor in causing Borrego

25  Health's harm.

26  / / /

27  / / /

28  / / /

7288673.3

**FORTY-SIXTH CAUSE OF ACTION**

(Intentional Interference with Contractual Relations)

Against All Defendants

839.   Borrego Health reincorporates paragraphs 1 through 54, 66 through 334, inclusive, as though fully set forth herein.

840.   Borrego Health had a contract with Medi-Cal.

841.   Borrego Health had contracts with its contract dental providers, including the corporate entities of the individually named Dentist Defendants.

842.   Defendants knew of Borrego Health's contracts with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers.

843.   Through the conduct alleged herein, Defendants intended to cause the contracted dental providers to breach the terms of their contract with Borrego Health, which thereby impacted Borrego Health's contract with Medi-Cal.

844.   Defendants' conduct made Borrego Health's performance under their contracts expensive and difficult.

845.   Defendants intended to disrupt performance of the contracts or at least knew that disruption of performance was substantially certain to occur by their conduct.

846.   As a result of Defendants' conduct, Borrego Health was harmed.

847.   Defendants' conduct was a substantial factor in causing Borrego Health's harm.

**FORTY-SEVENTH CAUSE OF ACTION**

(Intentional Interference with Prospective Economic Relations)

Against All Defendants

848.   Borrego Health reincorporates paragraphs 1 through 46, 66 through 334, inclusive, as though fully set forth herein.

849.   Borrego Health was in an economic relationship with Medi-Cal, which provided an economic benefit to Borrego Health.

FOURTH AMENDED COMPLAINT

7288673.3

850.   Borrego Health was in economic relationships with its contract dental providers, including the corporate entities of the individually named Dentist Defendants, which provided an economic benefit to Borrego Health.

851.   Defendants knew of Borrego Health's economic relationship with Medi-Cal.

852.   Defendants knew of Borrego Health's economic relationships with the corporate Dentist Defendants, as well as the contracts with individual contract dental providers.

853.   As outlined herein, Defendants engaged in wrongful conduct that was intended to disrupt Borrego Health's relationships with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers.

854.   Borrego Health's relationships with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers were disrupted.

855.   As a result of Defendants' conduct, Borrego Health was harmed.

856.   Defendants' conduct was a substantial factor in causing Borrego Health's harm.

## FORTY-EIGHTH CAUSE OF ACTION

### (Negligent Interference with Prospective Economic Relations)

### Against All Defendants

857.   Borrego Health reincorporates paragraphs 1 through 46, 66 through 334, inclusive, as though fully set forth herein.

858.   Borrego Health was in an economic relationship with Medi-Cal, which provided an economic benefit to Borrego Health.

859.   Borrego Health was in economic relationships with its contract dental providers, including the corporate entities of the individually named Dentist Defendants, which provided an economic benefit to Borrego Health.

860.   Defendants knew or should have known of Borrego Health's contract with Medi-Cal.

861.   Defendants knew or should have known of Borrego Health's contracts with the corporate Dentist Defendants, as well as the contracts with individual contract dental providers.

862.   As outlined herein, Defendants knew or should have known Borrego Health's relationships with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers would be disrupted if they failed to act with reasonable care.

863.   As outlined herein, Defendants failed to act with reasonable care when they engaged in wrongful conduct that was intended to disrupt Borrego Health's relationships with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers.

864.   Borrego Health's relationships with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers were disrupted.

865.   As a result of Defendants' conduct, Borrego Health was harmed.

866.   Defendants' conduct was a substantial factor in causing Borrego Health's harm.

## FORTY-NINTH CAUSE OF ACTION

### (Violations of Business & Professions Code § 17200, *et seq.*)

### Against All Defendants

867.   Borrego Health reincorporates paragraphs 1 through 485, inclusive, as though fully set forth herein.  This is due to the fact that Borrego Health believes that each and every one of the actions and omissions described above are part of the same, far-reaching and widespread unfair and/or fraudulent business activities designed and carried out to steal money from Borrego Health and funnel that money, directly or indirectly, to the Defendants. However, in the alternative, any one of or any combination of the above-listed Schemes would be sufficient to state a claim against the Defendants alleged to be involved in that Scheme or those Schemes.

868.   The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

869.   The UCL imposes strict liability. Borrego Health need not prove that defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices – but only that such practices occurred.

870.   A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

871.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

872.   As outlined herein, Defendants' actions were unfair.

873.   As outlined herein, Defendants' acts and practices constitute fraudulent business acts or practices as they have deceived Borrego Health and are highly likely to deceive members of the consuming public, including members of the contract dental program and/or members of the relevant state agencies.

## FIFTIETH CAUSE OF ACTION

### (Conspiracy)

### Against All Defendants

874.   Borrego Health reincorporates paragraphs 1 through 485, inclusive, as though fully set forth herein.  This is due to the fact that Borrego Health believes that each and every one of the actions and omissions described above are part of the same, far-reaching and widespread conspiracy designed and carried out to steal money from Borrego Health and funnel that money, directly or indirectly, to the Defendants.  However, in the alternative, any one of or any combination of the

7288673.3

1  above-listed Schemes would be sufficient to state a claim against the Defendants

2  alleged to be involved in that Scheme or those Schemes.

3       875.   As set forth herein, the facts involving the multiple Schemes described

4  above demonstrate the existence of a conspiracy between and among the Defendants

5  to act in furtherance of those Schemes, all of whom acted as co-conspirators of

6  another.

7       876.   Borrego Health was harmed by Defendants' actions.

8       877.   Defendants were responsible for Borrego Health's harm.

9       878.   Defendants were aware of each other's plans and agreed/intended such

10  wrongful acts to be committed.

11  **FIFTY-FIRST CAUSE OF ACTION**

12  (Breach of Fiduciary Duty)

13  Against Borrego Insiders

14       879.   Borrego Health reincorporates paragraphs 1 through 510, inclusive, as

15  though fully set forth herein.

16       880.   The Borrego Insiders owed fiduciary duties to Borrego Health.

17       881.   As outlined herein, the Borrego Insiders breached their duties to

18  Borrego Health.

19       882.   Borrego Health was damaged by the Borrego Insiders' breaches.

20  **FIFTY-SECOND CAUSE OF ACTION**

21  (Constructive Fraud)

22  Against Borrego Insiders and Premier Defendants

23       883.   Borrego Health reincorporates paragraphs 1 through 562, inclusive, as

24  though fully set forth herein.

25       884.   The Borrego Insiders and the Premier Defendants acted as Borrego

26  Health's agents, corporate officers and/or fiduciaries.

27       885.   The Borrego Insiders and the Premier Defendants acted on Borrego

28  Health's behalf in several transactions as outlined above.

7288673.3

1   886.   As outlined above, the Borrego Insiders and the Premier Defendants

2   knew, or should have known, pertinent information to the transactions.

3   887.   The Borrego Insiders and the Premier Defendants misled Borrego

4   Health by failing to disclose such pertinent information and/or omitting such

5   pertinent information from Borrego Health.

6   888.   As a result of the Borrego Insiders' and the Premier Defendants' failure

7   to disclose such information, Borrego Health was harmed.

8   889.   The Borrego Insiders' and the Premier Defendants' conduct was a

9   substantial factor in causing Borrego Health's harm.

10   **FIFTY-THIRD CAUSE OF ACTION**

11   (Unjust Enrichment/Restitution)

12   Against all Defendants

13   890.   Borrego Health reincorporates paragraphs 1 through 562, inclusive, as

14   though fully set forth herein.

15   891.   As outlined herein, Defendants unjustly received a benefit at the

16   expense of Borrego Health.

17   **FIFTY-FOURTH CAUSE OF ACTION**

18   (Intentional Misrepresentation)

19   Against Jim Hebets and The Hebets Company

20   892.   Borrego Health reincorporates paragraphs 1 through 46, 360 through

21   422, inclusive, as though fully set forth herein.

22   893.   Jim Hebets and The Hebets Company represented to Borrego Health,

23   among other things, that the 162B plans would not subject Borrego Health to tax

24   penalties, and that the 162B plan provided a fair market benefit package that was

25   superior to other options.

26   894.   Jim Hebets and The Hebets Company's representations were false at

27   the time they were made. For example, Borrego Health suffered a tax penalty from

28   the IRS as a direct result of Bruce Hebets' 162B plan.

187

895.   Borrego Health reasonably relied on Jim Hebets' and The Hebets Company's representations.

896.   As a result of relying on Jim Hebets' and The Hebets Company's representations, Borrego Health suffered harm.

897.   Borrego Health's reliance on Jim Hebets' and The Hebets Company's representations was a substantial factor in causing Borrego Health's harm.

### FIFTY-FIFTH CAUSE OF ACTION

#### (Negligent Misrepresentation)

#### Against Jim Hebets and The Hebets Company

898.   Borrego Health reincorporates paragraphs 1 through 46, 360 through 422, inclusive, as though fully set forth herein.

899.   As outlined above, Jim Hebets and The Hebets Company made several representations to Borrego Health regarding the scope and nature of the services they would provide and the benefits Borrego Health would receive from those services.

900.   Jim Hebets and The Hebets Company had no reasonable grounds for believing their representations were true at the time they were made.

901.   Jim Hebets and The Hebets Company intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Jim Hebets and The Hebets Company.

902.   Borrego Health reasonably relied on Jim Hebets' and The Hebets Company's representations.

903.   As a result of relying on Jim Hebets' and The Hebets Company's representations, Borrego Health was harmed.

904.   Borrego Health's reliance on Jim Hebets and The Hebets Company's representations were a substantial factor in causing Borrego Health harm.

/ / /

/ / /

7288673.3

**FIFTY-SIXTH CAUSE OF ACTION**

(Intentional Misrepresentation)

Against Mohammed Al Tekreeti, D.D.S.

905.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 232 through 237, inclusive, as though fully set forth herein.

906.   In part, Al Tekreeti misrepresented to Borrego Health that he would submit accurate claims information to Borrego Health for reimbursement.

907.   Al Tekreeti's representations were false at the time they were made. Upon information and belief, Al Tekreeti knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

908.   Borrego Health reasonably relied on Al Tekreeti's representations.

909.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

**FIFTY-SEVENTH CAUSE OF ACTION**

(Intentional Misrepresentation)

Against Jilbert Bakramian, D.D.S.

910.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 238 through 245, inclusive, as though fully set forth herein.

911.   In part, Bakramian misrepresented to Borrego Health that he would submit accurate claims information to Borrego Health for reimbursement.

912.   Bakramian's representations were false at the time they were made. Upon information and belief, Bakramian knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

913.   Borrego Health reasonably relied on Bakramian's representations.

914.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

7288673.3

**FIFTY-EIGHTH CAUSE OF ACTION**

(Negligent Misrepresentation)

Against Mohammed Al Tekreeti, D.D.S.

915.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 232 through 237, inclusive, as though fully set forth herein.

916.   As outlined above, Al Tekreeti made several representations to Borrego Health, including that the claims he submitted for reimbursement would be accurate and for the services performed by a dental provider eligible to serve Medi-Cal patients.

917.   Al Tekreeti had no reasonable grounds for believing his representations were true at the time they were made.

918.   Al Tekreeti intended for Borrego Health to rely on his representations.

919.   Borrego Health reasonably relied on Al Tekreeti's representations.

920.   As a result of relying on Al Tekreeti's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Al Tekreeti for services that should not have been paid.

921.   Borrego Health's reliance on Al Tekreeti's representations was a substantial factor in causing Borrego Health harm.

**FIFTY-NINTH CAUSE OF ACTION**

(Negligent Misrepresentation)

Against Jilbert Bakramian, D.D.S.

922.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 238 through 245, inclusive, as though fully set forth herein.

923.   As outlined above, Bakramian made several representations to Borrego Health, including that the claims he submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

924.   Bakramian had no reasonable grounds for believing their representations were true at the time they were made.

FOURTH AMENDED COMPLAINT

7288673.3

925. Bakramian intended for Borrego Health to rely on their representations.

926. Borrego Health reasonably relied on Bakramian's representations.

927. As a result of relying on Bakramian's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Bakramian for services that should not have been paid.

928. Borrego Health's reliance on Bakramian's representations was a substantial factor in causing Borrego Health harm.

**SIXTIETH CAUSE OF ACTION**

**(Reformation Based on Fraud Against Priest LLCs)**

929. Borrego Health reincorporates paragraphs 1 through 54, 335 through 359, 511 through 562, inclusive, as though fully set forth herein.

930. In each of the Priest Leases (Exhibits U, V, and W) the parties thereto express their intention that the Priest Leases be interpreted so as to make and maintain performance thereunder lawful. The unlawful purpose of the leases is self-evident. As explained above, each of the Priest Leases were entered into without the informed consent of Borrego Health's Board. Each of the leases call for a non-profit FQHC to pay and to report as operating expenses to CMS rent that is millions of dollars in excess of fair market rate, thereby resulting in the diversion of millions of dollars of federal health care funds to the Priest LLCs, and the inflation of reimbursement rates paid by the DHCS to the FQHC.

931. The above-described failure of the Priest Leases to reflect the true intent of the parties (i.e., that performance under the lease be only lawful) resulted from Bruce Hebets and Borrego Insiders' concealment from Borrego Health that, despite its express promise to the contrary, Borrego Health's performance of the pricing terms and duration of the above-mentioned written instruments would be unlawful.

932. Without knowledge of the true facts and in reliance on Bruce Hebets and Borrego Insiders false representations, Borrego Health was deceived and misled

into performing under a lease that differed materially from the expressed intent of the parties that performance thereunder be lawful. Borrego Health's reliance on Bruce Hebets and Borrego Insiders' fraudulent omissions was reasonable and justified in that he was Borrego Health's Chief Executive Officer and fiduciary.

933.   Fraud, as a basis for reformation, consists of (1) a false representation by one party and (2) justifiable reliance on the false representation by the other party. Here both exist. Civil Code section 3399 codifies the equitable remedy of reformation of written instruments. Section 3399 provides that a written contract may be revised on application of the party aggrieved, when, through fraud, mutual mistake, or mistake of one party that the other party knew of or suspected at the time, a written contract does not express the true intention of the parties.

934.   Here, the strong public interest in Borrego Health's continued service of underserved and financially disadvantaged patients throughout the communities of San Diego, San Bernardino, and Riverside Counties, as detailed above, compels the court's exercise of its equitable power to reform the Priest Leases.

935.   Even though the Borrego Health Board was never given the opportunity give its fully informed consent to any of the Priest Leases, the Board reasonably expects and intends that all Borrego Health contracts conform with all applicable laws.

936.   For the reasons detailed above, Borrego Health's intent that the Priest Leases conform with all applicable laws (consistent the terms of the leases) cannot possibly be fulfilled without reformation of the rent prices to fair market rate, and without reformation of the 30-year lease term to five years or less, and without reformation of the leases to allow the non-profit FQHC tenant to terminate the lease for good cause on reasonable notice.

937.   Plaintiff Borrego Health respectfully prays for each of the Priest Leases to be so reformed.

FOURTH AMENDED COMPLAINT

7288673.3

## <u>SIXTY-FIRST CAUSE OF ACTION</u>

### <u>(Rescission Based on Fraud Against Priest LLCs)</u>

938.   Borrego Health reincorporates paragraphs 1 through 54, 335 through 359, 511 through 562, inclusive, as though fully set forth herein.

939.   Alternatively, if the Court cannot exercise its statutory and/or equitable powers to reform the leases, Borrego Health is entitled to rescind the Priest Leases, and for restitution of all sums paid the Priest LLCs to date, less the reasonable rental value of the premises during Borrego Health's occupation of them.

940.   Borrego Health may rescind Priest Leases (1) if the contract is unlawful for causes which do not appear in its terms or conditions, and the parties are not equally at fault (Civ. Code, § 1689, subd. (b)(5)) or (2) if the public interest would be prejudiced by permitting the leases to stand (Civ. Code, § 1689, subd. (b)(6)). A commercial lease is unlawful if its consideration or object is (1) contrary to an express provision of law, (2) contrary to the policy of express law, though not expressly prohibited, or (3) otherwise contrary to good morals (Civ. Code, § 1667). Another ground for rescission and restitution not addressed by Civil Code section 1689, subdivision (b) allows recovery when the parties were ignorant of the illegality at the time they entered into the contract.[3]  Under the facts alleged in this Complaint, each and every one of the aforementioned grounds for rescission are met. In addition, the public interest will be prejudiced if the Priest Leases are permitted to stand, in that Borrego Health's ability to provide quality healthcare in underserved areas will be undermined by inequitable diversion of funds to defendants. Further, the fraud described above is grounds for rescission.

941.   Borrego Health therefore prays, in the alternative, and in the event that the Priest Leases cannot be reformed, for judgment rescinding the Priest Leases, and

---

[3] *Adams v. Heinsch* (1948) 89 Cal. App. 2d 300, 302–305, 200 P.2d 796 (also on ground of mistake); *Brashears v. Giannini* (1933) 131 Cal. App. 706, 709–711, 22 P.2d 47; *Restatement (2d) of Contracts,* § 198].

1  for restitution of all sums paid the Priest LLCs to date, less the reasonable rental

2  value of the premises during Borrego Health's occupation of the three leased

3  facilities, along with orders providing for the reasonable surrender of the premises in

4  a manner that will protect the interests of the patients Borrego Health is required to

5  serve.

6  ### SIXTY-SECOND CAUSE OF ACTION

7  ### (Common Count for Money Had and Received Against Priest LLCs)

8  942.   Borrego Health reincorporates paragraphs 1 through 54, 335 through

9  359, 511 through 562, inclusive, as though fully set forth herein.

10  943.   A judgment of rescission supports an award of money to Borrego

11  Health under a common count for money had and received. In addition to the facts

12  supporting the fraud count pled above, the following facts also support a common

13  count for money had and received.

14  944.   Beginning in 2012, and continuing through December 2016, Bruce

15  Hebets, Borrego Insiders, and Daryl Priest caused Borrego Health and several

16  Priest-owned entities to enter into various contracts under which millions in federal

17  healthcare funds were unlawfully diverted to the Priest-owned entities.

18  945.   Beginning in 2012, and continuing through 2020, the Priest LLCs

19  became indebted to Borrego Health in the sum of at least $11.5 million for money

20  had and received by the Priest LLCs. Neither the whole nor any part of this sum has

21  been paid, although demand therefor has been made, and there is now due, owing,

22  and unpaid the sum of at least $11.5 million, with interest thereon, at the legal rate

23  as the court may allow, according to proof at trial.

24  ### SIXTY-THIRD CAUSE OF ACTION

25  ### (Declaratory Relief Against Priest LLCs)

26  946.   Borrego Health reincorporates paragraphs 1 through 54, 335 through

27  359, 511 through 562, inclusive, as though fully set forth herein.

28  947.   An actual controversy exists in regard to the parties' duties and

1  obligations under the Priest Leases as alleged in this Complaint, and as such, a

2  judicial declaration of the parties' respective duties and obligations is appropriate as

3  to the matters in dispute, as alleged herein.

4  <u>**PRAYER**</u>

5  With respect to the First Cause of Action—RICO (As to All Defendants):

6      a.    For damages in an amount to be proven at trial, trebled pursuant to

7      statute;

8      b.    Pre-judgment and post-judgment interest; and

9      c.    Reasonable attorney's fees and costs.

10

11  With respect to the RICO, Intentional Misrepresentation, Negligent

12  Misrepresentation, False Promise, Fraudulent Concealment, Constructive Fraud,

13  Conspiracy, and Violations of the UCL Causes of Action (As to All Defendants):

14      a.    For imposition of a constructive trust in an amount subject to be proven

15      at trial and on any real or personal property purchased with a portion of

16      that amount;

17      b.    For punitive damages where allowed by law; and

18      c.    Pre-judgment and post-judgment interest.

19

20  With respect to the Sixtieth Cause of Action—Reformation Due to Fraud (Priest

21  LLCs only):

22      a.    Order reforming the payments under the Priest Leases to reflect only

23      fair market rate as rent due and owing, and further, to limit the term of

24      the leases as commercially reasonable to no more than five years;

25      b.    Order of restitution that all money paid to Priest LLCs in excess of the

26      amount of rent in the reformed Priest Leases be returned to Borrego

27      Health; and

28      c.    Pre-judgment and post-judgment interest on all sums ordered returned.

1

2 With respect to the Sixty-First Cause of Action—Rescission Due to Fraud (As to

3 Priest LLCs only):

4       a.    Rescission of the Priest Leases;

5       b.    For actual and consequential damages in an amount subject to proof at

6              trial, but in an amount no less than $11.5 million or, in the alternative,

7              restitution of all sums unlawfully paid, less the reasonable rental value

8              of the premises during Borrego Health's occupation of the three leased

9              facilities;

10       c.    Punitive damages as allowed by law;

11       d.    Order providing for the reasonable surrender of the premises in a

12              manner that will protect the interests, safety, and health of Borrego

13              Health's patients; and

14       e.    Pre-judgment and post-judgment interest.

15

16 With respect to all other causes of action:

17       a.    For damages in an amount to be proven at trial;

18       b.    Reasonable attorney's fees and costs as allowed by law;

19       c.    For punitive damages where allowed by law; and

20       d.    Such other and further relief the Court deems just and proper.

21

22 DATED: _____, 2022    HOOPER, LUNDY & BOOKMAN, P.C.

23

24

25 By:

26            DEVIN M. SENELICK
          Attorneys for Plaintiff Borrego Community

27           Health Foundation

28

FOURTH AMENDED COMPLAINT

7288673.3

8.   With respect to all causes of action:

a.   Costs of suit;

b.   Reasonable attorney's fees and costs as allowed by law; and

c.   Such other and further relief the Court deems just and proper.

Dated:  March 22, 2022                    HATTON, PETRIE & STACKLER

/s/  Gregory M. Hatton

By:_____
     Gregory M. Hatton
     Arthur R. Petrie, II
     Dan E. Heck
     Attorneys for Plaintiff
     BORREGO COMMUNITY HEALTH FOUNDATION

DEMAND FOR JURY TRIAL

BCHF hereby demands a jury trial in this matter.

Dated:  March 22, 2022                    HATTON, PETRIE & STACKLER

/s/  Gregory M. Hatton

By:_____
     Gregory M. Hatton
     Arthur R. Petrie, II
     Dan E. Heck
     Attorneys for Plaintiff
     BORREGO COMMUNITY HEALTH FOUNDATION