JOSEPH R. LAMAGNA (State Bar No. 246850)
JORDAN KEARNEY (State Bar No. 305483)
**HOOPER, LUNDY & BOOKMAN, P.C.**
101 W. Broadway, Suite 1200
San Diego, California 92101
Telephone: (619) 744-7300
Facsimile: (619) 230-0987
E-Mail: jlamagna@hooperlundy.com
       jkearney@hooperlundy.com

DEVIN M. SENELICK (State Bar No. 221478)
TARYN A. REID (State Bar No. 328772)
**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East, Suite 1600
Los Angeles, California 90067
Telephone: (310) 551-8111
Facsimile: (310) 551-8181
E-Mail: dsenelick@hooperlundy.com
       treid@hooperlundy.com

Attorneys for Plaintiff
BORREGO COMMUNITY HEALTH
FOUNDATION

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BORREGO COMMUNITY HEALTH FOUNDATION, a California nonprofit public benefit corporation, <br><br> Plaintiff, <br><br> vs. <br><br> INLAND VALLEY INVESTMENTS, LLC, a California limited liability company; DRP HOLDINGS, LLC, a California limited liability company; PROMENADE SQUARE, LLC, a California limited liability company; and DOES 1-50, inclusive, <br><br> Defendants. | Case No. 3:21-cv-01417-BEN-KSC <br><br> Hon. Roger T. Benitez, Courtroom 5A <br><br> **FOURTH AMENDED COMPLAINT FOR:** <br><br> **(1) FRAUD** <br> **(2) REFORMATION** <br> **(3) RESCISSION (in the alternative)** <br> **(4) MONEY HAD AND RECEIVED** <br> **(5) UNFAIR BUSINESS PRACTICES** <br> **(6) DECLARATORY RELIEF** <br> **(7) RICO** <br><br> **[DEMAND FOR JURY TRIAL]** |

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION/SUMMARY ...................................................4

II.    JURISDICTION AND VENUE.................................................6

III.   CAST OF CHARACTERS ....................................................6

    A.    BORREGO COMMUNITY HEALTH FOUNDATION ........................6

    B.    FORMER BORREGO INSIDERS .........................................7

    C.    PREMIER, PRIESTS AND OTHER PRIEST-RELATED ENTITIES ...........................................................9

    D.    DENTISTS ........................................................ 11

    E.    JAMES HEBETS AND HIS COMPANIES ............................. 12

    F.    OTHERS ......................................................... 12

    G.    ALTER EGO AND DOE ALLEGATIONS ............................. 13

IV.    RULE 9(b) REQUIREMENTS ............................................. 14

V.     THE SCHEMES THAT DAMAGED BORREGO HEALTH ......................... 16

    A.    The Scheme to Form and Sell Entities Formed by Borrego Insiders to Borrego Health (the "Borrego MSO/IPA Scheme") ........................... 16

    B.    The Scheme to Contract with Premier Allowing Premier to Get Paid Tens of Millions of Dollars to Purportedly Provide "Management Services" It Was Not Capable of Providing (the "Premier Scheme")................................................... 18

        i.     The Contract Dental Program Is Formed ..................... 18

        ii.    Hebets Proposes an MSO Idea, Which Is Rejected by Borrego Health............................................ 19

        iii.   The Borrego Health Insiders Enter into a Management Services Agreement on Borrego Health's Behalf Anyway .......... 21

        iv.    The Damages Suffered by Borrego Health Due to the Premier Scheme ......................................... 33

    C.    Certain Contract Dentists Submitted Fraudulent Bills with the Knowledge and Support of Premier and the Borrego Insiders (the "Fraudulent Dental Billing Scheme")....................................... 35

    D.    Since Premier Was Unable and Unwilling To, a Program Integrity Process is Implemented by Borrego Health.............................................. 40

Case No. 21-cv-01417-BEN-KSC

BORREGO COMMUNITY HEALTH FOUNDATION'S FOURTH AMENDED COMPLAINT

7329719.4

1

# **TABLE OF CONTENTS**

**Page**

2

3       E.     Premier and the Borrego Insiders Coverup Fraudulent Billing (the "Coverup Scheme") .................................................................. 44

4

5       F.     The Borrego Insiders Entered into Leases with Daryl Priest-Owed Entities for Above Market Rents and Terms Many Times the Market Amount (the "Priest Leases Scheme") ........................................ 52

6

7       G.     The Borrego Insiders Paid Themselves Above-Market Compensation and Granted Themselves Improper Benefits and Covered It Up (the "Compensation/Benefits Scheme") ........................ 59

8

9       H.     The Borrego Insiders Used Nepotism and Cronyism to Funnel Money to their Friends and Family (the "Nepotism and Cronyism Scheme") ................................................................................. 62

10

11       I.     The Borrego Insiders Tried To Purchase a Country Club to Personally Benefit Themselves (the "De Anza Country Club Scheme") ................................................................................. 64

12

13       J.     The Borrego Insiders Attempted to Pay Bruce Hebets a $5 Million Payout (the "Payout Scheme") .................................................. 66

14

15       K.     The Borrego Insiders Funneled Money to Bruce Hebets' Brother, Jim Hebets, and Jim Hebets' Firm (the "Jim Hebets Scheme") ............. 69

16       L.     Borrego Insider Chuck Kimball Leased a Barn to Borrego Health (the "Julian Barn Scheme") ........................................................ 72

17

18       M.     Borrego Insider Dennis Nourse Sold Property to Borrego Health to be Developed by Priest (the "Property Development Scheme") ............. 75

19

20       N.     Bruce Hebets and Karen Hebets Create a Sham "Consulting" Company and Contract with Premier To Obtain Payments From Premier for the Various Schemes Which Benefited the Premier Parties (the "KBH Healthcare Consulting Scheme") ............................ 79

21  VI.     CLEANING HOUSE .......................................................... 82

22  VII.    CHAPTER 11 BANKRUPTCY.............................................. 85

23  VIII.   THE RICO ENTERPRISE..................................................... 85

24       A.     Facts Common To RICO Cause of Action ............................. 88

25       B.     Racketeering Activity Distinct from Enterprise ...................... 90

26       C.     RICO Liability .................................................................. 91

27       D.     Issuance of Constructive Trusts .......................................... 97

28

Plaintiff Borrego Community Health Foundation ("Borrego Health") alleges as follows:

## I.     INTRODUCTION/SUMMARY

1.      Borrego Health is a California nonprofit public benefit corporation operating a Federally Qualified Health Center (also known as a FQHC).  Borrego Health provides primary and related healthcare services to historically underserved areas of San Diego, Riverside, and—until recently—San Bernadino counties.

2.      The primary scheme at issue in this matter is the Priest Leases Scheme (as defined below).  The core allegations of the Priest Leases Scheme can be found at paragraphs 190-203, however, as set forth herein, it is vital to understand that the Priest Leases Scheme is part and parcel of a larger set of schemes carried out by some or all of the same parties that were involved in the Priest Leases Scheme.  The larger set of schemes is the subject of ongoing litigation styled *Borrego Community Health Foundation v. Karen Hebets, et al.*, Case No. 22-cv-1056-BEN-KSC (the "Multi-Scheme Litigation").[1]

3.      While Borrego Health was attempting to complete its mission of providing healthcare to underserved communities, certain individuals and entities, both inside and outside of Borrego Health, siphoned off money from Borrego Health that should have benefitted to the community it serves.  The schemes of those various individuals and entities are set forth in detail below.  The schemes include selling useless assets to Borrego Health at inflated prices, entering into one-sided agreements with Borrego Health to its detriment, committing and/or covering up healthcare fraud though improper billing of dental services, entering into leases with Borrego Health that were many times fair market rates and terms, paying themselves above-market salaries and benefits, hiring friends and family members to work for Borrego Health

---

[1] At the appropriate time, Borrego Health intends to file a motion to consolidate this matter with the other pending matter.

Case No. 21-cv-01417-BEN-KSC

BORREGO COMMUNITY HEALTH FOUNDATION'S FOURTH AMENDED COMPLAINT

7329719.4

1    and paying them above-market salaries, and attempting to use Borrego Health to

2    purchase a country club.  Those same individuals and entities worked tirelessly to

3    cover up their misdeeds, and, until recently, were successful is doing so.

4        4.    The insiders were motivated by various forms of personal benefit.  First,

5    they used the excessive revenue generated by the schemes to set over-market salaries

6    for themselves and create other forms of compensation, such as automotive benefits,

7    retirement benefits, and free healthcare goods and services from Borrego Health.

8    Second, they used the excessive services and attendant revenue from Medi-Cal to

9    justify employing friends and family members at Borrego Health, also at inflated

10   salaries.  Third, on information and belief, the insiders allowed the outsiders to

11   participate in the fleecing of Borrego Health in exchange for kickbacks and/or other

12   benefits to the insiders.  For instance, Bruce Hebets (Borrego Health's former CEO)

13   and Karen Hebets (Borrego Health's former Vice President of Business Services) set

14   up a sham "consulting" company which entered into a sham agreement which paid

15   them $2 million of funds that had been previously stolen from Borrego Health.  Each

16   and every one of the participants of these schemes, including the Priest LLCs that are

17   Defendants here, received one or more improper benefits and/or payments as a result

18   of the schemes described below, and was incentivized to act in furtherance of those

19   schemes, actively seek to conceal those schemes and/or breached their duties to

20   prevent or stop those schemes.

21       5.    The false and fraudulent billing of dental services has resulted in Borrego

22   Health's suspension by California's Medicaid Program, Medi-Cal.  The state and

23   federal government are also investigating Borrego Health for tax issues, its non-profit

24   status, among many other things, due to these schemes.

25       6.    Fortunately, Borrego Health, through a newly constituted Board of

26   Trustees, has spent considerable time and effort trying to discover and unravel the

27   prior bad conduct to rehabilitate Borrego Health and ensure Borrego Health's viability

28   and compliance going forward.

7.      However, Borrego Health has been severely damaged and this action seeks to illuminate the various schemes, to seek financial compensation to recoup funds wrongly siphoned away from Borrego Health, and to hold the wrongdoers responsible for their actions.

## II.    JURISDICTION AND VENUE

8.      Venue is proper in this District pursuant to 31 USC section 3732(a) and 28 USC section 1391(c).  During the relevant time period, a substantial portion of the events complained of that give rise to Borrego Health's claims occurred in this District.

## III.   CAST OF CHARACTERS

### A.    BORREGO COMMUNITY HEALTH FOUNDATION

9.      Plaintiff Borrego Health is a nonprofit 501(c)(3) Federally Qualified Health Center ("FQHC").  Borrego Health provides high quality, comprehensive, compassionate primary health care to the people in their communities, regardless of their ability to pay, by partnering with licensed medical professionals across Southern California.  Borrego Health operates 33 clinics, primarily in underserved desert and inland communities throughout San Diego, Riverside, and—until recently—San Bernardino counties.  Borrego Health provides essential services in Family Practice, Pediatrics, OB/GYN, Internal Medicine, Podiatry, Dermatology, Cardiology, HIV/Hepatitis C and Covid-19 related testing and vaccinations to over 200,000 patients, most of whom cannot obtain affordable comprehensive primary care from other sources.  During the recent pandemic, Borrego Health tested tens of thousands of Californians for Covid-19 infections, and vaccinated tens of thousands of people against Covid-19.  Borrego Health's continued operation is in the public interest and, despite the harm it has suffered and the way it has been manipulated by its former executives and trustees, it delivers quality health care to people who need it.

10.     Much of the services Borrego Health provides to the community is funded by grants, including without limitation grants from the U.S. Health Resources

Case No. 21-cv-01417-BEN-KSC

7329719.4

and Services Administration ("HRSA").  Borrego Health received its first HRSA grant in 2003.

11.     Following the initial HRSA grant in 2003, Borrego Health experienced massive growth, expanding its services to what they are today, inclusive of dental, mental health and chiropractic services.  The majority of these services are provided through Borrego Health's internal programs, including brick-and-mortar medical and dental clinics and mobile units.  Borrego Health also operates a contract medical program in which it contracts with private practice providers to serve members of the community.

12.     As a non-profit public benefit corporation, Borrego Health does not have individual shareholders, but rather is operated by a Board of Trustees, all of whom currently serve on a volunteer basis.

B.     **FORMER BORREGO INSIDERS**

13.     <u>Bruce Hebets</u> was a longtime resident of San Diego County and had been a Sergeant with the San Diego Harbor Police Department prior to becoming CEO of Borrego Health Foundation in or around 2004.  Bruce Hebets served as Borrego Health's CEO beginning in 2004 until his retirement in September 2018.  Following a decline in Bruce Hebets' health, Borrego Health's Executive/Finance Committee – with Bruce Hebets' approval – appointed the then Chief Legal Officer, Mikia Wallis, as President of Borrego Health in December 2017, and later as interim CEO following Bruce Hebets' decision to take an extended medical leave, effective June 28, 2018.  Following Bruce Hebets' retirement, effective September 1, 2018, Mikia Wallis was appointed to the position of Borrego Health's CEO.  Bruce Hebets passed away in January 2019.

14.     <u>Karen Hebets</u> is an individual with her place of residence in Borrego Springs, California.  Karen Hebets was the Vice President of Business Services at Borrego Health.  Karen Hebets was also the wife of Bruce Hebets.

15.     <u>KBH Healthcare Consulting, LLC</u> was a California Limited Liability Company with its principal place of business in Borrego Springs, California.  Bruce Hebets and Karen Hebets were its only members, sharing a 50-50 interest.

16.     <u>Mikia Wallis, Esq.</u> is an individual with her place of residence in Julian, California.  Mikia Wallis is an attorney.  She graduated from the University of San Diego School of Law, and was admitted to the California Bar on or about June 1, 2007.  Mikia Wallis was Chief Legal Officer of Borrego Health, and was named interim CEO in June 2018 and CEO in September 2018.  Mikia Wallis was also on Borrego Health's Board of Trustees until October 2, 2020.  Mikia Wallis was placed on administrative leave from Borrego Health on October 9, 2020, and terminated by Borrego Health on December 15, 2020.

17.     <u>Diana Thompson, formerly Diana Troncoso,</u> is an individual with her place of residence in San Diego County, California.  Diana Thompson was Borrego Health's Chief Financial Officer from March 2013, and was terminated as of March 2021.  One of Diana Thompson's children is married to one of Bruce Hebets' and Karen Hebets' child, and she shares one or more grandchildren with Bruce Hebets and Karen Hebets.

18.     <u>Harry Ilsley</u> is an individual with his place of residence in Sheridan, Wyoming.  Harry Ilsley also owns or owned a house in Borrego Springs (near the De Anza Country Club golf course).  Harry Ilsley was a member of Borrego Health's Board of Trustees and was the Chair of the Board until 2017.  He was also on the Board's Executive/Finance Committee.

19.     <u>Dennis Nourse</u> in an individual with his place of residence in Cedarburg, Wisconsin.  Dennis Nourse was a former administrator of Borrego Health, and later hired Bruce Hebets to be CEO.  Dennis Nourse was a member of Borrego Health's Board of Trustees from mid-2012 until his resignation, and was a member of the Board's Executive/Finance Committee.

Case No. 21-cv-01417-BEN-KSC
BORREGO COMMUNITY HEALTH FOUNDATION'S FOURTH AMENDED COMPLAINT

7329719.4

20.    Mike Hickok in an individual with his place of residence in Borrego Springs, California (near the De Anza Country Club golf course).  Mike Hickok was a member of Borrego Health's Board of Trustees, and was a member of the Board's Executive/Finance Committee.

21.    Chuck Kimball an individual with his place of residence in Julian, California.  Chuck Kimball was a member of Borrego Health's Board of Trustees starting in approximately 2011, and was the Chair of the Board from 2017 to mid-2019 and Secretary from 2019 until his removal.  Chuck Kimball was also a member of the Board's Executive/Finance Committee.

22.    Karen Hebets, Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball are collectively referred to as "Borrego Insiders."  A subset of Borrego Insiders who served as members of the Borrego Health Board of Trustee are Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball, collectively referred to herein as "Board Insiders."

C.    **PREMIER, PRIESTS AND OTHER PRIEST-RELATED ENTITIES**

23.    Premier Healthcare Management, Inc. ("Premier") is a California corporation with its principal place of business in El Cajon, California.

24.    Summit Healthcare Management, Inc. ("Summit") was a California corporation with its principal place of business in El Cajon, California.  Summit merged with Premier in 2019.

25.    Daryl Priest is an individual with his place of residence in El Cajon, California.  Daryl Priest is the owner of Premier, Summit, and the Defendant Priest LLCs.  Prior to starting Premier Daryl Priest had no material healthcare experience.

26.    Nicholas ("Nick") Priest, Esq. is an individual with his place of residence in San Diego, California.  Nick Priest was the Chief Executive Officer of Premier. Nick Priest is the son of Daryl Priest.  Nick Priest is also an attorney.  He graduated from California Western School of Law and was admitted to the California Bar on or

7329719.4

1  about June 21, 2016.  Prior to working at Premier Nick Priest had no material

2  healthcare experience.

3       27.   Travis Lyon (erroneously referred to in prior pleadings as "Lyons") is an

4  individual with his place of residence in Alpine, California.  Travis Lyon was the

5  President and Chief Operating Officer of Premier.  He is also currently the President

6  of Real Estate Operations at Priest Development Corporation.

7       28.   Defendant Promenade Square, LLC ("Promenade") is a California limited

8  liability company whose primary place of business is in El Cajon, California.

9  Promenade is engaged in the commercial real estate business.  According to

10  documents publicly available on the California Secretary of State website,

11  Promenade's sole member and manager is Daryl Priest.  Promenade is the owner and

12  lessor of the structures and appurtenances located at 133 and 155 West Main Street, El

13  Cajon, County of San Diego, California, of which Borrego Health is the lessee

14  ("Promenade Lease").  Attached hereto as Exhibit A and incorporated as though set

15  forth in full herein is a true and correct copy of the Promenade Lease.

16       29.   Defendant DRP Holdings, LLC ("DRP") is a California limited liability

17  company whose primary place of business is in El Cajon, California.  DRP is engaged

18  in the commercial real estate business.  According to documents publicly available on

19  the California Secretary of State website, DRP's sole member and manager is Daryl

20  Priest.  DRP is the owner and lessor of the structures and appurtenances located at 590

21  North D Street, City of San Bernardino, County of San Bernardino, California, of

22  which Borrego Health is the lessee ("DRP Lease").  Attached hereto as Exhibit B and

23  incorporated as though set forth in full herein is a true and correct copy of the DRP

24  Lease.

25       30.   Defendant Inland Valley Investments, LLC ("Inland Valley") is a

26  California limited liability company whose primary place of business is in El Cajon,

27  California. Inland Valley is engaged in the commercial real estate business. According

28  to documents publicly available on the California Secretary of State website, Inland

10

Case No. 21-cv-01417-BEN-KSC

Valley's sole member and manager is Daryl Priest.  By way of assignment from DRP, Inland Valley is now the lessor of the structures and appurtenances located at 750 East Main Street, City of Barstow, County of San Bernardino, California, of which Borrego Health is the lessee ("Inland Valley Lease").  Attached hereto as Exhibit C and incorporated as though set forth in full herein is a true and correct copy of the Inland Valley Lease.  The Borrego Insiders and Premier Parties decided to have Borrego Health sign the lease for the Barstow facility before the facility even existed. On information and belief, the Premier Parties then presented the over-market lease to a federally insured lending institution to help obtain financing for the facility (making Borrego Health in essence a participant in the development and financing of the Barstow facility). As further demonstration of the interconnectedness of this Scheme, Travis Lyon, who was the CEO of Premier (a healthcare company), was the broker for the construction loan in connection with the Barstow deal and personally collected signatures from Bruce Hebets and Diana Thompson (then, Troncoso).

31.    For the sake of brevity, and because Borrego Health is informed and believes that Daryl Priest is the sole owner, member, and manager of Promenade, DRP, and Inland Valley:  (a) Promenade, DRP, and Inland Valley are also referred to collectively as the "Priest LLCs"; and (b) the three leases Borrego Health entered into with the Priest LLCs are referred to collectively as the "Priest Leases."

32.    Premier, Summit, Daryl Priest, Nick Priest, Travis Lyon, Promenade, DRP and Inland Valley are collectively referred to herein as the "Premier Parties."

D.    **DENTISTS**

33.    A number of individual dentists, and their professional corporations, were involved in the below-described schemes.  Many of those dentists/entities are defendants in the Multi-Scheme Litigation (and additional defendants may be added in the future), but for the sake of brevity, they are not listed here.  These dentists are collectively referred to herein as the "Dentists."

11

E.      **JAMES HEBETS AND HIS COMPANIES**

34.     <u>James "Jim" Hebets</u> is an individual with his place of residence in Scottsdale, Arizona.  Jim Hebets is Bruce Hebets' brother.

35.     <u>The Hebets Company</u> is a Missouri Corporation with its principal place of business in Phoenix, Arizona.  Jim Hebets is President and Founder of The Hebets Company, and has or had an ownership interest in The Hebets Company.  The Hebets Company provides accounting and consulting services and hold themselves out as experts in executive compensation to healthcare providers, including other FQHCs, in California and San Diego County.  The Hebets Company is a subsidiary of NFP Corp.  NFP is a network of independent financial advisors that includes over 175 firms in 41 states and Puerto Rico, specializing in life insurance and wealth transfer, corporate and executive benefits, and provides services across the state of California and San Diego County.

F.      **OTHERS**

36.     <u>Julian Medical Foundation</u> is a California nonprofit corporation, with its principal place of business in Julian, California.

37.     <u>Timothy Martinez, D.D.S.</u> graduated from the Harvard School of Dental Medicine in 1986 with a concentration in Health Care Administration. Throughout his 30 year career, he has had extensive experience in FQHC dental programs, state dental Medicaid administration, private practice, and academic positions at the Associate Dean level.  Prior to joining Borrego Health, Dr. Martinez served as the Associate Dean for Community Partnerships and Access to Care for two dental schools, Western University of Health Sciences and the University of New England, and before that, he served as the Massachusetts Medicaid Dental Director as well as the Dental Director for three large FQHCs in the greater Boston area, including the first FQHC in the nation Geiger-Gibson Community Health Center, Boston Health Care for the Homeless, and the South End Community Health Center.  Timothy Martinez

1  spearheaded the Program Integrity unit for Borrego Health, designed to detect and
2  address potential false or fraudulent billing.

3      38.   Maura Tuso, D.D.S. was a licensed dentist in California.  She lost her
4  license and was suspended by Medi-Cal.  Despite this, she provided services for
5  various dentists that were contracted with Borrego Health.  She has since provided
6  documents, evidence, and statements that she observed and engaged in fraudulent
7  practices at the direction of several contract dental providers, including Husam
8  Aldairi, Mohammed Al Tekreeti, Marlene Thompson, Douglas Ness, and George
9  Jared.

10     39.   Dr. Alfredo Ratniewski is the former Chief Medical Officer of Borrego
11 Health.

12     G.    **ALTER EGO AND DOE ALLEGATIONS**

13     40.   Borrego Health is informed and believes that at all relevant times each of
14 the Premier Parties was the agent and employee of each of the remaining Premier
15 Parties, and in doing the things hereinafter alleged was acting within the course and
16 scope of such agency and employment.  The Premier Parties operated in such a way as
17 to make their individual identities indistinguishable, and therefore are mere alter-egos
18 of one another.  Moreover, the Premier Parties aided and abetted each other in
19 accomplishing the acts and omissions alleged herein. (*See* Restatement (SECOND) of
20 Torts §876 (1979)). The Premier Parties, and each of them, fail to recognize the
21 uniqueness and independence of each other. At all times relevant hereto, there was a
22 such a unity of interest and ownership between the Premier Parties such that the
23 individual distinctions between them had ceased and that the facts as alleged herein
24 are such that an adherence to the fiction of the separate existence of the Premier
25 Parties would, under the particular circumstances alleged herein, sanction a fraud
26 and/or promote injustice.

27     41.   Specifically, the Priest LLCs and Premier Parties as a whole constituted a
28 single-enterprise, and as such, to avoid further fraud and injustice, the Priest LLCs

13

corporate structure is collapsible under recognized alter-ego doctrine. Daryl Priest acts as the sole manager, the applicable agent for service of process, and the Chief Executive Officer of each of the Priest LLCs. The Priest LLCs, Premier, and Summit, all have the same principal address for operations – Priest Properties – also owned and operated by Daryl Priest. Daryl Priest's personal attorney, Stephen Fitch, Esq., filed the Articles of Incorporation for each of the Priest LLCs. Travis Lyon acted at the instruction of Daryl Priest and the Priest LLCs to accomplish the goals of the Priest LLCs.

42.     In the alternative, Borrego Health may pierce the corporate veil of the Priest LLCs, as Daryl Priest's sole ownership and management of the Priest LLCs, as alleged herein, denotes that the entities are one in the same.

43.     In the alternative, each and every one of the Premier Party members was the agent of one another. Travis Lyon and Nicholas Priest acted at the direction of Daryl Priest, who acted at the direction of Premier, Summit and the Priest LLCs. The Defendants further ratified the conduct of their agents by continually accepting payment on the above-market leases, and improperly accepting payment for the conduct alleged in the Multi-Scheme Litigation.

44.     Further, the acts and omissions of the Premier Parties were done in concert with one another in furtherance of their common design and agreement to accomplish a particular result, namely extracting money from Borrego Health.

45.     Borrego Health is ignorant of the true names and capacities of those defendants sued herein as DOES 1 through 50, and for that reason has sued such defendants by fictitious names.  Borrego Health will seek leave of the Court to amend this Complaint to identify said defendants when their identities are ascertained.

## IV.     RULE 9(b) REQUIREMENTS

46.     Several of Borrego Health's claims are subject to Federal Rules of Civil Procedure Rule 9(b). Federal Rules of Civil Procedure Rule 9(b) states, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting

fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Notably, "[u]nder Ninth Circuit law, a pleading is sufficient for purposes of Rule 9(b) if it identifies the circumstances constituting fraud so that the defendant can prepare an adequate answer. While conclusory allegations will not suffice, statements which provide the time, place and nature of the alleged fraudulent activities will." *Zatkin v. Primuth*, 551 F.Supp. 39, 42 (S.D. Cal. 1982) (*citing Bosse v. Crowell, Collier and MacMillan*, 565 F.2d 602, 611 (9th Cir.1977); *Walling v. Beverly Enterprises*, 476 F.2d 393, 397 (9th Cir.1973)). For claims subject to Rule 9(b), the complaint must include "the who, what, when, where, and the how of the misconduct charged." *Aton Center, Inc. v. Northwest Administrators, Inc.*, No. 21CV1843-L-MSB, 2022 WL 4229307 *4 (Sept. 13, 2022 S.D. Cal.) (*quoting Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)). Importantly, however, a plaintiff need not plead every instance of fraud in order to "plead with particularity." Any assertion that only offering a sampling of alleged misconduct does not comply with Rule 9(b) is "unsupported by law." *Satmodo, LLC v. Whenever Communications*, No. 17-CV-0192, 2017 WL 637132 *2 (Dec. 8, 2017 S.D.C.A.). "The Ninth Circuit has stated Rule 9(b)'s particularity requirement can be met through use of sampling." *Satmodo, LLC v. Whenever Communications*, No. 17-CV-0192, 2017 WL 637132 *2 (Dec. 8, 2017 S.D.C.A.) (*citing Edeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998-99 (9th Cir. 2010). "Although it is not mandatory that [Plaintiff] provide representative examples, such examples would go a long way in providing the necessary particularity under Rule 9(b)." *Satmodo, LLC v. Whenever Communications*, No. 17-CV-0192, 2017 WL 637132 *2 (Dec. 8, 2017 S.D.C.A.) (*quoting Frazier ex rel. U.S. v. Iasis Healthcare Corp.*, 392 Fed.Appx. 535, 537 (9th Cir. 2010)). The below allegations and representative examples provide the "who, what, when, where, and how" of the alleged misconduct to put all Defendants on proper notice and is therefore sufficiently pled under Rule 9(b).

## V.      THE SCHEMES THAT DAMAGED BORREGO HEALTH

### A.      The Scheme to Form and Sell Entities Formed by Borrego Insiders to Borrego Health (the "Borrego MSO/IPA Scheme")

47.      One of the earliest discovered schemes concocted by the Borrego Insiders to the detriment of Borrego Health is the formation of Borrego Management Services Organization, LLC ("Borrego MSO") and Borrego Independent Physicians Association, A Professional Medical Corporation ("Borrego IPA"), and the sale of those entities to Borrego Health.

48.      While CEO of Borrego Health, Bruce Hebets devised a scheme to have Borrego Health incur unnecessary costs by providing physician services and administrative services to Borrego Health through companies that he and other Borrego Insiders would create and control.  This allowed the Borrego Insiders to improperly profit from those companies at the expense of Borrego Health.

49.      Both Borrego MSO and Borrego IPA were formed on or about July 19, 2010 through the assistance of Mikia Wallis, in-house counsel at Borrego Health. Mikia Wallis provided this service without charge to Borrego MSO or Borrego IPA, using Borrego Health resources to benefit some of the Borrego Insiders. Borrego MSO and Borrego IPA were potential referral sources for Medi-Cal beneficiaries.  Mikia Wallis was listed as the agent for service of process for both entities.

50.      As Bruce Hebets and other Borrego Insiders were not medical professionals, their ownership in Borrego IPA, which was a professional medical corporation, was constrained.  Thus, other friends, cronies, and referral sources became investors, including Dr. Alfredo Ratniewski and his daughter.  Dr. Alfredo Ratniewski was motivated to cooperate, in part, by the Borrego Insiders' decision to overcompensate him as Borrego Health's Chief Medical Officer and to overcompensate his family members who also worked at Borrego Health.

51.      Borrego MSO, on the other hand, is a lay entity, which was supposed to manage the Borrego IPA practice.  Bruce Hebets was sophisticated enough to try to

avoid scrutiny of the obvious conflict problems by keeping his name away from Borrego MSO.  Instead, Karen Hebets (Bruce Hebets' wife) was a shareholder, and was named as Borrego MSO's Chief Executive Officer.  Karen Hebets had no experience managing an IPA and was not qualified to do so.

52.     Through Borrego MSO's purported "management" services, Borrego MSO could charge Borrego IPA for unnecessary services, and funnel the funds to Karen Hebets and other Borrego Insiders.

53.     Borrego MSO and Borrego IPA were then contracted with Borrego Health to provide physician and administrative services to Borrego Health.  However, these services were already being provided without the unnecessary expense of contracting with outside companies.  Tellingly, Borrego MSO and Borrego IPA did not do business with any other healthcare providers, only Borrego Health.

54.     Eventually, a plan was developed by Bruce Hebets and other Borrego Insiders for Borrego Health to buy Borrego MSO and Borrego IPA.  The entities had no valuable assets to sell to Borrego Health.  The transaction was a sham transaction meant to obscure the self-dealing of Bruce Hebets and other Borrego Insiders.  Mikia Wallis facilitated the transaction, which was culminated with a November 1, 2012 purchase agreement whereby Borrego Health paid $2,000,000 to acquire Borrego MSO and Borrego IPA.

55.     On information and belief, the plan was to take some of that money and pay it to the investors of Borrego IPA.  Thus, all of the investors at Borrego MSO and Borrego IPA would profit at the expense of Borrego Health.

56.     On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.

/ / /

/ / /

/ / /

/ / /

7329719.4

B.   **The Scheme to Contract with Premier Allowing Premier to Get Paid Tens of Millions of Dollars to Purportedly Provide "Management Services" It Was Not Capable of Providing (the "Premier Scheme")**

i.   <u>**The Contract Dental Program Is Formed**</u>

57.   Borrego Health began a contract dental program in 2014.  In general, the Medi-Cal program recognizes the value of a FQHC expanding the availability of its services, so it allows FQHCs to enter into contracts with private practice healthcare professionals to provide services to the FQHC's members.

58.   In general, "contract dental" describes the arrangement where Borrego Health expanded its service area by entering into contracts with individual dentists and/or their practices.  Under those contracts, the contracted dentists agreed to provide certain dental services to eligible patients of Borrego Health.  Those services would then be billed to Medi-Cal by Borrego Health.  Borrego Health, in turn, pays the dentist a fee for the dental services rendered.

59.   Importantly, the fees that Borrego Health paid to the dentists were far greater than what the dentists would have been paid if they had billed Medi-Cal for the services directly.  Therefore, the dentists were motivated to contract with Borrego Health.  As a result, some dentists were taking their existing patients and converting them to "Borrego Health patients."

60.   The contract dental program expanded so quickly because Medi-Cal paid Borrego Health based a fixed rate for each service that Borrego Health (or its contracted dentists) provided.  The billing is known as "encounter" billing, and each "encounter" or visit Borrego Health (or its contracted dentists) has with a patient is reimbursed the fixed fee amount based on Borrego Health's historic costs.

61.   If the dentists were not contracted with Borrego Health and provided dental services to a Medi-Cal beneficiary, then the dentist would be paid under the Medi-Cal fee schedule, a per service billing method, that is described by many dentists as very low.

62.     The fixed fee, encounter-based payment was high relative to the costs of providing dental services.  This allowed Borrego Health to pay the contracted dentists more than what Medi-Cal would have paid to the dentist directly under the Medi-Cal fee schedule, and still retain a handsome profit.

63.     In each instance Borrego Health was billing Medi-Cal for the services that the contract dentist billed Borrego Health.

64.     Borrego initially managed the contract dental program on its own.

65.     By fall 2015, Borrego Health's contract dental program comprised approximately 20 to 25 percent of Borrego Health's total revenue.

### ii.     Hebets Proposes an MSO Idea, Which Is Rejected by Borrego Health

66.     Sometime in 2015, Bruce Hebets, possibly due to his experience with Borrego MSO and Borrego IPA, identified a significant business opportunity for an outside organization to provide management services for dental programs in FQHCs. Specifically, he proposed the idea of Borrego Health contracting with a MSO to provide management services for its contract dental program.

67.     Bruce Hebets originally proposed that he would own 100 percent of the MSO, then sell 90-95 percent of it to Daryl Priest and/or others.  This would have resulted in a large, direct payment by Daryl Priest and/or others to Bruce Hebets, and then ongoing payments by Borrego Health to Bruce Hebets through the MSO due to Bruce Hebets' retained ownership of 5-10 percent.

68.     During an Executive/Finance Committee meeting on August 27, 2015, Bruce Hebets discussed his proposal to form an MSO that would contract with Borrego Health to provide management services for the contract dental program. Borrego Insiders Harry Ilsley, Dennis Nourse, and Mike Hickok were present at this meeting, along with Mikia Wallis and Diana Thompson.  These Borrego Insiders supported the proposal.  However, Mikia Wallis identified the risk of Bruce Hebets staring a competing company.

69.     On September 22, 2015, in an email to Mikia Wallis, outside counsel for Borrego Health warned that any potential MSO arrangement involving Bruce Hebets implicated conflict-of-interest laws, would have to be an arms-length transaction and that any compensation paid to Bruce Hebets under the deal must be at the fair market value.  As detailed below, this advice was later ignored.

70.     The discussion of the MSO proposal carried over into the next meeting of the Executive/Finance Committee meeting that took place on September 24, 2015. The minutes from the meeting clearly document the attempt by Bruce Hebets, Mikia Wallis and Diana Thompson to convince the Executive/Finance Committee that Bruce Hebets' proposal was a good idea despite the conflict of interest issue being identified.

71.     For example, the Executive/Finance Committee members were told how no other company could provide this type of novel management services to FQHCs specific to their contract dental program needs.  The Executive/Finance Committee also discussed how Borrego Health could be a part-owner of the MSO.  Ultimately, the discussion was tabled for presentation to the entire Board at its October meeting, pending an analysis by outside counsel regarding Bruce Hebets' clear conflict of interest issue.

72.     On October 21, 2015, Bruce Hebets arranged a phone call with Diana Thompson, Mikia Wallis, and Dennis Nourse. Upon information and belief, the nature of this call was to further discuss the proposed MSO.

73.     Ultimately, on or about October 29, 2015, the full Borrego Health Board rejected Bruce Hebets' proposal to enter into an arrangement with a MSO in which he held ownership interest as a result of the inherent conflict of interest.[2]  Some Board members who were present at that meeting recall that the Board went as far as rejecting wholesale the idea that Borrego Health use an MSO to manage the contract

---

[2] This experience of the full Board rejecting his proposal likely influences subsequent actions by Bruce Hebets and others to avoid taking issues to the Board again and instead reach deals among Bruce Hebets and the Borrego Insiders.

7329719.4

dental program, regardless of who owned or operated it.  The non-Borrego Insider Board members believed the issue was settled; the MSO would not go forward.  The Borrego Health Board did not approve moving forward with a MSO at all.

74.     Outside counsel for Borrego Health attended the next meeting of the full Borrego Health board.  The Board took no action while they were in the meeting.  On or about December 11, 2015, Mikia Wallis told outside counsel that "the Finance Committee" was reviewing the issue and she would get back to the lawyers.  Mikia Wallis told outside counsel that the issue was put off until the next Board meeting on December 17, 2015.  Outside counsel was prepared to attend that meeting.  However, on December 16, 2015, Mikia Wallis called one of the outside lawyers and said something to the effect of "it appears we will not need you after all."

75.     On December 26, 2015, one of the outside counsel lawyers sent an email to Mikia Wallis asking if she needed anything more on the MSO issue.  Mikia Wallis falsely said that the Borrego Health decided not to move forward with the MSO plan. In fact, the MSO plan was going forward, albeit in a modified form.

### iii.     The Borrego Health Insiders Enter into a Management Services Agreement on Borrego Health's Behalf Anyway

76.     Notwithstanding the full Board's rejection of the very idea of an MSO and unbeknownst to Borrego Health, on March 1, 2016, Bruce Hebets and Premier executed a Management Services Agreement for Borrego Health's contract dental program ("Dental MSA").  None of the Borrego Insiders ever brought the Dental MSA to Borrego Health's full Board for consideration or approval.  Instead, the Borrego Insiders negotiated the terms of the arrangement with Premier and Mikia Wallis drafted the Dental MSA.  The Borrego Insiders then proceeded to enter into the agreement on Borrego Health's behalf, without any notice whatsoever to the full Board (whom they knew had already rejected the proposal).  Of note, the Articles of Organization for DRP Holdings were created the same week Bruce proposed having the Premier Parties handle the MSO in 2015.

77.     The existence of the Dental MSA was kept concealed by the Borrego Insiders.  In 2016, the person in charge of the contract dental program was Cynthia Preciado.  Cynthia Preciado was in charge of developing a team to manually scrub dental claims.  When the program became too large for her staff, Cynthia Preciado began developing a relationship with a vendor that would charge a total of $500,000 to develop and implement a process for scrubbing and submitting contract dental claims.

78.     Cynthia Preciado had this plan in motion and had even traveled to Utah to meet with the vendor to develop the process.  Then, in February 2016, she got a call from Bruce Hebets who told her that, effective immediately, she was no longer in charge of the contract dental program.  She drove to the office to speak with Bruce Hebets and Diana Thompson, but both refused to discuss the matter with her.  Only later was Cynthia Preciado informed of the arrangement with Daryl Priest.  She was instructed to hand everything over to Daryl Priest's son, Nick Priest, who was running Premier.

79.     What followed was essentially a "hostile takeover" of contract dental, spearheaded by Travis Lyon.  Cynthia Preciado was not included in any conversations, but was told to hand over all relevant documents.  Cynthia Preciado's access to the ShareDrive (the system which allowed her and her team to review claims) was terminated. All of Cynthia Preciado's team was fired.

80.      Even before the execution of the Dental MSA on March 1, 2016, there were ongoing discussions between the Board Insiders, Bruce Hebets, and the Premier Parties in order to ensure the Dental MSA moved forward. Indeed, Cynthia Preciado documented her concerns in emails. On February 11, 2016 (weeks before the Dental MSA was signed) Cynthia Preciado e-mailed Bruce Hebets expressing her concerns. She stated:

> "…there has been comments made that Daryl [Priest] and Travis [Lyon] are highly integrated with upper management and the Board of Directors interpreted as a measure of intimidation. There is a tone of 'better than you.'"

7329719.4

81.    Cynthia Preciado expressed her concerns later on to both Bruce Hebets and the other Borrego Insiders, but her concerns were promptly disregarded and concealed by the Borrego Insiders whenever such concerns were raised.

82.    Just as they kept Cynthia Preciado in the dark, Bruce Hebets and the Borrego Insiders never informed the entire Borrego Health Board of the Dental MSA, meaning that the Premier Parties were highly integrated with the Borrego Insiders long before the Dental MSA was even signed.

83.    Pursuant to the terms of the Dental MSA, Borrego Health was to pay Premier $5 per participating patient visit to any contract dentist for the first 8,000 visits, then $25 per participating patient visit thereafter.  In return, Premier agreed to provide the services to Borrego Health, including without limitation provider contracting (marketing and negotiating) and relations, claims management and processing (including "scrubbing" the contract dental claims for documentation errors or inconsistencies and ensuring claims are in such a format as Borrego Health may bill and submit to DHCS), management information system, quality management, patient management, reporting, and other general administrative services.

84.    The Dental MSA underwent two amendments – Amendment 1 and Amendment 2.  The Premier Parties were able to manipulate and control Borrego Health to such a degree that there were able to take what was an already unreasonable, one-sided agreement and amend it to make it even more unreasonable and one-sided, without offering anything in return.  The first Amendment was effective on or about December 22, 2016 ("Amendment 1") and the second on or about July 1, 2017 ("Amendment 2").

85.    Amendment 1 of the Dental MSA was signed again by Bruce Hebets and Daryl Priest.  Amendment 1 amended the term of the Dental MSA to extend for the five year period beginning January 1, 2017, subject to an automatic renewal of five years.  Amendment 1 also removed provision 3.B. from the Dental MSA which permitted Borrego Health to terminate the Dental MSA without cause.  Amendment 1

1  was completely one-sided to the benefit of Premier, and Borrego Health received no

2  additional consideration.  The Borrego Insiders negotiated the terms of Amendment 1

3  to the Dental MSA, Mikia Wallis drafted it, and the Borrego Insiders entered into

4  Amendment 1 to the Dental MSA on Borrego Health's behalf, without any notice

5  whatsoever to the full Board.

6      86.    Amendment 2 of the Dental MSA was signed by Mikia Wallis as

7  "Executive Vice President" of Borrego and Daryl Priest.  Amendment 2 to the Dental

8  MSA changed the compensation provisions of the original Dental MSA.  As a result,

9  Amendment 2 obligated Borrego Health to pay Premier $25 per visit, starting at the

10  first visit rather than the previous term of $5 per visit for the first 8,000 visits.

11  Amendment 2 did not obligate Premier to perform any additional services in exchange

12  for increasing their payment fivefold.  In essence, Amendment 2 conferred a benefit

13  (worth $160,000) to Premier without any corresponding consideration to Borrego

14  Health.  Again, Amendment 2 was completely one-sided to the benefit of Premier, and

15  Borrego Health received no additional consideration.  The lack of consideration and

16  other reasons makes Amendment 2 unenforceable, and the Premier Parties must return

17  the overpaid funds.  The Borrego Insiders negotiated the terms of Amendment 2 to the

18  Dental IPA, Mikia Wallis drafted it, and the Borrego Insiders entered into Amendment

19  2 to the Dental IPA on Borrego Health's behalf, without any notice whatsoever to the

20  full Board.

21      87.    The Dental MSA and Amendments should have been provided to the

22  Board for review and approval, but that was avoided by the Borrego Insiders.

23      88.    On September 8, 2017, Bruce Hebets and Daryl Priest entered into

24  another Management Services Agreement – this time for Borrego's Contract Medical

25  Program ("Medical MSA").  Another of Daryl Priest's companies, Summit Healthcare

26  Management, Inc. (which has subsequently been merged into Premier), agreed to

27  provide services similar to Premier's obligations under the Dental MSA. The terms of

28  the Medical MSA required Borrego Health to pay $25 per patient visit to Summit in

exchange for the management services provided.  The Borrego Insiders negotiated the terms of the arrangement with Premier, Mikia Wallis drafted the agreement and the Borrego Insiders entered into the agreement on Borrego Health's behalf, without any notice whatsoever to the full Board.

89.     As part of both the Dental MSA and Medical MSA, Premier and Summit, through Daryl Priest, represented that they had the skill and experience necessary to fulfill their obligations under the Dental MSA and Medical MSA.  Specifically, among other things, they represented they had skilled clinical providers to review and evaluate the claims.

90.     As part of the Dental MSA and corresponding Amendments, Premier Parties represented to Borrego Health that it was qualified and competent to provide necessary administrative and management services for a FQHC.  The Premier Parties further represented they would comply with all guidelines, laws and regulations governing transactions and security of electronic health records and other patient information.  The Premier Parties further represented they would both maintain and allow auditing of all bills generated which related to dental services provided under any agreement between Borrego Health and a contract dental provider.

91.     Exhibit "A" to the Dental MSA further outlines that Premier Parties represented that they would market and negotiate new contract dental agreements for the benefit of Borrego Health, provide ongoing education and training to contract dental service providers and their staff, and address contract dental service provider eligibility and claims inquiries.  The Premier Parties represented, among other things: (1) that they would obtain information from the contract dental providers to insure Borrego Health had all information that was required in order to properly and correctly bill Medi-Cal for such claims, (2) that they would monitor the claims, bills and payments to dentists to the benefit of Borrego Health to ensure compliance with all applicable statutes, regulations and laws, (3) that they would provide ongoing education to contracted dental providers to ensure compliance with Borrego Health

policies and procedures, (4) regarding patient eligibility, that they would actively track whether or not the services rendered were eligible for reimbursement for each participating patient, and (5) that they would, for the benefit of Borrego Health, perform both short and long-term financial and strategic planning, and manage Borrego Health's relationship with applicable regulatory agencies.

92.     As part of the Medical MSA, the Premier Parties represented they would comply with all guidelines, laws and regulations governing transactions and security of electronic health records and patient information.  Premier Parties further represented that they would provide any and all necessary staff, information systems, and support services needed to perform the services outlined in the Medical MSA. The Premier Parties represented, among other things: (1) that they would provide ongoing education to contracted providers to ensure compliance with Borrego Health policies and procedures, (2) that they would obtain information from contracted providers necessary for Borrego Health to properly bill for such claims, (3) that they would monitor claims, billing and payment for contracted providers to ensure Borrego Health's billing practices were compliance with applicable law, (4) as part of monitoring claims, that they would validate the eligibility and completeness of the claims submitted, and (5) that they would assist Borrego Health in verifying the credentials of healthcare providers requesting to partner with Borrego Health.

93.     The Premier Parties did not perform the obligations set forth in the Dental MSA and Medical MSA.  Rather, once the Dental MSA and Amendments were executed, the Premier Parties trained dentists how to maximize their revenue at the expense of Borrego Health, which also increased Premier's revenue because Premier received $25 per claim.  The Premier Parties represented that they were reviewing and scrubbing dental claims for accuracy, however, as outlined herein, thousands of unsubstantiated, duplicate and/or fraudulent claims were paid to dentists.  For each of these claims, Premier wrongfully received payment.  Further details of Premier Parties' conduct and breaches are alleged below.

94.     Bruce Hebets and the Borrego Insiders knew that $25 per claim was an unreasonably high price.  Before the Dental MSA was signed, Cynthia Preciado told them that $5 per claim would be reasonable.

95.     At the time the Premier Parties made these representations, they knew they lacked the knowledge, experience and skill to do these things, and that they would not be able to fulfill these promises.  Accordingly, the Premier Parties did not intend to perform these promises.

96.     At the time the Premier Parties made these representations, they knew these representations were false or had no reasonable grounds for believing the representations to be true.

97.     Payment to the dentists was typically initiated within 24 hours of receiving a bill from the dentists, and well before any payment had been made by Medi-Cal.  Further, the payments from Borrego Health to the dentists were not recouped by Premier if Medi-Cal never paid Borrego Health.  The Borrego Insiders Concealed the Premier Scheme from Borrego Health

98.     The Borrego Insiders concealed the Dental MSA, along with Amendment 1 and Amendment 2 thereto, and the Medical MSA from the full Borrego Health Board.  In fact, in August 2017, when the Borrego Insiders met to discuss expanding Borrego Health's relationship with Premier (or another Daryl Priest entity) to manage Borrego Health's nascent contract medical program, the Borrego Insiders (in a recorded conversation) acknowledge that they intentionally kept the 2016 Dental MSA from the full Board and that they intended to do the same with any future arrangement (which turned out to the Medical MSA).

99.     At a meeting of Borrego Insiders on August 31, 2017, Chuck Kimball asked with respect to the contemplated Medical MSA with the Premier Parties, "…can we just do that in the Executive Committee [i.e. Borrego Insiders only], because I can think of a couple of people that are going to object to that."  Indeed, the Board had already rejected prior efforts for a dental MSO.  Because the Borrego Insiders knew

1   that non-Borrego Insiders would object, the Borrego Insiders ultimately chose to

2   conceal it from the rest of Borrego Health.  After Chuck Kimball asked his question,

3   the following discussion took place (emphasis added):

4

5       BRUCE HEBETS: I guess the way I would answer that is, does this Committee
    want me to take this to the Board? Or does it feel comfortable enough without

6   it?

7       MIKE HICKOK: Take what specifically?

8       CHUCK KIMBALL: The idea?

9       BRUCE HEBETS: The idea of working with Daryl on the contract.

10      CHUCK KIMBALL: I think they should be advised about it. I don't know if it's
    a up or down, we do it or don't do it. But I think --

11

12      BRUCE HEBETS: It could be handled however this Committee wants. I can
    take this to the Board as an up-or-down decision, or just an advisement -- by the

13  way, we are doing this.

14      CHUCK KIMBALL: <u>I'm wondering if we can get away with doing -- literally,
    get away with not explaining the details</u>, but saying we are now moving forward

15  on adding Contract Medical to the Contract Dental load that we have, and it
    should be a great deal and all that sort of thing. If you don't have to go into

16  details, and nobody says, "Well, who's going to run it?"

17      BRUCE HEBETS: That's fine.

18      CHUCK KIMBALL: Then, are we in trouble there with (indiscernible) at all?

19  An idea?

20      MIKIA WALLIS: No. I believe that's already part of the strategic plan, so I
    don't know if that report even needs approval. But just as a, you know,

21  operational FYI.

22

23      CHUCK KIMBALL: An operational FYI is probably -- then I think there
    wouldn't be any problem presenting it. I think, in my mind, but Dennis and

24  Mike?

25      MIKE HICKOK: <u>I don't think the Board approved Daryl in the first place</u>.

26      CHUCK KIMBALL: I think you're right.

27      MIKE HICKOK: I don't recall ever being asked.  I mean, we discussed it.

28

Case No. 21-cv-01417-BEN-KSC

BORREGO COMMUNITY HEALTH FOUNDATION'S FOURTH AMENDED COMPLAINT

7329719.4

CHUCK KIMBALL: I think that was a slam dunk thing. It just happened, didn't it?

DENNIS NOURSE: I think what was discussed was, was it going to be your participation.

[OVERLAPPING SPEAKERS]

DENNIS NOURSE: It might come as a surprise to some to know that Daryl is out there doing this. That was never a part of the vote. And neither should be Contract Medical.

BRUCE HEBETS: The opportunity I put together -- trust me, I really wish that I had a piece of it, or that I received some kind of commission on it.

MIKE HICKOK: Don't we all.

BRUCE HEBETS: Because this is going to be off the (indiscernible) -- is still the only MSO that exists in the country doing this.

DENNIS NOURSE: Can we make that a conditional approval by the --

[OVERLAPPING SPEAKERS]

CHUCK KIMBALL: I was thinking, we are going to retire, like you and I. We could retire and draw a little salary.

MIKIA WALLIS: None of this goes in the minutes.

[OVERLAPPING SPEAKERS]

BRUCE HEBETS: If you were to analyze (indiscernible), he's at like $14- or $15 million a year revenue.

HARRY ILSLEY: Chuck?

CHUCK KIMBALL: Yeah?

HARRY ILSLEY: As I remember, and Bruce, you can correct me if I'm wrong, but when we first talked about, regarding Daryl, we got approval through the Executive Committee only. We did not take that to the Board.

CHUCK KIMBALL: I believe you're right.

HARRY ILSLEY: That's the same with Contract Dental. That was not approved by the Board. That was approved by the Executive Committee. So, I don't think you need to take this matter to the Board. I think the Executive Committee can approve it and go from there on it.

MIKE HICKOK: And Harry, I agree with you; it wouldn't be an up or down decision to the Board, but how about just advising them that this is going to be another program?

HARRY ILSLEY: And that's what we did before. We just advised them what we had done.

100.   Ultimately, the Borrego Insiders determined that Bruce Hebets would "share with the board [his] thoughts of going into contract medical, and just leave it at that."  And ultimately, the Borrego Insiders only told the full Board that they were expanding into "contract medical."  The Borrego Insiders continued to conceal that there was a third party involved.

101.   At the August 30, 2017 Borrego Health Board meeting, the minutes reflect that "Borrego Health will be pursuing a contract medical program," along with the notation "Information only."

102.   Beyond intentionally omitting information about the Dental MSA and Medical MSA from the full Borrego Health Board, the Borrego Insiders also implemented several internal mechanisms to conceal the Premier Scheme. One example of this is seen through Diana Thompson and Karen Hebets' significant violations of the nepotism policy (see the below "Nepotism and Cronyism Scheme"). Diana Thompson and Karen Hebets hired several family members to place in the billing and accounting department at Borrego Health. These family members did not have any prior experience in the healthcare industry, let alone FQHC experience. Karen Hebets and Diana Thompson then created a training protocol, in which the two "trained" their family members how to review the EOBs and claims submissions for errors and duplications.  As a direct result of Karen Hebets' and Diana Thompson's training, their family members allowed thousands of duplicate claims to be improperly processed.

103.   When non-familial employees requested to receive more broad departmental trainings, Diana Thompson instead ensured that employees were only

BORREGO COMMUNITY HEALTH FOUNDATION'S FOURTH AMENDED COMPLAINT

7329719.4

trained for isolated projects.  This allowed the process of reviewing the fraudulent claims to be insulated and hidden from Borrego Health as a whole.

104.   Further, prior to 2020, Mikia Wallis ensured that the details included in Board and Executive Committee meeting minutes were kept to a minimum.  After these meetings, Mikia Wallis would request her assistant send her the draft minutes so she could redline, edit, amend and delete information. That way, any subsequent requests for minutes would not reveal any details about what was discussed as it related to the alleged Schemes. For example, during the August 31, 2017 Executive Committee meeting, the Borrego Insiders were discussing the ongoing agreement with Daryl Priest and Premier. During the discussion, Mikia Wallis stated: "None of this goes in the minutes."

105.   On January 20, 2017, Travis Lyon told employees in Borrego Health's finance department that any communication regarding the Dental MSA needed to solely be directed to Travis Lyon.  This was to conceal from other Borrego Health employees what total monthly revenue Premier was receiving as a result of the Dental MSA.

106.   Mike Hickok would present monthly financial reports at each Board meeting.  At its highest, the compensation paid to Premier was $20 million in fiscal year 2019.  During fiscal year 2020, Borrego Health paid $18.15 million to Premier. However, despite Premier being Borrego Health's highest paid vendor, Mike Hickok failed to mention the arrangement in his reports.

107.   During the January 31, 2019 Executive Committee meeting, Mike Hickok admitted to Chuck Kimball that the Borrego Insiders had been keeping the full Borrego Health Board "out of the loop" (his words) as it pertained to Borrego Health's growth and the contract dental program.

108.   It was not until the summer of 2020 that Borrego Health Board members other than the Borrego Insiders became aware of the arrangement.

Case No. 21-cv-01417-BEN-KSC
BORREGO COMMUNITY HEALTH FOUNDATION'S FOURTH AMENDED COMPLAINT

109.   By email on or about July 23, 2020, Borrego Insider Mike Hickok admitted, "As long as I have been on the board our dealings with them [Premier] have been secretive mysterious and above all off limits to board members."  Mike Hickok's email went on to report the basic terms of the Dental MSA and Medical MSA (along with the total fees paid to Premier the prior year), demonstrating that he was familiar with the arrangement and its terms.  The email also admitted that, among other things, the Dental MSA and Medical MSA were never approved by the full Borrego Health Board, were never put out for competitive bidding, and were never reported on 990 forms.  Mike Hickok also stated that the arrangement with Premier "was hardly the extent of [Borrego Health's] involvement with the principals of Premier Healthcare" and that "no board member has ever seen the agreement or any other financial documents relating to this entity."  Mike Hickok did not explain why, since he knew about these arrangements, he had never raised them prior to this time.  Mike Hickok acknowledged "I have a fiduciary responsibility…" and that "each and every Board member can potentially be held accountable legally and financially for allowing an improper (and perhaps illegal) relationship to continue."

110.   It is clear that the Borrego Insiders were using contract dental as a source of money to fund their own enrichment. And others were in on this Scheme. When Jim Hebets (who was not employed by Borrego Health) was approached about possible cuts to the above-market, lucrative 162B plans the he sold to Borrego Health (alleged below), Jim Hebets responded on August 1, 2018, "Are you really sure that the board will actually want to cut these benefits given the good news about Contract Dental."

111.   Further, at a September 24, 2020 Finance Committee Meeting, the Dental MSA was discussed. Trustee Keenan Freeman indicated that billing software companies usually charge between $3-6 per claim, and that $25 per claim was outside of fair market value. Diana Thompson reassured Keenan Freeman that when the Dental MSA was entered into, several other vendors quoted 10%-12% of total revenue, which equated to approximately $25 per claim.

### iv.     The Damages Suffered by Borrego Health Due to the Premier Scheme

112.    Following the discovery of the Dental MSA and Medical MSA and the relationship with Premier by the full Borrego Health Board, Borrego Health retained a valuation expert to determine the maximum fair market value of the services Premier provided to Borrego Health, if those services were valuable at all.

113.    The valuation, conducted by BKD, determined that the fair market value of the contract dental services Premier was supposed to perform totaled $19 million over the term of the Dental MSA (at that point).  However, Borrego Health paid over $60 million for those services, meaning the Borrego Health overpaid by at least $40 million.  The fair market value of the contract medical services was $145,000 over the term of the Medical MSA (at that point).  Borrego Health paid over $383,000 for those services, meaning the Borrego Health overpaid by over double, or around $238,000.  Moreover, neither of these valuations take into account the various breaches of contract set forth herein, which would reduce the value of the services.

114.    The Dental MSA provides, in pertinent part, that Premier shall "defend, indemnify and hold Borrego Health free and harmless from any obligations, costs, claims, judgments, attorney's fees, or attachments arising from Premier's negligence in the performance of the services contemplated under this Agreement."  The Medical MSA states that Summit (now Premier) "shall defend, indemnify and hold Borrego Health, its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement."

115.    Borrego Health provided notice of Premier's indemnification obligation, but Premier has not provided any financial support.

116.    Separate and distinct from Premier's contractual duty to indemnify Borrego Health, Premier is also obligated to indemnify Borrego Health under equity principles, if either agreement were not enforceable.  "Equitable indemnity applies in

cases in which one party pays a debt for which another is primarily liable and which in equity and good conscience should have been paid by the latter party." *United Services Auto. Ass'n v. Alaska Ins. Co.* (2001) 94 Cal. App. 4th 638, 644-645 (emphasis added); *see also Prince v. Pacific Gas & Elec. Co.* (2009) 45 Cal. 4th 1151, 1163. As such, even if Premier were not contractually bound to indemnify Borrego Health, it still owes Borrego Health a duty of indemnification. *See Crawford v. Weather Shield Mfg., Inc.* (2008) 44 Cal. 4th 541, 551 ("[C]ontractual promise to 'defend' another against specified claims clearly connotes an obligation of active responsibility, from the outset, for the promisee's defense against such claims. The duty promised is to render, or fund, the service of providing a defense on the promisee's behalf—a duty that necessarily arises as soon as such claims are made against the promisee, and may continue until they have been resolved." [emphasis added]); Civil Code § 2778. As such, Premier is under an obligation to cover the expense of Borrego Health's defense against any claims subject to the Dental MSA and Medical MSA.

117. On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration. As Bruce Hebets stated at an August 31, 2017 meeting of the Borrego Insiders, "we've already made Daryl rich, but Daryl has made us richer."

118. In addition, when the fraud related to the contract dental program was uncovered, both the contract dental and in-house dental programs were treated as fraudulent by the Department of Health Care Services and payments were suspended in amount to be proven at trial. Under the payment suspension, Borrego Health has not been paid for the in-house dental services since the suspension was implemented in November 2020.

119. In addition, Borrego Health was also forced to hire an independent monitor pursuant to the terms of the November 2020 partial Medi-Cal suspension. These monitors have cost Borrego Health $2.7 million thus far.

7329719.4

120.   In addition, Borrego Health has also been forced to close both its Riverside and Barstow clinics.

121.   In addition, Borrego Health has also been forced to incur significant legal and consulting fees, in an amount to be proven at trial.

122.   In addition, Borrego Health has also lost a significant numbers of staff, and continues to have difficulty retaining employees.

C.   **Certain Contract Dentists Submitted Fraudulent Bills with the Knowledge and Support of Premier and the Borrego Insiders (the "Fraudulent Dental Billing Scheme")**

123.   Based on both Medi-Cal and Borrego Health's billing and payment structure, some of the dentists were also motivated to provide as many services to Borrego Health patients as possible, in some instances even where the services were not medically unnecessary.  Even more egregious, some dentists split services that could have been done in one encounter to multiple encounters so that they could collect multiple times.  More egregious than that, some dentists provided multiple services during a single encounter, but billed the services as multiple encounters.  Finally, most egregious of all, some dentists billed for services they never provided.

124.   Unbeknownst to Borrego Health, certain contract dentists and dental practices, Premier and the Borrego Insiders schemed to maximize their profits at the expense of the Medi-Cal program and Borrego Health.  Since the dentists were paid on a "per encounter" basis, certain contract dentists, with the knowledge and support of Premier and the Borrego Insiders, among other things (1) provided services were not medically unnecessary, (2) split services that could have been done in one encounter to multiple encounters so that they could collect multiple times, (3) provided multiple services during a single encounter, but billed the services as multiple encounters, and/or (4) billed for services they never provided.  This scheme is detailed below.

125.   As part of the Dental MSA, Premier, through the Premier Parties, were involved in the engagement and outreach of new dental providers for the contract

dental program. Once the Premier Parties found potential contract dental providers, the Premier Parties provided the dentists with a copy of their original Contract Dental Agreement.  The Premier Parties then reviewed the terms and conditions of the agreements with the dentists, including reviewing and explaining the addendums which addressed the billing and payment structure under Medi-Cal.  (*See i.e.* Ex. L, Addendum E.)  The Premier Parties did this for all Dentists with the exception of Velasquez and Thompson.

126.   Under the Dental MSA, Premier was also responsible for training the Dentists on how to properly submit their claims to Premier for payment. Premier employee, Maria Elena Fernandez, and Travis Lyon provided training to the Dentists. The Borrego Insiders were also involved in ensuring Premier Parties trained the contract dental providers in a way to maximize profits from the schemes.  For example, on February 20, 2018, Karen Hebets and Travis Lyon had an afternoon phone call to discuss training protocols.

127.   Under the Dental MSA, Premier was responsible for claims monitoring, which involved review of claims received by contract dental providers to ensure that claims were compliant with federal and state regulation prior to submission to Borrego Health for final submission to Medi-Cal for payment.  Prior to the Program Integrity implementation (discussed below), Borrego Insider Karen Hebets had responsibility for billing audits and identifying billing discrepancies.

128.   Under the Dental MSA, Premier was also responsible for implementing quality management measures to address patient grievances, audit and survey contract dental providers and provide Borrego Health with the findings of such surveys and audits, and provide education and training to contract dental providers who did not meet the requirements under the quality measures implemented.

129.   The Premier Parties completely abdicated their responsibilities under the Dental MSA, because effective performance would have undermined the scheme to facilitate contract dentists overbilling Borrego Health for services.  The Premier

Parties understood that the more claims that were submitted benefitted the Premier Parties, because Premier was compensated by Borrego Health based on the volume of claims.

130.   While it is true that the Premier Parties were derelict in their duties, their conduct went much further.  The Premier Parties actively supported the fraud described below.  On information and belief, the Premier Parties coached dentists on how to fraudulently bill Borrego Health, including coaching them on "claim splitting" and fraudulently billing for non-covered bridges.

131.   Dentists were paid on a per-encounter basis, so in the event that a dentist performed multiple procedures in one encounter, they were still paid for one encounter.  The Premier Parties coached dentists to split these claims, *i.e.*, bill one encounter on the day it occurred and the next day, so that the dentist could get paid for both.  This is a fraud on Borrego Health and on the government.  It is clear from the following paragraphs that the dentists took this practice to the extreme, sometimes billing for dozens of patient visits for one patient in a single month.

132.   Another way the Dentists, supported by the Premier Parties and Borrego Insiders, submitted false and fraudulent bills was through improper billing for bridges.  Dental bridges literally bridge a gap for a missing tooth.  A connected bridge covers both sides of the teeth next to the missing tooth to hold a false tooth in the missing spot.  A bridge is generally not covered by Medi-Cal.  To avoid this non-coverage, on information and belief, the Premier Parties coached dentists to bill for three crowns – one for missing tooth and one for each tooth beside it – instead of billing for a bridge, and to bill three separate encounters.  In this way, rather than billing for one non-covered service (and one visit), the dentist falsely documented three covered services and fraudulently billed for all three.

133.   Premier routinely approved of services that could not have possibly occurred.  Dentists were required to upload a progress note and an x-ray for Borrego Health to pay the dentists for certain claims.  Borrego Health has also identified

dozens of examples in which x-rays clearly demonstrate that the claimed service could not have occurred (e.g., because the x-ray submitted to Premier shows that the tooth supposedly receiving the service is no longer in the mouth of the patient), yet employees from Premier still signed their names to approve the services.

134.   After the Premier Parties received the claims from the Dentists, they would e-mail the bills to Diana Thompson, Karen Hebets, Julian Thompson, and other family members Borrego Insiders hired to Borrego Health's finance department. Premier would electronically submit the Dentists' claims to Borrego Health then e-mail its invoices for the claims it processed.  This occurred on a monthly basis.  For example, on December 10, 2019, Travis Lyon e-mailed Diana Thompson with Premier's November 2019 invoice.  The invoice included a total of 79,217 claims.  Of those claims, one dentist billed 2,190 claims, which was nearly ten times higher than the average claims billed by other contract dental providers that month.  To put this further into perspective, that dentist would have needed to see over 115 patients every business day that month to reach that total.  During that same month, another dentist billed for 1,195 claims, over five times the average claims billed by other contract dental providers that month.  The Premier Parties did not flag these billing practices as suspicious to Borrego Health.  Rather, Premier Parties pushed these claims forward, represented it reviewed the claims to confirm they were legitimate and had the required supporting documentation, and demanded $25 per claim they allegedly reviewed.  And despite these clear outliers, once the invoices were sent to Diana Thompson, she did not take any action to bring attention to these discrepancies, instead pushing them through Borrego Health's finance department for her step-son Julian Thompson to process Premier's payment.  Julian Thompson then mailed Premier a check for $1,980,425.00.  Additionally, the greater the number of claims, the more staff Borrego Health's finance department would need to keep the scheme concealed, allowing Diana Thompson more opportunities to hire more of her family for positions in which they lacked the qualifications.

Case No. 21-cv-01417-BEN-KSC

BORREGO COMMUNITY HEALTH FOUNDATION'S FOURTH AMENDED COMPLAINT

7329719.4

135.   In another example, on January 20, 2020, Travis Lyon e-mailed Diana Thompson with Premier's invoice for the December 2019 claims, which totaled 58,437 contract dental claims.  In the December 2019 invoice, a single office run by one of the dentists submitted 1,680 claims alone, over ten times the average number of claims of the other dental providers.  That same month, another dentist, billed 1,062 claims during that one month for one of his offices, over six times the average number of claims submitted by the other contract dental providers.  The Premier Parties did not flag these billing practices as suspicious to Borrego Health. Rather, the Premier Parties pushed these claims forward, represented it reviewed the claims to confirm they were legitimate and had the required supporting documentation, and demanded $25 per claim they allegedly reviewed.  And despite these clear outliers, once the invoices were sent to Diana Thompson, she did not take any action to bring attention to these discrepancies, instead pushing them through Borrego Health's finance department for her step-son to process Premier's payment and mail Premier a check for $1,460,925.00.  Additionally, the greater the number of claims, the more staff Borrego Health's finance department would need to keep the scheme concealed, allowing Diana Thompson more opportunities to hire more of her family for positions in which they lacked the qualifications.

136.   In another example, on March 16, 2020, Travis Lyon e-mailed Diana Thompson with Premier's invoice for the February 2020 claims, which totaled 67,928 contract dental claims. In the February 2020 invoice, a single office run by one dentist submitted 2,042 claims alone, over ten times the average number of claims of the other dental providers.  Another dentist billed 1,072 claims during that one month for one of his offices, over five times the average number of claims submitted by the other contract dental providers.  Another dentist billed 1,291 claims during that one month for one of his offices, over six times the average number of claims submitted by the other contract dental providers.  The Premier Parties did not flag these billing practices as suspicious to Borrego Health.  Rather, Premier pushed these claims forward,

BORREGO COMMUNITY HEALTH FOUNDATION'S FOURTH AMENDED COMPLAINT

1    represented it reviewed the claims to confirm they were legitimate and had the

2    required supporting documentation, and demanded $25 per claim they allegedly

3    reviewed.  And despite these clear outliers, once the invoices were sent to Diana

4    Thompson, she did not take any action to bring attention to these discrepancies,

5    instead pushing them through Borrego Health's finance department for her step-son to

6    process Premier's payment and mail Premier a check for $1,698,200.00. Additionally,

7    the greater the number of claims, the more staff Borrego Health's finance department

8    would need to keep the scheme concealed, allowing Diana Thompson more

9    opportunities to hire more of her family for positions in which they lacked the

10   qualifications.

11          D.    **Since Premier Was Unable and Unwilling To, a Program Integrity**

12                **Process is Implemented by Borrego Health**

13          137.   Despite its promises to do so, its representations that it could do so, and

14   its concealment of the fact that it could not do so, Premier completely lacked the

15   ability to appropriately conduct claims monitoring.

16          138.   In fact, it was not until 2019 that Premier hired its first and only

17   employee with any clinical experience whatsoever.  At that point, Premier hired a

18   2016 dental graduate, Nicholas Tapp, D.D.S.  Unsurprisingly, Nicholas Tapp was

19   related to other employees at Premier.  Nicholas Tapp did not even receive his dental

20   license until October 2017.  Indeed, staff from Borrego Health were largely

21   responsible for training Nicholas Tapp due his lack of knowledge and experience.

22          139.   Even after hiring Nicholas Tapp, Premier continuously failed to properly

23   review the contract dental claims.  For example, and without limitation, Premier

24   approved claims (and caused Borrego Health to pay for claims (1) where no

25   supporting documentation was provided, (2) for services performed on teeth which—

26   based on x-rays submitted with the claims—were no longer in the patients' mouth, (3)

27   which were duplicate (i.e. same claims, submitted multiple times), and (4) that were

28   facially and obviously not legitimate.

140.   For example, in February 2020, one dentist billed 18 different encounters for a single patient, despite the fact that there were only 19 business days in February 2020, meaning the bills showed this patient came in for dental services all but one business day in February 2020.  Premier did not flag these bills and took no steps to counsel or discipline this dentist.  Between June 2020 and July 2020, one dentist billed 30 different encounters for a single patient, meaning the bills showed this patient came in for dental services every other day during that time period.  Premier did not flag these bills and took no steps to counsel or discipline this dentist.

141.   As a result, Borrego Health was forced to hire its own employees and develop a Program Integrity program to review and audit contract dental claims and providers, tasks which Premier Parties were supposed to perform under the Dental MSA.

142.   In May 2017, Borrego Health hired Timothy Martinez, D.D.S. to be its Chief Dental Officer.  In this role, Dr. Timothy Martinez was tasked with developing a "Program Integrity" team for Borrego Health's contract dental program and providing practice management oversight for its in-house dental programs.  To assist in these efforts, Borrego Health and Dr. Martinez hired Nithya Venugopal, DDS, in January 2018 as Borrego Health's Dental Director of Program Integrity.

143.   Among other things, Dr. Timothy Martinez and Dr. Nithya Venugopal were tasked to create a system that would identify patterns on the "back-end" of claims submission (*i.e.* after the claims had been submitted).  Specifically, Dr. Timothy Martinez and Dr. Nithya Venugopal were supposed to identify:  (1) utilization of non-covered services; (2) overutilization of services; (3) incomplete, substandard, unnecessary treatment rendered by providers; and (4) billing discrepancies. The team also sought to develop and implement necessary steps to correct and prevent such issues.

144.   On May 5, 2017, the Program Integrity team set up initial evidence-based key references and questions for the new program integrity unit.  The key references

and questions were based on the National Medicaid Guidelines the Deputy Inspector General for Evaluation and Inspections May 15, 2015 report authored by Suzanne Murrin, titled: "QUESTIONABLE BILLING FOR MEDICAID PEDIATRIC DENTAL SERVICES IN CALIFORNIA."  The Murrin report reviewed claims submitted by dentists in California to DHCS and found that approximately 8% of the dental providers were billing outliers in terms of CDT codes billed, and of those identified outliers, only approximately 1.8% (or six out of 329 dentists) were disciplined by the California Dental Board for failing to meet quality of care standards.  Dr. Timothy Martinez used the Murrin report and its findings, as well as guidance from the 2017 National Medicaid and CHIP Oral Health Symposium (as organized by the Medicaid, Medicare, CHIP Services Dental Association), for reference when developing Borrego Health's internal compliance metrics.  Critically, at the time, there was no other guidance, data or reports setting out proper or improper billing and documentation protocols in the state for FQHCs contracting with private dental offices.

145.   The Program Integrity efforts began with a utilization review system which developed an algorithm for analyzing and sorting out outliers, particularly by focusing on high-billing providers among the contract dentists.  As the Program Integrity team's utilization review and claims data analytics capabilities became more robust and sophisticated, the team was soon able to also review for over-utilization of high-cost codes/services (dental providers with a standard deviation of one or more from the mean as far as individual high-cost codes, such as crowns and surgical extractions), percentage of preventive services and under-utilization of preventive services, as well as billing discrepancies, and lack of medical necessity.  Over time, the Program Integrity team also developed a mechanism to view visit count and examine excessive visits.

146.   Additionally, around mid-2019, the Program Integrity team built in certain parameters, referred to as the "enhanced review" parameters, to identify

problematic claims during the claims monitoring process, in large part after recognition that Premier was not properly vetting claims during the claims monitoring process, despite Premier's contractual obligation to do so.

147.   Once the utilization review analysis was conducted, the Program Integrity team would conduct site visits and chart reviews to directly assess compliance and suspected fraud, waste, and/or abuse among any dental practices and providers identified as outliers within the contract dental network (meaning providers who were one or more above the standard deviation in the different categories being reviewed).

148.   Specifically, Dr. Nithya Venugopal would receive a report and conduct a closer examination of any outlier practices or providers.  Then, Dr. Nithya Venugopal would work with Borrego Health's utilization management analyst to pull around ten to 15 charts from patients based on excessive patients visits and/or CDT code criteria under question for these providers.

149.   Next, a member of the Program Integrity team would collect information from the patient records regarding visits and services during an actual on-site visit, including supportive documentation such as radiographs, charts, and schedules.  The peer review process was designed to be objective through the use of a template peer review worksheet examining specific criteria.

150.   Based on the results of these findings, the Program Integrity team members would conduct comprehensive records review and assess compliance with Program Integrity rubric, consistent with the Medi-Cal Dental Provider Handbook.

151.   Following the chart reviews and site audits, the Program Integrity team would develop provider report cards and issue a "corrective action plan" to any provider whose practice was identified as deficient across certain criteria.  These plans would detail exactly what deficiencies were identified and how a provider was required to correct and improve his or her practice.  The Program Integrity team aimed to conduct re-audits of providers who had been issued a corrective action plan within 90 days to confirm whether or not the provider had corrected identified deficiencies by

again obtaining records from the provider and assessing compliance under the same rubric.

152.   Any follow-up action by the team depended on the results of these peer review and compliance audits.  For example, if the score improved, then the provider would be audited on an annual basis thereafter.

153.   Alternatively, if the score worsened, Dr. Timothy Martinez or Dr. Nithya Venugopal would escalate the matter to Borrego Health's Chief Compliance Officer, Gabriela Alvarado, and Mikia Wallis for determination of further action, up to and including termination of Borrego Health's agreement with the dentist.

154.   Additionally, where the Program Integrity team found evidence suggesting potential provider fraud, waste, and/or abuse, Dr. Timothy Martinez would meet with Gabriela Alvarado to discuss possible recoupment and recovery of funds, notification to DHCS and other state authorities, and submission of a claims inquiry form to DHCS to request an adjustment for either an underpayment or overpayment of claims.

155.   The Program Integrity team, once it came online and established processes after Dr. Timothy Martinez's arrival in 2017, reviewed back-end claims and identified outliers and other billing discrepancies.

E.   **Premier and the Borrego Insiders Coverup Fraudulent Billing (the "Coverup Scheme")**

156.   The Borrego Insiders and the Premier Parties were aware of the conduct and had received complaints and information, but did nothing to stop the practice. Instead, the Premier Parties worked with Borrego Insiders, including without limitation Mikia Wallis, Diana Thompson, and Karen Hebets to stop further inquiries and protect the dentists from both detection and/or consequences.  As stated herein, the Premier Parties were incentivized to allow providers to bill as many claims as possible, since Premier was paid on a per claim basis.  The Premier Parties were further incentivized to cover up for fraudulently billing dentists (including—and

7329719.4

especially—the most egregious dentists), since those were the dentists that submitted the highest number of claims and directly increased the amount that Premier was paid.

157.   The Borrego Insiders were incentivized to cover up for the fraudulently billing dentist since those billings allowed the other Schemes discussed herein to take place and/or resulted in kickback payments to the Borrego Insiders. For example, as an alleged above, Diana Thompson and Karen Hebets hired several family members to place in the billing and accounting department at Borrego Health. These family members were trained to ignore errors and duplications in the claims submitted by the Dentists through the Premier Parties.

158.   The Premier Parties and the Borrego Insiders used a number of different methods to cover up for fraudulently billing dentists, including without limitation the Dentists, as outlined below, including without limitation interference with audits, failing and refusing to reverse false/fraudulent claims, refusal to take action, general avoidance and unavailability and undue pressure.

159.   The Premier Parties, supported by the Borrego Insiders, would not permit Program Integrity audits to be random.  It required Program Integrity to provide advance notice to dentists, so that the dentists could be more prepared and take steps to avoid detection of problems by the Program Integrity team.

160.   While typically the Program Integrity team would book any compliance review appointments with contract dental providers through one of Premier's administrative staff, for reasons unknown to Borrego Health, any appointments with certain contract dentists  (both identified by the Program Integrity team as high-billing providers for certain costly services) were required to be set up by Travis Lyon personally.

161.   Occasionally, the Program Integrity team would identify claims that were falsely or fraudulently billed, and should have been reversed (*i.e.* the dentists should have refunded the money they received from Borrego Health, and Premier should have returned or credited the per visit fee back to Borrego Health).  However, the Premier

1    Parties and Borrego Insiders, including without limitation Karen Hebets and Diana

2    Thompson, would not follow through on claims reversals.

3        162.   On several occasions, based on suspicious or outright fraudulent claims

4    activity, Borrego Health's Program Integrity team would recommend and/or request

5    that a contract dental provider have their provider contract with Borrego Health

6    terminated.  The Premier Parties and Borrego Insiders would regularly support the

7    contract dental providers over Borrego Health and override decisions made by

8    Borrego Health, and would refuse to take action against fraudulently billing providers.

9        163.   On several occasions in 2019, during Program Integrity's

10   communications with contract dentists, Dr. Venugopal and Dr. Koutros were informed

11   by contract dental providers that the Premier Parties told dentists that if they did not

12   bill for specific conditions, regardless of the patients' true health status. Program

13   Integrity was also informed that the Premier Parties were training and/or encouraging

14   contract dental providers to split the claims up in certain manners, asserting that if the

15   contract dental providers did not bill for specific conditions over multiple days, that

16   the contract dental provider would not receive payment from Borrego Health. When

17   Program Integrity brought these concerns to Travis Lyon, he denied the assertions and

18   reassured Program Integrity that re-training would take place to address confusion

19   from the contract dental providers. After this, the Premier Parties became more

20   proactive in taking steps to conceal their schemes, working alongside Borrego Insiders

21   Diana Thompson and Karen Hebets to ensure duplicative claims would continue to be

22   submitted for billing.

23       164.   Both Dr. Timothy Martinez and Dr. Nithya Venugopal reported that,

24   whenever they raised issues about Premier to Mikia Wallis, they would immediately

25   receive a call or email from Travis Lyon or Nick Priest.  Clearly, Mikia Wallis was

26   sharing their internal concerns directly with the Premier Parties.  More often than not,

27   however, neither Premier nor Mikia Wallis actually addressed the underlying issue Dr.

28   Timothy Martinez or Dr. Nithya Venugopal identified with Premier.

165. Mikia Wallis made herself generally unavailable for meetings with the Program Integrity team. At most, Program Integrity staff were only allowed to block 15-minute intervals with her. As stated by Dr. Venugopal, "[Mikia Wallis] knew what we were doing but hated what we were finding."

166. Program Integrity team members repeatedly raised issues about certain high-billing providers who they identified as committing "suspect fraud" to Mikia Wallis and Borrego Health's former Chief Compliance Officer, but usually no action was ever taken against providers, who would remain eligible to continue providing and billing for improper services rendered to Borrego Health's patients.

167. Mikia Wallis would routinely push back or throw up barriers whenever they tried to implement some sort of final audit process for the contract dental providers. There was also an ongoing push-and-pull in terms of adding new contract dental providers to Borrego Health's network between the Program Integrity team and credentialing committee on one side and Premier and Mikia Wallis on the other. There were a number of instances where Travis Lyon, supported by Mikia Wallis, attempted to ram a number of new contract dental providers through Borrego Health's credentialing process, despite Dr. Timothy Martinez's insistence that the providers needed to be thoroughly vetted before approving them.

168. Mikia Wallis defended contract dental providers unreasonably, even after Program Integrity team members informed her of these providers' documented history of problematic billing practices and poor quality. Mikia Wallis herself reported that she encouraged staff to treat contract dental providers as part of Borrego Health's internal workforce and "to the extent that we feel the dentists have high quality of care, we need to defend them."

169. At the June 2017 Credentialing Committee, Dr. Timothy Martinez noted and the minutes reflected that Bruce Hebets, along with Premier's Travis Lyon and Nick Priest, all personally attended the meeting. Usually, credentialing committees

1    are autonomous bodies free from inadvertent pressure of having administration

2    involvement.

3         170.   There are numerous, specific examples of the Premier Parties and

4    Borrego Insiders working to cover up for fraudulently billing dentists.  A few of these

5    examples are outlined below.

6         171.   On April 12, 2017, Dr. Timothy Martinez emailed Travis Lyon to note

7    his concerns with the contract dental program as a result of the HMS/CMS audit

8    findings: "I can start to review with you and your team the three most common pitfalls

9    that Borrego was cited for: EXCESSIVE VISITS, INSUFFICIENT

10   DOCUMENTATION, NOT MEDICALLY NECESSARY.  We can start with

11   catching "EXCESSIVE VISIT" at the time the claim (called a superbill) is scanned by

12   the private dental offices and entered into your data banks."  Thus, the Premier Parties

13   were aware of issues with excessive visit billing, yet did nothing to detect or prevent

14   such billing, despite their contractual obligation to do so.

15        172.   Dr. Venugopal noted that dentists as a rule could not be terminated for

16   Program Integrity issues alone.  To terminate a dentist, Dr. Venugopal and Dr.

17   Martinez would have to also raise a quality or credentialing issue.  Even this, though,

18   was insufficient to terminate certain "untouchable" dentists (all of whom Program

19   Integrity identified as outlier providers).

20        173.   In February 2018, some of the Program Integrity team met with the

21   Premier Parties to review the newly developed contract dental patient forms, which

22   had been created to ensure consistent and accurate documentation across providers.

23   Though these were Borrego Health forms, Travis Lyon nevertheless retained final say

24   on how and when they were communicated to the contract dental providers – if ever.

25        174.   One dentist received "Provider Compliance Reports" on June 14, 2018

26   and September 13, 2018 following a series of audits conducted by the Program

27   Integrity team during which he received scores of zero (the lowest possible score) in

28   the following categories: proper documentation, eligible provider (meaning that the

7329719.4

provider's signature on the claims matches the dental superbill and clinical progress notes as required by the Medi-Cal Dental Provider Hand-book), and medically necessary (meaning that the documentation supports the level of services rendered). To address the clear deficiencies identified in the June 2018 audit, the Program Integrity team also put together a corrective action plan listing out each deficiency in detail and providing actionable steps that dentist was requested to take to correct the issues. That same dentist received the corrective action plan and returned a signed copy acknowledging it to the Program Integrity team but never actually worked on improving. That dentist also failed multiple peer review audits conducted by Program Integrity team members on March 31 and July 25, 2019, and most recently on August 31, 2020. The Premier Parties and the Borrego Insiders, including Mikia Wallis, refused to terminate that dentist.

175. When that dentist was up for re-credentialing, Dr. Timothy Martinez recommended against re-credentialing that dentist but he was overruled by the Premier Parties and Borrego Insiders, including without limitation Travis Lyon and Mikia Wallis. Despite the poor performance, the Premier Parties and Borrego Insiders submitted a "special license" to HRSA to allow that dentist to have a satellite intermittent dental clinic with Borrego Health (in space owned by another Daryl Priest entity that Borrego Health leased). That dentist was not actually terminated until the Board Insiders were no longer involved in the matter.

176. In both July and September 2018, Dr. Timothy Martinez notified Mikia Wallis in her capacity as Borrego Health's Chief Legal Officer about the results of the Program Integrity team's first analytics ran on the contract dentists, including those identified as outliers within the program. Mikia Wallis did not do anything to address the outliers.

177. Mikia Wallis was informed of billing issues with Dr. Tina Cho. For example, Dr. Martinez emailed Mikia Wallis on July 2, 2019 acknowledging "aberrant billing behavior" and attaching a document titled, "tina cho.docx," which included

examples of problematic claims.  However, on October 6, 2020, Mikia Wallis sent a letter to Special Agent Supervisor Craig Eastep which (falsely) stated that Borrego Health had no knowledge of potential billing discrepancies for services provided by Dr. Tina Cho.

178.   On October 12, 2019, a member of the Program Integrity team instructed that Borrego Health will deny claims for issues that he considers to be "black and white issues."  Travis Lyon responded, "Is Koutros and Venugopal aware that Ms. Wallis does not want us to use the Denti-Cal regulations as a reason to deny claims?"

179.   In March 2019, dentist Maura Tuso called Borrego Health's compliance hotline.  She left a message indicating that she wanted to report fraud.  Dr. Timothy Martinez facilitated a telephone conference to respond to Maura Tuso, which took place on March 18, 2019.  Travis Lyon joined Dr. Timothy Martinez on the call.

180.   Maura Tuso alleged that there was fraud occurring, including manipulating charts.  Dr. Timothy Martinez asked Maura Tuso to email any details. When these allegations were reported to Mikia Wallis, Mikia Wallis stated that Maura Tuso had lost her license and was not credible, and to cease any further investigation. Shockingly, despite knowledge that Maura Tuso had lost her license (and, thus, was suspended from Medi-Cal) and using this information in an attempt to discredit her, the Premier Parties and Borrego Insiders did nothing to prevent Maura Tuso from continuing to provide services through other contract dentists (and billing for them) or to remedy prior improper bills where Mauro Tuso provided services.

181.   On January 27, 2020, a member of the Program Integrity team conducted a surprise compliance audit of another one of the contract dentists.  That dentist refused to allow staff to audit the charts and called Travis Lyon to intervene.  This resulted in a meeting with Mikia Wallis, Travis Lyon, and Dr. Timothy Martinez, and a subsequent meeting with Premier's counsel.

182.   Following this meeting, on March 2, 2020, counsel for Premier informed a member of the Program Integrity team over the phone that such surprise audits of the

50

7329719.4

contract dental providers were unlawful and that all audits required written notice to contract dental providers at least five days before any audit.  This is false.

183.   Borrego Health requested and harangued Premier repeatedly to activate a "Prior Authorization" requirement, which required outlier providers and practices to obtain prior authorization from Borrego Health before performing certain high-cost services.  In a meeting on May 21, 2020, the Program Integrity team was told by Travis Lyon that he promised it would be turned on by June 1, 2020.  It was never activated.

184.   In a quality meeting on June 16, 2020, Dr. Venugopal told Travis Lyon that individual dentists were billing bridges as single unit crowns, and directed him to send a communication to providers that this practice must stop.  Travis Lyon refused.

185.   As late as September 2020, when questioned about the accusation from the California Dental Board against one dentist, Mikia Wallis continued to defend him.  She asserted that an external reviewer said that dentist's care was "exquisite" and that he was a "QI [Quality Improvement] success story."  This directly contradicts what Program Integrity and credentialing staff reported to Mikia Wallis regarding the poor quality of care by that dentist.

186.   On October 7, 2020, Dr. Nithya Venugopal presented audit findings regarding that dentist to Mikia Wallis, Dr. Timothy Martinez, Dr. Edgar Bulloch (Borrego Health's former CMO and CEO), and Mark Connelly (Borrego Health's Chief Operations Officer).  The presentation focused on the fact that a dentist had most likely falsely billed for excessive visits, in particular where no face-to-face encounter occurred, and improperly documented or falsified records, and finally often provided services below the standard of care or that lacked medical necessity.  Within the first ten minutes of the presentation, Mikia Wallis walked out.

187.   Borrego Health requested that Premier run a report on 2020 claims and identify any duplicates.  In September 2020, Premier provided a report identifying over 600 claims that were duplicated, meaning they were billed by Premier on behalf

of the dentists multiple times.  Borrego Health was not aware of the duplication at the time it paid the invoices of both the dentists and Premier for the duplicate claims. Despite notice of the duplication the Premier Parties and the Borrego Insiders did not reverse the claims, and the dentists did not repay the claims.  Although this report was only for 2020, Borrego Health is informed and believes that the same issues would exist in years prior to 2020.

188.   As a result, Borrego Health was forced to pay both Premier and several contract dental providers for services which should not have been paid or for services which were never rendered.

189.   On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.

F.   **The Borrego Insiders Entered into Leases with Daryl Priest-Owned Entities for Above Market Rents and Terms Many Times the Market Amount (the "Priest Leases Scheme")**

190.   Borrego Health only owns two of its facilities.  Therefore, Borrego Health must otherwise procure real property for its facilities.  This is accomplished by going to into the marketplace and securing facility leases in Southern California.  The resulting leases should be from an arm's length transaction at market prices, and the leases should be submitted to the Borrego Health Board of Trustees for approval. Borrego Health's facility leases must be: (1) entered into for a lawful purpose; (2) sought competitively, and subjected to a diligent market value analysis; and (3) to the extent reasonably possible, for no more than fair market rent and reasonable duration. The leases must also include reasonable terms under which the FQHC can terminate the lease.

191.   Yet, this scheme, the scheme subject to the above-captioned litigation, involved Borrego Health leasing certain real property from the Premier Parties or entities related to the Premier Parties at rents and terms that were well above market. Borrego Health was victimized by three grossly over-priced, 30-plus-year term facility

leases engineered by the Borrego Insiders and the Premier Parties or entities related to the Premier Parties.  The total combined full-term price of these three leases is over $100 million dollars.  As detailed below, these leases were never subject to due diligence and were executed by the Borrego Insiders, without submitting them to the full Board for analysis, review, and informed consent and approval.  Once in place, the leases were concealed from the full Borrego Health Board.  The reason for hiding them from the full Board is clear:  recent independent appraisals by CBRE show the total combined lease prices are $58 million over fair market rent.

192.   The leases at issue that are above fair market rent, without good cause, and without the fully informed consent of the Board, are *per se* unlawful *ab initio*, because, *inter alia*, they are entered into for an unlawful purpose, namely to defraud Borrego Health for millions of dollars, while at the same time exposing Borrego Health to regulatory sanctions and related adverse financial and tax consequences.

193.   The Priest LLCs, Daryl Priest (who owns the three Priest LLCs), Travis Lyon and the Borrego Insiders worked together to devise a scheme under which Borrego Health was a conduit of federal healthcare funds to pay for the overpriced Priest Leases.  The Priest LLCs, Daryl Priest, Travis Lyons and the Borrego Insiders worked together to make management and operational decisions at Borrego Health to allow the Priest Leases to be entered and to remain in operation undisclosed to Borrego Health's full board.

194.   Daryl Priest is an experienced owner and lessor of commercial properties. Travis Lyon is an experienced commercial real estate development and management executive.  Daryl Priest and Travis Lyon, on behalf of Promenade, DRP, and Inland Valley, must each present their commercial leases to banks providing them with mortgages and other funding related to their leased properties.  Daryl Priest and Travis Lyon, on behalf of Promenade, DRP, and Inland Valley, must perform due diligence regarding their lessees, before entering into a 30+ year lease that will be reviewed by lenders providing millions of dollars of financing to Promenade, DRP, and Inland

Valley.  Daryl Priest and Travis Lyon are therefore presumed to know Borrego
Health's business, including that it is a non-profit health care provider doing business
with federally-funded health programs.  Daryl Priest and Travis Lyon are presumed to
know fair market rent, that the stated rent in the Priest Leases is over fair market rent,
and that the lease terms of 30+ years are far beyond fair market lease terms (especially
in the absence of terms allowing Borrego Health to terminate the lease on reasonable
notice).  Under these facts and circumstances, Daryl Priest and Travis Lyon, on behalf
of Promenade, DRP, and Inland Valley, are charged with knowledge that they were
each entering into an over-fair market rent lease with a non-profit FQHC.

195.   Mikia Wallis and the Borrego Insiders knew or should have known that
the Priest Leases were well above market rents and terms.

196.   Mikia Wallis and the Borrego Insiders knew or should have known that
the Priest Leases would need to be approved by the full Board of Trustees.

197.   With minimum due diligence, the over-fair market rent price and
excessive duration of the Promenade Lease, DRP Lease, and Inland Valley Lease,
combined with the absence of any term allowing Borrego Health to terminate a lease
prior to their respective lease terms, would have been readily apparent.

198.   No rational, informed Board of Trustees for a non-profit FQHC would
have, or could have, lawfully approved the Promenade Lease, DRP Lease, or Inland
Valley Lease for, *inter alia*, the following reasons:

a.   The lease terms are unconscionable, and would result in the
diversion of millions of "over-fair market rent" dollars of federal health program
money to the Priest-owned entities;

b.   The Promenade Lease calls for payment of nearly $40,000 per
month over fair market rent, or more than $15,000,000 over fair market rent over the
33-year life of the lease;

c.     The DRP Lease calls for payment of nearly $39,000 per month over fair market rent, or approximately $14,000,000 over fair market rent over the 30-year life of the lease;

d.     The Inland Valley Lease calls for payment of more than $80,000 per month over fair market rent, or approximately $29,000,000 above fair market rent over the 30-year life of the lease;

e.     Approximately 90% of the revenue received by Borrego Health is paid by government funded health programs (Medi-Cal and Medicare), and therefore if the Priest Leases are enforceable, the vast majority of the over-fair market rent dollars paid could be government health program money;

f.     The over-fair market rent facility lease payments expose Borrego Health to reductions in the allowed reimbursements paid Borrego Health in prior years; and

g.     The close relationship between the Borrego Insiders and Daryl Priest and Travis Lyon (and, by extension, the Priest-owned LLCs) exposes the non-profit FQHC to adverse federal and state tax consequences.  The fact that the rent money would inure to insiders meant Borrego Health could be found to be failing in its obligations to ensure that its assets were being used predominantly for charitable purposes, exposing it to possible revocation of its 501(c)(3) status.

199.   If enforceable, the Priest Leases would have siphoned $58 million in over-fair market rent money from Borrego Health over the life of the leases.  Two of the leases (Inland Valley Lease in Barstow and DRP Lease in San Bernardino) have been terminated.  The Promenade Lease in El Cajon remains in operation with Borrego Health paying twice fair market rent under protest, with permission of the DHCS monitor overseeing Borrego Health's operations since late 2020.  Without judicial intervention on the Promenade Square lease, and without recovery of the $11.8 million in overpaid rent to date, the actions of the Borrego Insiders and a handful of Priest entities will continue to present an immediate threat to disable an

7329719.4

essential provider of primary healthcare services to underserved inland communities in San Diego and Riverside Counties.

200.   The Priest Leases were concealed from the full Borrego Health Board. The Borrego Insiders knew what was contained in regular reports to the full Borrego Health board, and more importantly, what was not.  The Borrego Insiders knew that financial reports presented to the full board did not include or otherwise call out the individual facility rents in a way that might suggest that they were over market or had unreasonably long lease terms.  Financial reports to the full Borrego Health Board include only the aggregate rents paid on all facilities.  The Borrego Insiders knew that Borrego Health's personnel would make monthly rent payments as requested, without questioning the reasonableness of those monthly rent payments.  Thus, unless the Priest Leases themselves were presented to the full Board of Trustees for vetting and approval, there was absolutely no way that Borrego Health would be put on notice of any potential financial or other injury associated with, or caused in whole or in part by over-market leases.

201.   The Borrego Insiders knew that full Board of Borrego Health would review only those contracts presented to them, and that they would never have reason to see the Priest LLC leases unless the Borrego Insiders managing the relationship with Priest LLCs decided to present the leases.  Thus, unless disclosed by the Borrego Insiders, there was no way that Borrego Health would be put on notice of the terms of the three subject leases, or that the Borrego Insiders were working with Daryl Priest, Travis Lyon, and, through them, the three Priest LLCs to make all management and operations decisions pertaining to the over-market leases for Borrego Health, and in a manner contrary to Borrego Health's financial and compliance interests.  The fact of injury from the leases and from the defendants' participation in Borrego Health's facilities procurement and operations and therefore could not be discovered.

202.   The Borrego Insiders' continued concealment of the leases from Borrego Health was a separate breach of fiduciary duty and/or duty of care in furtherance of the

1  scheme to steal money from Borrego Health every time a monthly rent check was

2  mailed to Borrego Health.

3        203.  The Priest Leases Scheme victimized Borrego Health in at least three

4  ways:

5              a.    <u>Exposure to State Suspensions and Federal Disqualification</u>: In

6  California, government funded health program funds flow to FQHCs under the

7  oversight of the California Department of Health Care Services ("DHCS").  DHCS is

8  empowered to suspend all reimbursement for the provision of health care services to

9  Medi-Cal members in accordance with, *inter alia,* Welfare and Institutions Code

10  section 14107.11 and Title 42 of the Code of Federal Regulations section 455.23.

11  Further, HRSA/Bureau of Primary Health Care ("BPHC") monitors FQHCs and can

12  suspend and/or disqualify Borrego Health from the FQHC program, including, *inter*

13  *alia,* an action by HRSA requiring Borrego Health to cease all activities in the program

14  pending corrective action (45 CFR 75.375) and possible suspension under HHS

15  regulations (2 CFR Part 376, 45 CFR 75.2).  DHCS is presently allowing Borrego

16  Health to continue operations under the guidance, oversight, and direction of a DHCS-

17  appointed independent monitor.

18              b.    <u>Reimbursement rate adjustments</u>: The cost of owning, renting,

19  maintaining, and upgrading clinic facilities is a substantial cost center for FQHCs

20  providing primary health care services.  As such, CMS recognizes the fair market

21  value of facility costs reasonably incurred and truthfully reported by FQHCs in

22  determining the reimbursement rates to be paid clinics operated by the FQHC.  Cost

23  reporting in excess of fair market value inflates the FQHC's mandatory cost reports

24  required under title 42 of the United States Code section 1395g, and exposes Borrego

25  Health to an order that it retroactively amend its cost reports, potentially leading to a

26  reduction in reimbursement rates paid by federally funded health programs.

27              c.    <u>Non-profit 501(c)(3) tax status</u>:  Contract payments to disqualified

28  persons in excess of fair market values (or other unlawful diversion of a non-profit

entity's revenue to falsely disguise profits as operating expenses) can result in tax liability and/or loss of non-profit tax exemption status at both the federal and state levels. (*See,* e.g., Internal Revenue Code sections 4958(c)(1) and 4958(f)(1) and related Treasury Department Regulations in section 53.4958-3.)

204. The concealment of the Priest Leases Scheme detailed above and of the fact of injury resulting therefrom worked to perfection until it came to light in late 2020. At that time, following October 2020 raids by state and federal law enforcement authorities, DHCS suspended payment of federal funds to Borrego Health in conjunction with an investigation unrelated to the Priest Leases. In the course of the investigation, numerous contracts were reviewed, including the Priest Leases.

205. Independent certified commercial real estate appraisers made the following findings: (a) on the Promenade Lease (El Cajon location), Borrego Health was paying $39,104.75 a month above fair market rent, or $469,257 above fair market rent per year; (b) on the DRP Lease (San Bernardino location), Borrego Health was paying $38,405.95 a month above fair market rent, or $460,871.40 above fair market rent per year; and (c) on the Inland Valley Lease (Barstow location), Borrego Health was paying $80,025.25 a month above fair market rent, or $960,303 above fair market rent per year. Additionally, the lease terms of 30 to 33 years on the Priest Leases is unreasonably over market as well. A reasonable fair market term for these commercial leases is three to five years.

206. In order to remain in operation, Borrego Health signed an agreement with DHCS in February 2021 under which an independent monitor selected by DHCS would institute a robust corporate integrity and compliance program at Borrego Health. As is relevant here, DHCS' monitor directed Borrego Health to: (1) stop paying above fair market rent on the Priest Leases; and (2) take action to address over-fair market rent payments, excessive 30-year lease terms, and the failure to include lease provisions under which Borrego Health may terminate the leases.

207.   In response, the Priest LLCs acted in unison.  The Priest LLCs demanded that Borrego Health continue to make over-fair market rent payments under the Priest Leases.  In a May 25, 2021 email, the Priest LLCs threatened that Borrego Health's failure to pay the demanded rent on any one of the Priest Leases will result in immediate eviction proceedings as to all three locations that are the subject of the Priest Leases.

208.   Because Borrego Health had no constructive or inquiry notice of the fact of injury throughout the eight-year life of the Priest Leases Scheme, Borrego Health's right to recover money stolen by defendants extends back to the commencement of each lease.  The accrual date applicable to RICO claims under the discovery rule (and to all other causes of action pled herein) is at the earliest October 2020, and Borrego Health may sue to recover for the entire eight years of losses.

209.   On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.

G.     **The Borrego Insiders Paid Themselves Above-Market Compensation and Granted Themselves Improper Benefits and Covered It Up (the "Compensation/Benefits Scheme")**

210.   Bruce Hebets received a high salary from Borrego Health.  For instance, in 2016, Bruce Hebets received more than $383,000 in salary, plus over $126,000 in "bonus," in addition to a "car allowance" of $1,000 per month and a "cell allowance" of $350 per month.  In 2017, Bruce Hebets received more than $529,000 in salary, plus over $87,000 in "bonus," in addition to the car and cell allowance.  The decision to increase Bruce Hebets' salary in 2017 was made by Harry Ilsley, Dennis Nourse, and Mike Hickok without conducting any compensation study to determine what a fair market salary would be for a FQHC. The three Borrego Insiders then represented to the full Borrego Health Board that this salary was fair market and was in line with other comparable FQHCs (which would later be refuted when an actual compensation study was conducted). In 2018 (partial year), Bruce Hebets received more than

$467,000 in salary, plus over $321,000 in "bonus," in addition to the car and cell allowance.

211.   Karen Hebets also received a high salary from Borrego Health.  For instance, in 2016, Karen Hebets received more than $227,000 in salary, plus over $40,000 in "bonus".  In 2017, Karen Hebets received more than $228,000 in salary, plus over $51,000 in "bonus".  In 2018 and 2019, Karen Hebets received more than $228,000 in salary, plus over $41,000 in "bonus".  In 2020, these salaries were reduced to more than $205,000 with a bonus of over $10,000.

212.   Diana Thompson, also received a high salary from Borrego Health.  For instance, in 2017, Diana Thompson was paid nearly $338,000.

213.   Mikia Wallis also received a high salary from Borrego Health.  For instance, in 2017, Mikia Wallis was paid over $440,000.

214.   The Borrego Insiders then proceeded to disguise their above-market salary and benefits by using improper evaluations.  For instance, the Borrego Insiders used Jim Hebets and his companies to create a bogus evaluation of the compensation packages, concluding—unsurprisingly—that they were appropriate.

215.   One Borrego Insider even stated that the executives kept their base salary low but took additional payments as "bonuses" and received other benefits "to avoid scrutiny."

216.   The Board Insiders also received compensation and other improper benefits.  In July 2015, Bruce Hebets inquired from counsel whether or not a FQHC can pay or compensate board members, but counsel informed him that payments were prohibited, other than very narrow exceptions.  Nevertheless, the Board Insiders received remuneration and benefits from Borrego Health, and were therefore effectively compensated by Borrego Health and incentivized to keep these Schemes going.

217.   For instance, the Board Insiders received free access to Borrego Health programs, benefits, prescription drugs and even hearing aids.

218.   An email from Mike Hickok dated August 31, 2020, confirmed the practice of improper remuneration and benefits to Board Insiders:

> This policy has existed since Borrego Health was founded.  I asked about this once myself (I currently get my pharmacy prescriptions  as a perk) and was told this was an acceptable practice. My understanding is staff and families get the same perk plus no charge for medical and dental care. As far as the missive that the  cost of these items should be put back into the healthcare of the community is almost too laughable to be taken seriously in view of the tens of millions of dollars we waste with double paying Providers or paying them for doing little to no work or paying firms like Premier Healthcare millions of dollars that in-house staff could do and much less expensively or the many (probably most) real estate leases that we pay exorbitantly over market rent and for well in excess of typical lease terms. I've been trying to call attention to these issues for *years* and gotten nowhere until the Borrego Sun stared to expose them. Alan Kuehn has been blowing the whistle for years about medicare fraud in the contract dental practice and the only thing that this board chose to do regarding him was blackball him as a board member because he was threatening to Makia and Tim Martinez and the ongoing scam with Premier Healthcare.
>
> So now calling attention to Trustees getting a perk of free pharmacy as some sort of impropriety is (on second thought) not *almost*  laughable it takes the cake ….

219.   Later, as discussed below, when this arrangement was revealed, the Borrego Health Board ended the practice.  However, in a September 2, 2020 e-mail between Mikia Wallis and the 2020 Board of Directors, it was clear that Mikia Wallis had never looked into the legality of such a practice during her tenure at Borrego Health. Further, none of the Board Insiders evaluated whether it was consistent with the by-laws or HRSA guidelines to allow such a practice.

220.   In 2019, Compensation Resources, Inc. ("CRI") was retained by Borrego Health to review and analyze the compensation of 15 Borrego Health executives.  CRI issued its report on or about July 19, 2019.  In sum, of the 15 executives reviewed, the CRI report concluded that the "Total Compensation Package (TCP) for eleven (11) of the Borrego officers is currently above the high end of their respective Market Ranges

of Reasonableness." In early 2020, a second CRI analysis was conducted for the other employees of Borrego Health, which also found excessive salaries.

221.    Mikia Wallis and the Borrego Insiders failed to raise the issues of nepotism, cronyism and above-market compensation to the full Borrego Health Board, and took steps to conceal the issues. When asked by the full Borrego Health Board to investigate and report on the compensation, Mikia Wallis' submitted multiple reports which lacked the necessary information to make any appropriate decisions.

222.    For instance, in one version of Mikia Wallis' report she used the salaries that had recently been reduced by an "equitable" adjustment, effectively attempting to conceal the past problems. On top of that, Bruce Hebets and Jim Hebets schemed to create a 162B Executive Bonus Plan that would pay Bruce Hebets and others additional compensation (a tax-free payment of $5,000 per month) while also siphoning millions to Jim Hebets' insurance company.

223.    On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.

H.    **The Borrego Insiders Used Nepotism and Cronyism to Funnel Money to their Friends and Family (the "Nepotism and Cronyism Scheme")**

224.    Bruce Hebets and Karen Hebets hired their family members to work at Borrego Health. The nepotistic hires benefited The Hebets family, so that they were encouraged to keep the above-described Schemes operating. This included Bruce and Karen's daughter Tiffany Hebets (Collections Clerk, paid approximately $46,700/year and daughter Amanda Troncoso (Lead Billing Internal Auditor, base salary $49,920/year). Amanda Troncoso is also the daughter-in-law of Diana Thompson.

225.    Mikia Wallis created a position for her husband, Jeremy Noble, at Borrego Health. Jeremy Noble was hired to be Director of Site Facility Compliance for Borrego Health in exchange for an annual base salary of $120,000, despite the fact that he lacked the skills needed for the position.

7329719.4

226.   Diana Thompson hired her family members to work in Borrego Health's billing department and elsewhere.  The nepotistic hires benefited Diana Thompson and her family, so that she was encouraged to keep the above-described schemes operating.  Moreover, by populating her department with family members, it effectively eliminated any meaningful oversight.  These family members included:  (1) her brother Jose Alfredo Villafana, IT Technician (base salary $45,760/year); (2) her brother Luis Troncoso, Facilities Maintenance Worker 3 (base salary: $57,200/year); (3) her sister Breanda Troncoso, Biller 2 (base salary $40,352/year); (4) her step-son Julian Thompson, Accounting Clerk 1 (base salary $45,739/year); (5) her step-son Jordan Thompson, Biller 2 (base salary $35,360); and (6) her daughter-in-law Amanda Troncoso, Lead Billing Internal Auditor (base salary $49,920/year).  Borrego Health even hired Diana Thompson's father to provide gardening services for Borrego Health.

227.   By hiring family members, as well as individuals that lacked experience in the healthcare industry and FQHC space, Borrego Insiders were able to conceal Schemes and the funds being funneled between and amongst the Defendants.  As already alleged herein, Diana Thompson and Karen Hebets trained their family members in the accounting department on how to review and process claims. While this task was supposed to be performed by the Premier Parties, they failed to do so. As a result, the Dentists provided incorrect and fraudulent claims to Premier, who then submitted the claims to Borrego Health.  The Borrego Insiders' family members failed to recognize the issues with the claims due to inexperience and the deceptive training provided by Karen Hebets and Diana Thompson.

228.   On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.

/ / /

/ / /

/ / /

I.     **The Borrego Insiders Tried To Purchase a Country Club to Personally Benefit Themselves (the "De Anza Country Club Scheme")**

229.   The October 2017 Executive/Finance Committee meeting was recorded. In that meeting, the Board Insiders and staff attendees (including Bruce Hebets, Mikia Wallis, and Diana Thompson) discussed a proposal to purchase the De Anza Country Club located in Borrego Springs.  According to the meeting discussions: (1) the country club was not performing well economically and was contemplating selling its assets or filing for bankruptcy, (2) some Borrego Insiders own or owned homes nearby whose property values would face decline, and (3) some Borrego Insiders were creditors of the country club through a limited liability company.

230.   Three of the four Board Insiders (Mike Hickok, Dennis Nourse, and Harry Ilsley) were members and nearby homeowners at De Anza Country Club during a period when the club was financially distressed and looking for a purchaser.  Mike Hickok was on the De Anza Board of Trustees and headed a committee at De Anza to arrange a purchaser for the country club.

231.   Mike Hickok mentioned that he wanted Borrego Health to buy the club so that Borrego Health would pay membership fees and subsequently offer "free" membership and free golf course access to the medical and dental providers Borrego Health partnered with.  Hickok admitted that most Borrego Health employees would not want this service, but that it made sense for Borrego Health to buy the country club since there was a "fire sale."

232.   Borrego Insiders decided not to present the plan to purchase the country club to the full Borrego Health Board.  Specifically, Chuck Kimball indicated several times during the meeting that if the issue were presented to the full Borrego Health Board, the Board would "f**k it up." (Expletive modified.) Kimball went on to state that the purpose of the Executive Committee was to make decisions without consulting the full Borrego Health Board.

7329719.4

233.   Following the October 2017 meeting, Borrego Health made a formal offer to purchase the country club, including paying earnest money on the deal.  As usual, the Borrego Insiders did not take the De Anza transaction to the full Board for its review or approval.

234.   Borrego Insiders sent a letter of intent and a "good-faith deposit" to De Anza, without the knowledge or approval of the full Board.  It was only after De Anza shared the letter with its shareholders that this scheme was discovered by others.

235.   In fact, in the recorded October 2017 Executive/Finance Committee meeting, the Borrego Insiders explicitly acknowledge that members of the full Board would disapprove of such a purchase.  Borrego Health does not know why the Borrego Insiders wanted a FQHC—*i.e.*, a healthcare provider for underserved communities— to purchase a country club, though Borrego Health suspects that some or all of those individuals would personally benefit from such a transaction, at the expense of Borrego Health.

236.   By email dated November 18, 2017, outside counsel for Borrego Health advised Mikia Wallis that there were potentially "severe consequences" to Borrego Health from the proposed transaction, outlining some of the major potential issues.

237.   The Borrego Insiders continued to pursue this deal into 2018, even after telling the full Board that it was "dead," and to hide that fact from the full Board. Diana Thompson stated, in an Executive Committee meeting in 2018, "when we left the last meeting with the board, the full board, we said or the executive committee, we said, we're not going to pursue this. We do have the obligation to notify them that we're discussing this."

238.   The Borrego Insiders acknowledged that they were interested parties.  At one point, in a 2018 Executive Committee meeting, Harry Ilsley said, "But do we really -- the three of you have got to recuse yourself from voting. That you have ownership in the LLC, you have homes that may be devalued if De Anza goes away." It is not clear which three individuals or what LLC he was referencing.

239.   The Borrego Insiders actively sought to conceal this proposed transaction, with one Borrego Insider stating at a 2018 Executive Committee meeting, "someone has offered to partner with us but the details are totally unknown. I personally don't want that information to leak out anywhere, but it's in the community already, I suppose, and you may hear about it and I don't want to have you have to call me to find out what's going on, okay?"

240.   It appears that Mike Hickok and Harry Illsley were unable to obtain a written favorable vote from a majority of the equity members at the De Anza club. Therefore, despite the Borrego Insider's efforts, the deal did not move forward, and de Anza returned the earnest money.

J.   **The Borrego Insiders Attempted to Pay Bruce Hebets a $5 Million Payout (the "Payout Scheme")**

241.   In or about March 2018, Bruce Hebets suffered from a worsening illness and decided to step down from his position as CEO.  Without putting it on the agenda, the Borrego Insiders proposed a $5 million payout for Bruce Hebets as part of a "transition agreement."  Around that time, the idea was first presented to the full Board of Trustees.  At that time it was first presented to the full Board, an agreement had already been created, which was drafted by Mikia Wallis.

242.   Mikia Wallis drafted the agreement at Bruce Hebets' request.  Mikia Wallis did not advise Borrego Health to get separate counsel with respect to the agreement, and told a Borrego Health Board member on or about April 5, 2018 that she "represented no one" in the transaction, despite that fact that she was Borrego Health's Chief Legal Officer and would shortly become Borrego Health's CEO.  The Board member encouraged Mikia Wallis to do her own research about to whom she owes a duty of loyalty as general counsel for Borrego Health.  Mikia Wallis argued that she was not required to represent the best interests of the organization (which is wrong), that she did not represent anyone with respect to this transaction, and that there was nothing wrong with having drafted the contract for Bruce Hebets.

243.   Despite her protestations to the Board, Mikia Wallis was aware of her conflict.  At one Executive Committee meeting in 2018, Mikia Wallis discussed presenting a proposed agreement to the full Board.  She said, "My concern is, I don't know that's best coming from me, considering the inherent conflict of interest."

244.   The Borrego Insiders did not do any diligence or get an independent analysis with respect to a proper amount for a buyout under the circumstances.  Two other Board members, who were not Board Insiders, objected to the payout, stated that additional diligence was required and asked for the vote to be delayed to allow for additional evaluation.

245.   During the discussion of the transition agreement, the Borrego Insiders argued that the extremely high buyout was appropriate due to the fact that Bruce Hebets had not received retirement benefits.  However, this was false as Bruce Hebets had a 162B plan.  (The existence of the 162B plan was concealed by the Borrego Insiders, including from the auditor retained to evaluate the appropriate amount of Bruce Hebets' payout.)

246.   The vote on the "transition agreement" and buyout was postponed to a later meeting.

247.   At the April 5, 2018 Borrego Health Board meeting, the issue was discussed.  The Borrego Insiders brought a man named Frank Church, who was supposedly an "independent auditor," to appear by phone in the meeting.  Frank Church did not appear to have any expertise or knowledge regarding the reasonableness of the payout.

248.   On July 13, 2018, Chuck Kimball e-mailed Mikia Wallis and Diana Thompson, stating that Bruce Hebets indicated that he would retire, but wanted to remain on payroll at a "reduced rate" for 5 years at a rate from his $500,000 annual salary. Chuck Kimball proceeded to state that after Bruce Hebets retired, Mikia Wallis and the Board Insiders would be completely in charge of Borrego Health.

249.   Later, still needing an independent evaluation of the payout amount, at the insistence of the non-Borrego Insider Board Trustees, Borrego Health retained FW Cook to conduct an evaluation.  FW Cook employee Marty Katz provided the results. After reviewing salaries and payouts for other CEOs, FW Cook concluded that an appropriate payout would be $2 million, not the $5 million that Bruce Hebets and Mikia Wallis proposed.  The analysis was provided without knowledge of the 162B plan and benefits, and was therefore fundamentally flawed.

250.   During the valuation process, Chuck Kimball and Mikia Wallis exchanged several e-mails, including an e-mail on September 27, 2018 which indicates an intent to exclude non-Borrego Insiders from Bruce Hebets' retirement negotiations.

251.   After this valuation occurred, Chuck Kimball proposed offering an accelerated payment structure to ensure Bruce Hebets received the full amount before his passing. During these e-mail exchanges with Mikia Wallis, Chuck Kimball admitted that the Borrego Insiders were making decisions about Borrego Health which involved "dodging the law."

252.   This $2 million payout amount was eventually agreed to by the full Borrego Health Board and Bruce Hebets.

253.   Months after the $2 million payout had already been completed, Borrego Health once again consulted with FW cook about the propriety of the 162B plan.  At that time, Marty Katz explained that he was told by Mikia Wallis that payments made to a 162B plan for Bruce Hebets' benefits were performance-based bonuses, which was false.  In actuality, this was a part of Bruce Hebets' regular compensation.  Marty Katz told a Borrego Health Board member that if he had known this information, the payout amount would have been lower.

254.   The Borrego Insiders also attempted to conceal the impropriety of the generous 162B plan offered to some Borrego Insiders.  In spring or summer 2019, certain Borrego Health Board Trustees asked Mikia Wallis to evaluate the current

7329719.4

162B plan and, if necessary, find alternative plans.  Mikia Wallis invited an individual to address the issue with the full Borrego Health board.  The individual identified himself as "Jim" without providing a last name.  He proceeded to praise the 162B plan.  It was only when a non-Borrego Insider Board member asked for his last name did Jim disclose that he was, in fact, Jim Hebets.

255.   Minutes from a meeting of Borrego Insiders from June 12, 2020 indicate that Borrego Health received a 20% remittance payment penalty from the IRS as a result of the Board Insider's decision to pay Bruce Hebets an excess of $1 million in 2018.

256.   On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.

K.   **The Borrego Insiders Funneled Money to Bruce Hebets' Brother, Jim Hebets, and Jim Hebets' Firm (the "Jim Hebets Scheme")**

257.   The Borrego Insiders entered into an arrangements, on behalf of Borrego Health, with Jim Hebets and/or companies owned or controlled by Jim Hebets, The Hebets Company, funneling additional Borrego Health funds to Borrego Insider cronies and family members.

258.   For instance, the Borrego Insiders collaborated to have Jim Hebets and/or his companies review and approve sham, inflated salaries for Borrego Health executives, including the Borrego Insiders.

259.   Jim Hebets directed the review and approval process through The Hebets Company.  However, when the sham fair market value analyses were presented to the Borrego Health Board, Jim Hebets ensured that his name was removed by the masthead and documents were carefully drafted to avoid reference to Jim Hebets and to conceal his involvement and obvious conflict of interest, even neglecting to mention his last name when introducing himself.

260.   Jim Hebets' firm, The Hebets Company, is located in Phoenix, Arizona. On the website (www.hebetsco.com), he boasts of specializing in FQHCs and creating

ways to increase executive compensation/benefits beyond what is specified in IRS code for qualified 403(b) or 457(b) plans.

261.   The Hebets Company's current website makes it perfectly clear that their agenda is to maximize executive compensation:

> Today's competitive labor market makes it increasingly difficult for businesses to hire and retain highly skilled employees. The Hebets Company's Executive Compensation and Supplemental Fringe Benefits division assists these enterprises in designing and implementing innovative compensation and benefit programs for purposes of recruiting and rewarding those key executives who are instrumental to the profitability of the company. Legislative changes over the years have repeatedly reduced the qualified plan benefits that can be allocated to this select group of highly compensated employees resulting in "reverse discrimination". But there are many worthwhile solutions.

262.   Jim Hebets' firm also boasts that it provides "Estate planning for the 'exceptionally wealthy,'" a seeming mismatch for Borrego as a non-profit, but perhaps exactly what Bruce Hebets sought and why Jim Hebets was involved.

263.   Bruce Hebets, Diana Thompson, and Mikia Wallis also schemed with The Hebets Company to increase executive compensation through contributions through automatic "bonuses" that were paid to 162B plans.  These automatic bonuses paid to many Borrego Insiders, including Bruce Hebets, Diana Thompson, Mikia Wallis, and Karen Hebets.

264.   Though the 162B plans appeared at first glance to be life insurance plans, they were never intended as such but were instead a strategy to pay above market to insiders without added scrutiny or tax liability.  Bruce Hebets and Karen Hebets worked directly with the Vice President and General Manager of The Hebets Company to "borrow" from their 162B accounts and transfer the funds from their respective 162B plans into their checking account.

265.   These were significant payments.  As of 2015, Bruce Hebets was receiving $3,500 per month for his 162B plan, and by 2017, he was receiving $5,000

per month.  These amounts were free of taxes, as on top of these payments, Borrego Health was also paying a tax true up.  As a result of this scheme, Bruce Hebets, Karen Hebets, and other Borrego Insiders got tax free bonuses every month, which they subsequently cashed out.

266.   Even after the loans, the value of these plans was substantial.  As of July 9, 2018, Bruce Hebets' 162B life insurance value was $1,236,000.  It appears this approximate value was paid out to Bruce Hebets' estate at the time of his death after a long illness in January 2019.

267.   Jim Hebets and The Hebets Company actively attempted to persuade Borrego Health to continue to use the 162B plans through The Hebets Company. For example, in July 2019, Jim Hebets e-mailed Mikia Wallis explaining the nature of the 162B program and the benefits of the plan. During these discussions, Jim Hebets made several misrepresentations. For example, Jim Hebets represented that the 162B would not subject Borrego Health to tax penalties. However, as alleged herein by way of example, the 162B plan in fact subjected Borrego Health to a tax penalty due to Bruce Hebets total compensation exceeding $1 million.

268.   These 162B plan payments also created a windfall for Jim Hebets and The Hebets Company, which sold and managed the plan.  As of July 2020, Borrego Health was paying $240,000 per month for the 162B plans.  This is immensely disproportionate.

269.   For scale, Borrego Health paid in full for a bridge life insurance policy that would allow staff losing their 162B plan benefit to retain up to two-times their salary, up to $500,000, in group term life insurance until they could select their own insurance at their own cost via annual open enrollment.  The cost of that plan was $15,420 per month.

270.   The Borrego Insiders, Jim Hebets, and The Hebets Company knew that the Borrego Health Board members would rely on the compensation analyses and would have no other resource to question them. Thus, the compensation analyses were

presented to the Board of Trustees for vetting and approval, but there was no way that Borrego Health would be put on notice of Jim Hebets' and his company's involvement or of any potential financial or other injury associated with, or caused in whole or in part by the flawed compensation analyses. Nor would the Board have any access to facts that might put them on inquiry notice that the Borrego Insiders, Jim Hebets, and The Hebets Company were working together to siphon funds from Borrego Health.

271.   There is little doubt that Borrego Health has only begun to scratch the surface of Jim Hebets' involvement in these Schemes. Jim Hebets met repeatedly alone and away from the Borrego Health offices with Bruce Hebets and Daryl Priest. Because Jim Hebets lived in Arizona, he would have had to travel for these in-person meetings with Daryl Priest. For example, Jim Hebets, Bruce Hebets, Jim Hebets' son, and Daryl Priest met at Coasterra Mexican Restaurant in San Diego on March 18, 2016. On February 27, 2018, they met in the lobby of Loews Resort in Coronado.

272.   On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration. For example, each time Bruce Hebets would give Jim Hebets access to his contacts at other FQHCs, Jim Hebets executed a "Compensation Split Arrangement between The Hebets Company and Bruce Hebets" that falsely listed Bruce Hebets as the "Insurance Agent" and paid Bruce 10% of the proceeds. Jim Hebets and Bruce Hebets executed such arrangements after Jim Hebets made sales to Rural Health Care, Inc., San Ysidro Health Center, Tony Weber (CEO of Golden Valley Health Centers), and Francisco Castellon (CEO of Omni Family Health). It is likely that discovery will uncover similar arrangements in which the money Jim Hebets siphoned off from Borrego Health would make it back to Bruce Hebets and/or Defendants.

L.   **Borrego Insider Chuck Kimball Leased a Barn to Borrego Health (the "Julian Barn Scheme")**

273.   Julian Medical Foundation, Inc. is a 501(c)(3) organization. Its stated mission is "To foster the presence and availability of high quality health and medical

care within the Julian area including being the owner of a rural health clinic in Julian and the promotion and sponsorship of activities addressing community-wide issues of health and safety."

274.   Julian Medical Foundation sought out property in Julian, California and solicited Bruce Hebets to operate a clinic in Julian.  Chuck Kimball led the efforts while he was Vice President of Julian Medical Foundation.

275.   Bruce Hebets and Chuck Kimball were acquaintances prior to their relationship at Borrego Health.

276.   Chuck Kimball repeatedly emailed Bruce Hebets starting in April 2009 regarding acquiring a barn to serve as a site for a future clinic operated by Borrego Health in Julian.  The target property identified by Chuck Kimball was a horse barn and surrounding land located at 2717 A Street in Julian, California (the "Horse Barn").

277.   Chuck Kimball saw an opportunity to benefit the Julian Medical Foundation to the detriment of Borrego Health.  Julian Medical Foundation could acquire the property, but it was not in a position to utilize it, finance it without subsidization, or develop it.  Chuck Kimball wanted Borrego Health to subsidize the acquisition and development of the property and insulate Julian Medical Foundation from any risk from acquiring the property.

278.   Thus, Julian Medical Foundation would acquire a property that was not useable in its current state, but Borrego Health would bear the risk of the acquisition by paying all costs of acquisition and ongoing financing to Julian Medical Foundation, including incurring liability for any mortgages secured by Julian Medical Foundation.

279.   In July and August 2009, Chuck Kimball began a fundraising drive for Julian Medical Foundation to acquire a property in Julian for a medical clinic.

280.   Even before Julian Medical Foundation was able to acquire the Horse Barn, Chuck Kimball coordinated the drafting of a lease between the Horse Barn owners and Borrego Health.

281.   Later, Chuck Kimball proposed that Julian Medical Foundation lease the Horse Barn to Borrego Health with Julian Medical Foundation as the landlord.

282.   Borrego Health agreed to lease the Horse Barn without even considering whether there was a market for the services should the Horse Barn be remodeled to accommodate a new clinic.  Instead, market analyses were conducted years later with the Horse Barn remaining unused by Borrego Health.

283.   In October 2010, Borrego Health entered into an agreement with Julian Medical Foundation and Chuck Kimball to lease the Horse Barn.  The lease terms were one-sided and the product of Julian Medical Foundation and Chuck Kimball exerting control over Borrego Health.

284.   The leased space was not necessary and the Horse Barn was unneeded and unusable.

285.   Initially, there was no specific lease amount specified.  Instead, it was set at whatever expenses Julian Medical Foundation had to own the property.  As a result of the ambiguity of the monthly rent, the Borrego Insiders and Julian Medical Foundation could manipulate the amount of rent for Borrego Health to pay to the Julian Medical Foundation.

286.   The Horse Barn was unusable by Borrego Health, but it paid the full rent to Julian Medical Foundation and then subleased the Horse Barn back to the original owners at a significant loss to Borrego Health, only reinforcing that the fair market rent for the Horse Barn was far less than Borrego Health was paying.

287.   The Borrego Insiders and Julian Medical Foundation were all aware that Borrego Health had no use for a barn and no intention to utilize it.  Yet, they set the term of the lease at 20 years in duration, with no termination clause for Borrego Health, not even if the property was never developed into a medical clinic.  If the lease were to be terminated or abandoned, Borrego Health agreed to pay off all mortgages on the Horse Barn.

288.   Later, by First Amendment to the lease dated November 7, 2013, Borrego Health agreed to Julian Medical Foundation's demand to increase the rent from at least $6,284 per month to $7,179, despite no additional consideration being offered by Julian Medical Foundation and Chuck Kimball.  The only justification was increased costs incurred by Julian Medical Foundation due to a property tax increase.

289.   Ultimately, the Horse Barn lease was so unsustainable that Borrego Health had to negotiate with Chuck Kimball to release Borrego Health from the lease, but that did not occur until 2022.  At that point, Chuck Kimball was aware of government scrutiny.

290.   Neither Chuck Kimball nor the Julian Medical Foundation has returned or forgiven any rent for the Horse Barn.

291.   The Borrego Insiders knew that Borrego Health Board members would review only those contracts presented to them, and that they would never have reason to see The Horse Barn lease unless it was presented to them.  Thus, unless the Horse Barn lease itself was presented to the Board for vetting and approval, there was absolutely no way that Borrego Health would be put on notice of any potential financial or other injury associated with, or caused in whole or in part by over-market leases.  Nor would the Board have any access to facts that might put them on inquiry notice that the Borrego Insiders were working together to siphon funds from Borrego Health.

292.   On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.

M.   **Borrego Insider Dennis Nourse Sold Property to Borrego Health to be Developed by Priest (the "Property Development Scheme")**

293.   Bruce Hebets and Dennis Nourse were friends prior to their relationship at Borrego Health.

294.   Dennis Nourse owned commercial property located on Palm Canyon Drive in Borrego, Springs with Assessor Parcel Number ("APN") 198-010-23-00

7329719.4

("Palm Canyon Parcel"), which fronts on Palm Canyon Drive just west of Country Club Road.

295.  Dennis Nourse saw an opportunity to benefit himself by facilitating a sale the Palm Canyon Parcel and involving Borrego Health.

296.  Dennis Nourse approached Bruce Hebets to discuss a sale.  Bruce Hebets saw an opportunity to involve Daryl Priest to develop the property, who he had familiarity with after two other clinic leases.

297.  Dennis Nourse, Bruce Hebets, and Daryl Priest collaborated so that Daryl Priest would acquire the commercially worthless parcel from Dennis Nourse, and then have it developed by Daryl Priest and his affiliated companies.  Once it was developed, the property would then be leased to Borrego Health at commercially unreasonable terms.

298.  Thus, the scheme was hatched whereby Dennis Nourse would be overpaid for the Palm Canyon Parcel, half of which was undevelopable foothills. Daryl Priest and his entities would overpay, but make up any loss by overcharging Borrego Health for development and the lease of the property.  The Borrego Insiders would sacrifice Borrego Health's interests could further ingratiate himself with Daryl Priest and to keep Dennis Nourse cooperative on the Executive/Finance Committee and to buy off Dennis Nourse as a future collaborator.

299.  Daryl Priest, though a wholly owned subsidiary created to purchase the Palm Canyon Parcel, Inland Development, LLC, entered into a contract with Dennis Nourse for the purchase.

300.  Contemporaneously, Bruce Hebets negotiated lease terms with Daryl Priest that were disadvantageous to Borrego Health.

301.  Dennis Nourse and Bruce Hebets brought the proposal to the Executive/Finance Committee, which was controlled by Borrego Insiders, including Dennis Nourse.

302.    Bruce Hebets and Mikia Wallis knew that such a business arrangement blatantly involved conflicts of interests.  As a result, Bruce Hebets directed Mikia Wallis to perform an analysis demonstrating how the transaction could proceed with Dennis Nourse recusing himself from a vote.

303.    Rather than conduct an impartial and independent analysis, Mikia Wallis endeavored to perform an outcome-oriented and flawed "analysis" that would give the Executive/Finance Committee poor legal advice that the arrangement was acceptable, at the expense of Borrego Health.

304.    Mikia Wallis brought the cursory analysis supporting the transaction to Bruce Hebets to ask him if she "was on the right track."  Thus, she was not exercising proper independence as Borrego Health's attorney, and was instead being controlled and directed by and agreeing to be nothing more than an instrument of Bruce Hebets.

305.    Mikia Wallis completed her internal analysis to the satisfaction of Bruce Hebets, and then sent it to outside counsel, who did not practice in the area of real estate transactions or conflict of interests issues for review and approval.  With minor modification, outside counsel approved the analysis, and the matter was brought to the Executive/Finance Committee for approval.

306.    The Board Insiders approved the proposed transaction with little questioning or scrutiny, including agreeing to the one-sided lease terms that Bruce Hebets had negotiated with Daryl Priest.

307.    Daryl Priest then immediately negotiated a lease with Borrego Health (the "Nourse Parcel Lease"), even though there was no land yet acquired by Daryl Priest and no structure to lease.

308.    The lease terms were not commercially reasonable, and included an agreement that Borrego Health would start paying full rent after Daryl Priest secured approved building plans, even though no one realistically expected to be able to occupy a finished structure for more than a year later.

7329719.4

309.   In other words, Borrego Health would be paying full rent for no property and still paying for much of the construction costs with no building to even use.

310.   The development of the land, however, still had to go through the local government approval process, including its design review committee.  At the design review committee, the development was met with resistance.

311.   Rather than counter the resistance, Daryl Priest sought to modify the terms of the deal to further his interests and make Borrego Health's position even less desirable.

312.   Daryl Priest proposed that Borrego Health purchase the Palm Canyon Parcel directly from Dennis Nourse, and that Daryl Priest would then develop the property under contract with Borrego Health.

313.   Thus it was agreed that the purchase agreement negotiated by Daryl Priest would be assigned to Borrego Health.  Borrego Health would return Daryl Priest's earnest money, and Borrego Health would pay $400,000 Dennis Nourse to purchase the Palm Canyon Parcel.

314.   This time, Bruce Hebets and Dennis Nourse decided not to go back to the full Borrego Health Board of Trustees or even the Board Insiders.

315.   Instead, Bruce Hebets and Denis Nourse brought Borrego Insider Harry Ilsley into the fold.  Harry Ilsley knew that the Board should have been involved, but agreed to work with Bruce Hebets and Denis Nourse to get the deal closed.

316.   Harry Ilsley, Dennis Nourse, and Bruce Hebets knew that Borrego Health Board members would review only those contracts presented to them, and that they would never have reason to see acquisition documents unless he or Bruce Hebets presented them.  Thus, unless the deal documents were presented to the Board of Trustees for vetting and approval, they would not know of any potential financial or other injury associated with, or caused in whole or in part by the real property transaction.  Nor would the Board have any access to facts that might put them on

1   inquiry notice that Harry Ilsley, Bruce Hebets, and Dennis Nourse were working

2   together to siphon funds from Borrego Health to Dennis Nourse and Daryl Priest.

3       317.   As usual, Bruce Hebets and Mikia Wallis facilitated and directed the

4   actions necessary to execute the deal documents without knowledge of Borrego

5   Health's full Board.

6       318.   On information and belief, the Borrego Insiders were compensated for

7   this access and control through kickbacks or other payments or remuneration.

8       **N.   Bruce Hebets and Karen Hebets Create a Sham "Consulting"**

9       **Company and Contract with Premier To Obtain Payments From**

10      **Premier for the Various Schemes Which Benefited the Premier**

11      **Parties (the "KBH Healthcare Consulting Scheme")**

12      319.   As discussed herein, various schemes were implemented which benefited

13  Premier and the Premier Parties which were hatched with the participation of support

14  of the Borrego Insiders, including without limitation Bruce Hebets and Karen Hebets.

15  This fact begs the question:  what was in it for Bruce Hebets and Karen Hebets?

16      320.   Although Borrego Health alleges on information and belief that the

17  Borrego Insiders were compensated for their participation in the various schemes

18  through kickbacks or other payments or remuneration, the KBH Healthcare Consulting

19  Scheme is one example which Borrego Health has recently discovered.

20      321.   KBH Healthcare Consulting was created in February 2017.  The business

21  address listed with the California Secretary of State is 3283 Broken Arrow Road,

22  Borrego Springs, California 92004.  At the time, this address is also listed as the home

23  address for Bruce Hebets and Karen Hebets.

24      322.   The Operating Agreement for KBH Healthcare Consulting was drafted by

25  Mikia Wallis and the Articles of Incorporation for KBH Healthcare Consulting were

26  created and filed by Mikia Wallis, at the same time she was Chief Legal Officer for

27  Borrego Health.  The Operating Agreement states that Bruce Hebets and Karen Hebets

28  will each of 50 percent ownership, and each will contribute $500 of capital.

323.   On or about February 1, 2017, KBH Healthcare Consulting entered into a written contract with Premier entitled "Consulting Agreement" (the KBH/Premier Contract").  The "services" that KBH Healthcare Consulting agreed to provide pertained to OMNI Family Health, which Premier apparently wanted to contract with to manage their dental services.  KBH Healthcare Consulting was supposed to "assist [Premier] in the procurement of a management contract regarding management of dental services with OMNI Family Health," to "consult on a weekly basis on the current status of the management agreement between [Premier] and OMNI Family Health," to "advise and assist [Premier] with compliance of regulations relating to the operation of FQHCs as to dental services," to "advice [sic] [Premier] on changes to laws and regulations relating to FQHC," and to "advise and assist [Premier] as to best practices related to management of dental services for a FQHC."

324.   Under the KBH/Premier Contract, KBH Healthcare was to be paid a retainer of $200,000 and 5 percent of the "adjusted net income" from amounts received from Premier's contract with OMNI Family Health.  Notably, other than describing the type of services that may be provided, the Premier/KBH Contract Amendment does not have any requirements that KBH Helathcare Consultant spend any minimum number of hours, accomplish any minimum number of tasks or have any preconditions to payment of $2 million whatsoever.

325.   Bruce Hebets and Karen Hebets sent the signed KBH/Premier Contract to Daryl Priest on February 10, 2017.  By email the same day, Bruce Hebets sent an email to Daryl Priest which read, "Here is the signed contract what time can I get the check" [sic].

326.   Apparently, Premier never was able to contract with OMNI, so the sham contract designed to funnel money from Premier and the Premier Parties to Bruce Hebets and Karen Hebets failed to work as intended.  Undeterred, the Scheme was modified.

327.   In May 2017, the Premier/KBH Contract was amended (the "Premier/KBH Contract Amendment").  The Premier/KBH Contract Amendment stated that the "services" KBH Healthcare Consulting was to provide was to assist Premier in the "procurement of management services agreements regarding management of dental services with FQHC's in the State of California and in other states," "to consult on a weekly basis on the current status of the management services agreement between [Premier] and any FQHC," to "advise and assist [Premier] with compliance matters," and "to advice [sic] [Premier] on changes to laws and regulations relating to the operation of FQHC," and "to advise and assist [Premier] as to the best practices related to management of dental services for a FQHC."

328.   The Premier/KBH Contract Amendment noted that a $200,000 retainer had already been paid to KBH Healthcare Consultants (owed 50-50 by Bruce Hebets and Karen Hebets).  The Premier/KBH Contract Amendment also required Premier to pay KBH Healthcare Consultants (owed 50-50 by Bruce Hebets and Karen Hebets) the sums of $75,000 per month for a term of 24 months (*i.e.* a total of $2 million). Notably, other than describing the type of services that may be provided, the Premier/KBH Contract Amendment does not have any requirements that KBH Healthcare Consultant spend any minimum number of hours, accomplish any minimum number of tasks or have any preconditions to payment of $2 million whatsoever.

329.   KBH Healthcare Consulting had a bank account with Chase, including a debit card.

330.   On or about February 13, 2017, a deposit of $200,000 was made to that account, which corresponds to the retainer amount due under the KBH/Premier Contract.

331.   On or about August 23, 2017, the debit card was used to obtain cash advances at Barona Resort and Casino for over $5,000.

7329719.4

332.   Between August 26 and September 1, 2017. the debit card was used to obtain cash advances at Barona Resort and Casino for over $20,000.

333.   On or about September 20, 2017, the debit card was used to obtain cash advances at Barona Resort and Casino for over $5,000.  The following day, attempts were made to withdraw money in excess of $5,000.

334.   Between October 11 and 12, 2017, the debit card was used to obtain cash advances at Barona Resort and Casino for over $9,000.  On October 12, 2017, two attempts to withdraw $1,000 each were declined.

335.   On or about June 8, 2019, the debit card was used to obtain cash advances at Barona Resort and Casino for over $4,000.

## VI.    <u>CLEANING HOUSE</u>

336.   After Bruce Hebets' death, the Borrego Health board found themselves picking up the pieces of a highly disorganized organization.  Since that time, the current Board (all of whom serve on a volunteer basis) has undertaken monumental efforts to identify and correct a number of issues in the organization.  Some of those efforts are set forth below.

337.   All of the Board Insiders have resigned or have removed been from the Borrego Health Board, including most recently the removal of Mike Hickok (Treasurer) and Chuck Kimball (Secretary) on October 2, 2020.  Ten new and diverse members were also added to the board between 2019 and 2020 and the Board was expanded to 13 members.

338.   The Board also began the process of a governance overhaul, including compiling a governance policy and making updates to Borrego Health's Bylaws and other key policies (through the progress was slow due to actions of both Chuck Kimball and Mikia Wallis, who blocked a number of reform efforts before their removals).

339.   The Board retained outside counsel to complete governance overhaul, including Bylaws and policies, and develop Committees with clear committee charters.

340.   A Board Policy Manual consisting of updated organization Bylaws and key governance policies was compiled by Board members and presented in April 2019.  The electronic Board Policy Book was officially adopted by the Board in June 2020.

341.   Current Board members are now required to complete a 3.5-hour Board training by Compensation Resources, Inc. and NACH, and Borrego Health has developed materials for on-boarding new Board members.  Board members are also required to complete 3 hours of on-line trainings and Borrego Health has offered additional NACH Board Governance Training to Board members.

342.   Borrego Health created and staffed the position of Governance Manager to assist the Board and committees in producing clear Board minutes, agendas, and helping to keep Board committees on track.

343.   Borrego Health retained Compensation Resources Inc. ("CRI") to analyze executive officer compensation and benefits and complete an Executive Compensation study (July 2019) and expanded CRI contract to look at total compensation system-wide (2020).  CRI also conducted Board training on governance with a focus on Board responsibility for oversight with respect to compensation (2019).

344.   In 2019, Borrego Health retained another company to review retirement benefits and develop new retirement plan.  The new company also will assist Borrego Health in developing more equitable total compensation plan, including performance bonus structure.

345.   Borrego Health also created new mechanisms to prevent improper arrangements, including overhauling the delegation of authority and procurement policies, creating the Board Audit Committee (2019), hiring new auditors (2020), and conducting a detailed review of IRS Form 990 (2019).

Case No. 21-cv-01417-BEN-KSC
BORREGO COMMUNITY HEALTH FOUNDATION'S FOURTH AMENDED COMPLAINT

346.   Mikia Wallis was removed as CEO on October 8, 2020.  All other staff in any way implicated by DHCS or DOJ to be involved in misconduct have been removed.  The entire executive leadership team was replaced.

347.   In October 2020, Borrego Health closed its contract dental program and replaced staff employed within the program who had been identified by DOJ and DHCS.

348.   Borrego Health terminated its relationship with Priest-related entities, terminating its leases at the Barstow and D Street locations, seeking amendment in Federal Court of its lease at the El Cajon site, and terminating its contracts with Premier.

349.   Borrego Health invested significantly in its compliance program. Borrego Health established a Compliance Department led by an experienced Chief Compliance Officer, and staffed the department to include a Director of Compliance, Director of Program Integrity, Compliance Auditor and Compliance Analyst.  At the Board level, Borrego Health created the Audit and Compliance Committee in January 2022, which hears detailed monthly compliance reports.

350.   Borrego Health also created a Compliance Program Manual and Compliance Hotline to assist with effectively identifying and resolving compliance concerns.  Borrego Health instituted a series of compliance trainings, including monthly staff compliance education, bimonthly billing and coding compliance trainings (instituted April 2022), code of conduct training, compliance team site visits (instituted January 2022), and executive training on fraud and abuse topics.

351.   Borrego Health engaged external auditing services from to evaluate its current claims, identify areas for improvement, and train staff and providers on those issues.

352.   Borrego Health has also invested in internal fraud prevention efforts aimed at individuals.  Borrego Health retained a compensation review company to review executive compensation, with the result of review leading to executive

7329719.4

compensation reform.  Borrego Health also implemented new conflict of interest policies, a restrictive employment of relatives policy, and has limited the Board's delegated authority to Borrego Health staff.

353.   Borrego Health has also implemented efforts to increase transparency of financials.  Borrego Health has ensured that management reports are now available at the clinic level and are incorporated into Board reports available to the full board and has instituted a provider dashboard to monitor financial metrics.

## VII.   CHAPTER 11 BANKRUPTCY

354.   Borrego Health filed for bankruptcy under Chapter 11 of the Bankruptcy Code on September 12, 2022 in the Southern District of California.

355.   The bankruptcy filing was necessary because of a lack of liquidity.

356.   All of the Schemes described herein had a material financial impact of either increasing liabilities or decreasing revenue or both.

357.   Had the Defendants not taken advantage of Borrego Health as described herein, Borrego Health would not have the liquidity issues it is currently experiencing.

358.   Borrego Health also would not have been subjected to oversight by an expensive monitor or been subject to a payment suspension by DHCS, including the ongoing dental payment suspension, which is causing it not to be paid for in-house dental services.

359.   Uncompensated in-house dental services are resulting in a loss of approximately $350,000 per month of revenue.

## VIII.   THE RICO ENTERPRISE

360.   "The elements of a civil RICO claim are simple enough: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to the plaintiff's 'business or property.'" *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996) (*citing* 18 U.S.C. §§ 1964(c), 1962(c); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

361.   For the purpose of additional clarity and for the convenience of Defendants and the Court, below is further detail of the RICO allegation which is pled with particularity in conformity with FRCP Rule 9(b).

362.   **Conduct**:  "To satisfy the 'conduct' element of a Section 1962(c) claim, a plaintiff must allege facts that the defendant had 'some part in directing [the enterprise's] affairs.' *LD v. United Behavioral Health*, 508 F. Supp.3d 583, 602 (N.D.C.A. 2020) (*citing Walter v. Dravson*, 538 F.3d 1244, 1249 (9th Cir. 2008)). Notably, "Relevant considerations to whether this element is met include whether the defendant 'occup[ies] a position in the chain of command ... through which the affairs of the enterprise are conducted,' whether it 'knowingly implement[ed] [the] decisions of upper management,' and whether its 'participation was vital to the mission's success.'" *LD v. United Behavioral Health*, 508 F. Supp.3d 583, 602 (N.D.C.A. 2020) (*citing Walter v. Dravson*, 538 F.3d 1244, 1249 (9th Cir. 2008)). "In the Ninth Circuit, to assess whether a defendant had a sufficient role in operation or management to meet the standard of § 1962(c) [and *Reves*], courts consider whether the defendant (1) gave or took directions; (2) occupied a position in the 'chain of command' through which the affairs of the enterprise are conducted; (3) knowingly implemented decisions of upper management; or (4) was indispensable to achievement of the enterprise's goal in that the defendant's position is 'vital' to the mission's success." *Ketayi v. Health Enrollment Group*, 516 F. Supp.3d 1092, 1136 (S.D.C.A, 2021) (*quoting Tatung Co., Ltd. v. Hsu*, No. SA-CV-13-1743, 2015 WL 11072178, at *20 (C.D. Cal. Apr. 23, 2015) (*quoting Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008)) (citations omitted)).

363.   **Of an Enterprise**: "The definition of 'enterprise' in the text of RICO is fairly straightforward. In its entirety, the definition is as follows: ' "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir. 2007) (*citing* 18 U.S.C. §

1961(4)). "As is evident from the text, this definition is not very demanding. A single 'individual' is an enterprise under RICO. Similarly, a single 'partnership,' a single 'corporation,' a single 'association,' and a single 'other legal entity' are all enterprises." *Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir. 2007). In *Odom v. Microsoft Corp.*, the Ninth Circuit explained, "We take this opportunity to join the circuits that hold that an associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise. *Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007) (citation and internal quotation marks omitted). The *Odom* Court turned to the Supreme Court decision in the *United States v. Turkette*, to note the criteria for an associated-in-fact enterprise, "The Supreme Court in *Turkette* articulated the criteria for an associated-in-fact enterprise under RICO. According to the Court, an associated-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.' To establish the existence of such an enterprise, a plaintiff must provide both 'evidence of an ongoing organization, formal or informal,' and 'evidence that the various associates function as a continuing unit.'" *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007) (citation and internal quotation marks omitted).

364. **Through a Pattern**:  The Supreme Court in *H.J. Inc. v. Northwestern Bell Telephone Co.* settled the long held debate of what constituted a "pattern" for RICO. The Court held, "To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240 (1989). The Court continued, continuity is, " … centrally a temporal concept – and particularly so in the RICO context, where what must be continuous, RICO's predicate acts or offenses, and the relationship these predicates must bear one to another, are distinct requirements." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 241 (1989). Importantly, "A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering

1 | activity, either implicit or explicit." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492
2 | U.S. 229, 241 (1989).

3 | 365. **Racketeering / Predicate Acts**:  Predicate acts, "… involve conduct that
4 | is 'chargeable' or 'indictable,' and 'offense[s]' that are 'punishable,' under various
5 | criminal statutes. As defined in the statute, racketeering activity consists not of acts for
6 | which the defendant has been convicted, but of acts for which he could be." *Sedima,*
7 | *S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 488 (1985) (*citing* § 1961(1)).

8 | 366. **Causing Injury**:  "Where the plaintiff alleges each element of the
9 | violation, the compensable injury necessarily is the harm caused by predicate acts
10 | sufficiently related to constitute a pattern, for the essence of the violation is the
11 | commission of those acts in connection with the conduct of an enterprise. Those acts
12 | are, when committed in the circumstances delineated in § 1962(c), "an activity which
13 | RICO was designed to deter." Any recoverable damages occurring by reason of a
14 | violation of § 1962(c) will flow from the commission of the predicate acts." *Sedima,*
15 | *S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497 (1985). Importantly, "RICO is to be
16 | read broadly. This is the lesson not only of Congress' self-consciously expansive
17 | language and overall approach, but also of its express admonition that RICO is to 'be
18 | liberally construed to effectuate its remedial purposes.' The statute's 'remedial
19 | purposes' are nowhere more evident than in the provision of a private action for those
20 | injured by racketeering activity." (citation and internal quotation marks omitted).
21 | *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497-98 (1985).

22 | A.    **Facts Common To RICO Cause of Action**

23 | 367.   The "Enterprise" is Borrego Health, a non-profit corporation in good
24 | standing, which the Defendants here and in the Multi-Scheme Litigation secretly
25 | commandeered for their own criminal purposes.  Bruce Hebets' death in 2019 does not
26 | alter the fact of his participation (as a Borrego Health insider) with Defendants here
27 | and in the Multi-Scheme Litigation in the operation and management of Borrego
28 |

1  Health, as described below.  If Bruce Hebets were alive, he would be named as a

2  defendant herein.

3       368.  Borrego Health is a FQHC engaged in interstate commerce, with a

4  mission to provide high quality, comprehensive, compassionate primary healthcare to

5  people in their communities, regardless of their ability to pay.  Borrego Health

6  operated over 20 clinics, and continues to operate more than a dozen, primarily in

7  underserved desert and inland communities throughout San Diego, Riverside, and San

8  Bernardino counties.  Borrego Health provides essential services in Family Practice,

9  Pediatrics, OB/GYN, Internal Medicine, Podiatry, Dermatology, Cardiology, and

10  HIV/Hepatitis C, most of whom cannot obtain affordable comprehensive primary care

11  from other sources.  During the recent pandemic, Borrego Health has tested tens of

12  thousands of Californians for Covid-19 infection and has vaccinated tens of thousands

13  of people for Covid-19.  Borrego Health's continued operation is in the public interest.

14       369.  The Priest LLCs, Daryl Priest, Nick Priest, Travis Lyon, Premier,

15  Summit, Jim Hebets, The Hebets Company, The Julian Medical Foundation, and the

16  Dentists  and DOES 1-250, are "Outsiders" to Borrego Health.

17       370.  The Defendants here and in the Multi-Scheme Litigation are associated

18  with the Enterprise in that they were either (1) Borrego Health executives or Board

19  members, (2) the Enterprise's landlords, (3) contracted dental providers, or (4) other

20  outside vendors.

21       371.  The Defendants here and in the Multi-Scheme Litigation are entities and

22  individuals separate from the Enterprise, and none of the Defendants is alleged to be

23  the Enterprise, or its members.

24       372.  Borrego Health is both the RICO enterprise and the victim.  Borrego

25  Health has lost tens of millions of dollars as a result of the fraudulent conduct of

26  Defendants here and in the Multi-Scheme Litigation and suffered other damages,

27  including without limitation an inability to be paid by Medi-Cal for in-house dental

28  services, an inability to provide contract dental services, and an exposure for

7329719.4

repayment to the Medi-Cal program for claims that were caused to be submitted by defendants and contract dentists that were not payable.

373.   The unlawful acts described herein were devised, directed and maintained by the Defendants here and in the Multi-Scheme Litigation who had control over, participated in, and/or took part in Borrego Health's operations and management.

**B.   Racketeering Activity Distinct from Enterprise**

374.   The pattern of racketeering described herein is separate and distinct from the Enterprise, due to both the relationship between the activities of the Enterprise and the pattern of racketeering activity, and how the racketeering activity differs from the usual daily activities of the enterprise is as follows:

375.   Borrego Health, the Enterprise, is engaged in interstate commerce acting as a FQHC.  It acquires good and products from across the country, including medical supplies.  It utilizes the internet and United States banking system to facilitate its operations, including using electronic billing to bill and receive payment from Medi-Cal.  Borrego Health also regularly uses mail to pay vendors and acquire good and products, including medical supplies and medications.

376.   Defendants here and in the Multi-Scheme Litigation worked together to perpetrate a number of schemes to steal money from the Enterprise paid to the Enterprise by state and federal payers utilizing primarily state and federal funds paid by Medi-Cal.  The schemes that Borrego Health in currently aware of are described above as the "Borrego MSO/IPA Scheme", the "Premier Scheme", "Fraudulent Dental Billing Scheme", the "Coverup Scheme", the "Priest Leases Scheme", the "Compensation/Benefits Scheme", the "Nepotism and Cronyism Scheme", the "De Anza Country Club Scheme", the "Payout Scheme", the "Jim Hebets Scheme", the "Julian Barn Scheme," the "Property Development Scheme" and the "KBH Healthcare Consulting Scheme."

377.   Each of these schemes was contrary to the ordinary and regular operations and management of Borrego Health, and involved the Defendants here and

in the Multi-Scheme Litigation effectively taking over the management and operations of Borrego Health in furtherance of these schemes.

378.   The primary mission of Borrego Health, as a FQHC, is the provision of healthcare to under-served communities.  All efforts of Borrego Health are to be directed at the efficient accomplishment of this mission.

C.   **RICO Liability**

379.   18 USC §§1962 (c) and (d):  As detailed herein, Defendants' conduct is unlawful under 18 U.S.C. 1962(c), and is also unlawful as a conspiracy under 18 U.S.C. § 1962(d).

380.   18 USC § 1341 (Mail Fraud):  The purpose of the "Borrego MSO/IPA Scheme", the "Premier Scheme", "Fraudulent Dental Billing Scheme", the "Coverup Scheme", the "Priest Leases Scheme", the "Compensation/Benefits Scheme", the "Nepotism and Cronyism Scheme", the "De Anza Country Club Scheme", the "Payout Scheme", the "Jim Hebets Scheme", the "Julian Barn Scheme", the "Property Development Scheme" and the KBH Healthcare Consulting Scheme was to effectively steal money from Borrego Health.

381.   In the manner detailed above, Defendants here and in the Multi-Scheme Litigation participated in devising and/or intending to devise the Schemes to perform the fraudulent acts described herein.

382.   The schemes could not work without the use of the United States Mail, which was used for the purpose of executing the schemes.

383.   Among other things and without limitation, the mail and e-mail was used to send correspondence and payments under the Premier Scheme, to send bills and payments for the Fraudulent Dental Billing Scheme, to send rent checks under the Priest Leases Scheme, and to send rent checks under the Julian Barn Scheme.

384.   Each individual mailing was an individual act essential to the success of the scheme (and therefore material) and constitutes a separate loss the victim suffered

as of the date of mailing.  This constitutes hundreds of predicate acts under 18 USC 1341 (Mail Fraud).

385.   18 USC § 1343 (Wire Fraud):  The purpose of the "Borrego MSO/IPA Scheme", the "Premier Scheme", "Fraudulent Dental Billing Scheme", the "Coverup Scheme", the "Priest Leases Scheme", the "Compensation/Benefits Scheme", the "Nepotism and Cronyism Scheme", the "De Anza Country Club Scheme", the "Payout Scheme", the "Jim Hebets Scheme", the "Julian Barn Scheme", the "Property Development Scheme" and the KBH Healthcare Consulting Scheme was to effectively steal money from Borrego Health.

386.   In the manned detailed above, Defendants here and in the Multi-Scheme Litigation participated in devising and/or intending to devise the schemes to perform the fraudulent acts described herein, and to use the interstate electronic transmission of documents for the purpose of executing, or attempting to execute, the schemes.  The schemes were used to steal funds from a federally funded and regulated FQHC, which in turn would result in the inflation of reimbursement rates the Federal Government would pay to the FQHC (Borrego Health) for thousands of patient encounters, as follows:

387.   Borrego Health is largely funded by state and federal health care dollars (primarily Medi-Cal), administered by and through the California Department of Healthcare Services.  Borrego Health must account for its lawful operating expenditures every year to the Center for Medicare and Medicaid Services (CMS), a federal agency within the United States department of Health and Human Services.

388.   The amount of funds stolen through the Schemes described herein are accounted for and included as facilities operating expenses reported to CMS.  These stolen funds would not be reported as individual line items on an annual CMD cost report.  Rather, the stolen funds would then be melded into and combined and aggregated with all other facilities operating costs of over 20 Southern California

clinics operated by Borrego Health, and then reported as an unidentified part of Borrego Health's annual cost reports submitted to CMS.

389.   In turn, the United States uses Borrego Health's annual cost reports to CMS in calculating the proper level of federal health care funding (or "reimbursement rates") to direct to Borrego Health.  Thus, inflated CMS cost reports, unless detected, inevitably result in increases in federally funded reimbursement rates for a FQHC such as Borrego Health.  This has the effect of compounding the crime by causing to federal government to cover some or all of the cost of the crime by way of increased reimbursement rates paid Borrego Health based on inflated expenses incurred by Borrego Health as a result of the Schemes.

390.   In addition, false or fraudulent bills were submitted electronically to Medi-Cal (and Borrego Health) under the Fraudulent Dental Services Scheme.

391.   The unlawful schemes described above, including the electronic communications described above, constitutes predicate acts under 18 USC §1343 (Wire Fraud) that are a material part of the schemes that Borrego Health could not avoid.

392.   Racketeering activity as described in 18 USC § 1961(1)(B), as an act indictable under 18 USC § 1957 (engaging in monetary transactions in property derived from specified unlawful activity that includes Federal healthcare offenses).  In addition to Mail Fraud and Wire Fraud, the schemes constitute a pattern of racketeering activity as described in 18 USC § 1961(1)(B), as acts indictable under 18 USC § 1957 ("Engaging in monetary transactions in property derived from specified unlawful activity").

393.   "Specified unlawful activity" is, in turn, defined in 18 USC § 1956 as including "any act or activity constituting an offense involving a 'Federal health care offense.'" 18 USC § 24 defines "Federal health care offense" as including "a violation of, or a criminal conspiracy to violate" any of the statutes set forth herein.

7329719.4

394.   18 USC § 669 (Theft or embezzlement in connection with health care): Whoever knowingly and willfully embezzles, steals, or otherwise without authority converts to the use of any person other than the rightful owner, or intentionally misapplies any of the moneys, funds, securities, premiums, credits, property, or other assets of a health care benefit program, shall be fined under this title or imprisoned not more than 10 years, or both.  "Health care benefit program" means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.  The schemes described herein are the means by which Defendants here and in the Multi-Scheme Litigation, and each of them, stole and converted to their own use public healthcare benefits paid Borrego Health by state and federal agencies at a time Borrego Health was the rightful owner of those funds.  In addition, in this particular statute, Borrego Health itself qualifies under the broad definition of "health care benefit program." Borrego Health is an "entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."  The theft and from Borrego Health exceeds $20,000,000.

395.   18 USC § 1347 (Health care fraud):  Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice (1) to defraud any healthcare benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any healthcare benefit program, in connection with the delivery of or payment for healthcare benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.  Here, by the Schemes described herein, Defendants here and in the Multi-Scheme Litigation, and each of them, defrauded Borrego Health and obtained money and/or property owned by and/or under the custody or control of Borrego Health.  These Schemes were substantial factor in and direct cause of the theft of funds under the custody and control of Borrego Health.  The

schemes were a substantial factor in and direct cause of the theft of more than $20,000,000 of funds under the custody and control of Borrego Health and Medi-Cal.

396.   <u>18 USC § 1001 (False Statements or entries generally)</u>:  Section 1001 is violated if someone knowingly or willfully conceals or covers up by any trick, scheme or device a material fact, which act is within the jurisdiction of a department or agency of the United States.  Here, Defendants here and in the Multi-Scheme Litigation were involved in the schemes that, as described herein, meet the elements of section 1001, in that the Defendants here and in the Multi-Scheme Litigation "knowingly or willfully conceal or cover up by any trick, scheme or device a material fact."  The schemes were used, in part, to steal funds from a federally funded and regulated FQHC.

397.   <u>Other federal healthcare offenses</u>:  In addition, the facts alleged herein also amount to "federal healthcare offenses" under the following statutes: 18 USC § 371 ("Conspiracy to commit offense or to defraud United States"); 18 USC §1035 ("False statements relating to health care matters"); 18 USC §1035 ("False statements relating to health care matters"); 18 USC § 287 ("False, fictitious or fraudulent claims"); 18 USC §1349 ("Attempt and conspiracy").

398.   The specific contracts entered into in furtherance of the scheme to steal money from Borrego Health are the: Borrego MSO, Borrego IPA, Dental MSA, Medical MSA, Aldairi Agreements, Hawatmeh Agreement, Mehdizadeh Agreements, Velasquez Agreement, Arakelyan Agreements, Hoang Agreement, Stephan Agreement, Rojo Agreement, Toledo Agreement, Thompson Agreement, Ness Agreement, Jared Agreement, Nourse Parcel Lease, CRI Contract, Julian Barn Lease, transition agreement, KHB/Premier Contract and Amendment and Priest Leases.[3]

399.   The Schemes were concealed by Defendants here and in the Multi-Scheme Litigation and most did not come to light until, at the earliest, October 2020

---

[3] Several of the mentioned agreements are available as attached exhibits in the Multi-Scheme Litigation.

during a government investigation.  But for that unrelated investigation, the schemes may have remained undiscovered.

400.   Because Borrego Health plaintiff had no constructive or inquiry notice of the fact of injury throughout the life of the schemes, its right to recover money stolen by Defendants here and in the Multi-Scheme Litigation extends back to the commencement of each of the Schemes.

401.   **Four Year RICO "Reach Back:"**  Even if the schemes were somehow communicated to persons who would ordinarily provide that information to the Borrego Health Board, it is still entitled to recover funds stolen under the schemes going back four years prior to the filing of the complaint, since each lease payment constitutes a separate wrongful act.

402.   Borrego Health, the United States, and the State of California are victims of the schemes here.  Borrego Health was victimized by the amount of money stolen. The Federal Government is a victim to the extent the inflated expenses incurred by Borrego Health as a result of the Schemes were included on annual cost reports to CMS (described above) that resulted in increased reimbursement rates, and therefore additional federal funds being improperly paid Borrego Health.  The Federal Government may have also been harmed if it provided federal matching dollars for any duplicative, unnecessary and unsupported dental services paid by Medi-Cal.

403.   The State of California is a victim to the extent to the extent the inflated expenses incurred by Borrego Health as a result of the Schemes were included on annual cost reports to CMS (described above) that resulted in increased reimbursement rates, and therefore causing additional state Medicaid funds being improperly paid Borrego Health.  The State of California may have also been harmed if it paid Borrego Health for any duplicative, unnecessary and unsupported dental services.

404.   The predicate acts described above relate to each other as part of a common plan.  The predicate acts are a part of a common plan to steal money from Borrego Health.  Each act is related as to its purpose, results, participants, victims and

method of commission.  The predicates form a closed-end series of related predicates extending over a substantial period.

405.   The facts described herein also demonstrate the existence of a conspiracy between Defendants here and in the Multi-Scheme Litigation.  **(18 USC § 1962(d).)**

406.   By way of their knowing participation in the scheme, each of the Defendants here and in the Multi-Scheme Litigation is a culpable person for purposes of **18 U.S.C. § 1964.**

407.   But for the Schemes detailed above, Borrego Health would not have entered into improper and above-market leases and other transactions, would have had a compliant and properly billed contract dental program, would not have attempted to buy a country club, etc.  Accordingly, Borrego Health has been damaged by the Schemes in an amount to be proven at trial.

408.   Accordingly, Borrego Health is entitled to damages in an amount to be proven at trial, trebled pursuant to statute, together with reasonable attorneys' fees and costs, and interest.

D.   **Issuance of Constructive Trusts**

409.   As outlined in detail herein, Borrego Health provided payment to the Defendants.  Those Defendants committed wrongful acts to receive money that they were not entitled to.

410.   Borrego Health has a right to the money wrongfully taken by Defendants.

411.   As such, Borrego Health seeks to have any and all funds wrongfully paid to Defendants placed in a constructive trust.

## FIRST CAUSE OF ACTION

(Imposition of a Constructive Trust Against Priest LLCs and Does 1-50)

412.   Borrego Health incorporates all prior paragraphs in this complaint as though fully set forth herein in this cause of action.

413.   In committing the acts and omissions alleged above, Hebets, acting as Borrego Health's Chief Executive Officer at the time, knowingly acted in concert with

each of the Priest LLCs to enter into 30+ year leases at more than twice FMR.  The Priest Leases were never presented to the Borrego Health Board for authorization or approval.

414.   In breach of his fiduciary duties, Hebets signed each of these contracts without:

E.   Approval from the Board;

F.   Disclosing their terms to the Board;

G.   Disclosing to the Board his relationship with Hebets;

H.   Presenting the Board with any evidence of due diligence in determining the fair market value of the contracts; and,

I.   A Board resolution **approving any of the Priest Leases.**

415.   There has been no action by the Board to ratify Hebets' signing of the Priest Leases or any of their amendments post signature.

416.   After Hebets signed the Priest Leases, Hebets and other former Borrego Health executives under Hebets' direct control, who had knowledge that the terms of the Priest Leases were over FMR, suppressed disclosure of those lease terms to the Board. The misrepresentations and failures to disclose information and suppression of information concerning the Priest Leases were made with the intent to induce Borrego Health to pay and continue to pay the Priest LLCs over-FMR, and to act in the manner herein alleged in reliance thereon.

417.   At all relevant times, Hebets was Borrego Health's chief executive officer, standing in a position of trust with respect to Borrego Health.  At all times, Hebets owed plaintiff a fiduciary duty.

418.   At the time Hebets' failure to disclose and suppression of facts occurred, and at the time the Borrego Health took actions in reliance thereon, Borrego Health was ignorant of the existence of the facts that Hebets and executives under his direct control suppressed and failed to disclose to the Borrego Health Board as detailed above. If the Borrego Health Board had been aware of the existence of the facts not

disclosed by the Priest LLCs, the Borrego Health would not have, as it did, paid substantial sums above market rent in violation of law and regulations pertaining to its governance.

419.   Concealment of the terms of the Promenade, DRP, and Inland Valley Leases from the Borrego Health Board, and prevention of due diligence in regard to the Priest Leases, was essential to success of the scheme. With a minimum of due diligence, the over-FMR price and excessive duration of the Priest Leases, combined with the absence of any terms allowing Borrego Health to terminate any of the Priest Leases prior to 2046 would have been readily apparent. The Priest Leases and due diligence reports relating to those leases therefore could not be presented to the Board. No rational, informed Board of Trustees for a non-profit FQHC would have, or could have lawfully approved any of the Priest Leases, for, inter alia, the following reasons:

A.   The lease terms are unconscionable, and would result in the diversion of millions of "over-FMR" dollars of federal health program money to entities owned by a friend and accomplice of the CEO;

B.   **As set** forth **above:**

   i.   The Promenade Lease calls for payment of nearly $40,000 **per month** over FMR, or more than $15,000,000 over FMR over the 33-year life of the lease;

   ii.   The DRP Lease calls for payment of nearly $39,000 **per month** over FMR, or approximately $14,000,000 over FMR over the 30-year life of the lease; and,

   iii.   The Inland Valley Lease calls for payment of more than $80,000 **per month** over FMR, or approximately $29,000,000 above FMR over the 30-year life of the lease.

C.   Approximately **90% of the revenue received by Borrego Health is paid by government funded health programs (Medi-Cal and Medicare), and therefore:**

- If the Promenade Lease was enforceable, then $13,500,000 of the over-FMR dollars paid to Promenade could be considered government funded health program money;

- If the DRP Lease was enforceable, $12,600,000 of the over-FMR dollars paid DRP could be considered government funded health program money; and,

- If the Inland Valley Lease was enforceable, nearly $26,000,000 of the over-FMR dollars paid Inland Valley could be considered government funded health program mone.;

D.   FQHC reimbursement rates are directly affected by the FQHC's annual operating cost reports submitted to CMS. Over-FMR facility lease payments result in inflated CMS cost reports (unless there is a reasonable basis for payment of over-FMR). Inflated cost reports expose Borrego Health to a demand that it amend and correct its prior cost reports to reflect FMR.  Amended cost reports showing $11,500,000 in reduced operating costs can result in retroactive rate adjustments. Retroactive rate adjustments resulting from amended cost reports showing FMR (as opposed to the over-FMR rent paid on the Priest leases) further expose Borrego Health to claims that it refund claims overpayments resulting from inflated cost reports in prior years.

E.   The close relationship between Hebets and Priest exposes the non-profit FQHC to adverse federal tax consequences as detailed above in regard to Internal Revenue Code and related Treasury Department regulations.

420.   The fraud and deceit alleged herein were not discovered by Borrego Health until law enforcement raids on or about October 20, 2020, a date within three years before the commencement of this action. Borrego Health could not with due diligence have discovered the fraud and deceit of the Priest LLCs until on or about this

date because the true facts were suppressed by Hebets, and others acting in concert with him even after his death, as detailed above.

421.    In contrast, the Priest LLCs were always aware that the Priest Leases called for payment of rent by a non-profit FQHC so far in excess of FMR that no reasonable Board would consider their approval, much less approve them.

422.    As alleged above, Priest is the sole manager and member of Promenade, DRP, and Inland Valley.  Priest is an experienced owner and successful lessor of commercial properties.  Promenade, DRP, and Inland Valley must each present its commercial leases to banks providing Promenade, DRP, and Inland Valley with mortgages and other funding on their leased properties. Promenade, DRP, and Inland Valley must perform due diligence regarding their lessees, before entering into a 30+ year lease that will be reviewed by lenders of Promenade, DRP, and Inland Valley. Promenade, DRP, and Inland Valley are therefore presumed to know Borrego Health's business, including that it is a non-profit health care provider doing business with federally funded health programs. Promenade, DRP, and Inland Valley are presumed to know FMR for their respective leases, that the rent is far in excess of FMR, and that the lease term of 30+ years is far beyond fair market lease terms (in the absence of a term allowing Borrego Health to terminate the lease on reasonable notice). Priest signed the Promenade, DRP, and Inland Valley Leases and presented them to Hebets for his signature. Under these facts and circumstances, Promenade, DRP, and Inland Valley are each charged with knowledge that they were entering into over-FMR leases with a non-profit FQHC.

423.    Accordingly, each of the Priest LLCs knowingly and willfully conspired and agreed with Hebets and Does 1-50, inclusive, to damage Borrego Health by and through Hebets' and others' fraud and deceit as described in detail above.

424.    As noted above, the Priest LLCs acted in concert in an effort to compel Borrego Health to continue to pay over-FMR rent on all three leases.  As such, by adoption, ratification, and joint enforcement of the fraudulently induced and

7329719.4

maintained Priest Leases, each of the Priest LLCs has joined with the other Priest LLCs in the conspiracy to defraud Borrego Health.

425.   By virtue of defendants' wrongful acts they hold stolen and embezzled funds totaling over $11.5 million, or real or personal property purchased with such funds, as constructive trustees for the benefit of plaintiff.

## **SECOND CAUSE OF ACTION**

(Reformation Based on Fraud Against Priest LLCs)

426.   Borrego Health incorporates all prior paragraphs in this complaint as though fully set forth herein in this cause of action.

427.   In each of the Priest Leases (Exhibits A, B, and C) the parties thereto express their intention that the Priest Leases be interpreted so as to make and maintain performance thereunder lawful.  The unlawful purpose of the leases is self-evident. As explained above, each of the Priest Leases were entered into without the informed consent of Borrego Health's Board. Each of the leases call for a non-profit FQHC to pay and to report as operating expenses to CMS rent that is millions of dollars in excess of FMR, thereby resulting in the diversion of millions of dollars of federal health care funds to the Priest LLCs, and the inflation of reimbursement rates paid by the DHCS to the FQHC.

428.   The above-described failure of the Priest Leases to reflect the true intent of the parties (i.e., that performance under the lease be only lawful) resulted from Hebets' concealment from Borrego Health that, despite its express promise to the contrary, Borrego Health's performance of the pricing terms and duration of the above-mentioned written instruments would be unlawful.

429.   Without knowledge of the true facts and in reliance on Hebets' false representations, Borrego Health was deceived and misled into performing under a lease that differed materially from the expressed intent of the parties that performance thereunder be lawful. Borrego Health 's reliance on Hebets' fraudulent omissions was

7329719.4

reasonable and justified in that he was at all times plaintiff Borrego Health's Chief Executive Officer and fiduciary.

430.   Fraud, as a basis for reformation, consists of (1) a false representation by one party and (2) justifiable reliance on the false representation by the other party. Here both exist. Civil Code section 3399 codifies the equitable remedy of reformation of written instruments. Section 3399 provides that a written contract may be revised on application of the party aggrieved, when, through fraud, mutual mistake, or mistake of one party that the other party knew of or suspected at the time, a written contract does not express the true intention of the parties.

431.   Here, the strong public interest in Borrego Health's continued service of underserved and financially disadvantaged patients throughout the communities of San Diego, San Bernardino, and Riverside Counties, as detailed above, compels the court's exercise of its equitable power to reform the Priest Leases.

432.   Even though the Borrego Health Board was never given the opportunity give its fully informed consent to any of the Priest Leases, the Board reasonably expects and intends that all Borrego Health contracts conform with all applicable laws.

433.   For the reasons detailed above, Borrego Health 's intent that the Priest Leases conform with all applicable laws (consistent the terms of the leases) cannot possibly be fulfilled without reformation of the rent prices to FMR, and without reformation of the 30-year lease term to five years or less, and without reformation of the leases to allow the non-profit FQHC tenant to terminate the lease for good cause on reasonable notice.

434.   Plaintiff Borrego Health respectfully prays for each of the Priest Leases to be so reformed.

## **THIRD CAUSE OF ACTION**

### (Rescission Based on Fraud Against Priest LLCs)

435.   Borrego Health incorporates all prior paragraphs in this complaint as though fully set forth herein in this cause of action.

436.   Alternatively, if the Court cannot exercise its statutory and/or equitable powers to reform the leases, Borrego Health is entitled to rescind the Priest Leases, and for restitution of all sums paid the Priest LLCs to date, less the reasonable rental value of the premises during Borrego Health's occupation of them.

437.   Borrego Health may rescind Priest Leases (1) if the contract is unlawful for causes which do not appear in its terms or conditions, and the parties are not equally at fault (Civ. Code, § 1689, subd. (b)(5)) or (2) if the public interest would be prejudiced by permitting the leases to stand (Civ. Code, § 1689, subd. (b)(6)). A commercial lease is unlawful if its consideration or object is (1) contrary to an express provision of law, (2) contrary to the policy of express law, though not expressly prohibited, or (3) otherwise contrary to good morals (Civ. Code, § 1667). Another ground for rescission and restitution not addressed by Civil Code section 1689, subdivision (b) allows recovery when the parties were ignorant of the illegality at the time they entered into the contract.[4]   Under the facts alleged in this Complaint, each and every one of the aforementioned grounds for rescission are met. In addition, the public interest will be prejudiced if the Priest Leases are permitted to stand, in that BCFH's ability to provide quality healthcare in underserved areas will be undermined by inequitable diversion of funds to defendants.  Further, the fraud described above is grounds for rescission.

438.   Borrego Health therefor prays, in the alternative, and in the event that the Priest Leases cannot be reformed, for judgment rescinding the Priest Leases, and for restitution of all sums paid the Priest LLCs to date, less the reasonable rental value of the premises during Borrego Health 's occupation of the three leased facilities, along with orders providing for the reasonable surrender of the premises in a manner that will protect the interests of the patients Borrego Health is required to serve.

---

[4] *Adams v. Heinsch* (1948) 89 Cal. App. 2d 300, 302–305, 200 P.2d 796 (also on ground of mistake); *Brashears v. Giannini* (1933) 131 Cal. App. 706, 709–711, 22 P.2d 47; *Restatement (2d) of Contracts,* § 198].

## **FOURTH CAUSE OF ACTION**

(Common Count for Money Had and Received Against Priest LLCs)

439.   Borrego Health incorporates all prior paragraphs in this complaint as though fully set forth herein in this cause of action.

440.   A judgment of rescission supports an award of money to Borrego Health under a common count for money had and received.  In addition to the facts supporting the fraud count pled above, the following facts also support a common count for money had and received.

441.   Borrego Health is further informed and believes Hebets and Priest were friends. Beginning in 2012, and continuing through December 2016, Hebets and Priest caused Borrego Health and several Priest-owned entities to enter into various contracts under which millions in federal healthcare funds were unlawfully diverted to the Priest-owned entities.

442.   Beginning in 2012, and continuing through 2020, the Priest LLCs became indebted to Borrego Health in the sum of at least $11.5 million for money had and received by the Priest LLCs. Neither the whole nor any part of this sum has been paid, although demand therefor has been made, and there is now due, owing, and unpaid the sum of at least $11.5 million, with interest thereon, at the legal rate as the court may allow, according to proof at trial.

## **FIFTH CAUSE OF ACTION**

(Violation of Business and Professions Code Section 17200, et seq. Against Priest LLCs)

443.   Borrego Health incorporates all prior paragraphs in this complaint as though fully set forth herein in this cause of action.

444.   The actions described herein constitute unlawful and unfair business practices within the meaning of Business & Professions Code section 17203. Borrego Health has requested that the Priest LLCs cease the unfair business practices described herein. The Priest LLCs have rejected and continue to reject these requests.

Case No. 21-cv-01417-BEN-KSC

7329719.4

445.   As a direct, proximate and foreseeable result of the Priest LLCs' unfair business practices, as described herein, Borrego Health has paid over $11.5 million in over-FMR rent, which is subject to orders of disgorgement and/or restitution under the UCL.

446.   Borrego Health is informed and believes, and based thereon alleges, the Priest LLCs' unlawful and unfair business practices, as described herein, are part of a plan to ignore and violate laws, and to compel Borrego Health to violate laws, applicable to contracts with non-profit FQHCs, as described above. Borrego Health is informed and believes, and based on that alleges, the Priest LLCs will continue with their unlawful and unfair business practices unless they are enjoined from doing so.

## SIXTH CAUSE OF ACTION

### (Declaratory Relief Against Priest LLCs)

447.   Borrego Health incorporates by reference all prior paragraphs above as though fully set forth herein.

448.   An actual controversy exists in regard to the parties' duties and obligations under the Priest Leases as alleged in this Complaint, and as such, a judicial declaration of the parties' respective duties and obligations is appropriate as to the matters in dispute, as alleged herein.

## SEVENTH CAUSE OF ACTION

### (RICO Against Priest LLCs)

449.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.  This is due to the fact that Borrego Health believes that each and every one of the actions and omissions described above are part of the same, far-reaching and widespread racketeering enterprise designed and carried out to steal money from Borrego Health and funnel that money, directly or indirectly, to the Defendants. However, in the alternative, any combination of the above-listed Schemes would be sufficient to state a claim against the Defendants alleged to be involved in those Schemes.

450.   As set forth herein, Defendants improperly engaged in a pattern of prohibited racketeering activity.

451.   As set forth herein, Defendants conduct gives rise to a cause of action for violation of RICO, and that unlawful conduct was the proximate cause of the Borrego Health's injury.

## **PRAYER FOR RELIEF**

WHEREFORE, Borrego Health prays for judgment against defendants, and each of them, as follows:

1.    With respect to the First Cause of Action—Constructive Trust:

      a.    For imposition of a constructive trust in an amount subject to proof at trial, but no less than $11.5 million and on any real or personal property purchased with a portion of that amount; and,

      b.    Pre-judgment and post-judgment interest.

2.    With respect to the Second Cause of Action—Reformation Due to Fraud:

      a.    Order reforming the payments under the Priest Leases to reflect only FMR as rent due and owing, and further, to limit the term of the leases as commercially reasonable to no more than five years;

      b.    Order of restitution that all money paid to Priest LLCs in excess of the amount of rent in the reformed Priest Leases be returned to Borrego Health; and

      c.    Pre-judgment and post-judgment interest on all sums ordered returned.

3.    With respect to the Third Cause of Action—Rescission Due to Fraud:

      a.    Rescission of the Priest Leases;

      b.    For actual and consequential damages in an amount subject to proof at trial, but in an amount no less than $11.5 million or, in the alternative, restitution of all sums unlawfully paid, less the reasonable rental value of the premises during Borrego Health's

occupation of the three leased facilities;

    c.    Punitive damages as allowed by law;

    d.    Order providing for the reasonable surrender of the premises in a manner that will protect the interests, safety, and health of Borrego Health's patients; and

    e.    Pre-judgment and post-judgment interest.

4.    With respect to the Fourth Cause of Action—Money Had and Received:

    a.    Order that money had and received by Priest LLCS be returned to Borrego Health, subject to proof at trial, but in an amount no less than $11.5 million; and

    b.    Pre-judgment and post-judgment interest.

5.    With respect to the Fifth Cause of Action—UCL Violations:

    a.    Restitution of all sums unlawfully paid, less the reasonable rental value of the premises during Borrego Health's occupation of the three leased facilities; and

    b.    Pre-judgment and post-judgment interest.

6.    With respect to the Sixth Cause of Action—Declaratory Relief:

    a.    A declaration of the rights and liabilities of the parties to the attached Priest leases, as to the matters alleged in dispute herein.

7.    With respect to the Seventh Cause of Action---RICO

    a.    For damages of $11.5 million, trebled to $34.5 million pursuant to statute;

    b.    Pre-judgment and post-judgment interest; and,

    c.    Reasonable attorney's fees and costs.

/ / /

/ / /

/ / /

/ / /

1     8.     With respect to all causes of action:

2            a.     Costs of suit;

3            b.     Reasonable attorney's fees and costs as allowed by law; and

4            c.     Such other and further relief the Court deems just and proper.

5

6   DATED:  April 3, 2023                    HOOPER, LUNDY & BOOKMAN, P.C.

7

8

9                                           By:  _____
                                                    DEVIN M. SENELICK
10                                          Attorneys for Plaintiff BORREGO
                                            COMMUNITY HEALTH FOUNDATION
11

7329719.4

1

## **DEMAND FOR JURY TRIAL**

2        Borrego Health hereby demands a jury trial in this matter.

3

4    DATED:  April 3, 2023            HOOPER, LUNDY & BOOKMAN, P.C.

5

6

7                                      By: _____

8                                            DEVIN M. SENELICK
                                       Attorneys for Plaintiff BORREGO
9                                      COMMUNITY HEALTH FOUNDATION

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 21-cv-01417-BEN-KSC
7329719.4
BORREGO COMMUNITY HEALTH FOUNDATION'S FOURTH AMENDED COMPLAINT

<u>**CERTIFICATE OF SERVICE**</u>

I, Devin M. Senelick, certify that on April 3, 2023, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to those attorneys of record registered on the CM/ECF system.

DATED:  April 3, 2023          HOOPER, LUNDY & BOOKMAN, P.C.

By: _____
          DEVIN M. SENELICK
Attorneys for Plaintiff BORREGO
COMMUNITY HEALTH FOUNDATION

Case No. 21-cv-01417-BEN-KSC

7329719.4

BORREGO COMMUNITY HEALTH FOUNDATION'S FOURTH AMENDED COMPLAINT